# EXHIBIT 1

1

1                  IN THE UNITED STATES DISTRICT COURT

2                  IN AND FOR THE DISTRICT OF DELAWARE

3                             - - -

4

     CYTIVA SWEDEN AB and GLOBAL   :    CIVIL ACTION
5    LIE SCIENCES SOLUTIONS USA    :
     LLC,                          :
6                                  :
                    Plaintiffs,    :
7                                  :
            vs.                    :
8                                  :
     BIO-RAD LABORATORIES, INC.,   :
9                                  :
                    Defendant.     :    NO. 18-1899-CFC-SRF
10

11                            - - -

12                            Wilmington, Delaware
                              Wednesday, September 2, 2020
13                            2:00 o'clock, p.m.
                              ***Telephone conference
14

15                            - - -

16   BEFORE:  HONORABLE SHERRY R. FALLON, U.S. MAGISTRATE JUDGE

17                            - - -

18   APPEARANCES:

19           SHAW KELLER LLP
             BY:  JOHN W. SHAW, ESQ.
20

21                   -and-

22

23

24                            Valerie J. Gunning
                              Official Court Reporter
25

**2**

1 APPEARANCES (Continued):
2
3    ARNOLD & PORTER KAYE SCHOLER LLP
     BY:  AMY DeWITT, ESQ. and
4    JENNIFER SKLENAR, ESQ.
     (Washington, D.C.)
5
           -and-
6
7    ARNOLD & PORTER KAYE SCHOLER LLP
     BY:  RYAN N. NISHIMOTO, ESQ.
8    (San Francisco, California)
9
           -and-
10
11   ARNOLD & PORTER KAYE SCHOLER LLP
     BY:  MICHAEL J. SEBBA, ESQ.
12   (New York, New York)
13
14         Counsel for Plaintiffs
15
16   POTTER, ANDERSON & CORROON LLP
     BY:  ALAN R. SILVERSTEIN, ESQ.
17
           -and-
18
19   QUINN EMANUEL URQUHART & SULLIVAN, LLP
     BY:  DAVID BILSKER, ESQ. and
20   FELIPE CORREDOR, ESQ.
     (San Francisco, California)
21
22         Counsel for Defendant
23
           - - -
24
25

**3**

1         P R O C E E D I N G S
2
3         (The following telephone conference was held
4  beginning at 2:00 p.m.)
5
6         THE COURT:  Good afternoon, everyone.  This is
7  Magistrate Judge Sherry Fallon.
8         This is the time I have set aside for a
9  discovery dispute teleconference in Cytiva Sweden and Global
10 Life Sciences Solutions versus Bio-Rad Laboratories.
11        Let me first find out, do we have a court
12 stenographer?
13        MS. GUNNING:  Yes, Your Honor.  It's Valerie
14 Gunning.
15        THE COURT:  Thank you, Ms. Gunning.
16        And do I have my law clerk, Ms. Polito?
17        MS. POLITO:  Good afternoon, Your Honor.  I'm on
18 the line.
19        THE COURT:  Okay.  Do we have a fall intern
20 joining us?  Do you know, Ms. Polito, if we'll be joined by
21 our intern or probably not?
22        MS. POLITO:  I don't think she's on the line
23 today.
24        THE COURT:  All right.  Very well.
25        Then let me start with the appearances of

**4**

1  counsel, starting with Delaware counsel for the plaintiff
2  and then plaintiffs' counsel, and then the same for
3  defendant.
4         Who is on the line for the plaintiffs?
5         MR. SHAW:  Good afternoon, Your Honor.  This is
6  John Shaw for the plaintiffs, and joining me from Arnold &
7  Porter are Jennifer Sklenar, Amy DeWitt, Brian Nishimoto,
8  and Michael Sebba.
9         THE COURT:  Very good.  Thank you.
10        And now for Bio-Rad, who is on the line?
11        MR. SILVERSTEIN:  Good afternoon, Your Honor.
12 This is Alan Silverstein from Potter Anderson.
13        With me on the line is David Bilsker and Felipe
14 Corredor from Quinn Emanuel.
15        THE COURT:  Very good.  And do we have anyone
16 else observing or listening to the proceedings who have not
17 yet identified themselves for our transcript?
18        Hearing none, we will begin.
19        This is Bio-Rad's motion to compel.  There are
20 three different issues that were raised in the motion.  I
21 have read the motion, the response and the exhibits, and I
22 am ready to proceed.
23        We'll start with the first issue, the
24 supplemental interrogatory that was made by the plaintiffs
25 with respect to conception and reduction to practice,

**5**

1  the supplemental response to Bio-Rad's Interrogatory Number
2  1.
3         Who will take the lead for Bio-Rad?
4         MR. BILSKER:  It's David Bilsker, Your Honor.  I
5  will.
6         THE COURT:  All right.  Before you begin,
7  Mr. Bilsker, you're sounding a bit like you're in an echo,
8  so maybe you can move back.
9         MR. BILSKER:  Is this better?
10        THE COURT:  That's better.
11        MR. BILSKER:  Okay.
12        THE COURT:  And I would instruct that anyone who
13 is not speaking to please put your microphone on mute so
14 that there is no background noise or interference.  So with
15 that, you may proceed.
16        MR. BILSKER:  So, Your Honor, this is a unique
17 situation, and I don't think it's covered by any of the
18 cases that plaintiff is relying on.  And it may make more
19 sense for me to actually address their cases because they're
20 really factually distinguishable.
21        So we have the situation where we have an
22 interrogatory outstanding for almost a year or more than a
23 year.  We finally got a response to it.  We created a
24 litigation strategy.  We went forward on that strategy.  We
25 essentially completed all of our depositions and then seven

6

1    days before the close of fact discovery, after all of those
2    depositions, we get a completely changed response.
3         So, and really, the justification for it, I'm
4    not sure exactly what plaintiffs are speaking of because
5    they say the justification was created by argument that we
6    made, and I'm not aware of any arguments that we made with
7    respect to conception and reduction to practice, so that
8    justification really does not exist.
9         As to the other justification that they come up
10   with, they say it's based on what happened during the
11   depositions, but essentially, what they are asking for is a
12   do-over.  They did not like -- apparently, they did not like
13   what happened during the depositions and they decided a
14   month after, apparently a month after the 30(b)(6)
15   deposition that they, I guess they think changed everything,
16   that they were going to change their theory.
17        And, again, this is not, this is not the kind of
18   situation that Rule 26 really contemplates.  Rule 26, and
19   when you look at all of their cases, deals with situations
20   where essentially a new fact, a fact has arisen that makes a
21   response not correct.
22        So, for instance, I don't know.  You know, if it
23   was a malpractice case and somebody said that people 1
24   through 6 were in the operating room and they find out after
25   looking at charts that, in fact, 1 through 6 were not in the

7

1    operating room, only 1 through 5 were, then they can correct
2    that fact.  And that's essentially what happened with
3    respect to all of these cases that they rely on.  There were
4    newly discovered facts.  But that's not the situation here.
5    All the facts were in plaintiffs' possession.  You had an
6    interrogatory outstanding for over a year.  This is, you
7    know, a relatively standard question in many pieces of
8    patent litigation, what is your conception and reduction to
9    practice date?  That's something that, you know, we had to
10   do the same thing.
11        They served an interrogatory on us that was the
12   same.  We did an investigation.  We talked to witnesses.  We
13   looked at our documents and we identified those dates and we
14   stuck with them.
15        They, on the other hand, are basically saying,
16   well, they did some investigation, but after, you know,
17   after Bio-Rad probed the theory that they put out, they
18   didn't like it so much anymore, so it's okay for them to
19   completely change everything at the end of discovery and go
20   forward.
21        So, for example, if you look at the Webex case
22   that they heavily rely on, in that case what the Court found
23   was it was reasonable for the, and I believe it was, it was
24   for the plaintiff to identify additional product that was
25   charged with infringing.

8

1         Now, plaintiff actually argued that it was
2    disclosed all along and they added more information after
3    the defendant supplied the source code, which the Court
4    actually agreed with.  So that's a situation, as I said
5    before, where new facts have come to light and you add in
6    more information based on those facts.
7         The plaintiff in that situation did not have the
8    source code, and after they received the source code, they
9    supplemented their, you know, their infringement contentions
10   to include that additional source code and more specifically
11   identify the product.
12        And, in fact, in that case, really what the
13   parties were arguing about was on a 30(b)(6) deposition
14   which had not yet occurred, would that deposition include
15   this new, this one new product?  That's not the situation we
16   have here.  All the depositions are over and their change in
17   theory came after we had taken all of our depositions.  And
18   it's not just one deposition that we took that's relevant.
19   There were at least four or five depositions that related to
20   conception.  There was Matt Souderman, Eva Harland, Mats
21   Lundkvist, who was the inventor and the 30(b)(6), and there
22   were some depositions that we decided not to take after the
23   testimony that we got.
24        So this is not, this is not the situation which
25   is existing in all the cases that they rely on, which is

9

1    some new fact.  And if it's going to be prejudicial to us,
2    absolutely.  We have a litigation strategy and theory that
3    we focused on, including not taking some of the depositions,
4    and it's, again, it's not just one, it's multiple
5    depositions.
6         There's no explanation for why this occurred so
7    late in the process.  Again, you know, this is, this is not
8    a fact.  This is a legal theory.  It's a contention-type
9    response which usually in Delaware occurs at the end of the
10   case because it gives the parties time to research all of
11   the facts and put together the facts with a legal theory to
12   come up with a response.
13        So, you know, basically, what I'm hearing is,
14   it's either one of two things.  They just didn't do a good
15   job when they, when they reviewed the facts and talked to
16   the witnesses before, if they talked to them at all before
17   coming up with a conception date or, worse, it's just they
18   want a do-over.
19        The strategy didn't pan out well for them.  Now
20   they don't like it and they just want a change.  And they
21   are saying there's really no harm to Bio-Rad because we've
22   got 40 days here before, you know, the end of expert
23   discovery.  We can fit things in.  Our expert reports are
24   due very shortly.
25        They -- it was plaintiffs who really wanted to

10

1 push on a fast discovery schedule. When Covid hit and we
2 were having some issues with respect to what the schedule
3 should be, we actually discussed extending discovery by a
4 certain amount of time and we could not get plaintiff to
5 agree to go past July 31st, and even with July 31st, we had
6 to agree that there would be no more written discovery
7 submitted.
8        So the discovery deadline is important and, in
9 fact, it's plaintiffs who relied on that deadline very
10 heavily in saying, you know, it has to be -- everything has
11 to be done by this date, we're not going to allow any more
12 written discovery, although I do admit that they said if a
13 couple of depositions have to go over because of scheduling,
14 we can do -- we can do that.
15        But this is not going to be a single deposition
16 that would have to be redone. It would be many depositions.
17 It would be a total change in our theory in the way we
18 approach this issue.
19        We already set ourselves -- we already planned
20 our strategy. We, you know, identified our dates, presented
21 our evidence, and there's no reason that they should change.
22 It's just, there's no new discovery of any facts. We made
23 no new arguments despite their, their indications to the
24 Court otherwise, and if, in fact, something came up in a
25 deposition, those depositions started June 18th, and the

11

1 last one was June 26th, and it wasn't until July 24th, I
2 believe, that we got the notice that they were changing the
3 response completely, which was one week before the close of
4 fact discovery.
5        So even when they proposed the issue about,
6 well, you can take more depositions, the only way we could
7 take more depositions is by going past the discovery
8 deadline, which is not really what happened in any of the
9 cases that they rely on.
10        So unless Your Honor has any further questions, I
11 will end it there.
12        THE COURT: All right. A couple of questions.
13        So you said in your papers, although I have not
14 heard it on the call, and naturally, you know, it's in your
15 papers and I've read your papers, but the Court has to be
16 guided by the Pennypack factors in considering whether to
17 strike or to exclude the evidence.
18        What other Pennypack factors other than the
19 prejudice which you've described as, you know, requiring a
20 change in defendant's theory of the case, what other
21 Pennypack factors are affected or weigh in favor of your
22 client, Bio-Rad, in light of this change, move up by about a
23 year the dates of conception and reduction to practice?
24        MR. BILSKER: Well, first, I do want to point
25 out that in this circuit, courts have held that you do not

12

1 actually have to abide by the Pennypack factors when you
2 have sophisticated parties, and that's in one of the cases
3 that Cytiva, plaintiff, cited. That's in the Teva
4 Pharmaceuticals case at *3 where they say, when you have
5 sophisticated parties represented by competent counsel,
6 courts have been less indulgent in their application of the
7 Pennypack factors and more likely to exclude evidence
8 without a strict showing of adherence to those factors.
9        Certainly, I think this is a situation where we
10 have sophisticated parties and sophisticated counsel, and
11 when you look at Pennypack and -- well, Pennypack was a
12 Civil Rights case from the 1970s under a -- I'm not even
13 sure if Rule 26 was the same at the same time. The case was
14 published in '77. So I'm not even positive that the same,
15 the same rule is in effect. But, again, according to courts
16 in this district, you don't have to abide by those factors
17 when you have sophisticated parties.
18        As far as the other Pennypack factors, I think
19 the first thing you have to look at is whether the harm is
20 going to be, or the change is going to be harmless. That's
21 what really is guiding everything and I don't think the
22 change here is harmless.
23        We created a strategy, and now based on that
24 strategy and them apparently thinking that their position is
25 a loser, they want to change everything. So that is not

13

1 harmless to us after having created that strategy, them
2 getting to change. So that is one.
3        The prejudice certainly works in our favor.
4 There is -- there very well may be a disruption of the
5 trial. We have expert reports starting in, I think they are
6 due in two weeks. Is that correct, Mr. Corredor?
7        MR. CORREDOR: Yes. Next Friday.
8        MR. BILSKER: So the expert reports are due next
9 Friday. Obviously, we would have to go forward with expert
10 discovery depositions there. It's going to throw off that
11 schedule completely.
12        As to the possibility of curing the prejudice, I
13 don't think there is a way to cure the prejudice. Just by
14 allowing us to take more depositions doesn't cure the
15 prejudice when we embarked on a litigation strategy based on
16 what they said.
17        So just allowing us to take depositions, it's
18 kind of like showing -- you know, you're playing poker.
19 It's like one party shows their hand and then the other side
20 decides what they are going to do, and that's just not the
21 way it works.
22        You know, and one very good example of that is
23 when you're in the Patent Office and you do an interference
24 proceeding with this type of situation where both parties
25 are alleging that they invented first. And the Patent

14

1  Office, where they do this all the time, they require both
2  parties to essentially submit sealed bids. You have to
3  submit your dates and evidence without the other side
4  seeing them. So there is no gamesmanship like is going on
5  here. So I don't think there is a way to cure it.
6          And then as to the explanation or failure to
7  disclose, I don't think there's any explanation at all. I
8  mean, what they said is, based on argument by Bio-Rad, so
9  that's what they say is Cytiva investigated based on
10 Bio-Rad's arguments and deposition testimony as parties are
11 expected to do.
12         Again, there's no argument. We didn't have any
13 opportunity to argue about conception or reduction to
14 practice. We were just in discovery. So there's no
15 argument that we made that would justify them changing their
16 position.
17         And as for the deposition testimony, that
18 doesn't justify it either. These are all their witnesses.
19 They should have, they should have interviewed these
20 witnesses before they came up with their date, which is
21 exactly what we did. We didn't just make them up and then
22 hope for the best. You interview the witnesses, you look at
23 the documents and you come up with a date.
24         So there's really no good explanation of that.
25 I don't think it is plausible. I know it's not plausible

15

1  with respect to the argument. There was no argument. So
2  that factor does not weigh in their favor.
3          And then I think that the last factor, which is
4  bad faith, I kind of think that goes along with the prior
5  one, which is their explanation is not an explanation at all
6  if there was no argument, and the idea that they found out
7  information at the deposition of their own witnesses who
8  they prepared for the deposition.
9          So they prepared fact witnesses for the
10 deposition. They certainly prepared the 30(b)(6) witness
11 for the deposition. Nothing changed before that. There's
12 not good faith there. It's only based on the fact that we
13 apparently did too good a job during the deposition and blew
14 up their theory that they wanted to change.
15         So I think all of the factors weigh in our
16 favor, Your Honor.
17         THE COURT: Just one other question before I
18 hear from plaintiff. Along with supplementing their
19 response to Interrogatory No. 1, they provided a list of
20 documents for I guess factual support of that theory, and is
21 it correct that these documents had been already produced in
22 discovery and defendants had them for several months,
23 notwithstanding the express listing of them in support of
24 the supplemental response?
25         MR. BILSKER: Well, it is true that we had the

16

1  documents along with hundreds of thousands of other
2  documents, but there's no way for us to go in there and
3  decide for them which documents are going to be used to
4  support a theory of conception. I mean, that's kind of
5  beyond, you know, beyond reason to say, here's a bunch of
6  documents. You figure out what our conception date is going
7  to be. And since you have the documents, there's no
8  prejudice to you doing that. I mean, that goes right to the
9  RTC case that we cited.
10         It's just not a reasonable position. You can't,
11 you can't produce hundreds of thousands of documents to
12 people and say, you figure out what the conception and
13 reduction to practice date is and which documents the
14 plaintiff is going to use to support that.
15         We asked them very specifically which documents
16 are you going -- which documents are you going to use to
17 support it. There were hundreds to start out with, more
18 than hundreds that appeared to relate to a prototype, and
19 they only relied on some small subset of that. And in their
20 new response, they basically jettisoned the majority of
21 those original documents, and they go to whole different
22 subsets.
23         So it's like, it's like two different cases now.
24 And, you know, if they are going to put on us that, oh,
25 there's no prejudice because you had the documents, well,

17

1  they're their documents. How are we in a better position to
2  figure out what their conception and reduction to practice
3  date is based on a pile of documents they dump on us than
4  they are when they're their documents and they can interview
5  the witnesses to figure out what their conception date is
6  going to be based on those documents.
7          Again, this is not like something that happened
8  spur of the moment. This case has been going on for six
9  years, and that interrogatory was out there for more than a
10 year before they finally responded. So they had more than
11 ample time to look through those documents in their
12 possession, talk to their witnesses about those documents,
13 and come up with real dates and which documents would
14 support this.
15         To put it on us is crazy.
16         THE COURT: All right. I will hear from
17 plaintiff now.
18         MR. NISHIMOTO: Good afternoon, Your Honor.
19 This is Ryan Nishimoto from Arnold & Porter.
20         THE COURT: Thank you.
21         MR. NISHIMOTO: And, Your Honor, I apologize.
22 If I cut out, please do interrupt me. I'm dealing with
23 school kids in the area that are on Zoom, and my
24 understanding is they are now off of Zoom but it has
25 affected my bandwidth this morning. Hopefully, that won't

18

1   be an issue.

2           THE COURT:  All right.  We'll keep an eye on it.

3   Thank you.

4           MR. NISHIMOTO:  Let me start by addressing

5   Mr. Bilsker's point that his observation that this issue is

6   not covered by any of the cases that Bio-Rad found in his

7   argument, which is not covered by the cases that Cytiva

8   introduced through its brief.  And I think that's important

9   to keep in mind, that this is Bio-Rad's burden, and they are

10  seeking to strike a supplemental discovery response that was

11  provided within the fact discovery period in response to

12  information that came to light during the fact discovery

13  period, and yet Bio-Rad seems to be arguing that because

14  there's no case that allows them to do that, they

15  nevertheless should be allowed to strike.

16          The observation also that parties change their

17  positions based on discovery that comes to light is

18  something that happened quite frequently in litigation, and

19  here, I know Mr. Bilsker had pointed to several statements

20  that Cytiva had made in its brief that based upon the

21  information that came to light in discovery, this is why

22  Cytiva gave its supplemental response.

23          Let me just provide an example.  So, for

24  example, during the deposition of Mr. Lundkvist, who is one

25  of the two named inventors, questioning came out as to

19

1   whether the modules on what's called the P0 prototype were

2   moveable came to light during that deposition, and there

3   was some question as to whether, in fact, they are moveable,

4   and that is the key aspect of the invention in this case.

5   And that's one example of something then that Cytiva went

6   back to look into following that deposition, and based on

7   that has then moved the conception and reduction to practice

8   date forward, and those dates then relate to a later

9   prototype, a P1 prototype, and, in fact, that prototype was

10  mentioned during, for example, the deposition of

11  Mr. Lundkvist.

12          So I think it's important to contextualize, one,

13  that the relief that Bio-Rad is seeking here is not covered

14  by the case law.  What they are seeking is to strike

15  information that was supplemented during discovery, and this

16  is not something that has been sprung on Bio-Rad.  The

17  information has been in their possession for quite some

18  time, and it is based upon information that came to light

19  during the discovery period and it was supplemented during

20  the discovery period.

21          To the point of prejudice, and I think it is

22  important to keep in mind that the Pennypack factors here

23  are relied on in each of the cases I believe that Cytiva

24  cites.  Pennypack factors are also addressed in Bio-Rad's

25  brief.  Two of those factors go to prejudice.

20

1           It was important to us to make sure that we

2   offered Bio-Rad a chance to ameliorate any prejudice that

3   they allege, and this was during the fact discovery period,

4   and at that time that we supplemented the interrogatory

5   response, there was seven weeks remaining until expert

6   reports were due.

7           So the argument that today, as we sit here

8   today, there's less time, two weeks before the expert

9   reports are due doesn't fully capture the opportunity that

10  Bio-Rad had and what we offered to them by way of helping

11  hear any prejudice that they had been able to articulate.

12          Now, what I heard today then on the question of

13  litigation strategy, we've heard a number of comments that

14  Bio-Rad developed a litigation strategy, but there has been

15  no explanation of what that is.  And it would concern me,

16  and I have not seen cases to this effect, that any party

17  could say we've developed a litigation strategy, including

18  during the fact discovery period, and it forecloses the

19  other side from supplementing or correcting its Rule 26

20  disclosures or its interrogatory responses based on an

21  unarticulated litigation strategy that the other side had

22  developed and was hoping to pursue, but is no longer able

23  to.

24          And I inflect able to as a question because I

25  want to go back to the point that, again, these dates have

21

1   been moved forward.  This is not a situation that is

2   reflected in the case law where the patentee is trying to

3   get around prior art by moving dates earlier and a late

4   disclosure on an earlier conception or a late disclosure of

5   an earlier reduction to practice.  We agree, there are

6   questions about the initial 2005 dates that were in our

7   first supplemental response.  That's why we have moved those

8   dates forward.

9           It would be unusual to me to be in a position

10  where the patentee in this case is precluded from arguing a

11  later conception and reduction to practice date and instead

12  be forced to argue an earlier conception and reduction to

13  practice date that is no longer what we believe accurately

14  reflected in the evidence.

15          THE COURT:  All right.  Thank you.

16          Any rebuttal, Mr. Bilsker?  Are you on mute,

17  Mr. Bilsker?  The Court can't hear you.

18          MR. BILSKER:  I'm sorry.  I'm sorry.

19          THE COURT:  That's okay.

20          MR. BILSKER:  Mr. Nishimoto mentioned the very

21  first issue, which was after the deposition, they heard the

22  testimony and they realized that maybe the prototype P0

23  didn't have moveable modules.  Well, that does not show good

24  faith and it's not a reasonable excuse.

25          Interchangeable modules have been at the center

22

1 of this case since it was first filed six years ago. It's a
2 limitation that's in every single claim, interchangeable
3 modules, and to say you didn't think about whether the
4 prototype had interchangeable moveable modules until after
5 the deposition is just not, it's not plausible.
6        Obviously, if you're relying on something for
7 your conception, and they questioned our witnesses heavily
8 about this, did you have a complete idea of the claimed
9 invention?  Well, if the prototype you're relying on for
10 conception or reduction to practice doesn't have the key
11 element of the invention, that's a pretty big issue.  That's
12 not something that just like slips by.
13        And if you did anything that was reasonable in
14 coming up with your initial response, you have all the
15 information.  You know what the limitations of the claim
16 were.  There's nothing new.  There's nothing new other than
17 maybe you didn't do your job.
18        And, again, that's not, that's not the basis for
19 amending and completely changing your theory.  It's not a
20 new fact.  And you didn't hear Mr. Nishimoto say anything
21 about what the argument that they put in the brief to you
22 was.  There was no argument that changed anything, and the
23 new evidence again, the "new evidence" is just testimony
24 coming from their own witnesses that they should have done
25 beforehand.  So that's one point.

23

1        The second point, which is this issue about,
2 well, they are moving the date later, not earlier, so that
3 makes all the other cases where people try to move back to
4 get around prior art inapplicable, no, it doesn't.  The
5 change, when people make a change, they are making a change
6 to basically save their patent.  Here, they picked a
7 conception and reduction to practice date that was early.
8 They know now that they're going to lose, so they want to
9 change.
10        So moving it one way or the other is not the
11 relevant thing.  The relevant thing is, they need to change
12 because they're going to lose based on what they have, which
13 is exactly the same as people who change by moving it back
14 because they see there's a piece of prior art that's going
15 to kill them.  So it's exactly the same thing and it's
16 identical to the RTC case, which is the only case that Your
17 Honor has which involved conception and reduction to
18 practice.
19        So that's it unless you have further questions.
20        THE COURT:  No further questions at this time,
21 and I am prepared to make a ruling on this issue.  The
22 transcript will serve as the order of the Court.  I will not
23 be issuing anything in writing subsequent to this hearing,
24 so the transcript will serve as the order, and any party who
25 wishes to take objections to my ruling may do so and Judge

24

1 Connolly will review my order to determine whether it's
2 clearly erroneous or contrary to law and the time
3 requirements under Rule 72(a) for taking objections to
4 nondispositive motions will govern.
5        With respect to defendant's motion to strike
6 plaintiffs' supplemental response to Interrogatory Number 1,
7 that motion is denied.  It's undisputed that on July 24th,
8 2020, one week prior to the close of fact discovery and
9 after the conclusion of fact witness depositions, the
10 plaintiff filed its supplemental interrogatory response
11 moving ahead by nearly a year the date it contends each
12 asserted claim of the patents-in-suit were conceived and
13 reduced to practice.
14        It is further undisputed that the documents
15 identified in support of the supplemental response were not
16 newly discovered and had earlier been produced in the
17 litigation, albeit not matched up with this, as they were
18 when the supplemental response was disclosed.
19        In determining not to strike plaintiffs'
20 supplemental response, the situs disclosure late in the
21 period of fact discovery, the Court has considered the
22 Pennypack factors as follows.
23        Factors 1 and 2 include prejudice or surprise to
24 the party against whom the evidence is offered and the
25 possibility of curing it.

25

1        The defendant argues that it is generally
2 prejudiced in that it constructed its litigation theory in
3 reliance on the earlier response and now has to adapt its
4 strategy to the supplemental response, but the defendant
5 does not provide any specific showing of prejudice, such as,
6 for example, an undermining of its argument pursuant to 35
7 U.S. Code, Section 102(g) or, again, for example, that the
8 plaintiff is maneuvering around relevant prior art
9 references.
10        Moreover, the plaintiff offered to cure any
11 alleged prejudice through a supplemental deposition or
12 depositions while there was ample time remaining prior to
13 the production of opening expert reports, but defendant
14 declined without explanation.
15        Factor 3 concerned potential disruption of an
16 orderly and efficient trial.  The defendant has not
17 demonstrated how the trial date would have been jeopardized
18 by supplemental depositions if taken even slightly beyond
19 the fact discovery deadline and how it would be, the trial
20 date would be jeopardized by having to go through the
21 documents identified in the supplemental response, which it
22 already had in its possession having had those documents
23 because they were previously produced.
24        Factor 4 concerns bad faith or willfulness in
25 withholding the disclosure.  The defendant only speculates

26

1  that the timing of the supplementation should be deemed bad
2  faith, or in its papers it has described it as
3  "sandbagging."
4       Because striking evidence is an extreme sanction
5  on which the defendant bears the burden in this instance,
6  the Court will not rest on a speculation of bad faith.
7       The Court in the Pennypack case, the Third
8  Circuit, Meyers versus Pennypack Woods Home Ownership,
9  indicates along with the other cases that address striking
10  evidence and excluding evidence that there has to be
11  some type of willfulness or bad conduct on the part of the
12  party making the late disclosure.  It's an extreme sanction
13  and the Court needs to carefully consider it before imposing
14  it.
15       While it's not adequately explained why this
16  issue came to a head when it did despite the relevant
17  documents having been disclosed well ahead of the end of
18  fact discovery, nonetheless, plaintiff plausibly responds
19  that it was complying with Rule 26 following further
20  investigation in connection with relevant deposition
21  testimony.
22       And then, finally, the last factor, the last
23  Pennypack factor is not in dispute as the parties, both
24  sides acknowledge the importance of the information related
25  to conception and reduction to practice.

