IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CYTIVA SWEDEN AB, and GLOBAL LIFE SCIENCES SOLUTIONS USA, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Redacted: Public Version |
| v. | ) ) | C.A. No. 18-1899-CFC-SRF |
| BIO-RAD LABORATORIES, INC., | ) ) | **CONSOLIDATED** |
| Defendant. | ) ) | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF ITS MOTION TO
EXCLUDE EXPERT OPINIONS OF DR. BRUCE GALE AND
IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT OPINIONS OF
DR. THOMAS KEARL**

John W. Shaw (No. 3362)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

OF COUNSEL:
Matthew M. Wolf
Jennifer Sklenar*
Amy DeWitt
Bridgette C. Boyd
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue, NW
Washington D.C. 20001
(202) 942-5462

Jeffrey A. Miller
Joseph B. Palmieri

ARNOLD & PORTER KAYE
SCHOLER LLP
3000 El Camino Real
Building 5, Suite 500
Palo Alto, CA 94306
(650) 319-4500

Ryan M. Nishimoto
ARNOLD & PORTER KAYE
SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
(213) 243-4000

Michael J. Sebba
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000

*Admitted in NY and CA only; practice
limited to matters before federal courts
and federal agencies

Dated: December 15, 2020

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES .............................................................. ii

INTRODUCTION ............................................................................1

NATURE AND STAGE OF THE PROCEEDINGS .............................1

SUMMARY OF THE ARGUMENT ...................................................1

ARGUMENT ...................................................................................2

I.   THE COURT SHOULD EXCLUDE CERTAIN OPINIONS OF
     DR. BRUCE GALE ................................................................2

     A.   Dr. Gale's Non-Infringement Opinions Are Inconsistent With
          The Court's Claim Construction Or Improperly Construe Terms ........3

     B.   Dr. Gale's Opinions Regarding Testing Of The Applikon 2020
          System In The 2016 Experiments Are Unreliable ..............................9

II.  THIS COURT SHOULD EXCLUDE CERTAIN OPINIONS OF DR.
     THOMAS KEARL ..............................................................15

     A.   Dr. Kearl Relies On Licenses With No Established Technical
          Comparability ..............................................................16

     B.   Dr. Kearl Should Be Excluded From Relying On Licenses With
          No Established Technical Comparability ...........................................17

CONCLUSION ...............................................................................19

CERTIFICATE OF COMPLIANCE ...................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Callaway Golf Co. v. Acushnet Co.*,
    C.A. No. 06-91-SLR, 2007 WL 4165401 (D. Del. Nov. 20, 2007) ............ 12, 13

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d. Cir. 2000) ................................................................ 2

*EMC Corp. v. Pure Storage, Inc.*,
    154 F. Supp. 3d 81 (D. Del. 2016) ...................................................... 7

*Schneider ex rel. Est. of Schneider v. Fried*,
    320 F.3d 396 (3d Cir 2003) ............................................................... 12

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) ......................................................... 3

*I/P Engine, Inc. v. AOL Inc.*,
    No. 2:11-cv512, 2012 WL 12068846 (E.D. Va. 2012) ..................................... 19

*LaserDynamics v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ............................................................. 18

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ......................................................... 17

*M2M Solutions LLC v. Enfora, Inc.*,
    167 F. Supp. 3d 665 (D. Del. 2016) ............................................... 18, 19

*McLeod v. Dollar Gen.*,
    No. 13-3113, 2014 WL 4634962 (E.D. Pa. Sept. 16, 2014) ............................... 15

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
    No. 11–cv–5341, 2014 WL 971765 (N.D. Cal. Mar. 5, 2014) ........................... 3

*MIICS & Partners Am. Inc. v. Toshiba Corp.*,
    C.A. No. 14-803-RGA, 2017 WL 11573565 (D. Del. Oct. 12,
    2017) ....................................................................................... 15

*MOSAID Techs. v. LSI Corp.*,
  C.A. No. 10-192-RGA, 2014 WL 807877 (D. Del. Feb. 28, 2014) ............ 12, 13

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) .................................................................................. 2

