HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CYTIVA SWEDEN AB and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC, | ) ) ) ) |
| Plaintiffs, | ) C.A. No. 18-1899-CFC ) Consolidated ) |
| v. | ) ) Redacted: Public Version ) |
| BIO-RAD LABORATORIES, INC., | ) ) |
| Defendant. | ) |

**DECLARATION OF STEVEN WERELEY, PH.D.**

i

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## Table of Contents

I.      INTRODUCTION ........................................................................................ 1

II.     ASSIGNMENT ........................................................................................ 4

III.    RELEVANT LEGAL PRINCIPALS ...................................................... 5

        A.      Burden Of Proof ............................................................................ 6

        B.      Infringement ................................................................................... 6

                1.        Direct Infringement......................................................... 6

                2.        Indirect Infringement ...................................................... 7

IV.     THE PATENTS IN SUIT ........................................................................ 8

        A.      The '420 Patent.............................................................................20

        B.      The '589 Patent.............................................................................20

        C.      The '591 Patent.............................................................................20

        D.      The '124 Patent.............................................................................21

V.      THE PERSON OF ORDINARY SKILL IN THE ART ............................21

VI.     CLAIM CONSTRUCTION ...................................................................23

VII.    BACKGROUND ...................................................................................27

VIII.   INFRINGEMENT ..................................................................................32

        A.      The '420 Patent.............................................................................35

                1.        Claim 1 ...........................................................................35

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

a.  "An automated liquid chromatography system"............35

b.  "a housing"...................................................................38

c.  "a master control unit connected to a system bus; and".44

d.  ■three or more fluid handling units arranged as interchangeable modular components comprising".......50

e.  "(i) an external fluidics section,"..................................62

f.  "(ii) an internal non-fluidics section"...........................69

g.  "including a bus connector for directly connecting the interchangeable modular component with the system bus, and"...........................................................................72

h.  "(iii) a panel member arranged to separate the fluidics section from the non-fluidics section;"........................77

i.  wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing ...84

j.  wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus ...............................89

k.  wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus; ................................................................93

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

l.     wherein the master control unit is arranged to automatically identify interchangeable modular components;...............................................................104

m.    wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and............................................................................107

n.     wherein the system is capable of performing automated liquid chromatography ...............................................123

B.    '589 Patent......................................................................124

    1.     Claim 1 ....................................................................124

        a.     "An automated liquid chromatography system comprising:...................................................124

        b.     "a housing unit and" .................................................127

        c.     "at least four modular fluid handling units" ...............133

        d.     "wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array,..........................................................................146

        e.     "wherein each modular fluid handling unit is configured for insertion into the receiving positions of the housing unit".........................................................................159

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

      f.     "wherein each modular fluid handling unit is … is readily interchangeable amongst similarly sized and shaped receiving positions of the housing unit, such that positioning of the modular fluid handling unit with respect to other modular fluid handling units permits a fluid flow path to be readily modified, wherein the fluid flow path is formed by fluidic connections between the modular fluid handling units, and" ............................. 160

      g.     "wherein each modular fluid handling unit … includes a CPU for independently performing fluid control operations in response to instructions over a system BUS." ................................................................... 168

C.     '591 Patent ................................................................. 178

    1.     Claim 9 ................................................................. 178

      a.     179

        (i)     An automated liquid chromatography system comprising: ...................................................... 179

        (ii)    a housing; ...................................................... 179

        (iii)   a master control unit connected to a system bus; and ................................................................ 179

        (iv)   two or more fluid handling units arranged as interchangeable modular components comprising ........................................................................ 180

        (v)    (i) an external fluidics section, ......................... 180

        (vi)   (ii) an internal non-fluidics section ................... 180

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

(vii)    including a bus connector for directly connecting the interchangeable modular component with the system bus, and.................................................180

(viii)   (iii) a panel member arranged to separate the fluidics section from the non-fluidics section, ...180

(ix)     wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing, ..180

(x)      wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus, ...............................181

(xi)     wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus,......................181

(xii)    wherein the master control unit is arranged to automatically identify interchangeable modular components,......................................................181

(xiii)   wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components, and........181

vi

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

(xiv)   wherein the system is capable of performing automated liquid chromatography. ....................181

b.   Claim 9 ......................................................................182

2.   Claim 14 .....................................................................182

a.   Claim 13 ....................................................................183

b.   Claim 14 ....................................................................186

D.   '124 Patent.......................................................................191

1.   Claim 16 .....................................................................191

a.   A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising.................................................191

b.   a housing and ..........................................................193

c.   two or more interchangeable fluid handling units,.......193

d.   the housing comprising a liquid handling panel including two or more component positions for receiving said interchangeable units, ................................................193

e.   wherein said units are arranged as interchangeable modular components, and include:..............................197

f.   a fluidics section; ......................................................198

g.   a non fluidics section in turn comprising electronics or electrical components or control means; and...............198

h.   a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

modular component to a component position of the liquid handling panel, and .....................................................198

i.  wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and ......................200

j.  respective non fluidics sections are internal to the housing. ....................................................................203

IX.  CONCLUSION ...........................................................................205

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## I.      INTRODUCTION

1.      The following is a brief summary of my background and qualifications, which are more fully set forth in my curriculum vitae, attached as Exhibit A.

2.      I have two Bachelor degrees, a Bachelor of Arts in Physics from Lawrence University, awarded in 1990, and a Bachelor of Science in Mechanical Engineering from Washington University in St. Louis, also awarded in 1990. The two degrees were awarded in the same year because I pursued a cooperative program where the classes from each university satisfied the requirements of the other university. I received my Master of Science in 1992 and Doctor of Philosophy in 1997, both from the Northwestern University Department of Mechanical Engineering. While pursuing my MS and PhD, I specialized in fluid mechanics, the study of how fluids move. After completing these degrees, I performed a post-doctoral research appointment at the University of California Santa Barbara in the Department of Mechanical and Environmental Engineering from 1997 until 1999. During my time at the University of California Santa Barbara I specialized in the study of microfluidics—the study of how fluids move in very small systems.

3.      I am currently and have been an employee of the Purdue University School of Mechanical Engineering since August 1999. I was hired as an Assistant

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Professor, promoted to Associate Professor in 2006 and subsequently to Professor in 2010.  I have been invited to serve as a visiting professor at three different universities, Technische Universität Darmstadt (Darmstadt, Germany), Universität der Bundeswehr (Munich, Germany) and Royal Melbourne Institute of Technology (Melbourne, Australia). These visits were partially paid for by the hosting universities. I hold the rank of Fellow in both the American Society of Mechanical Engineers (ASME) and the American Physical Society (APS).  Fellow status in the American Physical Society is an honor that is bestowed upon only 0.5% of APS membership.

4.     I have engaged in many research projects in the field of fluid mechanics, resulting a long list of publications featuring two co-authored textbooks, 14 book chapters, 83 peer-reviewed journal articles, nearly 200 conference papers and presentations and nine co-authored patents. I have delivered invited lectures all over the world. Some of these invited lectures have been at large international scientific meetings such as The Gordon Research Conference on Plasmonics and Nanophotonics (2016, Newry, ME), the Chinese Society for Micro and Nano Technologies (2016, Beijing, China), International Society for Photonics and Electronics (2015, San Diego, CA), World Conference on Experimental Heat

2

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Transfer, Fluid Mechanics and Thermodynamics (2015, Lisbon, Portugal), International Conference on Nanochannels, Microchannels, and Minichannels (2012, Puerto Rico, USA), International Conference on Fluid Mechanics and Fluid Power (2006, Mumbai, India), among many others.

5.      Much of my research throughout my career has been in the field of automated fluid handling systems. Topics include using light and electric fields to control fluid and particle motion (e.g. "Light-actuated electrothermal microfluidic flow for micro-mixing," published in Journal of Micromechanics and Microengineering, 2018), using arrays of valves to move fluid samples through fluidic networks (e.g. "On-chip dilution in nanoliter droplets," Analyst, 2015), and using light to control droplets' motions (e.g. "Open Optoelectrowetting Droplet Actuation," Applied Physics Letters, 2008). All the way back to my PhD work in 1997, I was building automated fluid handling systems. In the case of my PhD work, I designed a system with pumps and valves for the purpose of evaluating rotating filtration systems of the type used for separating cellular components from whole blood. Many of my patents are in the automated fluid handling area. These include "System and method for manipulation of particles," US Patent 9,778,400 (2017); "Hybrid device for on-chip concentration, manipulation, sorting and sensing of

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

particles on a plasmonic substrate," US Patent 9,443,632 (2016); "Variable volume mixing and automatic fluid management for programmable microfluids," US Patent 9,211,539 (2015); and "Microfluidic Purge Valve," US Patent 8,376,317 (2013); among others.

6.      From approximately 2009 I co-founded the company Microfluidics Innovations, LLC. Microfluidics Innovations specialized in designing and manufacturing automated liquid handling systems. The company was founded based on intellectual property developed during research from approximately the 5 years predating its founding. As a co-founder of the company my role was primarily that of scientific advisor in the fluid handling area. As such I was involved in many projects adapting Microfluidics Innovations products to customers' needs

## II.    ASSIGNMENT

7.      Counsel for Cytiva Sweden AB and Global Life Sciences Solutions USA LLC. (which I will refer to herein as "Cytiva") have engaged me in this case. I have been compensated at a rate of $600 per hour for my consulting work. My compensation is not contingent upon the outcome of this case.  I am submitting this declaration at the request of Cytiva.

4

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

8.      In formulating the opinions contained in this declaration, I have considered my training, knowledge, fundamental engineering principles, scientific principles, and experience in the relevant scientific disciplines, as well as the materials cited herein. In addition to the conclusions and opinions set forth in this declaration, my testimony may include responses to facts, arguments, allegations, or references raised by Defendants or their experts relating to this litigation.

9.      If asked, I will be prepared to present a basic tutorial to explain the terms and concepts related to the opinions set forth in my declaration, as well as to provide further background on liquid chromatography, the state of the art, the level of skill in the art, and the patents at issue. That tutorial may include demonstrative exhibits and exemplary liquid chromatography systems. In addition to the opinions and bases set forth in this declaration.

## III.    RELEVANT LEGAL PRINCIPALS

10.     Although I am not an attorney and will not offer legal opinions, in preparation for forming the opinions set forth in this declaration I have been informed regarding the relevant legal principles.  I have used my understanding of those principles in forming the opinions set forth herein.  My understanding of those principles is summarized below.

5

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## A.    Burden Of Proof

11.    I understand that Cytiva has the burden of proving infringement by a preponderance of the evidence. I understand that the "preponderance of the evidence" standard requires that the patentee present evidence which, considered in the light of all the facts, shows that the allegations of infringement are more likely true than not

## B.    Infringement

### 1.    Direct Infringement

12.    As set forth above, I understand that the infringement analysis comprises two steps, and that the first step is determining the proper construction of the Asserted Claims. I understand that the second step of the infringement analysis is determining whether an accused product contains or practices each claim element/limitation or its equivalent.

13.    I understand that there are two types of direct infringement: "literal" infringement and infringement under the "doctrine of equivalents."

14.    I understand that, in order for a patent claim to be literally infringed, each and every element/limitation of the claim must be present, as claimed, in the accused product. In order for a method patent claim to be literally infringed, someone

6

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

must perform each step, as claimed. It is also my understanding that the failure to meet even a single claim element or limitation is sufficient to show that the accused product does not literally infringe the asserted claim.

15.    I understand that one cannot avoid infringement merely by adding elements if each element or limitation recited in the claims is found in the accused product or method.

16.    I understand that a claim in dependent form includes all the limitations of the claim(s) from which it depends.

17.    I have been informed that Cytiva is not asserting infringement under the doctrine of equivalents, so I will not discuss it.

## 2.    Indirect Infringement

18.    I understand that one can be held liable for active inducement of patent infringement by inducing the completion of all steps or elements of a patent claim with knowledge that such acts constitute patent infringement.  I further understand that one can also be held liable for offering to sell or selling within the United States or importing into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to

7

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

## IV.   THE PATENTS IN SUIT

19.   This litigation involves United States Patent Nos. 9,709,589 ("the '589 Patent") (Ex. 32), 9,709,590 ("the '590 Patent") (Ex. 33), 9,709,591 ("the '591 Patent") (Ex. 34), 9,671,420 ("the '420 Patent") (Ex. 35), and RE47,124 ("the '124 Patent") (Ex. 36) (collectively, the "Asserted Patents").  In this declaration, will address infringement of certain claims of the '420, '589, '591 and '124 patents.

20.   The Asserted Patents disclose and claim novel automated liquid chromatography embodiments.  The Asserted Patents each state that:

> The present invention relates to the art of fluid handling system systems, and in particular to an automated fluid handling system that is highly flexible and configurable. The fluid handling system may e.g. be a liquid chromatography system, a filtration system, a chemical synthesis system or the like.

the '589 Patent, 1:22-27.[1]  The Asserted Patents also state:

> The object of the invention is to provide a new fluid handling system, which system overcomes one or more

---

[1] Unless I state otherwise, all citations to the Asserted Patents are from the '589 Patent.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> drawbacks of the prior art. This is achieved by the fluid
> handling system as defined in the independent claims.
>
> One advantage with such a fluid handling systems is that
> the system may easily be upgraded without need for add-
> on equipment, and that the flow path may be easily
> optimized for new experimental setups.

*Id.*, 1:50-59.

21.     The Asserted Patents state that one embodiment of the invention as

follows:

> FIG. 1 shows one embodiment of an automated fluid
> handling system modular in the form of a liquid
> chromatography system, with a plurality of
> interchangeable modular components arranged in a liquid
> handling panel wherein the reference numbers denotes:
>
> 1. Injection valve
>
> 2. Column valve with integrated pressure sensors
>
> 3. Conductivity monitor
>
> 4. UV monitor
>
> 5. Quaternary valve
>
> 6. Inlet valve B with integrated air sensor
>
> 7. System pump
>
> 8. Pressure monitor, system pump
>
> 9. Inlet valve A with integrated air sensor

9

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

10. System pump

11. Pressure monitor, sample pump

12. Sample pump

13. Rinsing system

14. Mixer with online filter

15. Sample inlet valve with integrated air sensor

16. Flow restrictor

17. pH valve

18. Outlet valve

*Id.*, 2:50-3:5.  For convenience, Fig. 1 is reproduced below, where placement of the above-identified modules are arranged in a liquid handling panel of the system:

10

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Fig. 1

22.     Exemplary modules, which the patent refers to as "interchangeable modular components" (and other terms), include injection valve 1, column valve 2, UV monitor 4, system pumps 7 and 10, inlet valve 6 and 9, sample inlet valve, pH valve 17, and outlet valve 18.

23.     Fig. 2 of the Asserted Patents "is a schematic illustration of a housing 20 with a liquid handling panel 22 of the fluid handling system in the form of a

11

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

modular liquid chromatography system 100 of FIG. 1.■  *Id.*, 5:38-41.  I have reproduced Fig. 2 below:



Fig. 2

24.    Liquid handling panel 22 is located on one side of housing 20, and defines a number of openings, which the Asserted Patents often call "locations."  The various modules are inserted into these locations.  The specification further states:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> In the disclosed configuration, as disclosed in detail above, the modular liquid chromatography system 100 comprises a plurality of fluid control valves in the form of: Injection valve 1, Column valve 2, Quaternary valve 5, Inlet valve B 6, Inlet valve A 9, Sample inlet valve 15, pH valve 17, and Outlet valve 18. The chromatography system 100 further comprises UV monitor 4, System pump B 7, System pump A 10, Sample pump 12, Mixer 14, and three Dummy modules 24.

*Id.*, 5:41-50.

25.    Another discussion the Asserted Patents have regarding modules is in the context of Fig. 4:

> FIGS. 4a to 4d are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. 4a shows a standard interchangeable modular component 26, e.g. a fluid control valve or the like. The standard component module 26 comprises a panel member 28, an external fluidics section 30 and an internal non-fluidics section 32. According to one embodiment, the panel member 28 essentially separates the fluidics in the external fluidics section 30 from electronics and control means in the internal non-fluidics section 32.

*Id.*, 6:4-13.  I have reproduced Figs. 4a-4d below:

13

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



26.     Except for the "dummy module" shown in Fig. 4b, each of the modules depicted in Figs. 4a-4b and 4d are made up of several members, or sections. A first is panel member 28. A second is non-fluidics section 32 and a third is fluidics section 30. Of course, a person of ordinary skill in the art ("POSITA") would understand that there could more sections than just these. Indeed, the Asserted

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Patents refer to various sensors that are externally located, e.g., pH electrodes.  Such sensors are electrochemical in nature and are located outside of the interior of the modules and housing.

27.    The Asserted Patents call out certain features that a POSITA would have realized were important advancements in liquid chromatography technology. One important advancement was providing users with the ability to easily modify their systems so that they could optimize the fluid flow paths of liquid chromatography runs:

> To fulfill a desired purpose, with the disclosed liquid chromatography system it is possible to adapt and extend the flow path in a simple and a flexible way.

*Id.*, 4:65-67.  The Asserted Patents further stress this advancement:

> According to one embodiment, all liquid handling components and sensors arranged at the liquid handling panel 22 are designed to be readily interchangeable. The interchangeability provides improved service and upgrade possibilities and also a possibility to customize the positions of the respective liquid handling components, such as the fluid control valves, e.g. in order to optimize the fluid path for a specific experimental setup.

*Id.*, 5:50-57.   The Asserted Patents provide further discussion regarding this important advancement in the context of Fig. 10:

15

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> FIG. 10 is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel. Taking into account the complexity of the disclosed interconnection arrangement, the benefit of optimizing the fluid paths in alternative configurations of the system becomes evident. The task of optimizing the fluid paths may e.g. be performed to reduce the total length/volume of the fluid paths/tubing arranged to interconnect the different component modules in the system. Alternatively the optimization may be performed to minimize the length/volume of one or more specific fluid paths, such as the sample output path from the column to the fraction collector, in order to minimize dispersion of the fractionized sample.

*Id.*, 8:61-9:7.  I have reproduced Fig. 10 below:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Fig. 10

28.     Another important aspect of the inventions in the Asserted Patents is the separation of a fluidics section of the modules from the electronics in an internal non-fluidics section:

> FIGS. 4a to 4d are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. 4a shows a standard interchangeable modular component 26, e.g. a fluid control valve or the like. The standard component module 26 comprises a panel member 28, an external fluidics section 30 and an internal non-fluidics section

17

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> 32. According to one embodiment, the panel member 28 essentially separates the fluidics in the external fluidics section 30 from electronics and control means in the internal non-fluidics section 32.

*Id.*, 6:4-13.  The Asserted Patents essentially repeat this important advancement, when stating:

> As is disclosed in FIGS. 4a to 4d, the interchangeable modular components 26 comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel. Said panel attachment member may be arranged so that all fluid connections of said modular component are arranged on a wet side of the panel attachment member separating them from electrical components that are arranged on a dry side thereof, hence providing a high degree of liquid resistance at the external part of the fluid handling panel, and so that the liquid resistance requirements for the internal sections may be somewhat lightened.

*Id.*, 6:23-35.

29.    I will discuss this in more detail below when addressing Bio-Rad's infringement of the Asserted Claims.  However, I note initially that the specification discloses multiple examples of modules that have electrical components in locations other than the non-fluidics sections of the modules.

30.    For example, above, I quoted a list of modules the Asserted Patents specifically identify, and a POSITA would understand that many of these can have

18

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

electrical components located in areas outside any non-fluidics section.  Such modules could include:

> 2. Column valve with integrated pressure sensors
>
> 3. Conductivity monitor
>
> 4. UV monitor
>
> 6. Inlet valve B with integrated air sensor
>
> 9. Inlet valve A with integrated air sensor
>
> 15. Sample inlet valve with integrated air sensor
>
> 17. pH valve

31.    The Asserted Patents further disclose having each module have its own CPU:

> In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42.

8:9-12.

32.    Cytiva uses the inventions claimed in the Asserted Patents in its ÄKTA avant and ÄKTA pure automated liquid chromatography systems.

19

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## A.   The '420 Patent

33.   The '420 Patent was filed on September 9, 2016 as a Continuation of U.S. patent application Ser. No. 15/165,876 filed May 26, 2016 which is a Continuation of U.S. patent application No. 14/463,039 filed Aug. 19, 2014 (now U.S. Pat. No. 9,404,902) which is a Continuation of U.S. patent application No. 13/376,929 (now U.S. Pat. No. 8,821,718) filed Dec. 8, 2011 which was a National Phase of the PCT application I mentioned above. It also claims priority to the Swedish patent application, filed Jun. 9, 2009, I discussed above.

## B.   The '589 Patent

34.   The '589 Patent was filed on May 26, 2016 as a Continuation of U.S. patent application No. 14/463,039 filed Aug. 19, 2014 which is a Continuation of U.S. patent application No. 13/376,929 (now U.S. Pat. No. 8,821,718) filed Dec. 8, 2011 which was a National Phase of the PCT application I mentioned above. It also claims priority to the Swedish patent application, filed Jun. 9, 2009, I discussed above.

## C.   The '591 Patent

35.   The '591 Patent was filed on July 8, 2016 as a Divisional of U.S. patent application No. 15/165,876, filed May 26, 2016 which is a Continuation of U.S.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

patent application No. 14/463,039 filed Aug. 19, 2014 which is a Continuation of U.S. patent application No. 13/376,929 (now U.S. Pat. No. 8,821,718) filed Dec. 8, 2011 which was a National Phase of the PCT application I mentioned above. It also claims priority to the Swedish patent application, filed Jun. 9, 2009, I discussed above.

### D.   The '124 Patent

36.     The '124 Patent is a reissued version of U.S. Patent No. 8,821,718 (the "'718 Patent").  The '718 Patent was filed on December 8, 2011 (and assigned U.S. patent application No. 13/376,929, which was a National Phase of the PCT application I mentioned above. It also claims priority to the Swedish patent application, filed Jun. 9, 2009, I discussed above.

## V.   THE PERSON OF ORDINARY SKILL IN THE ART

37.     I have been asked to provide a definition of "a person of ordinary skill in the art" ("POSITA") to whom the inventions disclosed and claimed in the patents-in-suit were directed, as of the relevant priority dates

38.     For purposes of this declaration, I have been asked to assume that the priority date for each of the Asserted Patents is June 9, 2009, which is the date the Swedish priority application was filed.  I note that my opinion regarding the

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

definition of a POSITA would not change should the Court or other decision maker

determine that that priority date is June 4, 2010, the filing date of the PCT application

I mentioned above.

39.    I have been informed that factors for determining ordinary skill in the

art may include one or more of the following: (1) the educational level of the

inventors; (2) the type of problems encountered in the art; (3) prior art solutions to

those problems; (4) the rapidity with which innovations are made; (5) the

sophistication of the relevant technology; and (6) the educational level of workers

active in the field.  I have considered these factors in my analysis.

40.    For example, I note that one of the inventors of the Asserted Patents,

Mats Lundkvist, has a bachelor's degree in Mechanical Engineering.  Lundkvist

10/22/2014 Tr. 42:15-44:8.

41.    In my opinion, a POSITA would have a scientific or technical

background with at least 5 years of experience in the design, service, operation,

and/or use of automated fluid handling systems, which would include liquid

chromatography systems, filtration systems, chemical synthesis systems or the like.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## VI.   CLAIM CONSTRUCTION

42.   I am informed that the Parties agreed to the following claim constructions:

| Claim Term(s) | Agreed Upon Construction |
|---|---|
| "CPU" / "CPU unit" | "central processing unit" |
| "the fluidics section is external to the housing and the non[-]fluidics section is internal to the housing" | "the fluidics section is on the outside of the housing and the non-fluidics section is on the inside of the housing" |

*See* Claim Construction Order, D.I. 89 (May 28, 2020).

43.   I am informed that Judge Connelly adopted the following claim constructions.

| Claim Term(s) | Court's Construction |
|---|---|
| "interchangeable modular component" | "component that can be inserted into and removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another component" |
| "interchangeable modular fluid handling unit" | "fluid handling unit that can be inserted into and removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another fluid handling unit" |

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

| Claim Term(s) | Court's Construction |
|---|---|
| "modular fluid handling unit" | "fluid handling unit that has a standardized size and shape that allows it to be exchanged with another fluid handling unit" |
| Claim Preambles ("An automated liquid chromatography system comprising"/ "A method of modifying a fluid flow path in an automated liquid chromatography system comprising"/ "A method for building an automated liquid chromatography system, the method comprising"/ "A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising") | The preambles are claim limitations. |
| "liquid chromatography system" | Plain and ordinary meaning |
| "automated liquid chromatography system" | Plain and ordinary meaning |
| "wherein the system is capable of performing automated liquid chromatography" | Plain and ordinary meaning |
| "non-fluidics section"/"non-fluidics section"/"non fluidics section" | "a section of the interchangeable fluid handling unit that includes electrical components and does not include fluidics components" |
| "a fluid handling section"/"a fluidics section" | "a section of the interchangeable fluid handling unit that includes fluidics |

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

| Claim Term(s) | Court's Construction |
|---|---|
| | components and does not include non-fluidics components" |

*Id.*

44.   I have been informed that the Court rejected Bio-Rad's proposed constructions for the terms "non-fluidics section"/"non-fluidics section"/"non fluidics section" and "a fluid handling section"/"a fluidics section." Bio-Rad sought the following constructions for these terms:

| "non-fluidics section"/"non-fluidics section"/"non fluidics section" | "a fluid handling section"/"a fluidics section" |
|---|---|
| "all the non-fluidics/electrical components of an interchangeable fluid handling unit" | "all the fluidics components of an interchangeable fluid handling unit" |

45.   As can be seen, the Court did not accept Bio-Rad's construction of these terms.   I have been provided with portions of the transcript of the hearing Judge Connolly held regarding claim construction.   Judge Connolly made several statements regarding why he did not accept Bio-Rad's constructions.   In one example, the Court stated

> But, see, actually, this is very interesting that you propose this. If you recall, I actually led with the questions that exactly went to this issue, because my first

25

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> question was about, can you have, do you have to have electronic components in the fluidics section, because I think it's clear that the written description allows for there to be non-fluidic components external to the non-fluidics section. They just, and I think this is a key, they just can't be in the fluidics section.

Markman Tr. 97:16-25. *See also*:

> So I'm not able to accept GE's position that on one hand a non-fluidic section can contain fluidics. On the other hand, a fluidics section cannot contain non-fluidics. On the other hand, the patent uses the indefinite article, so it contemplates one or more sections, and the Federal Circuit has said, understandably, that the indefinite article does not mean all. So that is what I find problematic about Bio-Rad's construction, is they want to say all the fluidic components.

*Id*, at 100:14-23. Finally, *see also*:

> That does not, however, preclude the possibility that there are other sections that are in the invention, and that's important because that is consistent with the use of the indefinite article, which is inconsistent with Bio-Rad's insistence that "all," either fluidic or non-fluidic components, are in the respective handling unit.

*Id*. 103:8-13.

46.     Judge Connolly's statements are consistent with the Asserted Patents, which, as I discussed, teach multiple different modules where electronics are located in locations other than their respective non-fluidics sections. *See* Paragraphs 29-30.

26

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## VII.  BACKGROUND

47.    Chromatography is a method for separating chemical components. There are many different kinds of chromatography. Common to many types chromatography is that chemical components (called the mobile phase) are separated by flowing them over a stationary material (called the stationary phase) for which those chemical components have varying degrees of affinity, i.e. they are attracted to greater or lesser degrees to the stationary phase.  These differing degrees of affinity allow some of the chemical components to move faster than others, separating the originally mixed chemical compounds into discrete bands. When performed with liquid chemical compounds, this process is called liquid chromatography.  Modern day liquid chromatography is a very complicated process, used for either diagnostics—analyzing the chemical components of a fluid or production—separating some desired chemical component from a fluid for the purpose of collecting that component or components for subsequent use.  Both applications of liquid chromatography are very complicated, requiring many different fluid operations to be performed precisely in succession in order for the chromatography to succeed.  Automated fluid handling is a critical part of modern

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

day automated liquid chromatography.  These concepts are discussed in detail in my textbook, Ngyuen, Wereley and Shaegh, 2018.

48.    Before Cytiva[2] invented the subject matter claimed in the Asserted Patents, automated liquid chromatography systems were complicated, as well as difficult to modify and use.  Before introducing its ÄKTA avant system, Cytiva sold several different liquid chromatography systems, for example the ÄKTA Explorer. The inventors recognized the issues identified here, and sought to overcome them with the inventions disclosed and claimed in the Asserted Patents.  For example, an early design document evidencing the work performed to develop the inventions noted that a goal was to eliminate what it referred to as a ██████████ of tubing users end up with when using prior art systems:

██████████████████████████████████

Ex. 1 (GEHCDEL127450 at 52).

49.    In another example, before introducing its NGC system that is the subject of this litigation, Bio-Rad sold a liquid chromatography system called the

---

[2] For ease of discussion, I am using Cytiva to refer to both Cytiva and its predecessors.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

DuoFlo.  Bio-Rad witnesses testified regarding the drawbacks of Bio-Rad's DuoFlo.

For example, Mr. Iovanni testified:



Iovanni Tr. 64:8-20.  Mr. Chapman provided similar testimony:



29

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Chapman Tr. 489:22-490:17.

50.    Bio-Rad's own internal documentation provides additional evidence that even Bio-Rad recognized that prior products were, as Messrs. Iovanni and Chapman put it, ███████████████████████████████████████████████████ ███████████████████:" This presentation, dated in September 2009, is a good example:



Ex. 4 (BRGE00016967).

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

51.     The slide above shows, side-by-side, ███████████████████

████████████████████████████ When asked about this slide

at his deposition, Mr. Iovanni reiterated his testimony regarding the DuoFlo, and

compared that design to what he referred to as a ████████ of the NGC system Bio-

Rad was contemplating:



31

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Iovanni Tr. 201:6-202.22.

## VIII. INFRINGEMENT

52.     In the following paragraphs, I provide a detailed discussion of how the Accused Products meet the limitations of the patents-in-suit.

53.     Before analyzing each of the asserted claims against Bio-Rad's NGC system, I will provide some background regarding the various models within the product line.

54.     Bio-Rad's NGC system has four main models, with each module having sub-models.  These four models are:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

- Quest

- Scout

- Discover

- Discover Pro

55.    The following table, from an internal Bio-Rad document, demonstrates

the differences between the models as well as the sub-models for each:



See BRGEDEL000070409.

56.    As can be seen, the Quest model comprises, among other items, a base

frame, two system pump modules, two blank modules, a sample inject valve module,

a UV detector module, and a mixer module.  The Quest 10 includes two F10 system

33

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

pumps while the Quest 100 includes two F100 pumps, with the main difference

between the two being the flow rate of each (0.001-10 ml/min for the F10 versus

0.010-100 ml/min for the F100). Ex. 5, p. 30. Both the Quest 10 and Quest 100 are

available as the Quest 10+ and the Quest 100+. The difference between the "+" and

the non-+" models is that the "+" modules come standard with multi-wavelength UV

detectors.

57.    As can also be seen, the Scout model comprises, among other items, a

base frame, two system pump modules, two blank modules, a sample inject valve

module, a UV detector module, a buffer blending valve module, a pH valve module,

and a mixer module. The Scout 10 includes two F10 system pumps while the Scout

100 includes two F100 pumps. As discussed, the main difference between the F10

and F100 systems pumps is the flow rate of each (0.001-10 ml/min for the F10 versus

0.010-100 ml/min for the F100). Ex. 5, p. 30. Both the Scout 10 and Scout 100 are

available as the Scout 10+ and the Scout 100+. The difference between the "+" and

the non-+" models is that the "+" modules come standard with multi-wavelength UV

detectors.

58.    As can also be seen, the Discover model comprises, among other items,

a base frame, an expansion frame (i.e., housing), two system pump modules, a

34

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

sample pump module, two inlet valve modules, a sample inject valve module, a multi-wavelength UV detector module, a buffer blending valve module, a pH valve module, a column switch module, and a mixer module. As with the Quest and Scout, the Discover 10 includes two F10 system pumps while the Discover 100 includes two F100 pumps.

59. Finally, the Discover Pro model comprises, among other items, a base frame, two expansion frames (i.e., housings), two system pump modules, a sample pump module, three blank modules, three inlet valve modules, a sample inject valve module, a multi-wavelength UV detector module, a buffer blending valve module, a pH valve module, a column switch module, an outlet valve module, and a mixer module. As with the Quest and Scout, the Discover Pro 10 includes two F10 system pumps while the Discover Pro100 includes two F100 pumps.

A.    The '420 Patent

1.    Claim 1

a.    "An automated liquid chromatography system"

60. Bio-Rad's NGC system is an "automated liquid chromatography system." First, there can really be no dispute that Bio-Rad's NGC is a "liquid chromatography system," as its documents are replete with statements saying as such. One example is in the NGC Instrument Guide:

35

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 11.  Note that this document not only states that the NGC system is a liquid chromatography system, but it also notes that the NGC system "rapidly automates" purification of biomolecules.   Thus, a POSITA would understand that the NGC system is an automated liquid chromatography system.

61.    At her deposition, Dr. Mavandadi ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ See   Ex.   6 (BRGE00065119).  When asked about this at her deposition, Dr. Mavandadi testified that ███████████████████████████████████████████████████████████ ████████ ███████████████████████████████████████████████

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Mavandadi Tr. 106:5-15.

62.    This is plainly the case with the NGC system. ▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌. Thus, the NGC system is plainly an "automated liquid chromatography system."

63.    Moreover, automated liquid chromatography systems must have certain components to perform liquid chromatography, including at least an injection valve, a suitable pump, an inline detector that can measure the relevant characteristics of the liquid exiting the chromatography column, and control software for processing, displaying, and/or storing the results, which operate without manual intervention.

64.    There is no dispute that Bio-Rad's NGC system has each of these. I will discuss these in more detail below, but as will be seen, all Bio-Rad NGC models come standard with a sample inject valve module (Ex. 5, pp. 28, 87), two system pump modules (Ex. 5, pp. 28, 87), and a UV monitor module (Ex. 5, pp. 65-70, 87).

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**b.**     **"a housing"**

65.     The NGC system plainly has a housing unit.  The following two figures, which are annotated to show the housing, come from Bio-Rad's NGC Instrument Guide:"



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 22, 24-26.

66.   The "housing" is annotated in red.  Note that the front view appears to depict a Discover Pro system, as it shows two expansion housings placed on top of the main enclosure.  The remaining views appear to show a Discover system since they each show the NGC system with a single expansion housing stacked on the main housing.

67.   Exhibit 21, a Bio-Rad marketing document, shows a good view of the Quest and Scout systems.  A portion is reprinted them below, with an annotation pointing to the housing:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 21, p. 3.

68. The "Assembly Procedure For Quest 10 Chrom 10 System NGC,"

Bates No. BRGEDEL1541-1565 provides additional information:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 24 BRGEDEL000001591.

69.    Exhibit 12 is the Technical Specification for the Next Generation Chromatography System. 

BRGEDEL401625.

70.    Mr. Iovanni testified that

. Iovanni Tr. 216:20-217:3.  Exhibit 12 contains the following entry as a specification for the NGC:

41

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



BRGEDEL401628.  This document further demonstrates that the NGC system has

a housing:



BRGEDEL401629.  Mr. Bland testified that this entry refers to the housing of the

NGC:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 86:2-86:17.

71.     The hardware specification for the NGC's Primary system Enclosure

(Ex. 11), further demonstrates that the NGC systems include a "housing:"



Ex. 11 (BRGEDEL445194).  Mr. Chapman testified that this document reflects a

housing as well:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Chapman Tr. 541:6-541:22.

72.     In sum, this claim element is plainly present in all NGC models.

        **c.**     **"a master control unit connected to a system bus; and"**

73.     The NGC system has a master control unit connected to a system bus. The NGC system has several components that that fall within this claim term, either alone or in combination with each other. The "master control unit" reads on either the component that Bio-Rad often refers to as the "system controller" or "single board computer," or the Chromlab computer, or the combination of the two.

74.     I will focus first on Bio-Rad's single board computer. Note that Mr. Iovanni testified that the terms master controller and system controller were used synonymously. Iovanni Tr. 170:22-171:8.

44

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

75.    Mr. Bland testified that the purpose of the single board computer in the NGC system was as follows:



Bland Tr. 36:1-36:13.  Mr. Bland also testified that the single board computer was installed inside the housing:  Bland Tr. 37:8-38:18.

76.    Mr. Bland testified that the purpose of the external PC connected to the NGC system was follows:



Bland Tr. 36:14-37:2.

45

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

77.     The single board computer is also described in Exhibit 30.

78.     Cytiva also took this photograph from the NGC it has:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

79.     All of Bio-Rad's specifications for its various modules indicate that the

CPUs (discussed below) on each of those modules communicate via ████████

████████████████

████████████████████████████████████████

Ex. 19 (BRGEDEL000282555) (██████████████)

████████████████████████████████████████

Ex. 13 (BRGE0096083)  (████████████████████████)

████████████████████████████████████████

Ex. 14 (BRGEDEL000450748) (██████████)

████████████████████████████████████████

Ex. 20 (BRGEDEL000281533) (██████████████████████).

████████████████████████████████████████

Ex. 25 (BRGEDEL000451791) (██████████████)

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 26 (BRGEDEL000450859)

Ex. 27 (BRGEDEL000450600) (

)

80.    Mr. Bland testified that single board computer communicates with each of the modules in the system via

Bland Tr. 144:1-144:11.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

81.    The external PC, which everyone will recognize contains a processing device (generally an Intel microprocessor, which will have several CPUs), also communicates via a system bus.  See, e.g., Ex. 5:



Ex. 5, p. 24.  See also:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**Connecting the NGC System to the ChromLab Computer**

**Note:** Ensure that the ChromLab computer and the NGC instrument are powered off before beginning this task.

You can connect the NGC system to the ChromLab computer in one of two ways:

■ Direct cable connection using a Cat 6 ethernet cable

■ Network connection through your network infrastructure

Ex. 31 (Installation Guide), p. 79.  Ethernet is a well-known bus.

82.    In sum, this limitation is plainly present in all NGC models.

> **d.    "three or more fluid handling units arranged as interchangeable modular components comprising"**

83.    All NGC models include "three or more" fluid handling units arranged as interchangeable modular components."

84.    As discussed, the Court construed "interchangeable modular component" to be a "*component that can be inserted into and removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another component.*"

85.    As discussed above, each NGC model can include the following modules:

|   | **Quest** | **Scout** | **Discover** | **Discover Pro** |
|---|---|---|---|---|
| 1 | System Pump | System Pump | System Pump | System Pump |
| 2 | System Pump | System Pump | System Pump | System Pump |

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

|  | Quest | Scout | Discover | Discover Pro |
|---|---|---|---|---|
| 3 | Sample Inject Valve | Sample Inject Valve | Sample Inject Valve | Sample Inject Valve |
| 4 | UV Detector | UV Detector | UV Detector | UV Detector |
| 5 |  | pH Valve | pH Valve | pH Valve |
| 6 |  |  | Column Switch Valve | Column Switch Valve |
| 7 |  |  | Sample Pump | Sample Pump |
| 8 |  |  | Buffer Inlet Valve | Buffer Inlet Valve |
| 9 |  |  |  | Sample Inlet Valve |
| 10 |  |  |  | Outlet Valve |

86.    Per the language of this claim, only three of Bio-Rad's modules need be "interchangeable modular components." In each of the NGC models, each of the system pumps are an "interchangeable modular component," and are thus two of the three that the claim requires. A third "interchangeable modular component" is Bio-Rad's sample inject valve module, which is also standard on all NGC models.

87.    Bio-Rad's Instrument Guide illustrates system pump modules:

51

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 28.

88.    Bio-Rad's Instrument Guide illustrates the sample inject valve module:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 37.

89.     First, these modules, like all the NGC modules, can be inserted into and removed from positions in the housing.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



The NGC instrument ships preassembled with the components necessary to perform gradient separations. The modular components slide into slots in the system known as *bays*. Some modules fit into single-wide bays while others require double-wide bays. Bays can be converted from one size to the other by adding or removing a center divider.

Each module has a unique electronic ID that enables the system to recognize its function when the module is placed into a bay. For example, the system can distinguish between a sample inject valve module and a sample inlet valve module even though they each occupy a single-wide slot.

The position of the module on the system can be changed to optimize the placement and minimize the length of tubing, reducing the system swept volume. The physical location of a module can be easily identified in the overall flow scheme required to run the application through the ChromLab software. Prior to starting a run, ChromLab performs a system check to ensure that all the required modules are physically present on the instrument.

This chapter explains in detail the modules that make up the NGC instrument.

*Id.*, p. 19. The Technical Specification for NGC indicates that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Ex. 12 (BRGEDEL401642).  This plainly indicates that all modules, including pump modules, sample inject valve modules, UV detector modules, and pH valve modules, ■can be inserted into and removed from positions in the housing■ and "exchanged with another component," just as the Court's construction requires.   Mr. Bland testified as follows regarding this requirement:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 98:13-101:1.

90.     This same document indicates that ▮▮▮▮▮▮ was required for each module:



Ex. 12 (BRGEDEL401629).

91.     Each of the modules have a standardized shape and size.  In particular, the NGC has system "bays," or positions, that can receive the modules.  This is seen in the excerpt from NGC Instrument Guide (Ex. 5) I pasted above (p. 19).  This same document illustrates this in more detail.  In a section of the Instrument Guide entitled "Replacing or Repositioning Modules on the NGC Instruments," Bio-Rad shows the following:

57

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 234.  The NGC can accommodate modules that are "single-wide" and "double-wide."  This is shown below:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



**Converting Bays to Fit Modules**

Some modules fit into single-wide bays while others require double-wide bays (such as the system and sample pump modules and the UV and UV/Vis detector modules). Bays can be converted from one size to the other by adding or removing the center divider.

The following image shows two adjacent, empty, single-wide bays.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 236-238 (p. 236 not reproduced).

92.    The pump modules are double-wide modules while the sample inject valve is a single-wide module.  This plainly demonstrates that these modules have a "standardized size and shape."  For example, just as Bio-Rad instructs in the Instrument Guide, an NGC user could, for example, remove a sample inject valve

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

module and insert into the single-wide bay another module, e.g., a pH valve module.

Likewise, an NGC user could remove a pump module and insert into the double-wide bay, e.g., a sample pump or a UV detector.  Similarly, an NGC user could convert the double-wide bay into a single-wide bay and insert a sample inject valve module an into one of the two resulting single-wide bays.

93.  Finally, by having these standard sized bays, the NGC system "allows [for the fluid handling unit] to be exchanged with another component."  Bio-Rad's Instrument Guide makes that clear, as it indicates that a person can replace or reposition modules:



### Replacing or Repositioning Modules on the NGC Instruments

**WARNING!**  Disconnect power to the NGC instrument before removing or repositioning any module. Do not attempt to service any component on the NGC instrument unless noted in this manual. Contact Bio-Rad for service requests.

**WARNING!**  To reduce the chance of liquid seeping into the instrument, all open bays must be filled with the NGC Blank module (catalog #788-4005). The NGC instrument will not operate if it detects a slot without a module inserted.

**To replace or reposition modules on the NGC instruments**

1.  On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2.  If necessary, disconnect all tubing lines to and from the module that you plan to replace or reposition.

3.  Loosen the captive screws on the front of the installed module.

4.  Firmly grasp both screws on the module and pull it forward out of its bay.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

*See* Ex. 5, p. 233.  *See also Id*. at 234-239.

94.     Thus, this claim element is plainly met by all NGC models.

### e.     "(i) an external fluidics section,"

95.     The "three or more fluid handling units arranged as interchangeable modular components" I identified above each have an "external fluidics section."

96.     As discussed, the Court construed "fluidics section to mean ■*a section of the interchangeable fluid handling unit that includes fluidics components and does not include non-fluidics components*."

97.     First, the specifications for each of these modules (and others) specify that they have a "fluidics section" because they state that



Ex. 13 (BRGE0096090)

62

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 14 (BRGEDEL000450753) (███████████).

98.   Mr. Chapman testified that these specifications were met for the pump modules (Chapman Tr. 529:12-530:17) and sample inject valve module (Chapman Tr. 528:16-529:10).

99.   These documents and Mr. Chapman's testimony demonstrates that the "fluidics section" for each of these modules, *e.g*., the two system pump modules and the sample inject valve module "*include[] fluidics components*," just as the Court's claim construction requires.

100.   The fluidics section for the system pump modules used in the NGC system is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 28-29.  Note that this figure annotated to show hidden portions of the fluidics section, *i.e*., a simplified illustration of the flow path within the fluidics section.

101.   Note that the NGC Instrument Guide illustrates the F10 pump module, but the F100 pump module is essentially identical for purposes of this infringement analysis, meaning that the structure corresponding to the recited fluidics section is the same.

102.   Note also that this portion of the Instrument Guide does not illustrate the priming ports that can be on the system pump modules.  These can be seen in the

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

assembly drawings, which is annotated to show the fluidics section, to show a simplified illustration of flow path within the fluidics section:



Ex. 23 (BRGEDEL1507) (F10 pump module).  *See also*:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 28, (BRGEDEL972) (F100 pump module)

103.   The fluidics section for the sample inject valve module used in the NGC system is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp 37-38.  This particular illustration does not show the complete fluid flow path, as the fluid flow paths of the fluidics section are not shown.  However, this can be seen in, for example, the following figure from Bio-Rad's Instrument Guide:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 40.

104.   As is seen, the fluidics section of each of these modules include fluidic components in the flow path like tubing inputs and outputs, sensors, flow cells and valve components.

105.   The Court's construction also requires that the fluidics section "*not include non-fluidics components.*"   None of the fluidics portions I have identified above contain non-fluidics components.   They all are involved in transmission of fluids, e.g., tubing, flow cells, tubing inputs and outputs, etc.

68

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

106.   A POSITA would recognize that externally located non-fluidics components in Bio-Rad's NGC system are not a part of the claimed fluidics section. Indeed, as discussed, the Court stated at the claim construction hearing that there can non-fluidics components like electronics external to the housing.   Markman Tr. 97:16-25.  Indeed, the Court also said each module can have more than just a fluidics section and a non-fluidics section.  *See e.g.*, *Id*, at 100:14-23 and 103:8-13.

107.   In sum, each model of Bio-Rad's NGC system has an external fluidics section, just as claimed.

### f.      "(ii) an internal non-fluidics section"

108.   The "three or more fluid handling units arranged as interchangeable modular components" I identified above each have an "internal non-fluidics section."

109.   As discussed, the Court construed "non-fluidics section" to mean "*a section of the interchangeable fluid handling unit that includes electrical components and does not include fluidics components*."

110.   As discussed, the specifications for each of these modules (and others) specify that they have a "non-fluidics section" because they state that ███████

██████████████████████████████████████████████████

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



█████ The specifications further state that ███████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████

Ex. 13 (BRGE0096090) (███████████████████)

Ex. 14 (BRGEDEL000450753) (███████████)

111.    Mr. Chapman testified that these specifications were met for the pump

modules (Chapman Tr. 529:12-530:17) and sample inject valve module (Chapman

Tr. 528:16-529:10).

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

112.   The assembly drawings for these modules demonstrate that these modules have a non-fluidics section that include electronic components but not fluidics components

- F10 System pump module: Ex. 23.

- F100 System pump module: Ex. 28.

- Sample inject valve module: Ex. 29.

113.   The NGC Service Manual (Ex. 16) further demonstrates that there is a non-fluidics section that is internal to the housing.

114.   System pump modules:



Ex. 16 (BRGEDEL317444, BRGEDEL317555).

115.   Sample inject module:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 16 (BRGEDEL317453-317454, BRGEDEL317564).

116.    These documents and Mr. Chapman's testimony demonstrates that the "non-fluidics section" for each of these modules, *e.g.*, the two system pump modules and the sample inject valve module "*include[] electrical components and does not include fluidics components*," just as the Court's claim construction requires.

> **g.**    **"including a bus connector for directly connecting the interchangeable modular component with the system bus, and"**

117.    The "three or more fluid handling units arranged as interchangeable modular components" I identified above each have a "bus connector for directly connecting the interchangeable modular component with the system bus."

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

118.   As discussed above, the NGC system has an ▮▮ system bus.  Mr. Bland testified that that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bland Tr. 110:13-15.

119.   The two system pump modules and the sample inject valve module have bus connectors that directly connect them to ▮▮▮▮▮▮▮▮▮▮.  Instrument Guide (Ex. 5) contains an illustration of an empty bay:



Ex. 5, p. 234.   Note that this figure from Bio-Rad's Instrument Guide is a simplification, as it does not show the connector.  However, as I will show below, connectors are plainly present.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

120.   Each module has a bus connector that mates with a complementary connector on the backplane.   Below are photographs Cytiva took showing the connector on a valve module that is annotated to show the connector:



Certain of the pins on each connector will connect to the NGC system bus.

121.   I was able to perform a video inspection of the NGC system that Cytiva has and confirmed that connectors like those in the above photographs are present on each module.

122.   In addition, these bus connectors "directly connect[]" each of the modules "with the system bus."   As seen below in another photograph taken by Cytiva, the backplane in the NGC system has connectors that receive and mate with the bus connectors on each module:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



123.   Bio-Rad's NGC Instrument Guide states the following:

> 9.   Place the module into the open bay and gently push it in as far as it will go.
>
> **Note:** Each module has an alignment pin on the back to ensure that it aligns correctly with the main communication board.

Ex. 5, p. 235.

124.   The alignment pin on each module ensures that the connector on the module and the connector on the NGC backplane mate properly.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

125.   As discussed above, the system bus is ▮▮▮▮▮▮▮.   Each module contains a bus controller.   I confirmed this with Cytiva, who took the following photographs of an NGC module they have, and they were able to determine that the module has a Linear Technology LTC4300A Hot Swappable 2-wire bus buffer, further establishing that there is a bus:



126.   The connection between ▮▮▮▮▮▮ on the module and ▮▮▮▮▮▮ on the backplane is direct because the electrical signals pass directly between the module and the backplane.

127.   Thus, this claim element is present in each of Bio-Rad's NGC models.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**h.    "(iii) a panel member arranged to separate the fluidics section from the non-fluidics section;"**

128.   The "three or more fluid handling units arranged as interchangeable modular components" I identified above each have a "panel member arranged to separate the fluidics section from the non-fluidics section."  As discussed, a panel member is a third section that makes up a module.  The structures that correspond to the claimed "panel member" for each of these modules is as follows:

129.   The panel member for the two system pump modules is identified below:



Ex. 5, p. 28.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

130.   Note that the panel member for the F100 pump module is, for purposes of the infringement analysis, is the same as for the F10 pump module shown above.

131.   The panel member for the sample inject valve module is identified below:



Ex. 5, p. 37.

132.   Further evidence that these modules have a panel member is seen in Bio-Rad's assembly drawings:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 28 (BRGEDEL000000972) (100 mL Pump Module)



Ex. 23 (BRGEDEL000001507) (10 mL Pump Module)

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 29 (BRGEDEL000001261) (Inject Valve Module)

133.   The panel members identified above plainly "separate the fluidics section from the non-fluidics section," just the claim requires.  Indeed, the are each interposed between the fluidics section and the non-fluidics section, just as illustrated in the Asserted Patents:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Asserted Patents, Fig. 4a (element 28).

134.   Note that I see no reason why the fact that certain of the modules have LEDs or displays integrated into their panel members takes them outside the scope of the claim language.  For one, as discussed, the fact that these are non-fluidics components is not relevant since under the Court's claim construction, only the fluidics section cannot have non-fluidics components such as electronics, and the panel member is a different section in that it is neither a "fluidics section" nor a "non-fluidics section."

135.   Mr. Bland testified that the portions I have identified as the claimed panel members is comprised of what Bio-Rad calls a "front plate" having an overlay affixed to the front plate portion on the external side of the system.  Bland Tr. 151:4:-155:21.  Mr. Chapman testified as follows regarding the purpose of the faceplate and overlay:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Chapman Tr. 386:13-389:1.

136.   Mr. Chapman's testimony thus further demonstrates that the face plate/overlay structure that each of Bio-Rad's modules has separates the fluidics section from the non-fluidics section.

137.   Thus, this claim element is met by all models of Bio-Rad's NGC system.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> **i.** **wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing**

138.   Each of Bio-Rad's NGC system models has a "liquid handling panel."

Bio-Rad's Instrument Guide shows this is present:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Ex. 5, p. 22.  As can be seen in the above illustration from Bio-Rad's documentation, the liquid handling panel has multiple "receiving positions."  Note that a portion of the liquid handling panel is hidden by the panel members of the modules.  The following illustration from Bio-Rad's Instrument Guide provides a view of a portion of the NGC liquid handling panel:



Ex. 5, p. 237.  Another view is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 234.  The below illustration shows how to convert a single-wide bay to a double-wide bay:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 238.

139.   The housing used in all models can accommodate up to ten modules and thus can have up to ten "component receiving positions," which satisfies the "at least four■ requirement.  As I discussed above, the size of Bio-Rad■ "bays" can be changed to be single-wide or double-wide bays, meaning depending on Bio-Rad's customer choice, the housing can accommodate as many as 10 modules (i.e., without

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

using any double wide modules).  In the Quest and Scout standard configurations, the following four positions in the below annotated version of figures from Bio-Rad's Instrument Guide are "component receiving positions:▪



See Ex. 5, p. 90.

140.   These four receiving positions are plainly arranged in a two dimensional array, just as the claim requires.  The same is true for the receiving positions of the housing in the Discover and Discover Pro models.

141.   Note the claim language only requires that the receiving positions be "adapted to receive said interchangeable modular components."  By reciting that the receiving positions are "adapted to receive," the claim only requires that they be able to receive the interchangeable modular components.

142.   As seen above, Bio-Rad's system pump modules, sample inject valve module, UV detector modules and pH valve modules are such that "when inserted,

88

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

the fluidics section is external to the housing and the non-fluidics section is internal

to the housing."

143.   Thus, this claim element is plainly present in all models of the NGC

system.

> **j.   wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus**

144.   Each "receiving position" of Bio-Rad's NGC system models has a

"complementary connector for connecting the bus connector of the interchangeable

modular component inserted therein to said system bus."   As seen below in

photograph taken by Cytiva, the backplane in the NGC system has connectors that

receive and mate with the bus connectors on each module:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



145.   Another photograph taken by Cytiva provides a closer view of one of the complementary connectors on the backplane of the NGC system:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



146.  These connectors are plainly "complementary" since when a module is installed, the connector on the module is inserted into the connector on the backplane.  Indeed, if the connector on the backplane were not a "complementary connector," the connector on the module would not fit, and no connection could be made.

147.  Bio-Rad's NGC Instrument Guide states the following:

> 9.  Place the module into the open bay and gently push it in as far as it will go.
>
> **Note:** Each module has an alignment pin on the back to ensure that it aligns correctly with the main communication board.

Ex. 5, p. 235.

91

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

148. The alignment pin on each module ensures that the connector on the module and the connector on the NGC backplane mate properly.

149. These complementary connectors in the NGC "connect[] the bus connector of the interchangeable modular component inserted therein to said system bus." As discussed, the system bus in Bio-Rad's NGC system is ███████ As Mr. Bland testified, ███████████████████████████████████

███████

Bland Tr. 144:1-144:11. Thus, by inserting the bus connectors on the modules into the complementary connectors on the backplane inside the NGC, that connector is inserted in the system bus, just as the claim requires.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> **k.**      **wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus;**

150.   The "three or more fluid handling units arranged as interchangeable modular components" I identified above each have an "dedicated CPU unit."  As noted above, the parties agreed that CPU should be construed as "central processing unit," which is what the abbreviation "CPU" stands for.  The specifications for each demonstrate this:



Ex. 14 (BRGEDEL000450746) (⬛⬛⬛⬛⬛⬛⬛)

Ex. 13 (BRGE0096081) (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛)

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

151.   As can be seen from the above excerpts, each of these Bio-Rad module

specifications  states: ███████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

152.   First, it is well known that microcontrollers include CPUs.  Mr. Bland

testified that ████████████████████████████

██████████████████████████████

██████████████████████████

██ ██

██████████████████████████

████████  ████████

██████████

██ ████████

██ ██████████████

Bland Tr. 105:2-105:17.

153.   Cytiva photographed the circuit board inside one of the modules of the

NGC it has, which confirms that each module has a CPU:

94

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



154.   In the photo, you can see the markings for this part is for an ADC7060.

The datasheet for this component confirms that it has a CPU:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 18 (GEHCDEL129737, at GEHCDEL129796).

155.   Bio-Rad's internal firmware specifications further demonstrate that the

Ex. 17 (BRGEDEL98274)

156.   The portions of specifications I excerpted above also demonstrate that

on each module allows ▪"the interchangeable modular

component to independently perform operations in response to instructions over the

system bus." As discussed, the Bio-Rad specifications each state that

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

████████████████████████████████████████████████████████

████████████████ This demonstrates that the CPU on each module "performs operations" since Bio-Rad's documents unambiguously state that ████████████

████████████████

157. The claim language further requires that the CPUs "allow[] the interchangeable modular component to independently perform operations in response to instructions over the system bus." This plainly happens. First, the language "independently perform operations" refers to the modules themselves, and thus requires that the particular module's operations be independent from the operations of other modules installed in the system. This is further supported by the claim language reciting that the independent operations be performed "in response to instructions over the system bus." A POSITA would understand this means that the CPU operates in conjunction with other processing devices in the system, and plainly does not mean that the in-module CPUs must operate completely by themselves. Such a reading of the claim would ignore the claim language and defy common engineering principles. Indeed, the fact that the specification describes use of a "master" control unit plainly would indicate to a POSITA that other processing devices are involved.

97

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

158.   At his deposition, Mr. Iovanni testified regarding the meaning of the word "independently" when questioned regarding Exhibit 4:



Iovanni  Tr.  105:9-105:22.   Mr.  Bland  testified  that ████████████████ ████████████████████████ (in the context of Exhibit 47, the system pump specification):



98

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 105:18-108:13.   When questioned regarding the column switch valve

module (Exhibit 50), Mr. Bland further testified that



100

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 129:2-130:16.

159.   Mr. Iovanni's testified:





Iovanni Tr. 105:9-105:22. Dr. Gale then states:



160.   I note initially that I presented Mr. Bland's testimony as evidence of infringement, although it also supports the construction I have determined a POSITA would use here. I won't repeat all his testimony, but this one quote is pertinent:





HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



161. Bland Tr. 107:13-108:13. Mr. Bland's agreement that the

████████████████████████████████████████████ is consistent with how I

believe a POSITA would understand the term.

162. In addition, I have reviewed the declaration provided by Nenad
Vukicevic, who reviewed portions of Bio-Rad's source code for the NGC system,
and this confirms the documentation and testimony that Bio-Rad's interchangeable
modular components independently perform operations ▪in response to instructions
over the system bus." See e.g., Paragraphs 5-8, 10.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

163.   In sum, this claim element is present in all models of the NGC system.

**l.      wherein the master control unit is arranged to automatically identify interchangeable modular components;**

164.   All models of the NGC system have a master control unit that "automatically identif[ies] interchangeable modular components."   The NGC Instrument Guide states:



Ex. 5, p. 19.  This August 5, 2010 specification also demonstrates that this claim limitation is met:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 12 (BRGEDEL401629).

165.   Mr. Bland testified that this takes place as well:



105

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Bland Tr. 194:4-196:12.

166.   I have also reviewed the Vukicevic declaration, where he shows this feature is present in Bio-Rad's source code, consistent with all of Bio-Rad's documentation and testimony.  See Vukicevic, Paragraph 9.

167.   In sum, this claim element is present in all models of the NGC system.

> **m.    wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and**

168.   This claim element is present in all models of the NGC system.

169.   The claim language asserts that the "housing is adapted to accommodate" a variety of different functional units, some of which must be "interchangeable modular components.  The "adapted to accommodate" claim language only requires that the housing have the ability to have the listed items.  In other words, for infringement to take place, the claim language does not require the listed items be present, but only that it is possible that the housing *can accommodate* them.  Each model can plainly have the listed items:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**Table 9. NGC chromatography system configurations**

| Module | NGC Quest | NGC Scout | NGC Discover | NGC Discover Pro |
|---|---|---|---|---|
| Sample injection valve | ✓ | ✓ | ✓ | ✓ |
| Single-wavelength UV and conductivity monitor (Available on the NGC Quest and NGC Scout systems only) | ✓ | ✓ | | |
| Multi-wavelength UV/Vis and conductivity monitor (Available on all NGC systems) | ✓ | ✓ | ✓* | ✓* |
| System pumps A and B | ✓ | ✓ | ✓ | ✓ |
| Mixer | ✓ | ✓ | ✓ | ✓ |
| pH valve | | ✓ | ✓ | ✓ |
| Buffer blending valve | | ✓ | ✓ | ✓ |
| Column switching valve 1 | | | ✓ | ✓ |
| Sample pump | | | ✓ | ✓ |
| Buffer inlet valves A and B | | | ✓ | ✓ |
| Third expansion tier | | | ✓ | ✓ |

**Table 9. NGC chromatography system configurations, continued**

| Module | NGC Quest | NGC Scout | NGC Discover | NGC Discover Pro |
|---|---|---|---|---|
| Fourth expansion tier | | | | ✓ |
| Sample inlet valve 1 | | | | ✓ |
| Outlet valve 1 | | | | ✓ |

*Only the multi-wavelength UV/Vis detector is available in the NGC Discover series.

Ex. 5, p. 87-88.

170.   All NGC models can "accommodate" any of the above listed modules.
For example, even the Quest, which, for example, does not come standard with a pH
valve module, can accommodate one.  Thus, a customer could purchase a Quest and
decide to purchase a pH valve as well.  Likewise, all NGC models can accommodate
a column switch valve and an inlet valve.  Any of these valve modules, along with

108

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

the sample inject valve that comes standard with the Quest (and all other models) comprise fluid control valves of different configurations.  Thus, all NGC models can "accommodate … at least two fluid control valves of different configurations."

171.   All models come standard with system pumps, meaning that all models can "accommodate least one pump."

172.   All NGC models can also "accommodate … at least one sensor unit." In the context of the Asserted Patents, UV module 4 is a sensor unit:

> As is illustrated in FIG. 2, there are three large component positions e.g. for pump modules, one UV-sensor position and 9 standard component positions, e.g. for fluid control valves or the like.

5:57-61.   All of Bio-Rad's NGC models comes standard with either a single wavelength UV detector module or a multi-wavelength UV detector module.  Thus, all of Bio-Rad's NGC models can "accommodate … at least one sensor unit.

173.   Finally, this limitation also requires "at least three of the pump, the sensor unit, and the fluid control valves are interchangeable modular components."

174.   As discussed, the two system pump modules and the sample inject valve modules are interchangeable modular components.  Thus, "at least three of the pump, the sensor unit, and the fluid control valves are interchangeable modular components," as required by the claim.

109

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

175.   To the extent this claim element requires that the recited "sensor unit" also be an interchangeable modular component, Bio-Rad's single and multi-wavelength UV detector modules qualify.

176.   As discussed, the Technical Specification for NGC indicates that the



Ex. 12 (BRGEDEL401642).  This plainly indicates that all modules, including UV detector modules, "can be inserted into and removed from positions in the housing" and "exchanged with another component," just as the Court's construction requires. Mr. Bland testified as follows regarding this requirement:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 98:13-101:1.

177.   This same document indicates that ▮▮▮▮▮▮▮ was required for each module:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 12 (BRGEDEL401629).

178.   Each of the modules have a standardized shape and size.  In particular, the NGC has system "bays," or positions, that can receive the modules, as I discussed above.   In a section of Bio-Rad's Instrument Guide entitled "Replacing or Repositioning Modules on the NGC Instruments," Bio-Rad shows the following:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Ex. 5, p. 234.  The NGC can accommodate modules that are "single-wide" and "double-wide."  This is shown below:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 236-238 (p. 236 not reproduced).

179.   The UV detector modules are double-wide modules.   This plainly demonstrates that these modules have a "standardized size and shape."

180.   Finally, by having these standard sized bays, the NGC system allows the module ■to be exchanged with another component."   Bio-Rad's Instrument

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Guide makes that clear, as it indicates that a person can replace or reposition modules:

**Replacing or Repositioning Modules on the NGC Instruments**

**WARNING!** Disconnect power to the NGC instrument before removing or repositioning any module. Do not attempt to service any component on the NGC instrument unless noted in this manual. Contact Bio-Rad for service requests.

**WARNING!** To reduce the chance of liquid seeping into the instrument, all open bays must be filled with the NGC Blank module (catalog #788-4005). The NGC instrument will not operate if it detects a slot without a module inserted.

**To replace or reposition modules on the NGC instruments**

1. On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.
2. If necessary, disconnect all tubing lines to and from the module that you plan to replace or reposition.
3. Loosen the captive screws on the front of the installed module.
4. Firmly grasp both screws on the module and pull it forward out of its bay.

*See* Ex. 5, p. 233.  *See also Id*. at 234-239.

181.   The UV detector module has a fluidics section, a non-fluidics section, and a panel member.  The specifications for the UV Detector modules specify that they have a "fluidics section" because they state that ███████████████████████████ ███████████████████████████

116

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 20 (BRGEDEL000281538) (█████████████████████)

Ex. 19 (BRGEDEL000282560) (█████████████████).

182. Mr. Chapman testified that these specifications were met for the single wavelength detector module (Chapman Tr. 532:4-533:13), and the multi-wavelength UV detector (Chapman Tr. 533:15-534:17).

183. The fluidics section for the single wavelength UV detector module used in the NGC system is as follows:

117

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 67, 205.

184.  The fluid handling section for the multi-wavelength UV detector module used in the NGC system is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 66, 69, 205.

185.   As is seen, the fluidics section of each of these modules include fluidic components like tubing, tubing inputs and outputs, as well as a flow cell.

186.   The Court's construction also requires that the fluid handling section ▪*not include non-fluidics components*."   None of the fluidics portions I have identified above contain non-fluidics components.   They are all involved in transmission of fluids, e.g., tubing, flow cells, tubing inputs and outputs, etc.

187.   Any non-fluidics components located externally are not a part of the claimed fluidics section.   Indeed, as discussed, the Court explicitly stated at the claim

119

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

construction hearing that there can be electronics external to the housing but not in the fluid handling section.  Markman Tr. 97:16-25.  Likewise, the Court also said each module can have more than just a fluid handling section and a non-fluidics section.  *See e.g.*, *id*, at 100:14-23 and 103:8-13.

188.   The fluidics section of the single wavelength UV detector module is as follows:



Ex. 16 (BRGEDEL317456, BRGEDEL317558).

189.   The fluidics section of the multi-wavelength UV detector module is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 16 (BRGEDEL317458-BRGEDEL317459, BRGEDEL317559).

190.   Finally, both the single and multi-wavelength UV monitor module have

panel members:



Ex. 5, p. 66.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 66.

191.   Finally, each UV monitor module has a CPU.



Ex. 20 (BRGEDEL000281532) (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛)

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 19 (BRGEDEL000282542) (███████████████████)

192.   Thus, the element is met, and all models of the NGC system infringe claim 1.

### n.   wherein the system is capable of performing automated liquid chromatography

193.   All models of Bio-Rad's NGC system are "capable of performing automated liquid chromatography."   First, all models perform liquid chromatography.  Likewise, all NGC models are capable of performing "automated" liquid chromatography:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



The NGC chromatography systems are preparative systems designed to rapidly automate the purification of biomolecules. The flexible, modular, and economical design makes NGC the instrument of choice for method development and scale-up. It is available in six preplumbed, factory-tested configurations at two different flow ranges. Each preconfigured system can be further customized and upgraded by adding valves, detectors, or pumps in order to meet specific application needs. Any system can be configured for either low flow rate or high flow rate operation by simply changing the system pump modules. As a result, a single hardware platform can be modified as the application need and scale change.

Ex. 5, p. 11.   As this Bio-Rad document (Instrument Guide), the NGC system "rapidly automates" purification of biomolecules.   Thus, a POSITA would understand that the NGC system is an automated liquid chromatography system.

194.   In sum, all Bio-Rad NGC models infringe claim 1 of the '420 patent.

**B.    '589 Patent**

    **1.    Claim 1**

        **a.    "An automated liquid chromatography system comprising:**

195.   Bio-Rad's NGC system is an "automated liquid chromatography system.   First, there can really be no dispute that Bio-Rad's NGC is a "liquid chromatography system," as its documents are replete with statements saying as such.   One example is in the NGC Instrument Guide:

124

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



The NGC chromatography systems are preparative systems designed to rapidly automate the purification of biomolecules. The flexible, modular, and economical design makes NGC the instrument of choice for method development and scale-up. It is available in six preplumbed, factory-tested configurations at two different flow ranges. Each preconfigured system can be further customized and upgraded by adding valves, detectors, or pumps in order to meet specific application needs. Any system can be configured for either low flow rate or high flow rate operation by simply changing the system pump modules. As a result, a single hardware platform can be modified as the application need and scale change.

Ex. 5, p. 11. Note that this document not only states that the NGC system is a liquid chromatography system, but it also notes that the NGC system "rapidly automates" purification of biomolecules. Thus, a POSITA would understand that the NGC system is an automated liquid chromatography system.

196. At her deposition, Dr. Mavandadi



See Ex. 6 (BRGE00065119). When asked about this at her deposition, Dr. Mavandadi testified that

125

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Mavandadi Tr. 106:5-15.

197.   This is plainly the case with the NGC system.  Indeed, according this

document of Exhibit 6.  Thus, the NGC system is plainly an "automated liquid

chromatography system."

198.   Moreover, automated liquid chromatography systems must have certain

components to perform liquid chromatography, including at least an injection valve,

a suitable pump, an inline detector that can measure the relevant characteristics of

the liquid exiting the chromatography column, and control software for processing,

displaying, and/or storing the results, which operate without manual intervention.

199.   There is no dispute that Bio-Rad's NGC system has each of these.  I

will discuss these in more detail below, but as will be seen, all Bio-Rad NGC models

come standard with a sample inject valve module (Ex. 5, pp. 28, 87), two system

pump modules (Ex. 5, pp. 28, 87), and a UV monitor module (Ex. 5, pp. 65-70, 87).

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

### b.    "a housing unit and"

200.   The NGC system plainly has a housing unit.  The following two figures, which are annotated to show the housing, come from Bio-Rad's NGC Instrument Guide:"



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 22, 24-26.

201.   The "housing" is annotated in red.  Note that the front view appears to depict a Discover Pro system, as it shows two expansion housings placed on top of the main enclosure.  The remaining views appear to show a Discover system since they each show the NGC system with a single expansion housing stacked on the main housing.

202.   Exhibit 21, a Bio-Rad marketing document, shows a good view of the Quest and Scout systems.  A portion is reprinted below and points to the housing:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 21, p. 3.

203. The "Assembly Procedure For Quest 10 Chrom 10 System NGC,"

Bates No. BRGEDEL1541-1565 provides additional information:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 24 (BRGEDEL000001591).

204.   Exhibit 12 is the Technical Specification for the Next Generation Chromatography System. ████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████ BRGEDEL401625.

205.   Mr. Iovanni testified that ███████████████████████████ ███████████████████████████. Iovanni Tr. 216:20-217:3.   Ex. 12 contains the following entry as a specification for the NGC:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



BRGEDEL401628.  This document further demonstrates that the NGC system has

a housing:



BRGEDEL401629.  Mr. Bland testified that this entry refers to the housing of the

NGC:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 86:2-86:17.

206.   The hardware specification for the NGC's Primary system Enclosure (Ex. 11), further demonstrates that the NGC systems include a "housing:"



Ex. 11 (BRGEDEL445194).  Mr. Chapman testified that this document reflects a housing as well:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Chapman Tr. 541:6-541:22.

207.   In sum, this claim element is plainly present in all NGC models.

**c.      "at least four modular fluid handling units"**

208.   All NGC models include "at least four modular fluid handling units."

209.   As discussed, the Court construed "modular fluid handling units" to be a "*fluid handling unit that has a standardized size and shape that allows it to be exchanged with another fluid handling unit.*"

210.   As discussed above, each NGC model can include the following modules:

|  | **Quest** | **Scout** | **Discover** | **Discover Pro** |
|---|---|---|---|---|
| 1 | System Pump | System Pump | System Pump | System Pump |
| 2 | System Pump | System Pump | System Pump | System Pump |
| 3 | Sample Inject Valve | Sample Inject Valve | Sample Inject Valve | Sample Inject Valve |

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

|  | Quest | Scout | Discover | Discover Pro |
|---|---|---|---|---|
| 4 | UV Detector | UV Detector | UV Detector | UV Detector |
| 5 |  | pH Valve | pH Valve | pH Valve |
| 6 |  |  | Column Switch Valve | Column Switch Valve |
| 7 |  |  | Sample Pump | Sample Pump |
| 8 |  |  | Buffer Inlet Valve | Buffer Inlet Valve |
| 9 |  |  |  | Sample Inlet Valve |
| 10 |  |  |  | Outlet Valve |

211.   At a minimum, each of the two system pump modules, sample inject valve module and UV monitor modules are "modular fluid handling units."

212.   Bio-Rad's Instrument Guide illustrates system pump modules:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 28.

213.   Bio-Rad's Instrument Guide illustrates the sample inject valve module:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 37.

214.   Bio-Rad's Instrument Guide illustrates UV Detection modules.  The single wavelength and multi-wavelength detectors are illustrated as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 66.

215.   These modules, like all the NGC modules, can be inserted and removed, functionality required for them to have the ability to ▀be exchanged with another fluid handling unit," which the Court's construction requires:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



### 2 The NGC Instrument

The NGC instrument ships preassembled with the components necessary to perform gradient separations. The modular components slide into slots in the system known as *bays*. Some modules fit into single-wide bays while others require double-wide bays. Bays can be converted from one size to the other by adding or removing a center divider.

Each module has a unique electronic ID that enables the system to recognize its function when the module is placed into a bay. For example, the system can distinguish between a sample inject valve module and a sample inlet valve module even though they each occupy a single-wide slot.

The position of the module on the system can be changed to optimize the placement and minimize the length of tubing, reducing the system swept volume. The physical location of a module can be easily identified in the overall flow scheme required to run the application through the ChromLab software. Prior to starting a run, ChromLab performs a system check to ensure that all the required modules are physically present on the instrument.

This chapter explains in detail the modules that make up the NGC instrument.

*Id.*, p. 19.  The Technical Specification for NGC indicates that ████████████ ████████████████████████████████████████████████████████████:



138

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Ex. 12 (BRGEDEL401642).  This plainly indicates that all modules, including pump modules, sample inject valve modules, UV detector modules, and pH valve modules, ■can be inserted into and removed from positions in the housing" and "exchanged with another component," just as the Court's construction requires.  Mr. Bland testified as follows regarding this requirement:



139

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 98:13-101:1.

216.   This same document indicates that ███████ was required for each module:



Ex. 12 (BRGEDEL401629).

217.   Each of the modules have a standardized shape and size.  In particular, the NGC has system "bays," or positions, that can receive the modules.  This is seen in the excerpt from NGC Instrument Guide (Ex. 5) I pasted above (p. 19).  This same document illustrates this in more detail.  In a section of the Instrument Guide entitled "Replacing or Repositioning Modules on the NGC Instruments," Bio-Rad shows the following:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 234. The NGC can accommodate modules that are "single-wide" and "double-wide." This is shown below:

142

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**Converting Bays to Fit Modules**

Some modules fit into single-wide bays while others require double-wide bays (such as the system and sample pump modules and the UV and UV/Vis detector modules). Bays can be converted from one size to the other by adding or removing the center divider.

The following image shows two adjacent, empty, single-wide bays.



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 236-238 (p. 236 not reproduced).

218.  The pump modules and the UV detector modules are double-wide modules while the sample inject valve and pH valve are single-wide modules.  This plainly demonstrates that these modules have a "standardized size and shape."  For example, just as Bio-Rad instructs in the Instrument Guide, an NGC user could, for

144

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

example, remove a sample inject valve module and insert into the single-wide bay a pH valve module. Likewise, an NGC user could remove a pump module and insert into the double-wide bay a UV detector. Similarly, an NGC user could convert the double-wide bay into a single-wide bay and insert one or both of the sample inject valve module and/or the pH valve module into the two single-wide bays.

219. Finally, by having these standard sized bays, the NGC system "allows [for the modular fluid handling unit] to be exchanged with another component." Bio-Rad's Instrument Guide makes that clear, as it indicates that a person can replace or reposition modules:

**Replacing or Repositioning Modules on the NGC Instruments**

WARNING! Disconnect power to the NGC instrument before removing or repositioning any module. Do not attempt to service any component on the NGC instrument unless noted in this manual. Contact Bio-Rad for service requests.

WARNING! To reduce the chance of liquid seeping into the instrument, all open bays must be filled with the NGC Blank module (catalog #788-4005). The NGC instrument will not operate if it detects a slot without a module inserted.

**To replace or reposition modules on the NGC instruments**

1. On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2. If necessary, disconnect all tubing lines to and from the module that you plan to replace or reposition.

3. Loosen the captive screws on the front of the installed module.

4. Firmly grasp both screws on the module and pull it forward out of its bay.

145

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

*See* Ex. 5, p. 233.  *See also Id*. at 234-239.

220.   Thus, this claim element is met by all NGC models.

> **d.**   **"wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array,**

221.   One side of the housing unit used on all NGC models has "plurality of receiving positions."   Several drawings from Bio-Rad's instrument guide are annotated below to show this:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



See Ex. 5, pp. 90-91.  As can be seen in the above illustrations from Bio-Rad's documentation, the NGC housing has multiple "receiving positions."  In the Quest and Scout models, no expansion housings are stacked on top of the main housing. Thus, the collection of receiving positions are boxed in red, as this will comprise the receiving positions of the "housing."

222.  The Quest and Scout housing can accommodate up to ten modules and thus can have up to ten "component receiving positions," which satisfies the "at least

147

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

four" requirement.   As I discussed above, the size of Bio-Rad's "bays" can be changed to be single-wide or double-wide bays, meaning depending on Bio-Rad's customer choice, the Quest and Scout can accommodate as many as 10 modules (i.e., without using any double wide modules).   In the Quest and Scout standard configurations, the following four positions in the below annotated version of figures from Bio-Rad's Instrument Guide are "component receiving positions:"



See Ex. 5, p. 90.

223.   These four receiving positions are plainly arranged in a two dimensional array, just as the claim requires.

224.   Note the claim language only requires that the receiving positions be "adapted to receive said interchangeable modular components."   By reciting that the receiving positions are "adapted to receive," the claim only requires that they be able to receive the interchangeable modular components.

148

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

225.   As seen above, Bio-Rad's system pump modules, sample inject valve module, UV detector modules and pH valve modules are such that "fluid handling section thereof is on the external side of the housing unit." The "fluid handling section for these modules is as follows:

226.   The specifications for each of the system pump, sample inject valve and UV Detector modules (and others) specify that they have a "fluid handling section" because they state that ███████████████████████████████████████



Ex. 13 (BRGE0096090) (████████████████████dule)



Ex. 14 (BRGEDEL000450753) ████████████████

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 20 (BRGEDEL000281538) (███████████████████)

Ex. 25 (BRGEDEL000451797) (████████████)

Ex. 19 (BRGEDEL000282560) (██████████████).

227.   Mr. Chapman testified that these specifications were met for the pump modules (Chapman Tr. 529:12-530:17), sample inject valve module (Chapman Tr. 528:16-529:10), single wavelength detector module (Chapman Tr. 532:4-533:13), and the multi-wavelength UV detector (Chapman Tr. 533:15-534:17).

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

228.   These documents and Mr. Chapman's testimony demonstrates that the "fluidics section" for each of these modules, *e.g.*, the two system pump modules, the sample inject valve module, and the single wavelength detector module, the multi-wavelength UV detector module "*include[] fluidics components*," just as the Court's claim construction for "fluid handling section" requires.

229.   Portions of the NGC Instrument Guide are annotated to show where the recited "fluid handling section" is found on these modules.

230.   The fluid handling section for the system pump modules used in the NGC system is as follows:



151

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Ex. 5, pp. 28-29.  Note this figure is annotated to show hidden portions of the fluidics section, *i.e*., a simplified illustration of the flow path within the fluidics section.

231.   Note that the NGC Instrument Guide illustrates the F10 pump module, but the F100 pump module is essentially identical for purposes of this infringement analysis, meaning that the structure corresponding to the recited fluidics section is the same.

232.   Note also that the section of the Instrument Guide does not illustrate the priming ports that can be on the system pump modules.  These can be seen in the assembly drawings, which are annotated to show the fluidics section, as I did above, to show a simplified illustration of flow path within the fluidics section:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 23 (BRGEDEL1507) (F10 pump module).  *See also*:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 28, (BRGEDEL972) (F100 pump module)

233.   The fluid handling section for the sample inject valve module used in the NGC system is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 37-38.  This particular illustration does not show the complete fluid flow path, as the fluid flow paths of the fluidics section are not shown.  However, this can be seen in, for example, the following figure from Bio-Rad's Instrument Guide:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 40.

234.   The fluid handling section for the single wavelength UV detector module used in the NGC system is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 67, 205.

235. The fluid handling section for the multi-wavelength UV detector module used in the NGC system is as follows:

157

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 66, 69, 205.

236.   As is seen, the fluid handling section of each of these modules include fluidic components like tubing inputs and outputs, valve components, pump components, flow cells, and other components through which fluid passes.

237.   The Court's construction also requires that the fluid handling section "*not include non-fluidics components*."   None of the fluidics portions I have identified above contain non-fluidics components.   All they do is receive tubing inputs and outputs, and pass fluids through them.   A POSITA would understand that these They are all plainly "fluidics components."

158

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

238.   Any non-fluidics components located externally are not a part of the claimed fluidics section.  Indeed, as discussed, the Court explicitly stated at the claim construction hearing that there can be electronics external to the housing but not in the fluid handling section.  Markman Tr. 97:16-25.  Likewise, the Court also said each module can have more than just a fluid handling section and a non-fluidics section.  *See e.g.*, *id*, at 100:14-23 and 103:8-13.

239.   No non-fluidics components are in the fluid handling section I identify above.

240.   In sum, each model of Bio-Rad's NGC system has an fluid handling section, just as claimed.

241.   Thus, this claim element is plainly present in all models of the NGC system.

> e.    **"wherein each modular fluid handling unit is configured for insertion into the receiving positions of the housing unit"**

242.   Each of the "modular fluid handling units" are "configured for insertion into the receiving positions of the housing unit."  *See* paragraphs 215-218.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> **f.** **"wherein each modular fluid handling unit is … is readily interchangeable amongst similarly sized and shaped receiving positions of the housing unit, such that positioning of the modular fluid handling unit with respect to other modular fluid handling units permits a fluid flow path to be readily modified, wherein the fluid flow path is formed by fluidic connections between the modular fluid handling units, and"**

243.   The modular fluid handling units in all NGC models are "readily interchangeable amongst similarly sized and shaped receiving positions of the housing unit.  Bio-Rad's Instrument Guide establishes this:



160

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Ex. 5, p. 19.

244. Bio-Rad's Instrument Guide provides detailed instructions for how a person can easily move modules from a first bay to a second bay:



See Ex. 5, p. 233. See also Id. at 234-239. This process would be easy for a user of the NGC to perform, meaning that Bio-Rad's modules are "readily interchangeable." Note that the bays correspond to the recited "receiving positions."

245. Likewise, as I have discussed, Bio-Rad's NGC has modules of two sizes, and they fit in correspondingly sized bays (single-wide or double-wide):

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

246. In the section of the Instrument Guide entitled "Replacing or Repositioning Modules on the NGC Instruments," Bio-Rad shows the following:



Ex. 5, p. 234.  The NGC can accommodate modules that are "single-wide" and "double-wide."  This is shown below:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

### Converting Bays to Fit Modules

Some modules fit into single-wide bays while others require double-wide bays (such as the system and sample pump modules and the UV and UV/Vis detector modules). Bays can be converted from one size to the other by adding or removing the center divider.

The following image shows two adjacent, empty, single-wide bays.



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 236-238 (p. 236 not reproduced).

247.   In addition, "positioning of the modular fluid handling unit with respect to other modular fluid handling units permits a fluid flow path to be readily modified," just as claimed.  See Ex. 5, p. 19, excerpted above.  See also:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



*NGC Chromatography Systems - Comprehensive Solutions For Protein Purification*

(Ex. 21 (BRGEDEL293539).  This same document refers to Bio-Rad's modules as

"plug and play:"



Ex. 21, p. BRGEDEL293542.

165

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

248. Also, Exhibit 22, entitled *NGC Chromatography Systems - Multidimensional (Multi-D) Plumbing Guide*, further indicates that modules can be placed in different receiving positions:

> This guide is designed to help plumb your NGC System for multidimensional (Multi-D) chromatography applications. These techniques can help enhance sample recovery and improve productivity by minimizing the steps and time required for protein purification. In addition, it shows the optimal locations for module placement to minimize tubing length and swept volume.

Ex. 22, p. 2.   Indeed, the setup on p. 2, for "2-tier + 2 CSV for tandem chromatography applications," shows a module arrangement that differs from the standard Quest and Scout configurations:

166

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 22, p. 3.

249.   Further, as discussed, Mr. Bland testified that this feature was present:



167

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 100:8-101:1.

250.   Finally, all Bio-Rad NGC models form a fluid flow path "by fluidic connections between the modular fluid handling units."   As discussed, the fluid handling section of the modules I identified have tubing inputs and outputs.   Tubing is connected between such inputs and outputs to create a "fluid flow path," just as claimed.

251.   In sum, all NGC models fall within the scope of this claim element.

       **g.**     **"wherein each modular fluid handling unit … includes a CPU for independently performing fluid control operations in response to instructions over a system BUS."**

252.   Each of the "at least modular fluid handling units" I identified above has a "CPU."   As noted above, the parties agreed that CPU should be construed as "central processing unit," which is what the abbreviation "CPU" stands for.   The specifications for each demonstrate the presence of a CPU on each module required by the claim:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 14 (BRGEDEL000450746) ( )

Ex. 20 (BRGEDEL000281532) ( )

Ex. 13 (BRGE0096081) (

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Ex. 19 (BRGEDEL000282542)

253.   As can be seen from the above excerpts, each of these Bio-Rad module

specifications  states:

254.   First, it is well known that microcontrollers include CPUs.  Mr. Bland

testified that

170

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 105:2-105:17.

255.   Cytiva photographed the circuit board inside one of the modules of the

NGC it has, which confirms that each module has a CPU:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

256.   In the photo, you can see the markings for this part is for an ADC7060.

The datasheet for this component confirms that it has a CPU:



**PROCESSOR REFERENCE PERIPHERALS**
**INTERRUPT SYSTEM**

There are 15 interrupt sources on the ADuC7060/ADuC7061 that are controlled by the interrupt controller. All interrupts are generated from the on-chip peripherals, except for the software interrupt (SWI), which is programmable by the user. The ARM7TDMI CPU core recognizes interrupts as one of two types only: a normal interrupt request (IRQ) or a fast interrupt request (FIQ). All the interrupts can be masked separately.

Ex. 18 (GEHCDEL129737, at GEHCDEL129796).

257.   Bio-Rad's internal firmware specifications further demonstrate that the

Ex. 17 (BRGEDEL98274).

258.   The portions of specifications I excerpted above also demonstrate that the integral microcontroller on each module allows ▪the interchangeable modular

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

component to independently perform operations in response to instructions over the system bus."  As discussed, the Bio-Rad specifications each state that ███████████

████████████████████████████████████████████

███████████  This demonstrates that the CPU on each module "performs operations" since Bio-Rad's documents unambiguously state that ████████████

███████████

259.  The claim language further requires that the CPUs "allow[] the interchangeable modular component to independently perform operations in response to instructions over the system bus."  This plainly happens.  First, the language "independently perform operations" refers to the modules themselves, and thus requires that the particular module's operations be independent from the operations of other modules installed in the system.  This is further supported by the claim language reciting that the independent operations be performed "in response to instructions over the system bus."  A POSITA would understand this means that the CPU operates in conjunction with other processing devices in the system, and plainly does not mean that the in-module CPUs must operate completely by themselves.  Such a reading of the claim would ignore the claim language and defy common engineering principles.  Indeed, the fact that the specification describes use

173

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

of a "master" control unit plainly would indicate to a POSITA that other processing devices are involved.

260.   At his deposition, Mr. Iovanni testified regarding the meaning of the word "independently" when questioned regarding Exhibit 4:



Iovanni Tr. 105:9-105:22.   Mr. Bland testified that ████████████ ████████████████████████████████████ (in the context of Exhibit 47, the system pump specification):



174

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 105:18-108:13.   When questioned regarding the column switch valve

module (Exhibit 50), Mr. Bland further testified that 

176

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Bland Tr. 129:2-130:16.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

261. In addition, I have reviewed the declaration provided by Nenad Vukicevic, who reviewed portions of Bio-Rad's source code for the NGC system, and this confirms the documentation and testimony that Bio-Rad's modular fluid handling units independently perform operations ■in response to instructions over the system bus." See e.g., Paragraphs 5-8, 10.

262. In sum, this claim element is present in all models of the NGC system.

263. Thus, all Bio-Rad NGC models infringe this claim.

## C. '591 Patent

### 1. Claim 9

264. Claim 9 depends on claim 1. Thus, I first analyze claim 1. I note that claim 1 of the '591 patent is almost identical to claim 1 of the '420 patent. The only differences are demonstrated in this redline:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**a.**

1. An automated liquid chromatography system comprising: a housing; a master control unit connected to a system bus; and ~~three~~two or more fluid handling units arranged as interchangeable modular components comprising (i) an external fluidics section, (ii) an internal non-fluidics section including a bus connector for directly connecting the interchangeable modular component with the system bus, and (iii) a panel member arranged to separate the fluidics section from the non-fluidics section~~:~~, wherein the housing comprises a liquid handling panel with ~~at least four~~two or more component receiving positions ~~arranged in a two dimensional array and~~ adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing~~:~~, wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus~~:~~, wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus~~:~~, wherein the master control unit is arranged to automatically identify interchangeable modular components~~:~~, wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least ~~three~~two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components~~:~~, and wherein the system is capable of performing automated liquid chromatography.

265.    As can be seen, the difference between these two claims is that claim 1 of the '591 patent requires only two (as opposed to three) fluid handling units arranged as interchangeable modular components, and these two need not be arranged in a two dimensional array.  For completeness, I address this claim here.

**(i)      An automated liquid chromatography system comprising:**

266.    See Section VIII.A.1.a.

**(ii)     a housing;**

267.    See Section VIII.A.1.b.

**(iii)    a master control unit connected to a system bus; and**

268.    See Section VIII.A.1.c.

179

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> **(iv)    two or more fluid handling units arranged as interchangeable modular components comprising**

269.   See Section VIII.A.1.d.  Note that this claim element is broader than that in the similar claim from the '420 patent, the difference being the number of interchangeable modular components.  The infringement analysis is thus the same.

> **(v)     (i) an external fluidics section,**

270.   See Section VIII.A.1.e.

> **(vi)    (ii) an internal non-fluidics section**

271.   See Section VIII.A.1.f.

> **(vii)   including a bus connector for directly connecting the interchangeable modular component with the system bus, and**

272.   See Section VIII.A.1.g.

> **(viii)  (iii) a panel member arranged to separate the fluidics section from the non-fluidics section,**

273.   See Section VIII.A.1.h.

> **(ix)    wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing,**

274.   See Section VIII.A.1.i.   Note this claim element, unlike the corresponding element in claim 1 of the '420 patent, does not require that the two component receiving positions be arranged in a two dimensional array.  Because this

180

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

element is thus broader, the infringement analysis is essentially the same, except there is no need to show this particular limitation.

> **(x)** **wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus,**

275.   See Section VIII.A.1.j.

> **(xi)** **wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus,**

276.   See Section VIII.A.1.k.

> **(xii)** **wherein the master control unit is arranged to automatically identify interchangeable modular components,**

277.   See Section VIII.A.1.l.

> **(xiii)** **wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components, and**

278.   See SectionVIII.A.1.m.

> **(xiv)** **wherein the system is capable of performing automated liquid chromatography.**

279.   See Section VIII.A.1.n.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

### b. Claim 9

280.   Claim 9 requires that "the system include[] at least two fluid pumps."

Each of Bio-Rad's NGC models comes standard with two system pumps:



See BRGEDEL000070409.   As seen, all NGC models come standard with either

two F10 pump modules or two F100 modules.  Thus, this claim is infringed.

### 2. Claim 14

281.   Claim 14 depends on claim 13, which in turn depends on claim 1.  Thus,

to demonstrate Bio-Rad's infringement of claim 14, I first demonstrate how claim

13 is infringed.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

### a.      Claim 13

282.   Claim 13 requires that the "fluidics section" of each of the two interchangeable modular component" recited in claim 1 have "one or more fluid connectors for connecting the fluid handling unit to a liquid chromatography fluid path and wherein all fluid connectors are on a wet side of the panel member."

283.   Each NGC model has this feature.  Note that the "wet side" of the panel member is the external portion.

284.   As seen in Section VIII.A.1.e the "fluidics section of each interchangeable modular component comprises one or more fluid connectors for connecting the fluid handling unit to a liquid chromatography fluid path.  For convenience, I reproduce the annotated drawings I placed in that Section, where it can plainly be seen that the "fluidics section" comprises "one or mor fluid connectors …"

285.   System pump modules:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 28-29.  As discussed, Bio-Rad's F100 pump module will look the same and have the same fluidics section.

286.   Below is another view of Bio-Rad's system pump module, this time showing the priming port:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 23 (BRGEDEL1507) (F10 pump module).  *See also*:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 28, (BRGEDEL972) (F100 pump module)

287.   This claim element further requires that all the recited fluid connectors be "on an external side of the panel member."  The above illustrations of Bio-Rad's modules demonstrates that this is the case.

288.   Thus, this claim element is present in all Bio-Rad NGC models.

**b.   Claim 14**

289.   Claim 14 requires that "the liquid chromatography fluid path [of the system recited in claim 13] is reconfigurable by moving the interchangeable modular

186

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

components freely between the component receiving positions." This is present in all NGC models.

290.   The "liquid chromatography fluid path" in each of Bio-Rad's NGC models is reconfigurable "by moving the interchangeable modular components freely between the component receiving positions." Bio-Rad's Instrument Guide explicitly says this functionality is possible:



Ex. 5, p. 19.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

291.   Bio-Rad's Instrument Guide provides detailed instructions for how a person can easily move modules from a first bay to a second bay:

**Replacing or Repositioning Modules on the NGC Instruments**

**WARNING!**  Disconnect power to the NGC instrument before removing or repositioning any module. Do not attempt to service any component on the NGC instrument unless noted in this manual. Contact Bio-Rad for service requests.

**WARNING!**  To reduce the chance of liquid seeping into the instrument, all open bays must be filled with the NGC Blank module (catalog #788-4005). The NGC instrument will not operate if it detects a slot without a module inserted.

**To replace or reposition modules on the NGC instruments**

1.   On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2.   If necessary, disconnect all tubing lines to and from the module that you plan to replace or reposition.

3.   Loosen the captive screws on the front of the installed module.

4.   Firmly grasp both screws on the module and pull it forward out of its bay.

*See* Ex. 5, p. 233.  *See also Id*. at 234-239.

292.   Bio-Rad also markets this feature, as seen in its marketing collateral. Here is one example:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



*NGC Chromatography Systems - Comprehensive Solutions For Protein Purification*

(Ex. 21 (BRGEDEL293539). This same document refers to Bio-Rad's modules as

"plug and play:"



Ex. 21, p. BRGEDEL293542.

189

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

293. Also, Exhibit 22, entitled *NGC Chromatography Systems - Multidimensional (Multi-D) Plumbing Guide*, further indicates that modules can be placed in different locations:

> This guide is designed to help plumb your NGC System for multidimensional (Multi-D) chromatography applications. These techniques can help enhance sample recovery and improve productivity by minimizing the steps and time required for protein purification. In addition, it shows the optimal locations for module placement to minimize tubing length and swept volume.

Ex. 22, p. 2.   Indeed, the setup on p. 2, for "2-tier + 2 CSV for tandem chromatography applications," shows a module arrangement that differs from the standard Quest and Scout configurations:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 22, p. 3.

294.    In sum, all NGC models fall within the scope of this claim element.

**D.    '124 Patent**

**1.    Claim 16**

**a.    A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising**

295.    Bio-Rad's NGC system (all models) is a liquid chromatography system: Bio-Rad's documents are replete with statements saying as such.   One example is in the NGC Instrument Guide:

191

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 11.  Likewise, all of Bio-Rad's NGC models are "arranged to provide a controlled fluid flow through a chromatography column." When interconnecting the fluid inputs and outputs on the NGC modules, fluid will pass through the system and is thus being controlled.  Moreover, the fluids will pass through a chromatography column.  Exemplary evidence showing this is as follows:



HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

296.   See Exhibit 5, p. 22 and Exhibit 21, p. BRGEDEL293539.

**b.      a housing and**

297.   See e.g., Section VIII.A.1.b

**c.      two or more interchangeable fluid handling units,**

298.   See e.g., Section VIII.A.1.d.  Note that Section VIII.A.1.d recites "three or more fluid handling units arranged as interchangeable modular components." Because claim 16 recites the need for only two of such interchangeable fluid handling units, it is broader (putting aside that claim 1 of the '420 patent requires that they be arranged interchangeable modular components, a requirement recited in a later element of claim 16) , and all of Bio-Rad's NGC models fall within the scope of this claim element for the same reason as discussed in Section VIII.A.1.d.

**d.      the housing comprising a liquid handling panel including two or more component positions for receiving said interchangeable units,**

299.   Each of Bio-Rad's NGC system models has a "liquid handling panel." Below is an annotated a figure from Bio-Rad's Instrument Guide showing this:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 22.  As can be seen in the above illustration from Bio-Rad's documentation, the liquid handling panel has "two or more component positions for receiving said interchangeable units."  Note that a portion of the liquid handling panel is hidden by the panel members of the modules.  The following illustration from Bio-Rad's Instrument Guide provides a view of a portion of the NGC liquid handling panel:

194

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 237.  Another view is as follows:



Ex. 5, p. 234.  The below illustration shows how to convert a single-wide bay to a double-wide bay:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 238.

300.   The housing used in all models can accommodate up to ten modules and thus can have up to ten "component receiving positions," which satisfies the "at least four" requirement.  As I discussed above, the size of Bio-Rad's "bays" can be changed to be single-wide or double-wide bays, meaning depending on Bio-Rad's customer choice, the housing can accommodate as many as 10 receiving positions

196

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

(i.e., without using any double wide modules).   Regardless, the below annotated

version of figures from Bio-Rad's Instrument Guide shows two positions:



See Ex. 5, p. 90-91.

301.   Thus, all NGC models meet this claim limitation.

### e.   wherein said units are arranged as interchangeable modular components, and include:

302.   See e.g., Section VIII.A.1.d.  Note that Section VIII.A.1.d recites "three

or more fluid handling units arranged as interchangeable modular components."

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

Because claim 16 recites the need for only two interchangeable modular components, it is broader, and all of Bio-Rad's NGC models fall within the scope of this claim element for the same reason as discussed in Section VIII.A.1.d.

**f.      a fluidics section;**

303.   See Section VIII.A.1.e.

**g.      a non fluidics section in turn comprising electronics or electrical components or control means; and**

304.   See Section VIII.A.1.f.

**h.      a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel, and**

305.   See Section VIII.A.1.h.   Further, the panel member of Bio-Rad's interchangeable modular components, e.g., the two system pump modules that are supplied with each NGC model, are "arranged … for attachment of the modular component to a component position of the liquid handling panel." As discussed, the panel members for Bio-Rad's modules comprises, among other things, what Bio-Rad calls a "front plate" having an overlay affixed to the front plate portion on the external side of the system.   Bland Tr. 151:4:-155:21.   Mr. Chapman testified as follows regarding the purpose of the faceplate and overlay:

198

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Chapman Tr. 386:13-387:17.  Mr. Chapman's testimony is confirmed by referring

to Bio-Rad's instructions to its customers for inserting modules:

199

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

> 9. Place the module into the open bay and gently push it in as far as it will go.
>
> **Note:** Each module has an alignment pin on the back to ensure that it aligns correctly with the main communication board.
>
> 10. Ensure that the screw holes on the module align with the screw holes on the bay.
>
> 11. Insert the screws that shipped with the module into the screw holes.
>
> 12. Tighten the screws to secure the module.

Exhibit 5, p. 235.

306.   In sum, all NGC models fall within the scope of this element.

> **i.     wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and**

307.   All Bio-Rad NGC models fall within the scope of this element.  As seen in the below from Bio-Rad's Instrument Guide, the fluidics sections of the two interchangeable modular components, e.g, system pump modules, are external to the housing;

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, p. 22.

308. Bio-Rad's system pump modules, which qualify as the interchangeable modular components for this claim, are such that the "fluidics sections are external to the housing." As discussed, the fluidics section for the system pumps are seen below:

201

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 5, pp. 28-29.

309.   Note that this figure is annotated to show hidden portions of the fluidics section, *i.e.*, a simplified illustration of the flow path within the fluidics section. Indeed, the specification for Bio-Rad's system pump modules says ██████████ ████████████



Ex. 13 (BRGE0096090) (███████████████████████)

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

310.   Mr. Chapman testified that this specification was met for the pump modules (Chapman Tr. 529:12-530:17).

311.   Thus, each NGC model falls within the scope of this claim element.

**j.    respective non fluidics sections are internal to the housing.**

312.   Likewise, as discussed, the specification for system pump modules specify that they have a "non-fluidics section" because they state that ███████



Ex. 13 (BRGE0096090) (█████████████████

313.   As discussed, Mr. Chapman testified that this specification was met. See Chapman Tr. 529:12-530:17.

203

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

314.   The NGC Service Manual further demonstrates that there is a non-fluidics section that is internal to the housing.



Ex. 16 (BRGEDEL317444, BRGEDEL317555).

315.   Thus, all Bio-Rad NGC models infringe this claim.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## IX.  CONCLUSION

316.  For the reasons stated above, it is my opinion that Bio-Rad infringes the Asserted Claims.

317.  I declare under penalty of perjury under the laws of the Untied States of America that the foregoing is a true and correct statement of my opinions and the supporting facts and that this declaration was executed on December 15, 2020 at West Lafayette Indiana.


Dated: December 15, 2020


Steven Wereley, Ph.D.

EXHIBIT A



**STEVEN T. WERELEY, PH.D.**
Professor, Mechanical Engineering
Birck Nanotechnology Center
Purdue University
Phone:  (765) 494-5624
wereley@purdue.edu
https://engineering.purdue.edu/~wereley/

**Mailing/Physical Addresses**

| Birck Nanotechnology Center, Room 2019 | Mechanical Engineering, Room 1077 |
|---|---|
| 1205 West State Street | 585 Purdue Mall |
| West Lafayette, IN  47907-1205 | West Lafayette, IN  47907-2088 |
| Fax:  (765) 496-6443 | Fax:  (765) 494-0539 |

## Research Interests

Micro and Nanoscale fluid mechanics (*microfluidics*), MEMS, bio-MEMS, biological flows at the cellular level, micro-scale laminar mixing, physiological sensors, electrical and optical manipulation of particles and fluids, development of microfluidic diagnostic techniques.

## Education

**Ph.D. Mechanical Engineering, Northwestern University, Evanston IL, 1997**. Dissertation Topic:  An investigation of the physics underlying rotating filtration using particle image velocimetry (PIV), computational particle tracking, and analytical methods.

**M.S. Mechanical Engineering, Northwestern University, Evanston, IL, 1992**. Thesis Topic:  A laser Doppler velocimetry (LDV) investigation of the velocity profiles developed in the annulus between differentially rotating cylinders.

**B.S. Mechanical Engineering, Washington University, St. Louis, MO, 1990**. Concentration in fluid mechanics: incompressible flow, compressible flow, and computational fluid dynamics.

**B.A. Physics, Lawrence University, Appleton, WI, 1990**. Physics curriculum (mechanics, electricity and magnetism, electronics, optics, quantum mechanics, experimental methods) combined in equal parts with liberal arts courses.

## Work Experience

**Professor,** School of Mechanical Engineering, Purdue University (2010-Present).  Taught Mechanical Engineering courses at the graduate and undergraduate levels and instructed graduate students in a lab setting.

**Alexander von Humboldt Fellow**, Universität der Bundeswehr, Munich, Germany, Sept.-Oct, 2014.

**Associate Professor,** School of Mechanical Engineering, Purdue University (2005-2010).  Taught Mechanical Engineering courses at the graduate and undergraduate levels and instructed graduate students in a laboratory environment.

**Alexander von Humboldt Fellow**, Universität der Bundeswehr, Munich, Germany, June-July 2009.

**Alexander von Humboldt Fellow**, Technische Universität Darmstadt, Darmstadt, Germany, Mar.-Aug., 2007.

**Assistant Professor,** School of Mechanical Engineering, Purdue University (1999-2005).  Taught Mechanical Engineering courses at the graduate and undergraduate levels and instructed graduate students in a laboratory environment.

**Post Doctoral Research Scientist,** Mechanical and Environmental Engineering Dept., University of California Santa Barbara (1997-1999).  Designed and constructed microfluidics experiments and developed custom particle image velocimetry algorithms specifically tailored to microfluidics applications.

## Currently Active Consulting Areas

Fluid mechanics measurements using particle image velocimetry (PIV) and other techniques
Fluid mechanics measurements in Microelectromechanical Systems (MEMS), bio-MEMS, and microscopic biological systems using micro-particle image velocimetry (μPIV) and related techniques
Oil spills, oil flows, other fluid spills; Custom-written PIV software and routines
Expert witness services for fluid mechanics, microfluidics, bio fluid mechanics, MEMS, bio-MEMS, and oil spill issues

Last updated: 10 September 2020

## Books (Monographs)

**M. Raffel, C. Willert, S. Wereley, J. Kompenhans**, Particle Image Velocimetry: A Practical Guide, 3rd ed., Springer, New York (2018). (ISBN 978-3-319-68851-0; https://doi.org/10.1007/978-3-319-68852-7t)

**N.T. Nguyen, S.T. Wereley and M. Shaegh**, Fundamentals and Applications of Microfluidics, Artech House, Boston, (1st ed. 2002; 2nd ed. 2006; 3rd ed. 2019). (ISBN 978-1-58053-972-2)

## Books (Edited Collections)

**B. Bhusan (Wereley, section editor)**, Encyclopedia of Nanotechnology, Springer, New York, 2012. (ISBN: 978-90-481-9750-7)

**CH Ahn, M Gijs, S Hardt, SG Kandlikar, JP Landers, Y Lin, A De Mello, H Morgan, NF de Rooij, ST Wereley, and RJ Yang** (section eds), Encyclopedia of Microfluidics and Nanofluidics (ed-in-chief Dongqing Li), Springer, New York (2008).

**R. Bashir and S.T. Wereley** (vol. eds), BioMEMS and Biomedical Nanotechnology (series ed M. Ferrari): Vol. 4: Biomolecular Sensing, Processing and Analysis, Kluwer, Boston (2007). (ISBN 978-0387255668)

## Book Chapters

14. **C Snoeyink and ST Wereley**, "Micro/nano flow characterization techniques," in Handbook of Nanotechnology (Springer, 2012).

13. **HS Chuang, A Kumar, SJ Williams, ST Wereley**, "Optoelectrically-enabled multiscale manipulation," in Handbook of Nanotechnology (Springer, 2012).

12. **JS Kwon, R Thakur and ST Wereley**, "Rapid electrokinetic patterning," in Handbook of Nanotechnology (Springer, 2012).

11. **CD Meinhart and ST Wereley**, "Micro Particle Velocimetry," Chapt. 7 in Micro/Nano Technology Systems for Bio-medical Applications-Microfluidics, Optics and Surface Chemistry, (ed. Chih-Ming Ho), Oxford University Press, Oxford UK (2010). ISBN13: 978-0-19-921969-8; ISBN10: 0-19-921969-9

10. **HS Chuang, A Kumar, ST Wereley**, "Optical flow characterization- micro particle image velocimetry (µPIV)," in Methods in Bioengineering: Microfabrication and Microfluidics (eds Lee and Zahn), Artech House, Boston (2009). ISBN 978-1-59693-401-6

9. **A Kumar, AH Ewing, and ST Wereley**, "Optical tweezers for manipulating cells and particles", Encyclopedia of Microfluidics and Nanofluidics (ed. Dongqing Li), Springer, New York (2008).

8. **P Chamarthy, A Kumar, J Cao, and ST Wereley**, "Fundamentals of Diffusion in microfluidic systems", Encyclopedia of Microfluidics and Nanofluidics (ed. Dongqing Li), Springer, New York (2008).

7. **P Chamarthy and ST Wereley**, "Micro-PIV-Based Diffusometry," Encyclopedia of Microfluidics and Nanofluidics (ed. Dongqing Li), Springer, New York (2008).

6. **J. Cao and S.T. Wereley**, "Micro-Particle Image Velocimetry in Biomedical Applications," in Encyclopedia of Biomaterials and Biomedical Engineering, 2nd edition, (eds G.E. Wnek and G.L. Bowlin), Informa Healthcare, New York (2008).

5. **I. Whitacre and S.T. Wereley**, "Particle Dynamics in a Dielectrophoretic Microdevice", in BioMEMS and Biomedical Nanotechnology (series ed M. Ferrari): Vol. 4: Biomolecular Sensing, Processing and Analysis (vol. eds R. Bashir and S.T. Wereley), Kluwer, Boston (2007).

4. **S.T. Wereley and C.D. Meinhart**, "Electrokinetics in Microdevices" in Complex Systems Science in BioMedicine, eds. Deisboeck, Kresh, Kepler, Kluwer, Boston (2006).

3. **S.Y. Lee, J. Jang, and S.T. Wereley**, "Optical Diagnostics to Investigate the Entrance Length in Microchannels," in MEMS Handbook, ed. Mohamed Gad-el-Hak, Springer, New York (2006).

2. **S.T. Wereley and C.D. Meinhart**, "Micron-Resolution Particle Image Velocimetry" in Micro- and Nano-Scale Diagnostic Techniques, ed. Kenny Breuer, Springer-Verlag, New York, (2005).

1. **C.D. Meinhart, S.T. Wereley, and J.G. Santiago**, "Micron-Resolution Velocimetry Techniques," Laser Techniques Applied to Fluid Mechanics, R. J. Adrian et al. (Eds.), Springer-Verlag, Berlin, pp. 57-70, (2000).

## Journal Publications

84.  TJ Moehling, DH Lee, ME Henderson, MK McDonald, PH Tsang, S Kaakeh, ES Kim, ST Wereley, TL Kinzer-Ursem, KN Clayton, JC Linnes, "A smartphone-based particle diffusometry platform for sub-attomolar detection of Vibrio cholerae in environmental water, Biosensors and Bioelectronics,Vol 167, pp 112497 (2020) https://doi.org/10.1016/j.bios.2020.112497

83. X Pan, JS Kwon, JW Khor, SM Mehdi Shamsi, ST Wereley, "Experimental and computational study of optically-driven electrothermal vortex," Prog. Comp. Fluid Dyn., Vol. 19, p. 307-315 (2019).

82. X Kou, PWS Heng, LW Chan, ST Wereley, MT Carvajal, "Effect of Roughness on the Dispersion of Dry Powders for Inhalation: a Dynamic Visualization Perspective," AAPS PharmSciTech, Vol. 20 (7), p. 271 (2019).

81. **W Ren, SI Mohammed, ST Wereley and J Irudayaraj**, "Magnetic Focus Lateral Flow Sensor for Detection of Cervical Cancer Biomarkers," Anal. Chem., Vol. 91, 2876−2884 (2019). http://dx.doi.org/10.1021/acs.analchem.8b04848

80. **KN Clayton, TJ Moehling, DH Lee, ST Wereley, JC Linnes, and TL Kinzer-Ursem**, "Particle Diffusometry: An Optical Detection Method for Vibrio cholerae Presence in Environmental Water Samples," Scientific Reports, Vol. 9, Article number: 1739 (2019). (2019) 9:1739 | https://doi.org/10.1038/s41598-018-38056-7

79. **SH Lee, JY Kim, ST Wereley, and JS Kwon**, "Light-actuated electrothermal microfluidic flow for micro-mixing," Journal of Micromechanics and Microengineering, Vol. 29, p. 017003. (2018) DOI: 10.1088/1361-6439/aaf0b1

78. **JC Ndukaife, Y Xuan, AGA Nnanna, AV Kildishev, VM Shalaev, ST Wereley, A Boltasseva**, ACS Nano, "High-Resolution Large-Ensemble Nanoparticles Trapping with Multifunctional Thermoplasmonic Nanohole Metasurface," Vol. 12, p. 5376-84, 2018. DOI: 10.1021/acsnano.8b00318

77. **KN Clayton, GD Berglund, JC Linnes, TL Kinzer-Ursem, and ST Wereley**, "DNA Microviscosity Characterization with Particle Diffusometry for Downstream DNA Detection Applications," Analytical Chemistry, Vol. 89, pages 13334-13341, 2017. DOI: 10.1021/acs.analchem.7b03513

76. **KN Clayton, D Lee, ST Wereley and TL Kinzer-Ursem**, "Measuring biotherapeutic viscosity and degradation on-chip with particle diffusometry," Lab Chip, Vol. 17, pages 4148-4159, 2017. DOI: 10.1039/C7LC00507E

75. **X Kou, ST Wereley, PWS Heng, LW Chan, and MT Carvajal**, "Powder dispersion mechanisms within a dry powder inhaler using microscale particle image velocimetry," International Journal of Pharmaceutics, Vol. 514, pp. 445-455, 2016. https://doi.org/10.1016/j.ijpharm.2016.07.040

74. **A Mishra, TR Maltais, TM Walter, A Wei, SJ Williams and ST Wereley**, "Trapping and viability of swimming bacteria in an optoelectric trap," Lab Chip, Vol. 16, pp. 1039-1046, 2016. DOI: 10.1039/c5lc01559f

73. **JC Ndukaife, AV Kildishev, AGA Nnanna, VM Shalaev, ST Wereley, and A Boltasseva**. "Long-range and rapid transport of individual nano-objects by a hybrid electrothermoplasmonic nanotweezer," Nature Nanotechnology, Vol. 11, pages 53–59, 2016. doi:10.1038/nnano.2015.248

72. **A Mishra, JW Khor, KN Clayton, SJ Williams, XD Pan, T Kinzer-Ursem, ST Wereley**, "Optoelectric patterning: Effect of electrode material and thickness on laser-induced AC electrothermal flow," Electrophoresis, Vol. 37, pp. 658–665, 2016. DOI: 10.1002/elps.201500473

71. **JS Kwon and ST Wereley**, "Light-actuated electrothermal microfluidic motion: experimental investigation and physical interpretation," Microfluidics and Nanofluidics, Vol 19, pp 609-619, 2015. DOI: 10.1007/s10404-015-1587-z

70. **R Thakur, AM Amin and ST Wereley**, "On-chip dilution in nanoliter droplets," Analyst Vol 140, pp 5855-5859, 2015. DOI: 10.1039/C4AN01829J

69. **A Mishra, V Kulkarni, JW Khor and ST Wereley**, "Mapping surface tension induced menisci with application to tensiometry and refractometry," Soft matter, Vol 11, pp 5619-5623, 2015. DOI: 10.1039/C5SM00497G

68. **JC Ndukaife, A Mishra, U Guler, AGA Nnanna, ST Wereley, and A Boltasseva**, "Photothermal Heating Enabled by Plasmonic Nanostructures for Electrokinetic Manipulation and Sorting of Particles," ACS Nano, Vol. 8, pp 9035–9043, 2014. http://dx.doi.org/10.1021/nn502294w

67. **A Mishra, JS Kwon, R Thakur, and ST Wereley**, "Optoelectrical microfluidics as a promising tool in biology," Trends in Biotechnology, Vol 32, pp 414–421, 2014. DOI: http://dx.doi.org/10.1016/j.tibtech.2014.06.002 [selected as cover article]

66. **C Snoeyink, Sourav Barman, Gordon Christopher, ST Wereley**, "Nano-scale 3D-PTV with Bessel Beam Microscopy," Meas. Sci. Technol. (2014) under review

65. **C Snoeyink, ST Wereley**, "A novel 3D3C particle tracking method suitable for microfluidic flow measurements," Exp Fluids Vol. 54, pp. 1453 (2013). DOI: 10.1007/s00348-012-1453-7

64. **JS Kwon, ST Wereley**, "Towards New Methodologies for Manipulation of Colloidal Particles in a Miniaturized Fluidic Device: Optoelectrokinetic Manipulation Technique," J. Fluids Eng., Vol. 135 (2), 2013. doi:10.1115/1.4023451

63. **AM Amin, R Thakur, S Madren, HS Chuang, M Thottethodi, TN Vijaykumar, ST Wereley, and SC Jacobson**, "Software-programmable continuous-flow multi-purpose lab-on-a-chip," Microfluidics and Nanofluidics, 2013. DOI 10.1007/s10404-013-1180-2

62. **C Snoeyink and ST Wereley**, "Single Image Far Field Sub-Diffraction Limit Imaging with Axicon," Optics Letters, Vol. 38, pp. 625–627, 2013. DOI 10.1364/OL.38.000625
    *selected for publication in Virtual Journal for Biomedical Optics, Vol. 8, Iss. 4, Page 625.*

61. **CB Park and ST Wereley**, "Rapid generation and manipulation of microfluidics vortex flows induced by AC electrokinetics with optical illumination," Lab on a Chip, Vol. 13, pp. 1289-1294, 2013. DOI: 10.1039/c3lc41021h [designated *HOT* article by editor]

60. **SH Lee, DJ Lee, CK Lee, YH Lee, ST Wereley, JH Oh**, "Direct fabrication of microelectrodes on a polymer substrate using selective ultrashort pulsed laser ablation of inkjet-printed Ag lines," Physica Status Solidi, Vol, 209, 2012. DOI: 10.1002/pssa.201228269

59. **Z Huang, ES McLamore, HS Chuang, W. Zhang, ST Wereley, JLC Leon, and MK Banks**, "Shear-induced detachment of biofilms from hollow fiber silicone membranes," Biotechnology and Bioengineering, Vol. 110, 2012. DOI: 10.1002/bit.24631

58. **JS Kwon SP Ravindranath A Kumar J Irudayaraj and ST Wereley**," Opto-electrokinetic manipulation for high-performance on-chip bioassays," Lab on a Chip, Vol. 12, 2012. DOI: 10.1039/c2lc40662d [cover article] [designated Top 10% by journal]

57. **HS Chuang, LC Gui, ST Wereley**, "Nano-resolution flow measurement based on single pixel evaluation PIV," Microfluidics and Nanofluidics, Vol. 13, 2012. DOI 10.1007/s10404-012-0939-1

56. **HS Chuang, R Thakur and ST Wereley**, "Characterizations of gas purge valves for liquid alignment and gas removal in a microfluidic chip", Journal of Micromechanics and Microengineering, Vol. 22 (2012). doi:10.1088/0960-1317/22/8/085023

55. **C. Snoeyink and S.T. Wereley**, "Three-dimensional locating of paraxial point source with axicon," Optics Letters, Vol. 37, 2012. http://dx.doi.org/10.1364/OL.37.002058

54. **P Augustsson, R Barnkob, ST Wereley, H Bruus and T Laurell**, "Automated and temperature-controlled micro-PIV measurements enabling long-term-stable microchannel acoustophoresis characterization," Lab on a Chip, 2011. 10.1039/C1LC20637K [cover article]

53. **A Kumar, SJ Williams, HS Chuang, NG Green and ST Wereley**, "Hybrid opto-electric manipulation in microfluidics—opportunities and challenges", Lab on a Chip (2011). DOI: 10.1039/c1lc20208a

52. **YH Kim, C Cierpka and ST Wereley**, "Flow field around a vibrating cantilever: coherent structure eduction by continuous wavelet transform and proper orthogonal decomposition," J. Fluid Mech., Vol. 669, pp. 584-606. (2011). doi:10.1017/S0022112010005318

51. **Wang, C., Sadeghi, F., Wereley, S. T., Rateick Jr., R. G., and Scott, R.**, "Experimental Investigation of Lubricant Extraction from a Micro-Pocket Flow," Tribology Transactions, Vol. 54, pp. 404-416 (2011).

50. **A Kumar, C Cierpka, SJ Williams, CJ Kähler and ST Wereley**, "3D3C velocimetry measurements of an electrothermal microvortex using wavefront deformation PTV and a single camera," Microfluidics and Nanofluidics, Vol. 10, pp 355-365 (2010). DOI 10.1007/s10404-010-0674-4

49. **HS Chuang, SC Jacobson, and ST Wereley**, "A diffusion-based cyclic particle extractor," Microfluidics and Nanofluidics (2010). DOI 10.1007/s10404-010-0589-0

48. **P Chamarthy, SV Garimella and ST Wereley**, "Measurement of the temperature non-uniformity in a microchannel heat sink using microscale laser-induced fluorescence," International J. Heat and Mass Transfer, Vol. 53, pp. 3275–3283 (2010). doi:10.1016/j.ijheatmasstransfer.2010.02.052

47. **A Kumar, HS Chuang, and ST Wereley**, "Dynamic Manipulation by Light and Electric Fields: Micrometer Particles to Microliter Droplets," Langmuir, Vol. 26, pp. 7656-7660 (2010). DOI: 10.1021/la100614h

46. **A Kumar, JS Kwon, SJ Williams, NG Green, NK Yip, and ST Wereley**, "Optically modulated electrokinetic manipulation and concentration of colloidal particles near an electrode surface," Langmuir, Vol. 26, pp 5262–5272 (2010). DOI: 10.1021/la904661y

45. **SJ Williams, A Kumar, NG Green and ST Wereley**, "Optically induced electrokinetic concentration and sorting of colloids," J. Micromech. Microeng. 20 (2010) 015022 (11pp).

44. **SJ Williams, CB Park, and ST Wereley**, "Advances and applications on microfluidic velocimetry techniques," Microfluidics and Nanofluidics, Vol. 8, p. 709-726 (2010). DOI: 10.1007/s10404-010-0588-1

43. **HS Chuang and ST Wereley**, "Rapid patterning of slurry-like elastomer composites using a laser-cut tape," J. Micromech. Microeng. 19 097001 (5pp)  doi: 10.1088/0960-1317/19/9/097001

42. **SJ Williams, A Kumar, N Green, and ST Wereley**, "A simple, optically induced electrokinetic method to concentrate and pattern nanoparticles," Nanoscale (2009). DOI:10.1039/B9NR00033

41.  **CP Wang, HS Chuang, F Sadeghi, and ST Wereley**, "Investigation of Fluid Flow out of Microcavities using μPIV," Tribology Transactions, Vol. 52, pp. 817-32 (2009).

40.  **ST Wereley and CD Meinhart**, "Recent Advances in Micro Particle Image Velocimetry," Annual Review of Fluid Mechanics, Vol . 42 (2010).

39.  **HS Chuang and ST Wereley**, "Design, fabrication and characterization of conducting PDMS for microheaters and temperature sensors," J. Micromechanics and Microengineering, Vol. 19, 045010 (2009) DOI: 10.1088/0960-1317/19/4/045010.

38.  **P Chamarthy, SV Garimella and ST Wereley**, "Non-Intrusive Temperature Measurement Using Microscale Visualization Techniques," Vol. 47, Exp. Fluids (2009). DOI 10.1007/s00348-009-0646-1

37.  **HS Chuang, A Kumar, and ST Wereley**, "Open Optoelectrowetting Droplet Actuation," Applied Physics Letters, Vol. 93, 064104 (2008).

36.  **SJ Williams, A Kumar and ST Wereley**, "Electrokinetic patterning of colloidal particles with optical landscapes," Lab on a Chip (2008). DOI: 10.1039/b810787d

35.  **A Kumar, SJ Williams and ST Wereley**, "Experiments on opto-electrically generated vortices," Microfluidics and Nanofluidics (2008). DOI: 10.1007/s10404-008-0339-8

34.  **SD Peterson, HS Chuang and ST Wereley**, "Three-Dimensional Particle Tracking Using Micro-Particle Image Velocimetry Hardware," Meas. Sci. Technol., Vol. 19, 115406 (2008). DOI: 10.1088/0957-0233/19/11/115406

33.  **A. Kumar, V. Gorti, H. Shang, G.U. Lee, N.K. Yip, and S.T. Wereley**, "Optical Diffusometry Techniques and Applications in Biological Agent Detection," J. Fluids Eng, Vol. 130, 111401 (2008). DOI:10.1115/1.2969430

32.  **V.M. Gorti, H. Shang, S.T. Wereley and G.U. Lee**, "Immunoassays in Nanolitre Volume Reactors using Fluorescent Particle Diffusometry," Langmuir, Vol. 24, pp. 2947-2952 (2008).

31.  **S.Y. Lee and S.T. Wereley**, "A novel pressure sensing mechanism based on the surface tension and thermodynamic p-v-T relation," J. Micromech. Microeng., Vol. 18, 015020 (2008).

30.  **P. Chamarthy, H.K. Dhavaleswarapu, S.V. Garimella, J.Y. Murthy and S.T. Wereley**, "Visualization of convection patterns near an evaporating meniscus using μPIV," Exp. Fluids, Vol. 44, pp. 431-438 (2008).

29.  **S.Y. Lee, J. Jang, and S.T. Wereley**, "Effects of Planar Inlet Plenums on the Hydrodynamically Developing Flows in Rectangular Microchannels of Complementary Aspect Ratios," Microfluidics and Nanofluidics (2008). DOI: 10.1007/s10404-007-0179-y

28.  **J. Jang and S.T. Wereley**, "Gaseous slip flow analysis of a micromachined flow sensor for ultra small flow applications," J. Micromech. Microeng., Vol. 17, pp. 229-237 (2007).

27.  **De Carlo, A.R. Rokkam, M. ul Haque, A. Wereley, S.T. Irazoqui, P.P. Wells, H.W. McLamb, W.T. Roux, S.J. Porterfield, D.M.**, "Development of a Microfluidic Ion Sensor Array (MISA) to Monitor Gravity-Dependent Calcium Fluxes in Ceratopteris Spores," Gravit. and Space Biol. Bull., Vol 19, pp. 123-124 (2006).

26.  **A. ul Haque, M. Rokkam, A. R. De Carlo, S.T. Wereley, H.W. Wells, W.T. McLamb, S.J. Roux, P.P Irazoqui, D.M. Porterfield**, "A MEMS fabricated cell electrophysiology biochip for in silico calcium measurements", Sensors and Actuators B, Vol. 123, pp. 391-399 (2007).

25.  **W. Qu, I. Mudawar, S.Y. Lee, S.T. Wereley**, "Experimental and Computational Investigation of Flow Development and Pressure Drop in a Rectangular Micro-Channel," ASME J. Electronic Packaging, Vol. 128, pp. 1-9 (2006).

24.  **J. Jang and S.T. Wereley**, "Effective heights and Tangential Momentum Accommodation Coefficients of gaseous slip flows in Deep Reactive Ion Etching rectangular microchannels," J. Micromech. Microeng., Vol. 16, pp. 493-504 (2006).

23.  **D. Liu, S. Garimella, and S.T. Wereley**, "Infrared Micro-Particle Image Velocimetry in Silicon-Based Microdevices," Exp. Fluids, Vol. 38, pp. 385-392 (2005).

22.  **J. Jang and S.T. Wereley**, "Pressure distributions of gaseous slip flow in straight and uniform rectangular microchannels," Microfluidics and Nanofluidics, Vol. 1, pp 41-51 (2004).

21.  **H. Sagi, Y. Zhao, and S.T. Wereley**, "Wide Range Flow Sensor—Vacuum through Viscous Flow Conditions," J. Vac. Sci. and Tech. A, Vol. 22, No. 5, pp 1992-1999 (2004).

20.  **Y.H. Kim, S.T. Wereley and C.H. Chun**, "Phase-resolved flow field produced by a vibrating cantilever plate between two endplates," Phys. Fluids, Vol. 16, 145-162 (2004).

19.  **L. Gui, S.T. Wereley, and Y.H. Kim**, "Advances and applications of the digital mask technique in particle image velocimetry experiments," Meas. Sci. Technol. Technol., Vol. 14, pp 1820–1828 (2003).

18. **C.D. Meinhart and S.T. Wereley**, "Theory of Diffraction-Limited Resolution in Micro Particle Image Velocimetry," Meas. Sci. Technol., Vol. 14, pp 1047-1053, (2003).

17. **S. Devasenathipathy, J.G. Santiago, S.T. Wereley, C.D. Meinhart, and K. Takehara**, "Particle imaging techniques for microfabricated fluidic systems," Exp. Fluids, Vol. 34, pp 504-514 (2003).

16. **S.T. Wereley and L. Gui**, "A correlation-based central difference image correction (CDIC) method and application in a four-roll mill flow PIV measurement," Exp. Fluids, Vol. 34, pp 42-51, (2003).

15. **S.T. Wereley, A. Akonur, and R.L. Lueptow**, "Particle–fluid velocities and fouling in rotating filtration of a suspension," J. Membrane Science, Vol. 209, No. 2, pp 469-484 (2002).

14. **V. Hohreiter, S.T. Wereley, M. Olsen, and J.Chung**, "Cross-correlation analysis for temperature measurement," Meas. Sci. Tech., Vol. 13, pp. 1072-1078, (2002).

13. **L. Gui and S.T. Wereley**, "A correlation-based continuous window shift technique for reducing the peak locking effect in digital PIV image evaluation," Exp. Fluids, Vol. 32, pp 506-517, (2002).

12. **S.W. Stone, C.D. Meinhart, and S.T. Wereley**, "A Microfluidic-based Nanoscope," Exp. Fluids, Vol. 33, No. 5, pp 613-619 (2002).

11. **S.T. Wereley, L. Gui, and C.D. Meinhart**, "Advanced Algorithms for Microscale Velocimetry," AIAA J., Vol. 40, No. 6, pp. 1047-1055 (2002).

10. **R. Gomez, R. Bashir, A. Sarakaya, M.R. Ladisch, J. Sturgis, J.P. Robinson, T. Geng, A.K. Bhunia, H.L. Apple, and S.T. Wereley**, "Microfluidic Biochip for Impedance Spectroscopy of Biological Species," Biomedical Microdevices, Vol. 3, No. 3, 201-209 (2001).

9. **S.T. Wereley and C.D. Meinhart**, "Second-Order Accurate Particle Image Velocimetry," Exp. Fluids, Vol. 31, 258-268, (2001).

8. **C.D. Meinhart, S.T. Wereley, and J.G. Santiago**, "A PIV Algorithm for Estimating Time-Averaged Velocity Fields," J. Fluids Eng., Vol. 122, 285-289, (2000).

7. **C.D. Meinhart, S.T. Wereley, M.H.B. Gray**, "Volume illumination for two-dimensional particle image velocimetry," Meas. Sci. Tech., Vol. 11, 809-814, (2000).

6. **S.T. Wereley and R.M. Lueptow**, "Velocity field for Taylor-Couette flow with an axial flow," Phys. Fluids, Vol. 11, No. 12, 3637-3649 (1999).

5. **C.D. Meinhart, S.T. Wereley, and J.G. Santiago**, "PIV Measurements of a Microchannel Flow," Exp. Fluids, Vol. 27, No. 5, 414-419, (1999).

4. **S.T. Wereley and R.M. Lueptow**, "Inertial particle motion in a Taylor Couette rotating filter," Phys. Fluids, Vol. 11, No. 2, 325-333, (1999).

3. **J.G. Santiago, S.T. Wereley, C.D. Meinhart, D. Beebee, and R.J. Adrian**, "A particle image velocimetry system for microfluidics," Exp. Fluids, Vol. 25, No. 4, 316-319, (1998).

2. **S.T. Wereley and R.M. Lueptow**, "Spatio-temporal character of nonwavy and wavy Taylor Couette flow," J. Fluid Mech. Vol. 364, 59-80, (1998).

1. **S.T. Wereley and R.M. Lueptow**, "Azimuthal velocity in supercritical circular Couette flow," Exp. Fluids, Vol. 18, pp. 1-9, (1994).

## Patents

9. **JC Ndukaife, AV Kildishev, AA Nnanna, A Boltasseva, VM Shalaev, ST Wereley**, "Multi-site particle sensing system," US Patent 10,436,780, Oct 8, 2019.

8. **JC Ndukaife, A Boltasseva, AA Nnanna, A Kildishev, VM Shalaev**, "System and method for manipulation of particles," US Patent 9,778,400, Oct 3, 2017.

7. **S.T. Wereley and C. Snoeyink**, "Single image super-resolution microscopy and telescope systems," US Patent 9,494,785, Nov 15, 2016.

6. **S.T. Wereley, A.A. Nnanna, A. Boltasseva, J.C. Ndukaife, A. Mishra**, "Hybrid device for on-chip concentration, manipulation, sorting and sensing of particles on a plasmonic substrate," US Patent 9,443,632, Sep 13, 2016.

5. **A.M.E. Amin, H.S. Chuang, S.T. Wereley, M.S. Thottethodi, T.N. Vijaykumar, S.C. Jacobson**, "Variable volume mixing and automatic fluid management for programmable microfluids," US Patent 9,211,539, Dec 15, 2015.

4. **H.S. Chuang, A. Kumar, S.T. Wereley**, "Open optoelectrowetting droplet actuation device and method," US Patent 8,753,498, June 17, 2014.

3. **H.S. Chuang and S.T. Wereley**, "Microfluidic Purge Valve," US Patent 8,376,317, Feb 19, 2013.

2. **C.D. Meinhart, J.G. Santiago, R.J. Adrian, and S.T. Wereley**, "Depth-of-Field Micron Resolution Velocimetry with Pulsed Images of Injected Solid Particles," US Patent 7,057,198, June 6, 2006.

1.  **C.D. Meinhart, J.G. Santiago, R.J. Adrian,** and **S.T. Wereley,** "Micron Resolution Particle Image Velocimeter," US Patent 6,653,651, Nov. 25, 2003.

## Articles About Our Microfluidics Work

**BE DiGregorio,** "Nanoscale Technology Separates Microbes by Size Mainly, Plus Charge," Vol. 8, No. 4, p. 155, April 2013.

## Trade Publication Articles

**S. Wereley, E. Robinson, T. Lundy,** "Microfluidics—The Birth of an Industry," R&D Magazine, Vol. 49, No. 2, pp. 44-46 (2006).

**A. ul Haque, M. Rokkam, A. R. De Carlo, S. T. Wereley, H.W. Wells, W.T. McLamb, S.J. Roux, D.M. Porterfield,** "Development of a MEMs based *in silico* cell physiology system for measuring real-time gravity responses in single cells," NASA Tech Briefs (2006).

**V. Gorti and S.T. Wereley,** "Benefits of microscale particle image velocimetry," Micro/Nano, Vol. 8, No. 9, pp. 18-19, (2003).

## Conference Presentations and Papers *26 invited or keynote*

190. **KN Clayton, TJ Moehling, D Lee, K Byers, M Henderson, A Witten, G Berglund, R Preston, ST Wereley, JC Linnes, TL Kinzer-Ursem**, "Development of a New Method and Platform for Point-of-Care Pathogen Detection," Society for Laboratory Automation and Screening, San Diego, California, February 5, 2018. Poster.

189. **KN Clayton, TJ Moehling, ST Wereley, JC Linnes, TL Kinzer-Ursem**, "Development of a New Method and Platform for Point-of-Care Pathogen Detection," Society for Laboratory Automation and Screening, San Diego, California, 2018. Poster.

188. **KN Clayton, TJ Moehling, D Lee, GD Berglund, AJ Witten, ST Wereley, JC Linnes, TL Kinzer-Ursem**, "Detecting Pathogens with Viscosity-Based Measurements," Miniaturized Systems for Chemistry and Life Sciences (µTAS), Savannah, Georgia, 2017. Oral Presentation.

187. **KN Clayton, TJ Moehling, GD Berglund, AJ Witten, D Lee, ST Wereley, JC Linnes, TL Kinzer-Ursem**, "A Viscosity-Based Measurement System for Pathogen Detection," American Institute of Chemical Engineers, Minneapolis, MN, 2017. Oral Presentation.

186. **KN Clayton, TJ Moehling, AJ Witten, GD Berglund, D Lee, ST Wereley, JC Linnes, TL Kinzer-Ursem**, "A Viscosity-Based Measurement System for Pathogen Detection," Biomedical Engineering Society, Phoenix, AZ, 2017. Oral Presentation.

185. **KN Clayton, ST Wereley and TL Kinzer-Ursem**, "Implementation of Particle Diffusometry for Bionanotechnology Measurements and Applications," International Conference on Bioengineering and Nanotechnology (Chicago, IL) 2017. *(Poster contest winner)*

184. **JC Ndukaife, AG Agwu Nnanna, AV Kildishev, VM Shalaev, ST Wereley** *(Invited)*, Alexandra Boltasseva, "Shaping the future of plasmon nano-optical tweezing", (Gordon Research Conference on Plasmonics and Nanophotonics, 2016)

183. **ST Wereley** *(Plenary Keynote)*, "Opto-electric Droplet and Particle Physics," Joint Symposium of the 18th Annual Conference of Chinese Society of Micro & Nano Technology and Microsystems & Nanoengineering Summit 2016 (CSMNT2016 & MAN2016), July 28–31, 2016 (Beijing, China).

182. **ST Wereley** *(Keynote)*, "Visualizing Microscale Electrothermal Vortices," International Symposium on Flow Visualization, June 19-22, 2016 (Gatlinburg, TN).

181. **ST Wereley**, "Droplet and Particle Technologies: Entrepreneurship Opportunities," The Second North Latitude 45 ° Innovative Entrepreneurial Forum, June 15-17, 2016 (Harbin, China).

180. **ST Wereley** *(Keynote)*, "," International Conference of Microfluidics, Nanofluidics and Lab-on-a-Chip, June 10-12, 2016 (Dalian, China).

179. **ST Wereley** *(Invited)*, "Non-contact Micro/Nano Object Manipulation," TechConnect World Innovation Conference and Expo 2016, May 23-25, 2016 (National Harbor, Maryland).

178. **Justus C. Ndukaife, A. G. Agwu Nnanna, Alexander V. Kildishev, Vladimir M. Shalaev, Steven T. Wereley, Alexandra Boltasseva**, "On-demand rapid transport and stable trapping of nanoparticles by a hybrid electrothermoplasmonic nanotweezer", (presented at SPIE Optics and Photonics 2016)

177. **Justus C. Ndukaife, A. G. Agwu Nnanna, Alexander V. Kildishev, Vladimir M. Shalaev, Steven T. Wereley, Alexandra Boltasseva**, "Controlled Rapid Delivery and On-chip Trapping of Nanoparticles by a Hybrid Electrothermoplasmonic Nanotweezer", (presented at CLEO 2016)

176. **Justus C. Ndukaife, A. G. Agwu Nnanna, Vladimir M. Shalaev, Steven T. Wereley, Alexandra Boltasseva**, "The hybrid electrothermoplasmonic nanotweezer: A new paradigm in nanomanipulation", (presented at MRS Spring Meeting, Phoenix, AZ, March 2016)

175. **Justus C. Ndukaife, A. G. Agwu Nnanna, Steven T. Wereley, Vladimir M. Shalaev, Alexandra Boltasseva**, "Plasmofluidic Device for On-chip Concentration, Manipulation and Sensing of Particles using TiN Plasmonic Nanoantenna Array", (presented at MRS Fall Meeting, Boston, MA, December 2015)

174. **Justus C. Ndukaife, A. G. Agwu Nnanna, Alexander V. Kildishev, Vladimir M. Shalaev, Steven T. Wereley, Alexandra Boltasseva**, "Hybrid Electroplasmonic Nanotweezer (HENT): Shaping the Future of Nanomanipulation", (poster presented at ASME IMECE Micro/Nano Forum 2015, Houston Texas, USA, November 13-19, 2015). (Best paper award)

173. **Justus C. Ndukaife, A. G. Agwu Nnanna, Alexandra Boltasseva, Steven T. Wereley**, "Versatile Plasmofluidic Device for Long-range Transport and On-chip Capture of Particles",(oral presentation at 11th International Symposium on PIV, Santa Barbara, CA September 14-16, 2015)

172. **Justus C. Ndukaife, Alexander V. Kildishev, A. G. Agwu Nnanna, Steven T. Wereley, Vladimir M. Shalaev, Alexandra Boltasseva** (*Invited*), "Electrothermoplasmonic Flow for Plasmon-assisted Optical Trapping", (invited talk for 2015 SPIE Conference on Plasmonics: Metallic Nanostructures and Their Optical Properties XIII, San Diego, California, USA, August 9-13, 2015)

171. **Justus C. Ndukaife, Alexander V. Kildishev, A. G. Agwu Nnanna, Steven T. Wereley, Vladimir M. Shalaev, Alexandra Boltasseva**, "Hybrid Electroplasmonic Nanotweezer (HENT): Versatile Plasmofluidic Device for On-chip Capture, Manipulation and Printing of Particles on Plasmonic Hotspots", (poster presented at Summer School on Complex Photonics at the International School of Physics, Enrico Fermi, Varenna, Italy, July 13-18, 2015)

170. **Justus C. Ndukaife, Alexander V. Kildishev, A. G. Agwu Nnanna, Steven T. Wereley, Vladimir M. Shalaev, Alexandra Boltasseva**, "Versatile Plasmofluidic Device for On-chip Concentration, Manipulation and Sensing of Particles in Suspensions", (poster presented at the Gordon Research Conference on Microfluidics, Mount Snow, VT, June 2015)

169. **Justus C. Ndukaife, Alexander V. Kildishev, A. G. Agwu Nnanna, Steven T. Wereley, Vladimir M. Shalaev, Alexandra Boltasseva**, "Plasmon-Assisted Optoelectrofluidics", (oral presentation AW3K.5, CLEO /A&T Topical Review - Optofluidics Microsystems I, 2015 Conference, San Jose, CA, USA, May 10-15, 2015)

168. **Justus C. Ndukaife, Avanish Mishra, Urcan Guler, A. G. Agwu Nnanna, Steven T. Wereley, Alexandra Boltasseva**, " Photothermal heating enabled by plasmonic nanoantennas for electrokinetic manipulation and sorting of submicron particles", (oral presentation FTh1K.2, CLEO 2014, San Jose, CA, USA, June 8-13, 2014)

167. **Justus C. Ndukaife, Avanish Mishra, Urcan Guler, A. G. Agwu Nnanna, Steven T. Wereley, Alexandra Boltasseva**, "Thermoplasmonics for Optofluidics", NSF Center for Photonics and Multiscale Nanomaterials IRG2 Review Meeting, March 28, 2014, Purdue University, W/L, USA

166**. Justus C. Ndukaife, Avanish Mishra, Urcan Guler, A. G. Agwu Nnanna, Steven T. Wereley, Alexandra Boltasseva**, "A new Plasmofluidic Device for On-chip Concentration, Manipulation and Sorting of Particles on a Plasmonic Substrate", (NSF Center for Photonics and Multiscale Nanomaterials All-Hands Meeting, September 26, 2014, University of Michigan, Ann Arbor, USA)

165. **K Clayton, A Mishra and ST Wereley**, "Rapid Electrokinetic Patterning for Vertical Stacking and Manipulation of Particles," Pres. #R10.00009, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (San Francisco, CA, Nov. 2014).

164. **A Mishra, S Williams and ST Wereley**, "Electrokientic Patterning of Metal Nanoparticles and Nanowires," Pres. #R10.00006, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (San Francisco, CA, Nov. 2014).

163. **R Thakur, A Amin and ST Wereley**, "Convection-diffusion driven concentration gradients in nanolitre droplets for microfluidic screening applications," Pres. #D10.00001, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (San Francisco, CA, Nov. 2014).

162. **JW Khor, A Mishra, X Pan and ST Wereley**, "Investigation of Material Dependence in Electrothermal Vortex," Pres. #A10.00004, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (San Francisco, CA, Nov. 2014).

161. **SJ Williams, A Mishra, V Velasco and ST Wereley**, "Electrothermal Flow Patterns Generated by Resistive Heaters", 12th International Conference on Nanochannels, Microchannels, and Minichannels, Chicago, USA, August 3-7, 2014.

160. **JC Ndukaife, A Mishra, U Guler, AA Nnanna, ST Wereley, and A Boltasseva**, "Photothermal heating enabled by plasmonic nanoantennas for electrokinetic manipulation and sorting of submicron particles," CLEO, San Jose, USA, June 8-13, 2014.

159. **A Mishra, V Kulkarni, JW Khor and ST Wereley**, "Low Interfacial Tension Measurement with Synthetic Schlieren Imaging," Pres. # E32.00001, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Pittsburgh, PA, Nov. 2013).

158. **ST Wereley and A Mishra**, "Hybrid Opto-electric Manipulation of Macromolecules," Pres. # E6.00001, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Pittsburgh, PA, Nov. 2013).

157. **SJ Williams, V Velasco, A Mishra, J-S Kwon, and ST Wereley**, "Rapid electrokinetic patterning (REP): manipulating colloids from nanoparticles to bacteria," 2013 Kentucky Nano Symposium, Louisville, KY, Aug. 16-17, 2013.

156. **C Snoeyink and ST Wereley**, "Bessel Beam Microscopy: Three Dimensional Particle Tracking with Super-Resolution," Particle Image Velocimetry 2013 (Delft, The Netherlands 1-3 July, 2013).

155. **A Mishra, V Kulkarni, JW Khor and ST Wereley**, "Surface Tension Induced Meniscus Measurement using Free Surface Synthetic Schlieren," Particle Image Velocimetry 2013 (Delft, The Netherlands 1-3 July, 2013).

154. **ST Wereley** (*Invited*), "Opto-electric Manipulation of Particles and Droplets," 8th World Conference on Experimental Heat Transfer, Fluid Mechanics and Thermodynamics *ExHFT-8* (June 16-20, 2013 Lisbon, Portugal).

153. **JS Kwon, ST Wereley**, "Theoretical and Experimental Characterization of an Electrothermal Microfluidic Flow," Advances in Microfluidics and Nanofluidics (Notre Dame, IN, May 24-26, 2013).

152. **A Mishra, K Clayton, R Thakur, SJ Williams, A Kumar, ST Wereley**, "Rapid Optoelectrokinetic Manipulation of Nanoparticles," Advances in Microfluidics and Nanofluidics (Notre Dame, IN, May 24-26, 2013).

151. **JS Kwon, V Velasco, SJ Williams, ST Wereley**, "Rapid Electrokinetic Patterning Technique for Manipulation of Colloids and Microorganisms and its Technical Advancement," Advances in Microfluidics and Nanofluidics (Notre Dame, IN, May 24-26, 2013).

150. **JS Kwon, V Velasco, SJ Williams, ST Wereley**, "Rapid Electrokinetic Patterning Technique for Manipulation of Colloids and Microorganisms, and its Technical Advancement," 2nd European Optical Society Conference on Optofluidics *EOSOF 2013* (Munich, Germany, May 13-15, 2013).

149. **A Mishra, R Thakur, SJ Williams, A Kumar, ST Wereley**, "Optoelectrokinetic trapping of Gold Nanoparticles," 2nd European Optical Society Conference on Optofluidics *EOSOF 2013* (Munich, Germany, May 13-15, 2013).

148. **ST Wereley (*Invited*)**, "A Multiscale Suite of Particle and Droplet Manipulation Technologies," ASME/IMECE, IMECE2012-85373, Houston, TX, Nov 2012.

147. **JS Kwon and ST Wereley**, "A new dimensionless variable for electrothermal microfluidic flow," ASME/IMECE, IMECE2012-94082, Houston, TX, Nov 2012.

146. **JP Kim, JS Kwon and ST Wereley**, "Experimental Results of Electrothermal Vortex in Parallel ITO-glass with High Conductivity Medium and AC electric field and Laser," ASME/IMECE, IMECE2012-94075, Houston, TX, Nov 2012.

145. **C Park and ST Wereley**, "Twin Vortex Flow Generation under a Non-Uniform Alternating Electric Field and Optical Illumination," IMECE2012-93989, ASME/IMECE, Houston, TX, Nov 2012. *Best poster, Fluids Engineering Division, Micro Nano Forum.*

144. **C Park and ST Wereley**, "AC electrokinetic flow generation with various types of electrodes," ASME/IMECE, IMECE2012-87858, Houston, TX, Nov 2012.

143. **ST Wereley (*Invited*)**, "Lab on a Chip Applications of Optoelectric Particle and Droplet Manipulation," ICNMM2012-73268, 10th International Conference on Nanochannels, Microchannels, and Minichannels, July 2012, Puerto Rico.

142. **JS Kwon and ST Wereley**, "μPIV characterization of a toroidal microfluidic vortex driven by opto-electrokinetic methods," Abstract D18.05, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Baltimore, MD, Nov. 2011).

141. **ST Wereley**, "Random uncertainty estimates of PIV measurements using correlation statistics," Abstract H26.02, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Baltimore, MD, Nov. 2011).

140. **JS Kwon and ST Wereley**, "INVESTIGATION FOR TOROIDAL MICROFLUIDIC VORTICES GENERATED BY A LASER ILLUMINATION APPLICATION IN AN UNIFORM ELECTRIC FIELD," IMECE/ASME, IMECE2011-62743, Denver, CO, Nov. 2011.

139. **K Han, ST Wereley, JH Oh, Z Zhang**, "STUDY ON FACTORS IN COFFEE-RING STRUCTURE FORMATION USING PIV METHOD," IMECE/ASME, IMECE2011-63231, Denver, CO, Nov. 2011.

138. **SJ Williams, JS Kwon, SP Ravindranath, J Irudayaraj, and ST Wereley**, "Rapid concentration and manipulation of colloids and microorganisms through double layer polarization electrokinetics," poster T32A, 15th International Conference on Miniaturized Systems for Chemistry and Life Sciences (Micro-TAS, Seattle, WA, Oct 2011).

137. **ST Wereley** (*invited*), "Software Programmable Lab-on-a-Chip Applications and Optimization," Lab-on-a-Chip World Congress (San Francisco, CA, Sep 2011).

136. **R Thakur, SJ Williams, R Cohn, J Rathfon, JF Berret, M Yan, ST Wereley**, "Patterning of non-spherical particles onto electrode surface: Study of orientation behavior under viscous fluid and AC electrokinetic forces," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Long Beach, CA, Nov. 2010).

135. **C Snoeyink and ST Wereley**, "A Novel 3 Dimension 3 Component Micro-PIV System," Pres. # RW.00007, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Long Beach, CA, Nov. 2010).

134. **C Park and ST Wereley**, "Using TEM For the Nano-scale Particle Image Velocimetry," IMECE/ASME, IMECE2010-38835, Vancouver, CA, Nov. 12-18, 2010.

133. **JS Kwon, S Ravindranath, A Kumar, J Irudayaraj, and ST Wereley**, Application of an optically induced electrokinetic manipulation technique on live bacteria," IMECE/ASME, IMECE2010-39324, Vancouver, CA, Nov. 12-18, 2010.

132. **R Thakur and ST Wereley**, "Optically Induced Rapid Electrokinetic patterning of Non-spherical particles- Study of The Colloidal Phase Transition," IMECE/ASME, IMECE2010-39665, Vancouver, CA, Nov. 12-18, 2010.

131. **SJ Williams and ST Wereley**, "Experiments and simulation of a dielectrophoretically oscillating microparticle," Paper 1598, Proceedings of the 15th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 5-8, 2010.

130. **JS Kwon, A Kumar, SJ Williams and ST Wereley**, "A study for opto-electrokinetic forces of colloidal particles on an electrode surface using Voronoi and Delaunay tessellation," Paper 1775, Proceedings of the 15th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 5-8, 2010.

129. **A Kumar, C Cierpka, SJ Williams, C J Kahler and ST Wereley**, "3D3C velocimetry measurements of an electrothermal microvortex using wavefront deformation PTV and a single camera," Paper 1594, Proceedings of the 15th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 5-8, 2010.

128. **ST Wereley** (*invited*), "Microscale Velocity and Temperature Measurement Techniques," American Institute of Aeronautics and Astronautics 40th Fluid Dynamics Conference (June 28-July 1, 2010, Chicago, IL).

127. **Smith, C.T., Thakur, R., Chuang, H.S., Kumar, A., Wereley, S.T.**, "A hybrid optoelectric device for multi-scale particle and droplet manipulation," Proceedings of SPIE, Vol.7762, pp.68, June, 2010.

126. **HS Chuang, A Kumar, CT Smith, and ST Wereley**, "Rapid and dynamic multiscale manipulation based on a hybrid optoelectric device," Trends in Optical Micromanipulation II, Innsbruck, Austria, April 11-16, 2010.

125. **ST Wereley, SJ Williams, A Kumar, CH Chuang, JS Kwon and CT Smith** (*invited*), "Opto-electric Manipulation of Droplets and Colloids for Material Assembly," Materials Research Society Spring Meeting (San Francisco, CA April 6-8, 2010).

124. **HS Chuang and ST Wereley** (*invited*), "Microfluidic gas purge valves," MNHMT2009/ASME, MNHMT2009-18534, Shanghai, China, Dec. 18-21, 2009.

123. **A Kumar, SJ Williams, and ST Wereley** "Micro and nano particle manipulation using optically modulated electrokinetic flows" ASME 2009 Micro/Nanoscale Heat and Mass Transfer International Conference, MNHMT2009-18493 Shanghai, China, Dec. 18-21, 2009. (*Awarded "Excellent Paper" distinction—3 given among 340 submissions*)

122. **HS Chuang, A Kumar, and ST Wereley**, "Light-Enabled Droplet Manipulations," Gallery of Fluid Motion, APS/DFD 62nd Annual Meeting, Minneapolis, MN, USA, Nov. 22-24, 2009. (APS highlighted video)

121. **HS Chuang, ST Wereley, and SC Jacobson**, "An automated cyclic particle extractor," IMECE/ASME, IMECE2009-10422, Lake Buena Vista, FL, USA, Nov. 13-19, 2009.

120. **A Kumar, SJ Williams, JS Kwon, NG Green, NK Yip, and ST Wereley**, "Optically induced rapid electrokinetic patterning: a study of the operational regimes and dominant forces" *Proc. ASME/IMECE*, Lake Buena Vista, FL, Nov. 13-19, 2009.

119. **SJ Williams**, A Kumar, ST Wereley, "Continuous colloidal concentration and patterning with optically induced AC electrokinetics" *2009 AIChE Annual Meeting, Annual Meeting of the American Electrophoresis Society*, Nashville, TN, Nov. 8-13, 2009.

118. **ST Wereley**, (*invited*), "Massively parallel opto/electric manipulation of colloidal particles," Laser Science XXV (Oct. 11-15, 2009, San Jose, CA).

117. **ST Wereley** (*invited*), "Micrometer and nanometer spatial resolution with μPIV," 25 Years of Particle Image Velocimetry in Aerodynamics (Sept. 23-25, 2009, Göttingen, Germany).

116. A Kumar, **SJ Williams**, and ST Wereley, "A novel optically driven electrokinetic technique for manipulating nanoparticles" *SPIE Symposium on SPIE Nanoscience + Engineering*, Vol. *7400*, paper 74000V, (San Diego, CA, Aug. 2-6, 2009).

115. **SJ Williams, A Kumar, and ST Wereley**, "Optically induced electrohydrodynamics and electrokinetic colloidal aggregation" Proc. ASME/FEDSM, Paper#2009-78121 (Vail, CO), Aug. 2-6, 2009.

114. **SJ Williams and ST Wereley**, "Hydrodynamic investigations of a dielectrophoretically trapped and agitated microparticle" Proc. ASME/FEDSM, Paper#2009-78068 (Vail, CO), Aug. 2-6, 2009.

113. **ST Wereley, E Judokusumo, A Kumar, and SJ Williams** (*invited*), "Velocity Fields in Electrooptically-Induced Fluid Flows," Proc. Seventh Int. ASME Conf. on Nanochannels, Microchannels and Minichannels (June 22-24, 2009, Pohang, South Korea).

112. **A Kumar, SJ Williams and ST Wereley**, "Optically Modulated Rapid Electrokinetic Patterning For Micro and Nano Particles," Proc. European Conferences on Biomedical Optics, Vol. *7371*, paper 737110 (14-18 June 2009, Munich, Germany).

111. **ST Wereley, SJ Williams, and A Kumar** (*invited*), "Optoelectric Micro/Nano Particle Manipulation for Biological Applications," presented at the LifeChips 2009 Symposium (UC-Irvine, Jan. 2009).

110. **ST Wereley** (*invited*), "Flow Diagnostics for Micro/Nano Device Characterization," presented at the International Conference on Fascinating Advancement in Mechanical Engineering 2009 (Mepco-Schlenk Engineering College, Sivakasi, TN, India, Dec. 2008).

109. **SJ Williams, SD Peterson, A Kumar, and ST Wereley**, "Three dimensional transport of an optically induced electrothermal microvortex," Pres. # LN.00003, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (San Antonio, TX, Nov. 2008).

108. **E Judokusumo, A Kumar, SJ Williams, and ST Wereley**, "Analysis of Optically Induced Fluid Flows in Electric Fields," Proc. ASME/IMECE 2008-66951 (October 31-November 6, 2008 Boston, 2008, Boston).

107. **HS Chuang, A Amin, M Thodentoddi, T Vijaykumar, S Jacobson, and ST Wereley**, "POLYDIMETHYLSILOXANES (PDMS) PERISTALTIC PUMP CHARACTERIZATION FOR PROGRAMMABLE LAB-ON-A-CHIP APPLICATIONS", Proc. 12th International Conference on Miniaturized Systems for Chemistry and Life Sciences (μTAS2008), San Diego, USA, Oct 12-16, 2008.

106. **A Kumar, SJ Williams, and ST Wereley**, "Rapid electrokinetic patterning of colloids using optical landscapes" Proc. 12th International Conference on Miniaturized Systems for Chemistry and Life Sciences (μTAS2008), San Diego, USA, Oct 12-16, 2008.

105. **SJ Williams, P Chamarthy and ST Wereley**, "Laser-Induced Fluorescence Thermometry for Joule Heating in AC Electrokinetic Chips," Proc. ASME-FED paper # 55175 (Jacksonville, FL, Aug. 10-14), 2008.

104. **SJ Williams, A Kumar and ST Wereley**, "Rapid colloidal assembly with optically induced electrokinetic forces," presented at University Government Industry Micro/nano Symposium, Louisville, KY, July 13-16, 2008.

103. **R Nasarek, ST Wereley, P Stephan**, "Flow field measurements near a moving meniscus of a capillary flow with micro Particle Image Velocimetry (μPIV), Proc. of the Sixth International Conference on Nanochannels, Microchannels, and Minichannels, Darmstadt, Germany, June 23-25, 2008.

102. **AM Amin, M Thottethodi, TN Vijaykumar, ST Wereley and SC Jacobson**, "Automatic Volume Management for Programmable Microfluidics," Programming Language Design and Implementation Conference (Tucson, AZ), paper #13, June 7-13, 2008.

101. **Z Huang, HS Chuang, ST Wereley and MK Banks**, "Effect of biofilm surface roughness on thickness of hydrodynamic boundary layer and coefficient of friction," Paper Coll-476, American Chemical Society Spring Meeting (New Orleans, LA), Apr. 6-10, 2008.

100. **A Kumar, NK Yip and ST Wereley**, "Particle transport on periodic potential landscapes," Pres. # EA.00004, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Salt Lake City, UT, Nov. 2007).

99. **P Chamarthy, ST Wereley and SV Garimella**, "Microscale laser-induced fluorescence method for non-intrusive temperature measurement," Proc. ASME/IMECE, Paper #2007-41935 (Seattle, WA), Nov. 11-15, 2007.

98.   **H.S. Chuang and S.T. Wereley**, "In-Vitro Wall Shear Stress Measurements for Microfluid Flows by using Second-order SPE micro-PIV," Proc. ASME/IMECE, Paper #2007-41171 (Seattle, WA), Nov. 11-15, 2007.

97.   **R. Muddu and S.T. Wereley**, "Numerical Simulation of Optical Trap systems," Proc. ASME/IMECE, Paper #2007-42411 (Seattle, WA), Nov. 11-15, 2007.

96.   **S.J. Williams, S.T. Wereley**, "Field Flow Analysis of Dielectrophoretically Suspended Particles," Proc. ASME/IMECE, Paper #2007-41252 (Seattle, WA), Nov. 11-15, 2007.

95.   **A.M. Amin, M. Thottethodi, T.N. Vijaykumar, S.T. Wereley and S.C. Jacobson**, "Aquacore: A General-Purpose Architecture for Programmable Microfluidics," paper T33C, µYAS (Paris, France), Oct. 7-11, 2007.

94.   **H.S. Chuang and S.T. Wereley**, "Nanometer-resolution and second-order accurate SPE micro-PIV," 7th International Symposium on Particle Image Velocimetry (Rome, Italy), Sept. 11-14, 2007.

93.   **A.M. Amin, M. Thottethodi, T.N.Vijaykumar, S.Wereley and S.C. Jacobson**, "AquaCore: A programmable Architecture for Microfluidics," Proc. 34th Annual International Symposium on Computer Architecture (ISCA) (San Diego, CA), pages 254-265, June 10-13, 2007.

92.   **S.T. Wereley** (*invited*), "Interesting Problems in Microflows," Schloß Dagstuhl-Seminar 07121: *Experimental Fluid Mechanics, Computer Vision & Pattern Recognition* (International Conference and Research Center for Computer Science, Wadern, Germany), March 18 – 23, 2007.

91.   **A.H. Ewing, S. Kim; S.T. Wereley**, "Mediating Fluidic Self- Assembly with optical traps," Proc. AICHE Annual Meeting, paper 35E, (San Francisco, CA) Nov. 12-17, 2006.

90.   **S.T. Wereley** (*keynote*), "Micro and Nanoscale Flow Measurement," 33rd National and 3rd International Conference on Fluid Mechanics and Fluid Power (Mumbai, India), Dec. 7-9, 2006.

89.   **A. Kumar, V. Gorti, S.T. Wereley**, "Biological Agent Detection Using Optical Diffusometry Methods," Proc. ASME/IMECE, Paper #2006-13267 (Chicago, IL), Nov. 5-10, 2006.

88.   **H.K. Dhavaleswarapu, P. Chamarthy, S.V. Garimella, J.Y. Murthy, and S.T. Wereley**, "Experimental Investigation of Thermocapillary Convection near an Evaporating Meniscus," Proc. ASME/IMECE, Paper #2006-13901 (Chicago, IL), Nov. 5-10, 2006.

87.   **P. Chamarthy, S.T. Wereley and S.V. Garimella**, "Simultaneous Measurement of Temperature and Velocity Using µPIV," Proc. ASME/IMECE, Paper #2006-14079 (Chicago, IL), Nov. 5-10, 2006.

86.   **H.-S. Chuang, S. T. Wereley**, "Study of Single Pixel Evaluation for Experimental Measurements in a Microchannel," Proc. ASME/IMECE, Paper #2006-14517 (Chicago, IL), Nov. 5-10, 2006.

85.   **C. Park, S.T. Wereley, O. Campanella, D.E. Nivens, K.M. Little, H. Sumali**, "Measurements of Mechanical Properties of Human Red Blood Cells," Proc. ASME/IMECE, Paper #2006-15175 (Chicago, IL), Nov. 5-10, 2006.

84.   **S.T. Wereley** (*invited*), "Micro and Nanoscale Flow Measurement and Visualization," Proceedings of the 12th International Symposium on Flow Visualization (Göttingen, Germany), Sept. 10-14, 2006.

83.   **P. Chamarthy, H.K. Dhavaleswarapu, S.V. Garimella, J.Y. Murthy and S.T. Wereley**, "Visualization of convection patterns near an evaporating meniscus using µPIV," Proceedings of the 12th International Symposium on Flow Visualization (Göttingen, Germany), Sept. 10-14, 2006.

82.   **H.-S. Chuang, S. T. Wereley, C. D. Meinhart, D. Tretheway**, "Single pixel evaluation PIV for nano-resolution flow measurements," paper number 32.4, Proceedings of the 13th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), June 26-29, 2006.

81.   **P. Chamarthy, S.T. Wereley and S.V. Garimella**, "Simultaneous Measurement of Temperature and Velocity using Cross-Correlation µPIV," paper number 12.4, Proceedings of the 13th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), June 26-29, 2006.

80.   **A.R. De Carlo, M. Rokkam, A. ul Haque, S.T. Wereley, P.P. Irazoqui, H.W. Wells, W.T. McLamb, S.J. Roux, D.M. Porterfield**, "Development of a Microfluidic Ion Sensor Array (MISA) to Monitor Gravity-Dependent Calcium Fluxes in Ceratopteris Spores," Abstract #56, Annual Meeting of the American Society for Gravitational and Space Biology (Reno, NV, November 1-4, 2005).

79.   **M. Rokkam, P. P. Irazoqui, A. ul Haque, A. R. De Carlo, S. T. Wereley, H.W. Wells, W.T. McLamb, D.M. Porterfield**, "Development and testing of an amplifier array for interfacing multichannel digital data acquisition and *in silico* cell physiology MEMS sensor devices," Institute of Biological Engineering Annual Meeting (Tucson, AZ, March 8-12, 2006).

78.   **A. ul Haque, A. R. De Carlo, M. Rokkam, S.T. Wereley, H.W. Wells, W.T. McLamb, S.J. Roux, D.M. Porterfield**. Design, fabrication and characterization of an in silico cell physiology lab for measuring cellular responses to microgravity, Institute of Biological Engineering Annual Meeting. March 8-12, 2006

77. **A. ul Haque, A. R. De Carlo, M. Rokkam, S.T. Wereley, H.W. Wells, W.T. McLamb, S.J. Roux, D.M. Porterfield**. Design, fabrication and characterization of an in silico cell physiology lab for measuring cellular responses to microgravity. International MEMS conference. Singapore, May 9-12, 2006

76. **J. Cao and S.T. Wereley**, "Shear-induced migration of dilute Brownian suspensions," Pres. # EC.00007, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Chicago, IL, Nov. 2005).

75. **P. Chamarthy and S.T. Wereley**, "Temperature Measurement using Brownian Motion in the Presence of a Velocity Gradient," Pres. # BB.00008, Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting (Chicago, IL, Nov. 2005).

74. **S.T. Wereley and C.D. Meinhart**, "Spatial Resolution and Errors of Single Pixel Interrogation," Proc. ASME/IMECE, Paper #2005-83065, (Orlando, FL, Nov. 2005).

73. **P. Chamarthy, S. Wereley, S. V. Garimella**, "Assessment of Alternate Approaches for Temperature Measurement using Brownian Motion," 6th International Symposium on Particle Image Velocimetry (Pasadena, CA, Sept. 21-23, 2005).

72. **J. Cao, S. T. Wereley**, "PIV Measurement in Capillary Tube Flow and Measurement Error Due to Multi-pixel Window Correlation," 6th International Symposium on Particle Image Velocimetry (Pasadena, CA, Sept. 21-23, 2005).

71. **S.T. Wereley, C.D. Meinhart, D. Tretheway, L. Gui, A. Sud**, "Bias and Random Errors in Single Pixel Interrogation," 6th International Symposium on Particle Image Velocimetry (Pasadena, CA, Sept. 21-23, 2005).

70. **S.T. Wereley**, "Optical Diagnostics for Nanoscale Flow Problems?" First International Nanofluidics Workshop (Boekelo, The Netherlands, April 18-20 2005).

69. **S.T. Wereley** (*keynote*), "Progress and Current Developments in Micro-PIV," Joint International PIVNET II / ERCOFTAC Workshop on Micro PIV and Applications in Microsystems (Delft, The Netherlands, April 7-8, 2005).

68. **L. Karp-Boss, P.A. Jumars, P. Grant, S.T. Wereley, and E.H. Klingler**, "Motion of diatoms in steady and unsteady shear flows," ASLO 2005 Aquatic Sciences Meeting (Salt Lake City, Utah, February 20-25, 2005).

67. **J. Cao and S.T. Wereley**, "Brownian particle distribution in tube flows," Proc. ASME/IMECE, Paper #2004-61899, (Anaheim, CA, Nov. 2004).

66. **S.Y. Lee, J. Jang, and S.T. Wereley**, "Entrance length of Low Reynolds number flow in microchannel," Proc. ASME/IMECE, Paper #2004-61908, (Anaheim, CA, Nov. 2004).

65. **P. Chamarthy and S.T. Wereley**, "Mixing Characteristics in a 2D Serpentine Micro-Channel ," Proc. ASME/IMECE, Paper #2004-61902, (Anaheim, CA, Nov. 2004).

64. **S.T. Wereley and I. Whitacre**, "Particle Dynamics in a Dielectrophoretic Microdevice," paper 3.2, Proceedings of the 12th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 12-15, 2004.

63. **D. Liu, S.V. Garimella, and S.T. Wereley**, "Infrared Micro-Particle Image Velocimetry of Fluid Flow in Silicon-Based Microdevices," ASME Heat Transfer/Fluids Engineering Summer Conference (Charlotte, NC), paper number: HT-FED2004-56385, July 2004.

62. **H.A. Diefes-Dux, P.K. Imbrie, K. Haghighi, G.U. Lee, S.T. Wereley, and P. Wankat**, "Nanotechnology Exposure in a First-Year Engineering Program," International Conference on Engineering Education and Research (Olomouc and Bouzov Castle, Czech Republic, June 27-30, 2004).

61. **S.T. Wereley**, "Microfluidic Diagnostics applied to Cold Gas Thruster Design and Analysis," ESA 4th International Spacecraft Propulsion Conference (Cagliari, Italy, June 2-4, 2004).

60. **S.T. Wereley, I. Whitacre, R. Bashir and H.B. Li**, "DEP Particle Dynamics and the Steady Drag Assumption," Nanotech 2004 (Boston, March 7-11, 2004).

59. **J. Jang and S.T. Wereley**, "A Capacitive Micro Gas Flow Sensor Based on Slip Flow," IEEE-MEMS 2004 (Maastrict, The Netherlands, January 25-29, 2004).

58. **S.T. Wereley, I. Whitacre, R. Bashir and H.B. Li**, "DEP Particle Dynamics and the Steady Drag Assumption," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, (East Rutherford, NJ, Nov. 2003).

57. **J. Cao and S.T. Wereley**, "The role of Brownian motion in fluid/particulate experiments," Proc. ASME/IMECE, Paper #2003-43360, (Washington, DC, Nov. 2003).

56. **S.Y. Lee and S.T. Wereley**, "Pressure Measurement in the Microchannel using Air Compression," Proc. ASME/IMECE, Paper #2003-41163, (Washington, DC, Nov. 2003).

55. **J. Jang and S.T. Wereley**, "Slip Flow Analyses of Capacitive Pressure-Based Micro Flow Sensor," Proc. ASME/IMECE, Paper #2003-41142, (Washington, DC, Nov. 2003).

54. **G.U. Lee and S.T. Wereley**, "Teaching Nanoscience and Engineering at an Intermediate Level," American Institute of Chemical Engineers Annual Meeting (San Francisco, CA), Nov. 16-21, 2003.

53. **S. Stone, C. D. Meinhart and S. T. Wereley**, "Out of plane spatial resolution of volume illumination PIV using a compound lens system," 5th International Symposium on Particle Image Velocimetry, (Pusan, Korea, Sept. 2003).

52. **Y. H. Kim, S. T. Wereley and C. H. Chun**, "Flow field produced by a vibrating cantilever plate in various geometries," 5th International Symposium on Particle Image Velocimetry, (Pusan, Korea, Sept. 2003).

51. **M.W. Eckerle, C.E. Nyquist, R.L. Schlipf, K. Haghighi, S.T. Wereley**, "Finite Element Modeling of a Micro-Scale Resonant Fan for Microfluidic Transport," ASAE Annual International Meeting, Paper 033098 (Las Vegas, NV, July 2003).

50. **J.Jang, Y. Zhao, and S.T. Wereley**, "Pressure Distributions and TMAC Measurements in Near-Unity Aspect Ratio, Anodically Bonded Microchannels," MEMS 2003, (Kyoto, Japan, Jan. 2003).

49. **S.T. Wereley and I. Whitacre (*invited*)**, "Velocity Averaging from Out of Plane Gradients in micro-PIV," Paper 2003-0782, American Institute of Aeronautics and Astronautics Annual Meeting, Reno, NV, Jan. 2003.

48. **C.H. Chung and S.T. Wereley**, "Numerical Simulation of Low- Speed Gas Flows in Microchannels," Paper 2003-0860, American Institute of Aeronautics and Astronautics Annual Meeting, Reno, NV, Jan. 2003.

47. **C.H. Chung and S.T. Wereley**, "Analysis of Gas Flows in Microchannels with Small Pressure Difference," Paper 2003-0861, American Institute of Aeronautics and Astronautics Annual Meeting, Reno, NV, Jan. 2003.

46. **S.T. Wereley, S.Y. Lee, and L.C. Gui** "Entrance Length and Turbulence Transition in Microchannels," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, Dallas, TX, Nov. 2002.

45. **S. Stone, C.D. Meinhart, and S.T. Wereley**, "Out of plane spatial resolution of volume illumination PIV," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, Dallas, TX, Nov. 2002.

44. **C.H. Chung and S.T. Wereley**, "Computation of Rerefied Gas Flows in Microchannels," JSME/KSME Fluids Engineering Conference (Nagoya, Japan, Nov. 2002).

43. **J. Jang, Y. Zhao, S.T. Wereley, and L.C. Gui**, "Mass Flow Measurements of Gases in Deep-RIE Microchannels," Proc. ASME/IMECE, Paper #2002-33779, (New Orleans, LA, Nov. 2002).

42. **S.Y. Lee, S.T. Wereley, L.C. Gui, W.L. Qu, and I. Mudawar**, "Microchannel Flow Measurement using Micro Particle Image Velocimetry," Proc. ASME/IMECE, Paper #2002-33682, (New Orleans, LA, Nov. 2002).

41. **S.T. Wereley and G.U. Lee**, "Teaching Nanotechnology/Nanoscience Across Disciplines," American Institute of Chemical Engineers Annual Meeting (Indianapolis, IN), Nov. 3-8, 2002.

40. **Eric Tkaczyk, Vandna Handa, Sangwoo Lee, Helen McNally, Lichuan Gui, Steve Wereley, Rashid Bashir,** "Determination Of The Charge Attached To Micro-Scale Devices Used In Fluidic Self-Assembly Processes", MRS Fall Meeting (Boston, MA) 2002.

39. **S.T. Wereley (*invited*)**, "Microfluidic manipulation of particles, cells, viruses, and molecules," BioMEMS and biomedical nanotechnology WORLD 2002, (Columbus, OH), Sept. 6-8, 2002.

38. **C.D. Meinhart, S. Stone, D. Tretheway, S.T. Wereley**, "Spatial Resolution Limits of Micron Resolution Particle Image Velocimetry," Proceeding of the Seiken Symposium on Particle Image Velocimetry (Tokyo, Japan), p. 57-71, August 23, 2002.

37. **S.T. Wereley and V.P. Hohreiter**, "Simultaneous, Spatially-Resolved Temperature and Velocity Measurements Using Cross-Correlation PIV," paper 15.1, Proceedings of the 11th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 8-11, 2002.

36. **L. Gui, S.T. Wereley and S.Y. Lee**, "Digital Filters for Reducing Background Noise in Micro PIV Measurements," paper 12.4, Proceedings of the 11th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 8-11, 2002.

35. **S.T. Wereley, V. Hohreiter, J. Chung**, "Simultaneous, spatially-resolved temperature and velocity measurements in microchannel flows," THERMES 2002: Thermal Challenges in Next Generation Electronic Systems, (Santa Fe, NM), January 13-16, 2002.

34. **Y.H. Kim, S.T. Wereley, C.H. Chun**, "Experimental study on the flow field around a vibrating cantilever plate," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, San Diego, CA, Nov. 2001.

33. **S.T. Wereley, V. Hohreiter, J.N. Chung**, "Simultaneous Temperature and Velocity Measurement," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, San Diego, CA, Nov. 2001.

32. **S. Stone, C.D. Meinhart, S.T. Wereley,** "Using Particle Image Velocimetry to Probe Wall Shapes with Nanoscope Resolution," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, San Diego, CA, Nov. 2001.

31. S.T. Wereley, C.D. Meinhart, S. Stone, V. Hohreiter, and J. Chung, Proc. SPIE Int. Soc. Opt. Eng., Vol. 4558, pp. 124-132 (San Francisco, Oct. 2001).

30. **V. Hohreiter, S.T. Wereley, J.N. Chung, M.G. Olsen,** "Cross-correlation analysis for temperature measurement," 4th International Symposium on Particle Image Velocimetry, Paper 1145, Göttingen, Germany, Sept. 2001.

29. **S.T. Wereley and L.C. Gui,** "PIV measurement in a four-roll-mill flow with a central difference image correction (CDIC) method," 4th International Symposium on Particle Image Velocimetry, Paper 1027, Göttingen, Germany, Sept. 2001.

28. **S. Stone, C.D. Meinhart, S.T. Wereley,** "Using μ-PIV to Probe Wall Shapes with Nanoscope Resolution," 4th International Symposium on Particle Image Velocimetry, Paper 1143, Göttingen, Germany, Sept. 2001.

27. **S.T. Wereley, C.D. Meinhart, S. Stone, V. Hohreiter, J. Chung,** "A Microfluidic MEMS Characterization Toolbox," International MEMS Workshop 2001, pp. 244-253, Singapore, July 2001.

26. **S.T. Wereley,** "Experiments and Simulations in Micro/Nano Domains," ASME Information Storage and Processing Systems Conference, Santa Clara, CA, June 2001.

25. **S.T. Wereley, L.C. Gui, and C.D. Meinhart (*invited*),** "Flow Measurement Techniques for the Microfrontier," Paper 2001-0243, American Institute of Aeronautics and Astronautics Annual Meeting, Reno, NV, Jan. 2001.

24. **C.D. Meinhart and S.T. Wereley (*invited*),** "Fluid Mechanics Issues at the Microscale," Paper 2001-0720, American Institute of Aeronautics and Astronautics Annual Meeting, Reno, NV, Jan. 2001.

23. **S.T. Wereley, H. Apple, R. Gomez, R. Bashir,** "Microfluidic Biomedical Device Characterization," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, Washington, DC, Nov. 2000.

22. **C.D. Meinhart, S.W. Stone, and S.T. Wereley,** "A microfluidic-based nanoscope," ICTAM 2000 (Chicago, IL), paper GV-13, Aug. 2000.

21. **S.T. Wereley and C.D. Meinhart,** "Accuracy Improvements in Particle Image Velocimetry Algorithms," paper 13.4, Proceedings of the 10th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 10-13, 2000.

20. **C.D. Meinhart, S. Stone, and S.T. Wereley,** "A Microfluidic-based Nanoscope," Proc. μTAS2000, pp. 83-86, Enschede, The Netherlands, May 2000.

19. **S.T. Wereley, C.D. Meinhart, and M.H.B. Gray,** "Depth Effects in Volume Illuminated PIV," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, New Orleans, LA, Nov. 1999.

18. **S.T. Wereley, C.D. Meinhart, M.H.B. Gray,** "Depth Effects in Volume Illuminated Particle Image Velocimetry," pp. 545-550, The Third International Workshop on Particle Image Velocimetry, Santa Barbara, CA, Sept. 1999.

17. **C.D. Meinhart, S.T. Wereley, and J.G. Santiago,** "A PIV Algorithm for Estimating Time-Averaged Velocity Fields," presented at the Symposium on Optical Methods and Image Processing in Fluid Flow ASME/JSME Fluids Engineering Conference, San Francisco, CA, July 18-23, 1999.

16. **Meinhart CD, Gray MHB, Wereley ST** "PIV Measurements of High-speed flows in Silicon-micromachined nozzles," (AIAA/ASME/SAE/ASEE 35th Joint Propulsion Conference and Exhibit, Los Angeles, CA, June 20-24, 1999) AIAA 99-3756.

15. **R.M. Lueptow and S.T. Wereley,** "Particle Distribution in Rotating Filtration," Proc. Amer. Filtration Soc., (Advances in Filtration and Separation Technology, Boston), Vol. 13, 252-259, 1999

14. **S.T. Wereley, C.D. Meinhart, J.G. Santiago, and R.J. Adrian,** "Velocimetry for MEMS Applications," Proc. ASME/DSC, Vol. 66, 453-459, (Micro-fluidics Symposium, Anaheim, CA, Nov. 1998).

13. **S.T. Wereley, C.D. Meinhart, and J.G. Santiago,** "Microfluidic PIV: Algorithms and Experiments," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, Philadelphia, PA, Nov. 1998.

12. **J.G. Santiago, S.T. Wereley, C.D. Meinhart, D.J. Beebe, and R.J. Adrian,** "A Micron-Resolution Particle Image Velocimetry System for Microfluidics," 8th International Symposium on Flow Visualization (Sorrento, Italy), Aug. 1998.

11. **C.D. Meinhart, J.G. Santiago, S.T. Wereley, and R.J. Adrian,** "Diagnostic techniques for microfluids research," Proceedings of the 9th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal) paper 6.4 (1998).

10. **J.G. Santiago, C.D. Meinhart, D.J. Beebe, S.T. Wereley, and R.J. Adrian,** "Velocimetry for Microfluidics," Solid State Sensor and Actuator Workshop (Hilton Head, SC), June 1998.

9. **S.T. Wereley, J.G. Santiago, R. Chiu, C.D. Meinhart, and R.J. Adrian**, "Micro-resolution particle image velocimetry," Proc. SPIE, Vol. 3258, pp. 122-133 (Micro- and Nano-Fabricated Structures and Devices for Biomedical Environmental Applications, San Jose, CA, Jan. 1998).

8. **S.T. Wereley and R.M. Lueptow**, "Particle Motion in a Taylor-Couette Filter Device," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, San Francisco, CA, Nov. 1997.

7. **S.T. Wereley and R.M. Lueptow**, "Particle motion in Taylor Couette flow," Proc. ASME/OED Intnl. Cong. Sym., Vol 1, pp. 73-80, 1997.

6. **S.T. Wereley and R.M. Lueptow**, "Velocity Field in Wavy Circular Couette Flow," Proc. 10th Int. Couette-Taylor Workshop, July 1997.

5. **S.T. Wereley and R.M. Lueptow**, "Mixing in Wavy Taylor Vortex Flow," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, Nov.1996.

4. **S.T. Wereley and R.M. Lueptow**, "Velocity Field in Wavy Vortex Flow," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, Nov. 1995.

3. **S.T. Wereley, S.A. Labhsetwar, and R.M. Lueptow**, "Wavy Taylor Vortex Flow: Experimental Velocity Vectors," Gallery of Fluid Motion at the 48th Annual Meeting of the APS/DFD, Nov. 1995.

2. **S.T. Wereley and R.M. Lueptow**, "Measurements of Velocity Fields with Application to Two-Phase Flow in a Taylor-Couette Separator," Proc. 9th Int. Couette-Taylor Workshop, Boulder, CO, Aug. 1995.

1. **S.T. Wereley, R.M. Lueptow, and K. Min**, "An LDV Investigation of the Taylor Vortex Phenomenon," Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, Tallahassee, FL, Nov. 1992.

### University/Corporate Invited Seminars

67. **Optoelectric Micro/Nano Particle and Droplet Manipulation**, presented at Northwestern University, Nov 8, 2012.

66. **PIV Overview**, Graduatekolleg GRK1114 seminar days, Kleinwalsertal, Austria, Jun 18-20, 2012.

65. **Analyzing Disaster: How big was the Deepwater Horizon disaster?**, presented at the Culver Academies, May 24, 2012.

64. **Optoelectric Micro/Nano Particle and Droplet Manipulation,** presented at Purdue Calumet, Water Institute, Sep 20, 2011.

63. **What can we learn about PIV Uncertainty from the correlation shape?**, presented at the PIV Uncertainty Workshop, Las Vegas, NV, May 11-13, 2011.

62. **Optoelectric Micro/Nano Particle and Droplet Manipulation**, presented at Virginia Tech, Apr 27, 2011.

61. **Using HUBzero to Distribute and Enable Analysis of Deepwater Horizon Oil Spill Videos,** Hubzero Workshop, IUPUI, Apr 5 2011.

60. **Optoelectric Micro/Nano Particle and Droplet Manipulation**, presented at Stanford University, Oct 26, 2010.

59. **Assessing Disaster: How much oil flowed from BP's Macondo well?** presented at Stanford University, Oct 27, 2010.

58. **Temperature and Particle Sizing using Brownian Motion**, presented at International Symposium on Micro/Nano Flow Measurement Techniques, Tokyo, Sept 2010.

57. **Optoelectric Micro/Nano Particle and Droplet Manipulation**, presented at The Ohio State University, Feb 26, 2010.

56. **Opto-Electro Particle Manipulation and Diagnostics**, presented at the Danish Technical University, Copenhagen, Denmark, Sept. 22, 2009.

55. **Opto-Electro Particle Manipulation and Diagnostics**, presented at the University of Alberta, Edmonton, Alberta, Canada, Sept. 13, 2009.

54. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at the DFG Priority Program SPP 1164 Nano- & Microfluidics, Bad Honnef, Germany, July 30, 2009.

53. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Deutsche Zentrum für Luft- und Raumfahrt (DLR), Cologne, Germany, July 29, 2009.

52. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Technische Universität Braunschweig, Braunschweig, Germany, July 13, 2009.

51. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Universität des Saarlandes, Saarbrücken, Germany, July 7, 2009.

50. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Yonsei University, Seoul, Korea, June 26, 2009.

49. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Korea Institute of Science and Technology (KIST), Seoul, Korea, June 25, 2009.

48. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Chung-Ang University, Seoul, Korea, June 25, 2009.

47. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at NYU-Poly, New York, NY, on Feb. 27, 2009.

46. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Columbia University, New York, NY, on Feb. 26, 2009.

45. **Flow Diagnostics and Optoelectric Micro/Nano Particle Manipulation**, presented at Stevens Institute of Technology, Hoboken, NJ, on Feb. 25, 2009.

44. **Optoelectric Micro/Nano Particle Manipulation**, presented at Indian Institute of Technology Madras, India, on Dec. 10, 2008.

43. **Optoelectric Micro/Nano Particle Manipulation**, presented at University of Southampton, Southampton UK, on Oct. 30, 2008.

42. **Optoelectric Micro/Nano Particle Manipulation**, presented at Rutgers University, New Brunswick, NJ, on Oct. 22, 2008.

41. **Flow Diagnostics for Micro/Nano Device Characterization**, presented at Technische Universität Braunschweig, Braunschweig, Germany, on Aug. 14, 2007.

40. **Flow Diagnostics for Micro/Nano Device Characterization**, presented at Universität Heidelberg, Heidelberg, Germany, on July 18, 2007.

39. **Flow Diagnostics for Micro/Nano Device Characterization**, presented at Universität Rostock, Rostock, Germany, on June 29, 2007.

38. **Microfluidics and suitable diagnostic techniques**, presented at Deutsche Zentrum für Luft- und Raumfahrt (DLR), Göttingen, Germany, on June 8, 2007.

37. **What Can We Learn From Diffusion in Microfluidics?**, presented at Johns Hopkins University, Baltimore, MD, Jan. 26, 2007.

36. **Manipulation and detection of nanoparticles using light**, Tools for Nano Engineering (ARO Workshop), Purdue University, Oct. 2-4, 2006.

35. What is "Nanofluidics"? or The Nano-izing of Fluid Mechanics, NCN nano-tutorial seminar series, Purdue University, Feb. 20, 2006.

34. **Micro/Nano Fluidics: fundamentals and devices**, presented in S.C. Johnson and Sons Science and Engineering Council, Racine, WI, Feb. 15, 2006.

33. **Introduction to Microfluidics**, presented at the CAMD / CBM2 2005 Summer Workshop, Louisiana State University, Baton Rouge, LA, July 25, 2005.

32. **Micro and Nanoscale Flow Diagnostics**, presented at University of Karlsruhe, Karlsruhe, Germany, April 12, 2005.

31. **Micro and Nanoscale Flow Diagnostics**, presented at Alberts-Ludwig University, Freiburg, Germany, April 13, 2005.

30. **Micro and Nanoscale Flow Diagnostics**, presented at Technical University of Darmstadt, Darmstadt, Germany, April 14, 2005.

29. **Experimental Microfluidics**, presented at Samsung Advanced Institute of Technology, Suwon, South Korea, Sept. 17, 2003.

28. **Experimental Microfluidics**, presented at POSTECH University, Pohang, South Korea, Sept. 18, 2003.

27. **Experimental Diagnostics for Microscale Sensor and Actuator Evaluation**, presented at AFRL Microfluidics Workshop, Los Angeles, CA, May 12, 2003.

26. **Microfluidics of Biomedical Microdevices**, presented at Baxter Healthcare, Round Lake, IL, April 25, 2003.

25. **Algorithm Improvements for Micro-PIV**, presented at TSI, Inc., Minneapolis, MN, April 7, 2003.

24. **Fluid Mechanics in Micro and Nano Domains**, presented at ARO Nanotechnology Workshop, Chicago, IL, Nov. 14, 2002.

23. **Fluid Mechanics and Heat Transfer Research at Purdue**, presented at Schlumberger Mechanical Eureka Community: Mechanical Systems, Dynamics & Design Seminar, Paris, Oct. 1-3 2002.

22. **Experimental Microfluidic Diagnostics and Educating Students and Professionals About Microfluidics**, AIAA Microfluidics Panel Discussion, AIAA Conference, St. Louis, MO, June 26, 2002.

21. **Characterization of Thermo-fluid Processes at MEMS level and the potential use of x-rays**, presented at Argonne National Laboratory, Chicago, IL, March 1, 2002.

20. **Physics Choices**, presented in Dept. of Physics Undergrad Lecture Series, Purdue University, Jan. 22, 2002.

19. **Microfluidic Diagnostic Techniques**, presented in the Civil Engineering Dept., Purdue University, October 2001.

18. **Experiments and Simulations in Micro/Nano Domains**, Data Storage Institute, Singapore, July 2001.
17. **Experiments and Simulations in Micro/Nano Domains**, Seagate Corp., Singapore, July 2001.
16. **Microfluidic Diagnostic Techniques**, presented in the Mechanical Engineering Dept., Nanyang Technological University, Singapore, July 2001.
15. **Experiments and Simulations in Micro/Nano Domains**, National Storage Industry Consortium Annual Meeting, Monterrey, CA, June 2001.
14. **Fluid Measurements in Micro/Nano Domains**, presented at The Colorado Center for Information Storage/Denver Section of the IEEE Magnetics Society seminar series, Boulder, CO, Jan. 2001.
13. **Microfluidic Diagnostic Techniques**, presented in the Mechanical Engineering Dept., Indiana University and Purdue University at Indianapolis (IUPUI), Indianapolis, IN, Nov. 2000.
12. **Microfluidic Diagnostic Techniques**, presented in the Materials Engineering Dept., Purdue University, West Lafayette, IN, Sept. 2000.
11. **Microfluidic Diagnostic Techniques**, presented at the Purdue University Nanotechnology Seminar Series, Purdue University, West Lafayette, IN, Sept. 2000.
10. **Microfluidics:  Theory and Experiment,** presented in the "All-Day MEMS overview," University of Illinois, Chicago, IL, Aug. 2000.
9. **Microfluidic Diagnostic Techniques**, presented at Daimler-Chrysler, Ulm, Germany, July, 2000.
8. **Microfluidic Diagnostic Techniques**, presented at the Paul-Scherrer Institut Laboratory for Micro- and Nanotechnology, Villigen, Switzerland, July, 2000.
7. **Microfluidic Diagnostic Techniques**, presented at 3M, Minneapolis, MN, June, 2000.
6. **MEMS: A brief introduction**, presented in the Monticello Business Forum seminar titled "Technologies of the 21st Century and How to Incorporate Them," Monticello, IN, May, 2000.
5. **Fluid Flow in Microscale Domains-Experiments and Analysis**, presented in the Applied Math Seminar Series, Math Department, Purdue University, West Lafayette, IN, Apr. 2000.
4. **Enhanced Micro-PIV**, presented in the Turbulence and Complex Flow Seminar Series, Theoretical and Applied Mechanics Department, University of Illinois, Urbana-Champaign, Feb. 2000.
3. **Microfluidic Diagnostic Techniques**, presented in the Mechanical Engineering Department Lecture Series at the University of Florida, Gainesville, FL, Dec. 1999.
2. **Microfluidic Diagnostic Techniques**, presented in the Society for the Advancement of Material and Process Engineering (SAMPE) Micro-Nano Scale Science and Technology Seminar Series, Purdue University, W. Lafayette, IN, Oct. 1999.
1. **Shear Field and Velocity Field in Taylor Vortex Flow**, presented at Baxter HealthCare, Fenwal Division, Round Lake, IL, Oct. 1996.

## Funding History

**Hummingbird, Inc., Environmental Cells for Transmission Electron Microscopy (TEM)**,  Two years (2010-2011), $225,000.
**NSF:ERC for Compact and Efficient Fluid Power**, Two (2) years (2006-2008), $5,000,000, $80,076
Cummins, Inc.:Proposal for Characterizing Fuel Contaminant Size and Type Two (2) years (2007-2009) $223,666.
**NSF:Experiments and Modeling of Advanced Optical Trap Systems for Manipulating and Sorting Micro and Nano Particles**, Three (3) years (2007-2010), $212,453
**NSF:Collaborative Research: Architecture and Prototype for a Programmable Lab-on-a-Chip**, Three (3) years (2007-2009), $315,000, $142,893
**DARPA: Micro/Nano Fluidics Fundamentals Focus Center (UCI/MF3)**, Three (3) years (2007-2010), $150,919
**AudioPixels, Inc.:Proposal for micro-PIV measurements to Audiopixels**, One (1) year (2009-2010), $34,607
**National Aeronautics and Space Administration (Bionetics Corp./NASA)**, "Microfluidic Ion Sensor Array," 2/7/2005 to 9/30/2006, *Total award: $140k, my portion: $70k.*
**Air Force Office of Scientific Research**, "STTR: High-resolution evanescent PIV for near-wall microfluidics," 9/15/2004 to 6/30/2005, *Total award: $75k, my portion: $42k.*
**National Science Foundation**, "Scaling down mechanically driven fluidic self-assembly," 8/15/2004 to 1/31/2006, *Total award:  $50k.*
**Cooling Technologies Research Center (NSF/Industry consortium)**, "Heat transport in Microchannels," 1/1/2004 to 12/31/2006, *Total award: $115k, my portion: $57k.*
**Lilly retention initiatives**, "Nanofact/Nanofiction honors class," 1/1/2004 to 5/31/2004, *Total award: $10k, my portion: $5k.*

Last updated: 10 September 2020

**21st Century Research and Technology Fund**—"Novel MEMS-Based Microscale Cooling System for the Thermal Management of Integrated Microelectronics," 2004 to 2006, *Total award: $1922k, my portion $39k.*

**National Science Foundation, DMI Materials Processing/Manufacturing,** "GOALI: Improvements spray drying manufacturing through control of drop size distributions," 9/15/2003 to 8/31/2006, *Total award: $389k, my portion: $130k.*

**TSI, Inc.,** "PIV algorithm improvements for TSI's Insight," 2003 to 2004, *Total award: $10k.*

**National Science Foundation, Nanoscale Undergraduate Education,** "NUE: New Learning and Discovery Experiences in Nanoscale Engineering Undergraduate Education," 2003 to 2004, *Total award: $100k, my portion: $19k.*

**Purdue Research Foundation**—"Interplay of Randomness and Determinism in Micro/Nanoflows," 2003 to 2005, *Total award: $13k.*

**National Science Foundation,** "SGER: Development of a multiscale manufacturing teaching laboratory," 2003 to 2004, *Total award: $100k, my portion: $17k.*

**National Science Foundation, Nanoscale Science and Engineering, Nanoscale Exploratory Research**— "Explorations in Biomedical Microdevices: Brownian Motion and Education," 2002 to 2003, *Total award: $100k my portion $89k.*

**National Science Foundation, Biological Oceanograpy**—"Form and Function of Phytoplankton in unsteady, low Reynolds-Number Flows," 9/1/2002 to 8/31/2006, *Total award: $970k, my portion $208k.*

**Showalter Trust**, "Towards the prevention and control of atherosclerosis: endothelial and smooth muscle cell response to pulsatile flow in stenotic blood vessels," 2001 to 2002, *Total award: $83k, my portion: $16.6k.*

**Naval Surface Warfare Center Crane Division (Purdue University Center for Sensing Science and Technology)**—"Integrated Detection of Hazardous Materials," 2001 to 2003, *Total award: $4000k, my portion $70k.*

**21st Century Research and Technology Fund**—"Center for Nanoscale Electronics/Biological Devices," 2000 to 2002, *Total award: $1480k, my portion $49k.*

**21st Century Research and Technology Fund**—"Intelligent MEMS-based Flow Sensors and Controllers," 2000 to 2002, *Total award: $816k, my portion $271k.*

**Purdue Research Foundation**—"Experimental Investigation of Prototypical MEMS Pumps," 2000 to 2002, *Total award: $13k.*

**3M Nontenured Faculty Award**—support for untenured faculty in the pursuit of basic research in the physical and/or biological sciences, 2/24/2000, *Total award: $39k.*

**ATC, Inc.,** unrestricted gift funding in support of research on micro-scale mass flow transducers, 12/30/1999, *Total award: $27K.*

## Short Courses

**Principles and Applications of Micro and Nanofluidics,** Center for Smart Interfaces, Darmstadt, Germany; offered twice—Mar 22-24, 2010 and Dec 14-16, 2011.

**Microfluidics**, April 26-28, 2004, Los Angeles, CA. ASME sponsored 3 day short course in which I taught one half day on the theory of flows at small length scales.

**Fundamentals and Applications of Microfluidics**, half day short course offered at ESA's Space Propulsion 2004, Cagliari, Italy, June 2-9, 2004.

**Microfluidics**, April 26-28, 2004, Los Angeles, CA. ASME sponsored 3 day short course in which I taught one half day on the theory of flows at small length scales.

**Fundamentals and Applications of Micro/Nanofluidics**, 3 hour short course offered at *Nanotech 2004*, in Boson, March 7-11, 2004.

**Fundamentals and Applications of Micro/Nanofluidics**, 3 hour short course presented at the *Nanotech 2003*, in San Francisco, Feb. 23-27, 2003. Topics addressed: theoretical background of micro/nano-scale fluid mechanics, modeling methods, practicalities of small-scale flows, experimental characterization techniques.

**Microfluidics**, half-day short course presented at the *International MEMS Workshop 2001*, in Singapore, July 4-6, 2001. Co-taught with Dr. Nam-Trung Nguyen, Nanyang Technical University, Singapore. Topics addressed: theoretical background of micro-scale fluid mechanics, experimental characterization techniques for microflows, fabrication techniques of microfluidic devices, and typical microfluidic applications.

## Awards and Memberships

**2nd Place, Gold Division, Burton D. Morgan Business Plan Competition**, company name PathVis, now OmniVis, 2017.

**Purdue Innovator Hall of Fame inductee** (2016)

Last updated: 10 September 2020

**United States Geological Survey Director's Award** for meritorious service to the nation during the Deepwater Horizon oil spill (2010).

**3rd Prize, ASME-IMECE Society-Wide Micro/Nano Technology Forum Best Poster Competition,** HS Chuang, A Kumar, and ST Wereley, "Rapid Electrokinetic Patterning Of Colloidal Particles With Optical Landscapes", Lake Buena Vista, Florida, 2009

**Alexander von Humboldt Fellow** (3/2007-8/2007; 6/2008-7/2008; 6/2009-7/2009)

**1st Place, Gold Division,** Burton D. Morgan Business Plan Competition. Ahmed M. Amin, S.C. Jacobson, M. Thottethodi, T.N. Vijaykumar and S.T. Wereley. "Microfluidic Innovations." Purdue University, West Lafayette, IN, February 2009.

**2nd Place, Gold Division,** Burton D. Morgan Business Plan Competition. SJ Williams, H.-S. Chuang and A Kumar. Liquid Qinetics. Purdue University, West Lafayette, IN, Feb. 24, 2009.

**1st Place Poster, Engineering Sciences,** SJ Williams, A Kumar, and ST Wereley, "Rapid electrokinetic patterning of colloids using optical landscapes", 2009 Graduate Student Poster Competition sponsored by Sigma Xi, Purdue University, West Lafayette, IN, Feb. 2009.

**3rd Place, 2008 Ecological Science and Engineering Poster Competition.** H.-S. Chuang and Steven T. Wereley. "Open Optolelectrowetting Droplet Actuation for Lab-on-a-Chip Applications." Dec. 5, 2008.

**Outstanding Video,** Gallery of Fluid Motion at Amer. Phys. Soc./Div. Fluid Dyn. Annual Meeting, SJ Williams, A Kumar, and ST Wereley, "Optically induced electrokinetic pattering and manipulation of particles," San Antonio, TX, Nov. 2008. *Note*: Most downloaded video from eCommons@Cornell for the month of December, 2008. (http://hdl.handle.net/1813/11399)

**"2008 Highlight"** distinction conferred by the journal <u>Measurement Science and Technology</u> to the article "Three-dimensional particle tracking using micro-particle image velocimetry hardware" by Peterson, Chuang, and Wereley.

**Young Researcher Poster Award Winner** at Proc. 12th International Conference on Miniaturized Systems for Chemistry and Life Sciences (µTAS 2008), A Kumar, SJ Williams and ST Wereley, "Rapid electrokinetic patterning of colloids using optical landscapes", San Diego, USA, Oct 12-16, 2008.

**Best Poster Award** at the 2nd Annual Birck Nanotechnology Research Review, S. Williams, A. Kumar, and S.T. Wereley, "Rapid electrokinetic patterning of colloidal particles with optical landscapes," April 14, 2008.

**21st Annual Purdue University Burton Morgan Business Plan Competition,** 4th place, A. Amin, H.S. Chuang, T.N. Vijaykumar, T. Thodentoddi, S.T. Wereley, and S. Jacobson, developed a business plan for commercializing programmable Lab-on-a-Chip devices.

**Seeds for Success Award (1/2007)**—awarded for proposals funded in excess of one million dollars

**3M Nontenured Faculty Award (3/2000, 3/2001, 3/2002)**—support for untenured faculty in the pursuit of basic research in the physical and/or biological sciences.

**Walter Murphy Fellowship (9/1990)**—support for outstanding graduate students

**Pi Tau Sigma** *Mechanical Engineering Honor Society*: student member (4/89); faculty advisor (4/99-present)

**American Physical Society (APS)**

**American Society of Mechanical Engineers (ASME)**

**American Institute of Aeronautics and Astronautics (AIAA)**


## Guest Class Lectures

**Microscale Heat and Fluid Flow Diagnostics**, ME 605, *Convection of Heat and Mass*, Professor Jayathi Murthy, Dec. 2003.

**Fundamentals of Microfluidics**, EE 595B, *Fundamentals of MEMS and Micro-Integrated Systems*, Professor Rashid Bashir, Oct., 2003.

**An Introduction to Nanotechnology**, ENGL373, *Science Fiction and Fantasy*, Prof. Kristina Bross, Feb. 2003.

**Fundamentals of Microfluidics**, EE 595B, *Fundamentals of MEMS and Micro-Integrated Systems*, Professor Rashid Bashir, Oct., 2002.

**The Benefits of a Physics Education in Mechanical Engineering**, PHYS 290A, *Seminar in Careers in Physics*, Professor Andrew Hirsch, Jan. 2002.

**Microscale Heat and Fluid Flow Diagnostics**, ME 605, *Convection of Heat and Mass*, Professor Suresh Garimella, Apr. 2001.

**Fundamentals of Microfluidics**, EE 595B, *Fundamentals of MEMS and Micro-Integrated Systems*, Professor Rashid Bashir, Feb., 2001.

**Microscale Fluid Flow Diagnostics**, ME 509, *Intermediate Fluid Dynamics*, Professor Steve Frankel, Dec. 2000.

**Microscale Fluidic Actuation**, ME 610, *Boundary Layer Theory*, Professor Mike Plesniak, Apr., 2000.

**Microscale Pumping Schemes**, EE 595B, *Fundamentals of MEMS and Micro-Integrated Systems*, Professor Rashid Bashir, Apr., 2000.
**Math and Science in Tom Stoppard's Arcadia**, ENGL 201, *The Nature of Literary Study*, Professor Kristina Bross, Apr., 2000.
**Fundamentals of Microfluidics**, EE 595B, *Fundamentals of MEMS and Micro-Integrated Systems*, Professor Rashid Bashir, Feb., 2000.
**Some thoughts on the science in Tom Stoppard's Arcadia**, THTR 570, *Dramatic Structure and Literature*, Professor Anne Fliotsos, Feb., 2000.
**Microscale Fluid Flow Diagnostics**, ME 509, *Intermediate Fluid Dynamics*, Professor Carl Wassgren, Dec. 1999.

### Conference Sessions Chaired *current through 2002*
**Biomedical Flows:** 11th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 8-11, 2002.
**Challenges in Micro and Nanoscale Transport:** THERMES 2002: Thermal Challenges in Next Generation Electronic Systems, (Santa Fe, NM), January 13-16, 2002.
**BioMEMS & Microfludic & MEMS/MST Sensor Applications:** International MEMS Workshop, (Singapore), July 4-6, 2001.
**Micro-Fluid Dynamics II:** American Physical Society/Division of Fluid Dynamics Annual Meeting, (Washington, D.C.), Nov.19-21, 2000.
**Aerodynamic Flows – 2:** 10th International Symposium on the Application of Laser Techniques to Fluid Mechanics, (Lisbon, Portugal), July 10-13, 2000.
**Interrogation Algorithms,** The Third International Workshop on Particle Image Velocimetry (Santa Barbara, CA), Sept. 12-14, 1999.

### Journal Reviews
AIAA Journal, AIChE Journal, J. Fluids Engineering, J. Micromechanics and Microengineering, Physics of Fluids, Experiments in Fluids, J. Fluid Mechanics, …

### Courses Taught
**ME697W: Micro/Nano Fluid Mechanics:** Fa05, Fa08
**ENGR195N: Special Topics in Nanotechnology Research Experiences:** Sp04 (team taught with Freshman Eng.)
**HONR199C: Nanofact/Nanofiction:** Sp04 (co-taught with K. Bross, ENGL)
**ME263: Introduction to Mechanical Engineering Design:** Sp01
**ME309: Introduction to Fluid Mechanics:** Fa99, Sp00 (Lead), Fa00, Fa04 (2 sections)
    **ME509: Intermediate Fluid Mechanics:** Fa01, Fa02, Fa06
**ME595W: Fundamentals of Particle Image Velocimetry:** Sp02, Sp05
**ME/ChE517: Micro/Nanoscale Physical Processes:** Sp01*, Sp02*, Sp03*, Sp04*, Sp06, Sp08*, Sp09
**ME610: Theory of Boundary Layer Flows:** Fa03
*co-taught with Gil Lee, CHE

### School/College/University Service
**Fluid Mechanics Area Chair** (5/2008-Present)
**ME Leadership Team** (5/2008-Present)
**Fluid Mechanics Seminar Series Organizer** (1/2000-5/2006)
**Faculty Advisor to Pi Tau Sigma**, the Mechanical Engineering Honor Society (4/2000-Present)
**College of Engineering Academic Grievance Committee** (8/2000-5/2004)
**ME Head's Advisory Council** (8/2003-5/2006)
**ME Research Committee** (8/2001-8/2003)
**Heat Transfer Faculty Search Committee** (8/2001-5/2002)
**Computational Thermal Sciences Faculty Search Committee** (12/2000-7/2001)
**Laboratory Committee** (3/2001-8/2001)
**Graduate Committee** (8/1999-8/2001)

# EXHIBIT 1

# FILED UNDER SEAL

# EXHIBIT 2

# FILED UNDER SEAL

Case 1:18-cv-01899-CFC-SRF   Document 196-1   Filed 12/22/20   Page 244 of 1041 PageID #: 8405
6/11/2020      GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.      Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


GE HEALTHCARE BIO-SCIENCES AB,

and GLOBAL LIFE SCIENCES

SOLUTIONS USA, LLC,

          Plaintiffs,         C.A. No. 18-

   v.                    1899-CFC

                              CONSOLIDATED

BIO-RAD LABORATORIES, INC.


          Defendant.

_____)


HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

CONFIDENTIAL BUSINESS INFORMATION

DEPOSITION OF ROBERT IOVANNI

APPEARING REMOTELY


June 11, 2020

9:02 a.m. Pacific


Reported by:  Lori J. Goodin, RPR, CLR, CRR,

RSA, California CSR #13959

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

6/11/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.          Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 2

1    REMOTE APPEARANCES:

2        FOR GE HEALTHCARE BIO-SCIENCES AB:

3            JEFFREY A. MILLER, ESQUIRE

             JOSEPH PALMIERI, ESQUIRE

4            ARNOLD & PORTER KAYE SCHOLER LLP

             300 El Camino Real

5            Five Palo Alto Squire

             Suite 500

6            Palo Alto, California  94306

             415-356-3000

7            jeffrey.miller@arnoldporter.com

8

9        FOR BIO-RAD LABORATORIES:

10           FELIPE CORREDOR, ESQUIRE

             QUINN EMANUEL URQUHART & SULLIVAN, LLP

11           50 California Street

             22nd Floor

12           San Francisco, CA  94111

             415-875-6448

13           felipecorredor@quinnemanuel.com

14

15       AND COCOUNSEL:

             JOHN CASSINGHAM, ESQUIRE

16           BIO-RAD LABORATORIES, INC.

             2754 Compass Drive

17           Suite 300

             Grand Junction, Colorado  81506

18           510-724-7000

19

20       ALSO PRESENT:

21           Glen Fortner, videographer

22           James Beall, document technician

6/11/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.          Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 3

1                    INDEX TO EXAMINATION

2    WITNESS:  ROBERT IOVANNI

3                                                  PAGE

4    EXAMINATION BY MR. MILLER                       9

5                    MR. CORREDOR                  300

6                    MR. MILLER                    302

7

8                       *   *   *

9                    INDEX TO EXHIBITS

10                    ROBERT IOVANNI

11               Thursday, June 11, 2020

12           Lori J. Goodin, RPR, CLR, CRR,

13            RSA, California CSR #13959

14

15    MARKED        DESCRIPTION                    PAGE

16    Exhibit 1   Notice of Deposition              15

17    Exhibit 2   30(b)(6) notice                   15

18    Exhibit 3   ███████████████████  ██

                  ████████  BRGE0006279-6341

19    Exhibit 4   ███████████████████  ██

                  █████████  BRGEDEL288592-288623

20    Exhibit 5   Presentation for Product         106

                  Proposal meeting,BRGE65053-65075

21    Exhibit 6   ███████████████████  ██

█        ████████, BRGE6302-6305

Page 4

1                          EXHIBITS CONTINUED
2     MARKED          DESCRIPTION                          PAGE
3     Exhibit 7       ███████████████████████████          ████

      █             ████████████████████████
4     █                    ████████████ BRGE65076
5     Exhibit 8       ██████████████████████████████       ████
                      ███████████████ BRGE6351-6366
6     Exhibit 9       ████████████████████████████         131
      BRGE6227
7     Exhibit 10      ████████████████████████████         136
      BRGE6470-6479
8     Exhibit 11      ██████████████████████████████       159
9                     BRGEDEL610165
10    Exhibit 12      Block diagram for presentation       163
                      BRGEDEL610166
11    Exhibit 13      Basic fluidic diagram                163
                      BRGEDEL610217
12    Exhibit 14      Fluidic diagram                      165
                      BRGEDEL610216
13    Exhibit 15      Fluidic diagram                      166
                      BRGEDEL610218
14    Exhibit 16      ████████████████████████████████████
                      ████████████████ BRGE65080
15    Exhibit 17      Early Industrial Design, View 1      182
                      BRGEDEL21985
16    Exhibit 18      Early Industrial Design, View 2      183
                      BRGEDEL22056
17    Exhibit 19      Early Industrial Design, View 3      183
                      BRGEDEL22714
18    Exhibit 20      Early Industrial Design, View 4      183
19                    BRGEDEL22768
20    Exhibit 21      Early Industrial Design, View 5      183
21                    BRGEDEL22853
22

6/11/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.          Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 5

1                        EXHIBITS CONTINUED

2    MARKED          DESCRIPTION                        PAGE

3    Exhibit 22      Early Industrial Design, View 6   183
                     BRGEDEL22913

4    Exhibit 23      Diagram with notes                184
                     BRGEDEL23006

5    Exhibit 24      Fluidic Diagram with steps        184
                     BRGEDEL23066

6    Exhibit 25      █████████████████████████
                     ██████, BRGEDEL341332-341334

7    Exhibit 26      ███████████████████               195
                     BRGEDEL341373-74

8    Exhibit 27      ████████████████████              196
                     BRGE16955-16987

9    Exhibit 28      ██████████████████████            211
                     BRGEDEL610167

10   Exhibit 29      █████████████████████     ████
11                   BRGEDEL401625-401658

12   Exhibit 30      █████████████████████████
                     ███████, BRGEDEL14644-14657

13   Exhibit 31      ███████████████████               218
                     BRGEDEL401312-401330

14   Exhibit 32      U.S. Patent 8,821,718             223

15   Exhibit 33      █████████████████████     ████
                     ██████████, BRGE34403

16   Exhibit 34      Quote from GE to Bio-Rad for      241
                     sale of Avant, 9/23/2009
17                   BRGEDEL175227-175228

18   Exhibit 35      E-mail from Mavandadi             242
19                   9/30/2009, BRGEDEL300620

20   Exhibit 36      Attachment to Exhibit 35 e-mail   242
21                   BRGEDEL300621-300645

22

6/11/2020      GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.      Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 6

1                    EXHIBITS CONTINUED

2     MARKED          DESCRIPTION                    PAGE

3     Exhibit 37   E-mail from S. Lin, 4/8/2010      250
                   BRGE421000

4     Exhibit 38   ██████████████████████████     ████

                   ████████████████████

5                  BRGEDEL217218-217219

6     Exhibit 39   E-mail, Avant service repair      256
                   report, 5/17/2011

7                  BRGEDEL393786-393789

8     Exhibit 40   ████████████████████████     ████
                   ██████████, BRGEDEL201040-201041

9     Exhibit 41   ████████████████████████     ████
                   ██████████, BRGEDEL335768

10    Exhibit 42   E-mail, Urban, attached to        277
                   Pleadings, 10/26/2012

11                 3538474_1

12    Exhibit 43   Hardware Specification for NGC    286
                   BRGEDEL0044322-445336

13    Exhibit 44   US Patent 10,401,335             294

14

15

16                  (All exhibits were provided.

17               electronically to the reporter.)

18

19

20

21

22

6/11/2020       GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.      Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 7

1          REPORTED REMOTELY FROM WASHINGTON, D.C.

2             THURSDAY, JUNE 11, 2020, 9:00 a.m.

3                        *   *   *

4

5                      PROCEEDINGS

6              THE VIDEOGRAPHER:   This is Tape

7      Number 1 of the videotaped deposition of

8      Robert Iovanni taken by counsel for the

9      plaintiff In the Matter of GE Healthcare

10     Bio-Sciences AB, et al. v. Bio-Rad

11     Laboratories, Inc., in the United States

12     District Court for the District of Delaware.

13     Case Number 18-1899 CFC.

14             This deposition is being conducted

15     on Zoom and being recorded at Tyson's Corner

16     Virginia, on June 11, 2020.

17             The time on the video screen is 9:02

18     Pacific time.

19             My name is Glen Fortner.  I am the

20     legal videographer, from Digital Evidence

21     Group.

22             The court reporter is Lori Goodin,

6/11/2020        GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.        Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 8

1    in association with Digital Evidence Group.

2            Will counsel please introduce

3    themselves for the record.

4            MR. MILLER:  My name is Jeffrey

5    Miller from Arnold & Porter.  And with me is

6    Joseph Palmieri, also from Arnold and Porter.

7            MR. CORREDOR:  Good morning, Felipe

8    Corredor from Quinn Emanuel on behalf of

9    Bio-Rad, and with me is John Cassingham from

10   Bio-Rad.

11           THE VIDEOGRAPHER:  Will the court

12   reporter please swear in the witness.

13           THE REPORTER:  Counsel, before

14   swearing in the witness, I have a short

15   statement to put on the record.

16           The attorneys participating in this

17   deposition acknowledge that due to the

18   severity of COVID-19 and following the

19   practice of social distancing, I am not

20   physically [resent in the deposition room and

21   that I will be swearing in the witness and

22   reporting this deposition remotely.

Page 9

1          All parties stipulate to the

2     validity of this remote swearing and remote

3     reporting via video conference and that it

4     will be admissible in the courtroom as if it

5     had been taken following Rule 30 and other

6     rules of the Federal Rules of Civil Procedure.

7                    *   *   *

8                  ROBERT IOVANNI

9          THE REPORTER:  Do you solemnly state

10    that the testimony you are about to give in

11    the cause now pending will be the truth, the

12    whole truth, and nothing but the truth, so

13    help you God.

14          THE WITNESS:  I do.

15                    *   *   *

16                  EXAMINATION

17   BY MR. MILLER:

18          Q.   Good morning.  Can you please state

19   your full name for the record.

20          A.   Sure.  Robert Alan Iovanni.

21          Q.   We will get into your education in a

22   little bit, but do you have a Ph.D. or no?

Page 63

1    initials PP.  Do you have an understanding as to

2    what PP stands for?

3          A.     Protein purification.

4          Q.     And in the portion there you see, it

5    says,

8          Do you see that?

9          A.     Yes.

10         Q.     You mentioned earlier that the

11   DuoFlow was an existing product for Bio-Rad when

12   you came into this portion of Bio-Rad.

13         Do you remember that?

14         A.     Yes.

15         Q.     In 2008, did you have an

16   understanding as to



Page  64



          Q.     If we could go to the BRGE 6284 of

the document.   And then towards the bottom third

Page 65

1    of the page there is a section entitled ████████

     ████████

     ████████████████████████████

     ████████████████████████████████

     ████████████████████████████

     ████████████████████████████████

     ████████████████████████████████████

     ████████████

9                    Do you see that?

10         A.    Yes.

11                   MR. CORREDOR:  Objection to the

12         form.

13    BY MR. MILLER:

14         Q.    Was the DuoFlow system that Bio-Rad

15    had on the market at the time, was it a modular

16    system?

17         A.    Yes.

18         Q.    And what was it about the DuoFlow

19    system that made it modular?

20         A.    We offered different types of

21    components that the user could use depending on

22    what type of chromatography they were looking to

Page 104

1    Page 14 of the document, Exhibit 4.



13              Do you see that?

14        A.    Yes.

15        Q.    Do you know what the ÄKTA purifier

16    was?

17        A.    It was one of the competitive

18    machines.

19        Q.    And that was from GE, right?

20        A.    Yes.

21        Q.

6/11/2020      GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.      Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 105



Page 106

1              MR. MILLER:  Why don't we mark as

2        the next exhibit and get it to the Share

3        folder, the Bates Number bearing BRGE65053

4        through BRGE65075.

5                   (Exhibit Number 5

6                    marked for identification.)

7    BY MR. MILLER:

8        Q.    Let me ask you a quick question

9    about the previous document?

10       A.    Uh-huh.

11       Q.    Is that a document that you reviewed

12   in preparation for your deposition today?

13       A.    Yes.

14       Q.    All right.  Let's move to the next

15   exhibit which I believe is Exhibit 5 which we

16   have just marked.

17             Can you take a look at it and tell

18   me if you can identify it?

19       A.    It looks like the presentation for

20   the day of that meeting.

21       Q.    If I ever meet Ms. Mavandadi I have

22   to apologize because it appears she has a Ph.D.?

Page 170

1      page.

2              MR. MILLER:   Okay.

3              THE WITNESS:   There we go.

4    BY MR. MILLER:

5        Q.    Okay.



6/11/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.          Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 171



6/11/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.          Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 172

1

Page 200

1              MR. CORREDOR:  Objection.

2      Mischaracterizes the document.

3              MR. MILLER:  I'm not trying to

4      mischaracterize anything.  So, make sure that

5      I'm not mischaracterizing, Mr. Iovanni.

6              THE WITNESS:  ███████████████

███  ████████████████████████

███  █████████████████████████

███  ████████████

██  ████████████

██  ███  ██████████████████

██  ████████████████

██  ███  █████  ██████████████

██  ███████████████████████

██  ██████████████████████

██  ████████████████████████

██  ███████

██  ██████████████████

██  ████████████████

██  ███  ███████████████████

██  ██████████████████████

██  ████████████████

Case 1:18-cv-01899-CFC-SRF   Document 196-1   Filed 12/22/20   Page 263 of 1041 PageID #: 8424

6/11/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.          Robert Iovanni
Highly Confidential - Attorneys' Eyes Only





Page 203

1    BY MR. MILLER:

2         Q.    In the NGC system that was

3    eventually released, were users able to easily

4    add, replace or reposition the modules?

5              MR. CORREDOR:  Objection, form.

6              THE WITNESS:  Yes.  I think

7       relatively speaking, yes.

8    BY MR. MILLER:

9         Q.    And why would users want to add a

10   module?

11             MR. CORREDOR:  Objection, calls for

12      speculation.

13   BY MR. MILLER:

14        Q.    Let me ask you this:  Do you know

15   why users would add modules to their NGC systems

16   as they were eventually sold?

17        A.    ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████

Page 215

1   ███████████████████████████

█   ████████████

█   ██████████████

█   ██   █████████   █████████████

█   ██████████████   ██████████████

█   ██████

█   ███   ████

8              MR. CORREDOR:  Objection, vague.

9              MR. MILLER:  Let's mark as

10     Exhibit 29 a document bearing the Bates

11     Number BRGEDEL401625 through BRGE 401658.

12                    (Exhibit Number 29

13                     marked for identification.)

14   BY MR. MILLER:

15        Q.    Once that shows up, if you can

16     identify Exhibit 29 for us.

17        A.    So, this is 29.  Okay.

18        Q.    Can you identify Exhibit 29 for us,

19     please?

20        A.    It is a technical specification for

21     the system.

22        Q.    ██████████████████████





Page 217

1

2

3

4           MR. MILLER:  Mark the next exhibit

5     bearing the Bates number BRGEDEL14644 through

6     14657.

7                     (Exhibit Number 30

8                      marked for identification.)

9     BY MR. MILLER:

10          Q.    When it is in the Share if you can

11    identify that document, that would be great.

12          A.    This will be Number 30?

13          Q.    Yes, Exhibit 30.  I will give you a

14    chance to review Exhibit 30.

15          A.    It hasn't come in yet.  Here it is.

16    All right.  Okay.

17          Q.    Can you identify Exhibit 30 for us,

18    please?

19          A.

6/11/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Laboratories, Inc.          Robert Iovanni
Highly Confidential - Attorneys' Eyes Only

Page 305

1            CERTIFICATE OF COURT REPORTER

2    UNITED STATES OF AMERICA )

3    DISTRICT OF COLUMBIA      )

4         I, LORI J. GOODIN, a Certified Shorthand
     Reporter do hereby certify:

5         That prior to being examined, the witness
     in the foregoing proceedings was by me duly sworn

6    to testify to the truth, the whole truth, and
     nothing but the truth.

7         That said proceedings were taken remotely
     before me at the time and places therein set

8    forth and were taken down by me in shorthand and
     thereafter transcribed into typewriting under my

9    direction and supervision;

10        I further certify that I am neither
     counsel for, nor related to, any party to said

11   proceedings, not in any wise interested in the
     outcome thereof.

12        In witness whereof, I have hereunto
     subscribed my name.

13   Dated:  June 11, 2020

14

15

16

17

18        _____

19        Lori J. Goodin, RPR, CLR, CRR,

20        RSA, California CSR #13959

21   My Commission expires:  May 14, 2021

22

# EXHIBIT 3

# FILED UNDER SEAL

Case 1:18-cv-01899-CFC-SRF   Document 196-1   Filed 12/22/20   Page 271 of 1041 PageID #: 8432
7/24/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.       Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 310

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CYTIVA SWEDEN AB, et al.,      )
                              )
              Plaintiff,      )
                              )
    v.                        )   Case No. 1:18-CV-
                              )        01899-CFC
BIO-RAD LABORATORIES,         )
INCORPORATED,                 )
                              )
              Defendants.     )
_____)


HIGHLY CONFIDENTIAL TECHNICAL ATTORNEYS EYES ONLY
PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF PHILIP CHAPMAN, MSc
30(b)6 and Personal Capacity, Volume II

APPEARING REMOTELY

July 24, 2020
12:11 P.M.

Reported by:  Lori J. Goodin, RPR, CLR, CRR,
              RSA, California CSR #13959

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 311

1

2                  REMOTE APPEARANCES:

3

4       FOR PLAINTIFF:

              ARNOLD & PORTER KAYE SCHOLER LLP
5             JEFFREY A. MILLER, ESQUIRE
              3000 El Camino Real Five Palo Alto
6             Square, Suite 500
              Palo Alto, CA  94306-3807
7             650.319.4538
8             Jeffrey.Miller@arnoldporter.com

9

10      FOR DEFENDANT:

              QUINN EMANUEL URQUHART & SULLIVAN, LLP
11            FELIPE CORREDOR, ESQUIRE
              50 California Street
12            22nd Floor
              San Francisco, California  94111
13            415-875-6600
14            Felipecorredor@quinnemanuel.com

15

16   ALSO PRESENT:

17            Sarah Howard, videographer
18            James Beall, document technician

19

20

21

22

Page 312

1          INDEX TO EXAMINATION

2     WITNESS:  PHILIP CHAPMAN, MSc

3

4     EXAMINATION BY                          PAGE

5     MR. MILLER                              319

6

7                      *   *   *

8

9               INDEX TO EXHIBITS

10             PHILIP CHAPMAN, MSc

11       Cytiva Sweden, AB, et al., v. Bio-Rad

12            Laboratories, Incorporated

13             Friday, July 24, 2020

14          Lori J. Goodin, RPR, CLR, CRR,

15           RSA, California CSR #13959

16    MARKED      DESCRIPTION                 PAGE

17    Exhibit 209  Philip Chapman 30(b)(6) Topics   320

18    Exhibit 210  Plaintiffs' Amended Notice of

19                 Deposition of Philip Chapman    330

20    Exhibit 211  NGC Chromatography System and

                   ChromLab Software Instrument

21                 Guide                           332

22

7/24/2020             Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.       Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 313

1                    INDEX TO EXHIBITS

2                  PHILIP CHAPMAN, MSc

3           Cytiva Sweden, AB, et al., v. Bio-Rad

4               Laboratories, Incorporated

5                  Friday, July 24, 2020

6             Lori J. Goodin, RPR, CLR, CRR,

7              RSA, California CSR #13959

8    MARKED       DESCRIPTION                          PAGE

9    Exhibit 212  NGC Chromatography Systems and

10                ChromLab Software Installation

11                Guide                               333

12   Exhibit 213  NGC Chromatography Systems and

                  ChromLab Software User Guide        335

13   Exhibit 214  NGC Chromatography Systems and

                  ChromLab Software Installation

14                Guide                               336

     Exhibit 215  NGC Chromatography Systems

15                Multidimensional Plumbing Guide     429

16   Exhibit 216  ██████████████████████████

                  ████████████████████                499

17   Exhibit 217  ██████████████████████████

                  ████████████████████████████        540

18   Exhibit 218  ██████████████████████████

                  ██████████████                      545

19   Exhibit 219  ██████████████████████████

                  ██████████████████████

     ██           ██████████████████                  548

21   Exhibit 220  ██████████████████████████

                  ████████████████████████████

     ██           ████████████████                    550

7/24/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.        Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 314

1                    INDEX TO EXHIBITS

2                  PHILIP CHAPMAN, MSc

3          Cytiva Sweden, AB, et al., v. Bio-Rad

4               Laboratories, Incorporated

5                 Friday, July 24, 2020

6            Lori J. Goodin, RPR, CLR, CRR,

7             RSA, California CSR #13959

8    MARKED        DESCRIPTION                    PAGE

9    Exhibit 221   ████████████████████████

██                ████████████████          552

11   Exhibit 222   ████████████████████████

                  ███████████████████████████

██                ██████████████            553

13   Exhibit 223   ████████████████████████

                                 █████████  555

14   Exhibit 224   █████████████████████████

██                ██████████████            605

16   Exhibit 225   Moran e-mail, 5/21/10     614

17   Exhibit 226   attachment to Exhibit 225  615

18   Exhibit 227   attachment to Exhibit 225  615

19   Exhibit 228   attachment to Exhibit 225  615

20   Exhibit 229   attachment to Exhibit 225  615

21   Exhibit 230   attachment to Exhibit 225  615

22   Exhibit 231   attachment to Exhibit 225  615

Page 315

1                       INDEX TO EXHIBITS

2                      PHILIP CHAPMAN, MSc

3           Cytiva Sweden, AB, et al., v. Bio-Rad

4               Laboratories, Incorporated

5                   Friday, July 24, 2020

6               Lori J. Goodin, RPR, CLR, CRR,

7                 RSA, California CSR #13959

8   MARKED        DESCRIPTION                        PAGE

9   Exhibit 232  e-mail chain, 9/30/13              620

10  Exhibit 233  PowerPoint, 10/9/15               623

11

12  Exhibit 234  ██████████████████████████

    ██          ████████████            630

14  Exhibit 235  Brown and Bilsker e-mail

15               exchange, 10/17/14               639

16  Exhibit 236  Brown and Bilsker e-mail

17               exchange, 3/16/15                643

18  Exhibit 237  summary of topics for Philip

19               Chapman 30(b)(6)                 650

20

21                        *   *   *

22

Page 316

1                    INDEX TO EXHIBITS

                  PHILIP CHAPMAN, MSc

2        Cytiva Sweden, AB, et al., v. Bio-Rad

                Laboratories, Incorporated

3                Friday, July 24, 2020

            Lori J. Goodin, RPR, CLR, CRR,

4             RSA, California CSR #13959

              PREVIOUSLY MARKED EXHIBITS

5      PRIOR MARKED EXHIBITS          FIRST REFERRAL

| | PRIOR MARKED EXHIBITS | FIRST REFERRAL |
|---|---|---|
| 6 | 40 | 600 |
| 7 | 46 | 490 |
| 8 | 47 | 502 |
| 9 | 48 | 508 |
| 10 | 49 | 511 |
| 11 | 50 | 512 |
| 12 | 51 | 517 |
| 13 | 52 | 518 |
| 14 | 53 | 520 |
| 15 | 54 | 521 |
| 16 | 55 | 525 |
| 17 | 56 | 525 |
| 18 | 57 | 534 |
| 19 | 58 | 535 |
| 20 | 59 | 539 |
| 21 | 61 | 558 |
| 22 | 62 | 559 |

Page 317

1              INDEX TO EXHIBITS

2            PHILIP CHAPMAN, MSc

3      Cytiva Sweden, AB, et al., v. Bio-Rad

4         Laboratories, Incorporated

5            Friday, July 24, 2020

6      Lori J. Goodin, RPR, CLR, CRR,

7        RSA, California CSR #13959

8        PREVIOUSLY MARKED EXHIBITS

9    PRIOR MARKED EXHIBITS          FIRST REFERRAL

10          63                        560

11          64                        561

12          83                        626

13          113                       608

14          114                       608

15          185                       485

16                    *   *   *

17

18      (All exhibits were provided

19    electronically to the court reporter.)

20

21

22

Page 318

1          FRIDAY, JULY 24, 2020, 12:11 P.M.

2                    PROCEEDINGS

3                      *   *   *

4          THE VIDEOGRAPHER:  This is Volume II

5     of the videotaped deposition of Dr. Philip

6     Chapman in the matter of Cytiva Sweden AB,

7     et al. versus Bio-Rad Laboratories,

8     Incorporated, in the United States District

9     Court for the District of Delaware, Case

10    Number 1:18-cv-01899-CFC.

11          This deposition is being held remote

12    by Zoom video conference physical reporting

13    on July 24, 2020.  The time on the video

14    screen is 12:11 p.m.

15          My name is Sarah Howard.  I am the

16    legal videographer for Digital Evidence

17    Group.  The court reporter today is Lori

18    Goodin in association with Digital Evidence

19    Group.

20          All parties to this deposition are

21    appearing remotely and have agreed to have

22    the witness sworn in remotely.  Due to the

Page 319

1      nature of remote reporting, please pause

2      briefly before speaking to ensure all parties

3      are heard completely.

4              Counsel will be identified on the

5      stenographic record for appearances.  The

6      witness has been previously sworn in, so

7      please proceed.

8                      *  *  *

9              PHILIP CHAPMAN, MSc,

10     a witness called for continued examination,

11     having been previously duly sworn, was examined

12     and testified further as follows:

13                     *  *  *

14                  EXAMINATION

15     BY MR. MILLER:

16         Q.   Good morning, Mr. Chapman.  My name

17     is Jeffrey Miller.  I will be taking the second

18     day of your deposition.  And I understand that

19     you went yesterday, so you probably know the

20     rules of the road; is that correct?

21         A.   Yes, correct.

22         Q.   And you understand that the oath you

Page 385

1    valve.  Correct?

2         A.    That's correct.

3         Q.    What is the purpose of a sample

4    inject valve in the NGC system?

5              MR. CORREDOR:  Object to form.

6              THE WITNESS:  So, the purpose of an

7         inject valve in any liquid chromatography

8         system is to enable the scientist to inject

9         their biological sample of interest, to have

10        it then be introduced onto the chromatography

11        column.

12   BY MR. MILLER:

13        Q.    And the sample inject valve is

14   included on all versions of the NGC.  Correct?

15        A.    Yes.

16        Q.    So, there are various portions of

17   the sample inject valve that are shown in an

18   exploded view on Page 37.  Do you see that?

19        A.    I do, yes.

20        Q.    So, first, we have -- let's try to

21   get some terminology consistent here.

22              First, there is the big rectangle

Page 386

1    that incorporates the circular portion.  Do you

2    see that?

3          A.    Yes.

4          Q.    Does Bio-Rad have a naming

5    convention for that rectangular item?

6          A.    It is called the face plate or the

7    overlay, interchangeably.

8               It is actually the overlay.  It is

9    the colored portion.

10          Q.    So, I see that there is sort of a --

11   there is the colored portion -- let me start

12   again.

13               Is the colored portion that we see

14   on Page 37 of the instrument guide, is that the

15   overlay?

16          A.    Yes.

17          Q.    And, it appears to be incorporated

18   by some other portion of the module.

19               Do you see that?

20          A.    The surrounding part, that is the

21   face plate.  That is the front metal panel to the

22   housing.

7/24/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 387



1      Q.     And do all of the modules that

2   Bio-Rad makes available with the NGC system

3   include a face plate and an overlay?

4      A.     Yes.

7/24/2020               Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.        Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order



Page 388

7/24/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.       Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 389



1

2   BY MR. MILLER:

3       Q.

Page 489



Page  490



18          (Whereupon, previously marked

19          Exhibit 46, first referral.)

20    BY MR. MILLER:

21        Q.    I have a few brief questions for you

22    of a document that has previously been marked as

Page 491

1    Exhibit 46.

2              When that gets into the share, let

3    us know.

4         A.    I will, thank you.  Exhibit 46?

5    Correct?

6         Q.    Yes.

7         A.    Okay, I'm looking at that now.

8    Okay.  I have that in front of me now.

9         Q.    Have you ever seen this document

10   before?

11        A.    I wasn't listed as a signatory on

12   it, but I quite probably have seen it or the

13   information contained within.

14        Q.    So, can you identify Exhibit 46 for

15   us, please.

16        A.



Page 527

1    Bates number BRGEDEL 450747.

2          A.    Okay.

3          Q.    And I'm sorry.  I read the wrong

4    number.

5                BRGEDEL 450746, the previous page.

6          A.    746.  Okay.

7          Q.



Page 528

1 ▐█████████

2      Q.    If you could go to BRGEDEL 450753,

3 please, of Exhibit 56.  Are you there?

4      A.    Sorry, I closed it.  I need to

5 reopen it quickly.  And it was Exhibit 56, you

6 said?

7      Q.    Yes. ▐███████████   ██████

8 ▐█████████████████████

9           Do you see that?

10      A.    One moment, please.  Sorry.

11 Juggling between screens.

12           Which page did you say it was?  Can

13 you give me that stamp again?

14      Q.    450753.

15      A.    753, yes.  Thank you.

16      Q.    And we are looking at Row D, or the

17 D row.

18 ▐███████████████████████

▐█████████████████████████████████

▐█████████████████████████████

▐█████████████████████████████

▐██████████████████████████████



Page 529

5    Q.    Was this specification met for the

6  inject valve module that Bio-Rad sells with its

7  NGC system?

8        MR. CORREDOR:   Object to the form.

9        THE WITNESS:   My opinion would be

10     yes.

11  BY MR. MILLER:

12    Q.    Is the same thing true for the pump

13  modules?

14        MR. CORREDOR:   Object to the form.

15        THE WITNESS:   I -- we would need to

16     go and see if that was listed as a

17     requirement and --

18  BY MR. MILLER:

19    Q.    Sure, let's go to Exhibit 47,

20  please.   And let's go to BRGE 96090.

7/24/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.     Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 530

1 ██████████████████████████████

██ ████████████████████████████

██ ████████████████████████████

██ ████████████████████████████

██ ████████████████

6                Do you see that?

7      A.     I do see that.

8      Q.     Was this specification met by the

9   pump -- NGC pump module sold with the NGC system?

10     A.     ████████████████████████

██   ████████████, I would say yes.

12     Q.     ████████████████████████

██   ████████████████████   ████████████

██   ████████████████████

15                MR. CORREDOR:  Object to the form.

16                THE WITNESS:  For the pump, yes, I

17      would say yes.

18  BY MR. MILLER:

19      Q.     Thank you.  Let's go to Exhibit 50.

20  Exhibit 50 you may recall is the specification

21  for the column switching valve.

22      A.     Yes.

Page 531

1          Q.    And if we could go to

2     BRGEDEL 450606.

3          A.    606.  Okay.

4          Q.    Again, the specification for the NGC

5     column switching valve module states, ███████

■     █████████████████████████████████

■     ████████████████████████████████

■     ███████████████████████████████

■     ██████████████████████████████████

■     ████████████████████

11               Do you see that?

12         A.    I do see that, yes.

13         Q.    Was this specification met by the

14    column switching valve module that Bio-Rad sells

15    for its NGC system?

16               MR. CORREDOR:  Object to the form.

17               THE WITNESS:  ████████████████████

■     ██████████████████████████ yes.

19    BY MR. MILLER:

20         Q.    ██████████████████████████████

■     ██████████████████████ That

22    specification was met as well, correct?

7/24/2020        Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.        Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 532

1          MR. CORREDOR:  Object to the form.

2          THE WITNESS:  For the column

3      switching valve, yes.

4  BY MR. MILLER:

5          Q.     Pull up Exhibit 52, please.

6  ████████████████████████████████████████

   ██ ██████████████████████████████████

8          A.     Correct.

9          Q.     If you could go to BRGEDEL 282561.

10         A.     561, yes.

11         Q.     I'm sorry.  I keep doing this to

12  you.

13                560.

14         A.     560, okay.

15         Q.     And the specification here for the

16  single-wavelength detector module states, ████

   ██ ████████████████████████████████████████

   ██ ████████████████████████████████████

   ██ ████████████████████████████████

   ██ ████████████████████████████████████

   ██ ████████████████████████████

22                Do you see that?

7/24/2020             Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.      Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 533

1          A.      I do see that, yes.

2          Q.      And, are was this specification met

3    for the single-wavelength detector module for the

4    NGC system?

5              MR. CORREDOR:  Object to the form.

6              THE WITNESS:  ███████████████

7        ████████████████ yes.

8    BY MR. MILLER:

9          Q.      ████████████████████

██    ████████████████████████

██    █████████

12             MR. CORREDOR:  Object to the form.

13             THE WITNESS:  For the detector, yes.

14   BY MR. MILLER:

15         Q.      Let's pull up Exhibit 54, please.

16   Exhibit 54, as you might remember, is the

17   ████████████████████

██    ████████████████  right?

19         A.      Correct.

20         Q.      If we could go to the page with the

21   Bates number BRGEDEL 281538.

22         A.      1538, yes.

Page 534

1        Q.    We have the same specification here

2   which states the design -- this is in Item D.

3        A.    Yes.  I'm looking at it, yes.

4        Q.    It states, the specification states,

5   ████████████████████████████████████████

    ███████████████████████████████████████

    █████████████████████████████████████

    ████████████████████████████████████

    ████████████████████████████

10            Do you see that?

11       A.    Yes.

12       Q.    Does the multi-wavelength detector

13  module that Bio-Rad sells for its NGC system meet

14  this specification?

15            MR. CORREDOR:  Object to the form.

16            THE WITNESS:  ████████████████

    ███████████████████████████ yes.

18            (Whereupon, previously marked

19            Exhibit 57, first referral.)

20  BY MR. MILLER:

21       Q.    Can we provide the witness with

22  Exhibit 57.

Page 535

1          A.    I have Exhibit 57 in front of me.

2          Q.    Thank you.  Can you identify

3     Exhibit 57 for us, please.

4          A.    So, according to the title on the

5     first page, this is the ███████████████

██████████████████████████████████████

█████     ███     ████████████████████████████

██     ██████████████████████████████████████

██     ████████████████████

██          ███     ██████████████████████████████

██     █████████████████████

██               █████████████████████████████████

██     ██████████████████████████████████

██     ████████████████████

15               (Whereupon, previously marked

16               Exhibit 58, first referral.)

17          MR. MILLER:  Why don't we provide

18     the witness with what has been marked as

19     Exhibit 58, previously.

20          THE WITNESS:  May I close 57 or will

21     we go back to that one?

22     BY MR. MILLER:

Page 540

1        A.    I will.  Okay, thank you.  I'm

2    looking at the document now.

3        Q.    Can you identify Exhibit 59 for us,

4    please?

5        A.    Again, this is ███████████

██  ██████████████████████████

██    ██  █████████████████████

██  █████████████████████████████

██  ████████████████████████

██    ██  ████████████████████████████

██  ███████████████████████

██  ██████████████████████████

██  ███████████████████████

14              (Exhibit Number 217

15                marked for identification.)

16              MR. MILLER:  Why don't we mark as

17    the next exhibit in order the document

18    bearing the Bates number BRGEDEL 445191

19    through BRGEDEL 445203.

20              DOCUMENT TECHNICIAN:  That has been

21    marked as Exhibit 217.

22              MR. MILLER:  Thank you.

7/24/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.        Philip Chapman Vol II
Highly Confidential - Technical - Attorneys' Eyes Only - Pursuant to Protective Order

Page 541

1          THE WITNESS:  Thank you.

2    BY MR. MILLER:

3          Q.    Let me know when Exhibit 217 gets to

4    your location.

5          A.    Okay.  I'm looking at it now.

6          Q.    Can you identify Exhibit 217 for us,

7    please.

8          A.



Page 542

1          Q.    If you go to the lower portion --

2     let me back up.

3               Let's go to page with the Bates

4     number BRGEDEL 445194.

5          A.    Okay.

6          Q.    There is a functional specification

7     table.  It starts about halfway down the page.

8     Do you see that?

9          A.    Yes.

10         Q.    And then under the general

11    requirements for the enclosure for the design,

12    the specification states, ███████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████

      █████████████████████████████████████

16               Do you see that?

17         A.    I do see that.

18         Q.    Does the NGC system that Bio-Rad

19    sells meet this specification?

20               MR. CORREDOR:  Object to the form.

21               THE WITNESS: ██████████████████████

      ███       ██████████   █████████████████████████

Page 657

1          CERTIFICATE OF COURT REPORTER

2          I, LORI J. GOODIN, RPR, CLR, CRR,

CA CSR # 13959 the reporter before whom the

3   foregoing deposition was taken, do hereby certify

that the witness whose testimony appears in the

4   foregoing deposition was sworn by me; that the

testimony of said witness was taken by me in

5   machine shorthand and thereafter transcribed by

computer-aided transcription; that said

6   deposition is a true record of the testimony

given by said witness; that I am neither counsel

7   for, related to, nor employed by any of the

parties to the action in which this deposition was

8   taken; and, further, that I am not a relative or

employee of any attorney or counsel employed by

9   the parties hereto, or financially or otherwise

interested in the outcome of this action.

10

11

12

13

14

15              _Lori J. Goodin_

16          LORI J. GOODIN, RPR, CLR, CRR

17          Notary Public in and for:

18

19   My Commission expires:  May 12, 2024

20   STATE OF CALIFORNIA, CA CSR# 13959

21   My Commission expires:  February 22, 2021

22

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5



**NGC Chromatography Systems
and ChromLab Software**

**Instrument Guide**
Version 6.0



Chapman Exhibit
7/24/2020
**211**

# NGC Chromatography Systems and ChromLab Software

## Instrument Guide

**Version 6.0**



 **1  Introduction**

The NGC chromatography systems are preparative systems designed to rapidly automate the purification of biomolecules. The flexible, modular, and economical design makes NGC the instrument of choice for method development and scale-up. It is available in six preplumbed, factory-tested configurations at two different flow ranges. Each preconfigured system can be further customized and upgraded by adding valves, detectors, or pumps in order to meet specific application needs. Any system can be configured for either low flow rate or high flow rate operation by simply changing the system pump modules. As a result, a single hardware platform can be modified as the application need and scale change.

1   |   Introduction

## The NGC Chromatography Systems

The NGC chromatography systems are available in a series of combinations. Each system is available with either two 10 ml system pumps (the 10 series) or two 100 ml system pumps (the 100 series).

Each system includes ChromLab software and the NGC touch screen.

■ NGC Quest chromatography system includes

☐ Two system pumps

☐ Mixer

☐ Sample injection valve

☐ Conductivity monitor with a single-wavelength UV detector (on the NGC Quest system) or a multi-wavelength UV/Vis detector (on the NGC Quest Plus system)

■ NGC Scout chromatography system includes

☐ All modules on the NGC Quest system

**Note:** The NGC Scout system includes the single-wavelength UV detector, the NGC Scout Plus system includes the multi-wavelength UV/Vis detector.

☐ pH detector

☐ Buffer blending valve

■ NGC Discover chromatography system includes

☐ All modules on the NGC Scout system

**Note:** Only the multi-wavelength UV/Vis detector is available on the NGC Discover systems.

☐ Column switching valve

☐ Two buffer inlet valves

☐ Sample pump

- NGC Discover Pro chromatography system includes

  - All modules on the NGC Discover system

    **Note:** Only the multi-wavelength UV/Vis detector is available on the NGC Discover systems.

  - Fourth expansion tier

  - Sample inlet valve

  - Outlet valve

## Main Features

NGC chromatography systems enable you to do the following:

- Easily create purification and maintenance protocols from predefined method templates and protocol phases

- Automate multicolumn purification processes using preprogrammed templates and multiple column switching valves

- Automate multiple sample injections using either the sample inlet valve and the sample pump or the C-96 autosampler

- Expand sample monitoring using the signal import module (SIM) to export digital signals to, and import digital signals from, external detectors

- Collect large-volume fractions using multiple outlet valves while also collecting small-volume fractions using the BioFrac fraction collector or NGC Fraction Collector

- Automatically prepare buffers using preprogrammed buffer blending protocols

- Analyze purification results through 1-click peak integration, determine protein concentration, and calculate column performance

- Automate purification protocol optimization using the scouting wizard

- Easily locate fractions containing peaks of interest and view the protein concentration within each fraction

1   |   Introduction

■ Extend the preconfigured systems with additional valves for buffers, samples, and columns

■ Organize the location of the modules to optimize separation performance based on method scale and complexity, and to minimize the system swept volume

■ Minimize errors when connecting tubing using the Point-to-Plumb feature in ChromLab software

## Site Requirements

### Power Considerations

**Note:** The power supply to the NGC system must be stable and within specifications at all times to ensure optimal operation. The power cable connected to the power inlet port must be rated for 7 amps or more.

**Table 1. Power requirements for the NGC system and ChromLab**

| Parameter | Requirement |
| --- | --- |
| Mains input voltage | AC 100—240 V; 50—60 Hz |
| NGC maximum power usage | 200—400 watts, dependent on system configuration |
| Number of power sockets | Minimum of three power sockets: <br>■ One socket for the NGC instrument <br>■ One socket for the computer running ChromLab <br>■ One socket for each fraction collector in use <br>■ A socket for any supported peripheral instrument that you attach (for example, the C-96 autosampler or a second Bio-Rad fraction collector) <br><br>**Tip:** The touch screen does not require a separate power supply. |
| Type of power sockets | IEC type connections, grounded sockets |

 2 **The NGC Instrument**

The NGC instrument ships preassembled with the components necessary to perform gradient separations. The modular components slide into slots in the system known as *bays*. Some modules fit into single-wide bays while others require double-wide bays. Bays can be converted from one size to the other by adding or removing a center divider.

Each module has a unique electronic ID that enables the system to recognize its function when the module is placed into a bay. For example, the system can distinguish between a sample inject valve module and a sample inlet valve module even though they each occupy a single-wide slot.

The position of the module on the system can be changed to optimize the placement and minimize the length of tubing, reducing the system swept volume. The physical location of a module can be easily identified in the overall flow scheme required to run the application through the ChromLab software. Prior to starting a run, ChromLab performs a system check to ensure that all the required modules are physically present on the instrument.

This chapter explains in detail the modules that make up the NGC instrument.

2   |   The NGC Instrument

# The NGC Instrument Illustrated

The illustrations in this section display the main components of the NGC Discover Pro chromatography system:

- Front View

- Back View

- Right Side View

- Left Side View

**Note:** Your system might not include all the modules shown in these illustrations. For a list of modules on the NGC Quest, NGC Scout, and NGC Discover chromatography systems, see Table 9 on page 87.

2   |   The NGC Instrument

## Front View



The NGC Instrument Illustrated

LEGEND

| | | | |
|---|---|---|---|
| 1 | Touch screen monitor | 2 | Sample pump |
| 3 | Sample inlet valve | 4 | Buffer tray |
| 5 | Empty bay, covered | 6 | LED display |
| 7 | Multi-wavelength UV/Vis detector | 8 | Conductivity monitor |
| 9 | Outlet valve | 10 | pH detector |
| 11 | Column and peripheral mount | 12 | Columns |
| 13 | Column grip | 14 | Column-switching valve |
| 15 | Buffer inlet B | 16 | Peripheral ports |
| 17 | USB ports and soft power switch | 18 | System pump B |
| 19 | Drip tray | 20 | Mixer |
| 21 | Buffer blending valve | 22 | System pump A |
| 23 | Buffer inlet A | 24 | Inject valve |
| 25 | Touch screen mounting arm | | |

2   |   The NGC Instrument

## Back View



| | | | |
|---|---|---|---|
| 1 | Cable connector port/hand grip | 2 | Cable connector port |
| 3 | Touch screen arm | 4 | Touch screen connector cable |
| 5 | Cable connector port/hand grip | 6 | Instrument's serial number label |
| 7 | Touch screen connector port | 8 | Ethernet connector port |
| 9 | Power outlet ports | 10 | Power inlet port |
| 11 | Fuse cover | 12 | Power on/off switch |

The NGC Instrument Illustrated

## Right Side View



LEGEND

| | | | |
|---|---|---|---|
| 1 | Drain hole | 2 | Peripheral port |
| 3 | Peripheral ports | 4 | USB ports |
| 5 | Soft power switch | 6 | Drip tray |
| 7 | Touch screen cable cover | 8 | Air sensor module |
| 9 | Column and peripheral mount | | |

2   |   The NGC Instrument

## Left Side View



LEGEND

| | | | |
|---|---|---|---|
| **1** | Buffer tray | **2** | Drain hole |
| **3** | Touch screen cable cover | **4** | USB ports |
| **5** | Peripheral port | **6** | Peripheral ports |
| **7** | Vents | | |

The NGC Instrument Illustrated

## Liquid Flow Path of the NGC Discover Pro System

At startup, ChromLab displays a default fluidic scheme in the System Control tab (as well as in the Method Editor tab and on the touch screen). The fluidic scheme depicts the plumbing flow for the modules. The image that follows displays the plumbing flow of the modules in the NGC Discover Pro system during a sample run. The modules in the fluidic scheme are described in detail in the sections that follow.

**To view or modify module parameters during a manual run**

▶   Click the module to access its dialog box.

Alternatively, select the module on the touch screen to access its dialog box.

**Tip:**   For more information about using ChromLab, see the NGC Chromatography Systems and ChromLab Software User Guide.



LEGEND

| | | | |
|---|---|---|---|
| 1 | System pumps A and B | 2 | Buffer inlet valves A and B |
| 3 | Buffer blending valve | 4 | Sample pump with pressure sensor |
| 5 | Sample inlet valve | 6 | Manual inject syringe |
| 7 | Sample inject valve | 8 | Waste (not provided) |
| 9 | Sample loop | 10 | Column switching valve |
| 11 | Column (not provided) | 12 | Multi-wavelength UV/Vis detector |
| 13 | Conductivity monitor | 14 | pH valve |
| 15 | Outlet valve | 16 | Fraction collector (separate instrument) |
| 17 | Waste (not provided) | | |

2   |   The NGC Instrument

## Pumps

The NGC systems can have up to three high-precision pumps: two system (or gradient) pumps (pump A and pump B) and one sample pump. The system pumps can create isocratic or linear gradients at a range of precisely controlled flow rates and pressures. The sample pump can load large sample volumes onto a column or fill large sample loops. Flow rates on all pumps can be controlled to avoid overpressure.



Pumps

## System Pumps

The system pumps perform isocratic or gradient elution at the specified flow rates.



LEGEND

| | | | |
|---|---|---|---|
| 1 | Pump flow status LED | 2 | Priming port |
| 3 | Module name | 4 | LED screen |
| 5 | Purge/pause buttons | 6 | Pump outlet port |
| 7 | Pump head | 8 | Pump inlet port |

## Detailed Attributes

The NGC systems include two system pumps: pump A (the left pump) and pump B (the right pump). The system pumps are available in two flow rates: 10 ml/min (the F10 pumps) and 100 ml/min (the F100 pumps).

**F10 Pump**

- Flow rate delivery: 0.001–10 ml/min specified

- Operating pressure range: 0–3,650 psi (0–25.2 MPa)

- Operating viscosity range: 0.35–10 cP

**F100 Pump**

- Flow rate delivery: 0.01–100 ml/min specified

- Operating pressure range: 0–1,450 psi (0–10 MPa)

- Operating viscosity range: 0.35–10 cP

## System Pump LEDs

Each system pump module is fitted with LEDs.

- Green LEDs indicate the pump is in use.

## How the System Pumps Function

Each NGC system ships with either two F10 pumps or two F100 pumps. The reciprocating pistons in each pump synchronize to deliver continuous flow with low pulsation. On the NGC Quest system (without a buffer blending valve), the system pumps operate such that the sum of the flow rates of pump A and pump B is equal to the maximum delivery rate. For example, if the flow of an F10 pump A equals 10 ml/min, then the rate for the F10 pump B must equal 0 ml/min. If the system is set to deliver 5 ml/min with a gradient mixture of 50% B, pump A and pump B each run at 2.5 ml/min.

Pumps

Each system pump module has an emergency Pause button and a Purge button.

■ Pressing the emergency Pause button on either system pump stops *both* pumps. If a run is in progress when you press Pause on either system pump, both system pumps stop and the run pauses.

You can resume or cancel the run through ChromLab. If you choose to cancel the run, you can save the run data up to that point.

■ Pressing Purge on a system pump runs that pump at full speed, replacing any air in the lines with buffer. Purge activates purging for the tubing lines that belong to that specific pump. For instance, when you press Purge on system pump A, pump A runs at maximum flow rate while pump B becomes idle. If you press Purge on pump B while pump A is purging, the purge on pump A stops and the purge on pump B starts. The Purge button is a toggle. To stop the purge, press Purge on that system pump again.

**Note:** The Purge button is deactivated when:

☐ A run is in progress

☐ Any of the modules are in calibration mode

☐ The buffer blending valve is included in the fluidic scheme



**Caution:** To avoid damaging the column, always ensure that it is offline when purging the system. Set the inject valve to waste, or remove the column from the system and replace with a union fitting.

**Tip:** You can pause the system through ChromLab using either the touch screen or the computer running ChromLab (known in this document as the ChromLab computer). You can also set timed purging of both pumps through ChromLab, which will set the inject valve to Waste for a set amount of time. For more information, see the NGC Chromatography Systems and ChromLab Software User Guide.

### Pump Priming Port

The pump priming port introduces fluid into, and removes air from, the inlet tubing line and the pump head.

**Piston Wash System**

The pumps on the NGC system automatically rinse behind the piston with a constant low flow of 20% ethanol. This prolongs the working lifetime of the seal by keeping the seal wetted and preventing salt crystals from depositing onto the pistons.

When the pumps are running, the pistons and the check valve located in each chamber automatically pump the rinse fluid, which circulates through the system. The tube holders on the side of the instrument hold two conical rinsing solution reservoirs, one for the system pumps and one for the sample pump (if present). The inlet and outlet tubing for the system pumps piston wash housing is immersed in one of the rinsing solution reservoirs. The inlet and outlet tubing for the sample pump is immersed in the second rinsing solution reservoir. The tubing connects to the wash housing ports at the back of the pump heads.

**Important:** Change the rinse fluid weekly. Place the washing system reservoir at the same height or above the level of the pump heads to avoid siphoning of the solution back to the reservoir. Ensure that the inlet tubing reaches the very bottom of the rinsing solution reservoir.

## Valves

All NGC systems include a sample inject valve. Your system might also include one or more of the following valves:

- Buffer blending valve

- Buffer inlet valve

- Sample inlet valve

- Outlet valve

- Column switching valve

All valves (except the buffer blending valve) are motorized rotary valves with a number of defined inlet and outlet ports. As the rotary valve turns, the flow path for the valve changes. The active ports are identified by LEDs. Green LEDs indicate that the flow through the port is from the system pumps. Blue LEDs indicate that the flow is from the sample pump. The pattern and location of the ports determine the flow path and function of each type of valve.

**Tip:**  Bio-Rad recommends inserting a Delrin or Tefzel 1/4–28 flat-bottom plug, included in the fittings kit, into unused valve ports to prevent particles from entering the valve.

Valves

## Sample Inject Valve

The sample inject valve enables the system to load a specific, predetermined volume of sample onto a column.

When the sample pump is installed, the sample inject valve enables the system to easily switch between manual loop filling, automated loop filling, and direct sample injection onto a column without replumbing the fluidic connections.

You can use the sample pump to load sample either directly onto a column or into a sample loop.



### Detailed Attributes

- Maximum operating pressure is 3,650 psi

2   |   The NGC Instrument

## Ports on the Sample Inject Valve



| Port | Function |
|---|---|
| Inject | Manually load sample using a syringe |
| Column | Outlet to top of column |
| Pump | Inlet from the system pump |
| Loop E | ▪ Inject: Inlet for buffer<br>▪ Load: Outlet to waste |
| Waste 1 | Outlet to waste (from the sample pump and sample loop) |
| Sample pump | Inlet from the sample pump |
| Loop F | ▪ Inject: Outlet to column<br>▪ Load: Inlet for the sample |
| Waste 2 | Outlet to waste (from the system pump) |

Valves

## Sample Inject Valve LEDs

The sample inject valve module is fitted with LEDs.

- Solid green LEDs indicate the flow is from the system pump.

- Solid blue LEDs indicate the flow is from the sample pump.

- Blinking green LEDs indicate the line to plumb using the Point-to-Plumb feature.

## How the Sample Inject Valve Works

The sample inject valve enables sample to be loaded onto the column. Several sample application techniques are available:

- The sample loop can be manually filled with sample using a syringe followed by injection onto a column by the system pumps

- The sample loop can be filled with sample using the sample pump (if installed) followed by injection onto a column by the system pumps

- Sample can be injected directly onto the column using the sample pump (if installed)

## Flow Paths of the Sample Inject Valve

In Manual mode (from the System Control tab in ChromLab), you can manually change the flow path of the sample inject valve from its dialog box.

The following images show the different flow paths of the sample inject valve.

LEGEND

| | |
|---|---|
| | Manual injection flow |
| | System pump flow |
| | Sample pump flow |
| | No flow |

2 | The NGC Instrument

| Valve Position | Explanation |
|---|---|

**Manual Load Loop/System Pump to Column**



- Directs system pump flow directly toward the column
- Aligns the sample loop with manual injection port so that sample can be manually filled into the loop using a syringe. Excess sample goes out waste port (W1)
- Chromatogram x-axis based on system pump flow rate

**System Pump Inject Loop/Sample Pump Waste**



- Directs system pump flow through the sample loop to load the sample from the loop onto the column
- Directs sample pump flow to waste (W2)
- Chromatogram x-axis based on system pump flow rate

Valves

| Valve Position | Explanation |
| --- | --- |

**Sample Pump Direct Inject/System Pump Waste**



- Directs system pump flow to waste (W2)
- Directs sample pump flow directly onto the column to load large volumes of sample
- Chromatogram x-axis based on sample pump flow rate

**Sample Pump Load Loop/System Pump to Column**



- Directs system pump flow directly onto the column
- Directs sample pump flow into the loop to load the loop with sample. Excess sample flows out through waste port (W1)
- Chromatogram x-axis based on system pump flow rate

Detectors

### Mixer LEDs

The mixer module is fitted with LEDs.

- A left green LED indicates the flow is from system pump A.

- A right green LED indicates the flow is from system pump B.

- Both LEDs light when both pumps are running.

- Blinking green LEDs indicate the line to plumb using the Point-to-Plumb feature.

## Detectors

All NGC systems include a detector module that contains a conductivity monitor and either a single-wavelength UV detector or a multi-wavelength UV/Vis detector. The single-wavelength UV detector and conductivity module can be replaced with a multi-wavelength UV/Vis detector and conductivity module and vice versa. Some configurations include a pH detector module. The pH detector module can be added as an upgrade to systems that do not offer it as a standard module.

### UV Detectors and Conductivity Monitor

The UV detectors measure the UV absorbance of biomolecules as they elute through the column. The conductivity monitor measures the ionic strength (salt concentration) of buffers.

**Single-Wavelength UV Detector and Conductivity Monitor**



**Multi-Wavelength UV Detector and Conductivity Monitor**



Detectors

## Single-Wavelength UV Detector



LEGEND

| | | | |
|---|---|---|---|
| 1 | Conductivity monitor | 2 | LED display |
| 3 | UV flow cell | 4 | UV detector housing |
| 5 | Point-to-Plumb indicator | | |

### Detailed Attributes

■ Two integrated LED UV bulbs

■ LED operating usage: approximately 5,000 hours

**Note:** If the reference output is below 0.9 volts you might need to replace the LED bulbs depending on the requirements of the experiment.

For information about changing the LED bulbs, see Replacing the Single-Wavelength UV Detector LED on page 207.

- Monitors UV absorbance one wavelength at a time

  □ 255 nm

  □ 280 nm (default)

  **Tip:**  Use ChromLab to change the absorbance wavelength values. For more information, see the NGC Chromatography Systems and ChromLab Software User Guide.

- UV absorbance range: 0–3,000 mAU

- UV linearity: ±5%

- Three interchangeable flow cells with path lengths of 2 mm, 5 mm (default), and 10 mm; see Table 4 on page 70 for specific information

  **Note:**  Use the preparative 2 mm flow cell to measure high concentrations of protein. The path lengths of the analytical 5 mm and 10 mm flow cells are longer and are appropriate for measuring lower concentrations of protein.

  For information about changing the flow cells, see Replacing the UV Flow Cell on page 202.

Detectors

## Multi-Wavelength UV/Vis Detector



LEGEND

| | | | |
|---|---|---|---|
| 1 | Conductivity monitor | 2 | UV/Vis detector flow cell |
| 3 | UV/Vis detector housing | | |

### Detailed Attributes

- Contains one tungsten and one deuterium lamp

- Lamp operating usage: approximately 2,000 hours for the tungsten bulb as well as the deuterium bulb

  For information about changing the UV lamps, see Replacing the Multi-Wavelength UV/Vis Detector Lamps on page 215.

  **Tip:** To conserve lamp life, in Manual mode open the Multi Wave Detector dialog box and turn off the UV/Vis lamps when the instrument is not in use.

- Monitors up to four wavelengths in the UV/Vis range of 190–800 nm

  **Tip:** Use ChromLab to change the absorbance wavelength values. For more information, see the NGC Chromatography Systems and ChromLab Software User Guide.

- UV absorbance range: 0–3,000 mAU

- UV linearity: ±5%

- Three interchangeable flow cells with path lengths of 2 mm, 5 mm (default), and 10 mm; see Table 4 for specific information

  For information about changing the flow cells, see Replacing the UV Flow Cell on page 202.

  **Note:** Use the preparative 2 mm flow cell to measure high concentrations of protein. The path lengths of the analytical 5 mm and 10 mm flow cells are longer and are appropriate for measuring lower concentrations of protein.

**Table 4.  Pressure limits of UV detector flow cells**

| Pump Size | Pressure | 2 mm | 5 mm | 10 mm |
|-----------|----------|------|------|-------|
| F10 | 500 psi | ✓ | ✓ | ✓ |
| F100 | 500 psi | ✓ | ✓ | ✓ |

## Conductivity Detector

**Detailed Attributes**

- Factory specified range: 0.01–999.9 mS/cm

- Validated working range: 0.01–300 mS/cm

- Accuracy: ±2%

- Flow cell volume: 6 µl

- Integrated temperature sensor range: 4–100°C

## How They Work

### UV Detectors

ChromLab recognizes the connected optic module (that is, either the single-wavelength UV or multi-wavelength UV/Vis module). The lamps turn on when the NGC instrument powers up. At the start of the method run, the system determines if the monitor is ready.

The warmup time for the LED lamp in the single-wavelength detector is negligible. The tungsten and deuterium lamps in the multi-wavelength detector require 60–90 min to warm up.

**Note:** For most accurate data with the tungsten and deuterium lamps, allow a minimum of 60 min warmup time.

### Conductivity Monitor

The temperature-compensated conductivity monitor calculates the conductivity of the sample and buffer mixture flowing through its flow cell. The stronger the salt concentration, the higher the conductivity signal.

Since conductivity of a solution can vary with changes in temperature, temperature variations of the sample are measured by the temperature sensor located in the conductivity flow cell. A temperature compensation factor (set in ChromLab) can be used to compare the conductivity of the sample in relation to the corresponding conductance at room temperature or a user-defined reference temperature.

Detectors

## pH Detector

The pH detector includes an integrated flow cell in which to insert a pH electrode. The pH of the solution flowing across the pH electrode is measured in real time. This is very useful for applications in which knowledge of the buffer pH is critical for a successful separation and/or the stability of the sample (for example, in antibody purifications). The pH can be temperature compensated.

The pH valve directs the flow to either

- pH — flow path is inline with the pH probe, or

- Bypass — flow path bypasses the electrode

**Note:** In Calibrate mode, the pH electrode is offline for calibration.



### Detailed Attributes

- Flow cell volume: 90 µl (200 µl including internal valve passageways)

- Electrode maximum operating pressure: 70 psi

- pH reading range: 0–14

- Accuracy: 0.1 pH units from 2–12

- Slope: 80–120%

- Offset: ±60 mV

  **Note:** Store the electrode in a pH electrode storage buffer or pH 7 standard buffer. For information about changing the pH probe, see Replacing the pH Probe on page 224.

### Ports on the pH Detector



Detectors

| Port | Description |
|---|---|
| In | Inlet from the conductivity monitor |
| Out | Outlet to the fraction collector |
| Cal In | Calibration inlet reserved for calibrating the pH valve |
| Cal Out | Outlet to calibration waste |

## How the pH Detector Works

The integrated pH electrode enables inline pH monitoring during a run. ChromLab calculates and displays temperature-compensated pH values.

You can program the position of the pH valve in ChromLab to direct the flow to the pH electrode, or to bypass the electrode. The section Changing the Flow Paths of the pH Valve on page 76 explains how to change the flow path.

The pH valve has an integrated calibration port to calibrate the probe offline without disconnecting the module from the system. Calibration is performed using calibration standards in ChromLab. For more information, see Calibrating pH on page 150.

### Changing the Flow Paths of the pH Valve

During a manual run, you can change the flow path of the pH valve by accessing its dialog box in ChromLab.

**To change the flow path of the pH valve**

1.  Touch or click the pH Valve module in the fluidic scheme to access its dialog box.



2.  In the pH Valve dialog box, select the appropriate choice:

    ■  pH — the flow path is inline with the pH probe

    ■  Bypass — the flow path bypasses the pH probe

# Tubing, Loops, Columns, and Fittings

This section lists the accessories supported for use with the NGC systems.

## Tubing

Table 5. NGC system tubing details

| Description | Diameter | Scope of Use | Maximum Pressure Rating | Mounted at Delivery |
|---|---|---|---|---|
| PEEK tubing, orange | OD: 1/16"<br>ID: 0.020" | High pressure tubing, recommended for flow rates less than 40 ml/min | 6,000 psi | Yes |
| PEEK tubing, green | OD: 1/16"<br>ID: 0.030" | High pressure tubing | 4,000 psi | Yes |
| Polytetrafluoroethylene (PTFE) tubing, transparent | OD: 1/8"<br>ID: 0.062" | Inlet tubing | 500 psi | No |
| Tefzel tubing, transparent | OD: 1/16"<br>ID: 0.020" | Waste | 4,000 psi | No |

# Sensors

## Air Sensors

The NGC chromatography systems can be fitted with an external air sensor module that can hold up to four air sensors. This module can be daisy chained to an extension module that can hold an additional four air sensors, providing a total of eight air sensors. The air sensors detect air, indicating the end of sample or buffer, and trigger appropriate events through ChromLab software. The air sensors are available in two sizes that differ in internal diameter to accommodate the two different tubing sizes:

- The large air sensors are used with the larger diameter 1/8" FEP tubing for the inlet ports of the pumps and inlet valves.

- The smaller air sensors are used with the smaller diameter 1/16" PEEK tubing.

The systems detect the number of air sensors that are attached to the instrument. Air sensors can be set to detect air in lines filled with buffer. If air is detected in these lines, the system pumps stop and the run pauses. You can continue the run after replenishing the buffer and purging the lines.

Air sensors can also be set to detect air in lines filled with sample. If air is detected in these lines, the sample pump stops so that it cannot pump air onto the column. If an air-bubble sensing event occurs during a method run, the run continues to the next step.



The air sensors are inserted into ports on the air sensor module. ChromLab detects the presence or absence of air sensors in the air sensor module. If you have fewer than four air sensors in the module, you must cover the unoccupied ports with a protective blank cover that Bio-Rad provides to prevent liquid from entering into the module's electronic circuitry.

The air sensors can be connected to

- The inlet port on the sample pump

- The inlet port on system pump A

- The inlet port on system pump B

- Any position along the flow path of the instrument, for example

    - Sample inject valve

    - Buffer inlet valve

Sensors

### Air Sensor LEDs

The air sensor module is fitted with LEDs.

- Green LEDs indicate the module is connected.

- Blue LEDs indicate air in the tubing.

  Prime the lines to remove air. See Priming and Purging the Systems on page 123 for more information.

### Air Sensor Tubing Length and Bubble Size

The response of the air sensor module is highly dependent on the bubble size and flow rate, and requires a minimum tubing length between the sensor outlet and the pump inlet. Table 8 lists recommended tubing lengths for various flow rates and bubble sizes.

Table 8.  Recommended air sensor tubing lengths

| Flow Rate | Bubble Size | 1/8" ID FEP Tubing Length (air sensor to pump inlet) |
| --- | --- | --- |
| 1 ml/min | 15–25 µl | ≥6" |
| 5 ml/min | 50–100 µl | ≥6" |
| 10 ml/min | 200 µl | ≥6" |
| 100 ml/min | 1.05–1.4 ml | ≥42" |

## Pressure Sensors

The NGC systems can have up to four integrated pressure sensors:

- System pressure sensor — located in the mixer module

- Precolumn and postcolumn pressure sensors — located in the column switching valve

  These pressure sensors protect the column and media from overpressure. One pressure sensor measures the pressure before the column to protect the column hardware. The other sensor measures the pressure after the column and calculates the pressure difference over the media bed. If the pressure differential value (Delta P) exceeds the preset limit, either the run pauses or another action is applied.

- Sample pump pressure sensor — located in the sample pump module

Each pressure sensor has an accuracy of ±2% or 2 psi, whichever is smaller.

## Temperature Sensor

The NGC systems have an integrated temperature sensor located in the conductivity flow cell that measures the run temperature. Sensor data is used for temperature compensation of conductivity and pH.

# Product Configurations

The NGC chromatography system is available in four standard configurations. This section lists the modules available for each configuration. You can add or remove modules to an existing configuration to customize the system. The configuration at your site might differ slightly from any of the standard configurations.

**Note:** All NGC systems are available with *either* the 10 ml/min *or* the 100 ml/min system pumps.

**Table 9.  NGC chromatography system configurations**

| Module | NGC Quest | NGC Scout | NGC Discover | NGC Discover Pro |
|---|---|---|---|---|
| Sample injection valve | ✓ | ✓ | ✓ | ✓ |
| Single-wavelength UV and conductivity monitor (Available on the NGC Quest and NGC Scout systems only) | ✓ | ✓ | | |
| Multi-wavelength UV/Vis and conductivity monitor (Available on all NGC systems) | ✓ | ✓ | ✓* | ✓* |
| System pumps A and B | ✓ | ✓ | ✓ | ✓ |
| Mixer | ✓ | ✓ | ✓ | ✓ |
| pH valve | | ✓ | ✓ | ✓ |
| Buffer blending valve | | ✓ | ✓ | ✓ |
| Column switching valve 1 | | | ✓ | ✓ |
| Sample pump | | | ✓ | ✓ |
| Buffer inlet valves A and B | | | ✓ | ✓ |
| Third expansion tier | | | ✓ | ✓ |

2   |   The NGC Instrument

**Table 9.  NGC chromatography system configurations, continued**

| Module | NGC Quest | NGC Scout | NGC Discover | NGC Discover Pro |
|---|---|---|---|---|
| Fourth expansion tier | | | | ✓ |
| Sample inlet valve 1 | | | | ✓ |
| Outlet valve 1 | | | | ✓ |
| *Only the multi-wavelength UV/Vis detector is available in the NGC Discover series. | | | | |

 3  Preparing the Instrument

The NGC instruments ship preassembled with the modules necessary to perform chromatographic separations. The instruments require minimal postinstallation setup to prepare them to run simple gradient separations. This chapter explains how to prepare the NGC systems for a method run.

3   |   Preparing the Instrument

## Module Review

The NGC systems are shipped in one of three standard configurations. Preparing the NGC systems differs slightly depending on the configuration.

**Tip:** For information about adding, removing, or moving modules, see Replacing or Repositioning Modules on the NGC Instruments on page 233.

## Standard NGC System Configurations

The standard NGC system configurations are depicted in the images that follow. Table 9 on page 87 lists specific information about each configuration.

**Note:** Each configuration can be converted to another by adding or removing modules. The configuration at your site might differ slightly from the configurations shown below.

**NGC Quest Chromatography System**



**NGC Scout Chromatography System**



Module Review

**NGC Discover Chromatography System**



**NGC Discover Pro Chromatography System**



# NGC Systems Accessories Kit

Each NGC system ships with an accessories kit. The contents of the kit are specific to the system. Verify the contents against those listed in the sections that follow.

The accessories kits contain the tubing, loops, and fittings necessary to complete the setup of the shipped configuration. All kits include

- NGC fittings kit

- 1 ml syringe

- Luer adapter

- Fittings tightener

- Touch screen and pivot arm kit

- Tool to attach touch screen

- Pump head wash inlet tubing (2)

- Pump head wash priming line

- 1/4-28 union

- System pump inlet tubing (2)

- 1 ml sample loop

- Waste tubing (2)

- Injection port

- 20 psi backpressure regulator

- Tubing retainers, small (1, for PEEK tubing management)

- Tubing retainers, large (2, for PTFE tubing management)

- Column tubing (2) and fittings (from inject valve to column top and from column bottom to UV detector inlet)

- Tube #2 (conductivity flow cell to 20 psi backpressure regulator)

- Tube #4 (backpressure regulator to the NGC Fraction Collector (NGC FC) or BioFrac fraction collector)

NGC Systems Accessories Kit

## NGC Scout Accessories Kit

The kit for the NGC Scout system includes all the accessories in the NGC systems kit as well as

- Tube #2 (20 psi backpressure regulator to pH valve inlet)

- pH waste tubing

- pH calibration port inlet tubing

- Colored tubing for the buffer blending valve

## NGC Discover Accessories Kit

The kit for the NGC Discover system includes all the accessories in the NGC Scout kit as well as

- Pump head wash inlet tubing (2) for the sample pump

- Pump head wash priming line for the sample pump

- 1/4-28 union

- Sample pump inlet tubing

- System pump inlet tubing (14) for inlet valves

- Column tubing (10) and fittings (from the column switching valve Top positions to column top, and from column bottom to column switching valve Bottom positions)

## NGC Discover Pro Accessories Kit

The kit for the NGC Discover Pro system includes all the accessories in the NGC Discover kit as well as

- Buffer inlet tubing (8) for inlet valve

- Tube #6 for the inlet valve

- Outlet valve tubing (12) for the outlet valve

- Tube #10 for the outlet valve

A   |   Maintaining the Instrument

# The Detectors

## Replacing the UV Flow Cell

The NGC systems ship with a 5 mm UV flow cell installed. Additional flow cells for analytical (10 mm) and preparative (2 mm) applications are available. This section explains how to change or replace the UV flow cell. The procedure is the same for both the single-wavelength UV and multi-wavelength UV/Vis detectors.

**To replace the UV flow cell**

1. On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2. Disconnect the inlet and outlet tubings from the UV cell.

3. With the screwdriver supplied in the fittings kit, loosen the two bolts on the UV flow cell.

   **Single-Wavelength UV Flow Cell**



The Detectors

**Multi-Wavelength UV/Vis Flow Cell**



4. Firmly grasp the bolts on the flow cell and lift the flow cell from its socket.

**Single-Wavelength UV Flow Cell**



A   |   Maintaining the Instrument

**Multi-Wavelength UV/Vis Flow Cell**



5. Verify that the square gasket is removed with the flow cell.

   **Tip:**  If the gasket is not on the flow cell, look inside the socket. The rubber gasket might have remained in the groove inside the socket. Remove the gasket and place it onto the flow cell that you removed.

6. Store the flow cell with the attached gasket and bolts in a safe, clean place for future use.

The Detectors

7.  Locate the flow cell. The flow cell should include

    ■  Two bolts

    ■  One square rubber gasket



8.  Place the flow cell into the socket on the UV monitor.

    **Note:** Ensure that the arrow on the top of the flow cell is pointing to the right, and that the two bolts on the flow cell align with the bolt holes in the socket. The guides on the bottom of the flow cell help to prevent inserting the flow cell incorrectly.

A   |   Maintaining the Instrument



9.   Tighten the bolts. If necessary, use the screwdriver.

10.  Reconnect the 1/4-28 fittings from the tubing to the top and bottom of the flow cell and ensure that they are secure.

11.  Reconnect the tubing lines to the conductivity monitor.

12.  Restart the NGC instrument.

## Replacing the Single-Wavelength UV Detector LED

This section explains how to replace the LED on the single-wavelength UV detector.

 **Caution:**  It is strongly suggested that you wear gloves when you replace the LED. Do not touch the LED glass with bare hands, as oils from your skin will degrade the lamp over time.

**To replace the single-wavelength UV LED**

1. On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2. Disconnect the tubing lines from the top and bottom of the UV cell.

3. Disconnect the tubing lines from the conductivity monitor.

4. The door to the LED is held in place by a pressure latch. Press down on the latch and then slide the door forward.

A   |   Maintaining the Instrument



The Detectors

**Tip:**  The door is tethered to the casing. It will hang to the side while you replace the lamps.



Opened LED case

Tethering tape

Door to case

You see the LED module with three thumbscrews. The LED itself is on the other side of the board.



5.   Completely loosen the top right thumbscrew.



Loosen top right thumbscrew first

The Detectors

6.  Loosen the left thumbscrews, alternating one turn on the top left screw then one turn on the bottom left screw until they are completely loosened.

**Tip:**  You might need to loosen the left two screws with a flathead screwdriver.



7.  Grasp the thumbscrews and pull the LED board straight forward out of the casing.



**WARNING!**  Use caution when removing the LED board. The LED might be hot to the touch after the board is removed.



The following image shows the LED housing without the LED board.



8.  Dispose of the used LED in an appropriate waste receptacle.

9.  Locate the new LED and remove it from its packing material.

The Detectors

**Front of LED Board**



**Back of LED Board**



10. Align the thumbscrews of the replacement LED with the holes on the housing and carefully insert the LED into the casing.

11. Tighten the three thumbscrews to secure the lamp into the casing.

12. Slide the door to the LED casing into place until the latch secures.

13. Reconnect the tubing lines to the top and bottom of the UV cell.

14. Reconnect the tubing lines to the conductivity monitor.

15. Restart the NGC instrument.

### Resetting the Single-Wavelength Lamp Time Details

The system tracks the lamp usage and displays the details on the Detector tab in the System Information dialog box in ChromLab.

After you change the single-wavelength lamps, you must reset the lamp time details in the system so that the details are current.

**To reset single wave-length lamp time details**

1.  Start ChromLab.

2.  Do one of the following:

    ◾ On the ChromLab computer, from the System Control tab open File > System Information and select the Detector tab.

    ◾ On the touch screen, open System Information from the menu and select the Detector tab.

3.  Click Reset Lamps Time.

4.  Restart the NGC instrument.

The values for lamp time hours for the single-wavelength UV lamps reset to 0.0 hr.

# Replacing the Multi-Wavelength UV/Vis Detector Lamps

This section explains how to replace the deuterium lamp or tungsten lamp inside the multi-wavelength UV/Vis detector. The replacement lamp unit includes the lamp, cable connector, and plug. The lamp is replaced as a unit.



**Caution:**  It is strongly suggested that you wear gloves when you replace the lamps. Do not touch the lamp glass with bare hands, as oils from your skin will degrade the lamp over time.

**To replace the multi-wavelength UV/Vis lamps**

1.  On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2.  Disconnect the tubing lines from the top and bottom of the UV cell.

3.  Disconnect the tubing lines from the conductivity monitor.

4.  Remove the multi-wavelength UV/Vis detector module from the instrument.

    See Replacing or Repositioning Modules on the NGC Instruments on page 233 for information about removing a module.

5.  Using a screwdriver, loosen the screw and remove the door on the left side of the module.



The deuterium and tungsten lamps are both accessible.



**Tip:** You might need to unscrew the cable connector for the tungsten lamp to access the collar to the cable connector for the deuterium lamp.

The Detectors

6. Remove the lamp:



**WARNING!**   Use caution when removing the lamps. The lamps might be hot to the touch after the module is removed.

a.   Using your fingers, loosen the collar on the cable plug.



b.   Pull the plug upward to disconnect the cable.



A | Maintaining the Instrument

    c. With a 2.5 mm hex key, remove the screws on the top and bottom of the lamp casing.



    d. Gently pull the lamp casing and lamp out of the socket.

       The following image shows a completely disassembled deuterium lamp unit.



    e. Dispose of the used lamp in an appropriate waste receptacle.

7. Locate the replacement lamp and remove it from its packaging.

8. Carefully insert the replacement lamp fixture into the socket.

9. Align the screw holes on the lamp unit with the screw holes in the case.

10. Using the 2.5 mm hex key, tighten the screws to secure the lamp unit.

The Detectors

11. Insert the cable plug and tighten the collar.

   **Tip:**  The deuterium lamp plug has seven connector pins, the tungsten lamp has five.



12. Replace the access door and tighten the screw with a Phillips screwdriver.

13. Slide the multi-wavelength UV/Vis module into its bay and fasten it in place by tightening the two screws.

14. Reconnect the tubing lines to the top and bottom of the UV cell.

15. Reconnect the tubing lines to the conductivity monitor.

16. Restart the NGC instrument.

**Note:** The multi-wavelength UV/Vis detector will go through an automated calibration routine when the system is restarted.

A | Maintaining the Instrument

## Replacing the Conductivity Monitor

The images in this section show the conductivity monitor on the single-wavelength UV detector module. Though the position of the conductivity monitor differs on the multi-wavelength UV/Vis module, the steps to replace the conductivity monitor are the same.

**To replace the conductivity monitor**

1. On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2. Disconnect the tubing lines from the conductivity monitor.

3. Loosen the two thumbscrews on the front of the detector.



The Detectors

4. Firmly grasp the detector and pull it toward you to detach it.



5. Dispose of the detector in an appropriate waste receptacle.

6. Locate the replacement detector and remove it from its packaging.

7. Align the two thumbscrews with the screw holes and the pin holes to the pins on the instrument.

   **Tip:** The thumbscrews are on the top of the detector. There are two guide bolts on the bottom of the detector.



  **Caution:** Do not bend or break the connector pins.

8. Gently push the detector onto the connector pins on the instrument.

9. Tighten the thumbscrews to secure the detector in place.

10. Reconnect the tubing lines to the conductivity monitor.

11. Restart the NGC instrument.

**Note:** The conductivity monitor will go through an automated calibration routine when you restart the system.

# pH Probe

## Storing the pH Electrode

When not in use, store the pH electrode in storage solution. See Table 15 on page 159 for recommended storage solutions.

**Tip:** Set the pH valve to Bypass mode until it is needed. This ensures the pH electrode remains in storage.

**To store the pH electrode**

1. Start ChromLab software.

2. Choose Tools > Calibrate to open the Calibration dialog box.

3. Select pH on the Calibrate dropdown list.

4. Press Start to set the pH monitor to Calibration mode.

5. On the pH valve, inject approximately 10 ml of pH electrode storage solution through the Cal In port.

6. Click Close to close the Calibration dialog box.

   **Note:** You might see a ChromLab message warning you about interrupting calibration. You can safely ignore this message. Any previous calibration performed on the pH valve is saved.

## Cleaning the pH Electrode

**To remove soluble contaminants**

▶ Sequentially immerse the electrode in the following solutions for 1 min each:

   ■ 0.1 M HCl

   ■ Distilled $H_2O$

   ■ 0.1 M NaOH

   ■ Distilled $H_2O$

   ■ 0.1 M HCl

**To remove lipophilic organic contaminants**

▶  Immerse the electrode in an organic solvent or a liquid detergent, for example

■  Bio-Rad cleaning concentrate, catalog #161-0722

■  2% Contrad, catalog #176-4118

## Replacing the pH Probe

The replacement pH probe is packaged in storage solution to protect it during shipping.

**To replace the pH probe**

1.  On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2.  Loosen the nut on the DNS cable and disconnect it from the DNS connector on the front of the pH module.



pH Probe

3.  Loosen the black collar on the pH probe.

4.  To remove the pH probe, lift the probe out of the pH flow cell.

    Dispose of the probe in an appropriate waste receptacle.

5.  Add a small amount of water (2 ml) to the pH flow cell.

6.  Locate the replacement pH probe and remove it from the storage solution.

7.  Ensure that the pH probe cord is threaded through the collar.

8.  Inspect the probe to determine if the air bubble in the stem has moved into the bulb area.

    **Tip:**  If bubbles are visible in the bulb area, hold the electrode by the top cap and shake it downward to move the bubbles into the stem.

9.  Carefully remove the plastic cap from the pH probe and ensure that the O-ring is in place on the body.



    **Caution:**  Use caution when removing the plastic cap so as not to damage the glass probe.

10. Insert the probe into the top of the pH flow cell.

11. Slide the collar over the pH probe onto the pH valve and hand-tighten the collar until it is snug.



    **Caution:**  Do not overtighten the collar. Overtightening will break the glass pH probe.

12. Connect the pH probe cable to the DNS connector on the pH valve module.

13. Restart the NGC instrument.

14. Calibrate the pH monitor. See Calibrating pH on page 150 for more information.

A   |   Maintaining the Instrument

# Other Components

## Attaching an Expansion Tier to the NGC Instrument



**WARNING!**   Disconnect power to the NGC instrument before attaching an expansion tier. Do not attempt to service any component on the NGC instrument unless noted in this manual. Contact Bio-Rad for service requests.

To attach the connector cable, you will need access to the back of the NGC instrument. If necessary, pull the NGC instrument away from the wall and rotate the instrument to gain access.

Important:  If you are adding a fourth expansion tier, you must attach it to an already attached third tier. The third and fourth tiers are not interchangeable. Ensure that the third tier is installed on the NGC instrument before attaching the fourth tier.

**To attach an expansion tier to the NGC instrument**

1.   On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2.   Remove all tubing lines to sample and buffer bottles and remove any bottles from the buffer tray.

3.   Lift the top off the NGC instrument and place it on the lab bench.

Other Components



**Tip:** The buffer tray can remain inside the top.

4. Locate the package that contains the expansion tier and 52" (1.32 m) connector cable.

**Important:** The cables that ship with third and fourth tiers are not interchangeable. You must use the cable that ships with the expansion tier. Inserting a third tier cable into the fourth tier connector ports will damage the cable and the ports.

- The catalog number for the 25" (63.5 cm) second-to-third tier connector cable is #100-24878.

- The catalog number for the 52" (1.32 m) third-to-fourth tier connector cable is #100-24892.

5. Carefully remove the tier from its packaging material.

6. Place the expansion tier on top of the already installed tier.

**Tip:** Although the images in this section show how to attach the fourth expansion tier to an already installed third tier, the procedure for attaching a third tier to a second tier is the same. These images are examples.



Fourth expansion tier

Previously attached third tier

7. Locate the connector cable that ships with the expansion tier.

8. View the connector ends. Each end is beveled. The direction of the bevel determines the tier into which to insert the connector:

- The end with the bevel slanting up inserts into the upper tier's connector port.

- The end with the bevel slanting down inserts into the lower tier's connector port.

Other Components



Bevel slanting down inserts into the lower tier connector port

Bevel slanting up inserts into the upper tier connector port

For example:



Fourth tier connector port

Third tier connector port

9. Firmly press the clips inward and insert the appropriate connector into the upper tier's connector port.



**Tip:** You hear a click when the connector is properly seated.





Other Components

10. Insert the other connector into the lower tier's connector port.



11. Place the top, with the buffer tray, on top of the NGC instrument and place the buffer bottles into the buffer tray.

12. Insert tubing lines into the sample and buffer bottles.

A | Maintaining the Instrument

13. Perform the following tasks:

| Task: | Refer to the section: |
|---|---|
| Insert modules into the new tier | Replacing or Repositioning Modules on the NGC Instruments on page 233 |
| Plumb the system | Plumbing NGC Systems on page 270 |
| Start the instrument | Starting the NGC Instrument on page 119 |
| Prime the system | Priming and Purging the Systems on page 123 |
| Calibrate the system | Calibrating the NGC Instrument on page 150 |

Other Components

## Replacing or Repositioning Modules on the NGC Instruments



**WARNING!**   Disconnect power to the NGC instrument before removing or repositioning any module. Do not attempt to service any component on the NGC instrument unless noted in this manual. Contact Bio-Rad for service requests.



**WARNING!**   To reduce the chance of liquid seeping into the instrument, all open bays must be filled with the NGC Blank module (catalog #788-4005). The NGC instrument will not operate if it detects a slot without a module inserted.

**To replace or reposition modules on the NGC instruments**

1.   On the touch screen, select Shut Down on the dropdown menu to exit ChromLab and shut down the NGC instrument.

2.   If necessary, disconnect all tubing lines to and from the module that you plan to replace or reposition.

3.   Loosen the captive screws on the front of the installed module.

4.   Firmly grasp both screws on the module and pull it forward out of its bay.

The following image shows an empty bay.



5.  Store the module and the screws in a safe place for future use.

    **Tip:**  If you received a replacement module from Bio-Rad, use the packaging provided with your shipment to return the damaged module to Bio-Rad.

6.  (Optional) Convert the bay to single wide or double wide.

    See Converting Bays to Fit Modules on page 237.

7.  Locate the module that you plan to install and remove it from its packaging.

Other Components

8.  The frame of the bay has tracks on the top and bottom of the right side. The module has guide rails on the top and bottom right side.

    Align the rails on the module with the tracks in the bay to properly guide it into position.

**Top of Module**                    **Bottom of Module**



9.  Place the module into the open bay and gently push it in as far as it will go.

    **Note:** Each module has an alignment pin on the back to ensure that it aligns correctly with the main communication board.

10. Ensure that the screw holes on the module align with the screw holes on the bay.

11. Insert the screws that shipped with the module into the screw holes.

12. Tighten the screws to secure the module.

A   |   Maintaining the Instrument

13.  Perform the following tasks:

| Task: | Refer to the section: |
| --- | --- |
| Plumb the system | Plumbing NGC Systems on page 270 |
| Start the instrument | Starting the NGC Instrument on page 119 |
| Prime the system | Priming and Purging the Systems on page 123 |
| Calibrate the system | Calibrating the NGC Instrument on page 150 |

Other Components

## Converting Bays to Fit Modules

Some modules fit into single-wide bays while others require double-wide bays (such as the system and sample pump modules and the UV and UV/Vis detector modules). Bays can be converted from one size to the other by adding or removing the center divider.

The following image shows two adjacent, empty, single-wide bays.



A   |   Maintaining the Instrument

**To convert a single-wide bay to a double-wide bay**

1. Complete steps 1–5 in the section To replace or reposition modules on the NGC instruments.

2. Gently lift the divider upward off of the lip to unhook it and then pull it out of the instrument.



3. Store the divider in a safe place for later use.

4. Complete steps 7–12 in the section To replace or reposition modules on the NGC instruments.

Other Components

**To convert a double-wide bay to a single-wide bay**

1.  Locate a divider.

2.  Complete steps 1–5 in the section To replace or reposition modules on the NGC instruments on page 233.

3.  Insert the top of the divider into its slot.

4.  Gently bend the divider and slide the bottom of the divider up onto the lip.

5.  Complete steps 7–12 in the section To replace or reposition modules on the NGC instruments.

 E Regulatory Information

The NGC instrument has been tested and found to be in compliance with all applicable requirements of the following safety and electromagnetic compliance standards. The NGC instrument is labeled with the following compliance marks.

## Safety Compliance

CE Mark:

- EN61010-1 Electrical Equipment for Measurement, Control, and Laboratory Use

- IEC 61010-1 Safety Requirements for Measurement, Control, and Laboratory Use, Part 1: General Requirements

cTUVus Mark:

- UL STD No. 61010-1 Electrical Equipment for Measurement, Control, and Laboratory Use, Part 1: General Requirements

- CAN/CSA C22.2 No. 61010-1-12 Safety Requirements for Measurement, Control, and Laboratory Use, Part 1: General Requirements (includes Amendment 1)

Products with these safety compliance marks are safe to use when operated in accordance with the instruction manual. This does not extend to accessories with no marks, even when used with this unit.



**Bio-Rad**
**Laboratories, Inc.**

---

*Life Science*
*Group*

**Web site** bio-rad.com  **USA** 1 800 424 6723  **Australia** 61 2 9914 2800  **Austria** 43 01 877 89019  **Belgium** 32 03 710 53 00
**Brazil** 55 11 3065 7550  **Canada** 1 905 364 3435  **China** 86 21 6169 8500  **Czech Republic** 36 01 459 6192
**Denmark** 45 04 452 10 00  **Finland** 35 08 980 422 00  **France** 33 01 479 593 00  **Germany** 49 089 3188 4393
**Hong Kong** 852 2789 3300  **Hungary** 36 01 459 6190  **India** 91 124 4029300  **Israel** 972 03 963 6050  **Italy** 39 02 49486600
**Japan** 81 3 6361 7000  **Korea** 82 2 3473 4460  **Mexico** 52 555 488 7670  **The Netherlands** 310 318 540 666
**New Zealand** 64 9 415 2280  **Norway** 47 0 233 841 30  **Poland** 36 01 459 6191  **Portugal** 351 21 4727717
**Russia** 7 495 721 14 04  **Singapore** 65 6415 3188  **South Africa** 36 01 459 6193  **Spain** 34 091 49 06 580
**Sweden** 46 08 555 127 00  **Switzerland** 41 0617 17 9555  **Taiwan** 886 2 2578 7189  **Thailand** 66 2 651 8311
**United Arab Emirates** 971 4 8187300  **United Kingdom** 44 01923 47 1301

---

10000049091 Ver C (10026253)    US/EG                                                    18-0529    0618    Sig 0118



# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# FILED UNDER SEAL

Case 1:18-cv-01899-CFC-SRF Document 196-1 Filed 12/22/20 Page 410 of 1041 PageID #: 8571
7/9/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Farah Mavandadi
Highly Confidential - Technical - Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

CYTIVA SWEDEN AB and          )
GLOBAL LIFE SCIENCES          )
SOLUTIONS USA LLC,            )
                              )
          Plaintiffs,         )
                              )
     -vs-                     )
                              )  C.A. No. 18-1899-CFC
BIO-RAD LABORATORIES,         )       CONSOLIDATED
INC.,                         )
                              )
          Defendant.          )
_____       )


**HIGHLY CONFIDENTIAL - TECHNICAL**
**ATTORNEY'S EYES ONLY**

VIDEOTAPED DEPOSITION
TAKEN REMOTELY VIA ZOOM VIDEOCONFERENCE
OF
FARAH MAVANDADI

523 JETER STREET
REDWOOD CITY, CALIFORNIA  94062
JULY 9, 2020
9:02 A.M.

REPORTED BY:
DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

1                    July 9, 2020

2          Videotaped deposition, taken remotely via

3     Zoom videoconference, of Farah Mavandadi,

4     located at 523 Jeter Street, Redwood City,

5     California  94062, reported remotely via Zoom

6     Videoconference by Debra Sapio Lyons, a

7     Registered Diplomat Reporter, a Certified

8     Realtime Reporter, a Certified Realtime

9     Captioner, a Certified LiveNote Reporter, an

10    Approved Reporter of the United States

11    District Court for the Eastern District of

12    Pennsylvania, a Certified Court Reporter of

13    the State of New Jersey, and a Notary Public

14    of the State of Delaware.

15

16

17

18

19

20

21

22

Page 3

1      (All Counsel and Participants present via Zoom

2      videoconference.)

3

4      APPEARANCES:

5

6          ARNOLD & PORTER KAYE SCHOLER LLP

           BY:  JEFFREY A. MILLER, ESQUIRE

7          3000 El Camino Real Five Palo Alto

           Square, Suite 500

8          Palo Alto, California  94306-3807

           650.319.4538

9          jeffrey.miller@arnoldporter.com

10         Attorneys for Plaintiffs

11

12         QUINN EMANUEL URQUHART & SULLIVAN, LLP

           BY:  FELIPE CORREDOR, ESQUIRE

13         50 California Street, 22nd Floor

           San Francisco, California  94111

14         415.875.6448

           felipecorredor@quinnemanuel.com

15         Attorneys for Defendant

16

17     ALSO PRESENT:

18

19         LAURA LAVERNIA, SUMMER ASSOCIATE

           ARNOLD & PORTER

20         HENRY MARTE, VIDEOGRAPHER/DOCUMENT TECH

21         DIGITAL EVIDENCE GROUP

22

7/9/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.      Farah Mavandadi
Highly Confidential - Technical - Attorneys' Eyes Only

Page 4

1                      I N D E X

2    WITNESS                                    PAGE

3    Farah Mavandadi

4     BY MR. MILLER                              15

5                    E X H I B I T S

6    NUMBER                  DESCRIPTION         PAGE

7     Exhibit 73, Plaintiffs' Notice of          20
      Deposition and Subpoena to Non-Party
8     Farah Mavandadi

9

10    Exhibit 74, e-mail correspondence          34
      bearing Bates numbers
11    BRGEDEL000300236 through
      BRGEDEL000300237

12

13    Exhibit 75, multipage document            101
      entitled ███████████████████
   █  ████████████████████████████
              ███████  bearing the Bates numbers
15    BRGE00065106 through  BRGE00065161

16

17    Exhibit 76, multipage document            126
      entitled NGC™ Medium Pressure
18    Chromatography Systems bearing Bates
      numbers BRGEDEL000246325 through
19    BRGEDEL000246360

20

21    Exhibit 77, e-mail correspondence         146
      bearing the Bates number
22    BRGEDEL000310414

Page 5

1                    E X H I B I T S

2    NUMBER                  DESCRIPTION                 PAGE

3    Exhibit 78, e-mail correspondence         157
     bearing Bates numbers

4    BRGEDEL000317118 through
     BRGEDEL000317119

5

6    Exhibit 79, e-mail correspondence         183
     bearing Bates numbers

7    BRGEDEL000285516 through
     BRGEDEL000285521

8

9    Exhibit 80, e-mail correspondence         189
     bearing Bates numbers

10   BRGEDEL000454986 through
     BRGEDEL000454987

11

12   Exhibit 81, e-mail correspondence         199
     bearing Bates numbers

13   BRGEDEL000325922

14

15   Exhibit 82, a multipage document          199
     bearing Bates numbers

16   BRGEDEL000325923 through
     BRGEDEL000325925

17

18   Exhibit 83, one-page document             209
     entitled Calendar Entry Meeting

19   bearing Bates number BRGEDEL000346234

20

21

22

Page 6

```
 1               E X H I B I T S

 2   NUMBER                DESCRIPTION              PAGE

 3   Exhibit 84, e-mail correspondence        214
     bearing Bates numbers

 4   BRGEDEL000436636 through
     BRGEDEL000436642

 5

 6   Exhibit 85, multipage document           216
     entitled TTT AKTA™ pure, Advanced

 7   configurations bearing Bates numbers
     BRGEDEL000436643 through

 8   BRGEDEL000436664

 9

10   Exhibit 86, e-mail correspondence        219
     bearing Bates numbers

11   BRGEDEL000175721 through
     BRGEDEL000175724

12

13   Exhibit 87, e-mail correspondence        222
     bearing the Bates number

14   BRGEDEL000316529

15

16   Exhibit 88, e-mail correspondence        227

17   bearing Bates number BRGEDEL000316533

18

19   Exhibit 89, multipage document           234
     entitled ██████████████ bearing

20   Bates numbers BRGEDEL000448581

21   through BRGEDEL000448613

22
```

Page 7

1                  E X H I B I T S

2   NUMBER                    DESCRIPTION                PAGE

3   Exhibit 90, multipage document              238
    entitled AKTA pure Protein

4   Purification your way bearing Bates
    numbers BRGEDEL000261366 through

5   BRGEDEL000261396

6

7   Exhibit 91, multipage document              242
    entitled AKTA™ pure Protein

8   purification your way bearing Bates
    numbers BRGEDEL000263336 through

9   BRGEDEL000263377

10

11  Exhibit 92, multipage document              244
    entitled TTT AKTA™ PURE System

12  Introduction bearing Bates numbers
    BRGEDEL000265458 through

13  BRGEDEL000265494

14

15  Exhibit 93, multipage document              245
    entitled TTT AKTA™ pure UNICORN™ 6.3

16  Your interface to AXCELLENCE bearing
    the Bates numbers BRGEDEL000439607

17  through BRGEDEL000439643

18

19  Exhibit 94, multipage document              246
    entitled AKTA™ pure Protein

20  purification your way bearing the

21  Bates numbers BRGEDEL000440176

22  through BRGEDEL000440229

Page 8

```
 1                    E X H I B I T S
 2   NUMBER                DESCRIPTION              PAGE
 3   Exhibit 95, multipage document              247
     entitled Service Products bearing the
 4   Bates numbers BRGEDEL000441677
     through BRGEDEL000441697
 5
 6   Exhibit 96, multipage document              248
     entitled Life Sciences Validation
 7   Services AKTA™ pure Validation
     Services bearing Bates numbers
 8   BRGEDEL000442435 through
     BRGEDEL000442452
 9
10   Exhibit 97, multipage document              249
     entitled TTT AKTA™ pure Protein
11   purification using AKTA™ pure
     Additional automation bearing Bates
12   numbers BRGEDEL000442885 through
13   BRGEDEL000442924
14
15   Exhibit 98, two-page document               250
     entitled AKTA™ pure, There's an AKTA™
16   pure for everyone., bearing the Bates
     numbers BRGEDEL000262459 through
17   BRGEDEL000262460
18
19
20
21
22
```

7/9/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Farah Mavandadi
Highly Confidential - Technical - Attorneys' Eyes Only

Page 9

```
 1               PREVIOUSLY MARKED EXHIBITS
 2    NUMBER                  DESCRIPTION              PAGE
 3    Exhibit Iovanni-3, multipage document            43
      entitled ███████████████████████████
      ███████████████████████████
      ████████████████████████████████████████
 5    bearing Bates numbers BRGE00006279
      through BRGE00006301
 6
 7    Exhibit Iovanni-4, multipage document            65
      entitled █████████████████████████
      █████████████████████████████████
      ██████████ bearing Bates numbers
 9    BRGEDEL000288592 through
      BRGEDEL000288623
10
11    Exhibit Iovanni-5, multipage document            70
      entitled ████████████████████
      ████████████████████████████████████
      ████████████████ bearing Bates numbers
13    BRGE00065053 through BRGE00065075
14
15    Exhibit Iovanni-6, multipage document            73
      entitled █████████████████████████████
      ██████████████████████████ bearing
      Bates numbers BRGE00006302 through
17    BRGE00006305
18
19    Exhibit Iovanni-7, one-page document             77
      entitled ██████████████████████████
      ██████████████████████████████
      ████████████████ bearing Bates number
22    BRGE00065076
```

7/9/2020        Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.        Farah Mavandadi
Highly Confidential - Technical - Attorneys' Eyes Only

Page 10

1                    PREVIOUSLY MARKED EXHIBITS
2    NUMBER                    DESCRIPTION                    PAGE
3    Exhibit Iovanni-10, multipage                           80
     document entitled ███████████████
     █████████████████████████████████████
            ██████ bearing Bates numbers
5    BRGE00006470 through BRGE00006479
6
7    Exhibit Iovanni-16, multipage                           81
     document entitled ████████████████
     ████████████████████████████████████
            ██████ bearing Bates numbers
9    BRGE00065080 through BRGE00065089
10
11   Exhibit Iovanni-27, multipage                           85
     document entitled █████████████████
     ██████████████████████████████ bearing Bates
     ████████████████████ numbers BRGE00016955 through
     BRGE00016987
14
15   Exhibit Iovanni-25, e-mail                              92
     correspondence bearing Bates numbers
16   BRGEDEL000341332 through
     BRGEDEL000341334
17
18   Exhibit Iovanni-30, multipage                           96
     document entitled █████████████████
     ████████████████████████████████████
            ██████ bearing Bates numbers
20   BRGEDEL000014644 through
21   BRGEDEL000014657
22

Page 11

1                    PREVIOUSLY MARKED EXHIBITS

2    NUMBER                    DESCRIPTION                PAGE

3    Exhibit Iovanni-29, multipage              111
     document bearing Bates numbers

4    BRGEDEL000401625 through
     BRGEDEL000401658

5

6    Exhibit Iovanni-31, multipage              116
     document entitled █████████████

     ████████████████████████████

     bearing Bates numbers

8    BRGEDEL000401312 through

9    BRGEDEL000401330

10

11   Exhibit Iovanni-33, multipage              122
     document bearing Bates numbers

12   BRGE00034403 through BRGE00034417

13

14   Exhibit Iovanni-35, e-mail                 171
     correspondence bearing Bates numbers

15   BRGEDEL000300620

16

17   Exhibit Iovanni-36 multipage document      171
     entitled ████████████████████

     ████████████        bearing Bates number

     BRGEDEL000300621 through

19   BRGEDEL000300645

20

21

22

Page 12

1                    PREVIOUSLY MARKED EXHIBITS

2      NUMBER                 DESCRIPTION                 PAGE

3       Exhibit Iovanni-37, e-mail              192
        correspondence bearing Bates numbers

4       BRGEDEL000421000 through
        BRGEDEL000421001

5

6       Exhibit Iovanni-40, e-mail              194
        correspondence bearing Bates numbers

7       BRGEDEL000201040 through

8       BRGEDEL000201041

9

10      Exhibit Iovanni-39, e-mail              202
        correspondence bearing Bates numbers

11      BRGEDEL000393786 through

12      BRGEDEL000393789

13

14

15

16

17

18

19

20

21      (Reporter's Note:   Exhibits were digitally

22        marked by Document Technician.)

Page 13

1                    THE VIDEOGRAPHER:  Okay.  We are

2           now on the record.  My name is Henry

3           Marte, I'm a videographer on behalf of

4           Digital Evidence Group.  Today's date is

5           July 9th, 2020 and the time is 9:02 a.m.

6                    This deposition is being held via

7           remote Zoom in the matter of Cytiva

8           Sweden AB, et al., versus Bio-Rad

9           Laboratories, Inc.  The deponent today

10          is Dr. Farah Mavandadi.  All appearances

11          are noted on the stenographic record.

12                   Will the court reporter please

13          administer the oath to the witness?

14                   THE REPORTER:  Counsel, before

15          swearing in the witness I have a

16          statement to put on the record.

17                   The attorneys participating in

18          this deposition acknowledge that due to

19          the severity of COVID-19 and following

20          the practice of social distancing, I am

21          not physically present in the deposition

22          room and I will be swearing in the

Page 14

1       witness and reporting this deposition

2       remotely.

3              Do all parties stipulate to the

4       validity of this remote swearing and

5       remote reporting via video conference

6       and that it will be admissible in the

7       courtroom as if it had been taken

8       following Rule 30 and other rules of the

9       Federal Rules of Civil Procedures?

10             MR. MILLER:  This is Jeffrey

11      Miller for the Plaintiffs, we -- we

12      agree.

13             MR. CORREDOR:  Felipe Corredor

14      for Defendant Bio-Rad, we agree as well.

15                    - - -

16             FARAH MAVANDADI, having been

17      first duly sworn, was examined and

18      testified as follows:

19                    - - -

20             THE REPORTER:  Thank you.

21             You may proceed.

22             MR. MILLER:  Thank you.

Page 105

1            MR. CORREDOR:  Objection.

2    BY MR. MILLER:

3        Q.     -- is that correct?

4            MR. CORREDOR:  Objection to the

5       form.

6            THE WITNESS:  That's what it

7       appears to be.

8            Again, there were some elements,

9       not everything we had thought about.

10   BY MR. MILLER:

11       Q.     Could you go to BRGE65119,

12   please?

13       A.     I am there.

14       Q.     At the very top there's a

15   sentence that says,



Page 106



Page 107



3    BY MR. MILLER:

4          Q.     Was the AKTA avant a -- an

5    automated liquid chromatography system?

6               MR. CORREDOR:  Objection to the

7          form.

8               THE WITNESS:  I believe so.

9    BY MR. MILLER:

10         Q.     Could you go to BRGE65132?

11              Are you there?  It's on the

12   screen for you.

13         A.     Yes, I'm there.

14         Q.

Page 254

1                    CERTIFICATE

2

3        I, Debra Sapio Lyons, a Registered
Diplomat Reporter, a Certified Realtime
4   Reporter, a Certified Realtime Captioner, an
Approved Reporter of the United States
5   District Court for the Eastern District of
Pennsylvania, a Certified Court Reporter for
6   the State of New Jersey; and Notary Public do
hereby certify:

7        That Farah Mavandadi, the witness whose
deposition is hereinbefore set forth, appeared
8   remotely via Zoom videoconference, was
remotely sworn by me and that such deposition
9   is a true record of the testimony given by
such witness, to the best of my ability and
10   thereafter reduced to typewriting under my
direction.

11        I further certify that I am not related to
any of the parties to this action by blood or
12   marriage and that I am in no way interested in
the outcome of the matter.

13        In witness whereof, I have hereunto set my
hand this 23rd day of July, 2020.

14

15

16

17

18

19

20        DEBRA SAPIO LYONS
CRR, RDR, CRC, CCR, CPE
21

22

# EXHIBIT 10

# FILED UNDER SEAL

Case 1:18-cv-01899-CFC-SRF  Document 196-1  Filed 12/22/20  Page 429 of 1041 PageID #: 8590

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____
                                )
GE HEALTHCARE                   )
BIO-SCIENCES AB and             )
GLOBAL LIFE SCIENCES            )
SOLUTIONS USA LLC,              )
                                )
          Plaintiffs,           )
                                )   C.A. No. 18-1899-CFC
     -vs-                       )        CONSOLIDATED
                                )
BIO-RAD LABORATORIES,           )
INC.,                           )
                                )
          Defendant.            )
_____


**HIGHLY CONFIDENTIAL - TECHNICAL**
**ATTORNEY'S EYES ONLY**

VIDEOTAPED DEPOSITION
TAKEN REMOTELY VIA ZOOM VIDEOCONFERENCE
OF
WAYNE CARLISLE BLAND

415 CAPITOL WAY NORTH
OLYMPIA, WASHINGTON  98501
JULY 7, 2020
9:02 A.M.

REPORTED BY:
DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE
_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

```
 1                    July 7, 2020

 2        Videotaped deposition, taken remotely via

 3   Zoom videoconference, of Wayne Carlisle Bland,

 4   located at 415 Capitol Way North, Olympia,

 5   Washington  98501, reported remotely via Zoom

 6   Videoconference by Debra Sapio Lyons, a

 7   Registered Diplomat Reporter, a Certified

 8   Realtime Reporter, a Certified Realtime

 9   Captioner, a Certified LiveNote Reporter, an

10   Approved Reporter of the United States

11   District Court for the Eastern District of

12   Pennsylvania, a Certified Court Reporter of

13   the State of New Jersey, and a Notary Public

14   of the State of Delaware.

15

16

17

18

19

20

21

22
```

```
                                                          Page 3
 1    (All Counsel and Participants present via Zoom
 2    videoconference.)
 3
 4    APPEARANCES:
 5        ARNOLD & PORTER KAYE SCHOLER LLP
          BY:  JEFFREY A. MILLER, ESQUIRE
 6        3000 El Camino Real Five Palo Alto
          Square, Suite 500
 7        Palo Alto, California  94306-3807
          650.319.4538
 8        jeffrey.miller@arnoldporter.com
          Attorneys for Plaintiffs
 9
10        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY:  FELIPE CORREDOR, ESQUIRE
11        50 California Street, 22nd Floor
          San Francisco, California  94111
12        415.875.6448
          felipecorredor@quinnemanuel.com
13        Attorneys for Defendant
14
15    ALSO PRESENT:
16
17        JOHN CASSINGHAM, ESQUIRE
          BIO-RAD LABORATORIES, INC.
18        HENRY MARTE, VIDEOGRAPHER/DOCUMENT TECH
          DIGITAL EVIDENCE GROUP
19
20
21
22
```

Page 4

```
 1                    I N D E X

 2   WITNESS                              PAGE

 3   Wayne Carlisle Bland

 4    BY MR. MILLER                       11

 5               E X H I B I T S

 6   NUMBER          DESCRIPTION          PAGE

 7    Exhibit 45, Plaintiff's Notice of   17

      Deposition and Subpoena to Non-Party

 8   Wayne Bland

 9

10    Exhibit 46, a multipage document    94

      entitled ███████████████████████

██        █████████  bearing Bates numbers

      BRGEDEL000441628 through

12    BRGEDEL000441653

13

14    Exhibit 47, a multipage document    102

      entitled Hardware Specification

15   bearing Bates numbers BRGE00096078

      through BRGE00096094

16

17    Exhibit 48, a multipage document    120

      entitled ████████████████████████████

██        █████████████  bearing Bates number

      BRGEDEL000001507 through

19   BRGEDEL000001540

20

21

22
```

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 5

1                    E X H I B I T S

2   NUMBER                    DESCRIPTION                    PAGE

3   Exhibit 49, a multipage document          122
    entitled ███████████████████████
    ██  ██████████████████ bearing Bates number
    BRGEDEL000000972 through
5   BRGEDEL000001007

6

7   Exhibit 50, a multipage document          126
    entitled Hardware Specification
8   bearing Bates numbers
    BRGEDEL000450595 through
9   BRGEDEL000450610

10

11  Exhibit 51, a multipage document          135
    entitled ██████████████████████
    ██  █████████████████████ bearing
    Bates number BRGEDEL000001234 through
13  BRGEDEL000001260

14

15  Exhibit 52, a multipage document          137
    entitled ████████████████████████████
16  bearing Bates numbers
    BRGEDEL000282551 through
17  BRGEDEL000282564

18

19  Exhibit 53, a multipage document          149
    entitled █████████████████████████
    ██  ███████████████████ bearing
21  the Bates numbers BRGEDEL000001650
22  through BRGEDEL000001693

```
                                                           Page 6
 1                      E X H I B I T S
 2    NUMBER                  DESCRIPTION              PAGE
 3    Exhibit 54, a multipage document           157
      entitled ███████████████████████
 4    bearing Bates numbers
      BRGEDEL000281529 through
 5    BRGEDEL000281542
 6
 7    Exhibit 55, a multipage document           164
      entitled ████████████████████████
 ██   ████████████████████████  bearing
      Bates number BRGEDEL000001346 through
 9    BRGEDEL000001379
10
11    Exhibit 56, a multipage document           168
      entitled Hardware Specification
12    bearing Bates numbers
      BRGEDEL000450743 through
13    BRGEDEL000450757
14
15    Exhibit 57, multipage document             172
      entitled ███████████████████████
 ██   ████████████████████████  bearing the
      Bates Number BRGEDEL000001261 through
17    BRGEDEL000001286
18
19    Exhibit 58, a multipage document           174
      entitled Hardware Specification
20    bearing the Bates Number
21    BRGEDEL000451786 through
22    BRGEDEL000451802
```

7/7/2020        GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.        Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 7

```
 1              E X H I B I T S
 2   NUMBER              DESCRIPTION              PAGE
 3   Exhibit 59, a multipage document            179
     entitled ███████████████████
     ████████████████  bearing the Bates
     numbers BRGEDEL000001405 through
 5   BRGEDEL000001439
 6
 7   Exhibit 60, e-mail correspondence           184
     bearing Bates number BRGEDEL98220
 8
 9   Exhibit 61, multipage document              185
     entitled █████████████████████
     █████████████████████
     bearing Bates numbers
11   BRGEDEL000098221 through
     BRGEDEL000098242
12
13   Exhibit 62, multipage document              186
     entitled █████████████████████
     █████████████████████
     bearing Bates numbers
15   BRGEDEL000098243 through
     BRGEDEL000098262
16
17   Exhibit 63, multipage document              186
     entitled ████████████████████
     ████████  bearing the Bates numbers
     BRGEDEL000098263 through
19   BRGELDEL000098270
20
21
22
```

Page 8

```
1                    E X H I B I T S
2   NUMBER                DESCRIPTION              PAGE
3   Exhibit 64, multipage document               187
    entitled ███████████████████████████
    ██████████████████████████████
        ██████████  bearing the Bates numbers
5   BRGEDEL000098271 through
    BRGEDEL000098314

6

7            PREVIOUSLY MARKED EXHIBITS
8   NUMBER                DESCRIPTION              PAGE
9   Exhibit Iovanni-6, a multipage               40
    document entitled ████████████████
    ███████████████████████████████
        ██████████  bearing Bates numbers
11  BRGE00006302 through BRGE00006305

12

13  Exhibit Iovanni-30, a multipage              54
    document entitled █████████████████████
    ███████████████████████████████████
        █████████ bearing Bates numbers
15  BRGEDEL000014644 through
    BRGEDEL000014657

16

17  Exhibit Iovanni-10, a multipage              57
    document entitled ████████████████████
    ████████████████████████████████████
        ████████, bearing Bates numbers
19  BRGE00006470 through BRGE00006479
20
21
22
```

Page 9

1                PREVIOUSLY MARKED EXHIBITS

2    NUMBER                DESCRIPTION              PAGE

3    Exhibit Iovanni-29, a multipage              73
     document entitled Technical

4    Specification bearing Bates number
     BRGEDEL000401625 through

5    BRGEDEL000401658

6

7    Exhibit Iovanni-44, United States           196
     Patent No. 10,401,335

8

9    Exhibit Iovanni-35, e-mail                   209
     correspondence bearing Bates number

10   BRGEDEL000300620

11

12   Exhibit Iovanni-36, multipage               209
     document entitled ███████████████
     ████████████████  bearing Bates
     numbers BRGEDEL000300621 through

14   BRGEDEL000300645

15

16   Exhibit Iovanni-39, e-mail                   217
     correspondence bearing Bates numbers

17   BRGEDEL000393786 through
     BRGEDEL000393789

18

19

20

21   (Reporter's Note:   Exhibits were digitally

22    marked by Document Technician.)

Page 10

1                THE VIDEOGRAPHER:  Okay.  We are

2        now on the record.  My name is Henry

3        Marte, videographer on behalf of Digital

4        Evidence Group.

5                Today's date is July 7th, 2020

6        and the time is 9:02 a.m. Pacific time.

7        This is in the matter of GE Healthcare

8        Bio-Sciences, AB et al., versus Bio-Rad

9        Laboratories, Inc.  The deponent today

10        is Wayne Bland.  All appearances are

11        noted on the stenographic record.

12                Would the court reporter please

13        administer the oath to the witness?

14                THE REPORTER:  Counsel, before

15        swearing in the witness, I have a

16        statement to put on the record.

17                The attorneys participating

18        this -- in this deposition acknowledge

19        that due to the severity of COVID-19 and

20        following the practice of social

21        distancing, I am not physically present

22        in the deposition room and that I will

Page 11

1          be swearing in the witness and reporting

2          this deposition remotely.

3                    Do all parties stipulate to the

4          validity of this remote swearing and

5          remote reporting via video conference,

6          and that it will be admissible in the

7          courtroom as if it had been taken

8          following Rule 30 and other rules of the

9          Federal Rules of Civil Procedures?

10                   MR. MILLER:  Jeffrey Miller, I

11         agree.

12                   MR. CORREDOR:  Felipe Corredor

13         for Defendant Bio-Rad, we agree as well.

14                   WAYNE CARLISLE BLAND, having been

15         first duly sworn, was examined and

16         testified as follows:

17                   THE REPORTER:  Thank you.

18                   You may proceed.

19    EXAMINATION

20    BY MR. MILLER:

21         Q.    Good morning, Mr. Bland.

22         A.    Good morning.

Page 35



1   had a -- let me start again.

2              Did each of the modules have a

3   CPU on them?

4        A.    They had -- they had -- yeah,

5   we'll call it a CPU.

6        Q.



Page 37

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
                    Highly Confidenital - Technical - Attorney's Eyes Only



7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 39

1

19          Q.      Uh-huh.   Thank you.

20                  And do you recall

21   approximately -- well, scratch that.

22                  When the first -- when the

Page 85

1        Q.      Yeah.

2        A.      Okay.  All right.

3        Q.      Yeah.  Let me make it clear so

4    it -- we get a complete question.





Page 86

1    BY MR. MILLER:

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only



Page 97

1    BY MR. MILLER:

2         Q.     If we could go to page

3    BRGEDEL40001642, which is Page 18 of Exhibit

4    29, and I'm looking -- looking at Row U.  It

5    says, ███████████████████████████████

███████████████    ████████████████

██    ███████

██    ██    ██████████████████

██  ██████████████████████████████

██                ████████████████████████

██  █████████████████████████████

██    ██    ████████

██    ██    █████████

██                ████████████████████████

██  ████████████████████████

██    ██    ██████

██    ██    ██████    █████████

██  █████████████████████████████

██  █████████████████████████████

██  ███████████████████████

██  █████████████████████████████

██  ███████████



Page 98

1          Do you see that?

2     A.     I do.

3     Q.

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only



7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.      Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 100



Page 101

1     ████████████████

2                    MR. MILLER:  Why don't we mark as

3           the next exhibit, a document bearing the

4           Bates number BRGE96078.  This will be

5           Exhibit 47.

6                    Let me make it more clear.  So

7           we'll -- let's mark as Exhibit 47 the

8           document bearing Bates number BRGE96078

9           through BRGE96094.

10                   Let us know when that gets there.

11                   THE VIDEOGRAPHER:  Give me --

12          give me one second, all right?

13                   Okay.  So I have 96078.  Is that

14          what you're looking for?

15                   MR. MILLER:  BRGE, not BRGEDEL.

16                   You don't have it?

17                   THE VIDEOGRAPHER:  Yeah.  I don't

18          see that number here.

19                   MR. MILLER:  Can we go off the

20          record for a second?

21                   MR. CORREDOR:  Sure.

22                   THE VIDEOGRAPHER:  All right.

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.        Wayne Bland
                        Highly Confidential - Technical - Attorney's Eyes Only

Page 104

1       go.

2    BY MR. MILLER:

3       Q.     So this particular page of

4    Exhibit 47 states "Product Description."  Do

5    you see that?

6       A.     I do.

7       Q.     And about halfway down the page

8    there's two lines.  One says, "Analytical

9    range," and the other one says, "Preparative

10   range."  Do you see that?

11      A.     I do.

12      Q.     Do you know what the -- do you

13   have an understanding as to what those

14   specifications are referring to?

15             MR. CORREDOR:  Objection, form.

16             THE WITNESS:  Go ahead.

17   BY MR. MILLER:

18      Q.     You can answer.

19      A.     Okay.

20             Yes, in the chromatography field,

21   and also in the scientific field, it's --

22   these are types of analysis that are ran and

Page 105

1   one is more precise than the other.

2        Q.     Further down there's a line that

3   states [as read]:



7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only



Page 107

Page 108



14   BY MR. MILLER:

15        Q.   Why don't we go to the next page

16   of Exhibit 47 which is BRGEE96082.

17        A.   Okay.

18        Q.   And there I'm looking at the --

19

21   that?

22        A.   I do.

Page 109

1      Q.     I'm not so much interested in

2   that, but the comment where it says



21   BY MR. MILLER:

22      Q.     Let's go to Page 6, which is

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 110



1     BRGE6083.

2          A.     Okay.

3          Q.

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
                        Highly Confidenital - Technical - Attorney's Eyes Only



Page 128

1   ███████████████████████████

██   ████   █████████████████████

██   ███████████████████████

4        Q.     Why don't we go to BRGEDEL450598?

5        A.     Okay.

6               MR. MILLER:  Henry, are you

7        there?

8               THE VIDEOGRAPHER:  I am.  I'm

9        just looking for the document.

10              MR. MILLER:  Okay.  Well, let's

11       keep going here.

12   BY MR. MILLER:

13       Q.     ██████████████████████████

██   ███████████████████████████████████

██   ███████████████████████████████████

██   ██████████████████████████████

██   ████████████████   Do you see that?

18              MR. CORREDOR:  Object to the

19       form.

20              THE WITNESS:  Where are you at?

21   BY MR. MILLER:

22       Q.     BRGEDEL450598, which is Page 4.

Page 129

1          A.     Okay.  Oh, right.  Okay.

2          Q.     █████████████████████████

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only



Page 130

17          THE REPORTER:  You'll need to

18     repeat your objection.

19          MR. CORREDOR:  Object to the

20     form.

21  BY MR. MILLER:

22          Q.    Can we go to BRGEDEL450601?

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 131



1          A.        Okay.

2          Q.        The first -- or excuse me.





Page 144

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 145

1      you see that?

2            Mr. Bland, do you see what I'm

3      looking at?

4            A.     No, sorry.   I was in the wrong

5      one.

6            Yes, I do.

7            Q.



Case 1:18-cv-01899-CFC-SRF   Document 196-1   Filed 12/22/20   Page 468 of 1041 PageID #: 8629

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
                        Highly Confidenital - Technical - Attorney's Eyes Only

Page 150

1        Q.      Yes.

2        A.      Not yet.

3               THE VIDEOGRAPHER:  Yeah, it's a

4        -- it's a bit big, so it's still

5        uploading.

6               THE WITNESS:  Oh, okay.

7               THE VIDEOGRAPHER:  Okay.  Refresh

8        now.

9               THE WITNESS:  Okay.

10   BY MR. MILLER:

11       Q.      Can you identify Exhibit 53 for

12   us, please?

13       A.      Yes, this is



7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
                        Highly Confidenital - Technical - Attorney's Eyes Only

Page 151



Page 152



Case 1:18-cv-01899-CFC-SRF   Document 196-1   Filed 12/22/20   Page 471 of 1041 PageID #: 8632
7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only



7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.        Wayne Bland
                        Highly Confidenital - Technical - Attorney's Eyes Only



Page 154



Page 155

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 156





Page 193

Page 194



Page 195



Page 196



13          MR. MILLER:  Can we provide the

14    witness with the -- with what's been

15    previously marked as Exhibit 44, please.

16          (Exhibit Iovanni-44, United

17    States Patent No. 10,401,335 was

18    previously marked for identification.)

19  BY MR. MILLER:

20          Q.    Can you identify Exhibit 44 for

21    us, please?

22          A.    I don't see it.

Page 197

1      Q.    Oh.

2            THE VIDEOGRAPHER:  So it's --

3      it's up.  It doesn't start with an "E"

4      so...

5            MR. MILLER:  Yeah, this is --

6            THE VIDEOGRAPHER:  It's Iovanni

7      Exhibit 44.  You should --

8            THE WITNESS:  Ah.

9            THE VIDEOGRAPHER:  -- refresh

10     your page.

11           THE WITNESS:  No.

12           THE VIDEOGRAPHER:  You got it?

13           THE WITNESS:  Did you just upload

14     it?

15           THE VIDEOGRAPHER:  I did.  Well,

16     about ten seconds ago or more.

17           THE WITNESS:  Oh, okay.  I

18     thought it was an older document.  Oh,

19     okay.

20           Okay.  I have it up.

21   BY MR. MILLER:

22     Q.    Can you identify Exhibit 44 for

7/7/2020          GE Healthcare Bio-Sciences AB, et al. v. Bio-Rad Labs, Inc.          Wayne Bland
Highly Confidenital - Technical - Attorney's Eyes Only

Page 222

                              CERTIFICATE

1

2

3          I, Debra Sapio Lyons, a Registered
Diplomat Reporter, a Certified Realtime
4   Reporter, a Certified Realtime Captioner, an
Approved Reporter of the United States
5   District Court for the Eastern District of
Pennsylvania, a Certified Court Reporter for
6   the State of New Jersey; and Notary Public for
the State of Delaware do hereby certify:

7

8          That Wayne Carlisle Bland, the witness
whose deposition is hereinbefore set forth,
9   was duly sworn by me and that such deposition
is a true record of the testimony given by
10  such witness, to the best of my ability and
thereafter reduced to typewriting under my
11  direction.

12

13         I further certify that I am not related to
any of the parties to this action by blood or
14  marriage and that I am in no way interested in
the outcome of the matter.
15         In witness whereof, I have hereunto set my
16  hand this 19th day of July, 2020.

17

18

19

20         _____
       DEBRA SAPIO LYONS
21     CRR, RDR, CRC, CCR, CPE

22

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 12

# FILED UNDER SEAL

# EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

# FILED UNDER SEAL

# EXHIBIT 16

# FILED UNDER SEAL

# EXHIBIT 17

# FILED UNDER SEAL

# EXHIBIT 18



# Low Power, Precision Analog Microcontroller, Dual Sigma-Delta ADCs, Flash/EE, ARM7TDMI

Data Sheet

# ADuC7060/ADuC7061

## FEATURES

**Analog input/output**
Dual (24-bit) ADCs
Single-ended and differential inputs
Programmable ADC output rate (4 Hz to 8 kHz)
Programmable digital filters
Built-in system calibration
Low power operation mode
  Primary (24-bit) ADC channel
    2 differential pairs or 4 single-ended channels
    PGA (1 to 512) input stage
    Selectable input range: ±2.34 mV to ±1.2 V
    30 nV rms noise
  Auxiliary (24-bit) ADC: 4 differential pairs or 7 single-ended channels
On-chip precision reference (±10 ppm/°C)
Programmable sensor excitation current sources
  200 µA to 2 mA current source range
Single 14-bit voltage output DAC
**Microcontroller**
ARM7TDMI core, 16-/32-bit RISC architecture
JTAG port supports code download and debug
Multiple clocking options
**Memory**
32 kB (16 kB × 16) Flash/EE memory, including 2 kB kernel
4 kB (1 kB × 32) SRAM
**Tools**
In-circuit download, JTAG based debug
Low cost, QuickStart™ development system
**Communications interfaces**
SPI interface (5 Mbps)
  4-byte receive and transmit FIFOs
UART serial I/O and I²C (master/slave)
**On-chip peripherals**
4× general-purpose (capture) timers including
  Wake-up timer
  Watchdog timer
Vectored interrupt controller for FIQ and IRQ
  8 priority levels for each interrupt type
  Interrupt on edge or level external pin inputs
16-bit, 6-channel PWM
**General-purpose inputs/outputs**
Up to 14 GPIO pins that are fully 3.3 V compliant
**Power**
AVDD/DVDD specified for 2.5 V (±5%)
Active mode: 2.74 mA (@ 640 kHz, ADC0 active)
10 mA (@ 10.24 MHz, both ADCs active)

**Packages and temperature range**
Fully specified for −40°C to +125°C operation
  32-lead LFCSP (5 mm × 5 mm)
  48-lead LFCSP and LQFP
**Derivatives**
  32-lead LFCSP (ADuC7061)
  48-lead LQFP and 48-lead LFCSP (ADuC7060)

## APPLICATIONS

Industrial automation and process control
Intelligent, precision sensing systems, 4 mA to 20 mA
  loop-based smart sensors

## GENERAL DESCRIPTION

The ADuC7060/ADuC7061 series are fully integrated, 8 kSPS, 24-bit data acquisition systems incorporating high performance multichannel sigma-delta (Σ-Δ) analog-to-digital converters (ADCs), 16-bit/ 32-bit ARM7TDMI® MCU, and Flash/EE memory on a single chip.

The ADCs consist of a primary ADC with two differential pairs or four single-ended channels and an auxiliary ADC with up to seven channels. The ADCs operate in single-ended or differential input mode. A single-channel buffered voltage output DAC is available on chip. The DAC output range is programmable to one of four voltage ranges.

The devices operate from an on-chip oscillator and a PLL generating an internal high frequency clock up to 10.24 MHz. The microcontroller core is an ARM7TDMI, 16-bit/32-bit RISC machine offering up to 10 MIPS peak performance; 4 kB of SRAM and 32 kB of nonvolatile Flash/EE memory are provided on chip. The ARM7TDMI core views all memory and registers as a single linear array.

The ADuC7060/ADuC7061 contains four timers. Timer1 is a wake-up timer with the ability to bring the part out of power saving mode. Timer2 is configurable as a watchdog timer. A 16-bit PWM with six output channels is also provided. The ADuC7060/ADuC7061 contains an advanced interrupt controller. The vectored interrupt controller (VIC) allows every interrupt to be assigned a priority level. It also supports nested interrupts to a maximum level of eight per IRQ and FIQ. When IRQ and FIQ interrupt sources are combined, a total of 16 nested interrupt levels is supported. On-chip factory firmware supports in-circuit serial download via the UART serial interface ports and nonintrusive emulation via the JTAG interface. The parts operate from 2.375 V to 2.625 V over an industrial temperature range of −40°C to +125°C.

Rev. F                                    Document Feedback
Information furnished by Analog Devices is believed to be accurate and reliable. However, no responsibility is assumed by Analog Devices for its use, nor for any infringements of patents or other rights of third parties that may result from its use. Specifications subject to change without notice. No license is granted by implication or otherwise under any patent or patent rights of Analog Devices. Trademarks and registered trademarks are the property of their respective owners.

One Technology Way, P.O. Box 9106, Norwood, MA 02062-9106, U.S.A.
Tel: 781.329.4700      ©2009–2017 Analog Devices, Inc. All rights reserved.
Technical Support                                    www.analog.com

**ADuC7060/ADuC7061**       Data Sheet

# PROCESSOR REFERENCE PERIPHERALS

## INTERRUPT SYSTEM

There are 15 interrupt sources on the ADuC7060/ADuC7061 that are controlled by the interrupt controller. All interrupts are generated from the on-chip peripherals, except for the software interrupt (SWI), which is programmable by the user. The ARM7TDMI CPU core recognizes interrupts as one of two types only: a normal interrupt request (IRQ) or a fast interrupt request (FIQ). All the interrupts can be masked separately.

The control and configuration of the interrupt system are managed through a number of interrupt related registers. The bits in each IRQ and FIQ register represent the same interrupt source, as described in Table 65.

Each ADuC7060/ADuC7061 contains a vectored interrupt controller (VIC) that supports nested interrupts up to eight levels. The VIC also allows the programmer to assign priority levels to all interrupt sources. Interrupt nesting needs to be enabled by setting the ENIRQN bit in the IRQCONN register. A number of extra MMRs are used when the full vectored interrupt controller is enabled.

Immediately save IRQSTA/FIQSTA upon entering the interrupt service routine (ISR) to ensure that all valid interrupt sources are serviced.

**Table 65. IRQ/FIQ MMR Bit Designations**

| Bit | Description | Comments |
|-----|-------------|----------|
| 0 | All interrupts OR'ed (FIQ only) | This bit is set if any FIQ is active |
| 1 | Software interrupt | User programmable interrupt source |
| 2 | Undefined | This bit is not used |
| 3 | Timer0 | General-Purpose Timer0 |
| 4 | Timer1 or wake-up timer | General-Purpose Timer1 or wake-up timer |
| 5 | Timer2 or watchdog timer | General-Purpose Timer2 or watchdog timer |
| 6 | Timer3 or STI timer | General-Purpose Timer3 |
| 7 | Undefined | This bit is not used |
| 8 | Undefined | This bit is not used |
| 9 | Undefined | This bit is not used |
| 10 | ADC | ADC interrupt source bit |
| 11 | UART | UART interrupt source bit |
| 12 | SPI | SPI interrupt source bit |
| 13 | XIRQ0 (GPIO IRQ0) | External Interrupt 0 |
| 14 | XIRQ1 (GPIO IRQ1) | External Interrupt 1 |
| 15 | I²C master IRQ | I²C master interrupt source bit |
| 16 | I²C slave IRQ | I²C slave interrupt source bit |
| 17 | PWM | PWM trip interrupt source bit |
| 18 | XIRQ2 (GPIO IRQ2) | External Interrupt 2 |
| 19 | XIRQ3 (GPIO IRQ3) | External Interrupt 3 |

## IRQ

The IRQ is the exception signal to enter the IRQ mode of the processor. It services general-purpose interrupt handling of internal and external events.

All 32 bits are logically OR'ed to create a single IRQ signal to the ARM7TDMI core. The four 32-bit registers dedicated to IRQ are described in the following sections.

### IRQSIG

IRQSIG reflects the status of the different IRQ sources. If a peripheral generates an IRQ signal, the corresponding bit in the IRQSIG is set; otherwise, it is cleared. The IRQSIG bits clear when the interrupt in the particular peripheral is cleared. All IRQ sources can be masked in the IRQEN MMR. IRQSIG is read only.

**IRQSIG Register**

| | |
|---|---|
| Name: | IRQSIG |
| Address: | 0xFFFF0004 |
| Default value: | Undefined |
| Access: | Read only |

### IRQEN

IRQEN provides the value of the current enable mask. When a bit is set to 1, the corresponding source request is enabled to create an IRQ exception. The IRQEN register cannot be used to disable an interrupt. Clear to 0 has no effect.

**IRQEN Register**

| | |
|---|---|
| Name: | IRQEN |
| Address: | 0xFFFF0008 |
| Default value: | 0x00000000 |
| Access: | Read and write |

### IRQCLR

IRQCLR is a write-only register that allows the IRQEN register to clear to mask an interrupt source. Each bit that is set to 1 clears the corresponding bit in the IRQEN register without affecting the remaining bits. The pair of registers, IRQEN and IRQCLR, allows independent manipulation of the enable mask without requiring an atomic read-modify-write. Clear to 0 has no effect.

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY      GEHCDEL129796

**Data Sheet**

**ADuC7060/ADuC7061**



*Figure 32. 48-Lead Low Profile Quad Flat Package [LQFP]*
*(ST-48)*
*Dimensions shown in millimeters*

## ORDERING GUIDE

| Model[1] | Temperature Range | Package Description | Package Option | Ordering Quantity |
|---|---|---|---|---|
| ADuC7060BCPZ32 | −40°C to +125°C | 48-Lead Lead Frame Chip Scale Package [LFCSP] | CP-48-5 | |
| ADuC7060BCPZ32-RL | −40°C to +125°C | 48-Lead Lead Frame Chip Scale Package [LFCSP] | CP-48-5 | 2,500 |
| ADuC7060BSTZ32 | −40°C to +125°C | 48-Lead Low Profile Quad Flat Package [LQFP] | ST-48 | |
| ADuC7060BSTZ32-RL | −40°C to +125°C | 48-Lead Low Profile Quad Flat Package [LQFP] | ST-48 | 2,000 |
| ADuC7061BCPZ32 | −40°C to +125°C | 32-Lead Lead Frame Chip Scale Package [LFCSP] | CP-32-11 | |
| ADuC7061BCPZ32-RL | −40°C to +125°C | 32-Lead Lead Frame Chip Scale Package [LFCSP] | CP-32-11 | 5,000 |
| EVAL-ADuC7060QSPZ | | ADuC7060 Quick Start Plus Development System | | |
| EVAL-ADuC7061MKZ | | ADuC7061 Quick Start Evaluation System | | |

[1] Z = RoHS Compliant Part.

©2009–2017 Analog Devices, Inc. All rights reserved. Trademarks and registered trademarks are the property of their respective owners.
D07079-0-2/17(F)



**ANALOG
DEVICES**

**w w w . a n a l o g . c o m**

Rev. F | Page 107 of 107

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

GEHCDEL129843

# EXHIBIT 19

# FILED UNDER SEAL

# EXHIBIT 20

# FILED UNDER SEAL

# EXHIBIT 21



# NGC™ Chromatography Systems

**Comprehensive Solutions for Protein Purification**



Chapman Exhibit
7/23/2020
**185**

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY                                      BRGEDEL000293533

# DESIGNED BY YOU.
# BUILT BY BIO-RAD.

## NGC Medium-Pressure Chromatography Systems

The NGC instrument is an automated liquid chromatography system focused on biomolecule purification at the research, process development, and laboratory-scale levels. At the core of the NGC platform is a truly modular and scalable system combined with a single, intuitive software package for system control and evaluation. Together, the NGC Systems provide a total laboratory solution.



**ALIGNS**

A single solution that aligns to your needs today and expands to support your future discoveries and throughput requirements



**ADAPTS**

A flexible system that adapts to your requirements and can be easily customized to suit your application needs



**ASSURES**

An intelligent design that assures functional simplicity and guides you from experimental setup to analysis and support



BRGEDEL000293534



# ALIGNS

## A single laboratory chromatography solution that aligns and scales to fit your throughput requirements

NGC Systems can be selected based on customer needs and can be further customized to fit changing customer requirements through the addition of more modules and capabilities.

**Capabilities included in all NGC Systems**

Choice of 10 ml/min or 100 ml/min system pumps, mixer module with multiple mixer barrel options (750 µl, 2 ml, 5 ml, 12 ml), automated sample inject valve, ChromLab™ Software, and a touch screen.

**Options available for all systems**

Compatible with the BioFrac™ Fraction Collector for automated fraction collection (analytical- to preparative-scale) and with the C-96 Autosampler for automated sample application.

  

**NGC Quest™ System**

Designed for the easy, dependable, and all-purpose purification of biomolecules with accurate gradients and high-resolution separations

**Base system includes:**
- Single-wavelength (UV) and conductivity detection
- ChromLab Software, for fast, easy automated and manual control — single platform compatible with all NGC Systems

**NGC™ Quest Plus System**

Designed for the all-purpose purification of biomolecules and simultaneous detection of proteins, peptides, nucleic acids, and other chromogenic molecules.

**Includes NGC Quest capability, plus:**
- Multi-wavelength (UV/Vis) detection of up to four wavelengths simultaneously

**NGC Scout™ System**

Designed for quick, reliable separations of proteins and peptides. Enables rapid scouting of protein purification conditions with automated gradients and buffer preparation

**Includes NGC Quest capability, plus:**
- Buffer blending valve for automated inline buffer preparation
- pH valve to monitor buffer pH and separation by pH gradients

**NGC™ Scout Plus System**

Designed for the simultaneous detection of proteins, peptides, nucleic acids, and other chromogenic molecules with expanded automation and scouting

**Includes NGC Scout capability, plus:**
- Multi-wavelength (UV/Vis) detection of up to four wavelengths simultaneously

**NGC Discover™ System**

Designed for higher throughput, rapid, and robust method and process development. Provides expanded scouting options with the simultaneous detection of proteins, peptides, nucleic acids, and other chromogenic molecules

**Includes NGC Scout Plus capability, plus:**
- Integrated sample pump, 100 ml/min
- Sample inlet valves
- Column switching valve, 10 ml or 100 ml options

**NGC™ Discover Pro System**

Designed for higher throughput, rapid, and secure method and process development

**Includes NGC Discover capability, plus:**
- Sample inlet valve
- Sample outlet valve

**Options**
- Tandem purification with additional column switching valve

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

BRGEDEL000293535

# NGC SYSTEM CAPABILITIES



## System Pumps

Pump selection of up to 10 ml/min or 100 ml/min flow rates with the option to switch out pumps to meet your application requirements.

### F10 Pumps
- Flow rate of 0.001–10 ml/min at 3,650 psi (25.2 MPa)
- Ideal for small-scale preparative purifications
- Can also be used for analytical HPLC separations

### F100 Pumps
- Flow rate of 0.01–100 ml/min at 1,450 psi (10 MPa)
- Flexible flow rate range
- Ideal for scale-up applications

## Sample Pump

For automated sample application with the ability to load large sample volumes. Includes an integrated pressure sensor.

## Mixer

Homogenizes buffers from two system pumps and can accommodate varying volumes (different sized barrels are available). Includes a mixer motor and integrated pressure sensor.

## Detectors

Ensure accurate detection of biomolecules such as proteins, peptides, nucleic acids, and chromophores. Include an integrated conductivity monitor (0.01–999 mS/cm) and an optional pH monitor (pH 1–14).

### Single-Wavelength (UV) Detector
For the detection of standard proteins (280 nm) or nucleic acids (255 nm).

### Multi-Wavelength (UV/Vis) Detector
For greater sensitivity and flexible detection of any biomolecules and chromophores (190–800 nm). Simultaneous multi-wavelength (UV/Vis) detection of up to four wavelengths.

## Air Sensor

Detects end of buffer and sample to protect against column damage. Air sensor extension enables use of up to four additional air sensors (eight total).

## Valves

### Sample Inject Valve
For accurate sample loading (μl to L volumes) with a low internal volume for minimal sample loss.

### Buffer Blending Valve
For fast pH scouting with automated inline buffer preparation and the ability to double the fluid output to 20 ml/min or 200 ml/min.

### pH Valve
For accurate, inline pH monitoring (pH 1–14). Includes integrated bypass valve and calibration port for in situ calibration.

### Buffer Inlet Valve
Automated switching between buffers (up to eight inlets per valve) for accelerated method development, column cleaning, and regeneration. Option to include two inlet valves, one for each system pump.

### Column Switching Valve and Reverse Flow
Automated column/media scouting of up to five columns without re-plumbing. Includes reverse flow for rapid elution, sample concentration, and column cleaning. Internal bypass allows automated system priming and cleaning with integrated pressure sensors that measure pre- and delta-column pressures.

### Outlet Valve
For enhanced automated fraction collection of large volume fractions with up to 12 vessels.

## Accessories

### BioFrac Fraction Collector (catalog #741-0002)
Reliable fraction collection from analytical to preparative scale with versatile capability to collect from 96-well plates to 20 mm tubes — fully compatible with all NGC Systems.



### C-96 Autosampler (catalog #788-5011, #788-5012)
Provides automated, accurate, and reproducible sample injections for optimal sample handling with optional cooling. Includes SIM 1/0 module and cable for seamless integration with the NGC Systems (#788-4016 and #788-5013, respectively).



BRGEDEL000293536

# PERSONALIZE AND EXPAND YOUR SYSTEM CAPABILITIES TO SUIT YOUR APPLICATION NEEDS AND WORKFLOW



**Tier Rotate™ Feature (3rd and 4th tiers)**
Flexible system design enables optimal placement of valves and detectors to minimize hold-up volume

**Magnetic column holders for optimal column placement**

**Add a tier for more capabilities**

**Touch screen**
Enables manual control for on-the-fly editing, real-time status updates, and calibration. Can be tethered to the left or right side

Buffer tray

Outlet valve

Sample inlet valve

Real-time status display

pH valve

UV/Vis and conductivity detector

Sample pump, 100 ml/min

Inlet valve

Column switching valve with reverse flow

Buffer blending valve

System gradient pumps, 10 ml/min or 100 ml/min

Mixer

BRGEDEL000293537



Powerful ChromLab Software control, transferable across all NGC Systems, enables minimal training and fast setup to analysis.



**Easy Instrument Setup**

### Select Fluidic Scheme
Guided fluidics selection allows application-based system setup with patent-pending adjustable fluidics selector

### Plumb System
Point-to-Plumb lighting provides step-by-step LED-guided setup for easy plumbing and eliminates the potential loss of precious sample or waste of expensive columns

**Quick Experiment Setup and Operation**

### Design Experiment
Quick and easy method setup and design using the powerful, intuitive ChromLab Software

### Control Experiment
Real-time flow path display controls buffer, sample, and valve position for easy identification of system status

**Analysis Made Easy**

### Data Analysis
Integrated data analysis with easy integration of multiple peaks and runs

### Confirm Purification and Separation
Stain-free technology allows protein separation, gel imaging, and analysis in under 30 min

BRGEDEL000293538

# EASY INSTRUMENT SETUP



**1**

## Select Fluidic Scheme

Select the fluidic scheme that best fits your application, set a default path, and optimize your module placement

To view the complete module library see bulletin 6326 or the NGC System Tour at bio-rad.com/NGCsystems

Click for more options

Buffer blending valve

Sample inlet valve

Pumps

Scroll, select, and customize each component of your fluidic scheme to fit your unique application

Click to edit or adjust your fluidic scheme

Make a selection that fits your application

**Choose** new modules to add to your system capabilities (for example, add a sample pump for loading large sample volumes)

**Change** module locations to adjust to your application and achieve optimal results

**2**

## Plumb System

Point-to-Plumb™ intuitive graphical indicators for simple, guided LED plumbing setup

Click on each step in the flow path to guide system plumbing. Then, appropriate LEDs will light up to guide plumbing (as shown above).

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

BRGEDEL000293539

# QUICK EXPERIMENT SETUP AND OPERATION

**3**

## Design Experiment

**The ChromLab Method Editor enables confident, automated walk-away purification**

Extensive column library selection and intuitive interface for custom self-packed columns



Phase-based method editing

Drag and adjust %B for quick adjustment to the gradient phase

**4**

## Control Experiment

**Manual controls conveniently located for quick and easy access provide total graphical user control of the NGC System with a coldroom-compatible touch screen or a computer**

For further details see the NGC System Tour at bio-rad.com/NGCsystems

Active flow path (green) is clearly highlighted for both sample and buffer

Real-time status displays of flow path devices



Graphical, manual control panel allows complete, accessible control of the system

Use the touch screen for making quick adjustments while in the coldroom or at your deli fridge

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

BRGEDEL000293540

# ANALYSIS MADE EASY



## Data Analysis

**Comprehensive data analysis that enables fast, accurate data comparison**

Ability to overlay and zoom in on multiple chromatograms



Simple peak integration across multiple runs with single button auto-integration

## Confirm Purification and Separation

**Stain-free technology allows protein separation, gel imaging, and analysis in under 30 min**



**Visual confirmation of chromatography results using stain-free gels and imaging. A,** Isolation of a histidine-tagged GFP protein from a crude *E. coli* lysate by affinity chromatography using an IMAC column. **B,** Purification was confirmed by SDS-PAGE using a Criterion™ TGX Stain-Free™ Gel run for 20 minutes and directly visualized on the Gel Doc™ EZ Imaging System without the need for Coomassie staining. Samples in lanes 2 (crude *E. coli* lysates), 3 (flowthrough from the IMAC column), 4 (10% imidazole column wash), and 5 (purified histidine-tagged GFP protein) were compared against Precision Plus Protein™ Unstained Standards (lane 1).

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

BRGEDEL000293541

 **ASSURES**

## Intelligent design that guides your setup and operation

### Pre-plumbed system

QC-validated performance optimized for low hold-up volume translates to more reproducible results and sharper peaks



**High-quality results with reproducible separations.** Eleven overlaid separations of a Bio-Rad size exclusion standard — composed of thyroglobulin, γ-globulin, ovalbumin, myoglobin, and vitamin B12 — performed on the NGC Quest System with a 10 x 300 mm size exclusion column.

### Real-time status displays

Provide immediate status of important parameters for clear diagnostics of key NGC instrument modules



### Module replacement service

Directly replace plug and play modules — eliminate lengthy downtime and costly service visits



Quick delivery          New module          Minimal downtime

### Open platform

Compatible with all medium-pressure columns and ChromLab Software includes method templates with column libraries



**Validated column applications on the NGC System**



**Completely transferable applications.** Identical comparisons of a Bio-Rad size exclusion standard (catalog #151-1901) performed on a Superdex 200 10/300 GL Size Exclusion Column with separations performed on the NGC Quest (—), ÄKTApurifier (—), and ÄKTA avant (—) Systems.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

# SELECTION GUIDE

**NGC Chromatography Systems**

| Catalog # Product description | NGC Quest 10 788-0001 | NGC Quest 10 Plus 788-0003 | NGC Quest 100 788-0002 | NGC Quest 100 Plus 788-0004 | NGC Scout 10 788-0005 | NGC Scout 10 Plus 788-0007 | NGC Scout 100 788-0006 | NGC Scout 100 Plus 788-0008 | NGC Discover 10 788-0009 | NGC Discover 100 788-0010 | NGC Discover 10 Pro 788-0011 | NGC Discover 100 Pro 788-0012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 788-4002 **NGC F10 Pump Module** | ● | ● | | | ● | ● | | | ● | | ● | |
| 788-4003 **NGC F100 Pump Module** | | | ● | ● | | | ● | ● | | ● | | ● |
| 788-4018 **NGC Mixer Module** | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| 788-4007 **NGC Sample Inject Valve Module** | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| 788-4008 **NGC Single-Wavelength Detector Module,** includes conductivity monitor | ● | | ● | | ● | | ● | | | | | |
| 788-4009 **NGC Multi-Wavelength Detector Module,** includes conductivity monitor | ○ | ● | ○ | ● | ○ | ● | ○ | ● | ● | ● | ● | ● |
| 788-4010 **NGC Buffer Blending Valve Module** | ○ | ○ | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ● |
| 788-4011 **NGC pH Valve Module,** includes pH probe | ○ | ○ | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ● |
| 788-4004 **NGC Sample Pump Module, integrated** | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ● | ● | ● |
| 788-4006 **NGC Inlet Valve Module** | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ● | ● | ● |
| 788-4012 **NGC Column Switching Valve Module,** 10 ml | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ● | ○ |
| 788-4026 **NGC Column Switching Valve Module,** 100 ml | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ● |
| 788-4013 **NGC Outlet Valve Module** | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ● |
| 788-6000 **ChromLab Software** | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

● Standard
○ Optional

**Note:** All NGC Systems include a touch screen and NGC Fittings Kit (catalog #788-4017) and are compatible with the BioFrac Fraction Collector and C-96 Autosampler.



## Specifications

### System Specifications

| | |
|---|---|
| Control system | ChromLab Software (compatible across all NGC Systems) |
| Dimensions (D x W x H) | 61 x 49 x 56 cm (NGC Quest and NGC Scout Systems) |
| | 61 x 49 x 74 cm (NGC Discover System) |
| Weight (excluding computer) | 41–46 kg (NGC Quest and NGC Scout Systems) |
| | 64 kg (NGC Discover System) |
| Power supply | 100–240 V, 50–60 Hz |
| Power consumption | 750 W maximum |

### System Pump

| | |
|---|---|
| Pump type | Reciprocating piston |
| Flow rate setting | 10 ml/min pumps: 0.001 to 10 ml/min (normal range) |
| | 100 ml/min pumps: 0.01 to 100 ml/min (normal range) |
| Flow rate accuracy | ±2% (conditions: F10 pump — 0.1 to 10 ml/min, F100 pump — 1.0 to 100 ml/min; pressure: <600 psi (4.1 MPa, 41 bar); viscosity: 0.5–3.7 cP) |
| Pressure range | 10 ml/min pumps: 0 to 25.2 MPa (3,650 psi) |
| | 100 ml/min pumps: 0 to 10 MPa (1,450 psi) |
| Viscosity range | 0.5–10.8 cP (for 10 ml/min and 100 ml/min pumps) |

### Sample Pump

| | |
|---|---|
| Pump type | Piston pump, metering type |
| Flow rate setting | 0.01 to 100 ml/min |
| Flow rate accuracy | ±2% |
| Pressure range | 0 to 10 MPa (1,450 psi) |
| Viscosity range | 0.5–10 cP |

### Mixer

| | |
|---|---|
| Mixing principle | Chamber with magnetic stirrer |
| Mixer volume | 263 µl (included), 750 µl (included), 2 ml, 5 ml (F10) |
| | 750 µl (included), 2 ml (included), 5 ml, 12 ml (F100) |
| Gradient composition accuracy | ± 0.5% (conditions: 3 to 97%B, 0.25 to 10 ml/min F10 pumps) |
| | ± 0.8% (conditions: 5 to 95%B, 1 to 100 ml/min F100 pumps) |

### Valves

| | |
|---|---|
| Type | Rotary valves and rocker solenoid |
| Number of valves | Up to 12 |
| Functions | Loop selection (PEEK Loop and DynaLoop™ offerings) |

### Pressure Sensors

| | |
|---|---|
| Placement of sensors | Standard: after system pump |
| | Options: pre-column, post-column |
| Range | 0–3,650 psi |
| Accuracy | ± 2 psi or 2%, whichever is greater |

### Inlet Valves

| | |
|---|---|
| Inlet A | 8 inlets |
| Inlet B | 8 inlets |
| Sample inlet | 8 inlets |

### UV and UV/Vis Detectors

(each includes an integrated conductivity monitor)

| | |
|---|---|
| Wavelength | Single-wavelength: 255 nm (nucleic acids) or 280 nm (proteins) |
| | Multi-wavelength (up to 4): 190–800 nm |
| Absorbance range | 0 to >2.8 AU |
| Linearity | 0 to 2 AU within ±5% |
| Operating pressure | 1,450 psi (10 MPa) for 5, 10 mm flow cells 700 psi (5 MPa) for 2 mm flow cells |
| Flow cells | Preparative: 2 mm (cell volume: 20 µl) |
| Optional interchangeable flow cells available in path lengths 2, 5, and 10 mm | Analytical: 5 mm (cell volume: 9 µl) Analytical: 10 mm (cell volume: 18 µl) |

### Conductivity Monitor

| | |
|---|---|
| Conductivity reading range | 0.01–999 mS/cm |
| Accuracy | ±2% |
| Operating pressure | 0–5.5 MPa (800 psi) |
| Flow cell volume | 6 µl |
| Temperature monitor range | 4–100°C |
| Temperature monitor accuracy | ±2% |

### pH Monitor

| | |
|---|---|
| pH reading range | 0 to 14 |
| Accuracy | ±0.1 pH unit within pH 2–12 |
| Operating pressure | 0 to 70 psi with pH probe inline and 0–500 psi in bypass mode |
| Flow cell volume | 100 µl (210 µl including internal flow paths) |

### BioFrac Fraction Collector

| | |
|---|---|
| Collection modes | |
| Time | 0.02–99,999 min |
| Drop | 1–99,999 drops, flow rate ≤5.0 ml/min |
| Volume | 0.02–99,999 ml |
| Collection rack options | 180 x 12–13 mm tubes, 120 x 15–16 mm tubes, 80 x 18–20 mm tubes, 168 x 1.5 ml microtubes, 24 x 30 mm tubes, 4 x 96, 48-, 24-, or 12-position microplates, and 20 x unlimited preparative volumes adaptor |
| Operating temperature | 4–40°C |
| Dimensions (W x D x H) | 44.5 x 35.6 x 38.7 cm |
| Safety | Meets IEC 61010 and CSA 22.2 certification |

### Column Switching

| | |
|---|---|
| Five-column valve | Can connect up to five columns with forward and reverse flow and bypass capability |

### Buffer Blending

| | |
|---|---|
| | Standard in the NGC Scout and NGC Discover Systems |

### Air Sensor Module

| | |
|---|---|
| Number of sensors | Up to 8 total air sensors (1 for end of sample detection, remaining are buffer) |
| Placement of built-in sensors | End of buffer, end of sample |
| Sensing principle | Acoustic |

**Note:** All NGC Systems include a touch screen and are compatible with the BioFrac Fraction Collector and C-96 Autosampler.

## Ordering Information

**NGC Medium-Pressure Chromatography Systems**
**NGC Quest Chromatography Systems**
For the all-purpose purification of biomolecules

| | |
|---|---|
| 788-0001 | **NGC Quest 10 System** |
| 788-0003 | **NGC Quest 10 Plus System** |
| 788-0002 | **NGC Quest 100 System** |
| 788-0004 | **NGC Quest 100 Plus System** |

**NGC Scout Chromatography Systems**
For rapid scouting of biomolecules

| | |
|---|---|
| 788-0005 | **NGC Scout 10 System** |
| 788-0006 | **NGC Scout 100 System** |

For rapid scouting of proteins, peptides, and nucleic acids

| | |
|---|---|
| 788-0007 | **NGC Scout 10 Plus System** |
| 788-0008 | **NGC Scout 100 Plus System** |

**NGC Discover Chromatography Systems**
For method development

| | |
|---|---|
| 788-0009 | **NGC Discover 10 System** |
| 788-0010 | **NGC Discover 100 System** |

**NGC System Modules and Accessories**
**System Pumps**

788-4002    **NGC F10 Pump Module**, pkg of 1, includes 10 ml/min system pump kit with necessary tubing and fittings, for creating buffer gradients, for use with the buffer blending valve to generate flow rates of up to 20 ml/min

788-4003    **NGC F100 Pump Module**, pkg of 1, includes 100 ml/min system pump kit with necessary tubing and fittings, for creating buffer gradients, for use with the buffer blending valve to generate flow rates of up to 200 ml/min

**Sample Pump**

788-4004    **NGC Sample Pump 100 Module**, pkg of 1, includes 100 ml/min sample pump kit with necessary tubing and fittings, for automated large-volume sample application via sample inject valve

**Detectors**

788-4008    **NGC Single-Wavelength Detector Module**, pkg of 1, includes UV/conductivity detector with necessary tubing and fittings, for nucleotide and protein detection, salt gradient generation

788-4009    **NGC Multi-Wavelength Detector Module**, pkg of 1, includes UV/Vis and conductivity detector kit with necessary tubing and fittings, for simultaneous four-wavelength monitoring of elution fractions between 190–800 nm and salt gradient generation

**Mixer**

788-4018    **NGC Mixer Module**, pkg of 1, can be extended with 2, 5, and 12 ml barrels for efficient gradient mixing at higher flow rates, for use with all NGC Systems, does not include mixer base or barrels

788-4019    **NGC F100 Mixer**, pkg of 1, 750 µl base and top assembly, included with all 100 ml/min NGC Systems

788-4020    **NGC F10 Mixer**, pkg of 1, 263 µl base and top assembly, included with all 10 ml/min NGC Systems

788-4021    **NGC F10 Mixer Barrel Kit**, pkg of 1, 750 µl extension barrel for F10 263 µl mixer, part of NGC Scout 10, NGC Discover 10 Systems

788-4022    **NGC F10 Mixer Barrel Kit**, pkg of 1, 2 ml extension barrel for F10 263 µl mixer, optional part

788-4028    **NGC F100 Mixer Barrel Kit**, pkg of 1, 2 ml extension barrel for F100 750 µl mixer, part of NGC Scout 100, NGC Discover 100 Systems

788-4023    **NGC F100 Mixer Barrel Kit**, pkg of 1, 5 ml extension barrel for F100 750 µl mixer, optional part

788-4024    **NGC F100 Mixer Barrel Kit**, pkg of 1, 12 ml extension barrel for 750 µl mixer, optional part

**Valves**

788-4010    **NGC Buffer Blending Valve Module**, pkg of 1, kit includes necessary tubing and fittings, for inline buffer preparation and generating pH gradients for quick pH scouting

788-4006    **NGC Inlet Valve Module**, pkg of 1, kit includes necessary tubing and fittings, for automated switching between multiple buffers and samples during method development

788-4011    **NGC pH Valve Module**, pkg of 1, kit includes the pH valve kit, pH probe, tubing, and fittings for accurate inline pH measurement

788-4012    **NGC Column Switching Valve Module (10 ml)**, kit includes the necessary tubing and fittings to accommodate the most common column types, holds 5 columns, for use with F10 systems and multiple columns for quick column scouting and reverse flow

788-4026    **NGC Column Switching Valve Module (100 ml)**, kit includes the necessary tubing and fittings to accommodate the most common column types, holds 5 columns, for use with F100 systems and multiple columns for quick column scouting and reverse flow

788-4013    **NGC Outlet Valve Module**, pkg of 1, kit includes necessary tubing and fittings for automated fraction collection of large-volume fractions with up to 12 vessels

**Air Sensor**

788-5017    **NGC Air Sensor Module**, pkg of 1, kit includes 2 large-bore air sensors to protect against air entering pumps and columns, supports up to 4 large- and small-bore air sensors, for detection of end of buffer and sample

788-5018    **NGC Air Sensor Extension Module**, pkg of 1, connects to the base air sensor module to support 4 additional air sensors, does not include any air sensors, optional part

788-5020    **NGC Air Sensor (small)**, pkg of 1, includes air sensor to exclude air from system and columns, detects air in small-diameter PEEK Tubing

788-5021    **NGC Air Sensor (large)**, pkg of 1, includes air sensor to exclude air from system and columns, detects air in large-diameter tubing

788-5019    **NGC Air Sensor Extension Cable**, pkg of 1, for placement of air sensors outside air sensor module

**Fraction Collector and Autosampler**

741-0002    **BioFrac Fraction Collector**, 100/240 V, fraction collector compatible with all NGC Systems, includes power cord, rack set F1 (2 x flatpack, 13 mm), BioFrac Diverter Valve, fittings kit

788-4025    **NGC Communication Adaptor**, pkg of 1, enables communication with Bio-Rad devices, such as the BioFrac Fraction Collector (#741-0002), with the NGC System

788-5011    **C-96 Autosampler**, 110/240 V, includes standard 84+3 vial tray (1.5 and 10 ml), control cable set to connect with NGC System, 1 ml syringe, 2 ml sample loop, also includes #760-5014, #760-5026, #760-0604, #788-4016, and #788-5013, compatible with all NGC Systems

788-5012    **C-96 Autosampler with cooling**, 110/240 V, with Peltier cooling, includes standard 84+3 vial tray (1.5 and 10 ml), control cable set to connect with NGC System, 1 ml syringe, 2 ml sample loop, also includes #760-5014, #760-5026, #760-0604, #788-4016, and #788-5013, compatible with all NGC Systems

Precision Plus Protein Standards are sold under license from Life Technologies Corporation, Carlsbad, CA for use only by the buyer of the product. The buyer is not authorized to sell or resell this product or its components.

ÄKTA, ÄKTApurifier, and Superdex are trademarks of GE Healthcare. PEEK is a trademark of Victrex PLC. The Apple logo is a trademark of Apple Inc.








**Download the NGC System Tour on the App Store and use this Augmented Reality (AR) Target to visualize the NGC System in your lab.**





**Bio-Rad Laboratories, Inc.**

Life Science Group

**Web site** www.bio-rad.com **USA** 800 424 6723 **Australia** 61 2 9914 2800 **Austria** 43 1 877 89 01 **Belgium** 03 710 53 00 **Brazil** 55 11 3065 7550 **Canada** 905 364 3435 **China** 86 21 6169 8500 **Czech Republic** 420 241 430 532 **Denmark** 44 52 10 00 **Finland** 09 804 22 00 **France** 01 47 95 69 65 **Germany** 49 89 31 884 0 **Greece** 30 210 9532 220 **Hong Kong** 852 2789 3300 **Hungary** 36 1 459 6100 **India** 91 124 4029300 **Israel** 03 963 6050 **Italy** 39 02 216091 **Japan** 81 3 6361 7000 **Korea** 82 2 34/3 4460 **Mexico** 52 555 488 76/0 **The Netherlands** 0318 540666 **New Zealand** 64 9 415 2280 **Norway** 23 38 41 30 **Poland** 48 22 331 99 99 **Portugal** 351 21 472 7700 **Russia** 7 495 721 14 04 **Singapore** 65 6415 3188 **South Africa** 27 (0) 861 246 723 **Spain** 34 91 590 5200 **Sweden** 08 555 12700 **Switzerland** 026 674 55 05 **Taiwan** 886 2 2578 7189 **Thailand** 1800 88 22 88 **United Kingdom** 020 8328 2000

Bulletin 6286 Rev E    US/EG                                                                    15-0864    0515    Sig 1214

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY                                      BRGEDEL000293546

# EXHIBIT 22



NGC™ Chromatography Systems

## Multidimensional (Multi-D) Plumbing Guide
Version 1.0

**BIO·RAD**

Chapman Exhibit
7/24/2020
**215**

Introduction

This guide is designed to help plumb your NGC System for multidimensional (Multi-D) chromatography applications. These techniques can help enhance sample recovery and improve productivity by minimizing the steps and time required for protein purification. In addition, it shows the optimal locations for module placement to minimize tubing length and swept volume.

Traditionally, multistep purifications have been labor intensive and time consuming, as fractions from a run are collected, pooled, and often dialyzed before being injected onto the next column. With the NGC System, well-characterized single-step purifications are combined to create tandem or automated multicolumn protocols, significantly decreasing sample loss and the time spent on the protein purification process. Typically, the columns in the combined methods have different chemistries or binding characteristics, enhancing selectivity, peak separation, and resolution.

In tandem chromatography, proteins of interest can be eluted from the first column and loaded directly onto a second column plumbed in series followed by analysis using the UV detector. For a tandem chromatography run to be successful, certain considerations must be taken into account, including the binding capacity of both columns, the optimal buffer composition (including pH and salt concentration), and the pressure ratings for both columns.

In two-step automated multicolumn (2-D) chromatography, proteins of interest are eluted from the first column (often an affinity column) and held in a sample loop before being injected directly onto a second column. With this technique, column pressure ratings and buffer conditions are not critical factors for a successful separation.

Using this plumbing guide in conjunction with the numerous tandem and 2-D templates in ChromLab™ Software should help you successfully set up and run your methods and achieve your protein purification goals more quickly and efficiently. Refer to the Multidimensional Chromatography Success Guide (bulletin 6701) for more information about Multi-D.

## 2-TIER + 2 CSV
## for tandem chromatography applications

Simple system configuration for tandem affinity and desalting columns. Proteins are eluted from the affinity column directly onto the desalting column.

**Example Templates**

**Affinity 1 ml — Desalting**
**Affinity 5 ml — Desalting**

**Tubing**

**(1)** Tube #2 — Length: 17 cm
Inject Valve Column to Column Switching Valve 1 In

**(2)** Tube #2 — Length: 17 cm
Column Switching Valve 1 Out to Column Switching Valve 2 In

**(3)** MWD:
Tube #2 — Length: 17 cm
Column Switching Valve 2 Out to Multi-Wavelength Detector In
*OR*
SWD (not shown):
Tube #1 — Length: 24.5 cm
Column Switching Valve 2 Out to Single-Wavelength Detector In



# 3-TIER + 2 CSV
# for tandem chromatography applications

3-tier system for tandem affinity and desalting columns. Proteins are eluted from the affinity column directly onto the desalting column.



**Example Templates**

Affinity 1 ml — Desalting
Affinity 5 ml — Desalting
Affinity 1 ml — Linear Gradient
Affinity 1 ml — Step Gradient
Affinity 5 ml — Linear Gradient
Affinity 5 ml — Step Gradient

**Tubing**

① Tube #2 — Length: 17 cm
Inject Valve Column to
Column Switching Valve 1 In

② Tube #2 — Length: 17 cm
Column Switching Valve 1 Out
to Column Switching Valve 2 In

③ MWD:
Tube #10 — Length: 33.5 cm
Column Switching Valve 2 Out
to Multi-Wavelength Detector In
*OR*
SWD (not shown):
Tube #1 — Length: 24.5 cm
Column Switching Valve 2 Out
to Single-Wavelength Detector In

Additional modules (grayed out) are shown in the optimal positions to minimize tubing length and swept volume.

3



**Bio-Rad
Laboratories, Inc.**

Life Science
Group

**Web site** bio-rad.com **USA** 1 800 424 6723 **Australia** 61 2 9914 2800 **Austria** 43 1 877 89 01 177 **Belgium** 32 (0)3 710 53 00 **Brazil** 55 11 3065 7550
**Canada** 1 905 364 3435 **China** 86 21 6169 8500 **Czech Republic** 420 241 430 532 **Denmark** 45 44 52 10 00 **Finland** 358 09 804 22 00
**France** 33 01 47 95 69 65 **Germany** 49 89 31 884 0 **Hong Kong** 852 2789 3300 **Hungary** 36 1 459 6100 **India** 91 124 4029300
**Israel** 972 03 963 6050 **Italy** 39 02 216091 **Japan** 81 3 6361 7000 **Korea** 82 2 3473 4460 **Mexico** 52 555 488 7670 **The Netherlands** 31 (0)318 540 666
**New Zealand** 64 9 415 2280 **Norway** 47 23 38 41 30 **Poland** 48 22 331 99 99 **Portugal** 351 21 472 7700 **Russia** 7 495 721 14 04
**Singapore** 65 6415 3188 **South Africa** 27 (0) 861 246 723 **Spain** 34 91 590 5200 **Sweden** 46 08 555 12700 **Switzerland** 41 026 674 55 05
**Taiwan** 886 2 2578 7189 **Thailand** 66 662 651 8311 **United Arab Emirates** 971 4 8187300 **United Kingdom** 44 020 8328 2000



# EXHIBIT 23

# FILED UNDER SEAL

# EXHIBIT 24

# FILED UNDER SEAL

# EXHIBIT 25

# FILED UNDER SEAL

# EXHIBIT 26

# FILED UNDER SEAL

# EXHIBIT 27

# FILED UNDER SEAL

# EXHIBIT 28

# FILED UNDER SEAL

# EXHIBIT 29

# FILED UNDER SEAL

# EXHIBIT 30

# FILED UNDER SEAL

# EXHIBIT 31



**NGC Chromatography Systems
and ChromLab Software**

**Installation Guide**
Version 6.0



Chapman Exhibit
7/24/2020
**212**

# NGC Chromatography Systems and ChromLab Software

## Installation Guide

**Version 6.0**



**Bio-Rad Technical Support Department**

The Bio-Rad Technical Support department in the U.S. is open Monday through Friday, 5:00 AM to 5:00 PM.

**Phone:** 1-800-424-6723, option 2

**Email:** Support@bio-rad.com (U.S./Canada only)

For technical assistance outside the U.S. and Canada, contact your local technical support office or click the Contact us link at www.biorad.com.

**Notice**

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage or retrieval system, without permission in writing from Bio-Rad.

Bio-Rad reserves the right to modify its products and services at any time. This guide is subject to change without notice. Although prepared to ensure accuracy, Bio-Rad assumes no liability for errors or omissions, or for any damage resulting from the application or use of this information.

Bio-Rad is a trademark of Bio-Rad Laboratories, Inc. in certain jurisdictions.

All trademarks used herein are the property of their respective owners.

Copyright © 2018 by Bio-Rad Laboratories. All rights reserved.

 # 1 Introduction

The NGC chromatography systems are preparative systems designed to rapidly automate the purification of biomolecules. The flexible, modular, and economical design makes NGC the instrument of choice for method development and scale-up. It is available in six preplumbed, factory-tested configurations at two different flow rates. Each preconfigured system can be further customized and upgraded by adding valves, detectors, or pumps in order to meet specific application needs. Any system can be configured for either low flow rate or high flow rate operation by simply changing the system pump modules. As a result, a single hardware platform can be modified as the application need and scale change.

ChromLab software enables you to control, manage, and evaluate the NGC system and the purification runs.

1    |    Introduction

## Main Features

NGC chromatography systems enable you to do the following:

- Easily create purification and maintenance protocols from predefined method templates and protocol phases

- Automate multicolumn purification processes using preprogrammed templates and multiple column switching valves

- Automate multiple sample injections using either the sample inlet valve and the sample pump or the C-96 autosampler

- Expand sample monitoring using the signal import module (SIM) to export digital signals to, and import digital signals from, external detectors

- Collect large-volume fractions using multiple outlet valves while also collecting small-volume fractions using the BioFrac fraction collector

- Automatically prepare buffers using preprogrammed buffer blending protocols

- Analyze purification results through 1-click peak integration, determine protein concentration, and calculate column performance

- Automate purification protocol optimization using the scouting wizard

- Easily locate fractions containing peaks of interest and view the protein concentration within each fraction

- Extend the preconfigured systems with additional valves for buffers, samples, and columns

- Organize the location of the modules to optimize separation performance based on method scale and complexity, and to minimize the system swept volume

- Minimize errors when connecting tubing using the Point-to-Plumb feature in ChromLab software

# Safety Information

This section explains the different safety alerts within this document. This section also provides information about the safe use and setup of the instrument.

## Safety Alerts

This document contains **WARNINGS** and **Cautions** pertaining to the installation and use of the NGC instrument.

| Alert Icon | | Definition |
|---|---|---|
| ⚠ | Flammable/ Extreme Heat | A hazardous situation that could result in serious personal injury or extreme damage to the instrument. Do not proceed until all stated conditions are met and clearly understood. |
| ⚠ | Electrical Shock | A hazardous situation that could result in serious personal injury or extreme damage to the instrument. Do not proceed until all stated conditions are met and clearly understood. |
| ⚠ | | A hazardous situation that could result in minor or moderate personal injury or damage to the instrument. Do not proceed until all stated conditions are met and clearly understood. |

## Safety Precautions

 **Caution:** The weight of the NGC system varies from moderate to heavy depending on the system in place. Take care when lifting the instrument onto the lab bench or into a standard cold cabinet. To reduce the risk of personal injury or damage to the instrument, three or more people should perform this task.

 **WARNING!**  Disconnect power to the NGC system before inserting, removing, or moving modules. No user-serviceable parts are inside any component unless noted in this manual. Refer servicing questions to Bio-Rad service personnel.

# Regulatory Information

The NGC instrument has been tested and found to be in compliance with all applicable requirements of the following safety and electromagnetic compliance standards. The NGC instrument is labeled with the following compliance marks.

## Safety Compliance

CE Mark:

- EN61010-1 Electrical Equipment for Measurement, Control, and Laboratory Use

- IEC 61010-1 Safety Requirements for Measurement, Control, and Laboratory Use, Part 1: General Requirements

cTUVus Mark:

- UL STD No. 61010-1 Electrical Equipment for Measurement, Control, and Laboratory Use, Part 1: General Requirements

- CAN/CSA C22.2 No. 61010-1-12 Safety Requirements for Measurement, Control, and Laboratory Use, Part 1: General Requirements (includes Amendment 1)

Products with these safety compliance marks are safe to use when operated in accordance with the instruction manual. This does not extend to accessories with no marks, even when used with this unit.

## Electromagnetic Compatibility (EMC)

CE Mark:

- EN61326 Class A Electrical Equipment for Measurement, Control, and Laboratory Use, General Requirements

The NGC instrument is designed to operate in a controlled electromagnetic environment. Do not use radio transmitters within 10 ft (3 m) of the instrument.

Connecting the Power and Communication Cables

# Connecting the Power and Communication Cables

The power sockets and communication ports for the NGC system are located on the back of the instrument. Because the back of the instrument will be very close to the back of the standard cold cabinet, it is recommended that you connect the power and communication cables before lifting the instrument into the cabinet.

**Note:** The Cat 6 ethernet cable to connect the NGC instrument to the computer running ChromLab software is approximately 10' (3.0 m) in length.



LEGEND

| 1 | Power on/off switch | 2 | Fuse cover |
|---|---|---|---|
| 3 | Power inlet port | 4 | Power outlet ports |
| 5 | Ethernet connection port | 6 | Touch screen connection port |

**To connect the power and communication cables**

1.  If you have not already done so, insert the end of the touch screen cable into the touch screen connection port on the back of the instrument.

2.  Insert the Cat 6 (or higher) cable into the ethernet port on the back of the instrument.

3.  (Optional) Connect the power cords for any peripheral instruments into the power outlet ports.

4.  Connect the power cable to the power inlet port.

5.  If installing the NGC instrument into a standard cold cabinet, direct the following cables through the access port on the side of the cabinet:

    ■  Touch screen cable

    ■  Ethernet cable

    ■  Power cable (if your cabinet does not have a power outlet)

6.  Press the I/O power switch to the On position.

 **Caution:**  The weight of the NGC instrument varies from moderate to heavy depending on the system. Take care when lifting the instrument into the cold cabinet. To reduce the risk of personal injury or damage to the instrument, three or more people should perform this task.

7.  If installing the NGC instrument into a standard cold cabinet:

    a.  Lift the instrument into position.

    b.  Connect the power cable to the power outlet.

## Connecting the NGC System to the ChromLab Computer

**Note:** Ensure that the ChromLab computer and the NGC instrument are powered off before beginning this task.

You can connect the NGC system to the ChromLab computer in one of two ways:

- Direct cable connection using a Cat 6 ethernet cable
- Network connection through your network infrastructure

### Establishing a Direct Cable Connection

**Tip:** You should have already inserted the Cat 6 ethernet cable into the port at the back of the NGC instrument. See To connect the power and communication cables on page 78.

If the ChromLab computer has two network adapters and you are establishing a direct connection to the NGC instrument, you can use the second adapter to connect the computer to your company's network.

**To establish a direct cable connection**

▶ Insert the loose end of the Cat 6 ethernet cable into one of the ethernet connection ports on the computer on which you plan to install ChromLab.

**Note:** The network adapter that is used to connect the NGC instrument needs to be configured to use TCP/IP 4.0 with dynamic host configuration protocol (DHCP). For information about configuring the network adapter, see Configuring the Network Adapter for Direct Connection on page 158.

## Establishing a Network Connection

When establishing a connection between the NGC system and the ChromLab computer through your network infrastructure, ensure that they are both on the same subnet. A DHCP server is required so that the system receives an IP address.

**Note:**  The DHCP server should be configured to always assign the same IP address to the system. See your network administrator for more information.

**Tip:**   You should have already inserted the Cat 6 ethernet cable into the port at the back of the NGC instrument. See To connect the power and communication cables on page 78.

**To establish a network connection**

▶    Insert the loose end of the Cat 6 ethernet cable into the network connection router or hub.



**Bio-Rad
Laboratories, Inc.**

*Life Science
Group*

**Web site** bio-rad.com  **USA** 1 800 424 6723  **Australia** 61 2 9914 2800  **Austria** 43 01 877 89019  **Belgium** 32 03 710 53 00
**Brazil** 55 11 3065 7550  **Canada** 1 905 364 3435  **China** 86 21 6169 8500  **Czech Republic** 36 01 459 6192
**Denmark** 45 04 452 10 00  **Finland** 35 08 980 422 00  **France** 33 01 479 593 00  **Germany** 49 089 3188 4393
**Hong Kong** 852 2789 3300  **Hungary** 36 01 459 6190  **India** 91 124 4029300  **Israel** 972 03 963 6050  **Italy** 39 02 49486600
**Japan** 81 3 6361 7000  **Korea** 82 2 3473 4460  **Mexico** 52 555 488 7670  **The Netherlands** 310 318 540 666
**New Zealand** 64 9 415 2280  **Norway** 47 0 233 841 30  **Poland** 36 01 459 6191  **Portugal** 351 21 4727717
**Russia** 7 495 721 14 04  **Singapore** 65 6415 3188  **South Africa** 36 01 459 6193  **Spain** 34 091 49 06 580
**Sweden** 46 08 555 127 00  **Switzerland** 41 0617 17 9555  **Taiwan** 886 2 2578 7189  **Thailand** 66 2 651 8311
**United Arab Emirates** 971 4 8187300  **United Kingdom** 44 01923 47 1301

10000049090 Ver C (10026252)   US/EG



18-0528   0618   Sig 0118

# EXHIBIT 32

US009709589B2

(12) **United States Patent**
Blomberg et al.

(10) Patent No.: **US 9,709,589 B2**
(45) Date of Patent: ***Jul. 18, 2017**

(54) **AUTOMATED FLUID HANDLING SYSTEM**

(71) Applicant: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

(72) Inventors: **Johan Blomberg**, Uppsala (SE); **Mats Lundkvist**, Uppsala (SE)

(73) Assignee: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/165,876**

(22) Filed: **May 26, 2016**

(65) **Prior Publication Data**

US 2016/0274070 A1    Sep. 22, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/463,039, filed on Aug. 19, 2014, which is a continuation of application (Continued)

(30) **Foreign Application Priority Data**

Jun. 9, 2009    (SE) ...................................... 0950431

(51) **Int. Cl.**
*B01D 35/00* (2006.01)
*G01N 35/10* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... *G01N 35/1097* (2013.01); *B01D 15/10* (2013.01); *B01D 29/60* (2013.01); (Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,044,593 A    8/1977   Haruki et al.
4,125,464 A    11/1978   Burger et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN    2567575 Y    8/2003
CN    101358952 A    2/2009
(Continued)

OTHER PUBLICATIONS

ADE 2040 Process Analyzer Manual—Basic Operation, Applikon Analytical, Version 1.4, pp. 1-30, Jul. 2006.
(Continued)

*Primary Examiner* — Richard Gurtowski
(74) *Attorney, Agent, or Firm* — Arent Fox LLP

(57) **ABSTRACT**

Automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

**30 Claims, 10 Drawing Sheets**



Shinoff
7/22/2020
**EX 119**

## US 9,709,589 B2

Page 2

### Related U.S. Application Data

No. 13/376,929, filed as application No. PCT/SE2010/050624 on Jun. 4, 2010, now Pat. No. 8,821,718.

(51) **Int. Cl.**

| | |
|---|---|
| **B01D 15/10** | (2006.01) |
| **G01N 30/88** | (2006.01) |
| **B01D 29/60** | (2006.01) |
| **G01N 30/24** | (2006.01) |
| **G01N 30/38** | (2006.01) |
| B01D 15/08 | (2006.01) |
| B01D 17/12 | (2006.01) |
| G01N 35/00 | (2006.01) |
| G01N 30/02 | (2006.01) |

(52) **U.S. Cl.**

CPC ............. *G01N 30/24* (2013.01); *G01N 30/38* (2013.01); *G01N 30/88* (2013.01); *B01D 15/08* (2013.01); *B01D 17/12* (2013.01); *B01D 2201/54* (2013.01); *G01N 2030/027* (2013.01); *G01N 2030/8804* (2013.01); *G01N 2030/8881* (2013.01); *G01N 2035/00326* (2013.01); *Y10T 137/6416* (2015.04); *Y10T 137/6525* (2015.04); *Y10T 137/6851* (2015.04); *Y10T 137/85986* (2015.04); *Y10T 137/87885* (2015.04)

### (56) References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,730,867 | A | 3/1998 | Drew et al. |
| 5,766,460 | A | 6/1998 | Bergstrom et al. |
| 5,896,273 | A | 4/1999 | Varghese et al. |
| 5,959,841 | A | 9/1999 | Allen et al. |
| 6,190,617 | B1 | 2/2001 | Clark et al. |
| 6,355,164 | B1 | 3/2002 | Wendell et al. |
| 6,434,018 | B1 | 8/2002 | Waltz |
| 6,599,484 | B1 | 7/2003 | Zigler et al. |
| 6,741,463 | B1 | 5/2004 | Akhtar et al. |
| 6,832,622 | B2 | 12/2004 | Hassel et al. |
| 6,968,958 | B2 | 11/2005 | Lauchner et al. |
| 7,374,674 | B2 | 5/2008 | Miyauchi et al. |
| 7,641,242 | B2 | 1/2010 | Van Pelt |
| 7,910,067 | B2 | 3/2011 | Knight et al. |
| 7,932,090 | B2 | 4/2011 | Carter et al. |
| 8,821,718 | B2 | 9/2014 | Blomberg et al. |
| 9,404,902 | B2 | 8/2016 | Blomberg et al. |
| 2002/0185442 | A1 | 12/2002 | Maiefski et al. |
| 2004/0089057 | A1 | 5/2004 | Hobbs et al. |
| 2004/0264145 | A1 | 12/2004 | Miller et al. |
| 2005/0051468 | A1 | 3/2005 | Miyauchi et al. |
| 2006/0047466 | A1 | 3/2006 | White |
| 2006/0274082 | A1 | 12/2006 | Cochran et al. |
| 2007/0081308 | A1 | 4/2007 | Ishida |
| 2007/0095126 | A1 | 5/2007 | Bailey et al. |
| 2007/0097636 | A1 | 5/2007 | Johnson et al. |
| 2007/0247826 | A1 | 10/2007 | Grady et al. |
| 2008/0023653 | A1 | 1/2008 | Lee et al. |
| 2008/0035542 | A1* | 2/2008 | Mourrata ............ G21G 1/0005 210/143 |
| 2008/0233653 | A1 | 9/2008 | Hess et al. |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 1984739 | U | 5/1968 |
| DE | 1418503 | A | 12/1975 |
| EP | 0309596 | A1 | 4/1989 |
| JP | 2002-333438 | A | 11/2002 |
| JP | 2005-106813 | A | 4/2005 |
| WO | WO 00/22429 | | 4/2000 |
| WO | WO 01/89681 | | 11/2001 |

| | | | |
|---|---|---|---|
| WO | WO 2005/042146 | A2 | 5/2005 |
| WO | WO 2006/134035 | | 12/2006 |
| WO | WO 2006/134035 | A1 | 12/2006 |
| WO | WO 2007/036712 | A1 | 4/2007 |

#### OTHER PUBLICATIONS

ADI 2040 Process Analyzer Manual—Analysis Methods, Applikon Analytical, Sep. 2002, pp. 1-44, Version 1.4.

ADI 2040 Process Analyzer Manual—Basic Maintenance & Spare parts, Applikon Analytical, Mar. 2008, Version 1.53, pp. 1-48.

ADI 2040 Process Analyzer Manual—Configuration, Applikon Analytical, Version 1.4, pp. 1-44, Jul. 2006.

ADI 2040 Process Analyzer Manual—Hardware & Installation, Applikon Analytical, Version 1.53, p. 144, May 2008.

ADI 2040 Process Analyzer Manual—Serial Communication, Applikon Analytical, Version 1.4, 134 pp., Apr. 2006.

ADI 2040 Process Analyzer Manual, Applikon Analytical, 1-10 pp., Apr. 1999.

ADI 2045 VA Instrument Manual, Applikon Analytical, 2007, pp. 1-80, Version 1.2.

ADI Process Analyzer Manual—Advanced Operation, Applikon Analytical, Version 1.53, pp. 1-78, Oct. 2007.

Andreas Schmid, "The Energy Issue in Whole Cell Oxyfunctionalization," GreenChem Symposium, Nov. 9, 2006, pp. 5349-5386.

APC, "Rack Enclosures and Open Frame Racks for Server and Networking Applications in it Environments," Rack Systems, 2006, pp. 4619-4638.

Applikon Analytical Confidential, "Analyzers 1999-2008," Bio-Rad Ex. 1004, Jul. 8, 2015, pp. 1323-1326.

Applikon Analytical, "Box Wet Part Module 3X," Bio-Rad Ex.1003, 1 page, Feb. 11, 2008.

Applikon Analytical, "Manual ADI 2040 Process Analyzer," Apr. 1999, Bio-Rad Ex. 1002, pp. 1-619.

Applikon Analytical, "Multi-purpose wet chemical analysis," Process Analyzer ADI 2040, Sep. 2008, pp. 1547-1554.

Applikon Analytical, "Trace Metal and Plating Bath Analysis," ADI2045VA Process Analyzer, Sep. 2007, pp. 1555-1562.

Bilsker, Petition for Inter Parties Review, *Bio-Rad Laboratories, Inc*, v. *GE Healthcare Bio-Science AB*, Sep. 2015, pp. 1-71.

Bio-Rad Laboratories, Inc., "Biologic Duoflow Chromatography System," Instruction Manual, 2003, pp. 5810-6048.

Brinkmann, "875 ProcessLab Components," ProcessLab, pp. 1-26, Mar. 2001.

Brinkmann, "875 ProcessLab Hardware," ProcessLab, pp. 1-15, Mar. 2007.

Brinkmann, "Is ProcessLab Explosion-Proof?" ProcessLab, pp. 1-12, Mar. 2001.

Dionex, "ICS-3000 Ion Chromatography System Operator's Manual," Thermo SCIENTIFIC, Jan. 2008, pp. 4779-5170.

Eda Tezcanli, "An Analytical Survey on Customization at Modular Systems in the Context of Industrial Design," A Thesis Submitted to the Graduate School of Engineering and Sciences of Izmir Institute of Technology in Partial Fulfillment of the Requirements for the Degree of Master of Science in Industrial Design, Jan. 2006, pp. 5701-5809.

EP Office Action dated Feb. 26, 2014 Issued on Corresponding EP Application No. 10786454.8.

General Electric, "Operating Instructions Original Instructions," • KTA pure, Apr. 2014, pp. 3785-3928.

General Electric, "User Manual," • KTA pure, Dec. 2014, pp. 3929-4445.

Gilson, Inc., "2007-2008 Product Guide," Bio-Rad Ex. 1010 pp. 1-37.

Gilson, Inc., "402 Syringe Pump User's Guide," Bio-Rad Ex. 1011, Jun. 2001, pp. 1-86.

Gilson, Inc., "402 Syringe Pump User's Guide," Jul. 2003, pp. 5208-5293.

Gilson, Inc., "Brochure," 2003, 1 Page.

Gilson, Inc., "Gilson Product Guide," 2004, pp. 5294-5343.

**US 9,709,589 B2**

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Gilson, Inc., "Product Guide," The Element of Purification, Jul. 2008, pp. 5171-5207.
Gilson, Inc., "Spec Sheet," 2003, 1 Page.
Gilson, Inc., "User's Guide," 2003, 1 Page.
H. Schafer, "Compact View of a Modular Design or a new Philosophy in Metrohm IC," Processional IC, pp. 1-90, Sep. 2007.
J. Van Burg, "EU Declaration of Conformity," Manual ADI 2045VA, 2007, pp. 620-1322.
John Loffink, "Dell PowerEdge M1000e Modular Enclosure Architecture," Dell Enterprise White Paper, Jan. 2008, pp. 4577-4618.
JP Office Action dated Dec. 17, 2013 Issued on Corresponding JP Application No. 2012-514920.
Labomatic Instruments AG, "Customer-specific preparative HPLC Systems," 5387-5389, date unknown.
Labomatic, "Labomatic HPLC valve and column system panel," pp. 5347-5348, date unknown.
Larry Tucker et al., "Videotaped Deposition of METROHM 30 (B) (6)," *GE Healthcare* vs. *Bio-Rad*, Aug. 10, 2015, pp. 1-292.
Metrohm- 850 Processional IC Manual, http://products.matrohm. com, pp. 1-146, date unknown.
Metrohm AG, "850 Professional IC," Bio-Rad Ex. 1017, pp. 1337-1479, Feb. 2007.
Metrohm- Intelligent Ion Chromatography, www.professional-ic. com, 2012, pp. 1-28.
Metrohm Ion analysis, "IC Pump-2.872.0010," 872 Extension Module, pp. 1-67, May 2009.
Metrohm, "850 Professional IC," AnCat-MCS-2.850.3030, Bio-Rad Ex. 1017, May 2009, pp. 1-143.
Metrohm-Peak, Inc., "Determination of Anions + Oxyhalides in Various Waters by Suppressed Conductivity (USEPA method 300 A&B)," IC Application Work AW US6-0125-052007, 2007, pp. 001327-001336.
Tecan Group Ltd, "Cavro OEM Pumps and Valves," 2008, 1 page.
Tecan Group Ltd, "Cavro XLP 6000," 2008, 1 page.
Tecan Systems, "Cavro XLP 6000 Modular Syringe Pump," Operating Manual, Part I, Oct. 2005, pp. 5542-5698.
Thomas Koshy, "Declaration of Thomas Koshy," in The United States District Court for the Southern District of New York, Civil Action No. 1:14-cv-07080-LTS, pp. 1-3, Oct. 30, 2014.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.*, v. *GE Healthcare Bio-Sciences AB*," Case: IPR2015-01826, U.S. Pat. No. 8,821,718 B2, Paper No. 11, Entered: Feb. 29, 2016, pp. 1-47.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.* v. *GE Healthcare Bio-Sciences AB*," Declaration of Dr. Bruce Gale in Support of Bio-Rad Laboratories' Petition for Institution of an IPR on U.S. Pat. No. 8,821,718, pp. 1-84, Sep. 2015.
Waters Corporation, "Waters 2767 Sample Manager, Injector, and Collector," Installation and Maintenance Guide, 2006, pp. 5390-5541.
Office Action issued in Chinese Patent Application No. 201510602257.9 dated Jul. 13, 2016.
Metrohm 850 Professional IC teardown system, Aug. 2016, pp. 1-9.
European Search Report dated Mar. 27, 2017 issued in corresponding European Patent Application No. 16205536.2. (8 pages).

* cited by examiner



Fig. 1



Fig. 2



Fig. 3



Fig. 4a



Fig. 4b



Fig. 4c

Fig. 4d



Fig. 5a



Fig. 5b



Fig. 6



Fig. 7a

Fig. 7b



Fig. 8



Fig. 9



Fig. 10

US 9,709,589 B2

**1**

## AUTOMATED FLUID HANDLING SYSTEM

### CROSS REFERENCE TO RELATED APPLICATION

This application is a Continuation of U.S. patent application Ser. No. 14/463,039 filed Aug. 19, 2014 which is a Continuation of U.S. patent application Ser. No. 13/376,929 filed Dec. 8, 2011 which is a 35 U.S.C. 371 National Phase of International Patent Application No. PCT/SE2010/050624 filed Jun. 4, 2010 which claims priority to Swedish Patent Application No. 0950431-7 filed Jun. 9, 2009, the disclosure of these prior applications are hereby incorporated in their entirety by reference

### BACKGROUND OF THE INVENTION

The present invention relates to the art of fluid handling system systems, and in particular to an automated fluid handling system that is highly flexible and configurable. The fluid handling system may e.g. be a liquid chromatography system, a filtration system, a chemical synthesis system or the like.

There is a large range of fluid handling systems e.g. in laboratories. Such systems comprise a number of fluid handling units, e.g. one or more pumps, valves, mixers, sensor units etc of different types. Said fluid handling units are interconnected by fluid conduits in the form of, rigid or flexible tubes or the like. Even though some systems may be designed for a specific type of application with a specific flow path, there often exists a need for flexibility and ability to alter or optimize the fluid flow path of the system. Moreover, upgrading is often restricted to specific kits provided by the manufacturer, and upgrade kits often is supplied as external add-on equipment to be arranged besides the original system, thus enlarging the foot print of the system and that need to be connected to the system both fluidically and electrically (i.e. to a system control bus or the like). Moreover, replacement of defect fluid handling units is a time consuming and delicate task.

One type of fluid handling system is liquid chromatography systems which is a standard method in laboratories, and there are a broad range of liquid chromatography systems available on the market. Common to most of the present systems is the lack of flexibility in adapting the instrument to a variety of different applications.

### SUMMARY OF THE INVENTION

The object of the invention is to provide a new fluid handling system, which system overcomes one or more drawbacks of the prior art. This is achieved by the fluid handling system as defined in the independent claims.

One advantage with such a fluid handling systems is that the system may easily be upgraded without need for add-on equipment, and that the flow path may be easily optimized for new experimental setups.

Embodiments of the invention are defined in the dependent claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described in detail below with reference to the drawings, in which

FIG. **1** shows one embodiment of a fluid handling system in the form of a liquid chromatography system, according to the present invention.

**2**

FIG. **2** is a schematic illustration of a housing with a liquid handling panel of the fluid handling system of FIG. **1**.

FIG. **3** is a schematic illustration of the housing with the liquid handling panel of FIG. **2** with the modular components of the fluid handling system removed.

FIGS. **4***a* to **4***d* are schematic illustrations of examples of component modules of the fluid handling system removed.

FIGS. **5***a* and **5***b* show a schematic embodiment of an automated fluid handling system.

FIG. **6** is a schematic illustration of an embodiment of a housing with a modular liquid handling panel with the modular components of the fluid handling system removed.

FIGS. **7***a* and **7***b* are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the fluid handling system removed.

FIG. **8** is a schematic illustration of an embodiment of the system architecture of one embodiment of a fluid handling system according to the present invention.

FIG. **9** is a schematic illustration of an embodiment of a master control unit of one embodiment of a fluid handling system according to the present invention.

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel for the liquid chromatography system of FIG. **1**.

### DETAILED DESCRIPTION OF THE INVENTION

According to one embodiment, there is provided an automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

According to another embodiment, there is provided a fluid handling system in the form of a liquid chromatography system comprising a housing, two or more high pressure pumps, at least one sensor unit and a plurality of fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components and the housing comprises a liquid handling panel with a plurality of component positions for receiving said modular components.

FIG. **1** shows one embodiment of an automated fluid handling system modular in the form of a liquid chromatography system, with a plurality of interchangeable modular components arranged in a liquid handling panel wherein the reference numbers denotes:

**1**. Injection valve
**2**. Column valve with integrated pressure sensors
**3**. Conductivity monitor
**4**. UV monitor
**5**. Quaternary valve
**6**. Inlet valve B with integrated air sensor
**7**. System pump
**8**. Pressure monitor, system pump
**9**. Inlet valve A with integrated air sensor
**10**. System pump
**11**. Pressure monitor, sample pump
**12**. Sample pump
**13**. Rinsing system

US 9,709,589 B2

3

**14**. Mixer with online filter
**15**. Sample inlet valve with integrated air sensor
**16**. Flow restrictor
**17**. pH valve
**18**. Outlet valve

The disclosed embodiment is supplied with three high precision pumps **7**, **10**, **12**. There are two System pumps **7**, **10**, System pump A **10** and System pump B **7**, and one Sample pump **12**. The System pumps **7**, **10** may be used individually, or in combination to generate isocratic or gradient elution in purification methods. The Sample pump **12** is dedicated for direct loading of sample onto a column, or for filling of sample loops.

Function of the Pumps

Each pump module consists of two pump heads (not shown). The individual heads are identical but actuated in opposite phase to each other by individual stepper motors, controlled by a microprocessor. The two pistons and pump heads work alternately to give a continuous, low pulsation, liquid delivery. The flow rate of the two System pumps may be varied between about 0.001 ml/min and 25.000 ml/min and the maximum operating pressure is about 20 MPa. The flow rate of the Sample pump may e.g. be varied between 0.01 and 25 ml/min and according to one embodiment the maximum operating pressure is 10 MPa.

According to one embodiment, the plurality of fluid control valves of at least two different configurations are valves of rotary type. Such a motorized rotary valve may consist of a Valve head with a number of defined bores with channels to the inlet and outlet ports of the valve. The Rotary disc, mounted on the motor, has a number of defined channels. The pattern of channels of the Rotary disc together with the pattern and location of the ports of the Valve head, define the flow path and function of each type of valve. When the Rotary disc turns, the flow path in the valve changes.

One embodiment of fluid control valves are Inlet valves A and B (**9**, **6** respectively) that are used to select which buffers or samples to use in a run, and Sample inlet valve **15** that is located before Sample pump **12**. Inlet valve A **9** 1 is located before System pump A **10**, Inlet valve B **6** is located before System pump B **10**, and Sample inlet valve **15** is located before Sample pump **12**. Inlet valve A and Inlet valve B are connected to another embodiment of a fluid control valve in the form of a Quaternary valve **5**. The Quaternary valve is used for automatic buffer preparation, and for formation of quaternary gradients. The number of inlets can be increased by installing component modules with extra inlet valves. Inlet valve A and Inlet valve B enable automatic changing between different buffers and wash solutions, and can be used to generate gradients by mixing buffer A and buffer B. The air sensors integrated in Inlet valve A and Inlet valve B can be used to prevent introduction of air into the pumps and columns.

The Quarternary valve is used for automatic mixing of four different solutions. The Quaternary valve opens one inlet port at a time, and the different solutions are mixed in a Mixer **14** to form the desired buffer. The opening time in the switching valve is controlled by the system. The volume for each inlet port opening increases stepwise when the flow increases. To obtain a homogeneous buffer composition, one has to make sure to use a mixer chamber volume suitable for the flow rate of the method.

The Quaternary valve can be used to create a gradient using four different solutions simultaneously in any combination. The percentage of each solution is controlled by instructions in the method. It is possible to form gradients

4

that changes the percentage of two, three or four solutions linearly over time. This is useful when advanced methods are developed.

The Sample inlet valve **15** enables automatic loading of different samples when using the Sample pump **12** to inject sample directly onto the column or to fill a sample loop. The Sample inlet valve has an inlet dedicated for buffer. This Buffer inlet is used in methods to fill the Sample pump with solution before sample is introduced. The Buffer inlet is also used to wash the Sample pump with buffer between runs. The air sensor integrated in the Sample inlet valve is e.g. used when sample is applied from a vessel onto a column by selecting Inject all sample using air sensor in the Sample application phase of a method. This function uses the Buffer inlet is used to finalize sample injection and to remove air from the Sample pump.

Still another embodiment of fluid control valve may be an Injection valve **1**, which is used to direct sample onto the column. The valve enables usage of a number of different sample application techniques. A sample loop can be connected to the Injection valve and filled either automatically using the Sample pump or manually using a syringe. The sample can also be injected directly onto the column using the Sample pump.

Still another embodiment of fluid control valve may be a Column valve **2** that is used for connection of columns to the system, and to direct the flow onto the column Up to five columns can be connected to the disclosed embodiment of said valve simultaneously. The valve also has a built-in bypass capillary that enables bypassing of connected columns.

The number of column positions can be increased by installing an extra Column valve. Both top and bottom of each column shall be connected to the Column valve. The top of the column shall be connected to one of the A ports (e.g., **1A**), and the bottom of the column shall be connected to the corresponding B port (e.g., **1B**). The flow direction can be set either from the top of the column to the bottom of the column, Down flow, or from the bottom of the column to the top of the column, Up flow. In the default flow path of the Column valve the columns are bypassed. Pressure monitors that measures the actual pressure over the column are integrated into the inlet and outlet ports of the Column valve.

Still another embodiment of fluid control valve may be a pH valve **17** that has an integrated flow cell where a pH electrode can be installed. This enables in-line monitoring of pH during the run. A flow restrictor is connected to the pH valve and can be included in the flow path to generate a backpressure high enough to prevent formation of air bubbles in the UV flow cell. The pH valve is used to direct the flow to the pH electrode and to the flow restrictor, or to bypass one or both.

Still another embodiment of fluid control valve may be an Outlet valve **18** that is used to direct the flow to a Fraction collector (not shown), to any of e.g. 10 outlet ports, or to waste. The number of outlets can be increased by installing an extra Outlet valve.

A Mixer **14** may e.g. be located after System pump A and System pump B and before the Injection valve. The purpose of the Mixer is to make sure that the buffers from the System pumps are mixed to give a homogeneous buffer composition. The Mixer has a built-in filter that prevents impurities from entering the flow path.

To fulfill a desired purpose, with the disclosed liquid chromatography system it is possible to adapt and extend the flow path in a simple and a flexible way. Up to three extra

US 9,709,589 B2

5                                                                  6

fluid control valves or the like can be installed using the free valve positions. Dummy modules are installed in these positions at delivery. To obtain an optional flow path, it is also possible to move the standard fluid control valves to other positions. There are also two types of extra air sensors available which can be installed before Sample inlet valve or after Injection valve.

In the configuration disclosed in FIG. 1, 7 inlets are available for each inlet valve. To increase the number of inlets, an extra inlet valve can be installed which increases the number of inlets to 14 for one of the valves. This optional configuration can be convenient for example when a larger number of samples will be used. There is also a general type of inlet valve, Valve X, which can be used to increase the number of inlets for example the Quaternary valve.

In the configuration disclosed in FIG. 1 with one column valve, 5 column positions are available. To increase the number of column positions to 10, an additional column valve can be installed in the instrument. An application can be to evaluate a number of different columns in method optimization.

In the configuration disclosed in FIG. 1 with one outlet valve, 10 outlet positions are available. To increase the number of outlets, one or two extra outlet valves can be connected, adding up to a total of 21 or 32 outlet positions. This optional configuration is convenient when collecting a number of large fractions outside the fraction collector.

Optional modules are easy to install in the disclosed modular liquid chromatography system. The dummy module is removed with a hexagon wrench and a bus cable is disconnected. The bus cable is connected to the optional fluid control valve or the like which is assembled in the instrument. The module is then added to the System properties in the control software. The available optional modules may e.g. be pre-configured to give the desired function. However, the function of a valve may e.g. be changed by changing the Node ID.

FIG. 2 is a schematic illustration of a housing 20 with a liquid handling panel 22 of the fluid handling system in the form of a modular liquid chromatography system 100 of FIG. 1. In FIG. 2 some components have been removed for clarity reasons. In the disclosed configuration, as disclosed in detail above, the modular liquid chromatography system 100 comprises a plurality of fluid control valves in the form of: Injection valve 1, Column valve 2, Quaternary valve 5, Inlet valve B 6, Inlet valve A 9, Sample inlet valve 15, pH valve 17, and Outlet valve 18. The chromatography system 100 further comprises UV monitor 4, System pump B 7, System pump A 10, Sample pump 12, Mixer 14, and three Dummy modules 24. According to one embodiment, all liquid handling components and sensors arranged at the liquid handling panel 22 are designed to be readily interchangeable. The interchangeability provides improved service and upgrade possibilities and also a possibility to customize the positions of the respective liquid handling components, such as the fluid control valves, e.g. in order to optimize the fluid path for a specific experimental setup. As is illustrated in FIG. 2, there are three large component positions e.g. for pump modules, one UV-sensor position and 9 standard component positions, e.g. for fluid control valves or the like. The component positions are given a standardized size and shape to provide simple interchangeability. According to one embodiment, each modular component is retained in a mating component position by a single screw, and it is connected to the master control unit by a single bus cable providing both communication and system power to each component. FIG. 3 is a schematic

illustration of the housing with the liquid handling panel of FIG. 2 with the modular components of the liquid chromatography system removed.

FIGS. 4a to 4d are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. 4a shows a standard interchangeable modular component 26, e.g. a fluid control valve or the like. The standard component module 26 comprises a panel member 28, an external fluidics section 30 and an internal non-fluidics section 32. According to one embodiment, the panel member 28 essentially separates the fluidics in the external fluidics section 30 from electronics and control means in the internal non-fluidics section 32.

FIG. 4b shows a Dummy module 24, which is intended to be placed in non used standard component positions. In the disclosed embodiment, the Dummy modules are provided with mounting grooves for attachment of accessories to the system. In the disclosed embodiment the dummy module is shown as a panel member 28 without any internal section FIGS. 4c and 4d shows a pump module and an UV-module, respectively, each having an external fluidics section 30 and an internal non-fluidics section 32.

As is disclosed in FIGS. 4a to 4d, the interchangeable modular components 26 comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel. Said panel attachment member may be arranged so that all fluid connections of said modular component are arranged on a wet side of the panel attachment member separating them from electrical components that are arranged on a dry side thereof, hence providing a high degree of liquid resistance at the external part of the fluid handling panel, and so that the liquid resistance requirements for the internal sections may be somewhat lightened. According to one embodiment, the interchangeable modular components are sealed against the liquid handling panel by a sealing member. According to another embodiment, not shown, the modular component does not comprise any panel member, but there is provided a suitable sealing arrangement between the component position openings of the liquid handling panel and the external surface of the interchangeable modular components 26. In the disclosed embodiments, the component position openings of the liquid handling panel and the interchangeable modular components 26 are shown to have an essentially rectangular crossectional shape, but other shapes may be equally applicable. According to one embodiment, there is provided a general fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components as is schematically disclosed in FIG. 5a. As discussed above such a system may be configured for essentially any type of automated liquid handling operations provided that suitable fluid handling units are provided as interchangeable modular components for the system. According to one embodiment there is provided an automated fluid handling system comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

The liquid handling panel 22 of the fluid handling system may e.g. be designed in any suitable manner to allow the modular components to be arranged in an efficient manner.

FIGS. 5a and 5b shows a schematic embodiment of an automated fluid handling system wherein the housing 20 comprises an internal climate panel 29 arranged at a distance behind the liquid handling panel 22 defining an air inlet

US 9,709,589 B2

7

compartment 35 and air outlet compartment 37 in the housing 20, the climate panel 29 being provided with complementary component positions 39 for receiving the internal non fluidics section 32 of the interchangeable modular components 26, and wherein the non-fluidics section 32 of at least one interchangeable modular component is provided with one or more air inlet openings 31 located in the air inlet compartment 35 and one or more air outlet openings 33 located in the air outlet compartment 37 when the interchangeable modular component arranged in position in the component position. FIG. 5b shows the fluid handling system of FIG. 5a in a schematic cross sectional view. As is indicated by inlet vent 41 and outlet vent 43, air for cooling interchangeable modular components 26 provided with air inlet and outlet openings 31, 33 is preferably arranged to enter the air inlet compartment 35 at a distance from the outlet vent 43 in order to avoid recirculation of air. The air circulation in the system may be achieved by a system cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37, through the at least one interchangeable modular component 26. Alternatively, the at least one interchangeable modular component 26 is provided with a local cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37. As is indicated, the complementary component positions 39 are arranged to provide a relatively air flow tight fit with respect to the internal non fluidics section 32 of the interchangeable modular components 26, and according to one embodiment, this may be achieved by a sealing arrangement. In FIG. 5b, there is shown a sealing member 45 for sealing the interchangeable modular components 26 with respect to the liquid handling panel 22, as discussed above. Other sealing member arrangements may be envisaged by a person skilled in the art. According to one embodiment, fluids are strictly restricted to the fluidics section 30 of the interchangeable modular component 26, but in alternative embodiments, only fluid connections are restricted to the fluidics section 30 allowing fluid to "cross" the fluid handling panel inside the non-fluidics section 30 of the interchangeable modular component 26.

In FIG. 5b there is further shown a master control unit 40 and buss connectors 42 for connecting the interchangeable modular components 26 to the master control unit 40. According to one embodiment, the component positions including the buss connectors 42 and the interchangeable modular components 26 are of plug and play configuration with respect to each other.

FIG. 6 is a schematic illustration of an embodiment of a housing 20 with a modular liquid handling panel 22 with the modular components of the liquid chromatography system removed. In the disclosed embodiment, also the layout of the liquid handling panel 22 is configurable by means of two interchangeable panel sections 34 which may be selected in accordance with the desired layout of the system. In FIG. 6 two different layouts of the interchangeable panel sections are disclosed, but the layout may include any suitable configuration.

FIGS. 7a and 7b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the liquid chromatography system removed. In the disclosed embodiment, the modular housing is comprised of a main housing 36 that comprises the master control unit including power supply and climate control for the whole housing, two expansion housing modules 38 and a side member 40. This approach provides very flexible expansion possibilities for the chromatography sys-

8

tem, while preserving the benefits of a single master control unit including power supply and climate control.

FIG. 8 is a schematic illustration of an embodiment of the system architecture of one embodiment of a modular liquid chromatography system according to the present invention. As mentioned above, the chromatography system may comprise a master control unit 40 arranged to communicate with all modular components e.g. 1-26, over a system bus 42 such as a CAN-bus or the like. In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42. In order to minimize the number of connectors to be attached to each modular component, the bus 42 further comprises power feed for the modular components. The Bus 42 may be connected to any suitable number of modular components arranged in the housing 20, but also to one or more modular components 44 outside of the housing 20 or the like. As is mentioned briefly above, the master control unit may further be arranged to control the climate in the housing. In addition to the disclosed modular components, other components of the chromatography system, e.g. a fraction collector or the like, may be arranged in the housing and the controlled climate therein.

According to one embodiment, different component modules are automatically identified by the master control unit, whereby they may be moved essentially freely between different positions. Moreover, the master control unit may be arranged to provide said information to Chromatography control software whereby experimental setup and planning may be performed. In one embodiment, the control system may be arranged to provide an optimized layout of the component modules with respect to the present layout of the liquid handling panel and available component modules for a specific experimental setup.

According to one embodiment, the interchangeable panel sections 34 of FIG. 5 and the expansion housing modules 38 of FIGS. 6a and 6b may be provided with means for automatic detection of the same to allow automatic configuration of the system by the master control unit 40. In one embodiment, each interchangeable panel section 34 and expansion housing module 38 comprises a hub (not shown) for connection to the system bus 42 in order to expand the system bus 42 network to the number of component modules in each interchangeable panel section 34 or expansion housing module 38.

FIG. 9 is a schematic illustration of an embodiment of a master control unit of one embodiment of a modular liquid chromatography system according to the present invention. The master control unit 40 comprises a system controller 46 for communicating with internal and external components and control computers (not shown) etc. According to one embodiment, the system controller comprises a suitable CPU 48, a bus controller 52, an external communications controller 50, such as a LAN unit, and a storage device 54. The bus controller 52 is providing communication with the component modules. The master control unit may further comprise a Power supply 56 and a climate controller 58 arranged to keep the internal climate in the housing 20 at a predetermined level as discussed above.

FIG. 10 is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel. Taking into account the complexity of the disclosed interconnection arrangement, the benefit of optimizing the fluid paths in alternative configurations of the system becomes evident. The task of optimizing the fluid paths may e.g. be performed

US 9,709,589 B2

9 10

to reduce the total length/volume of the fluid paths/tubing arranged to interconnect the different component modules in the system. Alternatively the optimization may be performed to minimize the length/volume of one or more specific fluid paths, such as the sample output path from the column to the fraction collector, in order to minimize dispersion of the fractionized sample.

The invention claimed is:

**1**. An automated liquid chromatography system comprising a housing unit and at least four modular fluid handling units,

wherein the housing unit

comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array,

wherein each modular fluid handling unit

is configured for insertion into the receiving positions of the housing unit,

is readily interchangeable amongst similarly sized and shaped receiving positions of the housing unit, such that positioning of the modular fluid handling unit with respect to other modular fluid handling units permits a fluid flow path to be readily modified, wherein the fluid flow path is formed by fluidic connections between the modular fluid handling units, and

includes a CPU for independently performing fluid control operations in response to instructions over a system BUS.

**2**. The automatic liquid chromatography system of claim **1**, wherein the modular fluid handling units are each connected to the system BUS.

**3**. The automatic liquid chromatography system of claim **1**, wherein the modular fluid handling units include a double piston pump, a sample pump, an inlet valve for selecting inlet fluid to a respective pump, an injection valve for injecting a sample onto a column connected to the flow path of the liquid chromatography system, a column valve for connecting one of a plurality of columns to the flow path, a UV-monitor, a mixer, a pH valve with an integrated flow cell for in-line monitoring of pH levels, a quaternary valve for automatic buffer preparation for formation of quaternary gradients, or any combination thereof.

**4**. The automatic liquid chromatography system of claim **1**, further comprising an expansion housing unit that includes a plurality of receiving positions, each receiving position being adapted to receive the modular fluid handling units.

**5**. The automatic liquid chromatography system of claim **1**, wherein the CPU automatically configures the modular fluid handling unit within the liquid chromatography system upon insertion into the receiving positions of the housing unit.

**6**. An automated liquid chromatography system comprising a housing unit and at least four freely arrangeable modular fluid handling units that control fluid flow through at least one chromatography column when fluidically interconnected to form a fluid path, wherein:

the housing unit is adapted to receive the modular fluid handling units;

the modular fluid handling units are adapted to fit into receiving positions of the housing unit, and each modular fluid handling unit includes a CPU for performing

fluid control operations independently irrespective of the location within the housing unit; and

a master control unit arranged to communicate through a system BUS to each fluid handling unit.

**7**. The automatic liquid chromatography system of claim **6**, wherein said housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are freely arrangeable modular fluid handling units.

**8**. The automatic liquid chromatography system of claim **1**, wherein the housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are arranged as modular fluid handling units.

**9**. The automatic liquid chromatography system of claim **8**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve.

**10**. The automatic liquid chromatography system of claim **1**, wherein the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when received in a receiving position of the housing unit.

**11**. The automatic liquid chromatography system of claim **1**, wherein the modular fluid handling units are of the same size.

**12**. The automatic liquid chromatography system of claim **1**, wherein the modular fluid handling units are of two or more sizes.

**13**. The automatic liquid chromatography system of claim **1**, wherein the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and

wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit.

**14**. The automatic liquid chromatography system of claim **13**, wherein the pH valve includes an integrated flow cell for in-line monitoring of pH levels.

**15**. The automatic liquid chromatography system of claim **1**, wherein the modular fluid handling units include two double piston pumps, one injection valve for injecting sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer.

**16**. The automatic liquid chromatography system of claim **15**, wherein the automatic liquid chromatography system further includes a column valve comprising pressure sensors integrated into inlet a outlet ports of the column valve for measuring the actual pressure over the connected column.

**17**. The automatic liquid chromatography system of claim **15**, wherein the automatic liquid chromatography system further includes a sample inlet valve.

**18**. The automatic liquid chromatography system of claim **15**, wherein the automatic liquid chromatography system further includes a conductivity monitor.

**19**. The automatic liquid chromatography system of claim **7**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve.

**20**. The automatic liquid chromatography system of claim **6**, wherein the modular fluid handling unit includes one or more fluid connectors for connecting the modular fluid handling unit to the fluid path and wherein all fluid connec-

US 9,709,589 B2

11

tors are on an external side of the housing unit when the modular fluid handling unit is fitted into a receiving position of the housing unit.

**21**. The automatic liquid chromatography system of claim **20**, wherein the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when fitted in a receiving position of the housing unit.

**22**. The automatic liquid chromatography system of claim **6**, wherein the modular fluid handling units are of the same size.

**23**. The automatic liquid chromatography system of claim **6**, wherein the modular fluid handling units are of two or more sizes.

**24**. The automatic liquid chromatography system of claim **6**, wherein the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and

    wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit.

**25**. The automatic liquid chromatography system of claim **24**, wherein the pH valve includes an integrated flow cell for in-line monitoring of pH levels.

12

**26**. The automatic liquid chromatography system of claim **6**, wherein the modular fluid handling units include two double piston pumps, one injection valve for injecting a sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer.

**27**. The automatic liquid chromatography system of claim **26**, wherein the automatic liquid chromatography system further includes a column valve comprising pressure sensors integrated into inlet and outlet ports of the column valve for measuring the actual pressure over the connected column.

**28**. The automatic liquid chromatography system of claim **26**, wherein the automatic liquid chromatography system further includes a sample inlet valve.

**29**. The automatic liquid chromatography system of claim **26**, wherein the automatic liquid chromatography system further includes a conductivity monitor.

**30**. The automatic liquid chromatography system of claim **6**, wherein the receiving positions of the housing are arranged in a two dimensional array.

* * * * *

# EXHIBIT 33

US009709590B2

(12) **United States Patent**

Blomberg et al.

(10) Patent No.: **US 9,709,590 B2**

(45) Date of Patent: **Jul. 18, 2017**

(54) **AUTOMATED FLUID HANDLING SYSTEM**

(71) Applicant: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

(72) Inventors: **Johan Blomberg**, Uppsala (SE); **Mats Lundkvist**, Uppsala (SE)

(73) Assignee: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/205,919**

(22) Filed: **Jul. 8, 2016**

(65) **Prior Publication Data**

US 2016/0320356 A1   Nov. 3, 2016

**Related U.S. Application Data**

(60) Division of application No. 15/165,876, filed on May 26, 2016, which is a continuation of application No.
(Continued)

(30) **Foreign Application Priority Data**

Jun. 9, 2009   (SE) ...................................... 0950431

(51) **Int. Cl.**
*G01N 35/10* (2006.01)
*B01D 15/10* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... *G01N 35/1097* (2013.01); *B01D 15/10* (2013.01); *B01D 29/60* (2013.01); *G01N 30/24* (2013.01); *G01N 30/38* (2013.01); *G01N 30/88* (2013.01); *B01D 15/08* (2013.01); *B01D 17/12* (2013.01); *B01D*

*2201/54* (2013.01); *G01N 2030/027* (2013.01); *G01N 2030/8804* (2013.01); *G01N 2030/8881* (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,044,593 A   8/1977   Haruki et al.
4,125,464 A   11/1978   Burger et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN   2567575 Y   8/2003
CN   101358952 A   2/2009
(Continued)

OTHER PUBLICATIONS

ADE 2040 Process Analyzer Manual—Basic Operation, Applikon Analytical, Version 1.4, pp. 1-30, Jul. 2006.
(Continued)

*Primary Examiner* — Richard Gurtowski
(74) *Attorney, Agent, or Firm* — Arent Fox LLP

(57) **ABSTRACT**

Automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

**20 Claims, 10 Drawing Sheets**



Shinoff
7/22/2020
**EX 120**

**US 9,709,590 B2**

Page 2

### Related U.S. Application Data

14/463,039, filed on Aug. 19, 2014, now Pat. No. 9,404,902, which is a continuation of application No. 13/376,929, filed as application No. PCT/SE2010/050624 on Jun. 4, 2010, now Pat. No. 8,821,718.

(51) **Int. Cl.**

| | | |
|---|---|---|
| *G01N 30/88* | (2006.01) | |
| *B01D 29/60* | (2006.01) | |
| *G01N 30/24* | (2006.01) | |
| *G01N 30/38* | (2006.01) | |
| *B01D 15/08* | (2006.01) | |
| *B01D 17/12* | (2006.01) | |
| *G01N 35/00* | (2006.01) | |
| *G01N 30/02* | (2006.01) | |

(52) **U.S. Cl.**
CPC ............... *G01N 2035/00326* (2013.01); *Y10T 137/6416* (2015.04); *Y10T 137/6525* (2015.04); *Y10T 137/6851* (2015.04); *Y10T 137/85986* (2015.04); *Y10T 137/87885* (2015.04)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,730,867 | A | 3/1998 | Drew et al. |
| 5,766,460 | A | 6/1998 | Bergstrom et al. |
| 5,896,273 | A | 4/1999 | Varghese et al. |
| 5,959,841 | A | 9/1999 | Allen et al. |
| 6,190,617 | B1 | 2/2001 | Clark et al. |
| 6,355,164 | B1 | 3/2002 | Wendell et al. |
| 6,434,018 | B1 | 8/2002 | Waltz |
| 6,599,484 | B1 | 7/2003 | Zigler et al. |
| 6,741,463 | B1 | 5/2004 | Akhtar et al. |
| 6,832,622 | B2 | 12/2004 | Hassel et al. |
| 6,968,958 | B2 | 11/2005 | Lauchner et al. |
| 7,374,674 | B2 | 5/2008 | Miyauchi et al. |
| 7,641,242 | B2 | 1/2010 | Van Pelt |
| 7,910,067 | B2 | 3/2011 | Knight et al. |
| 7,932,090 | B2 | 4/2011 | Carter et al. |
| 8,821,718 | B2 | 9/2014 | Blomberg et al. |
| 9,404,902 | B2 | 8/2016 | Blomberg et al. |
| 2002/0185442 | A1 | 12/2002 | Maiefski et al. |
| 2004/0089057 | A1 | 5/2004 | Hobbs et al. |
| 2004/0264145 | A1 | 12/2004 | Miller et al. |
| 2005/0051468 | A1 | 3/2005 | Miyauchi et al. |
| 2006/0047466 | A1 | 3/2006 | White |
| 2006/0274082 | A1 | 12/2006 | Cochran et al. |
| 2007/0081308 | A1 | 4/2007 | Ishida |
| 2007/0095126 | A1 | 5/2007 | Bailey et al. |
| 2007/0097636 | A1 | 5/2007 | Johnson et al. |
| 2007/0247826 | A1 | 10/2007 | Grady et al. |
| 2008/0023653 | A1 | 1/2008 | Lee et al. |
| 2008/0035542 | A1 | 2/2008 | Mourtada et al. |
| 2008/0233653 | A1 | 9/2008 | Hess et al. |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 1984739 | U | 5/1968 |
| DE | 1418503 | A | 12/1975 |
| JP | 2002-333438 | A | 11/2002 |
| JP | 2005-106813 | A | 4/2005 |
| WO | WO 00/22429 | | 4/2000 |
| WO | WO 01/89681 | | 11/2001 |
| WO | WO 2005/042146 | A2 | 5/2005 |
| WO | WO 2006/134035 | | 12/2006 |
| WO | WO 2006/134035 | A1 | 12/2006 |
| WO | WO 2007/036712 | A1 | 4/2007 |

#### OTHER PUBLICATIONS

ADI 2040 Process Analyzer Manual—Analysis Methods, Applikon Analytical, Sep. 2002, pp. 1-44, Version 1.4.

ADI 2040 Process Analyzer Manual—Basic Maintenance & Spare parts, Applikon Analytical, Mar. 2008, Version 1.53, pp. 1-48.

ADI 2040 Process Analyzer Manual—Configuration, Applikon Analytical, Version 1.4, pp. 1-44, Jul. 2006.

ADI 2040 Process Analyzer Manual—Hardware & Installation, Applikon Analytical, Version 1.53, p. 144, May 2008.

ADI 2040 Process Analyzer Manual—Serial Communication, Applikon Analytical, Version 1.4, 134 pp., Apr. 2006.

ADI 2040 Process Analyzer Manual, Applikon Analytical, 1-10 pp., Apr. 1999.

ADI 2045 VA Instrument Manual, Applikon Analytical, 2007, pp. 1-80, Version 1.2.

ADI Process Analyzer Manual—Advanced Operation, Applikon Analytical, Version 1.53, pp. 1-78, Oct. 2007.

Andreas Schmid, "The Energy Issue in Whole Cell Oxyfunctionalization," GreenChem Symposium, Nov. 9, 2006, pp. 5349-5386.

APC, "Rack Enclosures and Open Frame Racks for Server and Networking Applications in it Environments," Rack Systems, 2006, pp. 4619-4638.

Applikon Analytical Confidential, "Analyzers 1999-2008," Bio-Rad Ex. 1004, Jul. 8, 2015, pp. 1323-1326.

Applikon Analytical, "Box Wet Part Module 3X," Bio-Rad Ex.1003, 1 page, Feb. 11, 2008.

Applikon Analytical, "Manual ADI 2040 Process Analyzer," Apr. 1999, Bio-Rad Ex. 1002, pp. 1-619.

Applikon Analytical, "Multi-purpose wet chemical analysis," Process Analyzer ADI 2040, Sep. 2008, pp. 1547-1554.

Applikon Analytical, "Trace Metal and Plating Bath Analysis," ADI2045VA Process Analyzer, Sep. 2007, pp. 1555-1562.

Bilsker, Petition for Inter Parties Review, *Bio-Rad Laboratories, Inc*, v. *GE Healthcare Bio-Science AB*, Sep. 2015, pp. 1-71.

Bio-Rad Laboratories, Inc., "Biologic Duoflow Chromatography System," Instruction Manual, 2003, pp. 5810-6048.

Brinkmann, "875 ProcessLab Components," ProcessLab, pp. 1-26, Mar. 2001.

Brinkmann, "875 ProcessLab Hardware," ProcessLab, pp. 1-15, Mar. 2007.

Brinkmann, "Is ProcessLab Explosion-Proof?" ProcessLab, pp. 1-12, Mar. 2001.

Dionex, "ICS-3000 Ion Chromatography System Operator's Manual." Thermo Scientific, Jan. 2008, pp. 4779-5170.

Eda Tezcanli, "An Analytical Survey on Customization at Modular Systems in the Context of Industrial Design," A Thesis Submitted to the Graduate School of Engineering and Sciences of Izmir Institute of Technology in Partial Fulfillment of the Requirements for the Degree of Master of Science in Industrial Design, Jan. 2006, pp. 5701-5809.

EP Office Action dated Feb. 26, 2014 Issued on Corresponding EP Application No. 107864548.

General Electric, "Operating Instructions Original Instructions," • KTA pure, Apr. 2014, pp. 3785-3928.

General Electric, "User Manual," • KTA pure, Dec. 2014, pp. 3929-4445.

Gilson, Inc., "2007-2008 Product Guide," Bio-Rad Ex. 1010 pp. 1-37.

Gilson, Inc., "402 Syringe Pump User's Guide," Bio-Rad Ex. 1011, Jun. 2001, pp. 1-86.

Gilson, Inc., "402 Syringe Pump User's Guide," Jul. 2003, pp. 5208-5293.

Gilson, Inc., "Brochure," 2003, 1 Page.

Gilson, Inc., "Gilson Product Guide," 2004, pp. 5294-5343.

Gilson, Inc., "Product Guide," The Element of Purification, Jul. 2008, pp. 5171-5207.

Gilson, Inc., "Spec Sheet," 2003, 1 Page.

Gilson, Inc., "User's Guide," 2003, 1 Page.

H. Schafer, "Compact View of a Modular Design or a new Philosophy in Metrohm IC," Processional IC, pp. 1-90, Sep. 2007.

J. Van Burg, "EU Declaration of Conformity," Manual ADI 2045VA, 2007, pp. 620-1322.

John Loffink, "Dell PowerEdge M1000e Modular Enclosure Architecture," Dell Enterprise White Paper, Jan. 2008, pp. 4577-4618.

## US 9,709,590 B2

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

JP Office Action dated Dec. 17, 2013 Issued on Corresponding JP Application No. 2012-514920.
Labomatic Instruments AG, "Customer-specific preparative HPLC Systems," 5387-5389, date unknown.
Labomatic, "Labomatic HPLC valve and column system panel," pp. 5347-5348, date unknown.
Larry Tucker et al., "Videotaped Deposition of METROHM 30 (B) (6)," *GE Healthcare* vs. *Bio-Rad*, Aug. 10, 2015, pp. 1-292.
Metrohm—850 Processional IC Manual, http://products.matrohm. com, pp. 1-146, date unknown.
Metrohm AG, "850 Professional IC," Bio-Rad Ex. 1017, pp. 1337-1479, Feb. 2007.
Metrohm—Intelligent Ion Chromatography, www.professional-ic. com, 2012, pp. 1-28.
Metrohm Ion analysis, "IC Pump-2.872.0010," 872 Extension Module, pp. 1-67, May 2009.
Metrohm, "850 Professional IC," AnCat-MCS-2.850.3030, Bio-Rad Ex. 1017, May 2009, pp. 1-143.
Metrohm-Peak, Inc., "Determination of Anions + Oxyhalides in Various Waters by Suppressed Conductivity (USEPA method 300 A&B)," IC Application Work AW US6-0125-052007, 2007, pp. 001327-001336.
Tecan Group Ltd, "Cavro OEM Pumps and Valves," 2008, 1 page.
Tecan Group Ltd, "Cavro XLP 6000," 2008, 1 page.
Tecan Systems, "Cavro XLP 6000 Modular Syringe Pump," Operating Manual, Part I, Oct. 2005, pp. 5542-5698.
Thomas Koshy, "Declaration of Thomas Koshy," in the United States District Court for the Southern District of New York, Civil Action No. 1:14-cv-07080-LTS, pp. 1-3, Oct. 30, 2014.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.,* v. *GE Healthcare Bio-Sciences AB,*" Case: IPR2015-01826, U.S. Pat. No. 8,821,718 B2, Paper No. 11, Entered: Feb. 29, 2016, pp. 1-47.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.* v. *GE Healthcare Bio-Sciences AB,*" Declaration of Dr. Bruce Gale in Support of Bio-Rad Laboratories' Petition for Institution of an IPR on U.S. Pat. No. 8,821,718, pp. 1-84, Sep. 2015.
Waters Corporation, "Waters 2767 Sample Manager, Injector, and Collector," Installation and Maintenance Guide, 2006, pp. 5390-5541.
Metrohm 850 Professional IC teardown system, Aug. 2016, pp. 1-9.
Office Action issued in Chinese Patent Application No. 201510602257.9 dated Jul. 13, 2016.
European Search Report issued in European Patent Application No. 16205536 dated Mar. 17, 2017 (8 pages).

100



Fig. 1



Fig. 2



Fig. 3



Fig. 4a



Fig. 4b



Fig. 4c



Fig. 4d



Fig. 5a



Fig. 5b



Fig. 6



Fig. 7a

Fig. 7b



Fig. 8



Fig. 9

Fig. 10

US 9,709,590 B2

1

**AUTOMATED FLUID HANDLING SYSTEM**

CROSS REFERENCE TO RELATED APPLICATION

This application is a Divisional of U.S. patent application Ser. No. 15/165,876 filed May 26, 2016 which is a Continuation of U.S. patent application Ser. No. 14/463,039 filed Aug. 19, 2014 which is a Continuation of U.S. patent application Ser. No. 13/376,929 filed Dec. 8, 2011 which is a 35 U.S.C. 371 National Phase of International Patent Application No. PCT/SE2010/050624 filed Jun. 4, 2010 which claims priority to Swedish Patent Application No. 0950431-7 filed Jun. 9, 2009, the disclosure of these prior applications are hereby incorporated in their entirety by reference

BACKGROUND OF THE INVENTION

The present invention relates to the art of fluid handling system systems, and in particular to an automated fluid handling system that is highly flexible and configurable. The fluid handling system may e.g. be a liquid chromatography system, a filtration system, a chemical synthesis system or the like.

There is a large range of fluid handling systems e.g. in laboratories. Such systems comprise a number of fluid handling units, e.g. one or more pumps, valves, mixers, sensor units etc of different types. Said fluid handling units are interconnected by fluid conduits in the form of, rigid or flexible tubes or the like. Even though some systems may be designed for a specific type of application with a specific flow path, there often exists a need for flexibility and ability to alter or optimize the fluid flow path of the system. Moreover, upgrading is often restricted to specific kits provided by the manufacturer, and upgrade kits often is supplied as external add-on equipment to be arranged besides the original system, thus enlarging the foot print of the system and that need to be connected to the system both fluidically and electrically (i.e. to a system control bus or the like). Moreover, replacement of defect fluid handling units is a time consuming and delicate task.

One type of liquid handling system is liquid chromatography systems which is a standard method in laboratories, and there are a broad range of liquid chromatography systems available on the market. Common to most of the present systems is the lack of flexibility in adapting the instrument to a variety of different applications.

SUMMARY OF THE INVENTION

The object of the invention is to provide a new fluid handling system, which system overcomes one or more drawbacks of the prior art. This is achieved by the fluid handling system as defined in the independent claims.

One advantage with such a fluid handling systems is that the system may easily be upgraded without need for add-on equipment, and that the flow path may be easily optimized for new experimental setups.

Embodiments of the invention are defined in the dependent claims.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described in detail below with reference to the drawings, in which

2

FIG. 1 shows one embodiment of a fluid handling system in the form of a liquid chromatography system, according to the present invention.

FIG. 2 is a schematic illustration of a housing with a liquid handling panel of the fluid handling system of FIG. 1.

FIG. 3 is a schematic illustration of the housing with the liquid handling panel of FIG. 2 with the modular components of the fluid handling system removed.

FIGS. 4a to 4d are schematic illustrations of examples of component modules of the fluid handling system removed.

FIGS. 5a and 5b show a schematic embodiment of an automated fluid handling system.

FIG. 6 is a schematic illustration of an embodiment of a housing with a modular liquid handling panel with the modular components of the fluid handling system removed.

FIGS. 7a and 7b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the fluid handling system removed.

FIG. 8 is a schematic illustration of an embodiment of the system architecture of one embodiment of a fluid handling system according to the present invention.

FIG. 9 is a schematic illustration of an embodiment of a master control unit of one embodiment of a fluid handling system according to the present invention.

FIG. 10 is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel for the liquid chromatography system of FIG. 1.

DETAILED DESCRIPTION OF THE INVENTION

According to one embodiment, there is provided an automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

According to another embodiment, there is provided a fluid handling system in the form of a liquid chromatography system comprising a housing, two or more high pressure pumps, at least one sensor unit and a plurality of fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components and the housing comprises a liquid handling panel with a plurality of component positions for receiving said modular components.

FIG. 1 shows one embodiment of an automated fluid handling system modular in the form of a liquid chromatography system, with a plurality of interchangeable modular components arranged in a liquid handling panel wherein the reference numbers denotes:

**1.** Injection valve
**2.** Column valve with integrated pressure sensors
**3.** Conductivity monitor
**4.** UV monitor
**5.** Quaternary valve
**6.** Inlet valve B with integrated air sensor
**7.** System pump
**8.** Pressure monitor, system pump
**9.** Inlet valve A with integrated air sensor
**10.** System pump

US 9,709,590 B2

3

**11**. Pressure monitor, sample pump
**12**. Sample pump
**13**. Rinsing system
**14**. Mixer with online filter
**15**. Sample inlet valve with integrated air sensor
**16**. Flow restrictor
**17**. pH valve
**18**. Outlet valve

The disclosed embodiment is supplied with three high precision pumps **7**, **10**, **12**. There are two System pumps **7**, **10**, System pump A **10** and System pump B **7**, and one Sample pump **12**. The System pumps **7**, **10** may be used individually, or in combination to generate isocratic or gradient elution in purification methods. The Sample pump **12** is dedicated for direct loading of sample onto a column, or for filling of sample loops.

Function of the Pumps:

Each pump module consists of two pump heads (not shown). The individual heads are identical but actuated in opposite phase to each other by individual stepper motors, controlled by a microprocessor. The two pistons and pump heads work alternately to give a continuous, low pulsation, liquid delivery. The flow rate of the two System pumps may be varied between about 0.001 ml/min and 25.000 ml/min and the maximum operating pressure is about 20 MPa. The flow rate of the Sample pump may e.g. be varied between 0.01 and 25 ml/min and according to one embodiment the maximum operating pressure is 10 MPa.

According to one embodiment, the plurality of fluid control valves of at least two different configurations are valves of rotary type. Such a motorized rotary valve may consist of a Valve head with a number of defined bores with channels to the inlet and outlet ports of the valve. The Rotary disc, mounted on the motor, has a number of defined channels. The pattern of channels of the Rotary disc together with the pattern and location of the ports of the Valve head, define the flow path and function of each type of valve. When the Rotary disc turns, the flow path in the valve changes.

One embodiment of fluid control valves are Inlet valves A and B (**9**, **6** respectively) that are used to select which buffers or samples to use in a run, and Sample inlet valve **15** that is located before Sample pump **12**. Inlet valve A **9** 1 is located before System pump A **10**, Inlet valve B **6** is located before System pump B **10**, and Sample inlet valve **15** is located before Sample pump **12**. Inlet valve A and Inlet valve B are connected to another embodiment of a fluid control valve in the form of a Quaternary valve **5**. The Quaternary valve is used for automatic buffer preparation, and for formation of quaternary gradients. The number of inlets can be increased by installing component modules with extra inlet valves. Inlet valve A and Inlet valve B enable automatic changing between different buffers and wash solutions, and can be used to generate gradients by mixing buffer A and buffer B. The air sensors integrated in Inlet valve A and Inlet valve B can be used to prevent introduction of air into the pumps and columns.

The Quarternary valve is used for automatic mixing of four different solutions. The Quaternary valve opens one inlet port at a time, and the different solutions are mixed in a Mixer **14** to form the desired buffer. The opening time in the switching valve is controlled by the system. The volume for each inlet port opening increases stepwise when the flow increases. To obtain a homogeneous buffer composition, one has to make sure to use a mixer chamber volume suitable for the flow rate of the method.

4

The Quaternary valve can be used to create a gradient using four different solutions simultaneously in any combination. The percentage of each solution is controlled by instructions in the method. It is possible to form gradients that changes the percentage of two, three or four solutions linearly over time. This is useful when advanced methods are developed.

The Sample inlet valve **15** enables automatic loading of different samples when using the Sample pump **12** to inject sample directly onto the column or to fill a sample loop. The Sample inlet valve has an inlet dedicated for buffer. This Buffer inlet is used in methods to fill the Sample pump with solution before sample is introduced. The Buffer inlet is also used to wash the Sample pump with buffer between runs. The air sensor integrated in the Sample inlet valve is e.g. used when sample is applied from a vessel onto a column by selecting Inject all sample using air sensor in the Sample application phase of a method. This function uses the Buffer inlet is used to finalize sample injection and to remove air from the Sample pump.

Still another embodiment of fluid control valve may be an Injection valve **1**, which is used to direct sample onto the column. The valve enables usage of a number of different sample application techniques. A sample loop can be connected to the Injection valve and filled either automatically using the Sample pump or manually using a syringe. The sample can also be injected directly onto the column using the Sample pump.

Still another embodiment of fluid control valve may be a Column valve **2** that is used for connection of columns to the system, and to direct the flow onto the column. Up to five columns can be connected to the disclosed embodiment of said valve simultaneously. The valve also has a built-in bypass capillary that enables bypassing of connected columns.

The number of column positions can be increased by installing an extra Column valve. Both top and bottom of each column shall be connected to the Column valve. The top of the column shall be connected to one of the A ports (e.g., **1A**), and the bottom of the column shall be connected to the corresponding B port (e.g., **1B**). The flow direction can be set either from the top of the column to the bottom of the column, Down flow, or from the bottom of the column to the top of the column, Up flow. In the default flow path of the Column valve the columns are bypassed. Pressure monitors that measures the actual pressure over the column are integrated into the inlet and outlet ports of the Column valve.

Still another embodiment of fluid control valve may be a pH valve **17** that has an integrated flow cell where a pH electrode can be installed. This enables in-line monitoring of pH during the run. A flow restrictor is connected to the pH valve and can be included in the flow path to generate a backpressure high enough to prevent formation of air bubbles in the UV flow cell. The pH valve is used to direct the flow to the pH electrode and to the flow restrictor, or to bypass one or both.

Still another embodiment of fluid control valve may be an Outlet valve **18** that is used to direct the flow to a Fraction collector (not shown), to any of e.g. 10 outlet ports, or to waste. The number of outlets can be increased by installing an extra Outlet valve.

A Mixer **14** may e.g. be located after System pump A and System pump B and before the Injection valve. The purpose of the Mixer is to make sure that the buffers from the System

US 9,709,590 B2

5

pumps are mixed to give a homogenous buffer composition. The Mixer has a built-in filter that prevents impurities from entering the flow path.

To fulfill a desired purpose, with the disclosed liquid chromatography system it is possible to adapt and extend the flow path in a simple and a flexible way. Up to three extra fluid control valves or the like can be installed using the free valve positions. Dummy modules are installed in these positions at delivery. To obtain an optional flow path, it is also possible to move the standard fluid control valves to other positions. There are also two types of extra air sensors available which can be installed before Sample inlet valve or after Injection valve.

In the configuration disclosed in FIG. 1, 7 inlets are available for each inlet valve. To increase the number of inlets, an extra inlet valve can be installed which increases the number of inlets to 14 for one of the valves. This optional configuration can be convenient for example when a larger number of samples will be used. There is also a general type of inlet valve, Valve X, which can be used to increase the number of inlets to for example the Quaternary valve.

In the configuration disclosed in FIG. 1 with one column valve, 5 column positions are available. To increase the number of column positions to 10, an additional column valve can be installed in the instrument. An application can be to evaluate a number of different columns in method optimization.

In the configuration disclosed in FIG. 1 with one outlet valve, 10 outlet positions are available. To increase the number of outlets, one or two extra outlet valves can be connected, adding up to a total of 21 or 32 outlet positions. This optional configuration is convenient when collecting a number of large fractions outside the fraction collector.

Optional modules are easy to install in the disclosed modular liquid chromatography system. The dummy module is removed with a hexagon wrench and a bus cable is disconnected. The bus cable is connected to the optional fluid control valve or the like which is assembled in the instrument. The module is then added to the System properties in the control software. The available optional modules may e.g. be pre-configured to give the desired function. However, the function of a valve may e.g. be changed by changing the Node ID.

FIG. 2 is a schematic illustration of a housing 20 with a liquid handling panel 22 of the fluid handling system in the form of a modular liquid chromatography system 100 of FIG. 1. In FIG. 2 some components have been removed for clarity reasons. In the disclosed configuration, as disclosed in detail above, the modular liquid chromatography system 100 comprises a plurality of fluid control valves in the form of: Injection valve 1, Column valve 2, Quaternary valve 5, Inlet valve B 6, Inlet valve A 9, Sample inlet valve 15, pH valve 17, and Outlet valve 18. The chromatography system 100 further comprises UV monitor 4, System pump B 7, System pump A 10, Sample pump 12, Mixer 14, and three Dummy modules 24. According to one embodiment, all liquid handling components and sensors arranged at the liquid handling panel 22 are designed to be readily interchangeable. The interchangeability provides improved service and upgrade possibilities and also a possibility to customize the positions of the respective liquid handling components, such as the fluid control valves, e.g. in order to optimize the fluid path for a specific experimental setup. As is illustrated in FIG. 2, there are three large component positions e.g. for pump modules, one UV-sensor position and 9 standard component positions, e.g. for fluid control valves or the like. The component positions are given a

6

standardized size and shape to provide simple interchangeability. According to one embodiment, each modular component is retained in a mating component position by a single screw, and it is connected to the master control unit by a single bus cable providing both communication and system power to each component. FIG. 3 is a schematic illustration of the housing with the liquid handling panel of FIG. 2 with the modular components of the liquid chromatography system removed.

FIGS. 4a to 4d are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. 4a shows a standard interchangeable modular component 26, e.g. a fluid control valve or the like. The standard component module 26 comprises a panel member 28, an external fluidics section 30 and an internal non-fluidics section 32. According to one embodiment, the panel member 28 essentially separates the fluidics in the external fluidics section 30 from electronics and control means in the internal non-fluidics section 32.

FIG. 4b shows a Dummy module 24, which is intended to be placed in non used standard component positions. In the disclosed embodiment, the Dummy modules are provided with mounting grooves for attachment of accessories to the system. In the disclosed embodiment the dummy module is shown as a panel member 28 without any internal section FIGS. 4c and 4d shows a pump module and an UV-module, respectively, each having an external fluidics section 30 and an internal non-fluidics section 32.

As is disclosed in FIGS. 4a to 4d, the interchangeable modular components 26 comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel. Said panel attachment member may be arranged so that all fluid connections of said modular component are arranged on a wet side of the panel attachment member separating them from electrical components that are arranged on a dry side thereof, hence providing a high degree of liquid resistance at the external part of the fluid handling panel, and so that the liquid resistance requirements for the internal sections may be somewhat lightened. According to one embodiment, the interchangeable modular components are sealed against the liquid handling panel by a sealing member. According to another embodiment, not shown, the modular component does not comprise any panel member, but there is provided a suitable sealing arrangement between the component position openings of the liquid handling panel and the external surface of the interchangeable modular components 26. In the disclosed embodiments, the component position openings of the liquid handling panel and the interchangeable modular components 26 are shown to have an essentially rectangular crossectional shape, but other shapes may be equally applicable. According to one embodiment, there is provided a general fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components as is schematically disclosed in FIG. 5a. As discussed above such a system may be configured for essentially any type of automated liquid handling operations provided that suitable fluid handling units are provided as interchangeable modular components for the system. According to one embodiment there is provided an automated fluid handling system comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

US 9,709,590 B2

7

The liquid handling panel 22 of the fluid handling system may e.g. be designed in any suitable manner to allow the modular components to be arranged in an efficient manner.

FIGS. 5a and 5b shows a schematic embodiment of an automated fluid handling system wherein the housing 20 comprises an internal climate panel 29 arranged at a distance behind the liquid handling panel 22 defining an air inlet compartment 35 and air outlet compartment 37 in the housing 20, the climate panel 29 being provided with complementary component positions 39 for receiving the internal non fluidics section 32 of the interchangeable modular components 26, and wherein the non-fluidics section 32 of at least one interchangeable modular component is provided with one or more air inlet openings 31 located in the air inlet compartment 35 and one or more air outlet openings 33 located in the air outlet compartment 37 when the interchangeable modular component arranged in position in the component position. FIG. 5b shows the fluid handling system of FIG. 5a in a schematic cross sectional view. As is indicated by inlet vent 41 and outlet vent 43, air for cooling interchangeable modular components 26 provided with air inlet and outlet openings 31, 33 is preferably arranged to enter the air inlet compartment 35 at a distance from the outlet vent 43 in order to avoid recirculation of air. The air circulation in the system may be achieved by a system cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37, through the at least one interchangeable modular component 26. Alternatively, the at least one interchangeable modular component 26 is provided with a local cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37. As is indicated, the complementary component positions 39 are arranged to provide a relatively air flow tight fit with respect to the internal non fluidics section 32 of the interchangeable modular components 26, and according to one embodiment, this may be achieved by a sealing arrangement. In FIG. 5b, there is shown a sealing member 45 for sealing the interchangeable modular components 26 with respect to the liquid handling panel 22, as discussed above. Other sealing member arrangements may be envisaged by a person skilled in the art. According to one embodiment, fluids are strictly restricted to the fluidics section 30 of the interchangeable modular component 26, but in alternative embodiments, only fluid connections are restricted to the fluidics section 30 allowing fluid to "cross" the fluid handling panel inside the non-fluidics section 30 of the interchangeable modular component 26.

In FIG. 5b there is further shown a master control unit 40 and buss connectors 42 for connecting the interchangeable modular components 26 to the master control unit 40. According to one embodiment, the component positions including the buss connectors 42 and the interchangeable modular components 26 are of plug and play configuration with respect to each other.

FIG. 6 is a schematic illustration of an embodiment of a housing 20 with a modular liquid handling panel 22 with the modular components of the liquid chromatography system removed. In the disclosed embodiment, also the layout of the liquid handling panel 22 is configurable by means of two interchangeable panel sections 34 which may be selected in accordance with the desired layout of the system. In FIG. 6 two different layouts of the interchangeable panel sections are disclosed, but the layout may include any suitable configuration.

FIGS. 7a and 7b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with

8

the modular components of the liquid chromatography system removed. In the disclosed embodiment, the modular housing is comprised of a main housing 36 that comprises the master control unit including power supply and climate control for the whole housing, two expansion housing modules 38 and a side member 40. This approach provides very flexible expansion possibilities for the chromatography system, while preserving the benefits of a single master control unit including power supply and climate control.

FIG. 8 is a schematic illustration of an embodiment of the system architecture of one embodiment of a modular liquid chromatography system according to the present invention. As mentioned above, the chromatography system may comprise a master control unit 40 arranged to communicate with all modular components e.g. 1-26, over a system bus 42 such as a CAN-bus or the like. In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42. In order to minimize the number of connectors to be attached to each modular component, the bus 42 further comprises power feed for the modular components. The Bus 42 may be connected to any suitable number of modular components arranged in the housing 20, but also to one or more modular components 44 outside of the housing 20 or the like. As is mentioned briefly above, the master control unit may further be arranged to control the climate in the housing. In addition to the disclosed modular components, other components of the chromatography system, e.g. a fraction collector or the like, may be arranged in the housing and the controlled climate therein.

According to one embodiment, different component modules are automatically identified by the master control unit, whereby they may be moved essentially freely between different positions. Moreover, the master control unit may be arranged to provide said information to Chromatography control software whereby experimental setup and planning may be performed. In one embodiment, the control system may be arranged to provide an optimized layout of the component modules with respect to the present layout of the liquid handling panel and available component modules for a specific experimental setup.

According to one embodiment, the interchangeable panel sections 34 of FIG. 5 and the expansion housing modules 38 of FIGS. 6a and 6b may be provided with means for automatic detection of the same to allow automatic configuration of the system by the master control unit 40. In one embodiment, each interchangeable panel section 34 and expansion housing module 38 comprises a hub (not shown) for connection to the system bus 42 in order to expand the system bus 42 network to the number of component modules in each interchangeable panel section 34 or expansion housing module 38.

FIG. 9 is a schematic illustration of an embodiment of a master control unit of one embodiment of a modular liquid chromatography system according to the present invention. The master control unit 40 comprises a system controller 46 for communicating with internal and external components and control computers (not shown) etc. According to one embodiment, the system controller comprises a suitable CPU 48, a bus controller 52, an external communications controller 50, such as a LAN unit, and a storage device 54. The bus controller 52 is providing communication with the component modules. The master control unit may further comprise a Power supply 56 and a climate controller 58 arranged to keep the internal climate in the housing 20 at a predetermined level as discussed above.

US 9,709,590 B2

9

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel. Taking into account the complexity of the disclosed interconnection arrangement, the benefit of optimizing the fluid paths in alternative configurations of the system becomes evident. The task of optimizing the fluid paths may e.g. be performed to reduce the total length/volume of the fluid paths/tubing arranged to interconnect the different component modules in the system. Alternatively the optimization may be performed to minimize the length/volume of one or more specific fluid paths, such as the sample output path from the column to the fraction collector, in order to minimize dispersion of the fractionized sample.

The invention claimed is:

**1**. A method of modifying a fluid flow path in an automated liquid chromatography system comprising at least four interchangeable modular components comprising:

interchanging at least two of the interchangeable modular components in a housing unit comprising at least four component receiving positions arranged in a two dimensional array, so as to allow for modification of the liquid chromatography fluid flow path among the at least four interchangeable modular components;

wherein each of the at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit.

**2**. The method of claim **1**, wherein the interchanging of the at least two interchangeable modular components shortens the fluid flow path for the liquid chromatography.

**3**. The method of claim **1**, wherein the interchanging of the at least two interchangeable modular component shortens the fluid flow path between the interchangeable modular components.

**4**. The method of claim **1**, wherein the interchanging of the interchangeable modular components includes connecting each of the at least four interchangeable modular components to a system BUS.

**5**. The method of claim **1**, wherein the liquid chromatography system further comprises an expansion housing unit that includes a plurality of additional component receiving positions, each component receiving position being capable of receiving the interchangeable modular components, wherein the interchanging of the interchangeable modular components includes arranging at least one of the interchangeable modular components in a component receiving position in the expansion housing unit.

**6**. The method of claim **1**, wherein the interchangeable modular components include a double piston pump, a sample pump, an inlet valve for selecting inlet fluid to a respective pump, injection valve for injecting a sample onto a column connected to the flow path of the liquid chromatography system, a column valve for connecting one of a plurality of columns to the flow path, a UV-monitor, a mixer, a pH valve with an integrated flow cell for in-line monitoring of pH levels, a quaternary valve for automatic buffer preparation for formation of quaternary gradients, or any combination thereof.

**7**. The method of claim **1**, wherein each of the at least four interchangeable modular components are connected to a system BUS by a cable.

**8**. The method of claim **1**, wherein the at least four component receiving positions of the housing unit are of the same size.

10

**9**. The method of claim **1**, wherein the at least four component receiving positions of the housing unit are of two or more sizes.

**10**. The method of claim **1**, wherein the interchanging includes

removing an interchangeable modular component from the component receiving position and installing an interchangeable modular component of a different functionality or a dummy module,

installing an extra interchangeable modular component,

rearranging one or more of said interchangeable modular components among said at least four modular components,

or any combination thereof.

**11**. The method of claim **10**, wherein said rearranging includes exchanging one interchangeable modular component for another interchangeable modular component.

**12**. The method of claim **1**, wherein the interchanging of the at least two interchangeable modular components provides for upgrading and customizing the liquid chromatography system for various user customizable chromatography set-ups, wherein the placement and interchanging of the interchangeable modular components amongst the at least four component receiving positions and with respect to each of the other interchangeable modular components at the component receiving positions allows for modifying the liquid chromatography fluid flow path.

**13**. A method for building an automated liquid chromatography system, the method comprising

providing a

housing unit comprising a main controller, a power source and at least four component receiving positions arranged in a two dimensional array on one side of the housing, wherein the component receiving positions are of a size and shape that is capable of receiving an interchangeable modular fluid handling unit of a similar size and shape;

placing at least two interchangeable modular fluid handling units components in said component receiving positions; and

the at least two interchangeable modular fluid handling units being readily interchangeable and comprising a CPU that allows independent fluid control operations in response to instructions from the main controller when installed in the component receiving position of the housing unit.

**14**. The method of claim **13**, further comprising adding an expansion housing unit that includes a plurality of component receiving positions, each component receiving position being adapted to receive the at least one interchangeable modular fluid handling unit, and placing at least one additional interchangeable modular fluid handling unit in one of the component receiving positions in the expansion housing.

**15**. The method of claim **13**, wherein the component receiving positions are arranged in a two dimensional array on a panel member that separates an external side from an internal side of the housing.

**16**. The method of claim **15**, wherein the panel member comprises a plurality of component receiving positions of different sizes and shapes.

**17**. The method of claim **13**, wherein the CPU allows for automatic identification by the liquid chromatography system upon placement in a component receiving position of similar size and shape.

**18**. The method of claim **13**, wherein the at least two interchangeable modular fluid handling units are connected to the system by a system BUS.

US 9,709,590 B2

11

12

**19**. The method of claim **13**, wherein the at least two component receiving positions of the housing unit are of two or more sizes.

**20**. The method of claim **11**, wherein the exchanging of the another interchangeable modular fluid handling unit is an exchange of a different type.

\* \* \* \* \*

# EXHIBIT 34

US009709591B2

(12) **United States Patent**
Blomberg et al.

(10) **Patent No.:**     **US 9,709,591 B2**
(45) **Date of Patent:**      *Jul. 18, 2017

(54) **AUTOMATED FLUID HANDLING SYSTEM**

(71) Applicant: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

(72) Inventors: **Johan Blomberg**, Uppsala (SE); **Mats Lundkvist**, Uppsala (SE)

(73) Assignee: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/205,956**

(22) Filed: **Jul. 8, 2016**

(65)        **Prior Publication Data**
US 2016/0320357 A1     Nov. 3, 2016

**Related U.S. Application Data**

(60) Division of application No. 15/165,876, filed on May 26, 2016, which is a continuation of application No.
(Continued)

(30)    **Foreign Application Priority Data**

Jun. 9, 2009    (SE) ...................................... 0950431

(51) **Int. Cl.**
**B01D 35/00**       (2006.01)
**B01D 15/08**       (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... **G01N 35/1097** (2013.01); **B01D 15/10** (2013.01); **B01D 29/60** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56)          **References Cited**

U.S. PATENT DOCUMENTS

4,044,593 A     8/1977  Haruki et al.
4,125,464 A    11/1978  Burger et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN        2567575 Y      8/2003
CN     101358952 A      2/2009
(Continued)

OTHER PUBLICATIONS

Metrohm 850 Professional IC teardown system, Aug. 2016, pp. 1-9.

*Primary Examiner* — Richard Gurtowski
(74) *Attorney, Agent, or Firm* — Arent Fox LLP

(57)          **ABSTRACT**

Automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

**29 Claims, 10 Drawing Sheets**



Shinoff
7/22/2020
**EX 121**

## US 9,709,591 B2

Page 2

### Related U.S. Application Data

14/463,039, filed on Aug. 19, 2014, now Pat. No. 9,404,902, which is a continuation of application No. 13/376,929, filed as application No. PCT/SE2010/050624 on Jun. 4, 2010, now Pat. No. 8,821,718.

(51) **Int. Cl.**

| | |
|---|---|
| *G01N 21/00* | (2006.01) |
| *G01N 35/10* | (2006.01) |
| *B01D 15/10* | (2006.01) |
| *G01N 30/88* | (2006.01) |
| *B01D 29/60* | (2006.01) |
| *G01N 30/24* | (2006.01) |
| *G01N 30/38* | (2006.01) |
| *B01D 17/12* | (2006.01) |
| *G01N 35/00* | (2006.01) |
| *G01N 30/02* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *G01N 30/24* (2013.01); *G01N 30/38* (2013.01); *G01N 30/88* (2013.01); *B01D 15/08* (2013.01); *B01D 17/12* (2013.01); *B01D 2201/54* (2013.01); *G01N 2030/027* (2013.01); *G01N 2030/8804* (2013.01); *G01N 2030/8881* (2013.01); *G01N 2035/00326* (2013.01); *Y10T 137/6416* (2015.04); *Y10T 137/6525* (2015.04); *Y10T 137/6851* (2015.04); *Y10T 137/85986* (2015.04); *Y10T 137/87885* (2015.04)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,730,867 | A | 3/1998 | Drew et al. |
| 5,766,460 | A | 6/1998 | Bergstrom et al. |
| 5,896,273 | A | 4/1999 | Varghese et al. |
| 5,959,841 | A | 9/1999 | Allen et al. |
| 6,190,617 | B1 | 2/2001 | Clark et al. |
| 6,355,164 | B1 | 3/2002 | Wendell et al. |
| 6,434,018 | B1 | 8/2002 | Waltz |
| 6,599,484 | B1 | 7/2003 | Zigler et al. |
| 6,741,463 | B1 | 5/2004 | Akhtar et al. |
| 6,832,622 | B2 | 12/2004 | Hassel et al. |
| 6,968,958 | B2 | 11/2005 | Lauchner et al. |
| 7,374,674 | B2 | 5/2008 | Miyauchi et al. |
| 7,641,242 | B2 | 1/2010 | Van Pelt |
| 7,910,067 | B2 | 3/2011 | Knight et al. |
| 7,932,090 | B2 | 4/2011 | Carter et al. |
| 8,821,718 | B2 | 9/2014 | Blomberg et al. |
| 9,404,902 | B2 * | 8/2016 | Blomberg .............. G01N 30/88 |
| 2002/0185442 | A1 | 12/2002 | Maiefski et al. |
| 2004/0089057 | A1 | 5/2004 | Hobbs et al. |
| 2004/0264145 | A1 | 12/2004 | Miller et al. |
| 2005/0051468 | A1 | 3/2005 | Miyauchi et al. |
| 2006/0047466 | A1 | 3/2006 | White |
| 2006/0274082 | A1 | 12/2006 | Cochran et al. |
| 2007/0081308 | A1 | 4/2007 | Ishida |
| 2007/0095126 | A1 | 5/2007 | Bailey et al. |
| 2007/0097636 | A1 | 5/2007 | Johnson et al. |
| 2007/0247826 | A1 | 10/2007 | Grady et al. |
| 2008/0023653 | A1 | 1/2008 | Lee et al. |
| 2008/0035542 | A1 | 2/2008 | Mourtada et al. |
| 2008/0233653 | A1 | 9/2008 | Hess et al. |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 1984739 U | | 5/1968 |
| DE | 1418503 A | | 12/1975 |
| EP | 0309596 A1 | | 4/1989 |
| JP | 2002-333438 A | | 11/2002 |
| JP | 2005-106813 A | | 4/2005 |
| WO | WO 00/22429 | | 4/2000 |
| WO | WO 01/89681 | | 11/2001 |
| WO | WO 2005/042146 A2 | | 5/2005 |
| WO | WO 2006/134035 | | 12/2006 |
| WO | WO 2006/134035 A1 | | 12/2006 |
| WO | WO 2007/036712 A1 | | 4/2007 |

### OTHER PUBLICATIONS

Office Action issued in Chinese Patent Application No. 201510602257.9 dated Jul. 13, 2016.
ADE 2040 Process Analyzer Manual- Basic Operation, Applikon Analytical, Version 1.4, pp. 1-30, Jul. 2006.
ADI 2040 Process Analyzer Manual- Analysis Methods, Applikon Analytical, Sep. 2002, pp. 1-44, Version 1.4.
ADI 2040 Process Analyzer Manual- Basic Maintenance & Spare parts, Applikon Analytical, Mar. 2008, Version 1.53, pp. 1-48.
ADI 2040 Process Analyzer Manual- Configuration, Applikon Analytical, Version 1.4, pp. 1-44, Jul. 2006.
ADI 2040 Process Analyzer Manual- Hardware & Installation, Applikon Analytical, Version 1.53, p. 144, May 2008.
ADI 2040 Process Analyzer Manual- Serial Communication, Applikon Analytical, Version 1.4, 134 pp., Apr. 2006.
ADI 2040 Process Analyzer Manual, Applikon Analytical, 1-10 pp., Apr. 1999.
ADI 2045 VA Instrument Manual, Applikon Analytical, 2007, pp. 1-80, Version 1.2.
ADI Process Analyzer Manual- Advanced Operation, Applikon Analytical, Version 1.53, pp. 1-78, Oct. 2007.
Andreas Schmid, "The Energy Issue in Whole Cell Oxyfunctionalization," GreenChem Symposium, Nov. 9, 2006, pp. 5349-5386.
APC, "Rack Enclosures and Open Frame Racks for Server and Networking Applications in 11 Environments," Rack Systems, 2006, pp. 4619-4638.
Applikon Analytical Confidential, "Analyzers 1999-2008," Bio-Rad Ex. 1004, Jul. 8, 2015, pp. 1323-1326.
Applikon Analytical, "Box Wet Part Module 3X," Bio-Rad Ex. 1003, 1 page, Feb. 11, 2008.
Applikon Analytical, "Manual ADI 2040 Process Analyzer," Apr. 1999, Bio-Rad Ex. 1002, pp. 1-619.
Applikon Analytical, "Multi-purpose wet chemical analysis," Process Analyzer ADI 2040, Sep. 2008, 1547-1554.
Applikon Analytical, "Trace Metal and Plating Bath Analysis," ADI2045VA Process Analyzer, Sep. 2007, pp. 1555-1562.
Bilsker, Petition for Inter Parties Review, *Bio-Rad Laboratories, Inc*, v. *GE Healthcare Bio-Science AB*, Sep. 2015, pp. 1-71.
Bio-Rad Laboratories, Inc., "Biologic Duoflow Chromatography System," Instruction Manual, 2003, pp. 5810-6048.
Brinkmann, "875 ProcessLab Components," ProcessLab, pp. 1-26, Mar. 2001.
Brinkmann, "875 ProcessLab Hardware," ProcessLab, pp. 1-15, Mar. 2007.
Brinkmann, "Is ProcessLab Explosion-Proof?" ProcessLab, pp. 1-12, Mar. 2001.
Dionex, "ICS-3000 Ion Chromatography System Operator's Manual," Thermo Scientific, Jan. 2008, pp. 4779-5170.
Eda Tezcanli, "An Analytical Survey on Customization at Modular Systems in the Context of Industrial Design," A Thesis Submitted to the Graduate School of Engineering and Sciences of Izmir Institute of Technology in Partial Fulfillment of the Requirements for the Degree of Master of Science in Industrial Design. Jan. 2006, pp. 5701-5809.
EP Office Action dated Feb. 26, 2014 Issued on Corresponding EP Application No. 10786454.8.
General Electric, "Operating Instructions Original Instructions," • KTA pure, Apr. 2014, pp. 3785-3928.
General Electric, "User Manual," • KTA pure, Dec. 2014, pp. 3929-4445.
Gilson, Inc., "2007-2008 Product Guide," Bio-Rad Ex. 1010 pp. 1-37.
Gilson, Inc., "402 Syringe Pump User's Guide," Bio-Rad Ex. 1011, Jun. 2001, pp. 1-86.

**US 9,709,591 B2**

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Gilson, Inc., "402 Syringe Pump User's Guide," Jul. 2003, pp. 5208-5293.
Gilson, Inc., "Brochure," 2003, 1 Page.
Gilson, Inc., "Gilson Product Guide," 2004, pp. 5294-5343.
Gilson, Inc., "Product Guide," The Element of Purification, Jul. 2008, pp. 5171-5207.
Gilson, Inc., "Spec Sheet," 2003, 1 Page.
Gilson, Inc., "User's Guide," 2003, 1 Page.
H. Schafer, "Compact View of a Modular Design or a new Philosophy in Metrohm IC," Processional IC, pp. 1-90, Sep. 2007.
J. Van Burg, "EU Declaration of Conformity," Manual ADI 2045VA, 2007, pp. 620-1322.
John Loffink, "Dell PowerEdge M1000e Modular Enclosure Architecture," Dell Enterprise White Paper, Jan. 2008, pp. 4577-4618.
Jp Office Action dated Dec. 17, 2013 Issued on Corresponding JP Application No. 2012-514920.
Labomatic Instruments AG, "Customer-specific preparative HPLC Systems," 5387-5389, date unknown.
Labomatic, "Labomatic HPLC valve and column system panel," pp. 5347-5348, date unknown.
Larry Tucker et al., "Videotaped Deposition of Metrohm 30 (B) (6)," *GE Healthcare* vs. *Bio-Rad*, Aug. 10, 2015, pp. 1-292.
Metrohm- 850 Processional IC Manual, http://products.matrohm.com, pp. 1-146, date unknown.
Metrohm AG, "850 Professional IC," Bio-Rad Ex. 1017, pp. 1337-1479, Feb. 2007.
Metrohm- Intelligent Ion Chromatography, www.professional-ic.com, 2012, pp. 1-28.
Metrohm Ion analysis, "IC Pump-2.872.0010," 872 Extension Module, pp. 1-67, May 2009.
Metrohm, "850 Professional IC," AnCat-MCS-2.850.3030, Bio-Rad Ex. 1017, May 2009, pp. 1-143.
Metrohm-Peak, Inc., "Determination of Anions + Oxyhalides in Various Waters by Suppressed Conductivity (USEPA method 300 A&B)," IC Application Work AW US6-0125-052007, 2007, pp. 001327-001336.
Tecan Group Ltd, "Cavro OEM Pumps and Valves," 2008, 1 page.
Tecan Group Ltd, "Cavro XLP 6000," 2008, 1 page.
Tecan Systems, "Cavro XLP 6000 Modular Syringe Pump," Operating Manual, Part I, Oct. 2005, pp. 5542-5698.
Thomas Koshy, "Declaration of Thomas Koshy," In the United States District Court For the Southern District of New York, Civil Action No. 1:14-cv-07080-LTS, pp. 1-3, Oct. 30, 2014.
United States Patent and Trademark Office, "*Bio-Rad Laboratores, Inc.*, v. *GE Healthcare Bio-Sciences AB*," Case: IPR2015-01825, U.S. Pat. No. 8,821,718 B2, Paper No. 11, Entered: Feb. 29, 2016, pp. 1-47.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.* v. *GE Healthcare Bio-Sciences AB*," Declaration of Dr. Bruce Gale in Support of Bio-Rad Laboratories' Petition for Institution of an IPR on U.S. Pat. No. 8,821,718, Sep. 2015.
Waters Coporation, "Waters Sample Manager, Injector, and Collector," Installation and Maintenance Guide, 2006, pp. 5390-5541.
European Search Report dated Mar. 27, 2017 issued in corresponding European Patent Application No. 16205536.2. (8 pages).

* cited by examiner

Fig. 1



Fig. 2



Fig. 3



Fig. 4a



Fig. 4b



Fig. 4c



Fig. 4d



Fig. 5a



Fig. 5b



Fig. 6



Fig. 7a

Fig. 7b



Fig. 8



Fig. 9



Fig. 10

US 9,709,591 B2

**1**

**AUTOMATED FLUID HANDLING SYSTEM**

CROSS REFERENCE TO RELATED
APPLICATION

This application is a Divisional of U.S. patent application Ser. No. 15/165,876 filed May 26, 2016 which is a Continuation of U.S. patent application Ser. No. 14/463039 filed Aug. 19, 2014 which is a Continuation of U.S. patent application Ser. No. 13/376929 filed Dec. 8, 2011 which is a 35 U.S.C. 371 National Phase of International Patent Application No. PCT/SE2010/050624 filed Jun. 4, 2010 which claims priority to Swedish Patent Application No. 0950431-7 filed Jun. 9, 2009, the disclosure of these prior applications are hereby incorporated in their entirety by reference.

BACKGROUND OF THE INVENTION

The present invention relates to the art of fluid handling system systems, and in particular to an automat fluid handling system that is highly flexible and configurable. The fluid handling system may e.g. be a liquid chromatography system, a filtration system, a chemical synthesis system or the like.

There is a large range of fluid handling systems e.g. in laboratories. Such systems comprise a number of fluid handling units, e.g. one or more pumps, valves, mixers, sensor units etc of different types. Said fluid handling units are interconnected by fluid conduits in the form of, rigid or flexible tubes or the like. Even though some systems may be designed for a specific type of application with a specific flow path, there often exists a need for flexibility and ability to alter or optimize the fluid flow path of the system. Moreover, upgrading is often restricted to specific kits provided by the manufacturer, and upgrade kits often is supplied as external add-on equipment to be arranged besides the original system, thus enlarging the foot print of the system and that need to be connected to the system both fluidically and electrically (i.e. to a system control bus or the like). Moreover, replacement of defect fluid handling units is a time consuming and delicate task.

One type of liquid handling system is liquid chromatography systems which is a standard method in laboratories, and there are a broad range of liquid chromatography systems available on the market. Common to most of the present systems is the lack of flexibility in adapting the instrument to a variety of different applications.

SUMMARY OF THE INVENTION

The object of the invention is to provide a new fluid handling system, which system overcomes one or more drawbacks of the prior art. This is achieved by the fluid handling system as defined in the independent claims.

One advantage with such a fluid handling systems is that the system may easily be upgraded without need for add-on equipment, and that the flow path may be easily optimized for new experimental setups.

Embodiments of the invention are defined in the dependent claims.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described in detail below with reference to the drawings, in which

**2**

FIG. 1 shows one embodiment of a fluid handling system in the form of a liquid chromatography system, according to the present invention.

FIG. 2 is a schematic illustration of a housing with a liquid handling panel of the fluid handling system of FIG. 1.

FIG. 3 is a schematic illustration of the housing with the liquid handling panel of FIG. 2 with the modular components of the fluid handling system removed.

FIGS. 4a to 4d are schematic illustrations of examples of component modules of the fluid handling system removed.

FIGS. 5a and 5b show a schematic embodiment of an automated fluid handling system.

FIG. 6 is a schematic illustration of an embodiment of a housing with a modular liquid handling panel with the modular components of the fluid handling system removed.

FIGS. 7a and 7b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the fluid handling system removed.

FIG. 8 is a schematic illustration of an embodiment of the system architecture of one embodiment of a fluid handling system according to the present invention.

FIG. 9 is a schematic illustration of an embodiment of a master control unit of one embodiment of a fluid handling system according to the present invention.

FIG. 10 is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel for the liquid chromatography system of FIG. 1.

DETAILED DESCRIPTION OF THE
INVENTION

According to one embodiment, there is provided an automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

According to another embodiment, there is provided a fluid handling system in the form of a liquid chromatography system comprising a housing, two or more high pressure pumps, at least one sensor unit and a plurality of fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components and the housing comprises a liquid handling panel with a plurality of component positions for receiving said modular components.

FIG. 1 shows one embodiment of an automated fluid handling system modular in the form of a liquid chromatography system, with a plurality of interchangeable modular components arranged in a liquid handling panel wherein the reference numbers denotes:

**1**. Injection valve
**2**. Column valve with integrated pressure sensors
**3**. Conductivity monitor
**4**. UV monitor
**5**. Quaternary valve
**6**. Inlet valve B with integrated air sensor
**7**. System pump
**8**. Pressure monitor, system pump
**9**. Inlet valve A with integrated air sensor
**10**. System pump

US 9,709,591 B2

3

**11**. Pressure monitor, sample pump
**12**. Sample pump
**13**. Rinsing system
**14**. Mixer with online filter
**15**. Sample inlet valve with integrated air sensor
**16**. Flow restrictor
**17**. pH valve
**18**. Outlet valve

The disclosed embodiment is supplied with three high precision pumps **7**, **10**, **12**. There are two System pumps **7**, **10**, System pump A **10** and System pump B **7**, and one Sample pump **12**. The System pumps **7**, **10** may be used individually, or in combination to generate isocratic or gradient elution in purification methods. The Sample pump **12** is dedicated for direct loading of sample onto a column, or for filling of sample loops.

Function of the Pumps:

Each pump module consists of two pump heads (not shown). The individual heads are identical but actuated in opposite phase to each other by individual stepper motors, controlled by a microprocessor. The two pistons and pump heads work alternately to give a continuous, low pulsation, liquid delivery. The flow rate of the two System pumps may be varied between about 0.001 ml/min and 25.000 ml/min and the maximum operating pressure is about 20 MPa. The flow rate of the Sample pump may e.g. be varied between 0.01 and 25 ml/min and according to one embodiment the maximum operating pressure is 10 MPa.

According to one embodiment, the plurality of fluid control valves of at least two different configurations are valves of rotary type. Such a motorized rotary valve may consist of a Valve head with a number of defined bores with channels to the inlet and outlet ports of the valve. The Rotary disc, mounted on the motor, has a number of defined channels. The pattern of channels of the Rotary disc together with the pattern and location of the ports of the Valve head, define the flow path and function of each type of valve. When the Rotary disc turns, the flow path in the valve changes.

One embodiment of fluid control valves are Inlet valves A and B (**9**, **6** respectively) that are used to select which buffers or samples to use in a run, and Sample inlet valve **15** that is located before Sample pump **12**. Inlet valve A **9** 1 is located before System pump A **10**, Inlet valve B **6** is located before System pump B **10**, and Sample inlet valve **15** is located before Sample pump **12**. Inlet valve A and Inlet valve B are connected to another embodiment of a fluid control valve in the form of a Quaternary valve **5**. The Quaternary valve is used for automatic buffer preparation, and for formation of quaternary gradients. The number of inlets can be increased by installing component modules with extra inlet valves. Inlet valve A and Inlet valve B enable automatic changing between different buffers and wash solutions, and can be used to generate gradients by mixing buffer A and buffer B. The air sensors integrated in Inlet valve A and Inlet valve B can be used to prevent introduction of air into the pumps and columns.

The Quarternary valve is used for automatic mixing of four different solutions. The Quaternary valve opens one inlet port at a time, and the different solutions are mixed in a Mixer **14** to form the desired buffer. The opening time in the switching valve is controlled by the system. The volume for each inlet port opening increases stepwise when the flow increases. To obtain a homogeneous buffer composition, one has to make sure to use a mixer chamber volume suitable for the flow rate of the method.

4

The Quaternary valve can be used to create a gradient using four different solutions simultaneously in any combination. The percentage of each solution is controlled by instructions in the method. It is possible to form gradients that changes the percentage of two, three or four solutions linearly over time. This is useful when advanced methods are developed.

The Sample inlet valve **15** enables automatic loading of different samples when using the Sample pump **12** to inject sample directly onto the column or to fill a sample loop. The Sample inlet valve has an inlet dedicated for buffer. This Buffer inlet is used in methods to fill the Sample pump with solution before sample is introduced. The Buffer inlet is also used to wash the Sample pump with buffer between runs. The air sensor integrated in the Sample inlet valve is e.g. used when sample is applied from a vessel onto a column by selecting Inject all sample using air sensor in the Sample application phase of a method. This function uses the Buffer inlet is used to finalize sample injection and to remove air from the Sample pump.

Still another embodiment of fluid control valve may be an Injection valve **1**, which is used to direct sample onto the column. The valve enables usage of a number of different sample application techniques. A sample loop can be connected to the Injection valve and filled either automatically using the Sample pump or manually using a syringe. The sample can also be injected directly onto the column using the Sample pump.

Still another embodiment of fluid control valve may be a Column valve **2** that is used for connection of columns to the system, and to direct the flow onto the column Up to five columns can be connected to the disclosed embodiment of said valve simultaneously. The valve also has a built-in bypass capillary that enables bypassing of connected columns.

The number of column positions can be increased by installing an extra Column valve. Both top and bottom of each column shall be connected to the Column valve. The top of the column shall be connected to one of the A ports (e.g., **1A**), and the bottom of the column shall be connected to the corresponding B port (e.g., **1B**). The flow direction can be set either from the top of the column to the bottom of the column, Down flow, or from the bottom of the column to the top of the column, Up flow. In the default flow path of the Column valve the columns are bypassed. Pressure monitors that measures the actual pressure over the column are integrated into the inlet and outlet ports of the Column valve.

Still another embodiment of fluid control valve may be a pH valve **17** that has an integrated flow cell where a pH electrode can be installed. This enables in-line monitoring of pH during the run. A flow restrictor is connected to the pH valve and can be included in the flow path to generate a backpressure high enough to prevent formation of air bubbles in the UV flow cell. The pH valve is used to direct the flow to the pH electrode and to the flow restrictor, or to bypass one or both.

Still another embodiment of fluid control valve may be an Outlet valve **18** that is used to direct the flow to a Fraction collector (not shown), to any of e.g. 10 outlet ports, or to waste. The number of outlets can be increased by installing an extra Outlet valve.

A Mixer **14** may e.g. be located after System pump A and System pump B and before the Injection valve. The purpose of the Mixer is to make sure that the buffers from the System

US 9,709,591 B2

5

pumps are mixed to give a homogenous buffer composition. The Mixer has a built-in filter that prevents impurities from entering the flow path.

To fulfill a desired purpose, with the disclosed liquid chromatography system it is possible to adapt and extend the flow path in a simple and a flexible way. Up to three extra fluid control valves or the like can be installed using the free valve positions. Dummy modules are installed in these positions at delivery. To obtain an optional flow path, it is also possible to move the standard fluid control valves to other positions. There are also two types of extra air sensors available which can be installed before Sample inlet valve or after Injection valve.

In the configuration disclosed in FIG. **1**, 7 inlets are available for each inlet valve. To increase the number of inlets, an extra inlet valve can be installed which increases the number of inlets to 14 for one of the valves. This optional configuration can be convenient for example when a larger number of samples will be used. There is also a general type of inlet valve, Valve X, which can be used to increase the number of inlets to for example the Quaternary valve.

In the configuration disclosed in FIG. **1** with one column valve, 5 column positions are available. To increase the number of column positions to 10, an additional column valve can be installed in the instrument. An application can be to evaluate a number of different columns in method optimization.

In the configuration disclosed in FIG. **1** with one outlet valve, 10 outlet positions are available. To increase the number of outlets, one or two extra outlet valves can be connected, adding up to a total of 21 or 32 outlet positions. This optional configuration is convenient when collecting a number of large fractions outside the fraction collector.

Optional modules are easy to install in the disclosed modular liquid chromatography system. The dummy module is removed with a hexagon wrench and a bus cable is disconnected. The bus cable is connected to the optional fluid control valve or the like which is assembled in the instrument. The module is then added to the System properties in the control software. The available optional modules may e.g. be pre-configured to give the desired function. However, the function of a valve may e.g. be changed by changing the Node ID.

FIG. **2** is a schematic illustration of a housing **20** with a liquid handling panel **22** of the fluid handling system in the form of a modular liquid chromatography system **100** of FIG. **1**. In FIG. **2** some components have been removed for clarity reasons. In the disclosed configuration, as disclosed in detail above, the modular liquid chromatography system **100** comprises a plurality of fluid control valves in the form of: Injection valve **1**, Column valve **2**, Quaternary valve **5**, Inlet valve B **6**, Inlet valve A **9**, Sample inlet valve **15**, pH valve **17**, and Outlet valve **18**. The chromatography system **100** further comprises UV monitor **4**, System pump B **7**, System pump A **10**, Sample pump **12**, Mixer **14**, and three Dummy modules **24**. According to one embodiment, all liquid handling components and sensors arranged at the liquid handling panel **22** are designed to be readily interchangeable. The interchangeability provides improved service and upgrade possibilities and also a possibility to customize the positions of the respective liquid handling components, such as the fluid control valves, e.g. in order to optimize the fluid path for a specific experimental setup. As is illustrated in FIG. **2**, there are three large component positions e.g. for pump modules, one UV-sensor position and 9 standard component positions, e.g. for fluid control valves or the like. The component positions are given a

6

standardized size and shape to provide simple interchangeability. According to one embodiment, each modular component is retained in a mating component position by a single screw, and it is connected to the master control unit by a single bus cable providing both communication and system power to each component. FIG. **3** is a schematic illustration of the housing with the liquid handling panel of FIG. **2** with the modular components of the liquid chromatography system removed.

FIGS. **4***a* to **4***d* are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. **4***a* shows a standard interchangeable modular component **26**, e.g. a fluid control valve or the like. The standard component module **26** comprises a panel member **28**, an external fluidics section **30** and an internal non-fluidics section **32**. According to one embodiment, the panel member **28** essentially separates the fluidics in the external fluidics section **30** from electronics and control means in the internal non-fluidics section **32**.

FIG. **4***b* shows a Dummy module **24**, which is intended to be placed in non used standard component positions. In the disclosed embodiment, the Dummy modules are provided with mounting grooves for attachment of accessories to the system. In the disclosed embodiment the dummy module is shown as a panel member **28** without any internal section FIGS. **4***c* and **4***d* shows a pump module and an UV-module, respectively, each having an external fluidics section **30** and an internal non-fluidics section **32**.

As is disclosed in FIGS. **4***a* to **4***d*, the interchangeable modular components **26** comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel. Said panel attachment member may be arranged so that all fluid connections of said modular component are arranged on a wet side of the panel attachment member separating them from electrical components that are arranged on a dry side thereof, hence providing a high degree of liquid resistance at the external part of the fluid handling panel, and so that the liquid resistance requirements for the internal sections may be somewhat lightened. According to one embodiment, the interchangeable modular components are sealed against the liquid handling panel by a sealing member. According to another embodiment, not shown, the modular component does not comprise any panel member, but there is provided a suitable sealing arrangement between the component position openings of the liquid handling panel and the external surface of the interchangeable modular components **26**. In the disclosed embodiments, the component position openings of the liquid handling panel and the interchangeable modular components **26** are shown to have an essentially rectangular crossectional shape, but other shapes may be equally applicable. According to one embodiment, there is provided a general fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components as is schematically disclosed in FIG. **5***a*. As discussed above such a system may be configured for essentially any type of automated liquid handling operations provided that suitable fluid handling units are provided as interchangeable modular components for the system. According to one embodiment there is provided an automated fluid handling system comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

US 9,709,591 B2

7

The liquid handling panel 22 of the fluid handling system may e.g. be designed in any suitable manner to allow the modular components to be arranged in an efficient manner.

FIGS. 5a and 5b shows a schematic embodiment of an automated fluid handling system wherein the housing 20 comprises an internal climate panel 29 arranged at a distance behind the liquid handling panel 22 defining an air inlet compartment 35 and air outlet compartment 37 in the housing 20, the climate panel 29 being provided with complementary component positions 39 for receiving the internal non fluidics section 32 of the interchangeable modular components 26, and wherein the non-fluidics section 32 of at least one interchangeable modular component is provided with one or more air inlet openings 31 located in the air inlet compartment 35 and one or more air outlet openings 33 located in the air outlet compartment 37 when the interchangeable modular component arranged in position in the component position. FIG. 5b shows the fluid handling system of FIG. 5a in a schematic cross sectional view. As is indicated by inlet vent 41 and outlet vent 43, air for cooling interchangeable modular components 26 provided with air inlet and outlet openings 31, 33 is preferably arranged to enter the air inlet compartment 35 at a distance from the outlet vent 43 in order to avoid recirculation of air. The air circulation in the system may be achieved by a system cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37, through the at least one interchangeable modular component 26. Alternatively, the at least one interchangeable modular component 26 is provided with a local cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37. As is indicated, the complementary component positions 39 are arranged to provide a relatively air flow tight fit with respect to the internal non fluidics section 32 of the interchangeable modular components 26, and according to one embodiment, this may be achieved by a sealing arrangement. In FIG. 5b, there is shown a sealing member 45 for sealing the interchangeable modular components 26 with respect to the liquid handling panel 22, as discussed above. Other sealing member arrangements may be envisaged by a person skilled in the art. According to one embodiment, fluids are strictly restricted to the fluidics section 30 of the interchangeable modular component 26, but in alternative embodiments, only fluid connections are restricted to the fluidics section 30 allowing fluid to "cross" the fluid handling panel inside the non-fluidics section 30 of the interchangeable modular component 26.

In FIG. 5b there is further shown a master control unit 40 and buss connectors 42 for connecting the interchangeable modular components 26 to the master control unit 40. According to one embodiment, the component positions including the buss connectors 42 and the interchangeable modular components 26 are of plug and play configuration with respect to each other.

FIG. 6 is a schematic illustration of an embodiment of a housing 20 with a modular liquid handling panel 22 with the modular components of the liquid chromatography system removed. In the disclosed embodiment, also the layout of the liquid handling panel 22 is configurable by means of two interchangeable panel sections 34 which may be selected in accordance with the desired layout of the system. In FIG. 6 two different layouts of the interchangeable panel sections are disclosed, but the layout may include any suitable configuration.

FIGS. 7a and 7b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with

8

the modular components of the liquid chromatography system removed. In the disclosed embodiment, the modular housing is comprised of a main housing 36 that comprises the master control unit including power supply and climate control for the whole housing, two expansion housing modules 38 and a side member 40. This approach provides very flexible expansion possibilities for the chromatography system, while preserving the benefits of a single master control unit including power supply and climate control.

FIG. 8 is a schematic illustration of an embodiment of the system architecture of one embodiment of a modular liquid chromatography system according to the present invention. As mentioned above, the chromatography system may comprise a master control unit 40 arranged to communicate with all modular components e.g. 1-26, over a system bus 42 such as a CAN-bus or the like. In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42. In order to minimize the number of connectors to be attached to each modular component, the bus 42 further comprises power feed for the modular components. The Bus 42 may be connected to any suitable number of modular components arranged in the housing 20, but also to one or more modular components 44 outside of the housing 20 or the like. As is mentioned briefly above, the master control unit may further be arranged to control the climate in the housing. In addition to the disclosed modular components, other components of the chromatography system, e.g. a fraction collector or the like, may be arranged in the housing and the controlled climate therein.

According to one embodiment, different component modules are automatically identified by the master control unit, whereby they may be moved essentially freely between different positions. Moreover, the master control unit may be arranged to provide said information to Chromatography control software whereby experimental setup and planning may be performed. In one embodiment, the control system may be arranged to provide an optimized layout of the component modules with respect to the present layout of the liquid handling panel and available component modules for a specific experimental setup.

According to one embodiment, the interchangeable panel sections 34 of FIG. 5 and the expansion housing modules 38 of FIGS. 6a and 6b may be provided with means for automatic detection of the same to allow automatic configuration of the system by the master control unit 40. In one embodiment, each interchangeable panel section 34 and expansion housing module 38 comprises a hub (not shown) for connection to the system bus 42 in order to expand the system bus 42 network to the number of component modules in each interchangeable panel section 34 or expansion housing module 38.

FIG. 9 is a schematic illustration of an embodiment of a master control unit of one embodiment of a modular liquid chromatography system according to the present invention. The master control unit 40 comprises a system controller 46 for communicating with internal and external components and control computers (not shown)etc. According to one embodiment, the system controller comprises a suitable CPU 48, a bus controller 52, an external communications controller 50, such as a LAN unit, and a storage device 54. The bus controller 52 is providing communication with the component modules. The master control unit may further comprise a Power supply 56 and a climate controller 58 arranged to keep the internal climate in the housing 20 at a predetermined level as discussed above.

US 9,709,591 B2

9                                          10

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel. Taking into account the complexity of the disclosed interconnection arrangement, the benefit of optimizing the fluid paths in alternative configurations of the system becomes evident. The task of optimizing the fluid paths may e.g. be performed to reduce the total length/volume of the fluid paths/tubing arranged to interconnect the different component modules in the system. Alternatively the optimization may be performed to minimize the length/volume of one or more specific fluid paths, such as the sample output path from the column to the fraction collector, in order to minimize dispersion of the fractionized sample.

The invention claimed is:

**1**. An automated liquid chromatography system comprising:

  a housing;

  a master control unit connected to a system bus; and

  two or more fluid handling units arranged as interchangeable modular components comprising (i) an external fluidics section, (ii) an internal non-fluidics section including a bus connector for directly connecting the interchangeable modular component with the system bus, and (iii) a panel member arranged to separate the fluidics section from the non-fluidics section,

  wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing,

    wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus,

    wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus,

    wherein the master control unit is arranged to automatically identify interchangeable modular components,

    wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components, and

  wherein the system is capable of performing automated liquid chromatography.

**2**. The chromatography system of claim **1**, wherein the interchangeable modular components are sealed against the liquid handling panel by a sealing member.

**3**. The chromatography system of claim **1**, wherein all interchangeable modular components are of same size.

**4**. The chromatography system of claim **1**, wherein the interchangeable modular components are of two or more sizes.

**5**. The chromatography system of claim **1**, wherein the at least two fluid control valves are arranged as interchangeable modular components.

**6**. The chromatography system of claim **1**, wherein at least one of said interchangeable modular components further comprises a local cooling unit.

**7**. The chromatography system of claim **1**, wherein the housing includes at least four component receiving positions.

**8**. The chromatography system of claim **1**, wherein the system includes at least one dummy component arranged in a component receiving position not occupied by any one of said interchangeable modular components.

**9**. The chromatography system of claim **1**, wherein the system includes at least two fluid pumps.

**10**. The chromatography system of claim **1**, wherein the component receiving positions are arranged in a two dimensional array.

**11**. The chromatography system of claim **7**, wherein the at least four component receiving positions are arranged in a two dimensional array.

**12**. The chromatography system of claim **1**, wherein the system further comprises a pH electrode that is external to the housing.

**13**. The chromatography system of claim **1**, wherein the fluidics section of each interchangeable modular component comprises one or more fluid connectors for connecting the fluid handling unit to a liquid chromatography fluid path and wherein all fluid connectors are on a wet side of the panel member.

**14**. The chromatography system of claim **13**, wherein the liquid chromatography fluid path is reconfigurable by moving the interchangeable modular components freely between the component receiving positions.

**15**. The chromatography system of claim **1**, wherein the system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components at the liquid handling panel.

**16**. The chromatography system of claim **15**, wherein the master control unit is arranged to automatically detect said at least one expansion housing module and to perform automatic configuration of the system.

**17**. An automated liquid chromatography system comprising:

  a housing;

  a master control unit connected to a system bus; and

  two or more fluid handling units arranged as interchangeable modular components comprising (i) an external fluidics section, (ii) an internal non-fluidics section including a bus connector for directly connecting the interchangeable modular component with the system bus, and (iii) a panel member arranged to separate the fluidics section from the non-fluidics section,

  wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing,

  wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus,

  wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus,

  wherein the master control unit is arranged to automatically identify interchangeable modular components,

US 9,709,591 B2

11

wherein said housing is adapted to accommodate the following units: two double piston pumps, one injection valve for injecting sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer, wherein the double piston pumps, the injection valve, the UV monitor, and the mixer are interchangeable modular components; and wherein the system is capable of performing automated liquid chromatography.

**18**. The chromatography system of claim **17**, wherein the double piston pumps are configured to provide a flow rate between 0.001 ml/min and 25 ml/min.

**19**. The chromatography system of claim **17**, wherein the system further comprises a column valve comprising pressure sensors integrated into inlet and outlet ports of the column valve for measuring the actual pressure over the connected column.

**20**. The chromatography system of claim **17**, which further comprises a sample inlet valve.

**21**. The chromatography system of claim **17**, which further comprises a conductivity monitor.

**22**. The chromatography system of claim **17**, which further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components at the liquid handling panel.

**23**. The chromatography system according to claim **22**, wherein the master control unit is arranged to automatically detect said at least one expansion housing module and to perform automatic configuration of the system.

**24**. The chromatography system according to claim **1**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, an outlet valve or any combination thereof.

**25**. The chromatography system according to claim **5**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, an outlet valve or any combination thereof.

**26**. The chromatography system according to claim **12**, wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component.

**27**. The chromatography system according to claim **26**, wherein the pH valve includes an integrated flow cell for in-line monitoring of pH levels.

**28**. The chromatography system of claim **1**, wherein the system includes two double piston pumps, one injection valve for injecting a sample onto a column connected to a

12

flow path of the liquid chromatography system, a UV monitor, a mixer, a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients, wherein the double piston pumps, injection valve, monitor, mixer, pH valve, and quaternary valve are interchangeable modular components.

**29**. An automated liquid chromatography system comprising

a housing;

a master control unit connected to a system bus; and

two or more fluid handling units arranged as interchangeable modular components comprising (i) an external fluidics section, (ii) an internal non-fluidics section including a bus connector for directly connecting the interchangeable modular component with the system bus, and (iii) a panel member arranged to separate the fluidics section from the non-fluidics section,

wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non fluidics section is internal to the housing,

wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus,

wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus,

wherein the master control unit is arranged to automatically identify interchangeable modular components, and

wherein the system includes the following interchangeable modular components: two double piston pumps, a sample pump, two inlet valves for selecting inlet fluid to a respective pump, one injection valve for injecting sample onto a column connected to a flow path of the liquid chromatography system, a column valve for connecting one of a plurality of columns to the flow path, a UV-monitor, a mixer, a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and for formation of quaternary gradients.

* * * * *

# EXHIBIT 35

US009671420B2

(12) **United States Patent**
Blomberg et al.

(10) **Patent No.:** **US 9,671,420 B2**
(45) **Date of Patent:** *****Jun. 6, 2017**

(54) **AUTOMATED FLUID HANDLING SYSTEM**

(71) Applicant: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

(72) Inventors: **Johan Blomberg**, Uppsala (SE); **Mats Lundkvist**, Uppsala (SE)

(73) Assignee: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/261,250**

(22) Filed: **Sep. 9, 2016**

(65) **Prior Publication Data**

US 2016/0377644 A1      Dec. 29, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 15/165,876, filed on May 26, 2016, which is a continuation of application (Continued)

(30) **Foreign Application Priority Data**

Jun. 9, 2009    (SE) ...................................... 0950431

(51) **Int. Cl.**
*B01D 35/00* (2006.01)
*B01D 15/08* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... *G01N 35/1097* (2013.01); *B01D 15/10* (2013.01); *B01D 29/60* (2013.01); (Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,125,464 A    11/1978   Burger et al.
5,730,867 A     3/1998   Drew et al.
(Continued)

FOREIGN PATENT DOCUMENTS

DE         1984739 U      5/1968
DE         1418503 A     12/1975
(Continued)

OTHER PUBLICATIONS

ADE 2040 Process Analyzer Manual—Basic Operation, Applikon Analytical, Version 1.4, pp. 1-30, Jul. 2006.
(Continued)

*Primary Examiner* — Richard Gurtowski
(74) *Attorney, Agent, or Firm* — Arent Fox LLP

(57) **ABSTRACT**

Automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

**30 Claims, 10 Drawing Sheets**



Shinoff
7/22/2020
**EX 118**

## US 9,671,420 B2

Page 2

### Related U.S. Application Data

No. 14/463,039, filed on Aug. 19, 2014, now Pat. No. 9,404,902, which is a continuation of application No. 13/376,929, filed as application No. PCT/SE2010/050624 on Jun. 4, 2010, now Pat. No. 8,821,718.

(51) **Int. Cl.**

| | |
|---|---|
| *F16K 25/00* | (2006.01) |
| *G01N 35/10* | (2006.01) |
| *B01D 15/10* | (2006.01) |
| *G01N 30/88* | (2006.01) |
| *B01D 29/60* | (2006.01) |
| *G01N 30/24* | (2006.01) |
| *G01N 30/38* | (2006.01) |
| *B01D 17/12* | (2006.01) |
| *G01N 35/00* | (2006.01) |
| *G01N 30/02* | (2006.01) |

(52) **U.S. Cl.**

CPC ............ *G01N 30/24* (2013.01); *G01N 30/38* (2013.01); *G01N 30/88* (2013.01); *B01D 15/08* (2013.01); *B01D 17/12* (2013.01); *B01D 2201/54* (2013.01); *G01N 2030/027* (2013.01); *G01N 2030/8804* (2013.01); *G01N 2030/8881* (2013.01); *G01N 2035/00326* (2013.01); *Y10T 137/6416* (2015.04); *Y10T 137/6525* (2015.04); *Y10T 137/6851* (2015.04); *Y10T 137/85986* (2015.04); *Y10T 137/87885* (2015.04)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,766,460 | A | 6/1998 | Bergstrom et al. |
| 5,896,273 | A | 4/1999 | Varghese et al. |
| 5,959,841 | A | 9/1999 | Allen et al. |
| 6,190,617 | B1 | 2/2001 | Clark et al. |
| 6,355,164 | B1 | 3/2002 | Wendell et al. |
| 6,434,018 | B1 | 8/2002 | Waltz |
| 6,599,484 | B1 | 7/2003 | Zigler et al. |
| 6,741,463 | B1 | 5/2004 | Akhtar et al. |
| 6,832,622 | B2 | 12/2004 | Hassel et al. |
| 6,968,958 | B2 | 11/2005 | Lauchner et al. |
| 7,374,674 | B2 | 5/2008 | Miyauchi et al. |
| 7,641,242 | B2 | 1/2010 | Van Pelt |
| 7,910,067 | B2 | 3/2011 | Knight et al. |
| 7,932,090 | B2 | 4/2011 | Carter et al. |
| 8,821,718 | B2 | 9/2014 | Blomberg et al. |
| 9,404,902 | B2 * | 8/2016 | Blomberg .............. G01N 30/88 |
| 2002/0185442 | A1 | 12/2002 | Maiefski et al. |
| 2004/0089057 | A1 | 5/2004 | Hobbs et al. |
| 2004/0264145 | A1 | 12/2004 | Miller et al. |
| 2005/0051468 | A1 | 3/2005 | Miyauchi et al. |
| 2006/0047466 | A1 | 3/2006 | White |
| 2006/0274082 | A1 | 12/2006 | Cochran et al. |
| 2007/0081308 | A1 | 4/2007 | Ishida |
| 2007/0097636 | A1 | 5/2007 | Johnson et al. |
| 2007/0247826 | A1 | 10/2007 | Grady et al. |
| 2008/0023653 | A1 | 1/2008 | Lee et al. |
| 2008/0035542 | A1 | 2/2008 | Mourtada et al. |
| 2008/0233653 | A1 | 9/2008 | Hess et al. |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0309596 A1 | 4/1989 |
| JP | 2002-333438 A | 11/2002 |
| JP | 2005-106813 A | 4/2005 |
| WO | WO 00/22429 | 4/2000 |
| WO | WO 01/89681 | 11/2001 |
| WO | WO 2005/042146 A2 | 5/2005 |
| WO | WO 2006/134035 | 12/2006 |
| WO | WO 2007/036712 A1 | 4/2007 |

### OTHER PUBLICATIONS

ADI 2040 Process Analyzer Manual—Analysis Methods, Applikon Analytical, Sep. 2002, pp. 1-44, Version 1.4.

ADI 2040 Process Analyzer Manual—Basic Maintenance & Spare parts, Applikon Analytical, Mar. 2008, Version 1.53, pp. 1-48.

ADI 2040 Process Analyzer Manual—Configuration, Applikon Analytical, Version 1.4, pp. 1-44, Jul. 2006.

ADI 2040 Process Analyzer Manual—Hardware & Installation, Applikon Analytical, Version 1.53, p. 144, May 2008.

ADI 2040 Process Analyzer Manual—Serial Communication, Applikon Analytical, Version 1.4, 134 pp., Apr. 2006.

ADI 2040 Process Analyzer Manual, Applikon Analytical, 1-10 pp., Apr. 1999.

ADI 2045 VA Instrument Manual, Applikon Analytical, 2007, pp. 1-80, Version 1.2.

ADI Process Analyzer Manual—Advanced Operation, Applikon Analytical, Version 1.53, pp. 1-78, Oct. 2007.

Andreas Schmid, "The Energy Issue in Whole Cell Oxyfunctionalization," GreenChem Symposium, Nov. 9, 2006, pp. 5349-5386.

APC, "Rack Enclosures and Open Frame Racks for Server and Networking Applications in It Environments," Rack Systems, 2006, pp. 4619-4638.

Applikon Analytical Confidential, "Analyzers 1999-2008," Bio-Rad Ex. 1004, Jul. 8, 2015, pp. 1323-1326.

Applikon Analytical, "Box Wet Part Module 3X," Bio-Rad Ex.1003, 1 page, Feb. 11, 2008.

Applikon Analytical, "Manual ADI 2040 Process Analyzer," Apr. 1999, Bio-Rad Ex. 1002, pp. 1-619.

Applikon Analytical, "Multi-purpose wet chemical analysis," Process Analyzer ADI 2040, Sep. 2008, pp. 1547-1554.

Applikon Analytical, "Trace Metal and Plating Bath Analysis," ADI2045VA Process Analyzer, Sep. 2007, pp. 1555-1562.

Bilsker, Petition for Inter Parties Review, *Bio-Rad Laboratories, Inc*, v. *GE Healthcare Bio-Science AB*, Sep. 2015, pp. 1-71.

Bio-Rad Laboratories, Inc., "Biologic Duoflow Chromatography System," Instruction Manual, 2003, pp. 5810-6048.

Brinkmann, "875 ProcessLab Components," ProcessLab, pp. 1-26, Mar. 2001.

Brinkmann, "875 ProcessLab Hardware," ProcessLab, pp. 1-15, Mar. 2007.

Brinkmann, "Is ProcessLab Explosion-Proof?" ProcessLab, pp. 1-12, Mar. 2001.

Dionex, "ICS-3000 Ion Chromatography System Operator's Manual," Thermo Scientific, Jan. 2008, pp. 4779-5170.

Eda Tezcanli, "An Analytical Survey on Customization At Modular Systems in the Context of Industrial Design," A Thesis Submitted to the Graduate School of Engineering and Sciences of Izmir Institute of Technology in Partial Fulfillment of the Requirements for the Degree of Master of Science in Industrial Design, Jan. 2006, pp. 5701-5809.

EP Office Action dated Feb. 26, 2014 Issued on Corresponding EP Application No. 10786454.8.

General Electric, "Operating Instructions Original Instructions," ÄKTA pure, Apr. 2014, pp. 3785-3928.

General Electric, "User Manual," ÄKTA pure, Dec. 2014, pp. 3929-4445.

Gilson, Inc., "2007-2008 Product Guide," Bio-Rad Ex. 1010 pp. 1-37.

Gilson, Inc., "402 Syringe Pump User's Guide," Bio-Rad Ex. 1011, Jun. 2001, pp. 1-86.

Gilson, Inc., "402 Syringe Pump User's Guide," Jul. 2003, pp. 5208-5293.

Gilson, Inc., "Brochure," 2003, 1 Page.

Gilson, Inc., "Gilson Product Guide," 2004, pp. 5294-5343.

Gilson, Inc., "Product Guide," The Element of Purification, Jul. 2008, pp. 5171-5207.

Gilson, Inc., "Spec Sheet," 2003, 1 Page.

Gilson, Inc., "User's Guide," 2003, 1 Page.

## US 9,671,420 B2

Page 3

(56)            **References Cited**

OTHER PUBLICATIONS

H. Schafer, "Compact View of a Modular Design or a new Philosophy in Metrohm IC," Processional IC, pp. 1-90, Sep. 2007.

J. Van Burg, "EU Declaration of Conformity," Manual ADI 2045VA, 2007, pp. 620-1322.

John Loffink, "Dell PowerEdge M1000e Modular Enclosure Architecture," Dell Enterprise White Paper, Jan. 2008, pp. 4577-4618.

JP Office Action dated Dec. 17, 2013 Issued on Corresponding JP Application No. 2012-514920.

Labomatic Instruments AG, "Customer-specific preparative HPLC Systems," 5387-5389, date unknown.

Labomatic, "Labomatic HPLC valve and column system panel," pp. 5347-5348, date unknown.

Larry Tucker et al., "Videotaped Deposition of Metrohm 30 (B) (6)," GE Healthcare vs. Bio-Rad, Aug. 10, 2015, pp. 1-292.

Metrohm—850 Processional IC Manual, http://products.matrohm. com, pp. 1-146, date unknown.

Metrohm AG, "850 Professional IC," Bio-Rad Ex. 1017, pp. 1337-1479, Feb. 2007.

Metrohm—Intelligent Ion Chromatography, www.professional-ic. com, 2012, pp. 1-28.

Metrohm Ion analysis, "IC Pump-2.872.0010," 872 Extension Module, pp. 1-67, May 2009.

Metrohm, "850 Professional IC," AnCat-MCS-2.850.3030, Bio-Rad Ex. 1017, May 2009, pp. 1-143.

Metrohm-Peak, Inc., "Determination of Anions + Oxyhalides in Various Waters by Suppressed Conductivity (USEPA method 300 A&B)," IC Application Work AW US6-0125-052007, 2007, pp. 001327-001336.

Tecan Group Ltd, "Cavro OEM Pumps and Valves," 2008, 1 page.

Tecan Group Ltd, "Cavro XLP 6000," 2008, 1 page.

Tecan Systems, "Cavro XLP 6000 Modular Syringe Pump," Operating Manual, Part I, Oct. 2005, pp. 5542-5698.

Thomas Koshy, "Declaration of Thomas Koshy," In the United States District Court for the Southern District of New York, Civil Action No. 1:14-cv-07080-LTS, pp. 1-3, Oct. 30, 2014.

United States Patent and Trademark Office, "*Bio-Rad Laboratores, Inc.*, v. *GE Healthcare Bio-Sciences AB*," Case: IPR2015-01826, U.S. Pat. No. 8,821,718 B2, Paper No. 11, Entered: Feb. 29, 2016, pp. 1-47.

United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.* v. *GE Healthcare Bio-Sciences AB*," Declaration of Dr. Bruce Gale in Support of Bio-Rad Laboratories' Petition for Institution of an IPR on United States Patent No. 8,821,718, pp. 1-84, Sep. 2015.

Waters Corporation, "Waters 2767 Sample Manager, Injector, and Collector," Installation and Maintenance Guide, 2006, pp. 5390-5541.

Metrohm 850 Professional IC teardown system, (2.850.2220 ProfIC Anion MCS HP Gradient), Aug. 2016, pp. 1-9.

European Search Report dated Mar. 27, 2017 issued in corresponding European Patent Application No. 16205536.2. (8 pages).


\* cited by examiner



Fig. 1



Fig. 2



Fig. 3



Fig. 4a



Fig. 4b



Fig. 4c



Fig. 4d



Fig. 5a



Fig. 5b



Fig. 6



Fig. 7a

Fig. 7b

Fig. 8



Fig. 9



Fig. 10

US 9,671,420 B2

**1**

## AUTOMATED FLUID HANDLING SYSTEM

### CROSS REFERENCE TO RELATED APPLICATION

This application is a Continuation of U.S. patent application Ser. No. 15/165,876 filed May 26, 2016 which is a Continuation of U.S. patent application Ser. No. 14/463,039 filed Aug. 19, 2014 (now U.S. Pat. No. 9,404,902) which is a Continuation of U.S. patent application Ser. No. 13/376, 929 (now U.S. Pat. No. 8,821,718) filed Dec. 8, 2011 which is a 35 U.S.C. §371 National Phase of International Patent Application No. PCT/SE2010/050624 filed Jun. 4, 2010 which claims priority to Swedish Patent Application No. 0950431-7 filed Jun. 9, 2009, the disclosure of these prior applications are hereby incorporated in their entirety by reference

### BACKGROUND OF THE INVENTION

The present invention relates to the art of fluid handling system systems, and in particular to an automated fluid handling system that is highly flexible and configurable. The fluid handling system may e.g. be a liquid chromatography system, a filtration system, a chemical synthesis system or the like.

There is a large range of fluid handling systems e.g. in laboratories. Such systems comprise a number of fluid handling units, e.g. one or more pumps, valves, mixers, sensor units etc of different types. Said fluid handling units are interconnected by fluid conduits in the form of, rigid or flexible tubes or the like. Even though some systems may be designed for a specific type of application with a specific flow path, there often exists a need for flexibility and ability to alter or optimize the fluid flow path of the system. Moreover, upgrading is often restricted to specific kits provided by the manufacturer, and upgrade kits often is supplied as external add-on equipment to be arranged besides the original system, thus enlarging the foot print of the system and that need to be connected to the system both fluidically and electrically (i.e. to a system control bus or the like). Moreover, replacement of defect fluid handling units is a time consuming and delicate task.

One type of liquid handling system is liquid chromatography systems which is a standard method in laboratories, and there are a broad range of liquid chromatography systems available on the market. Common to most of the present systems is the lack of flexibility in adapting the instrument to a variety of different applications.

### SUMMARY OF THE INVENTION

The object of the invention is to provide a new fluid handling system, which system overcomes one or more drawbacks of the prior art. This is achieved by the fluid handling system as defined in the independent claims.

One advantage with such a fluid handling systems is that the system may easily be upgraded without need for add-on equipment, and that the flow path may be easily optimized for new experimental setups.

Embodiments of the invention are defined in the dependent claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described in detail below with reference to the drawings, in which

**2**

FIG. **1** shows one embodiment of a fluid handling system in the form of a liquid chromatography system, according to the present invention.

FIG. **2** is a schematic illustration of a housing with a liquid handling panel of the fluid handling system of FIG. **1**.

FIG. **3** is a schematic illustration of the housing with the liquid handling panel of FIG. **2** with the modular components of the fluid handling system removed.

FIGS. **4***a* to **4***d* are schematic illustrations of examples of component modules of the fluid handling system removed.

FIGS. **5***a* and **5***b* show a schematic embodiment of an automated fluid handling system.

FIG. **6** is a schematic illustration of an embodiment of a housing with a modular liquid handling panel with the modular components of the fluid handling system removed.

FIGS. **7***a* and **7***b* are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the fluid handling system removed.

FIG. **8** is a schematic illustration of an embodiment of the system architecture of one embodiment of a fluid handling system according to the present invention.

FIG. **9** is a schematic illustration of an embodiment of a master control unit of one embodiment of a fluid handling system according to the present invention.

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel for the liquid chromatography system of FIG. **1**.

### DETAILED DESCRIPTION OF THE INVENTION

According to one embodiment, there is provided an automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

According to another embodiment, there is provided a fluid handling system in the form of a liquid chromatography system comprising a housing, two or more high pressure pumps, at least one sensor unit and a plurality of fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components and the housing comprises a liquid handling panel with a plurality of component positions for receiving said modular components.

FIG. **1** shows one embodiment of an automated fluid handling system modular in the form of a liquid chromatography system, with a plurality of interchangeable modular components arranged in a liquid handling panel wherein the reference numbers denotes:

**1**. Injection valve
**2**. Column valve with integrated pressure sensors
**3**. Conductivity monitor
**4**. UV monitor
**5**. Quaternary valve
**6**. Inlet valve B with integrated air sensor
**7**. System pump
**8**. Pressure monitor, system pump
**9**. Inlet valve A with integrated air sensor
**10**. System pump

US 9,671,420 B2

3

**11**. Pressure monitor, sample pump

**12**. Sample pump

**13**. Rinsing system

**14**. Mixer with online filter

**15**. Sample inlet valve with integrated air sensor

**16**. Flow restrictor

**17**. pH valve

**18**. Outlet valve

The disclosed embodiment is supplied with three high precision pumps **7**, **10**, **12**. There are two System pumps **7**, **10**, System pump A **10** and System pump B **7**, and one Sample pump **12**. The System pumps **7**, **10** may be used individually, or in combination to generate isocratic or gradient elution in purification methods. The Sample pump **12** is dedicated for direct loading of sample onto a column, or for filling of sample loops.

Function of the Pumps:

Each pump module consists of two pump heads (not shown). The individual heads are identical but actuated in opposite phase to each other by individual stepper motors, controlled by a microprocessor. The two pistons and pump heads work alternately to give a continuous, low pulsation, liquid delivery. The flow rate of the two System pumps may be varied between about 0.001 ml/min and 25.000 ml/min and the maximum operating pressure is about 20 MPa. The flow rate of the Sample pump may e.g. be varied between 0.01 and 25 ml/min and according to one embodiment the maximum operating pressure is 10 MPa.

According to one embodiment, the plurality of fluid control valves of at least two different configurations are valves of rotary type. Such a motorized rotary valve may consist of a Valve head with a number of defined bores with channels to the inlet and outlet ports of the valve. The Rotary disc, mounted on the motor, has a number of defined channels. The pattern of channels of the Rotary disc together with the pattern and location of the ports of the Valve head, define the flow path and function of each type of valve. When the Rotary disc turns, the flow path in the valve changes.

One embodiment of fluid control valves are Inlet valves A and B (**9**, **6** respectively) that are used to select which buffers or samples to use in a run, and Sample inlet valve **15** that is located before Sample pump **12**. Inlet valve A **9** 1 is located before System pump A **10**, Inlet valve B **6** is located before System pump B **10**, and Sample inlet valve **15** is located before Sample pump **12**. Inlet valve A and Inlet valve B are connected to another embodiment of a fluid control valve in the form of a Quaternary valve **5**. The Quaternary valve is used for automatic buffer preparation, and for formation of quaternary gradients. The number of inlets can be increased by installing component modules with extra inlet valves. Inlet valve A and Inlet valve B enable automatic changing between different buffers and wash solutions, and can be used to generate gradients by mixing buffer A and buffer B. The air sensors integrated in Inlet valve A and Inlet valve B can be used to prevent introduction of air into the pumps and columns.

The Quarternary valve is used for automatic mixing of four different solutions. The Quaternary valve opens one inlet port at a time, and the different solutions are mixed in a Mixer **14** to form the desired buffer. The opening time in the switching valve is controlled by the system. The volume for each inlet port opening increases stepwise when the flow increases. To obtain a homogeneous buffer composition, one has to make sure to use a mixer chamber volume suitable for the flow rate of the method.

4

The Quaternary valve can be used to create a gradient using four different solutions simultaneously in any combination. The percentage of each solution is controlled by instructions in the method. It is possible to form gradients that changes the percentage of two, three or four solutions linearly over time. This is useful when advanced methods are developed.

The Sample inlet valve **15** enables automatic loading of different samples when using the Sample pump **12** to inject sample directly onto the column or to fill a sample loop. The Sample inlet valve has an inlet dedicated for buffer. This Buffer inlet is used in methods to fill the Sample pump with solution before sample is introduced. The Buffer inlet is also used to wash the Sample pump with buffer between runs. The air sensor integrated in the Sample inlet valve is e.g. used when sample is applied from a vessel onto a column by selecting Inject all sample using air sensor in the Sample application phase of a method. This function uses the Buffer inlet is used to finalize sample injection and to remove air from the Sample pump.

Still another embodiment of fluid control valve may be an Injection valve **1**, which is used to direct sample onto the column. The valve enables usage of a number of different sample application techniques. A sample loop can be connected to the Injection valve and filled either automatically using the Sample pump or manually using a syringe. The sample can also be injected directly onto the column using the Sample pump.

Still another embodiment of fluid control valve may be a Column valve **2** that is used for connection of columns to the system, and to direct the flow onto the column Up to five columns can be connected to the disclosed embodiment of said valve simultaneously. The valve also has a built-in bypass capillary that enables bypassing of connected columns.

The number of column positions can be increased by installing an extra Column valve. Both top and bottom of each column shall be connected to the Column valve. The top of the column shall be connected to one of the A ports (e.g., **1A**), and the bottom of the column shall be connected to the corresponding B port (e.g., **1B**). The flow direction can be set either from the top of the column to the bottom of the column, Down flow, or from the bottom of the column to the top of the column, Up flow. In the default flow path of the Column valve the columns are bypassed. Pressure monitors that measures the actual pressure over the column are integrated into the inlet and outlet ports of the Column valve.

Still another embodiment of fluid control valve may be a pH valve **17** that has an integrated flow cell where a pH electrode can be installed. This enables in-line monitoring of pH during the run. A flow restrictor is connected to the pH valve and can be included in the flow path to generate a backpressure high enough to prevent formation of air bubbles in the UV flow cell. The pH valve is used to direct the flow to the pH electrode and to the flow restrictor, or to bypass one or both.

Still another embodiment of fluid control valve may be an Outlet valve **18** that is used to direct the flow to a Fraction collector (not shown), to any of e.g. 10 outlet ports, or to waste. The number of outlets can be increased by installing an extra Outlet valve.

A Mixer **14** may e.g. be located after System pump A and System pump B and before the Injection valve. The purpose of the Mixer is to make sure that the buffers from the System

US 9,671,420 B2

5

pumps are mixed to give a homogenous buffer composition. The Mixer has a built-in filter that prevents impurities from entering the flow path.

To fulfill a desired purpose, with the disclosed liquid chromatography system it is possible to adapt and extend the flow path in a simple and a flexible way. Up to three extra fluid control valves or the like can be installed using the free valve positions. Dummy modules are installed in these positions at delivery. To obtain an optional flow path, it is also possible to move the standard fluid control valves to other positions. There are also two types of extra air sensors available which can be installed before Sample inlet valve or after Injection valve.

In the configuration disclosed in FIG. 1, 7 inlets are available for each inlet valve. To increase the number of inlets, an extra inlet valve can be installed which increases the number of inlets to 14 for one of the valves. This optional configuration can be convenient for example when a larger number of samples will be used. There is also a general type of inlet valve, Valve X, which can be used to increase the number of inlets to for example the Quaternary valve.

In the configuration disclosed in FIG. 1 with one column valve, 5 column positions are available. To increase the number of column positions to 10, an additional column valve can be installed in the instrument. An application can be to evaluate a number of different columns in method optimization.

In the configuration disclosed in FIG. 1 with one outlet valve, 10 outlet positions are available. To increase the number of outlets, one or two extra outlet valves can be connected, adding up to a total of 21 or 32 outlet positions. This optional configuration is convenient when collecting a number of large fractions outside the fraction collector.

Optional modules are easy to install in the disclosed modular liquid chromatography system. The dummy module is removed with a hexagon wrench and a bus cable is disconnected. The bus cable is connected to the optional fluid control valve or the like which is assembled in the instrument. The module is then added to the System properties in the control software. The available optional modules may e.g. be pre-configured to give the desired function. However, the function of a valve may e.g. be changed by changing the Node ID.

FIG. 2 is a schematic illustration of a housing 20 with a liquid handling panel 22 of the fluid handling system in the form of a modular liquid chromatography system 100 of FIG. 1. In FIG. 2 some components have been removed for clarity reasons. In the disclosed configuration, as disclosed in detail above, the modular liquid chromatography system 100 comprises a plurality of fluid control valves in the form of: Injection valve 1, Column valve 2, Quaternary valve 5, Inlet valve B 6, Inlet valve A 9, Sample inlet valve 15, pH valve 17, and Outlet valve 18. The chromatography system 100 further comprises UV monitor 4, System pump B 7, System pump A 10, Sample pump 12, Mixer 14, and three Dummy modules 24. According to one embodiment, all liquid handling components and sensors arranged at the liquid handling panel 22 are designed to be readily interchangeable. The interchangeability provides improved service and upgrade possibilities and also a possibility to customize the positions of the respective liquid handling components, such as the fluid control valves, e.g. in order to optimize the fluid path for a specific experimental setup. As is illustrated in FIG. 2, there are three large component positions e.g. for pump modules, one UV-sensor position and 9 standard component positions, e.g. for fluid control valves or the like. The component positions are given a

6

standardized size and shape to provide simple interchangeability. According to one embodiment, each modular component is retained in a mating component position by a single screw, and it is connected to the master control unit by a single bus cable providing both communication and system power to each component. FIG. 3 is a schematic illustration of the housing with the liquid handling panel of FIG. 2 with the modular components of the liquid chromatography system removed.

FIGS. 4a to 4d are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. 4a shows a standard interchangeable modular component 26, e.g. a fluid control valve or the like. The standard component module 26 comprises a panel member 28, an external fluidics section 30 and an internal non-fluidics section 32. According to one embodiment, the panel member 28 essentially separates the fluidics in the external fluidics section 30 from electronics and control means in the internal non-fluidics section 32.

FIG. 4b shows a Dummy module 24, which is intended to be placed in non used standard component positions. In the disclosed embodiment, the Dummy modules are provided with mounting grooves for attachment of accessories to the system. In the disclosed embodiment the dummy module is shown as a panel member 28 without any internal section FIGS. 4c and 4d shows a pump module and an UV-module, respectively, each having an external fluidics section 30 and an internal non-fluidics section 32.

As is disclosed in FIGS. 4a to 4d, the interchangeable modular components 26 comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel. Said panel attachment member may be arranged so that all fluid connections of said modular component are arranged on a wet side of the panel attachment member separating them from electrical components that are arranged on a dry side thereof, hence providing a high degree of liquid resistance at the external part of the fluid handling panel, and so that the liquid resistance requirements for the internal sections may be somewhat lightened. According to one embodiment, the interchangeable modular components are sealed against the liquid handling panel by a sealing member. According to another embodiment, not shown, the modular component does not comprise any panel member, but there is provided a suitable sealing arrangement between the component position openings of the liquid handling panel and the external surface of the interchangeable modular components 26. In the disclosed embodiments, the component position openings of the liquid handling panel and the interchangeable modular components 26 are shown to have an essentially rectangular crosssectional shape, but other shapes may be equally applicable. According to one embodiment, there is provided a general fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components as is schematically disclosed in FIG. 5a. As discussed above such a system may be configured for essentially any type of automated liquid handling operations provided that suitable fluid handling units are provided as interchangeable modular components for the system. According to one embodiment there is provided an automated fluid handling system comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

US 9,671,420 B2

7

The liquid handling panel 22 of the fluid handling system may e.g. be designed in any suitable manner to allow the modular components to be arranged in an efficient manner.

FIGS. 5a and 5b shows a schematic embodiment of an automated fluid handling system wherein the housing 20 comprises an internal climate panel 29 arranged at a distance behind the liquid handling panel 22 defining an air inlet compartment 35 and air outlet compartment 37 in the housing 20, the climate panel 29 being provided with complementary component positions 39 for receiving the internal non fluidics section 32 of the interchangeable modular components 26, and wherein the non-fluidics section 32 of at least one interchangeable modular component is provided with one or more air inlet openings 31 located in the air inlet compartment 35 and one or more air outlet openings 33 located in the air outlet compartment 37 when the interchangeable modular component arranged in position in the component position. FIG. 5b shows the fluid handling system of FIG. 5a in a schematic cross sectional view. As is indicated by inlet vent 41 and outlet vent 43, air for cooling interchangeable modular components 26 provided with air inlet and outlet openings 31, 33 is preferably arranged to enter the air inlet compartment 35 at a distance from the outlet vent 43 in order to avoid recirculation of air. The air circulation in the system may be achieved by a system cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37, through the at least one interchangeable modular component 26. Alternatively, the at least one interchangeable modular component 26 is provided with a local cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37. As is indicated, the complementary component positions 39 are arranged to provide a relatively air flow tight fit with respect to the internal non fluidics section 32 of the interchangeable modular components 26, and according to one embodiment, this may be achieved by a sealing arrangement. In FIG. 5b, there is shown a sealing member 45 for sealing the interchangeable modular components 26 with respect to the liquid handling panel 22, as discussed above. Other sealing member arrangements may be envisaged by a person skilled in the art. According to one embodiment, fluids are strictly restricted to the fluidics section 30 of the interchangeable modular component 26, but in alternative embodiments, only fluid connections are restricted to the fluidics section 30 allowing fluid to "cross" the fluid handling panel inside the non-fluidics section 30 of the interchangeable modular component 26.

In FIG. 5b there is further shown a master control unit 40 and buss connectors 42 for connecting the interchangeable modular components 26 to the master control unit 40. According to one embodiment, the component positions including the buss connectors 42 and the interchangeable modular components 26 are of plug and play configuration with respect to each other.

FIG. 6 is a schematic illustration of an embodiment of a housing 20 with a modular liquid handling panel 22 with the modular components of the liquid chromatography system removed. In the disclosed embodiment, also the layout of the liquid handling panel 22 is configurable by means of two interchangeable panel sections 34 which may be selected in accordance with the desired layout of the system. In FIG. 6 two different layouts of the interchangeable panel sections are disclosed, but the layout may include any suitable configuration.

FIGS. 7a and 7b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with

8

the modular components of the liquid chromatography system removed. In the disclosed embodiment, the modular housing is comprised of a main housing 36 that comprises the master control unit including power supply and climate control for the whole housing, two expansion housing modules 38 and a side member 40. This approach provides very flexible expansion possibilities for the chromatography system, while preserving the benefits of a single master control unit including power supply and climate control.

FIG. 8 is a schematic illustration of an embodiment of the system architecture of one embodiment of a modular liquid chromatography system according to the present invention. As mentioned above, the chromatography system may comprise a master control unit 40 arranged to communicate with all modular components e.g. 1-26, over a system bus 42 such as a CAN-bus or the like. In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42. In order to minimize the number of connectors to be attached to each modular component, the bus 42 further comprises power feed for the modular components. The Bus 42 may be connected to any suitable number of modular components arranged in the housing 20, but also to one or more modular components 44 outside of the housing 20 or the like. As is mentioned briefly above, the master control unit may further be arranged to control the climate in the housing. In addition to the disclosed modular components, other components of the chromatography system, e.g. a fraction collector or the like, may be arranged in the housing and the controlled climate therein.

According to one embodiment, different component modules are automatically identified by the master control unit, whereby they may be moved essentially freely between different positions. Moreover, the master control unit may be arranged to provide said information to Chromatography control software whereby experimental setup and planning may be performed. In one embodiment, the control system may be arranged to provide an optimized layout of the component modules with respect to the present layout of the liquid handling panel and available component modules for a specific experimental setup.

According to one embodiment, the interchangeable panel sections 34 of FIG. 5 and the expansion housing modules 38 of FIGS. 6a and 6b may be provided with means for automatic detection of the same to allow automatic configuration of the system by the master control unit 40. In one embodiment, each interchangeable panel section 34 and expansion housing module 38 comprises a hub (not shown) for connection to the system bus 42 in order to expand the system bus 42 network to the number of component modules in each interchangeable panel section 34 or expansion housing module 38.

FIG. 9 is a schematic illustration of an embodiment of a master control unit of one embodiment of a modular liquid chromatography system according to the present invention. The master control unit 40 comprises a system controller 46 for communicating with internal and external components and control computers (not shown) etc. According to one embodiment, the system controller comprises a suitable CPU 48, a bus controller 52, an external communications controller 50, such as a LAN unit, and a storage device 54. The bus controller 52 is providing communication with the component modules. The master control unit may further comprise a Power supply 56 and a climate controller 58 arranged to keep the internal climate in the housing 20 at a predetermined level as discussed above.

US 9,671,420 B2

9

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel. Taking into account the complexity of the disclosed interconnection arrangement, the benefit of optimizing the fluid paths in alternative configurations of the system becomes evident. The task of optimizing the fluid paths may e.g. be performed to reduce the total length/volume of the fluid paths/tubing arranged to interconnect the different component modules in the system. Alternatively the optimization may be performed to minimize the length/volume of one or more specific fluid paths, such as the sample output path from the column to the fraction collector, in order to minimize dispersion of the fractionized sample.

The invention claimed is:

**1.** An automated liquid chromatography system comprising:

a housing;

a master control unit connected to a system bus; and

three or more fluid handling units arranged as interchangeable modular components comprising (i) an external fluidics section, (ii) an internal non-fluidics section including a bus connector for directly connecting the interchangeable modular component with the system bus, and (iii) a panel member arranged to separate the fluidics section from the non-fluidics section;

wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing;

wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus;

wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus;

wherein the master control unit is arranged to automatically identify interchangeable modular components;

wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and

wherein the system is capable of performing automated liquid chromatography.

**2.** The chromatography system of claim **1**, wherein the interchangeable modular components are sealed against the liquid handling panel by a sealing member.

**3.** The chromatography system of claim **1**, wherein the interchangeable modular components are all of the same size.

**4.** The chromatography system of claim **1**, wherein the interchangeable modular components are of two or more sizes.

**5.** The chromatography system of claim **1**, wherein the liquid chromatography system further comprises a pH electrode that is external to the housing.

**6.** The chromatography system according to claim **5**, wherein the at least two fluid control valves include an

10

injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve.

**7.** The chromatography system according to claim **5**, wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component.

**8.** The chromatography system according to claim **7**, wherein the pH valve includes an integrated flow cell for in-line monitoring of pH levels.

**9.** The chromatography system of claim **1**, wherein the liquid chromatography system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

**10.** The chromatography system of claim **1**, wherein the liquid chromatography system comprises two double piston pumps, one injection valve for injecting sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer, wherein the pumps, valve, monitor, and mixer are interchangeable modular components.

**11.** The chromatography system of claim **10**, wherein the liquid chromatography system further comprises a column valve comprising pressure sensors integrated into inlet and outlet ports of the column valve for measuring the actual pressure over the connected column.

**12.** The chromatography system of claim **10**, wherein the liquid chromatography system further comprises a sample inlet valve.

**13.** The chromatography system of claim **10**, wherein the liquid chromatography system further comprises a conductivity monitor.

**14.** The chromatography system of claim **10**, wherein the liquid chromatography system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

**15.** The chromatography system according to claim **1**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve.

**16.** The chromatography system of claim **1**, wherein the liquid chromatography system includes two double piston pumps, one injection valve for injecting a sample onto a column connected to a flow path of the liquid chromatography system, a UV monitor, a mixer, a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients, wherein the pumps, injection valve, monitor, mixer, pH valve, and quaternary valve are interchangeable modular components.

**17.** An automated liquid chromatography system comprising:

a housing;

a master control unit connected to a system bus; and

two or more fluid handling units arranged as interchangeable modular components comprising a panel member arranged to separate a fluidics section from a non-fluidics section, wherein the fluidics section of each interchangeable modular component comprises one or more fluid connectors for connecting the fluid handling unit to a liquid chromatography fluid path and wherein all fluid connectors are on an external side of the panel member, said liquid chromatography fluid path being reconfigurable by moving the interchangeable modular components freely between the component receiving

US 9,671,420 B2

11

positions, and wherein the non-fluidics section includes a bus connector for directly connecting the interchangeable modular components to the system bus;

wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing;

wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus;

wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus;

wherein the master control unit is arranged to automatically identify interchangeable modular components;

wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and

wherein the system is capable of performing automated liquid chromatography.

**18**. The chromatography system of claim **17**, wherein the interchangeable modular components are all of the same size.

**19**. The chromatography system of claim **17**, wherein the interchangeable modular components are of two or more sizes.

**20**. The chromatography system of claim **17**, wherein the two or more component receiving positions are arranged in a two dimensional array.

**21**. The chromatography system of claim **17**, wherein the housing comprises at least four component receiving positions.

**22**. The chromatography system of claim **17**, wherein the liquid chromatograph system further comprises a pH electrode that is external to the housing.

**23**. The chromatography system according to claim **22**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve.

**24**. The chromatography system according to claim **22**, wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component.

**25**. The chromatography system according to claim **24**, wherein the pH valve includes an integrated flow cell for in-line monitoring of pH levels.

**26**. The chromatography system of claim **17**, wherein the liquid chromatography system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

12

**27**. An automated liquid chromatography system comprising:

a housing;

a master control unit connected to a system bus; and

two or more fluid handling units arranged as interchangeable modular components comprising a panel member arranged to separate a fluidics section from a non-fluidics section, wherein the fluidics section of each interchangeable modular component comprises one or more fluid connectors for connecting the fluid handling unit to a liquid chromatography fluid path and wherein all fluid connectors are on an external side of the panel member, said liquid chromatography fluid path being reconfigurable by moving the interchangeable modular components freely between the component receiving positions, and wherein the non-fluidics section includes a bus connector for directly connecting the interchangeable modular components to the system bus;

wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing;

wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus;

wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus;

wherein the master control unit is arranged to automatically identify interchangeable modular components;

wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and

wherein the system is capable of performing automated liquid chromatography.

**28**. The chromatography system of claim **27**, wherein the interchangeable modular components are all of the same size; or of two or more sizes.

**29**. The chromatography system of claim **27**, wherein the system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

**30**. The chromatography system of claim **27**, wherein the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component.

\*    \*    \*    \*    \*

# EXHIBIT 36

US00RE47124E

(19) **United States**

(12) **Reissued Patent**
Blomberg et al.

(10) Patent Number: **US RE47,124 E**
(45) Date of Reissued Patent: **Nov. 13, 2018**

(54) **AUTOMATED FLUID HANDLING SYSTEM**

(71) Applicant: **GE Healthcare Bio-Sciences AB**, Uppsala (SE)

(72) Inventors: **Johan Blomberg**, Uppsala (SE); **Mats Lundkvist**, Uppsala (SE)

(73) Assignee: **GE Healthcare Bio-Science AB**, Uppsala (SE)

(21) Appl. No.: **15/008,155**

(22) Filed: **Jan. 27, 2016**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **8,821,718**
     Issued: **Sep. 2, 2014**
     Appl. No.: **13/376,929**
     PCT Filed: **Jun. 4, 2010**
     PCT No.: **PCT/SE2010/050624**
     § 371 (c)(1),
     (2) Date: **Dec. 8, 2011**
     PCT Pub. No.: **WO2010/144037**
     PCT Pub. Date: **Dec. 16, 2010**

(30) **Foreign Application Priority Data**

Jun. 9, 2009    (SE) ...................................... 0950431

(51) **Int. Cl.**
     **B01D 35/00**       (2006.01)
     **G01N 35/10**       (2006.01)
     (Continued)

(52) **U.S. Cl.**
     CPC ......... **G01N 35/1097** (2013.01); **B01D 15/10**
     (2013.01); **B01D 29/60** (2013.01);
     (Continued)

(58) **Field of Classification Search**
     CPC .... G01N 35/1097; G01N 30/38; G01N 30/24;
     G01N 30/88; G01N 2030/8804;
     (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,044,593 A      8/1977  Haruki et al.
4,125,464 A  *  11/1978  Burger et al. ................. 210/658
                    (Continued)

FOREIGN PATENT DOCUMENTS

CN         2567575 Y      8/2003
CN       101358952 A      2/2009
                    (Continued)

OTHER PUBLICATIONS

"Manual ADI 2040 Process Analyzer" 1999-2007, Applikon Analytical B.V., pp. 1-134 (part 1).*
                    (Continued)

*Primary Examiner* — Ling X Xu
(74) *Attorney, Agent, or Firm* — Arent Fox LLP

(57)                    **ABSTRACT**

Automated fluid handling system comprising a housing (**20**) and two or more fluid handling units (**26**) arranged as interchangeable modular components with an external fluidics section (**30**) and an internal non fluidics section (**32**), and wherein the housing (**20**) comprises a liquid handling panel (**22**) with two or more component positions for receiving said interchangeable modular components (**26**) such that the external fluidics section (**30**) is separated from the non fluidics section (**32**) by the liquid handling panel (**22**).

**29 Claims, 10 Drawing Sheets**



Shinoff
7/22/2020
**EX 122**

## US RE47,124 E

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *B01D 29/60* | (2006.01) |
| *B01D 15/10* | (2006.01) |
| *G01N 30/24* | (2006.01) |
| *G01N 30/38* | (2006.01) |
| *G01N 30/88* | (2006.01) |
| *G01N 30/02* | (2006.01) |
| *G01N 35/00* | (2006.01) |
| *B01D 15/08* | (2006.01) |
| *B01D 17/12* | (2006.01) |

(52) **U.S. Cl.**

CPC ............. *G01N 30/24* (2013.01); *G01N 30/38* (2013.01); *G01N 30/88* (2013.01); *B01D 15/08* (2013.01); *B01D 17/12* (2013.01); *B01D 2201/54* (2013.01); *G01N 2030/027* (2013.01); *G01N 2030/8804* (2013.01); *G01N 2030/8881* (2013.01); *G01N 2035/00326* (2013.01); *Y10T 137/6416* (2015.04); *Y10T 137/6525* (2015.04); *Y10T 137/6851* (2015.04); *Y10T 137/85986* (2015.04); *Y10T 137/87885* (2015.04)

(58) **Field of Classification Search**

CPC ... G01N 2035/00326; G01N 2030/027; G01N 2030/8881; B01D 29/60; B01D 15/10; B01D 2201/54; B01D 17/12; B01D 15/08; Y10T 1375/6851; Y10T 137/6525; Y10T 137/6416; Y10T 137/85986; Y10T 137/87885

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,224,033 | A * | 9/1980 | Hansen et al. | ................. 436/53 |
| 5,730,867 | A | 3/1998 | Drew et al. | |
| 5,766,460 | A | 6/1998 | Bergstrom et al. | |
| 5,792,742 | A * | 8/1998 | Gold et al. | ..................... 514/9.3 |
| 5,896,273 | A | 4/1999 | Varghese et al. | |
| 5,959,841 | A | 9/1999 | Allen et al. | |
| 6,190,617 | B1 * | 2/2001 | Clark et al. | ................. 422/562 |
| 6,355,164 | B1 | 3/2002 | Wendell et al. | |
| 6,434,018 | B1 | 8/2002 | Waltz | |
| 6,599,484 | B1 * | 7/2003 | Zigler et al. | ................. 422/130 |
| 6,741,463 | B1 | 5/2004 | Akhtar et al. | |
| 6,832,622 | B2 | 12/2004 | Hassel et al. | |
| 6,968,958 | B2 | 11/2005 | Lauchner et al. | |
| 7,374,674 | B2 | 5/2008 | Miyauchi et al. | |
| 7,641,242 | B2 | 1/2010 | Van Pelt | |
| 7,910,067 | B2 | 3/2011 | Knight et al. | |
| 7,932,090 | B2 | 4/2011 | Carter et al. | |
| 8,821,718 | B2 | 9/2014 | Blomberg et al. | |
| 9,404,902 | B2 | 8/2016 | Blomberg et al. | |
| 9,671,420 | B2 | 6/2017 | Blomberg et al. | |
| 9,709,589 | B2 | 7/2017 | Blomberg et al. | |
| 9,709,590 | B2 | 7/2017 | Blomberg et al. | |
| 9,709,591 | B2 | 7/2017 | Blomberg et al. | |
| 2002/0185442 | A1 | 12/2002 | Maiefski et al. | |
| 2004/0089057 | A1 | 5/2004 | Hobbs et al. | |
| 2004/0264145 | A1 | 12/2004 | Miller et al. | |
| 2005/0051468 | A1 | 3/2005 | Miyauchi et al. | |
| 2006/0047466 | A1 | 3/2006 | White | |
| 2006/0274082 | A1 | 12/2006 | Cochran et al. | |
| 2007/0081308 | A1 | 4/2007 | Ishida | |
| 2007/0095126 | A1 | 5/2007 | Bailey et al. | |
| 2007/0097636 | A1 | 5/2007 | Johnson et al. | |
| 2007/0247826 | A1 | 10/2007 | Grady et al. | |
| 2008/0023653 | A1 | 1/2008 | Lee et al. | |
| 2008/0035542 | A1 | 2/2008 | Mourtada et al. | |
| 2008/0233653 | A1 * | 9/2008 | Hess et al. | ..................... 436/43 |
| 2014/0353224 | A1 | 12/2014 | Blomberg et al. | |
| 2017/0284985 | A1 | 10/2017 | Blomberg et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19847439 A1 | 4/2000 |
| EP | 0309596 A1 | 4/1989 |
| GB | 1418503 A | 12/1975 |
| GB | 1418503 A1 | 12/1975 |
| JP | 2002-333438 A | 11/2002 |
| JP | 2005-106813 A | 4/2005 |
| WO | 0022429 A1 | 4/2000 |
| WO | WO 00/22429 | 4/2000 |
| WO | WO-2001/089681 | 11/2001 |
| WO | WO-2005/042146 A2 | 5/2005 |
| WO | WO 2006/134035 | 12/2006 |
| WO | WO 2006/134035 A1 | 12/2006 |
| WO | WO-2007/036712 A1 | 4/2007 |

OTHER PUBLICATIONS

Final Written Decision, Inter Partes Review 2015-01826, Feb. 6, 2017.*

Decision to Institute, Inter Partes Review 2015-01826, Feb. 29, 2016.*

"Manual ADI 2040 Process Analyzer" 1999-2007, Applikon Analytical B.V., pp. 346-619 (part 2).*

General Electric, "User Manual," ÄKTA pure, Dec. 2014, pp. 3929-4445.

Dionex, "ICS-3000 Ion Chromatography System Operator's Manual," Thermo Scientific, Jan. 2008, pp. 4779-5170.

Bio-Rad Laboratories, Inc., "Biologic Duoflow Chromatography System," Instruction Manual, 2003, pp. 5810-6048.

Larry Tucker et al., "Videotaped Deposition of Metrohm 30 (B) (6)," *GE Healthcare vs. Bio-Rad*, Aug. 10, 2015, pp. 1-292.

Tecan Systems, "Cavro XLP 6000 Modular Syringe Pump," Operating Manual, Part I, Oct. 2005, pp. 5542-5698.

Office Action issued in Chinese Patent Application No. 201510602257.9 dated Jul. 13, 2016.

European Search Report issued in European Patent Application No. 16205536 dated Mar. 17, 2017 (8 pages).

Metrohm-Peak, Inc., "Determination of Anions + Oxyhalides in Various Waters by Suppressed Conductivity (USEPA method 300 A&B)," IC Application Work AW US6-0125-052007, 2007, pp. 001327-001336.

Metrohm Ion analysis, "IC Pump-2.872.0010," 872 Extension Module, pp. 1-67.

Applikon Analytical, "Multi-purpose wet chemical analysis," Process Analyzer ADI 2040, Sep. 2008, pp. 1547-1554.

Applikon Analytical, "Trace Metal and Plating Bath Analysis," ADI2045VA Process Analyzer, Sep. 2007, pp. 1555-1562.

General Electric, "Operating Instructions Original Instructions," ÄKTA pure, Apr. 2014, pp. 3785-3928.

John Loffink, "Dell PowerEdge M1000e Modular Enclosure Architecture," Dell Enterprise White Paper, Jan. 2008, pp. 4577-4618.

APC, "Rack Enclosures and Open Frame Racks for Server and Networking Applications in IT Environments," Rack Systems, 2006, pp. 4619-4638.

Gilson, Inc., "Product Guide," The Element of Purification, Jul. 2008, pp. 5171-5207.

Gilson, Inc., "402 Syringe Pump User's Guide," Jul. 2003, pp. 5208-5293.

Gilson, Inc., "Gilson Product Guide," 2004, pp. 5294-5343.

Gilson, Inc., "Spec Sheet," 2003, 1 Page.

Gilson, Inc., "Brochure," 2003, 1 Page.

Gilson, Inc., "User's Guide," 2003, 1 Page.

Labomatic, "Labomatic HPLC valve and column system panel," pp. 5347-5348.

Andreas Schmid, "The Energy Issue in Whole Cell Oxyfunctionalization," GreenChem Symposium, Nov. 9, 2006, pp. 5349-5386.

Labomatic Instruments AG, "Customer-specific preparative HPLC Systems," 5387-5389.

Waters Corporation, "Waters 2767 Sample Manager, Injector, and Collector," Installation and Maintenance Guide, 2006, pp. 5390-5541.

Tecan Group Ltd, "Cavro OEM Pumps and Valves," 2008, 1 page.

**US RE47,124 E**

Page 3

(56)         **References Cited**

OTHER PUBLICATIONS

Tecan Group Ltd, "Cavro XLP 6000," 2008, 1 page.
Eda Tezcanli, "An Analytical Survey on Customization at Modular Systems in the Context of Industrial Design," A Thesis Submitted to the Graduate School of Engineering and Sciences of Izmir Institute of Technology in Partial Fulfillment of the Requirements for the Degree of Master of Science in Industrial Design, Jan. 2006, pp. 5701-5809.
Applikon Analytical, "Box Wet Part Module 3X," Bio-Rad Ex. 1003, 1 page.
Gilson, Inc., "2007-2008 Product Guide," Bio-Rad Ex. 1010 pp. 1-37.
Gilson, Inc., "402 Syringe Pump User's Guide," Bio-Rad Ex. 1011, Jun. 2001, pp. 1-86.
David Bilsker, "*Bio-Rad Laboratories, Inc* v. *GE Healthcare Bio-Sciences AB*," United States Patent and Trademark Office, pp. 1-71.
Applikon Analytical Confidential, "Analyzers 1999-2008," Bio-Rad Ex. 1004, Jul. 8, 2015, pp. 1323-1326.
Thomas Koshy, "Declaration of Thomas Koshy," in the United States District Court for the Southern District of New York, Civil Action No. 1:14-cv-07080-LTS, pp. 1-3.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.* v. *GE Healthcare Bio-Sciences AB*," Declaration of Dr. Bruce Gale in Support of Bio-Rad Laboratories' Petition for Institution of an IPR on U.S. Pat. No. 8,821,718, pp. 1-84.
Metrohm Ion Analysis, "Intelligent Ion Chromatography," Professional IC 850, pp. 1-24.
Brinkmann, "875 ProcessLab Hardware," ProcessLab, pp. 1-15.
Brinkmann, "875 ProcessLab Components," ProcessLab, pp. 1-26.
H. Schäfer, "Compact View of a Modular Design or a new Philosophy in Metrohm IC," Processional IC, pp. 1-90.
Brinkmann, "Is ProcessLab Explosion-Proof?" ProcessLab, pp. 1-12.
Metrohm—Intelligent Ion Chromatography, www.professional-ic. com, 2012, pp. 1-28.
Metrohm—850 Processional IC Manual, http://products.matrohm. com, pp. 1-146.
ADI 2045 VA Instrument Manual, Applikon Analytical, 2007, pp. 1-80, Version 1.2.
ADI 2040 Process Analyzer Manual—Basic Maintenance & Spare parts, Applikon Analytical, Mar. 2008, Version 1.53, pp. 1-48.
ADI 2040 Process Analyzer Manual—Analysis Methods, Applikon Analytical, Sep. 2002, pp. 1-44, Version 1.4.
ADI 2040 Process Analyzer Manual—Serial Communication, Applikon Analytical, Version 1.4, Apr. 2006, pp. 1-134.
ADE 2040 Process Analyzer Manual—Basic Operation, Applikon Analytical, Version 1.4, pp. 1-30, Jul. 2006.
ADI Process Analyzer Manual—Advanced Operation, Applikon Analytical, Version 1.53, pp. 1-78, Oct. 2007.
ADI 2040 Process Analyzer Manual—Configuration, Applikon Analytical, Version 1.4, pp. 1-44, Jul. 2006.
ADI 2040 Process Analyzer Manual—Hardware & Installation, Applikon Analytical, Version 1.53, pp. 1-144, May 2008.

ADI 2040 Process Analyzer Manual, Applikon Analytical, 1-10 pp., Apr. 1999.
Bilsker, Petition for Inter Parties Review, *Bio-Rad Laboratories, Inc,* v. *GE Healthcare Bio-Science AB,* Sep. 2015, pp. 1-71.
Metrohm 850 Professional IC teardown summary (2.850.2220 ProfIC Anion MCS HP Gradient) Jul. 2016, pp. 1-9.
ADI 2040 Process Analyzer, Manual, Applikon Analytical, 1999-2007, *Bio-Rad Labs, Inc.* v. *GE Healthcare Biosciences AB,* IPR2015-01826, Bio-Rad Ex. 1002, pp. 1-619.
EP Office Action dated Feb. 26, 2014 Issued on Corresponding EP Application No. 10786454.8 (5 pages).
850 Professional IC Manual, Metrohm, AnCat-MCS-2.850.3030, May 2009, *Bio-Rad Labs, Inc.* v. *GE Healthcare Biosciences AB,* IPR2015-01826, Bio-Rad Ex. 1017, pp. 1-143, BIO-RAD001337-BIO-RAD001479.
Decision on Institution, *Bio-Rad Labs, Inc.* v. *GE Healthcare Biosciences AB,* IPR2015-01826, Paper No. 11, Feb. 29, 2016, pp. 1-47.
Metrohm 850 Professional IC Teardown Summary, 2.850.2220 ProfIC Anion MCS HP Gradient, Aug. 2016, pp. 1-9.
Biologic Duoflow Chromatography System, Instruction Manual, Bio-Rad Laboratories, Inc., 2003, BRGE00005810-BRGE00006048.
ICS-3000 Ion Chromatography System Operator's Manual, Dionex (Thermo Scientific), Doc. No. 065031, Rev. 04, Jan. 2008, BRGE00004779-BRGE00005170.
AKTA pure, User Manual, General Electric, Dec. 2014, BRGE00003929-BRGE00004445.
ADI 2045VA Manual, Applikon Analytical, 2007, BIO-RAD000620-BIO-RAD001322.
JP Office Action dated Dec. 17, 2013 issued on Corresponding JP Application No. 2012-514920, 6 pages (with English translation).
Deposition Transcript of Metrohm 30 (B) (6) Larry Tucker and Thomas Koshy, Aug. 10, 2015, *Bio-Rad Labs, Inc.* v. *GE Healthcare Biosciences AB,* IPR2015-01826, Bio-Rad Ex. 1005, p. 1-292.
Cavro XLP 6000 Modular Syringe Pump, Operating Manual, Tecan Systems, BRGE00005542-BRGE005698.
Waters 2767 Sample Manager, Injector, and Collector, Installation and Maintenance Guide, 71500276704 Rev B, Waters Corp., 2006, BRGE00005390-BRGE00005541.
European Search Report and Form 1507 issued in European Patent Application No. 16205536 dated Mar. 17, 2017 (8 pages).
Carvo OEM Pumps and Valves, Tecan Group, Ltd., Internet Archive, 1 page, BRGE00005699.
Carvo XLP 6000 60mm Stroke OEM Syringe Pump, Tecan Group, Ltd., Internet Archive, 1 page, BRGE00005700.
Gilson, Inc., Spec Sheet, Internet Archive, 1 page, BRGE00005344.
Gilson, Inc., Brochure, Internet Archive, 1 page, BRGE00005345.
Gilson, Inc., User Guide, Internet Archive, 1 page, BRGE00005346.
Andreas Schmid, "The Energy Issue in Whole Cell Oxyfunctionalization," GreenChem Symposium, Nov. 9, 2006, BRGE00005350-BRGE00005386.
Metrohm 811 Online IC / 821 Compact Online IC Brochure, pp. 1-11.
Brinkmann, "Is ProcessLab Explosion-Proof?" ProcessLab, 1 page.

* cited by examiner

100



Fig. 1



Fig. 2



Fig. 3



Fig. 4a



Fig. 4b



Fig. 4c



Fig. 4d



Fig. 5a



Fig. 5b



Fig. 6



Fig. 7a

Fig. 7b



Fig. 8



Fig. 9



Fig. 10

US RE47,124 E

**1**

# AUTOMATED FLUID HANDLING SYSTEM

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue; a claim printed with strikethrough indicates that the claim was canceled, disclaimed, or held invalid by a prior post-patent action or proceeding.**

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a filing under 35 U.S.C. §371 and claims priority to international patent application number PCT/SE2010/050624 filed Jun. 4, 2010, published on Dec. 16, 2010 as WO 2010/144037, which claims priority to application number 0950431-7 filed in Sweden on Jun. 9, 2009.

## BACKGROUND OF THE INVENTION

The present invention relates to the art of fluid handling system systems, and in particular to an automated fluid handling system that is highly flexible and configurable. The fluid handling system may e.g. be a liquid chromatography system, a filtration system, a chemical synthesis system or the like.

There is a large range of fluid handling systems e.g. in laboratories. Such systems comprise a number of fluid handling units, e.g. one or more pumps, valves, mixers, sensor units etc of different types. Said fluid handling units are interconnected by fluid conduits in the form of, rigid or flexible tubes or the like. Even though some systems may be designed for a specific type of application with a specific flow path, there often exists a need for flexibility and ability to alter or optimize the fluid flow path of the system. Moreover, upgrading is often restricted to specific kits provided by the manufacturer, and upgrade kits often is supplied as external add-on equipment to be arranged besides the original system, thus enlarging the foot print of the system and that need to be connected to the system both fluidically and electrically (i.e. to a system control bus or the like). Moreover, replacement of defect fluid handling units is a time consuming and delicate task.

One type of liquid handling system is liquid chromatography systems which is a standard method in laboratories, and there are a broad range of liquid chromatography systems available on the market. Common to most of the present systems is the lack of flexibility in adapting the instrument to a variety of different applications.

## SUMMARY OF THE INVENTION

The object of the invention is to provide a new fluid handling system, which system overcomes one or more drawbacks of the prior art. This is achieved by the fluid handling system as defined in the independent claims.

One advantage with such a fluid handling systems is that the system may easily be upgraded without need for add-on equipment, and that the flow path may be easily optimized for new experimental setups.

Embodiments of the invention are defined in the dependent claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows one embodiment of a fluid handling system in the form of a liquid chromatography system, according to the present invention.

**2**

FIG. **2** is a schematic illustration of a housing with a liquid handling panel of the fluid handling system of FIG. **1**.

FIG. **3** is a schematic illustration of the housing with the liquid handling panel of FIG. **2** with the modular components of the fluid handling system removed.

FIGS. **4**a to **4**d are schematic illustrations of examples of component modules of the fluid handling system removed.

FIGS. **5**a and **5**b show a schematic embodiment of an automated fluid handling system.

FIG. **6** is a schematic illustration of an embodiment of a housing with a modular liquid handling panel with the modular components of the fluid handling system removed.

FIGS. **7**a and **7**b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the fluid handling system removed.

FIG. **8** is a schematic illustration of an embodiment of the system architecture of one embodiment of a fluid handling system according to the present invention.

FIG. **9** is a schematic illustration of an embodiment of a master control unit of one embodiment of a fluid handling system according to the present invention.

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel for the liquid chromatography system of FIG. **1**.

## DETAILED DESCRIPTION OF THE INVENTION

According to one embodiment, there is provided an automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

According to another embodiment, there is provided a fluid handling system in the form of a liquid chromatography system comprising a housing, two or more high pressure pumps, at least one sensor unit and a plurality of fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components and the housing comprises a liquid handling panel with a plurality of component positions for receiving said modular components.

FIG. **1** shows one embodiment of an automated fluid handling system modular in the form of a liquid chromatography system, with a plurality of interchangeable modular components arranged in a liquid handling panel wherein the reference numbers denotes:

**1**. Injection valve
**2**. Column valve with integrated pressure sensors
**3**. Conductivity monitor
**4**. UV monitor
**5**. Quaternary valve
**6**. Inlet valve B with integrated air sensor
**7**. System pump
**8**. Pressure monitor, system pump
**9**. Inlet valve A with integrated air sensor
**10**. System pump
**11**. Pressure monitor, sample pump
**12**. Sample pump
**13**. Rinsing system

US RE47,124 E

3

**14**. Mixer with online filter
**15**. Sample inlet valve with integrated air sensor
**16**. Flow restrictor
**17**. pH valve
**18**. Outlet valve

The disclosed embodiment is supplied with three high precision pumps **7**, **10**, **12**. There are two System pumps **7**, **10**, System pump A **10** and System pump B **7**, and one Sample pump **12**. The System pumps **7**, **10** may be used individually, or in combination to generate isocratic or gradient elution in purification methods. The Sample pump **12** is dedicated for direct loading of sample onto a column, or for filling of sample loops.

Function of the Pumps:

Each pump module consists of two pump heads (not shown). The individual heads are identical but actuated in opposite phase to each other by individual stepper motors, controlled by a microprocessor. The two pistons and pump heads work alternately to give a continuous, low pulsation, liquid delivery. The flow rate of the two System pumps may be varied between about 0.001 ml/min and 25.000 ml/min and the maximum operating pressure is about 20 MPa. The flow rate of the Sample pump may e.g. be varied between 0.01 and 25 ml/min and according to one embodiment the maximum operating pressure is 10 MPa.

According to one embodiment, the plurality of fluid control valves of at least two different configurations are valves of rotary type. Such a motorized rotary valve may consist of a Valve head with a number of defined bores with channels to the inlet and outlet ports of the valve. The Rotary disc, mounted on the motor, has a number of defined channels. The pattern of channels of the Rotary disc together with the pattern and location of the ports of the Valve head, define the flow path and function of each type of valve. When the Rotary disc turns, the flow path in the valve changes.

One embodiment of fluid control valves are Inlet valves A and B (**9**, **6** respectively) that are used to select which buffers or samples to use in a run, and Sample inlet valve **15** that is located before Sample pump **12**. Inlet valve A **9** 1 is located before System pump A **10**, inlet valve B **6** is located before System pump B **10**, and Sample inlet valve **15** is located before Sample pump **12**. Inlet valve A and Inlet valve B are connected to another embodiment of a fluid control valve in the form of a Quaternary valve **5**. The Quaternary valve is used for automatic buffer preparation, and for formation of quaternary gradients. The number of inlets can be increased by installing component modules with extra inlet valves. Inlet valve A and Inlet valve B enable automatic changing between different buffers and wash solutions, and can be used to generate gradients by mixing buffer A and buffer B. The air sensors integrated in Inlet valve A and Inlet valve B can be used to prevent introduction of air into the pumps and columns.

The Quaternary valve is used for automatic mixing of four different solutions. The Quaternary valve opens one inlet port at a time, and the different solutions are mixed in a Mixer **14** to form the desired buffer. The opening time in the switching valve is controlled by the system. The volume for each inlet port opening increases stepwise when the flow increases. To obtain a homogeneous buffer composition, one has to make sure to use a mixer chamber volume suitable for the flow rate of the method.

The Quaternary valve can be used to create a gradient using four different solutions simultaneously in any combination. The percentage of each solution is controlled by instructions in the method. It is possible to form gradients

4

that changes the percentage of two, three or four solutions linearly over time. This is useful when advanced methods are developed.

The Sample inlet valve **15** enables automatic loading of different samples when using the Sample pump **12** to inject sample directly onto the column or to fill a sample loop. The Sample inlet valve has an inlet dedicated for buffer. This Buffer inlet is used in methods to fill the Sample pump with solution before sample is introduced. The Buffer inlet is also used to wash the Sample pump with buffer between runs. The air sensor integrated in the Sample inlet valve is e.g. used when sample is applied from a vessel onto a column by selecting Inject all sample using air sensor in the Sample application phase of a method. This function uses the Buffer inlet is used to finalize sample injection and to remove air from the Sample pump.

Still another embodiment of fluid control valve may be an Injection valve **1**, which is used to direct sample onto the column. The valve enables usage of a number of different sample application techniques. A sample loop can be connected to the Injection valve and filled either automatically using the Sample pump or manually using a syringe. The sample can also be injected directly onto the column using the Sample pump.

Still another embodiment of fluid control valve may be a Column valve **2** that is used for connection of columns to the system, and to direct the flow onto the column. Up to five columns can be connected to the disclosed embodiment of said valve simultaneously. The valve also has a built-in bypass capillary that enables bypassing of connected columns.

The number of column positions can be increased by installing an extra Column valve. Both top and bottom of each column shall be connected to the Column valve. The top of the column shall be connected to one of the A ports (e.g., **1A**), and the bottom of the column shall be connected to the corresponding B port (e.g., **1B**). The flow direction can be set either from the top of the column to the bottom of the column, Down flow, or from the bottom of the column to the top of the column, Up flow. In the default flow path of the Column valve the columns are bypassed. Pressure monitors that measures the actual pressure over the column are integrated into the inlet and outlet ports of the Column valve.

Still another embodiment of fluid control valve may be a pH valve **17** that has an integrated flow cell where a pH electrode can be installed. This enables in-line monitoring of pH during the run. A flow restrictor is connected to the pH valve and can be included in the flow path to generate a backpressure high enough to prevent formation of air bubbles in the UV flow cell. The pH valve is used to direct the flow to the pH electrode and to the flow restrictor, or to bypass one or both.

Still another embodiment of fluid control valve may be an Outlet valve **18** that is used to direct the flow to a Fraction collector (not shown), to any of e.g. 10 outlet ports, or to waste. The number of outlets can be increased by installing an extra Outlet valve.

A Mixer **14** may e.g. be located after System pump A and System pump B and before the Injection valve. The purpose of the Mixer is to make sure that the buffers from the System pumps are mixed to give a homogeneous buffer composition. The Mixer has a built-in filter that prevents impurities from entering the flow path.

To fulfil a desired purpose, with the disclosed liquid chromatography system it is possible to adapt and extend the flow path in a simple and a flexible way. Up to three extra

US RE47,124 E

5

fluid control valves or the like can be installed using the free valve positions. Dummy modules are installed in these positions at delivery. To obtain an optional flow path, it is also possible to move the standard fluid control valves to other positions. There are also two types of extra air sensors available which can be installed before Sample inlet valve or after Injection valve.

In the configuration disclosed in FIG. **1**, 7 inlets are available for each inlet valve. To increase the number of inlets, an extra inlet valve can be installed which increases the number of inlets to 14 for one of the valves. This optional configuration can be convenient for example when a larger number of samples will be used. There is also a general type of inlet valve, Valve X, which can be used to increase the number of inlets for example the Quaternary valve.

In the configuration disclosed in FIG. **1** with one column valve, 5 column positions are available. To increase the number of column positions to 10, an additional column valve can be installed in the instrument. An application can be to evaluate a number of different columns in method optimization.

In the configuration disclosed in FIG. **1** with one outlet valve, 10 outlet positions are available. To increase the number of outlets, one or two extra outlet valves can be connected, adding up to a total of 21 or 32 outlet positions. This optional configuration is convenient when collecting a number of large fractions outside the fraction collector.

Optional modules are easy to install in the disclosed modular liquid chromatography system. The dummy module is removed with a hexagon wrench and a bus cable is disconnected. The bus cable is connected to the optional fluid control valve or the like which is assembled in the instrument. The module is then added to the System properties in the control software. The available optional modules may e.g. be pre-configured to give the desired function. However, the function of a valve may e.g. be changed by changing the Node ID.

FIG. **2** is a schematic illustration of a housing **20** with a liquid handling panel **22** of the fluid handling system in the form of a modular liquid chromatography system **100** of FIG. **1**. In FIG. **2** some components have been removed for clarity reasons. In the disclosed configuration, as disclosed in detail above, the modular liquid chromatography system **100** comprises a plurality of fluid control valves in the form of: Injection valve **1**, Column valve **2**, Quaternary valve **5**, Inlet valve B **6**, Inlet valve A **9**, Sample inlet valve **15**, pH valve **17**, and Outlet valve **18**. The chromatography system **100** further comprises UV monitor **4**, System pump B **7**, System pump A **10**, Sample pump **12**, Mixer **14**, and three Dummy modules **24**. According to one embodiment, all liquid handling components and sensors arranged at the liquid handling panel **22** are designed to be readily interchangeable. The interchangeability provides improved service and upgrade possibilities and also a possibility to customize the positions of the respective liquid handling components, such as the fluid control valves, e.g. in order to optimize the fluid path for a specific experimental setup. As is illustrated in FIG. **2**, there are three large component positions e.g. for pump modules, one UV-sensor position and 9 standard component positions, e.g. for fluid control valves or the like. The component positions are given a standardized size and shape to provide simple interchangeability. According to one embodiment, each modular component is retained in a mating component position by a single screw, and it is connected to the master control unit by a single bus cable providing both communication and system power to each component. FIG. **3** is a schematic

6

illustration of the housing with the liquid handling panel of FIG. **2** with the modular components of the liquid chromatography system removed.

FIGS. **4***a* to **4***d* are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. **4***a* shows a standard interchangeable modular component **26**, e.g. a fluid control valve or the like. The standard component module **26** comprises a panel member **28**, an external fluidics section **30** and an internal non-fluidics section **32**. According to one embodiment, the panel member **28** essentially separates the fluidics in the external fluidics section **30** from electronics and control means in the internal non-fluidics section **32**.

FIG. **4***b* shows a Dummy module **24**, which is intended to be placed in non used standard component positions. In the disclosed embodiment, the Dummy modules are provided with mounting grooves for attachment of accessories to the system. In the disclosed embodiment the dummy module is shown as a panel member **28** without any internal section FIGS. **4***c* and **4***d* shows a pump module and an UV-module, respectively, each having an external fluidics section **30** and an internal non-fluidics section **32**.

As is disclosed in FIGS. **4***a* to **4***d*, the interchangeable modular components **26** comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel. Said panel attachment member may be arranged so that all fluid connections of said modular component are arranged on a wet side of the panel attachment member separating them from electrical components that are arranged on a dry side thereof, hence providing a high degree of liquid resistance at the external part of the fluid handling panel, and so that the liquid resistance requirements for the internal sections may be somewhat lightened. According to one embodiment, the interchangeable modular components are sealed against the liquid handling panel by a sealing member. According to another embodiment, not shown, the modular component does not comprise any panel member, but there is provided a suitable sealing arrangement between the component position openings of the liquid handling panel and the external surface of the interchangeable modular components **26**. In the disclosed embodiments, the component position openings of the liquid handling panel and the interchangeable modular components **26** are shown to have an essentially rectangular cross sectional shape, but other shapes may be equally applicable.

According to one embodiment, there is provided a general fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components as is schematically disclosed in FIG. **5***a*. As discussed above such a system may be configured for essentially any type of automated liquid handling operations provided that suitable fluid handling units are provided as interchangeable modular components for the system. According to one embodiment there is provided an automated fluid handling system comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

The liquid handling panel **22** of the fluid handling system may e.g. be designed in any suitable manner to allow the modular components to be arranged in an efficient manner.

FIGS. **5***a* and **5***b* shows a schematic embodiment of an automated fluid handling system wherein the housing **20** comprises an internal climate panel **29** arranged at a distance

7

behind the liquid handling panel **22** defining an air inlet compartment **35** and air outlet compartment **37** in the housing **20**, the climate panel **29** being provided with complementary component positions **39** for receiving the internal non fluidics section **32** of the interchangeable modular components **26**, and wherein the non-fluidics section **32** of at least one interchangeable modular component is provided with one or more air inlet openings **31** located in the air inlet compartment **35** and one or more air outlet openings **33** located in the air outlet compartment **37** when the interchangeable modular component arranged in position in the component position. FIG. **5b** shows the fluid handling system of FIG. **5a** in a schematic cross sectional view. As is indicated by inlet vent **41** and outlet vent **43**, air for cooling interchangeable modular components **26** provided with air inlet and outlet openings **31**, **33** is preferably arranged to enter the air inlet compartment **35** at a distance from the outlet vent **43** in order to avoid recirculation of air. The air circulation in the system may be achieved by a system cooling unit (not shown) providing a flow of air from the air inlet compartment **35** to the air outlet compartment **37**, through the at least one interchangeable modular component **26**. Alternatively, the at least one interchangeable modular component **26** is provided with a local cooling unit (not shown) providing a flow of air from the air inlet compartment **35** to the air outlet compartment **37**. As is indicated, the complementary component positions **39** are arranged to provide a relatively air flow tight fit with respect to the internal non fluidics section **32** of the interchangeable modular components **26**, and according to one embodiment, this may be achieved by a sealing arrangement. In FIG. **5b**, there is shown a sealing member **45** for sealing the interchangeable modular components **26** with respect to the liquid handling panel **22**, as discussed above. Other sealing member arrangements may be envisaged by a person skilled in the art. According to one embodiment, fluids are strictly restricted to the fluidics section **30** of the interchangeable modular component **26**, but in alternative embodiments, only fluid connections are restricted to the fluidics section **30** allowing fluid to "cross" the fluid handling panel inside the non-fluidics section **30** of the interchangeable modular component **26**.

In FIG. **5b** there is further shown a master control unit **40** and buss connectors **42** for connecting the interchangeable modular components **26** to the master control unit **40**. According to one embodiment, the component positions including the buss connectors **42** and the interchangeable modular components **26** are of plug and play configuration with respect to each other.

FIG. **6** is a schematic illustration of an embodiment of a housing **20** with a modular liquid handling panel **22** with the modular components of the liquid chromatography system removed. In the disclosed embodiment, also the layout of the liquid handling panel **22** is configurable by means of two interchangeable panel sections **34** which may be selected in accordance with the desired layout of the system. In FIG. **6** two different layouts of the interchangeable panel sections are disclosed, but the layout may include any suitable configuration.

FIGS. **7a** and **7b** are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the liquid chromatography system removed. In the disclosed embodiment, the modular housing is comprised of a main housing **36** that comprises the master control unit including power supply and climate control for the whole housing, two expansion housing modules **38** and a side member **40**. This approach provides very

8

flexible expansion possibilities for the chromatography system, while preserving the benefits of a single master control unit including power supply and climate control.

FIG. **8** is a schematic illustration of an embodiment of the system architecture of one embodiment of a modular liquid chromatography system according to the present invention. As mentioned above, the chromatography system may comprise a master control unit **40** arranged to communicate with all modular components e.g. **1-26**, over a system bus **42** such as a CAN-bus or the like. In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS **42**. In order to minimize the number of connectors to be attached to each modular component, the bus **42** further comprises power feed for the modular components. The Bus **42** may be connected to any suitable number of modular components arranged in the housing **20**, but also to one or more modular components **44** outside of the housing **20** or the like. As is mentioned briefly above, the master control unit may further be arranged to control the climate in the housing. In addition to the disclosed modular components, other components of the chromatography system, e.g. a fraction collector or the like, may be arranged in the housing and the controlled climate therein.

According to one embodiment, different component modules are automatically identified by the master control unit, whereby they may be moved essentially freely between different positions. Moreover, the master control unit may be arranged to provide said information to Chromatography control software whereby experimental setup and planning may be performed. In one embodiment, the control system may be arranged to provide an optimized layout of the component modules with respect to the present layout of the liquid handling panel and available component modules for a specific experimental setup.

According to one embodiment, the interchangeable panel sections **34** of FIG. **[5]** 6 and the expansion housing modules **38** of FIGS. **[6a]** 7a and **[6b]** 7b may be provided with means for automatic detection of the same to allow automatic configuration of the system by the master control unit **40**. In one embodiment, each interchangeable panel section **34** and expansion housing module **38** comprises a hub (not shown) for connection to the system bus **42** in order to expand the system bus **42** network to the number of component modules in each interchangeable panel section **34** or expansion housing module **38**.

FIG. **9** is a schematic illustration of an embodiment of a master control unit of one embodiment of a modular liquid chromatography system according to the present invention. The master control unit **40** comprises a system controller **46** for communicating with internal and external components and control computers (not shown) etc. According to one embodiment, the system controller comprises a suitable CPU **48**, a bus controller **52**, an external communications controller **50**, such as a LAN unit, and a storage device **54**. The bus controller **52** is providing communication with the component modules. The master control unit may further comprise a Power supply **56** and a climate controller **58** arranged to keep the internal climate in the housing **20** at a predetermined level as discussed above.

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel. Taking into account the complexity of the disclosed interconnection arrangement, the benefit of optimizing the fluid paths in alternative configurations of the system becomes evident.

9

The task of optimizing the fluid paths may e.g. be performed to reduce the total length/volume of the fluid paths/tubing arranged to interconnect the different component modules in the system. Alternatively the optimization may be performed to minimize the length/volume of one or more specific fluid paths, such as the sample output path from the column to the fraction collector, in order to minimize dispersion of the fractionated sample.

The invention being thus described, it will be obvious that the same may be varied in many ways. Such variations are not to be regarded as a departure from the spirit and scope of the invention, and all such modifications as would be obvious to one skilled in the art are intended to be included within the scope of the following claims.

What is claimed is:

[1. Automated fluid handling system comprising a housing and two or more interchangeable fluid handling units the housing comprising a liquid handling panel including two or more component positions for receiving said interchangeable units, wherein said units are arranged as interchangeable modular components, and include:

a fluidics section;

a non fluidics section comprising electronics or electrical components or control means; and

a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel,

and wherein the two or more component positions of the liquid handling panel are arranged for attachment of the panel members such that said respective fluidics sections are external to the housing and said respective non fluidics sections are internal to the housing.]

[2. The fluid handling system of claim 1, wherein the interchangeable modular components are sealed against the liquid handling panel by a sealing member.]

[3. The fluid handling system of claim 1, comprising a master control unit wherein the interchangeable modular components are connected to the master control unit by a system bus providing electrical communication to each interchangeable modular component.]

[4. The fluid handling system of claim 1, wherein all interchangeable modular components are of same size.]

[5. The fluid handling system of claim 1, wherein the interchangeable modular components are of two or more sizes.]

[6. The fluid handling system of claim 1, comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves comprise said interchangeable modular components.]

[7. The fluid handling system of claim 3, wherein the master control unit comprises a system climate controller for controlling the climate in the housing and the interchangeable modular components.]

[8. The fluid handling system of claim 1, wherein the housing comprises an internal climate panel arranged spaced from the liquid handling panel within the housing, said internal climate panel defining on one side an air inlet compartment and defining on an opposing side an air outlet compartment in the housing, the climate panel being provided with complementary component positions for receiving the internal non fluidics section of the interchangeable modular components, and wherein the non-fluidics section of at least one interchangeable modular component is provided with one or more air inlet openings located in the air inlet compartment and one or more air outlet openings

10

located in the air outlet compartment when the interchangeable modular component is arranged in position in the component position.]

[9. The fluid handling system of claim 8, further comprising a system cooling unit providing a flow of air from the air inlet compartment to the air outlet compartment, through said at least one interchangeable modular component.]

[10. The fluid handling system of claim 8, wherein said at least one interchangeable modular component is provided with a local cooling unit providing a flow of air from the air inlet compartment to the air outlet compartment.]

[11. The fluid handling system of claim 1, wherein the system is a liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column.]

[12. The fluid handling system of claim 1, wherein the system is a liquid filtration system.]

[13. The fluid handling system of claim 1, wherein the system is a chemical synthesis system.]

[14. The fluid handling system according to claim 1 wherein the system further comprises at least one expansion housing module for accommodating additional interchangeable modular components.]

[15. The fluid handling system according to claim 14, further including means for automatic detection of said module to allow automatic configuration of the system by a master control unit.]

16. A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising a housing and two or more interchangeable fluid handling units, the housing comprising a liquid handling panel including two or more component positions for receiving said interchangeable units, wherein said units are arranged as interchangeable modular components, and include:

a fluidics section;

a non fluidics section in turn comprising electronics or electrical components or control means; and

a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel,

and wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing.

17. The liquid chromatography system according to claim 16, wherein the interchangeable modular components include at least [one] *two* of: an injection valve; a column valve with integrated pressure sensors; a conductivity monitor; a UV monitor; a quaternary valve; an inlet valve with integrated air sensor; a system pump; a pump pressure monitor; [an inlet valve with integrated air sensor]; a rising valve; a mixer; a filter; a sample inlet valve; a flow restrictor; a pH valve; an outlet valve; [and] *or* a dummy component.

18. The liquid chromatography system according to claim 17, wherein said modular components are interconnected fluidically on the external side of the panel.

*19. The liquid chromatography system of claim 16, wherein the interchangeable modular components are sealed against the liquid handling panel by a sealing member.*

*20. The liquid chromatography system of claim 16, comprising a master control unit wherein the interchangeable modular components are connected to the master control unit by a system bus providing electrical communication to each interchangeable modular component, and wherein*

US RE47,124 E

11

each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus.

21. The liquid chromatography system of claim 16, wherein all interchangeable modular components are of same size.

22. The liquid chromatography system of claim 16, wherein the interchangeable modular components are of two or more sizes.

23. The liquid chromatography system of claim 16, comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

24. The liquid chromatography system of claim 20, comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

25. The liquid chromatography system of claim 16 wherein the system further comprises at least one expansion housing module for accommodating additional interchangeable modular components at the liquid handling panel.

26. The liquid chromatography system of claim 16, wherein the housing includes at least four component positions.

27. The liquid chromatography system of claim 26, wherein the at least four component positions are arranged in a two dimensional array.

28. The liquid chromatography system of claim 16, comprising

two double piston pumps,
one injection valve for injecting sample onto a column connecting to the flow path of the liquid chromatography system,
a UV monitor, and
a mixer.

29. The liquid chromatography system of claim 28, wherein the pump, valve, monitor, and mixer are interchangeable modular components.

30. The liquid chromatography system of claim 28, wherein the system further includes

a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and
a quaternary valve for automatic buffer preparation and formation of quaternary gradients.

31. The liquid chromatography system of claim 25, wherein the expansion housing module is attached to the housing and comprises two or more component positions adapted to receive additional interchangeable modular components at the liquid handling panel.

32. The liquid chromatography system of claim 31, wherein the component positions of the expansion housing module are arranged to receive interchangeable modules of the same size.

33. The liquid chromatography system of claim 31, wherein the component positions of the expansion housing module are arranged to receive interchangeable modules of two or more sizes.

34. The liquid chromatography system of claim 31, wherein the component positions of the expansion housing module comprise at least four component positions.

35. The liquid chromatography system of claim 16, wherein the fluidics section comprises one or more fluid connectors for connecting the interchangeable fluid handling unit to a fluid flow path of the liquid chro-

12

matography system, and the non fluidics section comprises an enclosure housing the with one or more air inlet openings.

36. The liquid chromatography system of claim 20, wherein the internal fluidics section comprises a bus connector for directly connecting the interchangeable modular component with the system bus, and each component position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus.

37. The liquid chromatography system of claim 16, wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two are interchangeable modular components.

38. A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising a housing, a master control unit connected to a system bus, two double piston pumps, and two or more interchangeable fluid handling units, the housing comprising a liquid handling panel including two or more component positions for receiving said interchangeable units, wherein said units are arranged as interchangeable modular components, and include:

a fluidics section;
a non fluidics section in turn comprising electronics or electrical components or control means, and including a bus connector for directly connecting the interchangeable modular component with the system bus; and
a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the interchangeable modular component to a component position of the liquid handling panel,
wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing,
wherein each component position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus,
wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus,
wherein the master control unit is arranged to automatically identify interchangeable modular components,
wherein the system includes at least a valve and a mixer as interchangeable modular components,
wherein the system is capable of performing automated liquid chromatography.

39. The liquid chromatography system according to claim 38, wherein said interchangeable modular components are interconnected fluidically on the external side of the system.

40. The liquid chromatography system of claim 38, wherein the interchangeable modular components are sealed against the liquid handling panel by a sealing member.

41. The liquid chromatography system of claim 38, wherein the housing includes at least four component positions arranged in a two dimensional array.

42. The liquid chromatography system of claim 38, wherein the system further comprises at least one expansion housing module for accommodating additional interchangeable modular components at the liquid handling panel.

US RE47,124 E

13                                                                    14

43. *The liquid chromatography system of claim 38, wherein said housing is further adapted to include at least one sensor unit and at least two fluid control valves of different configurations, of which at least the sensor unit, and the fluid control valves are interchangeable modular components.*

44. *The liquid chromatography system of claim 38, wherein the fluidics section comprises one or more fluid connectors for connecting the interchangeable fluid handling unit to a fluid flow path of the liquid chromatography system, and the non fluidics section comprises an enclosure housing the with one or more air inlet openings.*

*     *     *     *     *

# EXHIBIT 37

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -

 4
       GE HEALTHCARE BIO-SCIENCES    :    CIVIL ACTION
 5     AB, GE HEALTHCARE             :
       BIO-SCIENCES CORPORATION,     :
 6     and GENERAL ELECTRIC          :
       COMPANY,                      :
 7                                   :
                        Plaintiffs, :
 8                                   :
            vs.                      :
 9                                   :
       BIO-RAD LABORATORIES, INC.,   :
10                                   :
                        Defendant.   :    NO. 18-1899-CFC
11

12                            - - -

13                            Wilmington, Delaware
                              Thursday, May 14, 2020
14                            10:30 o'clock, a.m.
                              ***Telephone conference
15                            - - -

16
       BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
17
                              - - -
18
       APPEARANCES:
19

20              SHAW KELLER LLP
                BY:  JOHN W. SHAW, ESQ.
21

22                      -and-

23

24
                                   Valerie J. Gunning
25                                 Official Court Reporter
```

1     APPEARANCES (Continued):

2

3                     ARNOLD & PORTER KAYE SCHOLER LLP
                      BY:   JENNIFER SKLENAR, ESQ.
4                           (Washington, D.C.)

5                               -and-

6

7                     ARNOLD & PORTER KAYE SCHOLER LLP
                      BY:   JEFFREY A. MILLER, ESQ.
8                           (Palo Alto, California)

9                           Counsel for Plaintiffs

10

11                    POTTER, ANDERSON & CORROON LLP
                      BY:   ALAN R. SILVERSTEIN, ESQ. and
12                          DAVID E. MOORE, ESQ.

13                              -and-

14

15                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                      BY:   DAVID BILSKER, ESQ. and
16                          FELIPE CORREDOR, ESQ.
                            (San Francisco, California)

17

18                          Counsel for Defendant

19                              -   -   -

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3              (The telephone conference commenced at

 4    10:30 a.m.)

 5

 6              THE COURT:  All right.  Good morning, counsel.

 7              Can we have a roll call from the plaintiffs,

 8    please?

 9              MR. SHAW:  Good morning, Your Honor.  It's this

10    is John Shaw from Shaw Keller for plaintiffs.

11              Joining me from Arnold & Porter are Jennifer

12    Sklenar and Jeffrey Miller.

13              MS. SKLENAR:  Good morning.

14              THE COURT:  Good morning.  All right.  And the

15    defense?

16              MR. SILVERSTEIN:  Good morning, Your Honor.

17    Alan Silverstein from Potter Anderson for defendant.

18              With me on the line is my colleague, David

19    Moore, and David Bilsker and Felipe Corredor from Quinn

20    Emanuel.  Also on the line is John Katzenham, in-house

21    counsel for Bio-Rad.

22              THE COURT:  All right.  Thanks very much.

23              Okay.  Do you want to start?  We'll begin with

24    the interchangeability modularity terms, and I do want to

25    try to be brief.  I've read carefully the briefing, so let's
```

1   start with the plaintiffs, please.

2          MS. SKLENAR:  Good morning, Your Honor.  This is

3   Jennifer Sklenar.  If I can just start.

4          We have agreed with the other side to do the

5   groupings if we look at the joint brief, terms 8 through C

6   first, and then D, and then as a second grouping, and then

7   as the third, E through G, and then the fourth, H and I.

8   But, of course, we're happy to take it in whatever grouping

9   your Honor would prefer.

10         THE COURT:  Right.  So let's start with the

11   interchangeability.  I think that corresponds with what you

12   just said anyway.

13         MS. SKLENAR:  Yes.  We will do that.  So I will

14   turn it over to Mr. Miller, who is going to address the

15   first and fourth grouping.

16         MR. MILLER:  Excuse me.  Good morning, Your

17   Honor.  This is Jeffrey Miller from Arnold & Porter, and I'm

18   going to start by referring to our slide deck, which

19   Mr. Shaw e-mailed to your chambers yesterday, and I'm going

20   to start on slide 6, which just refers to the proposed

21   constructions from each side and then we can move on to a

22   basic concept of the law here, which is that this term is

23   something that has never been used before in this field, and

24   that opens up all of the intrinsic record to be used when

25   trying to construe this term.  So that means that the

1    prosecution history, the specification, the claim language,

2    it's all used, and importantly, you don't have to show any

3    kind of disclaimer to use those items the from the intrinsic

4    record, and sometimes you'll seen this referred to in the

5    case law as a coined term and we have some case law laid out

6    for you in slide 7 on that.

7         And there's no evidence in the record that this

8    term interchangeable modular component or the other similar

9    terms are anything other than a coined term.  Bio-Rad hasn't

10   proposed any, or hasn't shown any evidence that this term

11   was used before GE, which is now actually called Cytiva,

12   used it or anyone else did.

13        So I want to turn your attention to slide 10,

14   which shows a figure from the five patents that are in this

15   case and I think sort of lay the groundwork for what this

16   invention is about and helps understand this term.

17        So just real briefly.  GE started developing

18   this system in 2003.  It's listed on the liquid

19   chromatography products, and it recognized early on that a

20   big problem was that these systems were extremely difficult

21   to modify once they were out in the field.  They would

22   generally require a serviceperson to come in and install new

23   components, which could take as much as a day or two, and so

24   if you wanted to change the functionality of your system or

25   run different experiments, it was very cumbersome to try to

1    change what was going on, change the structure of the

2    system, and so that's when they developed this

3    interchangeability concept.

4         And you can see in slide 10 one of the

5    embodiments they had come up with, and you can see the

6    various positions in the front panel there and there are

7    callout numbers with reference numerals there and you can

8    see those little rectangles.  Each of those is an

9    individualized changeable fluid, interchangeable modular

10   component.

11        And the way in practice this would work is that

12   the customer, not a serviceperson from the company, would

13   come out, would put the various components where they wanted

14   to put them in order to make the experiment run as smoothly

15   as possible.  And it's not shown in the figure of the

16   patent, but the way you would finalize the experiment would

17   be to run tubing between the various components.

18        So you see that there are across the first row

19   at the top, there are four interchangeable modular

20   components, and if you wanted to run fluid from, for

21   example, the upper left-hand corner to the interchangeable

22   component marked as two and then on to number four, you

23   would run tubing, and the user could put that tubing into

24   little receptacles that are on those components and they

25   could run the tubing.

1    So this was a lot easier than having to open up

2    a cabinet or a housing and move things around and so it

3    makes it much easier.  Sometimes we refer to these things as

4    being plug and pl        of l   your old PC cards.  You

5    could put things  n one s ot      or the next one you could

6    move some compone           .   them into a different

7    slot.

8    So let's move on to slide 11, because this also

9    highlights what we're talking about here.  So on slide 11,

10   we've modified Figure 2 of the patent just to remove the

11   reference numerals and you can see across the top there's an

12   interchangeable modular component referred to as an inlet

13   valve and then right below that there's an outlet involve.

14   Right below that there's a sample inlet valve, and to the

15   right of the sample inlet valve, there's a mixer, et cetera,

16   et cetera.  There's all kinds different components with

17   different functionality involved in this particular

18   embodiment.

19   And on the right-hand side we've excerpted a

20   portion of Figure 8 from the '589 patent and you can see

21   that there's all different types of components.  And in the

22   real world what happens is that if you're a customer, say

23   you're a pharmaceutical company and you want to work through

24   a protein purification run, you only need to buy the

25   interchangeable modular components that you think you're

1    going to need, but if later on you find out that you needed

2    an additional mixer or a cautionary valve or whatnot, you

3    could buy more of them and then you could rearrange them in

4    the system as you saw fit.  You wouldn't have to have Cytiva

5    or GE come to your facility to do that for you.  You could

6    do it yourself.

7            Let's move on to slide 12, and this text from

8    the specification highlights what this is all about.  So you

9    can see it says, the present invention relates to the art of

10   fluid handling systems, and in particular to an automated

11   fluid handling system that is highly flexible and

12   configurable.

13           So this highlights an aspect of our construction

14   that we feel is important, which is that the interchangeable

15   modular components have to have the ability to have

16   different functionality to be placed at various locations.

17           THE COURT:  Okay.  So let me interrupt.  So I'm

18   looking at this excerpt.  Where is the must?  Where is the

19   language in the written description that says there's a

20   requirement that there has to be a different functionality

21   as opposed to that it would allow for different

22   functionality?

23           MR. MILLER:  Well, the point is, is that you

24   don't have -- so let's say this is being used in a

25   production facility.  You probably never would change the

1    position of the various components.  The point of the

2    construction is that in order to meet the limitation of the

3    claim, you have to have that ability.  So I don't know that

4    the word must appears anywhere in the patent, but certainly

5    it's a requirement of the system, of the module that you

6    have that ability.

7            THE COURT:  Okay.

8            MR. MILLER:  Okay.  And that's when the

9    specification here talks about something be highly flexible

10   and configurable, that's what it means.

11           We can go on to slide 13.  I think you're going

12   to be hearing Bio-Rad talk about this portion as well.

13   They focus on the first portion of the sentence, which

14   says that the interchangeability provides improved service

15   and upgrade possibilities, so if the module breaks, you

16   could put just another one in with the same functionality,

17   but they don't address the portion that follows, which says,

18   and also a possibility to customize positions of the

19   respective liquid handling components, such as the valves

20   and whatnot, in order to --

21           THE COURT:  Let me just go back, though.  Look,

22   if it doesn't have must, you're saying it just has to allow

23   for it.  So then why do we have to interpret the way you do?

24   Why don't we just leave it the way Bio-Rad wanted?

25           MR. MILLER:  Because I think what Bio-Rad would

1    say, in other words, under Bio-Rad's construction, they

2    would not be -- it's not even -- excuse me.  Under Bio-Rad's

3    construction, it doesn't have to have that ability.  In

4    other words, Bio-Rad's construction would cover the

5    situation where --

6                THE COURT:  No, they can't.  Under Bio-Rad's

7    construction, it could have that ability, it could be for a

8    different functionality, but it doesn't have to be.

9                MR. MILLER:  It doesn't have to be, that's what

10   they say, but it doesn't even have to have the ability to.

11   That's the point, which is that in order for the word

12   interchangeably to have any meaning at all, you have to be

13   able to interchange them into various different places.  In

14   other words, the claim does not say changeable.  It says,

15   interchangeable, interchangeably, so you need to be able to

16   move them from one position to another and the specification

17   stresses that.

18               THE COURT:  Right.  But you admit, right,

19   Bio-Rad's construction would allow for the other component

20   to have a different functionality.  Right?

21               MR. MILLER:  It doesn't exclude that

22   possibility.

23               THE COURT:  Right.  So therefore, because you

24   just said it doesn't have to have must, it just has to allow

25   for it.  Well, then, their construction allows for it.  It

1    allows for a different functionality.

2            MR. MILLER:  Well, that's like saying I

3    have a claim that requires the element A.  If I also have

4    the element B, it's not excluded, but that doesn't mean

5    that the claim requires it.

6            In the specification, the prosecution history

7    over and over again stressed the importance of being able to

8    change the position of the modules, which means that they

9    would have to be able to have different functionality.

10           THE COURT:  I don't get it.  Go ahead.

11           MR. MILLER:  Okay.  Well, if you look at -- I'm

12   going to move on now to Figure 14, and I think this might

13   help Your Honor.

14           So, I'm sorry, slide 14.  So in slide 14, we've

15   got Figure 10 from the patent and the specification which

16   repeatedly talks about being able to optimize fluid flow

17   path.

18           Bio-Rad, if you look at slide 15, this is an

19   excerpt from their brief, they talk about being able to

20   move, just shorten up the tubing, and that would optimize

21   fluid flow path, and that's not what the patent is talking

22   about.  The patent is making it clear that the way you

23   optimize fluid flow path is being able ti move these into

24   the various different positions.

25           So I would like to move on to our slide 19, and

1    I think this also helps, would help Your Honor with this

2    concept of interchangeability.

3            So slide 19 refers to a portion of the

4    specification, and in the yellow here we've highlighted a

5    portion that Bio-Rad relies on, and they rely pretty

6    heavily on this.  But you need to take the entire portion

7    of this piece of the specification in context, which is

8    that if you look at the green part, so the green part says

9    that taking into account the complexity of the disclosed

10   interconnection arrangement, the benefit of optimizing

11   fluid paths in alternative configurations becomes evident.

12   And, again, this demonstrates that the specification is

13   teaching you that you need to be able to move these

14   positions, these interchangeable modular components into

15   different positions.

16           All right.  So I would like to move on to --

17           THE COURT:  But their construction doesn't

18   preclude that.

19           MR. MILLER:  Well, it doesn't preclude it, but

20   it doesn't require it, and it's clear from the specification

21   this is an important function of the invention.

22           THE COURT:  Well, of course.  I don't think

23   there's any doubt it's an important function, but what

24   about, look at column 1 of the patent, and it talked about

25   replacing defective fluid handling units.  Right?  It's

1    replacing.  It says that the invention is designed to

2    overcome that.  So that's an important part of the

3    invention, too.  Right?

4              MR. MILLER:  All that would mean is that we can

5    modify our construction to being able to say that it

6    requires that you replace them and interchange them.  That

7    doesn't mean you don't read the important, read one

8    important aspect in and another out.

9              THE COURT:  No, but theirs reads both in whereas

10   yours doesn't.

11             MR. MILLER:  Yes, but their construction is

12   broader than what the specification requires.  In other

13   words --

14             THE COURT:  But yours precludes it.  You're

15   precluding embodiments where there's just a replacement.

16             MR. MILLER:  No, we're not.  You could take

17   their argument and flip it on its head.

18             If the argument is that ours exclusively calls

19   out changing -- change of functionality, it doesn't say you

20   can't replace.  It's just not making it required.  Again,

21   that argument would say that you just take, you construe the

22   claim to require both replaceability and interchangeability.

23   We frankly would be fine with that, but that's just adding

24   words into the claim -- into the construction.

25             Okay.  Let me move on to the prosecution history

1    because I think this further demonstrates what's going on

2    here.

3              If you go to -- we have an excerpt here in slide

4    22.  And remember, this is a coined term.  You don't need to

5    have a full-blown disavowal.  So we have a coined term here,

6    and here's a portion of the prosecution history where the

7    inventors were distinguishing their invention from the

8    Mourtada prior art reference, which you are going to hear

9    about a fair amount today.

10             So it says in Mourtada, and Mourtada is actually

11    an exhibit, I believe it's Exhibit G.  Mourtada had these

12    giant cassettes where it had valves and sensors and whatnot

13    kind of all part of the same cassette, and the Examiner took

14    the position that that was an interchangeable modular

15    component because you could just pull it out and put another

16    one in.

17             And --

18             THE COURT:  You know, you just said that.  I

19    thought you said this is a coined term of art.

20             MR. MILLER:  Well, they were not called

21    interchangeable modular components.

22             THE COURT:  I thought the Examiner called it

23    that.

24             MR. MILLER:  The Examiner, as is pretty common

25    during prosecution, the Examiner said that this piece of

1   prior art -- I'm reading.  This structure that's in

2   Mourtada, and I'm saying that it's an interchangeable

3   modular component, didn't use that -- the reference itself

4   didn't use the term interchangeable modular component.

5              So anyway -- I'm sorry.  Mourtada is Exhibit I.

6              In Mourtada, you had these very large cassettes,

7   and you could, if something broke or whatnot, you could pull

8   it out and put another one in, or these were complicated

9   things.  It was some kind of a radio isotope system, and you

10  could pull it out and rearrange some of the cloning and

11  whatnot and insert them again.

12             So what the patent attorney did here when

13  distinguishing Mourtada, he specifically said, and we have

14  this quote on slide 22 and it's Exhibit G of the patent --

15  of our materials here.  It says, while the cassettes, and he

16  is referring to Mourtada, are replaceable or exchangeable

17  with a differently configured cassette, in other words, you

18  could rearrange the tubing or whatnot, they are not

19  interchangeable with other components in the apparatus, and

20  this was confirmed in the drawings.

21             And so, for example, if you go to Figure 10 --

22  excuse me.  Figure 9 is a good example of this.  So in

23  Figure 9, there's this giant cassette 105, which takes up

24  almost the entire panel there.  You could pull that whole

25  thing out and you could either replace it with one that's

1   not broken anymore or you could rearrange, you know, pull it

2   out, rearrange all the tubing and put it back in again.  But

3   the point was, is that it had the same functionality, the

4   underlying cassette.

5            And so even during prosecution, the patent

6   attorney was arguing that there's a difference here between

7   interchangeability and replaceability, and

8   interchangeability was an important aspect with the

9   invention, which is, as we discussed, stressed throughout

10  the specification.

11           So I think if you go to slide 23, I think this

12  addresses the question you had for me earlier.  So in our

13  construction, we require that there be interchangeability.

14  So, in other words, you have to be able to, for example,

15  replace the inlet valve B, which is shown on the left-hand

16  side, with the outlet valve.

17           Our construction doesn't exclude the possibility

18  of doing replacements, so if you want to just replace one

19  outlet valve for another outlet valve, which is see on the

20  right-hand side, that is -- that's not excluded from our

21  construction.

22           Now, I want to address another point in their

23  brief.

24           THE COURT:  Just so I'm clear, their

25  construction doesn't preclude the interchangeability of

1     components with different functionality.

2                    MR. MILLER:  Yes, it does not preclude that.

3     That's true.

4                    THE COURT:  Right.

5                    MR. MILLER:  And in the specification, you know,

6     under that view, we should just frankly not construe it at

7     all because it doesn't mean anything.  In other words, the

8     specification says, hey, look, I have this thing here which

9     you've never heard of before called an interchangeable

10    modular component and these are the important features.  One

11    is that you should be able to replace them, and another,

12    which is the one we're focusing on, you need to be able to

13    put it in different positions so you can optimize fluid flow

14    and that means there's going to be different functionality.

15    That's an important thing to understand when instructing the

16    jury.  Otherwise, they're going to be left that, you know,

17    that feature is going to be sort of left that the -- no one

18    is going to be -- it's not going to be focused on and it is

19    an important aspect of the invention, and it opens up

20    potential prior art and what not, which frankly in this

21    situation it wouldn't be fair because we distinguished the

22    prior art by making this exact argument.

23                   THE COURT:  Well, actually, this has nothing to

24    do with the jury.  Right?  You're taking the position

25    because this is all about invalidity, isn't it?

1          MR. MILLER:  Well, certainly, I think that

2     Bio-Rad is going to take the position that this

3     interchangeable modular component could be any blob that

4     they say it is.  Like I said, if they want to construe -- if

5     Your Honor wants to construe the term to require both of

6     these important features, that would be fine with us.  We

7     are focusing on the one that really was not in the prior

8     art, which is the interchangeability of different functions,

9     components.

10         THE COURT:  But my point is that, that has

11    nothing to do with infringement.  When you say this is a

12    jury question, you point out how it's important to make it

13    clear to the jury.  I mean, correct me if I'm wrong, this

14    has got nothing to do with the jury.  This is all about

15    invalidity, or nothing about infringement, I should say.

16    It's all about invalidity.

17              In fairness, I think I just confused things

18    because the jury would be deciding invalidity.  But this is

19    not an infringement issue is what I'm getting at.  Right?  I

20    mean, this is all about invalidity.

21         MR. MILLER:  That's probably correct, Your

22    Honor.  I mean, I think that they want to have an

23    extraordinarily broad understanding of what one of these

24    components could be to try to bring in more prior art.

25              THE COURT:  Right.  And normally, that's the

1  plaintiff, but we've got the opposite situation here.  We

2  have a plaintiff trying to argue for a narrow interpretation

3  of these claims.

4          MR. MILLER:  I mean, I don't really know that

5  we're trying to narrow.  We're just trying to read it in

6  view of what the specification and the prosecution history

7  say, which is that they need to have different functions,

8  because in order to move them around, they need different

9  functions.

10          So, in other words, this is not a term that

11  whoever is making the decision is going to say, yes, I

12  know what that is and I'm going to know what it means.

13  Right?  In other words, so, you know, the experts who

14  have never heard of this term before we started using

15  these patents because it was never used before.  So what

16  does it mean?

17          So it's clear from the specification that both

18  of these functions were important.  The ability to take out

19  a broken one and replace it with a new one was not

20  unimportant.  You pointed to those portions of the

21  specification out as well, but it was also important that

22  they be able to move them around.  In other words, so if

23  you -- you know, if you draw -- if you take an element and

24  you say, well, I'm sorry.  My analogy escapes me at the

25  moment.  But if you just say that, you know, a personalized

1    motor vehicle is a nice broad term, right, that might ignore

2    the fact that the patent is saying that it has to be a

3    two-wheeled, you know, change ribbon, you know, apparatus.

4    Right?

5              So if you construed the -- if you just say it's

6    whatever this thing is, you know, this very broad concept

7    and you construe it that way but it's clear that the

8    specification and the prosecution said it was something

9    narrower, the claim should be construed to refer to what's

10   actually described in the patent, especially here, when we

11   don't have a term that has any common understanding.  It was

12   never used before.  This is an important part of the

13   invention.

14             So I just wanted to raise a couple more points

15   unless you have any other questions.

16             So if you go to slide 25 and 26, all the claims

17   require that there be at least two, at least three or at

18   least four of these interchangeable modular components,

19   and Bio-Rad made an argument that that means that however

20   many there are, they all have to be interchangeable.  In

21   other words, a good way of thinking about this is if you

22   had a system that has eight positions in it with eight

23   different -- had the ability to receive eight different

24   interchangeable modular components, even though the claim

25   says that there only has to be at least two of them,

1    Bio-Rad's position is that all eight of them in the system

2    would have to be interchangeable with each other.  And

3    that's -- frankly, we think that's not a good argument,

4    because basically what they are saying is that if you had a

5    system with eight and seven of them could be interchanged

6    with various, into various different positions, they could

7    design around their system by just making one of them fixed

8    in position, and that's plainly -- that would lead to a

9    bizarre result.

10                   And then --

11                   THE COURT:  Wait.  Sorry.  Say that again.  You

12   are saying if they could design around -- I'm just trying to

13   figure out how it relates to all -- tell me that again.

14                   MR. MILLER:  Okay.  So let me start again.

15                   So the interchangeable modular components need

16   to be -- you have to be able to put them into various

17   different locations inside the, you know, in the housing.

18   So if you look at, for example, Figure 1 or Figure 2.  Why

19   don't we look at Figure 2.  It's probably easier.

20                   So in Figure 2, in the upper left-hand corner,

21   you have this inlet valve, and then two spots away from

22   that, you have a -- you have, excuse me.  You have the

23   control valve, number two.  I'm sorry.  So let's say -- so

24   let's focus on the claims.  It requires at least two of

25   these.

1          So here, there would be at least two

2   interchangeable modular components, but as you see, there's

3   a number of different other locations inside this chassis,

4   and so under our construction, at least two means that if

5   you sell a system that has two interchangeable modular

6   components, even if there are all of these other

7   positions -- you know, let's assume for argument's sake

8   that number 6 on the far right-hand side, the inlet valve

9   B --

10          THE COURT:  Yes.

11          MR. MILLER:  -- let's say that for whatever

12   reason, that position was fixed and you could not put a

13   different type of component in it.  Under Bio-Rad's argument

14   that all of them have to be interchangeable modular

15   components, they would have a noninfringement argument

16   because they would be saying it's like, yeah, I know the

17   claim says that it only requires at least two, but their

18   view is that at least two means the system has to have two,

19   but all of the components within the system have to have the

20   same ability, and that would be, frankly, I think a silly

21   result.

22          Does that make sense?

23          THE COURT:  Show me where in the claim are they

24   pointing to, that that all must exist?

25          MR. MILLER:  Well, that's a good point, but if

1    you look at the brief on page 33, we have this reprinted on

2    slide 25.

3                    THE COURT:  Okay.  Hold up.  Page 33 of the

4    brief?

5                    MR. MILLER:  Reprinted on slide 25.

6                    THE COURT:  I mean, I'm just kind of confused.

7    They are going to say, I think, that the premise of your

8    hypothetical is wrong, that the IVB, if it's stationary,

9    it's not one of these interchangeable components.  So why is

10   there a design-around?

11                   MR. MILLER:  Well, their view, if you look at

12   their brief, they say a system -- it only has to have -- you

13   can sell a system with two.  It would fall within the scope

14   of the claim.  That's what they would say.  But if you sold

15   the system with four, even though the claim says at least

16   two, the claim requires that all four be interchangeable,

17   and that defies the claim language.

18                   The claim language says that the system only has

19   to have at least two that qualify as these interchangeable

20   modular components.  So what they are doing is trying to

21   rewrite the claim.

22                   So let me -- so, you know, if you take -- you

23   know, let's just focus in on, if you look at claim 16 of the

24   reissued patent, it says that there's a liquid

25   chromatography system arranged to provide a control fluid

1    flowthrough --

2              THE COURT:  Wait, wait.  I'm on the '589.  What

3    patent are you on now?

4              MR. MILLER:  I can go to the '589, too.  It

5    doesn't matter.

6              THE COURT:  All right.

7              MR. MILLER:  They're all --

8              THE COURT:  So you probably want to look at

9    claim 1 of the '589, maybe?

10             MR. MILLER:  Sure.  So it says that -- it says

11   an automated liquid chromatography system comprising a

12   housing unit and at least four modular fluid handling units.

13             THE COURT:  Okay.

14             MR. MILLER:  In the preamble.

15             THE COURT:  Now, under your hypo, IVB is not a

16   modular fluid handling unit.  Right?

17             MR. MILLER:  Under our hypo --

18             THE COURT:  You said it's stationary or can't

19   move.  It's stuck in there.

20             MR. MILLER:  Yes.  I mean, this is what Bio-Rad

21   would say, is that as long as -- if the system has four,

22   that's fine.  Right?  But if there are five, all five have

23   to meet requirements of what is stated here as at least four

24   modular components.

25             So, in other words, we say that the claim

1   requires that they all be able to be interchangeable.

2   Right?  Their position is that, well, if I add a fifth one

3   and my system doesn't have -- has one that can't be moved,

4   then there's no infringement, because even though it says at

5   least four, if I add a fifth, that one wouldn't meet the

6   limitations of the claim, and that's crazy.

7          I mean, it says that the claim uses the word

8   comprising in the transition, and so that's well understood

9   to mean that, you know, all the claim requires is what's

10  specifically stated, and if you add additional items, that

11  doesn't get you around infringement.

12         So, in other words, if there are four that meet

13  the definition of an interchangeable modular component, the

14  fact that there's a fifth position in the system that has a

15  component of some kind that does not meet the definition of

16  an interchangeable modular component, that doesn't mean that

17  you all of a sudden don't infringe.

18         THE COURT:  All right.

19         MR. MILLER:  Okay.  So I just want to address

20  one more item, which is the IPR.

21         THE COURT:  I'm not going to -- I mean, you

22  don't want me to consider the IPR.  Right?

23         MR. MILLER:  Something that's applicable here,

24  it's a different standard.

25         THE COURT:  I agree.  You know what?  I mean, I

1   don't think I need to consider the IPR to make my decision,

2   so let's just skip over the IPR.

3           MR. MILLER:  Okay.  Well, unless you have any

4   other questions from me, I think that's all I need to say

5   about this particular term.

6           THE COURT:  All right.  Let's hear from the

7   other side.

8           MR. CORREDOR:  Good morning, Your Honor.  Felipe

9   Corredor on behalf of Bio-Rad.

10          I think that Your Honor hit, really hit the nail

11  on the head.  When we were looking at the spec, the

12  specification during plaintiffs' presentation, which is, if

13  we start on our slides at slide 6, I think there's a key

14  passage that plaintiffs were discussing earlier.

15          The language that the specification uses is all

16  about possibility.  There's no mandatory requirement or need

17  to be able to do any of these things.  It's just these are

18  things that are possible thanks to the interchangeability,

19  and it includes --

20          THE COURT:  Well, let me ask you this.  Let me

21  just interrupt for a second.  So a couple things.

22          So, one, are you arguing plain and ordinary

23  meaning?

24          MR. CORREDOR:  Yes.  We think that is, our

25  proposed construction is the plain and ordinary meaning of

1    interchangeable modular component, yes.

2              THE COURT:  Where do you say that in your brief?

3              MR. CORREDOR:  I'm not sure we say it

4    explicitly.

5              THE COURT:  So why didn't you?  I mean, that's

6    usually the starting point when somebody argues plain and

7    ordinary meaning, which is the starting point in

8    construction.  Right?  They say it explicitly.  Why didn't

9    you say it here?

10             MR. CORREDOR:  Well, I think the plain and

11   ordinary meaning of the term is always in light of the

12   specification.  Right?  So I think the starting point

13   according to Phillips is in order to determine what the

14   plain and ordinary meaning is is the specification and the

15   claims, and I think that's where we started in the brief,

16   was a discussion of the term in the context of the

17   specification and the claims.

18             THE COURT:  But also on other terms, parties,

19   GE, for instance, page 68 of the brief, the wherein the

20   system is capable of performing automated liquid

21   chromatography says it's the plain and ordinary meaning.

22   That seems normal.  Why didn't you do that here?

23             MR. CORREDOR:  Well, why didn't we propose a

24   construction?  I see your question.

25             So I think --

1    THE COURT:  No.  I mean, I thought you were

2  going to tell me you're going to admit it's not the plain

3  and ordinary meaning and you are not arguing for it because

4  it's not in your brief, but now you're telling me you really

5  are?  You are asserting this is the plain and ordinary

6  meaning of the term?

7    So do you agree?  I mean, can you show me

8  anywhere where the term interchangeable, where you can --

9  excuse me, where you can show me that interchangeable

10  modular component exists in the prior art before these

11  patents?

12    MR. CORREDOR:  The specific phrase

13  interchangeable modular component, no, but the component,

14  words that make up that phrase, are known and used in the

15  art, and, in fact, GE itself pointed to a dictionary

16  definition before the PTAB about what interchangeable meant

17  and they include things that hit on that.  But I mean at

18  that time, I think there was a plain and ordinary meaning to

19  the words that make up this phrase.

20    THE COURT:  Okay.  So let's just close the loop

21  here.  You are now arguing plain and ordinary meaning.  Is

22  that what you are saying?

23    MR. CORREDOR:  Yes, but we think the proposal we

24  provide clarifies for the jury what it means, because a lay

25  jury will not necessarily understand the phrase

1    interchangeable modular component alone.

2              THE COURT:  Okay.  What does modular mean?

3              MR. CORREDOR:  So I think modular in our

4    construction, if we put up slide 3 of our deck, we have the

5    both sides' discussion.

6              So I think some of the terms use only modular in

7    some of the claims, so at the bottom.  So I think that's

8    what we would say modular means.  Modular means something

9    that has a standardized size and shape that allows it to be

10   exchanged with another unit.

11             THE COURT:  All right.  So then interchangeable

12   must mean something different than modular.  Right?

13             MR. CORREDOR:  Yes.

14             THE COURT:  So what does interchangeable mean

15   that is different than module, modular?

16             MR. CORREDOR:  I think modular is about the

17   standardized size and shape.  When we look at the top where

18   it's construing interchangeable, that it can be inserted and

19   removed from positions in the housing.  So modular is the

20   standardized size and shape, but it can also be inserted and

21   removed from positions in the housing.

22             THE COURT:  You say in your definition on slide

23   3, you say under modular, it has a standardized size and

24   shape that allows it to be exchanged with another.  How is

25   that different than it can be inserted into and removed from

1      positions in the housing unit?

2                MR. CORREDOR:  Well, I think it would help to

3      look at the figures to understand the difference between

4      the two.  So Figure 2, for example, on slide 8 of our deck.

5                THE COURT:  Okay.

6                MR. CORREDOR:  The difference is that a modular

7      unit is something that can be removed and replaced with

8      something else.

9                THE COURT:  All right.

10               MR. CORREDOR:  Whereas, because of its

11     standardized size and shape.  For example, I could remove

12     the outlet corner number 1, the INV valve.  I could remove

13     it and put another INV valve in and that's a modular unit.

14               The interchangeability means that now we have to

15     actually be able to -- the INV valve, I no longer want at

16     the top left corner.  I'm going to take it out and move it

17     to the second position, to the right of where it currently

18     is, and I think that is the interchangeability portion that

19     we're talking about.

20               THE COURT:  I'm having a hard time understanding

21     the difference between that and modular.  Why isn't that

22     just modular?

23               MR. CORREDOR:  I think that's -- that's correct

24     for unit 4, because 4 I think would be modular.  I think the

25     difference between the two is a very slight difference and

1    I'm not sure there's a dispute between the parties as to

2    that.

3                    THE COURT:  Well --

4                    MR. CORREDOR:  I think --

5                    THE COURT:  I think the point would be if -- I

6    mean, I think what the plaintiffs want to argue, I didn't

7    hear them argue it.  I mean, interchangeable goes to

8    functionality maybe.  Modular goes to the standardized size

9    and shape.

10                   MR. CORREDOR:  They have not proposed that, so

11   that's not in their language.  Right?  So I don't think that

12   is a dispute between the parties.  And the parties actually

13   in their brief, in the plaintiffs' brief, they said, I

14   mean, you can just construe modular for the handling unit

15   the same way as you do the other two terms that have

16   interchangeable in them.  There's no difference, and the

17   patent nowhere according to the plaintiffs themselves in

18   their briefs, and I don't have the pin cites, the term means

19   the same thing.

20                   THE COURT:  Right.

21                   MR. CORREDOR:  And I think we would agree with

22   that.  If Your Honor is inclined to construe them the same

23   way --

24                   THE COURT:  Well, they didn't make the argument,

25   so let's go ahead.  All right.

1    MR. CORREDOR:  All right.  So I think I was

2  discussing the specification.  So, yes.

3    THE COURT:  All right.

4    MR. CORREDOR:  I was reiterating the point I

5  made earlier, which is on slide 6.  The fact that the

6  specification only uses permissive possibility language and

7  not mandatory requirements or anything like that anywhere in

8  the specification.

9    THE COURT:  And you don't dispute that given

10  what you just said, that the other unit could have a

11  different functionality.  Your point is just it doesn't have

12  to?

13    MR. CORREDOR:  Exactly, yes.  So our point is it

14  can have different functionality.  It can have the same

15  functionality.  Either one is fine.  Either one meets our

16  proposed construction.  However, plaintiffs' proposed

17  construction is only met by one of those two, and both of

18  them, both of those possibilities serve as an upgrade,

19  were designed, and according to the specification in column

20  1, to solve problems in the prior art.  So both are

21  important to the invention.

22    THE COURT:  Okay.  So here's how I'm going to

23  rule.  I'm going to rule in your favor.  And the question

24  here is does the intrinsic evidence provide objective

25  boundaries to the scope of the disputed terms, and here the

1    intrinsic evidence shows that the patentee did not limit the

2    scope of the term such that the other component had to have

3    different functionality.  The claims themselves don't

4    require different functionality.

5              If you look at the written description, which is

6    shared by all of the patents, so I will refer to the '589

7    patent.  And if you look particularly to column 1, lines 39

8    to 42 and lines 50 to 52, the invention was designed to

9    overcome problems in the prior art, and one of those

10   problems was the replacement of defect -- that's a typo, I

11   guess, defective handling units, which the written

12   description described as time-consuming and delicate, a

13   delicate task.

14             And then if you look at column 5, lines 53 to

15   54 of the patent, there it references the

16   interchangeability, that interchangeability provides

17   improved service as well as upgrade possibilities.  That's

18   clearly not limiting.  That could be contemplating clearly

19   the same part being, a part rather being exchanged that

20   shared the functionalities, had the same functionality.

21             I think then there's also a problem with the

22   plaintiffs' position in that its proffered construction

23   would exclude two embodiments.  And then if you look here

24   where the patent discussed, summarizes Figure 2, and it

25   says, according to -- and this is quoting from column 5, all

1    liquid handling components and sensors arranged at the

2    liquid handling panel are designed to be readily

3    interchangeable.

4              And further, "The interchangeability provides

5    the improved service and upgrade possibilities and also a

6    possibility to customize the positions of the respective

7    liquid handling components such as the fluid control valve.

8    For example, in order to optimize the fluid path for

9    specific experimental setup."

10             Then if you look to the interchangeable modular

11   components, they include the UV monitor 4, whose

12   standardized sizes and shapes differs from all the other

13   disclosed interchangeable modular components.

14             So clearly, it was contemplating then the

15   substitution or the exchange of only, or the substitution or

16   exchange of a component that had the exact same

17   functionality.  A UV monitor 4 would only be interchangeable

18   with another UV monitor component, so that would be in order

19   to replace a defective UV monitor.  And you have the same

20   situation with regard to the pump system.  And so the

21   plaintiffs' position essentially would read out these

22   embodiments.

23             The plaintiff relies heavily on iridescent

24   networks and insists that we have a coined term here, but we

25   don't have a coined term of degree, which is what iridescent

1    networks is addressing.  And also the bottom line is, as the

2    Court said in Iridescent Networks is, I am required to

3    consider whether the intrinsic evidence provides objective

4    boundaries, and here, as I've explained, it doesn't provide

5    objective boundaries that would lead to the conclusion that

6    you must have different functionality.

7           And I just don't find that the distinguishing of

8    Mourtada during the prosecution history constitutes anything

9    clear or unequivocal, and at most it's an ambiguous

10   discussion and it would not, in my view, trump the more

11   powerful intrinsic evidence, which is set forth in the

12   written description that I've already discussed.

13          Okay.  Let's move to the preambles that are

14   limiting, which I think is the second category.  Here, let

15   me hear briefly from the defense.

16          MR. CORREDOR:  Yes, Your Honor.  It's Felipe

17   Corredor again.

18          Okay.  I'm not following my notes.

19          Your Honor, I guess the key dispute here between

20   the parties regarding the liquid chromatography term has to

21   do with whether the preambles are limiting, and if I may

22   turn your attention to slide 21 of our, of the deck Bio-Rad

23   submitted.

24          Here, they are trying to deviate from the

25   general rule that the preambles are not limiting.  Now, they

1   have a set of different reasons for it, and let me go

2   through one by one why none of their reasons support making

3   the preambles limiting.

4           Turning next to slide 22, the first basis they

5   say is an antecedent basis.  Now, in their argument, I think

6   it's important to note that the antecedent basis they point

7   to is only in a few scattered dependent claims and not in

8   the independent claims, which really are the core of the

9   invention.

10          And moreover, as the Federal Circuit has stated

11  in cases such as Summit 6, which is cited in our brief and

12  shown here on slide 22, that the antecedent basis is not

13  enough.

14          And so the claim at issue in Summit 6 had a

15  preamble that decided a computer implemented method for --

16          THE COURT:  Let me just interrupt.  Let me just

17  interrupt because we want to be mindful of the time here.  I

18  mean, Summit, there was no antecedent basis.  Is that

19  correct?

20          MR. CORREDOR:  There is an antecedent basis for

21  the client device.  Right.  So that client device throughout

22  the body of the claims are referring back to a client device

23  in the preamble.

24          THE COURT:  So you're saying there was an

25  antecedent basis in Summit?

1          MR. CORREDOR:  Yes, and the Federal Circuit

2    still found the preamble not to be limiting.

3          THE COURT:  Okay.

4          MR. CORREDOR:  All right.  So that's the main

5    point for Summit 6.

6          THE COURT:  Can you show me where -- I just want

7    to make clear so I can find it.  Where in Summit 6 does it

8    talk about there being an antecedent basis?

9          MR. CORREDOR:  Yes.  Let me pull that case up.

10         I think the claim at issue is on slide 22.

11   Right?  It's claim 38.  And, yes.  The issue the Federal

12   Circuit was deciding on page 22 of Summit 6 has to do with

13   claim 38, which is the one that was depicted in slide 22,

14   and it had an antecedent base for a client device in the

15   preamble.

16         THE COURT:  I'm sorry.  I'm reading it.  It

17   says, does not contend that the preamble to claim 30 is

18   necessary for providing an antecedent basis.

19         MR. CORREDOR:  Yes.  The parties may not have

20   contended that, but I mean the use of said was throughout

21   the claim, which is also recited in pages 1287 to 88 of the

22   case.  It's pretty clear that the client device found an

23   antecedent basis in the preamble.

24         THE COURT:  Okay.

25         MR. CORREDOR:  And I think more importantly,

1    this is -- all the cases that have been cited by the

2    parties, and especially by plaintiff, have to do with

3    antecedent basis in the independent claims, and here there

4    are no independent claims that rely on the preamble for

5    antecedent basis.  It's only in a few scattered, I think a

6    scattered dependent claim among the, I think they've

7    asserted 120 to 130 claims in this case.

8                    THE COURT:  Okay.

9                    MR. CORREDOR:  So if you have no other questions

10   on antecedent basis, I will move on to the next reason that

11   we provided for making the preamble limiting.

12                   THE COURT:  Okay.

13                   MR. CORREDOR:  It is the -- on slide 25, if you

14   will turn your attention to slide 25.

15                   Now, this is a case that I think is important.

16   This underlies the point.  I just wanted to read a passage

17   from it, which is at pages 1372 through 73 of Proveris,

18   which makes clear that the only reference in any independent

19   claim of the inventive concept of capturing of images was in

20   the preamble.  So the important aspect, the inventive aspect

21   in Proveris was claimed only in the preamble and that is why

22   it had to be limiting.

23                   Here, by contrast, if we switch to the next

24   slide, slide 26, the specification, the language that

25   appears in the preamble is liquid chromatography.  Right?

1    And the specification tells us that actually liquid

2    chromatography is not something that they have invented.

3           If you look at column 1 starting at line 41, it

4    says, one type of liquid handling system, the liquid

5    chromatography system, which is a standard method in

6    laboratories, and there are a broad range of liquid

7    chromatography systems available on the market.  And when

8    you go down a little bit more, line 48 under the summary of

9    the invention, I think it tells us that the provide a new

10   fluid handling system overcoming the drawbacks we discussed

11   in the context of the previous term, which have to do with

12   the modularity and interchangeability.

13          So I think the focus of the invention here is on

14   modularity and interchangeability, not on liquid

15   chromatography, and that is why I think the specification

16   for why liquid chromatography in the claims would not

17   breathe life or meaning into the claims, so that is not also

18   a satisfactory reason for making the preamble limiting.

19          Next I think is the structure point, and I think

20   there's a lot of -- I mean, the plaintiffs keep saying --

21          THE COURT:  I am having a hard time.  I look at

22   your slide 28.  I mean, it opens up and it says, what's

23   claimed is an automated liquid chromatography system

24   comprising.

25          This is a matter of common sense.  How is it not

```
 1    that everything else that follows is part of a claimed
 2    automated liquid chromatography system?  How does that not
 3    give life, meaning, vitality to the claim?
 4              MR. CORREDOR:  I think the way you've phrased
 5    the question, I think the body of the claims are what is
 6    giving life, meaning to the preamble.  So if you really --
 7    reading the preamble alone, an automated liquid
 8    chromatography system, we have no idea what that is.  There
 9    is no structure associated with it.  The only structure is
10    the one defined within the body of the claim, comprising the
11    housing unit, and for modular handling unit with each of
12    those components having several additional features recited
13    throughout the body of the claim.
14              So it really -- I don't think anything in the
15    preamble breathes life or meaning into the body of the
16    claims, and if it did, I mean, a lot of system claims
17    started with a system.  For example, Arctic Cat started just
18    like that.  A personal recreational vehicle comprising, and
19    there was a bunch of special limitations in the claim.
20              So the invention both in Arctic Cat and in this
21    case are especially defined as especially complete
22    inventions in the body of the claims without any reference
23    for reliance upon the preamble language.  I think that's the
24    key portion, the key part of why --
25              THE COURT:  You broke up.  You broke off
```

1  completely.  You said without any reference and then you

2  broke off.

3          MR. CORREDOR:  Well, without any reference or

4  reliance on the preamble language, and Arctic Cat

5  recreational vehicle here liquid chromatography system.  I

6  think that is the key point, that all the structural

7  features are in the body of the claim.  And I don't think

8  I've seen anything from plaintiffs about what additional

9  structure the preamble provides that is not already recited

10  in the body of the claims, and I think that's an important

11  reason why it cannot be limiting.

12          So I think Arctic Cat, just a note on Arctic Cat

13  on slide 29.  I think slide 29, that claim in Arctic Cat was

14  the one that is more closely analogous, especially in light

15  of Your Honor's question.  It really is, you know, extremely

16  analogous to this case, and plaintiffs certainly focus on

17  other claims in Arctic Cat, which makes the use and not

18  structural language clearer.  For example, on slide 30,

19  where it's clear that the personal recreational vehicle is a

20  mere use.  But all the claims in Arctic Cat were found to

21  have a preamble that was not limiting.

22          I think just to go over a few of the other cases

23  that plaintiffs have cited, if I can direct your attention

24  to slide 34.  They relied on Pacing Technology, and here

25  there's again a clear antecedent basis, the user, the user,

1      and so that is a distinguishing feature.

2             And then in Electro Scientific Industries on

3      slide 35, I think here we see what a structural component

4      that appears in the preamble would be, and here, the

5      preamble says, in a tool positioning system that is

6      implemented as part of a working processing system in which

7      the work pieces are electronic circuit boards, the tool

8      positioning system, et cetera, comprising.

9             So the circuit boards are a structural

10     component.  They really are something that has -- that adds

11     to what is recited in the body of the claim.

12            And seeing In re Fought on slide 36, which is

13     recited, a travel trailer having, indicating the body of the

14     claim, and the travel trailer there was found on page 1177,

15     I believe, to a structure, meaning it had to be portable and

16     it had to have living quarters and portability and living

17     quarters are not found anywhere in the body of the claim

18     depicted here.  So I think that distinguishes, you know,

19     plaintiffs' prior cases.

20            So there is no antecedent basis -- there is --

21     the invention is defined as a structurally complete

22     invention in the body of the claims, of the independent

23     claims, and not without reliance on the preamble.  I think

24     the combination of these and what has been found to be

25     limiting in prior cases and what has not really indicates

1    that the liquid chromatography language in this claim, the

2    claim at issue here or the claims at issue here, do not

3    breathe life, meaning, life or meaning to the claim, and I

4    think that is why we submit the claim, the preamble should

5    not be limiting.

6             THE COURT:  Okay.  Thank you.

7             MR. CORREDOR:  Thank you, Your Honor.

8             THE COURT:  I will hear from the plaintiff.

9             MS. SKLENAR:  Yes.  Thank you, Your Honor.  This

10    is Jennifer Sklenar.

11             This is an important issue.  All of the claims

12    that are recited have liquid chromatography systems somehow

13    in the preamble, but there are systems for that, or their

14    methods for performing or building those type of systems.

15             And if we go to our slide, slide 35 --

16             THE COURT:  How about when he says there's no

17    structure except in the dependent claims?

18             MS. SKLENAR:  Well, I think that they have not

19    cited a case that supports that.  Right?  When we get to

20    dependent claims, we do have many claims.  In fact, one

21    claim that every patent recites liquid chromatography system

22    in the body of the claim.  As a matter of patent law, that

23    means you have to read that as referring back to whatever

24    it's referencing back, which here is the preamble of the

25    independent claim.

1         So when you read those dependent claims, you

2    have to read it with the independent claim.  That means the

3    preamble of the independent claim must be a limitation, if

4    that makes sense.

5         I'm not aware of a single case that makes this

6    distinction that if you have the antecedent reference in the

7    dependent claim, that you just disregard it because it's not

8    in the independent claim.  That I believe fails as a matter

9    of patent law.

10         We cited multiple, multiple cases where there is

11    antecedent basis.  That is a reason to find that the

12    preamble is limiting, and I think Your Honor noted, the only

13    case they have where there's this issue, the only case they

14    cite to suggest that the preamble is not limiting is this

15    weird outlier case where the parties specifically didn't

16    argue that there was antecedent basis.  And so we see an

17    outlier decision there, but it wasn't even argued in that

18    case.  Here, we certainly are arguing it and it's nothing

19    that we have for every patent.

20         So the other reason I would cite as to why the

21    preambles are limitations, and if we go to our slide 38, it

22    is because they do breathe life and meaning into the claim.

23         We heard Bio-Rad's counsel suggest that somehow

24    GE, the patentee, didn't think that that was part of the

25    invention and had some reference about liquid chromatography

1    systems in the prior art, but when we read the

2    specification, it's abundantly clear that GE considered the

3    invention to be very specific configurations of liquid

4    chromatography systems.

5              And if we look at some of the excerpts we have

6    here about Figure 2 and Figure 1 on the slide, the

7    specification specifically refers to embodiments of the

8    invention in the form of modular liquid chromatography

9    systems.  So there's ample evidence here that the patentee

10   considered that to be structural limitations, structural

11   requirements of the claim.

12             THE COURT:  All right.  So I agree with you,

13   that's exactly what the patentee was doing, and it recited a

14   particular structure in the written description.  It

15   highlighted that structure as important and that the

16   preamble is limiting.  It provides an antecedent basis for

17   at least one claim in each of the asserted patents, and as I

18   say, there are multiple instances where the written

19   description cites a liquid chromatography system as an

20   example of a fluid handling system.  And the bottom line is,

21   I do think it gives life, meaning and vitality to the

22   claims.  I don't think Summit is applicable.  The parties

23   weren't arguing an antecedent basis and I just don't find

24   that as informative for my decision here.  So the preamble

25   is limiting I find.

1           All right.  Let's move to the next term or set

2     of terms, which is the liquid chromatography system and the

3     automated liquid chromatography system.  Let's hear from the

4     plaintiff first.

5           MS. SKLENAR:  Thank you, Your Honor.  So if we

6     turn now to slide 49, we see the parties' different

7     constructions.  And what we have -- I mean, it's basically

8     similar to a plain and ordinary meaning construction.  It's

9     a system capable of performing liquid or automated

10    chromatography given the particular wording of the claim.

11          And where do we get our construction from?  Ours

12    comes, and if we look at slide 50, from the Patent Office.

13    That's what, in the PTAB decision, that's what, if you

14    follow the rationale, their decision, the part of the claim

15    that was being construed was liquid chromatography system.

16    That is where the Patent Office explained what it means.

17          The construction that Bio-Rad --

18          THE COURT:  Why do you want me to start looking

19    at this IPR which uses a different standard.  Right?  I

20    mean, why should I just cloud this up by making reference to

21    the IPR?

22          MS. SKLENAR:  Your Honor can do it or can't do

23    it.  I think for the preamble, there's a different

24    situation, which we don't need to get into about why it's so

25    relevant.  For this, I think it is an example.  You know,

1   it's persuasive authority that the Court can look to as to

2   how the PTAB construed that language.  But basically we just

3   want it to be a system that does liquid chromatography.  And

4   if we look at Bio-Rad's construction -- I don't even know

5   frankly that Your Honor needs to construe this, but if we

6   look at Bio-Rad's construction, we don't really know where

7   they're getting that construction from.  It's different than

8   what they asserted at the Patent Office.

9          If we look at their brief, we don't really

10  know -- they don't seem to be arguing it based on a

11  definition or some clear requirement in the spec.  What they

12  say in the first brief is that when they looked at a claim,

13  that was the minimum requirement for a certain claim, but

14  they cite no law that that is the way claim construction

15  should be done.  They don't have a declaration from somebody

16  skilled in the art saying, this is the way everyone in the

17  field at the relevant time would have understood these terms

18  to mean.

19         So there's just really no meaning that they give

20  or no support that they give to their construction.  And

21  what I think they are trying to do here is just give a vague

22  enough construction that they basically can turn around and

23  say, any fluid handling system that you could somehow modify

24  to deal with the chromatography could be characterized as a

25  liquid chromatography system.  In other words, if you have a

1    water cooler, arguably, under Bio-Rad's construction, that

2    would be a liquid chromatography system because you could

3    somehow modify it and do what Bio-Rad replaced there, and we

4    just don't agree that that is what someone skilled in the

5    art would think a liquid chromatography system is.  They

6    have not supported it.  We think other things would be

7    required like detectors.

8              But I don't know that we need to get into any of

9    that, because I think we should either -- we would submit

10   that the Court should either give it its plain and ordinary

11   meaning with no construction or adopt the one we have, which

12   is basically just sort of explaining how that term would be

13   understood, that it would be capable of.  In other words, it

14   would have components, the system would have components that

15   can perform that liquid chromatography.

16             THE COURT:  What does automatic, or automated

17   mean rather?

18             MS. SKLENAR:  Automated would mean that

19   there's -- not mechanical, electrical components that

20   help govern the liquid chromatography aspect of it or

21   control the liquid --

22             THE COURT:  All right.  How does that different

23   then?  How does the automated liquid chromatography system

24   differ from the liquid chromatography system?

25             MS. SKLENAR:  So long ago, potentially still

1   used today, are very old-fashioned kinds where you could use

2   gravity, for example, to do some aspects of liquid

3   chromatography.  And so the automated is getting at the fact

4   that you definitely need some automation there, some

5   electrical components.

6            So with that, Your Honor, I think that really

7   covers the argument.  We think their construction is too

8   broad and doesn't really get to the issue of what a liquid

9   chromatography system is.  They want it to be broad enough

10  that they can later argue, well, you could have modified

11  something to perform liquid chromatography by doing all of

12  these things to it.  Maybe that's enough.  And this is

13  something we did see in the Patent Office proceeding where

14  they took a system that was clearly a liquid handling

15  system, had nothing, no disclosure having to do with liquid

16  chromatography and tried to argue, well, that could be a

17  liquid chromatography system because you can modify it, and

18  the Patent Office rejected that, and that's the reason that

19  the IPR wasn't instituted on certain of the claims.

20            THE COURT:  So why didn't the patentee then, you

21  know, title this patent and ask for patents in the abstract?

22  Why didn't he just talk about a liquid chromatography system

23  as opposed to an automated fluid handling system?

24            MS. SKLENAR:  So as is typical in drafting

25  claims, people, patent prosecutors will go generic and then

1      go narrower, and that's what's described in the spec.  It

2      talks about fluid handling systems, but then it talks about

3      very specific types of liquid chromatography.  And, in fact,

4      in the parent patent, in the '718 patent, there were claims

5      originally recited to both, and I think I have a slide that

6      shows that similar to what we see on page number 47.

7              So what we see there are the claims that appear

8      in the reissue patent, and this shows how they were affected

9      from the IPR proceedings.

10             The claim we see on the left, that one was held

11     to be unpatentable in the IPR proceedings.

12             THE COURT:  What slide are you on?

13             MS. SKLENAR:  47.

14             THE COURT:  Okay.

15             MS. SKLENAR:  That was held to be unpatentable.

16     The claim on the right, and, again, this is now part of the

17     '124 reissue patent, that was the claim where the Patent

18     Office refused to grant institution.  Bio-Rad did not even

19     get over the threshold of having this claim reviewed.

20             So we see that the patentee did try to write

21     claims to both, and after the IPR decision, in prosecuting

22     all of the remaining continuation patents, the other patents

23     asserted in this case, we took, we basically took what the

24     PTAB said to heart, that we weren't entitled to broader

25     claims and limited all of the claims from then on to liquid

1   chromatography systems.

2           THE COURT:  Okay.  All right.  Let me hear from

3   the other side.  Thank you.

4           MR. CORREDOR:  Your Honor, if it please the

5   Court, Felipe Corredor again for Bio-Rad.

6           I still -- I think we still have not heard from

7   plaintiffs what the structure is that makes up the liquid

8   chromatography system, and I think what we see here, if we

9   don't have a structure, then it's just a statement of use.

10          And if we look at our slide 39, we have a

11  citation to the Hewlett-Packard case in which the Federal

12  Circuit held that apparatus claims cover what a device is,

13  not what a device does.  So it's very important that we,

14  that these terms be structural.  Because they are not, I

15  think our position that they are mere statements of use and

16  they have not pointed, the other side also hasn't pointed to

17  anything structural that is inherent to liquid

18  chromatography, and they still haven't in today's

19  presentation.  And so these statements of use could not be

20  held to be limiting.

21          There's another case on the next slide, slide

22  40, which makes the same point, and I think In re Schrieber.

23  In that case, there was a dispensing top for passing popped

24  corn, and as you see it highlighted in the claims here, a

25  the lot the language had to do with popcorn.  So a

1    dispensing top for passing only several kernels of popped

2    popcorn at a time.  And the element, the opening at the

3    reduced end allows several kernels of popped popcorn to pass

4    through at the same time, and so forth.

5            So there's a lot of limitations having to do

6    with popcorn, and the Federal Circuit nevertheless held that

7    in a reference that that had nothing to do with popcorn, a

8    prior art reference that was related to the oil, so

9    anticipated as a matter of under Section 102 that the claims

10   at issue here and In re Schrieber, showing that the popcorn,

11   the recitations of popcorn were mere statements of use that

12   would not limit the claim.

13           THE COURT:  Okay.  But, wait.  Didn't we already

14   address whether it's limiting or not?

15           MR. CORREDOR:  The process of the preamble.

16   Sure, but I think we contend as well as to the extent it's

17   also in the body, it should not be limiting, and I think

18   based on Your Honor's ruling in the preamble, you might be

19   inclined to find these are limiting.  But to the extent they

20   are limiting, I think the structural point is still an

21   important one, so it's still important to keep in mind these

22   cases, this case law in terms of if it's limiting, the

23   proposed construction should be something that provides

24   structure to whatever that term is, and I think that is why

25   our proposed construction, we cite components, because GCS's

1    proposal, which is just a system capable of performing

2    liquids chromatography, doesn't -- there's no structural

3    component to it.  I think it would be indefinite if the

4    claim recited that alone, and so we really, the proposal we

5    put forth if this is to be limiting is that there be

6    specific components that are capable and that they can

7    deliver with liquid chromatography.

8              So we're trying to give structural meaning to

9    these terms, which I think we submit are not structural at

10   all, but to the extent we have found that they are, the

11   proposed construction should provide the structure that

12   plaintiffs have not been able to point to.

13             THE COURT:  So I guess I'm confused.  I'm sorry.

14   I understand those are arguments, I get them insofar as they

15   relate to what I thought I already decided, which is whether

16   the preamble is limiting or not.  And, look, I've got to

17   tell you, to be quite honest with you, I think the limiting

18   preamble issue is one, it's very difficult.  It's hard to

19   reconcile how statement of purpose is not limiting, but a

20   preamble is limiting if it gives meaning to the claim, but

21   the Federal Circuit case law has both of those statements in

22   it, so I'm never sure I get right whether a preamble is

23   limiting.  But I've decided it.

24             So I'm trying to figure out now the difference

25   between the proposed constructions of each side and I'm not

1    really getting why the argument you've just made, is

2    probative as it might be towards the limiting question or

3    not, helps me decide whether I should construe a liquid

4    chromatography system as either "a system capable of

5    performing liquid chromatography" or "a fluid handling

6    system that has components that can deliver controlled fluid

7    flow through a liquid chromatography column."

8           You are saying that -- maybe I guess you're

9    saying this column we need to provide the necessary

10   structure to understand the claim?  Is that your point?

11          MR. CORREDOR:  Yes.  I think the point is a

12   structural one.  So I think the plaintiffs' proposal still

13   lacks structure.  That's not an adequate -- I mean, if we're

14   going to find the term limiting, which Your Honor has, then

15   it could be a term that connotes structure and our proposed

16   construction points to components that can deliver through

17   the column.  That is the structure we are trying to provide

18   and I think that's the first point.

19          THE COURT:  I guess why does it have to contain

20   structure?  Why can't it contain a use?  I mean, I thought

21   the use question comes up in terms of whether it's limiting

22   or not, but if it is limiting, why then can't it be used

23   space and basically recite what GE proposes, which it just,

24   it limits the claim to be directed towards a system that's

25   capable of performing liquid chromatography?

```
 1              MR. CORREDOR:  I think the reason is that if it
 2    is limiting, it can only be limiting if it's a structural
 3    component.  Right?  Because we are, especially with these
 4    systems, we are dealing with system claims, and
 5    Hewlett-Packard and Schreiber teach that these cannot be
 6    limiting.
 7              So the fact that Your Honor has found these to
 8    be limiting means that they have to have structure because
 9    otherwise they would not have been limiting.  I think that's
10    why we submit that the proposed construction still has to
11    have structure, and the case law that is relevant to whether
12    it is limiting or not is also relevant to what the
13    construction should be.  That is, there should be a
14    structural construction, not a mere statement of use.
15              And another point I want to make in favor of our
16    proposed construction, I think it's illustrated on slide 41
17    of our presentation, which has to do with their proposed
18    construction, really renders a lot of language in the claim,
19    in claim 38 of the '124 patent superfluous.
20              So if we're construing a liquid chromatography
21    system as "a system capable of performing liquid
22    chromatography," then we're rendering the bulk of the last
23    limitation highlighted on slide 41, wherein the system is
24    capable of performing liquid chromatography, we're rendering
25    the bulk of that language totally superfluous.
```

1          And --

2          THE COURT:  Well, but their point is that it's

3    automated.  I mean, automated is narrower than just a liquid

4    chromatography system.  I mean, you can have systems that

5    gravity works as opposed to electric components and that's

6    why you can actually have something.  I guess you can have a

7    non-automated liquid chromatography system.

8          MR. CORREDOR:  Yes, but if the point was only

9    automated, you wouldn't have -- they wouldn't have had to

10   recite the capable of performing liquid chromatography

11   portion of the language.  So it's still rendering all of

12   that portion superfluous.

13         They could have said when the system is

14   automated, that is really where --

15         THE COURT:  Well, they could have said that.  If

16   I read it in its totality, the clause still has some meaning

17   because it has got the word automated.

18         MR. CORREDOR:  Yes, but not all the terms of the

19   claim have meaning, and I think if I read you a quick quote

20   from Merck on page I guess 395 F.3d at page 1372, the

21   Federal Circuit stated that a claim construction that gives

22   meaning to all the claims it prefers over one that does not

23   do so, and so the proposed construction that they're

24   advocating reads out a lot of these terms.

25         You are right, it does not read out automated,

1    but it reads out a whole bunch of other terms.  I think

2    that's another reason why the proposed construction is

3    wrong.

4              And, third, I think I heard plaintiff, there's

5    no portion in the spec that discusses anything about the

6    structure, and I think I would direct you to slide 42, which

7    is a place where there is some structure discussed, what a

8    liquid chromatography has.  And so it states, and I will

9    read it, "According to another embodiment, there is provided

10   a fluid handling system in the form of a liquid

11   chromatography system comprising a housing, two or more high

12   pressure pumps, at least one sensor unit and a plurality of

13   fluid control valves of at least two different

14   configurations."

15             So there are components and these are the

16   components that are referred to in our proposed

17   construction, and these are special pieces that I guess make

18   up the liquid chromatography system according to the

19   specification.

20             I think that is the third and last point I would

21   submit in favor of Bio-Rad's proposed construction for this

22   term, assuming it is a limiting term.

23             THE COURT:  All right.  Thank you.  I am though

24   going to give it the plain and ordinary meaning, and I don't

25   think it renders claim 38, the wherein clause of the '128

1    patent, *superfluous*.  As I say, I'm not sure I got it right

2    on the limiting issue, but you always have the Federal

3    Circuit to correct things.

4               Okay.  Let's go with the last set of terms,

5    which is the fluidics and non-fluidics sections.  Let's hear

6    from the plaintiff first.

7               MR. MILLER:  Thank you, Your Honor.  This is

8    Jeffrey Miller again.

9               And I'd like to direct your attention to slide

10   58 of our slide deck.  And this slide presents each side's

11   proposed constructions, and it highlights the accused.  And

12   real, the main issue is in that second bullet point, which

13   is whether the non-fluidics section requires all of the

14   electrical components of a particular fluid handling unit.

15   That's what Bio-Rad's construction would require.  We think

16   that that is unduly limiting.

17              THE COURT:  But let me ask you, can I just ask

18   something here?  Hold on.  You agree that the non-fluidics

19   section cannot have fluidics components.  Is that right?

20              MR. MILLER:  That's right, Your Honor.

21              THE COURT:  Do you agree that the fluidics

22   section cannot have non-fluidics components in it?

23              MR. MILLER:  It has a double negative in there.

24   I need to think about that clearly.  Cannot have

25   non-fluidics.

1          I'm sorry.  The question was:  Can the fluidics

2     section not have non-fluidics?

3          THE COURT:  So, in other words, your position is

4     for sure you're saying, hey, look, the non-fluidics section

5     can't have fluidics components.  Right?

6          MR. MILLER:  Right.

7          THE COURT:  So then let's do the flip side.  Can

8     the fluidics section have non-fluidics components?

9          MR. MILLER:  Yes, it can, and --

10         THE COURT:  Okay.  That seems problematic for

11    me.  I thought you might say that the non-fluidics

12    components can be external to the non-fluidics section and

13    they can be external to the fluidics section, but you're

14    telling me, so you're not treating them equally then.

15         MR. MILLER:  Our -- so I think that what the

16    claim says and what the specification says is that the

17    non-fluidics section cannot have fluidics.  I mean, that's

18    what the non-fluidics says.

19         The fluidics section can have fluidics

20    components for sure, and the specification plainly

21    shows that there are things that are on the non-fluidics

22    side --

23         THE COURT:  Yes, but you say in your slide, "as

24    evident by the phrase itself, the non-fluidics section

25    cannot have any fluidics components in it."  That's your

1    slide.

2              So why shouldn't the second bullet point read,

3    "as evident by the phrase itself, the fluidics section

4    cannot have any non-fluidic components in it"?

5              MR. MILLER:  Because there's no negative

6    language there.  It would be inconsistent with the patent

7    itself to say that.  The patent literally discloses fluid

8    handling units that have electrical components on the

9    website, on the fluidics section.  In other words,

10   non-fluidics, it's pretty clear.  It says non.  It's a

11   negative.

12             THE COURT:  It says fluidics.  I mean, you know,

13   I kind of lose you there.

14             MR. MILLER:  Well, the fluidics -- I mean, I

15   will give you a perfect example.

16             So if you look at -- we'll probably talk about

17   the pH electrode, but there are other examples.

18             THE COURT:  Look, I think the pH electrode is a

19   pretty good argument.

20             MR. MILLER:  Yes.

21             THE COURT:  I was thrown by your slide.  You

22   say, "as evident by the phrase itself."  So if the phrase

23   itself, non-fluidics means, as you say, that the section

24   can't have fluidics, then the phrase fluidics seems to me

25   would say, oh, if I use the same logic that it's the phrase

1   that is dispositive.  Well, if the phrase is as you say on

2   slide 66, as evident by the phrase itself, the non-fluidics

3   section can't have fluidics components, I don't understand

4   from that why the phrase fluidics section can have

5   non-fluidic components.

6           MR. MILLER:  Well, so non-fluidics has a -- I'm

7   sorry.  I'm not an English major.  Non is negative, so

8   that's clear.  Right?  You can't have any non-fluidics --

9   I'm sorry, fluidics in the non-fluidics section.

10          THE COURT:  Okay.

11          MR. MILLER:  Fluidics though, it certainly

12  requires that there be fluidics on that side.

13          THE COURT:  Right.

14          MR. MILLER:  It says nothing about it.  It

15  doesn't say you can't have them.

16          THE COURT:  Okay.

17          MR. MILLER:  Especially in the patent itself,

18  which points out numerous examples of there being

19  electronics on the fluidics side.

20          THE COURT:  Okay.  All right.  Keep going.

21          MR. MILLER:  Okay.  So we had mentioned the pH

22  electrode.  I think you understand that, but if you go to

23  slide 63, we've laid out one example of how that works.  So

24  if you look at claim 1 of -- this is the '591 patent, it

25  talks about there being an external fluidics section of a

1    particular fluid handling unit.  It qualifies it as a pH

2    electrode that's external to the housing, and claim 26 says

3    there's a pH electrode connected to the pH valve formed in

4    an interchangeable modular component.

5              So that plainly demonstrates that there's at

6    least two dependent claims that talk about there being a pH

7    electrode, which there's no dispute that's an electronid

8    component on the external portion of the fluid handling

9    unit.

10             And if you look at the specification, if you

11   look at slide 64, we've got a little piece --

12             THE COURT:  You broke off.  Your connection is

13   very, very bad and now you broke off completely.

14             MR. MILLER:  Can you hear me now?

15             THE COURT:  Yes.

16             MR. MILLER:  Okay.

17             THE COURT:  Can I just say something to counsel?

18   I mean, you all have got to do something better.  Now we're

19   all I know dealing with this pandemic and we're having to do

20   things by phone.  The number of times that folks do not have

21   a good line, it's frankly really concerning.

22             So especially to the Delaware counsel on the

23   line, please get the word around.  I mean, on pretty much

24   every call there's at least two lawyers that have a problem

25   with their connection.  They need to check it out ahead of

1   time.  It's really hard for our court reporter to do all of

2   this.

3            MR. MILLER:  Your Honor, I really apologize for

4   that.  Actually, I was pretty confident that it was working

5   well because everyone that I've spoken to on this system has

6   never complained, but I guess my indirect connection must be

7   degraded today.

8            But anyway, so I want to go back to what I was

9   talking about with respect to slide 64.  We've got the

10  little piece of column 4 there, but I actually think if you

11  look at the entire paragraph, which is in the '589 patent,

12  it starts at line 45 of column 4, and we referred to the

13  first three lines of this.  But if you go through the entire

14  paragraph, it really enforces that this is an electrical

15  component that is on the external portion of the fluid

16  handling unit.

17           And it says that, it talks about flow

18  restrictor, which is that's not an electrical component, is

19  connected to the pH valve, and then it goes on and it says,

20  the pH valve is used to direct the flow, and that's the

21  fluid, the flow to the pH electrode and to the flow

22  restrictor or to bypass or both.

23           So it's plainly teaching that there's a pH

24  electrode that's part of the fluid modular, modular fluid

25  handling unit that's in the fluidics section.

1          So, and I think it's important to look at a

2     couple of more pieces of the specification, and I will

3     direct your attention to slide 67.  Here we are talking

4     about, pointing out a quote from the '589 patent, which is

5     column 6, lines 3 through 13.  We highlighted in yellow a

6     portion of it.

7          It says, according to one embodiment, the panel

8     member, which is a part of the fluid handling unit,

9     essentially separates the fluidics and the external fluidics

10    section from electronics and control means in the internal

11    fluid non-fluidics section.

12         So what that is saying is that the panel member

13    separates the external fluidics section from whatever

14    electronics happen to be in the, in the non-fluidics

15    section.  It doesn't say anything about all of the

16    electronics have to be there, and, again, that would be

17    inconsistent with all the embodiments, which talk about

18    having electronics in that fluidics section.

19         The next slide 68 refers to another portion of

20    the specification.  And you can see about a third of the way

21    down, it says, said panel attachment member may, so this is

22    just one possibility of the embodiment, may be arranged so

23    that "all," the word "all" is there, "fluid connections of

24    the said modular component are arranged on a wet side panel

25    of the attachment member."

1          It says, separating them from, and notice the

2     word "all" is not there, all electrical components are

3     working on the dry side.  So this again is reinforcing

4     what we've been saying, which is that, yes, there are only

5     going to be electronic components in this, in the fluidics

6     section -- not fluidics section, excuse me, but it doesn't

7     say anything about all the electronics of the system having

8     to be in that non-fluidics section.

9          Now, again, slide 69, this is just another

10    example from the specification.  It talks about there being

11    sensors at the liquid handling panel.  That's the external

12    piece there.  That's an electronic component.  It's in the

13    slide, but I didn't mention it yet.

14         So slide 65.  That's Figure 2 which we talked

15    about earlier.  You can see a number of those components,

16    like the column valve, the pressure sensor, pressure sensor,

17    electrical component.  Those are all the other sensors that

18    are located.  Those are electrical components that are in

19    the fluidics section.

20         So I wanted to briefly address the prosecution

21    history and then I will turn it over or answer any questions

22    you have.

23         So here, Bio-Rad is arguing that there has been

24    a clear and unmistakable disavowal of claim scope, and we've

25    been through all of their quotes and whatnot from the

1    specification, and we don't think that a company, we're

2    close to being clear disavowal.

3              And if you look at slide 72 of our slide deck,

4    you can see that there are two excerpts from the Mourtada

5    reference, which is where the bulk of the discussion took

6    place.  These two portions of the figure, they were

7    reproduced in both an office action response and Bio-Rad

8    reproduced them in one of their briefs as well.  And what

9    they showed, that there is no non-fluidics section in

10   Mourtada, and that's true also for Bergstrom and for Hess.

11             This was the point that was made over and over

12   again during prosecution by the patent attorney, which is

13   that there is no non-fluidics section in this prior art.

14   And you can see that clearly in Mourtada because there's

15   this barrier, there's this wall where it is installed into.

16             And on one side, and you can see that on the

17   left-hand side of the slide, there are components and then

18   there's some tubing, which is labeled as 104, and if you

19   look at the right-hand side, there's also tubing, and what

20   is shown there is there's a pump right below that or below

21   and to the left.  And the point is, is that they HAD

22   distinguished this prior art and all the other prior art

23   and said, look, the electrical components and whatnot and

24   the fluid stuff, there's no non-fluidics section at all, so

25   therefore you can't say, you can't disallow this claim

1    over this prior art.  That point was made over and over

2    again.

3              We put one example in here, so on slide 73.

4    This is in the September 2013 office action response.

5    There's a quote and it says, thus, even if the valves, et

6    cetera, 105 and 203 were considered to be modular, there

7    were respective fluidics sections on both sides of those

8    cassettes.  In other words, the patentee was saying here and

9    they said it over and over again that there is no

10   non-fluidics section in this prior art and that's the key

11   piece.

12             Now, I'm sure when Bio-Rad comes up, because I

13   see it in their slides, they're going to be talking about

14   all of this discussion about electrical components and this,

15   that and the other thing.  But there's an important proviso

16   to that, which is that the claims that we're painting when

17   those arguments were made specifically said that the

18   non-fluidics section in term comprise electronics or

19   electrical components or control means.  We've reproduced

20   that claim in slide 74.  So it's not at all surprising

21   that the words electrical components and whatnot were

22   used.

23             But I would submit, Your Honor, that there's

24   nothing about claim 16 or any other claims that even where

25   they recite an electrical component in the claim language

1    regarding the non-fluidics section, it doesn't say anything

2    about the preclusion of any electronic components in the

3    fluidics section, and, again, that would be completely

4    inconsistent with what the patent teaches.

5              So we would submit, Your Honor, that there has

6    been no disavowal.  I think that sums up our argument.  Do

7    you have any questions for us?

8              THE COURT:  Yes.  Where are you calling from?

9              MR. MILLER:  I'm in California.

10             THE COURT:  And why are you using an Internet

11   phone?

12             MR. MILLER:  Because that's the only phone I

13   have.

14             THE COURT:  All right.  Let me hear from the

15   other side.

16             MR. BILSKER:  Good morning, Your Honor.  It's

17   David Bilsker for Bio-Rad.

18             I want to address some of the things that you

19   first raised.  One of the first points that you made was you

20   asked plaintiff why you're not treating equally the fluidics

21   and non-fluidics side and you said that was problematic.  I

22   agree.

23             What they are saying is, if electronics get wet

24   on one side, it's a problem, but if electronics gets wet on

25   another side, it's not a problem.  That doesn't make any

1    sense.  Wet electronics are a problem whether they're on one
2    side or the other.  If electronics are on one side and they
3    get wet and they are part of the module, well, that
4    electronic system is not just isolated completely on the
5    outside.  It goes to the inside as well.  That's where other
6    portions -- I mean, GE admits that there has to be
7    electronics on the inside, and it is the electronics on the
8    inside that then connect to the buff and all of those things
9    which are taught in the patent.  If I short out my
10   electronics on the outside, that short is also going to
11   carry through to the electronics on the inside.
12              THE COURT:  All right.  Don't you agree that
13   there's an embodiment in the written description which has a
14   pH electrode that is external to the housing?
15              MR. BILSKER:  There is a pH electrode which is
16   external to the housing, but that pH electrode is not part
17   of the module, and let me just go to our slides on that.
18   Sorry.  I've got to scroll to which slide it is.
19              All right.  So starting at our slide No. 62, if
20   Your Honor is there yet?
21              THE COURT:  Yes.  Okay.
22              MR. BILSKER:  All right.  So in the
23   specification it says, you've got a pH valve.  Right?  And
24   when look at the figure, Figure 2, the pH valve is what is
25   identified.

1          Now, on the pH valve, there is maybe -- there's

2     a little cup or reservoir, if you will, and in that cup or

3     reservoir one may install or connect a pH electrode to it.

4     It does not say the pH electrode is an integral part of the

5     actual pH valve module.  The pH, the electrode can be hooked

6     up to a separate monitor, like a separate computer or a

7     separate device, and it can be dipped into the reservoir on

8     the module itself.

9          So let's say that that electronic thing, that

10    electrode gets screwed up and it gets short out because it's

11    wet.  Does that travel back to the electronic in the module?

12    No.  And that's why you see in every single one of the

13    citations that they made, they actually, they actually

14    support it.

15         If you go to slide 65 where they cited some of

16    the claims that recited the pH electrode.  So it's

17    interesting to see that it never says the pH electrode is

18    part of the module.  It says it's part of the system.  And

19    there's actually, there are actually in that claim 12 that

20    we've got shown up there on slide 65, it actually says the

21    pH electrode is external to the housing.  It doesn't say

22    part of it.  It says all of it.

23         Now, if the pH electrode was part of the module,

24    the only way to communicate in any kind of electrical way

25    is, it would have to be connected to the electronics in the

 1     module, but this thing says the entire pH electrode is

 2     external.  So that supports us.  So does claim 26.  It says,

 3     the electrode is connected to a valve.  It doesn't say it's

 4     part of the valve.  And we've cited, I believe it's in the

 5     next slide, a number of cases from the Federal Circuit which

 6     says when A is connected to or attached to B, they're not

 7     the same thing.  So the electrode connected or attached to

 8     the pH valve, which is a totally separate thing, is not the

 9     pH valve, and the pH valve is what the module is.

10              Now, you know, I think one of the other -- so I

11     think I've addressed the pH electrode specifically with

12     respect to the specification, but when I get into the file

13     history, you're going to see that it absolutely, the

14     electronics cannot be on the outside.  The electronics of a

15     module cannot be on the outside.  That's not to say in the

16     system overall there can't be an electrical part which is

17     part of the system on the outside.

18              And, you know, just to address, and you can tell

19     me to shut up and move on, but this non-argument, the one

20     where non-fluidics means you can't have any fluidics, but

21     because the word non is not in the fluidics, you can have

22     electronics.

23              I mean, I think I have a slide and I took it

24     out.  It's kind of like the chicken and the egg.  Had we

25     called it electronics, then we would have called the other

1   side the non-electronics.  I mean, they took the word and

2   called the other side the non and, you know, one of the

3   things that plaintiff said was, in all the file history

4   stuff you can disregard it because the claims that were at

5   issue on the non-fluidics, we're talking about electrical

6   components specifically, I have no idea what relevance that

7   has to the issue because everyone agrees that non-fluidics

8   means exactly the same thing in all of the patents.

9            So when they were talking about electronics in

10   those claims, and the reason they were talking about

11   electronics, we think because they are part of the file

12   history.  It's not in your briefing because this is kind of

13   a new argument.  But the reason non- -- in the original

14   claims when it said non-fluidics, they had to specify

15   electronic components.  Just because they got a 112

16   rejection where the Examiner said, well, what does

17   non-fluidics mean?  I mean, that could be a solvent.  You

18   know, like the knobs.  Those are non-fluidics.

19            So what do you mean by non-fluidics?  And they

20   had to, they had to amend the claim to say, by non-fluidics,

21   we mean electrical stuff, and that's what it means

22   throughout all the claims.

23            And --

24            THE COURT:  And I realize, you know -- well, can

25   I see that?  Is that somewhere in the record before me in

1    the written brief?

2              MR. BILSKER:  It is not in the record.  What you

3    can see in Exhibit G, which is kind of like the one exhibit

4    that I'm going to point to over and over again, in Exhibit G

5    at page 1465, you will see the amendment, but I don't

6    believe that anyone put in the rejection that said you need

7    to tell me what non-fluidics means and then that's why they

8    added that in.  But, again, Your Honor, I don't think

9    there's any disagreement when we say non-fluidics, it means

10   exactly the same thing in all of the claims.

11              So the fact that they were talking about

12   electronics in the original prosecution when they were

13   referring to non-fluidics, I don't think that means that

14   somehow electronics are excluded in all the other claims

15   that say non-fluidics.  That really wouldn't make sense.

16              We can supplement the record if you want to try

17   to find -- well, I know we can find the original rejection

18   that rejected it on the 112 grounds, and I just happen to

19   remember that from long ago.  But I'm positive we didn't --

20              THE COURT:  Let me hear from the plaintiff.  I

21   think they would probably be well advised to agree with you

22   on that.

23              Do you agree, plaintiff, that non-fluidic is

24   synonymous with electrical?  Is that right?

25              MR. MILLER:  Yes, that's right.  I mean, it

1    could be more than that.

2              THE COURT:  On page 73 of the joint claim brief

3    you've got a parenthetical which says, "which has

4    non-fluidic or electrical component" when you refer to the

5    pH electrode.  So I'm going to assume then based on that and

6    your answer, which is a candid one, I think, yes, they are

7    interchangeable, to use a word we've used.  So, okay.

8              All right.  So keep going then, Bio-Rad.

9              MR. BILSKER:  It's Mr. Bilsker again.

10             So I did address the pH electrode.  You did hear

11   from plaintiff throwing out this argument that, oh, and

12   there's a bunch of other electrical components that are part

13   of modules and that are on the outside.

14             There is no evidence that those other things

15   that they identify are electronic.  For example, a pressure

16   sensor.  Are they telling us that no one ever measured

17   pressure until we got into the digital age and had an

18   electronic pressure measurement?  I think even from common

19   experience, we recognize that's not the case.

20             Every time we go to the gas station and our

21   tires are a little low and we go to fill it out and we take

22   out our trusted little, you know, tube device that fits on

23   the air nozzle and push it down and look at what the

24   pressure is, you know what the pressure is.  That is a

25   pressure sensor.  It has absolutely no electronic component

1    in it.

2              None of these things that they describe as being

3    electronic are actually described in the specification as

4    being electronic.  So I will agree that an electrode, given

5    the word electrode is electronic, but all the other, you

6    know, the other components that they rely on that are

7    electron I do not agree on and there's no evidence of that.

8              And --

9              THE COURT:  Hold on.  Give me a second to digest

10   some of the things you've said.  Hold on.

11             (Pause.)

12             THE COURT:  I'm just taking time here because as

13   I listen to the arguments, what just really calls out to me,

14   I just wonder whether there's not something that both sides

15   really should agree to here, that the --

16             MR. BILSKER:  Well, Your Honor, it's David

17   Bilsker.

18             I think both sides are in agreement that the

19   non-fluidics side does not have any fluids or liquids on it,

20   so the non-fluidics section cannot include any fluids or

21   liquids.  It's just the point that you raised, the first

22   question you asked the plaintiff.  We're not talking, you

23   know, equality here on both sides.

24             So electronics can't get wet on one side, but

25   they can get wet on the other, which I can tell you from

1   personal experience, having to use my cellphone right now,

2   my gate in the front of my house is connected to my

3   hardwired phone and it got wet outside and it shorted out

4   everything in my house on my phone, so I'm on my cellphone

5   now.  And that's the same problem we have, as you say

6   electronics can get wet on the outside of the system.

7               So I think that's the only thing we can agree

8   to, Your Honor.  I think we're in agreement that no fluids

9   in the non-fluidics section, and I think we are arguing

10  about what is in the fluidics section.  Does the fluidics

11  section allow electronics to get wet there?  There's no

12  problem, which Bio-Rad says no.  He says yes.

13              Your Honor, may I proceed or do you still want

14  time?

15              THE COURT:  Hold on.

16              (Pause.)

17              THE COURT:  Let's do this, Bio-Rad.  Let's start

18  with this.  We've got an indefinite article here, which the

19  Federal Circuit says that means one or more.

20              MR. BILSKER:  Yes.

21              THE COURT:  You're opening the door then to, and

22  that it doesn't mean all.

23              MR. BILSKER:  Well, I assume -- sorry.  I assume

24  you're referring to a section?  Is that what you are

25  referring to?

1          THE COURT:  Yes, yes.

2          MR. BILSKER:  Okay.  I can certainly address

3    that, Your Honor.

4          THE COURT:  Okay.  Go ahead.

5          MR. BILSKER:  I think it begs the question, what

6    is a section?  Is a section any fluid component or any

7    electrical component?

8          I think the argument is circular, that a

9    fluidics section means any single component.  If that's what

10   it meant, it would have said, a fluidic component and/or a

11   non-fluidic component, and I can absolutely show you as we

12   go through the statements in the file history that that is

13   not what a section means.  A section, a fluidics section,

14   means all of the fluidic components.  A non-fluidic section

15   means all of the electrical components.  And absolutely I

16   will show you that as I go through the file history.

17         May I proceed?

18         THE COURT:  Yes, but I want you to do, and it's

19   difficult with the telephone.  I'm going to let you do the

20   file history, but I want you to first walk me through your

21   best argument based on the written description and do them

22   in order of priority.

23         What's your number one piece of evidence in the

24   intrinsic evidence, in other words, and I want you to

25   prioritize written description over prosecution history.  In

1    other words, you pointed me in the written description, I

2    think, to compelling evidence that rebuts arguments made by

3    GE, but as I sit here right now, I don't have in my brain

4    where you pointed me to language which makes it clear why

5    your construction is the right construction.

6              MR. BILSKER:  Okay.  So if we go to slide 50 of

7    the Bio-Rad presentation.

8              THE COURT:  Yes.

9              MR. BILSKER:  And let me know when you are

10   there.  So slide 50 is an excerpt from column 6, lines 23 to

11   35 of the '589, and it is talking about fluidics sections,

12   non-fluidics sections.  But what you will also see in there

13   is that it says, it starts out, a panel member arranged to

14   separate the fluidics section from the non-fluidics section,

15   and then what does it go on to explain as to what those

16   mean?

17             The panel member, it goes on, said panel

18   attachment member may be arranged so that all fluid

19   connections.  So all fluid connections of a module is more

20   than just one particular component.  For example, a valve

21   has, like, six or seven ports in it many times and many

22   different tubes coming out of it.  So if you were to say,

23   well, the fluid section just means any one of those tubes,

24   that would be inconsistent with the statement.  It says, all

25   fluid connections.

1          And then it goes on to say, are arranged on a

2     wet side of the panel attachment member separating them from

3     electrical components.  It doesn't say one electrical

4     component.  It says, all electrical components of the

5     module.

6          And, you know, I will agree that the

7     specification is not explicit to say that every -- I think

8     it was assumed just because given what the purpose of the

9     invention was, which was to prevent electronics from getting

10    wet, it was you need your electronics separated from your

11    wet stuff, again, regardless of where they are.

12          I mean, again, it doesn't make sense for a

13    person of ordinary skill in the art to say, well, you can

14    get this electrical component wet and it will get screwed up

15    and that's okay, but if this other one gets wet and gets

16    screwed up, that's not okay.

17          So I don't think there's anything in the

18    specification that says it's okay to screw up some

19    electrical components with wet, but not other electrical

20    components with wet on a module itself.  And I apologize,

21    Your Honor, but this does become crystal clear when you go

22    to the file history.

23          THE COURT:  Okay.

24          MR. BILSKER:  So if that's okay, that's where

25    I'm going to go now.

```
 1                THE COURT:  Yes.  Let's go to the file history.
 2                MR. BILSKER:  So just as an overview, in slide
 3      54, we lay out the four things that the file history can
 4      show you and Your Honor can look at those.
 5                It is going to show that a section doesn't just
 6      mean you can draw a circle around any one component and
 7      claim --
 8                THE COURT:  Wait.  What did you say?  You're on
 9      what right now?  I couldn't hear.
10                MR. BILSKER:  I'm on 54.
11                THE COURT:  54?
12                MR. BILSKER:  Yes.
13                THE COURT:  All right.
14                MR. BILSKER:  So 54 is the five things that the
15      file history is going to show you, and one of the most
16      important ones is that a section, it's not just something
17      that you can draw a circle around.  You can pick one
18      component, draw --
19                THE COURT:  Hello?  Hold on.  Now you broke up.
20                MR. BILSKER:  Can you hear me?
21                THE COURT:  I can hear you now.
22                MR. BILSKER:  Okay.  Sorry.  I feel like we're
23      on that commercial.
24                So what I'm saying is, you can't just pick any
25      individual component and then draw a circle around it and
```

1    say it's a section even though it's surrounded by a bunch of

2    other different components on the same module of the same

3    type.  It's all of those are the same type that make up the

4    section.

5            So in discussing the file history, I think one

6    of the things that really stands out both in the argument

7    and in the briefing is that GE really only addresses the

8    Mourtada reference.  They completely ignore the Bergstrom

9    and the Hess discussion, and Bergstrom and Hess really do

10   drive home the points that what we're talking about is all

11   electrical components must be separated from all fluid

12   components on a module, and that's, I mean, Hess makes it

13   absolutely clear and so does Bergstrom.

14           If we go to Mourtada, you know, even if I was to

15   concede that this is only talking about fluids going to the

16   electrical side and not electric going to the fluid side,

17   well, that does happen to be the situation that was

18   illustrated in Mourtada, but I don't think there's anything

19   about the discussion that says it's okay to get electronics

20   wet when they are on the fluid side.  It just happened to be

21   the very specific thing that they were talking about in the

22   Mourtada example.

23           And, you know, one thing that's interesting, if

24   you go to slide 57, this is a diagram, this is the diagram

25   that they were actually talking about.  And on 57 you can

1    see in red, that's the 104 tubing that was going to the

2    electrical side.  You kind of see a little squiggle on the

3    top left and top right that shows that going through the

4    panel and onto the electrical side.  But what you see in

5    yellow is a bunch of other tubing that's fluidics.

6             And now, are we really -- I mean, is plaintiff

7    really saying you draw a circle around the red thing and

8    that's one section, and you draw another circle around, say,

9    the yellow that's just below the red.  That's another fluid

10   section, and a circle around the other yellow, that's

11   another one.  That's just not how anyone talked about it.

12            If we go to slide 58, here's where we start

13   getting into the other references.  This is Bergstrom.  And

14   what you can see in Bergstrom is they got rejected over

15   that.  Applicant then came back and said, wait, wait, wait,

16   wait.  In Bergstrom, what's shown on the outside of one of

17   these modules is a detector 40, and that detector has a

18   processing unit 55, which they say is very likely to be

19   electronic in nature.  And they then say, well, that can't

20   work because now you've got something electronic in nature,

21   the processing unit of the detector, right next to liquids,

22   and that is not going to work.

23            They say, you know, at the bottom there it says,

24   liquids, liquid and electronic parts sit side by side, so

25   they are not even using the word section there.  They are

1    talking about parts even though the claims were directed to

2    sections at that point.

3              If we go to the next slide, which is 59, and,

4    I'm sorry.  I'm just turning to my hard copy as well.

5              THE COURT:  So you're saying liquid and

6    electrical parts is side by side in Bergstrom.  Right?

7              MR. BILSKER:  Absolutely.

8              THE COURT:  All right.

9              MR. BILSKER:  They are saying they sit side by

10   side in Bergstrom and therefore Bergstrom doesn't anticipate

11   because in the claimed invention, fluidic and electronic

12   parts, cannot sit side by side.

13             THE COURT:  Right.  Right.

14             MR. BILSKER:  And slide 59, it's again, it's

15   another discussion of Bergstrom, and it's not -- in

16   Mourtada, the discussion was pretty limited.  It was maybe

17   two pages, but Bergstrom and Hess goes on through pages and

18   pages and they repeat the same thing many times.

19             So in slide 59 it says, modules in Bergstrom do

20   not separate their fluidic and electronic, electrical parts.

21   Then if you go onto the next part that's highlighted, again,

22   fluidic and electrical parts are not -- fluidic and

23   non-fluidic parts are not separated.  There's no suggestion

24   that you separate those.

25             And then if we go to the next slide, then it

1    becomes even more clear that when you are defining a

2    section, it's all the parts.

3            So this is Bergstrom yet again, and it's a

4    little bit weird, Your Honor, and I'm not exactly sure how

5    this happened, but in Exhibit G, if you go back to read it,

6    the pages do not appear chronologically.  It seems like they

7    were reproduced, I don't know, in some weird order.  So I'm

8    just noting that for you, because when I looked through it,

9    I had trouble finding the pages.  They are not in numerical

10   order.

11           THE COURT:  Right.

12           MR. BILSKER:  There's, like, three separate

13   sections.  But, in any event, in slide 60, what you see, it

14   says, it is clear from Bergstrom that this plug-in system

15   cannot separate fluidics and non-fluidic parts as claimed.

16   Well, the claims didn't say anything about parts.  It said

17   sections.

18           And if you keep going on, again, it says, the

19   fluidic and non-fluidic parts, I've underlined parts in red,

20   and then here's the part that shows that they're equating

21   all of the parts with a section.  The fluidic and

22   non-fluidic parts are separated by the panel member such

23   that the respective fluidics sections of the fluid handling

24   unit are external to the housing and the non and the

25   respective non-fluidics sections are internal to the

1    housing.

2                So this is what the plaintiff is saying about

3    the claimed invention.  The sections are separated because

4    all of their parts are separated.  That's how they're

5    interpreting their very own claim.

6                And then, so slide 61, which I don't really need

7    to go through that much, but this is a figure of the

8    detector in Bergstrom that they were talking about.  Forty

9    is the detector and 55 is the microprocessing unit they were

10   talking about, and those are on the outside of the module,

11   part of the module, integrated part of the module, and they

12   said that doesn't work.

13               But here is the most, I think the most salient

14   point, which was never addressed by GE and they completely

15   ignored it in the briefing and here.  This is the Hess

16   reference.  And in Hess, what the applicant said is he has

17   these boxes, and the boxes were alleged to be the modules in

18   the housing.  And what the applicant said is, hey, the

19   module in Hess, it has this electrical wire coming out of it

20   and external to the housing.  And they said, no, no, no.

21   That can't be our invention because now you've got a

22   non-fluidics part or section that is not internal to the

23   housing.

24               So you heard plaintiff say, hey, everything in

25   the file history just said there can't be fluid on the

1    non-fluid side.  Well, here's the applicant during the

2    argument, or during the prosecution saying, hey, you can't

3    have non-fluidics or electronics on the fluid side.  All of

4    your non-fluidics have to be inside the housing.  If you

5    have a part of a module that has electronics on the outside

6    where the fluidics are, that is not our invention.

7            So I think that that is the absolute most -- I

8    mean, that is dead-on, and what plaintiffs are arguing is,

9    hey, disregard it because it's not a clear disavowal.  Well,

10   I actually think it is a clear disavowal, but I also think

11   one of the points they are making, I think it was their

12   slide 21 and 22, when they were arguing about

13   interchangeability.  It's interesting that they said, well,

14   when you look at the file history to interpret something

15   when we want to interpret it, it doesn't have to be a clear

16   disavowal because it's a coined term.

17           Well, fluidics section and non-fluidics sections

18   in the context of the patent, are they standard everyday

19   terms?  I don't know.  I guess we could argue about that.  I

20   don't think it's a term that people commonly use.  I mean, I

21   think you understand what it means, but, you know, I think

22   the point about you need a clear disavowal for us, but you

23   don't need it for them I don't think is justified, but even

24   if it was, I think there is a clear disavowal when you look

25   at them saying Hess is not our invention because as part of

1    the module, you have electronics on the outside.

2              And, you know, the rest of the slides, I don't

3    know.  We've already gone through the pH valve -- excuse me,

4    the pH electrode.  But, you know, if we go to slide 67, this

5    actually goes back to the pH electrode, but I think Your

6    Honor said you've already understood that, so you don't want

7    me to go through this more.

8              But what this one said is, hey, all electronics

9    that are, that are part of a system are not necessarily part

10   of a module.  And this is in a footnote in one of the

11   discussions in Bergstrom, because the Examiner was trying to

12   say, hey, this module has electronics, and plaintiff, or GE

13   said, wait, wait, wait, wait, wait.  There's electronics,

14   but they are not part of the module.  And I think that

15   matches up perfectly with a pH electrode.

16             THE COURT:  Okay.

17             MR. BILSKER:  And you've got electronics outside

18   as not part of the module.

19             And then the rest of the slides, 68 and 69,

20   certainly, Your Honor can read those further.  You know

21   those cases.  We've already cited them.  I don't think I

22   need to go through them.

23             And then 69 just goes through this issue where

24   they say there's no clear disavowal, but they never

25   addressed Hess, and Hess is a clear disavowal.

1                    And I --

2                    THE COURT:  All right.  Let me say this.  I'm

3       in your corner right now, so let's give the plaintiff a

4       chance.

5                    MR. BILSKER:  All right.  I guess you're saying

6       rebuttal.

7                    THE COURT:  I'm sorry.  What?

8                    MR. BILSKER:  You said let's give the plaintiff

9       a chance.

10                   THE COURT:  To respond.

11                   MR. BILSKER:  Okay.

12                   THE COURT:  Let's hear -- all right.  So let's

13      hear from the plaintiff.

14                   So let's start with the pH electrode.  Okay?  I

15      came into this argument thinking I was going to rule your

16      way pretty much based on that, but right now I'm persuaded

17      that the valve and the electrode are two different things

18      and they ought to be treated as two different parts.

19                   So can you respond to that first?  Hello?

20                   MR. BILSKER:  Mr. Bilsker is still on.  I'm

21      going to put myself on mute.

22                   MR. MILLER:  I'm sorry, Your Honor.  I had

23      myself on mute.

24                   THE COURT:  Okay.

25                   MR. MILLER:  Can you hear me now?

1          THE COURT:  We can.  Thanks.  Go ahead.

2          MR. MILLER:  Okay.  Sorry about that.

3          Let me first point to Figure -- column 4.  I

4   mentioned this earlier, but this portion of the

5   specification starting at line 45 talks about this pH

6   electrode.  It says that there's an integrated flow cell

7   where the pH electrode can be installed, so there's this

8   flow cell which is integrated into the module and the pH

9   electrode is put in there.

10          So when you have a module that has, you know,

11   for example, a little connection that is integrated into

12   something and the pH electrode fits within it, that pretty

13   clearly says that it's part of the module at that point.  So

14   that would be the first point.

15          And I would like to address this business about

16   the pressure sensor and the valve and the tire gauge that

17   Mr. Bilsker referred to.  These patents, as we talked about

18   earlier, are directed to automated liquid chromatography

19   systems.  These sensors are electronic.  They are not like

20   the tire valve.  You need to have a sensor that gives a

21   reading that can feed into an electronic system.  So it's

22   going to be an electronic device.

23          So there are numerous other embodiments in the

24   patent that talk about having components on the wet side of

25   the module, and, you know, we identified those sensors, but

1    if you look at the same portion of the patent, there's a UV

2    monitor.  Obviously, that's going to be electronic.

3                 THE COURT:  All right.  So let's talk about the

4    prosecution history then.  I mean --

5                 MR. MILLER:  Okay.

6                 THE COURT:  -- I think Mr. Bilsker makes a

7    compelling argument that looks pretty clearly and

8    unequivocally, your client, or the applicant for the patent

9    I should say made clear, clearly and unequivocally, as far

10   as I'm concerned, that there are two sections, and that's

11   what differentiates this patent from Bergstrom and Hess.  So

12   why don't you walk me through your response to that.

13                MR. MILLER:  Okay.  So, first of all, I think

14   it's important to note that we don't disagree that there's

15   going to be a separation from the fluidics section and

16   non-fluidics section, but, first of all, there can be other

17   sections.

18                As you pointed out, the claim language talks

19   about a fluidics section and a non-fluidics section, and all

20   the claims use the transitional phrase comprising, which

21   means there can be other sections.

22                So even if you draw the circle --

23                THE COURT:  That wasn't how you distinguished

24   Bergstrom and Hess.  I mean, you pretty explicitly said to

25   the Examiner, hey, what makes this different is we've got

1   complete separation of the fluidic and the non-fluidic

2   section.  And, incidentally, I think that's consistent with,

3   you know, your slide, which says, hey, the phrase itself

4   tells you, there's no fluidic component in the non-fluidic

5   section.

6          MR. MILLER:  Well, our argument on non-fluidics

7   in the fluidics section, that's what I called the

8   non-fluidics section.

9          THE COURT:  As opposed to the fluidics section.

10  I mean, it's a referential definition.  Right?  It says,

11  this is a non-fluidics section as opposed to the fluidics

12  section.

13         MR. MILLER:  Well, yes, but where is the

14  negative language that says that there can't be?  I would

15  submit, Your Honor, that when it says fluidics, that just

16  means there can be fluidics components.  It doesn't say that

17  there can't be anything else.  There's going to be other

18  things.  There's going to be the pressure sensors, there's

19  going to be the UV monitors.  There's going to be all kinds

20  of other things, and the patent explicitly teaches that.

21         So why don't you turn to the prosecution

22  history.

23         So, first, let's talk about Bergstrom.  We

24  addressed Bergstrom in our brief, by the way.  I'm not sure

25  where they are coming from with that.

         1                    THE COURT:  Where in your brief?  Why don't you

         2      point to me in your brief where you address it.

         3                    MR. MILLER:  One second, please.  I need to find

         4      it.  It's on page 867.

         5                    THE COURT:  Okay.  Go ahead.

         6                    MR. MILLER:  So in Bergstrom, again, I'm looking

         7      at their slide 58.

         8                    THE COURT:  Their slide?  Okay.

         9                    MR. MILLER:  Well, they have the Bergstrom slide

        10      here.

        11                    THE COURT:  Yes.

        12                    MR. MILLER:  This is distinct in Bergstrom.

        13      Again, it says the detector also includes a processing unit.

        14      This is actually an important point.  Liquid chromatography

        15      systems have detectors in them.

        16                    As far as I know, every model of a liquid

        17      chromatography system has a detector in them and the

        18      detector is going to be on the wet side.  So our argument is

        19      actually consistent with what is being said here because it

        20      makes a distinction between a detector and it says it

        21      includes a processing unit, which is very likely to be

        22      electronic in nature.  So in the systems in the patent,

        23      there has to be a detector, and it's not going to be inside

        24      the box, because that would be a fluidics component.

        25                    THE COURT:  Right.

1          MR. MILLER:  So in Bergstrom, in that particular
2    piece of prior art, I guess they were all one piece, and so
3    it says that they're going to be -- there's going to be
4    electronic -- it says, liquid and electrical parts sit side
5    by side in the module in the baseplate.
6          So, again, what they are saying is that, hey,
7    look, there's no non-fluidics section here.  They are not
8    saying, and the word all appears nowhere in any of this
9    prosecution --
10         THE COURT:  No, but it's saying liquid and
11   electrical parts sit side by side as opposed to your
12   invention.  But your invention -- I mean, if you want to
13   buy -- you know, you are saying that, well, no, we've got
14   a pH electrode that's electric which sits by side with
15   fluidics components.  You are saying it's actually attached
16   to a fluidics component.
17         MR. MILLER:  Yes.  It's inside of something
18   that's inside of the pH module.
19         THE COURT:  How do you reconcile that with the
20   statement that says, what distinguishes and makes patentable
21   your patent is that, "liquid and electrical parts sit side
22   by side in Bergstrom but they don't in yours"?
23         MR. MILLER:  Because it's saying in the
24   non-fluidics section, there aren't going to be -- in the
25   non-fluidics section, there won't be any electronics.  It

1    doesn't say anything about what is going to be in the

2    fluidics section.  It's just saying, hey, look, we have a

3    non-fluidics section.  Your prior art does not teach a

4    non-fluidics section.  That's the distinction.  So that

5    can't arise to a clear and unmistakable disavowal because

6    they are talking about two different things.

7              What they are saying is, hey, look, you need to

8    move all of the electronics into the, into this non-fluidics

9    section.  All they were saying is like, look, what you are

10   pointing to as a non-fluidics section, it's not a

11   non-fluidics section because it has electronic components in

12   it.

13             THE COURT:  But it says, look at slide 59.  In

14   Bergstrom, the opposite is taught.  Fluid and non-fluidic

15   parts are together, and you are saying, no.  You know,

16   because of the definition you want me to adopt, you want a

17   one-way street.  You don't want to have reciprocity, so you

18   want to have non-fluidic as defined as not including

19   fluidic, but fluidic sections not defined as barring

20   non-fluidics, and yet --

21             MR. MILLER:  And -- I'm sorry.  Go ahead.

22             THE COURT:  And then to overcome the objection,

23   you say in Bergstrom the fluid and the non-fluidic parts are

24   together, which is what you want to have now in the fluidics

25   section.

 1                    MR. MILLER:  Well, but the entire discussion is

 2      about what the Examiner was saying was a non-fluidics

 3      section.

 4                    So the non-fluidics section --

 5                    THE COURT:  Show me where it is clear from the

 6      prosecution history they are only talking about a

 7      "non-fluidic section."

 8                    MR. MILLER:  Give me a moment, Your Honor.

 9                    (Pause.)

10                    MR. MILLER:  Are you looking at Exhibit D?

11                    THE COURT:  Yes, I'm there.

12                    MR. MILLER:  I think if you go to 1477.  In the

13      heat of the moment, this is all I can do right now.

14                    THE COURT:  Okay.  I'm there.

15                    MR. MILLER:  At the top there it says, wherein

16      this -- one, two, three, four, five lines down.

17                    THE COURT:  Okay.

18                    MR. MILLER:  It says, wherein the liquid

19      handling panel, the objects are arranged such that each

20      external fluidics of the unit is separated from its

21      respective modular section by the liquid handling panel.  It

22      says it is not disclosed in the prior art.

23                    So, and then they made a claim to say that the

24      fluidics section comprised electronics and electrical

25      components.  And I would submit that that is support to us,

1    right, because electronics components are explicitly recited

2    in the claim.

3              So that's what they are talking about, there's

4    no electronic components in the fluidics section.  They

5    would be crazy to do so because the specification literally

6    describes several examples where there are electronics on

7    the fluidics side.

8              MR. BILSKER:  Your Honor, I apologize for

9    interrupting, but did he say page 1477?

10             THE COURT:  Yes.

11             MR. BILSKER:  Okay.

12             MS. SKLENAR:  Your Honor, if I can just

13   interrupt for a second.  This is Ms. Sklenar.

14             If I could propose a compromise position in

15   order to address some of the comments that Your Honor has

16   made, but also try to get at the issue that I think we're

17   concerned about.

18             THE COURT:  Okay.

19             MS. SKLENAR:  If we could look at Figure 4A,

20   I can give you my proposed compromise with reference to

21   that.

22             THE COURT:  Okay.

23             MS. SKLENAR:  In light of Your Honor's comments,

24   we could agree to construction where there needs to be a

25   fluidics section with only fluidics, and that there needs to

1    be a non-fluidics section that can't have fluidics, but what

2    we're trying to preserve and carve out is this idea that

3    it's possible that there could be another section somewhere

4    on the module -- you know, not in the fluidics section, but

5    somewhere else.  For example, if we look at Figure 4A and

6    you see 28, which was the panel number, what we're trying to

7    prevent is someone from saying, we don't infringe this claim

8    if we have, say, stuck in the panel member 28 some lights.

9    So they'll say, well, there's electronics there and it's not

10   in the non-fluidics section.

11           So if Bio-Rad's construction is adopted, which

12   says all electronics for the module have to be in the

13   non-fluidics section, they would basically be excluding that

14   configuration from the claim where you got electronics

15   elsewhere but they are not in the fluidics section.

16           THE COURT:  But, see, actually, this is very

17   interesting that you propose this.  If you recall, I

18   actually led with the questions that exactly went to this

19   issue, because my first question was about, can you have, do

20   you have to have electronic components in the fluidics

21   section, because I think it's clear that the written

22   description allows for there to be non-fluidic components

23   external to the non-fluidics section.  They just, and I

24   think this is a key, they just can't be in the fluidics

25   section.

```
1              So basically, what you are saying makes sense to
2    me, I think.  Let's hear from Bio-Rad says.
3              MR. BILSKER:  Absolutely not, Your Honor.
4              THE COURT:  Why not?
5              MR. BILSKER:  Because again, it begs the
6    question.  What is a section?  They want to say you can have
7    a fluidics section, because if I have -- if I have this
8    fluid line here, I will draw a circle around this fluid line
9    and I'm going to call that a fluidics section, and then if I
10   have more fluidics on the side and they're next to
11   electronic parts, I'm not going to call those part of the
12   fluidics section.  Those are a different section.  And that
13   is completely inconsistent with the representation that they
14   made about Hess.
15             And let me just -- the reason I asked whether he
16   was pointing to page 1477 is because 1477 is talking about
17   Mourtada.  It's not talking about Bergstrom.
18             And if we go back to the slides on Hess --
19             THE COURT:  No, no.  Don't go there yet.  Let's
20   just finish up.  You see, look, if you've got --
21             MR. BILSKER:  Again, that's not what they
22   claimed.
23             THE COURT:  Just hold on a second, please.  I
24   mean, what I understand the compromise is, essentially, if
25   you agree with Bio-Rad, that if you have a non-fluidics
```

1    section, there can't be any fluidics in it, and a fluidics

2    section would mean there's no non-fluidics in it.

3            But could there be, in addition to those two

4    sections, a third section, and you could have a mix.  And as

5    I look at claim 1, for instance, of the '591 patent, it has

6    an external fluidics section.  It has to have one.  It has

7    to have an internal non-fluidics section.  So both of those

8    sections would have to exist and would have to have in one

9    case, the fluidics section, no non-fluidic component.  In

10   the second case, the non-fluidic section could not have any

11   fluidic component.

12           And then it has to have a separate section,

13   which is something distinct and different and is not within

14   those two sections, and Bio-Rad here is saying you can't

15   live with that.

16           MR. BILSKER:  Absolutely not.  Again, it begs

17   the question.  What is the section at that point?  So I have

18   a module and I have an outside part of it and I'm going to

19   split it up into little, little piles, and I'm going to say,

20   hey, I've actually got 45 different sections here on this

21   module, 45 different sections on the outside.  You know, I

22   don't -- there's a bunch of electronics, but they're all on

23   the top half.  So because they're on the top half, I'm going

24   to call only the bottom half my fluidics section and I'm not

25   going to call the top half my fluidics section, and that's

1    just not what they said during the prosecution.  The section

2    was defined as all parts of that type, and that's again, if

3    we go through slide 58, 59 --

4         THE COURT:  But I guess what I'm getting at it

5    is, I think, GE, would you agree then, would you agree to

6    Bio-Rad's construction?

7         MS. SKLENAR:  No, because our issue with their

8    construction is that it says essentially all electronics for

9    the module, for the entire module have to be in a

10   non-fluidics section.  And, again, that would allow --

11        THE COURT:  Fair enough.  So what if it just

12   said though, a section -- yes.  I mean, you know, here's

13   where I am.  I will just tell you right now.

14        So I'm not able to accept GE's position that on

15   one hand a non-fluidic section can contain fluidics.  On the

16   other hand, a fluidics section cannot contain non-fluidics.

17   On the other hand, the patent uses the indefinite article,

18   so it contemplates one or more sections, and the Federal

19   Circuit has said, understandably, that the indefinite

20   article does not mean all.

21        So that is what I find problematic about

22   Bio-Rad's construction, is they want to say all the fluidic

23   components.

24        MS. SKLENAR:  Yes.  I apologize.

25        THE COURT:  That's all right.  You know, but GE,

1    you know, I can't live with the way you want to interpret

2    it.

3                    MS. SKLENAR:  Yes.  If we can put all of our

4    cards on the table.

5                    THE COURT:  Well, that's helpful.

6                    MS. SKLENAR:  The reason we're fighting about

7    this is because Bio-Rad wants to argue for noninfringement

8    that they have some electrical components like lights that

9    are in the panel member, so neither of the sections we're

10   talking about, the fluidics or non-fluidics, but are in the

11   panel member.

12                   So, for example, what we see in Figure 4A at 28,

13   they want their construction so they can then turn around

14   and say, we don't infringe because we don't have all of our

15   electrical components in one section.  And what we're

16   submitting -- and, again, we are modifying our approach.  We

17   are willing to agree that a fluidics section cannot have

18   electronics or electrical components, but what we can't live

19   with is this notion that somehow you could get outside of

20   the scope of this claims by putting little lights in a

21   different section.

22                   THE COURT:  But that is not before you.  Right?

23   You kind of did an all-or-nothing in your proposal.  I mean,

24   it seems to me you could have been more judicious in the

25   proposal and then left this issue for trial and figure it

1    out.

2             So why don't we just step back and let's go

3    with, I'm looking at page 94 of your brief where we've got

4    the competing construction proposals for fluid handling

5    section.  Right?  And you've got a section of the

6    interchangeable fluid handling unit that includes fluidics

7    components.

8             So why don't you just change that to be

9    consistent with your construction of a non-fluidic section

10   and say that this would be a section of the interchangeable

11   fluid of the interchangeable fluid handling unit that does

12   not include electrical components.

13            MS. SKLENAR:  And we're willing to do that, Your

14   Honor.  It's the all issue we can't live with.

15            THE COURT:  Okay.  But, you know, then that's

16   fair and I think that's a legitimate complaint.  So here's

17   where I am.  That's how I'm going to interpret these terms.

18            I'm going to interpret non-fluidics section to

19   mean, "a section of the interchangeable fluid handling unit

20   that includes electrical components and does not include

21   fluidics components."

22            I'm going to construe a fluid handling section

23   to mean, "a section of the interchangeable fluid handling

24   unit that includes fluidics components and does not include

25   non-fluidics components."  And that seems to me to be the

1    most reasonable construction.  That is consistent with what

2    I think were clear and unequivocal statements to distinguish

3    this patent from Bergstrom and Hess, because the basis of

4    the distinctions to the Patent Examiner were that this

5    patent had two sections that, at least two sections, one is

6    non-fluidic, one is fluidic, that are separated completely

7    and that do not contain components of the other section.

8            That does not, however, preclude the possibility

9    that there are other sections that are in the invention, and

10   that's important because that is consistent with the use of

11   the indefinite article, which is inconsistent with Bio-Rad's

12   insistence that "all," either fluidic or non-fluidic

13   components, are in the respective handling unit.

14           So that actually seems to me is the right result

15   in this case and I'm going to construe then these last group

16   of terms in that manner.

17           All right.  Is there anything else for me to

18   construe?

19           MS. SKLENAR:  Nothing from plaintiff, Your

20   Honor.

21           MR. BILSKER:  Mr. Bilsker.  None.

22           THE COURT:  Okay.  I'm going to ask the

23   plaintiff to submit within a week from today a written order

24   of the claim chart and the basis of my rulings are set forth

25   in today's telephone conference.

1          I read the briefs carefully.  I've articulated

2     the general basis of my rulings.  I'm cognizant that there's

3     de novo review in the Federal Circuit, so that really no

4     matter what I say has really no consequence, but I

5     appreciate the briefing and the arguments of the parties

6     today.  And if you will just submit that order that is

7     consistent with my rulings today within a week, I will sign

8     it forthwith.

9          Anything else from the plaintiffs?

10         MS. SKLENAR:  Nothing, Your Honor.  Thank you so

11    much for your time.

12         THE COURT:  Anything from the defense?

13         MR. BILSKER:  I was just curious about the

14    transcript, but I guess we can handle it.

15         THE COURT:  What do you mean?

16         MR. BILSKER:  Whether we would get the

17    transcript just to make sure that the order is consistent

18    with the transcript.  I was having a little trouble writing

19    as quickly as you were speaking.

20         THE COURT:  Well, let's actually, before we

21    leave, where is there any ambiguity in what I've ruled on in

22    your mind?

23         MR. BILSKER:  I don't think there's ambiguity.

24    I just didn't have the exact words that you said.  I didn't

25    get a chance to write them down exactly.  Maybe my associate

1    did.   That's all I was saying.

2                THE COURT:   No, that's fair.   And, really, I

3    think the big point is, it is kind of the thing that

4    disturbed me from the beginning with the plaintiffs'

5    argument, is on those last two, the fluidics and the

6    non-fluidics, I just interpreted it as far as I'm concerned

7    in a manner that's consistent, and I think that Bio-Rad even

8    agreed insofar as it being consistent.   That's the big

9    distinction there.

10                So, okay.   If because of the current situation

11    you need more time to get the order in, to get the

12    transcript ready, that's fine, but at least as of now we'll

13    set it for a week from today, and the obligation will be on

14    plaintiffs to submit the proposed claim construction order.

15    Okay?

16                Everybody have a great day.   Stay safe.   Thanks

17    very much.   Bye-bye.

18                (Counsel respond, "Thank you, Your Honor.")

19                (Telephone conference concluded at 1:12 p.m.)

20                        -   -   -

21

22

23

24

25

**'**

**'124** [2] - 50:17, 55:19
**'128** [1] - 57:25
**'589** [6] - 7:20, 24:2,
24:4, 24:9, 33:6,
63:11, 64:4, 78:11
**'591** [2] - 61:24, 99:5
**'718** [1] - 50:4

**1**

**1** [10] - 12:24, 21:18,
24:9, 30:12, 32:20,
33:7, 39:3, 45:6,
61:24, 99:5
**10** [4] - 5:13, 6:4,
11:15, 15:21
**102** [1] - 52:9
**104** [2] - 66:18, 82:1
**105** [2] - 15:23, 67:6
**10:30** [2] - 1:14, 3:4
**11** [2] - 7:8, 7:9
**112** [2] - 72:15, 73:18
**1177** [1] - 42:14
**12** [2] - 8:7, 70:19
**120** [1] - 38:7
**1287** [1] - 37:21
**13** [2] - 9:11, 64:5
**130** [1] - 38:7
**1372** [2] - 38:17, 56:20
**14** [4] - 1:13, 11:12
11:14
**1465** [1] - 73:5
**1477** [4] - 95:12, 96:9,
98:16
**15** [1] - 11:18
**16** [2] - 23:23, 67:24
**18-1899-CFC** [1] -
1:10
**19** [2] - 11:25, 12:3
**1:12** [1] - 105:19

**2**

**2** [6] - 7:10, 21:18,
21:19, 21:20, 30:4,
33:24, 45:6, 65:14,
69:24
**2003** [1] - 5:18
**2013** [1] - 67:4
**2020** [1] - 1:13
**203** [1] - 67:6
**21** [2] - 35:22, 86:12
**22** [8] - 14:4, 15:14,
36:4, 36:12, 37:10,
37:12, 37:13, 86:12
**23** [2] - 16:11, 78:10
**25** [5] - 20:16, 23:2,
23:5, 38:13, 38:14

**26** [4] - 20:16, 38:24,
62:2, 71:2
**28** [4] - 39:22, 97:6.
97:8, 101:12
**29** [2] - 41:13

**3**

**3** [3] - 29:4, 29:23,
64:5
**30** [2] - 37:17, 41:18
**33** [2] - 23:1, 23:3
**34** [1] - 41:24
**35** [3] - 42:3, 43:15
78:11
**36** [1] - 42:12
**38** [5] - 37:11, 37:13,
44:21, 55:19, 57:25
**39** [2] - 33:7, 51:10
**395** [1] - 56:20

**4**

**4** [7] - 30:24, 34:11,
34:17, 63:10, 63:12,
89:3
**40** [2] - 51:22, 82:17
**41** [3] - 39:3, 55:16.
55:23
**42** [2] - 33:8, 57:6
**45** [4] - 63:12, 89:5.
99:20, 99:21
**47** [2] - 50:6, 50:13
**48** [1] - 39:8
**49** [1] - 46:6
**4A** [3] - 96:19, 97:5,
101:12

**5**

**5** [2] - 33:14, 33:25
**50** [4] - 33:8, 46:12
78:6, 78:10
**52** [1] - 33:8
**53** [1] - 33:14
**54** [5] - 33:15, 80:3,
80:10, 80:11, 80:14
**55** [2] - 82:18, 85:9
**57** [2] - 81:24, 81:25
**58** [4] - 58:10, 82:12,
92:7, 100:3
**59** [5] - 83:3, 83:14,
83:19, 94:13, 100:3

**6**

**6** [11] - 4:20, 22:8,
26:13, 32:5, 36:11,
36:14, 37:5, 37:7,
37:12, 64:5, 78:10

**60** [1] - 84:13
**61** [1] - 85:6
**62** [1] - 69:19
**63** [1] - 61:23
**64** [2] - 62:11, 63:9
**65** [3] - 65:14, 70:15,
70:20
**66** [1] - 61:2
**67** [2] - 64:3, 87:4
**68** [3] - 27:19, 64:19,
87:19
**69** [3] - 65:9, 87:19
87:23

**7**

**7** [1] - 5:6
**72** [1] - 66:3
**73** [2] - 38:17, 67:3
74:2
**74** [1] - 67:20

**8**

**8** [3] - 4:5, 7:20, 30:4
**867** [1] - 92:4
**88** [1] - 37:21

**9**

**9** [2] - 15:22, 15:23
**94** [1] - 102:3

**A**

**a.m** [2] - 1:14, 3:4
**AB** [1] - 1:5
**ability** [9] - 8:15, 9:3,
9:6, 10:3, 10:7,
10:10, 19:18, 20:23,
22:20
**able** [19] - 10:13,
10:15, 11:7, 11:9,
11:16, 11:19, 11:23,
12:13, 13:5, 16:14,
17:11, 17:12, 19:22,
21:16, 25:1, 26:17,
30:15, 53:12, 100:14
**absolute** [1] - 86:7
**absolutely** [8] - 71:13,
74:25, 77:11, 77:15,
81:13, 83:7, 98:3,
99:16
**abstract** [1] - 49:21
**abundantly** [1] - 45:2
**accept** [1] - 100:14
**According** [1] - 57:9
**according** [6] - 27:13,
31:17, 32:19, 33:25,
57:18, 64:7

**account** - 12:9
**accused** [1] - 58:11
**action** [2] - 66:7, 67:4
**ACTION** [1] - 1:4
**actual** [1] - 70:5
**add** [3] - 25:2, 25:5
25:10
**added** [1] - 73:8
**adding** [1] - 13:23
**addition** [1] - 99:3
**additional** [4] - 8:2,
25:10, 40:12, 41:8
**address** [13] - 4:14,
9:17, 16:22, 25:19,
52:14, 65:20, 68:18,
71:18, 74:10, 77:2,
89:15, 92:2, 96:15
**addressed** [4] - 71:11,
85:14, 87:25, 91:24
**addresses** [2] - 16:12,
81:7
**addressing** [1] - 35:1
**adds** [1] - 42:10
**adequate** [1] - 54:13
**admit** [2] - 10:18, 28:2
**admits** [1] - 69:6
**adopt** [2] - 48:11,
94:16
**adopted** [1] - 97:11
**advised** [1] - 73:21
**advocating** [1] - 56:24
**affected** [1] - 50:8
**age** [1] - 74:17
**ago** [2] - 48:25, 73:19
**agree** [21] - 25:25,
28:7, 31:21, 45:12,
48:4, 58:18, 58:21,
68:22, 69:12, 73:21,
73:23, 75:4, 75:7,
75:15, 76:7, 79:6,
96:24, 98:25, 100:5,
101:17
**agreed** [2] - 4:4, 105:8
**agreement** [2] - 75:18,
76:8
**agrees** [1] - 72:7
**ahead** [7] - 11:10,
31:25, 62:25, 77:4,
89:1, 92:5, 94:21
**air** [1] - 74:23
**ALAN** [1] - 2:11
**Alan** [1] - 3:17
**all-or-nothing** [1] -
101:23
**alleged** [1] - 85:17
**allow** [6] - 8:21, 9:22,
10:19, 10:24, 76:11,
100:10
**allows** [6] - 10:25,
11:1, 29:9, 29:24,

52:3, 97:22
**almost** [1] - 15:24
**alone** [3] - 29:1, 40:7,
53:4
**alternative** [1] - 12:11
**Alto** [1] - 2:7
**ambiguity** [2] -
104:21, 104:23
**ambiguous** [1] - 35:9
**amend** [1] - 72:20
**amendment** [1] - 73:5
**amount** [1] - 14:9
**ample** [1] - 45:9
**analogous** [2] - 41:14,
41:16
**analogy** [1] - 19:24
**AND** [1] - 1:2
**ANDERSON** [1] - 2:11
**Anderson** [1] - 3:17
**answer** [2] - 65:21,
74:6
**antecedent** [20] - 36:5,
36:6, 36:12, 36:18,
36:20, 36:25, 37:8,
37:14, 37:18, 37:23,
38:3, 38:5, 38:10,
41:25, 42:20, 44:6,
44:11, 44:16, 45:16,
45:23
**anticipate** [1] - 83:10
**anticipated** [1] - 52:9
**anyway** [3] - 4:12,
15:5, 63:8
**apologize** [4] - 63:3,
79:20, 96:8, 100:24
**apparatus** [3] - 15:19,
20:3, 51:12
**appear** [2] - 50:7, 84:6
**APPEARANCES** [2] -
1:18, 2:1
**applicable** [2] - 25:23,
45:22
**applicant** [5] - 82:15,
85:16, 85:18, 86:1,
90:8
**appreciate** [1] - 104:5
**approach** [1] - 101:16
**Arctic** [8] - 40:17,
40:20, 41:4, 41:12,
41:13, 41:17, 41:20
**arguably** [1] - 48:1
**argue** [8] - 19:2, 31:6,
31:7, 44:16, 49:10,
49:16, 86:19, 101:7
**argued** [1] - 44:17
**argues** [1] - 27:6
**arguing** [11] - 16:6,
26:22, 28:3, 28:21,
44:18, 45:23, 47:10
65:23, 76:9, 86:8,

86:12
**argument** [26] - 13:17, 13:18, 13:21, 17:22, 20:19, 21:3, 22:13, 22:15, 31:24, 36:5, 49:7, 54:1, 60:19, 68:6, 71:19, 72:13, 74:11, 77:8, 77:21, 81:6, 86:2, 88:15, 90:7, 91:6, 92:18, 105:5
**argument's** [1] - 22:7
**arguments** [5] - 53:14, 67:17, 75:13, 78:2, 104:5
**arise** [1] - 94:5
**ARNOLD** [2] - 2:2, 2:6
**Arnold** [2] - 3:11, 4:17
**arranged** [8] - 23:25, 34:1, 64:22, 64:24, 78:13, 78:18, 79:1, 95:19
**arrangement** [1] - 12:10
**art** [25] - 8:9, 14:8, 14:19, 15:1, 17:20, 17:22, 18:8, 18:24, 28:10, 28:15, 32:20, 33:9, 45:1, 47:16, 48:5, 52:8, 66:13, 66:22, 67:1, 67:10, 79:13, 93:2, 94:3, 95:22
**article** [4] - 76:18, 100:17, 100:20, 103:11
**articulated** [1] - 104:1
**aspect** [7] - 8:13, 13:8, 16:8, 17:19, 38:20, 48:20
**aspects** [1] - 49:2
**asserted** [4] - 38:7, 45:17, 47:8, 50:23
**asserting** [1] - 28:5
**associate** [1] - 104:25
**associated** [1] - 40:9
**assume** [4] - 22:7, 74:5, 76:23
**assumed** [1] - 79:8
**assuming** [1] - 57:22
**attached** [3] - 71:6, 71:7, 93:15
**attachment** [4] - 64:21, 64:25, 78:18, 79:2
**attention** [6] - 5:13, 35:22, 38:14, 41:23, 58:9, 64:3
**attorney** [3] - 15:12, 16:6, 66:12

**authority** [1] - 47:1
**automated** [21] - 8:10, 24:11, 27:20, 39:23, 40:2, 40:7, 46:3, 46:9, 48:16, 48:18, 48:23, 49:3, 49:23, 56:3, 56:7, 56:9, 56:14, 56:17, 56:25, 89:18
**automatic** [1] - 48:16
**automation** [1] - 49:4
**available** [1] - 39:7
**aware** [1] - 44:5

## B

**bad** [1] - 62:13
**barrier** [1] - 66:15
**barring** [1] - 94:19
**base** [1] - 37:14
**based** [5] - 47:10, 52:18, 74:5, 77:21, 88:16
**baseplate** [1] - 93:5
**basic** [1] - 4:22
**basis** [22] - 36:4, 36:5, 36:6, 36:12, 36:18, 36:20, 36:25, 37:8, 37:18, 37:23, 38:3, 38:5, 38:10, 41:25, 42:20, 44:11, 44:16, 45:16, 45:23, 103:3, 103:24, 104:2
**become** [1] - 79:21
**becomes** [2] - 12:11, 84:1
**BEFORE** [1] - 1:16
**begin** [1] - 3:23
**beginning** [1] - 105:4
**begs** [3] - 77:5, 98:5, 99:16
**behalf** [1] - 26:9
**below** [5] - 7:13, 7:14, 66:20, 82:9
**benefit** [1] - 12:10
**Bergstrom** [30] - 66:10, 81:8, 81:9, 81:13, 82:13, 82:14, 82:16, 83:6, 83:10, 83:15, 83:17, 83:19, 84:3, 84:14, 85:8, 87:11, 90:11, 90:24, 91:23, 91:24, 92:6, 92:9, 92:12, 93:1, 93:22, 94:14, 94:23, 98:17, 103:3
**best** [1] - 77:21
**better** [1] - 62:18
**between** [10] - 6:17, 16:6, 30:3, 30:21,

30:25, 31:1, 31:12, 35:19, 53:25, 92:20
**big** [3] - 5:20, 105:3, 105:8
**BILSKER** [39] - 2:15, 68:16, 69:15, 69:22, 73:2, 74:9, 75:16, 76:20, 76:23, 77:2, 77:5, 78:6, 78:9, 79:24, 80:2, 80:10, 80:12, 80:14, 80:20, 80:22, 83:7, 83:9, 83:14, 84:12, 87:17, 88:5, 88:8, 88:11, 88:20, 96:8, 96:11, 98:3, 98:5, 98:21, 99:16, 103:21, 104:13, 104:16, 104:23
**Bilsker** [8] - 3:19, 68:17, 74:9, 75:17, 88:20, 89:17, 90:6, 103:21
**BIO** [3] - 1:4, 1:5, 1:9
**Bio** [46] - 3:21, 5:9, 9:12, 9:24, 9:25, 10:1, 10:2, 10:4, 10:6, 10:19, 11:18, 12:5, 18:2, 20:19, 21:1, 22:13, 24:20, 26:9, 35:22, 44:23, 46:17, 47:4, 47:6, 48:1, 48:3, 50:18, 51:5, 57:21, 58:15, 65:23, 66:7, 67:12, 68:17, 74:8, 76:12, 76:17, 78:7, 97:11, 98:2, 98:25, 99:14, 100:6, 100:22, 101:7, 103:11, 105:7
**BIO-RAD** [1] - 1:9
**Bio-Rad** [29] - 3:21, 5:9, 9:12, 9:24, 9:25, 11:18, 12:5, 18:2, 20:19, 24:20, 26:9, 35:22, 46:17, 48:3, 50:18, 51:5, 65:23, 66:7, 67:12, 68:17, 74:8, 76:12, 76:17, 78:7, 98:2, 98:25, 99:14, 101:7, 105:7
**Bio-Rad's** [17] - 10:1, 10:2, 10:4, 10:6, 10:19, 21:1, 22:13, 44:23, 47:4, 47:6, 48:1, 57:21, 58:15, 97:11, 100:6, 100:22, 103:11
**BIO-SCIENCES** [2] - 1:4, 1:5

**bit** [2] - 39:8, 84:4
**bizarre** [1] - 21:9
**blob** [1] - 18:3
**blown** [1] - 14:5
**boards** [2] - 42:7, 42:9
**body** [14] - 36:22, 40:5, 40:10, 40:13, 40:15, 40:22, 41:7, 41:10, 42:11, 42:13, 42:17, 42:22, 43:22, 52:17
**bottom** [5] - 29:7, 35:1, 45:20, 82:23, 99:24
**boundaries** [3] - 32:25, 35:4, 35:5
**box** [1] - 92:24
**boxes** [2] - 85:17
**brain** [1] - 78:3
**breaks** [1] - 9:15
**breathe** [3] - 39:17, 43:3, 44:22
**breathes** [1] - 40:15
**brief** [22] - 3:25, 4:5, 11:19, 16:23, 23:1, 23:4, 23:12, 27:2, 27:15, 27:19, 28:4, 31:13, 36:11, 47:9, 47:12, 73:1, 74:2, 91:24, 92:1, 92:2, 102:3
**briefing** [5] - 3:25, 72:12, 81:7, 85:15, 104:5
**briefly** [3] - 5:17, 35:15, 65:20
**briefs** [3] - 31:18, 66:8, 104:1
**bring** [1] - 18:24
**broad** [6] - 18:23, 20:1, 20:6, 39:6, 49:8, 49:9
**broader** [2] - 13:12, 50:24
**broke** [7] - 15:7, 40:25, 41:2, 62:12, 62:13, 80:19
**broken** [2] - 16:1, 19:19
**buff** [1] - 69:8
**building** [1] - 43:14
**bulk** [3] - 55:22, 55:25, 66:5
**bullet** [2] - 58:12, 60:2
**bunch** [6] - 40:19, 57:1, 74:12, 81:1, 82:5, 99:22
**business** [1] - 89:15
**buy** [3] - 7:24, 8:3, 93:13

**BY** [5] - 1:20, 2:3, 2:7, 2:11, 2:15
**bye** [2] - 105:17
**bye-bye** [1] - 105:17
**bypass** [1] - 63:22

## C

**cabinet** [1] - 7:2
**California** [3] - 2:7, 2:16, 68:9
**callout** [1] - 6:7
**candid** [1] - 74:6
**cannot** [15] - 41:11, 55:5, 58:19, 58:22, 58:24, 59:17, 59:25, 60:4, 71:14, 71:15, 75:20, 83:12, 84:15, 100:16, 101:17
**capable** [10] - 27:20, 46:9, 48:13, 53:1, 53:6, 54:4, 54:25, 55:21, 55:24, 56:10
**capturing** [1] - 38:19
**cards** [2] - 7:4, 101:4
**carefully** [2] - 3:25, 104:1
**carry** [1] - 69:11
**carve** [1] - 97:2
**case** [26] - 5:5, 5:15, 37:9, 37:22, 38:7, 38:15, 40:21, 41:16, 43:19, 44:5, 44:13, 44:15, 44:18, 50:23, 51:11, 51:21, 51:23, 52:22, 53:21, 55:11, 74:19, 99:9, 99:10, 103:15
**cases** [9] - 36:11, 38:1, 41:22, 42:19, 42:25, 44:10, 52:22, 71:5, 87:21
**cassette** [4] - 14:13, 15:17, 15:23, 16:4
**cassettes** [4] - 14:12, 15:6, 15:15, 67:8
**Cat** [8] - 40:17, 40:20, 41:4, 41:12, 41:13, 41:17, 41:20
**category** [1] - 35:14
**cautionary** [1] - 8:2
**cell** [2] - 89:6, 89:8
**cellphone** [2] - 76:1, 76:4
**certain** [2] - 47:13, 49:19
**certainly** [7] - 9:4, 18:1, 41:16, 44:18, 61:11, 77:2, 87:20
**cetera** [4] - 7:15, 7:16

42:8, 67:6
**chambers** [1] - 4:19
**chance** [3] - 88:4,
88:9, 104:25
**change** [8] - 5:24, 6:1,
8:25, 11:8, 13:19,
20:3, 102:8
**changeable** [2] - 6:9,
10:14
**changing** [1] - 13:19
**characterized** [1] -
47:24
**chart** [1] - 103:24
**chassis** [1] - 22:3
**check** [1] - 62:25
**chicken** [1] - 71:24
**chromatography** [83]
- 5:19, 23:25, 24:11,
27:21, 35:20, 38:25,
39:2, 39:5, 39:7,
39:15, 39:16, 39:23,
40:2, 40:8, 41:5,
43:1, 43:12, 43:21,
44:25, 45:4, 45:8,
45:19, 46:2, 46:3,
46:10, 46:15, 47:3,
47:24, 47:25, 48:2,
48:5, 48:15, 48:20,
48:23, 48:24, 49:3,
49:9, 49:11, 49:16,
49:17, 49:22, 50:3,
51:1, 51:8, 51:18,
53:2, 53:7, 54:4,
54:5, 54:7, 54:25,
55:20, 55:22, 55:24,
56:4, 56:7, 56:10,
57:8, 57:11, 57:18,
89:18, 92:14, 92:17
**chronologically** [1] -
84:6
**circle** [6] - 80:6, 80:17,
80:25, 82:7, 82:8,
82:10, 90:22, 98:8
**circuit** [2] - 42:7, 42:9
**Circuit** [12] - 36:10,
37:1, 37:12, 51:12,
52:6, 53:21, 56:21,
58:3, 71:5, 76:19,
100:19, 104:3
**circular** [1] - 77:8
**citation** [1] - 51:11
**citations** [1] - 70:13
**cite** [4] - 44:14, 44:20,
47:14, 52:25
**cited** [8] - 36:11, 38:1,
41:23, 43:19, 44:10,
70:15, 71:4, 87:21
**cites** [2] - 31:18, 45:19
**CIVIL** [1] - 1:4
**claim** [95] - 5:1, 9:3,

10:14, 11:3, 11:5,
13:22, 13:24, 20:9,
20:24, 22:17, 22:23,
23:14, 23:15, 23:16,
23:17, 23:18, 23:21,
23:23, 24:9, 24:25,
25:6, 25:7, 25:9,
36:14, 37:10, 37:11,
37:13, 37:17, 37:21,
38:6, 38:19, 40:3,
40:10, 40:13, 40:19,
41:7, 41:13, 42:11,
42:14, 42:17, 43:1,
43:2, 43:3, 43:4,
43:21, 43:22, 43:25,
45:17, 46:10, 46:14,
47:12, 47:13, 47:14,
50:10, 50:16, 50:17,
50:19, 52:12, 53:4,
53:20, 54:10, 54:24,
55:18, 55:19, 56:19,
56:21, 57:25, 59:16,
61:24, 62:2, 65:24,
66:25, 67:20, 67:24,
67:25, 70:19, 71:2,
72:20, 74:2, 80:7,
85:5, 90:18, 95:23,
96:2, 97:7, 97:14,
99:5, 103:24, 105:14
**claimed** [7] - 38:21,
39:23, 40:1, 83:11,
84:15, 85:3, 98:22
**claims** [57] - 19:3,
20:16, 21:24, 27:15,
27:17, 29:7, 33:3,
36:7, 36:8, 36:22,
38:3, 38:4, 38:7,
39:16, 39:17, 40:5,
40:16, 40:22, 41:10,
41:17, 41:20, 42:22,
42:23, 43:2, 43:11,
43:17, 43:20, 44:1,
45:22, 49:19, 49:25,
50:4, 50:7, 50:21,
50:25, 51:12, 51:24,
52:9, 55:4, 56:22,
62:6, 67:16, 67:24,
70:16, 72:4, 72:10,
72:14, 72:22, 73:10,
73:14, 83:1, 84:16,
90:20, 101:20
**clarifies** [1] - 28:24
**clause** [2] - 56:16,
57:25
**clear** [35] - 11:22,
12:20, 16:24, 18:13,
19:17, 20:7, 35:9,
37:7, 37:22, 38:18,

41:19, 41:25, 45:2,
47:11, 60:10, 61:8,
65:24, 66:2, 78:4,
79:21, 81:13, 84:1,
84:14, 86:9, 86:10,
86:15, 86:22, 86:24,
87:24, 87:25, 90:9,
94:5, 95:5, 97:21,
103:2
**clearer** [1] - 41:18
**clearly** [9] - 33:18,
34:14, 49:14, 58:24,
66:14, 89:13, 90:7,
90:9
**client** [6] - 36:21,
36:22, 37:14, 37:22,
90:8
**cloning** [1] - 15:10
**close** [2] - 28:20, 66:2
**closely** [1] - 41:14
**cloud** [1] - 46:20
**cognizant** [1] - 104:2
**coined** [8] - 5:5, 5:9,
14:4, 14:5, 14:19,
34:24, 34:25, 86:16
**colleague** [1] - 3:18
**COLM** [1] - 1:16
**column** [15] - 12:24,
32:19, 33:7, 33:14,
33:25, 39:3, 54:7,
54:9, 54:17, 63:10,
63:12, 64:5, 65:16,
78:10, 89:3
**combination** [1] -
42:24
**coming** [3] - 78:22,
85:19, 91:25
**commenced** [1] - 3:3
**comments** [2] - 96:15,
96:23
**commercial** [1] -
80:23
**common** [4] - 14:24,
20:11, 39:25, 74:18
**commonly** [1] - 86:20
**communicate** [1] -
70:24
**company** [3] - 6:12,
7:23, 66:1
**COMPANY** [1] - 1:6
**compelling** [2] - 78:2,
90:7
**competing** [1] - 102:4
**complained** [1] - 63:6
**complaint** [1] - 102:16
**complete** [3] - 40:21,
42:21, 91:1
**completely** [8] - 41:1,
62:13, 68:3, 69:4,
81:8, 85:14, 98:13,

103:6
**complexity** [1] - 12:9
**complicated** [1] - 15:8
**component** [52] - 5:8,
6:10, 6:22, 7:12,
10:19, 14:15, 15:3,
15:4, 17:10, 18:3,
22:13, 25:13, 25:15,
25:16, 27:1, 28:10,
28:13, 29:1, 33:2,
34:16, 34:18, 42:3,
42:10, 53:3, 55:3,
62:4, 62:8, 63:15,
63:18, 64:24, 65:12,
65:17, 67:25, 74:4,
74:25, 77:6, 77:7,
77:9, 77:10, 77:11,
78:20, 79:4, 79:14,
80:6, 80:18, 80:25,
91:4, 92:24, 93:16,
99:9, 99:11
**components** [100] -
5:23, 6:13, 6:17,
6:20, 6:24, 7:6, 7:16,
7:21, 7:25, 8:15, 9:1,
9:19, 12:14, 14:21,
15:19, 17:1, 18:9,
18:24, 20:18, 20:24,
21:15, 22:2, 22:6,
22:15, 22:19, 23:9,
23:20, 24:24, 34:1,
34:7, 34:11, 34:13,
40:12, 48:14, 48:19,
49:5, 52:25, 53:6,
54:6, 54:16, 56:5,
57:15, 57:16, 58:14,
58:19, 58:22, 59:5,
59:8, 59:12, 59:20,
59:25, 60:4, 60:8,
61:3, 61:5, 65:2,
65:5, 65:15, 65:18,
66:17, 66:23, 67:14,
67:19, 67:21, 68:2,
72:6, 72:15, 74:12,
75:6, 77:14, 77:15,
79:3, 79:4, 79:19,
79:20, 81:2, 81:11,
81:12, 89:24, 91:16,
93:15, 94:11, 95:25,
96:1, 96:4, 97:20,
97:22, 100:23,
101:8, 101:15,
101:18, 102:7,
102:12, 102:20,
102:21, 102:24,
102:25, 103:7,
103:13
**comprise** [1] - 67:18
**comprised** [1] - 95:24
**comprising** [8] -

24:11, 25:8, 39:24,
40:10, 40:18, 42:8,
57:11, 90:20
**compromise** [3] -
96:14, 96:20, 98:24
**computer** [2] - 36:15,
70:6
**concede** [1] - 81:15
**concept** [5] - 4:22
6:3, 12:2, 20:6,
38:19
**concerned** [3] - 90:10,
96:17, 105:6
**concerning** [1] - 62:21
**concluded** [1] -
105:19
**conclusion** [4] - 35:5
3:3, 103:25, 105:19
**confident** [1] - 63:4
**configurable** [2] -
8:12, 9:10
**configuration** [1] -
97:14
**configurations** [3] -
12:11, 45:3, 57:14
**configured** [1] - 15:17
**confirmed** [1] - 15:20
**confused** [3] - 18:17,
23:6, 53:13
**connect** [2] - 69:8
70:3
**connected** [7] - 62:3,
63:19, 70:25, 71:3,
71:6, 71:7, 76:2
**connection** [4] -
62:12, 62:25, 63:6,
89:11
**connections** [4] -
64:23, 78:19, 78:25
**CONNOLLY** [1] - 1:16
**connotes** [1] - 54:15
**consequence** [1] -
104:4
**consider** [3] - 25:22,
26:1, 35:3
**considered** [3] - 45:2,
45:10, 67:6
**consistent** [9] - 91:2,
92:19, 102:9, 103:1,
103:10, 104:7,
104:17, 105:7, 105:8
**constitutes** [1] - 35:8
**construction** [63] -
8:13, 9:2, 10:1, 10:3,
10:4, 10:7, 10:19,
10:25, 12:17, 13:5,
13:11, 13:24, 16:13,
16:17, 16:21, 16:25,
22:4, 26:25, 27:8,

27:24, 29:4, 32:16, 32:17, 33:22, 46:8, 46:11, 46:17, 47:4, 47:6, 47:7, 47:14, 47:20, 47:22, 48:1, 48:11, 49:7, 52:23, 52:25, 53:11, 54:16, 55:10, 55:13, 55:14, 55:16, 55:18, 56:21, 56:23, 57:2, 57:17, 57:21, 58:15, 78:5, 96:24, 97:11, 100:6, 100:8, 100:22, 101:13, 102:4, 102:9, 103:1, 105:14

**constructions** [4] - 4:21, 46:7, 53:25, 58:11

**construe** [13] - 4:25, 13:21, 17:6, 18:4, 18:5, 20:7, 31:14, 31:22, 47:5, 54:3, 102:22, 103:15, 103:18

**construed** [4] - 20:5, 20:9, 46:15, 47:2

**construing** [2] - 29:18, 55:20

**consuming** [1] - 33:12

**contain** [5] - 54:19, 54:20, 100:15, 100:16, 103:7

**contemplates** [1] - 100:18

**contemplating** [2] - 33:18, 34:14

**contend** [2] - 37:17, 52:16

**contended** [1] - 37:20

**context** [4] - 12:7, 27:16, 39:11, 86:18

**continuation** [1] - 50:22

**Continued** [1] - 2:1

**contrast** [1] - 38:23

**control** [7] - 21:23, 23:25, 34:7, 48:21, 57:13, 64:10, 67:19

**controlled** [1] - 54:6

**cooler** [1] - 48:1

**copy** [1] - 83:4

**corn** [1] - 51:24

**corner** [5] - 6:21, 21:20, 30:12, 30:16, 88:3

**CORPORATION** [1] - 1:5

**correct** [5] - 18:13, 18:21, 30:23, 36:19

58:3

**CORREDOR** [39] - 2:16, 26:8, 26:24, 27:3, 27:10, 27:23, 28:12, 28:23, 29:3, 29:13, 29:16, 30:2, 30:6, 30:10, 30:23, 31:4, 31:10, 31:21, 32:1, 32:4, 32:13, 35:16, 36:20, 37:1, 37:4, 37:9, 37:19, 37:25, 38:9, 38:13, 40:4, 41:3, 43:7, 51:4, 52:15, 54:11, 55:1, 56:8, 56:18

**Corredor** [4] - 3:19, 26:9, 35:17, 51:5

**corresponds** [1] - 4:11

**CORROON** [1] - 2:11

**Counsel** [2] - 2:9, 2:18

**counsel** [6] - 3:6, 3:21, 44:23, 62:17, 62:22, 105:18

**couple** [3] - 20:14, 26:21, 64:2

**course** [2] - 4:8, 12:22

**COURT** [17] - 1:1, 3:6, 3:14, 3:22, 4:10, 8:17, 9:7, 9:21, 10:6, 10:18, 10:23, 11:10, 12:17, 12:22, 13:9, 13:14, 14:18, 14:22, 16:24, 17:4, 17:23, 18:10, 18:25, 21:11, 22:10, 22:23, 23:3, 23:6, 24:2, 24:6, 24:8, 24:13, 24:15, 24:18, 25:18, 25:21, 25:25, 26:6, 26:20, 27:2, 27:5, 27:18, 28:1, 28:20, 29:2, 29:11, 29:14, 29:22, 30:5, 30:9, 30:20, 31:3, 31:5, 31:20, 31:24, 32:3, 32:9, 32:22, 36:16, 36:24, 37:3, 37:6, 37:16, 37:24, 38:8, 38:12, 39:21, 40:25, 43:6, 43:8, 43:16, 45:12, 46:18, 48:16, 48:22, 49:20, 50:12, 50:14, 51:2, 52:13, 53:13, 54:19, 56:2, 56:15, 57:23, 58:17, 58:21, 59:3, 59:7, 59:10, 59:23, 60:12, 60:18, 60:21, 61:10, 61:13, 61:16, 61:20, 62:12,

62:15, 62:17, 68:8, 68:10, 68:14, 69:12, 69:21, 72:24, 73:20, 74:2, 75:9, 75:12, 76:15, 76:17, 76:21, 77:1, 77:4, 77:18, 78:8, 79:23, 80:1, 80:8, 80:11, 80:13, 80:19, 80:21, 83:5, 83:8, 83:13, 84:11, 87:16, 88:2, 88:7, 88:10, 88:12, 88:24, 89:1, 90:3, 90:6, 90:23, 91:9, 92:1, 92:5, 92:8, 92:11, 92:25, 93:10, 93:19, 94:13, 94:22, 95:5, 95:11, 95:14, 95:17, 96:10, 96:18, 98:22, 97:16, 98:4, 98:19, 98:23, 100:4, 100:11, 100:25, 101:5, 101:22, 102:15, 103:22, 104:12, 104:15, 104:20, 105:2

**court** [1] - 63:1

**Court** [5] - 1:25, 35:2, 47:1, 48:10, 51:5

**cover** [2] - 10:4, 51:12

**covers** [1] - 49:7

**crazy** [2] - 25:6, 96:5

**crystal** [1] - 79:21

**cumbersome** [1] - 5:25

**cup** [2] - 70:2

**curious** [1] - 104:13

**current** [1] - 105:10

**customer** [2] - 6:12, 7:22

**customize** [2] - 9:18, 34:6

**Cytiva** [2] - 5:11, 8:4

# D

**D.C** [1] - 2:3

**DAVID** [2] - 2:12, 2:15

**David** [4] - 3:18, 3:19, 68:17, 75:16

**de** [1] - 104:3

**dead** [1] - 86:8

**dead-on** [1] - 86:8

**deal** [1] - 47:24

**dealing** [2] - 55:4, 62:19

**decide** [1] - 54:3

**decided** [3] - 36:15, 53:15, 53:23

**deciding** [2] - 18:18,

37:12

**decision** [7] - 19:11, 26:1, 44:17, 45:24, 46:13, 46:14, 50:21

**deck** [6] - 4:18, 29:4, 30:4, 35:22, 58:10, 66:3

**declaration** [1] - 47:15

**defect** [1] - 33:10

**defective** [3] - 12:25, 33:11, 34:19

**Defendant** [2] - 1:10 2:18

**defendant** [1] - 3:17

**defense** [3] - 3:15 35:15, 104:12

**defies** [1] - 23:17

**defined** [6] - 40:10, 40:21, 42:21, 94:18, 94:19, 100:2

**defining** [1] - 84:1

**definitely** [1] - 49:4

**definition** [7] - 25:13, 25:15, 28:16, 29:22, 47:11, 91:10, 94:16

**degraded** [1] - 63:7

**degree** [1] - 34:25

**DELAWARE** [1] - 1:2

**Delaware** [2] - 1:13, 62:22

**delicate** [2] - 33:12, 33:13

**deliver** [3] - 53:7, 54:6, 54:16

**demonstrates** [3] - 12:12, 14:1, 62:5

**dependent** [7] - 36:7, 38:6, 43:17, 43:20, 44:1, 44:7, 62:6

**depicted** [2] - 37:13, 42:18

**describe** [1] - 75:2

**described** [4] - 20:10, 33:12, 50:1, 75:3

**describes** [1] - 96:6

**description** [11] - 8:19, 33:5, 33:12, 35:12, 45:14, 45:19, 69:13, 77:21, 77:25, 78:1, 97:22

**design** [3] - 21:7 21:12, 23:10

**design-around** [1] - 23:10

**designed** [4] - 13:1, 32:19, 33:8, 34:2

**detector** [10] - 82:17, 82:21, 85:8, 85:9, 92:13, 92:17, 92:18, 92:20, 92:23

**detectors** [2] - 48:7, 92:15

**determine** [1] - 27:13

**developed** [1] - 6:2

**developing** [1] - 5:17

**deviate** [1] - 35:24

**device** [10] - 36:21, 36:22, 37:14, 37:22, 51:12, 51:13, 70:7, 74:22, 89:22

**diagram** [2] - 81:24

**dictionary** [1] - 28:15

**differ** [1] - 48:24

**difference** [8] - 16:6, 30:3, 30:6, 30:21, 30:25, 31:16, 53:24

**different** [54] - 5:25, 7:6, 7:16, 7:17, 7:21, 8:16, 8:20, 8:21, 10:8, 10:13, 10:20, 11:1, 11:9, 11:24, 12:15, 17:1, 17:13, 17:14, 18:8, 19:7, 19:8, 20:23, 21:6, 21:17, 22:3, 22:13, 25:24, 29:12, 29:15, 29:25, 32:11, 32:14, 33:3, 33:4, 35:6, 36:1, 46:6, 46:19, 46:23, 47:7, 48:22, 57:13, 78:22, 81:2, 88:17, 88:18, 90:25, 94:6, 98:12, 99:13, 99:20, 99:21, 101:21

**differentiates** [1] - 90:11

**differently** [1] - 15:17

**differs** [1] - 34:12

**difficult** [3] - 5:20, 53:18, 77:19

**digest** [1] - 75:9

**digital** [1] - 74:17

**dipped** [1] - 70:7

**direct** [5] - 41:23, 57:6, 58:9, 63:20, 64:3

**directed** [3] - 54:24 83:1, 89:18

**disagree** [1] - 90:14

**disagreement** [1] - 73:9

**disallow** [1] - 66:25

**disavowal** [12] - 14:5, 65:24, 66:2, 68:6, 86:9, 86:10, 86:16, 86:22, 86:24, 87:24 87:25, 94:5

**disclaimer** [1] - 5:3

**disclosed** [3] - 12:9, 34:13, 95:22

**discloses** [1] - 60:7
**disclosure** [1] - 49:15
**discussed** [5] - 16:9, 33:24, 35:12, 39:10, 57:7
**discusses** [1] - 57:5
**discussing** [3] - 26:14, 32:2, 81:5
**discussion** [10] - 27:16, 29:5, 35:10, 66:5, 67:14, 81:9, 81:19, 83:15, 83:16, 95:1
**discussions** [1] - 87:11
**dispensing** [2] - 51:23, 52:1
**dispositive** [1] - 61:1
**dispute** [5] - 31:1, 31:12, 32:9, 35:19, 62:7
**disputed** [1] - 32:25
**disregard** [3] - 44:7, 72:4, 86:9
**distinct** [2] - 92:12, 99:13
**distinction** [4] - 44:6, 92:20, 94:4, 105:9
**distinctions** [1] - 103:4
**distinguish** [1] - 103:2
**distinguished** [3] - 17:21, 66:22, 90:23
**distinguishes** [2] - 42:18, 93:20
**distinguishing** [4] - 14:7, 15:13, 35:7, 42:1
**DISTRICT** [2] - 1:1, 1:2
**disturbed** [1] - 105:4
**done** [1] - 47:15
**door** [1] - 76:21
**double** [1] - 58:23
**doubt** [1] - 12:23
**down** [5] - 39:8, 64:21, 74:23, 95:16, 104:25
**drafting** [1] - 49:24
**draw** [9] - 19:23, 80:6, 80:17, 80:18, 80:25, 82:7, 82:8, 90:22, 98:8
**drawbacks** [1] - 39:10
**drawings** [1] - 15:20
**drive** [1] - 81:10
**dry** [1] - 65:3
**during** [8] - 14:25, 16:5, 26:12, 35:8, 66:12, 86:1, 86:2, 100:1

**E**

**e-mailed** [1] - 4:19
**early** [1] - 5:19
**easier** [3] - 7:1, 7:3, 21:19
**egg** [1] - 71:24
**eight** [5] - 20:22, 20:23, 21:1, 21:5
**either** [7] - 15:25, 32:15, 48:9, 48:10, 54:4, 103:12
**electric** [3] - 56:5, 81:16, 93:14
**ELECTRIC** [1] - 1:6
**electrical** [46] - 48:19, 49:5, 58:14, 60:8, 63:14, 63:18, 65:2, 65:17, 65:18, 66:23, 67:14, 67:19, 67:21, 67:25, 70:24, 71:16, 72:5, 72:21, 73:24, 74:4, 74:12, 77:7, 77:15, 79:3, 79:4, 79:14, 79:19, 81:11, 81:16, 82:2, 82:4, 83:6, 83:20, 83:22, 85:19, 93:4, 93:11, 93:21, 95:24, 101:8, 101:15, 101:18, 102:12, 102:20
**Electro** [1] - 42:2
**electrode** [37] - 60:17, 60:18, 61:22, 62:2, 62:3, 62:7, 63:21, 63:24, 69:14, 69:15, 69:16, 70:3, 70:4, 70:5, 70:10, 70:16, 70:17, 70:21, 70:23, 71:1, 71:3, 71:7, 71:11, 74:5, 74:10, 75:4, 75:5, 87:4, 87:5, 87:15, 88:14, 88:17, 89:6, 89:7, 89:9, 89:12, 93:14
**electron** [1] - 75:7
**electronic** [30] - 42:7, 62:7, 65:5, 65:12, 68:2, 69:4, 70:9, 70:11, 72:15, 74:15, 74:18, 74:25, 75:3, 75:4, 75:5, 82:19, 82:20, 82:24, 83:11, 83:20, 89:19, 89:21, 89:22, 90:2, 92:22, 93:4, 94:11, 96:4, 97:20, 98:11
**electronics** [49] - 61:19, 64:10, 64:14, 64:16, 64:18, 65:7, 67:18, 68:23, 68:24, 69:1, 69:2, 69:7, 69:10, 69:11, 70:25, 71:14, 71:22, 71:25, 72:1, 72:9, 72:11, 73:12, 73:14, 75:24, 76:6, 76:11, 79:9, 79:10, 81:19, 86:3, 86:5, 87:1, 87:8, 87:12, 87:13, 87:17, 93:25, 94:8, 95:24, 96:1, 96:6, 97:9, 97:12, 97:14, 99:22, 100:8, 101:18
**element** [4] - 11:3, 11:4, 19:23, 52:2
**elsewhere** [1] - 97:15
**EMANUEL** [1] - 2:15
**Emanuel** [1] - 3:20
**embodiment** [5] - 7:18, 57:9, 64:7, 64:22, 69:13
**embodiments** [7] - 6:5, 13:15, 33:23, 34:22, 45:7, 64:17, 89:23
**end** [1] - 52:3
**enforces** [1] - 63:14
**English** [1] - 61:7
**entire** [7] - 12:6, 15:24, 63:11, 63:13, 71:1, 95:1, 100:9
**entitled** [1] - 50:24
**equality** [1] - 75:23
**equally** [2] - 59:14, 68:20
**equating** [1] - 84:20
**escapes** [1] - 19:24
**especially** [8] - 20:10, 38:2, 40:21, 41:14, 55:3, 61:17, 62:22
**ESQ** [7] - 1:20, 2:3, 2:7, 2:11, 2:12, 2:15, 2:16
**essentially** [4] - 34:21, 64:9, 98:24, 100:8
**et** [4] - 7:15, 7:16, 42:8, 67:5
**event** [1] - 84:13
**everyday** [1] - 86:18
**evidence** [12] - 5:7, 5:10, 32:24, 33:1, 35:3, 35:11, 45:9, 74:14, 75:7, 77:23, 77:24, 78:2
**evident** [5] - 12:11, 59:24, 60:3, 60:22, 61:2
**exact** [3] - 17:22, 34:16, 104:24
**exactly** [7] - 32:13, 45:13, 72:8, 73:10, 84:4, 97:18, 104:25
**Examiner** [9] - 14:13, 14:22, 14:24, 14:25, 72:16, 87:11, 90:25, 95:2, 103:4
**example** [23] - 6:21, 15:21, 15:22, 16:14, 21:18, 30:4, 30:11, 34:8, 40:17, 41:18, 45:20, 46:25, 49:2, 60:15, 61:23, 65:10, 67:3, 74:15, 78:20, 81:22, 89:11, 97:5, 101:12
**examples** [3] - 60:17, 61:18, 96:6
**except** [1] - 43:17
**excerpt** [4] - 8:18, 11:19, 14:3, 78:10
**excerpted** [1] - 7:19
**excerpts** [2] - 45:5, 66:4
**exchange** [2] - 34:15, 34:16
**exchangeable** [1] - 15:16
**exchanged** [3] - 29:10, 29:24, 33:19
**exclude** [3] - 10:21, 16:17, 33:23
**excluded** [3] - 11:4, 16:20, 73:14
**excluding** [1] - 97:13
**exclusively** [1] - 13:18
**excuse** [7] - 4:16, 10:2, 15:22, 21:22, 28:9, 65:6, 87:3
**exhibit** [2] - 14:11, 73:3
**Exhibit** [7] - 14:11, 15:5, 15:14, 73:3, 73:4, 84:5, 95:10
**exist** [2] - 22:24, 99:8
**exists** [1] - 28:10
**experience** [2] - 74:19, 76:1
**experiment** [2] - 6:14, 6:16
**experimental** [1] - 34:9
**experiments** [1] - 5:25
**experts** [1] - 19:13
**explain** [1] - 78:15
**explained** [2] - 35:4, 46:16
**explaining** [1] - 48:12
**explicit** [1] - 79:7
**explicitly** [5] - 27:4, 27:8, 90:24, 91:20, 96:1
**extent** [2] - 52:16, 52:19, 53:10
**external** [18] - 59:12, 59:13, 61:25, 62:2, 62:8, 63:15, 64:9, 64:13, 65:11, 69:14, 69:16, 70:21, 71:2, 84:24, 85:20, 95:20, 97:23, 99:6
**extraordinarily** [1] - 18:23
**extremely** [2] - 5:20, 41:15

**F**

**F.3d** [1] - 56:20
**facility** [2] - 8:5, 8:25
**fact** [9] - 20:2, 25:14, 28:15, 32:5, 43:20, 49:3, 50:3, 55:7, 73:11
**fails** [1] - 44:8
**fair** [5] - 14:9, 17:21, 100:11, 102:16, 105:2
**fairness** [1] - 18:17
**fall** [1] - 23:13
**far** [4] - 22:8, 90:9, 92:16, 105:6
**fashioned** [1] - 49:1
**favor** [3] - 32:23, 55:15, 57:21
**feature** [2] - 17:17, 42:1
**features** [4] - 17:10, 18:6, 40:12, 41:7
**Federal** [12] - 36:10, 37:1, 37:11, 51:11, 52:6, 53:21, 56:21, 58:2, 71:5, 76:19, 100:18, 104:3
**feed** [1] - 89:21
**FELIPE** [1] - 2:16
**Felipe** [4] - 3:19, 26:8, 35:16, 51:5
**few** [3] - 36:7, 38:5, 41:22
**field** [3] - 4:23, 5:21, 47:17
**fifth** [3] - 25:2, 25:5, 25:14
**fighting** [1] - 101:6
**figure** [8] - 5:14, 6:15, 21:13, 53:24, 66:6, 69:24, 85:7, 101:25
**Figure** [21] - 7:10, 7:20, 11:12, 11:15,

15:21, 15:22, 15:23,
21:18, 21:19, 21:20,
30:4, 33:24, 45:6,
65:14, 69:24, 89:3,
96:19, 97:5, 101:12
**figures** [1] - 30:3
**file** [13] - 71:12, 72:3,
72:11, 77:12, 77:16,
77:20, 79:22, 80:1,
80:3, 80:15, 81:5,
85:25, 86:14
**fill** [1] - 74:21
**finalize** [1] - 6:16
**fine** [5] - 13:23, 18:6,
24:22, 32:15, 105:12
**finish** [1] - 98:20
**first** [21] - 4:6, 4:15,
6:18, 9:13, 36:4,
46:4, 47:12, 54:18,
58:6, 63:13, 68:19,
75:21, 77:20, 88:19,
89:3, 89:14, 90:13,
90:16, 91:23, 97:19
**fit** [1] - 8:4
**fits** [2] - 74:22, 89:12
**five** [5] - 5:14, 24:22,
80:14, 95:16
**fixed** [2] - 21:7, 22:12
**flexible** [2] - 8:11, 9:9
**flip** [2] - 13:17, 59:7
**flow** [11] - 11:16,
11:21, 11:23, 17:13
54:7, 63:17, 63:20,
63:21, 89:6, 89:8
**flowthrough** [1] - 24:1
**fluid** [60] - 6:9, 6:20,
8:10, 8:11, 11:16,
11:21, 11:23, 12:11
12:25, 17:13, 23:25
24:12, 24:16, 34:7,
34:8, 39:10, 45:20,
47:23, 49:23, 50:2,
54:5, 54:6, 57:10,
57:13, 58:14, 60:7,
62:1, 62:8, 63:15,
63:21, 63:24, 64:8,
64:11, 64:23, 66:24,
77:6, 78:18, 78:19,
78:23, 78:25, 81:11,
81:16, 81:20, 82:9,
84:23, 85:25, 86:1,
86:3, 94:14, 94:23,
98:8, 102:4, 102:6,
102:11, 102:19,
102:22, 102:23
**fluidic** [39] - 60:4,
61:5, 73:23, 74:4,
77:10, 77:11, 77:14
83:11, 83:20, 83:22
83:23, 84:15, 84:19

84:21, 84:22, 91:1,
91:4, 94:14, 94:18,
94:19, 94:23, 95:7,
97:22, 99:9, 99:10,
99:11, 100:15,
100:22, 102:9,
103:6, 103:12
**fluidics** [170] - 58:5,
58:13, 58:18, 58:19,
58:21, 58:22, 58:25,
59:1, 59:2, 59:4,
59:5, 59:8, 59:11,
59:12, 59:13, 59:17,
59:18, 59:19, 59:21,
59:24, 59:25, 60:3,
60:9, 60:10, 60:12,
60:14, 60:23, 60:24,
61:2, 61:3, 61:4,
61:6, 61:8, 61:9,
61:11, 61:12, 61:19,
61:25, 63:25, 64:9,
64:11, 64:13, 64:14,
64:18, 65:5, 65:6,
65:8, 65:19, 66:9,
66:13, 66:24, 67:7,
67:10, 67:18, 68:1,
68:3, 68:20, 68:21,
71:20, 71:21, 72:5,
72:7, 72:14, 72:17,
72:18, 72:19, 72:20,
73:7, 73:9, 73:13,
73:15, 75:19, 75:20,
76:9, 76:10, 77:9,
77:13, 78:11, 78:12,
78:14, 82:5, 84:15,
84:23, 84:25, 85:22,
86:3, 86:4, 86:6,
86:17, 90:15, 90:16,
90:19, 91:6, 91:7,
91:8, 91:9, 91:11,
91:15, 91:16, 92:24,
93:7, 93:15, 93:16,
93:24, 93:25, 94:2,
94:3, 94:4, 94:8,
94:10, 94:11, 94:20,
94:24, 95:2, 95:4,
95:20, 95:24, 96:4,
96:7, 96:25, 97:1,
97:4, 97:10, 97:13,
97:15, 97:20, 97:23,
97:24, 98:7, 98:9,
98:10, 98:12, 98:25,
99:1, 99:2, 99:6,
99:7, 99:9, 99:24,
99:25, 100:10,
100:15, 100:16,
101:10, 101:17,
102:6, 102:18,
102:21, 102:24,
102:25, 105:5, 105:6
**fluids** [4] - 75:19,

75:20, 76:8, 81:15
**focus** [5] - 9:13,
21:24, 23:23, 39:13,
41:16
**focused** [1] - 17:18
**focusing** [2] - 17:12,
18:7
**folks** [1] - 62:20
**follow** [1] - 46:14
**following** [1] - 35:18
**follows** [2] - 9:17, 40:1
**footnote** [1] - 87:10
**FOR** [1] - 1:2
**form** [2] - 45:8, 57:10
**formed** [1] - 62:3
**forth** [4] - 35:11, 52:4,
53:5, 103:24
**forthwith** [1] - 104:8
**forty** [1] - 85:8
**Fought** [1] - 42:12
**four** [12] - 6:19, 6:22,
20:18, 23:15, 23:16,
24:12, 24:21, 24:23,
25:5, 25:12, 80:3,
95:16
**fourth** [2] - 4:7, 4:15
**Francisco** [1] - 2:16
**frankly** [7] - 13:23,
17:6, 17:20, 21:3,
22:20, 47:5, 62:21
**front** [2] - 6:6, 76:2
**full** [1] - 14:5
**full-blown** [1] - 14:5
**function** [2] - 12:21,
12:23
**functionalities** [1] -
33:20
**functionality** [23] -
5:24, 7:17, 8:16,
8:20, 8:22, 9:16,
10:8, 10:20, 11:1,
11:9, 13:19, 16:3,
17:1, 17:14, 31:8,
32:11, 32:14, 32:15,
33:3, 33:4, 33:20,
34:17, 35:6
**functions** [4] - 18:8,
19:7, 19:9, 19:18

## G

**gas** [1] - 74:20
**gate** [1] - 76:2
**gauge** [1] - 89:16
**GCS's** [1] - 52:25
**GE** [17] - 1:4, 1:5,
5:11, 5:17, 8:5,
27:19, 28:15, 44:24,
45:2, 54:23, 69:6,
78:3, 81:7, 85:14,

87:12, 100:5, 100:25
**GE's** [1] - 100:14
**GENERAL** [1] - 1:6
**general** [2] - 35:25,
104:2
**generally** [1] - 5:22
**generic** [1] - 49:25
**giant** [2] - 14:12,
15:23
**given** [4] - 32:9, 46:10,
75:4, 79:8
**govern** [1] - 48:20
**grant** [1] - 50:18
**gravity** [2] - 49:2, 56:5
**great** [1] - 105:16
**green** [2] - 12:8
**grounds** [1] - 73:18
**groundwork** [1] - 5:15
**group** [1] - 103:15
**grouping** [3] - 4:6
4:8, 4:15
**groupings** [1] - 4:5
**guess** [14] - 33:11,
35:19, 53:13, 54:8,
54:19, 56:6, 56:20,
57:17, 63:6, 86:19,
88:5, 93:2, 100:4,
104:14
**Gunning** [1] - 1:24

## H

**HAD** [1] - 66:21
**half** [4] - 99:23, 99:24,
99:25
**hand** [11] - 6:21, 7:19,
16:15, 16:20, 21:20,
22:8, 66:17, 66:19,
100:15, 100:16,
100:17
**handle** [1] - 104:14
**handling** [39] - 8:10,
8:11, 9:19, 12:25,
24:12, 24:16, 31:14,
33:11, 34:1, 34:2,
34:7, 39:4, 39:10,
40:11, 45:20, 47:23,
49:14, 49:23, 50:2,
54:5, 57:10, 58:14,
60:8, 62:1, 62:8,
63:16, 63:25, 64:8,
65:11, 84:23, 95:19,
95:21, 102:4, 102:6,
102:11, 102:19,
102:22, 102:23,
103:13
**happy** [1] - 4:8
**hard** [5] - 30:20,
39:21, 53:18, 63:1,
83:4

**hardwired** [1] - 76:3
**head** [2] - 13:17, 26:11
**HEALTHCARE** [2] -
1:4, 1:5
**hear** [19] - 14:8, 26:6,
31:7, 35:15, 43:8,
46:3, 51:2, 58:5,
62:14, 68:14, 73:20,
74:10, 80:9, 80:20,
80:21, 88:12, 88:13,
88:25, 98:2
**heard** [6] - 17:9,
19:14, 44:23, 51:6,
57:4, 85:24
**hearing** [1] - 9:12
**heart** [1] - 50:24
**heat** [1] - 95:13
**heavily** [2] - 12:6,
34:23
**held** [9] - 50:10, 50:15,
51:12, 51:20, 52:6
**hello** [2] - 80:19, 88:19
**help** [4] - 11:13, 12:1,
30:2, 48:20
**helpful** [1] - 101:5
**helps** [3] - 5:16, 12:1,
54:3
**Hess** [16] - 66:10,
81:9, 81:12, 83:17,
85:15, 85:16, 85:19,
86:25, 87:25, 90:11
90:24, 98:14, 98:18
103:3
**Hewlett** [2] - 51:11,
55:5
**Hewlett-Packard** [2] -
51:11, 55:5
**high** [1] - 57:11
**highlighted** [6] - 12:4,
45:15, 51:24, 55:23,
64:5, 83:21
**highlights** [4] - 7:9.
8:8, 8:13, 58:11
**highly** [2] - 8:11, 9:9
**history** [24] - 5:1, 11:6,
13:25, 14:6, 19:6,
35:8, 65:21, 71:13,
72:3, 72:12, 77:12,
77:16, 77:20, 77:25,
79:22, 80:1, 80:3,
80:15, 81:5, 85:25,
86:14, 90:4, 91:22,
95:6
**hit** [3] - 26:10, 28:17
**hold** [7] - 23:3, 58:18,
75:9, 75:10, 76:15,
80:19, 98:23
**home** [1] - 81:10
**honest** [1] - 53:17
**Honor** [52] - 3:9, 3:16,

4:2, 4:9, 4:17, 11:13, 12:1, 18:5, 18:22, 26:8, 26:10, 31:22, 35:16, 35:19, 43:7, 43:9, 44:12, 46:5, 46:22, 47:5, 49:6, 51:4, 54:14, 55:7, 58:7, 58:20, 63:3, 67:23, 68:5, 68:16, 69:20, 73:8, 75:16, 76:8, 76:13, 77:3, 79:21, 80:4, 84:4, 87:6, 87:20, 88:22, 91:15, 95:8, 96:8, 96:12, 96:15, 98:3, 102:14, 103:20, 104:10, 105:18

**Honor's** [3] - 41:15, 52:18, 96:23

**HONORABLE** [1] - 1:16

**hooked** [1] - 70:5

**house** [3] - 3:20, 76:2, 76:4

**housing** [18] - 7:2, 21:17, 24:12, 29:19 29:21, 30:1, 40:11, 57:11, 62:2, 69:14, 69:16, 70:21, 84:24 85:1, 85:18, 85:20, 85:23, 86:4

**hypo** [2] - 24:15, 24:17

**hypothetical** [1] - 23:8

### I

**idea** [3] - 40:8, 72:6, 97:2

**identified** [2] - 69:25, 89:25

**identify** [1] - 74:15

**ignore** [2] - 20:1, 81:8

**ignored** [1] - 85:15

**illustrated** [2] - 55:16, 81:18

**images** [1] - 38:19

**implemented** [2] - 36:15, 42:6

**importance** [1] - 11:7

**important** [31] - 8:14, 12:21, 12:23, 13:2, 13:7, 13:8, 16:8, 17:10, 17:15, 17:19. 18:6, 18:12, 19:18, 19:21, 20:12, 32:21. 36:6, 38:15, 38:20, 41:10, 43:11, 45:15. 51:13, 52:21, 64:1, 67:15, 80:16, 90:14 92:14, 103:10

**importantly** [2] - 5:2, 37:25

**improved** [3] - 9:14, 33:17, 34:5

**IN** [2] - 1:1, 1:2

**in-house** [1] - 3:20

**INC** [1] - 1:9

**incidentally** [1] - 91:2

**inclined** [2] - 31:22, 52:19

**include** [6] - 28:17, 34:11, 75:20, 102:12, 102:20, 102:24

**includes** [6] - 26:19, 92:13, 92:21, 102:6, 102:20, 102:24

**including** [1] - 94:18

**inconsistent** [6] - 60:6, 64:17, 68:4, 78:24, 98:13, 103:11

**indefinite** [5] - 53:3, 76:18, 100:17, 100:19, 103:11

**independent** [9] - 36:8, 38:3, 38:4, 38:18, 42:22, 43:25, 44:2, 44:3, 44:8

**indicates** [1] - 42:25

**indicating** [1] - 42:13

**indirect** [1] - 63:6

**individual** [1] - 80:25

**individualized** [1] - 6:9

**Industries** [1] - 42:2

**informative** [1] - 45:24

**infringe** [3] - 25:17, 97:7, 101:14

**infringement** [5] - 18:11, 18:15, 18:19, 25:4, 25:11

**inherent** [1] - 51:17

**inlet** [6] - 7:12, 7:14, 7:15, 16:15, 21:21, 22:8

**insert** [1] - 15:11

**inserted** [3] - 29:18 29:20, 29:25

**inside** [10] - 21:17, 22:3, 69:5, 69:7, 69:8, 69:11, 86:4, 92:23, 93:17, 93:18

**insistence** [1] - 103:12

**insists** [1] - 34:24

**insofar** [2] - 53:14, 105:8

**install** [2] - 5:22, 70:3

**installed** [2] - 66:15, 89:7

**instance** [2] - 27:19, 99:5

**instances** [1] - 45:18

**instituted** [1] - 49:19

**institution** [1] - 50:18

**instructing** [1] - 17:15

**integral** [1] - 70:4

**integrated** [4] - 85:11, 89:6, 89:8, 89:11

**interchange** [2] - 10:13, 13:6

**interchangeability** [20] - 3:24, 4:11, 6:3, 9:14, 12:2, 13:22, 16:7, 16:8, 16:13, 16:25, 18:8, 26:18, 30:14, 30:18, 33:16, 34:4, 39:12, 39:14, 86:13

**interchangeable** [52] - 5:8, 6:9, 6:19, 6:21, 7:12, 7:25, 8:14, 10:15, 12:14, 14:14, 14:21, 15:2, 15:4, 15:19, 17:9, 18:3, 20:18, 20:20, 20:24, 21:2, 21:15, 22:2, 22:5, 22:14, 23:9, 23:16, 23:19, 25:1, 25:13, 25:16, 27:1, 28:8, 28:9, 28:13, 28:16, 29:1, 29:11, 29:14, 29:18, 31:7, 31:16, 34:3, 34:10, 34:13, 34:17, 62:4, 74:7, 102:6, 102:10, 102:11, 102:19, 102:23

**interchangeably** [2] - 10:12, 10:15

**interchanged** [1] - 21:5

**interconnection** [1] - 12:10

**interesting** [4] - 70:17, 81:23, 86:13, 97:17

**internal** [4] - 64:10, 84:25, 85:22, 99:7

**Internet** [1] - 68:10

**interpret** [6] - 9:23, 86:14, 86:15, 101:1, 102:17, 102:18

**interpretation** [1] - 19:2

**interpreted** [1] - 105:6

**interpreting** [1] - 85:5

**interrupt** [5] - 8:17, 26:21, 36:16, 36:17, 96:13

**interrupting** [1] - 96:9

**intrinsic** [7] - 4:24, 5:3, 32:24, 33:1, 35:3, 35:11, 77:24

**INV** [3] - 30:12, 30:13 30:15

**invalidity** [5] - 17:25, 18:15, 18:16, 18:18, 18:20

**invented** [1] - 39:2

**invention** [29] - 5:16, 8:9, 12:21, 13:1, 13:3, 14:7, 16:9, 17:19, 20:13, 32:21, 33:8, 36:9, 39:9, 39:13, 40:20, 42:21, 42:22, 44:25, 45:3, 45:8, 79:9, 83:11, 85:3, 85:21, 86:6, 86:25, 93:12, 103:9

**inventions** [1] - 40:22

**inventive** [2] - 38:19, 38:20

**inventors** [1] - 14:7

**involve** [1] - 7:13

**involved** [1] - 7:17

**IPR** [10] - 25:20, 25:22, 26:1, 26:2, 46:19, 46:21, 49:19, 50:9, 50:11, 50:21

**iridescent** [2] - 34:23, 34:25

**Iridescent** [1] - 35:2

**isolated** [1] - 69:4

**isotope** [1] - 15:9

**issue** [21] - 18:19, 36:14, 37:10, 37:11, 43:2, 43:11, 44:13, 49:8, 52:10, 53:18, 58:2, 58:12, 72:5, 72:7, 87:23, 96:16, 97:19, 100:7, 101:25, 102:14

**item** [1] - 25:20

**items** [2] - 5:3, 25:16

**itself** [12] - 15:3, 28:15, 59:24, 60:3, 60:7, 60:22, 60:23, 61:2, 61:17, 70:8, 79:20, 91:3

**IVB** [2] - 23:8, 24:15

### J

**JEFFREY** [1] - 2:7

**Jeffrey** [3] - 3:12, 4:17, 58:8

**JENNIFER** [1] - 2:3

**Jennifer** [3] - 3:11, 4:3, 43:10

**JOHN** [1] - 1:20

**John** [2] - 3:10, 3:20

**joining** [1] - 3:11

**joint** [2] - 4:5, 74:2

**judicious** [1] - 101:24

**jury** [8] - 17:16, 17:24, 18:12, 18:13, 18:14, 18:18, 28:24, 28:25

**justified** [1] - 86:23

### K

**Katzenham** [1] - 3:20

**KAYE** [2] - 2:2, 2:6

**keep** [5] - 39:20, 52:21, 61:20, 74:8, 84:18

**KELLER** [1] - 1:20

**Keller** [1] - 3:10

**kernels** [2] - 52:1, 52:3

**key** [7] - 26:13, 35:19. 40:24, 41:6, 67:10, 97:24

**kind** [14] - 5:3, 7:4, 14:13, 15:9, 23:6, 25:15, 60:13, 70:24, 71:24, 72:12, 73:3, 82:2, 101:23, 105:3

**kinds** [3] - 7:16, 49:1, 91:19

**knobs** [1] - 72:18

**known** [1] - 28:14

### L

**labeled** [1] - 66:18

**laboratories** [1] - 39:6

**LABORATORIES** [1] - 1:9

**lacks** [1] - 54:13

**laid** [2] - 5:5, 61:23

**language** [22] - 5:1, 8:19, 23:17, 23:18, 26:15, 31:11, 32:6, 38:24, 40:23, 41:4, 41:18, 43:1, 47:2, 51:25, 55:18, 55:25. 56:11, 60:6, 67:25, 78:4, 90:18, 91:14

**large** [1] - 15:6

**last** [5] - 55:22, 57:20, 58:4, 103:15, 105:5

**law** [9] - 4:22, 5:5, 43:22, 44:9, 47:14, 52:22, 53:21, 55:11

**lawyers** [1] - 62:24

**lay** [3] - 5:15, 28:24, 80:3

**lead** [2] - 21:8, 35:5

**least** [21] - 20:17,

20:18, 20:25, 21:24, 22:1, 22:4, 22:17, 22:18, 23:15, 23:19, 24:12, 24:23, 25:5, 45:17, 57:12, 57:13, 62:6, 62:24, 103:5, 105:12
**leave** [2] - 9:24, 104:21
**led** [1] - 97:18
**left** [11] - 6:21, 16:15, 17:16, 17:17, 21:20, 30:16, 50:10, 66:17, 66:21, 82:3, 101:25
**left-hand** [4] - 6:21, 16:15, 21:20, 66:17
**legitimate** [1] - 102:16
**life** [8] - 39:17, 40:3, 40:6, 40:15, 43:3, 44:22, 45:21
**light** [3] - 27:11, 41:14, 96:23
**lights** [3] - 97:8, 101:8, 101:20
**likely** [2] - 82:18, 92:21
**limit** [2] - 33:1, 52:12
**limitation** [3] - 9:2, 44:3, 55:23
**limitations** [5] - 25:6, 40:19, 44:21, 45:10, 52:5
**limited** [2] - 50:25, 83:16
**limiting** [42] - 33:18, 35:14, 35:21, 35:25, 36:3, 37:2, 38:11, 38:22, 39:18, 41:11, 41:21, 42:25, 43:5, 44:12, 44:14, 45:16, 45:25, 51:20, 52:14, 52:17, 52:19, 52:20, 52:22, 53:5, 53:16, 53:17, 53:19, 53:20, 53:23, 54:2, 54:14, 54:21, 54:22, 55:2, 55:6, 55:8, 55:9, 55:12, 57:22, 58:2, 58:16
**limits** [1] - 54:24
**line** [12] - 3:18, 3:20, 35:1, 39:3, 39:8, 45:20, 62:21, 62:23, 63:12, 89:5, 98:8
**lines** [7] - 33:7, 33:8, 33:14, 63:13, 64:5, 78:10, 95:16
**liquid** [76] - 5:18, 9:19, 23:24, 24:11, 27:20, 34:1, 34:2, 34:7,

35:20, 38:25, 39:1, 39:4, 39:6, 39:14, 39:16, 39:23, 40:2, 40:7, 41:5, 43:1, 43:12, 43:21, 44:25, 45:3, 45:8, 45:19, 46:2, 46:3, 46:9, 46:15, 47:3, 47:25, 48:2, 48:5, 48:15, 48:20, 48:21, 48:23, 48:24, 49:2, 49:8, 49:11, 49:14, 49:15, 49:17, 49:22, 50:3, 50:25, 51:7, 51:17, 53:7, 54:3, 54:5, 54:7, 54:25, 55:20, 55:21, 55:24, 56:3, 56:7, 56:10, 57:8, 57:10, 57:18, 65:11, 82:24, 83:5, 89:18, 92:14, 92:16, 93:4, 93:10, 93:21, 95:18, 95:21
**liquids** [5] - 53:2, 75:19, 75:21, 82:21, 82:24
**listed** [1] - 5:18
**listen** [1] - 75:13
**literally** [2] - 60:7, 96:5
**live** [4] - 99:15, 101:1, 101:18, 102:14
**living** [2] - 42:16
**LLP** [5] - 1:20, 2:2, 2:6, 2:11, 2:15
**located** [1] - 65:18
**locations** [3] - 8:16, 21:17, 22:3
**logic** [1] - 60:25
**look** [56] - 4:5, 9:21, 11:11, 11:18, 12:8, 12:24, 17:8, 21:18, 21:19, 23:1, 23:11, 23:23, 24:8, 29:17, 30:3, 33:5, 33:7, 33:14, 33:23, 34:10, 39:3, 39:21, 45:5, 46:12, 47:1, 47:4, 47:6, 47:9, 51:10, 53:16, 59:4, 60:16, 60:18, 61:24, 62:10, 62:11, 63:11, 64:1, 66:3, 66:19, 66:23, 69:24, 74:23, 80:4, 86:14, 86:24, 90:1, 93:7, 94:2, 94:7, 94:9, 94:13, 96:19, 97:5, 98:20, 99:5
**looked** [2] - 47:12, 84:8
**looking** [6] - 8:18,

26:11, 46:18, 92:6, 95:10, 102:3
**looks** [1] - 90:7
**loop** [1] - 28:20
**lose** [1] - 60:13
**low** [1] - 74:21

## M

**mailed** [1] - 4:19
**main** [2] - 37:4, 58:12
**major** [1] - 61:7
**mandatory** [2] - 26:16, 32:7
**manner** [2] - 103:16, 105:7
**marked** [1] - 6:22
**market** [1] - 39:7
**matches** [1] - 87:15
**materials** [1] - 15:15
**matter** [6] - 24:5, 39:25, 43:22, 44:8, 52:9, 104:4
**mean** [73] - 11:4, 13:4, 13:7, 17:7, 18:13, 18:20, 18:22, 19:4, 19:16, 23:6, 24:20, 25:7, 25:9, 25:16, 25:21, 25:25, 27:5, 28:1, 28:7, 28:17, 29:2, 29:12, 29:14, 31:6, 31:7, 31:14, 36:18, 37:20, 39:20, 39:22, 40:16, 46:7, 46:20, 47:18, 48:17, 48:18, 54:13, 54:20, 56:3, 56:4, 59:17, 60:12, 60:14, 62:18, 62:23, 69:6, 71:23, 72:1, 72:17, 72:19, 72:21, 73:25, 76:22, 78:16, 79:12, 80:6, 81:12, 82:6, 86:8, 86:20, 90:4, 90:24, 91:10, 93:12, 98:24, 99:2, 100:12, 100:20, 101:23, 102:19, 102:23, 104:15
**meaning** [28] - 10:12, 26:23, 26:25, 27:7, 27:11, 27:14, 27:21, 28:3, 28:6, 28:18, 28:21, 39:17, 40:3, 40:6, 40:15, 42:15, 43:3, 44:22, 45:21, 46:8, 47:19, 48:11, 53:8, 53:20, 56:16, 56:19, 56:22, 57:24
**means** [35] - 4:25,

9:10, 11:8, 17:14, 19:12, 20:19, 22:4, 22:18, 28:24, 29:8, 30:14, 31:18, 43:23, 44:2, 46:16, 55:8, 60:23, 64:10, 67:19, 71:20, 72:8, 72:21, 73:7, 73:9, 73:13, 76:19, 77:9, 77:13, 77:14, 77:15, 78:23, 86:21, 90:21, 91:16
**meant** [2] - 28:16, 77:10
**measured** [1] - 74:16
**measurement** [1] - 74:18
**mechanical** [1] - 48:19
**meet** [5] - 9:2, 24:23, 25:5, 25:12, 25:15
**meets** [1] - 32:15
**member** [12] - 64:8, 64:12, 64:21, 64:25, 78:13, 78:17, 78:18, 79:2, 84:22, 97:8, 101:9, 101:11
**mention** [1] - 65:13
**mentioned** [2] - 61:21, 89:4
**Merck** [1] - 56:20
**mere** [4] - 41:20, 51:15, 52:11, 55:14
**met** [1] - 32:17
**method** [2] - 36:15, 39:5
**methods** [1] - 43:14
**microprocessing** [1] - 85:9
**might** [5] - 11:12, 20:1, 52:18, 54:2, 59:11
**MILLER** [75] - 2:7, 4:16, 8:23, 9:8, 9:25, 10:9, 10:21, 11:2, 11:11, 12:19, 13:4, 13:11, 13:16, 14:20, 14:24, 17:2, 17:5, 18:1, 18:21, 19:4, 21:14, 22:11, 22:25, 23:5, 23:11, 24:4, 24:7, 24:10, 24:14, 24:17, 24:20, 25:19, 25:23, 26:3, 58:7, 58:20, 58:23, 59:6, 59:9, 59:15, 60:5, 60:14, 60:20, 61:6, 61:11, 61:14, 61:17, 61:21, 62:14, 62:16, 63:3, 68:9, 68:12, 73:25, 88:22, 88:25,

89:2, 90:5, 90:13, 91:6, 91:13, 92:3, 92:6, 92:9, 92:12, 93:1, 93:17, 93:23, 94:21, 95:1, 95:8, 95:10, 95:12, 95:15, 95:18
**Miller** [4] - 3:12, 4:14, 4:17, 58:8
**mind** [2] - 52:21, 104:22
**mindful** [1] - 36:17
**minimum** [1] - 47:13
**mix** [1] - 99:4
**mixer** [2] - 7:15, 8:2
**model** [1] - 92:16
**modified** [2] - 7:10, 49:10
**modify** [5] - 5:21, 13:5, 47:23, 48:3, 49:17
**modifying** [1] - 101:16
**modular** [58] - 5:8, 6:9, 6:19, 7:12, 7:25, 8:15, 12:14, 14:14, 14:21, 15:3, 15:4, 17:10, 18:3, 20:18, 20:24, 21:15, 22:2, 22:5, 22:14, 23:20, 24:12, 24:16, 24:24, 25:13, 25:16, 27:1, 28:10, 28:13, 29:1, 29:2, 29:3, 29:6, 29:8, 29:12, 29:15, 29:16, 29:19, 29:23, 30:6, 30:13, 30:21, 30:22, 30:24, 31:8, 31:14, 34:10, 34:13, 40:11, 45:8, 62:4, 63:24, 64:24, 67:6, 95:21
**modularity** [3] - 3:24, 39:12, 39:14
**module** [40] - 9:5, 9:15, 29:15, 69:3, 69:17, 70:5, 70:8, 70:11, 70:18, 70:23, 71:1, 71:9, 71:15, 78:19, 79:5, 79:20, 81:2, 81:12, 85:10, 85:11, 85:19, 86:5, 87:1, 87:10, 87:12, 87:14, 87:18, 89:8, 89:10, 89:13, 89:25, 93:5, 93:18, 97:4, 97:12, 99:18, 99:21, 100:9
**modules** [5] - 11:8, 74:13, 82:17, 83:19, 85:17

**moment** [3] - 19:25, 95:8, 95:13
**monitor** [6] - 34:11, 34:17, 34:18, 34:19, 70:6, 90:2
**monitors** [1] - 91:19
**MOORE** [1] - 2:12
**Moore** [1] - 3:19
**moreover** [1] - 36:10
**morning** [9] - 3:6, 3:9, 3:13, 3:14, 3:16, 4:2, 4:16, 26:8, 68:16
**most** [6] - 35:9, 80:15, 85:13, 86:7, 103:1
**motor** [1] - 20:1
**Mourtada** [19] - 14:8, 14:10, 14:11, 15:2, 15:5, 15:6, 15:13, 15:16, 35:8, 66:4, 66:10, 66:14, 81:8, 81:14, 81:18, 81:22, 83:16, 98:17
**move** [2] - 4:21, 7:2, 7:6, 7:8, 8:7, 10:16, 11:12, 11:20, 11:23, 11:25, 12:13, 12:16, 13:25, 19:8, 19:22, 24:19, 30:16, 35:13, 38:10, 46:1, 71:19, 94:8
**moved** [1] - 25:3
**MR** [152] - 3:9, 3:16, 4:16, 8:23, 9:8, 9:25, 10:9, 10:21, 11:2, 11:11, 12:19, 13:4, 13:11, 13:16, 14:20, 14:24, 17:2, 17:5, 18:1, 18:21, 19:4, 21:14, 22:11, 22:25, 23:5, 23:11, 24:4, 24:7, 24:10, 24:14, 24:17, 24:20, 25:19, 25:23, 26:3, 26:8, 26:24, 27:3, 27:10, 27:23, 28:12, 28:23, 29:3, 29:13, 29:16, 30:2, 30:6, 30:10, 30:23, 31:4, 31:10, 31:21, 32:1, 32:4, 32:13, 35:16, 36:20, 37:1, 37:4, 37:9, 38:13, 40:4, 41:3, 43:7, 51:4, 52:15, 54:11, 55:1, 56:8, 56:18, 58:7, 58:20, 58:23, 59:6, 59:9, 59:15, 60:5, 60:14, 60:20, 61:6, 61:11, 61:14, 61:17, 61:21,

62:14, 62:16, 63:3, 68:9, 68:12, 68:16, 69:15, 69:22, 73:2, 73:25, 74:9, 75:16, 76:20, 76:23, 77:2, 77:5, 78:6, 78:9, 79:24, 80:2, 80:10, 80:12, 80:14, 80:20, 80:22, 83:7, 83:9, 83:14, 84:12, 87:17, 88:5, 88:8, 88:11, 88:20, 88:22, 88:25, 89:2, 90:5, 90:13, 91:6, 91:13, 92:3, 92:6, 92:9, 92:12, 93:1, 93:17, 93:23, 94:21, 95:1, 95:8, 95:10, 95:12, 95:15, 95:18, 96:8, 96:11, 98:3, 98:5, 98:21, 99:16, 103:21, 104:13, 104:16, 104:23
**MS** [22] - 3:13, 4:2, 4:13, 43:9, 43:18, 46:5, 46:22, 48:18, 48:25, 49:24, 50:13, 50:15, 96:12, 96:19, 96:23, 100:7, 100:24, 101:3, 101:6, 102:13, 103:19, 104:10
**multiple** [3] - 44:10, 45:18
**must** [10] - 8:18, 9:4, 9:22, 10:24, 22:24, 29:12, 35:6, 44:3, 63:6, 81:11
**mute** [2] - 88:21, 88:23

**N**

**nail** [1] - 26:10
**narrow** [2] - 19:2, 19:5
**narrower** [3] - 20:9, 50:1, 56:3
**nature** [3] - 82:19, 82:20, 92:22
**necessarily** [2] - 28:25, 87:9
**necessary** [2] - 37:18, 54:9
**need** [29] - 7:24, 8:1, 10:15, 12:6, 12:13, 14:4, 17:12, 19:7, 19:8, 21:15, 26:1, 26:4, 26:16, 46:24, 48:8, 49:4, 54:9, 58:24, 62:25, 73:6,

79:10, 85:6, 86:22, 86:23, 87:22, 89:20, 92:3, 94:7, 105:11
**needed** [1] - 8:1
**needs** [3] - 47:5, 96:24, 96:25
**negative** [5] - 58:23, 60:5, 60:11, 61:7, 91:14
**networks** [2] - 34:24, 35:1
**Networks** [1] - 35:2
**never** [11] - 4:23, 8:25, 17:9, 19:14, 19:15, 20:12, 53:22, 63:6, 70:17, 85:14, 87:24
**nevertheless** [1] - 52:6
**new** [4] - 5:22, 19:19, 39:9, 72:13
**next** [14] - 7:5, 36:4, 38:10, 38:23, 39:19, 46:1, 51:21, 64:19, 71:5, 82:21, 83:3, 83:21, 83:25, 98:10
**nice** [1] - 20:1
**NO** [1] - 1:10
**non** [114] - 56:7, 58:5, 58:13, 58:18, 58:22, 58:25, 59:2, 59:4, 59:8, 59:11, 59:12, 59:17, 59:18, 59:21, 59:24, 60:4, 60:10, 60:23, 61:2, 61:5, 61:6, 61:7, 61:8, 61:9, 64:11, 64:14, 65:8, 66:9, 66:13, 66:24, 67:10, 67:18, 68:1, 68:21, 71:20, 72:5, 72:7, 72:14, 72:17, 72:18, 72:19, 72:20, 73:7, 73:9, 73:13, 73:15, 75:19, 75:20, 76:9, 77:11, 77:14, 78:12, 78:14, 83:23, 84:15, 84:19, 84:22, 84:24, 84:25, 85:22, 86:17, 86:3, 86:4, 86:17, 90:16, 90:19, 91:1, 91:4, 91:6, 91:8, 91:11, 93:7, 93:24, 93:25, 94:3, 94:4, 94:8, 94:10, 94:11, 94:20, 94:23, 95:2, 95:4, 95:7, 97:1, 97:10, 97:13, 97:22, 97:23,

98:25, 99:2, 99:7, 99:9, 99:10, 99:10, 100:10, 100:15, 100:16, 101:10, 102:9, 102:18, 102:25, 103:6, 103:12, 105:6
**non-argument** [1] - 71:19
**non-automated** [1] - 56:7
**non-electronics** [1] - 72:1
**non-fluid** [1] - 86:1
**non-fluidic** [23] - 60:4, 61:5, 73:23, 74:4, 77:11, 77:14, 83:23, 84:15, 84:19, 84:22, 91:1, 91:4, 94:14, 94:18, 94:23, 95:7, 97:22, 99:9, 99:10, 100:15, 102:9, 103:6, 103:12
**non-fluidics** [81] - 58:5, 58:13, 58:18, 58:22, 58:25, 59:2, 59:4, 59:8, 59:11, 59:12, 59:17, 59:18, 59:21, 59:24, 60:10, 60:23, 61:2, 61:6, 61:8, 61:9, 64:11, 64:14, 65:8, 66:9, 66:13, 66:24, 67:10, 67:18, 68:1, 68:21, 71:20, 72:5, 72:7, 72:14, 72:17, 72:18, 72:19, 72:20, 73:7, 73:9, 73:13, 73:15, 75:19, 75:20, 76:9, 78:12, 78:14, 84:25, 85:22, 86:3, 86:4, 86:17, 90:16, 90:19, 91:6, 91:8, 91:11, 93:7, 93:24, 93:25, 94:3, 94:4, 94:8, 94:10, 94:11, 94:20, 95:2, 95:4, 97:1, 97:10, 97:13, 97:23, 98:25, 99:2, 99:7, 100:10, 100:16, 101:10, 102:18, 102:25, 105:6
**none** [3] - 36:2, 75:2, 103:21
**noninfringement** [2] - 22:15, 101:7
**normal** [1] - 27:22
**normally** [1] - 18:25
**note** [3] - 36:6, 41:12, 90:14
**noted** [1] - 44:12

**notes** [1] - 35:18
**nothing** [12] - 17:23, 18:11, 18:14, 18:15, 44:18, 49:15, 52:7, 61:14, 67:24, 101:23, 103:19, 104:10
**notice** [1] - 65:1
**noting** [1] - 84:8
**notion** [1] - 101:19
**novo** [1] - 104:3
**nowhere** [2] - 31:17, 93:8
**nozzle** [1] - 74:23
**number** [11] - 6:22, 21:23, 22:3, 22:8, 30:12, 50:6, 62:20, 65:15, 71:5, 77:23, 97:6
**numbers** [1] - 6:7
**numerals** [2] - 6:7, 7:11
**numerical** [1] - 84:9
**numerous** [2] - 61:18, 89:23

**O**

**o'clock** [1] - 1:14
**objection** [1] - 94:22
**objective** [3] - 32:24, 35:3, 35:5
**objects** [1] - 95:19
**obligation** [1] - 105:13
**obviously** [1] - 90:2
**OF** [1] - 1:2
**Office** [6] - 46:12, 46:16, 47:8, 49:13, 49:18, 50:18
**office** [2] - 66:7, 67:4
**Official** [1] - 1:25
**oil** [1] - 52:8
**old** [2] - 7:4, 49:1
**old-fashioned** [1] - 49:1
**once** [1] - 5:21
**one** [90] - 6:4, 7:5, 9:16, 10:16, 13:7, 14:16, 15:8, 15:25, 16:18, 17:10, 17:12, 17:17, 18:7, 18:23, 19:19, 21:7, 23:9, 25:2, 25:3, 25:5, 25:20, 26:22, 32:15, 32:17, 33:9, 36:2, 37:13, 39:4, 40:10, 41:14, 43:20, 45:17, 48:11, 50:10, 52:21, 53:18, 54:12, 56:22, 57:12, 61:23, 64:7,

64:22, 66:8, 66:16, 67:3, 68:19, 68:24, 69:1, 69:2, 70:3, 70:12, 71:10, 71:19, 72:2, 73:3, 74:6, 74:16, 75:24, 76:19, 77:23, 78:20, 78:23, 79:3, 79:15, 80:6, 80:15, 80:17, 81:5, 81:23, 82:8, 82:11, 82:16, 86:11, 87:8, 87:10, 92:3, 93:2, 94:17, 95:16, 99:6, 99:8, 100:15, 100:18, 101:15, 103:5, 103:6
**one-way** [1] - 94:17
**ones** [1] - 80:16
**open** [1] - 7:1
**opening** [2] - 52:2, 76:21
**opens** [3] - 4:24, 17:19, 39:22
**opposed** [6] - 8:21, 49:23, 56:5, 91:9, 91:11, 93:11
**opposite** [2] - 19:1, 94:14
**optimize** [5] - 11:16, 11:20, 11:23, 17:13, 34:8
**optimizing** [1] - 12:10
**order** [17] - 6:14, 9:2, 9:20, 10:11, 19:8, 27:13, 34:8, 34:18, 77:22, 84:7, 84:10, 96:15, 103:23, 104:6, 104:17, 105:11, 105:14
**ordinary** [14] - 26:22, 26:25, 27:7, 27:11, 27:14, 27:21, 28:3, 28:5, 28:18, 28:21, 46:8, 48:10, 57:24, 79:13
**original** [3] - 72:13, 73:12, 73:17
**originally** [1] - 50:5
**otherwise** [2] - 17:16, 55:9
**ought** [1] - 88:18
**outlet** [5] - 7:13, 16:16, 16:19, 30:12
**outlier** [1] - 44:15, 44:17
**outside** [16] - 69:5, 69:10, 71:14, 71:15, 71:17, 74:13, 76:3, 76:6, 82:16, 85:10, 86:5, 87:1, 87:17,

99:18, 99:21, 101:19
**overall** [1] - 71:16
**overcome** [3] - 13:2, 33:9, 94:22
**overcoming** [1] - 39:10
**overview** [1] - 80:2
**own** [1] - 85:5

**P**

**p.m** [1] - 105:19
**Pacing** [1] - 41:24
**Packard** [2] - 51:11, 55:5
**page** [14] - 23:1, 23:3, 27:19, 37:12, 42:14, 50:6, 56:20, 73:5, 74:2, 92:4, 96:9, 98:16, 102:3
**pages** [7] - 37:21, 38:17, 83:17, 83:18, 84:6, 84:9
**painting** [1] - 67:16
**Palo** [1] - 2:7
**pandemic** [1] - 62:19
**panel** [20] - 6:6, 15:24, 34:2, 64:7, 64:12, 64:21, 64:24, 65:11, 78:13, 78:17, 79:2, 82:4, 84:22, 95:19, 95:21, 97:6, 97:8, 101:9, 101:11
**paragraph** [2] - 63:11, 63:14
**parent** [1] - 50:4
**parenthetical** [1] - 74:3
**part** [41] - 12:8, 13:2, 14:13, 20:12, 33:19, 40:1, 40:24, 42:6, 44:24, 46:14, 50:16, 63:24, 64:8, 69:3, 69:16, 70:4, 70:18, 70:22, 70:23, 71:4, 71:16, 71:17, 72:11, 74:12, 83:21, 84:20, 85:11, 85:22, 86:5, 86:25, 87:9, 87:14, 87:18, 89:13, 98:11, 99:18
**particular** [9] - 7:17, 8:10, 26:5, 45:14, 46:10, 58:14, 62:1, 78:20, 93:1
**particularly** [1] - 33:7
**parties** [10] - 27:18, 31:1, 31:12, 35:20, 37:19, 38:2, 44:15, 45:22, 104:5

**parties'** [1] - 46:6
**parts** [23] - 82:24, 83:1, 83:6, 83:12, 83:20, 83:22, 83:23, 84:2, 84:15, 84:16, 84:19, 84:21, 84:22, 85:4, 88:18, 93:4, 93:11, 93:21, 94:15, 94:23, 98:11, 100:2
**pass** [1] - 52:3
**passage** [2] - 26:14, 38:16
**passing** [2] - 51:23, 52:1
**patent** [52] - 6:16, 7:10, 7:20, 9:4, 11:15, 11:21, 11:22, 12:24, 15:12, 15:14, 16:5, 20:2, 20:10, 23:24, 24:3, 31:17, 33:7, 33:15, 33:24, 43:21, 43:22, 44:9, 44:19, 49:21, 49:25, 50:4, 50:8, 50:17, 55:19, 58:1, 60:6, 60:7, 61:17, 61:24, 63:11, 64:4, 66:12, 68:4, 69:9, 86:18, 89:24, 90:1, 90:8, 90:11, 91:20, 92:22, 93:21, 99:5, 100:17, 103:3, 103:5
**Patent** [7] - 46:12, 46:16, 47:8, 49:13, 49:18, 50:17, 103:4
**patentable** [1] - 93:20
**patentee** [1] - 33:1, 44:24, 45:9, 45:13, 49:20, 50:20, 67:8
**patents** [10] - 5:14, 19:15, 28:11, 33:6, 45:17, 49:21, 50:22, 72:8, 89:17
**path** [4] - 11:17, 11:21, 11:23, 34:8
**paths** [1] - 12:11
**Pause** [3] - 75:11, 76:16, 95:9
**PC** [1] - 7:4
**people** [2] - 49:25, 86:20
**perfect** [1] - 60:15
**perfectly** [1] - 87:15
**perform** [2] - 48:15, 49:11
**performing** [9] - 27:20, 43:14, 46:9, 53:1, 54:5, 54:25, 55:21, 55:24, 56:10
**permissive** [1] - 32:6

**person** [1] - 79:13
**personal** [3] - 40:18, 41:19, 76:1
**personalized** [1] - 19:25
**persuaded** [1] - 88:16
**persuasive** [1] - 47:1
**pH** [43] - 60:17, 60:18, 61:21, 62:1, 62:3, 62:6, 63:19, 63:20, 63:21, 63:23, 69:14, 69:15, 69:16, 69:23, 69:24, 70:1, 70:3, 70:4, 70:5, 70:16, 70:17, 70:21, 70:23, 71:1, 71:8, 71:9, 71:11, 74:5, 74:10, 87:3, 87:4, 87:5, 87:15, 88:14, 89:5, 89:7, 89:8, 89:12, 93:14, 93:18
**pharmaceutical** [1] - 7:23
**Phillips** [1] - 27:13
**phone** [5] - 62:20, 68:11, 68:12, 76:3, 76:4
**phrase** [15] - 28:12, 28:14, 28:19, 28:25, 59:24, 60:3, 60:22, 60:24, 60:25, 61:1, 61:2, 61:4, 90:20, 91:3
**phrased** [1] - 40:4
**pick** [2] - 80:17, 80:24
**piece** [9] - 12:7, 14:25, 62:11, 63:10, 65:12, 67:11, 77:23, 93:2
**pieces** [3] - 42:7, 57:17, 64:2
**piles** [1] - 99:19
**pin** [1] - 31:18
**place** [2] - 57:7, 66:6
**placed** [1] - 8:16
**places** [1] - 10:13
**plain** [13] - 26:22, 26:25, 27:6, 27:10, 27:14, 27:21, 28:2, 28:5, 28:18, 28:21, 46:8, 48:10, 57:24
**plainly** [4] - 21:8, 59:20, 62:5, 63:23
**plaintiff** [23] - 19:1, 19:2, 34:23, 38:2, 43:8, 46:4, 57:4, 58:6, 68:20, 72:3, 73:20, 73:23, 74:11, 75:22, 82:6, 85:2, 85:24, 87:12, 88:3, 88:8, 88:13, 103:19,

103:23
**plaintiffs** [15] - 3:7, 3:10, 4:1, 26:14, 31:6, 31:17, 39:20, 41:8, 41:16, 41:23, 51:7, 53:12, 86:8, 104:9, 105:14
**Plaintiffs** [2] - 1:7, 2:9
**plaintiffs'** [8] - 26:12, 31:13, 32:16, 33:22, 34:21, 42:19, 54:12, 105:4
**play** [1] - 7:4
**plug** [2] - 7:4, 84:14
**plug-in** [1] - 84:14
**plurality** [1] - 57:12
**point** [47] - 8:23, 9:1, 10:11, 16:3, 16:22, 18:10, 18:12, 22:25, 27:6, 27:7, 27:12, 31:5, 32:4, 32:11, 32:13, 36:6, 37:5, 38:16, 39:19, 41:6, 51:22, 52:20, 53:12, 54:10, 54:11, 54:18, 55:15, 56:2, 56:8, 57:20, 58:12, 60:2, 66:11, 66:21, 67:1, 73:4, 75:21, 83:2, 85:14, 86:22, 89:3, 89:13, 89:14, 92:2, 92:14, 99:17, 105:3
**pointed** [1] - 19:20, 28:15, 51:16, 78:1, 78:4, 90:18
**pointing** [4] - 22:24, 64:4, 94:10, 98:16
**points** [8] - 20:14, 54:16, 61:18, 68:19, 81:10, 86:11
**popcorn** [7] - 51:25, 52:2, 52:3, 52:6, 52:7, 52:10, 52:11
**popped** [1] - 51:23, 52:1, 52:3
**portability** [1] - 42:18
**portable** [1] - 42:15
**Porter** [2] - 3:11, 4:17
**PORTER** [2] - 2:2, 2:6
**portion** [19] - 7:20, 9:12, 9:13, 9:17, 12:3, 12:5, 12:6, 14:6, 30:18, 40:24, 56:11, 56:12, 57:5, 62:8, 63:15, 64:6, 64:19, 89:4, 90:1
**portions** [3] - 19:20, 66:6, 69:6
**ports** [1] - 78:21
**position** [18] - 9:1

10:16, 11:8, 14:14,
17:24, 18:2, 21:1,
21:8, 22:12, 25:2,
25:14, 30:17, 33:22,
34:21, 51:15, 59:3,
96:14, 100:14
**positioning** [2] - 42:5,
42:8
**positions** [13] - 6:6,
9:18, 11:24, 12:14,
12:15, 17:13, 20:22,
21:6, 22:7, 29:19,
29:21, 30:1, 34:6
**positive** [1] - 73:19
**possibilities** [4] -
9:15, 32:18, 33:17,
34:5
**possibility** [8] - 9:18,
10:22, 16:17, 26:16,
32:6, 34:6, 64:22,
103:8
**possible** [3] - 6:15,
26:18, 97:3
**potential** [1] - 17:20
**potentially** [1] - 48:25
**POTTER** [1] - 2:11
**Potter** [1] - 3:17
**powerful** [1] - 35:11
**practice** [1] - 6:11
**preamble** [38] - 24:14,
36:15, 36:23, 37:2,
37:15, 37:17, 37:23,
38:4, 38:11, 38:20,
38:21, 38:25, 39:18,
40:6, 40:7, 40:15,
40:23, 41:4, 41:9,
41:21, 42:4, 42:5,
42:23, 43:4, 43:13,
43:24, 44:3, 44:12,
44:14, 45:16, 45:24,
46:23, 52:15, 52:18,
53:16, 53:18, 53:20,
53:22
**preambles** [5] - 35:13,
35:21, 35:25, 36:3,
44:21
**preclude** [5] - 12:18,
12:19, 16:25, 17:2,
103:8
**precludes** [1] - 13:14
**precluding** [1] - 13:15
**preclusion** [1] - 68:2
**prefer** [1] - 4:9
**prefers** [1] - 56:22
**premise** [1] - 23:7
**present** [1] - 8:9
**presentation** [4] -
26:12, 51:19, 55:17,
78:7
**presents** [1] - 58:10

**preserve** [1] - 97:2
**pressure** [11] - 57:12,
65:16, 74:15, 74:17,
74:18, 74:24, 74:25,
89:16, 91:18
**pretty** [12] - 12:5,
14:24, 37:22, 60:10,
60:19, 62:23, 63:4,
83:16, 88:16, 89:12,
90:7, 90:24
**prevent** [2] - 79:9,
97:7
**previous** [1] - 39:11
**prioritize** [1] - 77:25
**priority** [1] - 77:22
**probative** [1] - 54:2
**problem** [8] - 5:20,
33:21, 62:24, 68:24,
68:25, 69:1, 76:5,
76:12
**problematic** [3] -
59:10, 68:21, 100:21
**problems** [3] - 32:20,
33:9, 33:10
**proceed** [2] - 76:13
77:17
**proceeding** [1] - 49:13
**proceedings** [2] -
50:9, 50:11
**process** [1] - 52:15
**processing** [5] - 42:6,
82:18, 82:21, 92:13,
92:21
**production** [1] - 8:25
**products** [1] - 5:19
**proffered** [1] - 33:22
**proposal** [6] - 28:23,
53:1, 53:4, 54:12,
101:23, 101:25
**proposals** [1] - 102:4
**propose** [3] - 27:23,
96:14, 97:17
**proposed** [21] - 4:20,
5:10, 26:25, 31:10,
32:16, 52:23, 52:25,
53:11, 53:25, 54:15,
55:10, 55:16, 55:17,
56:23, 57:2, 57:16,
57:21, 58:11, 96:20,
105:14
**proposes** [1] - 54:23
**prosecuting** [1] -
50:21
**prosecution** [19] - 5:1,
11:6, 13:25, 14:6,
14:25, 16:5, 19:6,
20:8, 35:8, 65:20,
66:12, 73:12, 77:25,
86:2, 90:4, 91:21,
93:9, 95:6, 100:1

**prosecutors** [1] -
49:25
**protein** [1] - 7:24
**Proveris** [2] - 38:17
38:21
**provide** [8] - 23:25,
28:24, 32:24, 35:4,
39:9, 53:11, 54:9,
54:17
**provided** [2] - 38:11,
57:9
**provides** [7] - 9:14,
33:16, 34:4, 35:3,
41:9, 45:16, 52:23
**providing** [1] - 37:18
**proviso** [1] - 67:15
**PTAB** [4] - 28:16,
46:13, 47:2, 50:24
**pull** [6] - 14:15, 15:7,
15:10, 15:24, 16:1,
37:9
**pump** [2] - 34:20,
66:20
**pumps** [1] - 57:12
**purification** [1] - 7:24
**purpose** [2] - 53:19,
79:8
**push** [1] - 74:23
**put** [20] - 6:13, 6:14,
6:23, 7:5, 7:6, 9:16,
14:15, 15:8, 16:2,
17:13, 21:16, 22:12,
29:4, 30:13, 53:5,
67:3, 73:6, 88:21,
89:9, 101:3
**putting** [1] - 101:20

## Q

**qualifies** [1] - 62:1
**qualify** [1] - 23:19
**quarters** [2] - 42:16,
42:17
**questions** [6] - 20:15,
26:4, 38:9, 65:21,
68:7, 97:18
**quick** [1] - 56:19
**quickly** [1] - 104:19
**QUINN** [1] - 2:15
**Quinn** [1] - 3:19
**quite** [1] - 53:17
**quote** [4] - 15:14,
56:19, 64:4, 67:5
**quotes** [1] - 65:25
**quoting** [1] - 33:25

## R

**RAD** [1] - 1:9
**Rad** [29] - 3:21, 5:9

9:12, 9:24, 9:25,
11:18, 12:5, 18:2,
20:19, 24:20, 26:9,
35:22, 46:17, 48:3,
50:18, 51:5, 65:23,
66:7, 67:12, 68:17,
74:8, 76:12, 76:17,
78:7, 98:2, 98:25,
99:14, 101:7, 105:7
**Rad's** [17] - 10:1, 10:2,
10:4, 10:6, 10:19,
21:1, 22:13, 44:23,
47:4, 47:6, 48:1,
57:21, 58:15, 97:11,
100:6, 100:22,
103:11
**radio** [1] - 15:9
**raise** [1] - 20:14
**raised** [2] - 68:19,
75:21
**range** [1] - 39:6
**rather** [2] - 33:19,
48:17
**rationale** [1] - 46:14
**re** [3] - 42:12, 51:22,
52:10
**read** [18] - 3:25, 13:7,
19:5, 34:21, 38:16,
43:23, 44:1, 44:2,
45:1, 56:16, 56:19,
56:25, 57:9, 60:2,
84:5, 87:20, 104:1
**readily** [1] - 34:2
**reading** [4] - 15:1,
37:16, 40:7, 89:21
**reads** [3] - 13:9,
56:24, 57:1
**ready** [1] - 105:12
**real** [3] - 5:17, 7:22,
58:12
**realize** [1] - 72:24
**really** [39] - 18:7, 19:4,
26:10, 28:4, 36:8,
40:6, 40:14, 41:15,
42:10, 42:25, 47:6,
47:9, 47:19, 49:6,
49:8, 53:4, 54:1,
55:18, 56:14, 62:21,
63:1, 63:3, 63:14,
73:15, 75:13, 75:15,
81:6, 81:7, 81:9,
82:6, 82:7, 85:6,
104:3, 104:4, 105:2
**rearrange** [5] - 8:3,
15:10, 15:18, 16:1,
16:2
**reason** [13] - 22:12,
38:10, 39:18, 44:11,
44:11, 44:20, 49:18,
55:1, 57:2, 72:10,

72:13, 98:15, 101:6
**reasonable** [1] - 103:1
**reasons** [2] - 36:1,
36:2
**rebuts** [1] - 78:2
**rebuttal** [1] - 88:6
**receive** [1] - 20:23
**receptacles** [1] - 6:24
**reciprocity** [1] - 94:17
**recitations** [1] - 52:11
**recite** [3] - 54:23,
56:10, 67:25
**recited** [11] - 37:21,
40:12, 41:9, 42:11,
42:13, 43:12, 45:13
50:5, 53:4, 70:16,
96:1
**recites** [1] - 43:21
**recognize** [1] - 74:19
**recognized** [1] - 5:19
**reconcile** [2] - 53:19,
93:19
**record** [6] - 4:24, 5:4,
5:7, 72:25, 73:2,
73:16
**recreational** [3] -
40:18, 41:5, 41:19
**rectangles** [1] - 6:8
**red** [4] - 82:1, 82:7,
82:9, 84:19
**reduced** [1] - 52:3
**refer** [4] - 7:3, 20:9,
33:6, 74:4
**reference** [17] - 6:7,
7:11, 14:8, 15:3,
38:18, 40:22, 41:1,
41:3, 44:6, 44:25,
46:20, 52:7, 52:8,
66:5, 81:8, 85:16,
96:20
**references** [2] - 33:15
82:13
**referencing** [1] - 43:24
**referential** [1] - 91:10
**referred** [5] - 5:4, 7:12,
57:16, 63:12, 89:17
**referring** [7] - 4:18,
15:16, 36:22, 43:23,
73:13, 76:24, 76:25
**refers** [4] - 4:20, 12:3,
45:7, 64:19
**refused** [1] - 50:18
**regard** [1] - 34:20
**regarding** [2] - 35:20,
68:1
**regardless** [1] - 79:11
**reinforcing** [1] - 65:3
**reissue** [2] - 50:8,
50:17
**reissued** [1] - 23:24

**reiterating** [1] - 32:4
**rejected** [3] - 49:18, 73:18, 82:14
**rejection** [3] - 72:16 73:6, 73:17
**relate** [1] - 53:15
**related** [2] - 52:8
**relates** [2] - 8:9, 21:13
**relevance** [1] - 72:6
**relevant** [4] - 46:25, 47:17, 55:11, 55:12
**reliance** [3] - 40:23, 41:4, 42:23
**relied** [1] - 41:24
**relies** [2] - 12:5, 34:23
**rely** [2] - 12:5, 38:4, 75:6
**remaining** [1] - 50:22
**remember** [2] - 14:4, 73:19
**remove** [3] - 7:10, 30:11, 30:12
**removed** [4] - 29:19, 29:21, 29:25, 30:7
**rendering** [3] - 55:22, 55:24, 56:11
**renders** [2] - 55:18, 57:25
**repeat** [1] - 83:18
**repeatedly** [1] - 11:16
**replace** [8] - 13:6, 13:20, 15:25, 16:15, 16:18, 17:11, 19:19 34:19
**replaceability** [2] - 13:22, 16:7
**replaceable** [1] - 15:16
**replaced** [2] - 30:7 48:3
**replacement** [2] - 13:15, 33:10
**replacements** [1] - 16:18
**replacing** [2] - 12:25, 13:1
**Reporter** [1] - 1:25
**reporter** [1] - 63:1
**representation** [1] - 98:13
**reprinted** [2] - 23:1, 23:5
**reproduced** [4] - 66:7, 66:8, 67:19, 84:7
**require** [5] - 5:22, 12:20, 13:22, 16:13, 18:5, 20:17, 33:4, 58:15
**required** [3] - 13:20, 35:2, 48:7

**requirement** [5] - 8:20, 9:5, 26:16, 47:11, 47:13
**requirements** [3] - 24:23, 32:7, 45:11
**requires** [11] - 11:3, 11:5, 13:6, 13:12, 21:24, 22:17, 23:16, 25:1, 25:9, 58:13, 61:12
**reservoir** [3] - 70:2, 70:3, 70:7
**respect** [2] - 63:9, 71:12
**respective** [7] - 9:19, 34:6, 67:7, 84:23, 84:25, 95:21, 103:13
**respond** [2] - 88:1C, 88:19, 105:18
**response** [3] - 66:7 67:4, 90:12
**rest** [2] - 87:2, 87:19
**restrictor** [2] - 63:18, 63:22
**result** [3] - 21:9. 22:21, 103:14
**review** [1] - 104:3
**reviewed** [1] - 50:19
**rewrite** [1] - 23:21
**ribbon** [1] - 20:3
**right-hand** [4] - 7:19, 16:20, 22:8, 66:19
**roll** [1] - 3:7
**row** [1] - 6:18
**rule** [4] - 32:23, 35:25, 88:15
**ruled** [1] - 104:21
**ruling** [1] - 52:18
**rulings** [3] - 103:24, 104:2, 104:7
**run** [7] - 5:25, 6:14, 6:17, 6:20, 6:23, 6:25, 7:24

**S**

**safe** [1] - 105:16
**sake** [1] - 22:7
**salient** [1] - 85:13
**sample** [2] - 7:14, 7:15
**San** [1] - 2:16
**satisfactory** [1] - 39:18
**saw** [1] - 8:4
**scattered** [3] - 36:7, 38:5, 38:6
**SCHOLER** [2] - 2:2 2:6
**Schreiber** [1] - 55:5
**Schreiber** [2] - 51:22,

52:10
**SCIENCES** [2] - 1:4 1:5
**Scientific** [1] - 42:2
**scope** [6] - 23:13, 32:25, 33:2, 65:24, 101:20
**screw** [1] - 79:18
**screwed** [3] - 70:10, 79:14, 79:16
**scroll** [1] - 69:18
**second** [11] - 4:6, 26:21, 30:17, 35:14, 58:12, 60:2, 75:9, 92:3, 96:13, 98:23, 99:10
**section** [131] - 58:13, 58:19, 58:22, 59:2, 59:4, 59:8, 59:12, 59:13, 59:17, 59:19, 59:24, 60:3, 60:9, 60:23, 61:3, 61:4, 61:9, 61:25, 63:25, 64:10, 64:11, 64:13, 64:15, 64:18, 65:6, 65:8, 65:19, 66:9, 66:13, 66:24, 67:10, 67:18, 68:1, 68:3, 75:20, 76:9, 76:10, 76:11, 76:24, 77:6, 77:9, 77:13, 77:14, 78:14, 78:23, 80:5, 80:16, 81:1, 81:4, 82:8, 82:10, 82:25, 84:2, 84:21, 85:22, 86:17, 90:15, 90:16, 90:19, 91:2, 91:5, 91:7, 91:8, 91:9, 91:11, 91:12, 93:7, 93:24, 93:25, 94:2, 94:3, 94:4, 94:9, 94:10, 94:11, 94:25, 95:3, 95:4, 95:7, 95:21, 95:24, 96:4, 96:25, 97:1, 97:3, 97:4, 97:10, 97:13, 97:15, 97:21, 97:23, 97:25, 98:6, 98:7, 98:9, 98:12, 99:1, 99:2, 99:4, 99:6, 99:7, 99:9, 99:10, 99:12, 99:17, 99:24, 99:25, 100:1, 100:10, 100:12, 100:15, 100:16, 101:15, 101:17, 101:21, 102:5, 102:9, 102:10, 102:18, 102:19, 102:22, 102:23,

103:7
**Section** [1] - 52:9
**sections** [25] - 58:5, 67:7, 78:11, 78:12, 83:2, 84:13, 84:17, 84:23, 84:25, 85:3, 86:17, 90:10, 90:17, 90:21, 94:19, 99:4, 99:8, 99:14, 99:20, 99:21, 100:18, 101:9, 103:5, 103:9
**see** [42] - 6:4, 6:5, 6:8, 6:18, 7:11, 7:20, 8:9, 16:19, 22:2, 27:24, 42:3, 44:16, 46:6, 49:13, 50:6, 50:7, 50:10, 50:20, 51:8, 51:24, 64:20, 65:15, 66:4, 66:14, 66:16, 67:13, 70:12, 70:17, 71:13, 72:25, 73:3, 73:5, 78:12, 82:1, 82:2, 82:4, 82:14, 84:13, 97:6, 97:16, 98:20, 101:12
**seeing** [1] - 42:12
**seem** [1] - 47:1C
**sell** [2] - 22:5, 23:13
**sense** [7] - 22:22, 39:25, 44:4, 69:1, 73:15, 79:12, 98:1
**sensor** [7] - 57:12, 65:16, 74:16, 74:25, 89:16, 89:20
**sensors** [7] - 14:12, 34:1, 65:11, 65:17, 89:19, 89:25, 91:18
**sentence** [1] - 9:13
**separate** [10] - 70:6, 70:7, 71:8, 78:14, 83:20, 83:24, 84:12, 84:15, 99:12
**separated** [8] - 79:10, 81:11, 83:23, 84:22, 85:3, 85:4, 95:20, 103:6
**separates** [2] - 64:9. 64:13
**separating** [2] - 65:1, 79:2
**separation** [2] - 90:15, 91:1
**September** [1] - 67:4
**serve** [1] - 32:18
**service** [3] - 9:14, 33:17, 34:5
**serviceperson** [2] - 5:22, 6:12
**set** [6] - 35:11, 36:1, 46:1, 58:4, 103:24,

105:13
**setup** [1] - 34:9
**seven** [2] - 21:5, 78:21
**several** [4] - 40:12, 52:1, 52:3, 96:6
**shape** [6] - 29:9, 29:17, 29:20, 29:24 30:11, 31:9
**shapes** [1] - 34:12
**shared** [2] - 33:6, 33:20
**Shaw** [3] - 3:10, 4:19
**SHAW** [3] - 1:20, 1:20, 3:9
**short** [3] - 69:9, 69:10, 70:10
**shorted** [1] - 76:3
**shorten** [1] - 11:20
**show** [11] - 5:2, 22:23 28:7, 28:9, 37:6, 77:11, 77:16, 80:4, 80:5, 80:15, 95:5
**showed** [1] - 66:9
**showing** [1] - 52:10
**shown** [7] - 5:10, 6:15, 16:15, 36:12, 66:20, 70:20, 82:16
**shows** [5] - 5:14, 33:1, 50:6, 50:8, 59:21, 82:3, 84:20
**shut** [1] - 71:19
**side** [56] - 4:4, 4:21, 7:19, 16:16, 16:20, 22:8, 26:7, 51:3, 51:16, 53:25, 59:7, 59:22, 61:12, 61:19 64:24, 65:3, 66:16, 66:17, 66:19, 68:15, 68:21, 68:24, 68:25, 69:2, 72:1, 72:2, 75:19, 75:24, 79:2, 81:16, 81:20, 82:2, 82:4, 82:24, 83:6, 83:9, 83:10, 83:12, 86:1, 86:3, 89:24, 92:18, 93:4, 93:5, 93:11, 93:14, 93:21, 93:22, 96:7, 98:10
**side's** [1] - 58:10
**sides** [4] - 67:7, 75:14 75:18, 75:23
**sides'** [1] - 29:5
**sign** [1] - 104:7
**silly** [1] - 22:2C
**SILVERSTEIN** [2] - 2:11, 3:16
**Silverstein** [1] - 3:17
**similar** [3] - 5:8, 46:8, 50:6
**single** [3] - 44:5.

70:12, 77:9
**sit** [7] - 78:3, 82:24, 83:9, 83:12, 93:4, 93:11, 93:21
**sits** [1] - 93:14
**situation** [7] - 10:5, 17:21, 19:1, 34:20, 46:24, 81:17, 105:10
**six** [1] - 78:21
**size** [6] - 29:9, 29:17, 29:20, 29:23, 30:11, 31:8
**sizes** [1] - 34:12
**skill** [1] - 79:13
**skilled** [2] - 47:16, 48:4
**skip** [1] - 26:2
**SKLENAR** [23] - 2:3, 3:13, 4:2, 4:13, 43:9, 43:18, 46:5, 46:22, 48:18, 48:25, 49:24, 50:13, 50:15, 96:12, 96:19, 96:23, 100:7, 100:24, 101:3, 101:6, 102:13, 103:19, 104:10
**Sklenar** [4] - 3:12, 4:3, 43:10, 96:13
**slide** [100] - 4:18, 4:20, 5:6, 5:13, 6:4, 7:8, 7:9, 8:7, 9:11, 11:14, 11:18, 11:25, 12:3, 14:3, 15:14, 16:11, 20:16, 23:2, 23:5, 26:13, 29:4, 29:22, 30:4, 32:5, 35:22, 36:4, 36:12, 37:10, 37:13, 38:13, 38:14, 38:24, 39:22, 41:13, 41:18, 41:24, 42:12, 42:12, 43:15, 44:21, 45:6, 46:6, 46:12, 50:5, 50:12, 51:10, 51:21, 55:16, 55:23, 57:6, 58:9, 58:10, 59:23, 60:1, 60:21, 61:2, 61:23, 62:11, 63:9, 64:3, 64:19, 65:9, 65:13, 65:14, 66:3, 66:17, 67:3, 67:20, 69:18, 69:19, 70:15, 70:20, 71:5, 71:23, 78:6, 78:10, 80:2, 81:24, 82:12, 83:3, 83:14, 83:19, 83:25, 84:13, 85:6, 86:12, 87:4, 91:3, 92:7, 92:8, 92:9, 94:13, 100:3
**slides** [6] - 26:13,

67:13, 69:17, 87:2, 87:19, 98:18
**slight** [1] - 30:25
**slot** [2] - 7:5, 7:7
**smoothly** [1] - 6:14
**sold** [1] - 23:14
**solve** [1] - 32:20
**solvent** [1] - 72:17
**someone** [2] - 48:4, 97:7
**sometimes** [2] - 5:4, 7:3
**somewhere** [3] - 72:25, 97:3, 97:5
**sorry** [18] - 11:14, 15:5, 19:24, 21:11, 21:23, 37:16, 53:13, 59:1, 61:7, 61:9, 69:18, 76:23, 80:22, 83:4, 88:7, 88:22, 89:2, 94:21
**sort** [3] - 5:15, 17:17, 48:12
**space** [1] - 54:23
**speaking** [1] - 104:19
**spec** [4] - 26:11, 47:11, 50:1, 57:5
**special** [2] - 40:19, 57:17
**specific** [6] - 26:12, 34:9, 45:3, 50:3, 53:6, 81:21
**specifically** [7] - 15:13, 25:10, 44:15, 45:7, 67:17, 71:11, 72:6
**specification** [47] - 5:1, 8:8, 9:9, 10:16, 11:6, 11:15, 12:4, 12:7, 12:12, 12:20, 13:12, 16:10, 17:5, 17:8, 19:6, 19:17, 19:21, 20:8, 26:12, 26:15, 27:12, 27:14, 27:17, 32:2, 32:6, 32:8, 32:19, 38:24, 39:1, 39:15, 45:2, 45:7, 57:19, 59:16, 59:20, 62:10, 64:2, 64:20, 65:10, 66:1, 69:23, 71:12, 75:3, 79:7, 79:18, 89:5, 96:5
**specify** [1] - 72:14
**split** [1] - 99:19
**spoken** [1] - 63:5
**spots** [1] - 21:21
**squiggle** [1] - 82:2
**standard** [4] - 25:24, 39:5, 46:19, 86:18

**standardized** [7] - 29:9, 29:17, 29:20, 29:23, 30:11, 31:8, 34:12
**stands** [1] - 81:6
**start** [12] - 3:23, 4:1, 4:3, 4:10, 4:18, 4:20, 21:14, 26:13, 46:18, 76:17, 82:12, 88:14
**started** [5] - 5:17, 19:14, 27:15, 40:17
**starting** [6] - 27:6, 27:7, 27:12, 39:3, 69:19, 89:5
**starts** [2] - 63:12, 78:13
**statement** [5] - 51:9, 53:19, 55:14, 78:24, 93:20
**statements** [6] - 51:15, 51:19, 52:11, 53:21, 77:12, 103:2
**STATES** [1] - 1:1
**states** [1] - 57:8
**station** [1] - 74:20
**stationary** [2] - 23:8, 24:18
**stay** [1] - 105:16
**step** [1] - 102:2
**still** [13] - 37:2, 48:25, 51:6, 51:18, 52:20, 52:21, 54:12, 55:10, 56:11, 56:16, 76:13, 88:20
**street** [1] - 94:17
**stressed** [2] - 11:7, 16:9
**stresses** [1] - 10:17
**structural** [15] - 41:6, 41:18, 42:3, 42:9, 45:10, 51:14, 51:17, 52:20, 53:2, 53:8, 53:9, 54:12, 55:2, 55:14
**structurally** [1] - 42:21
**structure** [23] - 6:1, 15:1, 39:19, 40:9, 41:9, 42:15, 43:17, 45:14, 45:15, 51:7, 51:9, 52:24, 53:11, 54:10, 54:13, 54:15, 54:17, 54:20, 55:8, 55:11, 57:6, 57:7
**stuck** [2] - 24:19, 97:8
**stuff** [4] - 66:24, 72:4, 72:21, 79:11
**submit** [12] - 43:4, 48:9, 53:9, 55:10, 57:21, 67:23, 68:5, 91:15, 95:25,

103:23, 104:6, 105:14
**submitted** [1] - 35:23
**submitting** [1] - 101:16
**substitution** [2] - 34:15
**sudden** [1] - 25:17
**suggest** [2] - 44:14, 44:23
**suggestion** [1] - 83:23
**SULLIVAN** [1] - 2:15
**summarizes** [1] - 33:24
**summary** [1] - 39:8
**Summit** [8] - 36:11, 36:14, 36:18, 36:25, 37:5, 37:7, 37:12, 45:22
**sums** [1] - 68:6
**superfluous** [4] - 55:19, 55:25, 56:12, 58:1
**supplement** [1] - 73:16
**support** [4] - 36:2, 47:20, 70:14, 95:25
**supported** [1] - 48:6
**supports** [2] - 43:19, 71:2
**surprising** [1] - 67:20
**surrounded** [1] - 81:1
**switch** [1] - 38:23
**synonymous** [1] - 73:24
**system** [85] - 5:18, 5:24, 6:2, 8:4, 8:11, 9:5, 15:9, 20:22, 21:1, 21:5, 21:7, 22:5, 22:18, 22:19, 23:12, 23:13, 23:15, 23:18, 23:25, 24:11, 24:21, 25:3, 25:14, 27:20, 34:20, 39:4, 39:5, 39:10, 39:23, 40:2, 40:8, 40:16, 40:17, 41:5, 42:5, 42:6, 42:8, 43:21, 45:19, 45:20, 46:2, 46:3, 46:9, 46:15, 47:3, 47:23, 47:25, 48:2, 48:5, 48:14, 48:23, 48:24, 49:9, 49:14, 49:15, 49:17, 49:22, 49:23, 51:8, 53:1, 54:4, 54:6, 54:24, 55:4, 55:21, 55:23, 56:4, 56:7, 56:13, 57:10, 57:11, 57:18, 63:5, 65:7,

69:4, 70:18, 71:16, 71:17, 76:6, 84:14, 87:9, 89:21, 92:17
**systems** [16] - 5:20, 8:10, 39:7, 43:12, 43:13, 43:14, 45:1, 45:4, 45:9, 50:2, 51:1, 55:4, 56:4, 89:19, 92:15, 92:22

---

# T

**table** [1] - 101:4
**talks** [9] - 9:9, 11:16, 50:2, 61:25, 63:17, 65:10, 89:5, 90:18
**task** [1] - 33:13
**taught** [2] - 69:9, 94:14
**teach** [2] - 55:5, 94:3
**teaches** [2] - 68:4, 91:20
**teaching** [2] - 12:13, 63:23
**Technology** [1] - 41:24
**Telephone** [1] - 1:14
**telephone** [4] - 3:3, 77:19, 103:25, 105:19
**term** [37] - 4:22, 4:25, 5:5, 5:8, 5:9, 5:10, 5:16, 14:4, 14:5, 14:19, 15:4, 18:5, 19:10, 19:14, 20:1, 20:11, 26:5, 27:11, 27:16, 28:6, 28:8, 31:18, 33:3, 34:24, 34:25, 35:20, 39:11, 46:1, 48:12, 52:24, 54:14, 54:15, 57:22, 67:18, 86:16, 86:20
**terms** [20] - 3:24, 4:5, 5:9, 27:18, 29:6, 31:15, 32:25, 46:2, 47:17, 51:14, 52:22, 53:9, 54:21, 56:18, 56:24, 57:1, 58:4, 86:19, 102:17, 103:16
**text** [1] - 8:7
**THE** [172] - 1:1, 1:2, 3:6, 3:14, 3:22, 4:10, 8:17, 9:7, 9:21, 10:6, 10:18, 10:23, 11:10, 12:17, 12:22, 13:9, 13:14, 14:18, 14:22, 16:24, 17:4, 17:23, 18:10, 18:25, 21:11, 22:10, 22:23, 23:3,

23:6, 24:2, 24:6, 24:8, 24:13, 24:15, 24:18, 25:18, 25:21, 25:25, 26:6, 26:20, 27:2, 27:5, 27:18, 28:1, 28:20, 29:2, 29:11, 29:14, 29:22, 30:5, 30:9, 30:20, 31:3, 31:5, 31:20, 31:24, 32:3, 32:9, 32:22, 36:16, 36:24, 37:3, 37:6, 37:16, 37:24, 38:8, 38:12, 39:21, 40:25, 43:6, 43:8, 43:16, 45:12, 46:18, 48:16, 48:22, 49:20, 50:12, 50:14, 51:2, 52:13, 53:13, 54:19, 56:2, 56:15, 57:23, 58:17, 58:21, 59:3, 59:7, 59:10, 59:23, 60:12, 60:18, 60:21, 61:10, 61:13, 61:16, 61:20, 62:12, 62:15, 62:17, 68:8, 68:10, 68:14, 69:12, 69:21, 72:24, 73:20, 74:2, 75:9, 75:12, 76:15, 76:17, 76:21, 77:1, 77:4, 77:18, 78:8, 79:23, 80:1, 80:8, 80:11, 80:13, 80:19, 80:21, 83:5, 83:8, 83:13, 84:11, 87:16, 88:2, 88:7, 88:10, 88:12, 88:24, 89:1, 90:3, 90:6, 90:23, 91:9, 92:1, 92:5, 92:8, 92:11, 92:25, 93:10, 93:19, 94:13, 94:22, 95:5, 95:11, 95:14, 95:17, 96:10, 96:18, 96:22, 97:16, 98:4, 98:19, 98:23, 100:4, 100:11, 100:25, 101:5, 101:22, 102:15, 103:22, 104:12, 104:15, 104:20, 105:2
**theirs** [1] - 13:9
**themselves** [2] - 31:17, 33:3
**therefore** [3] - 10:23, 66:25, 83:10
**they've** [1] - 38:6
**thinking** [2] - 20:21, 88:15
**third** [5] - 4:7, 57:4, 57:20, 64:20, 99:4

**three** [4] - 20:17, 63:13, 84:12, 95:16
**threshold** [1] - 50:19
**throughout** [5] - 16:9, 36:21, 37:20, 40:13, 72:22
**throwing** [1] - 74:11
**thrown** [1] - 60:21
**Thursday** [1] - 1:13
**ti** [1] - 11:23
**time-consuming** [1] - 33:12
**tire** [2] - 89:16, 89:20
**tires** [1] - 74:21
**title** [1] - 49:21
**today** [7] - 14:9, 49:1, 63:7, 103:23, 104:6, 104:7, 105:13
**today's** [2] - 51:18, 103:25
**together** [2] - 94:15, 94:24
**took** [7] - 14:13, 49:14, 50:23, 66:5, 71:23, 72:1
**tool** [2] - 42:5, 42:7
**top** [12] - 6:19, 7:11, 29:17, 30:16, 51:23, 52:1, 82:3, 95:15, 99:23, 99:25
**totality** [1] - 56:16
**totally** [2] - 55:25, 71:8
**towards** [2] - 54:2, 54:24
**trailer** [2] - 42:13, 42:14
**transcript** [4] - 104:14, 104:17, 104:18, 105:12
**transition** [1] - 25:8
**transitional** [1] - 90:20
**travel** [3] - 42:13, 42:14, 70:11
**treated** [1] - 88:18
**treating** [2] - 59:14, 68:20
**trial** [1] - 101:25
**tried** [1] - 49:16
**trouble** [2] - 84:9, 104:18
**true** [2] - 17:3, 66:10
**trump** [1] - 35:10
**trusted** [1] - 74:22
**try** [6] - 3:25, 5:25, 18:24, 50:20, 73:16, 96:16
**trying** [14] - 4:25, 19:2, 19:5, 21:12, 23:20, 35:24, 47:21, 53:8, 53:24, 54:17, 87:11,

97:2, 97:6
**tube** [1] - 74:22
**tubes** [2] - 78:22, 78:23
**tubing** [11] - 6:17, 6:23, 6:25, 11:20, 15:18, 16:2, 66:18, 66:19, 82:1, 82:5
**turn** [9] - 4:14, 5:13, 35:22, 38:14, 46:6, 47:22, 65:21, 91:21, 101:13
**turning** [2] - 36:4, 83:4
**two** [39] - 5:23, 6:22, 20:3, 20:17, 20:25, 21:21, 21:23, 21:24, 22:1, 22:4, 22:5, 22:17, 22:18, 23:13, 23:16, 23:19, 30:4, 30:25, 31:15, 32:17, 33:23, 57:11, 57:13, 62:6, 62:24, 66:4, 66:6, 83:17, 88:17, 88:18, 90:10, 94:6, 95:16, 99:3, 99:14, 103:5, 105:5
**two-wheeled** [1] - 20:3
**type** [6] - 22:13, 39:4, 43:14, 81:3, 100:2
**types** [2] - 7:21, 50:3
**typical** [1] - 49:24
**typo** [1] - 33:10

**U**

**U.S.D.C.J** [1] - 1:16
**under** [13] - 10:1, 10:2, 10:6, 17:6, 22:4, 22:13, 24:15, 24:17, 29:23, 39:8, 48:1, 52:9
**underlies** [1] - 38:16
**underlined** [1] - 84:19
**underlying** [1] - 16:4
**understandably** [1] - 100:19
**understood** [4] - 25:8, 47:17, 48:13, 87:6
**unduly** [1] - 58:16
**unequivocal** [2] - 35:9, 103:2
**unequivocally** [2] - 90:8, 90:9
**unimportant** [1] - 19:20
**unit** [30] - 24:12, 24:16, 29:10, 30:1, 30:7, 30:13, 30:24, 31:14, 32:10, 40:11,

57:12, 58:14, 62:1, 62:9, 63:16, 63:25, 64:8, 82:18, 82:21, 84:24, 85:9, 92:13, 92:21, 95:20, 102:6, 102:11, 102:19, 102:24, 103:13
**UNITED** [1] - 1:1
**units** [4] - 12:25, 24:12, 33:11, 60:8
**unless** [2] - 20:15, 26:3
**unmistakable** [2] - 65:24, 94:5
**unpatentable** [2] - 50:11, 50:15
**up** [31] - 4:24, 6:5, 7:1, 11:20, 15:23, 17:19, 23:3, 28:14, 28:19, 29:4, 37:9, 39:22, 40:25, 46:20, 51:7, 54:21, 57:18, 67:12, 68:6, 70:6, 70:10, 70:20, 71:19, 79:14, 79:16, 79:18, 80:19, 81:3, 87:15, 98:20, 99:19
**upgrade** [4] - 9:15, 32:18, 33:17, 34:5
**upper** [2] - 6:21, 21:20
**URQUHART** [1] - 2:15
**user** [3] - 6:23, 41:25
**uses** [5] - 25:7, 26:15, 32:6, 46:19, 100:17
**UV** [6] - 34:11, 34:17, 34:18, 34:19, 90:1, 91:19

**V**

**vague** [1] - 47:21
**Valerie** [1] - 1:24
**valve** [33] - 7:13, 7:14, 7:15, 8:2, 16:15, 16:16, 16:19, 21:21, 21:23, 22:8, 30:12, 30:13, 30:15, 34:7, 62:3, 63:19, 63:20, 65:16, 69:23, 69:24, 70:1, 70:5, 71:3, 71:4, 71:8, 71:9, 78:20, 87:3, 88:17, 89:16, 89:20
**valves** [4] - 9:19, 14:12, 57:13, 67:5
**various** [10] - 6:6, 6:13, 6:17, 8:16, 9:1, 10:13, 11:24, 21:6, 21:16
**vehicle** [4] - 20:1,

40:18, 41:5, 41:19
**view** [5] - 17:6, 19:6, 22:18, 23:11, 35:10
**vitality** [2] - 40:3 45:21
**vs** [1] - 1:8

**W**

**wait** [14] - 21:11, 24:2 52:13, 60:8, 82:15, 82:16, 87:13
**walk** [2] - 77:20, 90:12
**wall** [1] - 66:15
**wants** [2] - 18:5, 101:7
**Washington** [1] - 2:3
**water** [1] - 48:1
**website** [1] - 60:9
**week** [3] - 103:23, 104:7, 105:13
**weird** [3] - 44:15, 84:4, 84:7
**wet** [21] - 64:24, 68:23, 68:24, 69:1, 69:3, 70:11, 75:24, 75:25, 76:3, 76:6, 76:11, 79:2, 79:10, 79:11, 79:14, 79:15, 79:19, 79:20, 81:20, 89:24, 92:18
**whatnot** [3] - 8:2, 9:20, 14:12, 15:7, 15:11, 15:18, 65:25, 66:23, 67:21
**wheeled** [1] - 20:3
**whereas** [2] - 13:9, 30:10
**wherein** [5] - 27:19, 55:23, 57:25, 95:15, 95:18
**whole** [2] - 15:24, 57:1
**willing** [2] - 101:17, 102:13
**Wilmington** [1] - 1:13
**wire** [1] - 85:19
**wonder** [1] - 75:14
**word** [13] - 9:4, 10:11, 25:7, 56:17, 62:23, 64:23, 65:2, 71:21, 72:1, 74:7, 75:5, 82:25, 93:8
**wording** [1] - 46:10
**words** [25] - 10:1, 10:4, 10:14, 13:13, 13:24, 15:17, 16:14, 17:7, 19:10, 19:13, 19:22, 20:21, 24:25, 25:12, 28:14, 28:19, 47:25, 48:13, 59:3, 60:9, 67:8, 67:21,

77:24, 78:1, 104:24
**works** [2] - 56:5, 61:23
**world** [1] - 7:22
**write** [2] - 50:20, 104:25
**writing** [1] - 104:18
**written** [13] - 8:19, 33:5, 33:11, 35:12, 45:14, 45:18, 69:13, 73:1, 77:21, 77:25, 78:1, 97:21, 103:23

## Y

**yellow** [5] - 12:4, 64:5, 82:5, 82:9, 82:10
**yesterday** [1] - 4:19
**yourself** [1] - 8:6

HIGHLY CONFIDENTIAL - SOURCE CODE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CYTIVA SWEDEN AB and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC, | ) ) ) ) |
| Plaintiffs, | ) C.A. No. 18-1899-CFC ) Consolidated ) |
| v. | ) **HIGHLY CONFIDENTIAL-** ) **FILED UNDER SEAL** |
| BIO-RAD LABORATORIES, INC., | ) ) |
| Defendant. | ) |

## <u>Declaration of Nenad Vukicevic</u>

1.      Counsel for Cytiva Sweden AB and Global Life Sciences Solutions USA LLC. (which I will refer to herein as "Cytiva") have engaged me in this case. I have been compensated at a rate of $325 per hour for my consulting work. My compensation is not contingent upon the outcome of this case.  I am submitting this declaration at the request of Cytiva.

2.      I obtained a BS degree in Electrical Engineering from the University of Belgrade, Serbia, and have 39 years of experience in embedded systems, computer languages, high-performance computing, and application development on many

HIGHLY CONFIDENTIAL - SOURCE CODE

systems. I have been employed by Intrepid Technology since 1989, where I am one of the founding partners. I have experience and familiarity with many programming languages and have extensive experience reviewing source code for litigation matters.

3.     I was asked to review certain source code produced by Bio-Rad Laboratories, Inc. ("Bio-Rad") executed by Bio-Rad's NGC liquid chromatography system.

4.     The source code was produced in the form of multiple folders, labeled as ChromLabvX.YSource.  These folders appear to be different versions of the software for the NGC system, titled Versions 3.1, 3.2, 3.3, 4.0, 5.0.2, and 6.0.  A review of each folder revealed a similar folder structure for each of them. For the code review, I focused mainly on the latest, version 6.0, and verified that the code is not different in any significant way for the other versions.

5.     ███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████

6.     █████████████████████████████████████

██████████████████████████████████████████

HIGHLY CONFIDENTIAL - SOURCE CODE



HIGHLY CONFIDENTIAL - SOURCE CODE



HIGHLY CONFIDENTIAL - SOURCE CODE

████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

12.     I declare under penalty of perjury under the laws of the Untied States of America that the foregoing is a true and correct statement of my opinions and the supporting facts and that this declaration was executed on December 15, 2020 at Half Moon Bay, California.

Dated: December 15, 2020

_____

Nenad Vukicevic

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CYTIVA SWEDEN AB  and | ) | |
| GLOBAL LIFE SCIENCES | ) | |
| SOLUTIONS USA LLC, | ) | |
| | ) | |
| | ) | C.A. No. 18-1899-CFC |
| Plaintiffs, | ) | Consolidated |
| | ) | |
| v. | ) | |
| | ) | |
| BIO-RAD LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JEFFREY A. MILLER IN SUPPORT OF
PLAINTIFFS' OPENING BRIEF IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT OF INFRINGEMENT OF
CLAIM 1 OF U.S. PATENT NO. 9,671,420,
CLAIM 1 OF U.S. PATENT NO. 9,709,589,
CLAIM 14 OF U.S. PATENT NO. 9,709,591, AND
CLAIM 16 OF U.S. PATENT NO. RE47,124**

1

I, Jeffrey A. Miller, declare and state as follows:

1.    I am a partner with Arnold & Porter Kaye Scholer LLP, counsel of record for plaintiffs Cytiva Sweden AB and Global Life Sciences Solutions USA LLC (together, "Cytiva") in this action.  I provide this declaration in support of Cytiva's Motion for Summary Judgment of Infringement Claim 1 of U.S. Patent No. 9,671,420, Claim 1 of U.S. Patent No. 9,709,589, Claim 14 of U.S. Patent No. 9,709,591, and Claim 16 of U.S. Patent No. Re47,124.

2.    I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

3.    Attached hereto as **Exhibit 8** is a true and correct copy of excerpts of the Deposition Transcript of Dr. Bruce Gale.

4.    Attached hereto as **Exhibit 9** is a true and correct copy of excerpts of the publicly available document, titled "NGC Chromatography Systems and ChromLab Software User Guide Version 6.0."

5.    Attached hereto as **Exhibit 15** is a true and correct copy of the Expert Rebuttal Report of Dr. Bruce Gale, served on October 21, 2020.

1

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed on December 15, 2020 in Palo

Alto, California.

Jeffrey A. Miller

2

# EXHIBIT 8

# FILED UNDER SEAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Cytiva Sweden AB and Global Life

Sciences Solutions USA, LLC,

                 Plaintiff,       Case No.

                            18-1899-CFC

       -against-

Bio-Rad Laboratories, Inc.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

HIGHLY CONFIDENTIAL

VIDEO-RECORDED DEPOSITION OF

DR. BRUCE GALE

Zoom Videoconference

11/25/2020

8:28 a.m. (MT)

REPORTED BY: AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1                                              11/25/2020

2                                              8:28 a.m.  (MT)

3

4          VIDEO-RECORDED DEPOSITION OF DR. BRUCE GALE,

5    held virtually via Zoom Videoconferencing, before

6    Amanda Gorrono, Certified Live Note Reporter, and

7    Notary Public of the State of New York.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
                                                          Page 3
  1    A P P E A R A N C E S

  2    (Via Zoom Videoconferencing

  3

  4    ON BEHALF OF PLAINTIFF:  CYTIVA SWEDEN AB AND GLOBAL
       LIFE SCIENCES SOLUTIONS USA, LLC:
  5         Jennifer Sklenar, Esquire
            Arnold & Porter Kaye Scholer LLP
  6         601 Massachusetts Ave, NW
            Washington, D.C. 20001-3743
  7         PHONE:  202.942.5786
  8         E-MAIL: Jennifer.sklenar@arnoldporter.com
  9
 10    ON BEHALF OF DEFENDANT:  BIO-RAD LABORATORIES, INC.:
            Sean Damon, Esquire
 11         Quinn Emanuel Urquhart & Sullivan, LLP
            1300 I Street NW
 12         #900
            Washington, D.C. 20005
 13         PHONE: 202-538-8260
            E-MAIL: Seandamon@quinnemanuel.com
 14

 15

 16    ALSO PRESENT:
 17    Brian Cannon, Esquire, on behalf of Bio-Rad, Quinn
 18    Emanuel Urquhart & Sullivan, LLP
 19    Andy Mortensen, legal videographer, Digital Evidence
 20

 21

 22
```

Page 4

1                        I N D E X

2

3      WITNESS                  EXAMINATION BY          PAGE

4      DR. BRUCE GALE        MS. SKLENAR                  7

5

6                        E X H I B I T S

7

8      EXHIBIT      DESCRIPTION                        PAGE

9      Exhibit 326  Dr. Gale's Opening Report.......    81

10     Exhibit 327  Dr. Gale's Rebuttal Report......    81

11     Exhibit 328  Dr. Gale's Reply...............     81

12     Exhibit 329  Dr. Wereley's Opening Report....    81

13     Exhibit 330  Dr. Wereley's Rebuttal Report...    81

14     Exhibit 331  Dr. Wereley's Reply............     81

15     Exhibit 332  Declaration of Dr. Bruce Gale...   154

16     Exhibit 333  Declaration of Dr. Bruce Gale

17                  Regarding Claim Construction....   155

18     Exhibit 334  Declaration of Dr. Bruce Gale

19                  in support of Bio-Rad

20                  Laboratories' Petition for

21                  Institution of an IPR on US

22                  Patent No. 8,821,718............   155

Case 1:18-cv-01899-CFC-SRF   Document 196-1   Filed 12/22/20   Page 882 of 1041 PageID #:
9043
11/25/2020        Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.      Bruce Gale, Ph.D.
Highly Confidential

Page 5

1                    E X H I B I T S, CON'T

2

3      EXHIBIT       DESCRIPTION                          PAGE

4      Exhibit 335   List of Programs on the 2040

5                    Instrument......................   194

6      Exhibit 336   2040 System Test Report........    244

7      Exhibit 337   NGC chromatography systems and

8                    ChromLab software instrument

9                    guide..........................    357

10     Exhibit 338   Bio-Rad Hardware Specification..   367

11

12              PREVIOUSLY MARKED EXHIBITS IDENTIFIED

13

14     EXHIBIT       DESCRIPTION                          PAGE

15     Shinoff       Asserted Patents................ 123

16     Exhibits

17     118 - 122

18

19

20

21

22

Page 6

1                    THE VIDEOGRAPHER:   Stand by please.

2                    This begins the media of the

3     videotaped deposition of Dr. Bruce Gale, taken by

4     Counsel for the plaintiffs in the matter of Cytiva

5     Sweden AB and Global Life Sciences Solutions USA

6     LLC, versus Bio-Rad Laboratories, Inc., in the United

7     States District Court for the District of Delaware,

8     Case No. 18-1899-CFC.

9                    This deposition is being conducted by

10    Zoom and recorded in Irving, Texas, on November 25,

11    2020.  The time on the video screen is 8:28 a.m.

12    Mountain Time.

13                   My name is Andy Mortensen.  I'm the

14    legal videographer from Digital Evidence Group.  The

15    court reporter is Amanda Gorrono, in association with

16    Digital Evidence Group.

17                   All parties for this deposition are

18    appearing remotely and have agreed to the witness

19    being sworn in remotely.  Due to the nature of remote

20    reporting, please pause briefly before speaking, to

21    ensure all parties are heard completely.

22                   Will counsel please introduce

Page 7

1    themselves for the record?

2                    MS. SKLENAR:  Yes.  Good morning.  My

3    name is Jennifer Sklenar.  I'm with Arnold & Porter

4    representing plaintiffs.

5                    MR. DAMON:  Good morning.  Sean Damon

6    and Brian Cannon on behalf of Bio-Rad, from Quinn

7    Emanuel.

8                    THE VIDEOGRAPHER:  Thank you.  Will

9    the court reporter please swear in the witness?

10   D R.   B R U C E   G A L E, called as a witness,

11   having been first duly sworn by a Notary Public of

12   the State of New York, was examined and testified as

13   follows:

14   EXAMINATION BY

15   MS. SKLENAR:

16          Q.      Good morning, Dr. Gale.

17          A.      Good morning.

18          Q.      Could you please state your full name

19   for the record?

20          A.      Bruce Kent Gale.

21          Q.      And you are an expert witness in this

22   case for Bio-Rad, correct?

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Bruce Gale, Ph.D.
Highly Confidential



Page 352

1    agreements produced by Bio-Rad and Cytiva other than

2    the two you've summarized?

3          A.       Actually, I think there were like six

4    or eight or some number of license agreements.  I

5    don't remember specifically.  They were -- there were

6    more than two.

7          Q.       You don't summarize any agreements

8    other than the ████████████████████████████████

█    ████████████████████, correct?

10         A.       That's correct.

11         Q.       ████████████████████████████████

█    █████████████████████████████████

█    █████████████ ██████████████████

█    █████ ██ █████████████████████████

█    ██████████████████████████████████████████

█    █████████████████████████

█    ████ ██ ████████████████████████████

█    █████████████████████

█    ████ ██ ███ █████████████████████████████

█    █████████████████

21         Q.       And liquid chromatography is to

22    separate biological materials, right?

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Bruce Gale, Ph.D.
Highly Confidential

Page 353

1          A.          Yeah.   I mean, the mechanisms are

2    different but they are both used to do analytical

3    measurements.

4          Q.          But they are different technologies.

5    Can we agree on that?

6          A.          Sure.

7          Q.          Okay.   Let's keep moving.   And I want

8    to turn now to a new topic.

9                      And that's the meaning of the term

10   "automated liquid chromatography" --

11                     MS. SKLENAR:   Strike that.

12         Q.          -- "automated liquid chromatography

13   system."  You understand that Dr. Wereley has

14   provided what he believes is an automated liquid

15   chromatography system, correct?

16         A.          I -- I mean, I recall reading

17   something to that effect.

18         Q.          And if we turn to his rebuttal

19   report, let's see, Paragraph 320.   Are you there?

20         A.          I am.

21         Q.          Okay.   It's Page 396, Paragraph 320,

22   he says, "In my opinion, a POSITA would understand

Page 354

1   that an automated liquid chromatography system

2   requires many ... components," and then he goes onto

3   list them.  Do you see that?

4          A.        Yes.

5          Q.        Okay.  And I just want to ask you,

6   first of all, is it your understanding that the NGC

7   system is an automated liquid chromatography system?

8                  MR. DAMON:  Objection.

9          A.        I believe it's been characterized as

10  that.  I mean, some of this goes to how you define

11  some of these terms so -- I guess it -- in general, I

12  know that it's, you know, intended to do liquid

13  chromatography and that it can do many of these

14  things in an automated fashion, but I also know that

15  those terms mean something very specific in this

16  patent and it may or may not meet those specific

17  terms.

18         Q.        You haven't taken a position that the

19  NGC system is not an automated liquid chromatography

20  system as you understand the term, correct?

21                  MR. DAMON:  Objection; form.

22         A.        Yeah.  I don't -- I don't think I

Page 355

1  wrote anything to that effect that it's not an

2  automated liquid chromatography system, but as noted,

3  you know, there's -- some of these claims or some of

4  these terms are used sometimes that may or may not

5  fit, I guess.

6          Q.      But you haven't pointed out any

7  instances where you think the NGC system could be

8  considered something different than an automated

9  liquid chromatography system, right?

10                 MR. DAMON:  Objection to form.

11         A.      Yeah.  I don't recall right off that

12 I did anything to that effect.

13         Q.      So you agree that the NGC system has

14 an injection valve?

15                 MR. DAMON:  Objection; form.

16         A.      I mean, it can, yes.

17         Q.      And you agree that the NGC system has

18 a sample pump?

19         A.      I know that the NGC system has some

20 pumps, yes.

21         Q.      And the pumps are used to pump

22 sample, correct, in the NGC system?

Page 356

1        A.        That they -- I believe there is a

2   sample pump.

3        Q.        And the NGC systems have control

4   software, right?

5                  MR. DAMON:  Objection.

6        A.        Yeah.  As far as I know, there's

7   software that runs the instrument.

8        Q.        And the NGC system has in-line

9   detectors, right?

10                 MR. DAMON:  Objection; form.

11       A.        I believe it has some detectors that

12   are included.

13       Q.        And it has in-line detectors,

14   correct, the NGC system?

15                 MR. DAMON:  Objection; form.

16       A.        Yeah.  Yeah, that's my understanding.

17       Q.        And those in-line detectors in the

18   NGC system can measure characteristics of the liquid

19   existing the chromatography column, right?

20       A.        Yeah.  I guess I don't have any

21   reason to object to that.

22       Q.        So let's go to Tab O?

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.      Bruce Gale, Ph.D.
Highly Confidential

Page 357

1              THE TECH:  (Complying.)

2                   MS. SKLENAR:  And mark it as next in

3    order.

4                   (Whereupon, Exhibit 337, NGC

5    chromatography systems and ChromLab software

6    instrument guide, was marked for identification.)

7                   MS. SKLENAR:  What's the number?  I'm

8    sorry.

9                   THE TECH:  The next number is 336 --

10   no, I'm sorry.  337.

11                  MS. SKLENAR:  337.

12   BY MS. SKLENAR:

13        Q.       So Exhibit 337 is the NGC

14   chromatography systems and ChromLab software

15   instrument guide.  Do you see that?

16        A.       I do.

17        Q.       Is this a document you've reviewed?

18        A.       I have looked at it, yes.

19        Q.       Let's turn to Page 65.  Let's look at

20   the very bottom portion under UV detectors and

21   conductivity monitor.  It says, "UV detectors measure

22   the UV absorbance of biomolecules as they elute

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.       Bruce Gale, Ph.D.
Highly Confidential

Page 358

1    through the column."  Do you see that?

2          A.        I do.

3          Q.        UV absorbance is a characteristic of

4    the sample that's eluted from the column, right?

5          A.        That's true.

6          Q.        Okay.  So what this is saying is that

7    the UV detector can measure the absorbance after the

8    liquid leaves the column, right?

9          A.        That's correct.

10         Q.        And every model of Bio-Rad's NGC

11   liquid chromatography product includes a UV monitor,

12   right?

13                   MR. DAMON:  Objection; form.

14         A.        I don't specifically recall, but I

15   think that's true.

16         Q.        And the UV module in Bio-Rad's NGC

17   systems measures UV absorbance and a conductivity of

18   the fluids that have passed through the column,

19   right?

20         A.        Sorry.  Can you say that one more

21   time?

22         Q.        The UV module in the Bio-Rad NGC

Page 359

1    systems measures UV absorbance and conductivity of

2    the fluids that have passed through the column?

3                    MR. DAMON:  Objection.

4         A.        I don't recall if the UV monitor

5    measures conductivity or not.  I don't know.

6         Q.        But at least in terms of -- so you

7    don't know that one way or another?

8         A.        You know, I don't recall if it has a

9    conductivity measurement in that system, in the UV

10   monitor system.

11        Q.        At the very least it measures the UV

12   absorbance of the fluids that pass through the

13   column, correct?

14        A.        That's correct.

15        Q.        Okay.  Are you aware of column valves

16   that issued in the prior art with integrated pressure

17   sensors prior to the 2009, 2010 time period?

18                    MR. DAMON:  Objection; form.

19        A.        I don't recall when those became

20   common.

21        Q.        So you're -- you don't know one way

22   or another; is that right?

Page 360

1              MR. DAMON:  Objection.

2        A.      Yeah.  I don't -- I don't

3   specifically remember, yeah, when that occurred.

4        Q.      Are there -- would you expect a

5   column valve with an integrated pressure sensor to

6   have any electronics or electrical components on the

7   front-facing portion?

8              MR. DAMON:  Objection; form.

9        A.      I mean, it could.  It's certainly not

10  required.

11       Q.      Okay.  But you're aware of column

12  values with integrated pressure sensors that have

13  electrical components or electronics on the outside

14  of the housing; is that right?

15             MR. DAMON:  Objection; form.

16       A.      Yeah.  I mean, like I said, it's --

17  it's there are electronic pressure sensors, there's

18  mechanical pressure sensors.  Anyways, there's --

19  there are ones that have electronic pressure sensors.

20       Q.      For -- sorry, you just said

21  electronic pressure sensors and mechanical pressure

22  sensors, right?

Page 389

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2              I, Amanda Gorrono, the officer before
     whom the foregoing depositions were taken, do hereby
3    certify that the foregoing transcript is a true and
     correct record of the testimony given; that said
4    testimony was taken by me stenographically and
     thereafter reduced to typewriting under my direction;
5    and that I am neither counsel for, related to, nor
     employed by any of the parties to this case and have
6    no interest, financial or otherwise, in its outcome.

7              IN WITNESS WHEREOF, I have hereunto
     set my hand this 25th day of November, 2020.

8

9

10

11

12

13

14   AMANDA GORRONO, CLR

15   CLR NO:  052005 - 01

16

17

18   Notary Public in and for the State of New York

19   County of Suffolk

20   My Commission No.  01G06041701

21   Expires:  01/07/2023

22

# EXHIBIT 9



**NGC Chromatography Systems
and ChromLab Software**

**User Guide**
Version 6.0

BIO·RAD

Chapman Exhibit
7/24/2020
**213**

# NGC Chromatography Systems and ChromLab Software

## User Guide

**Version 6.0**



## Bio-Rad Technical Support Department

The Bio-Rad Technical Support department in the U.S. is open Monday through Friday, 5:00 AM to 5:00 PM, Pacific time.

**Phone:** 1-800-424-6723, option 2

**Email:**   Support@bio-rad.com (U.S./Canada only)

For technical assistance outside the U.S. and Canada, contact your local technical support office or click the Contact us link at www.biorad.com.

## Notice

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage or retrieval system, without permission in writing from Bio-Rad.

Bio-Rad reserves the right to modify its products and services at any time. This user guide is subject to change without notice. Although prepared to ensure accuracy, Bio-Rad assumes no liability for errors or omissions, or for any damage resulting from the application or use of this information.

Bio-Rad is a trademark of Bio-Rad Laboratories, Inc. in certain jurisdictions.

All trademarks used herein are the property of their respective owner.

Copyright © 2018 by Bio-Rad Laboratories, Inc. All rights reserved.



# 1 Introduction

NGC chromatography systems provide a general purpose purification platform for purifying all forms of biomolecules using a combination of chromatography techniques. The systems are also useful for developing and optimizing purification protocols. The systems can provide highly purified proteins, peptides, nucleic acids, monoclonal antibodies, and other small molecules.



1   |   Introduction

ChromLab software enables you to set up and control an NGC instrument, run protein separations and other operations manually, program methods to automate purification runs, evaluate the results, and generate and print experiment reports. This user guide explains how to perform all these tasks.

## Main NGC Features

NGC chromatography systems enable you to do the following:

- Easily create purification and maintenance protocols from predefined method templates and protocol phases

- Automate multicolumn purification processes using preprogrammed templates and multiple column switching valves

- Automate multiple sample injections using either the sample inlet valve and the sample pump or the C-96 autosampler

- Expand sample monitoring using the signal import module (SIM) to export digital signals to and import digital signals from external detectors

- Collect large-volume fractions using multiple outlet valves while also collecting small-volume fractions using the BioFrac fraction collector

- Automatically prepare buffers using preprogrammed buffer blending protocols

- Analyze purification results through 1-click peak integration, determine protein concentration and calculate column performance

- Automate purification protocol optimization using the scouting wizard

- Easily locate fractions containing peaks of interest and view the protein concentration within each fraction

- Extend the preconfigured systems with additional valves for buffers, samples, and columns

Main NGC Features

- Organize the location of the modules to optimize separation performance based on method scale and complexity, and to minimize the system swept volume

- Minimize errors when connecting tubing using the Point-to-Plumb feature in ChromLab software

1   |   Introduction

## NGC Chromatography Systems

All NGC chromatography systems include ChromLab software and the NGC touch screen.



NGC chromatography systems are available in several combinations. Each system is equipped with either two 10 ml system pumps (the 10 series) or two 100 ml system pumps (the 100 series).

The NGC Quest chromatography system includes the following:

■   Two system pumps

■   Mixer

■   Sample injection valve

■   Conductivity monitor with either a single-wavelength UV detector or a multi-wavelength UV/Vis detector (available on the Plus systems)

NGC Chromatography Systems

The NGC Scout chromatography system includes the following:

- All modules on the Quest system

- pH detector valve

- Buffer blending valve

The NGC Discover chromatography system includes the following:

- All modules on the Scout system

- Column switching valve

- Two buffer inlet valves

- Sample pump

The NGC Discover Pro chromatography system includes the following:

- All modules on the Discover system

- Fourth expansion tier

- Sample inlet valve

- Outlet valve

1   |   Introduction

# Finding Out More

After you install NGC documentation from the NGC Chromatography Systems and ChromLab  Software USB drive, you can access installed NGC guides and tutorials on the Help menu in any ChromLab view.

More information about the NGC chromatography systems and ChromLab software is available from the following sources.

■ The NGC Chromatography Systems and ChromLab Software Installation Guide is available on your NGC Chromatography Systems Software USB drive as a .pdf file. This guide explains how to set up your environment, set up and install the NGC instrument in the lab, install ChromLab software, and connect ChromLab to the NGC system.

■ The NGC Chromatography Systems and ChromLab Software Instrument Guide is available on your NGC Chromatography Systems Software USB drive as a .pdf file. This illustrated guide details the modules that make up the NGC instrument and includes troubleshooting and maintenance information.

■ For ChromLab Help, click the question mark in the upper right corner in dialog boxes to access relevant information. Screen-level help is also available on the Help menu.

■ NGC video tutorials are available on the NGC Chromatography Systems Software USB drive as .mp4 files.

**Tip:**  You can click the Bio-Rad logo in the upper right corner of any ChromLab window to launch the Bio-Rad website.

 2  # The Workspace

ChromLab software provides an intuitive interface for developing chromatography methods, operating an NGC instrument, and analyzing data from chromatography runs.

ChromLab software presents four primary workspaces.

- The Home window
- The System Control window
- The Method Editor window
- The Evaluation window

Each workspace is shown and described in this chapter. The NGC instrument touch screen is also described.

## The Home Window

ChromLab software opens with the Home window, which displays three panes and the System Control tab.



The three panes provide quick access to the system control, method editor, and evaluation workspaces, as well as to the Browse Data dialog box in which you can browse and manage your data. Links to recently viewed or completed runs, methods, and analyses appear at the bottom of each workspace pane. The name of connected NGC systems and the location of the ChromLab database appear in the status bar at the bottom of the window.

**Tip:**  Clicking the Bio-Rad logo in the upper right corner of any ChromLab window launches the Bio-Rad website. Check the website often for updates to ChromLab documentation.

The Home Window

Method Editor and Evaluation tabs become visible in the Home window when you select tasks in the Method Editor and Evaluation panes.



## File Menu Commands

**Connect to System** — starting ChromLab connects you to the most recently connected NGC instrument. ChromLab can connect to multiple NGC instruments and run methods on all connected instruments at the same time.

This command opens a dialog box that enables you to choose another NGC chromatography system to connect to. ChromLab detects the NGC systems available on the same subnetwork or a system directly connected to the computer. ChromLab displays the system name, network name, and IP address of the detected systems. To connect to a system, you can:

- Select a name in the list of detected systems and click Connect.

  **Note:** If your system does not appear in the list, click Detect. ChromLab searches the network for available NGC systems and refreshes the list.

- Select the appropriate radio button, enter the system's name or IP address, and click Connect.

  **Tip:** To obtain the system's name and IP address select System Information on the instrument touch screen dropdown menu.

**Disconnect System** — displays links from which you can disconnect ChromLab software from a specific NGC system or all connected NGC systems.

**Manual Run** — opens the System Control window in manual mode so you can perform a manual run or set up your system manually.

**Calibrate** — opens the Calibration dialog box, which displays instructions and options for selecting a module and calibrating it. See Calibrations on page 74 for details.

**Open Template** — opens the Template dialog box in which you can select a method template from template folders organized by technique.

**Open Method** — opens a dialog box in which you can select a method to view or run. You can also select Show Runs and Analyses to display files associated with the selected method.

The Home Window

**New Method** — opens the Method Editor window in which you can create a method using standard method phases and steps.

**Browse Data** — opens the Browse Data dialog box in which you can browse and manage your ChromLab projects, methods, runs, and analyses. See Chapter 8, Managing ChromLab Data on page 341 for more information.

**Import** — displays links from which you can import the following:

- **NGC File** — opens a dialog box in which you can import a method, a method with runs, a run, or an analysis with its associated runs and method exported from ChromLab software running on another NGC system. See Importing NGC Data Files on page 351 for more information.

- **Unicorn Data** — opens a dialog box in which you can import a Unicorn data file into the NGC database. See Importing Unicorn Data Files on page 359 for more information.

- **DuoFlow Data** — opens a dialog box in which you can import a BioLogic DuoFlow data file into the NGC database. See Importing BioLogic DuoFlow Data Files on page 361 for more information.

**Export** — displays links from which you can export the following:

- **Methods/Method Runs** — opens a dialog box in which you can export both single or multiple methods and single or multiple methods with associated runs.

- **Runs** — opens a dialog box in which you can export single or multiple runs.

- **Analyses** — opens a dialog box in which you can export single or multiple analyses with their associated runs and methods.

  See Exporting NGC Data Files on page 353 for more information.

**Open Run** — opens a dialog box in which you can select a run to view or analyze. You can also select Show Methods and Analyses to display files associated with the selected run.

**Open Analysis** — opens a dialog box in which you can select an analysis to view. You can also select Show Runs and Methods to display files associated with the selected analysis.

**Preferences** — opens dialog boxes in which you can do the following:

- Select pressure units for all system and software pressure values. This is a global setting. See Units Tab on page 106 for more information.

- Set up an SMTP server to receive email messages about system notifications from the ChromLab computer. See Email Server Setup Tab on page 107 for more information.

- Set default values for parameters used in new methods. The settings appear in the Method Settings window. See Method Editor Tab on page 109 for more information.

- Create and configure a rack library for your fraction collectors. This a global setting. See Rack Library Tab on page 111 for more information.

- Set display preferences for the Evaluation window. See Evaluation Tab on page 113 for more information.

**Exit** — closes ChromLab.

## Help Menu Commands

**Help** — displays screen-level help topics and links to installed manuals.

**Export Diagnostic Logs** — opens the Export Diagnostic Logs dialog box in which you can export all critical information that Bio-Rad Technical Support requires to diagnose issues. The log files and data are zipped and saved to a location that you choose. See Exporting Diagnostic Logs on page 363 for more information.

**About** — displays ChromLab copyright and version information.

## The System Control Window

The System Control window enables you to run the NGC instruments manually, monitor method runs while they are running, select fluidic schemes, calibrate pumps and detectors, and verify the accuracy of instrument plumbing. This window displays each connected system on a separate tab. The system's tab displays a chromatogram during a run. A fluidic scheme graphically depicts the flow path of all the modules on the system. A status panel appears above each module displaying its real-time status. In manual mode, clicking a module displays its controls and detailed settings. The Run Log documents each action that occurs during a run. The Run Queue lists all runs ready to be started.



System Control functionality is detailed in Chapter 3, System Control.

# The Method Editor Window

The Method Editor window enables you to create, open, review, edit, and run a method. You can also open and edit a method template to create a new template. Method Editor functionality is detailed in Chapter 5, Method Editor. See also Chapter 6, Creating a Method.



The Evaluation Window

# The Evaluation Window

The Evaluation window enables you to view and compare run data, perform peak integration, and save run data as analyses. Evaluation functionality is detailed in Chapter 7, Evaluating Results.



## Instrument Control Touch Screen

In addition to ChromLab software running on a computer, the instrument is equipped with a touch screen that accesses system control functionality. You can use this touch screen to run, control, and monitor a run independent of ChromLab. See System Control on page 33 for more information.

**Tip:**   When the NGC system has been inactive for two hours the LED display screens on the instrument turn off, the touch screen dims, and a dialog box appears on the touch screen informing you that the system is in standby mode. You can take the system out of standby mode by touching OK in the dialog box, starting the system pumps by initiating a manual or method run, or clicking on a module in the fluidic scheme that has an LED display.



## Touch Screen Menu Commands

**Calibrate** — opens the Calibration dialog box, which displays instructions and settings for selecting a module and calibrating it. See Calibrating a Module on page 74 for details.

**Point-to-Plumb** — starts the Point-to-Plumb feature and simultaneously turns off instrument LED lights so you can visually verify or change instrument plumbing. Displays the current fluidic scheme. See Verifying Plumbing with the Point-to-Plumb Feature on page 77 for details.

**Change Fluidic Scheme** — opens the Fluidic Scheme Selector dialog box in which you can edit the fluidic scheme or choose another one. See Fluidic Scheme Configurations on page 59 for details.

**Map Fluidic Scheme** — opens the Fluidic Scheme Mapping dialog box in which you can map devices on your instrument to their position in the fluidic scheme. See Fluidic Scheme Mapping on page 70 for details.

**System Settings** — opens the System Settings dialog box in which you can customize system settings. See System Settings on page 79 for more information about customizing your system.

**System Information** — opens the System Information dialog box, which lists the serial number and other general information about the NGC device as well as information about the system components, processes, and UV and UV/Vis detectors. From this dialog box, you can also set a static IP address for the system. See System Information on page 102 for more details.

**Service** — for Bio-Rad technical service staff use only. Do not select this command.

**Help** — displays detailed information about touch screen menu commands.

**About** — displays ChromLab version and copyright information.

**Shut Down** — shuts down the NGC system, including the connected computer.

## Touch Screen Toolbar Commands

**Save** — saves in a data file the steps executed during a manual run.

**Clear** — deletes manual run data from the touch screen display.

**Autoscale** — automatically scales the chromatogram's primary y-axis to the tallest peak height during the run. Autoscaling is enabled by default.

**Reset Zoom** — resets the view to show the full chromatogram.

**Annotate** — adds a note to the chromatogram at points on the x-axis during a run or after the run completes.

**Flush System** — automatically starts a system flush run if the flush template selected in System Settings matches the current fluidic scheme.

> **Note:** If a flush template has not been selected in System Settings, or if the selected template does not match the current fluidic scheme, clicking this command opens the templates dialog box from which you can select a system flush template to run.



# 3 System Control

The ChromLab System Control window is the main interface to the connected NGC chromatography system. This interface also appears on the system's touch screen. System Control settings enable you to perform a manual run, monitor and control a method run, verify the device plumbing with the Point-to-Plumb feature, control and calibrate the system, and map two or more valves of the same type on your instrument to their position in the fluidic scheme.

In the Home window, you can access the System Control window by selecting the System Control tab.

## System Control Window

The ChromLab computer can connect to multiple NGC systems and run methods on each system simultaneously. The System Control window displays a tab for each NGC system to which the ChromLab computer is connected. Each tab displays a chromatogram viewer and a graphical fluidic scheme. The chromatogram is a time-, volume-, or column volume-based view of the run data acquired from the instrument. The fluidic scheme is a real-time view of the instrument status and flow.

For enhanced viewing, you can maximize the chromatogram or the fluidic scheme using the Expand buttons on the right side of the window. This is especially useful for touch screen viewing.

3   |   System Control

The fluidic scheme graphically depicts the flow between modules and how the system is configured and plumbed for an experiment. Each module's real-time status appears next to its image. For manual runs, a list of executed commands appears in the Run Log pane. In method mode, phases and steps of the method being run appear in their respective tabs, along with controls to stop or pause the run and hold the step. The Run Queue pane lists all the runs that are ready to be started and enables you to turn off the lamps after the runs are complete. The Run Queue pane is accessible in both manual and method modes.



LEGEND

| 1 | The menu bar provides quick access to File, View, Manual, Tools, and Help menu commands. |
| --- | --- |
| 2 | Tabs provide quick navigation among open windows (Home, System Control, Method Editor, and Evaluation). |
| | Tabs also provide quick access to each connected NGC system. |

System Control Window

LEGEND

| 3 | The tab toolbar provides commands to save the current run, delete manual run data from the display, autoscale the UV trace, change the chromatogram view, annotate the chromatogram, and flush the system using the system flush template selected in System Settings. |
|---|---|
| 4 | Expand buttons expand the selected pane to fill the screen. |
| 5 | The chromatogram viewer displays data acquired from the instrument as traces based on time, volume, or column volume. |
| 6 | The chromatogram legend matches each trace to its trace type and color and displays the wavelength value in nanometers for UV traces. You can view or hide traces by clicking them. |
| 7 | In method mode, run data appear in the Method Editor Phase and Step panes. In both modes, the Run Log pane presents a time-stamped record of run steps and events; the Run Queue pane lists runs that are waiting to start and enables you to turn off the lamps after the runs are complete. |
| 8 | The Fluidic Scheme pane depicts graphically how modules are configured and plumbed for an experiment. |

## File Menu Commands

**Connect to System** — opens a dialog box that enables you to choose another NGC chromatography system to connect to. See Connecting ChromLab Computers to NGC Systems on page 40 for more information.

**Disconnect System** — displays links which you use to disconnect ChromLab software from a connected NGC system or all connected NGC systems.

**Take Control** — opens a dialog box that enables you to take control of the NGC system from a connected user. This is useful in the event that the controlling computer is locked or the user performing a run is not available and there is an immediate need to stop the system.

**System Settings** — opens the System Settings dialog box in which you can customize system settings. See System Settings on page 79 for more information about customizing your system.

**System Information** — opens the System Information dialog box, which lists the serial number and other general information about the NGC device as well as information about the system components, processes, and UV and UV/Vis detectors. See System Information on page 102 for more information.

**Preferences** — opens dialog boxes in which you can do the following:

- Select pressure units for all system and software pressure values. This is a global setting. See Units Tab on page 106 for more information.

- Set up an SMTP server to receive email messages about system notifications from the ChromLab computer. See Email Server Setup Tab on page 107 for more information.

- Set default values for parameters used in new methods. The settings appear in the Method Settings window. See Method Editor Tab on page 109 for more information.

- Create and configure a rack library for your fraction collectors. This a global setting. See Rack Library Tab on page 111 for more information.

- Set display preferences for the Evaluation window. See Evaluation Tab on page 113 for more information.

**Exit** — closes ChromLab.

## View Menu Commands

**Show Chromatogram** — displays a chromatogram of the current run data. Clearing this command hides the chromatogram from view.

**Show Fluidics** — displays the fluidic scheme. Clearing this command hides the fluidic scheme from view.

System Control Window

## Manual Menu Commands

**Enter/Exit Manual Mode** — toggles ChromLab between manual and automatic modes.

**Save Recorded Manual Run** — in manual mode, saves in a data file the steps executed during a manual run.

**Clear Recorded Data** — deletes manual run data from the display.

## Tools Menu Commands

**Calibrate** — opens the Calibration dialog box, which displays instructions and settings for selecting a module and calibrating it. See Calibrating a Module on page 74 for details.

**Point-to-Plumb** — starts the Point-to-Plumb feature and simultaneously turns off instrument LED lights so you can visually verify port locations during instrument plumbing. Displays the current fluidic scheme. Gray lines indicate the flow path. Clicking a line in the window turns on LED lights on the instrument corresponding to ports to be connected. See Verifying Plumbing with the Point-to-Plumb Feature on page 77 for details.

**Change Fluidic Scheme** — opens the Fluidic Scheme Selector dialog box in which you can edit the fluidic scheme or choose another one. See Fluidic Scheme Configurations on page 59 for details.

**Map Fluidic Scheme** — opens the Fluidic Scheme Mapping dialog box, which displays the location of two or more valves of the same type in the fluidic scheme, for instance two or more inlet valves or column-switching valves. You can use this dialog box to map the device on your instrument to its position in the fluidic scheme. See Fluidic Scheme Mapping on page 70 for details.

**Flow Rate Converter**— opens the Flow Rate Converter tool, which enables you to determine the flow rate to use for each column in the method based on the column size and the initial rate entered. A rate entered in ml/min is converted to cm/h and L/h; a rate entered in cm/hr is converted to ml/min and L/h. You can copy the result in the converter and paste it into your method.

3 | System Control

## Help Menu Commands

**Help** — displays screen-level help topics and links to installed manuals.

**Export Diagnostic Logs** — opens the Export Diagnostic Logs dialog box in which you can export all critical information that Bio-Rad Technical Support requires to diagnose issues. The log files and data are zipped and saved to a location that you choose. See Exporting Diagnostic Logs on page 363 for more information.

**About** — displays version and copyright information about ChromLab software.

## Toolbar Commands

**Save** — saves in a data file steps executed during a manual run.

**Clear** — deletes manual run data from the display.

**Autoscale** — automatically scales the chromatogram's primary y-axis to the tallest peak height during the run. Autoscaling is enabled by default. When disabled, you can change the value of each individual UV trace. The Autoscale mode and the UV trace values are saved when you save the run.

**Reset Zoom** — resets the view to show the full chromatogram.

**Annotate** — adds a note to the chromatogram at points on the x-axis during a run or after the run completes.

**Flush System** — automatically starts a system flush run if the flush template selected in System Settings matches the current fluidic scheme.

> **Note:** If a flush template has not been selected in System Settings, or if the selected template does not match the current fluidic scheme, clicking this command opens the templates dialog box from which you can select a system flush template to run. See System Flush Tab on page 98 for more information.

System Control Window

## Context Menu Commands

**To access context menu commands**

▶   Right-click in the chromatogram and choose a command from the menu that appears.

**Undo Zoom** — restores immediately previous zoom level.

**Reset Zoom** — resets the view to show the full chromatogram.

**Autoscale UV Trace** — automatically scales the primary y-axis to the tallest peak height during the run. While enabled, UV scale in the legend cannot be manually set. When disabled, you can change the value of each individual UV trace. The Autoscale mode and the UV trace values are saved when you save the run.

**Copy Chromatogram** — copies the chromatogram to the clipboard so you can paste it into another application.

**Save Chromatogram As** —saves the chromatogram in an image format you choose (.bmp, .gif, .jpeg, .png, or .tiff).

**Export as .csv** — exports run data as a .csv file, which can be opened in spreadsheet applications.

# EXHIBIT 15

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CYTIVA SWEDEN AB, and GLOBAL LIFE
SCIENCES SOLUTIONS USA LLC,

        Plaintiffs

        v.

BIO-RAD LABORATORIES, INC.,

        Defendant.

C.A. No. 18-1899-CFC
Consolidated

**DEMAND FOR JURY TRIAL**

**HIGHLY CONFIDENTIAL
(TECHNICAL) – ATTORNEYS' EYES
ONLY**

## <u>REBUTTAL EXPERT REPORT OF DR. BRUCE GALE</u>

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BASIS FOR OPINIONS ........................................................................................1

        A.      Qualifications ...............................................................................................2

        B.      Materials Considered ...................................................................................2

        C.      Level of Ordinary Skill in the Art ...............................................................2

III.    LEGAL STANDARDS ..........................................................................................2

        A.      Non-Infringement ........................................................................................2

                1.      Literal ...............................................................................................3

                2.      Doctrine of Equivalents ...................................................................3

                3.      Prosecution History..........................................................................3

                4.      Indirect Infringement .......................................................................4

IV.     THE ASSERTED PATENTS ..................................................................................4

V.      CLAIM CONSTRUCTION....................................................................................6

VI.     SUMMARY OF OPINIONS ................................................................................12

VII.    OVERVIEW OF THE ACCUSED PRODUCTS..................................................13

VIII.   NON-INFRINGEMENT OF THE ASSERTED PATENTS ...............................14

        A.      Non-Infringement of the '420 Patent .........................................................14

                1.      Element [1.e]: "an external fluidics section" ..................................14

                2.      Element [1.f]: "an internal non-fluidics section".............................44

                3.      Element [1.h]: "a panel member arranged to separate the fluidics
                        section from the non-fluidics section" ............................................47

                4.      Element [1.i]: "wherein the housing comprises a liquid handling
                        panel with at least four component receiving positions arranged in
                        a two dimensional array and adapted to receive said
                        interchangeable modular components such that, when inserted, the

i

fluidics section is external to the housing and the non-fluidics section is internal to the housing." ...........................................47

5.    Element [1.k]: "wherein each interchangeable modular component includes a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus" ............................................49

6.    Element [1.l]: "wherein the master control unit is arranged to automatically identify interchangeable modular components" .................56

7.    Element [1.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit and the fluid control valves are interchangeable modular components" ........................................58

8.    Dependent Claim 5: "further comprises a pH electrode that is external to the housing" ..................................................65

9.    Dependent Claim 6: "that the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve" ..........................................65

10.   Dependent Claim 7: "the pH electrode is connected to a pH valve formed as an interchangeable modular component" ...................66

11.   Dependent Claim 8: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels" ...................................66

12.   Dependent Claim 15: "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve." ...................................................66

13.   Element [17.v]: "a panel member arranged to separate a fluidics section from a non-fluidics section" ...................................66

14.   Element [17.ix]: "wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing" ...................................66

15.   Element [17.xi]: "wherein each interchange modular component includes a dedicated CPU unit allowing the interchangeable

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

modular component to independently perform operations in response to instructions over the system bus" ........................................... 67

16.  Element [17.xiii]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit, and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components" ..................................... 67

17.  Dependent Claim 22 ......................................................................... 68

18.  Dependent Claim 23 ......................................................................... 68

19.  Dependent Claim 24 ......................................................................... 68

20.  Dependent Claim 25 ......................................................................... 68

21.  Element [27.e]: "a panel member arranged to separate a fluidics section from a non-fluidics section" ................................................ 68

22.  Element [27.i]: "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing" ................................................. 69

23.  Element [27.k]: "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus" ..................... 70

24.  Element [27.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components" ....................................... 71

25.  Dependent Claim 30: "the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component" ................................................................................... 72

B.  Non-Infringement of the '589 Patent ..................................................... 72

1.  Element [1.d]: "wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array" ................................................ 73

2.  Element [1.g]: "wherein each modular fluid handling unit . . . includes a CPU for independently performing fluid control operations in response to instructions over a system BUS" ..................... 73

3.  Element [6.f]: "each modular fluid handling unit includes a CPU for performing fluid control operations independently irrespective of the location within the housing unit" ................................................ 73

4.  Dependent Claim 7: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are freely arrangeable modular fluid handling units" ................................................ 73

5.  Dependent Claim 8: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit and the fluid control valves are arranged as modular fluid handling units" ................................................ 74

6.  Dependent Claim 9: "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve" ................................................ 74

7.  Dependent Claim 13: "the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit" ..................... 75

8.  Dependent Claim 14: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels" ................................................ 75

9.  Dependent Claim 21: "the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when fitted in a receiving position of the housing unit" ..................... 75

10. Dependent Claim 24: "a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit" ..................... 76

11. Dependent Claim 25: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels" ................................................ 76

iv

12.   Dependent Claim 26: "the modular fluid handling units include two double piston pumps, one injection valve for injecting a sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer" ..............................77

C.   Non-Infringement of the '590 Patent ...................................................77

1.   Element [1.b]: "interchanging at least two of the interchangeable modular components in a housing unit comprising at least four component receiving positions arranged in a two dimensional array, so as to allow for modification of the liquid chromatography fluid flow path among the at least four interchangeable modular components" ..............................................................................77

2.   Element [1.c]: "wherein each of the at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit" .......................................................78

3.   Claims 2 and 3, Flow path shortened...........................................79

4.   Claims 10 and 12 .......................................................................80

5.   Element [13.h]: "comprising a CPU that allows independent fluid control operations in response to instructions from the main controller when installed in the component receiving position of the housing unit" .......................................................................80

6.   Claim 14 "adding an expansion housing unit that includes a plurality of component receiving positions, each component receiving position being adapted to receive the at least one interchangeable modular fluid handling unit, and placing at least one additional interchangeable modular fluid handling unit in one of the component receiving positions in the expansion housing"..............81

7.   Claim 17: "the CPU allows for automatic identification by the liquid chromatography system upon placement in a component receiving position of similar size and shape" .............................................81

8.   Claim 18: "the at least two interchangeable modular fluid handling units are connected to the system by a system BUS" ................................81

D.   The '591 Patent ................................................................................82

1.   The NGC System Does Not Infringe Claim 9 of the '591 Patent at Least Because it Lacks Several Elements in Claim 1 from Which it Depends.....................................................................................82

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

2.    Dependent Claim 26: "the pH electrode is connected to a pH valve formed as an interchangeable modular component" ................................ 85

3.    Dependent Claim 27: "the pH valve include[] an integrated flow cell for in-line monitoring of pH levels" ................................ 85

E.    Non-Infringement of the '124 Patent ................................................ 85

1.    Element [16.h]: "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel." ................................................................................ 85

2.    Element [16.i]: "wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing" ................................................ 86

3.    Element [16.j]: "respective non fluidics sections are internal to the housing" ........................................................................ 87

4.    Dependent Claim 20: "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus" ................... 87

5.    Dependent Claim 28 "the system includes two double piston pumps, one injection valve for injecting sample onto a column connecting to the flow path of the liquid chromatography system, a UV monitor, and a mixer" ........................................... 88

6.    Dependent Claim 30: "further includes a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients" ..................................... 88

IX.   NON-INFRINGING ALTERNATIVES ........................................... 89

X.    LICENSES ..................................................................... 94

A.    ███████████████████████████████████████ ................ 96

B.    ███████████████████████████████████████ ............... 102

XI.   OTHER COMMENTS ....................................................... 107

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

## LIST OF REPORT EXHIBITS

| Exhibit No. | Description |
|---|---|
| Exhibit 1 | List of Materials Relied Upon |
| Exhibit 2 | 10.22.2014 Lundkvist Depo Tr. |
| Exhibit 3 | Markman Hearing Transcript |
| Exhibit 4 | NGC Chromatography System |
| Exhibit 5 | (Filed Under Seal) BRGE00000846 - 864 |
| Exhibit 5 | (Filed Under Seal) BRGE00000846 - 864 |
| Exhibit 6 | (Filed Under Seal) BRGE00000572 - 597 |
| Exhibit 7 | (Filed Under Seal) BRGE00000511 - 544 |
| Exhibit 8 | (Filed Under Seal) BRGE00000598 - 622 |
| Exhibit 9 | (Filed Under Seal) BRGE00000545 - 571 |
| Exhibit 10 | (Filed Under Seal) BRGE00000623 - 654 |
| Exhibit 11 | (Filed Under Seal) BRGE00000785 - 826 |
| Exhibit 12 | (Filed Under Seal) BRGE00000655 - 688 |
| Exhibit 13 | (Filed Under Seal) BRGE00000714 - 747 |
| Exhibit 14 | (Filed Under Seal) BRGE00000689 - 713 |
| Exhibit 15 | (Filed Under Seal) BRGE00000477 - 510 |
| Exhibit 16 | (Filed Under Seal) BRGE00000748 - 784 |
| Exhibit 17 | Blank |
| Exhibit 18 | (Filed Under Seal) BRGE00002458 |
| Exhibit 20 | U.S. Publication No. 2008/0035542 ("Mourtada") |
| Exhibit 21 | U.S. Patent No. 5,766,460 ("Bergstrom") |
| Exhibit 22 | U.S. Publication No. 2008/0233653 ("Hess") |
| Exhibit 23 | 06.26.2020 Lundkvist Depo Tr. |
| Exhibit 24 | 10.17.2014 Scandella Depo Tr. |
| Exhibit 25 | Preliminary Injunction Hearing Declaration Images |
| Exhibit 26 | 08.17.2016 Soderman Depo Tr. |
| Exhibit 27 | 07.23.2020 Chapman Depo Tr. |
| Exhibit 28 | 06.24.2020 Hareland Depo Tr. |
| Exhibit 29 | ███████████████████ BRGEDEL000610423 - 610434 |
| Exhibit 30 | ███████████████ BRGEDEL000610047 - 610068 |

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

I, Bruce Gale, Ph.D., declare as follows:

# I.     INTRODUCTION

1.     I have been retained by counsel for Defendants Bio-Rad Laboratories, Inc. ("Bio-Rad") as an expert in the above captioned case.  As part of this engagement, I have been asked to provide my opinions regarding U.S. Patent Nos. 9,709,589 ("the '589 patent"), 9,709,590 ("the '590 patent"), 9,709,591 ("the '591 patent"), 9,671,420 ("the '420 patent"), and RE47,124 ("the '124 patent") (collectively, the "Asserted Patents" or "Patents-in-Suit"), specifically the validity of the Asserted Patents and whether or not the Bio-Rad NGC systems infringes the Asserted Patents.

2.     I am being compensated at my usual hourly rate of $500.  I am being separately reimbursed for any out-of-pocket expenses.  My compensation does not depend in any way on the outcome of this case or the particular testimony or opinions that I express.  I have personal knowledge of the facts stated in this report, and I could and would competently testify to them if called upon to do so.

3.     This report discusses my opinions with respect to the '589, '590, '591, '420, and '124 patents.  In particular it is my opinion that the accused NGC systems do not infringe claims 1, 2, 4, 6-10, 12-17, 19-21, 23-27, and 30 of the '589 patent, claims 1-4, 10, 12-14, 17, and 18 of the '590 patent, claims 9, 14, 26, and 27 of the '591 patent, claims 1, 4-9, 15, 25, 27, 29, and 30 of the '420 patent, and claims 16, 19, 20, 22, 25, 27, 28, 30, and 33-35 of the '124 patent ("Asserted Claims").  This report also contains my responses to the Expert Reports of Dr. Steven Wereley and Mr. Nenad Vukicevic.  These opinions, and the basis for these opinions, are set forth in full detail below.  I also incorporate prior reports and declarations that I have submitted in this case and patent office proceedings.

# II.    BASIS FOR OPINIONS

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

### A.      Qualifications

4.      I fully incorporate herein by reference the qualifications disclosed in my opening report on invalidity.

### B.      Materials Considered

5.      In forming the opinions set forth in this report, I have considered and relied upon my education, knowledge of the relevant fields, and experience.  I have also reviewed and considered the Asserted Patents, their priority applications, and their prosecution file histories, the Court's claim construction ruling and the expert report of Dr. Wereley as well as  other materials expressly set forth in this report and identified in Ex. 1.

### C.      Level of Ordinary Skill in the Art

6.      In my opinion, for the Asserted Patents, a person of ordinary skill in the art ("POSITA") at the time of the invention would have a bachelor's degree in Mechanical Engineering, Bioengineering, or Electrical Engineering and three years of fluid handling machine design experience, or would have an advanced degree in a similar field with at least one year of related design experience.  This is the same level of experience that I proposed in my report on invalidity.

## III.    LEGAL STANDARDS

7.      I am not a legal expert and offer no legal opinions.  However, I have been informed by counsel of the following legal standards that apply to the pertinent technical issues, and I have applied those standards where appropriate in arriving at my conclusions expressed in this declaration.

### A.      Non-Infringement

8.      I understand that when considering whether a person or entity infringes the asserted claims, each of the asserted claims must be considered individually, and to establish

2

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

infringement of a patent, all of the elements of at least one of the asserted claims must be present, either literally or by an equivalent.

9.      I understand that there are independent claims and dependent claims.  An independent claim is read separately to determine its scope.  A dependent claim is one that is based on an independent claim.  To determine the scope of the dependent claim, I understand that it must be read to include all the elements of the claim(s) from which it depends, together with the additional limitations contained in the dependent claim.

### 1.      Literal

10.      I understand that Cytiva bears the burden of proving by a preponderance of the evidence that Bio-Rad infringes the Asserted Claims.  I have been informed that analysis of patent infringement requires two steps.  The first step is to properly construe the patent claims, which is a step taken by the Court.  The second step is to apply the construed claims to the accused product on an element-by-element basis.  A patent claim cannot be "literally" infringed if each and every claim element is not found in the accused product.  In other words, if one element is not satisfied, the claim is not infringed.  If an independent claim is not infringed, I understand that a claim depending from the independent claim, which must have all the elements of the independent claim, also is not infringed.

11.      I have interpreted the claims from the perspective of a person having ordinary skill in the art and have interpreted them in light of the Court's claim construction, the specification and the prosecution file history and any relevant extrinsic evidence.

### 2.      Doctrine of Equivalents

12.      I understand from Dr. Wereley's report on infringement ¶ 17, that neither he nor the Plaintiff are relying on the doctrine of equivalents, so I will not discuss it in my report.

### 3.      Prosecution History

3

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

13.     I understand that a patent owner is prevented from recapturing  what had been surrendered during prosecution to obtain allowance of the claims.  I  understand that the claims of the patent cannot be interpreted to cover subject matter that the patent owner argued to the U.S. Patent Office was beyond the scope of the claims.  I have been informed that estoppel arises when an amendment or argument is made to secure the patent and the amendment or argument narrows the patent's scope.

14.     I have also been informed that estoppel arises only where the patentee clearly and unambiguously disavowed claim scope.

### 4.     Indirect Infringement

15.     I have been informed that an accused infringer may induce or contribute to the infringement of a claim by either: a) encouraging a party to take steps knowing that the acts they induced constitute patent infringement and the encouraging acts actually resulted in patent infringement or b) selling or importing into the United States a component of a patented machine manufacture, combination or composition or a material or an apparatus for use in practicing a patented process, which constitutes a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and the component is not a staple article or commodity of commerce suitable for substantial non-infringing use.

## IV.   THE ASSERTED PATENTS

16.     I fully incorporate herein by reference the discussion of the Asserted Patents, their prosecution histories, and Cytiva's alleged conception and reduction to practice disclosed in my opening report.

17.     Overall, as outlined in my opening report, liquid chromatography and modularity are nothing novel to the asserted patents.  Not only do the Metrohm and Applikon systems

4

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

discussed in my opening report demonstrate this, Bio-Rad's own DuoFlow prior art system does as well.  The main difference between the DuoFlow, which was a modular system where the modules are stackable, and the NGC, which is a modular system in which the modules slide into slots in a housing, is the form factor and space.  This difference is analogous to the difference between a stereo system (DuoFlow) and a card catalog (NGC).  Both forms of modularity allow users to replace individual modules or add additional modules to the systems.  But just like a card catalogue, or an Ikea dresser that has a housing and slots to insert individual drawers, there is nothing new or novel about the idea of using a single housing that can accommodate multiple individual components.

18.      I do not see anything in the specification of the asserted patents or in Dr. Wereley's report, for example at paragraphs 23-30, that describes the inventors of the asserted patents as having invented any new chromatography function or process.  What I mean by this is that the patents do not claim to perform chromatography is some new and different way.  Ex. 2 Oct. 22, 2014 Lundkvist Depo. 88:2-90:7.  Rather, the patents are directed at using past methods and components with those components simply arranged in a particular manner, *e.g*.,:  as interchangeable units with the electronics section of the unit on one side of a panel member and inside the housing, and the fluidics section of the unit on the other side of the panel member and outside the housing.  Thus, at most, the patents claim a different form factor, one in which modularity is achieved using a single housing like a card catalogue or Ikea dresser, rather than using stackable boxes like old stereo.  But this form factor is not new or novel regardless of what type of application it is applied to.

19.      Liquid chromatography systems are just a tool scientists use in their research. Accordingly, what scientists' value most in a chromatography system is that it be capable of

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

performing the specific chromatography techniques they require in order to, for example, purify proteins for use in their research.  The specific form factor, or the form of modularity that the system employs is secondary, at best, in a user's assessment of what liquid chromatography system will be capable of satisfying their needs.  A user will never buy a system that is not able to perform the chromatography techniques required.  In other words, function is far more important than form to a user of liquid chromatography systems.  As I stated above, the patents in suit are not directed to performing any new aspect of chromatography or performing any existing aspect of chromatography in any new way.  Rather the patents are simply directed to form factor or aesthetic aspects of chromatography. The machine is likely to ship more easily as a single unit rather than as multiple boxes.  But I do not consider this to be any type of technological advance.

## V.    CLAIM CONSTRUCTION

20.    I understand that the Court has entered a Claim Construction Order.[1]

21.    I understand that the parties agreed on the following constructions relevant to the Asserted Patents discussed in this report.

| Terms | Agreed Construction |
|---|---|
| "CPU" / "CPU unit" | "central processing unit" |
| "the fluidics section is external to the housing and the non[-]fluidics section is internal to the housing" | "the fluidics section is on the outside of the housing and the non-fluidics section is on the inside of the housing" |

22.    I understand that the Court has construed the disputed terms as follows.

| Terms | Court's Claim Construction |
|---|---|
| "interchangeable modular component" | "component that can be inserted into and removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another component" |
| "interchangeable modular fluid | "fluid handling unit that can be inserted into and |

---

[1]  D.I. 89.

6

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

| | |
|---|---|
| handling unit" | removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another fluid handling unit" |
| Claim Preambles ("An automated liquid chromatography system comprising" / "A method of modifying a fluid flow path in an automated liquid chromatography system comprising" / "A method for building an automated liquid chromatography system, the method comprising"/ "A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising") | The preambles are claim limitations. |
| "liquid chromatography system" | Plain and ordinary meaning |
| "automated liquid chromatography system" | Plain and ordinary meaning |
| "wherein the system is capable of performing automated liquid chromatography" | Plain and ordinary meaning |
| "non-fluidics section" / "non-fluidics section" / "non fluidics section" | "a section of the interchangeable fluid handling unit that includes electrical components and does not include fluidics components" |
| "a fluid handling section" / "a fluidics section" | "a section of the interchangeable fluid handling unit that includes fluidics components and does not include non-fluidics components" |

23.     In all cases, I applied the agreed claim constructions or the Court's constructions as one of ordinary skill in the art would interpret them in light of the specification and the file history in performing my analyses and rendering my opinions in this report.

24.     In this regard, it is my opinion that Dr. Wereley has misconstrued the Court's claim construction at least with respect to the terms fluidics section and non-fluidics section in Paragraphs 57-58 of his report.  He has done so, apparently, because he did not state in his opening report that he reviewed the file history where the inventors of the asserted patents made certain statements explaining what their inventions were not.  By failing to review those statements, Dr. Wereley interprets the Court's claim construction (and statements made during

7

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

the hearing that are not part of the claim construction) in a way which is inconsistent with the inventors' statements during the prosecution. I will address these issue more particularly with respect to certain elements but address them here in a general manner as well.

25.     Dr. Wereley quotes isolated portions of what I understand to be the hearing transcript from the claim construction proceedings to claim that there can be non-fluidics (electronics) outside the non-fluidics section of each module. (Wereley Report ¶57). But what the portion of the hearing transcript that Dr. Wereley quoted did not say is that electronics of the module can be in the fluidics section, even if they are not in the non-fluidics section. Ex. 3, Markman Hearing Tr., 97:16-25. All it says is that it may be possible for there to be electronics that are not in the fluidics section that are also not in a non-fluidics section. *Id.* That does not mean that once can indiscriminately define electrical components as being in some section that is neither a fluidics section or a non-fluidics section for purposes of establishing infringement. By failing to review the file history and see how the inventors interpreted what a "section" is, Dr. Wereley is interpreting the claims and asserting infringement against the Bio-Rad devices in ways that are inconsistent with the word section in the asserted patents and the representations the inventors made to the patent office to obtain their patent. By doing so, Dr. Wereley is also interpreting the random passages he was presented from the claim construction hearing in an improper way.

26.     For example, the judge stated at pages 90-91 of the hearing transcript after counsel went through some, but not even all, the statements in the file history that the inventors made to obtain their claims that there was clear and unmistakable representations by the inventors that the electrical components should be separated from the fluidic components:

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

6          THE COURT:  -- I think Mr. Bilsker makes a

7    compelling argument that looks pretty clearly and

8    unequivocally, your client, or the applicant for the patent

9    I should say made clear, clearly and unequivocally, as far

10   as I'm concerned, that there are two sections, and that's

11   what differentiates this patent from Bergstrom and Hess.  So

12   why don't you walk me through your response to that.

13          MR. MILLER:  Okay.  So, first of all, I think

14   it's important to note that we don't disagree that there's

15   going to be a separation from the fluidics section and

16   non-fluidics section, but, first of all, there can be other

17   sections.

18          As you pointed out, the claim language talks

19   about a fluidics section and a non-fluidics section, and all

20   the claims use the transitional phrase comprising, which

21   means there can be other sections.

22          So even if you draw the circle --

23          THE COURT:  That wasn't how you distinguished

24   Bergstrom and Hess.  I mean, you pretty explicitly said to

25   the Examiner, hey, what makes this different is we've got

91

1    complete separation of the fluidic and the non-fluidic

2    section.  And, incidentally, I think that's consistent with,

3    you know, your slide, which says, hey, the phrase itself

4    tells you, there's no fluidic component in the non-fluidic

5    section.

6          MR. MILLER:  Well, our argument on non-fluidics

7    in the fluidics section, that's what I called the

8    non-fluidics section.

9          THE COURT:  As opposed to the fluidics section.

10   I mean, it's a referential definition.  Right?  It says,

11   this is a non-fluidics section as opposed to the fluidics

12   section.

27.

9

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

28.     The Court then reiterated at pages 102-103 of the hearing transcript, the clear and unequivocal statements that the inventors had made to obtain their patents and about there needing to be two sections:  a fluidics section and a non fluidics section and there had to be complete separation between the fluidics and the electronics in them:

10

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

18          I'm going to interpret non-fluidics section to

19    mean, "a section of the interchangeable fluid handling unit

20    that includes electrical components and does not include

21    fluidics components."

22          I'm going to construe a fluid handling section

23    to mean, "a section of the interchangeable fluid handling

24    unit that includes fluidics components and does not include

25    non-fluidics components."  And that seems to me to be the

103

1    most reasonable construction.  That is consistent with what

2    I think were clear and unequivocal statements to distinguish

3    this patent from Bergstrom and Hess, because the basis of

4    the distinctions to the Patent Examiner were that this

5    patent had two sections that, at least two sections, one is

6    non-fluidic, one is fluidic, that are separated completely

7    and that do not contain components of the other section.

8          That does not, however, preclude the possibility

9    that there are other sections that are in the invention, and

10    that's important because that is consistent with the use of

11    the indefinite article, which is inconsistent with Bio-Rad's

12    insistence that "all," either fluidic or non-fluidic

13    components, are in the respective handling unit.

14          So that actually seems to me is the right result

15    in this case and I'm going to construe then these last group

16    of terms in that manner.

17          All right.  Is there anything else for me to

29.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

30.     Again, just because there is a theoretical possibility that there may be yet a third or forth section where there could be an electrical or fluidic component, does not mean that any component that is encountered that is inconsistent with an infringement theory can be dealt with by claiming it is in a "section" that is distinct from what is otherwise a fluidics or non fluidics section.  Any creation of this alternative additional section that is inconsistent with how the inventors construed the prior art is not permissible and Dr. Wereley failed to consider that in any way in his opening report.

31.     I note that relevant portions of the file history that inform that a section cannot be defined as Dr. Wereley has tried to do in his infringement report appear as Ex. G in the joint claim construction briefing which I understand has the Document number DI 52-8 (Ex. 19)[2].  I will be referring to pages from that Exhibit G, which I incorporate into this report as well as the Mortada, Ex. 20, Bergstrom Ex. 21, and Hess Ex. 22 references discussed in those pages of the File History.  I will also refer, when necessary to the slides that counsel used during the claim construction hearing to illustrate points from the File History.

## VI.    SUMMARY OF OPINIONS

32.     As set forth in detail below, based on my review of the Asserted Patents, including the Asserted Claims and the prosecution histories of the Asserted Patents, the claim constructions in this matter, the accused products and functionality the Wereley and Vukicevic Reports, and the materials listed in Exhibit 1, I have reached the following opinions:

- The accused products do not directly or indirectly infringe,  any asserted claim of the '420 patent;

- The accused products do not directly or indirectly infringe, any asserted claim of the '589 patent;

---

[2]  For clarity, I refer to the original exhibit identification Exhibit G throughout. But Exhibit G is Exhibit 19 here.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

- The accused products do not directly or indirectly infringe, any asserted claim of the '590 patent;

- The accused products do not directly or indirectly infringe, any asserted claim of the '591 patent;

- The accused products do not directly or indirectly infringe, any asserted claim of the '124 patent;

- Dr. Wereley and Mr. Vukicevic have failed to identify how the accused products meet each and every limitation of any Asserted Claim sufficient to establish infringement;

- Even if Dr. Wereley and Mr. Vukicevic assertions regarding infringement were correct, which they are not, there are non-infringing alternatives available to Bio-Rad; and

- Last with respect to licenses that may provide a basis for determining a reasonable royalty because they are directed to comparable technology, I have analyzed a number of agreements and provided an opinion for how the technology in those licenses is similar to the technology in the assert patents.

33. In the following sections, I provide a narrative of my opinions.

**VII. OVERVIEW OF THE ACCUSED PRODUCTS**

34. The NGC system is a liquid handling system that functions in essentially the same as the prior DuoFlow system. The only real difference is the form factor in the way the components are arranged. The system includes modules with both electrical and liquid components. In all the NGC modules, there are electrical components that are not on either side of a panel member and are thus not separated from the fluidics components as required by the claims. For the same reasons, all the modules have electrical components that sit beside fluidic components and are not on either side of the liquid handling panel and are not internal to the housing as required by the claims. Those components are therefore in the fluidics section. Because of this arrangement, the NGC instrument fails to meet multiple elements of the claims and one of the primary requirements goals of the asserted patents, to separate the electrical and

13

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

fluidic components of the modules by having them on either side of at least two different  panels (the panel member and the liquid handling panel).

## VIII.   NON-INFRINGEMENT OF THE ASSERTED PATENTS

35.     Based on my analysis of the Asserted Claims as well as an analysis of the accused products and functionalities it is my opinion that Bio-Rad does not directly or indirectly infringe, the Asserted Claims.  Below, I address the elements that are lacking in the accused products.

### A.     Non-Infringement of the '420 Patent

#### 1.     Element [1.e]: "an external fluidics section"

36.     Element [1.e][3] of the '420 patent requires "an external fluidics section."  As the court defined it, a "fluidics section" means: "**a section of the interchangeable fluid handling unit that includes fluidics components and does not include non-fluidics components.**" While the Court did not construe the term "external" I understand it to mean external to the housing.  This is consistent with other elements and phrases of the claim such as the first wherein clause of claim 1 of the '420 patent which states that when the interchangeable modular components are inserted into the housing the fluidics section is external to the housing and the non fluidic section is internal to the housing.  *See* '420 patent, Claim 1 at Col. 9:28-34.

37.     At paragraphs 105-119 of his report, Dr. Wereley argues that four different configurations of the Bio-Rad NGC machine, the 1) Quest, 2) Scout, 3) Discover and 4) Discover Pro (*See* Dr. Wereley at paragraphs 93-96 identifying various components in each of these four systems to satisfy element 1(d) "three or more fluid handling units arranged as interchangeable modular components comprising")

---

[3] For convenience and consistency, I refer to the elements using the same nomenclature as Dr. Wereley.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

38.     Dr. Wereley then selects two system pumps and a sample injection valve that he finds present in each of these modules satisfy element 1(e).  *See* Wereley at ¶105-114.  Dr. Wereley states the components satisfy the element because, among other things, the specifications for each of the modules state that ███████████████████████████ ████████  *Id.* at ¶ 107.

39.     Dr. Wereley then goes on to cite to images of NGC pump modules and a sample inject valve module and then purportedly illustrates the components that define the external fluidics section on those modules.  *See Id.* at ¶ 110, 112, 113.  He states that the portions he has illustrated/identified are all involved in the transmission of fluidics, *e.g.*, tubing, flow cells and outputs etc.  *Id.* at ¶ 115.

40.     While recognizing that each of them modules have electronics visible to the user and outside the housing, Dr. Wereley states in conclusory fashion, without any analysis, including without any reference to statements the inventors made during the prosecution to obtain their patents, that "[a] POSITA would recognize that externally located non-fluidics components in Bio-Rad's NGC system are not a part of the claimed fluidics section."  *Id.* at ¶116.  I disagree.  From what Dr. Wereley has presented in his opening report, there is no way for one of ordinary skill in the art to draw that conclusion other than *ipse dixit*.

41.     What I mean by that is that Dr. Wereley has identified  nothing in his opening report that would provide any guidance to one of skill in the art on how a "section", whether fluidics or non-fluidics, is to be defined in the asserted patents.  The failure of analysis and facts results in a lack of proof on this element and Dr. Wereley having failed to meet his burden of proof in this report.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

42.     Moreover, when one of ordinary skill in the art performs  an analysis of the patent, the statements the inventors made to obtain their patents, and the actual modules that have been accused, they would only be able to come to the conclusion that there is no external fluidics section in the two pump and one injection valve module that Dr. Wereley has relied on to prove infringement of this element.

43.     Throughout the specification of the asserted patents, the inventors stress that there needs to be separation of fluidics and electronics components to ensure that electronics are not harmed when changing fluid connections and when a leak occurs.  *See, e.g.*, Col. 2: 28-32 (a liquid handling panel to separate fluidics and electronics); Col 6: 17-620(in one embodiment, the panel member essentially separates the fluidics section from the electronics and internal electronics); Col. 6: 10-29 (noting various arrangements, including with and without a panel member such that the electronics are separated from the fluidics through the use of such components as a suitable sealing arrangement  between the housing opening and the external fluidics side of the module); Col. 7:7-25 (noting air tight sealing between the component positions and the non fluidics section and noting configurations, such as that claimed, where fluids are strictly on one side of the fluid handling panel and the electronics are strictly on the other:  "According to one embodiment, fluids are strictly restricted to the fluidics section 30 of the interchangeable modular components 26, but in alternative embodiments , only fluid connections are restricted to the fluidics section 30 allowing fluid to "cross" the fluid handling panel inside the non-fluidics section 30 of the interchangeable modular component 26.")

44.     I note that nowhere in the patent is there a description of anything other than two sections in a module, a fluidics section and a non-fluidics section.  To the extent there is some other intermediate section, it is nowhere described in the patents or how to determine it.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

Nonetheless, even if one of skill in the art were to assume that such a section could exist, they would recognize that such a section would need to satisfy the goals of the invention, which is to keep the fluids separate from the electronics.  Dr. Wereley never considered this requirement, which is present not only in the passages cited above, but also by the named inventor Mr. Lundkvist, Cytiva's previous expert, Dr. Scandella, and statements that the inventors made during prosecution to obtain the patents.

45.     For example, the named inventor Mr. Lundkvist testified:  "If it can get liquid on the electrical component, it will not be our concept. . . So –in our concept it, has to be separated with a sealing, those two parts – the liquid and the electrical stuff.".  Ex. 2, 10/17/14 Dep at 141:14-19.

| | |
|---|---|
| 14 | And it was important to separate the |
| 15 | fluidic section from the electrical components, |
| 16 | such as circuit boards, because the front side |
| 17 | where they have the flow path, the -- customer |
| 18 | handled it with the finger -- finger tights -- |
| 19 | when you screw it in, the valve, for example? |
| 20 | When you have the customer not have |
| 21 | mounted it in the proper way, they can maybe get |
| 22 | loose and spraying all around with the liquid? |
| 23 | And it's important to protect that |
| 24 | leakage so it won't go in the electrical circuit |
| 25 | board, so -- the electrical component. |

46.

47.     Ex. 2, 10/17/2014 Lundkvis Dep. At 140:6-25.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

```
11        Q.     So it would not be your concept if you
12   had electrical components on the front within
13   the flow path?
14        A.     If it can get liquid on the electrical
15   component, it will not be our concept.
16        Q.     Okay.
17        A.     So -- in our concept it, has to be
18   separated with a sealing, those two parts -- the
19   liquid and the electrical stuff.
```

48.

49.     Ex. 2, 10/17/2014 Lundkvis Dep at 141:11-19.

```
20        Q.     So you can't -- based on what you said
21   before, you don't want -- also based on what
22   your patent says -- you say that the electrical
23   components -- the circuit boards, the motors,
24   the pH sensor, the UV sensor --
25        A.     Yeah.

 1                     LUNDKVIS
 2        Q.     -- all need to be inside the housing
 3   in that non-fluidic section, right?
 4        A.     I'm referring to the concept again.
 5             It's just important to separate those
 6   with a sealing?
 7             And if it's outside or inside, it
 8   doesn't matter for the concept.
 9             Yes, if it's sealed off, that's very
10   important, so it won't -- they won't
11   interfere -- the liquid won't interfere -- let
12   it come down to the electric circuit board.
```

50.

51.     Ex. 2, 10/17/2014 Lundkvis Dep at 144:20 – 145:12.

52.     In fact, Mr. Lundkvist testified that the separation was so important and central to

his invention that he did not consider a system in which the fluidics and electronics were not

18

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

separated as something that he had invented.  Ex. 23, 06/26/2020 Lundkvis Dep at 151:24-

155:15

| | |
|---|---|
| 6 | Is fair to say that if a system |
| 7 | does not require the fluidic components to |
| 8 | be separated from the electrical components, |
| 9 | is it fair to say that such a system is not |
| 10 | what you consider to be your idea or your |
| 11 | invention? |
| 12 | MR. NISHIMOTO:  Objection, form. |
| 13 | A.    Yes, my idea was to have a -- a |
| 14 | wall to separate these, the fluidics, from |
| 15 | the electronics, yes. |

53.

54.     Ex. 23, 06/26/2020 Lundkvis Dep at 151:24-155:15 (only 155:6-15 reproduced

here).

55.     Plaintiffs' first expert similarly identified the importance of the separation of

electronics and fluidics to the invention at pages 54-56 of his deposition reproduced below:

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

14  saw.

15   Q   What's the purpose of this invention, as   10:39:56

16  you understand it, that's described in the '718

17  patent?

18     A   Well, as I see it, this invention allows

19  the user to have greater flexibility in terms of how

20  he uses his -- his fluidics handling system, and in   10:40:12

21  terms of the different types of applications that

22  can be used, and in terms of easily reconfiguring

23  the system to accommodate new uses and possibly new

24  environments where the machine is used.

25     Q   What's the reason for separating the   10:40:34

Page 54

1  fluidics sections from the electrical components?

2     A   Well, one reason is to protect the

3  electrical components.  The electrical components

4  typically are sensitive and easily damaged by

5  contact with -- with fluids, particularly the kinds   10:40:53

6  of fluids that are used in the fluidics section.

7     Q   Any other reason?

8     A   Probably other reasons.  One -- one reason

9  is to make it easier to contain it, to control the

10  environment of the electronics components.   10:41:10

11     Q   Anything else?

12     A   There -- if you let me think for a minute,

13  I could come up with some more.

14     Q   Go ahead.

15     A   But those are --   10:41:24

16     Q   Go ahead and think.

17     A   Well, another is that in a laboratory

18  environment, one is -- solutions are constantly

19  getting splashed around when they don't -- when you

20  don't intend them to be.  A piece of tubing breaks   10:41:35

21  or pops off of a fitting, or a beaker tips over and

22  you end up with -- with salt solution splashed on

23  the front of your instrument.  These are the kinds

24  of things that happen in the lab, and that an

25  instrument -- instrument such as these automated   10:41:52

Page 55

56.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

57.

> 1 liquid handling systems, you'd like them to be able
> 2 to cope with that.

EX.

58.     Over and over again during the prosecution of the applications that lead to the

patents and in order to distinguish their invention over the prior art, the inventors relied on and

pointed to the same need for separation of fluidics and electronics in their invention to ensure

that the electronics would not become wet and therefore likely damaged.  For example, when

addressing and distinguishing the Mourtada reference from their invention, the inventors stated:

"The reason for separating the fluidic and non-fluidic sections is to stop the non fluidic sections

getting wet when pipes etc. are reconfigured on the machine, and/or when the modular

components are rearranged.  None of those features are disclosed in or obvious from Mourtada

… The apparatus as proposed in claim 1 thus provides the unexpected advantage that not only

can component positions be reconfigured easily and thereby simplify the fluidic interconnection

of the components used, but alternatively, fluidic reconfiguration can be carried out without

precious electrical pars becoming wet or contaminated.  This is particularly advantageous where

toxic or corrosive, or pathogenic liquids are being handled.  On the one hand the organisation of

the components can be optimised, and they can be protected in use.  These advantages are not

present in Mourtada or any prior art cited." Ex. G at GEHC 001477- 1478. (emphasis added)

59.     With respect to the Bergstrom prior art the inventors were distinguishing they

stated:  "Applicants submit that Bergstrom has given no thought to what happens when one

unplugs a module and gets the electrical contacts 19 wet which will be inevitable since the

contacts 19 appear to be housed in the cup shaped aperture 14, or what happens to the processor

55 in Figure 10 when that gets wet.  *Id.* at GEHC 001451.

21

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

60.     The inventors said the separation requirement was even more important in liquid chromatography systems as opposed to other automated fluid handling systems:  "The features of claim 17 as applied to liquid chromatography are particularly advantageous because such a system is typically used for many different initial experiments to prove the principles for larger scale operations.  In such use, the system components are frequently reconfigured and in so doing the advantages of fluid and non-fluid separation, as claimed in claim 17 become even more significant, for example by providing a housing for liquid chromatography components including a liquid handling panel for accepting the components and avoiding contamination of electrical components."  Ex. G at GEHC 001418.

61.     To ensure that the goals of the invention were met, the inventors described in great detail during the prosecution when they were distinguishing the prior art what was necessary to separate the fluidics from the non-fluidics sections and what would not be considered separation – something that still had a likelihood of the electronic components of a module becoming wet when fluid connections were changed, modules were rearranged, or a leak occurred.  If that was possible, then one of skill in the art would recognize that the fluidics and the non fluidics (electronics) were not in distinct sections that were separated.  Rather they would be in the same section.

62.     And as will be explained in more detail in the following paragraphs that is what is present in the Bio-Rad accused modules.  One of ordinary skill in the art reading the file history would only be able to come to the conclusion that the external electronics that Dr. Wereley recognizes are present in the accused Bio-Rad modules (the two pumps and injection valve, Wereley ¶ 116) are not in sections that are distinct from the fluidics sections.  Rather, they are in the same section and not separated in the manner the inventors said they needed to be to be part

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

of the invention and distinct from the prior art.  For example, the accused pump module has

switches, a display, and LED lights which the user sees, as well as a PCB and ribbon electrical

connector in the overlay.  *See e.g.*, Wereley ¶ 142, showing pictures of accused pumps in Ex. 48,

49 and ¶ 150 quoting from manual Ex. 47 stating that there are switches on the exterior of the

pump modules.  *See also* Ex. 25.

63.     In particular, the inventors pointed out that for there to be separation of the

electrical components and the fluidic components of a module such that they were in separate

sections and unlikely to have fouling/wetting  or contamination of the electrical components if

there was a leak of the fluidic components, there had to be a particular spatial relationship

between the components.

64.     In particular, the inventors said multiple times that the fluidics and the electronic

components of a module need to be on opposite sides of a panel for a) them to be separated, b)to

ensure that the electronics would not get wet if there was a leak, and c) to define the electronics

and the fluidics as being in separate sections.  In discussing Bergstrom, the inventors said:  "The

modules of Bergstrom do not separate their fluidic and electrical parts (where they have

electrical parts).  Further, those paths cross into the base plate at about the same region.  The

detector module 10 of Figure 10 illustrates that fluid and electrical parts are adjacent, **not on

either side of a panel.**  Ex. G at GEHC 001451.

65.     After stating that Bergstrom gives no thought to making sure that electrical parts

do not get wet, which I cited to above, the inventors then reemphasize, one paragraph later, the

separation point and again state that the fluidic and electronic parts need to be on opposite sides

of a panel in the invention.  In fact they not only state that the electronic parts in a modules need

to be on opposite sides of one panel, but on opposite sides of two different panels :  "These

23

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

problems in the Bergstrom design are not addressed in Burger, but are cleverly addressed in presently claimed invention <mark>by separating</mark> the fluidic and non fluidic parts of fluid handling units <mark>**across a fluid handling panel**</mark> and <mark>**across a panel member of the modular components**</mark>, **which inhibits the problems mentioned immediately above**." *Id.*

66.     The accused modules do not meet those requirements for multiple reasons and therefore do not have external fluidics sections, ones that do not have electrical components, for multiple reasons.

67.     First, having failed to refer to any of the File History statements which require the fluidics components of a module to be separated from the electrical components by at least two different panels to be considered by one of ordinary skill in the art to have distinct fluidics and electronics sections, Dr. Wereley provides no detailed analysis of the alleged panel member of the modules that are supposed to separate fluidics from electronics components of a module to meet the requirement that the electronics and fluidics are in separate sections.

68.     Dr. Wereley purports to analyze the panel member as claim element 1(h) at paragraphs 138- 147.  But the analysis is cursory and conclusory again.  At paragraphs 139 and 141, Dr. Wereley pastes pictures of a Bio-Rad system pump and a sample inject valve and simply draws a red arrow and red box and concludes these are the panel members of the modules.  I reproduce those figures below:

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



69.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



70.

71.     At paragraph 145, Dr. Wereley cites to testimony from two Bio-Rad witnesses to establish that what he has pointed to is a panel member.  But, the testimony does not do so.  Both Mr. Bland, and Mr. Chapman, whose testimony is quoted, state that the component that Dr. Wereley points to as the panel member is actually two separate parts:  there is 1) "a front plate" and an "overlay"  *Id.* at ¶ 145.  Mr. Chapman testified that ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████.  *Id.* at p. 91 (quoting Chapman testimony).

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

72.     In other words, Mr. Chapman's testimony makes clear that the faceplate is what is responsible for allowing the module to be mounted on the instrument housing.  I have confirmed this by holding and physically examining a number of the Bio-Rad modules.  The specification of the asserted patents describes the panel member as the structure that is used to attach the module to a component position in the in the liquid handling panel.  *See e.g.*, '420 patent Col. 6:30-34 ("As is disclosed in FIGS. 4a to 4d, the interchangeable modular components 26 comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel.")

73.     The first problem with Dr. Wereley's analysis is that he equates two distinct parts, the face plate and the overlay and calls them collectively the panel member.  *See* Wereley at ¶ 146, referring to the "face plate/overly structure"  The assembly drawing from one exemplary module,

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



74.

Ex. 6, BRGE00000582.

75.

76.

One can see from the figure that the overlay is full of electronics.  There is a printed circuit board which appears brown or copper colored. There is a ribbon wire connector, and there are LED lights shown on this module.  Other modules also have a display that the user can see as well as switches for the user to activate.  The

28

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

LED lights, the display and the switches are not trivial elements added to avoid infringement as I understand plaintiff's counsel portrays them.  Rather the LED lights tell a user where to make fluidic connections and the display enables users to easily see values and parameters on the modules.  ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████  Even Plaintiffs' witnesses Mr. Soderman testified that the LEDs are useful Ex. 26, 115-116 ("Q: What do you think about those small LED lamps? A. Good to have for a beginner.") and Bio-Ra employees have pointed out that it is a feature which users like and appreciate.  Ex. 27, Chapman Depo Tr. at 206:21-207:13.

77.     In any event, given that the overlay and faceplate are two separate structures held together by a few drops of glue, one of ordinary skill in the art would not consider them collectively the panel member.

78.     But, even if one of ordinary skill in the art reading the specification considered the overlay and faceplate to be the panel member, they would not consider the electronics that are part of the overlay to be in a separate section of the module from the fluidics section as Dr. Wereley concludes with no analysis.  At paragraph 149 of his report, Dr. Wereley merely says: "I see no reason why the fact that certain of the modules have LEDs or displays integrated into their panel members takes them outside the scope of the claim language.  For one, as discussed, the fact that these are non-fluidics components is not relevant since under the Court's claim construction, only the fluidics section cannot have non-fluidics components such as electronics, and the panel member is a different section in that it is neither a 'fluidics section' nor a 'non-fluidics section'."

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

79.     Dr. Wereley makes the statement that he does  not see any reason why the electronics "integrated into the panel members takes them outside the scope of the claim language without analyzing the file history to see how the inventors characterized their invention and how they treated what is a fluidics section.  When the file history is examined, one of ordinary skill in the art can only come to the conclusion that what Dr. Wereley points to as a panel member and a fluidics section of the accused modules do not satisfy the requirements of the claims and are not consistent with how the inventors characterized their invention or the fluidics section in the file history.  As a result, Dr. Wereley's opening report fails to meet Plaintiffs' burden of establishing the existence of this element in the accused modules.

80.     Dr. Wereley merely concludes with absolutely no analysis that anything "integrated into the panel member" is a different section from the fluidics and electronics sections.  I do not agree and neither would one of ordinary skill in the art who read the specification and the file history.

81.     First, the inventors addressed this very issue in the file history.  With respect to fluidics and electronics and the existence of separate sections, the inventors stated that the fluidics and the electronics need to be on either side of a panel.  *See* Ex. G GEHC 001451 (The detector module 10 of Figure 10 illustrates that the fluid and electrical parts are adjacent, **not on either side of a panel"**) (emphasis added); ("Bergstrom has given no thought to what happens when one unplugs a module and gets the electrical contacts 19 wet which will be inevitable since the contacts 19 appear to be housed in the cup shaped aperture 14…  These problems in the Bergstrom design are not addressed in Burger, but are cleverly addressed in presently claimed invention **by separating the fluidic and non-fluidic parts of fluid handling units across a**

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

**fluid handling panel** and <mark>across</mark> **a panel member of the modular components**, which inhibits the problems mentioned immediately above.")(emphasis added)

82.    The first quote from the inventors in the above paragraph shows that they consider the panel member, which like all physical objects has a thickness, has two sides, (*i.e.* "either sided"). It is apparent Dr. Wereley did not consider this fact. If he did, Dr. Wereley could not make the accused panel member consistent with the inventor statements by claiming that rather than two sides, the panel member has four sides: 1) the side the user sees, 2) the inner side of that side in the thickness of the panel, 3) the side that is mounted against the housing, 4) the inner side of that side which is also in the thickness of the panel. In standard English usage, which does not differ from the way one of ordinary skill in the art would understand what the inventors said, "either" indicates two options.

83.    The same conclusion would be reached by one of skill in the art reading the second quote from Ex. G at page GEHC 1451 that I quoted above that the inventors made regarding the arrangement of the fluidics and electronics of a module. In the second quote, again distinguishing Bergstrom, the inventors stated that the fluidics must sit "**across**" two different panels: 1) the fluid handling panel and 2) the panel member. The accused products satisfy neither of these requirements and would not be considered by one of ordinary skill in the art to therefore contain a fluidics section with no electronics in the section.

84.    As with the word "**either**" in the first quote, one of ordinary skill in the art would understand the use of the word "**across**" with reference to the fluidics and electronics of a panel being across two different panels to refer to the panel having two sides and the electronics and fluidics of a module lying on the opposite sides. That is not the case with the accused modules

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

85. According to Dr. Wereley, the electronics are "embedded" in the panel member and thus part of a separate section from the fluidics.  In addition to the fact that this embedded notion is inconsistent with the two statements I quoted above stating that the fluidics and electronics should be on either side of the panel member and across two different panels, the liquid handling panel, which the electronics and fluidics in the accused modules surely are not, and the panel member which they also are not – it is also inconsistent with other statements and the physical arrangements of the components in the Bergstrom reference that the inventors distinguished.

86. In the file history, the inventors stated that one can see how Bergstrom arranged his components in Figs. 1 and 4(a) where you can see a flow line 5 in baseplate 1.  Ex. G at GEHC 1449.  I reproduce those figures and others from Bergstrom (Ex. 21) below.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



FIG. 1

87.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

88.     The inventors repeatedly described the flow line "5" as being adjacent to the electrical connectors "12" and therefore, having fluidics which are not separated from the electronics in the base plate "1" which had been equated to the panel member.  Ex. G, GEHC at 1449-1451.

89.     Dr. Wereley's claim that electronics integrated in the thickness of the panel member are in a separate section and separated from the fluidics section of the module is inconsistent with what the inventors said about Bergstrom.  As can be seen in Figure 4(a), which I reproduce below and which the inventors referenced when distinguishing Bergstrom as not having separate fluidics and electronics sections that were separated, the electronics lines "12" in Bergstrom are integrated in the base plate/panel member and are distanced from the fluid lines "5" which are also embedded in the base plate.

90.     In Fig. 4(a) one sees a blow up of a single module "10" in base plate "1".  One can see in the figure that the flow line "5" is within the thickness of the base plate

91.     This is also shown in Fig. 2 which I also reproduce below.

92.    as



FIG. 4a

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



FIG. 2

93.

94.     Similarly, the Bergstrom specification states that the electrical lines "12" which are depicted in Fig. 1, are also embedded in baseplate 1.  *See* Ex. 21 Bergstrom 5,766,460 at Col. 3:50-54 (One or more lines/conductors (**12**) for signal and power transmissions from or to connected modules may be arranged in the base plate (**1**) preferably along the flow lines (**5**).".  Nonetheless, even though the electronics were integrated  in the thickness of the baseplate/panel member and so too were the fluid lines (5).  Although those lines were parallel or near each other, they would have to be embedded in different thickness of the baseplate/panel member.  But, consistent with the prior statements of the inventors that the fluids and electronics in a module had to be on different sides of two different panels, the inventors did not consider Bergstrom to have modules with separate fluid and electronics sections or have those sections separated.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

95.     Consequently, Dr. Wereley's analysis that having electronics integrated  in the thickness of the panel member creates a different section that is separated from the fluidics section, is not consistent with the file history and one of ordinary skill would not come to the same conclusion that Dr. Wereley did.  Rather, after reading the portions of the file history I have discussed thus far, one of ordinary skill in the art would conclude that the accused modules do not have an external fluidics section—one that has no electrical components.

96.     Dr. Wereley's analysis that integrated  electronics are a separate section from the fluidics does not consider at all that such an analysis fails to account for the accused devices and the analysis regarding them being inconsistent with the purpose of the invention.  As I detailed previously, the patent, the inventor and plaintiff's prior experts also stressed that the purpose of the invention was to have electronics and fluidics in distinct sections that are separated and sealed from each other so as to keep the fluids from wetting or damaging the electronics such as when fluid connections are being changed or if there is a leak.  That is not the case in the accused devices.

97.     As I explained above and as can been seen in the photo of the assembly procedure for the inject valve that I reproduced in this report, the overlay attaches to the face plate only with a few drops of glue.  That method of attachment is not sufficient to seal the electronics which Dr. Wereley says are "integrated " in the "panel member" from fluids on the module.  To confirm this, I physically examined at least two different modules recently, a pump module and a pH module with respect to the relationship between the overlay and the faceplate.  I confirmed by looking at these physical samples that fluid that leaks from the modules would not be sealed from the electronics Dr. Wereley describes as being integrated  in the panel member.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

98.     To be sure of this, I also spoke to Bio-Rad employee Joe Hilario.  I understand that Mr. Hilario has experience with and responsibility  for assembly of Bio-Rad modules and is familiar through his experience with whether fluid can seep into and wet the electronics that Dr. Wereley states are integrated  in the panel member.  Mr. Hilario confirmed, consistent with my examination of the modules, that in fact leaking fluid can wet the electronics that Dr. Wereley describes as being embedded in the panel member.  My examination and Mr. Hilario confirmed that there is no sealing member, like a gasket, that seals the overlay to the faceplate and prevents electronics from getting wet.  Consistent with this fact,  The Bio-Rad products do not carry the same classification specified by a certifying organization as the Cytiva products, with respect to the degree that electronics and fluidics are separated from each other.

99.     Consequently, the actual facts related to the accused modules demonstrate that they are not consistent with the purpose of the invention, to separate the fluids in a module from the electronics and therefore, have them in separate sections where the likelihood of the electronics getting wet is low.  This fact also demonstrates that Dr. Wereley's conclusion that electronics "embedded in the panel member" as Dr. Wereley describes them, are not in a different section from the fluidics.  For one of ordinary skill in the art to determine that fluids and electronics are in separate sections, they should be arranged and separated in such a way that the purpose of the invention will be fulfilled—electronics will not get wet if there is a fluid leak.

100.    Yet another set of representations in the file history from the inventors that are inconsistent with Dr. Wereley's summary conclusion that electronics integrated  in the panel

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

member[4] of the accused modules are in a separate section from the fluidics are the representations about the Hess reference.

101.    The applicants distinguished the Hess reference as not having a fluidics section separated from a non fluidics section because the modules in Hess had an electrical connection coming out of the back of a module while there were fluids on the front of the module.  *See* Ex. G at 1416-1417 ("Therefore, the boxes of Hess must be electrically interconnected, and it follows that these connections are external to said boxes and not internal to any housing…This means that the bus connections cannot be internal to said boxes or internal to any 'housing.'  On the contrary, the bus connections must be external to said boxes to make sense of the description. Therefore, in Hess, respective non fluidics sections are not internal to any housing as claimed.").

102.    The inventors recognized that Hess had an internal electronics sections that was separated and sealed from the fluidics section:  *See* Ex. G at 1423 ("Since the Hess design was conceived with radioactive product processing in mind [e.g. see abstract] the need for sealing each box and electrically connecting each box such that liquid radioactive contamination does not penetrate the boxes or box electrical interconnections is very important, but results in a costly system.").

103.    Nonetheless, the inventors stated that Hess was inconsistent with the invention because although it had electronics inside a housing that was separated and sealed from fluidics, there was one electrical component, a bus interconnection that was external and not internal to said housing in Hess.  *See, e.g.*, Ex. G at 1424 ("Therefore, the boxes of Hess must be

---

[4] I am simply repeating Dr. Wereley's description of the arrangement but not agreeing with it.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

electrically interconnected, and it follows that these connections are external to said boxes and not internal to any 'housing'."). According to the inventors, the electrical connections had to be at the back of the boxes. *Id.* at 1416 ("So by process of elimination, bus connections [in Hess] have to be at the back of the boxes – there is no other place for them if the boxes are stackable and fit side by side as illustrated.").

104.    Below, I have reproduced an exemplary figure from the Hess reference (Ex. 22). In Fig. 2 below one of ordinary skill in the art can see that the system has fluid components on the front of the boxes, while the bus connections that the inventors described are on the opposite side and cannot be seen.



Fig. 2

105.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY



Fig. 4

106.

107.     In this arrangement, one of ordinary skill in the art would see the bus connections at the back of the boxes, purple arrow, would be on the other side of at least two walls from the fluidics, which are indicated with a red arrow.  Even with this two wall separation, the inventors said the arrangement was inconsistent with their invention.  There is no way to square this representation about Hess, with Dr. Wereley's claim that electronics integrated  in the panel member are in a separate section from the fluidics in the accused modules.  The electronics in Hess are on the other side of two walls from the fluidics, not right next to them as in the accused modules, yet the inventors said this was not separation and not its invention because there was a single electrical component that was not inside the housing even though there were many other electrical components inside the housing.

108.     The inventors further stressed why this type of arrangement was not its invention. Not only did the inventors consider that their invention had to have the fluidic and electronic

41

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

components of a module separated, such that there were distinct and separate fluidics and electronics sections in the module, but the separation had to be accomplished in a particular way which is inconsistent with Dr. Wereley's analysis.

109.    Even if one of ordinary skill in the art would assume, contrary to the facts, that electronics integrated in the panel member of the accused products somehow separated them from the fluidics in the modules and protected them from getting wet, this is not consistent with the invention as the inventors represented it to the Examiner. The inventors unequivocally stated, over and over again, that any protection of electronics of a module had to consist of "collective" protection in which one module's electronics were being protected in the same way and in the same structure as all the other modules' electronics.

110.    The inventors described the collective protection of the electronics of a module of the invention as follows in distinguishing it from Hess in Ex. G at 1414-1415:

> According to the claimed invention, the liquid handling panel of the housing, together with the panel members of the modular components is arranged to separate the fluidics sections with respect to the non fluidics sections of the modular components such that the respective fluidics sections are external to the housing and the respective non

Page 6 of 19

111.                                                                                    GEHC 001414

42

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

Appl. No. 13/376,929
Amendment dated May 28, 2014
Reply to Office action of March 17, 2014

fluidics sections are internal to the housing. In general terms, as pointed out in the present

application [0060], this concept allows for collective liquid protection of internal parts of

the modular components present inside the housing and separated from the fluidics

sections by the fluid handling panel/members. In contrast, in the design of Hess, each

independent module needs to be sealed and resistant to liquids in order to provide a safe

working environment and to comply with relevant regulations for fluid handling systems.

Since the Hess design was conceived with radioactive product processing in mind

[e.g. see abstract] the need for sealing each box and electrically connecting each box such

that liquid radioactive contamination does not penetrate the boxes or electrical

interconnections is very important, but results in a costly system. The presently claimed

system provides a much lower cost alternative to the Hess design because the collective

protection of the housing claimed negates the need for the individual sealed boxes of

Hess.

Applicant submits also that there is no disclosure in Hess of the separation

concept of the fluidic sections and the non fluidic sections as claimed in present claim 1

"such that said respective fluidics sections are external to the housing and said respective

non fluidics sections are internal to the housing". In Hess, each individual box must be

connected to the bus in some way, but nothing detailed is illustrated concerning any

connection. In this regard, the most pertinent description in Hess appears to be [0077] and

[0078]:

> [0077] To further reduce the complexity of the configuration, the system
> may include an intelligent bus system which recognizes connected components.
> Advantageously, standard connecting cables can be employed which only differ by
> having different lengths.

Page 7 of 19

112.

GEHC_001415

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

113.    At best, (which I do not agree with) what Dr. Wereley describes as electronics integrated in the panel member to create a section distinct from the fluidics section would be an example of individual protection of fluidics from electronics in each module that the inventors distinguished their invention from over Hess.  Such individual protection does not provide the "collective protection" that the inventors said was necessary in their invention.  In other words, the electronics integrated in each panel member of each module in the Bio-Rad accused modules and system are not protected from the fluidics by being inside a housing that protects them all. Rather the integrated electronics that Dr. Wereley points to are each protected individually.

114.    A person of ordinary skill in the art reading the inventors' statements about Hess would recognize that if in Hess, a single electronic cable exiting the back of a module, in which the cable was spaced apart from the fluidics at the front of the module by at least two walls and a much greater distance than the electronics in the Bio-Rad accused devices are distanced from the fluidics, did not constitute a distinct section that was separated from the fluidics section, then neither does what Dr. Wereley calls the electronics integrated in the panel member of the accused modules.

115.    For these reasons, the accused devices do not have an external fluidics section. Similarly, the subsequent elements that I will discuss in the following paragraphs relating to the non fluidics section and the separation of the fluidics from the non fluidics by a panel member and the non fluidics section being internal to the housing and separated from the fluidics by a liquid handling panel when the module is inserted into the housing are also not met.

### 2.    Element [1.f]: "an internal non-fluidics section"

116.    Element [1.f] of the '420 patent requires "an internal non-fluidics section."

117.    The NGC System does not infringe this element because the NGC System does not include "an internal non-fluidics section" as required by claim 1 of the '420 patent.  As

44

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

detailed with respect to element 1(e) in the prior paragraphs, which I incorporated herein, each of the Bio-Rad accused modules contain either LED lights, a display or both that are visible to the user and on the same side of the panel member as the fluidics.  The pump modules also have electronic switches on the same side of the panel member as the fluidics.  They also contain electronics such as a PCB and ribbon line in the "overlay" shown in the assembly documents cited and that are exhibits to this report.  These are all part of the non-fluidics section and cannot simply be considered a separate section from the electronics that are inside the housing.

118.    In paragraphs 118- 126 Dr. Wereley concludes that there is a non fluidic section, one that he believes does not have fluidics, by pointing to electronics inside the housing.  But, as discussed previously, Dr. Wereley does not at all consider the File History.  As I discussed previously regarding element 1(e), when the file history is examined, one of ordinary skill in the art can only come to the conclusion that there is not a non fluidics section in the accused Bio-Rad modules.

119.    For example, the Hess reference certainly had electronics that were sealed in a box and separated from the fluidics that were outside the housing and on the front face visible to the user.  *See* Ex. G at 1423 ("Since the Hess design was conceived with radioactive product processing in mind [e.g. see abstract] the need for sealing each box and electrically connecting each box such that liquid radioactive contamination does not penetrate the boxes or box electrical interconnections is very important, but results in a costly system."); *See* Figs. 2 and 4 reproduced above from the Hess reference showing the fluidics.

120.    Nonetheless, as shown in the previous element, the inventors stated Hess was distinct from their invention because there was a single electrical component, a connector between modules, that exited from the back of each module.  The inventors considered that

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

single electrical line to be part of the non fluidics section of each module and not separated from the fluidics of each module.

121.    There is no way to distinguish the arrangement of Hess and the arguments the inventors made regarding there being electrical components not separated from fluidic components in the Hess modules from the arrangement in the Bio-Rad accused modules.  Each of the Bio-Rad modules has electronics that are not inside the housing, just like Hess.  Therefore the Bio-Rad modules do not have a non fluidics section.

122.    Further as discussed with element 1(e), it is not proper to call the electronics in the accused devices that are "integrated  in the panel member" a section that is distinct from either the electronics inside the housing or the  fluidics outside the housing.  For example, as discussed previously, with respect to the figures of Bergstrom that I reproduced above showing the flow channel 5 and the electrical lines 12, the Bergstrom reference has electronics and fluidics integrated  in a baseplate structure, yet the inventors did not consider them to be distinct sections that were separated.  Moreover, the inventors stated that for electronics and fluidics to be in separate sections, they had to be on opposite sides of a at least two different panels—the panel member and the liquid handling panel.  Ex. G at 1451.  There is no way for this to be true and the Bio-Rad accused modules to meet the claim limitation.

123.    As I discussed previously, I do not believe the overlay is the panel member.  Thus, the electronics that Dr. Wereley states are "integrated in the panel member are actually in the overlay and on the same side of the panel member (faceplate) as the fluidics.  Moreover, even if one considers the overlay and the faceplate as being a single unit that is the panel member, the fluidics and electronics are still not on opposite sides of the two required panel members—the liquid handling panel and the panel member as the inventors stated they must be.  Ex. G at 1451.

46

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

124.     For all these reasons and those discussed with respect to element 1(e), the three accused Bio-Rad liquid handling units do not have a non fluidics section.

    **3.**    **Element [1.h]: "a panel member arranged to separate the fluidics section from the non-fluidics section"**

125.     Element [1.h] of the '420 patent requires "a panel member arranged to separate the fluidics section from the non-fluidics section."

126.     The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed.  I incorporate my discussion of the prior two elements for this element.  In summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as integrated in the panel member. "Integrating" as shown with the arrangement of Bergstrom, does not create separate sections.  There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum, the electronics that Dr. Wereley describes as being integrated  in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

    **4.**    **Element [1.i]: "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."**

127.     Element [1.i] of the '420 patent requires "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional

47

array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

128.    I have discussed why this element is not met with respect to my discussion of elements 1(e), 1(f) and 1(h).  I incorporate those discussions fully for this element.

129.    The NGC System does not infringe this element because the alleged housing lacks the underlined portions of the claim element: "a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

130.    In summary, the failure of proof for this element is most easily demonstrated with reference to the inventors' discussion of the Hess reference.  As discussed with respect to elements 1(e) and 1(f), in the Hess reference, each module had electronics sealed in a box and fluidics visible from a side that one can consider the front of the box.  The inventors pointed out that what the examiner was considering the modules also had a single electrical connection exiting the back of the box. *See e.g.*, ¶¶ 107-112 herein.  For this reason, they concluded that Hess did not have a non fluidics section internal to said housing and a fluidics section external to said housing.  There is no way for one of ordinary skill in the art to distinguish the arrangement in Hess that the inventors said was outside the scope of their invention with the arrangement in the accused modules.  In the accused modules, there are electronics outside the housing.  Those electronics cannot be a section that is distinct from the electronics that are inside the housing, just like the single electronic connection in Hess was not distinct from the electronics contained in the sealed boxes.  Because the electronics inside  the sealed boxes in Hess, that the examiner

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

considered a housing did not constitute a non fluidics section that was internal to said housing when inserted, one of ordinary skill in the art could  not also consider the electronics that Dr. Wereley considered to be embedded in the panel member to be a non fluidic section that is distinct from the electronics that are inside the housing in the Bio-Rad accused modules.

131.    Therefore, Dr. Wereley has failed to meet his burden to establish the existence of this element in the accused fluid handling modules.

> 5.    **Element [1.k]: "wherein each interchangeable modular component includes a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus"**

132.    Element [1.k] of the '420 patent requires "wherein each interchangeable modular component includes a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

133.    The NGC System does not infringe any claims of the '420 patent because the alleged interchangeable modular component lacks "a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus" as claimed.

134.     In particular, Dr. Wereley, at paragraphs 160-170 of his report where he discusses this element, has not established and met his burden of proof that each module acts independently to perform operations after receiving instructions over the bus.  First, I do not believe that Dr. Wereley has used the proper definition of the CPU's on the modules acting independently.  Second, I do not see proof under the definition that he does use that each of the accused modules acts independently of other modules.

135.    Dr. Wereley interprets the "independent" language in the claim to mean independent of other modules.  *See* Wereley ¶167.  But that is not how one of ordinary skill in

49

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

the art would interpret that limitation.  The specification gives two alternatives for control.  First it describes the master control unit communicating with each module over a bus and those control signals issued by the MCU controlling the modules.  *See* Col. 7: 57-60 ("As mentioned above, the chromatography system may comprise a master control unit 40 arranged to communicate with all modular components e.g. 1-26 over a system bus 42 such as a CAN-bus or the like").  In that embodiment, something other than a CPU on the module would instruct the module what to do.  The control function could be carried out by for example a particular voltage/current that would make a pump operate at a certain rate. (e.g., A high signal makes the motor operate at one rate and a low signal makes it operate at another rate).

136.    Alternatively, the specification indicates that each module could also have a CPU that would allow the module to <u>independently</u> perform operations in response to instructions over the bus.  *See* col. 7: 60-63 ("In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42.")  One of ordinary skill in the art would <u>not</u> read that alternative to do nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (e.g., A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely forward it to another device to create that same current or voltage or simply translate that instruction into a different format.

137.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

signal indicates and what the MCU would have done on its own, something that is independent of the signal the MPU sent.

138.     One example of that would be the function described for the 2040 instrument which I detailed in my invalidity report.  In the 2040, the burette modules have a CPU located directly on them.  The 2040 User Manual indicates that the burette modules have very precise control – the ability to vary flow in one of 10,000 increments.  To maintain such precise control, one of ordinary skill in the art would recognize that the burette module, using its CPU is independently monitoring the flow value and constantly making adjustments to ensure the set value is being maintained.  In that situation, the CPU on the burette is operating independently of the master control unit which would have only sent the original instruction for what the initial parameter should be.

139.     Given that the specification describes the back to back situations where either: 1)the Master Control Unit controls the operation of the module, and contrasts that with 2) the situation where the CPU independently controls an operation of the module in response to an instruction from the MCU, one of ordinary skill in the art would not understand the independent control to be control that is independent of what is occurring in other modules as Dr. Wereley does.

140.     Contrary to what Dr. Wereley concludes at paragraph 167, the mention of the MCU and the fact that the MCU needs to send instructions would not lead one of ordinary skill in the art to interpret independently to mean independent of other modules just because the CPU must receive some signal from the MCU. ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████     As I explained in the

51

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

paragraph above relating to what the 2040 burette module does, just because a CPU receives an instruction from an MCU does not mean that functions carried out by the CPU cannot be independent of the MCU command.

141.    There is no reference in the specification to modules communicating with each other in relation to the control function.  Rather the two embodiments in the specification that are directed to this limitation relate to the MCU controlling the module, or the CPU on the module receiving a signal from the MCU and then acting independently of the MCU in carrying out some function on the module.

142.    I do not see anything in the testimony that Dr. Wereley cited that leads to a different conclusion.  First, Dr. Wereley cites the testimony of Mr. Iovanni who testified that ███ ████████████████████████████████████████████████████████ *See* Wereley ¶ 168. ████████████████████████████████████████████████████ ██████████████████████████████████████████ It is fully consistent with the definition I have put forward. ████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ Moreover, as I explain below, one of ordinary skill in the art would not look to the Bio-Rad accused product to determine how to interpret the independent limitation in the patent, a limitation created by a different company related to a different system.

143.    Mr. Bland's testimony that Dr. Wereley cites also does not support his construction of this element of the claim. All that Mr. Bland testified was that in the accused system, ████████████████████████████████████████████. *Id.* at ¶ 168, pages 108-109.  But, that does not mean that is what the claim term in the patent means.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

That would be like saying that a car that can maintain its speed independent of a driver pressing the accelerator pedal, defines the meaning of a claim in a patent written about a different car that says the car operates independently of operator control.  Independent of operator control could certainly relate to an autonomous driving system, not simply cruise control.  One needs to see how the term is used in the patent, not some application outside the patent.  There is no way to link those facts to determine the meaning of the claim element.  I understand that the element of a patent claim must be interpreted in light of what is disclosed in the specification, not with reference to an accused device.  If the latter was the method of interpretation, than one would always interpret the claim with the way the accused product worked and there would always be infringement of every patent.

144.    Moreover, Mr. Bland's testimony shows that the CPU's on the accused modules do not act independently of the instructions from the MCU.  As Dr. Wereley put in his report, Mr. Bland testified that: ███████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████     *Id*. at ¶168 p. 108.  This testimony indicates ████████████████████

███████████████████████████████████████████  not that it is operating independently.

145.    I understand that Bio-Rad identified its understanding of the independent requirement in its non-infringement contentions . *See e.g.*, ROG Response 6 supplemented on May 22, 2020.  By choosing not to address this construction at all in his opening report, I understand that neither Dr. Wereley nor Mr. Vukicevic can raise it either one of their responsive reports.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

146.    Next, even if Dr. Wereley's construction were correct, that independent means: "that the particular module's operations be independent from the operations of other modules installed in the system."

147.    First, I have reviewed the report of Mr. Vukicevic who allegedly studied the source code to show that it operated in a way consistent with the claims.  I do not find that what he states in his report establishes that.  For example, nowhere in his report does Mr. Vukicevic state that the Master Control unit issues commands over a bus to a CPU on each of the accused modules  that then uses those commands to control the operation of the module independently of other modules .  The closest he comes is in paragraph 5, but that paragraph does not say that commands travel over a bus and control each of the accused modules independently of other modules

148.    After identifying a number of file names, which I do not think prove anything about the existence of the disputed element, Mr. Vukicevic states that 

Vukicevic at ¶ 5.  But this proves nothing with respect to the element.

He also says nothing about the claimed bus or any requirement for independence.

149.    In paragraph 7 Mr. Vukicevic states that

This does not indicate that the claim

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

limitation is being used. It does not identify what is sending the signals, how they are being sent and to what on the CU.

150.    So, nothing that I see in Mr. Vukicevic's report establishes that the accused devices function in the manner claimed.  In fact, in the next few sentences, Mr. Vukicevic states ████████████████████████████████████████████████████████████████ ██████████ Again, this does not establish that the MCU is sending the commands, over a bus to the CPU on each module.  Nor does it establish that each CPU is acting independently from the CPU on any other module as Dr. Wereley interprets the limitation.  ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

151.    Dr. Wereley's independent analysis of this element also does not establish the existence of this element in the accused device.  Thus, Dr. Wereley has failed to meet his burden in his opening report.

152.    In particular, nothing in paragraphs 160-170 of Dr. Wereley's report establishes that the CPU on each of the accused modules is receiving signals over a system bus that then cause it to carry out operations on the module.  Moreover, nothing in those paragraphs of Dr. Wereley's report indicate that any signals that the CPUs receive are from the MCU which is the only description the specification contains for where the signals must be coming from.  See Col. 7: 54-67, Description of Fig. 8 Dr. Wereley nowhere in his report identifies where the signals are originating from.  Thus he has failed to meet his burden to establish this element.  Additionally, see next element.  Further, the separate computer that a user of the Bio-Rad accused devices uses to input information and which contains the user interface is not the MCU as described in the specification.  Rather, it is a distinct control computer.  See Col. 8: ("The master control unit 40

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

comprises a system controller 46 for communicating with internal and external components and control computers (not shown)"). Indeed, having a master control unit outside the housing would also be inconsistent with how the inventors distinguished Hess during prosecution, as it would require a bus outside of the housing.

### 6. Element [1.l]: "wherein the master control unit is arranged to automatically identify interchangeable modular components"

153. Element [1.l] of the '420 patent requires "wherein the master control unit is arranged to automatically identify interchangeable modular components."

154. The NGC System does not infringe any claims of the '420 patent because the alleged master control unit is not "arranged to automatically identify interchangeable modular components" as claimed. The evidence that Dr. Wereley cites at paragraphs 171-174 shows that this element is not met. Rather than showing that the MCU automatically identifies an interchangeable modular unit, the testimony of Mr. Bland that Dr. Wereley cited shows that ██ ██████████████████████████████████████████████████████ *See e.g.*, Wereley at ¶ 171.

155. The NGC Instrument guide also does not establish that the MCU identifies each interchangeable module that inserted into the machine. All the guide says is: "Each module has a unique electronic ID that enables the system to recognize its function when the module is placed into the bay. For example, the system can distinguish between a sample inject valve module and a sample inlet valve module even though they each occupy a single wide slot." *See* Wereley at ¶171. ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████. *Id.*

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

156.    But the fact that the system identifies a module does not mean the element is met. The system is composed of multiple elements.  The claim element, however, is very specific. The MCU is the component in the system that must identify the module inserted into the housing.  The fact that the identity may be passed on to the MCU at some point after it is identified by some other component of the system does not satisfy the element.  One of ordinary skill in the art would understand identify to mean the component that makes the identification, not any component that later receives the information.  This is consistent with the specification which states it is the MCU which makes the identification and not CPU's on modules.  Col. 8: 8-14 ("According to one embodiment, different component modules are automatically identified by the master control u nit, whereby they may be moved essentially freely between different positions.  Moreover, the master control unit may be arranged to provide said information to Chromatography control software whereby experimental setup and planning may be performed.").  This passage makes clear to one of ordinary skill in the art that having one device in a system identifying a module is different from that device passing that identity on to other devices in the system as occurs in the accused system.

157.    Last, I see nothing in Mr. Vukicevic's report that shows that Plaintiff has met its burden of establishing the existence of this element.  In paragraph 8 of his report, Mr. Vukicevic states that ███████████████████████████████████████████████████████ ██████████████████████████████████████████████ Vukicevic, ¶ 8. First, Mr. Vukicevic is not even sure if this is the case.  Second, nothing in this sentence or in any other part of Mr. Vukicevic's report establish that it is the MCU, which identifies the modules as the claim requires.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

158.    Therefore, Dr. Wereley, Mr. Vukicevic and Plaintiffs have failed to establish the existence of this element in the accused devices. .

> **7.    Element [1.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit and the fluid control valves are interchangeable modular components"**

159.    For the reasons stated previously the sample inject module and the two system pump modules are not interchangeable modular components because the interchangeable modular components of claim 1 need to have the fluidics and non fluidics sections of elements 1.e and 1.f as well as the separation requirements of elements 1 (h, i, j) and the independent operations requirements of element 1.k and identification requirement of 1(l) which the sample inject module and the two pump modules do not have as described previously which I incorporate herein.  The same is true for the other fluid handling modules that Dr. Wereley identifies as alternatives to the pump and  inject valve for this element.

160.    Further, with respect to the UV module that Dr. Wereley relies on to satisfy this claim element, he identifies a sensor unit, but neither the Bio-Rad single or multi-wavelength UV detectors qualifies as interchangeable modular units that can satisfy this element because neither has the required fluidics and non fluidics sections, a panel member for separating those sections, and a liquid handling panel for separating those sections, nor does either satisfy the requirement that the electronics be internal to the housing when inserted.

161.    One of ordinary skill in the art reading the file history, specification and claims would conclude that the Bio-Rad single and multi-wavelength detectors are not interchangeable modular units as required by the claims.  In fact, the inventors addressed this very type of component and unequivocally stated that such a detector did not come within the claims of its invention.

58

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

162.     In distinguishing the Bergstrom reference the inventors pointed to the detector module 10 as not being within the realm of its invention.  *See* Ex. G at GEHC 1450.  In particular, the inventors first said:

> lines/conductors 12 [column 3 lines 50-58]. Further, column 7 lines 3 to 11 describes signal communication to a detector module 40 (Figure 10) via contacts 20 on the module and corresponding contacts 19 (Figure 1) on the base plate 1.  The detector 40 also includes a processing unit 55, which is very likely to be electronic in nature and conductors 41 which both appear to be next to liquid paths. It is suggested that other modules will have corresponding power and signal paths: *"other modules (for instance valve modules) may be provided with power and signal transmission lines/conductors."* [column 7 lines 8-10].

163.

164.     The Bergstrom specification at Col. 7: 3-11 describes that the detector module can be based on pH, UV, IR, conductivity, capacitance refractive index, etc.:

**7**

function in the form of valves, filter, matrices, additional connection, detectors, etc.

FIG. **10** illustrates a detector module. The detector unit (**40**) may be based on pH, UV, IR, conductivity, capacitance, refractive index, etc. The transmission of signals from the   5
module is effected through lines/conductors (**41**) and con-
tacts (**20**) to corresponding contacts (**19**—shown in FIG. **1**)
in the connecting device. Correspondingly, other modules
(for instance valve modules) may be provided with power
and signal transmission lines/conductors. Detector modules   10
may be equipped with signal processing units (**55**).

165.

166.     The Bio-Rad UV modules have both a UV detector and a conductivity detector on them as can be seen in the images below along with Fig. 10 from the Bergstrom patent:

59

167.  .

168. 



169.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

170.    Further images of the Bio-Rad UV and conductivity detectors are attached as an exhibit to this report.

171.    The inventors made it clear and unequivocally stated that a detector, such as a single or multiwavelength detector which Dr. Wereley has accused of satisfying this element cannot.

172.    The statements were so clear that even Cytiva's prior expert Dr. Scandella recognized that the UV detector had electronics on the same side of the panel member as the fluidics section.  That testimony is reproduced below:

> 11  BY MR. BILSKER:
> 12     Q   So let's see if you can answer it again.
> 13  Is the screen on the Bio-Rad Multi UV Wavelength
> 14  Detector, is that electronics?
> 15     A   As an isolated element, it is electronics,   10:18:49
> 16  yes.
> 17     Q   Is it an electrical component?
> 18     A   It is an electrical component, yes.
> 19     Q   And that electrical component, is that
> 20  internal or external to the housing of the machine?   10:19:03
> 21     A   Well, I, as not an expert in this area,
> 22  assume that the surface of the screen is -- is not
> 23  an electrical component.  What's behind it is an
> 24  electrical component.
> 25     Q   Do you know whether any of the electrical   10:19:22
>                                                          Page 37

173.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

15    Q    Really?  So you think the claim is -- you    10:26:32

16  think it's fine to have electronics and electrical

17  components external to the housing of the machine?

18    A    For example, the conductivity cell that

19  you've already pointed to is external to the

20  machine.                                    10:26:46

21    Q    I know that.

22    A    And if you consider that the -- that the

23  electrodes of the conductivity cell are electronics

24  or electronic, or whatever you want to -- however

25  you want to define that, then that's external to the  10:26:58

Page 44

1  machine, yes.

2    Q    And the light source is an electrical

3  component, and that would be external to the housing

4  of the machine, correct?

5    A    It might be.  I didn't determine where the   10:27:08

6  light source was.

7    Q    Well, let's assume that the light source is

8  contained within -- within that housing that you

9  point to that says fluidics section.  Do you see

10  that?                                       10:27:28

11    A    Okay.

12    Q    If it's contained within that, that would

13  be an electrical component which is external to the

14  housing of the machine, correct?

15         MR. NISHIMOTO:  Objection.  Form.        10:27:31

174.    16         THE WITNESS:  Yes, I think so.

62

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

175.     In fact, Dr. Scandella testified at p. 48 of his deposition that the UV module, which was exhibit 41 to his report  contained electronic components on the same side of the panel member as the fluidics.

> 12     Q     The module shown in Figure 41 --
> 13     A     Yes.
> 14     Q     -- in your declaration has electrical
> 15  components on the same side of the panel as the        10:30:5
> 16  fluidics section, correct?
> 17     A     Right.

176.

177.     I reproduce Fig. 41 along with Dr. Scandella's annotations of the figure and a short paragraph from his report describing the figure below:



Fig. 41

42.     The panel member also provides for attachment of the modular component to the liquid handling panel.  Specifically, the panel member contains a screw or screws (shown in Figure 41 above) which, when tightened, attach the modular component to the liquid handling

178.     panel (shown in Figure 42 below).  *See also* NGC Instrument Guide v. 1 pp. 187-188

63

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

179.     Given the statements of the inventors, the testimony of Dr. Scandella and the images of the UV and conductivity detector, one of ordinary skill in the art could not conclude that the UV/Conductivity modules have: fluidics and non fluidics sections, that they have a panel member that separates the fluidic from non fluidic sections, that they have a liquid handling panel that separtes fluid from non fluidics, that the non fluidic electronic section is internal to the housing when inserted into the respective cavity of the housing.  I have confirmd in conversations with Joe Hilario that each of the Bio-Rad UV/Conductivity modules (eg single and multi-wavelength) have electronics outside the housing and on the same side of the panel member as the fluidics section.  For example, ██████████████████████████ ██████████████████████. . For at least all these reasons, the UV/Conductivity module cannot meet this claim element.  I did not see any other sensor unit that Dr. Wereley relied on to meet the sensor limitation, but even if he did, all the sensor units that Bio-Rad can use in the accused systems contain the same arrangement as the UV/Conductivity modules. There are electronics that are part of the modules that are on the outside of the housing and on the same side of the panel member as the fluidics.  Thus, such sensor units would not meet the limitations of the claims for the reasons already described previously for the liquid handling units.  Moreover sensor units such as the PH detector contain additional electronics that are part of the module, external rather than internal to the housing and on the same side of the panel member as the fluidics.  The PH detector has an electrode that is placed in contact with fluid and is part of the module.  Thus the PH detector module cannot meet this limitation of claim 1 or the limitations of claim 5 below.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

180.     Many of the subsequent claims contain the same limitations and whether or not specifically stated, the arguments made thus far are specifically incorporated and become part of the argument for the subsequent limitations as well.

### 8.     Dependent Claim 5: "further comprises a pH electrode that is external to the housing"

181.     Claim 5 depends from claim 1, and requires that the recited liquid chromatography system "further comprises a pH electrode that is external to the housing."

182.     I have discussed why this element is not met with respect to my discussion of element 1.e. and the last element discussed above for claim 1(m).  I incorporate those discussions fully for this element.  Therefore, the "pH electrode" is not "external to the housing" as required.

### 9.     Dependent Claim 6: "that the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve"

183.     Claim 6 depends from claim 5, and requires "that the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve."

184.     I have discussed why this element is not met with respect to my discussion of element 1.e. and the other elements of claim 1.  All of the fluid handling modules in the Bio-Rad accused devices are structured in the same way as the pump and inject valves I discussed with claim 1 and cannot meet the elements of that claim for the same reasons.  Further, as discussed above with regard to element 1(m) all of the sensor units or modules used in the Bio-Rad accused devices have the same general structure.  In addition to the types of electronics identified for the fluid handling units, all the sensor units have further electronics outside the housing which are used to perform the sensing function.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

### 10. Dependent Claim 7: "the pH electrode is connected to a pH valve formed as an interchangeable modular component"

185.    Claim 7 depends from claim 5, and requires that "the pH electrode is connected to a pH valve formed as an interchangeable modular component."

186.    For the reasons stated previously with respect to the claims discussed already, a pH valve with an electrode attached in the Bio-Rad accused products cannot infringe.

### 11. Dependent Claim 8: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels"

187.    Claim 8 depends from claim 7, and requires that "the pH valve includes an integrated flow cell for in-line monitoring of pH levels."  See claim 7.

### 12. Dependent Claim 15: "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve."

188.    Claim 15 depends from claim 1, and requires "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve."

189.    For the reasons stated previously with respect to the claims already discussed, any of these modules in the Bio-Rad system cannot meet the limitations of this claim. .

### 13. Element [17.v]: "a panel member arranged to separate a fluidics section from a non-fluidics section"

190.    Element [17.v] of the '420 patent requires "a panel member arranged to separate a fluidics section from a non-fluidics section."

191.    I have discussed why this element is not met with respect to my discussion of element 1(e) through 1.h.  I incorporate those discussions fully for this element.

### 14. Element [17.ix]: "wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when

66

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

> inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing"

192.    See corresponding element of claim 1 which I incorporate herein. Element

> **15.    Element [17.xi]: "wherein each interchange modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus"**

193.    Element [17.xi] of the `420 patent requires "each interchange modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

194.    I have discussed why this element is not met with respect to my discussion of element 1.k . I incorporate those discussions fully for this element.

195.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the "modular fluid handling unit" cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

196.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

> **16.    Element [17.xiii]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit, and at least two fluid control valves of different configurations, of which at least two of the**

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

> **pump, the sensor unit, and the fluid control valves are interchangeable modular components"**

197.    Element [17.xiii] of the '420 patent requires "said housing is adapted to accommodate at least one pump, at least one sensor unit, and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components"

198.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

### 17.    Dependent Claim 22

199.    *Claim 22* is analogous to dependent claim 5.  *See* VII.A.8.

### 18.    Dependent Claim 23

200.    *Claim 23* is analogous to dependent claim 6.  *See* VII.A.9.

### 19.    Dependent Claim 24

201.    *Claim 24* is analogous to dependent claim 7.  *See* VII.A.10.

### 20.    Dependent Claim 25

202.    *Claim 25* is analogous to dependent claim 8.  *See* VII.A.11.

### 21.    Element [27.e]: "a panel member arranged to separate a fluidics section from a non-fluidics section"

203.    Element [27.e] of the '420 patent requires "a panel member arranged to separate a fluidics section from a non-fluidics section."

204.    I have discussed why this element is not met with respect to my discussion of element 1.h.  I incorporate those discussions fully for this element.

205.    The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed.  I incorporate my discussion of elements [1.e] and [1.f] for this element.  In

68

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as embedded in the panel member. "Embedding" as shown with the arrangement of Bergstrom does not create separate sections.  There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum, the electronics that Dr. Wereley describes as being embedded in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

> 22.   **Element [27.i]: "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing"**

206.   Element [27.i] of the '420 patent requires "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

207.   I have discussed why this element is not met with respect to my discussion of elements 1(e), 1(f) and 1(h).  I incorporate those discussions fully for this element.

208.   The NGC System does not infringe this element because the alleged housing lacks the underlined portions of the claim element: "the housing comprises <u>a liquid handling panel</u> with at least four component receiving positions arranged in a two dimensional array and

69

adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

209.    In summary, the failure of proof for this element is most easily demonstrated with reference to the inventors' discussion of the Hess reference.  As discussed with respect to elements 1(e) and 1(f), in the Hess reference, each module had electronics sealed in a box and fluidics visible from a side that one can consider the front of the box.  The inventors pointed out that what the examiner was considering the modules also had a single electrical connection exiting the back of the box. *See* e.g. ¶ 91-93 herein.  For this reason, they concluded that Hess did not have a non fluidics section internal to said housing and a fluidics section external to said housing.  There is no way for one of ordinary skill in the art to distinguish the arrangement in Hess that the inventors said was outside the scope of their invention with the arrangement in the accused modules.  In the accused modules, there are electronics outside the housing.  Those electronics cannot be a section that is distinct from the electronics that are inside the housing, just like the single electronic connection in Hess was not distinct from the electronics contained in the sealed boxes.  Because the electronics inside the sealed boxes in Hess, that the examiner considered a housing did not constitute a non fluidics section that was internal to said housing when inserted, one of ordinary skill in the art could not also consider the electronics that Dr. Wereley considered to be embedded in the panel member to be a non fluidic section that is distinct from the electronics that are inside the housing in the Bio-Rad accused modules.

210.    Therefore, Dr. Wereley has failed to meet his burden to establish the existence of this element in the accused fluid handling modules.

> **23.    Element [27.k]: "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus"**

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

211.    Element [27.k] of the '420 patent requires "each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

212.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

213.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the "modular fluid handling unit" cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

214.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

**24.    Element [27.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components"**

215.    For the reasons stated previously the sample inject module and the two system pump modules are not interchangeable modular components because the interchangeable modular components of claim 1 need to have the fluidics and non fluidics sections of elements 1.e and 1.f as well as the separation requirements of elements 1 (h, i, j) and the independent

71

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

operations requirements of element 1.k and identification requirement of 1(l) which the sample inject module and the two pump modules do not have as described previously which I incorporate herein.

216.    In summary, with respect to the UV module that Dr. Wereley points relies on to satisfy this claim element, he identifies a sensor unit, but neither the Bio-Rad single or multi-wavelength UV detectors qualifies as interchangeable modular units that can satisfy this element because neither has the required fluidics and non fluidics sections, a panel member for separating those sections, and a liquid handling panel for separating those sections, nor does either satisfy the requirement that the electronics be internal to the housing when inserted.

217.    One of ordinary skill in the art reading the file history, specification and claims would conclude that the Bio-Rad single and multi-wavelength detectors are not interchangeable modular units as required by the claims.  In fact, the inventors addressed this very type of component and unequivocally stated that such a detector did not come within the claims of its invention.

### 25.    Dependent Claim 30: "the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component"

218.    Claim 30 depends from claim 27, and requires that "the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component."

219.    I have discussed why this element is not met with respect to my discussion of element 1.e and claim 5.  I incorporate those discussions fully for this element.  Therefore, the "pH electrode" is not "external to the housing" as required.

### B.    Non-Infringement of the '589 Patent

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

1.   **Element [1.d]: "wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array"**

220.   Element [1.d]: "wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array."

221.   I have discussed why there is not fluid handling section in the accused products with respect to claim 1 of the 420 paten which I incorporate fully herein.

2.   **Element [1.g]: "wherein each modular fluid handling unit . . . includes a CPU for independently performing fluid control operations in response to instructions over a system BUS"**

222.   Element [1.g] of the '589 patent requires "wherein each modular fluid handling unit . . . includes a CPU for performing fluid control operations independently irrespective of the location within the housing unit."

223.   See discussion for corresponding element of claim 1 of the 420 patent incorporated herein.

3.   **Element [6.f]: "each modular fluid handling unit includes a CPU for performing fluid control operations independently irrespective of the location within the housing unit"**

224.   See corresponding element of claim 1 of the 420 patent incorporated herein.

4.   **Dependent Claim 7: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are freely arrangeable modular fluid handling units"**

73

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

225. Claim 7 depends from 6, and requires that the "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are freely arrangeable modular fluid handling units."

226. I have discussed why this element is not met with respect to my discussion of claim 1 and element 1.e and dependent claims 5-6 of the '420 patent. I incorporate those discussions fully for this element.

> **5.** **Dependent Claim 8: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit and the fluid control valves are arranged as modular fluid handling units"**

227. Claim 8 depends from 1, and requires that the "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit and the fluid control valves are arranged as modular fluid handling units."

228. I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent. I incorporate those discussions fully for this element.

> **6.** **Dependent Claim 9: "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve"**

229. Claim 9 depends from claim 8, which in turn depends from claim 1, and requires that "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve."

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

230.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**7.    Dependent Claim 13: "the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit"**

231.    Claim 13 depends from claim 1, and requires that "the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit."

232.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**8.    Dependent Claim 14: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels"**

233.    Claim 14 depends from claim 13, and requires that "the pH valve includes an integrated flow cell for in-line monitoring of pH levels."

234.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**9.    Dependent Claim 21: "the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when fitted in a receiving position of the housing unit"**

235.    Claim 21 depends from claim 20, and requires that "the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when fitted in a receiving position of the housing unit."

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

236.    I have discussed why this element is not met with respect to my discussion of element 1.h of the '420 patent.  I incorporate those discussions fully for this element.

237.    The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed.  I incorporate my discussion of elements [1.e] and [1.f] for this element.  In summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as embedded in the panel member.  "Embedding" as shown with the arrangement of Bergstrom does not create separate sections.  There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum, the electronics that Dr. Wereley describes as being embedded in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

**10.     Dependent Claim 24: "a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit"**

238.    Claim 24 depends from claim 6, and requires "a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit."

239.

**11.     Dependent Claim 25: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels"**

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

240.    Claim 24 depends from claim 24, which depends from claim 6, and requires "the pH valve includes an integrated flow cell for in-line monitoring of pH levels."

241.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

> **12.     Dependent Claim 26: "the modular fluid handling units include two double piston pumps, one injection valve for injecting a sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer"**

242.    Claim 26 depends from claim 6, and requires "the modular fluid handling units include two double piston pumps, one injection valve for injecting a sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer."

243.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

> **C.     Non-Infringement of the '590 Patent**
>
> **1.     Element [1.b]: "interchanging at least two of the interchangeable modular components in a housing unit comprising at least four component receiving positions arranged in a two dimensional array, so as to allow for modification of the liquid chromatography fluid flow path among the at least four interchangeable modular components"**

244.    Dr. Wereley has not shown that this element was met.  I understand that in order to infringe this claim, which is a method claim the steps claimed need to have been performed. Additionally, they need to have been performed in the United States and after the 590 patent issued on January 18, 2017. I see no such proof offered in Dr. Wereley's report.

245.    At paragraphs 491-507, Dr. Wereley states that he has seen videos of people changing modules.  But he does not establish in his report where this alleged changing is

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

occurring, and he does not establish the date on which the alleged changing occurred. Further he does not establish that the fluid flow path actually changed. I understand that this element requires that fluid be flowed through the system and that the path be different than the path that existed before the change. I do not see evidence of that in Dr. Wereley's report.

246. Moreover, Dr. Wereley's claim, citing testimony from Mr. Chapman at ¶ 501, that Bio-Rad changes the modules on customers machines approximately ██ of the time does not establish infringement of this element. First, the testimony from Mr. Chapman stated that he guessed changes were made in ██ of the occasions where he was present helping customers. That does not mean that Mr. Chapman is present at 100% of customer sites and thus his guess of ██ equates to ██ of Bio-Rad customers performing this operation. Second, Mr. Chapman did not testify that the times where he was present and customers made changes were done in the United States and after January 18, 2017. Last, Mr. Chapman did not testify that the fluid flow patent changed. Moving a module to a different position does not necessarily change the flow path. For example if one has two pump modules, module one can be placed where module 2 was, and a new pump can then be placed where module one was.

247. Additionally, Dr. Wereley cites as proof the fact that Discover machines are shipped with no modules in them and then are populated with modules. But placing a module in a machine with no modules does not satisfy the claim. Rather, modules must be taken out, and the flow path in situation one and situation two, (the interchanged modules) must be different. That is not possible when the first situation had no flow path at all because it had no modules.

> **2. Element [1.c]: "wherein each of the at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit"**

78

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

248.     Element [1.c] of the '590 patent requires "wherein each of the at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit."

249.     The NGC System does not infringe claim 1 of the '590 patent because it lacks "at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit."

250.     I have discussed why this element is not met with respect to my discussion of elements 1.k of the '420 patent.  I incorporate those discussions fully for this element.

251.     In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the "modular fluid handling unit" cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

252.     Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

### 3.     Claims 2 and 3, Flow path shortened

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

253.    None of the evidence that Dr. Wereley cited shows that even if modules are interchanged, the flow path is shortened.  The same is true for the evidence he cited for claim 3.  Thus, he failed to meet his burden on these claims.

### 4.    Claims 10 and 12

254.    Dr. Wereley has not met his burden to establish infringement of these claims.  While he says the steps claimed could be done, he points to nothing where these steps were actually done in the United States after Jan. 18, 2017.  That is what is necessary to establish infringement of this method claim.  For this reason, he has not met his burden to show infringement.

### 5.    Element [13.h]: "comprising a CPU that allows independent fluid control operations in response to instructions from the main controller when installed in the component receiving position of the housing unit"

255.    Element [13.h] requires "the at least two interchangeable modular fluid handling units … compris[e] a CPU that allows independent fluid control operations in response to instructions from the main controller when installed in the component receiving position of the housing unit"

256.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

257.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the modular component's cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

258.     Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

> **6.      Claim 14 "adding an expansion housing unit that includes a plurality of component receiving positions, each component receiving position being adapted to receive the at least one interchangeable modular fluid handling unit, and placing at least one additional interchangeable modular fluid handling unit in one of the component receiving positions in the expansion housing"**

259.     While Dr. Wereley states that the elements of these claims could be done, he does not cite evcidence showing that the expansion housings were used.  Nor does he show any use in the United States after January 18, 2017.  He has therefore failed to meet his burden to establish infringement.

> **7.      Claim 17: "the CPU allows for automatic identification by the liquid chromatography system upon placement in a component receiving position of similar size and shape"**

260.     I do not agree with Dr. Wereley that the CPU does need to do the identification. In any event, the testimony that Dr. Wereley cites and his conclusion about infringement of this claim are inconsistent with the conclusions he reached in corresponding claims of the 420 patent where he stated that the MCU was doing the identification.  I incorporated the arguments I made with respect to that claim.  Moreover as with the other claims in this patent he has not shown that the method was actually performed in the U.S. at the proper time.

> **8.      Claim 18: "the at least two interchangeable modular fluid handling units are connected to the system by a system BUS"**

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

261.     Dr. Wereley has not provided any evidence showing that this step was performed in the U.S. at the proper time to establish infringement.  Therefore he has failed to meet his burden of proof.

**D.      The '591 Patent**

**1.      The NGC System Does Not Infringe Claim 9 of the '591 Patent at Least Because it Lacks Several Elements in Claim 1 from Which it Depends**

262.     Claim 9 depends on claim 1.  I note that claim 1 of the '591 patent is nearly identical to claim 1 of the '420 patent.  Thus, I incorporate my analysis of claim 1 of the '420 patent.

**(a)      Element [1.v]: an external fluidics section**

263.     Element [1.v] requires "an external fluidics section."

264.     I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

**(b)      Element [1.vi]: an internal non fluidics section**

265.     I have discussed why this element is not met with respect to my discussion of element 1.f of the '420 patent.  I incorporate those discussions fully for this element.

**(c)      Element [1.viii]: "a panel member arranged to separate the fluidics section from the non-fluidics section"**

266.     Element [1.viii] of claim 1 of the '591 patent requires "a panel member arranged to separate the fluidics section from the non-fluidics section."

267.     The NGC System does not infringe claim 9 at least because it lacks "a panel member arranged to separate the fluidics section from the non-fluidics section," as claimed.

268.     I have discussed why this element is not met with respect to my discussion of element 1.h of the '420 patent.  I incorporate those discussions fully for this element.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

269.    The NGC System does not infringe this element because the NGC System does

not include "a panel member arranged to separate the fluidics section from the non-fluidics

section" as claimed.  I incorporate my discussion of elements [1.e] and [1.f] of the '420 patent

for this element.  In summary, the electronics in the housing are not a separate non-fluidics

section from the electronics Dr. Wereley describes as embedded in the panel member.

"Embedding" as shown with the arrangement of Bergstrom does not create separate sections.

There is no way to square the representations the inventors made about Mourtada, Bergstrom and

Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have

electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum,

the electronics that Dr. Wereley describes as being embedded in the panel member are the

fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as

the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates

that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

> **(d)    Element [1.ix]: "wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing"**

270.    Element [1.ix] of claim 1 of the '591 patent requires "wherein the housing

comprises a liquid handling panel with two or more component receiving positions adapted to

receive said interchangeable modular components such that, when inserted, the fluidics section is

external to the housing and the non-fluidics section is internal to the housing."

271.    The NGC System does not infringe claim 9 at least because it lacks "wherein the

housing comprises a liquid handling panel with two or more component receiving positions

adapted to receive said interchangeable modular components such that, when inserted, the

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

fluidics section is external to the housing and the non-fluidics section is internal to the housing," as claimed.

272.   I have discussed why this element is not met with respect to my discussion of elements 1.e and 1.f of the '420 patent.  I incorporate those discussions fully for this element.

> **(e)   Claim [1.xi]: "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus"**

273.   Dependent claim [1.xi] requires "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

274.   The NGC System does not infringe claim 9 at least because it lacks "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus," as claimed.

275.   I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

276.   In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the modular component's cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

84

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

277.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

### 2.    Dependent Claim 26: "the pH electrode is connected to a pH valve formed as an interchangeable modular component"

278.    Claim 26 depends from claim 12, and recites that "the pH electrode is connected to a pH valve formed as an interchangeable modular component."

279.    I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

### 3.    Dependent Claim 27: "the pH valve include[] an integrated flow cell for in-line monitoring of pH levels"

280.    Claim 27 depends from claim 26, and further requires that "the pH valve include[] an integrated flow cell for in-line monitoring of pH levels."

281.    I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

### E.    Non-Infringement of the '124 Patent

### 1.    Element [16.h]: "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel."

282.    Element [16.h] requires "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel."

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

283.    The NGC System does not infringe claim 16 at least because it lacks "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel," as claimed.

284.    I have discussed why this element is not met with respect to my discussion of element 1.h of the '420 patent.  I incorporate those discussions fully for this element.

285.    The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed.  I incorporate my discussion of elements [1.e] and [1.f] of the '420 patent for this element.  In summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as embedded in the panel member. "Embedding" as shown with the arrangement of Bergstrom does not create separate sections. There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum, the electronics that Dr. Wereley describes as being embedded in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

> **2.    Element [16.i]: "wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing"**

286.    Element [16.i] requires "wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing."

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

287.    The NGC System does not infringe claim 16 at least because it lacks "the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing" as claimed.

288.    I have discussed why this element is not met with respect to my discussion of elements 1.e and 1.f of the '420 patent.  I incorporate those discussions fully for this element.

### 3.    Element [16.j]: "respective non fluidics sections are internal to the housing"

289.    Element [16.j] requires that the "respective non fluidics sections are internal to the housing."

290.    I have discussed why this element is not met with respect to my discussion of element 1.f of the '420 patent.  I incorporate those discussions fully for this element.

### 4.    Dependent Claim 20: "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus"

291.    Element [20.c] requires "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus."

292.    The NGC System does not infringe Claim 20 at least because it lacks "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus" as claimed.

293.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

294.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the modular component's cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

295.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

> **5.    Dependent Claim 28 "the system includes two double piston pumps, one injection valve for injecting sample onto a column connecting to the flow path of the liquid chromatography system, a UV monitor, and a mixer"**

296.    Claim 28 depends from claim 16, and further requires that the system recited there comprise "two double piston pumps, one injection valve for injecting sample onto a column connecting to the flow path of the liquid chromatography system, a UV monitor, and a mixer."

297.    I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

> **6.    Dependent Claim 30: "further includes a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients"**

298.    Claim 30 depends from claim 28, which in turn depends on claim 16, and requires that the system "further includes a pH-valve with an integrated flow cell for in-line monitoring of

88

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients."

299.    I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

## IX.    NON-INFRINGING ALTERNATIVES

300.    I have also been asked to opine on the existence of non-infringing alternatives and the relative difficult in creating a non infringing alternative by modifying the accused NGC products.  In summary, it is my opinion that non-infringing alternatives, such as the Bio-Rad DuoFlow, exist.  That chromatography system was the predecessor to the NGC.  Moreover, modifications to the NGC could be designed which would avoid infringement.



302.    In this regard, Dr. Wereley has his analysis backwards.  He states that not having a CPU on each module would result in increased cost and complexity and it is not clear that it

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

would work.  Wereley at ¶ 686.  This is certainly not the case.  One of ordinary skill in the art would recognize that when CPUs were more expensive and one was trying to keep the costs down, multiple CPUs were shared between interchangeable fluid handling modules.  This is evident from the Applikon 2040 which was designed in the late 1990s when CPUs were more expensive than 10 years later when the asserted patents were filed.  The Applikon 2040 directly refutes Dr. Wereley's claim that it would be more expensive to have a shared CPU than it would be to have a CPU on every module.

303.    Based on published data, the cost of a microprocessor decreased by between a hundred and a thousand-fold in the ten years between the late 1990s and the 2009 time frame when the asserted patents were filed.  The chart published at the following site http://www.singularity.com/charts/page62.html, shows that cost per transistor from 1998 to approximately 2009 decreased by about one thousand fold.  This would equate to a significant drop in the cost of a CPU required to perform any significant number of instructions.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



304.

305.    Second, it is well understood in the engineering world that a CPU is a general purpose device that can be programmed over and over to perform multiple different operations. A CPU carries out operations in response to instructions which generally exist as source code. When one changes the source code, which can also be referred to as reprogramming it, they change the operations of the CPU.  Because of the way a CPU operates, there are basic components that one of skill in the art would understand are present in a CPU, such as an Arithmetic Logic Unit (ALU), that performs among other things arithmetic and logic operations, registers for storing values, and other memory for storing programs or other operational values.

306.    

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



309. These non-infringing alternatives for the CPUs apply to all asserted independent claims except for '124 patent claim 16, and also to dependent '124 patent claim 20.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

310.    Dr. Wereley again resorts to a misinterpretation of the Court's claim construction order and fails to account for representations in the file history, when he claims that a rearrangement of the connections of each module to the system bus would not result in a non-infringing alternative.  As I discussed previously with respect to the elements relating to fluidics sections, non fluidic sections, and the separation of the same by the panel member and the liquid handling panel, the inventors unequivocally stated with respect to the Hess reference that when you have an electrical connection for a module to other modules or the system bus outside the housing, that is not the claimed invention.  See File History (Claim Construction Ex. G) at 1416 ("So by process of elimination, bus connections [in Hess] have to be at the back of the boxes – there is no other place for them, if the boxes are stackable and fit side by side as illustrated.  This means that the bus connections cannot be internal to said boxes or internal to any 'housing'.  On the contrary, the bus connections must be external to said boxes to make sense of the description.  Therefore, in Hess, *respective non fluidics sections are not internal to any housing as claimed*.")

311.    By ignoring this very unequivocal statement, Dr. Wereley, by the mere waving of his hand, calls any non fluidic component which is not consistent with the claim, part of a separate section.  But, the inventor's representations make it clear that one cannot do that.  The external electrical connections, such as those to the bus are part of the non fluidics section as a whole.  If they were not, then the way the inventors distinguished Hess would be meaningless.  One could just as easily call the electrical connection on the back of the box, which is quite distant from the fluidic components, much more distant that the electrical components such as LEDs and the displays in the accused products, part of a separate non fluidic section.  The inventors made it clear that was not allowable.  The electrical connection at the back of the

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

modules were part of the same non fluidic section as the electrical components contained inside the housing in Hess.  When these representations are considered, the design around that Bio-Rad proposed is a non-infringing alternative.  ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.  This configuration would be the same that the inventors said with regard to Hess did not qualify as their invention.

312.    This non-infringing alternatives for the bus connectors applies to all asserted independent claims except for claim 6 of the '589 patent and claims 1 and 13 of the '590 patent.

313.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████.  That was actually one of the reasons that Cytiva's predecessor decided to update the prior generation AKTA machines.  Ex. 28, Hareland Depo Tr. at 75-77.  That would be a relatively simple task.  Last, if one wanted to make the DuoFlow more cosmetically pleasing, a cabinet could be built around the individual modules to make them look more like an integrated system.  This would be akin to building a cabinet around your separate stereo components to make them look more like a single system.

## X.    LICENSES

314.    I understand that, to be relevant to the assessment of damages in a patent case, a license must be technologically and economically comparable to a hypothetical license between the parties to the patents-in-suit.  I have been asked to assess the technological comparability of

the licenses produced by Bio-Rad, and one license produced by Cytiva, in this litigation.  As part of my assessment, I have evaluated at least the following four factors:  Similarities and differences between the patent claims and their scope, the manner in which the claimed inventions are implemented and the value of the inventions to the parties' business, the differences between the claimed inventions and other known means of achieving the same operational goals or benefits, and the relative value of other, non-patented features of the products into which the claimed inventions may be incorporated.  In making my assessment, I have considered the embodiments described in the licensed patents as well as their claims.

315.    I further understand that there are other aspects of license comparability that are not technological in nature.  Among these are things such as license structure and the economic circumstances of the parties.  I have not been asked to offer and I am not offering any opinions, or any analysis directed toward any non-technological aspects of comparability.

316.    It has been explained to me that, to assist the finder of fact, a determination must be made as to whether licensed technology is sufficiently comparable to the hypothetical license at issue in suit.  When relying on licenses to prove a reasonable royalty, alleging a loose comparability between different technologies or licenses does not suffice.  I have been informed that the analysis does involve an element of approximation and uncertainty, but in order to be technologically comparable the technologies of the patents being considered must not be substantially different.

317.    I reviewed evidence regarding all of the license agreements that I understand Dr. Kearl is relying on as comparable licenses in relation to determining a reasonable royalty.  Based on my review, it is my opinion that the licenses he relies on cover patents that are technologically

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

comparable and in some cases more advanced than the technology covered by the asserted patents.

**A.**

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

B.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



## XI.    OTHER COMMENTS

348.    The opinions expressed in this report are my preliminary opinions based on my review to date of the evidence produced at this stage of the case.  I reserve the right to amend or supplement my opinions in light of additional information or materials that may be provided to me or that are relied upon by any of Plaintiffs' experts or witnesses, as well as opinions that Plaintiffs' experts or witnesses may present.  I reserve my right to amend or update my opinions

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

as appropriate in response to any future developments.  With this in mind, based on the analysis I have conducted and for the reasons set forth below, I have preliminarily reached the conclusions and opinions in this report.

349.    At a hearing or at trial I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this report.  I have not yet selected the particular exhibits that might be used.  I may also rely on visual aids and may rely on analogies concerning elements of the patents discussed above, Plaintiffs' alleged practicing products, the accused products, the references cited in this report, or any related technologies.  In addition, I may create or assist in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right to do so, such as demonstrations of devices and software to further support the positions in this report.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

DATED:  October 21, 2020

Bruce K. Gale, Ph.D.