# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CYTIVA SWEDEN AB,<br>and GLOBAL LIFE SCIENCES<br>SOLUTIONS USA LLC, | )<br>)<br>) | C.A. No. 18-1899-CFC-SRF<br>Consolidated |
| Plaintiffs, | )<br>) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| | )<br>) | **PUBLIC VERSION** |
| BIO-RAD LABORATORIES, INC., | ) | |
| Defendant. | )<br>) | |

## DEFENDANT BIO-RAD LABORATORIES, INC.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS OF DR. BRUCE GALE AND IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS OF DR. <u>JAMES KEARL</u>

OF COUNSEL:

Kevin P.B. Johnson
Brian C. Cannon
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel: (650) 801-5000

David Bilsker
Felipe Corredor
Andrew E. Naravage
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Alan R. Silverstein (#5066)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
asilverstein@potteranderson.com

*Attorneys for Defendant Bio-Rad Laboratories, Inc.*

Anne S. Toker
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000

Sean D. Damon
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000

Dated:  January 12, 2021
6997941 / 45671

Public Version Dated: January 19, 2021

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..........................................................................................................1

SUMMARY OF THE ARGUMENT ..........................................................................1

LEGAL STANDARD .................................................................................................3

ARGUMENT ..............................................................................................................3

I.      THERE IS NO BASIS TO EXCLUDE DR. GALE'S OPINIONS ...............3

      B.      Dr. Gale's Opinions Properly Applied The Court's Claim Constructions And He Did Not Rely On Improper Claim Constructions .........................................................................................9

            1.      Dr. Gale Faithfully Applied The Court's Construction of "Fluidics Section" and "Non-Fluidics Section" .........................9

            2.      Dr. Gale's Opinions On Claims Not Construed Properly Rely On The Plain And Ordinary Meaning To A Person Of Ordinary Skill In The Art ...................................................13

II.     THERE IS NO BASIS TO EXCLUDE DR. KEARL'S OPINIONS ...........17

      A.      Dr. Kearl's Reasonable Royalty Opinions Respond To Plaintiff's Position ...............................................................................17

      B.      Dr. Kearl's Limited Discussion of All Available License Agreements Is Permissible ...............................................................19

CONCLUSION ...........................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Callaway Golf Co. v. Acushnet Co.*,
  2007 WL 4165401 (D. Del. Nov. 20, 2007)...........................................................8

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*,
  150 F.3d 1354 (Fed. Cir. 1998) .............................................................20

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
  430 F. Supp. 2d 346 (D. Del. 2006)....................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)....................................................................3, 9

*Eli Lilly & Co. v. Actavis Elizabeth LLC*,
  2010 WL 11570123 (D.N.J. May 13, 2010)..........................................7

*EMC Corp. v. Pure Storage, Inc.*,
  154 F. Supp. 3d 81 (D. Del. 2016)............................................. 13, 15

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
  575 F.3d 1312, 1321 (Fed. Cir. 2009) ...............................................13

*In re Gabapentin Patent Litig.*,
  2011 WL 12516763 (D.N.J. Apr. 8, 2011)..........................................7

*GPNE Corp. v. Apple Inc.*,
  108 F. Supp. 3d 839 (N.D. Cal. 2015),
  *aff'd*, 830 F.3d 1365 (Fed. Cir. 2016 ..............................................15

*I/P Engine, Inc. v. AOL Inc.*,
  2012 WL 12068846 (E.D. Va. Oct. 12, 2012)....................................21

*LaserDynamics v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)...........................................................21

*Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*,
  2009 WL 10689350 (E.D. Va. June 23, 2009) ...................................15

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ...........................................................................20

*M2M Solutions LLC v. Enfora, Inc.*,
  167 F. Supp. 3d 665 (D. Del. 2016)...................................................................20

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
  2014 WL 971765 (N.D. Cal. Mar. 5, 2014) ......................................................15

*Monsanto Co. v. David*,
  516 F.3d 1009 (Fed. Cir. 2008) ......................................................................7, 8

*Personalized User Model, L.L.P. v. Google Inc.*,
  2014 WL 807736 (D. Del. Feb. 27, 2014).........................................................13

*Schuchardt v. President of U.S.*,
  802 F. App'x 69 (3d Cir. 2020) .......................................................................7, 8