27

1       So for these reasons, defendant's motion to
2  strike the supplemental response is denied.
3       Are we ready to move on to the second issue,
4  which relates to the regulatory documents?
5       MR. NISHIMOTO:  For Cytiva, yes, Your Honor.
6       THE COURT:  Okay.  Who will address that issue?
7  Mr. Bilsker, will you be addressing that on behalf of
8  defendant or will some other counsel other than Mr. Bilsker
9  address it.
10       MR. CORREDOR:  Your Honor, this is Felipe
11  Corredor.  I will be addressing this issue.
12       THE COURT:  Okay.  Very well.  Go ahead.
13       MR. CORREDOR:  This issue is about written
14  regulatory submissions that mention third-party competitors,
15  specifically Knauer, and for context, it's important to
16  understand Dr. Darby's testimony both in his deposition and
17  earlier, much earlier in the case six years ago at the time
18  of the preliminary injunction.
19       Dr. Darby, who was the vice president in charge
20  of the entire business at Cytiva, which was then known as GE
21  Healthcare until 2015, testified recently in his deposition
22  that he learned about Knauer, an important third-party
23  competitor, for the first time in the context of where he
24  did in connection with submissions made to the regulators.
25       So the specific quote from the regulator,

28

1  Exhibit 5 at page 130 is, we asked him:  In what context did
2  you come to learn of Knauer as a competitor?
3       And he responded, when we were doing the
4  regulatory findings for the acquisition of the business by
5  Danaher, in that spectrum of competitors, which also
6  suggests that there are other likely third-party competitors
7  in this space that are mentioned in those regulatory
8  submissions.
9       Now, this testimony is inconsistent with prior
10  testimony and argument, testimony from Dr. Darby, and
11  arguments made by Cytiva in the context of the preliminary
12  injunction proceedings, which are -- docket nine is the
13  brief in the consolidated case that came from the Southern
14  District of New York that's cited in the papers, but also
15  docket 11 is Dr. Darby's declaration, which we did not
16  explicitly cite in the papers, but I think one important
17  point is how inconsistent it is with paragraph 21 of Dr.
18  Darby's declaration where he stated in the context of the
19  preliminary injunction proceeding that "the NDC and access
20  systems are the only protein purification systems featuring
21  the modular panel designs allowing for the swapping of
22  interchangeable modules that are currently marketed or sold
23  for the purpose of protein purification in the United
24  States."
25       Now, the same consistency in Cytiva's likely

29

1  arguments regarding the lost profit form of damages they
2  will be seeking is this.  They will be arguing that this is
3  just a two-player market.  All sales that went to Bio-Rad
4  would have gone to Cytiva but for Bio-Rad's infringement.
5  But based on Dr. Darby's testimony and what he said Cytiva
6  has submitted to the regulatory authorities, it is -- it
7  will show that there is some inconsistency in Cytiva's
8  position that they have taken, and accordingly, these
9  documents are responsive to the requests for production that
10  we cite in our papers, which are essentially number 54 and
11  68.
12       No. 54, which are the documents sufficient to
13  show GE's market share in the market for modular protein
14  purification systems, and 68, documents sufficient to
15  identify any company that GE believes participated in the
16  market for modular protein purification systems.
17       The documents that Cytiva cites in its
18  opposition don't really explain what the -- how significant
19  Knauer is a competitor in this space whereas the regulatory
20  submissions, because they were dealing with a lot of
21  antitrust-related issues as exemplified in Exhibit 7 through
22  an FTC press release about all the business units that
23  Danahar, the acquiring party, had to divest itself of
24  because of overlap with Cytiva's, among other things,
25  chromatography product.  It's important, and this

1 information is responsive and it's important to the damages
2 theory that will be at issue in this case.
3        And I did want to respond to one last point that
4 Cytiva made in its opposition, which is regarding this idea
5 that they cited the correspondence between the parties and
6 said that this information likely doesn't exist, but if you
7 look at that page 2 of the e-mail, the statement was very
8 vague, and I had actually asked Mr. Nishimoto at a
9 subsequent meet and confer what exactly he meant, because we
10 did not want to move if the documents don't exist contrary
11 to Dr. Darby's testimony, who said that they do exist.
12        And the only thing he told me is that they asked
13 Dr. Darby and he could not find the documents he testified
14 about. So they did not make any representation about any
15 effort to search for these documents outside of asking Dr.
16 Darby, and so we do believe that based on Dr. Darby's
17 current testimony.
18        Unless Your Honor has any questions, I think
19 that completes my argument.
20        THE COURT: All right. Well, again, just a few
21 brief ones before I hear from the plaintiff with respect to
22 the argument that the information is contained in the
23 "regulatory documents," assuming for the sake of argument
24 such documents exist.
25        When I look at Rule, request for production 54,

31

1 it doesn't seem to be specifically directed to such
2 documents. That interrogatory seems to seek documents, or
3 that production request seems to seek documents showing GE's
4 market share in the relevant market.
5        Request for Production 66 seems to seek
6 documents showing efforts by GE to increase or maintain its
7 market share.
8        And then request for production 68 is most
9 related to what it is Bio-Rad is seeking in that request for
10 production 68 seeks documents identifying companies GE
11 believes compete in the relevant market.
12        So in light of that, it looks like these were
13 not specifically requested, but putting that aside for the
14 moment, I want to confirm that when these responses were
15 submitted and answered by Cytiva, that you're not
16 contending, or Bio-Rad is not contending that there are any
17 deficiencies in the production responses. It's just the
18 deposition of Dr. Darby suggested that there might be
19 regulatory documents that have some bearing at least with
20 respect to request for production 68.
21        Is that correct, that there weren't perceived
22 deficiencies in the prior responses by Cytiva?
23        MR. CORREDOR: Your Honor, I think we would
24 disagree. I think Dr. Darby's testimony shows that their
25 production was deficient because there are documents that

1 relate to the market share and how GE's markets share
2 compares to the market share of third-party competitors.
3 And it's not just Knauer, because in the excerpt I read from
4 Dr. Darby's deposition at page 130, he referred to learning
5 about Knauer in a spectrum, "spectrum of competitors."
6        And so in those regulatory submissions, I mean,
7 it's likely that they played out the market share of third
8 parties in order to minimize, you know, the dominant market
9 position that GE has or Cytiva has in this space, and it
10 shows that actually we have not received documents
11 sufficient to show either these market share or the full
12 spectrum of companies that participate in this market which
13 go directly to RFP 64 and 58.
14        THE COURT: All right. It seems to the Court
15 that this is not so much of a discovery dispute as it is
16 more of an argument that will eventually be made at some
17 point, even in a motion practice perhaps or eventually at
18 trial taking issue with allegedly inconsistent positions
19 that Cytiva is taking, depending on what goals it wishes to
20 advance, i.e., pursuing lost profits as a damages theory in
21 litigation or whatever position it had taken with respect to
22 facilitate its acquisition or with regulatory issues about a
23 more fulsome multiple party market. And I'm really
24 struggling here to see where this is a discovery matter for
25 the Court when I'm told by Cytiva that there are no such

33

1 documents in existence regardless.
2        MR. CORREDOR: Well, I mean, I think that is a
3 question for Cytiva, because when I asked that question, we
4 also didn't want to bring disputes to Your Honor about
5 documents that don't exist.
6        But when I asked that question, and the
7 statement in the correspondence is -- was very vague. And
8 there is, my understanding based on followup conversations
9 with Mr. Nishimoto is that they have not really looked for
10 these documents other than asking Dr. Darby if he had them,
11 and Dr. Darby did not have the documents, so he may not have
12 retained them, but presumably, you know, either outside
13 counsel or people involved in the acquisition more closely
14 than Dr. Darby would have these documents. And so this is,
15 you know, a prototypical discovery dispute about compelling
16 information, documents that we should get responsive to our
17 RFPs that we have not gotten, and that makes the production
18 that we have made deficient.
19        THE COURT: All right. Then I will hear from
20 Cytiva, please.
21        MS. DeWITT: Good afternoon, Your Honor. This
22 is Amy DeWitt from Arnold & Porter.
23        And I think Your Honor asked the right questions
24 there, because if we can just start with the document
25 requests themselves, No. 64 and No. 66, No. 68 were all

34

1 documents sufficient to show or sufficient to identify, and
2 they were broadly, they were broadly phrased. Documents
3 sufficient to show GE's market share, efforts by GE or
4 companies that GE believe participate in the market for
5 modular chromatography systems.
6 We satisfied those discovery obligations. We
7 have provided numerous examples of documents dating back
8 2014/2015 to Bio-Rad of these market share reports that were
9 tracked by Cytiva and GE at the time, and they go right up
10 through March of 2019, and we provided some examples to you
11 as Exhibit B, C, D and E. All of them address Knauer as a
12 competitor.
13 Exhibit C has 17 pages dedicated to discussing
14 Knauer as one of GE or Cytiva's competitors. Exhibit D is a
15 market research tracker. So seven different companies.
16 This is dated 2/2 2019, right around the time that Bio-Rad
17 is claiming there's some sort of inconsistency with what
18 Cytiva is submitting to some regulatory agency.
19 In Exhibit E, it's a global playbook from 2019
20 that discusses "the top three competitors which include
21 Knauer."
22 So Bio-Rad is trying to manufacture some
23 inconsistency based on Mr. Darby's testimony. And Bio-Rad's
24 counsel even admitted, Mr. Darby stepped down from
25 day-to-day practice around 2015 or 2016 and he was not

36

1 submissions, and that was a preliminary investigation that
2 we referenced in our letter brief.
3 THE COURT: All right. Any further
4 investigation beyond Dr. Darby?
5 MS. DeWITT: Not at this time, Your Honor. And
6 if it -- the submission of Mr. Darby was Cytiva at the time,
7 but the regulatory submissions themselves, it's my
8 understanding they were from Danahar, not Cytiva.
9 THE COURT: All right. Thank you.
10 All right. Mr. Corredor, anything further?
11 MR. CORREDOR: Yes. Just briefly, Your Honor.
12 One point is the documents that were cited by counsel, I
13 think it's important to note that these documents really
14 don't show the relative, what GE's market share is compared
15 to the, to the second competitors in this space, and we
16 think that it's something that would be definitely in the
17 regulatory submissions. And so that's just one example of
18 the deficiencies that are found even in the documents that
19 they had cited to.
20 MS. DeWITT: And if I may, I apologize, Your
21 Honor. I do want to respond to that, and I am looking at
22 Exhibit D.
23 THE COURT: All right. Take a moment. We'll
24 get that along with you if you don't mind.
25 All right. I'm pulling it up now. Exhibit D?

35

1 involved in (inaudible) of the company.
2 Bio-Rad was able to take the deposition of that
3 person, Anna Elston, and she testified that Knauer was a
4 competitor.
5 So all of this information shows no
6 inconsistency whatsoever. In the preliminary injunction
7 briefing and the declaration that Mr. Corredor quoted, those
8 were from 2014, 2015, and the market has changed since then.
9 Knauer, and the documents will show, was a small player at
10 that time, and they disclose those are also evident in the
11 exhibits that we have shown you.
12 So we don't believe there has been any
13 deficiency in Cytiva's discovery obligations. We produced
14 multiple documents that show that Knauer has been and is
15 today a competitor of Cytiva and Cytiva recognizes that. So
16 we don't think that there is any basis to compel additional
17 documents here.
18 THE COURT: All right. Can you address the
19 issue of whether or not such documents exist as it was
20 raised in your papers and also by opposing counsel?
21 MS. DeWITT: Yes. When the issue was raised by
22 Bio-Rad, we went to Mr. Darby, who was the one person at
23 Cytiva that would know if they existed, and we asked him to
24 conduct an investigation. He said he looked through
25 thousands of his e-mails. He did not find those

37

1 MS. DeWITT: Exhibit D, and I am on -- the last
2 three digits of the Bates number are 923, so it's actually
3 page 136 out of 196.
4 THE COURT: All right. Let me get there. I
5 have it. Page No. 923. Go ahead.
6 MS. DeWITT: And this is global market share,
7 and I apologize for the quality of it, but you can see a
8 bar chart on the left that shows relative global unit
9 shares of GE Waters Protein BioSolution, Bio-Rad, Knauer,
10 Agilent, and some others. I apologize. I think that's
11 APAC.
12 So I don't know what Mr. Corredor is speaking to
13 when he says the documents. And we have produced these
14 through multiple time periods. This is just not a one-off
15 document. There is a of market share documents just like
16 this called a biotracker that had been produced to Bio-Rad
17 in this litigation.
18 THE COURT: All right. I will turn back to
19 Mr. Corredor. Anything further with respect to this motion
20 to compel?
21 MR. CORREDOR: Yes. One last point, Your Honor.
22 I mean, I think we heard from counsel that the investigation
23 really wasn't very complete and Dr. Darby testified that he
24 found out this information about Knauer and the whole
25 spectrum of competitors from regulatory submissions, so I

38

1   mean these documents must exist and they would be, they
2   would have been submitted to the authorities.  That's it,
3   Your Honor.
4           THE COURT:  All right.  Thank you.
5           Again, having read the submissions and the
6   exhibits and having heard the arguments of counsel, it is
7   the Court's ruling that defendant's motion to compel the
8   production of regulatory documents identifying competitors
9   in the modular chromatography product market is denied.
10          The plaintiff, having conferred preliminarily
11  with Dr. Darby following the deposition, has determined that
12  those documents are not in existence, they're not available.
13  Admittedly, the plaintiff did not go further, but indicates
14  that even if they were available, they're likely in the
15  possession of Danahar, not Cytiva.
16          Again, we are all assuming hypothetically that
17  such documents exist, but even assuming their existence, the
18  Court finds that the discovery requests on which defendant
19  relies, they're not specifically directed to such documents.
20  At the time the requests for production were filed and
21  thereafter, the defendant did not raise any deficiencies
22  in plaintiffs' production of discovery relating to the
23  market, market participants and market shares, and, in
24  fact, the exhibits that have been discussed on this call,
25  which were attended to Cytiva's response to this motion,

39

1   do demonstrate that there was discovery, and specific
2   discovery with respect to a competitor Knauer with respect
3   to market share, market participants and the market,
4   relevant market itself.
5           Bio-Rad seeks to compel on the basis that
6   plaintiff has taken inconsistent positions on these topics
7   depending on the goals it wants to advance in litigation
8   with respect to a damages theory as contrasted with other
9   positions it has taken with regulators, but the
10  interrogatories themselves do not -- again, they ask for
11  documents sufficient to show, and while defendant argues
12  that the regulatory documents, their existence will shed the
13  most light on plaintiffs' position, such an argument
14  demonstrates that such documents, even if arguably
15  available, would be cumulative and not proportional to the
16  needs of the case under Rule 26 in the Court's view based on
17  what the plaintiff has demonstrated it has already provided
18  on the issues to the defendant.
19          So that is my ruling with respect to this motion
20  to compel the second category of documents, the regulatory
21  documents.
22          The third issue relates to privilege and a
23  clawed back inventory disclosure form and whether that opens
24  the door to a subject matter waiver.
25          So is the defendant ready to proceed with

40

1   respect to item number three on the Court's agenda?
2           MR. CORREDOR:  Yes, Your Honor.  Mr. Corredor
3   again.  I will address this one.
4           Now, I wanted to get started.  Before getting
5   into the waiver issue, I would like to argue based on the
6   privilege log, which is Exhibit 9 to our motion, and Cytiva
7   has cited the Spalding case, but actually, if you look at
8   the privilege log, Exhibit 9, and just as an example, on the
9   first page of Exhibit 9, the specific entry numbers 2, 5, 9
10  and 12, but many of these entries that are identified as
11  draft patent application materials are not logged to
12  reflect, in a way that reflects any communication between an
13  attorney and a client, and so they are missing a necessary
14  elements for privilege to apply in the first place, at least
15  for those entries that are not, that don't reflect
16  communications between clients because --
17          THE COURT:  Has this been raised though with the
18  Court or with opposing counsel, that is the deficiencies in
19  the manner and the description in which they were entered on
20  the privilege log, because if it hasn't, it's not a matter
21  ripe for the Court.
22          MR. CORREDOR:  I believe I can pull up the
23  exhibit.  I believe it was raised with counsel.  It was not
24  included in our papers because of page limitations, but if I
25  can pull up the exhibit quickly.

41

1           THE COURT:  All right.  If it is an exhibit,
2   please direct me to where I should be looking.
3           MR. CORREDOR:  Yes.  One second, Your Honor.
4           (Pause.)
5           MR. CORREDOR:  Yes.  Exhibit 4 at page 4, which
6   is the correspondence between the parties.
7           THE COURT:  All right.
8           MR. CORREDOR:  The bottom of page 4 is where we
9   raised this issue, and I believe we also discussed it with
10  them on the -- on one of the subsequent meet and confers.
11          THE COURT:  All right.  Go ahead.
12          MR. CORREDOR:  Yes.  So the point I just wanted
13  to make is that those materials were not even communicated
14  between attorneys and clients as noted in Exhibit 4 at page
15  4, and they are not, accordingly, not subject to the
16  attorney/client privilege under Spalding.
17          Now, even if those entries and the remaining
18  patent application materials were the communications between
19  attorneys and clients, even if they are privileged, there
20  has been a waiver as a result of what happened with the
21  Exhibit 67 document.
22          Now, Cytiva in its opposition admits that Mr.
23  Lundqvist testified that the invention disclosure form was
24  an accurate summary of his invention.  Specifically, this
25  is Exhibit 10 of page 240, lines 4 though 6.  And this

42

1  testimony shows that he relied on it during deposition to
2  support the idea of what his invention was.
3          And it is also important to note that
4  Mr. Lundqvist was testifying on behalf of Cytiva as a
5  30(b)(6) designee on conception and reduction to practice.
6  So this testimony shows reliance by Cytiva on Exhibit 67.
7          And Mr. Lundqvist also provided additional
8  testimony at pages, for example, page 238, line 3 to 5 of
9  his deposition, where he testified that he recognized it
10  as a disclosure of the invention, and then subsequently at
11  page 241 he testified about the patents application process
12  and how the information went to in-house counsel in order
13  to be incorporated into the draft patent application
14  materials. So this just showed additional reliance on these
15  materials.
16          And moving on, Your Honor, about, you know,
17  whether, whether the Exhibit 57, all of that was proper or
18  not. I think it is worth noting here that Cytiva in its
19  opposition does not cite any case at all supporting the idea
20  that a document that is used in a deposition can be clawed
21  back if the use is not objected to at that deposition, and I
22  think, you know, their failure to cite any specific case
23  speaks volumes about what happened and what the implications
24  of what happened with Exhibit 67 should be.
25          The two cases they do cite are completely

43

1  inapposite. First, they cite to Hanes. It doesn't even
2  deal with waiver at all. And then they also cite to IBM,
3  which talks about waiver in the context, in a very different
4  context, which is waiver as a result of disclosures made to
5  a third party.
6          So the only cases that have been cited by either
7  side show that, you know, waiver is -- follows in these
8  circumstances. And the two specific cases are Kramer and
9  LunarGaming. In both cases, show that a failure to object
10  either to questions in the case of Kramer or to exhibits in
11  the case of LunarGaming at a deposition waive the privilege
12  over, over those materials.
13          And LunarGaming actually cites several cases
14  holding as much in support of its own holding that "under
15  both state and federal law, if a privileged document is used
16  at a deposition and the privilege holder fails to object
17  immediately, the privilege is waived," and this is at page
18  star five of LunarGaming.
19          Now, in its opposition, Cytiva argued that there
20  were other uses of the exhibit in LunarGaming, but if you
21  read the decision, the Court found that the very first
22  unobjected to use of the privileged document at the first
23  deposition waived the privilege and the discussion of
24  additional later uses in other depositions and in a motion
25  for summary judgment only further strengthen the waiver,

44

1  but, you know, if the use, the unobjected to use at the very
2  first deposition was enough to waive the privilege. And the
3  Court ruled as much by reasoning that, you know, pointing in
4  part to the Rule 502(b)(3) requirement that the party
5  asserting privilege must promptly rectify any inadvertent
6  disclosure upon discovery, and the failure to object at the
7  deposition waives the privilege with respect to, in that
8  case it was, I guess, a document called the 2003 memo.
9          So I think it's pretty -- our position is that
10  it's pretty clear that there has been a waiver here.
11          And now the second issue is the scope of the
12  waiver, and I think based on the factors and the sword and
13  shield (inaudible) and Rule 502(a), it is our contention
14  that this waiver extends to the draft patent application
15  material that is the subject of our motion, one, because the
16  waiver was intentional. Counsel elected not to object at
17  the deposition.
18          The patent application material compared the
19  same subject matter, which is the description of the
20  invention that was made in preparation for filing for patent
21  applications under the subject matter, and that all of these
22  materials should in fairness be considered together because,
23  Your Honor, the description of the invention has changed
24  over time. And I think we heard a little bit of that in
25  the, in Mr. Bilsker's argument earlier today, but that is

45

1  why we need -- you know, if it's appropriate to extend the
2  waiver under subject matter doctrine to the remainder, to
3  the remaining related draft patent application materials
4  that we identified just exactly as Your Honor ruled in Hoff
5  Mountain, which is a case that Cytiva cited, where it found
6  that -- where you found that, Your Honor found that the
7  waiver extended to related subject matters.
8          I think that's all I have, Your Honor.
9          THE COURT: Yes. I figured that you were at the
10  end when you paused.
11          I have a few questions, if you don't mind,
12  before I hear from Cytiva.
13          With respect to this case, there was a
14  protective order that Cytiva cited, and actually, it's
15  docket item number -- I think it's docket item 37 if I have
16  it correctly in the case. In any event, it's paragraph 46
17  of the protective order, which incorporates the clawback
18  provisions of Rule 26(b)(5)(B). So when there is, assume
19  for this hypothetical, when there is an inadvertent
20  disclosure of privileged information that's able to be
21  clawed back, and you don't dispute that. Am I correct on
22  that?
23          MR. CORREDOR: Well, I think the answer is
24  two-pronged. One is, as a general matter, there is a
25  clawback provision, and I think what makes Exhibit 57

46

48

1  different is that we did use it at the deposition of
2  Mr. Lundqvist, and so as a result, the time to have clawed
3  back that document was at the deposition, because if you
4  read, you know, both Rule 502(b)(3), Rule of Evidence
5  502(B)(3) and Rule 26(b)(5), which we just cited, both of
6  them emphasize, you know, the need to do this promptly. And
7  when a document is presented to you in deposition, not only
8  was, you know, the counsel defending Mr. Lundkvist there.
9        Mr. Sorby, who was involved in these documents,
10 was also attending the deposition, and he did not say
11 anything about this material being privileged.
12       So I think there is an absence of action to claw
13 things back. And just as an example, I mean, they, Cytiva
14 used a privilege document with one of our witnesses. At
15 least it was partially privileged. And I immediately on the
16 spot clawed it back and said, you know, you can't ask
17 questions about this one slide in the document because it's
18 privileged and we're clawing it back pursuant to the
19 protective order, and then I followed up with a letter
20 which, you know, they did not do, and so that is the key
21 point here, Your Honor.
22       THE COURT:  All right.  Thank you.  I will hear
23 from plaintiffs' counsel.
24       MR. NISHIMOTO:  Thank you, Your Honor.  Ryan
25 Nishimoto again for the plaintiff.

1  said, I think, we cited it in our brief, and, again, Your
2  Honor has the transcript, the extent of his testimony on
3  that.
4        Here, where there's nothing on the face of the
5  document indicating it's privileged, the witness knew
6  nothing about the document.  Where, to my mind, no one at
7  the deposition knew or suspected the document was
8  privileged, it strikes me as unusual then to find a clear
9  and intentional waiver of the privilege when the basis for
10 the privilege wasn't even established and the witness knew
11 nothing about it.
12       It's a point that I've raised, Cytiva has raised
13 in its opposition.  It's the last paragraph and it goes to
14 the question of whether anyone at the deposition suspected
15 the document was privileged, and counsel for Bio-Rad had
16 represented that he did not.
17       There was an exchange immediately following the
18 questioning on this document as to whether the witness had
19 waived privilege and counsel defending Cytiva, who was me,
20 said, I disagree.  I don't think there has been a waiver,
21 and, in fact, I didn't see a waiver based on that
22 questioning, and if we look back at the information that
23 was injected into the case, there was no privileged
24 information.
25       When we went back and looked and investigated

47

49

1        Let me address, first of all, the issue that we
2  raised in opposition, which I heard again from Mr. Corredor,
3  which is the assertion that the witness relied on this
4  Exhibit 67 to describe his invention.
5        THE COURT:  I read the transcript, and actually,
6  I have the transcript pages in front of me, so I don't need
7  it, you know, repeated if you don't mind.  I'm more
8  interested in addressing the issue of whether a prompt
9  objection was required at the deposition, whether it was
10 sufficient and timely, but 12 days later a request to claw
11 it back was made.  And if it is, in fact, waived as to the
12 disclosure form, where do we stand with regard to subject
13 matter waiver?
14       MR. NISHIMOTO:  Thank you, Your Honor.  I
15 appreciate the guidance.
16       On the issue of the promptness of the objection,
17 it's important to note, and Your Honor has the transcript in
18 front of you, that the witness had no idea what he was
19 looking at in terms of who created it, where it came from,
20 who drafted the summary, whether he had even submitted it in
21 a bench disclosure.
22       There's nothing on the face of the document
23 itself that indicates privilege, that states that it's
24 something that was prepared by prosecution counsel.  There's
25 no signatures on it.  And, in fact, the witness himself

1  these issues, more specifically, issues related to whether
2  there was any clawback, there were a number of documents
3  that we needed to address.
4        Let me address then, and I apologize.  I'm a
5  little disjointed here.
6        So what I just addressed was why that was not
7  raised at deposition.  No one realized it was privilege
8  before during the deposition.  Your Honor noted the 12 days
9  that counsel has or, excuse me, that Bio-Rad in its brief.
10 And I will say it took us awhile to go back and take a look
11 at whether there were additional documents, what was the
12 origin of Exhibit 67, whether there was a privilege claim on
13 this.
14       I happened also to be out of the office for a
15 week on a family vacation an opinion.  But importantly, the
16 point here is during that 12-day gap, nothing happened in
17 the interim with regard to Exhibit 7 -- 57.  It was not
18 being subsequently used in a summary judgment motion at the
19 time, used in subsequent deposition by either party.  It
20 wasn't on anyone's radar as far as I know.
21       THE COURT:  You're breaking up, Mr. Nishimoto,
22 so please try and stay close to your microphone.  And,
23 again, I will ask others if you are not muted, please stay
24 on mute.  I'm muting my microphone as well.
25       MR. NISHIMOTO:  Thank you.  Let me just say the

50

1 fact that nothing happened in the interim with that document
2 is an important point, and that is -- that distinguishes
3 this case from, for example, the LunarGaming case that
4 Bio-Rad has cited wherein LunarGaming, the document was
5 subsequently used in a summary judgment motion. It was
6 subsequently used at a second deposition. It kept coming
7 around in the litigation. Here, nothing happened during
8 that interim.
9        THE COURT: Go ahead.
10       MR. NISHIMOTO: When it comes then to the
11 subject matter waiver, and as we pointed out in our brief,
12 the Hock Mountain case, of course, which the Court is aware
13 of and Mr. Corredor alluded to that as well, I think it's
14 important to note and to remind everyone here, I think, of course,
15 that that is reserved for unusual situations.
16       There is no attempt to use this information as a
17 sword in this case. Cytiva has no intent of doing that.
18 There's no information from Exhibit 67 that it is attempted
19 to be used as a sword. There is nothing from any of the
20 documents that it had been withheld as privileged in this
21 case or clawed back that Cytiva is attempting to use.
22       This is not a case even where the inventor
23 himself has relied on the document to support his invention
24 or testimony regarding it, and so it certainly does not
25 reach that level of a subject matter waiver.

51

1        Now, the first issue that came up when
2 Mr. Corredor was speaking was the observation that certain
3 entries on a privilege log he says did not identify a person
4 to whom the information was communicated. I don't believe
5 that was briefed here. I don't believe that issue was ripe
6 for the Court. But addressing that, Mr. Corredor also noted
7 that during Mr. Lundqvist's deposition, that is the
8 inventor, after the questioning on Exhibit 67, Mr. Lundkvist
9 was asked, what is the patent application process? And he
10 said, well, we talked to the prosecution counsel at then GE
11 Healthcare, Leonard Sorby.
12       Now, that information itself is not privileged.
13 That's the kind of information that would appear on a
14 privilege log. And to the extent there are questions about
15 who information was translated to during the patent
16 application process, I think the inventor testimony there
17 clarifies it, and to the extent there's questions on the
18 law, we'd be happy to address that. But I don't think
19 because that issue has been presented on the papers, it was
20 certainly not something that we addressed in the papers, but
21 I wanted to address it here.
22       THE COURT: Thank you.
23       Anything further, Mr. Corredor? I think you may
24 be on mute.
25       MR. CORREDOR: Sorry, Your Honor. My apologies.