*Personalized User Model, L.L.P. v. Google Inc.*,
  C.A. No. 09-525-LPS, 2014 WL 807736 (D. Del. Feb. 27, 2014) ...................... 6

*Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*,
  576 F. Supp. 107 (D. Del. 1983) ........................................................................ 15

*Stecyk v. Bell Helicopter Textron, Inc.*,
  295 F.3d 408 (3d Cir. 2002) ............................................................................... 12

*Virnetx, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ......................................................................... 17

*Withrow v. Spears*,
  967 F. Supp. 2d 982 (D. Del. 2013) ..................................................................... 2

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
  C.A. No. 09-157-RGA, 2013 WL 865974 (D. Del. Mar. 7, 2013) ............. 12, 15

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019) ................................................................... 18

## Other Authorities

Federal Rule of Evidence 702 .................................................................... 1, 2, 12, 15

Federal Rule of Evidence 703 ...................................................................... 12, 14, 15

## INTRODUCTION

Plaintiffs Cytiva Sweden AB and Global Life Solutions USA LLC (collectively, "Plaintiffs") move to exclude certain opinions and testimony of the experts of Defendant Bio-Rad Laboratories, Inc. ("Bio-Rad"). In support of Bio-Rad's claims of non-infringement and obviousness, Bio-Rad's technical expert Dr. Bruce Gale proffers legally impermissible and unreliable opinions.  In rebuttal to Plaintiffs' expert opinions on damages, Bio-Rad's expert Dr. Thomas Kearl proffers opinions on prior licenses that are unsupported and thus unreliable. As discussed below, these opinions fail to meet the threshold admissibility requirements of Federal Rule of Evidence 702 and should be excluded.

## NATURE AND STAGE OF THE PROCEEDINGS

This patent infringement action was initiated in 2014 and transferred to this Court in 2018. (D.I. 1.) The parties exchanged expert reports on September 14, 2020, rebuttal reports on October 21, 2020, and reply reports on November 11, 2020. Expert depositions concluded November 25, 2020. The pre-trial conference is scheduled for June 9, 2021, and trial will commence June 21, 2021.

## SUMMARY OF THE ARGUMENT

1.     Certain opinions of Dr. Gale should be excluded because 1) the opinions are based on a claim construction contrary to the Court's ruling and 2) the opinions are unreliable as they lack any sufficient knowledge basis.

2.    Certain opinions of Dr. Thomas Kearl that are based on license agreements should be excluded because he failed to make any threshold showing of technological comparability between the patents licensed under those agreements and the Asserted Patents.

## **ARGUMENT**

A court may permit opinion testimony from an expert only if the testimony "will assist the trier of fact" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The Third Circuit has characterized the admissibility of expert testimony as falling into three categories: "qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d. Cir. 2000). The party offering the expert testimony bears the burden of proving that the testimony is admissible. *Withrow v. Spears*, 967 F. Supp. 2d 982, 992 (D. Del. 2013). That burden must be met by a preponderance of the evidence. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

## I.    THE COURT SHOULD EXCLUDE CERTAIN OPINIONS OF DR. BRUCE GALE

Dr. Gale's opinions should be excluded because (1) they are based on a claim construction contrary to the Court's ruling, (2) they are unreliable as Dr. Gale lacks the requisite knowledge required for the opinions, and (3) he improperly relies on

hearsay testimony as the sole support for his opinions, with no independent investigation or analysis.

### A. Dr. Gale's Non-Infringement Opinions Are Inconsistent With The Court's Claim Construction Or Improperly Construe Terms

Dr. Gale's non-infringement opinions regarding the terms "fluidics section," "non-fluidics section," "panel member," and "independently perform operations in response to instructions over a BUS" usurp the Court's role in construing the claims, are unreliable, and can serve only to confuse a jury. Such expert testimony based on an erroneous or impermissible claim construction is properly excluded as irrelevant. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury."); *see also MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11–cv–5341, 2014 WL 971765 at 5 (N.D. Cal. Mar. 5, 2014) ("[T]estimony grounded in the prosecution history to discern the meaning of a claim is properly excluded from presentation to the jury, especially where, as here, a fair reading of the expert report reveals an intention to argue claim construction.").