*Stickle v. Heublein, Inc.*,
  716 F.2d 1550 (Fed. Cir. 1983) ........................................................................19

*Wis. Alumni Research Found. v. Apple Inc.*,
  905 F.3d 1341 (Fed. Cir. 2018) ................................................................. 13, 17

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
  2013 WL 865974 *2 (D. Del. Mar. 7, 2013) ......................................................8

*Zimmer Surgical, Inc. v. Stryker Corporation*,
  365 F. Supp. 3d 466 (D. Del. 2019)............................................................. 20-21

## **Rules**

Fed. R. Evid. 702 ........................................................................................................3

## **INTRODUCTION**

Plaintiff's motions to exclude opinions of Bio-Rad's technical and damages experts should be denied.  First, Dr. Bruce Gale's videotaped demonstration that the prior art 2040 System was readily capable of performing liquid chromatography—together with Dr. Gale's written report on the work—is fully admissible and squarely in line with precedent regarding expert opinions.  Furthermore, Dr. Gale faithfully applied the Court's claim constructions and relied upon the understanding of one of ordinary skill in the art for claim terms requiring a plain and ordinary meaning.  Dr. James Kearl's damages opinions are likewise reliable and should not be stricken.

## **SUMMARY OF THE ARGUMENT**

The prior art automated liquid handling device called the 2040 System invalidates Plaintiff's patent claims because it is modular and readily able to conduct liquid chromatography.  Indeed, Dr. Gale predicted this would be so when all he had was the manual.  In this litigation, Dr. Gale acquired a 2040 System and videotaped it performing liquid chromatography.  Dr. Gale kept the device in his laboratory at the University of Utah, and Plaintiff inspected it and took Dr. Gale's deposition.  Plaintiff, however, is desperate to keep from the jury any evidence of the 2040 System.  To that end they seek to strike Dr. Gale's opinions because Dr. Gale instructed his graduate students to handle some of the work with 2040 System.  Black

letter law, however, rejects Plaintiff's position: experts are fully entitled to rely on the work of others.

In providing his non-infringement opinions, Dr. Gale dutifully applied the Court's constructions for "fluidics section" and "non-fluidics section."  Where a claim term had a plain and ordinary meaning—and was not specifically construed by the Court—such as "panel member," Dr. Gale used that term as one of ordinary skill in the art would understand it in context of the specification and the prosecution history.  This is precisely what patent law requires.  Indeed, Dr. Gale was responding to Plaintiff's expert's opinions that deviated from the understandings of a person of ordinary skill in the art.  Dr. Gale's opinions are reliable and will be helpful for the jury.

With respect to damages, Bio-Rad's expert Dr. Kearl offers an opinion about a reasonable royalty based on an adjustment to Plaintiff's expert's opinion and on ▮ comparable license agreements.  Though he also summarizes and briefly discusses all available license agreements, including ▮ patent license agreements neither party contends are comparable, he relies on them principally for the form of the royalty.  Plaintiff's reliance on an alleged lack of a detailed technological comparability analysis for these license agreements as a basis to exclude Dr. Kearl's opinions should be rejected.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that an expert witness may testify if, among other things, "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The trial court is tasked as gatekeeper to determine whether a proffered expert's testimony meets this standard. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).

## ARGUMENT

## I.   THERE IS NO BASIS TO EXCLUDE DR. GALE'S OPINIONS

### A.   Dr. Gale's Opinions Regarding the 2040 System Are Reliable

Plaintiff raises two complaints about Dr. Gale's opinions concerning the prior art 2040 System: (1) that Dr. Gale was not sufficiently involved in the demonstration that the 2040 System can readily conduct liquid chromatography and (2) that Dr. Gale spoke to a Bio-Rad scientist to confirm his own understanding about the time needed to set up chromatography.[1]  Both complaints should be rejected.  It is black

---

[1] Plaintiff does not dispute that Dr. Gale is a qualified expert.  He is a Professor of Mechanical Engineering at the University of Utah and the Director of the State of Utah Center of Excellence for Biomedical Microfluidics as well as the College of Engineering Nanofabrication Lab.  Ex. H ¶6.  He is also an Adjunct Professor at the University of Utah in the Departments of Bioengineering, Electrical and Computer Engineering, and Materials Science.  *Id.*  He has published more than 350 papers and in the field.  *Id.* ¶7; Ex. M.