52

1 Yes, Your Honor. A couple of quick points.
2        One, I think Mr. Nishimoto said that
3 Mr. Lundqvist had no idea what the document was, but if you
4 look at page 238, lines 3 to 5, he testified that he
5 recognized it as a disclosure of invention, so he actually
6 knew what the form was. And based on his testimony, this is
7 the type of document that were exchanged with Mr. Sorby on
8 page 241. And so it would be incumbent on counsel and
9 Mr. Sorby to have clawed back the documents right then and
10 there if they wanted to preserve the privilege.
11       And then the other thing, the other point I
12 wanted to make is I heard Mr. Nishimoto attempt to
13 distinguish LunarGaming, but I would direct your attention
14 to page *5 of that, of that case again, and I will read a
15 passage that I think is important, which is Based on the
16 federal and state law cited above and the Rule 502(b)(3)
17 requirement that Lunar promptly rectify inadvertent
18 disclosure upon discovery, Lunar's failure to object at the
19 deposition waived the privilege with respect to the 2003.
20       So this was -- this shows that the Court was
21 basing its decision on the failure to object at that very
22 first deposition and was not relying on, you know, the
23 subsequent use that Mr. Nishimoto pointed out was not made
24 in this case.
25       That is all I have, Your Honor.

53

1        THE COURT: All right. Thank you.
2        MR. NISHIMOTO: Your Honor, if I may --
3        THE COURT: Go ahead.
4        MR. NISHIMOTO: Apologies. This is Ryan
5 Nishimoto again.
6        I do want to note that we do, as the Court
7 pointed out, have a protective order in this case that
8 governed, which should be the guiding principle here. I'm
9 not familiar with what protective order or other issues were
10 at issue in an unrelated case like LunarGaming.
11       THE COURT: All right. Having heard the
12 arguments of counsel in conjunction with reading the
13 submissions, I'm prepared to make a ruling on the record
14 with respect to this application. And defendant's motion to
15 compel production of a clawed back invention disclosure form
16 and draft patent application material is denied, and my
17 reasons are as follows.
18       Certainly, ideally, if a privileged document
19 comes into play in a deposition in a perfect world, one
20 would expect that an immediate objection on privilege would
21 be made and the document clawed back. But in this instance
22 there are a number of reasons that will guide me in terms of
23 not finding a privilege waiver here.
24       The invention disclosure form introduced as an
25 exhibit to the Lundkvist deposition was clawed back by the

54

1  plaintiff in accordance with paragraph 45 of the protective
2  order, which incorporates the clawback provisions of Rule
3  26(b)(5)(B).
4            I have read the Lundkvist deposition transcript
5  attached as Exhibit 10 to document item number 139 and rely
6  upon the testimony as follows as factual support for my
7  discovery ruling.
8            Lundkvist didn't remember seeing the documents,
9  did not prepare the invention disclosure form, did not
10  submit a disclosure or description of the relevant modular
11  system, finds the summary of the idea consistent with what
12  he invented but had no participation in the drafting of the
13  patent application that was filed.  And while with that, as
14  has been represented on this record, there was nothing
15  glaring or standing out to indicate that this document was
16  privileged, so the Court finds that the clawback of it, even
17  though it took 12 days to do that, does not subject the
18  plaintiff to a privilege waiver as with respect to this
19  document.  And the facts I've just quoted just for the
20  record are from pages 237 to 240 of the Lundkvist
21  deposition.
22            The deposition testimony of the witness that
23  I've just summarized in my view does not amount to a
24  privilege waiver as the witness did not testify to reliance
25  on the invention disclosure form to disclose or describe his

55

1  idea or invention at his deposition, and therefore I find no
2  subject matter waiver as to the plaintiffs' draft patent
3  application materials.
4            As it was noted in the arguments, the subject
5  matter waiver is really limited in the situation in which a
6  party intentionally put protected information into the
7  litigation for a tactical advantage, which in fairness
8  requires a further disclosure of related protected
9  information in order to prevent a selective and misleading
10  presentation of evidence to the disadvantage of the
11  adversary, and that's really what is going on in Hoff
12  Mountain versus Merex at 2016 Westlaw 690883.
13            Here, the Court finds the plaintiffs' disclosure
14  inadvertent, not intentional.  Thus, the subject matter
15  waiver is not invoked.  With respect to those, any
16  alleged infirmities in logging items on the privilege
17  log to indicate who the communications were between, I
18  instruct that the parties meet and confer about that and
19  then present any issues to the Court with respect to
20  deficiencies in the privilege log or improper designation
21  of items on the privilege log as privileged when they are
22  not, in fact, attorney/client communications or work product
23  documents.
24            I don't know that that issue is sufficiently
25  ripe for me.  It wasn't really spelled out in the papers,

56

1  and based on what I'm hearing from Cytiva, it wasn't
2  expected to come up with respect to this discovery dispute
3  teleconference.  So the parties should continue to work on
4  that and promptly bring to my attention any issues that
5  remain with respect to the privilege log.
6            So those are my rulings.  As I said earlier, any
7  objections can be taken up in accordance with the time frame
8  under Rule 72(a).  This transcript will serve as the order
9  of the Court.
10            With that, anything further from the Bio-Rad
11  defendant?
12            MR. BILSKER:  No, Your Honor.
13            THE COURT:  Anything further from the plaintiff?
14            MR. NISHIMOTO:  No, Your Honor.
15            THE COURT:  All right.  This concludes our
16  discovery teleconference.  Take care.  Stay well, counsel.
17  Thank you.
18            (Counsel respond, "Thank you, Your Honor.")
19            (Telephone conference concluded at 3:23 p.m.)
20                        -  -  -
21
22
23
24
25

**'**

**'77** [1] - 12:14

# 1

**1** [7] - 5:2, 6:23, 6:25, 7:1, 15:19, 24:6, 24:23
**10** [2] - 41:25, 54:5
**102(g** [1] - 25:7
**11** [1] - 28:15
**12** [4] - 40:10, 47:10, 49:8, 54:17
**12-day** [1] - 49:16
**130** [2] - 28:1, 32:4
**136** [1] - 37:3
**139** [1] - 54:5
**17** [1] - 34:13
**18-1899-CFC-SRF** [1] - 1:9
**18th** [1] - 10:25
**196** [1] - 37:3
**1970s** [1] - 12:12

# 2

**2** [4] - 1:12, 24:23, 30:7, 40:9
**2/2** [1] - 34:16
**2003** [2] - 44:8, 52:19
**2005** [1] - 21:6
**2014** [1] - 35:8
**2014/2015** [1] - 34:8
**2015** [3] - 27:21, 34:25, 35:8
**2016** [2] - 34:25, 55:12
**2019** [3] - 34:10, 34:16, 34:19
**2020** [2] - 1:12, 24:8
**21** [1] - 28:17
**237** [1] - 54:20
**238** [2] - 42:8, 52:4
**240** [2] - 41:25, 54:20
**241** [2] - 42:11, 52:8
**24th** [2] - 11:1, 24:7
**26** [6] - 6:18, 12:13, 20:19, 26:19, 39:16
**26(b)5** [1] - 46:5
**26(b)(5)(B)** [2] - 45:18, 54:3
**26th** [1] - 11:1
**2:00** [2] - 1:13, 3:4

# 3

**3** [4] - 12:4, 25:15, 42:8, 52:4
**30(b)(6** [5] - 6:14, 8:13, 8:21, 15:10,

**42:5**

**31st** [2] - 10:5
**35** [1] - 25:6
**37** [1] - 45:15
**3:23** [1] - 56:19

# 4

**4** [7] - 25:24, 41:5, 41:8, 41:14, 41:15, 41:25
**40** [1] - 9:22
**45** [1] - 54:1
**46** [1] - 45:16

# 5

**5** [6] - 7:1, 28:1, 40:9, 42:8, 52:4, 52:14
**502(a** [1] - 44:13
**502(B)(3** [1] - 46:5
**502(B)(3** [3] - 44:4, 46:4, 52:16
**54** [3] - 29:10, 29:12, 30:25
**57** [3] - 42:17, 45:25, 49:17
**58** [1] - 32:13

# 6

**6** [3] - 6:24, 6:25, 41:25
**64** [2] - 32:13, 33:25
**66** [2] - 31:5, 33:25
**67** [7] - 41:21, 42:6, 42:24, 47:4, 49:12, 50:18, 51:8
**68** [6] - 29:11, 29:14, 31:8, 31:10, 31:20, 33:25
**690883** [1] - 55:12

# 7

**7** [2] - 29:21, 49:17
**72(a** [1] - 24:3
**72(a)** [1] - 56:8

# 9

**9** [4] - 40:6, 40:8, 40:9
**923** [2] - 37:2, 37:5

# A

**AB** [1] - 1:4
**abide** [2] - 12:1, 12:16
**able** [5] - 20:11, 20:22, 20:24, 35:2, 45:20

**absence** [1] - 46:12
**absolutely** [1] - 9:2
**access** [1] - 28:19
**accordance** [2] - 54:1, 56:7
**according** [1] - 12:15
**accordingly** [2] - 29:8, 41:15
**accurate** [1] - 41:24
**accurately** [1] - 21:13
**acknowledge** [1] - 26:24
**acquiring** [1] - 29:23
**acquisition** [3] - 28:4, 32:22, 33:13
**ACTION** [1] - 1:4
**action** [1] - 46:12
**adapt** [1] - 25:3
**add** [1] - 8:5
**added** [1] - 8:2
**additional** [7] - 7:24, 8:10, 35:16, 42:7, 42:14, 43:24, 49:11
**address** [12] - 5:19, 26:9, 27:6, 27:9, 34:11, 35:18, 40:3, 47:1, 49:3, 49:4, 51:18, 51:21
**addressed** [3] - 19:24, 49:6, 51:20
**addressing** [5] - 18:4, 27:7, 27:11, 47:8, 51:6
**adequately** [1] - 26:15
**adherence** [1] - 12:8
**admit** [1] - 10:12
**admits** [1] - 41:22
**admitted** [1] - 34:24
**admittedly** [1] - 38:13
**advance** [2] - 32:20, 39:7
**advantage** [1] - 55:7
**adversary** [1] - 55:11
**advertent** [1] - 44:5
**affected** [2] - 11:21, 17:25
**afternoon** [6] - 3:6, 3:17, 4:5, 4:11, 17:18, 33:21
**agency** [1] - 34:18
**agenda** [1] - 40:1
**Agilent** [1] - 37:10
**ago** [2] - 22:1, 27:17
**agree** [3] - 10:5, 10:6, 21:5
**agreed** [1] - 8:4
**ahead** [7] - 24:11, 26:17, 27:12, 37:5, 41:11, 50:9, 53:3
**ALAN** [1] - 2:16

**Alan** [1] - 4:12
**albeit** [1] - 24:17
**allege** [1] - 20:3
**alleged** [2] - 25:11, 55:16
**allegedly** [1] - 32:18
**alleging** [1] - 13:25
**allow** [1] - 10:11
**allowed** [1] - 18:15
**allowing** [3] - 13:14, 13:17, 28:21
**allows** [1] - 18:14
**alluded** [1] - 50:13
**almost** [1] - 5:22
**ameliorate** [1] - 20:2
**amending** [1] - 22:19
**amount** [2] - 10:4, 54:23
**ample** [2] - 17:11, 25:12
**AMY** [1] - 2:3
**Amy** [2] - 4:7, 33:22
**AND** [1] - 1:2
**Anderson** [1] - 4:12
**ANDERSON** [1] - 2:15
**Anna** [1] - 35:3
**answer** [1] - 45:23
**answered** [1] - 31:15
**antitrust** [1] - 29:21
**antitrust-related** [1] - 29:21
**APAC** [1] - 37:11
**apologies** [2] - 51:25, 53:4
**apologize** [5] - 17:21, 36:20, 37:7, 37:10, 49:4
**appear** [1] - 51:13
**APPEARANCES** [2] - 1:18, 2:1
**appearances** [1] - 3:25
**appeared** [1] - 16:18
**application** [14] - 12:6, 40:11, 41:18, 42:11, 42:13, 44:14, 44:18, 45:3, 51:9, 51:16, 53:14, 53:16, 54:13, 55:3
**applications** [1] - 44:21
**apply** [1] - 40:14
**appreciate** [1] - 47:15
**approach** [1] - 10:18
**appropriate** [1] - 45:1
**area** [1] - 17:23
**arguably** [1] - 39:14
**argue** [3] - 14:13, 21:12, 40:5

**argued** [2] - 8:1, 43:19
**argues** [2] - 25:1, 39:11
**arguing** [4] - 8:13, 18:13, 21:10, 29:2
**argument** [19] - 6:5, 14:8, 14:12, 14:15, 15:1, 15:6, 18:7, 20:7, 22:21, 22:22, 25:6, 28:10, 30:19, 30:22, 30:23, 32:16, 39:13, 44:25
**arguments** [8] - 6:6, 10:23, 14:10, 28:11, 29:1, 38:6, 53:12, 55:4
**arisen** [1] - 6:20
**Arnold** [3] - 4:6, 17:19, 33:22
**ARNOLD** [3] - 2:2, 2:7, 2:11
**art** [4] - 21:3, 23:4, 23:14, 25:8
**articulate** [1] - 20:11
**aside** [2] - 3:8, 31:13
**aspect** [1] - 19:4
**asserted** [1] - 24:12
**asserting** [1] - 44:5
**assertion** [1] - 47:3
**assume** [1] - 45:18
**assuming** [3] - 30:23, 38:16, 38:17
**attached** [1] - 54:5
**attempt** [2] - 50:16, 52:12
**attempted** [1] - 50:18
**attempting** [1] - 50:21
**attended** [1] - 38:25
**attending** [1] - 46:10
**attention** [2] - 52:13, 56:4
**attorney** [1] - 40:13
**attorney/client** [2] - 41:16, 55:22
**attorneys** [2] - 41:14, 41:19
**authorities** [2] - 29:6, 38:2
**available** [3] - 38:12, 38:14, 39:15
**aware** [2] - 6:6, 50:12
**awhile** [1] - 49:10

# B

**background** [1] - 5:14
**bad** [5] - 15:4, 25:24, 26:1, 26:6, 26:11
**bandwidth** [1] - 17:25
**bar** [1] - 37:8

**Based** [1] - 52:15
**based** [25] - 6:10, 8:6, 12:23, 13:15, 14:8, 14:9, 15:12, 17:3, 17:6, 18:17, 18:20, 19:6, 19:18, 20:20, 23:12, 29:5, 30:16, 33:8, 34:23, 39:16, 40:5, 44:12, 48:21, 52:6, 56:1
**basing** [1] - 52:11
**basis** [4] - 22:18, 35:16, 39:5, 48:9
**Bates** [1] - 37:2
**bearing** [1] - 31:19
**bears** [1] - 26:5
**BEFORE** [1] - 1:16
**beforehand** [1] - 22:25
**begin** [2] - 4:18, 5:6
**beginning** [1] - 3:4
**behalf** [2] - 27:7, 42:4
**believes** [2] - 29:15, 31:11
**bench** [1] - 47:21
**best** [1] - 14:22
**better** [3] - 5:9, 5:10, 17:1
**between** [7] - 30:5, 40:12, 40:16, 41:6, 41:14, 41:18, 55:17
**beyond** [4] - 16:5, 25:18, 36:4
**bids** [1] - 14:2
**big** [1] - 22:11
**Bilsker** [8] - 4:13, 5:4, 5:7, 18:19, 21:16, 21:17, 27:7, 27:8
**BILSKER** [11] - 2:19, 5:4, 5:9, 5:11, 5:16, 11:24, 13:8, 15:25, 21:18, 21:20, 56:12
**Bilsker's** [2] - 18:5, 44:25
**BIO** [1] - 1:8
**Bio** [36] - 3:10, 4:10, 4:19, 5:1, 5:3, 7:17, 9:21, 11:22, 14:8, 14:10, 18:6, 18:9, 18:13, 19:13, 19:16, 19:24, 20:2, 20:10, 20:14, 29:3, 29:4, 31:9, 31:16, 34:8, 34:22, 34:23, 35:2, 35:22, 37:9, 37:16, 39:5, 48:15, 49:9, 50:4, 56:10
**BIO-RAD** [1] - 1:8
**Bio-Rad** [29] - 3:10, 4:10, 5:3, 7:17, 9:21,

11:22, 14:8, 18:6, 18:13, 19:13, 19:16, 20:2, 20:10, 20:14, 29:3, 31:9, 31:16, 34:8, 34:16, 34:22, 35:2, 35:22, 37:9, 39:5, 48:15, 49:9, 50:4, 56:10
**Bio-Rad's** [7] - 4:19, 5:1, 14:10, 18:9, 19:24, 29:4, 34:23
**BioSolution** [1] - 37:9
**biotracker** [1] - 37:16
**bit** [2] - 5:7, 44:24
**blew** [1] - 15:13
**bottom** [1] - 41:8
**breaking** [1] - 49:21
**Brian** [1] - 4:7
**brief** [10] - 18:8, 18:20, 19:25, 22:21, 28:13, 30:21, 36:2, 48:1, 49:9, 50:11
**briefed** [1] - 51:5
**briefing** [1] - 35:7
**briefly** [1] - 36:11
**bring** [2] - 33:4, 56:4
**broadly** [2] - 34:2
**bunch** [1] - 16:5
**burden** [2] - 18:9, 26:5
**business** [3] - 27:20, 28:4, 29:22
**BY** [5] - 1:19, 2:3, 2:11, 2:16, 2:19

## C

**California** [2] - 2:8, 2:20
**capture** [1] - 20:9
**care** [1] - 56:16
**carefully** [1] - 26:13
**case** [44] - 6:23, 7:21, 7:22, 8:12, 9:10, 11:20, 12:4, 12:12, 12:13, 16:9, 17:8, 18:14, 19:4, 19:14, 21:2, 21:10, 22:1, 23:16, 26:7, 27:17, 28:13, 30:2, 39:16, 40:7, 42:19, 42:22, 43:10, 43:11, 44:8, 45:5, 45:13, 45:16, 48:23, 50:3, 50:12, 50:17, 50:21, 50:22, 52:14, 52:24, 53:7, 53:10
**cases** [19] - 5:18, 5:19, 6:19, 7:3, 8:25, 11:9, 12:2, 16:23, 18:6, 18:7, 19:23, 20:16,

23:3, 26:9, 42:25, 43:6, 43:8, 43:9, 43:13
**category** [1] - 39:20
**center** [1] - 21:25
**certain** [2] - 10:4, 51:2
**certainly** [6] - 12:9, 13:3, 15:10, 50:24, 51:20, 53:18
**chance** [1] - 20:2
**change** [20] - 6:16, 7:19, 8:16, 9:20, 10:17, 10:21, 11:20, 11:22, 12:20, 12:22, 12:25, 13:2, 15:14, 18:16, 23:5, 23:9, 23:11, 23:13
**changed** [6] - 6:2, 6:15, 15:11, 22:22, 35:8, 44:23
**changing** [3] - 11:2, 14:15, 22:19
**charge** [1] - 27:19
**charged** [1] - 7:25
**chart** [1] - 37:8
**charts** [1] - 6:25
**chromatography** [3] - 29:25, 34:5, 38:9
**Circuit** [1] - 26:8
**circuit** [1] - 11:25
**circumstances** [1] - 43:8
**cite** [7] - 28:16, 29:10, 42:19, 42:22, 42:25, 43:1, 43:2
**cited** [14] - 12:3, 16:9, 28:14, 30:5, 36:12, 36:19, 40:7, 43:6, 45:5, 45:14, 46:5, 48:1, 50:4, 52:16
**cites** [3] - 19:24, 29:17, 43:13
**Civil** [1] - 12:12
**CIVIL** [1] - 1:4
**claim** [4] - 22:2, 22:15, 24:12, 49:12
**claimed** [1] - 22:8
**claiming** [1] - 34:17
**clarifies** [1] - 51:17
**claw** [2] - 46:12, 47:10
**clawback** [5] - 45:17, 45:25, 49:2, 54:2, 54:16
**clawed** [10] - 39:23, 42:20, 45:21, 46:2, 46:16, 50:21, 52:9, 53:15, 53:21, 53:25
**clawing** [1] - 46:18
**clear** [2] - 44:10, 48:8
**clearly** [1] - 24:2

**clerk** [1] - 3:16
**client** [2] - 11:22, 40:13
**clients** [3] - 40:16, 41:14, 41:19
**close** [4] - 6:1, 11:3, 24:8, 49:22
**closely** [1] - 33:13
**Code** [1] - 25:7
**code** [4] - 8:3, 8:8, 8:10
**coming** [4] - 9:17, 22:14, 22:24, 50:6
**comments** [1] - 20:13
**communicated** [2] - 41:13, 51:4
**communication** [1] - 40:12
**communications** [4] - 40:16, 41:18, 55:17, 55:22
**companies** [4] - 31:10, 32:12, 34:4, 34:15
**company** [2] - 29:15, 35:1
**compared** [2] - 36:14, 44:18
**compares** [1] - 32:2
**compel** [4] - 4:19, 35:16, 37:20, 38:7, 39:5, 39:20, 53:15
**compelling** [1] - 33:15
**compete** [1] - 31:11
**competent** [1] - 12:5
**competitor** [7] - 27:23, 28:2, 29:19, 34:12, 35:4, 35:15, 39:2
**competitors** [10] - 27:14, 28:5, 28:6, 32:2, 32:5, 34:14, 34:20, 36:15, 37:25, 38:8
**complete** [2] - 22:8, 37:23
**completed** [1] - 5:25
**completely** [6] - 6:2, 7:19, 11:3, 13:11, 22:19, 42:25
**completes** [1] - 30:19
**complying** [1] - 26:19
**conceived** [1] - 24:12
**conception** [22] - 4:25, 6:7, 7:8, 8:20, 9:17, 11:23, 14:13, 16:4, 16:6, 16:12, 17:2, 17:5, 19:7, 21:4, 21:11, 21:12, 22:7, 22:10, 23:7,

23:17, 26:25, 42:5
**concern** [1] - 20:15
**concerned** [1] - 25:15
**concerns** [1] - 25:24
**concluded** [1] - 56:19
**concludes** [1] - 56:15
**conclusion** [1] - 24:9
**conduct** [2] - 26:11, 35:24
**confer** [2] - 30:9, 55:18
**conference** [3] - 1:13, 3:3, 56:19
**conferred** [1] - 38:10
**confers** [1] - 41:10
**confirm** [1] - 31:14
**conjunction** [1] - 53:12
**connection** [2] - 26:20, 27:24
**Connolly** [1] - 24:1
**consider** [1] - 26:13
**considered** [2] - 24:21, 44:22
**considering** [1] - 11:16
**consistency** [1] - 28:25
**consistent** [1] - 54:11
**consolidated** [1] - 28:13
**constructed** [1] - 25:2
**contained** [1] - 30:22
**contemplates** [1] - 6:18
**contending** [2] - 31:16
**contends** [1] - 24:11
**contention** [2] - 9:8, 44:13
**contention -type** [1] - 9:8
**contentions** [1] - 8:9
**context** [7] - 27:15, 27:23, 28:1, 28:11, 28:18, 43:3, 43:4
**contextualize** [1] - 19:12
**continue** [1] - 56:3
**Continued** [1] - 2:1
**contrary** [2] - 24:2, 30:10
**contrasted** [1] - 39:8
**conversations** [1] - 33:8
**correct** [6] - 6:21, 7:1, 13:6, 15:21, 31:21, 45:21
**correcting** [1] - 20:19
**correctly** [1] - 45:16
**CORREDOR** [16] -

2:20, 13:7, 27:10, 27:13, 31:23, 33:2, 36:11, 37:21, 40:2, 40:22, 41:3, 41:5, 41:8, 41:12, 45:23, 51:25
**Corredor** [13] - 4:14, 13:6, 27:11, 35:7, 36:10, 37:12, 37:19, 40:2, 47:2, 50:13, 51:2, 51:6, 51:23
**correspondence** [3] - 30:5, 33:7, 41:6
**CORROON** [1] - 2:15
**counsel** [27] - 4:1, 4:2, 12:5, 12:10, 27:8, 33:13, 34:24, 35:20, 36:12, 37:22, 38:6, 40:18, 40:23, 42:12, 44:16, 46:8, 46:23, 47:24, 48:15, 48:19, 49:9, 51:10, 52:8, 53:12, 56:16, 56:18
**Counsel** [2] - 2:13, 2:22
**couple** [3] - 10:13, 11:12, 52:1
**course** [2] - 50:12, 50:14
**COURT** [45] - 1:1, 3:6, 3:15, 3:19, 3:24, 4:9, 4:15, 5:6, 5:10, 5:12, 11:12, 15:17, 17:16, 17:20, 18:2, 21:15, 21:19, 23:20, 27:6, 27:12, 30:20, 32:14, 33:19, 35:18, 36:3, 36:9, 36:23, 37:4, 37:18, 38:4, 40:17, 41:1, 41:7, 41:11, 45:9, 46:22, 47:5, 49:21, 50:9, 51:22, 53:1, 53:3, 53:11, 56:13, 56:15
**court** [1] - 3:11
**Court** [26] - 1:24, 7:22, 8:3, 10:24, 11:15, 21:17, 23:22, 24:21, 26:6, 26:7, 26:13, 32:14, 32:25, 38:18, 40:18, 40:21, 43:21, 44:3, 50:12, 51:6, 52:20, 53:6, 54:16, 55:13, 55:19, 56:9
**Court's** [3] - 38:7, 39:16, 40:1
**courts** [3] - 11:25, 12:6, 12:15
**covered** [4] - 5:17, 18:6, 18:7, 19:13

**Covid** [1] - 10:1
**crazy** [1] - 17:15
**created** [5] - 5:23, 6:5, 12:23, 13:1, 47:19
**cumulative** [1] - 39:15
**cure** [4] - 13:13, 13:14, 14:5, 25:10
**curing** [2] - 13:12, 24:25
**current** [1] - 30:17
**cut** [1] - 17:22
**CYTIVA** [1] - 1:4
**Cytiva** [45] - 3:9, 12:3, 14:9, 18:7, 18:20, 18:22, 19:5, 19:23, 27:5, 27:20, 28:11, 29:4, 29:5, 29:17, 30:4, 31:15, 31:22, 32:9, 32:19, 32:25, 33:3, 33:20, 34:9, 34:18, 35:15, 35:23, 36:6, 36:8, 38:15, 40:6, 41:22, 42:4, 42:6, 42:18, 43:19, 45:5, 45:12, 45:14, 46:13, 48:12, 48:19, 50:17, 50:21, 56:1
**Cytiva's** [6] - 28:25, 29:7, 29:24, 34:14, 35:13, 38:25

# D

**D.C** [1] - 2:4
**damages** [4] - 29:1, 30:1, 32:20, 39:8
**Danahar** [3] - 29:23, 36:8, 38:15
**Danaher** [1] - 28:5
**Darby** [14] - 27:19, 28:10, 30:13, 30:16, 31:18, 33:10, 33:11, 33:14, 34:24, 35:22, 36:4, 36:6, 37:23, 38:11
**Darby's** [9] - 27:16, 28:15, 28:18, 29:5, 30:11, 30:16, 31:24, 32:4, 34:23
**date** [17] - 7:9, 9:17, 10:11, 14:20, 14:23, 16:6, 16:13, 17:3, 17:5, 19:8, 21:11, 21:13, 23:2, 23:7, 24:11, 25:17, 25:20
**dated** [1] - 34:16
**dates** [10] - 7:13, 10:20, 11:23, 14:3, 17:13, 19:8, 20:25, 21:3, 21:6, 21:8

**dating** [1] - 34:7
**David** [2] - 4:13, 5:4
**DAVID** [1] - 2:19
**day-to-day** [1] - 34:25
**days** [5] - 6:1, 9:22, 47:10, 49:8, 54:17
**deadline** [4] - 10:8, 10:9, 11:8, 25:19
**deal** [1] - 43:2
**dealing** [2] - 17:22, 29:20
**deals** [1] - 6:19
**decide** [1] - 16:3
**decided** [2] - 6:13, 8:22
**decides** [1] - 13:20
**decision** [2] - 43:21, 52:21
**declaration** [3] - 28:15, 28:18, 35:7
**declined** [1] - 25:14
**dedicated** [1] - 34:13
**deemed** [1] - 26:1
**Defendant** [2] - 1:9, 2:22
**defendant** [15] - 4:3, 8:3, 25:1, 25:4, 25:13, 25:16, 25:25, 26:5, 27:8, 38:18, 38:21, 39:11, 39:18, 39:25, 56:11
**defendant's** [5] - 11:20, 24:5, 27:1, 38:7, 53:14
**defendants** [1] - 15:22
**defending** [2] - 46:8, 48:19
**deficiencies** [6] - 31:17, 31:22, 36:18, 38:21, 40:18, 55:20
**deficiency** [1] - 35:13
**deficient** [2] - 31:25, 33:18
**definitely** [1] - 36:16
**DELAWARE** [1] - 1:2
**Delaware** [3] - 1:12, 4:1, 9:9
**demonstrate** [1] - 39:1
**demonstrated** [2] - 25:17, 39:17
**demonstrates** [1] - 39:14
**denied** [4] - 24:7, 27:2, 38:9, 53:16
**deposition** [57] - 6:15, 8:13, 8:14, 8:18, 10:15, 10:25, 14:10, 14:17, 15:7, 15:8, 15:10, 15:11, 15:13, 18:24, 19:2, 19:6,