Despite never having provided opinions concerning claim construction, Dr. Gale improperly relies on claim constructions already rejected by the Court, and supplants the plain and ordinary meaning of terms by attempting to raise new claim

construction issues for terms that neither party sought constructions for during the claim construction process. Indeed, Dr. Gale admits that he used the specification, file history of the Asserted Patents, and the inventor's testimony to construe the claims:

> Q. Right. So you—I just want to understand what you did in your analysis. You felt like it was appropriate, though, to go to the specification, go to the file history, look at what the inventor said, and use all of that to interpret the claims as part of your analysis; is that what you're saying?
>
> A. I did that.

(Ex. 1 at 169:12-20 (objection omitted)[1]; *see also id.* 172:14-173:6, 174:2-18, 186:4-188:5.) Moreover, Dr. Gale essentially admitted that he performed a claim construction analysis of the Court's construction. (*See* Ex. 2 ¶ 23 ("In all cases, I applied the agreed claim constructions or the Court's constructions as one of ordinary skill in the art would interpret them in light of the specification and the file history in performing my analyses and rendering my opinions in this report.").) Nearly the entirety of Dr. Gale's rebuttal report, as it concerns non-infringement, relies upon the file history, patent specification, and inventor's testimony as he rehashes the same arguments advanced by Bio-Rad during claim construction and proposes new constructions for terms that should be given their plain and ordinary

---

[1] "Ex." refers to Exhibits attached to the Declaration of Amy L. DeWitt in Support of Plaintiffs' Motion to Exclude Expert Opinions, filed concurrently herewith.

meaning. (*Id.* ¶¶ 42-126.) Because these fundamental errors infect nearly his entire report, the majority[2] of his non-infringement opinions concerning the terms "fluidics section," "non-fluidics section," "panel member," and "independently perform operations in response to instructions over a BUS" should be excluded.

### 1. Dr. Gale's interpretation of "fluidics section" and "non-fluidics section" is inconsistent with the Court's construction

Over Bio-Rad's objection, this Court construed "fluidics section" to mean "a section of the interchangeable fluid handling unit that includes fluidics components and does not include non-fluidics components" and construed "non-fluidics section" to mean "a section of the interchangeable fluid handling unit that includes electrical components and does not include fluidics components." (D.I. 89 at 3.)

Dr. Gale's non-infringement opinions are plainly an attempt to claw back Bio-Rad's construction, previously rejected by the Court, that the non-fluidics section comprises "all the non-fluidics/electrical components of an interchangeable fluid handling unit." Such testimony is "unreliable and unhelpful to the finder of fact." *See, e.g.*, *Personalized User Model, L.L.P. v. Google Inc.*, C.A. No. 09-525-LPS,

---

[2] Specifically, the following paragraphs of Dr. Gale's Rebuttal Report should be excluded: 42-54; 58-67; 78-96; 100-115; 117-124; 126; 128-131; 135-141; 159-180; 182; 184; 186; 189; 191-192; 194-196; 198-202; 204-205; 207-210; 212-214; 215-217; 219; 221; 223-224; 226; 228; 230; 232; 236-237; 241; 243; 249-252; 256-258; 264-265; 267-269; 271-272; 274-277; 279; 281; 283-285; 287-288; 290; 292-295; 297; 299.

2014 WL 807736, at *1 (D. Del. Feb. 27, 2014) (excluding opinion based on a construction the court had specifically rejected).

In interpreting the term "fluidics section" for his non-infringement opinions, Dr. Gale opines that a POSITA would not understand external non-fluidic components to be in a separate section from the external fluidics section. (*See* Ex. 2 ¶ 62 ("[T]he external electronics … are not in sections that are distinct from the fluidics sections. Rather, they are in the same section and not separated in the manner the inventors said they needed to be to be [*sic*] part of the invention and distinct from the prior art."). Dr. Gale further opines that the specification only describes two sections—a fluidics section and a non-fluidics section. (*See id.* ¶ 44.)