3

letter law that an expert may rely on the work of others.  And Dr. Gale's conversations with a Bio-Rad scientists are entirely proper and reliable, and the substance was confirmed by Plaintiff's own expert Dr. Wereley.

### 1. Plaintiff Is Desperate To Keep Out Evidence Of The 2040 System Because It Invalidates The Patent Claims

#### (a) The PTAB Relied On The Manual For The 2040 System To Invalidate Predecessor Patent Claims

The prior art 2040 System is a modular device for automated liquid handling that renders invalid all of Plaintiff's patent claims—as Bio-Rad demonstrated in its motion for summary judgment.  D.I. 183.

As background, Plaintiff is well familiar with the 2040 System.  In an Inter Partes review proceeding before the Patent Trial & Appeal Board ("PTAB"), the PTAB ruled that the manual for the 2040 System invalidated all of the claims of Plaintiff's predecessor patent—the patent that started this litigation.  Ex. D.[2]  At the PTAB, Dr. Gale offered opinions that the 2040 System was a modular system for automated liquid handling with a housing and fluidics and non-fluidics sections and other features that anticipated Plaintiff's claims.  Ex. D.  The PTAB largely agreed.  D.I. 183 at 3.  The claims at that time did not include the term "liquid

---

[2]  Lettered exhibits refer to exhibits to the Declaration of Felipe Corredor, filed contemporaneously herewith.

chromatography" – but Plaintiff added that limitation to obtain the patents at issue in this case.

In June 2015, at the preliminary injunction hearing before the S.D.N.Y., Dr. Gale testified based on his experience and expertise that the 2040 System could perform liquid chromatography. Ex. E at 199:22-201:17, 202:8-14. That prediction was true. Dr. Gale acquired a 2040 System and videotaped it performing liquid chromatography. D.I. 208.

> (b)   Dr. Gale Reliably Demonstrated The 2040 System Performs Liquid Chromatography

During this litigation, Dr. Gale acquired a 2040 System and kept it in his laboratory. Ex. G at 190:4-193:7. With his students' assistance, Dr. Gale "performed tests to show the 2040 System can deliver controlled fluid flow to and through a liquid chromatograph column"—that is, to perform automated liquid chromatography. Ex. H ¶299; Dr. Gale supervised his students' work. Ex. G at 112:22-113:6, 113:11-17 (describing weekly meetings). Dr. Petersen corroborated Dr. Gale's role and supervision. Ex. I at 46:17-47:17.

Accordingly, Dr. Gale prepared a report describing how "[w]e performed a chromatography separation of 5 food dyes simultaneously on the [2040 System]" and that the results were "reproducible." Ex. J. at 1. Plaintiff took the depositions of the student assistant. Ex. I at 99:18-100:4 (Dr. Petersen testifying that they "were able to put a dye into a chromatography column automatically hands off" and that

"it worked very well.  It was also very reproducible.  Every time we [ran it,] it gave very reproducible values in terms of the times the dye came off, and just the order of things like that.  It was very reproducible.").  The Test Report also describes exactly the menu choices to program the device.  Ex. J at 1-3.  Dr. Gale also provided videos of two "tests showing the 2040 System performing liquid chromatography" as exhibits to his report.  Ex. H ¶299; *see* D.I. 208.[3]

In short, Dr. Gale conducted and oversaw a transparent demonstration that the 2040 System can readily conduct liquid chromatography.  Accordingly, Dr. Gale opined that the 2040 System invalidates all of the asserted claims.  Ex. H ¶282.[4] There is no basis to exclude these opinions.

---

[3]  Plaintiff's assertion that "Travis White 'kept notes on more of the detailed questions on how the programming occurred'" likewise fails.  Br. at 11.  The "program" is a series of menu choices on the 2040 System in Dr. Gale's laboratory, and Plaintiff inspected that 2040 System.  Ex. L at 1, 3.  Plaintiff makes no argument, nor can it, about how the notes or programming would affect in any way the outcome of the demonstration.

[4]  Plaintiff contends that the 2040 System "is neither marketed for nor includes any programming for liquid chromatography."  Br. at 13-14.  This argument not only addresses the weight of the evidence, it is false.  Indeed, Plaintiff's expert concedes that "liquid chromatography systems are a form of fluid handling systems" and he could provide no reason why the 2040 System could not be used for liquid chromatography.  Ex. K at 12:13-14; 221:16-222:1.