19:10, 21:21, 22:5, 25:11, 26:20, 27:16, 27:21, 31:18, 32:4, 35:2, 38:11, 42:1, 42:9, 42:20, 42:21, 43:11, 43:16, 43:23, 44:2, 44:7, 44:17, 46:1, 46:3, 46:7, 46:10, 47:9, 48:7, 48:14, 49:7, 49:8, 49:19, 50:6, 51:7, 52:19, 52:22, 53:19, 53:25, 54:4, 54:21, 54:22, 55:1
**depositions** [22] - 5:25, 6:2, 6:11, 6:13, 8:16, 8:17, 8:19, 8:22, 9:3, 9:5, 10:13, 10:16, 10:25, 11:6, 11:7, 13:10, 13:14, 13:17, 24:9, 25:12, 25:18, 43:24
**describe** [2] - 47:4, 54:25
**described** [2] - 11:19, 26:2
**description** [4] - 40:19, 44:19, 44:23, 54:10
**designation** [1] - 55:20
**designee** [1] - 42:5
**designs** [1] - 28:21
**despite** [2] - 10:23, 26:16
**determine** [1] - 24:1
**determined** [1] - 38:11
**determining** [1] - 24:19
**developed** [3] - 20:14, 20:17, 20:22
**DeWitt** [9] - 2:3, 4:7, 33:21, 33:22, 35:21, 36:5, 36:20, 37:1, 37:6
**different** [6] - 4:20, 16:21, 16:23, 34:15, 43:3, 46:1
**digits** [1] - 37:2
**direct** [2] - 41:2, 52:13
**directed** [2] - 31:1, 38:19
**directly** [1] - 32:13
**disadvantage** [1] - 55:10
**disagree** [2] - 31:24, 48:20
**disclose** [3] - 14:7, 35:10, 54:25
**disclosed** [3] - 8:2,

24:18, 26:17
**disclosure** [21] - 21:4, 24:20, 25:25, 26:12, 39:23, 41:23, 42:10, 44:6, 45:20, 47:12, 47:21, 52:5, 52:18, 53:15, 53:24, 54:9, 54:10, 54:25, 55:8, 55:13
**disclosures** [2] - 20:20, 43:4
**discovered** [2] - 7:4, 24:16
**discovery** [43] - 3:9, 6:1, 7:19, 9:23, 10:1, 10:3, 10:6, 10:8, 10:12, 10:22, 11:4, 11:7, 13:10, 14:14, 15:22, 18:10, 18:11, 18:12, 18:17, 18:21, 19:15, 19:19, 19:20, 20:3, 20:18, 24:8, 24:21, 25:19, 26:18, 32:15, 32:24, 33:15, 34:6, 35:13, 38:18, 38:22, 39:1, 39:2, 44:6, 52:18, 54:7, 56:2, 56:16
**discussed** [3] - 10:3, 38:24, 41:9
**discusses** [1] - 34:20
**discussing** [1] - 34:13
**discussion** [1] - 43:23
**disjointed** [1] - 49:5
**dispute** [6] - 3:9, 26:23, 32:15, 33:15, 45:21, 56:2
**disputes** [1] - 33:4
**disruption** [2] - 13:4, 25:15
**distinguish** [1] - 52:13
**distinguishable** [1] - 5:20
**distinguishes** [1] - 50:2
**district** [1] - 12:16
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 28:14
**divest** [1] - 29:23
**do-over** [2] - 6:12, 9:18
**docket** [4] - 28:12, 28:15, 45:15
**doctrine** [1] - 45:2
**document** [27] - 33:24, 37:15, 41:21, 42:20, 43:15, 43:22, 44:8, 46:3, 46:7, 46:14, 46:17, 47:22, 48:5, 48:6, 48:7,

48:15, 48:18, 50:1, 50:4, 50:23, 52:3, 52:7, 53:18, 53:21, 54:5, 54:15, 54:19
**documents** [79] - 7:13, 14:23, 15:20, 15:21, 16:1, 16:2, 16:3, 16:6, 16:7, 16:11, 16:13, 16:15, 16:16, 16:21, 16:25, 17:1, 17:3, 17:4, 17:6, 17:11, 17:12, 17:13, 24:14, 25:21, 25:22, 26:17, 27:4, 29:9, 29:12, 29:14, 29:17, 30:10, 30:13, 30:15, 30:23, 30:24, 31:2, 31:3, 31:6, 31:10, 31:19, 31:25, 32:10, 33:1, 33:5, 33:10, 33:11, 33:14, 33:16, 34:1, 34:2, 34:7, 35:9, 35:14, 35:17, 35:19, 36:12, 36:13, 36:18, 37:13, 37:15, 38:1, 38:8, 38:12, 38:17, 38:19, 39:11, 39:12, 39:14, 39:20, 39:21, 46:9, 49:2, 49:11, 50:20, 52:9, 54:8, 55:23
**dominant** [1] - 32:8
**done** [2] - 10:11, 22:24
**door** [1] - 39:24
**down** [1] - 34:24
**Dr** [19] - 27:16, 27:19, 28:10, 28:15, 28:17, 29:5, 30:11, 30:13, 30:15, 30:16, 31:18, 31:24, 32:4, 33:10, 33:11, 33:14, 36:4, 37:23, 38:11
**draft** [6] - 40:11, 42:13, 44:14, 45:3, 53:16, 55:2
**drafted** [1] - 47:20
**drafting** [1] - 54:12
**due** [5] - 9:24, 13:6, 13:8, 20:6, 20:9
**dump** [1] - 17:3
**during** [18] - 6:10, 6:13, 15:13, 18:12, 18:24, 19:2, 19:10, 19:15, 19:19, 20:3, 20:18, 42:1, 49:8, 49:16, 50:7, 51:7, 51:15

## E

**e-mail** [1] - 30:7
**e-mails** [1] - 35:25
**early** [1] - 23:7
**echo** [1] - 5:7
**effect** [2] - 12:15, 20:16
**efficient** [1] - 25:16
**effort** [1] - 30:15
**efforts** [2] - 31:6, 34:3
**either** [7] - 9:14, 14:18, 32:11, 33:12, 43:6, 43:10, 49:19
**elected** [1] - 44:16
**element** [1] - 22:11
**elements** [1] - 40:14
**Elston** [1] - 35:3
**EMANUEL** [1] - 2:19
**Emanuel** [1] - 4:14
**embarked** [1] - 13:15
**emphasize** [1] - 46:6
**end** [6] - 7:19, 9:9, 9:22, 11:11, 26:17, 45:10
**entered** [1] - 40:19
**entire** [1] - 27:20
**entries** [4] - 40:10, 40:15, 41:17, 51:3
**entry** [1] - 40:9
**erroneous** [1] - 24:2
**ESQ** [8] - 1:19, 2:3, 2:3, 2:7, 2:11, 2:16, 2:19, 2:20
**essentially** [6] - 5:25, 6:11, 6:20, 7:2, 14:2, 29:10
**established** [1] - 48:10
**Eva** [1] - 8:20
**event** [1] - 45:16
**eventually** [2] - 32:16, 32:17
**evidence** [12] - 10:21, 11:17, 12:7, 14:3, 21:14, 22:23, 24:24, 26:4, 26:10, 55:10
**Evidence** [1] - 46:4
**evident** [1] - 35:10
**exactly** [6] - 6:4, 14:21, 23:13, 23:15, 30:9, 45:4
**example** [13] - 7:21, 13:22, 18:23, 18:24, 19:5, 19:10, 25:6, 25:7, 36:17, 40:8, 42:8, 46:13, 50:3
**examples** [2] - 34:7, 34:10
**excerpt** [1] - 32:3

**exchange** [1] - 48:17
**exchanged** [1] - 52:7
**exclude** [2] - 11:17, 12:7
**excluding** [1] - 26:10
**excuse** [2] - 21:24, 49:9
**exemplified** [1] - 29:21
**exhibit** [5] - 40:23, 40:25, 41:1, 43:20, 53:25
**Exhibit** [26] - 28:1, 29:21, 34:11, 34:13, 34:14, 34:19, 36:22, 36:25, 37:1, 40:6, 40:8, 40:9, 41:5, 41:14, 41:21, 41:25, 42:6, 42:17, 42:24, 45:25, 47:4, 49:12, 49:17, 50:18, 51:8, 54:5
**exhibits** [5] - 4:21, 35:11, 38:6, 38:24, 43:10
**exist** [9] - 6:8, 30:6, 30:10, 30:11, 30:24, 33:5, 35:19, 38:1, 38:17
**existed** [1] - 35:23
**existence** [4] - 33:1, 38:12, 38:17, 39:12
**existing** [1] - 8:25
**expect** [1] - 53:20
**expected** [2] - 14:11, 56:2
**expert** [8] - 9:22, 9:23, 13:5, 13:8, 13:9, 20:5, 20:8, 25:13
**explain** [1] - 29:18
**explained** [1] - 26:15
**explanation** [8] - 9:6, 14:6, 14:7, 14:24, 15:5, 20:15, 25:14
**explicitly** [1] - 28:16
**express** [1] - 15:23
**extend** [1] - 45:1
**extended** [1] - 45:7
**extending** [1] - 10:3
**extends** [1] - 44:14
**extent** [3] - 48:2, 51:14, 51:17
**extreme** [1] - 26:4, 26:12
**eye** [1] - 18:2

## F

**face** [2] - 47:22, 48:4
**facilitate** [1] - 32:22

**fact** [31] - 6:1, 6:20, 6:25, 7:2, 8:12, 9:1, 9:8, 10:9, 10:24, 11:4, 15:9, 15:12, 18:11, 18:12, 19:3, 19:9, 20:3, 20:18, 22:20, 24:8, 24:9, 24:21, 25:19, 26:18, 38:24, 47:11, 47:25, 48:21, 50:1, 55:22
**factor** [6] - 15:2, 15:3, 25:15, 25:24, 26:22, 26:23
**factors** [15] - 11:16, 11:18, 11:21, 12:1, 12:7, 12:8, 12:16, 12:18, 15:15, 19:22, 19:24, 19:25, 24:22, 24:23, 44:12
**facts** [9] - 7:4, 7:5, 8:5, 8:6, 9:11, 9:15, 10:22, 54:19
**factual** [1] - 15:20, 54:6
**factually** [1] - 5:20
**fails** [1] - 43:16
**failure** [6] - 14:6, 42:22, 43:9, 44:6, 52:18, 52:21
**fairness** [2] - 44:22, 55:7
**faith** [6] - 15:4, 15:12, 21:24, 25:24, 26:2, 26:6
**fall** [1] - 3:19
**Fallon** [1] - 3:7
**FALLON** [1] - 1:16
**familiar** [1] - 53:9
**family** [1] - 49:15
**far** [2] - 12:18, 49:20
**fast** [1] - 10:1
**favor** [4] - 11:21, 13:3, 15:2, 15:16
**featuring** [1] - 28:20
**federal** [2] - 43:15, 52:16
**FELIPE** [1] - 2:20
**Felipe** [2] - 4:13, 27:10
**few** [2] - 30:20, 45:11
**figure** [4] - 16:6, 16:12, 17:2, 17:5
**figured** [1] - 45:9
**filed** [4] - 22:1, 24:10, 38:20, 54:13
**filing** [1] - 44:20
**finally** [3] - 5:23, 17:10, 26:22
**findings** [1] - 28:4
**first** [18] - 3:11, 4:23, 11:24, 12:19, 13:25,

21:7, 21:21, 22:1, 27:23, 40:9, 40:14, 43:1, 43:21, 43:22, 44:2, 47:1, 51:1, 52:22
**fit** [1] - 9:23
**five** [2] - 8:19, 43:18
**focused** [1] - 9:3
**followed** [1] - 46:19
**following** [5] - 3:3, 19:6, 26:19, 38:11, 48:17
**follows** [4] - 24:22, 43:7, 53:17, 54:6
**followup** [1] - 33:8
**FOR** [1] - 1:2
**forced** [1] - 21:12
**forecloses** [1] - 20:18
**form** [9] - 29:1, 39:23, 41:23, 47:12, 52:6, 53:15, 53:24, 54:9, 54:25
**forward** [6] - 5:24, 7:20, 13:9, 19:8, 21:1, 21:8
**four** [1] - 8:19
**frame** [1] - 56:7
**Francisco** [2] - 2:8, 2:20
**frequently** [1] - 18:18
**Friday** [2] - 13:7, 13:9
**front** [2] - 47:6, 47:18
**FTC** [1] - 29:22
**full** [1] - 32:11
**fully** [1] - 20:9
**fulsome** [1] - 32:23

## G

**gamesmanship** [1] - 14:4
**gap** [1] - 49:16
**GE** [11] - 27:20, 29:15, 31:6, 31:10, 32:9, 34:3, 34:4, 34:9, 34:14, 37:9, 51:10
**GE's** [5] - 29:13, 31:3, 32:1, 34:3, 36:14
**general** [1] - 45:24
**generally** [1] - 25:1
**glaring** [1] - 54:15
**Global** [1] - 3:9
**global** [3] - 34:19, 37:6, 37:8
**GLOBAL** [1] - 1:4
**goals** [2] - 32:19, 39:7
**govern** [1] - 24:4
**governed** [1] - 53:8
**guess** [3] - 6:15, 15:20, 44:8

**H**

guidance [1] - 47:15
guide [1] - 53:22
guided [1] - 11:16
guiding [2] - 12:21, 53:8
GUNNING [1] - 3:13
Gunning [3] - 1:24, 3:14, 3:15

hand [2] - 7:15, 13:19
Hanes [1] - 43:1
happy [1] - 51:18
Harland [1] - 8:20
harm [2] - 9:21, 12:19
harmless [3] - 12:20, 12:22, 13:1
head [1] - 26:16
Healthcare [2] - 27:21, 51:11
hear [9] - 15:18, 17:16, 20:11, 21:17, 22:20, 30:21, 33:19, 45:12, 46:22
heard [10] - 11:14, 20:12, 20:13, 21:21, 37:22, 38:6, 44:24, 47:2, 52:12, 53:11
hearing [4] - 4:18, 9:13, 23:23, 56:1
heavily [3] - 7:22, 10:10, 22:7
held [2] - 3:3, 11:25
helping [1] - 20:10
himself [2] - 47:25, 50:23
hit [1] - 10:1
Hock [1] - 50:12
Hoff [2] - 45:4, 55:11
holder [1] - 43:16
holding [2] - 43:14
Home [1] - 26:8
Honor [43] - 3:13, 3:17, 4:5, 4:11, 5:4, 5:16, 11:10, 15:16, 17:18, 17:21, 23:17, 27:5, 27:10, 30:18, 31:23, 33:4, 33:21, 33:23, 36:5, 36:11, 36:21, 37:21, 38:3, 40:2, 41:3, 42:16, 44:23, 45:4, 45:6, 45:8, 46:21, 46:24, 47:14, 47:17, 48:2, 49:8, 51:25, 52:1, 52:25, 53:2, 56:12, 56:14, 56:18
HONORABLE [1] - 1:16
hope [1] - 14:22
hopefully [1] - 17:25
hoping [1] - 20:22
house [1] - 42:12
hundreds [4] - 16:1, 16:11, 16:17, 16:18
hypothetical [1] - 45:19
hypothetically [1] - 38:16

**I**

i.e [1] - 32:20
IBM [1] - 43:2
idea [9] - 15:6, 22:8, 30:4, 42:2, 42:19, 47:18, 52:3, 54:11, 55:1
ideally [1] - 53:18
identical [1] - 23:16
identified [7] - 4:17, 7:13, 10:20, 24:15, 25:21, 40:10, 45:4
identify [5] - 7:24, 8:11, 29:15, 34:1, 51:3
identifying [2] - 31:10, 38:8
immediate [1] - 53:20
immediately [3] - 43:17, 46:15, 48:17
implications [1] - 42:23
importance [1] - 26:24
important [16] - 10:8, 18:8, 19:12, 19:22, 20:1, 27:15, 27:22, 28:16, 29:25, 30:1, 36:13, 42:3, 47:17, 50:2, 50:14, 52:15
importantly [1] - 49:15
imposing [1] - 26:13
improper [1] - 55:20
IN [2] - 1:1, 1:2
in-house [1] - 42:12
inadvertent [1] - 45:19, 52:17, 55:14
inapplicable [1] - 23:4
inapposite [1] - 43:1
inaudible [2] - 35:1, 44:13
INC [1] - 1:8
include [4] - 8:10, 8:14, 24:23, 34:20
included [1] - 40:24
including [2] - 9:3, 20:17
inconsistency [4] - 29:7, 34:17, 34:23,
35:6
inconsistent [4] - 28:9, 28:17, 32:18, 39:6
incorporated [1] - 42:13
incorporates [2] - 45:17, 54:2
increase [1] - 31:6
incumbent [1] - 52:8
indicate [2] - 54:15, 55:17
indicates [3] - 26:9, 38:13, 47:23
indicating [1] - 48:5
indications [1] - 10:23
indulgent [1] - 12:6
infirmities [1] - 55:16
inflect [1] - 20:24
information [28] - 8:2, 8:6, 15:7, 18:12, 18:21, 19:15, 19:17, 19:18, 22:15, 26:24, 30:1, 30:6, 30:22, 33:16, 35:5, 37:24, 42:12, 45:20, 48:22, 48:24, 50:16, 50:18, 51:4, 51:12, 51:13, 51:15, 55:6, 55:9
infringement [2] - 8:9, 29:4
infringing [1] - 7:25
initial [2] - 21:6, 22:14
injected [1] - 48:23
injunction [4] - 27:18, 28:12, 28:19, 35:6
instance [3] - 6:22, 26:5, 53:21
instead [1] - 21:11
instruct [2] - 5:12, 55:18
intent [1] - 50:17
intentional [3] - 44:16, 48:9, 55:14
intentionally [1] - 55:6
interchangeable [4] - 21:25, 22:2, 22:4, 28:22
interested [1] - 47:8
interference [2] - 5:14, 13:23
interim [3] - 49:17, 50:1, 50:8
intern [2] - 3:19, 3:21
interrogatories [1] - 39:10
interrogatory [9] - 4:24, 5:22, 7:6, 7:11, 17:9, 20:4, 20:20, 24:10, 31:2
Interrogatory [3] - 5:1, 15:19, 24:6
interrupt [1] - 17:22
interview [2] - 14:22, 17:4
interviewed [1] - 14:19
introduced [2] - 18:8, 53:24
invented [2] - 13:25, 54:12
invention [17] - 19:4, 22:9, 22:11, 41:23, 41:24, 42:2, 42:10, 44:20, 44:23, 47:4, 50:23, 52:5, 53:15, 53:24, 54:9, 54:25, 55:1
inventor [4] - 8:21, 50:22, 51:8, 51:16
inventors [1] - 18:25
inventory [1] - 39:23
investigated [2] - 14:9, 48:25
investigation [7] - 7:12, 7:16, 26:20, 35:24, 36:1, 36:4, 37:22
invoked [1] - 55:15
involved [2] - 23:17, 33:13, 35:1, 46:9
issue [30] - 4:23, 10:18, 11:5, 18:1, 18:5, 21:21, 22:11, 23:1, 23:21, 26:16, 27:3, 27:6, 27:11, 27:13, 30:2, 32:18, 35:19, 35:21, 39:22, 40:5, 41:9, 44:11, 47:1, 47:8, 47:16, 51:1, 51:5, 51:19, 53:10, 55:24
issues [10] - 4:20, 10:2, 29:21, 32:22, 39:18, 49:1, 53:9, 55:19, 56:4
issuing [1] - 23:23
item [4] - 40:1, 45:15, 54:5
items [2] - 55:16, 55:21
itself [4] - 29:23, 39:4, 47:23, 51:12

**J**

JENNIFER [1] - 2:3
Jennifer [1] - 4:7
jeopardized [2] - 25:17, 25:20
jettisoned [1] - 16:20
job [3] - 9:15, 15:13, 22:17
JOHN [1] - 1:19
John [1] - 4:6
joined [1] - 3:20
joining [2] - 3:20, 4:6
Judge [2] - 3:7, 23:25
JUDGE [1] - 1:16
judgment [3] - 43:25, 49:18, 50:5
July [4] - 10:5, 11:1, 24:7
June [2] - 10:25, 11:1
justification [4] - 6:3, 6:5, 6:8, 6:9
justify [2] - 14:15, 14:18

**K**

KAYE [3] - 2:2, 2:7, 2:11
keep [3] - 18:2, 18:9, 19:22
KELLER [1] - 1:19
kept [1] - 50:6
key [3] - 19:4, 22:10, 46:20
kids [1] - 17:23
kill [1] - 23:15
kind [5] - 6:17, 13:18, 15:4, 16:4, 51:13
Knauer [15] - 27:15, 27:22, 28:2, 29:19, 32:3, 32:5, 34:11, 34:14, 34:21, 35:3, 35:9, 35:14, 37:9, 37:24, 39:2
known [1] - 27:20
Kramer [2] - 43:8, 43:10

**L**

LABORATORIES [1] - 1:8
Laboratories [1] - 3:10
last [8] - 11:1, 15:3, 26:22, 30:3, 37:1, 37:21, 48:13
late [5] - 9:7, 21:3, 21:4, 24:20, 26:12
law [7] - 3:16, 19:14, 21:2, 24:2, 43:15, 51:18, 52:16
lead [1] - 5:3
learn [1] - 28:2
learned [1] - 27:22

learning [1] - 32:4
least [4] - 8:19, 31:19, 40:14, 46:15
left [1] - 37:8
legal [2] - 9:8, 9:11
Leonard [1] - 51:11
less [2] - 12:6, 20:8
letter [2] - 36:2, 46:19
level [1] - 50:25
LIE [1] - 1:5
Life [1] - 3:10
light [9] - 8:5, 11:22, 18:12, 18:17, 18:21, 19:2, 19:18, 31:12, 39:13
likely [6] - 12:7, 28:6, 28:25, 30:6, 32:7, 38:14
limitation [1] - 22:2
limitations [2] - 22:15, 40:24
limited [1] - 55:5
line [6] - 3:18, 3:22, 4:4, 4:10, 4:13, 42:8
lines [2] - 41:25, 52:4
list [1] - 15:19
listening [1] - 4:16
listing [1] - 15:23
litigation [16] - 5:24, 7:8, 9:2, 13:15, 18:18, 20:13, 20:14, 20:17, 20:21, 24:17, 25:2, 32:21, 37:17, 39:7, 50:7, 55:7
LLC [1] - 1:5
LLP [6] - 1:19, 2:2, 2:7, 2:11, 2:15, 2:19
log [9] - 40:6, 40:8, 40:20, 51:3, 51:14, 55:17, 55:20, 55:21, 56:5
logged [1] - 40:11
logging [1] - 55:16
look [13] - 6:19, 7:21, 12:11, 12:19, 14:22, 17:11, 19:6, 30:7, 30:25, 40:7, 48:22, 49:10, 52:4
looked [4] - 7:13, 33:9, 35:24, 48:25
looking [4] - 6:25, 36:21, 41:2, 47:19
looks [1] - 31:12
lose [2] - 23:8, 23:12
loser [1] - 12:25
lost [2] - 29:1, 32:20
Lunar [1] - 52:17
Lunar's [1] - 52:18
LunarGaming [9] - 43:9, 43:11, 43:13,

43:18, 43:20, 50:3, 50:4, 52:13, 53:10
Lundkvist [9] - 8:21, 18:24, 19:11, 46:8, 51:8, 53:25, 54:4, 54:8, 54:20
Lundqvist [5] - 41:23, 42:4, 42:7, 46:2, 52:3
Lundqvist 's [1] - 51:7

**M**

Magistrate [1] - 3:7
MAGISTRATE [1] - 1:16
mail [1] - 30:7
mails [1] - 35:25
maintain [1] - 31:6
majority [1] - 16:20
malpractice [1] - 6:23
maneuvering [1] - 25:8
manner [1] - 40:19
manufacture [1] - 34:22
March [1] - 34:10
market [31] - 29:3, 29:13, 29:16, 31:4, 31:7, 31:11, 32:1, 32:2, 32:7, 32:8, 32:11, 32:12, 32:23, 34:3, 34:4, 34:8, 34:15, 35:8, 36:14, 37:6, 37:15, 38:9, 38:23, 39:3, 39:4
marketed [1] - 28:22
markets [1] - 32:1
matched [1] - 24:17
material [4] - 44:15, 44:18, 46:11, 53:16
materials [9] - 40:11, 41:13, 41:18, 42:14, 42:15, 43:12, 44:22, 45:3, 55:3
Mats [1] - 8:20
Matt [1] - 8:20
matter [13] - 32:24, 39:24, 40:20, 44:19, 44:21, 45:2, 45:24, 47:13, 50:11, 50:25, 55:2, 55:5, 55:14
matters [1] - 45:7
mean [8] - 14:8, 16:4, 16:8, 32:6, 33:2, 37:22, 38:1, 46:13
meant [1] - 30:9
meet [3] - 30:9, 41:10, 55:18
memo [1] - 44:8

mention [1] - 27:14
mentioned [3] - 19:10, 21:20, 28:7
Merex [1] - 55:12
Meyers [1] - 26:8
MICHAEL [1] - 2:11
Michael [1] - 4:8
microphone [3] - 5:13, 49:22, 49:24
might [1] - 31:18
mind [6] - 18:9, 19:22, 36:24, 45:11, 47:7, 48:6
minimize [1] - 32:8
misleading [1] - 55:9
missing [1] - 40:13
modular [6] - 28:21, 29:13, 29:16, 34:5, 38:9, 54:10
modules [6] - 19:1, 21:23, 21:25, 22:3, 22:4, 28:22
moment [3] - 17:8, 31:14, 36:23
month [2] - 6:14
months [1] - 15:22
moreover [1] - 25:10
morning [1] - 17:25
most [2] - 31:8, 39:13
motion [7] - 4:19, 4:20, 4:21, 24:5, 24:7, 27:1, 32:17, 37:19, 38:7, 38:25, 39:19, 40:6, 43:24, 44:15, 49:18, 50:5, 53:14
motions [1] - 24:4
Mountain [3] - 45:5, 50:12, 55:12
move [5] - 5:8, 11:22, 23:3, 27:3, 30:10
moveable [1] - 19:2
moved [3] - 19:7, 21:1, 21:7
moving [6] - 21:3, 23:2, 23:10, 23:13, 24:11, 42:16
MR [38] - 4:5, 4:11, 5:4, 5:9, 5:11, 5:16, 11:24, 13:7, 13:8, 15:25, 17:18, 17:21, 18:4, 21:18, 21:20, 27:5, 27:10, 27:13, 31:23, 33:2, 36:11, 37:21, 40:2, 40:22, 41:3, 41:5, 41:8, 41:12, 45:23, 46:24, 47:14, 49:25, 50:10, 51:25, 53:2, 53:4,

56:12, 56:14
MS [9] - 3:13, 3:17, 3:22, 33:21, 35:21, 36:5, 36:20, 37:1, 37:6
multiple [4] - 9:4, 32:23, 35:14, 37:14
must [2] - 38:1, 44:5
mute [4] - 5:13, 21:16, 49:24, 51:24
muted [1] - 49:23
muting [1] - 49:24

**N**

named [1] - 18:25
naturally [1] - 11:14
NDC [1] - 28:19
nearly [1] - 24:11
necessary [1] - 40:13
need [4] - 23:11, 45:1, 46:6, 47:6
needed [1] - 49:3
needs [2] - 26:13, 39:16
nevertheless [1] - 18:15
new [14] - 2:12, 6:20, 8:5, 8:15, 9:1, 10:22, 10:23, 16:20, 22:16, 22:20, 22:23
New [2] - 2:12, 28:14
newly [2] - 7:4, 24:16
next [2] - 13:7, 13:8
nine [1] - 28:12
NISHIMOTO [12] - 2:7, 17:18, 17:21, 18:4, 27:5, 46:24, 47:14, 49:25, 50:10, 53:2, 53:4, 56:14
Nishimoto [12] - 4:7, 17:19, 21:20, 22:20, 30:8, 33:9, 46:25, 49:21, 52:2, 52:12, 52:23, 53:5
NO [1] - 1:9
noise [1] - 5:14
nondispositive [1] - 24:4
none [1] - 4:18
nonetheless [1] - 26:18
note [5] - 36:13, 42:3, 47:17, 50:14, 53:6
noted [4] - 41:14, 49:8, 51:6, 55:4
nothing [12] - 15:11, 22:16, 47:22, 48:4, 48:6, 48:11, 49:16, 50:1, 50:7, 50:19,