During claim construction, Bio-Rad proposed a construction requiring that ***all*** non-fluidics components must be in the claimed non-fluidics section and ***all*** of the fluidics components must be in the claimed fluidics section. (*See* D.I. 60 at 72, 93.) The Court rejected this and specifically left open the possibility that non-fluidics components could be located external to the non-fluidics section and there could be "other sections" in the fluid handling units. (*See* Ex. 3 at 103:8-13 ("That does not, however, preclude the possibility that there are other sections that are in the invention, and that's important because that is consistent with the use of the indefinite article, which is inconsistent with Bio-Rad's insistence that 'all,' either

fluidic or non-fluidic components, are in the respective handling unit."); *id.* 97:16-25, 100:14-23.)

Dr. Gale is improperly importing a requirement into the claims that ***all*** non-fluidic components must be "separated" from the fluidics section. The claims require only that the fluidics *section* and non-fluidics *section* be separated by the claimed "panel member"—requiring that the fluidics section be separated from other sections improperly narrows the scope of the claim and is inconsistent with the Court's construction. Accordingly, these opinions should be excluded as unreliable and unhelpful**.**

### 2. Dr. Gale has no basis for construing terms that should be given their plain and ordinary meaning by a POSITA

Dr. Gale improperly displaces the plain and ordinary meaning of terms not construed by the Court with his own interpretations based on the file history, specification, and inventor's statements. When a court does not construe a term or orders that the ordinary meaning applies, it is given its plain and ordinary meaning as understood by one skilled in the art. *See EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 109 (D. Del. 2016).

Dr. Gale construes the term "panel member"—which was neither disputed by the parties nor construed by the Court—by limiting the term to exclude structures that include integrated electronics. In discussing the panel member, Dr. Gale ignores the plain and ordinary meaning of the term and relies on the file history. (*See, e.g.*,

Ex. 2 ¶ 126 ("There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics."); Ex. 1 at 174:2-18 (confirming that he consulted the file history and specification to construe panel member).) Accordingly, Dr. Gale's non-infringement opinions regarding the "panel member" should be excluded to the extent he relies on the file history for his analysis.

Similarly, Dr. Gale construes the term "independently perform operations in response to instructions over a BUS"—which was not disputed by the parties nor construed by the Court. In doing so, Dr. Gale relies on the specification to (improperly and incorrectly) import what he asserts is one of two embodiments into his definition of how a POSITA would understand the term. (*See* Ex. 2 ¶ 136.) Based on this embodiment, Dr. Gale opines that a POSITA would understand that "the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the MPU sent." (*Id.* ¶ 137.) However, Dr. Gale's construction provides no guidance as to how a POSITA would understand the plain and ordinary meaning of the term, but rather how, in his view, a POSITA would veer from the ordinary meaning due to how he reads the specification. Accordingly, because Dr. Gale construes this term, as

8

opposed to opining on how a POSITA would understand the term, such opinions are improper claim construction and should be excluded.

**B.   Dr. Gale's Opinions Regarding Testing Of The Applikon 2020 System In The 2016 Experiments Are Unreliable**

Dr. Gale attempts to establish invalidity of the Asserted Patents based on, among other things, the alleged prior art Applikon 2040 System ("2040 System"). (*See* Ex. 4 ¶¶ 294-99 (describing system).) In support, Dr. Gale relies on a lab report of an experiment he claimed to have performed in 2016 (the "2016 Experiments") in an effort to show that the 2040 System is a "liquid chromatography system," a requirement of all Asserted Claims.[3] (*See id.* Exhibit 4.)[4] Dr. Gale further opines, based on nothing more than the unverified hearsay testimony from a Bio-Rad employee, that the "amount of time" and amount of "work" necessary for the 2040 System to perform liquid chromatography was "less than or at least in the same range as a user who purchases an accused Bio-Rad device." (Ex. 6 ¶ 40.)

As explained below, Dr. Gale's opinions relating to the 2016 Experiments should be excluded because they are unreliable. He was neither sufficiently involved

---

[3] This position is particularly surprising because Bio-Rad deposed a representative of the company who sold the 2040 System, who testified that he had never heard of or seen the 2040 System used for liquid chromatography. (Ex. 5 at 226:10-17, 228:11-17.)