## 2.     The Law Does Not Require An Expert To Personally Conduct All The Work Supporting Their Opinions

Plaintiff's primary complaint about Dr. Gale's opinions is that he did not personally conduct all of the work with the 2040 System.  Plaintiff is asking this Court for a new legal standard unsupported by precedent.

First, "reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703." *Schuchardt v. President of U.S.,* 802 F. App'x 69, 75 (3d Cir. 2020).

Indeed, "an expert need not have obtained the basis for his opinion from personal perception." *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008). For example, an expert may rely on scientific testing conducted in a laboratory run by the expert.  *In re Gabapentin Patent Litig.*, 2011 WL 12516763, at *11 (D.N.J. Apr. 8, 2011) (denying motion to exclude expert testimony because the expert "runs the lab where the relevant testing was done, is familiar with the [scientific testing] procedures and designs the quality controls used in these tests").  The fact that an expert did not conduct his own experiments "does not render his opinion unreliable and inadmissible." *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 2010 WL 11570123, at *3 (D.N.J. May 13, 2010).  Indeed, Plaintiff offers no argument or evidence that Dr. Gale's actions in any way deviated from professional norms in the field.  And Plaintiff's expert agreed.  Ex. K at 29:16-30:12 (agreeing that professors "oversee" students).

Plaintiff's cases are inapt and involve situations where an expert had no supervisory role.  See, e.g. *Callaway Golf Co. v. Acushnet Co.*, 2007 WL 4165401, at \*1 (D. Del. Nov. 20, 2007); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 865974, at \*2 (D. Del. Mar. 7, 2013) (expert did not examine key documents or operations).

In contrast, at deposition, Dr. Gale confirmed he was involved, videotaped the process, understood exactly what was happening and supervised the process.  Ex. G at 112:22-113:7 (emphases added).  This is more than enough under the law. *Monsanto*, 516 F.3d at 1015;  *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 363 (D. Del. 2006) (rejecting challenge to an expert who relied on the experiments of another).

### 3. Dr. Gale's Discussions With Bio-Rad Scientist Shaefer Do Not Render His Opinions Unreliable

Plaintiff complains that Dr. Gale confirmed his understanding of the time necessary to configure the 2040 system with discussions with Katie Schaefer, a Bio-Rad scientist.  Br. at 15. This is not grounds to strike the opinions and Plaintiff offers no law that would support that result.

As a threshold matter, experts like Dr. Gale are entitled to rely on hearsay. *Schuchardt,* 802 F. App'x at 75; Rule 702, 703, FRE. And nothing Shaefer discussed in any way alters the outcome of the demonstration.  This is because regardless of what automated liquid chromatography system one uses, it requires some amount of

time and some amount of work planning the experiment and calculations.  Ex. N ¶¶37-40.  Plaintiff's expert agrees.  He testified that "there are always calculations required when you're doing, you know, engineering measurements and things like that." Ex. K at 15:13-16.  Plaintiff's own expert therefore agrees with Dr. Gale about the time necessary to work with a new machine.  Exclusion of Bio-Rad's expert when Plaintiff's expert agrees with him cannot be an appropriate remedy on consideration of a *Daubert* motion.

### B. Dr. Gale's Opinions Properly Applied The Court's Claim Constructions And He Did Not Rely On Improper Claim Constructions

Plaintiff moves to exclude Dr. Gale's non-infringement opinions as either (1) inconsistent with the Court's claim construction of "fluidics section" and "non-fluidics section" or (2) relying on impermissible claim construction opinions for terms not construed by the Court.  Br. at 5-8.  Plaintiff's objections are misplaced.

#### 1. Dr. Gale Faithfully Applied The Court's Construction of "Fluidics Section" and "Non-Fluidics Section"

##### (a)   Dr. Gale Applied The Constructions For His Opinions

The Court construed "fluidics section" to mean "a section of the interchangeable fluid handling unit that includes fluidics components and does not include non-fluidics components." Ex. A at 3.  It similarly construed "non-fluidics section" as "a section of the interchangeable fluid handling unit that includes electrical components and does not include fluidics components." *Id.*

Dr. Gale's non-infringement opinions are fully consistent with these claim constructions.  Ex. B ¶23 ("In all cases, I applied the agreed claim constructions or the Court's constructions as one of ordinary skill in the art would interpret them in light of the specification and the file history in performing my analyses and rendering my opinions in this report."); *see also id.* ¶¶22, 25-30 (identifying and discussing Court's construction of "fluidics section").