54:14
notice [1] - 11:2
noting [1] - 42:18
notwithstanding [1] - 15:23
Number [2] - 5:1, 24:6
number [8] - 20:13, 29:10, 37:2, 40:1, 45:15, 49:2, 53:22, 54:5
numbers [1] - 40:9
numerous [1] - 34:7

**O**

o'clock [1] - 1:13
object [6] - 43:9, 43:16, 44:6, 44:16, 52:18, 52:21
objected [1] - 42:21
objection [3] - 47:9, 47:16, 53:20
objections [2] - 23:25, 24:3, 56:7
obligations [2] - 34:6, 35:13
observation [2] - 18:5, 18:16, 51:2
observing [1] - 4:16
obviously [2] - 13:9, 22:6
occurred [2] - 8:14, 9:6
occurs [1] - 9:9
OF [1] - 1:2
offered [4] - 20:2, 20:10, 24:24, 25:10
office [1] - 49:14
Office [3] - 13:23, 14:1
Official [1] - 1:24
one [37] - 8:15, 8:18, 9:4, 9:14, 11:1, 11:3, 12:2, 13:2, 13:19, 13:22, 15:5, 15:17, 18:24, 19:5, 19:12, 22:25, 23:10, 24:8, 28:16, 30:3, 34:14, 35:22, 36:12, 36:17, 37:14, 37:21, 40:3, 41:3, 41:10, 44:15, 45:24, 46:14, 46:17, 48:6, 49:7, 52:2, 53:19
one-off [1] - 37:14
ones [1] - 30:21
opening [1] - 25:13
opens [1] - 39:23
operating [2] - 6:24, 7:1
opinion [1] - 49:15

opportunity [2] - 14:13, 20:9
opposing [2] - 35:20, 40:18
opposition [7] - 29:18, 30:4, 41:22, 42:19, 43:19, 47:2, 48:13
order [13] - 23:22, 23:24, 24:1, 32:8, 42:12, 45:14, 45:17, 46:19, 53:7, 53:9, 54:2, 55:9, 56:8
orderly [1] - 25:16
origin [1] - 49:12
original [1] - 16:21
otherwise [1] - 10:24
ourselves [1] - 10:19
outside [2] - 30:15, 33:12
outstanding [2] - 5:22, 7:6
overlap [1] - 29:24
own [3] - 15:7, 22:24, 43:14
Ownership [1] - 26:8

**P**

p.m [3] - 1:13, 3:4, 56:19
P0 [2] - 19:1, 21:22
P1 [1] - 19:9
page [17] - 28:1, 30:7, 32:4, 37:3, 37:5, 40:9, 40:24, 41:5, 41:8, 41:14, 41:25, 42:8, 42:11, 43:17, 52:4, 52:8, 52:14
pages [4] - 34:13, 42:8, 47:6, 54:20
pan [1] - 9:19
panel [1] - 28:21
papers [12] - 11:13, 11:15, 26:2, 28:14, 28:16, 29:10, 35:20, 40:24, 51:19, 51:20, 55:25
paragraph [4] - 28:17, 45:16, 48:13, 54:1
part [2] - 26:11, 44:4
partially [1] - 46:15
participants [2] - 38:23, 39:3
participate [2] - 32:12, 34:4
participated [1] - 29:15
participation [1] - 54:12
parties [16] - 8:13,

9:10, 12:2, 12:5, 12:10, 12:17, 13:24, 14:2, 14:10, 18:16, 26:23, 30:5, 32:8, 41:6, 55:18, 56:3
party [15] - 13:19, 20:16, 23:24, 24:24, 26:12, 27:14, 27:22, 28:6, 29:23, 32:2, 32:23, 43:5, 44:4, 49:19, 55:6
passage [1] - 52:15
past [2] - 10:5, 11:7
Patent [2] - 13:23, 13:25
patent [14] - 7:8, 23:6, 40:11, 41:18, 42:13, 44:14, 44:18, 44:20, 45:3, 51:9, 51:15, 53:16, 54:13, 55:2
patentee [2] - 21:2, 21:10
patents [2] - 24:12, 42:11
patents -in-suit [1] - 24:12
Pause [1] - 41:4
paused [1] - 45:10
Pennypack [14] - 11:16, 11:18, 11:21, 12:1, 12:7, 12:11, 12:18, 19:22, 19:24, 24:22, 26:7, 26:8, 26:23
people [6] - 6:23, 16:12, 23:3, 23:5, 23:13, 33:13
perceived [1] - 31:21
perfect [1] - 53:19
perhaps [1] - 32:17
period [7] - 18:11, 18:13, 19:19, 19:20, 20:3, 20:18, 24:21
periods [1] - 37:14
person [3] - 35:3, 35:22, 51:3
Pharmaceuticals [1] - 12:4
phrased [1] - 34:2
picked [1] - 23:6
piece [1] - 23:14
pieces [1] - 7:7
pile [1] - 17:3
place [1] - 40:14
plaintiff [23] - 4:1, 5:18, 7:24, 8:1, 8:7, 10:4, 12:3, 15:18, 16:14, 17:17, 24:10, 25:8, 25:10, 26:18, 30:21, 38:10, 38:13,

39:6, 39:17, 46:25, 54:1, 54:18, 56:13
Plaintiffs [2] - 1:6, 2:13
plaintiffs [6] - 4:4, 4:6, 4:24, 6:4, 9:25, 10:9
plaintiffs ' [9] - 4:2, 7:5, 24:6, 24:19, 38:22, 39:13, 46:23, 55:2, 55:13
planned [1] - 10:19
plausible [3] - 14:25, 22:5
plausibly [1] - 26:18
play [1] - 53:19
playbook [1] - 34:19
played [1] - 32:7
player [2] - 29:3, 35:9
playing [1] - 13:18
point [17] - 11:24, 18:5, 19:21, 20:25, 22:25, 23:1, 28:17, 30:3, 32:17, 36:12, 37:21, 41:12, 46:21, 48:12, 49:16, 50:2, 52:11
pointed [4] - 18:19, 50:11, 52:23, 53:7
pointing [1] - 44:3
points [1] - 52:1
poker [1] - 13:18
Polito [2] - 3:16, 3:20
POLITO [2] - 3:17, 3:22
PORTER [3] - 2:2, 2:7, 2:11
Porter [3] - 4:7, 17:19, 33:22
position [10] - 12:24, 14:16, 16:10, 17:1, 21:9, 29:8, 32:9, 32:21, 39:13, 44:9
positions [2] - 18:17, 32:18, 39:6, 39:9
positive [1] - 12:14
possession [5] - 7:5, 17:12, 19:17, 25:22, 38:15
possibility [2] - 13:12, 24:25
potential [1] - 25:15
Potter [1] - 4:12
POTTER [1] - 2:15
practice [19] - 4:25, 6:7, 7:9, 11:23, 14:14, 16:13, 17:2, 19:7, 21:5, 21:11, 21:13, 22:10, 23:7, 23:18, 24:13, 26:25, 32:17, 34:25, 42:5

precluded [1] - 21:10
prejudice [14] - 11:19, 13:3, 13:12, 13:13, 13:15, 16:8, 16:25, 19:21, 19:25, 20:2, 20:11, 24:23, 25:5, 25:11
prejudiced [1] - 25:2
prejudicial [1] - 9:1
preliminarily [1] - 38:10
preliminary [5] - 27:18, 28:11, 28:19, 35:6, 36:1
preparation [1] - 44:20
prepare [1] - 54:9
prepared [6] - 15:8, 15:9, 15:10, 23:21, 47:24, 53:13
present [1] - 55:19
presentation [1] - 55:10
presented [3] - 10:20, 46:7, 51:19
preserve [1] - 52:10
president [1] - 27:19
press [1] - 29:22
presumably [1] - 33:12
pretty [3] - 22:11, 44:9, 44:10
prevent [1] - 55:9
previously [1] - 25:23
principle [1] - 53:8
privilege [32] - 39:22, 40:6, 40:8, 40:14, 40:20, 41:16, 43:11, 43:16, 43:17, 43:23, 44:2, 44:5, 44:7, 46:14, 47:23, 48:9, 48:10, 48:19, 49:7, 49:12, 51:3, 51:14, 52:10, 52:19, 53:20, 53:23, 54:18, 54:24, 55:16, 55:20, 55:21, 56:5
privileged [16] - 41:19, 43:15, 43:22, 45:20, 46:11, 46:15, 46:18, 48:5, 48:8, 48:15, 48:23, 50:20, 51:12, 53:18, 54:16, 55:21
probed [1] - 7:17
proceed [3] - 4:22, 5:15, 39:25
proceeding [2] - 13:24, 28:19
proceedings [2] - 4:16, 28:12

process [4] - 9:7, 42:11, 51:9, 51:16
produce [1] - 16:11
produced [6] - 15:21, 24:16, 25:23, 35:13, 37:13, 37:16
product [6] - 7:24, 8:11, 8:15, 29:25, 38:9, 55:22
production [14] - 25:13, 29:9, 30:25, 31:3, 31:8, 31:10, 31:17, 31:20, 31:25, 33:17, 38:8, 38:20, 38:22, 53:15
Production [1] - 31:5
profit [1] - 29:1
profits [1] - 32:20
prompt [4] - 47:8
promptly [4] - 44:5, 46:6, 52:17, 56:4
promptness [1] - 47:16
pronged [1] - 45:24
proper [1] - 42:17
proportional [1] - 39:15
proposed [1] - 11:5
prosecution [2] - 47:24, 51:10
protected [2] - 55:6, 55:8
protective [6] - 45:14, 45:17, 46:19, 53:7, 53:9, 54:1
Protein [1] - 37:9
protein [4] - 28:20, 28:23, 29:13, 29:16
prototype [8] - 16:18, 19:1, 19:9, 21:22, 22:4, 22:9
prototypical [1] - 33:15
provide [2] - 18:23, 25:5
provided [6] - 15:19, 18:11, 34:7, 34:10, 39:17, 42:7
provision [1] - 45:25
provisions [2] - 45:18, 54:2
published [1] - 12:14
pull [2] - 40:22, 40:25
pulling [1] - 36:25
purification [4] - 28:20, 28:23, 29:14, 29:16
purpose [1] - 28:23
pursuant [2] - 25:6, 46:18

pursue [1] - 20:22
pursuing [1] - 32:20
push [1] - 10:1
put [7] - 5:13, 7:17, 9:11, 16:24, 17:15, 22:21, 55:6
putting [1] - 31:13

**Q**

quality [1] - 37:7
questioned [1] - 22:7
questioning [4] - 18:25, 48:18, 48:22, 51:8
questions [12] - 11:10, 11:12, 21:6, 23:19, 23:20, 30:18, 33:23, 43:10, 45:11, 46:17, 51:14, 51:17
quick [1] - 52:1
quickly [1] - 40:25
Quinn [1] - 4:14
QUINN [1] - 2:19
quite [2] - 18:18, 19:17
quote [1] - 27:25
quoted [2] - 35:7, 54:19

**R**

Rad [29] - 3:10, 4:10, 5:3, 7:17, 9:21, 11:22, 14:8, 18:6, 18:13, 19:13, 19:16, 20:2, 20:10, 20:14, 29:3, 31:9, 31:16, 34:8, 34:16, 34:22, 35:2, 35:22, 37:9, 37:16, 39:5, 48:15, 49:9, 50:4, 56:10
RAD [1] - 1:8
Rad's [7] - 4:19, 5:1, 14:10, 18:9, 19:24, 29:4, 34:23
radar [1] - 49:20
raise [1] - 38:21
raised [10] - 4:20, 35:20, 35:21, 40:17, 40:23, 41:9, 47:2, 48:12, 49:7
reach [1] - 50:25
read [9] - 4:21, 11:15, 32:3, 38:5, 43:21, 46:4, 47:5, 52:14, 54:4
reading [1] - 53:12
ready [2] - 4:22, 27:3, 39:25

real [1] - 17:13
realized [2] - 21:22, 49:7
really [18] - 5:20, 6:3, 6:8, 6:18, 8:12, 9:21, 9:25, 11:8, 12:21, 14:24, 29:18, 32:23, 33:9, 36:13, 37:23, 55:5, 55:11, 55:25
reason [2] - 10:21, 16:5
reasonable [4] - 7:23, 16:10, 21:24, 22:13
reasoning [1] - 44:3
reasons [3] - 27:1, 53:17, 53:22
rebuttal [1] - 21:16
received [2] - 8:8, 32:10
recently [1] - 27:21
recognized [2] - 42:9, 52:5
recognizes [1] - 35:15
record [3] - 53:13, 54:14, 54:20
rectify [2] - 44:5, 52:17
redone [1] - 10:16
reduced [1] - 24:13
reduction [16] - 4:25, 6:7, 7:8, 11:23, 14:13, 16:13, 17:2, 19:7, 21:5, 21:11, 21:12, 22:10, 23:7, 23:17, 26:25, 42:5
referenced [1] - 36:2
references [1] - 25:9
referred [1] - 32:4
reflect [2] - 40:12, 40:15
reflected [2] - 21:2, 21:14
reflects [1] - 40:12
regard [2] - 47:12, 49:17
regarding [3] - 29:1, 30:4, 50:24
regardless [1] - 33:1
regulator [1] - 27:25
regulators [2] - 27:24, 39:9
regulatory [17] - 27:4, 27:14, 28:4, 28:7, 29:6, 29:19, 30:23, 31:19, 32:6, 32:22, 34:18, 36:7, 36:17, 37:25, 38:8, 39:12, 39:20
relate [3] - 16:18, 19:8, 32:1

related [8] - 8:19, 26:24, 29:21, 31:9, 45:3, 45:7, 49:1, 55:8
relates [2] - 27:4, 39:22
relating [1] - 38:22
relative [2] - 36:14, 37:8
relatively [1] - 7:7
release [1] - 29:22
relevant [10] - 8:18, 23:11, 25:8, 26:16, 26:20, 31:4, 31:11, 39:4, 54:10
reliance [4] - 25:3, 42:6, 42:14, 54:24
relied [6] - 10:9, 16:19, 19:23, 42:1, 47:3, 50:23
relief [1] - 19:13
relies [1] - 38:19
rely [5] - 7:3, 7:22, 8:25, 11:9, 54:5
relying [4] - 5:18, 22:6, 22:9, 52:22
remain [1] - 56:5
remainder [1] - 45:2
remaining [4] - 20:5, 25:12, 41:17, 45:3
remember [1] - 54:8
remind [1] - 50:14
repeated [1] - 47:7
Reporter [1] - 1:24
reports [7] - 9:23, 13:5, 13:8, 20:6, 20:9, 25:13, 34:8
representation [1] - 30:14
represented [3] - 12:5, 48:16, 54:14
request [7] - 30:25, 31:3, 31:5, 31:8, 31:9, 31:20, 47:10
requested [1] - 31:13
requests [4] - 29:9, 33:25, 38:18, 38:20
require [1] - 14:1
required [1] - 47:9
requirement [2] - 44:4, 52:17
requirements [1] - 24:3
requires [1] - 55:8
requiring [1] - 11:19
research [2] - 9:10, 34:15
reserved [1] - 50:15
respect [24] - 4:25, 6:7, 7:3, 10:2, 15:1,

24:5, 30:21, 31:20, 32:21, 37:19, 39:2, 39:8, 39:19, 40:1, 44:7, 45:13, 52:19, 53:14, 54:18, 55:15, 55:19, 56:2, 56:5
respond [2] - 30:3, 36:21, 56:18
responded [2] - 17:10, 28:3
responds [1] - 26:18
response [27] - 4:21, 5:1, 5:23, 6:2, 6:21, 9:9, 9:12, 11:3, 15:19, 15:24, 16:20, 18:10, 18:11, 18:22, 20:5, 21:7, 22:14, 24:6, 24:10, 24:15, 24:18, 24:20, 25:3, 25:4, 25:21, 27:2, 38:25
responses [4] - 20:20, 31:14, 31:17, 31:22
responsive [3] - 29:9, 30:1, 33:16
rest [1] - 26:6
result [2] - 41:20, 43:4, 46:2
retained [1] - 33:12
review [1] - 24:1
reviewed [1] - 9:15
RFP [1] - 32:13
RFPs [1] - 33:17
Rights [1] - 12:12
ripe [3] - 40:21, 51:5, 55:25
room [2] - 6:24, 7:1
RTC [2] - 16:9, 23:16
rule [1] - 12:15
Rule [17] - 6:18, 12:13, 20:19, 24:3, 26:19, 30:25, 39:16, 44:4, 44:13, 45:18, 46:4, 46:5, 52:16, 54:2, 56:8
ruled [2] - 44:3, 45:4
ruling [6] - 23:21, 23:25, 38:7, 39:19, 53:13, 54:7
rulings [1] - 56:6
Ryan [3] - 17:19, 46:24, 53:4
RYAN [1] - 2:7

**S**

sake [1] - 30:23
sales [1] - 29:3
san [1] - 2:8
San [1] - 2:20

sanction [2] - 26:4, 26:12
sandbagging [1] - 26:3
satisfied [1] - 34:6
save [1] - 23:6
schedule [3] - 10:1, 10:2, 13:11
scheduling [1] - 10:13
SCHOLER [3] - 2:2, 2:7, 2:11
school [1] - 17:23
SCIENCES [1] - 1:5
Sciences [1] - 3:10
scope [1] - 44:11
sealed [1] - 14:2
search [1] - 30:15
Sebba [1] - 4:8
SEBBA [1] - 2:11
second [7] - 23:1, 27:3, 36:15, 39:20, 41:3, 44:11, 50:6
Section [1] - 25:7
see [4] - 23:14, 32:24, 37:7, 48:21
seeing [1] - 14:4, 54:8
seek [3] - 31:2, 31:3, 31:5
seeking [5] - 18:10, 19:13, 19:14, 29:2, 31:9
seeks [2] - 31:10, 39:5
seem [1] - 31:1
selective [1] - 55:9
sense [1] - 5:19
September [1] - 1:12
serve [3] - 23:22, 23:24, 56:8
served [1] - 7:11
set [2] - 3:8, 10:19
seven [3] - 5:25, 20:5, 34:15
several [3] - 15:22, 18:19, 43:13
share [14] - 29:13, 31:4, 31:7, 32:1, 32:2, 32:7, 32:11, 34:3, 34:8, 36:14, 37:6, 37:15, 39:3
shares [2] - 37:9, 38:23
SHAW [3] - 1:19, 1:19, 4:5
Shaw [1] - 4:6
shed [1] - 39:12
SHERRY [1] - 1:16
Sherry [1] - 3:7
shield [1] - 44:13
shortly [1] - 9:24

**show** [12] - 21:23, 29:7, 29:13, 32:11, 34:1, 34:3, 35:9, 35:14, 36:14, 39:11, 43:7, 43:9
**showed** [1] - 42:14
**showing** [5] - 12:8, 13:18, 25:5, 31:3, 31:6
**shown** [1] - 35:11
**shows** [8] - 13:19, 31:24, 32:10, 35:5, 37:8, 42:1, 42:6, 52:20
**side** [5] - 13:19, 14:3, 20:19, 20:21, 43:7
**sides** [1] - 26:24
**signatures** [1] - 47:25
**significant** [1] - 29:18
**Silverstein** [1] - 4:12
**SILVERSTEIN** [2] - 2:16, 4:11
**single** [2] - 10:15, 22:2
**sit** [1] - 20:7
**situation** [12] - 5:17, 5:21, 6:18, 7:4, 8:4, 8:7, 8:15, 8:24, 12:9, 13:24, 21:1, 55:5
**situations** [2] - 6:19, 50:15
**situs** [1] - 24:20
**six** [3] - 17:8, 22:1, 27:17
**SKLENAR** [1] - 2:3
**Sklenar** [1] - 4:7
**slide** [1] - 46:17
**slightly** [1] - 25:18
**slips** [1] - 22:12
**small** [2] - 16:19, 35:9
**sold** [1] - 28:22
**Solutions** [1] - 3:10
**SOLUTIONS** [1] - 1:5
**sophisticated** [5] - 12:2, 12:5, 12:10, 12:17
**Sorby** [4] - 46:9, 51:11, 52:7, 52:9
**sorry** [3] - 21:18, 51:25
**sort** [1] - 34:17
**Souderman** [1] - 8:20
**sounding** [1] - 5:7
**source** [4] - 8:3, 8:8, 8:10
**Southern** [1] - 28:13
**space** [4] - 28:7, 29:19, 32:9, 36:6
**Spalding** [2] - 40:7, 41:16
**speaking** [4] - 5:13,

6:4, 37:12, 51:2
**speaks** [1] - 42:23
**specific** [6] - 25:5, 27:25, 39:1, 40:9, 42:22, 43:8
**specifically** [8] - 8:10, 16:15, 27:15, 31:1, 31:13, 38:19, 41:24, 49:1
**spectrum** [5] - 28:5, 32:5, 32:12, 37:25
**speculates** [1] - 25:25
**speculation** [1] - 26:6
**spelled** [1] - 55:25
**spot** [1] - 46:16
**sprung** [1] - 19:16
**spur** [1] - 17:8
**stand** [1] - 47:12
**standard** [1] - 7:7
**standing** [1] - 54:15
**star** [1] - 43:18
**start** [5] - 3:25, 4:23, 16:17, 18:4, 33:24
**started** [2] - 10:25, 40:4
**starting** [2] - 4:1, 13:5
**state** [2] - 43:15, 52:16
**statement** [2] - 30:7, 33:7
**statements** [1] - 18:19
**STATES** [1] - 1:1
**States** [1] - 28:24
**states** [1] - 47:23
**stay** [3] - 49:22, 49:23, 56:16
**stenographer** [1] - 3:12
**stepped** [1] - 34:24
**strategy** [14] - 5:24, 9:2, 9:19, 10:20, 12:23, 12:24, 13:1, 13:15, 20:13, 20:14, 20:17, 20:21, 25:4
**strengthen** [1] - 43:25
**strict** [1] - 12:8
**strike** [7] - 11:17, 18:10, 18:15, 19:14, 24:5, 24:19, 27:2
**strikes** [1] - 48:8
**striking** [2] - 26:4, 26:9
**struggling** [1] - 32:24
**stuck** [1] - 7:14
**subject** [14] - 39:24, 41:15, 44:15, 44:19, 44:21, 45:2, 45:7, 47:12, 50:11, 50:25, 54:17, 55:2, 55:4, 55:14
**submission** [1] - 36:6

**submissions** [11] - 27:14, 27:24, 28:8, 29:20, 32:6, 36:1, 36:7, 36:17, 37:25, 38:5, 53:13
**submit** [3] - 14:2, 14:3, 54:10
**submitted** [5] - 10:7, 29:6, 31:15, 38:2, 47:20
**submitting** [1] - 34:18
**subsequent** [5] - 23:23, 30:9, 41:10, 49:19, 52:23
**subsequently** [4] - 42:10, 49:18, 50:5, 50:6
**subset** [1] - 16:19
**subsets** [1] - 16:22
**sufficient** [8] - 29:12, 29:14, 32:11, 34:1, 34:3, 39:11, 47:10
**sufficiently** [1] - 55:24
**suggested** [1] - 31:18
**suggests** [1] - 28:6
**suit** [1] - 24:12
**SULLIVAN** [1] - 2:19
**summarized** [1] - 54:23
**summary** [4] - 41:24, 43:25, 47:20, 49:18, 50:5, 54:11
**supplemental** [16] - 4:24, 5:1, 15:24, 18:10, 18:22, 21:7, 24:6, 24:10, 24:15, 24:18, 24:20, 25:4, 25:11, 25:18, 25:21, 27:2
**supplementation** [1] - 26:1
**supplemented** [4] - 8:9, 19:15, 19:19, 20:4
**supplementing** [2] - 15:18, 20:19
**supplied** [1] - 8:3
**support** [11] - 15:20, 15:23, 16:4, 16:14, 16:17, 17:14, 24:15, 42:2, 43:14, 50:23, 54:6
**supporting** [1] - 42:19
**surprise** [1] - 24:23
**suspected** [2] - 48:7, 48:14
**swapping** [1] - 28:21
**SWEDEN** [1] - 1:4
**Sweden** [1] - 3:9
**sword** [3] - 44:12,

50:17, 50:19
**system** [1] - 54:11
**systems** [5] - 28:20, 29:14, 29:16, 34:5

## T

**tactical** [1] - 55:7
**talks** [1] - 43:3
**teleconference** [3] - 3:9, 56:3, 56:16
**Telephone** [1] - 1:13
**telephone** [2] - 3:3, 56:19
**terms** [2] - 47:19, 53:22
**testified** [8] - 27:21, 30:13, 35:3, 37:23, 41:23, 42:9, 42:11, 52:4
**testify** [1] - 54:24
**testifying** [1] - 42:4
**testimony** [24] - 8:23, 14:10, 14:17, 21:22, 22:23, 26:21, 27:16, 28:9, 28:10, 29:5, 30:11, 30:17, 31:24, 34:23, 42:1, 42:6, 42:8, 48:2, 50:24, 51:16, 52:6, 54:6, 54:22
**Teva** [1] - 12:3
**THE** [46] - 1:1, 1:2, 3:6, 3:15, 3:19, 3:24, 4:9, 4:15, 5:6, 5:10, 5:12, 11:12, 15:17, 17:16, 17:20, 18:2, 21:15, 21:19, 23:20, 27:6, 27:12, 30:20, 32:14, 33:19, 35:18, 36:3, 36:9, 36:23, 37:4, 37:18, 38:4, 40:17, 41:1, 41:7, 41:11, 45:9, 46:22, 47:5, 49:21, 50:9, 51:22, 53:1, 53:3, 53:11, 56:13, 56:15
**themselves** [4] - 4:17, 33:25, 36:7, 39:10
**theory** [16] - 6:16, 7:17, 8:17, 9:2, 9:8, 9:11, 10:17, 11:20, 15:14, 15:20, 16:4, 22:19, 25:2, 30:2, 32:20, 39:8
**thereafter** [1] - 38:21
**therefore** [1] - 55:1
**thinking** [1] - 12:24
**Third** [1] - 26:7
**third** [7] - 27:14,

27:22, 28:6, 32:2, 32:7, 39:22, 43:5
**third-party** [4] - 27:14, 27:22, 28:6, 32:2
**thousands** [3] - 16:1, 16:11, 35:25
**three** [4] - 4:20, 34:20, 37:2, 40:1
**throw** [1] - 13:10
**timely** [1] - 47:10
**timing** [1] - 26:1
**today** [6] - 3:23, 20:7, 20:8, 20:12, 35:15, 44:25
**together** [2] - 9:11, 44:22
**took** [3] - 8:18, 49:10, 54:17
**top** [1] - 34:20
**topics** [1] - 39:6
**total** [1] - 10:17
**tracked** [1] - 34:9
**tracker** [1] - 34:15
**transcript** [9] - 4:17, 23:22, 23:24, 47:5, 47:6, 47:17, 48:2, 54:4, 56:8
**translated** [1] - 51:15
**trial** [5] - 13:5, 25:16, 25:17, 25:19, 32:18
**true** [1] - 15:25
**try** [2] - 23:3, 49:22
**trying** [2] - 21:2, 34:22
**turn** [1] - 37:18
**two** [10] - 9:14, 13:6, 16:23, 18:25, 19:25, 20:8, 29:3, 42:25, 43:8, 45:24
**two-player** [1] - 29:3
**two-pronged** [1] - 45:24
**type** [4] - 9:8, 13:24, 26:11, 52:7

## U

**U.S** [2] - 1:16, 25:7
**unarticulated** [1] - 20:21
**under** [8] - 12:12, 24:3, 39:16, 41:16, 43:14, 44:21, 45:2, 56:8
**undermining** [1] - 25:6
**undisputed** [2] - 24:7, 24:14
**unique** [1] - 5:16
**unit** [1] - 37:8
**United** [1] - 28:23

**UNITED** [1] - 1:1
**units** [1] - 29:22
**unless** [3] - 11:10, 23:19, 30:18
**unobjected** [2] - 43:22, 44:1
**unrelated** [1] - 53:10
**unusual** [3] - 21:9, 48:8, 50:15
**up** [21] - 6:9, 9:12, 9:17, 10:24, 11:22, 14:20, 14:21, 14:23, 15:14, 17:13, 22:14, 24:17, 34:9, 36:25, 40:22, 40:25, 46:19, 49:21, 51:1, 56:2, 56:7
**URQUHART** [1] - 2:19
**USA** [1] - 1:5
**uses** [2] - 43:20, 43:24

# V

**vacation** [1] - 49:15
**vague** [2] - 30:8, 33:7
**Valerie** [2] - 1:24, 3:13
**versus** [3] - 3:10, 26:8, 55:12
**vice** [1] - 27:19
**view** [2] - 39:16, 54:23
**volumes** [1] - 42:23
**vs** [1] - 1:7

# W

**waive** [2] - 43:11, 44:2
**waived** [5] - 43:17, 43:23, 47:11, 48:19, 52:19
**waiver** [26] - 39:24, 40:5, 41:20, 43:2, 43:3, 43:4, 43:7, 43:25, 44:10, 44:12, 44:14, 44:16, 45:2, 45:7, 47:13, 48:9, 48:20, 48:21, 50:11, 50:25, 53:23, 54:18, 54:24, 55:2, 55:5, 55:15
**waives** [1] - 44:7
**wants** [1] - 39:7
**Washington** [1] - 2:4
**Waters** [1] - 37:9
**Webex** [1] - 7:21
**Wednesday** [1] - 1:12
**week** [3] - 11:3, 24:8, 49:15
**weeks** [3] - 13:6, 20:5, 20:8
**weigh** [3] - 11:21,

15:2, 15:15
**Westlaw** [1] - 55:12
**whatsoever** [1] - 35:6
**whereas** [1] - 29:19
**wherein** [1] - 50:4
**whole** [2] - 16:21, 37:24
**willfulness** [2] - 25:24, 26:11
**Wilmington** [1] - 1:12
**wishes** [2] - 23:25, 32:19
**withheld** [1] - 50:20
**withholding** [1] - 25:25
**witness** [10] - 15:10, 24:9, 47:3, 47:18, 47:25, 48:5, 48:10, 48:18, 54:22, 54:24
**witnesses** [12] - 7:12, 9:16, 14:18, 14:20, 14:22, 15:7, 15:9, 17:5, 17:12, 22:7, 22:24, 46:14
**Woods** [1] - 26:8
**works** [2] - 13:3, 13:21
**world** [1] - 53:19
**worse** [1] - 9:17
**worth** [1] - 42:18
**writing** [1] - 23:23
**written** [3] - 10:6, 10:12, 27:13

# Y

**year** [6] - 5:22, 5:23, 7:6, 11:23, 17:10, 24:11
**years** [3] - 17:9, 22:1, 27:17
**York** [3] - 2:12, 28:14

# Z

**Zoom** [2] - 17:23, 17:24

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GE HEALTHCARE BIO-SCIENCES AB, | ) | |
| GE HEALTHCARE BIO-SCIENCES | ) | |
| CORPORATION, and GENERAL | ) | |
| ELECTRIC COMPANY, | ) | C.A. No. 18-1899-CFC |
| | ) | |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| v. | ) | |
| | ) | |
| BIO-RAD LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT BIO-RAD LABORATORIES, INC.'S**
**FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Bio-Rad

Laboratories, Inc. ("Bio-Rad") requests that Plaintiffs GE Healthcare Bio-Sciences AB, GE

Healthcare Bio-Sciences Corporation, and General Electric Company answer, in writing and

under oath, the following Interrogatories within thirty (30) days of service.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is

not explicitly defined, the meaning to be used is the commonly accepted definition of the term.