[4] To the extent Bio-Rad attempts to rely on this report as a reference unto itself, it was not disclosed during fact discovery or in Bio-Rad's invalidity contentions and was performed years after the priority date of the Asserted Patent.

in the experiments nor did he investigate the amount of work that went into the experiments, which would be necessary for his opinions, particularly about the time and effort that went into retrofitting the 2040 System to perform liquid chromatography. His opinions are rendered further unreliable by his wholesale reliance on the testimony of a Bio-Rad employee, with no independent analysis or investigation.

### 1.   Dr. Gale misrepresented his involvement in the 2016 Experiments

Dr. Gale represented that he personally performed and recorded the 2016 Experiments regarding the 2040 System. (Ex. 4 ¶ 299 ("*I also performed* tests to show the 2040 System can deliver controlled fluid flow to and through a liquid chromatograph column"); *id.* ("*I recorded* videos of these tests showing the 2040 System performing liquid chromatography.") (emphases added).) In fact, however, those representations were false; the experiments were performed by students working in Dr. Gale's laboratory—Kevin Petersen and Travis White. (Ex. 7 at 99:12-100:8 (Petersen explaining that the 2016 Experiments were run by "myself and Travis White"); *id.* 46:17-47:17.)

Dr. Gale ultimately admitted at his deposition that he is "not sure … what[he] did or didn't do" on the 2016 Experiments. (Ex. 1 at 107:4-12.) He witnessed only part of the 2016 Experiments, and could not "recall specifically whether [he] watched this part or that part." (*Id.* 113:8-114:9.) He also admitted that, contrary to

10

what he wrote in his report, he did not record any of the videos, but was rather in his "office across the hall." (*Id.* 110:13-22.)[5] Additionally, notwithstanding his opinion that "the 2040 System machine easily performed liquid chromatography and was readily programmed to do so" (Ex. 6 ¶ 42), Dr. Gale testified that he does not "know how much time it took to program" the 2016 Experiments and he is not even sure if he was "physically present when" the programming was performed. (Ex. 1 at 217:1-5; *see also* Ex. 7 at 97:1-17 (Petersen explaining that only he and Travis White entered the program).) Dr. Gale further admitted that he "never put a full program in" the 2040 System. (Ex. 1 at 235:21-236:1.)

Nor did Dr. Gale ever review the work of those that actually performed the 2016 Experiments. While Travis White "kept notes on more of the detailed questions on how the programming occurred" (Ex. 7 at 88:20-89:4), Dr. Gale admitted that he has "never seen [Travis White's notebook], never relied on it, never used it," and that it was "never in [his] possession." (Ex. 1 at 209:6-210:1.) In fact, Dr. Petersen discarded Travis White's notes and Dr. Gale never had an opportunity to review them. (Ex. 7 at 89:15-90:2.)

---

[5] Given Dr. Gale's shifting inability to recall details of the 2016 Experiments (*see* Ex. 1 at 78:15-79:2, 79:14-19), his reliance on his memory should not be given credit.

## 2. Dr. Gale's opinions regarding the 2016 Experiments lack a sufficient knowledge basis

Federal Rule of Evidence 702 requires that an expert base his testimony on "reliable principles and methods." To be reliable, an expert cannot base his testimony "on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (footnote and internal citations omitted); *MOSAID Techs. v. LSI Corp.*, C.A. No. 10-192-RGA, 2014 WL 807877, at *1 (D. Del. Feb. 28, 2014). Further, Federal Rule of Evidence 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." However, "[i]t is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