Plaintiff argues otherwise, contending that his opinions are "an attempt to claw back Bio-Rad's construction[] ... that the non-fluidics section comprises 'all the non-fluidics/electrical components of an interchangeable fluid handling unit.'" Br. at 5.  Not so.  Dr. Gale is responding to Plaintiff's self-defining approach to identifying the fluidics section in the Bio-Rad device, which clearly intermingles fluidics and non-fluidics.

        (b)    <u>Dr. Gale's Opinions Are A Response To Plaintiff's Self-Identifying Definition Of "Section"</u>

As Bio-Rad pointed out in its motion for summary judgment directed to "fluidics section," it is undisputed that in Bio-Rad's devices, the front of the accused modules contains both fluidics and electronics such as LED lights, a printed circuit board, and ribbon wire connector.  D.I. 178 at 6-7.

In the face of this undisputed evidence, Plaintiff resorted to a word game: that any fluidics in the front of the module are in the "fluidics section" and any electronics are self-defined to be in a different section.  An example of Plaintiff's line drawing

can be seen by its own expert's red annotations on an image of the Bio-Rad device,

carving out the external electronics like LEDs and screen:



Ex. S, ¶110.

At deposition, however, Plaintiff's expert conceded the LEDs "are adjacent to

the fluid" on the outside of the accused Bio-Rad systems.  Ex. K at 333:24-25.

In responding to Plaintiff's line-drawing exercise, Dr. Gale provided an

opinion that a person of ordinary skill in the art would not call external electronics

that are side-by-side with fluidics a separate "section" from the fluidics—especially

in light of the prosecution history.  Ex. B ¶62 ("One of ordinary skill in the art

reading the file history would only be able to come to the conclusion that the external

electronics that Dr. Wereley recognizes are present in the accused Bio-Rad modules

… ***are not in sections that are distinct from the fluidics sections***.  Rather, they are

in the same section and not separated in the manner the inventors said they needed

to be to be part of the invention and distinct from the prior art." (emphasis added)).

This is consistent with this Court's statements at the *Markman* hearing,

recognizing that the file history demonstrates separation of fluidics and non-fluidics:

- "[T]he applicant for the patent … made clear, clearly and unequivocally, that there are two sections, and that's what differentiates this patent from Bergstrom and Hess."

- "[Y]ou pretty explicitly said to the Examiner, hey, what makes this different is we've got complete separation of the fluidic and the non-fluidic section."

Ex. R at 90:8-11, 90:24-91:2.

Dr. Gale's opinions therefore adequately point out that the lack of separation

between fluidics and non-fluidics in the external section Plaintiff identifies as the

"fluidics section" takes the accused product outside the scope of the asserted claims.

Plaintiff's contention that Dr. Gale's opinion "improperly narrows the scope

of the claim" is thus incorrect.  Br. at 7.  The Court's construction already properly

narrowed the scope of the claim to exclude "non-fluidics components" from the

claimed "fluidics section."  Ex. A at 3.  It is Plaintiff's contrary contentions (and Dr.

Wereley's opinions) that are inconsistent with this construction.

Plaintiff's cases are inapt because in those decisions, the expert directly contradicted the court's construction. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1317, 1321 (Fed. Cir. 2009); *Personalized User Model, L.L.P. v. Google Inc.*, 2014 WL 807736, at *1 (D. Del. Feb. 27, 2014). By contrast, Dr. Gale faithfully applied the Court's construction. *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 109-10 (D. Del. 2016) (allowing expert testimony).

Dr. Gale's opinions should be allowed.

### 2. Dr. Gale's Opinions On Claims Not Construed Properly Rely On The Plain And Ordinary Meaning To A Person Of Ordinary Skill In The Art

The Court did not construe "panel member" or "independently perform operations in response to instructions over a BUS." Ex. A. Plaintiff complains that Bio-Rad's Dr. Gale construed these terms "based on the file history, specification, and inventor's statements." Br. at 7. Plaintiff's motion is odd because Dr. Gale did exactly what the law requires: he interpreted the plain and ordinary meaning of the claims as they would be understood by one of ordinary skill in light of the intrinsic evidence. *See Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1348 (Fed. Cir. 2018). Indeed, "expert testimony on the understanding of a skilled artisan is appropriate to assist the jury." *EMC*, 154 F. Supp. 3d at 109.