Notwithstanding any definition set forth below, each word, term, or phrase used in these

Requests for Production is intended to have the broadest meaning permitted under the Federal

Rules of Civil Procedure. In these Requests for Production, the following terms are to be given

their ascribed definitions:

1.      The term "Bio-Rad" shall mean Defendant Bio-Rad Laboratories, Inc. and, where

applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.

2.      "Plaintiffs," "You," "Your," and "GE" shall refer to Plaintiffs GE Healthcare Bio-Sciences AB, GE Healthcare Bio-Sciences Corporation, and General Electric Company, individually and collectively, including, without limitation, all corporate locations of each, and all predecessors, predecessors-in-interest, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationships with GE Healthcare Bio-Sciences AB, GE Healthcare Bio-Sciences Corporation, or General Electric Company and others acting on behalf of GE Healthcare Bio-Sciences AB, GE Healthcare Bio-Sciences Corporation, or General Electric Company.

3.      "This action" shall mean the above captioned litigation, *GE Healthcare Bio-Sciences AB et al. v. Bio-Rad Laboratories, Inc.*, Civil Action No. 1:18-1899-CFC (D. Del.).

4.      "S.D.N.Y. litigation" shall mean *GE Healthcare Bio-Sciences AB et al. v. Bio-Rad Laboratories, Inc.*, Case No. 2:14-cv-07080 (LTS) (S.D.N.Y.).

5.      "Patents-in-Suit" and "Asserted Patents" shall mean United States Patent No. 9,709,589 (the "'589 Patent"), U.S. Patent No. 9,709,590 (the "'590 Patent"), U.S. Patent No. 9,709,591 (the "'591 Patent"), and U.S. Patent No. 9,671,420 (the "'420 Patent").

6.      "Related Patents" shall mean all patents and patent applications claiming priority to Patent Application No. 0950431-7 filed in Sweden on June 9, 2009 and/or to International Patent Application No. PCT/SE2010/050624 filed on June 4, 2010, including U.S. Patent No. 8,821,718, U.S. Patent No. 9,404,902, and U.S. Patent No. RE47,124.

7.      "Documents" shall mean all written, graphic or otherwise recorded material, Including without limitation, electronically stored information regardless of the form of storage medium, microfilms or other film records or impressions, tape recordings or computer cards,

floppy disks or printouts, any and all papers, photographs, films, recordings, memoranda, books, records, accounts, communications, letters, telegrams, correspondence, notes of meetings, notes of conversations, notes of telephone calls, inter-office memoranda or written communications of any nature, recordings of conversations either in writings or upon any mechanical or electrical recording devices, Including e-mail, notes, papers, reports, analyses, invoices, canceled checks or check stubs, receipts, minutes of meetings, time sheets, diaries, desk calendars, ledgers, schedules, licenses, financial statements, telephone bills, logs, and any differing versions of any of the foregoing, whether so denominated, formal, informal or otherwise, as well as copies of the foregoing which differ in any way, including by the addition of handwritten notations or other written or printed matter of any nature, from the original. The foregoing also specifically includes information stored in a computer database and capable of being generated in documentary form, such as electronic mail, text messages (i.e., SMS messages), other electronic messages including messages sent or received via Slack, WhatsApp, Google Hangouts, Facebook Messenger, and the like.

8.      "Communications" shall mean, without limitation, any transmission, conveyance or exchange of a word, statement, fact, thing, idea, Document, instruction, information, demand or question by any medium, whether by written, oral or other means, including but not limited to, electronic communications and electronic mail ("e-mail").

9.      "Thing" shall mean any physical specimen or tangible item in Your possession, custody or control, including without limitation research and development samples, prototypes, productions samples, and the like.

10.      "Person" shall mean any individual, corporation, proprietorship, association, joint venture, company, partnership or other business or legal entity, including governmental bodies

and agencies. The masculine includes the feminine and vice versa; the singular includes the plural and vice versa.

11.　　The term "identify" with respect to a person means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment.

12.　　The term "identify" with respect to a document means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

13.　　"Include" and "including" shall mean including without limitation.

14.　　The terms "all," "any," and "each" shall each be construed as encompassing any and all.

15.　　The words "or" and "and" shall be read both in the conjunctive and in the disjunctive wherever they appear, and neither of these words shall be interpreted to limit the scope of these Requests for Production.

16.　　"Referring to," "relating to," "showing," or "regarding" shall mean containing, describing, discussing, embodying, commenting upon, identifying, incorporating, summarizing, constituting, comprising, or otherwise pertinent to the matter or any aspect thereof.

17.　　The use of the singular form of any word includes the plural and vice versa.

18.　　The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

19.　　"Prior art" shall refer to all systems, products, publications, articles, communications, or other documents describing or explaining Modular Automated Fluid Handling Systems, chromatography systems, or other preparative protein purification systems

that allow for interchangeable fluid handling modules or units and were in existence prior to June 9, 2009.

20.     "Infringe" and "infringement" means direct infringement, contributory infringement, infringement by inducement, literal infringement, and infringement under the doctrine of equivalents.

21.     The term "asserted claims" refers to each and every claim of the Asserted Patents that Plaintiffs contend Bio-Rad infringes. The term "asserted claim" refers to one of the asserted claims.

22.     The phrase "written description" refers to the requirement that "[t]he specification shall contain a written description of the invention" as set forth in 35 U.S.C. § 112 ¶ 1 and *Ariad Pharm., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336 (Fed. Cir. 2010).

23.     The phrase "enabling disclosure" refers to the requirement that "[t]he specification shall contain a written description of . . . the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same" as set forth in 35 U.S.C. § 112 ¶ 1.

24.     The foregoing terms shall carry the same definitions whether they appear capitalized or in lower case.

## **INSTRUCTIONS**

The following instructions apply to these Requests for Production and should be considered as a part of each such INTERROGATORY.

1.     If in responding to these Interrogatories you claim any ambiguity in either an Interrogatory or a definition or instruction applicable thereto, identify in your response the language you consider ambiguous and state the interpretation you are using in responding.

2.      If you object to any of these Interrogatories on any grounds that it is protected from disclosure by the attorney-client privilege, work-product doctrine, or any other privilege, you shall identify (i) the author(s), speaker, addressee(s), any indicated or blind copyee(s), or third parties; (ii) the date; (iii) the subject matter(s) of the information; (iv) the nature of the privilege or immunity asserted; and (v) any additional facts on which you would base your claim of privilege or immunity.

3.      No part of an Interrogatory may be left unanswered merely because you assert an objection to another part of that Interrogatory.

4.      If Plaintiffs contend that Plaintiffs cannot answer any of these Interrogatories completely, Plaintiffs shall answer to the extent possible, specifying the reasons for Plaintiffs' inability to answer the remainder of the Interrogatory, and stating what information, knowledge, or belief Plaintiffs have concerning any unanswered portion.

5.      If Plaintiffs elect to avail themselves of the procedure for answering Interrogatories authorized by Federal Rule of Civil Procedure 33(d), Plaintiffs shall specify the Bates numbers of the documents from which the answer may be derived or ascertained.

6.      Pursuant to Federal Rule of Civil Procedure 26(e), this set of Interrogatories is a continuing one and requires further and supplemental responses by any recipient of this set of Interrogatories as and whenever such person acquires additional information after the time of the initial responses hereunder. Plaintiffs are under a similar duty to correct any incorrect response that they later learns is incorrect.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

For each claim of the Asserted Patents, describe in detail on an element-by-element basis, all facts relating to its conception and reduction to practice, including identifying each purported inventor, the date of conception, the date of reduction to practice of its subject matter, all acts you contend represent diligence occurring between the dates of conception and reduction to practice, each person involved in such conception, diligence and/or reduction to practice and each such person's specific contributions thereto, where the invention was first conceived and/or reduced to practice, when, where, and to whom the invention was first disclosed, and identifying each person, including third parties, who worked on any portion (no matter how trivial) of the subject matter, including any portion of the alleged invention(s) described and claimed in the Asserted Patents, describing in detail each person's role and the dates and places each such person assisted, supervised, or was otherwise so involved, and identifying all documents relating to these facts.

**INTERROGATORY NO. 2:**

State whether Plaintiff contends there are secondary considerations that should be considered by the Court in connection with its determination pursuant to 35 U.S.C. § 103 of the validity of each asserted claim of the Asserted Patents, and if the answer is anything other than an unqualified no for any claim, identify for that claim each such secondary consideration and describe in detail Plaintiffs' contentions as to why each such secondary consideration demonstrates obviousness or nonobviousness and all facts in support thereof, including any documents in support of such facts, testimony from past cases in support of such facts, and any persons with knowledge of such facts.

OF COUNSEL:

Kevin P.B. Johnson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel: (650) 801-5000

David Bilsker
Felipe Corredor
Andrew E. Naravage
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600

Anne S. Toker
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: (212) 849-7000

Dated: May 24, 2019
6224559 / 45671

POTTER ANDERSON & CORROON LLP

By:    /s/ Alan R. Silverstein
       Bindu A. Palapura (#5370)
       Alan R. Silverstein (#5066)
       Jennifer Penberthy Buckley (#6264)
       Hercules Plaza, 6   Floor
       1313 N. Market Street
       Wilmington, DE 19801
       Tel: (302) 984-6000
       bpalapura@potteranderson.com
       asilverstein@potteranderson.com
       jbuckley@potteranderson.com

*Attorneys for Defendant Bio-Rad Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Alan R. Silverstein, hereby certify that on May 24, 2019, true and correct copies of the

within document were served on the following counsel of record at the addresses and in the

manner indicated:

## <u>VIA ELECTRONIC MAIL</u>

| | |
|---|---|
| John W. Shaw | Jennifer Sklenar |
| David M. Fry | Ryan N. Nishimoto |
| Nathan R. Hoeschen | ARNOLD & PORTER KAYE SCHOLER LLP |
| SHAW KELLER LLP | 777 South Figueroa Street, 44th Floor |
| I.M. Pei Building | Los Angeles, CA 90017-5844 |
| 1105 North Market Street, 12th Floor | jennifer.sklenar@arnoldporter.com |
| Wilmington, DE 19801 | ryan.nishimoto@arnoldporter.com |
| jshaw@shawkeller.com | |
| dfry@shawkeller.com | |
| nhoeschan@shawkeller.com | |
| | |
| Matthew M. Wolf | Jeffrey A. Miller |
| Bridgette Boyd | ARNOLD & PORTER KAYE SCHOLER LLP |
| Anne Pearlman | 3000 El Camino Real |
| ARNOLD & PORTER KAYE SCHOLER LLP | Palo Alto, CA 94306-3807 |
| 601 Massachusetts Avenue, NW | jeffrey.miller@arnoldporter.com |
| Washington DC, 20001-3743 | |
| matthew.wolf@arnoldporter.com | |
| bridgette.boyd@arnoldporter.com | |
| anne.pearlman@arnoldporter.com | |

_____/s/ Alan R. Silverstein_____
Alan R. Silverstein

6077685/45671

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GE HEALTHCARE BIO-SCIENCES AB, and GLOBAL LIFE SCIENCES SOLUTIONS USA, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | C.A. No. 18-1899-CFC |
| BIO-RAD LABORATORIES, INC., | ) ) | **CONSOLIDATED** |
| Defendant. | ) ) | |

**PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSES TO DEFENDANT
BIO-RAD LABORATORIES, INC.'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs GE

HEALTHCARE BIO-SCIENCES AB and Global Life Sciences Solutions USA LLC

(collectively "Plaintiffs") hereby provide the following supplemental responses to the First Set of

Interrogatories served by BIO-RAD LABORATORIES, INC. ("Bio-Rad"):

**PRELIMINARY STATEMENT**

Plaintiffs' investigation, discovery and analysis are ongoing, and Plaintiffs' response to

each of these interrogatories is based on information and documents presently available to

Plaintiffs after reasonable inquiry. Plaintiffs reserve the right to supplement or amend these

responses in the event further information and/or documents are disclosed or discovered. In

addition, Plaintiffs' responses are given without prejudice to its rights to introduce as evidence at

trial any subsequently discovered or unintentionally omitted information and/or documents.

Specific objections to each of these interrogatories are made on an individual basis in the

responses below. In addition to these specific objections, Plaintiffs make certain continuing

objections ("General Objections") to the interrogatories. These General Objections are hereby

incorporated by reference into the responses made to each separate interrogatory. For particular emphasis, Plaintiffs have, from time to time, expressly included one or more of the General Objections in certain of its responses below. Plaintiffs' response to each individual interrogatory is submitted without prejudice to, and without in any respect waiving, any General Objections not expressly set forth in that specific response. Accordingly, the inclusion of any specific objection in a response to an interrogatory below is neither intended as, nor shall in any way be deemed to be, a waiver of any General Objections or of any other specific objection made herein or that may be asserted at a later date. In addition, the failure to include at this time any continuing or specific objection to an interrogatory is neither intended as, nor shall in any way be deemed to be, a waiver of Plaintiffs' right to assert that or any other objection at a later date.

No incidental or implied admissions are intended by the responses herein. Plaintiffs' response and/or objections to a particular interrogatory shall not be taken as an admission that Plaintiffs accept or admits the existence of any "fact" set forth in or assumed by that interrogatory.

## **GENERAL OBJECTIONS**

Plaintiffs make the following General Objections to Bio-Rad's interrogatories, including without limitation the instructions and definitions set forth therein, whether or not separately set forth in each response to each individual interrogatory.

1.     Plaintiffs object to the interrogatories to the extent they seek information protected by any relevant privilege or legal protection, including, without limitation, the attorney-client privilege, the work product doctrine, the joint defense privilege, the settlement or settlement negotiation privilege, settlement materials, or trial preparation materials. Any statement herein to the effect that Plaintiffs will provide information in response to an

interrogatory is limited to information that does not fall within the scope of any relevant privilege.

2.      Plaintiffs object to the interrogatories to the extent they are overly broad, unduly burdensome or seek information that is irrelevant to any claim or defense and not reasonably calculated to lead to the discovery of admissible evidence.

3.      Plaintiffs object to the interrogatories to the extent that they are vague, ambiguous, and use unlimited, undefined, subjective or open-ended terms or phrases.

4.      Plaintiffs object to the interrogatories to the extent that the purported benefit of the discovery sought by the interrogatories is outweighed by the burden and expense of responding to the interrogatories pursuant to Rules 26(b)(1) and 26(b)(2) of the Federal Rules of Civil Procedure.

5.      Plaintiffs object to the interrogatories to the extent they attempt to impose burdens on plaintiffs inconsistent with, or in excess of, the requirements of the Federal Rules of Civil Procedure, the Local Rules of this Court, and/or EU or Swedish privacy, data protection or any other applicable laws.

6.      Plaintiffs object to the interrogatories to the extent they seek confidential, proprietary, trade secret, private or financial information that is protected from disclosure by any applicable trade secret or privacy statute or law. Plaintiffs will provide such information only pursuant to the terms of a suitable protective order agreed to by the parties and entered by the court in this action, a suitable protective order entered by the court in response to a party's motion for protective order filed in the action, and/or with the consent of any third party that may claim confidentiality rights with respect to information responsive to the interrogatories.

7.     Plaintiffs object to each interrogatory to the extent it seeks information regarding testifying experts, relating to the opinions of testifying experts, or subject to expert discovery in advance of any deadline set by the Court for experts in its April 20, 2020 Revised Scheduling Order.

8.     Plaintiffs object to the interrogatories to the extent they seek information unknown to Plaintiffs, that refers to persons, entities or events not known to plaintiffs, or that relates to documents not within Plaintiffs' possession, custody, or control. Such a requirement would exceed Plaintiffs' obligations under the Federal Rules and would subject Plaintiffs to unreasonable and undue oppression, burden and expense. In responding to these interrogatories, Plaintiffs shall respond only on behalf of itself and shall not undertake the burden and expense of attempting to provide information presently unknown to Plaintiffs or relating to documents outside Plaintiffs' possession, custody, or control.

9.     Plaintiffs object to the interrogatories to the extent they fail to specify a relevant time period, or to the extent any part of any specified time period is irrelevant to any claim or defense at issue in this case, on the grounds that the interrogatories are overly broad, unduly burdensome, and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

10.    Plaintiffs object to the terms "GE", "You", "Your" and "Plaintiffs" as defined in the interrogatories, as overly broad and unduly burdensome, to the extent the interrogatories purport to seek information relating to persons or entities that are separate and distinct from GE and over whom GE exercises no control. In responding to these interrogatories, GE shall interpret the terms "GE," "You," and "Plaintiffs" to refer only to Plaintiffs GE Healthcare Bio-Sciences AB, GE Healthcare Bio-Sciences Corporation, and General Electric Company.

11.     Plaintiffs object to the definitions of the terms "Patents-in-Suit" and "Asserted Patents" as overly broad and unduly burdensome to the extent that the interrogatories purport to seek information relating to patents other than those specifically listed in the Complaint: U.S. Patent Nos. 9,709,589, 9,709,590, 9,709,591, and 9,671,420.

12.     Plaintiffs object to the definition of the term "Related Patents" as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the cases to the extent it seeks to include within its scope "any and all applications claiming priority to Patent Application No. 0950431-7 filed in Sweden on June 9, 2009 and/or to International Application No. PCT/SE2010/050624 filed on June 4, 2010...."

13.     Plaintiffs object to the term "Documents" as vague, ambiguous, overly broad, and unduly burdensome.

14.     Plaintiffs object to the term "Prior art" as vague, ambiguous, overly broad, and unduly burdensome to the extent it seeks to include within its scope "all systems, products, publications, articles, communications, or other documents describing or explaining [various topics] in existence prior to June 9, 2009."

15.     Plaintiffs object to Bio-Rad's instructions as overly broad and unduly burdensome.

16.     Each and all of these General Objections shall be deemed incorporated by reference into each and every objection made herein to a specific interrogatory.

17.     Discovery and Plaintiffs' investigation in connection with this case are continuing. As a result, Plaintiffs' objections and responses are limited to information obtained and reviewed to date and are given without prejudice to Plaintiffs' right to amend or supplement its objections and responses after considering information or reviewed through further discovery.

Plaintiffs reserve its rights to supplement its responses consistent with the applicable Federal Rules of Civil Procedure and the District of Delaware's Local Rules.

## **INTERROGATORIES**

### **INTERROGATORY NO. 1:**

For each claim of the Asserted Patents, describe in detail on an element-by-element basis, all facts relating to its conception and reduction to practice, including identifying each purported inventor, the date of conception, the date of reduction to practice of its subject matter, all acts you contend represent diligence occurring between the dates of conception and reduction to practice, each person involved in such conception, diligence and/or reduction to practice and each such person's specific contributions thereto, where the invention was first conceived and/or reduced to practice, when, where, and to whom the invention was first disclosed, and identifying each person, including third parties, who worked on any portion (no matter how trivial) of the subject matter, including any portion of the alleged invention(s) described and claimed in the Asserted Patents, describing in detail each person's role and the dates and places each such person assisted, supervised, or was otherwise so involved, and identifying all documents relating to these facts.

### **RESPONSE TO INTERROGATORY NO. 1:**

GE incorporates its General Objections. GE objects to the interrogatory to the extent that it seeks information or documents covered by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. GE also objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks "all facts relating to its conception and reduction to practice" of each claim of the Asserted Patents. GE further objects to this interrogatory as compound and containing multiple subparts asserted in a single interrogatory.

Subject to its general and specific objections, GE responds as follows: GE will identify, pursuant to Federal Rule of Civil Procedure 33(d), documents for which the response to this interrogatory can be derived.

### **FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Plaintiffs hereby incorporate their objections and responses to Bio-Rad's Interrogatories in their entirety.

Subject to its general and specific objections, Plaintiffs supplement their response as follows: Each claim of the Asserted Patents were conceived by Johan Blomberg and Mats Lundquist in or around June of 2005 and reduced to practice no later than in or around December 2005. Additionally, purusant to Federal Rule of Procedure 33(d), Plaintiffs identify the following documents for which the response to this interrogatory can be derived:

GEHC_021910 – GEHC_021918; GEHC_021919 – GEHC_021934; GEHC_026813 – GEHC_026814; GEHC_027017 – GEHC_027017; GEHC_029487 – GEHC_029488; GEHC_029489 – GEHC_029489; GEHC_029491 – GEHC_029491; GEHC_048484 – GEHC_048490; GEHC_048492 – GEHC_048498; GEHC_048544 – GEHC_048554; GEHC_050578 – GEHC_050582; GEHC_050583 – GEHC_050587; GEHC_050589 – GEHC_050594; GEHC_050600 – GEHC_050605; GEHC_050606 – GEHC_050615; GEHC_050616 – GEHC_050626; GEHC_050639 – GEHC_050646; GEHC_050647 – GEHC_050652; GEHC_050653 – GEHC_050663; GEHC_050664 – GEHC_050669; GEHC_050670 – GEHC_050678; GEHC_050679 – GEHC_050684; GEHC_050685 – GEHC_050692; GEHC_050697 – GEHC_050704; GEHC_050705 – GEHC_050711; GEHC_051363 – GEHC_051369; GEHC_051498 – GEHC_051498; GEHC_051499 – GEHC_051499; GEHC_063219 – GEHC_063221; GEHC_063222 – GEHC_063223; GEHC_063224 – GEHC_063225; GEHC_063230 – GEHC_063231; GEHC_063232 – GEHC_063233; GEHC_063234 – GEHC_063235; GEHC_063236 – GEHC_063238; GEHC_063239 – GEHC_063243; GEHC_063244 – GEHC_063247; GEHC_063248 – GEHC_063251; GEHC_063252 – GEHC_063258; GEHC_063396 – GEHC_063403; GEHC_066650 – GEHC_066650; GEHC_066651 – GEHC_066651; GEHC_066653 – GEHC_066653; GEHC_072888 – GEHC_072896; GEHC_072897 – GEHC_072908; GEHC_180199 – GEHC_180205; GEHC_185779 – GEHC_185779; GEHC_185780 – GEHC_185780; GEHC_185781 – GEHC_185781; GEHC_188868 – GEHC_188875; GEHC_138865 – GEHC_138866; GEHC_138867 – GEHC_138868; GEHC_138869 – GEHC_138870; GEHC_138871 – GEHC_138872; GEHC_138873 – GEHC_138874; GEHC_138875 – GEHC_138876; GEHC_138877 – GEHC_138879; GEHC_138880 – GEHC_138881; GEHC_138952 – GEHC_138953; GEHC_144475 – GEHC_144478; GEHC_144479 – GEHC_144481; GEHC_144482 – GEHC_144485; GEHC_144486 – GEHC_144490; GEHC_144491 – GEHC_144496; GEHC_144497 – GEHC_144502; GEHC_144503 – GEHC_144507; GEHC_144508 – GEHC_144514; GEHC_144515 – GEHC_144519; GEHC_144520 – GEHC_144527; GEHC_156415 – GEHC_156417; GEHCDEL495087 – GEHCDEL495088; GEHCDEL492820 – GEHCDEL492826; GEHCDEL472253 – GEHCDEL472256; GEHCDEL042936 – GEHCDEL042938; GEHCDEL496160 – GEHCDEL496162; GEHCDEL042930 – GEHCDEL042933; GEHCDEL496154 – GEHCDEL496157; GEHCDEL042926 – GEHCDEL042928;

GEHCDEL042921 – GEHCDEL042924; GEHCDEL496145 – GEHCDEL496148;
GEHCDEL042918 – GEHCDEL042919; GEHCDEL496142 – GEHCDEL496143;
GEHCDEL042908 – GEHCDEL042911; GEHCDEL042912 – GEHCDEL042916;
GEHCDEL496132 – GEHCDEL496135; GEHCDEL496136 – GEHCDEL496140;
GEHCDEL042898 – GEHCDEL042902; GEHCDEL496122 – GEHCDEL496126;
GEHCDEL042891 – GEHCDEL042896; GEHCDEL496110 – GEHCDEL496114;
GEHCDEL042884 – GEHCDEL042889; GEHCDEL496103 – GEHCDEL496108;
GEHCDEL190799 – GEHCDEL190802; GEHCDEL042877 – GEHCDEL042882;
GEHCDEL496096 – GEHCDEL496101; GEHCDEL042872 – GEHCDEL042875;
GEHCDEL490361 – GEHCDEL490362; GEHCDEL190790 – GEHCDEL190797;
GEHCDEL190784 – GEHCDEL190787; GEHCDEL042864 – GEHCDEL042870;
GEHCDEL140755 – GEHCDEL140764; GEHCDEL042853 – GEHCDEL042855;
GEHCDEL042849 – GEHCDEL042851; GEHCDEL042839 – GEHCDEL042846;
GEHCDEL190776 – GEHCDEL190782; GEHCDEL496032 – GEHCDEL496038;
GEHCDEL474275 – GEHCDEL474318

Plaintiffs' investigation is ongoing, and Plaintiffs reserve the right to amend and/or

supplement this response as additional facts become available through discovery.


## INTERROGATORY NO. 2

State whether Plaintiff contends there are secondary considerations that should be considered by the Court in connection with its determination pursuant to 35 U.S.C. § 103 of the validity of each asserted claim of the Asserted Patents, and if the answer is anything other than an unqualified no for any claim, identify for that claim each such secondary consideration and describe in detail Plaintiffs' contentions as to why each such secondary consideration demonstrates obviousness or nonobviousness and all facts in support thereof, including any documents in support of such facts, testimony from past cases in support of such facts, and any persons with knowledge of such facts.