Dr. Gale's opinions regarding the 2016 Experiments should be excluded because his expert report reflects insufficient personal knowledge of any material aspect of those Experiments. *Callaway Golf Co. v. Acushnet Co.*, C.A. No. 06-91-SLR, 2007 WL 4165401, at *1 (D. Del. Nov. 20, 2007); *see also XpertUniverse, Inc. v. Cisco Sys., Inc.*, C.A. No. 09-157-RGA, 2013 WL 865974, at *3 (D. Del. Mar. 7, 2013) (excluding expert opinion based on insufficient personal knowledge of relevant issues). This situation is similar to that in *Callaway*, in which testimony by Acushnet's expert was excluded because, even though the expert personally

observed testing conducted by Acushnet personnel, the expert "neither prepared nor tested anything." *Callaway*, 2007 WL 4165401, at *1. (Unlike in *Callaway*, however, Dr. Gale did not even observe all the testing here, *see* Ex. 1 at 113:8-114:9.)  Likewise here, Dr. Gale's "'expert report' reflects no personal knowledge of any material aspect of the subject matter and cannot be used to confer any indicia of trustworthiness to the test results." *Id*. Consequently, and even more so than the expert whose opinions were excluded in *Callaway*, Dr. Gale cannot vouch for the reliability of the test results and is certainly in no position to opine on the amount of time and effort in programming the 2040 System to perform liquid chromatography. *See MOSAID*, 2014 WL 807877, at *3 (finding that gaps in expert's knowledge of underlying facts render the opinions unreliable).

### 3. Dr. Gale's opinions comparing the 2040 System to the Accused Systems lack a sufficient knowledge basis

Compounding the problems in Dr. Gale's opinions regarding the 2016 Experiments is the basis for his ultimate opinion that the 2040 System—which is neither marketed for nor includes any programming for liquid chromatography— could be used to perform liquid chromatography with the same "amount of time" and "amount of work" as the accused Bio-Rad NGC systems. (Ex. 6 ¶ 40.) Notably, the NGC systems are pre-programmed to perform liquid chromatography and are

marketed as having "fast setup to analysis," and "easy to use." (Ex. 9 at BRGEDEL000100360; Ex. 8 at BRGEDEL000403804.)

Because Dr. Gale has never performed liquid chromatography using an NGC system (and, as noted above, was not present when the 2040 System was allegedly programmed to perform liquid chromatography), his sole support for his opinion is a conversation with Bio-Rad specialist Katie Schaefer, who "confirmed" various details about Bio-Rad's NGC system. (Ex. 6 ¶¶ 36, 37, 39, 40; Ex. 1 at 29:1-3, 234:10-18.) Dr. Gale conceded he performed no independent analysis to confirm Ms. Schaefer's statements. (*See* Ex. 1 at 266:6-18, 268:20-269:7.) Moreover, Dr. Gale: (i) did not take notes of his conversation with Ms. Schaefer; (ii) could not remember details of the conversation; (iii) could not recall whether the discussion covered topics not in his report; (iv) was "not sure" whether Ms. Schaefer indicated a minimal amount of time it would take to program an existing NGC system to perform liquid chromatography; and (v) could not consistently recall if he spoke to Ms. Schaefer about the 2040 System or explained to her what was involved in programming the 2040 System. (*Id*. at 105:12-22, 106:19-107:3, 274:9-17, 298:1-10.)[6]

---

[6] The most Dr. Gale was able to recall about programming time for the NGC was that Ms. Schaefer "indicated it was, you know, some time. It was—it was not five minutes. It was several hours in those cases." (Ex. 1 at 275:6-19.)

Although an expert is allowed some latitude to rely on hearsay, Rule 703 "does not authorize experts to merely "parrot" the ideas and opinions of other experts or individuals." *McLeod v. Dollar Gen.*, No. 13-3113, 2014 WL 4634962, at *5 (E.D. Pa. Sept. 16, 2014); *see also Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107, 158 (D. Del. 1983) (finding that although Rule 703 allows experts to rely on otherwise inadmissible evidence, "this does not magically render the hearsay evidence admissible"). Inadmissible and unverifiable hearsay, such as the type Dr. Gale relies on here with none of his own investigation, is not the type of information on which experts would reasonably rely to form an opinion. *See MIICS & Partners Am. Inc. v. Toshiba Corp.*, C.A. No. 14-803-RGA, 2017 WL 11573565, at *2 (D. Del. Oct. 12, 2017). Rule 702 compels the same conclusion—because Dr. Gale uncritically adopted Ms. Schaefer's statements without conducting any independent assessment or analysis, or even reviewing any documents, his opinions should be excluded. *See XpertUniverse*, 2013 WL 865974, at *3.