(a)   Dr. Gale Properly Relies On The Plain And Ordinary
Meaning Of "Panel Member"

As to "panel member," Dr. Gale explains how a person of ordinary skill in the art would understand the claimed "panel member" in the context of the patents-in-suit and the accused NGC system.  Ex. B ¶¶68-77.  For example, Dr. Gale opines that "what one of ordinary skill in the art reading the specification and looking at the accused product would call the panel member as it is what attaches the module to the housing."  *Id.* ¶75.  As another example, he explains how this is consistent with the usage of "panel member" in the specification.  *Id.* ¶72 ("The specification of the asserted patents describes the panel member as the structure that is used to attach the module to a component position in the in the liquid handling panel. (citing Ex. C at 6:30-34)).  Dr. Gale could not be more clear that he was applying the plain and ordinary meaning in light of the intrinsic evidence—exactly what the law requires.

Furthermore, it is Plaintiff that offers a contorted interpretation of "panel member."  Ex. B ¶126.  Contrary to Plaintiff's interpretation, Dr. Gale relies on the file history to opine that one of ordinary skill would understand that the "electronics" in Bio-Rad's system "are not on 'either side' of the panel member as the inventors said they must be."  *Id.*  Further, Dr. Gale responds that "one of ordinary skill in the art who read the specification and the file history" would not agree with Dr. Wereley "that anything 'integrated into the panel member' is a different section from the fluidics and electronics sections."  *Id.* ¶80; *id.* ¶¶80-96.  In other words, Dr. Gale is

14

opining that, under any meaning to one of ordinary skill in the art, what Dr. Wereley and Plaintiff accuse does not fall within the scope of the claims as one of ordinary skill in the art would understand them.[5]

None of these opinions are improper claim construction opinions.  Indeed, the cases Plaintiff cites involved either an expert contradicting a claim construction order, *EMC*, 154 F. Supp. 3d at 109-10, or deviating from the plain meaning. *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765, at *5 (N.D. Cal. Mar. 5, 2014).

In contrast, Dr. Gale's opinions as to the plain and ordinary meaning in light of the file history is appropriate.  *GPNE Corp. v. Apple Inc.*, 108 F. Supp. 3d 839, 856 (N.D. Cal. 2015) (finding expert's use of prosecution history to be "proper testimony to aid the jury in applying the claims to the accused devices") (citation omitted), *aff'd*, 830 F.3d 1365 (Fed. Cir. 2016); *Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 2009 WL 10689350, at *5-6 (E.D. Va. June 23, 2009) (finding no error in use of prosecution history at trial, including by the technical expert's reliance

---

[5]  Plaintiff's misleading citation to a single paragraph of Dr. Gale's Rebuttal Report (Br. at 8 (citing Ex. B ¶126)) ignores that Dr. Gale begins that paragraph by "incorporat[ing] [his] discussion of the prior two elements for this element." Ex. B ¶126.  And, as discussed above, that discussion demonstrates that Dr. Gale is explaining what the plain and ordinary meaning of the term is, in the context of the patents-in-suit and the accused NGC system.

on the prosecution history "in reaching and explaining his non-infringement opinion to the jury," and noting the lack of authority to the contrary).

        (b)    <u>Dr. Gale Properly Relies On The Plain And Ordinary Meaning Of "Independently Perform … Over A BUS"</u>

Plaintiff's objection to Dr. Gale's opinions as to "independently perform operations in response to instructions over a BUS" (Br. at 8-9) fails for the same reasons as its complaints about "panel member."

Dr. Gale's opinions explain how a person of ordinary skill in the art would understand the phrase in the context of the patents-in-suit. Indeed, his discussion begins by opining that Dr. Wereley's opinion that the accused NGC system satisfies these claim limitations "is not how one of ordinary skill in the art would interpret that limitation." Ex. B ¶135. He explains how "independently perform operations" is described in the only embodiment in the specification in which there is a CPU on every module. *Id.* ¶136. Dr. Gale then explains that "one of ordinary skill in the art would understand the passage in the specification relating to the independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the M[C]U sent." *Id.* ¶137. Notably, the portion of the specification quoted by Dr. Gale closely tracks the claim language. *See* Ex. C at 8:16-19 ("In one embodiment, each modular component is provided with a dedicated CPU unit

*allowing the component to independently perform operations in response to instructions over the BUS* 42." (emphasis added)).  Accordingly, Dr. Gale's opinion is based entirely on how a person of ordinary skill in the art would understand the claim language.  It is fully appropriate.  *Wis. Alumni Research Found.,* 905 F.3d at 1348.