## RESPONSE TO INTERROGATORY NO. 2:

GE incorporates its General Objections. GE objects to the interrogatory to the extent that

it seeks information or documents covered by the attorney-client privilege, the work product

doctrine, or any other applicable privilege or immunity. GE also objects to this interrogatory on

the grounds that it is overly broad and unduly burdensome to the extent that it seeks Plaintiffs to

"describe in detail Plaintiffs' contentions as to why each such secondary consideration

demonstrates obviousness or nonobviousness and all facts in support thereof." GE further

objects to this interrogatory as compound and containing multiple subparts asserted in a single

GEHCDEL129324 – GEHCDEL129367; GEHCDEL129368 – GEHCDEL129374; GEHCDEL129375; GEHCDEL129376 – GEHCDEL129391; GEHCDEL129392 – GEHCDEL129401; GEHCDEL129424; GEHCDEL129425; GEHCDEL129426; GEHCDEL129427; GEHCDEL129428; GEHCDEL129429; GEHCDEL129463 – GEHCDEL129468; GEHCDEL129586; GEHCDEL129587; GEHCDEL129588; GEHCDEL129590; GEHCDEL129594 - GEHCDEL129602; GEHCDEL12980; GEHCDEL437004 - GEHCDEL437006; GEHC_0069390 – GEHC_0069399; GEHC_034403 – GEHC_034469; GEHC_070492 – GEHC_070500; GEHC_070585-GEHC_070591; GEHC_070606; GEHC_007444 – GEHC_007587; GEHC_007588 - GEHC_00802; GEHC_101283 – GEHC_101287; GEHC_158954 – GEHC_158970

Plaintiffs' investigation is ongoing, and Plaintiffs reserve the right to amend and/or supplement this response as additional facts become available through discovery.

<table>
<tr><td>

OF COUNSEL:
Ryan M. Nishimoto
ARNOLD & PORTER KAYE
 SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
(213) 243-4000

Jennifer Sklenar*
Mathew M. Wolf
Amy DeWitt
ARNOLD & PORTER KAYE
 SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5462

Jeffrey A. Miller
Joseph B. Palmieri
ARNOLD & PORTER KAYE
 SCHOLER LLP
3000 El Camino Real
Building 5, Suite 500
Palo Alto, CA 94306
(650) 319-4500

Dated: June 8, 2020

*Admitted in NY and CA only; practice
limited to matters before federal courts and
federal agencies

</td><td>

*/s/ Amy DeWitt*
John W. Shaw (No. 3362)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

</td></tr>
</table>

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on June 8, 2020, this document was served on

the persons listed below in the manner indicated:

### BY EMAIL

David E. Moore
Bindu A. Palapura
Stephanie E. O'Byrne
Alan R. Silverstein
Tracey E. Timlin
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com
asilverstein@potteranderson.com
ttimlin@potteranderson.com

David Bilsker
Andrew E. Naravage
Felipe Corredor
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davidbilsker@quinnemanuel.com
andrewnaravage@quinnemanueal.com
felipecorredor@quinnemanuel.com

Anne S. Toker
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
(212) 849-7000
annetoker@quinnemanuel.com

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5015
kevinjohnson@quinnemanuel.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CYTIVA SWEDEN AB  and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC, ) ) ) ) ) Plaintiffs, ) ) v. ) ) BIO-RAD LABORATORIES, INC., ) ) Defendant. ) | C.A. No. 18-1899-CFC Consolidated |

**PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSES TO DEFENDANT BIO-RAD LABORATORIES, INC.'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs CYTIVA SWEDEN AB and Global Life Sciences Solutions USA LLC (collectively "Plaintiffs") hereby provide the following supplemental responses to the First Set of Interrogatories served by BIO-RAD LABORATORIES, INC. ("Bio-Rad"):

**PRELIMINARY STATEMENT**

Plaintiffs' investigation, discovery and analysis are ongoing, and Plaintiffs' response to each of these interrogatories is based on information and documents presently available to Plaintiffs after reasonable inquiry.  Plaintiffs reserve the right to supplement or amend these responses in the event further information and/or documents are disclosed or discovered.  In addition, Plaintiffs' responses are given without prejudice to its rights to introduce as evidence at trial any subsequently discovered or unintentionally omitted information and/or documents.

1

Specific objections to each of these interrogatories are made on an individual basis in the responses below.  In addition to these specific objections, Plaintiffs make certain continuing objections ("General Objections") to the interrogatories.  These General Objections are hereby incorporated by reference into the responses made to each separate interrogatory.  For particular emphasis, Plaintiffs have, from time to time, expressly included one or more of the General Objections in certain of its responses below.  Plaintiffs' response to each individual interrogatory is submitted without prejudice to, and without in any respect waiving, any General Objections not expressly set forth in that specific response.  Accordingly, the inclusion of any specific objection in a response to an interrogatory below is neither intended as, nor shall in any way be deemed to be, a waiver of any General Objections or of any other specific objection made herein or that may be asserted at a later date.  In addition, the failure to include at this time any continuing or specific objection to an interrogatory is neither intended as, nor shall in any way be deemed to be, a waiver of Plaintiffs' right to assert that or any other objection at a later date.

No incidental or implied admissions are intended by the responses herein.  Plaintiffs' response and/or objections to a particular interrogatory shall not be taken as an admission that Plaintiffs accept or admits the existence of any "fact" set forth in or assumed by that interrogatory.

## **GENERAL OBJECTIONS**

Plaintiffs make the following General Objections to Bio-Rad's interrogatories, including without limitation the instructions and definitions set forth therein, whether or not separately set forth in each response to each individual interrogatory.

US 168082769v1

1.      Plaintiffs object to the interrogatories to the extent they seek information protected by any relevant privilege or legal protection, including, without limitation, the attorney-client privilege, the work product doctrine, the joint defense privilege, the settlement or settlement negotiation privilege, settlement materials, or trial preparation materials.  Any statement herein to the effect that Plaintiffs will provide information in response to an interrogatory is limited to information that does not fall within the scope of any relevant privilege.

2.      Plaintiffs object to the interrogatories to the extent they are overly broad, unduly burdensome or seek information that is irrelevant to any claim or defense and not reasonably calculated to lead to the discovery of admissible evidence.

3.      Plaintiffs object to the interrogatories to the extent that they are vague, ambiguous, and use unlimited, undefined, subjective or open-ended terms or phrases.

4.      Plaintiffs object to the interrogatories to the extent that the purported benefit of the discovery sought by the interrogatories is outweighed by the burden and expense of responding to the interrogatories pursuant to Rules 26(b)(1) and 26(b)(2) of the Federal Rules of Civil Procedure.

5.      Plaintiffs object to the interrogatories to the extent they attempt to impose burdens on plaintiffs inconsistent with, or in excess of, the requirements of the Federal Rules of Civil Procedure, the Local Rules of this Court, and/or EU or Swedish privacy, data protection or any other applicable laws.

6.      Plaintiffs object to the interrogatories to the extent they seek confidential, proprietary, trade secret, private or financial information that is protected from disclosure by any

applicable trade secret or privacy statute or law. Plaintiffs will provide such information only pursuant to the terms of a suitable protective order agreed to by the parties and entered by the court in this action, a suitable protective order entered by the court in response to a party's motion for protective order filed in the action, and/or with the consent of any third party that may claim confidentiality rights with respect to information responsive to the interrogatories.

7.     Plaintiffs object to each interrogatory to the extent it seeks information regarding testifying experts, relating to the opinions of testifying experts, or subject to expert discovery in advance of any deadline set by the Court for experts in its April 20, 2020 Revised Scheduling Order.

8.     Plaintiffs object to the interrogatories to the extent they seek information unknown to Plaintiffs, that refers to persons, entities or events not known to plaintiffs, or that relates to documents not within Plaintiffs' possession, custody, or control. Such a requirement would exceed Plaintiffs' obligations under the Federal Rules and would subject Plaintiffs to unreasonable and undue oppression, burden and expense. In responding to these interrogatories, Plaintiffs shall respond only on behalf of itself and shall not undertake the burden and expense of attempting to provide information presently unknown to Plaintiffs or relating to documents outside Plaintiffs' possession, custody, or control.

9.     Plaintiffs object to the interrogatories to the extent they fail to specify a relevant time period, or to the extent any part of any specified time period is irrelevant to any claim or defense at issue in this case, on the grounds that the interrogatories are overly broad, unduly burdensome, and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4

10.     Plaintiffs object to the terms "GE", "You", "Your" and "Plaintiffs" as defined in the interrogatories, as overly broad and unduly burdensome, to the extent the interrogatories purport to seek information relating to persons or entities that are separate and distinct from GE and over whom GE exercises no control.  In responding to these interrogatories, GE shall interpret the terms "GE," "You," and "Plaintiffs" to refer only to Plaintiffs GE Healthcare Bio-Sciences AB, GE Healthcare Bio-Sciences Corporation, and General Electric Company.

11.     Plaintiffs object to the definitions of the terms "Patents-in-Suit" and "Asserted Patents" as overly broad and unduly burdensome to the extent that the interrogatories purport to seek information relating to patents other than those specifically listed in the Complaint: U.S. Patent Nos. 9,709,589, 9,709,590, 9,709,591, and 9,671,420.

12.     Plaintiffs object to the definition of the term "Related Patents" as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the cases to the extent it seeks to include within its scope "any and all applications claiming priority to Patent Application No. 0950431-7 filed in Sweden on June 9, 2009 and/or to International Application No. PCT/SE2010/050624 filed on June 4, 2010…."

13.     Plaintiffs object to the term "Documents" as vague, ambiguous, overly broad, and unduly burdensome.

14.     Plaintiffs object to the term "Prior art" as vague, ambiguous, overly broad, and unduly burdensome to the extent it seeks to include within its scope "all systems, products, publications, articles, communications, or other documents describing or explaining [various topics] in existence prior to June 9, 2009."

US 168082769v1

15.     Plaintiffs object to Bio-Rad's instructions as overly broad and unduly burdensome.

16.     Each and all of these General Objections shall be deemed incorporated by reference into each and every objection made herein to a specific interrogatory.

17.     Discovery and Plaintiffs' investigation in connection with this case are continuing.  As a result, Plaintiffs' objections and responses are limited to information obtained and reviewed to date and are given without prejudice to Plaintiffs' right to amend or supplement its objections and responses after considering information or reviewed through further discovery. Plaintiffs reserve its rights to supplement its responses consistent with the applicable Federal Rules of Civil Procedure and the District of Delaware's Local Rules.

## **INTERROGATORIES**

## **INTERROGATORY NO. 1:**

For each claim of the Asserted Patents, describe in detail on an element-by-element basis, all facts relating to its conception and reduction to practice, including identifying each purported inventor, the date of conception, the date of reduction to practice of its subject matter, all acts you contend represent diligence occurring between the dates of conception and reduction to practice, each person involved in such conception, diligence and/or reduction to practice and each such person's specific contributions thereto, where the invention was first conceived and/or reduced to practice, when, where, and to whom the invention was first disclosed, and identifying each person, including third parties, who worked on any portion (no matter how trivial) of the subject matter, including any portion of the alleged invention(s) described and claimed in the Asserted Patents, describing in detail each person's role and the dates and places each such person assisted, supervised, or was otherwise so involved, and identifying all documents relating to these facts.

## **RESPONSE TO INTERROGATORY NO. 1:**

GE incorporates its General Objections.  GE objects to the interrogatory to the extent that it seeks information or documents covered by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  GE also objects to this interrogatory on

the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks "all facts relating to its conception and reduction to practice" of each claim of the Asserted Patents.  GE further objects to this interrogatory as compound and containing multiple subparts asserted in a single interrogatory.

Subject to its general and specific objections, GE responds as follows:  GE will identify, pursuant to Federal Rule of Civil Procedure 33(d), documents for which the response to this interrogatory can be derived.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Plaintiffs hereby incorporate their objections and responses to Bio-Rad's Interrogatories in their entirety.

Subject to its general and specific objections, Plaintiffs supplement their response as follows:  Each claim of the Asserted Patents were conceived by Johan Blomberg and Mats Lundquist in or around June of 2005 and reduced to practice no later than in or around December 2005.  Additionally, purusant to Federal Rule of Procedure 33(d), Plaintiffs identify the following documents for which the response to this interrogatory can be derived:

GEHC_021910 – GEHC_021918; GEHC_021919 – GEHC_021934; GEHC_026813 – GEHC_026814; GEHC_027017 – GEHC_027017; GEHC_029487 – GEHC_029488; GEHC_029489 – GEHC_029489; GEHC_029491 – GEHC_029491; GEHC_048484 – GEHC_048490; GEHC_048492 – GEHC_048498; GEHC_048544 – GEHC_048554; GEHC_050578 – GEHC_050582; GEHC_050583 – GEHC_050587; GEHC_050589 – GEHC_050594; GEHC_050600 – GEHC_050605; GEHC_050606 – GEHC_050615; GEHC_050616 – GEHC_050626; GEHC_050639 – GEHC_050646; GEHC_050647 – GEHC_050652; GEHC_050653 – GEHC_050663; GEHC_050664 – GEHC_050669; GEHC_050670 – GEHC_050678; GEHC_050679 – GEHC_050684; GEHC_050685 – GEHC_050692; GEHC_050697 – GEHC_050704; GEHC_050705 – GEHC_050711; GEHC_051363 – GEHC_051369; GEHC_051498 – GEHC_051498; GEHC_051499 – GEHC_051499; GEHC_063219 – GEHC_063221; GEHC_063222 – GEHC_063223; GEHC_063224 – GEHC_063225; GEHC_063230 – GEHC_063231; GEHC_063232 – GEHC_063233; GEHC_063234 – GEHC_063235; GEHC_063236 – GEHC_063238;

7

GEHC_063239 – GEHC_063243; GEHC_063244 – GEHC_063247; GEHC_063248 – GEHC_063251; GEHC_063252 – GEHC_063258; GEHC_063396 – GEHC_063403; GEHC_066650 – GEHC_066650; GEHC_066651 – GEHC_066651; GEHC_066653 – GEHC_066653; GEHC_072888 – GEHC_072896; GEHC_072897 – GEHC_072908; GEHC_180199 – GEHC_180205; GEHC_185779 – GEHC_185779; GEHC_185780 – GEHC_185780; GEHC_185781 – GEHC_185781; GEHC_188868 – GEHC_188875; GEHC_138865 – GEHC_138866; GEHC_138867 – GEHC_138868; GEHC_138869 – GEHC_138870; GEHC_138871 – GEHC_138872; GEHC_138873 – GEHC_138874; GEHC_138875 – GEHC_138876; GEHC_138877 – GEHC_138879; GEHC_138880 – GEHC_138881; GEHC_138952 – GEHC_138953; GEHC_144475 – GEHC_144478; GEHC_144479 – GEHC_144481; GEHC_144482 – GEHC_144485; GEHC_144486 – GEHC_144490; GEHC_144491 – GEHC_144496; GEHC_144497 – GEHC_144502; GEHC_144503 – GEHC_144507; GEHC_144508 – GEHC_144514; GEHC_144515 – GEHC_144519; GEHC_144520 – GEHC_144527; GEHC_156415 – GEHC_156417; GEHCDEL495087 – GEHCDEL495088; GEHCDEL492820 – GEHCDEL492826; GEHCDEL472253 – GEHCDEL472256; GEHCDEL042936 – GEHCDEL042938; GEHCDEL496160 – GEHCDEL496162; GEHCDEL042930 – GEHCDEL042933; GEHCDEL496154 – GEHCDEL496157; GEHCDEL042926 – GEHCDEL042928; GEHCDEL042921 – GEHCDEL042924; GEHCDEL496145 – GEHCDEL496148; GEHCDEL042918 – GEHCDEL042919; GEHCDEL496142 – GEHCDEL496143; GEHCDEL042908 – GEHCDEL042911; GEHCDEL042912 – GEHCDEL042916; GEHCDEL496132 – GEHCDEL496135; GEHCDEL496136 – GEHCDEL496140; GEHCDEL042898 – GEHCDEL042902; GEHCDEL496122 – GEHCDEL496126; GEHCDEL042891 – GEHCDEL042896; GEHCDEL496110 – GEHCDEL496114; GEHCDEL042884 – GEHCDEL042889; GEHCDEL496103 – GEHCDEL496108; GEHCDEL190799 – GEHCDEL190802; GEHCDEL042877 – GEHCDEL042882; GEHCDEL496096 – GEHCDEL496101; GEHCDEL042872 – GEHCDEL042875; GEHCDEL490361 – GEHCDEL490362; GEHCDEL190790 – GEHCDEL190797; GEHCDEL190784 – GEHCDEL190787; GEHCDEL042864 – GEHCDEL042870; GEHCDEL140755 – GEHCDEL140764; GEHCDEL042853 – GEHCDEL042855; GEHCDEL042849 – GEHCDEL042851; GEHCDEL042839 – GEHCDEL042846; GEHCDEL190776 – GEHCDEL190782; GEHCDEL496032 – GEHCDEL496038; GEHCDEL474275 – GEHCDEL474318

Plaintiffs' investigation is ongoing, and Plaintiffs reserve the right to amend and/or supplement this response as additional facts become available through discovery.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Plaintiffs hereby incorporate their objections and responses to Bio-Rad's Interrogatories

in their entirety.

Subject to its general and specific objections, Plaintiffs supplement their response as follows:

Each Asserted Claim of the '124, '420, '589, '590, and '591 Patents was conceived by Johan Blomberg and Mats Lundquist no later than August 2006 and reduced to practice no later than October 2006.

The inventors and those working in conjunction with them were reasonably and continuously diligent in reducing their inventions to practice.

Pursuant to Federal Rule of Procedure 33(d), Plaintiffs identify the following additional documents for which responsive information to this interrogatory can be derived:

GEHC_047703 - GEHC_047731; GEHC_063106 - GEHC_063118; GEHC_069852 - GEHC_069881; GEHC_078582 - GEHC_078601; GEHC_078689 - GEHC_079737; GEHC_128523 - GEHC_128560; GEHC_137189 - GEHC_137192; GEHC_138846 - GEHC_138846; GEHC_138847 - GEHC_138847; GEHC_138848 - GEHC_138851; GEHC_138852 - GEHC_138853; GEHC_138854 - GEHC_138855; GEHC_138856 - GEHC_138857; GEHC_138865 - GEHC_138866; GEHC_138867 - GEHC_138868; GEHC_138869 - GEHC_138870; GEHC_138871 - GEHC_138872; GEHC_138873 - GEHC_138874; GEHC_138875 - GEHC_138876; GEHC_138877 - GEHC_138879; GEHC_138880 - GEHC_138881; GEHC_138882 - GEHC_138884; GEHC_138885 - GEHC_138887; GEHC_138888 - GEHC_138890; GEHC_138891 - GEHC_138892; GEHC_138893 - GEHC_138895; GEHC_138896 - GEHC_138899; GEHC_138900 - GEHC_138902; GEHC_138903 - GEHC_138905; GEHC_138906 - GEHC_138909; GEHC_138911 - GEHC_138914; GEHC_138915 - GEHC_138917; GEHC_138918 - GEHC_138921; GEHC_138922 - GEHC_138925; GEHC_138926 - GEHC_138929; GEHC_138930 - GEHC_138933; GEHC_138934 - GEHC_138937; GEHC_138938 - GEHC_138941; GEHC_138942 - GEHC_138943; GEHC_138944 - GEHC_138944; GEHC_138949 - GEHC_138951; GEHC_138949 - GEHC_138951.; GEHC_188470 - GEHC_188472; GEHCDEL000661 - GEHCDEL000665; GEHCDEL042568 - GEHCDEL042575; GEHCDEL042579 - GEHCDEL042586; GEHCDEL042589 - GEHCDEL042596; GEHCDEL042603 - GEHCDEL042609; GEHCDEL042611 - GEHCDEL042618; GEHCDEL042621 - GEHCDEL042628; GEHCDEL046238 - GEHCDEL046241; GEHCDEL127450 - GEHCDEL127455; GEHCDEL190566 - GEHCDEL190574; GEHCDEL190608 - GEHCDEL190615; GEHCDEL191586 - GEHCDEL191589; GEHCDEL436098 - GEHCDEL436101; GEHCDEL437634 -

9

GEHCDEL437672; GEHCDEL472219 - GEHCDEL472246; GEHCDEL476681 -
GEHCDEL476684; GEHCDEL487848 - GEHCDEL487850; GEHCDEL487848 -
GEHCDEL487850; GEHCDEL490345 - GEHCDEL490347; GEHCDEL492787 -
GEHCDEL492790; GEHCDEL495500 - GEHCDEL495508; GEHCDEL495536 -
GEHCDEL495543; GEHCDEL495547 - GEHCDEL495554; GEHCDEL495557 -
GEHCDEL495564; GEHCDEL495578 - GEHCDEL495584; GEHCDEL495586 -
GEHCDEL495593; GEHCDEL495609 - GEHCDEL495616; GEHCDEL495654 -
GEHCDEL495662; GEHCDEL495775 - GEHCDEL495782; GEHCDEL497476 -
GEHCDEL497479; GEHCDEL042558 - GEHCDEL042566

## INTERROGATORY NO. 2

State whether Plaintiff contends there are secondary considerations that should be considered by the Court in connection with its determination pursuant to 35 U.S.C. § 103 of the validity of each asserted claim of the Asserted Patents, and if the answer is anything other than an unqualified no for any claim, identify for that claim each such secondary consideration and describe in detail Plaintiffs' contentions as to why each such secondary consideration demonstrates obviousness or nonobviousness and all facts in support thereof, including any documents in support of such facts, testimony from past cases in support of such facts, and any persons with knowledge of such facts.

## RESPONSE TO INTERROGATORY NO. 2:

GE incorporates its General Objections.  GE objects to the interrogatory to the extent that it seeks information or documents covered by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  GE also objects to this interrogatory on the grounds that it is overly broad and unduly burdensome to the extent that it seeks Plaintiffs to "describe in detail Plaintiffs' contentions as to why each such secondary consideration demonstrates obviousness or nonobviousness and all facts in support thereof."  GE further objects to this interrogatory as compound and containing multiple subparts asserted in a single interrogatory.  GE further objects to the extent this interrogatory seeks legal conclusions or prematurely seeks expert opinion.  GE further objects to this interrogatory to the extent it is attempting to shift the burden of proof on invalidity to GE.  GE further objects to this interrogatory as premature given the Court's Scheduling Order.

July 24, 2020                              __/s/ *Ryan M. Nishimoto* _____
                                           John W. Shaw (No. 3362)
                                           Nathan R. Hoeschen (No. 6232)
                                           SHAW KELLER LLP
                                           I.M. Pei Building
                                           1105 North Market Street, 12th Floor
                                           Wilmington, DE 19801
                                           (302) 298-0700
                                           jshaw@shawkeller.com
                                           nhoeschen@shawkeller.com
                                           Attorneys for Plaintiffs

                                           OF COUNSEL:
                                           Jeffrey A. Miller
                                           Joseph B. Palmieri
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           3000 El Camino Real
                                           Building 5, Suite 500
                                           Palo Alto, CA 94306
                                           (650) 319-4500

                                           Matthew M. Wolf
                                           Jennifer Sklenar*
                                           Bridgette Boyd
                                           Anne W. Pearlman
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           601 Massachusetts Avenue, NW
                                           Washington D.C. 20001
                                           (202) 942-5462

                                           Ryan M. Nishimoto
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           777 South Figueroa Street, 44th Floor
                                           Los Angeles, CA 90017
                                           (213) 243-4000

                                           Michael J. Sebba
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           250 West 55th Street |
                                           New York, New York 10019
                                           (212) 836-8000

*Admitted in NY and CA only; practice limited to matters before federal courts and federal
agencies

25

US 168082769v1

# CERTIFICATE OF SERVICE

I, Michael J. Sebba,  hereby certify that on July 24, 2020, this document was served on the persons listed below in the manner indicated:

**BY EMAIL**

David E. Moore
Bindu A. Palapura
Stephanie E. O'Byrne
Alan R. Silverstein
Tracey E. Timlin
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com
asilverstein@potteranderson.com
ttimlin@potteranderson.com

David Bilsker
Andrew E. Naravage
Felipe Corredor
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davidbilsker@quinnemanuel.com
andrewnaravage@quinnemanueal.com
felipecorredor@quinnemanuel.com

Anne S. Toker
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
(212) 849-7000
annetoker@quinnemanuel.com

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5015
kevinjohnson@quinnemanuel.com

*/s/ Michael J. Sebba*
John W. Shaw (No. 3362)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

OF COUNSEL:
Jeffrey A. Miller
Joseph B. Palmieri
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Building 5, Suite 500
Palo Alto, CA 94306
(650) 319-4500

Matthew M. Wolf
Jennifer Sklenar*
Bridgette Boyd
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington D.C. 20001
(202) 942-5462

Ryan M. Nishimoto
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
(213) 243-4000

Michael J. Sebba
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street |
New York, New York 10019
(212) 836-8000

*Admitted in NY and CA only; practice limited to matters before federal courts and federal agencies

# EXHIBIT 5

**From:** Felipe Corredor
**Sent:** Thursday, August 6, 2020 5:18 PM
**To:** Nishimoto, Ryan M. <Ryan.Nishimoto@arnoldporter.com>
**Cc:** Silverstein, Alan R. <asilverstein@potteranderson.com>; bpalapura@potteranderson.com;
dmoore@potteranderson.com; Brge Team <BrgeTeam@quinnemanuel.com>; SKGEHealthcare
<SKGEHealthcare@shawkeller.com>; jshaw@shawkeller.com; GE - BioRad <GE-
BioRad@arnoldporter.com>
**Subject:** RE: Cytiva v. Bio-Rad, No. 18-1899 - discovery meet and confer

Ryan,

As to points (1) (Cytiva's improper supplemental response to Interrogatory No. 1) and (4) (privilege
issues), the parties are at an impasse.

However, your email on point (4) makes very concerning, unfounded accusations.  As we have stated
before, Mr. Bilsker had no indication that Exhibit 67 was privileged; it was among his preparation
materials in connection with the conception and reduction to practice 30(b)(6) topic Mr. Lundkvist was
designated on.  You still have provided no explanation whatsoever for how Mr. Bilsker could have
known it was privileged while you, defending the deposition (with superior information on Plaintiffs'
documents than Mr. Bilsker) and with Mr. Sorby attending, sat through Mr. Bilsker's long line of
questioning regarding Exhibit 67 and never thought to claw it back on privilege grounds.  Given the lack
of any indication of privilege, either from the document or from yourself, Mr. Bilsker believed it was
either not privileged or, if it was, Plaintiffs intentionally produced it in order to rely on it.

Your unfounded accusations to the contrary are extremely concerning.  As you know, making
accusations of ethical violations in order to gain an advantage in civil litigation, such as by trying to
rectify a mistake you made in failing to claw back a document Plaintiffs have now decided is privileged,
is itself contrary to your ethical obligations as an attorney.  See Cal. Bar Rule of Prof. Conduct 3.10.  Your
accusations are further not well taken given Mr. Sebba's conduct at the Lee deposition; there, in the
face of a prompt and explicit assertion of privilege over an inadvertently produced slide by Bio-Rad, Mr.
Sebba went off the record in order to continue reviewing the privileged slide notwithstanding Bio-Rad's
assertion of privilege over that slide and to make arguments against privilege based on the slide's
content.  Lee Rough Tr. 82:12-84:9.  Plaintiffs should not be so quick to make unfounded accusations of
ethical violations given your own team's failure to refrain from examining a slide over which Bio-Rad had
asserted privilege.

As to point (2) (documents submitted to regulators), we would like to understand better what Cytiva's
position is, including whether documents exist at all.  A meet and confer might be productive.

As to claim and prior art narrowing, a meet and confer would also be productive.

Please provide Plaintiffs' availability for a meet and confer tomorrow.

Regards,
Felipe

**Felipe Corredor**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

1

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6448 Direct
415.875.6600 Main Office Number
415.875.6700 FAX
felipecorredor@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Nishimoto, Ryan M. [mailto:Ryan.Nishimoto@arnoldporter.com]
**Sent:** Wednesday, August 5, 2020 2:56 PM
**To:** Felipe Corredor <felipecorredor@quinnemanuel.com>
**Cc:** Silverstein, Alan R. <asilverstein@potteranderson.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; Brge Team <BrgeTeam@quinnemanuel.com>; SKGEHealthcare <SKGEHealthcare@shawkeller.com>; jshaw@shawkeller.com; GE - BioRad <GE-BioRad@arnoldporter.com>
**Subject:** RE: Cytiva v. Bio-Rad, No. 18-1899 - discovery meet and confer

<div style="background-color:#FFF2CC; text-align:center; font-weight:bold;">[EXTERNAL EMAIL]</div>

Hi Felipe --

We agree that these issues discussed on July 30 need to be resolved expeditiously and may not drag on indefinitely.

On (1), Bio-Rad has not articulated how it is unable to obtain the discovery it needs to address Cytiva's supplemental interrogatory response, and we again invite Bio-Rad to let us know what that might be.

On (2), Cytiva maintains its position that it has satisfied its discovery obligations by producing the documents sought by Bio-Rad's formal requests.  Moreover, based on preliminary investigation, Cytiva does not believe it has discoverable documents of the type sought.