In sum, all of Dr. Gale's opinions regarding the 2016 Experiments should be excluded.

## II.   THIS COURT SHOULD EXCLUDE CERTAIN OPINIONS OF DR. THOMAS KEARL

To rebut the opinions concerning damages proffered by Plaintiffs' expert John Bone, Bio-Rad served the Rebuttal Expert Report of Dr. Thomas Kearl, who opines

that a royalty rate of █████ is appropriate.[7] As explained below, Dr. Kearl's opinions regarding licenses for which there is no demonstration of technical comparability to the Asserted Patents should be excluded.

## A.    Dr. Kearl Relies On Licenses With No Established Technical Comparability

Dr. Kearl attempts to demonstrate the reasonableness of his proffered rate of ██ by comparing it to rates from ██ licenses produced by the parties and included in a table ("Table 4") in his report as part of his analysis under the *Georgia-Pacific* factors. (*See*, *e.g.*, Ex. 10 ¶¶ 119-22, ¶ 123 ("The royalty rates in Table 4 range between ████████ with the majority between ███████"); *id.* ¶ 136 ("Since my proposed upper bound of ███ falls well within the range of actual licensed technologies, there is no reason to expect that it would be outside this range."); *id.* ¶ 138.)

Dr. Kearl also refers to the licenses in Table 4 as covering either "form" or "function" technologies, arguing that "function" technologies garner a higher rate than the purported "form" technologies of the patents-in-suit).  (Ex. 10 ¶ 138 ("The licenses provided in this matter covering different functional and form technologies . . . ."); *id.* ¶ 139; Ex. 11 at 213:6-11 ("But as I just indicated if you had

---

[7] In his report, Dr. Kearl only proffered a 2% reasonable royalty. After Plaintiffs' expert pointed out a deficiency in Dr. Kearl's analysis, Dr. Kearl proffered an additional rate of 3.5% at his deposition. (Ex. 11 at 203:16-21.)

royalties that were no higher than ███████, for technologies that are functional and not just form factors, then you might question a form factor royalty that is in excess of that by these same parties."). While Dr. Kearl claimed that his "form v. function" comparison was based on "Mr. Bone's summary of his review of the licensed technologies," Dr. Kearl acknowledged that Mr. Bone never performed any such "form" or "function" classification, and that was his (Dr. Kearl's) own interpretation of the license, despite admitting he has no expertise to make any such classification. (Ex. 11 at 235:2-6, 236:2-4, 219:21-220:2.)

Of the ██ licenses in Table 4, Bio-Rad's technical expert Dr. Gale provided opinions of technical comparability to only ██ licenses—████████████████ ████████████████████████ Dr. Gale performed no comparison of the technology claimed by the Asserted Patents and the technology covered by the other ███ licenses. (Ex. 1 at 352:7-10.)

**B.  Dr. Kearl Should Be Excluded From Relying On Licenses With No Established Technical Comparability**

In providing an opinion on a royalty based on existing license agreements, an expert must establish comparability between the technology covered by the license agreements and the technology claimed in the patents-in-suit. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). Courts within this district have consistently applied this principle to exclude expert opinions on license agreements

17

where the expert has not shown sufficient technical comparability. *See*, *e.g.*, *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 496 (D. Del. 2019) (excluding opinions on license agreement where technical comparability was not established); *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 675-79 (D. Del. 2016) (excluding expert damages testimony based on insufficient technical comparison of licenses). Accordingly, Dr. Kearl's opinions on the ██ licenses for which there is a complete absence of evidence of technical comparability should be excluded.