## II.   THERE IS NO BASIS TO EXCLUDE DR. KEARL'S OPINIONS

### A.   Dr. Kearl's Reasonable Royalty Opinions Respond To Plaintiff's Position

Dr. Kearl opines that the proper rate Bio-Rad would agree to as a willing licensee is " ▮ of Bio-Rad's net sales of instruments and modules."  Ex. O ¶110.  The principal basis for this opinion is an adjustment to the reasonable royalty rate proffered by Plaintiff's damages expert Mr. Bone.  *Id.* ¶¶106-11; *see also* Ex. P at 204:20-206:6.  This is entirely appropriate, and Plaintiff does not challenge these opinions in its *Daubert* motion.

As a check on the reasonableness of a ▮ royalty rate, Dr. Kearl also relies on ▮ comparable licenses.  Ex. O ¶¶143-51.  Dr. Kearl opines that these ▮ agreements are "consistent with my opinion that the appropriate royalty rate is no greater than ▮ of net sales."  *Id.* ¶148; Ex. P at 302:18-303:8.  As part of these opinions, Dr. Kearl relies on the opinions regarding the technological comparability of those ▮ licenses provided by Bio-Rad's technical expert Dr. Gale.  Ex. O ¶¶143-

51; *see* Ex. B ¶¶318-47.  This is perfectly appropriate damages expert analysis, and Plaintiff again does ***not*** challenge them in its motion.

In the context of a broader discussion of the *Georgia-Pacific* factors, Dr. Kearl also outlines "additional evidence that supports a reasonable royalty of no more than ▮▮▮ in this matter."  Ex. O ¶112; *id.* ¶¶112-42 (discussing this evidence in the context of the *Georgia-Pacific* factors).  As part of this discussion, Dr. Kearl criticizes Mr. Bone's "set[ting] aside information about the form of the licenses and the type of royalty in framing the hypothetical negotiation in this case."  *Id.* ¶119.  As part of this criticism, Dr. Kearl identifies and summarizes all ▮▮▮ license agreements produced by the parties in this case (including the ▮▮ comparable license agreements).  *Id.* ¶119 & Tbl. 4; Ex. Q.  All but ▮▮ of the licenses involved a royalty that took the form of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. O ¶120.[6]  Dr. Kearl thus opined that "[n]one of the licenses have the ▮▮▮▮▮▮ ▮▮▮▮▮ that Mr. Bone believes would be the result of a hypothetical negotiation" and that "none of the actual licenses would have the anomalies that are implied by Mr. Bone's atypical form of royalties."  *Id.*

As part of Dr. Kearl's summary of the license agreements, Dr. Kearl also outlined Mr. Bone's own characterization of the technologies involved in nine

---

[6] Dr. Kearl acknowledges the different form of the Umetrics–GE Healthcare license. *See* Ex. O ¶120.

agreements, which indicate that the technologies concerned in these agreements all include a variety of ███████████████. *Id.* ¶121.  Neither expert contends the licenses other than the ███ discussed by both Dr. Kearl and Dr. Gale are technologically comparable.

Although the ███ comparable licenses alone are sufficient to support all of Dr. Kearl's opinions (*see id.* ¶116), in order to completely assess all of the available evidence, Dr. Kearl also noted that the range of royalties in all available licenses was ████████ with the majority sit in the ██████ range.  *Id.* ¶¶123, 135; *see also id.* ¶138 (noting that none came close to Mr. Bone's "implied high rate of ███").[7]

## B. Dr. Kearl's Limited Discussion of All Available License Agreements Is Permissible

Dr. Kearl's limited discussion of all available evidence, including the ███ license agreements no party contends are comparable, is permissible.  These licenses are reflective of industry practice, which is relevant to the ***form*** of the reasonable royalty.  *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1561-62 (Fed. Cir. 1983) (reversing damages award in the form of "a royalty on Heublein's production rather than on a lump-sum for each machine" based on lack of "evidence that users in the food industry upon purchase of food processing equipment also expect to pay a ***use***