On (4), we disagree with Bio-Rad's position that Cytiva has waived privilege/work product as to Ex. 67.  None of the testimony provided by Mr. Lundkvist divulged any privileged information relating to Ex. 67.  In fact, Mr. Lundkvist had never seen the document before, didn't know who prepared it, and did not recognize the text contained in the document.  As to counsel's obligations, the minute Mr. Bilker suspected that the document may have been privileged -- which appears to be suggested by his ensuing comment that Mr. Lundkvist may have somehow "waived" a privilege -- Mr. Bilsker had an ethical obligation under Cal. Bar Rule of Prof. Conduct 4.4 to refrain from examining it any more than was necessary to determine it was privileged or work product.  Bio-Rad's counsel is well aware of this obligation, as you have notified us of such inadvertent production in the past.  *See* June 1, 2020 F. Corredor email.  The *Luna Gaming* case cited in your email is readily distinguishable as, for example, none of Mr. Lundkvist's testimony that included privileged information, nor was Ex. 67 used in subsequent depositions or in court filings prior to it being clawed back.

As to claim narrowing, please provide us with a proposal that includes a corresponding reduction in prior art references.

Best regards,
Ryan

_____

Ryan Nishimoto
Arnold & Porter
Office: +1 213.243.4158
Mobile:  +1 323.336.5165
ryan.nishimoto@arnoldporter.com

**From:** Felipe Corredor <felipecorredor@quinnemanuel.com>
**Sent:** Wednesday, August 5, 2020 11:59 AM
**To:** Nishimoto, Ryan M. <Ryan.Nishimoto@arnoldporter.com>
**Cc:** Silverstein, Alan R. <asilverstein@potteranderson.com>;
zzz.External.bpalapura@potteranderson.com <bpalapura@potteranderson.com>;
zzz.External.dmoore@potteranderson.com <dmoore@potteranderson.com>; Brge Team
<BrgeTeam@quinnemanuel.com>; SKGEHealthcare <SKGEHealthcare@shawkeller.com>;
zzz.External.jshaw@shawkeller.com <jshaw@shawkeller.com>; GE - BioRad <GE-
BioRad@arnoldporter.com>
**Subject:** RE: Cytiva v. Bio-Rad, No. 18-1899 - discovery meet and confer

External E-mail

Ryan,

We have not heard back on the below.  Please respond to provide at least Plaintiffs' position on the documents submitted to regulatory authorities as testified to by Dr. Darby, as you said you would by Tuesday, and Plaintiffs' position on claim narrowing.  We are available to meet and confer on the latter tomorrow morning.

Regards,
Felipe

**Felipe Corredor**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6448 Direct
415.875.6600 Main Office Number
415.875.6700 FAX
felipecorredor@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you

3

have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Felipe Corredor
**Sent:** Monday, August 3, 2020 1:19 PM
**To:** Nishimoto, Ryan M. <Ryan.Nishimoto@arnoldporter.com>
**Cc:** Silverstein, Alan R. <asilverstein@potteranderson.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; Brge Team <BrgeTeam@quinnemanuel.com>; SKGEHealthcare <SKGEHealthcare@shawkeller.com>; jshaw@shawkeller.com; GE - BioRad <GE-BioRad@arnoldporter.com>
**Subject:** RE: Cytiva v. Bio-Rad, No. 18-1899 - discovery meet and confer

Ryan,

We disagree with the characterizations in your email.

On the initial matter, we agreed that the parties will not object to motions initiated after the fact discovery period on the issues discussed on the July 30 meet and confer on the grounds of timeliness as long as the parties' continuing resolution efforts take place expeditiously this week, but we did not agree to allow these issues to drag on indefinitely.

On the first issue, the prejudice to Bio-Rad is significant, as Plaintiffs' complete change of their response to Interrogatory No. 1 a week prior to the close of fact discovery, after depositions on conception and reduction to practice were complete, including both percipient and fact witnesses, completely alters Bio-Rad's litigation strategy and gives Plaintiffs an unfair tactical advantage through its sandbagging.  Such prejudice cannot be ameliorated.

On the second issue, we look forward to receiving Plaintiffs' position tomorrow.

On the third issue, we are in receipt of Plaintiffs' supplemental responses and are still evaluating them.

On the fourth issue (privilege), the relevant portions of Mr. Lundkvist's testimony include Tr. at 237:1-242:16.  This series of pages shows that the invention disclosure statement, Exhibit 67, was discussed for numerous pages without any indication from you that it was privileged.  This was even true in light of subsequent questioning in the same area where you instructed the witness not to divulge communications with attorneys.  There was further discussion about waiver on the record, and yet you never indicated or attempted to claw back Exhibit 67.  In addition, as I noted during the meet and confer, Plaintiffs and Bio-Rad do not have access to the same information about Exhibit 67—Plaintiffs obviously have superior knowledge about its origins and import.  Mr. Bilsker did not know or suspect Exhibit 67 was privileged both because it was not marked as such and because parties can waive privilege in an attempt to rely on some documents that support their position and you never objected to the use of the document despite a significant amount of question about it.  Mr. Lundkvist's testimony, your reticence, and Mr. Sorby's knowledge and attendance at Mr. Lundkvist's deposition, should have prompted Plaintiffs to claw back the document at the deposition if their position was that it was a privileged document.  *See, e.g., Luna Gaming–San Diego, LLC v. Dorsey & Whitney, LLP*, 2010 WL 275083, at *5 (S.D .Cal. Jan. 13, 2010).  Moreover, leaving aside the issue of waiver resulting from Exhibit 67, patent application materials that were not communicated between an attorney and client are not even subject to the attorney-client privilege.

4

Finally, upon further review of the Sorby transcript, Bio-Rad will forego a motion to compel answers to questions he was instructed not to answer on privilege grounds.

In addition, I note that Bio-Rad also raised, but you have omitted from your email, the issue of patent claim narrowing.  Please promptly provide Plaintiffs' position on claim narrowing, including timing of such narrowing sufficiently in advance of the opening expert report deadline.  To the extent Plaintiffs are not prepared to expeditiously agree to claim narrowing, we request a meet and confer on this issue, as Bio-Rad may have no choice but to seek relief from the Court.

Regards,
Felipe

**Felipe Corredor**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6448 Direct
415.875.6600 Main Office Number
415.875.6700 FAX
felipecorredor@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Nishimoto, Ryan M. [mailto:Ryan.Nishimoto@arnoldporter.com]
**Sent:** Thursday, July 30, 2020 6:54 PM
**To:** Felipe Corredor <felipecorredor@quinnemanuel.com>
**Cc:** Silverstein, Alan R. <asilverstein@potteranderson.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; Brge Team <BrgeTeam@quinnemanuel.com>; SKGEHealthcare <SKGEHealthcare@shawkeller.com>; jshaw@shawkeller.com; GE - BioRad <GE-BioRad@arnoldporter.com>
**Subject:** RE: Cytiva v. Bio-Rad, No. 18-1899 - discovery meet and confer

**[EXTERNAL EMAIL]**

Hi Felipe --

We write to memorialize the parties' meet-and-confer efforts this afternoon with respect to the issues raised in your July 28 email below.

As an initial matter, we agreed that the parties' respective issues should be subject to further efforts toward resolution, and that the parties will not object to motions initiated after the fact discovery period on the subjects we discussed today on the grounds of timeliness (including the issues raised by Cytiva regarding source code review and our July 29 letter).

On the first issue (Cytiva's supplemental response to interrogatory no. 1), Bio-Rad had not considered whether there was any way to ameliorate its alleged prejudice.  You agreed that Bio-Rad would provide this, to the extent it has an answer.

On the second issue (documents testified to by Dr. Darby and requested in Bio-Rad's letters of July 7 and July 14), you confirmed that Bio-Rad's July 28 request was not intended to expand the scope of the request as set forth in its July 7 and 14 letters.  We agreed to consider the issue and provide a further response tomorrow (Friday) 7/31.

On the third issue (supplemental responses to interrogatory nos. 3, 4, and 9), we confirmed that Cytiva would serve these supplemental responses tomorrow (Friday) 7/31.

On the fourth issue (privilege clawback):

- Bio-Rad agreed to send cites to Mr. Lundkvist's testimony that allegedly waived privilege and to Mr. Sorby's deposition transcript as to the specific objections/instructions with which Bio-Rad takes issue.
- We also discussed whether Bio-Rad's counsel knew or suspected that the document Mr. Bilsker used during the deposition of Mr. Lundkvist (Ex. 67) was privileged during the deposition.  We understood your response to be that Bio-Rad's counsel did not know this document was privileged, and apparently was not aware of this fact until the clawback notice issued.  Please let us know if we misunderstood your statements.
- Finally, Bio-Rad agreed to send authority supporting the idea of waiver where neither counsel nor the witness at deposition knew document was privileged.

Best regards,
Ryan

_____

Ryan Nishimoto
Arnold & Porter
Office: +1 213.243.4158
Mobile:  +1 323.336.5165
ryan.nishimoto@arnoldporter.com

**From:** Felipe Corredor <felipecorredor@quinnemanuel.com>
**Sent:** Tuesday, July 28, 2020 1:58 PM
**To:** Boyd, Bridgette <Bridgette.Boyd@arnoldporter.com>; Silverstein, Alan R. <asilverstein@potteranderson.com>; zzz.External.bpalapura@potteranderson.com <bpalapura@potteranderson.com>; zzz.External.dmoore@potteranderson.com <dmoore@potteranderson.com>; Brge Team <BrgeTeam@quinnemanuel.com>
**Cc:** Miller, Jeffrey <Jeffrey.Miller@arnoldporter.com>; SKGEHealthcare <SKGEHealthcare@shawkeller.com>; zzz.External.jshaw@shawkeller.com <jshaw@shawkeller.com>; GE - BioRad <GE-BioRad@arnoldporter.com>
**Subject:** Cytiva v. Bio-Rad, No. 18-1899 - discovery meet and confer

External E-mail

Counsel,

We write to request a meet and confer on the below issues on Wednesday morning (PT) or Thursday after 3pm PT.  Please let us know what time works for you.

First, Plaintiffs' second supplemental response to Interrogatory No. 1, served on Friday July 24, is entirely untimely and prejudicial.  Bio-Rad believes it is not appropriate for Plaintiffs to change their conception/reduction to practice timeline and cited documents after all depositions of Plaintiffs' witnesses have been completed, nearly a month after the deposition of named inventor Mr. Lundkvist (Plaintiffs' 30(b)(6) witness on the relevant Topic No. 34), and just a week before the close of fact discovery, under the guise of a "supplementation."  Moreover, all of the documents cited in the "supplementation" have been in Plaintiffs' possession since long before Mr. Lundkvist's deposition.

Second, given Plaintiffs' failure to produce the documents discussing Lab AKTA products that were submitted to regulatory authorities in connection with the Danaher acquisition, as testified to by Dr. Darby and requested in Bio-Rad's letters of July 7 and July 14, Bio-Rad intends to move to compel production of such documents.

Third, given Plaintiffs' failure to supplement their responses to Interrogatory Nos. 3 and 4 despite agreeing to do so weeks ago, Bio-Rad intends to move to compel those supplemental responses.  Relatedly, now that the depositions of Bio-Rad's 30(b)(6) designees on damages-related topics have concluded, Bio-Rad also expects Plaintiffs to timely supplement their response to Interrogatory No. 9.

Finally, regarding the motion to compel production of purportedly privileged documents on which the parties have previously met and conferred, Bio-Rad intends to also include improper privilege objections and instructions not to answer made at the Sorby deposition.

Regards,
Felipe

**Felipe Corredor**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6448 Direct
415.875.6600 Main Office Number
415.875.6700 FAX
felipecorredor@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GE HEALTHCARE BIO-SCIENCES AB, GE HEALTHCARE BIO-SCIENCES CORPORATION, and GENERAL ELECTRIC COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> BIO-RAD LABORATORIES, INC., <br><br> Defendant and Counterclaim Plaintiff. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 1:14-cv-07080-LTS-SN |

**DEFENDANT BIO-RAD LABORATORIES, INC.'S**
**THIRD SET OF REQUESTS FOR PRODUCTION**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant Bio-Rad Laboratories, Inc. ("Bio-Rad") requests that Plaintiffs GE Healthcare Bio-Sciences AB, GE Healthcare Bio-Sciences Corporation, and General Electric Company produce for inspection and copying the documents and things set forth below at the offices of Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010 within thirty (30) days of service.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests for Production is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. In these Requests for Production, the following terms are to be given their ascribed definitions:

02030-00002/7300838.1                                 1

1.      In accordance with Local Civil Rule 26.3, the terms "Plaintiff" and "Defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.  This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

2.      "Plaintiffs," "GE," "You," and "Your" shall refer to Plaintiffs GE Healthcare Bio-Sciences AB, GE Healthcare Bio-Sciences Corporation, and General Electric Company, individually and collectively, including, without limitation, all corporate locations of each, and all predecessors, predecessors-in-interest, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationships with respondent and others acting on behalf of respondent.

3.      "Bio-Rad" shall refer to Defendant Bio-Rad Laboratories, Inc. and all its predecessors or successors, parents, divisions, subsidiaries, and affiliates thereof, and all officers, agents, employees, counsel and other persons acting on its behalf.

4.      "'718 patent" shall mean U.S. Patent No. 8,821,718 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

5.      The terms "referring to," "relating to," "showing," or "regarding" shall mean containing, describing, discussing, embodying, commenting upon, identifying, incorporating, summarizing, constituting, comprising, or otherwise pertinent to the matter or any aspect thereof.

6.      "Modular preparative protein purification systems" refers to all systems featuring a "modular panel design allowing for interchangeable placement of the fluid handing units and

which separated the fluidics section from the non-fluidics section," as defined in paragraph 11 of the Declaration of Nigel Darby in Support of Plaintiffs' Motion for a Preliminary Injunction. (Dkt. 11.)

7.      In accordance with Local Civil Rule 26.3, the term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

8.      In accordance with Local Civil Rule 26.3, the term "identify" with respect to a document means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).  In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Federal Rule of Civil Procedure 33(d).

9.      In accordance with Local Civil Rule 26.3, "person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

10.      In accordance with Local Civil Rule 26.3, the term "identify" with respect to a person means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment.

11.      In accordance with Local Civil Rule 26.3, the terms "all," "any," and "each" shall each be construed as encompassing any and all.

12.     In accordance with Local Civil Rule 26.3, the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

13.     In accordance with Local Civil Rule 26.3, the use of the singular form of any word includes the plural and vice versa.

14.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

## INSTRUCTIONS

The following instructions apply to these Requests for Production and should be considered as a part of each such Request for Production.

1.     Each document is to be produced along with all non-identical drafts thereof in their entirety, without abbreviation or redaction.

2.     All documents shall be produced in the order that they are kept in the usual course of business, and shall be produced in their original folders, binders, covers or containers, or photocopies thereof.

3.     In the event that any document called for by these requests or subsequent requests is to be withheld on the basis of the attorney-client privilege, work-product doctrine, or any other privilege or immunity, that document is to be identified by stating (i) the author(s), addressee(s), and any indicated or blind copyee(s); (ii) the document's date, number of pages and attachments or appendices; (iii) the subject matter(s) of the document; (iv) the nature of the privilege or immunity asserted; and (v) any additional facts on which You would base Your claim of privilege or immunity.

4.     These Requests for Production shall be deemed continuing so as to require further and supplemental production in accordance with the Federal Rules of Civil Procedure.

5.      State, for each request, whether or not there exist any documents within the scope of the request and whether any such documents are in Your possession, custody, or control.

6.      Any response made by reference to documents shall identify by document production number each responsive document.

7.      All documents that respond, in whole or in part, to any portion of any request shall be produced in their entirety, including all attachments and enclosures.

8.      Color copies of documents are to be produced where color is necessary to interpret or understand the contents.

9.      The source(s) or derivation of each document produced shall be specifically identified.

10.     In the event that any document called for by these requests or subsequent requests has been destroyed or discarded, that document is to be identified by stating: (i) the author(s), addressee(s), and any indicated or blind copyee(s); (ii) the document's date, number of pages and attachments or appendices; (iii) the document's subject matter; (iv) the date of destruction or discard, manner of destruction or discard, and reason for destruction or discard; (v) the persons who were authorized to carry out such destruction or discard; and (vi) whether any copies of the document presently exist and, if so, the name of the custodian of each copy.

11.     Electronic records and computerized information must be produced in their native electronic format, together with a description of the system from which they were derived sufficient to permit rendering the records and information intelligible.

12.     If your response to a particular request for production is a statement that you lack the ability to comply with that request, you must specify whether the inability to comply is because the particular item or category of information never existed, has been destroyed, has

been lost, misplaced, or stolen, or has never been, or is no longer, in your possession, custody, or control, in which case the name and address of any person or entity known or believed by you to have possession, custody, or control of that information or category of information must be identified.

      13.     Unless otherwise indicated in a particular request, the request is not date or time limited.

      14.     Where an identified document is in a language other than English, state whether an English translation of such document exists.  If a document is in a language other than English and an English translation exists, identify and provide both documents.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 55**:

Documents sufficient to show whether a third party supplied any of the modules used in the ÄKTA pure or avant systems.

**REQUEST FOR PRODUCTION NO. 56**:

Documents sufficient to show whether the modules used in the ÄKTA pure or avant systems were specifically designed for use in those systems.

**REQUEST FOR PRODUCTION NO. 57**:

Documents sufficient to show whether the modules used in the ÄKTA pure or avant systems existed prior to development of those systems.

**REQUEST FOR PRODUCTION NO. 58**:

Documents sufficient to identify individuals who participated in negotiations with third-party suppliers of components for the ÄKTA pure or avant systems on behalf of Plaintiffs.

**REQUEST FOR PRODUCTION NO. 59**:

Documents sufficient to show whether any third-party modules were considered for use in the ÄKTA pure or avant systems.

**REQUEST FOR PRODUCTION NO. 60:**

Documents sufficient to show evaluations and feasibility studies regarding the use of third-party modules in the ÄKTA pure or avant systems.

**REQUEST FOR PRODUCTION NO. 61:**

Documents sufficient to identify individuals responsible for Plaintiffs' evaluations and feasibility studies regarding the use of third-party modules in the ÄKTA pure or avant systems.

**REQUEST FOR PRODUCTION NO. 62:**

Documents sufficient to identify individuals responsible for designing modules for use in the ÄKTA pure or avant systems.

**REQUEST FOR PRODUCTION NO. 63:**

Documents sufficient to show whether individuals substantively involved in the design and development of the ÄKTA pure or avant systems, including the '718 patent's inventors, knew about the Gilson 402 Syringe Pump or the Tecan Cavro XLP 6000 Modular Syringe Pump.

**REQUEST FOR PRODUCTION NO. 64:**

Documents sufficient to show GE's market share in the market for modular preparative protein purification systems.

**REQUEST FOR PRODUCTION NO. 65:**

Documents sufficient to show GE's market share in the market for liquid chromatography systems operating in the medium pressure range of 35-50 psi.

**REQUEST FOR PRODUCTION NO. 66:**

Documents sufficient to show any efforts by GE to increase or maintain its market share in the market for modular preparative protein purification systems.

**REQUEST FOR PRODUCTION NO. 67:**

Documents sufficient to show efforts by GE to increase or maintain its market share in the market for liquid chromatography systems operating in the medium pressure range of 35-50 psi.

**REQUEST FOR PRODUCTION NO. 68:**

Documents sufficient to identify any companies that GE believes participate in the market for modular preparative market.

**REQUEST FOR PRODUCTION NO. 69:**

Documents sufficient to identify any companies that GE believes participate in the market for liquid chromatography systems operating in the medium pressure range of 35-50 psi.

**REQUEST FOR PRODUCTION NO. 70:**

Documents sufficient to show any studies or evaluations of GE's share in the market for modular preparative protein purification systems.

**REQUEST FOR PRODUCTION NO. 71:**

Documents sufficient to show any studies or evaluations of GE's share in the market for liquid chromatography systems operating in the medium pressure range of 35-50 psi.

Dated:  October 30, 2015                    Respectfully submitted,


                                            By:    /s/ Felipe Corredor
                                               Anne S. Toker
                                               Sky Adams
                                               QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP
                                               51 Madison Avenue, 22nd Floor
                                               New York, New York 10010
                                               T: (212) 849-7000
                                               F: (212) 849-7100
                                               annetoker@quinnemanuel.com
                                               skyadams@quinnemanuel.com

                                               Kevin P.B. Johnson
                                               QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP
                                               555 Twin Dolphin Drive, 5th Floor
                                               Redwood Shores, CA 94065
                                               T: (650)-801-5000
                                               T: (650)-801-5100
                                               kevinjohnson@quinnemanuel.com

                                               *Attorneys for Defendant and Counterclaim-
                                               Plaintiff Bio-Rad Laboratories, Inc.*

Of counsel:
David Bilsker
Felipe Corredor
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:  415-875-6600
Facsimile:  415-875-6700
davidbilsker@quinnemanuel.com
felipecorredor@quinnemanuel.com

*Attorney for Defendant and Counterclaim-
Plaintiff Bio-Rad Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 30, 2015, I caused a true and correct copy of the foregoing to be

served via e-mail on the following counsel for Plaintiffs GE Healthcare Bio-Science AB, GE

Healthcare Bio-Sciences Corporation, and General Electric Company.

> Matthew T. Salzmann
> ARNOLD & PORTER LLP
> 399 Park Avenue
> New York, NY 10022-4690
> Telephone: +1 212 715 1000
> Facsimile: +1 212 715 1399
> matthew.salzmann@aporter.com
>
> Matthew Wolf
> ARNOLD & PORTER LLP
> 555 Twelfth Street, N.W.
> Washington, DC 20004
> Telephone: +1 202 942 5000
> Facsimile: +1 202 942 599
> Matthew.Wolf@aporter.com
>
> Jennifer Sklenar
> Ryan M. Nishimoto
> Amie L. Medley
> Kristen L. Johns
> ARNOLD & PORTER LLP
> 777 South Figueroa Street, 44th Floor
> Los Angeles, California 90017-5844
> Telephone: + 1 213.243.4000
> Facsimile: +1 213.243.4199
> Jennifer.Sklenar@aporter.com
> Ryan.Nishimoto@aporter.com
> Kristen.Johns@aporter.com

<div align="right">

*/s/ Felipe Corredor*
Felipe Corredor

</div>

# EXHIBIT 8

![FTC logo] **FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

/////////////////

# FTC Imposes Conditions on Danaher Corporation's Acquisition of GE Biopharma

March 19, 2020

## Merger likely to reduce competition in highly concentrated markets that supply biopharmaceutical companies with key inputs

FOR RELEASE

TAGS: biologics | international cooperation | Health Care | Prescription Drugs | Manufacturing | Pharmaceuticals | Bureau of Competition | Competition | Merger

Danaher Corporation has agreed to divest assets to settle Federal Trade Commission charges that its proposed $21.4 billion acquisition of General Electric's biopharmaceutical business, GE Biopharma, would violate federal antitrust law.

The FTC alleges that the proposed acquisition would substantially lessen competition in the United States (and potentially the rest of the world) in highly concentrated product markets for ten products that companies use to manufacture biopharmaceutical drugs.

Danaher will divest to Sartorius AG all rights and assets to research, develop, manufacture, market, and sell these products. Based in Germany, Sartorius provides bioprocessing equipment and other products to the life sciences industry.

The products to be divested include:

**Microcarrier Beads.** Used in cell culture bioprocessing, microcarrier beads provide a surface to grow cells. Danaher and GE are the two leading global suppliers, and each other's closest competitors. The acquisition as proposed would reduce the number of major suppliers from three to two.

**Conventional Low-Pressure Liquid Chromatography Columns.** Conventional LPLC columns are containers that hold chromatography resins used as the adsorbent during the stationary phase. There are only three main suppliers, including Danaher and GE, both of which hold a significant share of the market.

**Conventional Low-Pressure Liquid Chromatography Skids.** These systems of pumps, valves, sensors, tubing, electronic components, software, and flow paths control the flow of liquid in the columns. GE is the leading supplier; GE and Danaher compete directly in this market; and there are few other significant suppliers.

**Single-Use Low Pressure Liquid Chromatography Skids.** These skids control the flow of liquid in the same way as conventional liquid chromatography skids, except certain components are disposable. GE is the dominant supplier, and GE and Danaher are two of only three significant suppliers.

**Chromatography Resins.** These chemically-treated resins constitute the stationary phase in chromatography. Each resin type differs in its chemical characteristics and uses, and each type constitutes a distinct antitrust market. GE and Danaher have competitively significant overlaps in three resin markets: affinity resins, ion exchange resins, and mixed

mode resins. GE is the dominant supplier of chromatography resins, and Danaher is a significant, independent competitor.

**Low-Pressure Liquid Chromatography Continuous Chromatography Systems.** LPLC continuous chromatography systems allow for the simultaneous processing of multiple columns in LPLC. These systems consist of pumps, valves, sensors, tubing, electronic components, software, and flow paths composed of either multi-use or single-use components. Danaher and GE are two of five suppliers.

**Single-Use Tangential Flow Filtration Systems.** These systems control the filtration process, which removes unwanted molecules during the cell growth by running liquids through porous membranes. Combined, Danaher and GE would have a significant portion of the market.

**Label-Free Molecular Characterization Instruments.** Researchers use these instruments for a number of bioprocessing applications, including drug discovery. Danaher and GE are significant competitors in this market. The remainder of the market is highly fragmented.

Further details about the consent agreement—which requires Danaher to supply the divested products to Sartorius for a limited time while Sartorius establishes its own manufacturing capability—are set forth in the analysis to aid public comment for this matter.

Commission staff and the staff of antitrust agencies in Brazil, China, the European Union, and Israel worked cooperatively to analyze the proposed transaction and potential remedies.

The Commission vote to issue the complaint and accept the proposed consent order for public comment was 3-2. Commissioners Rohit Chopra and Rebecca Kelly Slaughter voted no. The FTC will publish the consent agreement package in the Federal Register shortly. Instructions for filing comments appear in the published notice. Comments must be received 30 days after publication in the Federal Register. Once processed, comments will be posted on Regulations.gov.

**NOTE:** The Commission issues an administrative complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. When the Commission issues a consent order on a final basis, it carries the force of law with respect to future actions. Each violation of such an order may result in a civil penalty of up to $43,280.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about how competition benefits consumers or file an antitrust complaint. Like the FTC on Facebook, follow us on Twitter, read our blogs, and subscribe to press releases for the latest FTC news and resources.

# Contact Information

MEDIA CONTACT:
Betsy Lordan
*Office of Public Affairs*
202-326-3707

STAFF CONTACT:
Lisa DeMarchi Sleigh
*Bureau of Competition*
202-326-2535



ftc.gov

# EXHIBIT 9

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 | FAX (415) 875-6700

WRITER'S DIRECT DIAL NO.
**(415) 875-6448**

WRITER'S INTERNET ADDRESS
**felipecorredor@quinnemanuel.com**

July 7, 2020

**<u>Via E-Mail</u>**

Jennifer Sklenar
Arnold & Porter
601 Massachusetts Ave, NW
Washington, DC 20001-3743

Re:     *GE Healthcare Bio-Sciences AB et al. v. Bio-Rad Laboratories, Inc.*, Case No. 1:18-cv-01899-CFC

Counsel:

We write to follow up regarding document requests made at the deposition of Nigel Darby.

First, we are entitled to documents Dr. Darby relied upon in preparing his declaration, which are also responsive to, among others, Bio-Rad's RFP Nos. 37 ("All documents supporting Your claims for damages, including but not limited to, all documents supporting Your claim for damages based on a reasonable royalty, lost profits, actual damages, or statutory damages.") and 38 ("All documents regarding any sale Plaintiffs allegedly lost because of the NGC system.") in the consolidated case.  As Dr. Darby testified, these documents include documentary evidence regarding Shawn Anderson (Darby Rough Tr. at 117:9-19), document(s) supporting his $100 million estimate for the NextAKTA development expenses (*id.* at 119:2-9), and document(s) supporting his statements about lost sales (*id.* at 120:11-24).  We have been unable to locate these documents in Plaintiffs' production.  Please immediately produce these documents or identify by bates number where in the production they may be found.

Second, we are also entitled to documents related to the market for modular chromatography products, including, without limitation, market share and competitor data, that were submitted to government agencies as Dr. Darby testified to.  *See id.* at 128:22-129:14, 134:11-135:5.  These documents are responsive to, among others, Bio-Rad's RFP Nos. 64 ("Documents sufficient to show GE's market share in the market for modular preparative protein purification systems."), 66 ("Documents sufficient to show any efforts by GE to increase or maintain its market share in the market for modular preparative protein purification systems."), and 68 ("Documents sufficient to identify any companies that GE believes participate in the market for modular preparative market.").  We have been unable to locate these documents in Plaintiffs' production.

02030-00002/12227771.1

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Please immediately produce these documents or identify by bates number where in the production they may be found.

Best regards,

*/s/ Felipe Corredor*
Felipe Corredor