Exclusion is appropriate even where an expert purports to use a license to demonstrate the structure of the license or use the rate as a "reasonableness" check, which Dr. Kearl admitted he was doing here. (Ex. 11 at 212:20-213:22, 209:1-14.) The Federal Circuit has rejected the use of non-comparable licenses for either structure of the license or amount. *See LaserDynamics v. Quanta Comput., Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012) (reversing decision of lower court that allowed use of non-comparable license as to the form, but not the amount, of a reasonable royalty). Similarly, as Judge Andrews found in *Enfora*:

> Lastly, I find little merit in Defendants' argument that Dr. Choi can use incomparable licenses in his reasonable royalty analysis if he only uses them as a "sanity check," rather than using them to drive the analysis. Federal Circuit precedent requires that for a license to be used in a damages analysis, the license must be proven comparable to the hypothetical negotiation. *See, e.g., Lucent Techs.*, 580 F.3d at 1325. Defendants cannot escape this requirement by suggesting that the incomparable licenses only played a minor role as a quantitative reference point, instead of being a driving force in the reasonable royalty estimate.

*Enfora*, 167 F. Supp. 3d at 678; *see also I/P Engine, Inc. v. AOL Inc.*, No. 2:11-cv512, 2012 WL 12068846, at *2 (E.D. Va. 2012) ("Because the form of the royalty is equally important as the amount of the royalty, the Court concludes that if an agreement is non-comparable as to one aspect of the royalty question, it is non-comparable as to all aspects."). Accordingly, because Dr. Kearl has failed to establish any of the ███ licenses are technically comparable, any opinions based on those licenses should be excluded.

## CONCLUSION

For the reasons provided above, the Court should exclude the opinions and testimony of Bio-Rad's experts.

Respectfully submitted,

/s/ John W. Shaw

OF COUNSEL:                          John W. Shaw (No. 3362)
Matthew M. Wolf                      Nathan R. Hoeschen (No. 6232)
Jennifer Sklenar*                    SHAW KELLER LLP
Amy DeWitt                           I.M. Pei Building
Bridgette C. Boyd                    1105 North Market Street, 12th Floor
ARNOLD & PORTER KAYE                 Wilmington, DE 19801
SCHOLER LLP                          (302) 298-0700
601 Massachusetts Avenue, NW         jshaw@shawkeller.com
Washington D.C. 20001                nhoeschen@shawkeller.com
(202) 942-5462                       *Attorneys for Plaintiffs*

Jeffrey A. Miller
Joseph B. Palmieri
ARNOLD & PORTER KAYE
SCHOLER LLP
3000 El Camino Real
Building 5, Suite 500
Palo Alto, CA 94306
(650) 319-4500

Ryan M. Nishimoto
ARNOLD & PORTER KAYE
SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
(213) 243-4000

Michael J. Sebba
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000

*Admitted in NY and CA only; practice
limited to matters before federal courts
and federal agencies

Dated: December 15, 2020

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's November 6, 2019 Standing Order, I hereby confirm

that this brief complies with the type and number limitations set forth in the Standing

Order. I certify that this document contains 4,480 words, which were counted using

the word count feature in Microsoft Word, in 14-point Times New Roman font.  The

word count does not include the cover page, table of contents and authorities, or the

counsel blocks font. The total number of words in all of Plaintiffs' case-dispositive

and *Daubert* briefs is less than 12,500 words, calculated in the above manner.

*/s/ John W. Shaw*

John W. Shaw (No. 3362)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, John W. Shaw, hereby certify that on December 15, 2020, this document

was served on the persons listed below in the manner indicated:

### <u>BY EMAIL</u>

David E. Moore
Bindu A. Palapura
Stephanie E. O'Byrne
Alan R. Silverstein
POTTER ANDERSON
& CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com
asilverstein@potteranderson.com

Anne S. Toker
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
(212) 849-7000
annetoker@quinnemanuel.com

David Bilsker
Andrew E. Naravage
Felipe Corredor
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davidbilsker@quinnemanuel.com
andrewnaravage@quinnemanueal.com
felipecorredor@quinnemanuel.com

Kevin P.B. Johnson
Brian C. Cannon
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5015
kevinjohnson@quinnemanuel.com
briancannon@quinnemanuel.com

Sean D. Damon
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I Street NW Suite 900
Washington, D.C. 20005
(202) 538-8260
seandamon@quinnemanuel.com

*/s/ John W. Shaw*
John W. Shaw (No. 3362)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*