---

[7] These opinions are also supported by the ███ comparable licenses, which had rates of ████████████ Ex. O ¶¶147, 150.  Dr. Kearl's statement about function versus form with which Plaintiff takes issue (Br. at 16-17 (citing Ex. O ¶139)) is also supported by his discussion of the comparable licenses. Ex. O ¶151.

royalty (whether based on a separate method patent or on the right to control use of patented machines)," such that "a willing licensor could not have reasonably expected to secure a *use* royalty from either the maker or user"); *see also Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1359 (Fed. Cir. 1998) (affirming damages award because "[t]he evidence established that lump-sum paid-up licenses based on projected royalties were common in the industry"). And Dr. Kearl's discussion of the royalty *rates* is entirely consistent with the ███ license agreements that *are* comparable—which Plaintiff does not challenge.

None of Plaintiff's cited cases hold otherwise. *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) rejected attempted reliance on "eight varied license agreements" to "support the jury's lump-sum damages award" because the other agreements were "radically different" from the hypothetical agreement at issue. 580 F.3d at 1327; *see also id.* at 1328-30 (contrasting IBM portfolio agreement with a jury's lump sum royalty award). Dr. Kearl's opinions demonstrate that the agreements he relies on are not "radically different" from the hypothetical agreement he proffers or from the two comparable agreements.

Nor does *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665 (D. Del. 2016), support Plaintiff. Unlike in that case, where the expert was relying on non-comparable agreements as a sanity check, Dr. Kearl's "sanity check" relies on the ███ *comparable* agreements. *M2M*, 167 F. Supp. 3d at 677. Similarly, *Zimmer*

20

*Surgical, Inc. v. Stryker Corporation*, 365 F. Supp. 3d 466 (D. Del. 2019), excluded opinions based on a license agreement lacking ***both*** technological and economical comparability "to ***establish*** a reasonable royalty rate." *Id.* at 494-95 (emphasis added). Dr. Kearl's analysis does not use the agreements to ***establish*** a rate.

Plaintiff also asserts that *LaserDynamics v. Quanta Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012), "rejected the use of non-comparable licenses for either structure of the license or amount." Br. at 18. But that case is inapt. *LaserDynamics*, 694 F.3d at 77-78. There, the agreement was a ***lump sum*** agreement (for $6 million) whereas plaintiff's expert testimony was "based on a ***running royalty*** of 6%." *Id.* at 65 (emphasis added). The agreement at issue thus also materially differed from the twenty-eight other lump sum license agreements admitted into evidence. *Id.* at 58. By contrast, Dr. Kearl is not basing his royalty calculation on the license agreements that are the subject of Plaintiff's motion, nor are those agreements materially different from the ███ licenses that Dr. Kearl focuses on in confirming his reasonable royalty opinions.

The consistency in both form and royalty rate between the ██ comparable agreements and ████████████ agreements Plaintiff attacks also distinguishes the facts here from *I/P Engine, Inc. v. AOL Inc.*, 2012 WL 12068846 (E.D. Va. Oct. 12, 2012). Not only did the defendant in that case concede that the challenged lump sum licenses were not comparable, but the court also relied on the likelihood of jury

confusion. *Id.* at *2.  Not so here, where ████████ agreements Dr. Kearl

discusses are similar to each other.

## CONCLUSION

Bio-Rad respectfully requests that the Court deny Plaintiff's motions.

OF COUNSEL:

Kevin P.B. Johnson
Brian C. Cannon
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA  94065
Tel: (650) 801-5000

David Bilsker
Felipe Corredor
Andrew E. Naravage
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
Tel: (415) 875-6600

Anne S. Toker
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000

Sean D. Damon
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000

Dated:  January 12, 2021
6997941 / 45671

Public Version Dated: January 19, 2021

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:   /s/ Alan R. Silverstein
        David E. Moore (#3983)
        Bindu A. Palapura (#5370)
        Alan R. Silverstein (#5066)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE  19801
        Tel:  (302) 984-6000
        dmoore@potteranderson.com
        bpalapura@potteranderson.com
        asilverstein@potteranderson.com

*Attorneys for Defendant Bio-Rad
Laboratories, Inc.*

23