# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GE HEALTHCARE BIO-SCIENCES AB and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC<br>　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>BIO-RAD LABORATORIES, INC.,<br><br>　　　　　　Defendant. | C.A. No. 18-1899-CFC |

## CLAIM CONSTRUCTION ORDER

Consistent with the reasoning set forth on the record during the May 14,

2020 claim construction hearing, the Court rules that, as used in the asserted

claims of U.S. Patent Nos. 9,671,420, 9,709,589, 9,709,590, 9,709,591 and

RE47,124, the following terms have the following meanings:

## I.　　AGREED-UPON CONSTRUCTIONS

| Claim Term(s) | Agreed Upon Construction |
|---|---|
| "CPU" / "CPU unit" | "central processing unit" |
| "the fluidics section is external to the housing and the non[-]fluidics section is internal to the housing" | "the fluidics section is on the outside of the housing and the non-fluidics section is on the inside of the housing" |

1

## II.    DISPUTED CONSTRUCTIONS

| Claim Term(s) | Court's Construction |
| --- | --- |
| "interchangeable modular component" | "component that can be inserted into and removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another component" |
| "interchangeable modular fluid handling unit" | "fluid handling unit that can be inserted into and removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another fluid handling unit" |
| "modular fluid handling unit" | "fluid handling unit that has a standardized size and shape that allows it to be exchanged with another fluid handling unit" |
| Claim Preambles ("An automated liquid chromatography system comprising"/ "A method of modifying a fluid flow path in an automated liquid chromatography system comprising"/ "A method for building an automated liquid chromatography system, the method comprising"/ "A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising") | The preambles are claim limitations. |
| "liquid chromatography system" | Plain and ordinary meaning |
| "automated liquid chromatography system" | Plain and ordinary meaning |

| Claim Term(s) | Court's Construction |
|---|---|
| "wherein the system is capable of performing automated liquid chromatography" | Plain and ordinary meaning |
| "non-fluidics section"/"non-fluidics section"/"non fluidics section" | "a section of the interchangeable fluid handling unit that includes electrical components and does not include fluidics components" |
| "a fluid handling section"/"a fluidics section" | "a section of the interchangeable fluid handling unit that includes fluidics components and does not include non-fluidics components" |

SO ORDERED THIS 28th day of ____May____, 2020,

_____
United States District Judge

# EXHIBIT B

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CYTIVA SWEDEN AB, and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC, | |
| Plaintiffs | C.A. No. 18-1899-CFC<br>Consolidated |
| v. | **DEMAND FOR JURY TRIAL** |
| BIO-RAD LABORATORIES, INC., | **HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY** |
| Defendant. | |

**REBUTTAL EXPERT REPORT OF DR. BRUCE GALE**

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.    BASIS FOR OPINIONS.......................................................................................1

    A.    Qualifications.............................................................................................2

    B.    Materials Considered .................................................................................2

    C.    Level of Ordinary Skill in the Art .............................................................2

III.    LEGAL STANDARDS ........................................................................................2

    A.    Non-Infringement......................................................................................2

        1.    Literal.............................................................................................3

        2.    Doctrine of Equivalents .................................................................3

        3.    Prosecution History.......................................................................3

        4.    Indirect Infringement ....................................................................4

IV.    THE ASSERTED PATENTS ...............................................................................4

V.    CLAIM CONSTRUCTION.................................................................................6

VI.    SUMMARY OF OPINIONS .............................................................................12

VII.    OVERVIEW OF THE ACCUSED PRODUCTS...............................................13

VIII.    NON-INFRINGEMENT OF THE ASSERTED PATENTS...............................14

    A.    Non-Infringement of the '420 Patent .....................................................14

        1.    Element [1.e]: "an external fluidics section" ...............................14

        2.    Element [1.f]: "an internal non-fluidics section".........................44

        3.    Element [1.h]: "a panel member arranged to separate the fluidics section from the non-fluidics section" ........................................47

        4.    Element [1.i]: "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the

i

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

fluidics section is external to the housing and the non-fluidics section is internal to the housing." ............................................................ 47

5. Element [1.k]: "wherein each interchangeable modular component includes a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus" ............................................................ 49

6. Element [1.l]: "wherein the master control unit is arranged to automatically identify interchangeable modular components" ................ 56

7. Element [1.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit and the fluid control valves are interchangeable modular components" ........................................................ 58

8. Dependent Claim 5: "further comprises a pH electrode that is external to the housing" .................................................................. 65

9. Dependent Claim 6: "that the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve" ...................................................... 65

10. Dependent Claim 7: "the pH electrode is connected to a pH valve formed as an interchangeable modular component" .................................. 66

11. Dependent Claim 8: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels" ........................................ 66

12. Dependent Claim 15: "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve." .................................................... 66

13. Element [17.v]: "a panel member arranged to separate a fluidics section from a non-fluidics section" .......................................... 66

14. Element [17.ix]: "wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing" .................................................. 66

15. Element [17.xi]: "wherein each interchange modular component includes a dedicated CPU unit allowing the interchangeable

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

modular component to independently perform operations in response to instructions over the system bus" ............................................67

16. Element [17.xiii]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit, and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components"....................................67

17. Dependent Claim 22 ....................................................................68

18. Dependent Claim 23 ....................................................................68

19. Dependent Claim 24 ....................................................................68

20. Dependent Claim 25 ....................................................................68

21. Element [27.e]: "a panel member arranged to separate a fluidics section from a non-fluidics section" ..........................................68

22. Element [27.i]: "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing"...............................................69

23. Element [27.k]: "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus".....................70

24. Element [27.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components".....................................71

25. Dependent Claim 30: "the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component"................................................72

B. Non-Infringement of the '589 Patent......................................................72

1. Element [1.d]: "wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array" ................................73

2.  Element [1.g]: "wherein each modular fluid handling unit . . . includes a CPU for independently performing fluid control operations in response to instructions over a system BUS" .....................73

3.  Element [6.f]: "each modular fluid handling unit includes a CPU for performing fluid control operations independently irrespective of the location within the housing unit"................................................73

4.  Dependent Claim 7: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are freely arrangeable modular fluid handling units" .................................73

5.  Dependent Claim 8: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit and the fluid control valves are arranged as modular fluid handling units"........................................................74

6.  Dependent Claim 9: "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve"...................................................74

7.  Dependent Claim 13: "the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit".....................................75

8.  Dependent Claim 14: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels".......................................75

9.  Dependent Claim 21: "the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when fitted in a receiving position of the housing unit"....................75

10. Dependent Claim 24: "a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit"......................................76

11. Dependent Claim 25: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels"......................................76

iv

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

12.    Dependent Claim 26: "the modular fluid handling units include two double piston pumps, one injection valve for injecting a sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer" ..............................77

C.    Non-Infringement of the '590 Patent ..................................................77

1.    Element [1.b]: "interchanging at least two of the interchangeable modular components in a housing unit comprising at least four component receiving positions arranged in a two dimensional array, so as to allow for modification of the liquid chromatography fluid flow path among the at least four interchangeable modular components" .................................................................................77

2.    Element [1.c]: "wherein each of the at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit" .......................................................78

3.    Claims 2 and 3, Flow path shortened ..........................................79

4.    Claims 10 and 12 ......................................................................80

5.    Element [13.h]: "comprising a CPU that allows independent fluid control operations in response to instructions from the main controller when installed in the component receiving position of the housing unit" ...............................................................80

6.    Claim 14 "adding an expansion housing unit that includes a plurality of component receiving positions, each component receiving position being adapted to receive the at least one interchangeable modular fluid handling unit, and placing at least one additional interchangeable modular fluid handling unit in one of the component receiving positions in the expansion housing" ..............81

7.    Claim 17: "the CPU allows for automatic identification by the liquid chromatography system upon placement in a component receiving position of similar size and shape" ............................................81

8.    Claim 18: "the at least two interchangeable modular fluid handling units are connected to the system by a system BUS" ................................81

D.    The '591 Patent ....................................................................................82

1.    The NGC System Does Not Infringe Claim 9 of the '591 Patent at Least Because it Lacks Several Elements in Claim 1 from Which it Depends..............................................................................................82

v

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

2.    Dependent Claim 26: "the pH electrode is connected to a pH valve formed as an interchangeable modular component"...................................85

3.    Dependent Claim 27: "the pH valve include[] an integrated flow cell for in-line monitoring of pH levels"...................................85

E.    Non-Infringement of the '124 Patent ...................................85

1.    Element [16.h]: "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel." ...................................85

2.    Element [16.i]: "wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing" ...................................86

3.    Element [16.j]: "respective non fluidics sections are internal to the housing" ...................................87

4.    Dependent Claim 20: "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus"...................................87

5.    Dependent Claim 28 "the system includes two double piston pumps, one injection valve for injecting sample onto a column connecting to the flow path of the liquid chromatography system, a UV monitor, and a mixer" ...................................88

6.    Dependent Claim 30: "further includes a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients" ...................................88

IX.    NON-INFRINGING ALTERNATIVES ...................................89

X.    LICENSES...................................94

A.    ███████████████████████████████████...................96

B.    ███████████████████████████████████...............102

XI.    OTHER COMMENTS...................................107

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

## LIST OF REPORT EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| Exhibit 1 | List of Materials Relied Upon |
| Exhibit 2 | 10.22.2014 Lundkvist Depo Tr. |
| Exhibit 3 | Markman Hearing Transcript |
| Exhibit 4 | NGC Chromatography System |
| Exhibit 5 | (Filed Under Seal) BRGE00000846 - 864 |
| Exhibit 5 | (Filed Under Seal) BRGE00000846 - 864 |
| Exhibit 6 | (Filed Under Seal) BRGE00000572 - 597 |
| Exhibit 7 | (Filed Under Seal) BRGE00000511 - 544 |
| Exhibit 8 | (Filed Under Seal) BRGE00000598 - 622 |
| Exhibit 9 | (Filed Under Seal) BRGE00000545 - 571 |
| Exhibit 10 | (Filed Under Seal) BRGE00000623 - 654 |
| Exhibit 11 | (Filed Under Seal) BRGE00000785 - 826 |
| Exhibit 12 | (Filed Under Seal) BRGE00000655 - 688 |
| Exhibit 13 | (Filed Under Seal) BRGE00000714 - 747 |
| Exhibit 14 | (Filed Under Seal) BRGE00000689 - 713 |
| Exhibit 15 | (Filed Under Seal) BRGE00000477 - 510 |
| Exhibit 16 | (Filed Under Seal) BRGE00000748 - 784 |
| Exhibit 17 | Blank |
| Exhibit 18 | (Filed Under Seal) BRGE00002458 |
| Exhibit 20 | U.S. Publication No. 2008/0035542 ("Mourtada") |
| Exhibit 21 | U.S. Patent No. 5,766,460 ("Bergstrom") |
| Exhibit 22 | U.S. Publication No. 2008/0233653 ("Hess") |
| Exhibit 23 | 06.26.2020 Lundkvist Depo Tr. |
| Exhibit 24 | 10.17.2014 Scandella Depo Tr. |
| Exhibit 25 | Preliminary Injunction Hearing Declaration Images |
| Exhibit 26 | 08.17.2016 Soderman Depo Tr. |
| Exhibit 27 | 07.23.2020 Chapman Depo Tr. |
| Exhibit 28 | 06.24.2020 Hareland Depo Tr. |
| Exhibit 29 | ██████████████████████████ |
| Exhibit 30 | ██████████████████████ |

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

performing the specific chromatography techniques they require in order to, for example, purify proteins for use in their research.  The specific form factor, or the form of modularity that the system employs is secondary, at best, in a user's assessment of what liquid chromatography system will be capable of satisfying their needs.  A user will never buy a system that is not able to perform the chromatography techniques required.  In other words, function is far more important than form to a user of liquid chromatography systems.  As I stated above, the patents in suit are not directed to performing any new aspect of chromatography or performing any existing aspect of chromatography in any new way.  Rather the patents are simply directed to form factor or aesthetic aspects of chromatography. The machine is likely to ship more easily as a single unit rather than as multiple boxes.  But I do not consider this to be any type of technological advance.

**V.      CLAIM CONSTRUCTION**

20.      I understand that the Court has entered a Claim Construction Order.[1]

21.      I understand that the parties agreed on the following constructions relevant to the Asserted Patents discussed in this report.

| Terms | Agreed Construction |
|---|---|
| "CPU" / "CPU unit" | "central processing unit" |
| "the fluidics section is external to the housing and the non[-]fluidics section is internal to the housing" | "the fluidics section is on the outside of the housing and the non-fluidics section is on the inside of the housing" |

22.      I understand that the Court has construed the disputed terms as follows.

| Terms | Court's Claim Construction |
|---|---|
| "interchangeable modular component" | "component that can be inserted into and removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another component" |
| "interchangeable modular fluid | "fluid handling unit that can be inserted into and |

---

[1]  D.I. 89.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

| | |
|---|---|
| handling unit" | removed from positions in the housing and that has a standardized size and shape that allows it to be exchanged with another fluid handling unit" |
| Claim Preambles ("An automated liquid chromatography system comprising" / "A method of modifying a fluid flow path in an automated liquid chromatography system comprising" / "A method for building an automated liquid chromatography system, the method comprising"/ "A liquid chromatography system arranged to provide a controlled fluid flow through a chromatography column, the system comprising") | The preambles are claim limitations. |
| "liquid chromatography system" | Plain and ordinary meaning |
| "automated liquid chromatography system" | Plain and ordinary meaning |
| "wherein the system is capable of performing automated liquid chromatography" | Plain and ordinary meaning |
| "non-fluidics section" / "non-fluidics section" / "non fluidics section" | "a section of the interchangeable fluid handling unit that includes electrical components and does not include fluidics components" |
| "a fluid handling section" / "a fluidics section" | "a section of the interchangeable fluid handling unit that includes fluidics components and does not include non-fluidics components" |

23.    In all cases, I applied the agreed claim constructions or the Court's constructions as one of ordinary skill in the art would interpret them in light of the specification and the file history in performing my analyses and rendering my opinions in this report.

24.    In this regard, it is my opinion that Dr. Wereley has misconstrued the Court's claim construction at least with respect to the terms fluidics section and non-fluidics section in Paragraphs 57-58 of his report.  He has done so, apparently, because he did not state in his opening report that he reviewed the file history where the inventors of the asserted patents made certain statements explaining what their inventions were not.  By failing to review those statements, Dr. Wereley interprets the Court's claim construction (and statements made during

7

the hearing that are not part of the claim construction) in a way which is inconsistent with the inventors' statements during the prosecution.  I will address these issue more particularly with respect to certain elements but address them here in a general manner as well.

25.     Dr. Wereley quotes isolated portions of what I understand to be the hearing transcript from the claim construction proceedings to claim that there can be non-fluidics (electronics) outside the non-fluidics section of each module.  (Wereley Report ¶57).  But what the portion of the hearing transcript that Dr. Wereley quoted did not say is that electronics of the module can be in the fluidics section, even if they are not in the non-fluidics section.  Ex. 3, Markman Hearing Tr., 97:16-25.  All it says is that it may be possible for there to be electronics that are not in the fluidics section that are also not in a non-fluidics section.  *Id.*  That does not mean that once can indiscriminately define electrical components as being in some section that is neither a fluidics section or a non-fluidics section for purposes of establishing infringement.  By failing to review the file history and see how the inventors interpreted what a "section" is, Dr. Wereley is interpreting the claims and asserting infringement against the Bio-Rad devices in ways that are inconsistent with the word section in the asserted patents and the representations the inventors made to the patent office to obtain their patent.  By doing so, Dr. Wereley is also interpreting the random passages he was presented from the claim construction hearing in an improper way.

26.     For example, the judge stated at pages 90-91 of the hearing transcript after counsel went through some, but not even all, the statements in the file history that the inventors made to obtain their claims that there was clear and unmistakable representations by the inventors that the electrical components should be separated from the fluidic components:

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

6      THE COURT:  -- I think Mr. Bilsker makes a

7      compelling argument that looks pretty clearly and

8      unequivocally, your client, or the applicant for the patent

9      I should say made clear, clearly and unequivocally, as far

10     as I'm concerned, that there are two sections, and that's

11     what differentiates this patent from Bergstrom and Hess.  So

12     why don't you walk me through your response to that.

13        MR. MILLER:  Okay.  So, first of all, I think

14     it's important to note that we don't disagree that there's

15     going to be a separation from the fluidics section and

16     non-fluidics section, but, first of all, there can be other

17     sections.

18        As you pointed out, the claim language talks

19     about a fluidics section and a non-fluidics section, and all

20     the claims use the transitional phrase comprising, which

21     means there can be other sections.

22        So even if you draw the circle --

23        THE COURT:  That wasn't how you distinguished

24     Bergstrom and Hess.  I mean, you pretty explicitly said to

25     the Examiner, hey, what makes this different is we've got

91

1      complete separation of the fluidic and the non-fluidic

2      section.  And, incidentally, I think that's consistent with,

3      you know, your slide, which says, hey, the phrase itself

4      tells you, there's no fluidic component in the non-fluidic

5      section.

6        MR. MILLER:  Well, our argument on non-fluidics

7      in the fluidics section, that's what I called the

8      non-fluidics section.

9        THE COURT:  As opposed to the fluidics section.

10     I mean, it's a referential definition.  Right?  It says,

11     this is a non-fluidics section as opposed to the fluidics

12     section.

27.

9

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

28.     The Court then reiterated at pages 102-103 of the hearing transcript, the clear and unequivocal statements that the inventors had made to obtain their patents and about there needing to be two sections:  a fluidics section and a non fluidics section and there had to be complete separation between the fluidics and the electronics in them:

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

18          I'm going to interpret non-fluidics section to

19    mean, "a section of the interchangeable fluid handling unit

20    that includes electrical components and does not include

21    fluidics components."

22          I'm going to construe a fluid handling section

23    to mean, "a section of the interchangeable fluid handling

24    unit that includes fluidics components and does not include

25    non-fluidics components."  And that seems to me to be the

103

1    most reasonable construction.  That is consistent with what

2    I think were clear and unequivocal statements to distinguish

3    this patent from Bergstrom and Hess, because the basis of

4    the distinctions to the Patent Examiner were that this

5    patent had two sections that, at least two sections, one is

6    non-fluidic, one is fluidic, that are separated completely

7    and that do not contain components of the other section.

8          That does not, however, preclude the possibility

9    that there are other sections that are in the invention, and

10    that's important because that is consistent with the use of

11    the indefinite article, which is inconsistent with Bio-Rad's

12    insistence that "all," either fluidic or non-fluidic

13    components, are in the respective handling unit.

14          So that actually seems to me is the right result

15    in this case and I'm going to construe then these last group

16    of terms in that manner.

29.    17          All right.  Is there anything else for me to

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

30.     Again, just because there is a theoretical possibility that there may be yet a third or forth section where there could be an electrical or fluidic component, does not mean that any component that is encountered that is inconsistent with an infringement theory can be dealt with by claiming it is in a "section" that is distinct from what is otherwise a fluidics or non fluidics section.  Any creation of this alternative additional section that is inconsistent with how the inventors construed the prior art is not permissible and Dr. Wereley failed to consider that in any way in his opening report.

31.     I note that relevant portions of the file history that inform that a section cannot be defined as Dr. Wereley has tried to do in his infringement report appear as Ex. G in the joint claim construction briefing which I understand has the Document number DI 52-8 (Ex. 19)[2].  I will be referring to pages from that Exhibit G, which I incorporate into this report as well as the Mortada, Ex. 20, Bergstrom Ex. 21, and Hess Ex. 22 references discussed in those pages of the File History.  I will also refer, when necessary to the slides that counsel used during the claim construction hearing to illustrate points from the File History.

## VI.    SUMMARY OF OPINIONS

32.     As set forth in detail below, based on my review of the Asserted Patents, including the Asserted Claims and the prosecution histories of the Asserted Patents, the claim constructions in this matter, the accused products and functionality the Wereley and Vukicevic Reports, and the materials listed in Exhibit 1, I have reached the following opinions:

- The accused products do not directly or indirectly infringe,  any asserted claim of the '420 patent;

- The accused products do not directly or indirectly infringe, any asserted claim of the '589 patent;

_____

[2]  For clarity, I refer to the original exhibit identification Exhibit G throughout. But Exhibit G is Exhibit 19 here.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

42.     Moreover, when one of ordinary skill in the art performs  an analysis of the patent, the statements the inventors made to obtain their patents, and the actual modules that have been accused, they would only be able to come to the conclusion that there is no external fluidics section in the two pump and one injection valve module that Dr. Wereley has relied on to prove infringement of this element.

43.     Throughout the specification of the asserted patents, the inventors stress that there needs to be separation of fluidics and electronics components to ensure that electronics are not harmed when changing fluid connections and when a leak occurs.  *See, e.g.*, Col. 2: 28-32 (a liquid handling panel to separate fluidics and electronics); Col 6: 17-620(in one embodiment, the panel member essentially separates the fluidics section from the electronics and internal electronics); Col. 6: 10-29 (noting various arrangements, including with and without a panel member such that the electronics are separated from the fluidics through the use of such components as a suitable sealing arrangement  between the housing opening and the external fluidics side of the module); Col. 7:7-25 (noting air tight sealing between the component positions and the non fluidics section and noting configurations, such as that claimed, where fluids are strictly on one side of the fluid handling panel and the electronics are strictly on the other:  "According to one embodiment, fluids are strictly restricted to the fluidics section 30 of the interchangeable modular components 26, but in alternative embodiments , only fluid connections are restricted to the fluidics section 30 allowing fluid to "cross" the fluid handling panel inside the non-fluidics section 30 of the interchangeable modular component 26.")

44.     I note that nowhere in the patent is there a description of anything other than two sections in a module, a fluidics section and a non-fluidics section.  To the extent there is some other intermediate section, it is nowhere described in the patents or how to determine it.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

Nonetheless, even if one of skill in the art were to assume that such a section could exist, they would recognize that such a section would need to satisfy the goals of the invention, which is to keep the fluids separate from the electronics.  Dr. Wereley never considered this requirement, which is present not only in the passages cited above, but also by the named inventor Mr. Lundkvist, Cytiva's previous expert, Dr. Scandella, and statements that the inventors made during prosecution to obtain the patents.

45.



HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

60.     The inventors said the separation requirement was even more important in liquid chromatography systems as opposed to other automated fluid handling systems:  "The features of claim 17 as applied to liquid chromatography are particularly advantageous because such a system is typically used for many different initial experiments to prove the principles for larger scale operations.  In such use, the system components are frequently reconfigured and in so doing the advantages of fluid and non-fluid separation, as claimed in claim 17 become even more significant, for example by providing a housing for liquid chromatography components including a liquid handling panel for accepting the components and avoiding contamination of electrical components." Ex. G at GEHC 001418.

61.     To ensure that the goals of the invention were met, the inventors described in great detail during the prosecution when they were distinguishing the prior art what was necessary to separate the fluidics from the non-fluidics sections and what would not be considered separation – something that still had a likelihood of the electronic components of a module becoming wet when fluid connections were changed, modules were rearranged, or a leak occurred.  If that was possible, then one of skill in the art would recognize that the fluidics and the non fluidics (electronics) were not in distinct sections that were separated.  Rather they would be in the same section.

62.     And as will be explained in more detail in the following paragraphs that is what is present in the Bio-Rad accused modules.  One of ordinary skill in the art reading the file history would only be able to come to the conclusion that the external electronics that Dr. Wereley recognizes are present in the accused Bio-Rad modules (the two pumps and injection valve, Wereley ¶ 116) are not in sections that are distinct from the fluidics sections.  Rather, they are in the same section and not separated in the manner the inventors said they needed to be to be part

22

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

of the invention and distinct from the prior art.  For example, the accused pump module has switches, a display, and LED lights which the user sees, as well as a PCB and ribbon electrical connector in the overlay.  *See e.g.*, Wereley ¶ 142, showing pictures of accused pumps in Ex. 48, 49 and ¶ 150 quoting from manual Ex. 47 stating that there are switches on the exterior of the pump modules.  *See also* Ex. 25.

63.     In particular, the inventors pointed out that for there to be separation of the electrical components and the fluidic components of a module such that they were in separate sections and unlikely to have fouling/wetting  or contamination of the electrical components if there was a leak of the fluidic components, there had to be a particular spatial relationship between the components.

64.     In particular, the inventors said multiple times that the fluidics and the electronic components of a module need to be on opposite sides of a panel for a) them to be separated, b)to ensure that the electronics would not get wet if there was a leak, and c) to define the electronics and the fluidics as being in separate sections.  In discussing Bergstrom, the inventors said:  "The modules of Bergstrom do not separate their fluidic and electrical parts (where they have electrical parts).  Further, those paths cross into the base plate at about the same region.  The detector module 10 of Figure 10 illustrates that fluid and electrical parts are adjacent, **not on either side of a panel.**  Ex. G at GEHC 001451.

65.     After stating that Bergstrom gives no thought to making sure that electrical parts do not get wet, which I cited to above, the inventors then reemphasize, one paragraph later, the separation point and again state that the fluidic and electronic parts need to be on opposite sides of a panel in the invention.  In fact they not only state that the electronic parts in a modules need to be on opposite sides of one panel, but on opposite sides of two different panels :  "These

23

problems in the Bergstrom design are not addressed in Burger, but are cleverly addressed in presently claimed invention **by separating** the fluidic and non fluidic parts of fluid handling units **across a fluid handling panel** and **across a panel member of the modular components**, **which inhibits the problems mentioned immediately above**." *Id.*

66.    The accused modules do not meet those requirements for multiple reasons and therefore do not have external fluidics sections, ones that do not have electrical components, for multiple reasons.

67.    First, having failed to refer to any of the File History statements which require the fluidics components of a module to be separated from the electrical components by at least two different panels to be considered by one of ordinary skill in the art to have distinct fluidics and electronics sections, Dr. Wereley provides no detailed analysis of the alleged panel member of the modules that are supposed to separate fluidics from electronics components of a module to meet the requirement that the electronics and fluidics are in separate sections.

68.    Dr. Wereley purports to analyze the panel member as claim element 1(h) at paragraphs 138- 147.  But the analysis is cursory and conclusory again.  At paragraphs 139 and 141, Dr. Wereley pastes pictures of a Bio-Rad system pump and a sample inject valve and simply draws a red arrow and red box and concludes these are the panel members of the modules.  I reproduce those figures below:



69.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



70.

71.     At paragraph 145, Dr. Wereley cites to testimony from two Bio-Rad witnesses to establish that what he has pointed to is a panel member.  But, the testimony does not do so.  Both Mr. Bland, and Mr. Chapman, whose testimony is quoted, state that the component that Dr. Wereley points to as the panel member is actually two separate parts:  there is 1) "a front plate" and an "overlay"  *Id.* at ¶ 145.  Mr. Chapman testified that █████████████████ ███████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ *Id.* at p. 91 (quoting Chapman testimony).

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

72.     In other words, Mr. Chapman's testimony makes clear that the faceplate is what is responsible for allowing the module to be mounted on the instrument housing.  I have confirmed this by holding and physically examining a number of the Bio-Rad modules.  The specification of the asserted patents describes the panel member as the structure that is used to attach the module to a component position in the in the liquid handling panel.  *See e.g.*, '420 patent Col. 6:30-34 ("As is disclosed in FIGS. 4a to 4d, the interchangeable modular components 26 comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel.")

73.     The first problem with Dr. Wereley's analysis is that he equates two distinct parts, the ████████████████ and calls them collectively the panel member.  *See* Wereley at ¶ 146, referring to the ████████████████    The assembly drawing from one exemplary module, which is how all the modules are created, shows that the ████████████████ ████████████████, and it is the ████████ which attaches to the housing and would properly be called the panel member.



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



74.

Ex. 6, BRGE00000582.

75.     As one can see in the figure above for the inject valve, there is a hole between the two red circles at the top and the bottom.  Those holes are where the screws are inserted to attach the module to the housing.  That structure on the left side of the picture is what one of ordinary skill in the art reading the specification and looking at the accused product would call the panel member as it is what attaches the module to the housing.

76.     The ▮▮▮▮ which is on the right side of the figure is attached to the ▮▮▮▮▮▮▮▮▮▮▮.  One can see from the figure that the overlay is full of electronics.  There is a ▮▮▮▮▮▮▮ which appears brown or copper colored.  There is a ribbon wire connector, and there are LED lights shown on this module.  Other modules also have a display that the user can see as well as switches for the user to activate.  The

LED lights, the display and the switches are not trivial elements added to avoid infringement as I understand plaintiff's counsel portrays them.  Rather the LED lights tell a user where to make fluidic connections and the display enables users to easily see values and parameters on the modules.  The switches allow the user to manually control the purge and priming capabilities of the pumps.  See Wereley ¶ 160, citing Ex. 47, "1 Product Description" of Analytical Preparative Pump Module.  ████████████████████████████

██████████████████████████████████████████

██████ and Bio-Ra employees have pointed out that it is a feature which users like and appreciate.  Ex. 27, Chapman Depo Tr. at 206:21-207:13.

77.    In any event, given that the ██████████████ are two separate structures held together by a ████████████, one of ordinary skill in the art would not consider them collectively the panel member.

78.    But, even if one of ordinary skill in the art reading the specification considered the overlay and faceplate to be the panel member, they would not consider the electronics that are part of the overlay to be in a separate section of the module from the fluidics section as Dr. Wereley concludes with no analysis.  At paragraph 149 of his report, Dr. Wereley merely says: "I see no reason why the fact that certain of the modules have LEDs or displays integrated into their panel members takes them outside the scope of the claim language.  For one, as discussed, the fact that these are non-fluidics components is not relevant since under the Court's claim construction, only the fluidics section cannot have non-fluidics components such as electronics, and the panel member is a different section in that it is neither a 'fluidics section' nor a 'non-fluidics section'."

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

79.     Dr. Wereley makes the statement that he does  not see any reason why the electronics "integrated into the panel members takes them outside the scope of the claim language without analyzing the file history to see how the inventors characterized their invention and how they treated what is a fluidics section.  When the file history is examined, one of ordinary skill in the art can only come to the conclusion that what Dr. Wereley points to as a panel member and a fluidics section of the accused modules do not satisfy the requirements of the claims and are not consistent with how the inventors characterized their invention or the fluidics section in the file history.  As a result, Dr. Wereley's opening report fails to meet Plaintiffs' burden of establishing the existence of this element in the accused modules.

80.     Dr. Wereley merely concludes with absolutely no analysis that anything "integrated into the panel member" is a different section from the fluidics and electronics sections.  I do not agree and neither would one of ordinary skill in the art who read the specification and the file history.

81.     First, the inventors addressed this very issue in the file history.  With respect to fluidics and electronics and the existence of separate sections, the inventors stated that the fluidics and the electronics need to be on either side of a panel.  *See* Ex. G GEHC 001451 (The detector module 10 of Figure 10 illustrates that the fluid and electrical parts are adjacent, **not on either side of a panel"**) (emphasis added); ("Bergstrom has given no thought to what happens when one unplugs a module and gets the electrical contacts 19 wet which will be inevitable since the contacts 19 appear to be housed in the cup shaped aperture 14…  These problems in the Bergstrom design are not addressed in Burger, but are cleverly addressed in presently claimed invention **by separating the fluidic and non-fluidic parts of fluid handling units** across a

30

**fluid handling panel** and across **a panel member of the modular components**, which inhibits the problems mentioned immediately above.")(emphasis added)

82.     The first quote from the inventors in the above paragraph shows that they consider the panel member, which like all physical objects has a thickness, has  two sides, (*i.e. "*either sided").  It is apparent Dr. Wereley did not consider this fact.  If he did, Dr. Wereley could not make the accused panel member consistent with the inventor statements by claiming that rather than two sides, the panel member has four sides:  1) the side the user sees, 2) the inner side of that side in the thickness of the panel, 3) the side that is mounted against the housing, 4) the inner side of that side which is also in the thickness of the panel.  In standard English usage, which does not differ from the way one of ordinary skill in the art would understand what the inventors said, "either" indicates two options.

83.     The same conclusion would be reached by one of skill in the art reading the second quote from Ex. G at page GEHC 1451 that I quoted above that the inventors made regarding the arrangement of the fluidics and electronics of a module.  In the second quote, again distinguishing Bergstrom, the inventors stated that the fluidics must sit "**across**" two different panels:  1) the fluid handling panel and 2) the panel member.  The accused products satisfy neither of these requirements and would not be considered by one of ordinary skill in the art to therefore contain a fluidics section with no electronics in the section.

84.     As with the word "**either**" in the first quote, one of ordinary skill in the art would understand the use of the word "**across**" with reference to the fluidics and electronics of a panel being across two different panels to refer to the panel having two sides and the electronics and fluidics of a module lying on the opposite sides.  That is not the case with the accused modules

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

85.     According to Dr. Wereley, the electronics are "embedded" in the panel member and thus part of a separate section from the fluidics.  In addition to the fact that this embedded notion is inconsistent with the two statements I quoted above stating that the fluidics and electronics should be on either side of the panel member and across two different panels, the liquid handling panel, which the electronics and fluidics in the accused modules surely are not, and the panel member which they also are not – it is also inconsistent with other statements and the physical arrangements of the components in the Bergstrom reference that the inventors distinguished.

86.     In the file history, the inventors stated that one can see how Bergstrom arranged his components in Figs. 1 and 4(a) where you can see a flow line 5 in baseplate 1.  Ex. G at GEHC 1449.  I reproduce those figures and others from Bergstrom (Ex. 21) below.



FIG. 1

87.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

88.     The inventors repeatedly described the flow line "5" as being adjacent to the electrical connectors "12" and therefore, having fluidics which are not separated from the electronics in the base plate "1" which had been equated to the panel member.  Ex. G, GEHC at 1449-1451.

89.     Dr. Wereley's claim that electronics integrated  in the thickness of the panel member are in a separate section and separated from the fluidics section of the module is inconsistent with what the inventors said about Bergstrom.  As can be seen in Figure 4(a), which I reproduce below and which the inventors referenced when distinguishing Bergstrom as not having separate fluidics and electronics sections that were separated, the electronics lines "12" in Bergstrom are integrated  in the base plate/panel member and are distanced from the fluid lines "5" which are also embedded in the base plate.

90.     In Fig. 4(a) one sees a blow up of a single module "10" in base plate "1".  One can see in the figure that the flow line "5" is within the thickness of the base plate

91.     This is also shown in Fig. 2 which I also reproduce below.

34

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

92.     as



FIG. 4a

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



FIG. 2

93.

94.      Similarly, the Bergstrom specification states that the electrical lines "12" which are depicted in Fig. 1, are also embedded in baseplate 1. *See* Ex. 21 Bergstrom 5,766,460 at Col. 3:50-54 (One or more lines/conductors (**12**) for signal and power transmissions from or to connected modules may be arranged in the base plate (**1**) preferably along the flow lines (**5**).". Nonetheless, even though the electronics were integrated  in the thickness of the baseplate/panel member and so too were the fluid lines (5).  Although those lines were parallel or near each other, they would have to be embedded in different thickness of the baseplate/panel member. But, consistent with the prior statements of the inventors that the fluids and electronics in a module had to be on different sides of two different panels, the inventors did not consider Bergstrom to have modules with separate fluid and electronics sections or have those sections separated.

95.     Consequently, Dr. Wereley's analysis that having electronics integrated  in the thickness of the panel member creates a different section that is separated from the fluidics section, is not consistent with the file history and one of ordinary skill would not come to the same conclusion that Dr. Wereley did.  Rather, after reading the portions of the file history I have discussed thus far, one of ordinary skill in the art would conclude that the accused modules do not have an external fluidics section—one that has no electrical components.

96.     Dr. Wereley's analysis that integrated  electronics are a separate section from the fluidics does not consider at all that such an analysis fails to account for the accused devices and the analysis regarding them being inconsistent with the purpose of the invention.  As I detailed previously, the patent, the inventor and plaintiff's prior experts also stressed that the purpose of the invention was to have electronics and fluidics in distinct sections that are separated and sealed from each other so as to keep the fluids from wetting or damaging the electronics such as when fluid connections are being changed or if there is a leak.  That is not the case in the accused devices.

97.     As I explained above and as can been seen in the photo of the assembly procedure for the inject valve that I reproduced in this report, the overlay attaches to the face plate only with a few drops of glue.  That method of attachment is not sufficient to seal the electronics which Dr. Wereley says are "integrated " in the "panel member" from fluids on the module.  To confirm this, I physically examined at least two different modules recently, a pump module and a pH module with respect to the relationship between the overlay and the faceplate.  I confirmed by looking at these physical samples that fluid that leaks from the modules would not be sealed from the electronics Dr. Wereley describes as being integrated  in the panel member.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

113.    At best, (which I do not agree with) what Dr. Wereley describes as electronics integrated in the panel member to create a section distinct from the fluidics section would be an example of individual protection of fluidics from electronics in each module that the inventors distinguished their invention from over Hess.  Such individual protection does not provide the "collective protection" that the inventors said was necessary in their invention.  In other words, the electronics integrated in each panel member of each module in the Bio-Rad accused modules and system are not protected from the fluidics by being inside a housing that protects them all. Rather the integrated electronics that Dr. Wereley points to are each protected individually.

114.    A person of ordinary skill in the art reading the inventors' statements about Hess would recognize that if in Hess, a single electronic cable exiting the back of a module, in which the cable was spaced apart from the fluidics at the front of the module by at least two walls and a much greater distance than the electronics in the Bio-Rad accused devices are distanced from the fluidics, did not constitute a distinct section that was separated from the fluidics section, then neither does what Dr. Wereley calls the electronics integrated in the panel member of the accused modules.

115.    For these reasons, the accused devices do not have an external fluidics section. Similarly, the subsequent elements that I will discuss in the following paragraphs relating to the non fluidics section and the separation of the fluidics from the non fluidics by a panel member and the non fluidics section being internal to the housing and separated from the fluidics by a liquid handling panel when the module is inserted into the housing are also not met.

**2.    Element [1.f]: "an internal non-fluidics section"**

116.    Element [1.f] of the '420 patent requires "an internal non-fluidics section."

117.    The NGC System does not infringe this element because the NGC System does not include "an internal non-fluidics section" as required by claim 1 of the '420 patent.  As

detailed with respect to element 1(e) in the prior paragraphs, which I incorporated herein, each of the Bio-Rad accused modules contain either LED lights, a display or both that are visible to the user and on the same side of the panel member as the fluidics.  The pump modules also have electronic switches on the same side of the panel member as the fluidics.  They also contain electronics such as a PCB and ribbon line in the "overlay" shown in the assembly documents cited and that are exhibits to this report.  These are all part of the non-fluidics section and cannot simply be considered a separate section from the electronics that are inside the housing.

118.    In paragraphs 118- 126 Dr. Wereley concludes that there is a non fluidic section, one that he believes does not have fluidics, by pointing to electronics inside the housing.  But, as discussed previously, Dr. Wereley does not at all consider the File History.  As I discussed previously regarding element 1(e), when the file history is examined, one of ordinary skill in the art can only come to the conclusion that there is not a non fluidics section in the accused Bio-Rad modules.

119.    For example, the Hess reference certainly had electronics that were sealed in a box and separated from the fluidics that were outside the housing and on the front face visible to the user.  *See* Ex. G at 1423 ("Since the Hess design was conceived with radioactive product processing in mind [e.g. see abstract] the need for sealing each box and electrically connecting each box such that liquid radioactive contamination does not penetrate the boxes or box electrical interconnections is very important, but results in a costly system."); *See* Figs. 2 and 4 reproduced above from the Hess reference showing the fluidics.

120.    Nonetheless, as shown in the previous element, the inventors stated Hess was distinct from their invention because there was a single electrical component, a connector between modules, that exited from the back of each module.  The inventors considered that

124. For all these reasons and those discussed with respect to element 1(e), the three accused Bio-Rad liquid handling units do not have a non fluidics section.

### 3. Element [1.h]: "a panel member arranged to separate the fluidics section from the non-fluidics section"

125. Element [1.h] of the '420 patent requires "a panel member arranged to separate the fluidics section from the non-fluidics section."

126. The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed. I incorporate my discussion of the prior two elements for this element. In summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as integrated in the panel member. "Integrating" as shown with the arrangement of Bergstrom, does not create separate sections. There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics. At a minimum, the electronics that Dr. Wereley describes as being integrated in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be. Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

### 4. Element [1.i]: "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

127. Element [1.i] of the '420 patent requires "wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

128. I have discussed why this element is not met with respect to my discussion of elements 1(e), 1(f) and 1(h). I incorporate those discussions fully for this element.

129. The NGC System does not infringe this element because the alleged housing lacks the underlined portions of the claim element: "a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

130. In summary, the failure of proof for this element is most easily demonstrated with reference to the inventors' discussion of the Hess reference. As discussed with respect to elements 1(e) and 1(f), in the Hess reference, each module had electronics sealed in a box and fluidics visible from a side that one can consider the front of the box. The inventors pointed out that what the examiner was considering the modules also had a single electrical connection exiting the back of the box. *See e.g.*, ¶¶ 107-112 herein. For this reason, they concluded that Hess did not have a non fluidics section internal to said housing and a fluidics section external to said housing. There is no way for one of ordinary skill in the art to distinguish the arrangement in Hess that the inventors said was outside the scope of their invention with the arrangement in the accused modules. In the accused modules, there are electronics outside the housing. Those electronics cannot be a section that is distinct from the electronics that are inside the housing, just like the single electronic connection in Hess was not distinct from the electronics contained in the sealed boxes. Because the electronics inside  the sealed boxes in Hess, that the examiner

48

considered a housing did not constitute a non fluidics section that was internal to said housing when inserted, one of ordinary skill in the art could  not also consider the electronics that Dr. Wereley considered to be embedded in the panel member to be a non fluidic section that is distinct from the electronics that are inside the housing in the Bio-Rad accused modules.

131.     Therefore, Dr. Wereley has failed to meet his burden to establish the existence of this element in the accused fluid handling modules.

5.     **Element [1.k]: "wherein each interchangeable modular component includes a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus"**

132.     Element [1.k] of the '420 patent requires "wherein each interchangeable modular component includes a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

133.     The NGC System does not infringe any claims of the '420 patent because the alleged interchangeable modular component lacks "a dedicated cpu unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus" as claimed.

134.      In particular, Dr. Wereley, at paragraphs 160-170 of his report where he discusses this element, has not established and met his burden of proof that each module acts independently to perform operations after receiving instructions over the bus.  First, I do not believe that Dr. Wereley has used the proper definition of the CPU's on the modules acting independently.  Second, I do not see proof under the definition that he does use that each of the accused modules acts independently of other modules.

135.     Dr. Wereley interprets the "independent" language in the claim to mean independent of other modules.  *See* Wereley ¶167.  But that is not how one of ordinary skill in

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

the art would interpret that limitation.  The specification gives two alternatives for control.  First it describes the master control unit communicating with each module over a bus and those control signals issued by the MCU controlling the modules.  *See* Col. 7: 57-60 ("As mentioned above, the chromatography system may comprise a master control unit 40 arranged to communicate with all modular components e.g. 1-26 over a system bus 42 such as a CAN-bus or the like").  In that embodiment, something other than a CPU on the module would instruct the module what to do.  The control function could be carried out by for example a particular voltage/current that would make a pump operate at a certain rate. (e.g., A high signal makes the motor operate at one rate and a low signal makes it operate at another rate).

136.    Alternatively, the specification indicates that each module could also have a CPU that would allow the module to <u>independently</u> perform operations in response to instructions over the bus.  *See* col. 7: 60-63 ("In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42.")  One of ordinary skill in the art would <u>not</u> read that alternative to do nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (e.g., A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely forward it to another device to create that same current or voltage or simply translate that instruction into a different format.

137.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

signal indicates and what the MCU would have done on its own, something that is independent of the signal the MPU sent.

138.    One example of that would be the function described for the 2040 instrument which I detailed in my invalidity report.  In the 2040, the burette modules have a CPU located directly on them.  The 2040 User Manual indicates that the burette modules have very precise control – the ability to vary flow in one of 10,000 increments.  To maintain such precise control, one of ordinary skill in the art would recognize that the burette module, using its CPU is independently monitoring the flow value and constantly making adjustments to ensure the set value is being maintained.  In that situation, the CPU on the burette is operating independently of the master control unit which would have only sent the original instruction for what the initial parameter should be.

139.    Given that the specification describes the back to back situations where either: 1)the Master Control Unit controls the operation of the module, and contrasts that with 2) the situation where the CPU independently controls an operation of the module in response to an instruction from the MCU, one of ordinary skill in the art would not understand the independent control to be control that is independent of what is occurring in other modules as Dr. Wereley does.

140.    Contrary to what Dr. Wereley concludes at paragraph 167, the mention of the MCU and the fact that the MCU needs to send instructions would not lead one of ordinary skill in the art to interpret independently to mean independent of other modules just because the CPU must receive some signal from the MCU.  The fact that some signal needs to go from the MCU to the CPU does not mean that all the functions carried out by the CPU have to be controlled directly in response to individual discrete commands from the MCU.  As I explained in the

51

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

158.     Therefore, Dr. Wereley, Mr. Vukicevic and Plaintiffs have failed to establish the existence of this element in the accused devices. .

       **7.**      **Element [1.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit and the fluid control valves are interchangeable modular components"**

159.     For the reasons stated previously the sample inject module and the two system pump modules are not interchangeable modular components because the interchangeable modular components of claim 1 need to have the fluidics and non fluidics sections of elements 1.e and 1.f as well as the separation requirements of elements 1 (h, i, j) and the independent operations requirements of element 1.k and identification requirement of 1(l) which the sample inject module and the two pump modules do not have as described previously which I incorporate herein.  The same is true for the other fluid handling modules that Dr. Wereley identifies as alternatives to the pump and  inject valve for this element.

160.     Further, with respect to the UV module that Dr. Wereley relies on to satisfy this claim element, he identifies a sensor unit, but neither the Bio-Rad single or multi-wavelength UV detectors qualifies as interchangeable modular units that can satisfy this element because neither has the required fluidics and non fluidics sections, a panel member for separating those sections, and a liquid handling panel for separating those sections, nor does either satisfy the requirement that the electronics be internal to the housing when inserted.

161.     One of ordinary skill in the art reading the file history, specification and claims would conclude that the Bio-Rad single and multi-wavelength detectors are not interchangeable modular units as required by the claims.  In fact, the inventors addressed this very type of component and unequivocally stated that such a detector did not come within the claims of its invention.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

179.    Given the statements of the inventors, the testimony of Dr. Scandella and the images of the UV and conductivity detector, one of ordinary skill in the art could not conclude that the UV/Conductivity modules have: fluidics and non fluidics sections, that they have a panel member that separates the fluidic from non fluidic sections, that they have a liquid handling panel that separtes fluid from non fluidics, that the non fluidic electronic section is internal to the housing when inserted into the respective cavity of the housing.  I have confirmd in conversations with Joe Hilario that ██████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████ . For at least all these reasons, the UV/Conductivity module cannot meet this claim element.  I did not see any other sensor unit that Dr. Wereley relied on to meet the sensor limitation, but even if he did, all the sensor units that Bio-Rad can use in the accused systems contain the same arrangement as the UV/Conductivity modules. There are electronics that are part of the modules that are on the outside of the housing and on the same side of the panel member as the fluidics.  Thus, such sensor units would not meet the limitations of the claims for the reasons already described previously for the liquid handling units.  Moreover sensor units such as the PH detector contain additional electronics that are part of the module, external rather than internal to the housing and on the same side of the panel member as the fluidics.  The PH detector has an electrode that is placed in contact with fluid and is part of the module.  Thus the PH detector module cannot meet this limitation of claim 1 or the limitations of claim 5 below.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

180.    Many of the subsequent claims contain the same limitations and whether or not specifically stated, the arguments made thus far are specifically incorporated and become part of the argument for the subsequent limitations as well.

### 8.    Dependent Claim 5: "further comprises a pH electrode that is external to the housing"

181.    Claim 5 depends from claim 1, and requires that the recited liquid chromatography system "further comprises a pH electrode that is external to the housing."

182.    I have discussed why this element is not met with respect to my discussion of element 1.e. and the last element discussed above for claim 1(m).  I incorporate those discussions fully for this element.  Therefore, the "pH electrode" is not "external to the housing" as required.

### 9.    Dependent Claim 6: "that the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve"

183.    Claim 6 depends from claim 5, and requires "that the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve."

184.    I have discussed why this element is not met with respect to my discussion of element 1.e. and the other elements of claim 1.  All of the fluid handling modules in the Bio-Rad accused devices are structured in the same way as the pump and inject valves I discussed with claim 1 and cannot meet the elements of that claim for the same reasons.  Further, as discussed above with regard to element 1(m) all of the sensor units or modules used in the Bio-Rad accused devices have the same general structure.  In addition to the types of electronics identified for the fluid handling units, all the sensor units have further electronics outside the housing which are used to perform the sensing function.

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

> inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing"

192.    See corresponding element of claim 1 which I incorporate herein. Element

**15.    Element [17.xi]: "wherein each interchange modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus"**

193.    Element [17.xi] of the '420 patent requires "each interchange modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

194.    I have discussed why this element is not met with respect to my discussion of element 1.k . I incorporate those discussions fully for this element.

195.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the "modular fluid handling unit" cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

196.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

**16.    Element [17.xiii]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit, and at least two fluid control valves of different configurations, of which at least two of the**

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

211.    Element [27.k] of the '420 patent requires "each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

212.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

213.    In summary, a person of ordinary skill in the art would not read this limitation to mean that the "modular fluid handling unit" cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would not read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

214.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

24.    **Element [27.m]: "wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components"**

215.    For the reasons stated previously the sample inject module and the two system pump modules are not interchangeable modular components because the interchangeable modular components of claim 1 need to have the fluidics and non fluidics sections of elements 1.e and 1.f as well as the separation requirements of elements 1 (h, i, j) and the independent

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

operations requirements of element 1.k and identification requirement of 1(l) which the sample inject module and the two pump modules do not have as described previously which I incorporate herein.

216.    In summary, with respect to the UV module that Dr. Wereley points relies on to satisfy this claim element, he identifies a sensor unit, but neither the Bio-Rad single or multi-wavelength UV detectors qualifies as interchangeable modular units that can satisfy this element because neither has the required fluidics and non fluidics sections, a panel member for separating those sections, and a liquid handling panel for separating those sections, nor does either satisfy the requirement that the electronics be internal to the housing when inserted.

217.    One of ordinary skill in the art reading the file history, specification and claims would conclude that the Bio-Rad single and multi-wavelength detectors are not interchangeable modular units as required by the claims.  In fact, the inventors addressed this very type of component and unequivocally stated that such a detector did not come within the claims of its invention.

### 25.    Dependent Claim 30: "the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component"

218.    Claim 30 depends from claim 27, and requires that "the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component."

219.    I have discussed why this element is not met with respect to my discussion of element 1.e and claim 5.  I incorporate those discussions fully for this element.  Therefore, the "pH electrode" is not "external to the housing" as required.

### B.    Non-Infringement of the '589 Patent

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

1.    **Element [1.d]: "wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array"**

220.    Element [1.d]: "wherein the housing unit comprises on one external side of the housing unit a plurality of receiving positions, each receiving position adapted to receive the modular fluid handling units therein such that a fluid handling section thereof is on the external side of the housing unit, the receiving positions being arranged in a two dimensional array."

221.    I have discussed why there is not fluid handling section in the accused products with respect to claim 1 of the 420 paten which I incorporate fully herein.

2.    **Element [1.g]: "wherein each modular fluid handling unit . . . includes a CPU for independently performing fluid control operations in response to instructions over a system BUS"**

222.    Element [1.g] of the '589 patent requires "wherein each modular fluid handling unit . . . includes a CPU for performing fluid control operations independently irrespective of the location within the housing unit."

223.    See discussion for corresponding element of claim 1 of the 420 patent incorporated herein.

3.    **Element [6.f]: "each modular fluid handling unit includes a CPU for performing fluid control operations independently irrespective of the location within the housing unit"**

224.    See corresponding element of claim 1 of the 420 patent incorporated herein.

4.    **Dependent Claim 7: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are freely arrangeable modular fluid handling units"**

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

225.    Claim 7 depends from 6, and requires that the "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are freely arrangeable modular fluid handling units."

226.    I have discussed why this element is not met with respect to my discussion of claim 1 and element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

     **5.    Dependent Claim 8: "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit and the fluid control valves are arranged as modular fluid handling units"**

227.    Claim 8 depends from 1, and requires that the "housing unit is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit and the fluid control valves are arranged as modular fluid handling units."

228.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

     **6.    Dependent Claim 9: "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve"**

229.    Claim 9 depends from claim 8, which in turn depends from claim 1, and requires that "the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, and an outlet valve."

230.   I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**7.   Dependent Claim 13: "the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit"**

231.   Claim 13 depends from claim 1, and requires that "the automatic liquid chromatography system further comprises a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit."

232.   I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**8.   Dependent Claim 14: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels"**

233.   Claim 14 depends from claim 13, and requires that "the pH valve includes an integrated flow cell for in-line monitoring of pH levels."

234.   I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**9.   Dependent Claim 21: "the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when fitted in a receiving position of the housing unit"**

235.   Claim 21 depends from claim 20, and requires that "the fluid handling section of the modular fluid handling unit is sealed from an internal side of the housing unit when fitted in a receiving position of the housing unit."

236.    I have discussed why this element is not met with respect to my discussion of element 1.h of the '420 patent.  I incorporate those discussions fully for this element.

237.    The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed.  I incorporate my discussion of elements [1.e] and [1.f] for this element.  In summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as embedded in the panel member. "Embedding" as shown with the arrangement of Bergstrom does not create separate sections.  There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum, the electronics that Dr. Wereley describes as being embedded in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

### 10.    Dependent Claim 24: "a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit"

238.    Claim 24 depends from claim 6, and requires "a pH electrode that is external to the housing unit, and wherein the pH electrode is connected to a pH valve arranged as a modular fluid handling unit."

239.

### 11.    Dependent Claim 25: "the pH valve includes an integrated flow cell for in-line monitoring of pH levels"

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

240.    Claim 24 depends from claim 24, which depends from claim 6, and requires "the pH valve includes an integrated flow cell for in-line monitoring of pH levels."

241.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**12.      Dependent Claim 26: "the modular fluid handling units include two double piston pumps, one injection valve for injecting a sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer"**

242.    Claim 26 depends from claim 6, and requires "the modular fluid handling units include two double piston pumps, one injection valve for injecting a sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer."

243.    I have discussed why this element is not met with respect to my discussion of element 1.e and dependent claims 5-6 of the '420 patent.  I incorporate those discussions fully for this element.

**C.      Non-Infringement of the '590 Patent**

**1.      Element [1.b]: "interchanging at least two of the interchangeable modular components in a housing unit comprising at least four component receiving positions arranged in a two dimensional array, so as to allow for modification of the liquid chromatography fluid flow path among the at least four interchangeable modular components"**

244.    Dr. Wereley has not shown that this element was met.  I understand that in order to infringe this claim, which is a method claim the steps claimed need to have been performed.  Additionally, they need to have been performed in the United States and after the 590 patent issued on January 18, 2017. I see no such proof offered in Dr. Wereley's report.

245.    At paragraphs 491-507, Dr. Wereley states that he has seen videos of people changing modules.  But he does not establish in his report where this alleged changing is

77

248.    Element [1.c] of the '590 patent requires "wherein each of the at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit."

249.    The NGC System does not infringe claim 1 of the '590 patent because it lacks "at least four interchangeable modular components comprises a CPU unit for independently performing fluid control operations in response to instructions from a system controller when installed in a component receiving position of the housing unit."

250.    I have discussed why this element is not met with respect to my discussion of elements 1.k of the '420 patent.  I incorporate those discussions fully for this element.

251.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the "modular fluid handling unit" cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

252.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

3.    **Claims 2 and 3, Flow path shortened**

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

253.    None of the evidence that Dr. Wereley cited shows that even if modules are interchanged, the flow path is shortened.  The same is true for the evidence he cited for claim 3.  Thus, he failed to meet his burden on these claims.

**4.      Claims 10 and 12**

254.    Dr. Wereley has not met his burden to establish infringement of these claims. While he says the steps claimed could be done, he points to nothing where these steps were actually done in the United States after Jan. 18, 2017.  That is what is necessary to establish infringement of this method claim.  For this reason, he has not met his burden to show infringement.

**5.      Element [13.h]: "**comprising a CPU that allows independent fluid control operations in response to instructions from the main controller when installed in the component receiving position of the housing unit**"**

255.    Element [13.h] requires "the at least two interchangeable modular fluid handling units … compris[e] a CPU that allows independent fluid control operations in response to instructions from the main controller when installed in the component receiving position of the housing unit"

256.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

257.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the modular component's cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

80

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

258.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

6.    Claim 14 "adding an expansion housing unit that includes a plurality of component receiving positions, each component receiving position being adapted to receive the at least one interchangeable modular fluid handling unit, and placing at least one additional interchangeable modular fluid handling unit in one of the component receiving positions in the expansion housing"

259.    While Dr. Wereley states that the elements of these claims could be done, he does not cite evcidence showing that the expansion housings were used.  Nor does he show any use in the United States after January 18, 2017.  He has therefore failed to meet his burden to establish infringement.

7.    Claim 17: "the CPU allows for automatic identification by the liquid chromatography system upon placement in a component receiving position of similar size and shape"

260.    I do not agree with Dr. Wereley that the CPU does need to do the identification. In any event, the testimony that Dr. Wereley cites and his conclusion about infringement of this claim are inconsistent with the conclusions he reached in corresponding claims of the 420 patent where he stated that the MCU was doing the identification.  I incorporated the arguments I made with respect to that claim.  Moreover as with the other claims in this patent he has not shown that the method was actually performed in the U.S. at the proper time.

8.    Claim 18: "the at least two interchangeable modular fluid handling units are connected to the system by a system BUS"

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

261.    Dr. Wereley has not provided any evidence showing that this step was performed in the U.S. at the proper time to establish infringement.  Therefore he has failed to meet his burden of proof.

### D.    The '591 Patent

#### 1.    The NGC System Does Not Infringe Claim 9 of the '591 Patent at Least Because it Lacks Several Elements in Claim 1 from Which it Depends

262.    Claim 9 depends on claim 1.  I note that claim 1 of the '591 patent is nearly identical to claim 1 of the '420 patent.  Thus, I incorporate my analysis of claim 1 of the '420 patent.

##### (a)    Element [1.v]: an external fluidics section

263.    Element [1.v] requires "an external fluidics section."

264.    I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

##### (b)    Element [1.vi]: an internal non fluidics section

265.    I have discussed why this element is not met with respect to my discussion of element 1.f of the '420 patent.  I incorporate those discussions fully for this element.

##### (c)    Element [1.viii]: "a panel member arranged to separate the fluidics section from the non-fluidics section"

266.    Element [1.viii] of claim 1 of the '591 patent requires "a panel member arranged to separate the fluidics section from the non-fluidics section."

267.    The NGC System does not infringe claim 9 at least because it lacks "a panel member arranged to separate the fluidics section from the non-fluidics section," as claimed.

268.    I have discussed why this element is not met with respect to my discussion of element 1.h of the '420 patent.  I incorporate those discussions fully for this element.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

269.    The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed.  I incorporate my discussion of elements [1.e] and [1.f] of the '420 patent for this element.  In summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as embedded in the panel member. "Embedding" as shown with the arrangement of Bergstrom does not create separate sections. There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum, the electronics that Dr. Wereley describes as being embedded in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

   (d)    Element [1.ix]: "wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing"

270.    Element [1.ix] of claim 1 of the '591 patent requires "wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing."

271.    The NGC System does not infringe claim 9 at least because it lacks "wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

fluidics section is external to the housing and the non-fluidics section is internal to the housing," as claimed.

272.    I have discussed why this element is not met with respect to my discussion of elements 1.e and 1.f of the '420 patent.  I incorporate those discussions fully for this element.

(e)    **Claim [1.xi]: "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus"**

273.    Dependent claim [1.xi] requires "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus."

274.    The NGC System does not infringe claim 9 at least because it lacks "wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus," as claimed.

275.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

276.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the modular component's cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

277.   Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

### 2.   Dependent Claim 26: "the pH electrode is connected to a pH valve formed as an interchangeable modular component"

278.   Claim 26 depends from claim 12, and recites that "the pH electrode is connected to a pH valve formed as an interchangeable modular component."

279.   I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

### 3.   Dependent Claim 27: "the pH valve include[] an integrated flow cell for in-line monitoring of pH levels"

280.   Claim 27 depends from claim 26, and further requires that "the pH valve include[] an integrated flow cell for in-line monitoring of pH levels."

281.   I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

### E.   Non-Infringement of the '124 Patent

### 1.   Element [16.h]: "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel."

282.   Element [16.h] requires "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel."

85

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

283.    The NGC System does not infringe claim 16 at least because it lacks "a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel," as claimed.

284.    I have discussed why this element is not met with respect to my discussion of element 1.h of the '420 patent.  I incorporate those discussions fully for this element.

285.    The NGC System does not infringe this element because the NGC System does not include "a panel member arranged to separate the fluidics section from the non-fluidics section" as claimed.  I incorporate my discussion of elements [1.e] and [1.f] of the '420 patent for this element.  In summary, the electronics in the housing are not a separate non-fluidics section from the electronics Dr. Wereley describes as embedded in the panel member. "Embedding" as shown with the arrangement of Bergstrom does not create separate sections. There is no way to square the representations the inventors made about Mourtada, Bergstrom and Hess with respect to separation, with the arrangement in the Bio-Rad accused modules that have electronics adjacent to and on the same side of the panel member as the fluidics.  At a minimum, the electronics that Dr. Wereley describes as being embedded in the panel member are the fluidics in the Bio-Rad accused modules, which are not on "either side" of the panel member as the inventors said they must be.  Ex. G at 1451 ("The detector module 10 of Fig. 10 illustrates that fluid and electrical parts are adjacent **not on either side of a panel.**")(emphasis added).

2.    **Element [16.i]: "wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing"**

286.    Element [16.i] requires "wherein the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing."

86

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

287.    The NGC System does not infringe claim 16 at least because it lacks "the liquid handling panel of the housing and the panel members are arranged such that the fluidics sections are external to the housing and respective non fluidics sections are internal to the housing" as claimed.

288.    I have discussed why this element is not met with respect to my discussion of elements 1.e and 1.f of the '420 patent.  I incorporate those discussions fully for this element.

### 3.    Element [16.j]: "respective non fluidics sections are internal to the housing"

289.    Element [16.j] requires that the "respective non fluidics sections are internal to the housing."

290.    I have discussed why this element is not met with respect to my discussion of element 1.f of the '420 patent.  I incorporate those discussions fully for this element.

### 4.    Dependent Claim 20: "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus"

291.    Element [20.c] requires "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus."

292.    The NGC System does not infringe Claim 20 at least because it lacks "wherein each of the interchangeable modular components includes a dedicated CPU unit allowing each of the interchangeable modular components to independently perform operations in response to instructions over the bus" as claimed.

293.    I have discussed why this element is not met with respect to my discussion of element 1.k of the '420 patent.  I incorporate those discussions fully for this element.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

294.    In summary, a person of ordinary skill in the art would <u>not</u> read this limitation to mean that the modular component's cpu does nothing more than take the signal that the master control unit has sent and forward it.  For example, if the master control unit sent out a signal that would deliver a certain voltage or current to a module to make it operate at a certain level (*e.g.*, A high or low signal), one of ordinary skill in the art would <u>not</u> read the specification to mean that the CPU would take an instruction and merely create that same current or voltage or simply translate that instruction into a different format.

295.    Rather, one of ordinary skill in the art would understand the passage in the specification relating to the use independent operation of the CPU to mean that a signal is received from the master control unit and then the CPU does something above and beyond what that signal indicates and what the MCU would have done on its own, something that is independent of the signal the CPU sent.

> **5.    Dependent Claim 28 "the system includes two double piston pumps, one injection valve for injecting sample onto a column connecting to the flow path of the liquid chromatography system, a UV monitor, and a mixer"**

296.    Claim 28 depends from claim 16, and further requires that the system recited there comprise "two double piston pumps, one injection valve for injecting sample onto a column connecting to the flow path of the liquid chromatography system, a UV monitor, and a mixer."

297.    I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

> **6.    Dependent Claim 30: "further includes a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients"**

298.    Claim 30 depends from claim 28, which in turn depends on claim 16, and requires that the system "further includes a pH-valve with an integrated flow cell for in-line monitoring of

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients."

299.    I have discussed why this element is not met with respect to my discussion of element 1.e of the '420 patent.  I incorporate those discussions fully for this element.

## IX.    NON-INFRINGING ALTERNATIVES

300.    I have also been asked to opine on the existence of non-infringing alternatives and the relative difficult in creating a non infringing alternative by modifying the accused NGC products.  In summary, it is my opinion that non-infringing alternatives, such as the Bio-Rad DuoFlow, exist.  That chromatography system was the predecessor to the NGC.  Moreover, modifications to the NGC could be designed which would avoid infringement.

301.    First, with respect to the claims that require the presence of a microprocessor on each individual module that receives instructions from either the master control unit or the system controller and implements instructions independently, there are a number of design options available that would avoid that limitation of the claims.  For example, the instructions that the individual who reviewed the source code on Plaintiffs' behalf, Mr. Vukicevic, claims that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ As I explained with respect to the 2040 system, putting a CPU on each module was the result of Moore's law, in which the cost of CPUs became so low that there was no significant different in the cost of placing a CPU on each module or having a shared CPU.

302.    In this regard, Dr. Wereley has his analysis backwards.  He states that not having a CPU on each module would result in increased cost and complexity and it is not clear that it

89

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

comparable and in some cases more advanced than the technology covered by the asserted patents.



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



## XI.    OTHER COMMENTS

348.    The opinions expressed in this report are my preliminary opinions based on my review to date of the evidence produced at this stage of the case.  I reserve the right to amend or supplement my opinions in light of additional information or materials that may be provided to me or that are relied upon by any of Plaintiffs' experts or witnesses, as well as opinions that Plaintiffs' experts or witnesses may present.  I reserve my right to amend or update my opinions

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

DATED:  October 21, 2020

Bruce K. Gale, Ph.D.

# EXHIBIT C

US009671420B2

(12) **United States Patent**
Blomberg et al.

(10) Patent No.: **US 9,671,420 B2**
(45) Date of Patent: ***Jun. 6, 2017**

(54) **AUTOMATED FLUID HANDLING SYSTEM**

(71) Applicant: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

(72) Inventors: **Johan Blomberg**, Uppsala (SE); **Mats Lundkvist**, Uppsala (SE)

(73) Assignee: **GE HEALTHCARE BIO-SCIENCES AB**, Uppsala (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/261,250**

(22) Filed: **Sep. 9, 2016**

(65) **Prior Publication Data**

US 2016/0377644 A1      Dec. 29, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 15/165,876, filed on May 26, 2016, which is a continuation of application
(Continued)

(30) **Foreign Application Priority Data**

Jun. 9, 2009    (SE) ...................................... 0950431

(51) **Int. Cl.**
 **B01D 35/00**          (2006.01)
 **B01D 15/08**          (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... **G01N 35/1097** (2013.01); **B01D 15/10** (2013.01); **B01D 29/60** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,125,464 A    11/1978  Burger et al.
5,730,867 A     3/1998  Drew et al.
(Continued)

FOREIGN PATENT DOCUMENTS

DE       1984739 U     5/1968
DE       1418503 A    12/1975
(Continued)

OTHER PUBLICATIONS

ADE 2040 Process Analyzer Manual—Basic Operation, Applikon Analytical, Version 1.4, pp. 1-30, Jul. 2006.

*Primary Examiner* — Richard Gurtowski
(74) *Attorney, Agent, or Firm* — Arent Fox LLP

(57) **ABSTRACT**

Automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

**30 Claims, 10 Drawing Sheets**



## US 9,671,420 B2

Page 2

### Related U.S. Application Data

No. 14/463,039, filed on Aug. 19, 2014, now Pat. No. 9,404,902, which is a continuation of application No. 13/376,929, filed as application No. PCT/SE2010/050624 on Jun. 4, 2010, now Pat. No. 8,821,718.

(51) **Int. Cl.**

| | |
|---|---|
| *F16K 25/00* | (2006.01) |
| *G01N 35/10* | (2006.01) |
| *B01D 15/10* | (2006.01) |
| *G01N 30/88* | (2006.01) |
| *B01D 29/60* | (2006.01) |
| *G01N 30/24* | (2006.01) |
| *G01N 30/38* | (2006.01) |
| *B01D 17/12* | (2006.01) |
| *G01N 35/00* | (2006.01) |
| *G01N 30/02* | (2006.01) |

(52) **U.S. Cl.**

CPC ............. *G01N 30/24* (2013.01); *G01N 30/38* (2013.01); *G01N 30/88* (2013.01); *B01D 15/08* (2013.01); *B01D 17/12* (2013.01); *B01D 2201/54* (2013.01); *G01N 2030/027* (2013.01); *G01N 2030/8804* (2013.01); *G01N 2030/8881* (2013.01); *G01N 2035/00326* (2013.01); *Y10T 137/6416* (2015.04); *Y10T 137/6525* (2015.04); *Y10T 137/6851* (2015.04); *Y10T 137/85986* (2015.04); *Y10T 137/87885* (2015.04)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,766,460 | A | 6/1998 | Bergstrom et al. |
| 5,896,273 | A | 4/1999 | Varghese et al. |
| 5,959,841 | A | 9/1999 | Allen et al. |
| 6,190,617 | B1 | 2/2001 | Clark et al. |
| 6,355,164 | B1 | 3/2002 | Wendell et al. |
| 6,434,018 | B1 | 8/2002 | Waltz |
| 6,599,484 | B1 | 7/2003 | Zigler et al. |
| 6,741,463 | B1 | 5/2004 | Akhtar et al. |
| 6,832,622 | B2 | 12/2004 | Hassel et al. |
| 6,968,958 | B2 | 11/2005 | Lauchner et al. |
| 7,374,674 | B2 | 5/2008 | Miyauchi et al. |
| 7,641,242 | B2 | 1/2010 | Van Pelt |
| 7,910,067 | B2 | 3/2011 | Knight et al. |
| 7,932,090 | B2 | 4/2011 | Carter et al. |
| 8,821,718 | B2 | 9/2014 | Blomberg et al. |
| 9,404,902 | B2 * | 8/2016 | Blomberg .............. G01N 30/88 |
| 2002/0185442 | A1 | 12/2002 | Maiefski et al. |
| 2004/0089057 | A1 | 5/2004 | Hobbs et al. |
| 2004/0264145 | A1 | 12/2004 | Miller et al. |
| 2005/0051468 | A1 | 3/2005 | Miyauchi et al. |
| 2006/0047466 | A1 | 3/2006 | White |
| 2006/0274082 | A1 | 12/2006 | Cochran et al. |
| 2007/0081308 | A1 | 4/2007 | Ishida |
| 2007/0097636 | A1 | 5/2007 | Johnson et al. |
| 2007/0247826 | A1 | 10/2007 | Grady et al. |
| 2008/0023653 | A1 | 1/2008 | Lee et al. |
| 2008/0035542 | A1 | 2/2008 | Mourtada et al. |
| 2008/0233653 | A1 | 9/2008 | Hess et al. |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0309596 A1 | 4/1989 |
| JP | 2002-333438 A | 11/2002 |
| JP | 2005-106813 A | 4/2005 |
| WO | WO 00/22429 | 4/2000 |
| WO | WO 01/89681 | 11/2001 |
| WO | WO 2005/042146 A2 | 5/2005 |
| WO | WO 2006/134035 | 12/2006 |
| WO | WO 2007/036712 A1 | 4/2007 |

### OTHER PUBLICATIONS

ADI 2040 Process Analyzer Manual—Analysis Methods, Applikon Analytical, Sep. 2002, pp. 1-44, Version 1.4.

ADI 2040 Process Analyzer Manual—Basic Maintenance & Spare parts, Applikon Analytical, Mar. 2008, Version 1.53, pp. 1-48.

ADI 2040 Process Analyzer Manual—Configuration, Applikon Analytical, Version 1.4, pp. 1-44, Jul. 2006.

ADI 2040 Process Analyzer Manual—Hardware & Installation, Applikon Analytical, Version 1.53, p. 144, May 2008.

ADI 2040 Process Analyzer Manual—Serial Communication, Applikon Analytical, Version 1.4, 134 pp., Apr. 2006.

ADI 2040 Process Analyzer Manual, Applikon Analytical, 1-10 pp., Apr. 1999.

ADI 2045 VA Instrument Manual, Applikon Analytical, 2007, pp. 1-80, Version 1.2.

ADI Process Analyzer Manual—Advanced Operation, Applikon Analytical, Version 1.53, pp. 1-78, Oct. 2007.

Andreas Schmid, "The Energy Issue in Whole Cell Oxyfunctionalization," GreenChem Symposium, Nov. 9, 2006, pp. 5349-5386.

APC, "Rack Enclosures and Open Frame Racks for Server and Networking Applications in It Environments," Rack Systems, 2006, pp. 4619-4638.

Applikon Analytical Confidential, "Analyzers 1999-2008," Bio-Rad Ex. 1004, Jul. 8, 2015, pp. 1323-1326.

Applikon Analytical, "Box Wet Part Module 3X," Bio-Rad Ex.1003, 1 page, Feb. 11, 2008.

Applikon Analytical, "Manual ADI 2040 Process Analyzer," Apr. 1999, Bio-Rad Ex. 1002, pp. 1-619.

Applikon Analytical, "Multi-purpose wet chemical analysis," Process Analyzer ADI 2040, Sep. 2008, pp. 1547-1554.

Applikon Analytical, "Trace Metal and Plating Bath Analysis," ADI2045VA Process Analyzer, Sep. 2007, pp. 1555-1562.

Bilsker, Petition for Inter Parties Review, *Bio-Rad Laboratories, Inc,* v. *GE Healthcare Bio-Science AB,* Sep. 2015, pp. 1-71.

Bio-Rad Laboratories, Inc., "Biologic Duoflow Chromatography System," Instruction Manual, 2003, pp. 5810-6048.

Brinkmann, "875 ProcessLab Components," ProcessLab, pp. 1-26, Mar. 2001.

Brinkmann, "875 ProcessLab Hardware," ProcessLab, pp. 1-15, Mar. 2007.

Brinkmann, "Is ProcessLab Explosion-Proof?" ProcessLab, pp. 1-12, Mar. 2001.

Dionex, "ICS-3000 Ion Chromatography System Operator's Manual," Thermo Scientific, Jan. 2008, pp. 4779-5170.

Eda Tezcanli, "An Analytical Survey on Customization At Modular Systems in the Context of Industrial Design," A Thesis Submitted to the Graduate School of Engineering and Sciences of Izmir Institute of Technology in Partial Fulfillment of the Requirements for the Degree of Master of Science in Industrial Design, Jan. 2006, pp. 5701-5809.

EP Office Action dated Feb. 26, 2014 Issued on Corresponding EP Application No. 10786454.8.

General Electric, "Operating Instructions Original Instructions," ÄKTA pure, Apr. 2014, pp. 3785-3928.

General Electric, "User Manual," ÄKTA pure, Dec. 2014, pp. 3929-4445.

Gilson, Inc., "2007-2008 Product Guide," Bio-Rad Ex. 1010 pp. 1-37.

Gilson, Inc., "402 Syringe Pump User's Guide," Bio-Rad Ex. 1011, Jun. 2001, pp. 1-86.

Gilson, Inc., "402 Syringe Pump User's Guide," Jul. 2003, pp. 5208-5293.

Gilson, Inc., "Brochure," 2003, 1 Page.

Gilson, Inc., "Gilson Product Guide," 2004, pp. 5294-5343.

Gilson, Inc., "Product Guide," The Element of Purification, Jul. 2008, pp. 5171-5207.

Gilson, Inc., "Spec Sheet," 2003, 1 Page.

Gilson, Inc., "User's Guide," 2003, 1 Page.

# US 9,671,420 B2

Page 3

(56) **References Cited**

OTHER PUBLICATIONS

H. Schafer, "Compact View of a Modular Design or a new Philosophy in Metrohm IC," Processional IC, pp. 1-90, Sep. 2007.
J. Van Burg, "EU Declaration of Conformity," Manual ADI 2045VA, 2007, pp. 620-1322.
John Loffink, "Dell PowerEdge M1000e Modular Enclosure Architecture," Dell Enterprise White Paper, Jan. 2008, pp. 4577-4618.
JP Office Action dated Dec. 17, 2013 Issued on Corresponding JP Application No. 2012-514920.
Labomatic Instruments AG, "Customer-specific preparative HPLC Systems," 5387-5389, date unknown.
Labomatic, "Labomatic HPLC valve and column system panel," pp. 5347-5348, date unknown.
Larry Tucker et al., "Videotaped Deposition of Metrohm 30 (B)(6)," GE Healthcare vs. Bio-Rad, Aug. 10, 2015, pp. 1-292.
Metrohm—850 Processional IC Manual, http://products.matrohm.com, pp. 1-146, date unknown.
Metrohm AG, "850 Professional IC," Bio-Rad Ex. 1017, pp. 1337-1479, Feb. 2007.
Metrohm—Intelligent Ion Chromatography, www.professional-ic.com, 2012, pp. 1-28.
Metrohm Ion analysis, "IC Pump-2.872.0010," 872 Extension Module, pp. 1-67, May 2009.
Metrohm, "850 Professional IC," AnCat-MCS-2.850.3030, Bio-Rad Ex. 1017, May 2009, pp. 1-143.

Metrohm-Peak, Inc., "Determination of Anions + Oxyhalides in Various Waters by Suppressed Conductivity (USEPA method 300 A&B)," IC Application Work AW US6-0125-052007, 2007, pp. 001327-001336.
Tecan Group Ltd, "Cavro OEM Pumps and Valves," 2008, 1 page.
Tecan Group Ltd, "Cavro XLP 6000," 2008, 1 page.
Tecan Systems, "Cavro XLP 6000 Modular Syringe Pump," Operating Manual, Part I, Oct. 2005, pp. 5542-5698.
Thomas Koshy, "Declaration of Thomas Koshy," In the United States District Court for the Southern District of New York, Civil Action No. 1:14-cv-07080-LTS, pp. 1-3, Oct. 30, 2014.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.*, v. *GE Healthcare Bio-Sciences AB*," Case: IPR2015-01826, U.S. Pat. No. 8,821,718 B2, Paper No. 11, Entered: Feb. 29, 2016, pp. 1-47.
United States Patent and Trademark Office, "*Bio-Rad Laboratories, Inc.* v. *GE Healthcare Bio-Sciences AB*," Declaration of Dr. Bruce Gale in Support of Bio-Rad Laboratories' Petition for Institution of an IPR on United States Patent No. 8,821,718 B2, pp. 1-84, Sep. 2015.
Waters Corporation, "Waters 2767 Sample Manager, Injector, and Collector," Installation and Maintenance Guide, 2006, pp. 5390-5541.
Metrohm 850 Professional IC teardown system, (2.850.2220 ProfIC Anion MCS HP Gradient), Aug. 2016, pp. 1-9.
European Search Report dated Mar. 27, 2017 issued in corresponding European Patent Application No. 16205536.2. (8 pages).

\* cited by examiner

100



Fig. 1



Fig. 2



Fig. 3



Fig. 4a



Fig. 4b



Fig. 4c



Fig. 4d



Fig. 5a



Fig. 5b



Fig. 6



Fig. 7a

Fig. 7b



Fig. 8



Fig. 9



Fig. 10

US 9,671,420 B2

**1**

# AUTOMATED FLUID HANDLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a Continuation of U.S. patent application Ser. No. 15/165,876 filed May 26, 2016 which is a Continuation of U.S. patent application Ser. No. 14/463,039 filed Aug. 19, 2014 (now U.S. Pat. No. 9,404,902) which is a Continuation of U.S. patent application Ser. No. 13/376, 929 (now U.S. Pat. No. 8,821,718) filed Dec. 8, 2011 which is a 35 U.S.C. §371 National Phase of International Patent Application No. PCT/SE2010/050624 filed Jun. 4, 2010 which claims priority to Swedish Patent Application No. 0950431-7 filed Jun. 9, 2009, the disclosure of these prior applications are hereby incorporated in their entirety by reference

## BACKGROUND OF THE INVENTION

The present invention relates to the art of fluid handling system systems, and in particular to an automated fluid handling system that is highly flexible and configurable. The fluid handling system may e.g. be a liquid chromatography system, a filtration system, a chemical synthesis system or the like.

There is a large range of fluid handling systems e.g. in laboratories. Such systems comprise a number of fluid handling units, e.g. one or more pumps, valves, mixers, sensor units etc of different types. Said fluid handling units are interconnected by fluid conduits in the form of, rigid or flexible tubes or the like. Even though some systems may be designed for a specific type of application with a specific flow path, there often exists a need for flexibility and ability to alter or optimize the fluid flow path of the system. Moreover, upgrading is often restricted to specific kits provided by the manufacturer, and upgrade kits often is supplied as external add-on equipment to be arranged besides the original system, thus enlarging the foot print of the system and that need to be connected to the system both fluidically and electrically (i.e. to a system control bus or the like). Moreover, replacement of defect fluid handling units is a time consuming and delicate task.

One type of liquid handling system is liquid chromatography systems which is a standard method in laboratories, and there are a broad range of liquid chromatography systems available on the market. Common to most of the present systems is the lack of flexibility in adapting the instrument to a variety of different applications.

## SUMMARY OF THE INVENTION

The object of the invention is to provide a new fluid handling system, which system overcomes one or more drawbacks of the prior art. This is achieved by the fluid handling system as defined in the independent claims.

One advantage with such a fluid handling systems is that the system may easily be upgraded without need for add-on equipment, and that the flow path may be easily optimized for new experimental setups.

Embodiments of the invention are defined in the dependent claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described in detail below with reference to the drawings, in which

**2**

FIG. **1** shows one embodiment of a fluid handling system in the form of a liquid chromatography system, according to the present invention.

FIG. **2** is a schematic illustration of a housing with a liquid handling panel of the fluid handling system of FIG. **1**.

FIG. **3** is a schematic illustration of the housing with the liquid handling panel of FIG. **2** with the modular components of the fluid handling system removed.

FIGS. **4**a to **4**d are schematic illustrations of examples of component modules of the fluid handling system removed.

FIGS. **5**a and **5**b show a schematic embodiment of an automated fluid handling system.

FIG. **6** is a schematic illustration of an embodiment of a housing with a modular liquid handling panel with the modular components of the fluid handling system removed.

FIGS. **7**a and **7**b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with the modular components of the fluid handling system removed.

FIG. **8** is a schematic illustration of an embodiment of the system architecture of one embodiment of a fluid handling system according to the present invention.

FIG. **9** is a schematic illustration of an embodiment of a master control unit of one embodiment of a fluid handling system according to the present invention.

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel for the liquid chromatography system of FIG. **1**.

## DETAILED DESCRIPTION OF THE INVENTION

According to one embodiment, there is provided an automated fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components with an external fluidics section and an internal non fluidics section, and wherein the housing comprises a liquid handling panel with two or more of component positions for receiving said interchangeable modular components such that the external fluidics section is separated from the non fluidics section by the liquid handling panel.

According to another embodiment, there is provided a fluid handling system in the form of a liquid chromatography system comprising a housing, two or more high pressure pumps, at least one sensor unit and a plurality of fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components and the housing comprises a liquid handling panel with a plurality of component positions for receiving said modular components.

FIG. **1** shows one embodiment of an automated fluid handling system modular in the form of a liquid chromatography system, with a plurality of interchangeable modular components arranged in a liquid handling panel wherein the reference numbers denotes:

**1**. Injection valve
**2**. Column valve with integrated pressure sensors
**3**. Conductivity monitor
**4**. UV monitor
**5**. Quaternary valve
**6**. Inlet valve B with integrated air sensor
**7**. System pump
**8**. Pressure monitor, system pump
**9**. Inlet valve A with integrated air sensor
**10**. System pump

US 9,671,420 B2

3

**11.** Pressure monitor, sample pump

**12.** Sample pump

**13.** Rinsing system

**14.** Mixer with online filter

**15.** Sample inlet valve with integrated air sensor

**16.** Flow restrictor

**17.** pH valve

**18.** Outlet valve

The disclosed embodiment is supplied with three high precision pumps **7**, **10**, **12**. There are two System pumps **7**, **10**, System pump A **10** and System pump B **7**, and one Sample pump **12**. The System pumps **7**, **10** may be used individually, or in combination to generate isocratic or gradient elution in purification methods. The Sample pump **12** is dedicated for direct loading of sample onto a column, or for filling of sample loops.

Function of the Pumps:

Each pump module consists of two pump heads (not shown). The individual heads are identical but actuated in opposite phase to each other by individual stepper motors, controlled by a microprocessor. The two pistons and pump heads work alternately to give a continuous, low pulsation, liquid delivery. The flow rate of the two System pumps may be varied between about 0.001 ml/min and 25.000 ml/min and the maximum operating pressure is about 20 MPa. The flow rate of the Sample pump may e.g. be varied between 0.01 and 25 ml/min and according to one embodiment the maximum operating pressure is 10 MPa.

According to one embodiment, the plurality of fluid control valves of at least two different configurations are valves of rotary type. Such a motorized rotary valve may consist of a Valve head with a number of defined bores with channels to the inlet and outlet ports of the valve. The Rotary disc, mounted on the motor, has a number of defined channels. The pattern of channels of the Rotary disc together with the pattern and location of the ports of the Valve head, define the flow path and function of each type of valve. When the Rotary disc turns, the flow path in the valve changes.

One embodiment of fluid control valves are Inlet valves A and B (**9**, **6** respectively) that are used to select which buffers or samples to use in a run, and Sample inlet valve **15** that is located before Sample pump **12**. Inlet valve A **9 1** is located before System pump A **10**, Inlet valve B **6** is located before System pump B **10**, and Sample inlet valve **15** is located before Sample pump **12**. Inlet valve A and Inlet valve B are connected to another embodiment of a fluid control valve in the form of a Quaternary valve **5**. The Quaternary valve is used for automatic buffer preparation, and for formation of quaternary gradients. The number of inlets can be increased by installing component modules with extra inlet valves. Inlet valve A and Inlet valve B enable automatic changing between different buffers and wash solutions, and can be used to generate gradients by mixing buffer A and buffer B. The air sensors integrated in Inlet valve A and Inlet valve B can be used to prevent introduction of air into the pumps and columns.

The Quarternary valve is used for automatic mixing of four different solutions. The Quaternary valve opens one inlet port at a time, and the different solutions are mixed in a Mixer **14** to form the desired buffer. The opening time in the switching valve is controlled by the system. The volume for each inlet port opening increases stepwise when the flow increases. To obtain a homogeneous buffer composition, one has to make sure to use a mixer chamber volume suitable for the flow rate of the method.

4

The Quaternary valve can be used to create a gradient using four different solutions simultaneously in any combination. The percentage of each solution is controlled by instructions in the method. It is possible to form gradients that changes the percentage of two, three or four solutions linearly over time. This is useful when advanced methods are developed.

The Sample inlet valve **15** enables automatic loading of different samples when using the Sample pump **12** to inject sample directly onto the column or to fill a sample loop. The Sample inlet valve has an inlet dedicated for buffer. This Buffer inlet is used in methods to fill the Sample pump with solution before sample is introduced. The Buffer inlet is also used to wash the Sample pump with buffer between runs. The air sensor integrated in the Sample inlet valve is e.g. used when sample is applied from a vessel onto a column by selecting Inject all sample using air sensor in the Sample application phase of a method. This function uses the Buffer inlet is used to finalize sample injection and to remove air from the Sample pump.

Still another embodiment of fluid control valve may be an Injection valve **1**, which is used to direct sample onto the column. The valve enables usage of a number of different sample application techniques. A sample loop can be connected to the Injection valve and filled either automatically using the Sample pump or manually using a syringe. The sample can also be injected directly onto the column using the Sample pump.

Still another embodiment of fluid control valve may be a Column valve **2** that is used for connection of columns to the system, and to direct the flow onto the column Up to five columns can be connected to the disclosed embodiment of said valve simultaneously. The valve also has a built-in bypass capillary that enables bypassing of connected columns.

The number of column positions can be increased by installing an extra Column valve. Both top and bottom of each column shall be connected to the Column valve. The top of the column shall be connected to one of the A ports (e.g., **1A**), and the bottom of the column shall be connected to the corresponding B port (e.g., **1B**). The flow direction can be set either from the top of the column to the bottom of the column, Down flow, or from the bottom of the column to the top of the column, Up flow. In the default flow path of the Column valve the columns are bypassed. Pressure monitors that measures the actual pressure over the column are integrated into the inlet and outlet ports of the Column valve.

Still another embodiment of fluid control valve may be a pH valve **17** that has an integrated flow cell where a pH electrode can be installed. This enables in-line monitoring of pH during the run. A flow restrictor is connected to the pH valve and can be included in the flow path to generate a backpressure high enough to prevent formation of air bubbles in the UV flow cell. The pH valve is used to direct the flow to the pH electrode and to the flow restrictor, or to bypass one or both.

Still another embodiment of fluid control valve may be an Outlet valve **18** that is used to direct the flow to a Fraction collector (not shown), to any of e.g. 10 outlet ports, or to waste. The number of outlets can be increased by installing an extra Outlet valve.

A Mixer **14** may e.g. be located after System pump A and System pump B and before the Injection valve. The purpose of the Mixer is to make sure that the buffers from the System

US 9,671,420 B2

5

pumps are mixed to give a homogenous buffer composition. The Mixer has a built-in filter that prevents impurities from entering the flow path.

To fulfill a desired purpose, with the disclosed liquid chromatography system it is possible to adapt and extend the flow path in a simple and a flexible way. Up to three extra fluid control valves or the like can be installed using the free valve positions. Dummy modules are installed in these positions at delivery. To obtain an optional flow path, it is also possible to move the standard fluid control valves to other positions. There are also two types of extra air sensors available which can be installed before Sample inlet valve or after Injection valve.

In the configuration disclosed in FIG. 1, 7 inlets are available for each inlet valve. To increase the number of inlets, an extra inlet valve can be installed which increases the number of inlets to 14 for one of the valves. This optional configuration can be convenient for example when a larger number of samples will be used. There is also a general type of inlet valve, Valve X, which can be used to increase the number of inlets to for example the Quaternary valve.

In the configuration disclosed in FIG. 1 with one column valve, 5 column positions are available. To increase the number of column positions to 10, an additional column valve can be installed in the instrument. An application can be to evaluate a number of different columns in method optimization.

In the configuration disclosed in FIG. 1 with one outlet valve, 10 outlet positions are available. To increase the number of outlets, one or two extra outlet valves can be connected, adding up to a total of 21 or 32 outlet positions. This optional configuration is convenient when collecting a number of large fractions outside the fraction collector.

Optional modules are easy to install in the disclosed modular liquid chromatography system. The dummy module is removed with a hexagon wrench and a bus cable is disconnected. The bus cable is connected to the optional fluid control valve or the like which is assembled in the instrument. The module is then added to the System properties in the control software. The available optional modules may e.g. be pre-configured to give the desired function. However, the function of a valve may e.g. be changed by changing the Node ID.

FIG. 2 is a schematic illustration of a housing 20 with a liquid handling panel 22 of the fluid handling system in the form of a modular liquid chromatography system 100 of FIG. 1. In FIG. 2 some components have been removed for clarity reasons. In the disclosed configuration, as disclosed in detail above, the modular liquid chromatography system 100 comprises a plurality of fluid control valves in the form of: Injection valve 1, Column valve 2, Quaternary valve 5, Inlet valve B 6, Inlet valve A 9, Sample inlet valve 15, pH valve 17, and Outlet valve 18. The chromatography system 100 further comprises UV monitor 4, System pump B 7, System pump A 10, Sample pump 12, Mixer 14, and three Dummy modules 24. According to one embodiment, all liquid handling components and sensors arranged at the liquid handling panel 22 are designed to be readily interchangeable. The interchangeability provides improved service and upgrade possibilities and also a possibility to customize the positions of the respective liquid handling components, such as the fluid control valves, e.g. in order to optimize the fluid path for a specific experimental setup. As is illustrated in FIG. 2, there are three large component positions e.g. for pump modules, one UV-sensor position and 9 standard component positions, e.g. for fluid control valves or the like. The component positions are given a

6

standardized size and shape to provide simple interchangeability. According to one embodiment, each modular component is retained in a mating component position by a single screw, and it is connected to the master control unit by a single bus cable providing both communication and system power to each component. FIG. 3 is a schematic illustration of the housing with the liquid handling panel of FIG. 2 with the modular components of the liquid chromatography system removed.

FIGS. 4a to 4d are schematic illustrations of examples of fluid handling units in the form of modular component of the fluid handling system removed. FIG. 4a shows a standard interchangeable modular component 26, e.g. a fluid control valve or the like. The standard component module 26 comprises a panel member 28, an external fluidics section 30 and an internal non-fluidics section 32. According to one embodiment, the panel member 28 essentially separates the fluidics in the external fluidics section 30 from electronics and control means in the internal non-fluidics section 32.

FIG. 4b shows a Dummy module 24, which is intended to be placed in non used standard component positions. In the disclosed embodiment, the Dummy modules are provided with mounting grooves for attachment of accessories to the system. In the disclosed embodiment the dummy module is shown as a panel member 28 without any internal section FIGS. 4c and 4d shows a pump module and an UV-module, respectively, each having an external fluidics section 30 and an internal non-fluidics section 32.

As is disclosed in FIGS. 4a to 4d, the interchangeable modular components 26 comprises a panel member arranged to separate the fluidics section from the non fluidics section and for attachment to a component position in the liquid handling panel. Said panel attachment member may be arranged so that all fluid connections of said modular component are arranged on a wet side of the panel attachment member separating them from electrical components that are arranged on a dry side thereof, hence providing a high degree of liquid resistance at the external part of the fluid handling panel, and so that the liquid resistance requirements for the internal sections may be somewhat lightened. According to one embodiment, the interchangeable modular components are sealed against the liquid handling panel by a sealing member. According to another embodiment, not shown, the modular component does not comprise any panel member, but there is provided a suitable sealing arrangement between the component position openings of the liquid handling panel and the external surface of the interchangeable modular components 26. In the disclosed embodiments, the component position openings of the liquid handling panel and the interchangeable modular components 26 are shown to have an essentially rectangular crosssectional shape, but other shapes may be equally applicable. According to one embodiment, there is provided a general fluid handling system comprising a housing and two or more fluid handling units arranged as interchangeable modular components as is schematically disclosed in FIG. 5a. As discussed above such a system may be configured for essentially any type of automated liquid handling operations provided that suitable fluid handling units are provided as interchangeable modular components for the system. According to one embodiment there is provided an automated fluid handling system comprising at least one fluid pump, at least one sensor unit and two or more fluid control valves of at least two different configurations, wherein at least the fluid control valves are arranged as interchangeable modular components.

US 9,671,420 B2

7

The liquid handling panel 22 of the fluid handling system may e.g. be designed in any suitable manner to allow the modular components to be arranged in an efficient manner.

FIGS. 5a and 5b shows a schematic embodiment of an automated fluid handling system wherein the housing 20 comprises an internal climate panel 29 arranged at a distance behind the liquid handling panel 22 defining an air inlet compartment 35 and air outlet compartment 37 in the housing 20, the climate panel 29 being provided with complementary component positions 39 for receiving the internal non fluidics section 32 of the interchangeable modular components 26, and wherein the non-fluidics section 32 of at least one interchangeable modular component is provided with one or more air inlet openings 31 located in the air inlet compartment 35 and one or more air outlet openings 33 located in the air outlet compartment 37 when the interchangeable modular component arranged in position in the component position. FIG. 5b shows the fluid handling system of FIG. 5a in a schematic cross sectional view. As is indicated by inlet vent 41 and outlet vent 43, air for cooling interchangeable modular components 26 provided with air inlet and outlet openings 31, 33 is preferably arranged to enter the air inlet compartment 35 at a distance from the outlet vent 43 in order to avoid recirculation of air. The air circulation in the system may be achieved by a system cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37, through the at least one interchangeable modular component 26. Alternatively, the at least one interchangeable modular component 26 is provided with a local cooling unit (not shown) providing a flow of air from the air inlet compartment 35 to the air outlet compartment 37. As is indicated, the complementary component positions 39 are arranged to provide a relatively air flow tight fit with respect to the internal non fluidics section 32 of the interchangeable modular components 26, and according to one embodiment, this may be achieved by a sealing arrangement. In FIG. 5b, there is shown a sealing member 45 for sealing the interchangeable modular components 26 with respect to the liquid handling panel 22, as discussed above. Other sealing member arrangements may be envisaged by a person skilled in the art. According to one embodiment, fluids are strictly restricted to the fluidics section 30 of the interchangeable modular component 26, but in alternative embodiments, only fluid connections are restricted to the fluidics section 30 allowing fluid to "cross" the fluid handling panel inside the non-fluidics section 30 of the interchangeable modular component 26.

In FIG. 5b there is further shown a master control unit 40 and buss connectors 42 for connecting the interchangeable modular components 26 to the master control unit 40. According to one embodiment, the component positions including the buss connectors 42 and the interchangeable modular components 26 are of plug and play configuration with respect to each other.

FIG. 6 is a schematic illustration of an embodiment of a housing 20 with a modular liquid handling panel 22 with the modular components of the liquid chromatography system removed. In the disclosed embodiment, also the layout of the liquid handling panel 22 is configurable by means of two interchangeable panel sections 34 which may be selected in accordance with the desired layout of the system. In FIG. 6 two different layouts of the interchangeable panel sections are disclosed, but the layout may include any suitable configuration.

FIGS. 7a and 7b are schematic illustrations of an embodiment of a modular housing with a liquid handling panel with

8

the modular components of the liquid chromatography system removed. In the disclosed embodiment, the modular housing is comprised of a main housing 36 that comprises the master control unit including power supply and climate control for the whole housing, two expansion housing modules 38 and a side member 40. This approach provides very flexible expansion possibilities for the chromatography system, while preserving the benefits of a single master control unit including power supply and climate control.

FIG. 8 is a schematic illustration of an embodiment of the system architecture of one embodiment of a modular liquid chromatography system according to the present invention. As mentioned above, the chromatography system may comprise a master control unit 40 arranged to communicate with all modular components e.g. 1-26, over a system bus 42 such as a CAN-bus or the like. In one embodiment, each modular component is provided with a dedicated CPU unit allowing the component to independently perform operations in response to instructions over the BUS 42. In order to minimize the number of connectors to be attached to each modular component, the bus 42 further comprises power feed for the modular components. The Bus 42 may be connected to any suitable number of modular components arranged in the housing 20, but also to one or more modular components 44 outside of the housing 20 or the like. As is mentioned briefly above, the master control unit may further be arranged to control the climate in the housing 20. In addition to the disclosed modular components, other components of the chromatography system, e.g. a fraction collector or the like, may be arranged in the housing and the controlled climate therein.

According to one embodiment, different component modules are automatically identified by the master control unit, whereby they may be moved essentially freely between different positions. Moreover, the master control unit may be arranged to provide said information to Chromatography control software whereby experimental setup and planning may be performed. In one embodiment, the control system may be arranged to provide an optimized layout of the component modules with respect to the present layout of the liquid handling panel and available component modules for a specific experimental setup.

According to one embodiment, the interchangeable panel sections 34 of FIG. 5 and the expansion housing modules 38 of FIGS. 6a and 6b may be provided with means for automatic detection of the same to allow automatic configuration of the system by the master control unit 40. In one embodiment, each interchangeable panel section 34 and expansion housing module 38 comprises a hub (not shown) for connection to the system bus 42 in order to expand the system bus 42 network to the number of component modules in each interchangeable panel section 34 or expansion housing module 38.

FIG. 9 is a schematic illustration of an embodiment of a master control unit of one embodiment of a modular liquid chromatography system according to the present invention. The master control unit 40 comprises a system controller 46 for communicating with internal and external components and control computers (not shown) etc. According to one embodiment, the system controller comprises a suitable CPU 48, a bus controller 52, an external communications controller 50, such as a LAN unit, and a storage device 54. The bus controller 52 is providing communication with the component modules. The master control unit may further comprise a Power supply 56 and a climate controller 58 arranged to keep the internal climate in the housing 20 at a predetermined level as discussed above.

US 9,671,420 B2

9

FIG. **10** is a schematic illustration of one embodiment of a fluidic interconnection arrangement between the modular components of the liquid handling panel. Taking into account the complexity of the disclosed interconnection arrangement, the benefit of optimizing the fluid paths in alternative configurations of the system becomes evident. The task of optimizing the fluid paths may e.g. be performed to reduce the total length/volume of the fluid paths/tubing arranged to interconnect the different component modules in the system. Alternatively the optimization may be performed to minimize the length/volume of one or more specific fluid paths, such as the sample output path from the column to the fraction collector, in order to minimize dispersion of the fractionated sample.

The invention claimed is:

**1**. An automated liquid chromatography system comprising:

a housing;

a master control unit connected to a system bus; and

three or more fluid handling units arranged as interchangeable modular components comprising (i) an external fluidics section, (ii) an internal non-fluidics section including a bus connector for directly connecting the interchangeable modular component with the system bus, and (iii) a panel member arranged to separate the fluidics section from the non-fluidics section;

wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing;

wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus;

wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus;

wherein the master control unit is arranged to automatically identify interchangeable modular components;

wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least three of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and

wherein the system is capable of performing automated liquid chromatography.

**2**. The chromatography system of claim **1**, wherein the interchangeable modular components are sealed against the liquid handling panel by a sealing member.

**3**. The chromatography system of claim **1**, wherein the interchangeable modular components are all of the same size.

**4**. The chromatography system of claim **1**, wherein the interchangeable modular components are of two or more sizes.

**5**. The chromatography system of claim **1**, wherein the liquid chromatography system further comprises a pH electrode that is external to the housing.

**6**. The chromatography system according to claim **5**, wherein the at least two fluid control valves include an

10

injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve.

**7**. The chromatography system according to claim **5**, wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component.

**8**. The chromatography system according to claim **7**, wherein the pH valve includes an integrated flow cell for in-line monitoring of pH levels.

**9**. The chromatography system of claim **1**, wherein the liquid chromatography system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

**10**. The chromatography system of claim **1**, wherein the liquid chromatography system comprises two double piston pumps, one injection valve for injecting sample onto a column connecting a flow path of the liquid chromatography system, a UV monitor, and a mixer, wherein the pumps, valve, monitor, and mixer are interchangeable modular components.

**11**. The chromatography system of claim **10**, wherein the liquid chromatography system further comprises a column valve comprising pressure sensors integrated into inlet and outlet ports of the column valve for measuring the actual pressure over the connected column.

**12**. The chromatography system of claim **10**, wherein the liquid chromatography system further comprises a sample inlet valve.

**13**. The chromatography system of claim **10**, wherein the liquid chromatography system further comprises a conductivity monitor.

**14**. The chromatography system of claim **10**, wherein the liquid chromatography system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

**15**. The chromatography system according to claim **1**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve.

**16**. The chromatography system of claim **1**, wherein the liquid chromatography system includes two double piston pumps, one injection valve for injecting a sample onto a column connected to a flow path of the liquid chromatography system, a UV monitor, a mixer, a pH-valve with an integrated flow cell for in-line monitoring of pH levels, and a quaternary valve for automatic buffer preparation and formation of quaternary gradients, wherein the pumps, injection valve, monitor, mixer, pH valve, and quaternary valve are interchangeable modular components.

**17**. An automated liquid chromatography system comprising:

a housing;

a master control unit connected to a system bus; and

two or more fluid handling units arranged as interchangeable modular components comprising a panel member arranged to separate a fluidics section from a non-fluidics section, wherein the fluidics section of each interchangeable modular component comprises one or more fluid connectors for connecting the fluid handling unit to a liquid chromatography fluid path and wherein all fluid connectors are on an external side of the panel member, said liquid chromatography fluid path being reconfigurable by moving the interchangeable modular components freely between the component receiving

US 9,671,420 B2

11

positions, and wherein the non-fluidics section includes a bus connector for directly connecting the interchangeable modular components to the system bus;

wherein the housing comprises a liquid handling panel with two or more component receiving positions adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing;

wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus;

wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus;

wherein the master control unit is arranged to automatically identify interchangeable modular components;

wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and

wherein the system is capable of performing automated liquid chromatography.

**18**. The chromatography system of claim **17**, wherein the interchangeable modular components are all of the same size.

**19**. The chromatography system of claim **17**, wherein the interchangeable modular components are of two or more sizes.

**20**. The chromatography system of claim **17**, wherein the two or more component receiving positions are arranged in a two dimensional array.

**21**. The chromatography system of claim **17**, wherein the housing comprises at least four component receiving positions.

**22**. The chromatography system of claim **17**, wherein the liquid chromatograph system further comprises a pH electrode that is external to the housing.

**23**. The chromatography system according to claim **22**, wherein the at least two fluid control valves include an injection valve, a column valve with integrated pressure sensors, a quaternary valve, an inlet valve, a sample inlet valve, a pH valve, or an outlet valve.

**24**. The chromatography system according to claim **22**, wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component.

**25**. The chromatography system according to claim **24**, wherein the pH valve includes an integrated flow cell for in-line monitoring of pH levels.

**26**. The chromatography system of claim **17**, wherein the liquid chromatography system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

12

**27**. An automated liquid chromatography system comprising:

a housing;

a master control unit connected to a system bus; and

two or more fluid handling units arranged as interchangeable modular components comprising a panel member arranged to separate a fluidics section from a non-fluidics section, wherein the fluidics section of each interchangeable modular component comprises one or more fluid connectors for connecting the fluid handling unit to a liquid chromatography fluid path and wherein all fluid connectors are on an external side of the panel member, said liquid chromatography fluid path being reconfigurable by moving the interchangeable modular components freely between the component receiving positions, and wherein the non-fluidics section includes a bus connector for directly connecting the interchangeable modular components to the system bus;

wherein the housing comprises a liquid handling panel with at least four component receiving positions arranged in a two dimensional array and adapted to receive said interchangeable modular components such that, when inserted, the fluidics section is external to the housing and the non-fluidics section is internal to the housing;

wherein each component receiving position includes a complementary connector for connecting the bus connector of the interchangeable modular component inserted therein to said system bus;

wherein each interchangeable modular component includes a dedicated CPU unit allowing the interchangeable modular component to independently perform operations in response to instructions over the system bus;

wherein the master control unit is arranged to automatically identify interchangeable modular components;

wherein said housing is adapted to accommodate at least one pump, at least one sensor unit and at least two fluid control valves of different configurations, of which at least two of the pump, the sensor unit, and the fluid control valves are interchangeable modular components; and

wherein the system is capable of performing automated liquid chromatography.

**28**. The chromatography system of claim **27**, wherein the interchangeable modular components are all of the same size; or of two or more sizes.

**29**. The chromatography system of claim **27**, wherein the system further comprises at least one expansion housing module arranged to be attached to the housing and for accommodating additional interchangeable modular components.

**30**. The chromatography system of claim **27**, wherein the system further comprises a pH electrode that is external to the housing, and wherein the pH electrode is connected to a pH valve formed as an interchangeable modular component.

\*   \*   \*   \*   \*

# EXHIBIT D

Trials@uspto.gov                                        Paper 39
571-272-7822                                Entered: February 6, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BIO-RAD LABORATORIES, INC.,
Petitioner,

v.

GE HEALTHCARE BIO-SCIENCES AB,
Patent Owner.
_____

Case IPR2015-01826
Patent 8,821,718 B2
_____

Before GRACE KARAFFA OBERMANN, JO-ANNE M. KOKOSKI, and
MICHELLE N. ANKENBRAND, *Administrative Patent Judges.*

ANKENBRAND, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
Determining Claims 1–3 and 5 Unpatentable
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73*
Dismissing as Moot Patent Owner's Motion to Exclude
*37 C.F.R. 42.64(c)*

IPR2015-01826
Patent 8,821,718 B2

# I.    INTRODUCTION

This is a Final Written Decision in an *inter partes* review challenging the patentability of claims 1–3 and 5 ("the challenged claims") of U.S. Patent No. 8,821,718 B2 (Ex. 1001, "the '718 patent"). We have jurisdiction under 35 U.S.C. § 6. For the reasons that follow, we determine Petitioner demonstrates, by a preponderance of evidence, that claims 1–3 and 5 are unpatentable.

## A.  Procedural History

Bio-Rad Laboratories, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") for *inter partes* review pursuant to 35 U.S.C. § 311. On February 29, 2016, we instituted trial on three grounds of unpatentability asserted in the Petition:

(1)  Whether claims 1–3 and 5 of the '718 patent are unpatentable under 35 U.S.C. § 102 as anticipated by the 2040 Manual;[1]

(2)  Whether claim 3 of the '718 patent is unpatentable under 35 U.S.C. § 103 as obvious over the 2040 Manual; and

(3)  Whether claim 1 of the '718 patent is unpatentable under 35 U.S.C. § 102 as anticipated by the Gilson 402 User Guide.[2]

Paper 11 ("Institution Decision" or "Inst. Dec.").

GE Healthcare Biosciences AB ("Patent Owner") filed a Response (Paper 23, "Resp."), and Petitioner filed a Reply (Paper 28, "Reply").

---

[1] Applikon Analytical B.V., ADI 2040 Process Analyzer Manual (Ex. 1002, "2040 Manual").

[2] Gilson 402 Syringe Pump User's Guide, *available at* http://web.archive.org/web/20031115192306/http://www.gilson.com/Products/prodPDF.asp?pID=17&pdftid=USER (Ex. 1011, "Gilson 402 User Guide").

IPR2015-01826
Patent 8,821,718 B2

Petitioner supports its Petition with the Declaration of Dr. Bruce Gale
(Ex. 1018).  Patent Owner relies on the Declaration of Mats Söderman
(Ex. 2009).

Patent Owner's fully briefed Motion to Exclude also is pending.
Paper 32 (Motion); Paper 36 (Petitioner's Response); Paper 37 (Patent
Owner's Reply).  The record further includes a transcript of the final oral
hearing conducted on November 17, 2016.  Paper 38 ("Tr.").

### B.  Related Proceedings

The parties indicate that the '718 patent is the subject of a concurrent
proceeding in the United States District Court for the Southern District of
New York:  *GE Healthcare Bio-Sciences AB v. Bio-Rad Laboratories, Inc.*,
Case No. 1:14-cv-07080-LTS-SN (S.D.N.Y.), which has been stayed.
Pet. 1; Paper 10, 1.  The '718 patent also is the subject of a reissue
proceeding, U.S. Patent Reissue Application No. 15/008,155 (filed January
27, 2016), which the Board stayed pending the completion of this
proceeding.  Paper 10, 1; *see* Paper 18.

### C.  The '718 Patent

The '718 patent, titled "Automated Fluid Handling System," issued on
September 2, 2014.  The '718 patent relates to "an automated fluid handling
system that is highly flexible and configurable."  Ex. 1001, 1:15–16.  The
fluid handling system may be, *inter alia*, a liquid chromatography system
comprising a number of fluid handling units, including pumps, valves,
mixers, and sensor units.  *Id.* at 1:16–18.  According to the specification,
although fluid handling systems are known in the art, most of the
conventional systems lack flexibility, such that the systems cannot be
configured for a variety of different applications and replacing defective

3

IPR2015-01826
Patent 8,821,718 B2

components (i.e., fluid handling units) is "a time consuming and delicate task." *Id.* at 1:19–41.  In addition, conventional systems require specific kits for upgrading that are supplied as external add-on equipment and arranged beside the original system, thereby enlarging the system's footprint. *Id.* at 1:27–33.

According to one embodiment, the fluid handling system comprises housing 20 and two or more fluid handling units 26 arranged as interchangeable modular components with external fluidics section 30 and internal non fluidics section 32, wherein housing 20 comprises liquid handling panel 22 with two or more component positions for receiving said interchangeable modular components such that external fluidics section 30 is separated from internal non fluidics section 32 by panel member 28 attached to liquid handling panel 22.  *Id.* at Abstract, 2:23–31, Figs. 2–4a.  According to another embodiment, the fluid handling system is in the form of a liquid chromatography system. *Id.* at 2:32–63.  Figure 2 of the '718 patent is reproduced below.

IPR2015-01826
Patent 8,821,718 B2



Fig. 2

Figure 2 is a schematic illustration of housing 20 with liquid handling panel 22 of the fluid handling system in the form of liquid chromatography system 100. Ex. 1001, 5:26–28. Liquid chromatography system 100 comprises a plurality of fluid control valves in the form of injection valve 1, column valve 2, quaternary valve 5, inlet valve B 6, inlet valve A 9, sample inlet valve 15, pH valve 17, and outlet valve 18. *Id.* at 5:31–35. Liquid chromatography system 100 further comprises UV monitor 4, system pump B 7, system pump A 10, sample pump 12, mixer 14, and three dummy modules 24. *Id.* at 5:35–38.

*D. Illustrative Claim*

Claim 1 is illustrative of the challenged claims and recites:

1.      Automated fluid handling system comprising a housing and two or more interchangeable fluid handling units the housing comprising a liquid handling panel including two or more component positions for receiving said interchangeable

5

IPR2015-01826
Patent 8,821,718 B2

> units, wherein said units are arranged as interchangeable modular components, and include:
>
>> a fluidics section;
>>
>> a non fluidics section comprising electronics or electrical components or control means; and
>>
>> a panel member arranged to separate the fluidics section from the non fluidics section and for attachment of the modular component to a component position of the liquid handling panel,
>
> and wherein the two or more component positions of the liquid handling panel are arranged for attachment of the panel members such that said respective fluidics sections are external to the housing and said respective non fluidics sections are internal to the housing.

Ex. 1001, 8:64–9:14.

Claims 2, 3, and 5 depend from claim 1 and, therefore, include the limitations of claim 1. Claim 2 further requires a sealing member that seals the interchangeable modular components against the liquid handling panel. *Id.* at 9:15–17. Claim 3 adds a master control unit to the fluid handling system, and requires that the interchangeable modular components are connected to the master control unit through a system bus providing electrical communication to each interchangeable modular component. *Id.* at 9:18–22. Claim 5 requires that the interchangeable modular components are of two or more sizes. *Id.* at 9:25–26.

## II.    DISCUSSION

Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e);

6

IPR2015-01826
Patent 8,821,718 B2

37 C.F.R. § 42.1(d).  Below, we discuss whether Petitioner has met its burden with respect to claims 1–3 and 5.

### A. Level of Ordinary Skill in the Art

We begin our analysis by addressing the level of ordinary skill in the art.  Petitioner argues, and Dr. Gale testifies, that a person of ordinary skill in the art relevant to the '718 patent "generally" would have had "a bachelor's degree in Mechanical Engineering, Bioengineering, or Electrical Engineering and three years of fluid handling machine design experience" or an advanced degree in any of those fields and at least one year of design experience.  Pet. 19; Ex. 1018 ¶ 16.  Mr. Söderman testifies that a person of ordinary skill in the art would have had "a scientific or technical background with at least 5 years of experience in the design, service of, operation, and/or use of automated fluid handling systems."  Ex. 2009 ¶ 10.

The parties' proposals for the level of ordinary skill in the art have distinctions, e.g., "a bachelor's degree" versus "scientific or technical background," and "design experience" versus "design, service, operation, and/or use experience."  We, however, find those distinctions to be of little consequence.  An express definition of the level of ordinary skill is not required in all situations, as the prior art references can reflect the level of ordinary skill in the art.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (absence of specific findings on "level of skill in the art does not give rise to reversible error 'where the prior art itself reflects an appropriate level and a need for testimony is not shown'") (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985)).  Neither party provides a sufficient explanation as to how either of the specific proposals regarding the level of ordinary skill changes the

7

IPR2015-01826
Patent 8,821,718 B2

analysis in this proceeding.  We find the level of ordinary skill in the art to be reflected in the cited references.

To the extent that a more specific definition is required, we adopt the following as the level of ordinary skill in the art:  the equivalent, through education or technical training and practical experience, of a bachelor's degree in mechanical engineering, bioengineering, or electrical engineering, and at least three years of experience in design, service, operation, and/or use of automated fluid handling systems.  The definition we adopt is based on the testimony of the parties' experts, as well as our review of the '718 patent, the type of problems and solutions described therein, and the prior art involved in this proceeding.

## B.  Mr. Söderman's Qualifications as an Expert

Petitioner argues that Mr. Söderman's qualifications as an expert are "suspect" because Mr. Söderman:  (1) does not have a university degree, (2) has not worked personally on the design of a chromatography system, and (3) does not have design experience in electrical engineering.  Reply 16 n.4.  Petitioner, however, does not move to exclude Mr. Söderman's testimony or take an express and affirmative position that Mr. Söderman is not qualified as an expert.  *Id.*  To the extent that Petitioner suggests as much, we disagree and find that Mr. Söderman is sufficiently "qualified in the pertinent art" to opine from the perspective of a person of ordinary skill in the art.  *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363–64 (Fed. Cir. 2008); *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1372–73 (Fed. Cir. 2010) (Federal Rule of Evidence 702 does not require a complete overlap between an expert witness's technical qualifications and the field of invention).

IPR2015-01826
Patent 8,821,718 B2

Specifically, Mr. Söderman has experience as a staff mechanical design engineer—a position in which he serves as a technical expert for Patent Owner's research and development unit. Ex. 2010, 1. Mr. Söderman also worked as a team leader overseeing a staff of mechanical design engineers and electrical design engineers during the development of Patent Owner's ÄKTA avant and ÄKTA pure chromatography systems, which Patent Owner identifies as commercial embodiments of the '718 patent. Ex. 2009 ¶ 3; Ex. 2010, 1–2; *see* Resp. 1–2, 52–53. Further, although Mr. Söderman did not receive a university degree, his testimony establishes that he received four years of formal instruction in mechanical engineering at a technical college. Ex. 1024, 3–4 (8:13–17, 9:11–10:12). Thus, Mr. Söderman's knowledge, skill, training, and experience in the field of automated fluid handling systems is sufficient to render him qualified to offer expert testimony in this proceeding. To the extent that Mr. Söderman is more familiar with the service, operation, and use of automated fluid handling systems and less familiar with their design or the design of their electrical components, we weigh Mr. Söderman's testimony accordingly, taking into account the extent of his expertise in those areas. *See, e.g.*, *Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010) (holding the Board has discretion to give more weight to one item of evidence over another "unless no reasonable trier of fact could have done so").

## C. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016). Under

IPR2015-01826
Patent 8,821,718 B2

that standard, claim terms are generally given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

In the Institution Decision, we provided a preliminary construction of several claim phrases, as reproduced in the table below:

| Claim phrase | Construction |
|---|---|
| two or more interchangeable fluid handling units . . . wherein said units are arranged as interchangeable modular components (claim 1) | two or more fluid handling units of a standardized size and shape . . . arranged such that they may be used in place of other fluid handling units of the same standardized size and shape |
| fluidics sections are external to the housing and . . . non fluidics sections are internal to the housing (claim 1) | a fluidics section is on the outside of the housing and its respective non-fluidics section is on the inside of the housing |

The parties do not dispute our preliminary construction of the phrase "fluidics sections are external to the housing and . . . non fluidics sections are internal to the housing." We have reconsidered that construction in light of the arguments and evidence adduced during trial, and maintain that construction based on the full record.

Patent Owner disputes our construction of the phrase "two or more interchangeable fluid handling units . . . wherein said units are arranged as interchangeable modular components," more particularly, our construction of the phrase "arranged as interchangeable modular components." Resp. 22–34. We address that dispute below.

The parties also address the construction of the phrase "connected to the master control unit by a system bus providing electrical communication

10

IPR2015-01826
Patent 8,821,718 B2

to each interchangeable modular component" recited in claim 3, as well as the term "each" within that phrase. Pet. 22–24; Resp. 34–39; Reply 10–13. For any limitation of claim 3 that requires express construction, we discuss that construction as part of our analysis of the ground of unpatentability.

   1. *Two or more interchangeable fluid handling units . . . wherein said units are arranged as interchangeable modular components*

   In the Institution Decision, we declined to adopt either Petitioner's or Patent Owner's proposed construction of the phrase "two or more interchangeable fluid handling units . . . wherein said units are arranged as interchangeable fluid modular components." Inst. Dec. 10. In particular, we explained that Petitioner's proposed construction failed to give effect to the term "interchangeable" as used in the disputed phrase. *Id.* We further explained that Patent Owner's proposed construction of the term "interchangeable" improperly read into the claim an embodiment described in the specification. *Id.* at 10–11. Based on our review and analysis of the claim language and written description, we determined that the claim language and written description embraced the ordinary and customary meaning of the term "interchangeable." *Id.* at 11.

   Patent Owner disputes that conclusion, arguing that the broadest reasonable construction of the phrase "arranged as interchangeable modular components" should be interpreted to "include a requirement of ready interchangeability of the fluid handling units." Resp. 22. Patent Owner further argues that the interchangeability "necessarily relates to an end user of the automated fluid handling system, and not to a manufacturer constructing the system," and that claim 1 "necessarily includes, as part of the interchangeable fluid handling units, units that change the fluid flow of the system." *Id.*

11

IPR2015-01826
Patent 8,821,718 B2

Petitioner replies that the Board "correctly declined to include a requirement that the claimed 'interchangeable fluid handling units' be 'readily interchangeable.'"  Reply 2.  Petitioner further contends Patent Owner's arguments that the claims require interchangeability to relate to an end user of the system, and that the interchangeable fluid handling units must include units that change the fluid flow of the system, are arguments "for importing two *additional* requirements into the claims."  *Id.* at 3.

A claim term will be interpreted more narrowly than its ordinary and customary meaning where the "patentee sets out a definition and acts as [its] own lexicographer," or the "patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012).  "The standards for finding lexicography and disavowal are exacting."  *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  To act as a lexicographer, "a patentee must 'clearly set forth a definition of the disputed claim term' and 'clearly express an intent to redefine the term.'"  *Id.* (citation omitted); *see In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (any special definitions for claim terms or phrases must be set forth "with reasonable clarity, deliberateness, and precision").

Similarly, to disavow claim scope, "the specification or prosecution history [must] make clear that the invention does not include a particular feature."  *GE Lighting*, 750 F.3d at 1309 (internal citation, quotation, and alterations omitted).  To do so, the patentee may "include[] in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  *Aventis*, 675 F.3d at 1330 (internal quotations omitted).  Ambiguous language does not constitute disavowal.

12

IPR2015-01826
Patent 8,821,718 B2

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–26 (Fed. Cir. 2003). Nor is it sufficient "that the only embodiments, or all of the embodiments, contain a particular limitation." *Aventis*, 675 F.3d at 1330.

Beginning with the claim language, as we must, we note that claim 1 recites the term "interchangeable" in the phrase "arranged as interchangeable modular components" without further limitation or elaboration. In other words, the plain language of the claim does not include any requirement regarding how interchangeable the fluid handling units must be, to whom the fluid handling units must be interchangeable, or how the interchangeable units may or may not affect the fluid flow of the system. *See* Ex. 1001, 8:64–9:14.

Turning to the specification of the '718 patent, we find no special definition for the term "interchangeable." As we stated in the Institution Decision, "[t]he use of 'interchangeable' and related terms in the specification . . . does not indicate any deviation from its ordinary and customary meaning." Inst. Dec. 10. For example, the specification provides that the automated fluid handling system includes "a plurality of interchangeable modular components arranged in a liquid handling panel." Ex. 1001, 2:43–44; *see also id.* 5:45–5:50 ("The component positions are given a standard size and shape to provide simple interchangeability."); 6:37–41 (the system "may be configured for essentially any type of automated liquid handling operations provided that suitable fluid handling units are provided as interchangeable modular components for the system."). The specification also refers to the components provided in Figures 4a through 4d (e.g., valves, pumps, dummy components, and monitors) as types of interchangeable modular components. *Id.* at 5:58–6:14; *see also id.* at

13

IPR2015-01826
Patent 8,821,718 B2

2:46–64 (identifying the interchangeable modular components of Figure 1); 10:48–48 (claim 17, reciting that the interchangeable modular components include at least one of a number of valves, monitors, a system pump, and a dummy module).

Patent Owner contends that a construction of "interchangeable" that does not include ready interchangeability, such as the construction provided in the Institution Decision, improperly includes "a configuration expressly disclaimed in the specification of the '718 patent." Resp. 26. Namely, Patent Owner contends that the specification distinguishes fluid handling systems having fluid handling units that are "readily interchangeable" (i.e., the fluid handling systems recited in claim 1) from prior art systems "which are not." *Id.* at 28. As support, Patent Owner points to portions of the specification that describe prior art systems in which replacing defective fluid handling units was "a time consuming and delicate task," or systems that lacked "flexibility in adapting the instrument to a variety of different applications." *Id.* at 26–27 (citing Ex. 1001, 1:19–35, 36–41, 45–52).

Those portions of the specification, however, do not indicate a distinction between ready interchangeability and interchangeability. Rather, the specification distinguishes between systems that contain interchangeable components and those that do not (e.g., systems that require add-on equipment). *See* Ex. 1001, 1:19–35, 1:39–41 (explaining that most of the prior art liquid handling systems "lack . . . flexibility in adapting the instrument to a variety of different applications"), 1:49–51 ("One advantage with such [i.e., the recited] fluid handling systems is that the system may easily be upgraded without need for add-on equipment, and that the flow path may be easily optimized for new experimental setups."). Nor do we

14

IPR2015-01826
Patent 8,821,718 B2

find that the specification contains a clear teaching that Patent Owner intended a meaning of the term "interchangeable" that is narrower than its plain and ordinary meaning. *Aventis*, 675 F.3d at 1330; *see In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1287 (Fed. Cir. 2016). Thus, we do not find that the specification supports restricting the scope of the term "interchangeable" to units that are "readily interchangeable."[3]

Likewise, we do not find that the specification supports restricting the scope of the term "interchangeable" or the phrase "arranged as interchangeable modular components" to units that are interchangeable by the end user of the automated fluid handling system, or to units that change the fluid flow of the system. With regard to the former, although Patent Owner provides citations to the specification that it contends support such a restriction, *see* Resp. 30–31, we agree with Petitioner that the specification does not set forth "who must be the one to interchange the fluid handling units," or "use the word 'user.'"[4]  Reply 8.

---

[3] We focus our discussion on the specification because the prosecution history of the '718 patent was not submitted as evidence and, therefore, is not of record in this proceeding.

[4] Even if we agreed with Patent Owner that claim 1 requires interchangeability by an end user of the system, this proceeding does not turn on that issue of claim construction. Here, a preponderance of the evidence establishes that the descriptions and instructions provided in the 2040 Manual are intended for an end user of the system. Tr. 13:22–14:2; Ex. 1002, 9 (stating that the 2040 Manual "consists of different parts with different objects which are addressed to different user personnel"); Ex. 1024, 26 (98:2–6) (Mr. Söderman's testimony confirming that the 2040 Manual is "written for the end user"); *see id.* (98:7–99:1, 101:8–19).

15

IPR2015-01826
Patent 8,821,718 B2

With regard to the latter, the specification does refer to several embodiments in which the system is configured to adapt or extend the fluid flow path. Ex. 1001, 4:53–59. In those embodiments, additional optional valves can be added to the system, or standard fluid control valves can be moved to other positions.[5] *Id.* Yet, as explained above, the specification identifies pumps and monitors (in addition to valves) as types of interchangeable modular components of the system. *Id.* at 5:58–6:14; *see also id.* at 10:41–48 (claim 17, reciting that the "interchangeable modular components include at least one of," among others, "a system pump" and "a pump pressure monitor."). Thus, the specification is not limited to a particular embodiment or type of interchangeable modular component. Even if it was, however, it is improper to read an embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *In re Van Guens*, 988 F.2d 1181, 1184 (Fed. Cir. 1993); *see, e.g.*, *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1330–32 (Fed. Cir. 2004) (refusing to import a requirement into the claim, reasoning that a "particular advantage" described in the written description "is but one feature" among other disclosed features of the invention and each claim is not "limited to" such disclosed "advantage[] or feature[]"). Here, as

---

[5] Patent Owner appears to assert that the phrase "interchangeable modular components" refers only to the valves and excludes pumps and monitors described in the '718 patent specification. *See* Resp. 12. Mr. Söderman opines similarly. Ex. 2009 ¶ 71 ("Indeed, the '718 patent discloses that two or more pumps may be interchanged as fluid handling units and this interchanging would not alter or optimize the fluid flow path. However, these are additional elements that are optional in terms of their ability to be interchanged."). Neither Patent Owner nor Mr. Söderman, however, directs us to support for such a narrow reading of the phrase.

16

IPR2015-01826
Patent 8,821,718 B2

explained above, the claim language is broad and places no restriction on the term "interchangeable" or the phrase "arranged as interchangeable modular components."

Accordingly, for these reasons, and those provided in the Institution Decision (Inst. Dec. 9–11), we reaffirm our determination that, under the broadest reasonable construction, the phrase "two or more interchangeable fluid handling units . . . arranged as interchangeable modular components" means "two or more fluid handling units of a standardized size and shape . . . arranged such that they may be used in place of other fluid handling units of the same standardized size and shape."

### D. Anticipation of Claims 1–3 and 5 by the 2040 Manual

Petitioner contends that the 2040 Manual anticipates each of the challenged claims. Pet. 27–38. Patent Owner responds that the 2040 Manual does not disclose two or more interchangeable fluid handling units, as required by claim 1. Resp. 39–44. Patent Owner also argues that the 2040 Manual does not disclose that each fluid handling unit connects to and communicates with the master control unit over a system bus, as required by claim 3. *Id.* at 44–49. Based on our review of the arguments and evidence of record, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that the 2040 Manual anticipates each challenged claim, as explained below.

### 1. The 2040 Manual

The 2040 Manual consists of seven parts that are "addressed to different user personnel" and describe, *inter alia*, the hardware, configuration, operation, and maintenance of an instrument that conducts

17

IPR2015-01826
Patent 8,821,718 B2

analyses using potentiometric and colorimetric methods.  Ex. 1002, 9, 15.[6]
The instrument has two lockable glass doors, the lower of which provides
access to the wet part of the instrument.  *Id.* at 15.  The wet part includes "20
identical mounting positions for wet part modules, which can be placed in
any of the available positions.  This results in maximal flexibility for the wet
part lay-out for numerous analysis configurations."  *Id.*  The construction of
the wet part and wet part modules "ensures a strict separation between the
wet part and the electrical part" of the instrument.  *Id.*  A figure from the
2040 Brochure[7] illustrating the instrument described in the 2040 Manual is
reproduced below.



---

[6] Citations to all asserted prior art references are to the page numbers that
Petitioner provides on the documents.

[7] Applikon Analytical B.V., ADI 2040 Process Analyzer Brochure
(Ex. 1006).  We provide a figure depicting a color version of the system
described in the 2040 Manual, as shown in the 2040 Brochure, because the
figure provided in the 2040 Manual is difficult to reproduce with visual
clarity.

IPR2015-01826
Patent 8,821,718 B2

The figure illustrates the two lockable glass doors, as well as the twenty wet part mounting positions represented by four rows and five columns of squares. Ex. 1006, 2; *see* Ex. 1002, 15. As depicted, wet part modules are mounted in all of the available positions, but the 2040 Manual provides that wet part positions can be unused, in which case the those positions should be covered with a blind plate. Ex. 1002, 100. Wet part modules can be removed from the instrument and replaced by "unscrewing the module from the rear side of the door" and de-coupling the electric cable at the module. *Id.* at 577. If a wet part module is to be "removed permanently," it should be replaced by a blind plate. *Id.*

The instrument is controlled by a Computer Board Assembly and several modules, including an Input/Output ("I/O") module. The I/O module controls wet part modules, external devices, and communication with external devices, such as a remote control. *Id.* at 15. A schematic illustration is reproduced below.

IPR2015-01826
Patent 8,821,718 B2



The schematic illustration shows how the instrument is controlled by the central computer board, which uses an internal serial bus to interface the I/O module, serial module, sensor module, and burette modules.  *Id.* at 16–17.

### 2.  Analysis

Anticipation under 35 U.S.C. § 102 requires "the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).  We address first the disputed limitations of the challenged claims and then turn to the remaining limitations, which Patent Owner does not address in the Response.

20

IPR2015-01826
Patent 8,821,718 B2

> ### *a. Interchangeable fluid handling units . . . arranged as interchangeable modular components*

All of the challenged claims require "two or more interchangeable fluid handling units . . . arranged as interchangeable modular components." According to Petitioner, the 2040 Manual discloses such interchangeable fluid handling units.  Pet. 28–29, 31–33; Reply 14–15.  In that regard, Petitioner identifies the twenty identical mounting positions, which can receive wet part modules.  Pet. 28–29, 31–33.  Petitioner also points to the 2040 Manual's statements that a wet part module can be (1) placed in any available mounting position, and (2) removed and replaced by unscrewing the module from the rear side of the door and disconnecting the cable that provides electrical connection.  *Id.* at 29 (citing Ex. 1002, 15, 577).  And Petitioner points to certain figures of the 2040 Manual that depict different arrangements or layouts of the fluid handling units in the system.  Reply 15 (comparing Ex. 1002, 245, *with id.* at 252).

Patent Owner counters that several of the 2040 Manual's wet part modules, which are hardwired, are not "readily interchangeable," or "capable of [being] arranged by the end user of the equipment," and, therefore, are not interchangeable modular components.  Resp. 39, 41–43.  Patent Owner further contends that even if the burette modules can be easily relocated to a different position, they are not "interchangeable within the meaning of the '718 patent" because relocating them does not alter the fluid flow path of the system.  *Id.* at 39–40, 43–44.  Patent Owner's assertions are based on its proposed claim construction.  Tr. 20:7–21:16 (confirming that Patent Owner's arguments regarding the limitations of claim 1 are based solely on applying Patent Owner's claim construction).  We find Patent Owner's arguments unpersuasive because, as explained above, we do not

21

IPR2015-01826
Patent 8,821,718 B2

interpret "interchangeable fluid handling units . . . arranged as interchangeable modular components" to require ready interchangeability, interchangeability by an end user, and interchangeability that alters the fluid flow path of the system.

Under our claim construction, the claim limitation at issue requires only two or more fluid handling units of a standardized size and shape arranged such that they may be used in place of other fluid handling units of the same standardized size and shape. We find that the 2040 Manual teaches that limitation. The 2040 Manual explains that the wet part of the system "has 20 identical mounting positions for wet part modules, which can be placed in *any* of the available positions," resulting in "maximal flexibility for the wet part lay-out for numerous analysis configurations." Ex. 1002, 15 (emphasis added). The 2040 Manual provides mechanical schematics for each wet part module that show how each module is connected to the door and electrical part of the system. *Id.* at 101–71. Further, as Mr. Söderman's testimony confirms, the 2040 Manual describes how the modules can be removed and replaced. *Id.* at 577; *see also* Ex. 1024, 15 (55:6–56:2) (agreeing that the 2040 Manual describes removing a module by opening the wet part door, unscrewing the four screws that attach the module to the housing, and unplugging a cable); *id.* at 16 (60:11–20), 19 (72:13–73:5) (testifying that although the 2040 Manual does not provide step-by-step instructions for inserting a new module, like the '718 patent specification, the 2040 Manual describes inserting a new module by reconnecting an electrical cable); Ex. 1002, 149 (depicting three configurations of the stirrer/vessel module each with a different module (i.e., a first type of solenoid valve module, a second type of solenoid valve module, or a tubing

IPR2015-01826
Patent 8,821,718 B2

module) below it).  Additionally, Dr. Gale testifies that the 2040 Manual
describes a system "designed specifically so that one can mix and match and
change the overall configurations and placements for the wet part modules
depending on the application at hand."  Ex. 1018 ¶ 48; *see id.* ¶¶ 86–87;
Ex. 2011, 25:25–26:14, 26:20–27:6, 27:21–29:11, 41:21–42:24.  We credit
Dr. Gale's testimony in that regard, which is supported by the above-
discussed teachings of the 2040 Manual.

Moreover, Patent Owner and Mr. Söderman agree that the 2040
Manual describes some interchangeability of wet part modules.  Resp. 44
(explaining that the 2040 Manual describes two different layouts showing
how the wet part modules "are put together into an actual system" and
depicting those different layouts); Ex. 2009 ¶ 30 ("some minor re-
configuration of the system [described in the 2040 Manual] is possible").
For example, Mr. Söderman testifies that the differently sized burette
modules described in the 2040 Manual are modular components that can be
exchanged with one another to inject or withdraw liquid samples at larger or
smaller volumes.  Ex. 2009 ¶ 70; Ex. 1024, 21 (80:19–81:12).  Patent Owner
agrees, noting that "one size Burette Module can be easily replaced with
another size Burette Module."  Resp. 7.  The 2040 Manual also discloses
that two or more or more burette modules can be used in the same system
layout.  Ex. 1002, 117, 119, 121, 123 (depicting the four different types of
burette modules); *id.* at 252–53 (hydraulic planning sheets showing more
than two burette modules in the layout of the system).  Nevertheless, Patent
Owner asserts and Mr. Söderman opines that exchanging the burette
modules does not comport with the meaning of interchangeable because it
"does not alter or optimize the fluid flow path of the liquid handling

23

IPR2015-01826
Patent 8,821,718 B2

system."  Resp. 43–44; Ex. 2009 ¶ 70; Ex. 1024, 21 (81:12–16).  As explained above, however, the claims do not require a change in fluid flow path.  Given the foregoing, we find that Petitioner establishes, by a preponderance of the evidence, that the 2040 Manual discloses "two or more interchangeable fluid handling units . . . arranged as interchangeable modular components," as recited in claim 1 of the '718 patent.

> ### b.  *The interchangeable modular components are connected to the master control unit by a system bus providing electrical communication to each interchangeable modular component*

Claim 3 requires that the interchangeable modular components "are connected to the master control unit by a system bus providing electrical communication to each interchangeable modular component."  Petitioner contends that the 2040 Manual discloses that limitation.  Pet. 36–38.  In particular, Petitioner asserts that the 2040 manual describes that the burette modules directly connect to and communicate with the central computer board over a system bus, and the other modules "first connect to the I/O modules which then use the system bus to communicate" with the central computer board (i.e., the connection and communication is indirect).  *Id.* at 36–37 (citing Ex. 1002, 16–17).  Dr. Gale testifies similarly, opining that the wet part modules are still connected to the central computer board and communicating over the system bus even though they have an intermediate component between them (the I/O card in the I/O module) that facilitates the transfer of information.  Ex. 1018 ¶ 96.

Patent Owner agrees that all of the wet part modules except the burette modules are connected to the I/O module or sensor module in the layouts depicted in the 2040 Manual.  Resp. 45 (citing Ex. 1002, 15, 289, 367, which all depict a first layout of wet part modules, and Ex. 1002, 252,

IPR2015-01826
Patent 8,821,718 B2

which depicts a second layout of wet part modules), 47 (citing Ex. 1002, 17); Tr. 25:22–3.  Patent Owner asserts, however, that the wet part modules (other than the burette modules) do not connect to or communicate with the system bus in those layouts.  Resp. 45.  We disagree.

The 2040 Manual states that the process analyzer, which includes the wet part modules, "is controlled by" the central computer board in combination with the I/O module, a serial module, and a sensor module. Ex. 1002, 15.  The I/O module controls the wet part modules, external devices, and communication with external devices.  *Id.*  The central computer board uses an internal serial bus for interfacing the I/O module, serial module, and sensor module, and burette modules (depicted above in § II.E.1).  *Id.* at 16–17.  The 2040 Manual also states that the system can include hydraulic planning sheets for the wet part.  *Id.* at 252.  One of the sheets, which Patent Owner reproduces in its Response, presents a hydraulic scheme or layout of the wet part.  *Id.*; *see* Resp. 45.  A second sheet indicates "the location of the wet part modules in the internal serial bus." Ex. 1002, 252.  We find one of ordinary skill in the art would have understood, from the above-referenced disclosures of the 2040 Manual, that the wet part modules are connected to the master control unit, and that there is system bus communication to the wet part modules.[8]  Though both the

---

[8] Referring to a schematic drawing of the pump module, Patent Owner also contends the cable depicted therein provides power to the pump component, "is not a 'system bus[,]' and does not include any communication" with the central computer board.  Resp. 48 (citing Ex. 2009 ¶¶ 81–83, 85).  Patent Owner's contention is based on Petitioner's alternative argument that the I/O card "could be considered part of the [m]aster [c]ontrol [u]nit."  Pet. 37–38. In light of our findings above, we do not reach that alternative argument.

IPR2015-01826
Patent 8,821,718 B2

connection and communication are indirect (i.e., facilitated through the I/O card and I/O module, as Dr. Gale testifies), the parties agree that nothing in claim 3 requires a direct connection to, or direct communication through, the system bus.  Pet. 23; Tr. 14:3–16, 16:16–19, 28:6–16.  Accordingly, Petitioner establishes by a preponderance of the evidence that the 2040 Manual discloses the limitations of claim 3 of the '718 patent.

*c.  Additional limitations*

Petitioner contends that the 2040 Manual discloses the remaining limitations of claim 1, and the additional limitations of claims 2 and 5. Pet. 27–29, 31–35 (discussing the remaining limitations of claim 1 and citing Ex. 1002, 15–17, 101–71, 252; Ex. 1018 ¶¶ 26–39), 36 (discussing claim 2 and citing Ex. 1002, 101–71), 38 (discussing claim 5 and citing Ex. 1002, 80, 145, 577).  Patent Owner does not address the merits of Petitioner's assertions regarding those limitations.  *See generally* Resp.  In the Scheduling Order, we cautioned Patent Owner that any arguments for patentability not raised in the Response would be deemed waived.  Paper 12, 2–3; *see also* 37 C.F.R. § 42.23(a) ("Any material fact not specifically denied may be considered admitted.").  After having reviewed the unrebutted arguments and evidence presented by Petitioner concerning the remaining limitations of claim 1 and the additional limitations of claims 2 and 5, we are persuaded by those arguments, which we adopt as our own. *See* Pet. 27–29, 31–36, 38.  Accordingly, we find that a preponderance of the evidence establishes that the 2040 Manual discloses those elements of claims 1, 2, and 5.

IPR2015-01826
Patent 8,821,718 B2

### 3. Conclusion

Based on our review of the record arguments and evidence, and for the foregoing reasons, we determine that Petitioner establishes, by a preponderance of the evidence, that the 2040 Manual anticipates claims 1–3 and 5 of the '718 patent.

### E. Obviousness of Claim 3 Based on the 2040 Manual

Petitioner asserts that "[t]o the extent that the 2040 Manual does not disclose the modules being connected to the master control unit by a system bus," the subject matter of claim 3 would have been obvious to a skilled artisan "based on what is disclosed in the 2040 Manual." Pet. 43. As discussed in the previous section, we agree with Petitioner that the 2040 Manual discloses the limitations of claim 3. Accordingly, we need not reach Petitioner's alternative argument.

Had we determined that the 2040 Manual does not disclose the limitations of claim 3, however, we are not persuaded Petitioner shows sufficiently that the subject matter of claim 3 would have been obvious over the 2040 Manual.[9] Petitioner's argument that "having the I/O card on the modules is a design choice" is conclusory and does not provide articulated

---

[9] A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Obviousness is resolved based on underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

IPR2015-01826
Patent 8,821,718 B2

reasoning with rational underpinnings as to why the ordinary artisan would have placed the I/O card on any wet part module other than a burette module. *KSR*, 550 U.S. at 418; *see In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements."). Further, as Patent Owner points out, Dr. Gale identifies several advantages of placing the I/O card in a separate I/O module, as opposed to on the wet part module itself. Specifically, Dr. Gale opines that "it is more efficient and economical to make the I/O card separate for many of the modules" because "it makes the system more flexible and actually improves interchangeability." Ex. 1018 ¶ 98; Ex. 2011, 54:24–55:3; *see id.* at 55:5–16 (testifying that such placement would have allowed one to "easily swap in a new wet part module" and "connect it up" without "the expense or engineering to come up with that [the I/O card] on each module").

### F. Anticipation of Claim 1 by the Gilson 402 User Guide

Petitioner contends that the Gilson 402 User Guide anticipates claim 1. Pet. 54–56. Patent Owner responds that the Gilson 402 User Guide does not disclose two or more interchangeable fluid handling units that are interchangeable modular components. Resp. 55–58. Based on our review of the arguments and evidence of record, we determine that Petitioner has not demonstrated by a preponderance of the evidence that the Gilson 402 User Guide anticipates claim 1, as explained below.

### 1. The Gilson 402 User Guide

The Gilson 402 User Guide describes a low pressure syringe pump for transferring liquids that includes three standard configurations: (1) single syringe, single valve; (2) dual syringe with Tee junction; and (3) dual

IPR2015-01826
Patent 8,821,718 B2

syringe, dual valve.  Ex. 1011, 11.  Figures of the three configurations are reproduced below.



Figures (a), (b), and (c) depict the three standard configurations of the syringe pump.  *Id.*  Figure (a) depicts the single syringe, single valve configuration, figure (b) depicts the dual syringe with Tee junction configuration, and figure (c) depicts the dual syringe, dual valve configuration.  *Id.*  The front panel of the instrument contains one syringe pump unit on the left, and one of three possible units on the right:  a blanking plate, a syringe with Tee junction module, or another syringe and valve module.  *Id.* at 16.  The different configurations allow for "a wide range of applications" and the configuration used depends on the desired application.  *Id.*  The Gilson 402 User Guide describes how the system can be upgraded from a single syringe configuration (figure (a)) to a dual syringe configuration (figures (b) and (c)).  *Id.* at 34–39.

### 2. Analysis

As explained above, claim 1 requires "two or more interchangeable fluid handling units . . . arranged as interchangeable modular components." Petitioner argues that the Gilson 402 User Guide discloses that limitation because it depicts the pump with a housing and two positions for inserting

29

IPR2015-01826
Patent 8,821,718 B2

syringe pump/valve modules that are the same size and shape.  Pet. 54–55
(citing Ex. 2011, 11, 34).  Petitioner and Dr. Gale further rely on the
configurations provided in figures (a) and (b) (depicted above), and the
instructions for upgrading the system from a single syringe configuration to
a syringe and Tee junction configuration.  *Id.*; *see* Ex. 2011, 60:21–24, 61:9–
22.  The instructions explain that a blanking plate is removed from the right
side of the front panel and replaced by a Tee junction, which fits into the
mounting recess.  Ex. 1011, 35–36.  The steps for making the upgrade
include undoing the two nuts that secure the blanking plate inside of the
front panel, removing the blanking plate, inserting the module into the
mounting recess, and securing the module in place using the two provided
screws.  *Id.*

Patent Owner argues that the Gilson 402 User Guide does not include
any teaching that the syringe on the left side of the instrument "is capable of
being removed" and interchanged with another module.  Resp. 57.  Like
Petitioner, Patent Owner points to the instructions in the Gilson 402 User
Guide for upgrading the system.  *Id.* at 56–57.  Patent Owner asserts,
however, that each of the upgrades requires exchanging components on the
right side of the instrument, but not on the left side.  *Id.* at 57; Ex. 2009
¶¶ 87–89.  In sum, Patent Owner argues that only one unit in the Gilson
instrument (i.e., the unit on the right hand side) "is available for upgrading
or interchanging," which does not meet claim 1's requirement of at least two
units that "are 'arranged such that they may be used in place of other fluid
handling units of the same size and shape.'"  *Id.* at 56 (quoting Inst. Dec.
11).  We agree with Patent Owner.

30

IPR2015-01826
Patent 8,821,718 B2

Petitioner admits that the Gilson 402 User Guide "depicts the left module as stationary." Reply 23–24. Further, as Patent Owner points out, the Gilson 402 User Guide explains that "the front panel of the instrument contains a syringe pump unit . . . on the left, and one of three possible units on the right: a blanking plate, a syringe and Tee junction module, or another syringe and valve module." Ex. 1011, 16; *see* Resp. 57. That teaching is consistent with the instructions for upgrading the system, which are directed to replacing or exchanging components on the right side of the system. *See* Ex. 1011, 34–39. For example, the instructions state that a user "can install a second module on the front panel so that your syringe pump has two syringes. The right hand module can be a Tee junction or a second valve." *Id.* at 33. The instructions go on to explain that the "syringe and Tee junction module must be mounted on the right of the 402 [instrument]" and depict replacing the module (a blanking plate) on the right hand side with the Tee junction module. *Id.* at 34. The Gilson 402 User Guide also describes upgrading to a dual syringe and valve configuration by removing the Tee junction module from the right side of the instrument and replacing it with a syringe and valve module. *Id.* at 39.

Petitioner argues that the Gilson 402 User Guide describes the syringe module on the left side "as 'function[ing] in the same way' as the second [syringe] module." Reply 23 (quoting Ex. 1011, 21). Petitioner, however, does not direct us to any description in the Gilson 402 User Guide disclosing or suggesting that the syringe on the left side (even if it functions identically to the syringe on the right side) can be exchanged with another component. *See generally* Pet.; Reply.

31

IPR2015-01826
Patent 8,821,718 B2

Petitioner also argues that the Gilson 402 User Guide "consistently depicts [the left module] as identical to the second syringe and valve module, to be mounted on the right side, suggesting that they can in fact be interchanged" *Id.* at 24. Yet, neither Petitioner nor Dr. Gale identifies anything in the Gilson 402 User Guide disclosing or suggesting that the syringe module on the left side can be removed, much less inserted into a different position. Rather, Dr. Gale agrees that, even though he relied on pages 34, 35, and 39 of the Gilson 402 User Guide to illustrate the interchangeability of the left side syringe pump module, those pages do not indicate whether that module can be removed from the device. Ex. 2011, 60:21–62:2.

In any event, Petitioner's assertion that the depiction of the two syringes as identical suggests that they are, in fact, interchangeable rests on attorney argument that is insufficiently supported by the record developed during trial. Petitioner, therefore, does not demonstrate by a preponderance of the evidence that the Gilson 402 User Guide discloses "two or more interchangeable fluid handling units . . . arranged as interchangeable modular components," as set forth in claim 1 of the '718 patent.

### 3. Conclusion

Based on our review of the record arguments and evidence, and for the foregoing reasons, we determine that Petitioner does not demonstrate, by a preponderance of the evidence, that the Gilson 402 User Guide anticipates claim 1 of the '718 patent.

### G. Motion to Exclude

We turn next to Patent Owner's Motion to Exclude. *See* Papers 32, 26, 37. Patent Owner moves to exclude Exhibits 1022 and 1023, as well as

IPR2015-01826
Patent 8,821,718 B2

the corresponding portions of Petitioner's Reply that rely on Exhibit 1022.

Paper 32, 1.  Because our decision does not rely on either of the challenged

exhibits or the portions of Petitioner's Reply that rely on Exhibit 1022, we

dismiss Patent Owner's Motion to Exclude as moot.

III.   CONCLUSION

For the foregoing reasons, we determine that Petitioner has

established, by a preponderance of the evidence, that claims 1–3 and 5 of the

'718 patent are unpatentable under 35 U.S.C. § 102(b) as anticipated by the

2040 User Manual.

IV.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–3 and 5 of the '718 patent are *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Exclude

(Paper 32) is *dismissed* as moot; and

FURTHER ORDERED that this is a Final Written Decision;

therefore, parties to the proceeding seeking judicial review of the decision

must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2015-01826
Patent 8,821,718 B2

FOR PETITIONER:

David L. Bilsker
Anne Toker
QUINN EMANUEL URQUHART & SULLIVAN
davidbilsker@quinnemanuel.com
annetoker@quinnemanuel.com

FOR PATENT OWNER:

Jeff Vockrodt
Robert Schulman
Christopher Yaen
ARENT FOX LLP
jeff.vockrodt@arentfox.com
robert.schulman@arentfox.com
christopher.yaen@arentfox.com

# EXHIBIT E

                                                              1

         F65ggehh


   1    UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
   2    ------------------------------x

   3    GE HEALTHCARE BIO-SCIENCES AB,
        GE HEALTHCARE BIO-SCIENCES
   4    CORPORATION, and GENERAL
        ELECTRIC COMPANY,
   5
                      Plaintiffs,
   6
                  v.                          14 Civ. 7080 (LTS)
   7
        BIO-RAD LABORATORIES, INC.,
   8
                      Defendant.
   9
        ------------------------------x
   10                                         New York, N.Y.
                                              June 5, 2015
   11                                         9:30 a.m.

   12   Before:

   13                   HON. LAURA TAYLOR SWAIN,

   14                                          District Judge

   15                         APPEARANCES

   16   ARNOLD & PORTER, LLP
             Attorneys for Plaintiffs GE HEALTHCARE
   17   MATTHEW M. WOLF
        JENNIFER A. SKLENAR
   18   MARCO J. MARTEMUCCI
        KRISTEN L. JOHNS
   19
        QUINN EMANUEL
   20        Attorneys for Defendant Bio-Rad Laboratories
        DAVID BILSKER
   21   KEVIN P.B. JOHNSON
        ANNE TOKER
   22   SKY ADAMS

   23

   24

   25


                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

F65GGEHH2                        Gale - direct

1    here removed and you put it side-by-side with the Bio-Rad

2    module, how would that compare to those two figures I just

3    showed you?

4    A.  It would look exactly the same.

5    Q.  Can we go to that portion that says "hardware" on the same

6    page.  And right in the middle it says the "ADI 2040."  Do you

7    see that?  Highlight that and go on to the next line and the

8    next.  Keep going.

9           What do you understand it to mean when it says the ADI

10   2040 has a modular wet part with 20 uniform positions?

11   A.  It's a modular instrument that has these 20 different

12   positions that you can see in the picture in the upper left

13   here, and these modules can be moved around readily and easily;

14   that's what the flexibility of modular design clearly implies.

15   Q.  So you just were sitting here when Mr. Wolf was asking

16   Dr. Kearl questions about modularity and flexibility and

17   whether those drove sales.  The words modularity and

18   flexibility as they're used here with the 2040, how do you

19   understand that in relation to the way that Mr. Wolf is using

20   it?

21   A.  Well, I understand that they -- they're very similar.

22   Q.  When it says that -- the 2040 manual says that the 2040 can

23   be used for -- configured for almost any application, what do

24   you understand that to mean?

25   A.  That means that it can be used for a wide variety of wet

200

F65GGEHH2                    Gale - direct

1   chemistry or liquid chromatography applications.

2   Q.  Would you understand the 2040 to be saying that it can only

3   be used for those four or five applications that are actually

4   described as having software packages?

5   A.  Certainly not.  There's literally thousands of applications

6   that this 2040 instrument can be used for.

7   Q.  You've looked at the two claims in the '718 patent that

8   relate to chromatography, correct?

9   A.  I have.

10  Q.  What extra structural elements do those claims identify

11  over, say, claim 1, which is an automated liquid -- automated

12  fluid handling system?

13  A.  None.

14  Q.  In your box there, you have something marked as DDX, I

15  believe it's 6 or 7, which is a column.  Can you pull that out.

16          You relied in part on a declaration from Mr. Koshy who

17  said that the 2040 could be used with a module to perform

18  chromatography.  Do you recall that?

19  A.  I do.

20  Q.  How, if at all, do you relate what you have in your hand,

21  that column, to, say, the module that Mr. Koshy was

22  identifying?

23  A.  This would be the module that would be required to complete

24  that, to perform the chromatography.

25  Q.  What is the 2040 machine designed for as far as delivering

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

201

F65GGEHH2                    Gale - direct

1    controlled fluid flow?

2    A.  That's primarily what it's for, to deliver a controlled

3    fluid flow and to basically turn on and off different flows.

4    Q.  Can we put that picture of the 2040 back up.

5            When you say deliver controlled fluid flow, can you

6    describe what you mean by that.

7    A.  They would be able to deliver flows at basically either a

8    continuous rate or at a controlled rate, one that you could

9    define.

10   Q.  So you see in that picture that we have up, we have that

11   one component kind of in the middle with a red collar on it?

12   A.  Yes.

13   Q.  And there seem to be tubes going in and out of that one, is

14   that right?

15   A.  Yes.

16   Q.  What would you do to, say, put the column that you have in

17   your hand, the DDX6, in place of that?

18           MS. SKLENAR:  Objection.  None of this is in his

19   declaration.

20           MR. BILSKER:  It would be impossible to put it in his

21   declaration to reply to Dr. Scandella when Dr. Scandella's

22   declaration submitted a supplemental declaration that we never

23   had an opportunity to reply to unless he was clairvoyant and

24   knew exactly what Dr. Scandella was going to say.  There has

25   been no opportunity to identify that.  He's merely replying to

202

F65GGEHH2                    Gale - direct

1    what Dr. Scandella said.

2              MS. SKLENAR:  May I reply to that.

3              THE COURT:  Briefly.

4              MS. SKLENAR:  Dr. Gale has a section in his report

5    explaining why he thinks this is a liquid chromatography

6    system.  He doesn't mention any of these arguments.

7              THE COURT:  Overruled.  I'll allow it.

8    Q.  What would you do to put the chromatography column there in

9    place of, say, that end of the red collar?

10   A.  You'd just disconnect the tubes from the red item and then

11   you would attach them at the top and the bottom of this

12   particular instrument.

13   Q.  How long do you think that would take you?

14   A.  Two minutes.

15   Q.  Dr. Gale, let's turn to exhibit 109 -- excuse me --

16   exhibit 108, which is the 2040 brochure.  I'm sorry.  Exhibit

17   109 is the 2045 brochure.

18             THE COURT:  What was the number again of the column?

19   Q.  Can you read off that number.

20   A.  DDX6.

21             THE COURT:  You offer that?

22             MR. BILSKER:  I offer that into evidence, your Honor.

23             MS. SKLENAR:  No objection.

24             THE COURT:  DDX6 is admitted.

25             (Defendant's Exhibit DDX6 received in evidence)

# EXHIBIT F

# INTENTIONALLY OMITTED

# EXHIBIT G

11/25/2020     Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.     Bruce Gale, Ph.D.
Highly Confidential

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - -

Cytiva Sweden AB and Global Life
Sciences Solutions USA, LLC,
    Plaintiff,    Case No.
           18-1899-CFC

-against-

Bio-Rad Laboratories, Inc.,
    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

HIGHLY CONFIDENTIAL
VIDEO-RECORDED DEPOSITION OF
DR. BRUCE GALE
Zoom Videoconference
11/25/2020
8:28 a.m. (MT)

REPORTED BY: AMANDA GORRONO, CLR
CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

---

Page 2

1            11/25/2020

2            8:28 a.m. (MT)

3

4      VIDEO-RECORDED DEPOSITION OF DR. BRUCE GALE,

5 held virtually via Zoom Videoconferencing, before

6 Amanda Gorrono, Certified Live Note Reporter, and

7 Notary Public of the State of New York.

8

---

Page 3

1    A P P E A R A N C E S

2   (Via Zoom Videoconferencing

3

4 ON BEHALF OF PLAINTIFF: CYTIVA SWEDEN AB AND GLOBAL
    LIFE SCIENCES SOLUTIONS USA, LLC:

5     Jennifer Sklenar, Esquire
    Arnold & Porter Kaye Scholer LLP

6     601 Massachusetts Ave, NW
    Washington, D.C. 20001-3743

7     PHONE: 202.942.5786

8     E-MAIL: Jennifer.sklenar@arnoldporter.com

9

10 ON BEHALF OF DEFENDANT: BIO-RAD LABORATORIES, INC.:
    Sean Damon, Esquire

11     Quinn Emanuel Urquhart & Sullivan, LLP
    1300 I Street NW

12     #900
    Washington, D.C. 20005

13     PHONE: 202-538-8260
    E-MAIL: Seandamon@quinnemanuel.com

14

15

16 ALSO PRESENT:

17 Brian Cannon, Esquire, on behalf of Bio-Rad, Quinn

18 Emanuel Urquhart & Sullivan, LLP

19 Andy Mortensen, legal videographer, Digital Evidence

20

21

22

---

Page 4

1        I N D E X

2

3 WITNESS      EXAMINATION BY     PAGE

4 DR. BRUCE GALE     MS. SKLENAR      7

5

6        E X H I B I T S

7

8 EXHIBIT    DESCRIPTION       PAGE

9 Exhibit 326 Dr. Gale's Opening Report....... 81

10    Exhibit 327 Dr. Gale's Rebuttal Report...... 81

11    Exhibit 328 Dr. Gale's Reply................ 81

12    Exhibit 329 Dr. Wereley's Opening Report.... 81

13    Exhibit 330 Dr. Wereley's Rebuttal Report... 81

14    Exhibit 331 Dr. Wereley's Reply............. 81

15    Exhibit 332 Declaration of Dr. Bruce Gale... 154

16    Exhibit 333 Declaration of Dr. Bruce Gale

17        Regarding Claim Construction.... 155

18    Exhibit 334 Declaration of Dr. Bruce Gale

19        in support of Bio-Rad

20        Laboratories' Petition for

21        Institution of an IPR on US

22        Patent No. 8,821,718............ 155

---

1 (Pages 1 to 4)

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Bruce Gale, Ph.D.
Highly Confidential

Page 109

1     A.    Yes.
2     Q.    But you can't tell me which portions
3   you wrote?
4          MR. DAMON:  Objection; form.
5     A.    This was four years ago.  I mean, he
6   wrote up a -- he and I talked about an outline.  He
7   wrote up some pieces, I wrote up some pieces, we put
8   them together.  He -- I don't know.  We worked
9   together on writing the report.
10    Q.    Okay.  We're going to come back to
11  this.  Did you personally record any videos relating
12  to the work that was done on the 2040 System?
13    A.    Not at that time.  I mean, I've taken
14  some videos of -- well, I don't think so.  I was
15  trying to think if I took any other videos of that,
16  but I don't -- I don't think so.
17    Q.    So you personally haven't recorded
18  any videos relating to any work on the 2040 System;
19  is that right?
20    A.    When we -- I know we took some
21  pictures.  And, you know, more recently when we were
22  checking on some things about processors and some

Page 110

1   other things like that in the 2040 System, we may
2   have taken some videos.  I don't specifically recall.
3     Q.    So you don't know one way or another
4   whether you recorded any videos related to work on
5   the 2040 System?
6          MR. DAMON:  Objection to form.
7     A.    Yeah, I don't specifically recall if
8   a video was taken or not.  I mean, the videos that
9   I've presented to you were not ones that I took
10  myself.  But I've -- I've taken pictures myself
11  personally, and there may have been video or two in
12  there.  I don't recall.
13    Q.    The videos that were presented with
14  your report, you don't appear on those videos, right?
15    A.    That's correct.
16    Q.    And who recorded these videos?
17    A.    Kevin Petersen.
18    Q.    You weren't present when those videos
19  were recorded, correct?
20    A.    I was in the building I was in my
21  office across the hall watching while they did it.
22  So I don't know what "present" means.

Page 111

1     Q.    Could you see the experiments going
2   on, as they were occurring?
3     A.    Yes, my office window looks directly
4   into my lab.
5     Q.    Okay.  So your testimony was you
6   actually were sitting there watching the experiments?
7          MR. DAMON:  Objection to form.
8     A.    My testimony was that I was present,
9   and that I could check on them whenever I wanted to.
10    Q.    And you're -- you're basing that off
11  of your recollection from what happened in 2016,
12  right?
13         MR. DAMON:  Objection to form.
14    A.    Yes.  And -- and I'm not saying -- I
15  mean, those videos are hours long, right?  So I may
16  or may not have been there the entire time.  But I do
17  recall being in the building when Kevin and -- when
18  Kevin did the experiments.
19    Q.    How many times did you -- did you
20  check on the experiment?
21         MR. DAMON:  Objection; form.
22    A.    You know, I don't -- I don't recall.

Page 112

1   I know that I went in, saw it set up.  You know,
2   they -- I mean, I -- he -- Kevin was excited to show
3   me that it was working and things like that.  So I
4   went in at least a couple of times.
5     Q.    And do you recall what you
6   specifically said?
7     A.    I don't recall saying -- I don't
8   recall now.
9     Q.    Right.  So -- so we're talking about
10  four years ago, right?
11    A.    Yep.
12    Q.    Okay.  So is there anything else you
13  specifically recall, that you can testify under oath,
14  occurred in November of 2016, in terms of your --
15  your going in to check or discussions that were had
16  about the experiments?
17    A.    I mean, you're asking almost an
18  impossible question, that if it had happened last
19  week I don't know if I could have -- I could answer
20  in a reasonable way.
21         The question, as I interpret it, is,
22  was I present?  Was I involved with this process?

                                    28  (Pages 109 to 112)

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Bruce Gale, Ph.D.
Highly Confidential

Page 113

1   Yes.  Did I see what happened?  Yes.  Do I have
2   videos that show that the whole thing worked?  Yes.
3   Did I understand how they programmed it?  Did I
4   understand what they moved around?  Did I understand
5   how the wiring and other things were done?  Yes, I
6   understand all of these things.  I was present, I
7   looked at it, I was involved.
8        Q.    Okay.  But do you recall anything
9   else about specific discussions that occurred during
10  those experiments in November 2016?
11       A.    I mean, I meet with -- met with Kevin
12  on at least a weekly basis, and often more often --
13  or more than that in this time frame.  And we'd talk
14  about, you know, the experiments, what they were
15  trying to do, how they were going about it.  I don't
16  remember the details, but I remember that they took
17  place, so...
18       Q.    So you can't tell me any more about
19  specific discussions that occurred in November 2016,
20  correct?
21       A.    No.  I mean, well, you have
22  everything that I have.

Page 114

1        Q.    Okay.  And you can't tell me more
2   about the specific portions of the experiment that
3   you personally observed, correct?
4             MR. DAMON:  Objection; form.
5        A.    Yeah.  I don't recall specifically
6   whether I watched this part or that part.  But I do
7   recall seeing the separations when they were done.  I
8   recall seeing the, you know, the machine in
9   operation.  That -- that's what I recall.
10       Q.    You mentioned earlier that they moved
11  parts around.  Do you remember saying that?
12       A.    Yeah.  Some of the modules.
13       Q.    Okay.  So what do you recall
14  specifically about what Mr. Petersen and Mr. White
15  did in terms of moving modules around?
16       A.    I asked them to move some modules.
17  They -- I think -- I believe they videotaped that.
18  They, you know, unscrewed the modules, moved them,
19  you know, took one out -- or took two of them out,
20  moved the one up.  I think they actually moved four
21  of them.  And I -- actually, I did that on occasion
22  with them so I understood how it happened and what it

Page 115

1   took and how hard or easy it was.  So I've done that
2   as well.
3        Q.    So when did you do that?
4        A.    I did that in 2016.  I actually did
5   it about a month ago too.
6        Q.    So when you did it in 2016, which
7   modules did you move around?
8        A.    You know, I don't specifically
9   recall.  I believe in the report it says specifically
10  which ones Kevin and Travis moved as part of the
11  demonstration.
12       Q.    But you don't recall which ones you
13  moved around; is that right?
14       A.    Yeah, I don't.  You know, I probably
15  started in the top left corner or something like
16  that.
17       Q.    You don't know for sure, do you?
18       A.    No.
19       Q.    Okay.  And did you -- did you record
20  the time it took somewhere?
21            MR. DAMON:  Objection.
22       A.    Did I -- did I record when I did it?

Page 116

1        Q.    Yes.
2        A.    I don't think so.
3        Q.    So you didn't do that in 2016?  You
4   didn't actually use a stopwatch and record how much
5   time it took you to move modules around, right?
6        A.    No.  Kevin and Travis did that, so I
7   didn't do it separately.
8        Q.    And when you said you experimented
9   with moving modules around over the last month, is
10  that right?
11       A.    Yes.
12       Q.    And when was that exactly?
13            MR. DAMON:  Objection.
14       A.    I don't know.  Five weeks ago,
15  something like that, six weeks ago.
16       Q.    Was that before you finalized your
17  first report?
18       A.    I don't specifically recall.  I think
19  it was before the second report, but I'm not going to
20  stake my life on that one.
21       Q.    Which modules did you move around?
22       A.    Moved around specifically -- well

29  (Pages 113 to 116)

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Bruce Gale, Ph.D.
Highly Confidential

Page 189

1    that there's a manual that has been -- is part of the
2    prior art appendix that you provided for the
3    2040 System?
4        A.    That's correct.
5        Q.    It's a lengthy manual, right?
6        A.    It is, indeed.
7        Q.    Have you read the entire thing?
8        A.    I have not read the entire thing.
9        Q.    Which parts have you read?
10       A.    I've -- well, I've, you know, looked
11   over it briefly.  I've -- let's see, I'd have to pull
12   it up probably answer that question.
13       Q.    So are you doing that?
14       A.    I can.
15       Q.    Well, do you -- what parts, if any,
16   do you recall right now?  Without reference to the
17   manual.
18       A.    I mean, I specifically went through
19   all of the drawings of all the parts and the
20   description of all the modules.  I went through the
21   description of how the -- how to program the system,
22   how it works.  I read the introduction.  I've read, I

Page 190

1    think -- anyways, how to use it, change it, operate
2    it.  But as you note, it's quite long.  There's some
3    parts that aren't as relevant.
4        Q.    How did you obtain the 2040 System
5    that was in your lab?
6        A.    It was -- I don't remember the exact
7    details at this point, but it was -- I think it
8    was -- we found one that we could purchase and
9    Bio-Rad purchased that, and had it shipped to my lab.
10       Q.    How much was it purchased for?
11       A.    You know, I don't recall right off.
12       Q.    Any ballpark estimate?
13       A.    I don't know.  $10,000, something
14   like that.
15       Q.    How much were the systems when they
16   were sold in the -- like, let's say 2008, 2009 time
17   frame by Applikon?
18       A.    You know, I don't know.
19       Q.    Do you have any understanding, in
20   terms of ballpark?
21             MR. DAMON:  Objection to form.
22       A.    I have not looked to figure that out.

Page 191

1        Q.    So it could be $25,000, $50,000,
2    $100,000, more.  You don't know, correct?
3             MR. DAMON:  Objection; form.
4        A.    You're correct.  I don't -- I don't
5    know what the typical sales price was.
6        Q.    Okay.  Do you know the price that any
7    system sold for prior to the 2010 time period?
8        A.    I vaguely remember that Mr. Koshy
9    might have said something to that effect, but I don't
10   remember.
11       Q.    Do you know what the profit margin
12   was?  Or do you know what the profit margin was for
13   Applikon, the manufacturer of those systems?
14       A.    I don't recall.
15       Q.    Did you ever know what the profit
16   margin was?
17       A.    I don't know if I knew.  I don't
18   recall that coming up, but I may have known it at
19   some point.
20       Q.    Did you ever know the price the
21   system sold for?
22             MR. DAMON:  Objection to form.

Page 192

1        A.    Again, I read, you know, a number of
2    Metrohm documents that might have come up in the
3    deposition of some of the Metrohm folks.  I don't
4    remember.
5        Q.    You're not sure one way or another
6    what the price was, correct?
7        A.    Correct.
8        Q.    Has the 2040 System that -- that
9    Bio-Rad shipped to you -- first of all, when did you
10   receive that?
11             MR. DAMON:  Objection; form.
12       A.    I believe it arrived in 2016.  I
13   don't remember the precise dates or anything like
14   that.
15       Q.    You can't remember exactly when you
16   received the 2040 System that Bio-Rad arranged for?
17       A.    I mean, it was sometime in 2015 or
18   2016.
19       Q.    Okay.  Has that system been basically
20   within your custody since then?  Since you acquired
21   it?
22       A.    Yes.

48  (Pages 189 to 192)

Page 193

1    Q.    And where has it been this whole
2    time?
3         A.    It's been in my lab the entire time,
4    other than when it's been in my office recently.
5    Q.    And why was it moved to your office?
6         A.    So that your attorneys could come and
7    look at it.
8    Q.    Okay.  And what is your lab?
9         MR. DAMON:  Objection; form.
10   A.    I mean, what do you mean by what is
11   my lab?
12   Q.    I mean, how many -- how many liquid
13   chromatography systems are in your lab?
14   A.    Depends on how you count liquid
15   chromatography systems, but I have probably three or
16   four.
17   Q.    What -- what liquid chromatography
18   systems -- and we're going to come back to the -- the
19   2040 System, but setting that aside, what other
20   systems that you considered to be liquid
21   chromatography systems have you had in your lab?
22   A.    So all the liquid chromatography

Page 194

1    systems I have, we built ourselves.
2    Q.    Okay.  And are those systems that you
3    or your students use?
4         A.    Yeah.  We use them every day.
5    Q.    So if I understand your testimony,
6    you have three or four systems that are liquid
7    chromatography systems in your lab, that you or your
8    students have built, that are used every day?
9         A.    We don't use all three or four of
10   them every day, but we use one or the other of them
11   pretty much every day.  Probably not every Sunday or
12   something like that, but I do research with these
13   instruments, I use them regularly.  They are a major
14   part of what I do in my lab.
15        MS. SKLENAR:  Now, why don't we go to
16   Tab G and mark that as the next in order.
17        THE TECH:  (Complying.)
18        (Whereupon, Exhibit 335, List of
19   Programs on the 2040 Instrument, was marked for
20   identification.)
21   Q.    If we can blow up so we can read
22   what's on the monitor, please?

Page 195

1    A.    Sorry.  Did you say Tab G?
2    Q.    Yes.
3    A.    Because I don't see that in my list.
4    Q.    It should appear.
5         THE TECH:  Yeah, it takes just a
6    little -- there's a little bit of lag time between
7    when it comes up.  It's Exhibit 335.  It should be
8    there now if you refresh your web browser.
9         THE WITNESS:  Okay.
10        MS. SKLENAR:  It should also be on
11   the screen.
12   Q.    Do you recognize this Exhibit 335?
13   A.    Yes.
14   Q.    And this is a list of what?
15   A.    These are -- it looks like the list
16   of different programs on the 2040 instrument that's
17   in my office presently.
18   Q.    And did it -- when the system was
19   delivered to you, did it have all of these programs
20   on it?
21   A.    It had several programs on it.  I
22   don't remember exactly what all of them were, but in

Page 196

1    fact, most of these were already on it.
2    Q.    Which of these programs listed on
3    Exhibit 335 were added by individuals in your lab?
4         A.    I can't be positive exactly, but like
5    the chrom test, the chrom test2, the chrom test2
6    copy, probably that chrom2 and maybe the
7    chrm_gradient one.  The other ones I -- I'm not
8    positive about.
9    Q.    Okay.  Who programmed -- so let's
10   focus on the one that starts with chrom.  Who
11   programmed chrm_gradient?
12   A.    I mean, it would have been one of my
13   students, either Kevin or Travis, if -- the -- I know
14   the chrom2, the chrom test2, the chrom2 and the chrom
15   test were ones that we did.  The chrm_gradient may or
16   may not have been ours.  But that would have been
17   done by either Kevin or Travis if it was done by us.
18   Q.    You're not sure if anyone in your lab
19   did chrm_gradient?
20   A.    I'm not positive.
21   Q.    And if someone in your lab did the
22   chrm_gradient, you're not familiar with the efforts

11/25/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Bruce Gale, Ph.D.
Highly Confidential

Page 389

1   CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2          I, Amanda Gorrono, the officer before
    whom the foregoing depositions were taken, do hereby
3   certify that the foregoing transcript is a true and
    correct record of the testimony given; that said
4   testimony was taken by me stenographically and
    thereafter reduced to typewriting under my direction;
5   and that I am neither counsel for, related to, nor
    employed by any of the parties in this case and have
6   no interest, financial or otherwise, in its outcome.
7          IN WITNESS WHEREOF, I have hereunto
    set my hand this 25th day of November, 2020.
8
9
10
11
12
13
14   _____
15   AMANDA GORRONO, CLR
16   CLR NO: 052005 - 01
17
18   Notary Public in and for the State of New York
19   County of Suffolk
20   My Commission No. 01G06041701
21   Expires: 01/07/2023
22

Page 390

1   Bruce Gale, Ph.D., c/o
    Quinn Emanuel Urquhart & Sullivan, LLP
2   1300 I Street NW, #900
    Washington, D.C. 20005
3
4   Case: Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.
    Date of deposition: November 25, 2020
5   Deponent: Bruce Gale, Ph.D.
6
7   Please be advised that the transcript in the above
8   referenced matter is now complete and ready for signature.
9   The deponent may come to this office to sign the transcript,
10   a copy may be purchased for the witness to review and sign,
11   or the deponent and/or counsel may waive the option of
12   signing. Please advise us of the option selected.
13   Please forward the errata sheet and the original signed
14   signature page to counsel noticing the deposition, noting the
15   applicable time period allowed for such by the governing
16   Rules of Procedure. If you have any questions, please do
17   not hesitate to call our office at (202)-232-0646.
18
19
20   Sincerely,
     Digital Evidence Group
21   Copyright 2020 Digital Evidence Group
     Copying is forbidden, including electronically, absent
22   express written consent.

Page 391

1   Digital Evidence Group, L.L.C.
    1730 M Street, NW, Suite 812
2   Washington, D.C. 20036
    (202) 232-0646
3
4   SIGNATURE PAGE
    Case: Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.
5   Witness Name: Bruce Gale, Ph.D.
    Deposition Date: November 25, 2020
6
7   I do hereby acknowledge that I have read
    and examined the foregoing pages
8   of the transcript of my deposition and that:
9
10   (Check appropriate box):
     ( ) The same is a true, correct and
11   complete transcription of the answers given by
     me to the questions therein recorded.
12   ( ) Except for the changes noted in the
     attached Errata Sheet, the same is a true,
13   correct and complete transcription of the
     answers given by me to the questions therein
14   recorded.
15
16   _____   _____
17   DATE          WITNESS SIGNATURE
18
19
20
21   _____   _____
22   DATE          NOTARY

Page 392

1   Digital Evidence Group, LLC
2   1730 M Street, NW, Suite 812
3   Washington, D.C. 20036
4   (202)232-0646
5
6          ERRATA SHEET
7
8   Case: Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.
9   Witness Name: Bruce Gale, Ph.D.
10   Deposition Date: November 25, 2020
11   Page No.   Line No.    Change
12
13
14
15
16
17
18
19
20
21   _____   _____
22   Signature            Date

98  (Pages 389 to 392)

# EXHIBIT H

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CYTIVA SWEDEN AB, and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC, | |
| Plaintiffs | C.A. No. 18-1899-CFC Consolidated |
| v. | **DEMAND FOR JURY TRIAL** |
| BIO-RAD LABORATORIES, INC., | **HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY** |
| Defendant. | |

<u>**OPENING EXPERT REPORT OF DR. BRUCE GALE**</u>

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

4.      I attach as Exh.[1] 1 my *curriculum vitae*, which includes a complete list of my qualifications.

5.      I received a bachelor's of science degree in Mechanical Engineering from Brigham Young University in 1995 and received my Ph.D. in Bioengineering from the University of Utah in 2000.  My thesis was on the development, fabrication, and testing of a microscale electrical field flow fractionation system, a type of liquid chromatography system. This project involved the development of this new chromatography technique as well as all the liquid handling, connections, and detection components.  Furthermore, I was involved in research and design of all fluid handling components for both macroscale and microscale versions of multiple other types of field flow fractionation systems.

6.      Since receiving my Ph.D. I have been continuously involved in academia.  I am currently a Professor of Mechanical Engineering at the University of Utah and am the Director of the State of Utah Center of Excellence for Biomedical Microfluidics as well as the College of Engineering Nanofabrication Lab.  I am also an Adjunct Professor at the University of Utah in the Departments of Bioengineering, Electrical and Computer Engineering, and Materials Science. I was named Researcher of the Year in 2012, 2013, and 2016 for the Mechanical Engineering Department at the University of Utah.  I recently received the Distinguished Research Award from the University of Utah at the May 2020 graduation.

7.      As part of my work as a scientist and researcher, I have published more than 350 articles, more than 140 of which are published in archival journals such as: *Analytical Chemistry*, *Analytical and Bioanalytical Chemistry*, *Journal of Chromatography*, *Analyst*, *Analytical Methods*, *Electrophoresis*, *Journal of the Electrochemical Society*, *Sensors and Actuators*, *Lab*

---

[1]   Exh. __ refers to exhibits attached to this report unless otherwise noted.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

*on a Chip*, *Langmuir*, and other top chemistry and engineering journals.  I have written 5 book chapters as well.  These papers and book chapters cover a wide range of topics, but primarily center on microfluidic devices for biology and chemistry.  About 1/3 of my papers are for the design and characterization of field flow fractionation instruments, which is a type of liquid chromatography.  These papers on field flow fractionation papers reflect our efforts to design and automate a variety of chromatography systems.  Many of my other papers discuss issues related to the Asserted Patents including: liquid handling sensors, conductivity sensors, oxygen sensors, optical detection systems, liquid handling component automation and integration, control systems for liquid handling devices, and other analytical devices.

8.      I have taught several courses related to the Asserted Patents.  First, I have taught our senior design course on two occasions.  This course requires seniors in Mechanical Engineering to design and develop their own products.  As part of this course, it was my responsibility to teach important engineering design principles, review the progress of the design teams, and guide these teams in their progress.  Many of these projects involve automation, fluidics, and electronics.  I also regularly teach a class on microfluidics, which is the science and engineering of small scale fluidics.  In this course I teach principles of fluidic automation, fluid component engineering, fluid physics, and system manufacturing.  I have also taught courses on: dynamics, physiology, biosensors, biomaterials, and microelectromechanical systems (MEMS).  Furthermore, I have advised graduate students in many related areas of study including:  pumps, valves, chromatography systems, biosensors, optical detection techniques, highly-parallel surface plasmon resonance (SPR) systems, automated sample preparation systems, biomolecule analysis systems, and medical devices.

3

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

280.     In all cases, I applied the agreed claim constructions or the Court's constructions in performing my analyses and rendering my opinions in this report.

## VI.     SUMMARY OF OPINIONS

281.     It is my opinion that certain prior art references and systems anticipate and/or render obvious all the Asserted Claims of the Asserted Patents.

282.     As set forth in detail below, it is my opinion that the Asserted Claims of the Asserted Patents—claims 1, 2, 4, 6-10, 12-17, 19-21, 23-27, and 30 of the '589 patent, claims 1-4, 10, 12-14, 17, and 18 of the '590 patent, claims 9, 14, 26, and 27 of the '591 patent, claims 1, 4-9, 15, 25, 27, 29, and 30 of the '420 patent, and claims 16, 19, 20, 22, 25, 27, 28, 30, and 33-35 of the '124 patent—are invalidated by each of the following prior art references:

- The 2040 System alone or in combination with the 850 System and/or the 811 System and/or the Agilent 1100/1200 Series and/or Hess and/or the DuoFlow System and/or Wendell

- The 850 System alone or in combination with the 811 System and/or the Agilent 1100/1200 Series and/or Hess and/or the 2040 System and/or the DuoFlow System

- The NGC Prototype System alone or in combination with the 2040 System and/or the 850 System and/or the DuoFlow System and/or the Agilent 1100/1200 Series

283.     It is also my opinion that the Asserted Claims of the Asserted Patents are invalidated for lack of written desciption, lack of enablement, and/or indefiniteness under Section 112.

284.     It is further my opinion that the Asserted Claims of the Asserted Patents are invalidated for improper inventorship.

285.     In the following sections, I provide a narrative of my opinions.

## VII.     DESCRIPTION OF THE STATE OF THE ART AND SUMMARY OF PRIOR ART REFERENCES

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



(2040 Brochure at BRGE00001521-22; *see also* 2040 Manual at BRGE00003266-67.[120])

299.   I have inspected and analyzed a 2040 System that I have in my laboratory.  I also performed tests to show the 2040 System can deliver controlled fluid flow to and through a liquid chromatograph column and which I consider an automated liquid chromatography system capable of performing automated liquid chromatography.  The tests are described in the test report, attached as Exh. 4.  I recorded videos of these tests showing the 2040 System performing liquid chromatography.  A video of the test conducted on November 12, 2016 is attached as Exh. 5 and a video of the test conducted on November 14, 2016 is attached as Exh. 6.  An edited version of the video for the November 12, 2016 test is attached as Exh. 7, and an edited version of the video for the November 14, 2016 test is attached as Exh. 8. I may choose to rely on all or parts of these videos in my trial testimony

D.    **The 850 System**

120   Although I cite to the version of the 2040 Manual labeled BRGE00003253, the same disclosures I rely on can be found in the version of the same document produced as BIO-RAD-000001, which was used as Exhibit 6 at the Metrohm deposition.  See Metrohm Tr. at 102:11-105:25 (also testifying that there were no major hardware changes to the 2040 System from 2008 until 2015).

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



- Deposition testimony of Bob Iovanni, Wayne Bland, Farah Mavandadi, and Shawn Anderson.

348.    The accused NGC system products do not infringe any of the Asserted Claims of the Asserted Patents.  However, to the extent that Plaintiffs contend that the accused products meet every element of an asserted claim, that claim is invalid under Plaintiffs' claim interpretation as anticipated under 35 U.S.C. § 102(g) or at least obvious under 35 U.S.C. § 103.

349.    I discuss the NGC Prototype System in Section IX.

## VIII.  INVALIDITY OF THE ASSERTED PATENTS

**A.    The '589 Patent Is Invalid in View of the 2040 System Alone or in Combination with the 850 System and/or the 811 System and/or the Agilent 1100/1200 Series and/or Hess and/or the DuoFlow System and/or Wendell**

**1.    Claim 1[a]:** An automated liquid chromatography system comprising

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

350.    The 2040 System discloses an automated liquid chromatography system that can be used, for example, for chromatography.

351.    The 2040 System discloses a multitude of "wet part modules" that are used for automated liquid handling.  (2040 Brochure at BRGE00001521 ("The Applikon Analytical ADI 2040 Process Analyzer is a multipurpose wet chemical analyzer, that has been designed to offer flexibility and withstand the harshest environments.  It makes use of proven analytical techniques, like titration, colorimetry and dynamic standard addition with ion selective electrodes.").)  Because the software of the 2040 System allows it to run automated functions (*Id.* at BRGE00001522 ), the system is automated.  (*Id.* ("The software allows independent runs for analyses, validation of the results, calibration of the system and cleaning of the sampling device, measuring cell and probes as well as control of external devices such as sample preconditioners.  These various runs can be activated via the human interface, but also on time basis, by remote control or by if-statement.  Using these options the Analyzer can for example run a calibration and/or cleaning cycle if a result lies outside certain pre-defined limits.  Sample streams may be overriden [sic] or reactivated for analysis, by preprogramming, remote control or by if-statement.  The Analyzer is able to verify the presence of sample and trigger an alarm when insufficient.  It will keep a record of recent analyses, including titration curves and calibration data, to ease trouble shooting.").)  These modules allow the system to automatically direct fluid flow to and through a liquid chromatography column.

352.    Numerous disclosures in the 2040 System documentation further reinforce the automated nature of this liquid chromatography system.  For example, the 2040 System performs automatic calibration and cleaning.  (*Id.* at BRGE00001521 "Its rugged hardware and the possibility to do automatic calibration & cleaning, results in a 99.5% up-time.")  The 2040

131

System's "controller makes it possible to run up to 3 independent analyses simultaneously." (*Id.*)  The 2040 System performs "[t]itration through a full scan with decreasing burette additions in the vicinity of the inflection point, automatically finding inflection points."  (*Id.* at BRGE00001524.)  The 2040 System performs differential colorimetry where "[t]he color development stabilization is automatically detected by making use of differential absorbance measurements."  (*Id.*)  The 2040 System performs an automated method for dynamic standard addition.  (*Id.* ("This method has been developed specially to work with ion-sensitive electrodes. A small and precise amount of sample is taken, and buffer will be added.  The Analyzer will then do a measurement and instruct the burette to add a calculated amount of standard solution to the mixture.  Then it will repeat the measurement.  From the difference it will calculate the original concentration.").)

353.    The 2040 System consists of up to 20 "wet part modules."  (2040 Manual at BRGE00003266.)  The wet part modules generally have a collection of tubes that are used to carry fluid between modules as can be seen in the figure below:

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**



(2040 Brochure at BRGE00001521.)

354.   The numerous wet part modules have various functions relating to the movement and analysis of a fluid stream.  According to the 2040 Manual, "[o]ne wet part can have different functions depending on the wet part configuration.  For example, a Valve module can be used as an addition valve to add a reagent into the reaction vessel or as a sample selection valve for sample stream selection."  (2040 Manual at BRGE00003305.)

355.   As the 2040 Manual explains, the overall system is "controlled by a Computer Board Assembly in combination with an Input/Output (I/O) Module, a Serial module and a Sensor Module.  The I/O module controls wet part modules, external devices and the communication with external devices including remote control.  The serial module is used to

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

connect an external computer to perform serial communications.  The Sensor Module reads the signals from the connected sensors and convert these to digital values. . . . The Computer Board Assembly drives the human interface and the memory card and uses an internal serial bus for interfacing the I/O Module(s), the Serial modules, the Sensor Module(s) and the burette module(s)."  (*Id.* at BRGE00003266-67.)  The system also has a memory card and uses a serial bus to communicate with the I/O Modules, the Sensor Modules, the Serial Modules, and the Burette Modules.

356.   The 2040 System is a liquid chromatography system.  The 2040 Brochure discloses that "Applikon Analytical systems are available using titration, colorimetric analysis, ion selective electrodes or more complex electrochemical analysis techniques such as voltammetry and ion chromatography."  (2040 Brochure at BRGE00001527.)  A POSITA would have recognized that the 2040 System is one of Applikon Analytical systems that can perform ion chromatography.  Further, a POSITA would have recognized that the disclosure of "ion chromatography" is a disclosure that the 2040 System can be used for liquid chromatography.  Ion chromatography is a specific type of liquid chromatography that is well known to those skilled in the art.

357.   The 2040 System has standard components to perform liquid chromatography.  More specifically, the 2040 System has all the components that typically make up a liquid chromatography system: valves, pumps, mixers, and sensors.

358.   Specifically, the 2040 System discloses a Solenoid Valve Module that can have one or two plunger valves and be used as a sample, liquid addition, or drain valve.  (2040 Manual at BRGE00003307.)  The 2040 System discloses a Macro Pipette Module that can be used with the 2/2 or 3/2 Valve Modules to provide sampling. (*Id.* at BRGE00003308.)  The 2040

134

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

System discloses Tubing Pump Modules that come in multiple configurations and can provide flow rates of 5, 40, 120 or 320 ml/minute. (*Id.* at BRGE00003309.) There is a constant speed pump with an AC motor, and one with a DC motor that has a peristaltic pump head. (*Id.*) These modules are used for adding reagents, sample or rinse solutions, for carrying sample from the Sampling System Loop Module or draining the reaction vessel. (*Id.*)

359.   The 2040 System discloses a Burette Valve Module that has a rotary type of valve with five hydraulic connections. (*Id.* at BRGE00003310.) It can be used in a variety of different configurations. (*Id.*) The 2040 System discloses a Burette Selector Valve Module that has ten hydraulic connection ports and is a rotary type valve. It can be used for sampling, reagent addition and rinsing. (*Id.*) The 2040 System discloses a Burette Module that consists of a cylinder and motor controlled piston. (*Id.* at BRGE00003311.) This configuration allows the cylinder to be filled and the contents dosed. (*Id.*) This module is very flexible and can be combined with a number of other modules. (*Id.* at BRGE00003312-15.)

360.   The 2040 System discloses a Sampling System Loop Module that can be used for highly reproducible closed loop sampling. (*Id.* at BRGE00003317.) It can be used in its 3 way or 2 way configuration and in conjunction with valves pumps or burettes. (*Id.*)

361.   The 2040 System discloses a Stirrer/Vessel Holder Module used to stir or mix a sample. (*Id.* at BRGE00003306.)

362.   The 2040 System discloses a Cuvette Module that can be used to detect light absorbance of the sample coming off the column. (*Id.* at BRGE00003322.) This module has a number of different light sources and a number of different filters that can be used to detect light of different wavelengths. (*Id.* at BRGE00003323.) Samples in the module may be stirred using a magnetic stir bar. (*Id.* at BRGE00003322.) The 2040 System discloses a Basic Probe

Colorimeter Module to detect the wavelength of light which can indicate the presence of particular components coming off the column.  (*Id.* at BRGE00003326.)  The 2040 System discloses a sensor to measure the conductivity of a solution and a sensor to measure pH.  (*Id.* at BRGE00003371, -3373.)  There is also a sensor to measure temperature.  (*Id.* at BRGE00003371-3372.)

363.     Since the 2040 System is designed to deliver automated fluid flow to a variety of different devices and has all the components necessary to deliver such flow to a chromatography column, it meets all the elements of this claim.  During his deposition, Metrohm witness Mr. Koshy testified that the 2040 System included pumps that can provide controlled delivery. Metrohm Tr. at 91:5-92:4.  Mr. Thomas Koshy further testified that the 2040 System was capable of performing chromatography—it included all the components needed to accomplish chromatography such as the sample loop and a pump, and readily available columns could be included or connected with the 2040 System.  *Id.* at 143:20-144:15; 161:23-162:9; 243:8-244:12.

364.     To the extent the 2040 System does not anticipate claim 1 because it is not considered a liquid chromatography system, it would have been obvious in light of the 2040 System and the knowledge of a person of ordinary skill in the art.

365.     As I testified at the PI hearing in the SDNY case, the 2040 System was designed to deliver controlled fluid flow to various components.  There would be no reason to argue that one of those components would not be a chromatography column, and it would take about two minutes to hook a column up to the 2040 System.  A POSITA would have motivation to use the 2040 System for such an application because it is automated, can be programmed, and already has all the necessary components to perform chromatography.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

366.    Moreover, a person of ordinary skill in the art knowing the modular liquid chromatography systems already available to the public would be motivated to use the 2040 System to perform liquid chromatography because it has all the necessary components.  Multiple prior art systems disclose the use of chromatography with systems having the same modular components as the 2040 System.  For example, the Metrohm 850 Professional IC System is an automated Ion Chromatography system, as discussed below in my discussion of the 850 System for '589 claim 1.  *See, e.g.*, Cation Prep 1 Manual at 4, 10-14; AnCat Manual at 4-5.  The Metrohm 811 Online Ion Chromatograph is an automated Ion Chromatography system.  *See infra* § VIII.A.1.(a); *see also* 811 Online IC Instructions for Use at 6.  The NGC Prototype System is an automated liquid chromatography system, as discussed below in my discussion of the NGC Prototype System for '589 claim 1.  *See, e.g.*, ███████████████ ██████████.  Bio-Rad's DuoFlow system is a modular chromatography system used for "high resolution purification of proteins, peptides, and other biomolecules."  DuoFlow Manual, p. 1-1; *see infra* § VIII.A.1.(b).

367.    A person of ordinary skill in the art would have been motivated to use such teachings to perform liquid chromatography with the 2040 because the prior art systems each deal with modular design systems that perform liquid chromatography.  Such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.  This is confirmed by the testimony of Mr. Koshy, who testified that the 2040 System as sold could be used for liquid chromatography, as it had all the components needed to do so.  Koshy Decl. ¶ 8; Metrohm Tr. at 143:44-144:15, 161:23-163:1, 233:18-234:8, 243:8-244:12.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

368.    Bio-Rad has acquired a 2040 System that performs automated liquid chromatography and contains the modules described in the 2040 Manual.  I have performed tests that show the 2040 System can deliver controlled fluid flow to and through a liquid chromatograph column and which I consider an automated liquid chromatography system capable of performing liquid chromatography.  The tests are described in the test report, attached as Exh. 4.  I recorded videos of these tests showing the 2040 System performing liquid chromatography.  A video of the test conducted on November 12, 2016 is attached as Exh. 5 and a video of the test conducted on November 14, 2016 is attached as Exh. 6.  An edited version of the video for the November 12, 2016 test is attached as Exh. 7, and an edited version of the video for the November 14, 2016 test is attached as Exh. 8.

(a)    The 2040 System in Combination with the 811 System

369.    To the extent the 2040 System is found not to disclose an automated liquid chromatography system, this element would be obvious in light of the 2040 alone or in combination with the 811 System which discloses this limitation.

370.    For example, the 811 System discloses an automated liquid chromatography system used, for example, for ion chromatography.  (811 Instructions at 6.)  "The Metrohm 811 Online Ion Chromatograph is designed to provide continuous sample analysis in a process environment."  (811 Instructions at 6.)  The 811 System can be custom-tailored to fit most ion chromatography applications.  (811 Instructions at 6 ("The 811 can be custom-tailored to fit most IC applications.  The single-channel instrument allows either anions or cations to be analyzed.  The dual channel version is normally used to analyze anions and cations simultaneously, and is housed in the single channel cabinet.").)

371.    The 811 System is automated using a built-in PC, which can call up and execute calibration procedures or different sample sequences.  (811/821 Brochure at 5 ("With a freely

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

DATED:  September 14, 2020

_____

Bruce K. Gale, Ph.D.

# EXHIBIT I

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Cytiva Sweden AB et al.,

Plaintiff,

Civil Action

-against-          No. 18-1899-CFC

Bio-Rad Laboratories, Inc.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEO-RECORDED DEPOSITION OF
KEVIN PETERSEN
Zoom Recorded Videoconference
11/18/2020
1:37 p.m. (CST)

REPORTED BY:  AMANDA GORRONO, CLR
CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

1          11/18/2020

2          1:37 p.m. (CST)

3

4       VIDEO-RECORDED DEPOSITION OF KEVIN PETERSEN,

5    held virtually via Zoom Videoconferencing, before

6    Amanda Gorrono, Certified Live Note Reporter, and

7    Notary Public of the State of New York.

## Page 3

1    A P P E A R A N C E S

2    (Via Zoom Videoconferencing):

3

4    ON BEHALF OF PLAINTIFF Cytiva Sweden AB et al.:

5       MICHAEL J. SEBBA, ESQUIRE

        ARNOLD & PORTER KAYE SCHOLER LLP

        250 West 55th Street

6       New York, New York 10019-9710

        PHONE:  212.836.7529

7       E-MAIL: Michael.sebba@arnoldporter.com

8

9    ON BEHALF OF DEFENDANT Bio-Rad Laboratories, Inc. and
     the witness

10      DAIVD BILSKER, ESQUIRE

        QUINN EMANUEL URQUHART & SULLIVAN LLP

11      50 California Street

        22nd Floor

12      San Francisco, California 94111

        PHONE: 415.875.6600

13      E-MAIL: Davidbilsker@quinnemanuel.com

14

15   ALSO PRESENT:

16   Sean Damon, Esquire, Quinn Emanuel Urquhart &

17   Sullivan LLP

18   Andy Mortensen, Legal Videographer, Digital Evidence

19   Group

20

21

22

## Page 4

1          I N D E X

2    WITNESS           EXAMINATION BY        PAGE

3    KEVIN PETERSEN     MR. SEBBA              7

4                      MR. BILSKER     151

5                      MR. SEBBA       168

6                      MR. BILSKER     170

7

8          E X H I B I T S

9    EXHIBIT     DESCRIPTION              PAGE

10   Exhibit 290  Notice of Subpoena.............  22

11   Exhibit 291  Kevin Petersen's LinkedIn
                  Profile........................  24

12   Exhibit 292  C1 Petersen Notebook............   50

13   Exhibit 293  App A 234......................   82

14   Exhibit 294  10/20/16 E-mail................  107

15   Exhibit 295  PBS/Methanol Gradient
                  Spreadsheet....................  109

16   Exhibit 296  Travis White's LinkedIn
                  Profile........................  112

17   Exhibit 297  11/15/16 E-mail................  117

18   Exhibit 298  Exhibit 4 to Dr. Gale's Expert
                  Report.........................  120

19

20   Exhibit 299  Screengrab 1...................  123

21   Exhibit 300  Screengrab 2...................  124

22

11/18/2020             Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.             Kevin Petersen

Page 45

1   get the device, you know, physically in the location
2   (inaudible) power supply figured out.
3            I think that, you know, the actual --
4   during the bulk of the testing happened in probably
5   about a 39-hour time frame.  It probably took -- at
6   least in my time.  I don't know Travis's time, but it
7   was probably about -- about 40 hours worth of work.
8   With the actual -- once you figured out what the
9   system is actually doing, and you just want to try
10  and run some tests.  So it was not a lot.
11           Q.   So when you say -- when you're
12  estimating that 40 hours, what steps were done in
13  those 40 hours?
14           A.   Again, this is where I have to
15  compare what my notebook says relative to when I
16  submitted times to Dr. Gale.  So I would suspect that
17  steps that were probably done in that were, one,
18  figuring out how to do the gradients, how to actually
19  pump it, verify that it does pump it, get the
20  programming all done, and actually have it do
21  chromatography and see if it separated anything.
22           So the bulk of the steps were

Page 46

1   probably done in -- at least in the terms of the time
2   I spent.  I don't know about Travis's hours.
3            Q.   Were you provided any documents with
4   the 2040 System?
5            A.   So, I looked for the manuals, because
6   I thought sure we had a manual.  But I didn't see any
7   electronic copies of manuals in the documents I
8   provided, so I must have been given a hardcopy
9   manual.  So either Travis or I would have followed
10  the hardcopy manual, or even Travis may have hardcopy
11  manual.  Travis may have found an electronic manual,
12  but I believe we worked off of a hardcopy manual that
13  came with the instrument.
14           Q.   Were there any other documents that
15  you operated off of?
16           A.   No.
17           Q.   So what was Dr. Gale's role in the
18  Applikon Project?
19           A.   So, he -- he came to us, like I
20  mentioned, and said we'd like you to make this do
21  chromatography.  We would give him occasional updates
22  and say this is where we're at, these are the

Page 47

1   problems we're having.
2            And let's see, later he -- I think we
3   came to him at one point and said we were able to get
4   to do chromatography, and here's some of our data.
5   He's like great, the lawyers would like you to film
6   it now.  So okay.  So I think we filmed it at some
7   point and said okay, now the lawyers would like you
8   to switch components.  So okay, so we moved this to
9   there and that to there.  And so we filmed that we
10  could switch it too.
11           That's -- as far as I remember,
12  that's mostly what -- I think I asked him later, you
13  know, should I go this direction or that direction?
14  He said he didn't think those issues were necessary
15  just yet, or at all.  Mostly we just waited for him
16  for general directions as to what he wanted us to do,
17  and we were able to do it.
18           Q.   And you weren't given direction by
19  anyone else?
20           A.   No.
21           Q.   So is if fair to say that the only
22  people involved in the Applikon Project were -- would

Page 48

1   be you, Mr. White, and Dr. Gale?
2            A.   Yes.
3            Q.   Okay.  Did you read the entire
4   hardcopy 2040 manual that you mentioned before?
5            A.   No, certainly not.
6            Q.   Do you know what parts of it you
7   read?
8            A.   We would have read the parts related
9   to programming it, we would have read parts related
10  to hardware-specific questions we may have had.  I --
11  I don't remember.  Again, this is four years ago
12  since I've even, you know, seen this.
13           Q.   Did you find any sections of the
14  manual that specifically discuss liquid
15  chromatography?
16           A.   It's been too long since I've
17  actually had a manual in front of me to answer that
18  question.  I don't know.
19           Q.   Did you find any instructions in the
20  manual for using the 2040 System to perform ion
21  chromatography?
22           A.   Again, I don't remember that one

12  (Pages 45 to 48)

11/18/2020          Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.          Kevin Petersen

---

Page 97

1      THE TECH:  (Complying.)
2      Q.    All right.  Let's focus on the
3   program titled chrom test2.  So you believe that you
4   and Travis White created the program chrom test2,
5   correct?
6      A.    Yes.
7      Q.    Would that program have been entered
8   through the interface shown in this photo of the
9   2040 System?
10     A.    Yes.
11     Q.    Who would have entered it?
12     A.    Travis primarily, and then I would
13  have also entered things as well.
14     Q.    Who would have been present while you
15  and Travis were entering all the steps in this
16  program?
17     A.    Just Travis or I.
18     Q.    And how long would that have taken?
19     A.    I don't remember, unfortunately.  It
20  didn't seem like it took too long, but it was a very
21  bold interface, and so it wasn't as easy as just
22  typing in a value.  You had to literally go through

---

Page 98

1   and add each one.
2      Q.    Do you have an estimate on how long
3   it took?
4      A.    I -- unfortunately, I'm not the best
5   person to ask on the estimate of time, simply because
6   it's so long ago.  But it does -- it was not -- it
7   didn't seem like it took an unreasonable amount of
8   time.
9      Q.    Would have that been recorded in the
10  timesheet that you provided to Mr. Bilsker and
11  Mr. Damon?
12     A.    The time that it spent to physically
13  stand up the instrument and program in the inputs?
14  Is that the question?
15     Q.    Yes.
16     A.    No.  It wouldn't be reflected there.
17     Q.    Okay.  How many inputs were required
18  to create the program chrom test2?
19     A.    I don't remember.  But the program is
20  on the instrument, so you can see for yourself.
21     Q.    Were there any documents used as a
22  reference during the programming of chrom test2?

---

Page 99

1      A.    The manual I'm sure Travis would have
2   used.
3      Q.    Were there any notes referred to
4   during the programming of chrom test2?
5      A.    Again, it would have been in Travis's
6   notebook.
7      Q.    Okay.  Were there any flow charts
8   created when programming chrom test2?
9      A.    No.  Not that I'm aware.
10     Q.    And so was chrom test --
11        MR. SEBBA:  Withdrawn.
12     Q.    Was the program chrom test2 run as
13  part of the Applikon Project?
14     A.    Yes.
15     Q.    By whom?
16     A.    By myself and by Travis.
17     Q.    And what were the results?
18     A.    That we were able to put a dye into a
19  chromatography column automatically hands off, and
20  then change the gradient across that chromatography
21  column, and then dilute the individual dyes in almost
22  a baseline fashion.  In other words, it worked very

---

Page 100

1   well.  It was also very reproducible.  Every time we
2   run that it gave very reproducible values in terms of
3   the times the dyes came off, and just the order of
4   things like that.  It was very reproducible.
5      Q.    How many times did you run that
6   experiment?
7      A.    I think two or three.  I'd have to
8   look at the final report.
9      Q.    Do you remember when you first were
10  able to run that experiment?
11     A.    Not exactly.  And when you say "that
12  experiment," you remember there's a -- there's an
13  iterative process, right?  Where you run it and say,
14  do I need to change the program at all?  If it works,
15  then you say, okay, that's good, and you don't touch
16  the program anymore.
17     Q.    Approximately how many iterations of
18  this program did you create in the Applikon Project?
19     A.    I don't know.  If you were to look at
20  the actual panel and say, oh, all of those are
21  different programs and how many iterations were
22  there?  It depends on what you call an iteration.

---

25  (Pages 97 to 100)

Page 177

1    Digital Evidence Group, L.L.C.
     1730 M Street, NW, Suite 812
2    Washington, D.C. 20036
     (202) 232-0646
3
4    SIGNATURE PAGE
     Case: Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.
5    Witness Name: Kevin Petersen
     Deposition Date: November 18, 2020
6
7    I do hereby acknowledge that I have read
     and examined the foregoing pages
8    of the transcript of my deposition and that:
9
10   (Check appropriate box):
     ( ) The same is a true, correct and
11   complete transcription of the answers given by
     me to the questions therein recorded.
12   ( ) Except for the changes noted in the
     attached Errata Sheet, the same is a true,
13   correct and complete transcription of the
     answers given by me to the questions therein
14   recorded.
15
16
17   _____    _____
     DATE           WITNESS SIGNATURE
18
19
20
21   _____    _____
22   DATE           NOTARY

Page 178

1    Digital Evidence Group, LLC

2    1730 M Street, NW, Suite 812

3    Washington, D.C.  20036

4    (202)232-0646

5

6          ERRATA SHEET

7

8    Case: Cytiva Sweden AB, et al. v. Bio-Rad Laboratories, Inc.

9    Witness Name: Kevin Petersen

10   Deposition Date: November 18, 2020

11   Page No.   Line No.    Change

12

13

14

15

16

17

18

19

20

21   _____    _____

22   Signature               Date

45  (Pages 177 to 178)

# EXHIBIT J

**Test Report 11-14-16**

We performed a chromatography separation of 5 food dyes simultaneously on the Applikon instrument. The separation was complete and appeared to be a baseline separation between the dyes. The separation results were also reproducible with the centers of each of the dyes eluting at the same times. Each test was performed on different days spanning an 11 day period. The results were also reproducible after switching the positions of two of the fluidic components within the Applikon instrument.

**Instrument Programming Details**

The goal of the programming was to reproduce the steps of a dye chromatography experiment. The shared stirrer for PBS and methanol mixing was the sole supply of fluid to the 5mL/min peristaltic pump that was pumping the elutant through the C18 chromatography column. Figure 1 shows all the various pumps, valves and stirrers that were programmed to perform the experiment, the names on the labels will be used throughout the programming description. All the programming was performed on the instrument using the built-in keypad and function buttons. Any pump or valve that is not labeled in the figure was not required for the chromatography experiments that we performed.



Figure 1. Initial layout of fluidic components in the Applikon instrument for performing chromatography in Tests A, B, and C.

The first step in the program was a flush of the sampling column using 100% methanol to ensure that all contaminants were flushed out of the column. To perform the flush 40 mL of methanol was pumped from the methanol supply into the stirrer/supply reservoir using the methanol burette pump. Due to the 20 mL capacity of the burette, this required the burette to fill and dispense twice. After the methanol was pumped into the supply reservoir, the 5mL/min peristaltic pump was switched on and the methanol was drawn from the reservoir and pumped to the sample injection valve which was set in the

"on" position.  In the "on" position the fluid from the peristaltic pump bypasses the sample loop itself and flows straight into the chromatography column.

After pumping pure methanol through the column, the next step was to return the fluid in the column to 50% PBS. This was easily achieved by adding 30 mL of PBS and 15mL of methanol to the reservoir which had 15mL of methanol remaining after flushing the column. Of the 60 mL of the 50/50 methanol mix, 45 mL was pumped through the column (the equivalent of three times the volume of the column). After the 50/50 mix was pumped through the column, the next step was to return the fluid in the column to 100% PBS before adding the sample. This was achieved by adding PBS to the stirrer 15mL at a time six times while the peristaltic pump continued to pump through the column. The result of this step left the fluid in the column as <1% methanol, which we considered to be acceptably close to 100% PBS for our purposes.

While the column was being returned to 100% PBS the sample was prepared for injection into the column by pumping 10 mL of the dye into the sample loop selector valve using the sample burette pump.  The volume of the loop is only 0.5 mL however a much larger volume was pushed through the loop to ensure that the sample loop contained only the sample.  The sample loop is filled while the valve is in the "on" position.  In the "on" position, fluid pumped by the sample burette flows through the sample loop and passes directly to the sample waste reservoir.  Once the sample was pumped into the loop and the column was filled with 100% PBS, the loop valve was switched to the "off" position.  This allowed the 5mL/min peristaltic pump to pump the elutant through the sample loop to push the sample in the loop into the column. The elutant at this point was changed to 10% methanol by adding methanol and PBS to the stirrer while the peristaltic pump was switched "off".

The next phase of the experimental program was the methanol gradient, which incrementally increased the concentration of methanol from the starting concentration of 10% to the final concentration of 75% over 40 minutes. To ensure the correct concentrations, the starting volume of 10% methanol was fixed at 40mL and that volume was maintained throughout by adding 5mL of a combination of PBS and methanol every minute to compensate for the amount being pumped every minute by the peristaltic pump.

After the completion of the methanol gradient the methanol concentration was increased to 100% by adding methanol to the stirrer 15mL at a time while continuing to run the peristaltic pump. This was repeated several times until the concentration of methanol was sufficiently high to ensure that all contaminants were flushed from the column and the fluid in the column was 100% methanol.  At this point, the flows were turned off and the cap was placed over the exit of the column to store it until the next test.

## Flow Path Description

The flow path of the various fluids through the instrument are shown in the following figure. The color code for each fluid is as follows: Green is used to show the flow path of the pure PBS, red is used to show the flow path of pure methanol, orange is used to show the flow path of the elutant which can be PBS, methanol or some combination of the two depending on the point in the chromatography program and black is the sample flow path of the sample when the sample loop valve is in the "on" position (the only difference in the "off" would be that the loop itself would be orange instead of black indicating that the elutant from the peristaltic pump is flowing through the loop). The blue arrows in the figure are

used to show the direction of the flow in each piece of tubing. It should be noted that any piece of tubing that is not one of the colors mentioned above is not used in this experiment.



To Chromatography Column

To Sample Waste

Figure 2. Instrument Flow Path Diagram

**Chromatography**

The initial sample was a combination of 5 food dyes dissolved in 1X PBS buffer at pH 7.3.  The first test used a sample with small and varying concentrations of each dye.  In the second test, each dye was .02% in 1X PBS by weight (See Table 1).  We programmed the Applikon instrument to prepare the column with a variety of flushes, then load the mixed sample, and finally gradually increase the percent methanol in the elutant buffer for a completely automated process with no hands-on processing.  Specifically, we used one burette pump with sample loop to inject a precise amount of sample to the column.  We used the other two burette pumps and valves to add varying amounts of methanol or 1X PBS to the stirrer/supply vessel.  The stirrer/supply vessel mixed the incoming volumes to produce a smooth steady gradient that was continuously pumped out through the peristaltic pump, and through the sample loop valve to the column.  We collected the fractions off the column manually because we did not have an autosampler to collect them for us.  The name of the routine that we programmed using the display and interface that was provided native to the Applikon instrument was called "chrom test2"

All components used came with the Applikon instrument as it was delivered to us.  The device is designed to suit particular processes and applications and as received it was suited for higher flow rates than we needed.  We purchased a different peristaltic pump from Applikon that was rated for smaller flows to make it more compatible with lab-scale chromatography systems.  We also used new peristaltic tubing since we did not know the condition of the peristaltic tubing itself.  To perform the chromatography, we used a common C18 chromatography column (Biotage part # FSL0-1118-0012), and an adapter (Idex Health& Science part # P-650) to connect the tubing from the Applikon instrument to the column.  All food dyes were purchased from (Flinn Scientific part # AP7375).

The hands-off program clearly separated the 5 food dyes from each other with what appears to be a baseline separation between them.  Test A was performed on 11-3-16 with a mixture containing only a small concentration of each of the food dyes, then in Test B (performed 11-4-16), the concentration of mixed food dyes was increased for better visibility in the photographs and also to show reproducibility.  Test C (11-11-16) was a repeat of Test B, and was filmed from start to finish.  In Test D (11-14-16), several physical components of the Applikon system were switched relative to the previous 3 tests.  Specifically, the "sample loop valve B", and the "rinse B" peristaltic pump were switched and also the "carrier" peristaltic pump, and the "sample loop valve A" were switched in the instrument.  After switching these components, and the same chromatography was performed a 4th time.  Test D showed that two of the various subcomponents could be easily switched in about 10 minutes time, and the chromatography results after the switching were unaffected.  The entire chromatography separation process was filmed for Test C.  The switching of the "carrier" peristaltic pump, and the "sample loop valve A" and the immediate Test D that followed was also filmed.

In Tests A, B, C, and D the vials were numbered and collected at the same time so that the vial number would be directly comparable in each of the other tests.  Because manual collection times were not identical for each collected tube (some were 50 seconds and others 60 etc.), some tubes ended up with more volume than can be capped without spilling.  Capping was useful to photograph all the eluted dyes in a single image so some of the liquid from the tops of some tubes was poured or pipetted out to allow capping and subsequent photographing.  Below is a summary of the results shown in Table 1 and Figures 3-6.  The results are quite reproducible with each of the 5 colored peaks eluting at the same times in all four tests.

Table 1 Description of individual dyes present in the separated mixture and listing the vial and corresponding elution time for each dye present.

|  | Test A mixture (initial wt. % dye in 1X PBS) | Test B mixture (initial wt. % dye in 1X PBS) | Test C mixture (initial wt. % dye in 1X PBS) | Test D mixture (initial wt. % dye in 1X PBS) | Center of peak (vial #) | Center of peak elution time (minutes) |
|---|---|---|---|---|---|---|
| Yellow 5 | 0.0077 | 0.02 | 0.02 | 0.02 | 6-7 | 51.1 |
| Yellow 6 | 0.0084 | 0.02 | 0.02 | 0.02 | 14-15 | 58.1 |
| Red 40 | 0.0024 | 0.02 | 0.02 | 0.02 | 18-19 | 101.6 |
| Blue 1 | 0.0038 | 0.02 | 0.02 | 0.02 | 24-25 | 107 |
| Red 3 | 0.002 | 0.02 | 0.02 | 0.02 | 34-35 | 116.5 |



Figure 3. Test A at low dye concentration.  a) starting mixture of dyes.  b) separated dye by fractions collected.  The centers of each peak of eluted colors were at vials 6-7, 14-15, 18-19, 24-25, 34-35.



Figure 4. Test B at higher dye concentration.  a) starting mixture of dyes.  b) separated dye by fractions collected.  The centers of each peak of eluted colors were at vials 6-7, 14-15, 18-19, 24-25, 34-35.



Figure 5. Test C at higher dye concentration.  a) starting mixture of dyes.  b) separated dye by fractions collected.  The centers of each peak of eluted colors were at vials 6-7, 14-15, 18-19, 24-25, 34-35.



Figure 6. Test D at higher dye concentration and after switching instrument components.  a) starting mixture of dyes.  b) separated dye by fractions collected.  The centers of each peak of eluted colors were at vials 6-7, 14-15, 18-19, 24-25, 34-35.

The colors of each individual dye as diluted in 1X PBS match the hues found in the fractions collected after chromatography.  Each dye also elutes in the order expected based upon the results of others who have separated food dyes on C18 columns under similar conditions.



Figure 7.  Individual dilutions of dry dye powders in 1X PBS from left to right:  FDC Yellow #5, FDC Yellow #6, FDC Red #40, FDC Blue #1, FDC Red #3.



Figure 8.  Fluidic components for chromatography.  a) layout for the first three tests (Tests A, B, C).  b) layout for the last test (Test D).  Note the switched location of "carrier" peristaltic pump, and the "sample loop valve A".  We also switched the location of "rinse B" peristaltic pump and "sample loop valve B" but this was not filmed.

# EXHIBIT K

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF DELAWARE

3

   Case No. 18-1899-CFC

4    _____

5    CYTIVA SWEDEN AB, and GLOBAL

   LIFE SCIENCES SOLUTIONS USA LLC,

6

7                        Plaintiffs,

8              v.

9    BIO-RAD LABORATORIES, INC.,

10                       Defendant.

   _____

11

12

13

14

15

           REMOTE VIDEOCONFERENCED AND

16

          VIDEOTAPED DEPOSITION OF

17

            STEVEN WERELEY, PhD

18

19

20

21

22

23   DATE TAKEN: NOVEMBER 20, 2020

24   REPORTED BY: PAUL J. FREDERICKSON, CSR

25   JOB NO. 4343717

                                        Page 1

1  "Fundamentals and Applications of   07:16:28
2  Microfluidics."                        07:16:30
3     Q.   And does that have a number of   07:16:32
4  different editions?                     07:16:34
5     A.   Yes, it does.                   07:16:35
6     Q.   Did you write the chapter or the   07:16:37
7  few sentences on liquid chromatography in   07:16:40
8  that textbook?                          07:16:42
9     A.   Well, it was a collaborative   07:16:43
10 effort, so I certainly, you know,        07:16:46
11 contributed to writing it.  I don't know   07:16:51
12 which words exactly I wrote and which words   07:16:53
13 I didn't.  And there is also, in addition to   07:16:56
14 the text portion of that section on liquid   07:16:58
15 chromatography, there's a few examples.   07:17:06
16 And, you know, so we sort of traded       07:17:08
17 around/circulated these drafts and everyone   07:17:12
18 commented.                               07:17:14
19    Q.   Yeah.  So that -- sorry, that   07:17:15
20 wasn't the question.                     07:17:16
21       Did you actually write -- so   07:17:17
22 when you wrote the textbook, I assume     07:17:19
23 certain people had primary responsibility   07:17:21
24 for certain chapters.  Is that fair?     07:17:22
25    A.   That -- yeah, that's fair.     07:17:26

Page 10

1     Q.   Did you have primary            07:17:27
2  responsibility for the liquid -- for the   07:17:29
3  chromatography chapter?                  07:17:30
4     A.   I guess I would say I didn't --   07:17:33
5  I wasn't primarily responsible for writing   07:17:34
6  that chapter but we all contributed to   07:17:37
7  editing that chapter.                    07:17:40
8     Q.   Yeah.  So let's just see if we   07:17:41
9  can stick with the questions and we'll   07:17:43
10 probably get done a lot quicker.  That again   07:17:45
11 wasn't the question.                     07:17:49
12       Why was it that you didn't have   07:17:49
13 primary responsibility for the           07:17:52
14 chromatography section?                  07:17:53
15    A.   We divided up the topics in the   07:17:57
16 book, and, you know, everybody took       07:17:59
17 different topics, and this was not on my   07:18:01
18 list.                                    07:18:04
19    Q.   So was it just you threw the   07:18:05
20 topics in the air and wherever they landed   07:18:07
21 that's what you got to write?  Or was it   07:18:10
22 divided up based on experience?          07:18:12
23    A.   It was -- we divided the topics   07:18:16
24 up based on who wanted to write or        07:18:19
25 contribute to each section.              07:18:23

Page 11

1     Q.   So you decided that you didn't   07:18:27
2  want to write the section on chromatography;   07:18:29
3  correct?                                 07:18:32
4     A.   I decided that I would rather   07:18:35
5  write other sections.                    07:18:38
6       But I guess I have to come back   07:18:42
7  to the fact that everyone contributed to all   07:18:45
8  of the sections that we wrote.           07:18:46
9     Q.   What is it about working on   07:18:52
10 automated fluid handling systems that gives   07:18:54
11 you any type of experience to the         07:18:56
12 liquid chromatography systems?           07:19:01
13    A.   Liquid chromatography systems   07:19:05
14 are a form of fluid handling systems.     07:19:06
15    Q.   Right.                          07:19:11
16       But your work on automated fluid   07:19:13
17 handling doesn't give you expertise in   07:19:16
18 automated liquid chromatography systems;   07:19:18
19 correct?                                 07:19:20
20    A.   I would say -- so I was trained   07:19:21
21 on liquid chromatography in graduate school,   07:19:25
22 and over the years since then I've used   07:19:29
23 liquid chromatography in several projects.   07:19:32
24    Q.   When you say you were "trained   07:19:36
25 on liquid chromatography in graduate     07:19:38

Page 12

1  school," explain to me what you mean by   07:19:40
2  that.                                    07:19:42
3     A.   I was trained to use a liquid   07:19:44
4  chromatography system, you know, in the   07:19:47
5  course of my research in graduate school.   07:19:50
6     Q.   What does that mean?  You read a   07:19:53
7  book?  You watched a video?              07:19:55
8     A.   Both read a book as well as, you   07:19:59
9  know, hands-on experience.               07:20:03
10    Q.   What did you use liquid         07:20:05
11 chromatography for in graduate school?   07:20:07
12    A.   It was largely, I would say --   07:20:09
13 largely the case that we used liquid      07:20:13
14 chromatography to -- well, I was trained in   07:20:15
15 liquid chromatography in order to -- in --   07:20:21
16 let's say in anticipation of the need to use   07:20:27
17 it in my research.                       07:20:31
18       Subsequently we didn't need to   07:20:34
19 use that, didn't need to go that way in my   07:20:35
20 research project.                        07:20:38
21    Q.   So when you say you were        07:20:39
22 "trained," tell me what that means.      07:20:40
23    A.   You know, I guess that -- that   07:20:45
24 covers the -- learning the theory of liquid   07:20:46
25 chromatography and then learning the     07:20:51

Page 13

4 (Pages 10 - 13)

| | |
|---|---|
| 1 practice of liquid chromatography.   07:20:52 | 1 chromatography"?   07:23:04 |
| 2   Q.   So learning the theory is like   07:20:55 | 2   A.   I'm telling you about the system   07:23:04 |
| 3 reading something.  Is that fair?   07:20:57 | 3 that I was trained on in the '90s.   07:23:06 |
| 4     MR. MILLER:  Objection,   07:20:59 | 4   Q.   Well, so in an automated liquid   07:23:08 |
| 5     foundation.   07:21:00 | 5 chromatography system, is it your   07:23:11 |
| 6 BY MR. BILSKER:   07:21:00 | 6 understanding or your opinion that you just   07:23:13 |
| 7   Q.   What did you mean by "learning   07:21:02 | 7 put the sample in and tell the machine "run   07:23:15 |
| 8 the theory"?  Tell me exactly what you did   07:21:03 | 8 chromatography"?   07:23:19 |
| 9 as far as learning the theory.   07:21:07 | 9   A.   Could you tell me the time frame   07:23:20 |
| 10   A.   I was reading passages in   07:21:08 | 10 that you're talking about?   07:23:23 |
| 11 textbooks and, you know, performing some   07:21:10 | 11   Q.   Today.   07:23:24 |
| 12 calculations, things like that.   07:21:14 | 12   Okay.   07:23:24 |
| 13   Q.   What kind of calculations were   07:21:16 | 13   So these days, yeah, the number   07:23:27 |
| 14 you performing?   07:21:17 | 14 of calculations required are relatively few.   07:23:34 |
| 15   A.   Flow-rate calculations,   07:21:20 | 15 But you still have to, let's say, choose the   07:23:34 |
| 16 pore-size calculations, things like that.   07:21:23 | 16 right column for -- for your application.   07:23:37 |
| 17   Q.   Why would you have to do that?   07:21:24 | 17   Q.   So when you say you "choose the   07:23:41 |
| 18   A.   To understand how the liquid   07:21:27 | 18 right column," you don't just tell the   07:23:43 |
| 19 chromatography was performing.   07:21:30 | 19 machine what you're planning to separate and   07:23:45 |
| 20   Q.   To understand how liquid   07:21:35 | 20 the machine just doesn't do it on its own?   07:23:47 |
| 21 chromatography was performing, you had to   07:21:36 | 21   A.   It depends on the machine.   07:23:52 |
| 22 perform pore size and flow-rate   07:21:39 | 22   Q.   So which machines do it on their   07:23:54 |
| 23 calculations?  Explain that to me.   07:21:43 | 23 own?   07:23:56 |
| 24   A.   You have to do -- you have to do   07:21:46 | 24   A.   I've -- I guess I can't comment   07:23:58 |
| 25 some calculations in order to understand how   07:21:47 | 25 on the machines and model numbers at this   07:24:00 |
| Page 14 | Page 16 |

| | |
|---|---|
| 1 to set up the liquid chromatography system.   07:21:49 | 1 point.   07:24:02 |
| 2   Q.   Oh, so you weren't using an   07:21:53 | 2   Q.   Well, you just said it depends   07:24:02 |
| 3 automated liquid chromatography system then?   07:21:55 | 3 on the machine, so tell me which machine it   07:24:04 |
| 4   A.   These -- so this was in the   07:21:58 | 4 does and which machine it doesn't.   07:24:07 |
| 5 '90s, and it was a much older system.  So I   07:22:01 | 5   A.   I can't provide you with an   07:24:09 |
| 6 guess I would say it was automated in that   07:22:07 | 6 exhaustive list.   07:24:11 |
| 7 there were sensors and pumps and, you know,   07:22:10 | 7   Q.   Give me some examples.  I don't   07:24:12 |
| 8 a column and valves and all of that.  So,   07:22:14 | 8 want an exhaustive list.  Give me some   07:24:15 |
| 9 yeah, I guess I would characterize it as   07:22:19 | 9 examples.   07:24:18 |
| 10 automated liquid chromatography.   07:22:24 | 10   A.   I can't recall at this point.   07:24:18 |
| 11   Q.   Well, how could it be automated   07:22:25 | 11   Q.   So you said it depends on the   07:24:19 |
| 12 if you had to do calculations?   07:22:27 | 12 machine but you have no idea of any machines   07:24:21 |
| 13   A.   I guess there are always --   07:22:34 | 13 that allow you to just put it in and say,   07:24:23 |
| 14 there are always calculations required when   07:22:36 | 14 "Perform chromatography on this," and it   07:24:26 |
| 15 you're doing, you know, engineering   07:22:37 | 15 picks the column?   07:24:28 |
| 16 measurements and things like that.   07:22:39 | 16   A.   I can't recall at this point.   07:24:29 |
| 17   Q.   So what kinds of calculations   07:22:40 | 17   Q.   So as far as your training, you   07:24:31 |
| 18 are always required using an automated   07:22:42 | 18 talked about reading in a book and sitting   07:24:40 |
| 19 liquid chromatography system?   07:22:45 | 19 down with a piece of paper and doing some   07:24:43 |
| 20   A.   So flow-rate calculations,   07:22:47 | 20 calculations.  So the types of calculations   07:24:45 |
| 21 pore-size calculations, things like that.   07:22:53 | 21 that you would have to do, explain those to   07:24:46 |
| 22   Q.   So are you telling me, are you   07:22:55 | 22 me.  Or the types of calculations that you   07:24:49 |
| 23 telling the jury, that in an automated   07:22:57 | 23 were trained to do in order to perform   07:24:51 |
| 24 liquid chromatography system you don't just   07:22:59 | 24 chromatography on an automated liquid   07:24:54 |
| 25 put the sample in and tell the machine "run   07:23:01 | 25 chromatography instrument.   07:24:56 |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

Page 26

```
 1      Q.   And tell me what goes into        07:32:48
 2  choosing the column based on the          07:32:49
 3  application.                               07:32:51
 4      A.   You have to look at what things   07:32:53
 5  you would like to separate and what        07:32:56
 6  affinities they might have and then decide 07:32:59
 7  which column to choose.                    07:33:04
 8      Q.   So for someone as experienced as  07:33:08
 9  you, I take it that would just take a few  07:33:10
10  minutes; is that right?                    07:33:13
11      A.   The -- well, the choice of the    07:33:15
12  column is an important choice, and I       07:33:18
13  wouldn't characteristic how long it would  07:33:20
14  take.                                      07:33:23
15      Q.   What do you mean by you wouldn't  07:33:23
16  characterize how long it would take?  You  07:33:26
17  have a lot of experience in this field.  So 07:33:28
18  given all that experience, I assume you    07:33:29
19  would just be able to pick out a column    07:33:31
20  within a few minutes; right?               07:33:33
21      A.   I wouldn't want to characterize   07:33:34
22  the amount of time it would take me to     07:33:35
23  choose a liquid chromatography column      07:33:37
24  because it varies by the application, it   07:33:40
25  varies by the problem.                     07:33:42
```

Page 27

```
 1      Q.   Well, give me the range of times  07:33:44
 2  it's taken you to select a column.         07:33:46
 3      A.   I can't really give a range of    07:33:49
 4  times.  I guess I could say between -- you 07:33:52
 5  know -- in the simplest situation in which 07:33:55
 6  you are repeating an analysis that you've  07:33:58
 7  done before, the column might already be in 07:34:00
 8  the machine, and so that might be zero time. 07:34:02
 9          But on an upper end, I can't       07:34:07
10  really bound that.                         07:34:09
11      Q.   Well, why not?  I mean,           07:34:11
12  you've -- you say that you have experience 07:34:13
13  in chromatography.  I'm assuming there are 07:34:15
14  times when you've done chroma- -- a        07:34:17
15  chromatography experiment that you've never 07:34:19
16  done before.  So how long did it take to   07:34:21
17  select a column?                           07:34:23
18      A.   Yeah, so there are certainly      07:34:29
19  times when we've done separations that we  07:34:31
20  haven't done before, and those are the times 07:34:34
21  that typically take more.  You're stepping 07:34:35
22  away from what you -- processes that       07:34:38
23  you've -- separations that you've performed 07:34:42
24  before.  So those typically take longer, but 07:34:44
25  I can't really quantify how long those might 07:34:46
```

Page 28

```
 1  have taken.                                07:34:49
 2      Q.   Why can't you quantify it?  I     07:34:50
 3  mean, you were involved, weren't you?      07:34:51
 4      A.   Yes, I was involved.  But these   07:34:54
 5  are -- we're describing now a body of work, 07:34:55
 6  and some of it was done a long time ago.    07:35:01
 7  So, you know, memory fades.  Some of it was 07:35:04
 8  done more recently and, you know, they're  07:35:07
 9  diverse amounts of time.                   07:35:11
10          Each project has different        07:35:13
11  aspects to it, different separations that  07:35:15
12  you might do, you know, in the course of   07:35:17
13  that project.                              07:35:20
14          So, anyhow, a lot of factors,     07:35:21
15  you know, factor into the choice of the    07:35:24
16  column.                                    07:35:25
17      Q.   When you say "a lot of factors,"  07:35:26
18  explain some of the factors.              07:35:28
19      A.   Well, you need to choose a        07:35:30
20  liquid chromatography column appropriately 07:35:33
21  so that the material that you would like to 07:35:36
22  separate has some contrast with the        07:35:40
23  background of all the other materials that 07:35:44
24  are in that sample.                        07:35:47
25      Q.   Are you done?                     07:35:51
```

Page 29

```
 1      A.   Yes.                              07:35:51
 2      Q.   Well, so let's take the ones      07:35:53
 3  that you've done recently.  Describe some of 07:35:54
 4  those ones that you've done recently and how 07:35:57
 5  hose factors factored in and what kind of  07:35:59
 6  time frame we're talking about.            07:36:02
 7      A.   Yeah, so recently we've used      07:36:07
 8  this FPLC, fast protein liquid             07:36:10
 9  chromatography, to collect certain proteins, 07:36:15
10  and we use those proteins to coat a nano   07:36:21
11  bead.  The proteins that we're collecting  07:36:28
12  are various, and the backgrounds are also  07:36:32
13  assorted.  And so the calculation time is -- 07:36:36
14  you know, it varies, and I can't really    07:36:41
15  quantify that.                             07:36:44
16      Q.   Well, you say "it varies."  I     07:36:46
17  mean, were you doing any of the            07:36:47
18  calculations?                              07:36:49
19      A.   I was overseeing the -- the       07:36:49
20  student who was doing the calculations.    07:36:51
21      Q.   So given that you were            07:36:53
22  overseeing, are we talking about, like, a  07:36:56
23  lunchtime amount of time to do the         07:36:58
24  calculations?  A day?  A week?  What are we 07:37:00
25  talking here?                              07:37:03
```

**Page 30**

```
 1      A.   So the way that university        07:37:04
 2   professors work is, you know, we study,    07:37:07
 3   we -- we advise graduate students and post  07:37:11
 4   docs about how to perform their research.   07:37:15
 5   And we leave the -- a lot of the research   07:37:18
 6   and actual production of knowledge up to the 07:37:23
 7   students.  The students -- you know, we     07:37:25
 8   discuss problems with them and then they go 07:37:27
 9   away and they perform calculations.  They   07:37:29
10   perform experiments.  They -- you know, they 07:37:32
11   think about things.  They come back and talk 07:37:34
12   to us.                                      07:37:36
13          So how long a calc- -- first of     07:37:37
14   all, I probably don't know how long a       07:37:39
15   student spent on a calculation.  But second 07:37:41
16   of all, it's -- we're always working with   07:37:43
17   trainees.  These students are always --     07:37:48
18   we're training them from scratch.  And so   07:37:50
19   they might take a longer time to do a       07:37:52
20   calculation in the beginning, and they might 07:37:55
21   take a shorter time to do a calculation     07:37:56
22   toward the end of their research.           07:37:58
23      Q.   So what you're saying, then, is    07:38:00
24   you really don't have a feel for what a     07:38:03
25   reasonable amount of time to do a           07:38:06
```

**Page 31**

```
 1   calculation to figure out a column is.      07:38:07
 2   Fair?                                       07:38:11
 3      A.   I don't believe that was the       07:38:12
 4   question that you asked.                    07:38:14
 5      Q.   Well, do you have an idea of        07:38:15
 6   what a reasonable amount of time to do a    07:38:17
 7   calculation to determine the column, for    07:38:19
 8   example, that you just talked about now, on 07:38:22
 9   separating various proteins, you don't      07:38:28
10   really have any idea whether your student   07:38:30
11   that you say you're supervising is spending 07:38:33
12   a reasonable or an unreasonable amount of   07:38:37
13   time doing the calculations; correct?       07:38:38
14      A.   Could you -- could you start        07:38:40
15   that again from the beginning?              07:38:41
16      Q.   Right.                              07:38:42
17          So you just testified about         07:38:42
18   supervising a student who is doing          07:38:45
19   calculations on selecting columns that are  07:38:48
20   being used right now.  And would it be fair 07:38:50
21   to say that you do not have an idea of what 07:38:53
22   a reasonable amount of time and what an     07:38:56
23   unreasonable amount of time is to do those  07:38:59
24   calculations?                               07:39:01
25          MR. MILLER:  Objection,             07:39:05
```

**Page 32**

```
 1   foundation.                                 07:39:05
 2      A.   So we're talking about a           07:39:07
 3   particular student.  And like I said, you   07:39:08
 4   know, it's my job to teach these students to 07:39:10
 5   do these calculations.                      07:39:14
 6          When I send them away to do         07:39:17
 7   their research and their calculations, I'm  07:39:19
 8   not sure how long they're spending on those 07:39:23
 9   calculations.  If they come back to me and  07:39:25
10   it's clear that they've been pulling their  07:39:27
11   hair out or they haven't finished, you know, 07:39:30
12   they haven't been able to do these          07:39:32
13   calculations, well, then it's clear that    07:39:34
14   they need some more instruction.            07:39:36
15      Q.   So that wasn't the question.       07:39:38
16          The question was, do you have an    07:39:40
17   idea of what would be a reasonable amount of 07:39:42
18   time for your student to do the calculations 07:39:44
19   and what would be an unreasonable amount of 07:39:47
20   time?                                       07:39:49
21      A.   It would depend on -- that         07:39:53
22   depends on the student.                     07:39:55
23      Q.   So the student that you have in    07:39:56
24   mind right now, what's that student's name? 07:39:57
25      A.   Hui Ma.                            07:40:01
```

**Page 33**

```
 1      Q.   Okay.                              07:40:01
 2          For Hui Ma.  And is that a          07:40:03
 3   master's level student?  A PhD-level        07:40:05
 4   student?  A postdoc?  What is it?           07:40:08
 5      A.   Quay is a PhD student.             07:40:10
 6      Q.   What is a reasonable amount of     07:40:13
 7   time and what's an unreasonable amount of   07:40:15
 8   time for Hui Ma to perform the calculations 07:40:17
 9   you think he's performing now for the       07:40:22
10   chromatography experiments that are         07:40:24
11   occurring under your supervision?           07:40:26
12      A.   To a great extent I don't care     07:40:29
13   how long it takes him to do the             07:40:32
14   calculations.  I care that he does the      07:40:34
15   calculations correctly and I care that he   07:40:35
16   understands the process so that he has an   07:40:37
17   insight into the -- you know, the separation 07:40:39
18   that he's trying to perform.                07:40:43
19      Q.   All right.                         07:40:43
20          Well, let me ask you this.          07:40:45
21   Would it affect one way or another, whether 07:40:47
22   he's using an automated liquid              07:40:49
23   chromatography system, the amount of time he 07:40:52
24   spends calculating which column to use?     07:40:55
25      A.   He is using a liquid              07:40:59
```

1 will take. It's not -- it's not all you    07:50:01
2 need. It's -- it's a starting point.    07:50:04
3    Q.    So one of the things we talked    07:50:08
4 about is calculations that go into selection    07:50:10
5 of a column, which you need to do whether    07:50:12
6 your system is automated or not -- even when    07:50:15
7 you -- when you have an automated liquid    07:50:18
8 chromatography system for any new separation    07:50:20
9 that you haven't done before, you've got to    07:50:22
10 do calculations on which column you're    07:50:25
11 selecting. Fair?    07:50:27
12    A.    That's correct.    07:50:29
13    Q.    What about -- there are certain    07:50:30
14 chemicals in addition to the sample that    07:50:33
15 you've got to put onto the column as well to    07:50:35
16 get the material -- your sample to get it    07:50:38
17 off the column; correct?    07:50:42
18    A.    There are -- I mean, I guess    07:50:44
19 there's -- first of all, the field of liquid    07:50:46
20 chromatography is really broad, and the    07:50:48
21 range of processes that are performed with    07:50:52
22 liquid chromatography are really broad. But    07:50:55
23 they typically will involve some kind of a    07:51:00
24 carrier fluid that has to be introduced to    07:51:03
25 the column in addition to your sample.    07:51:07

Page 42

1    Q.    Do you -- in an automated liquid    07:51:11
2 chromatography system when you're performing    07:51:13
3 a separation, a chromatography separation    07:51:15
4 that you haven't done before, do you have to    07:51:19
5 do calculations to identify the carrier    07:51:21
6 fluid?    07:51:24
7    A.    There are -- yes, there are    07:51:28
8 calculations that are required to determine    07:51:29
9 the carrier fluid.    07:51:31
10    What I mean is -- so when you're    07:51:34
11 doing calculations, there are several kinds    07:51:38
12 of calculations that you might do. For    07:51:41
13 instance, there are calculations that lead    07:51:45
14 to a numerical answer, like the flow rate    07:51:47
15 and consumption of volume calculation. And    07:51:51
16 then there are calculations that you do in    07:51:54
17 another way, which is let's say I use this    07:51:57
18 carrier fluid. Then I do a calculation for    07:52:00
19 how long a separation would take. Let's say    07:52:02
20 I use that carrier fluid. How long would a    07:52:04
21 separation take? Or would it even be    07:52:07
22 possible?    07:52:09
23    So it's not -- there aren't a    07:52:11
24 finite -- or an infinite number of    07:52:13
25 calculations. There are, you know, let's    07:52:16

Page 43

1 say a smaller -- there's a smaller universe    07:52:17
2 of carrier fluid choices.    07:52:20
3    Q.    So when you're -- when you are    07:52:23
4 doing calculations for the carrier fluid,    07:52:29
5 what goes into the selection of what the    07:52:33
6 carrier fluid is going to be?    07:52:36
7    A.    It depends on the separation    07:52:38
8 that you would like to do.    07:52:39
9    Q.    So let's take the one that you    07:52:43
10 say is being done by Mr. Wa -- Ma, excuse    07:52:45
11 me, your graduate student. What goes into    07:52:50
12 the calculations for the carrier fluid that    07:52:53
13 has to be selected for his experiments?    07:52:57
14    A.    Once you've -- so we have to    07:53:01
15 calculate -- we have to determine how close    07:53:10
16 we are to the -- I guess -- so we have to    07:53:12
17 determine the concentration of the sample in    07:53:19
18 the carrier fluid.    07:53:22
19    Q.    Is that it?    07:53:27
20    A.    No, but I can't give you an    07:53:28
21 exhaustive list.    07:53:30
22    Q.    Well, I actually would like an    07:53:30
23 exhaustive list. So let's go through it.    07:53:32
24    Tell me -- tell me the    07:53:34
25 calculations that you would have to do with    07:53:35

Page 44

1 respect to the carrier fluid in the    07:53:38
2 separations that are being performed under    07:53:40
3 your supervision now.    07:53:42
4    A.    I can't give you an exhaustive    07:53:47
5 list at this point.    07:53:50
6    Q.    Well, tell me what you can give    07:53:52
7 me.    07:53:53
8    A.    Sorry, what was the calculation    07:53:57
9 that we were talking about?    07:53:58
10    Q.    The calculations that go into --    07:53:59
11 that are related to the carrier fluid.    07:54:01
12    The carrier fluid is going to be    07:54:03
13 responsible for, in one regard, for getting    07:54:05
14 the material off the column; correct?    07:54:09
15    A.    The carrier fluid certainly    07:54:15
16 carries the fluid -- the sample through the    07:54:17
17 column.    07:54:19
18    Q.    What's responsible for knocking    07:54:20
19 the sample off the column at different --    07:54:22
20    A.    It depends -- sorry.    07:54:23
21    Q.    Go ahead.    07:54:27
22    A.    Well, so typically after a    07:54:33
23 separation is performed, then you will flush    07:54:34
24 the column and remove all of the -- let's    07:54:38
25 say all of the remaining material from the    07:54:43

Page 45

12 (Pages 42 - 45)

| | |
|---|---|
| 1 do based on whatever you read or had      08:22:21 | 1 of the potential technologies that we were   08:24:40 |
| 2 previously done.            08:22:25 | 2 looking at using in that, in the scope of    08:24:44 |
| 3    Q.   What system was that?      08:22:27 | 3 my -- either my master's or PhD work was    08:24:47 |
| 4    A.   I don't recall.  I don't know     08:22:29 | 4 liquid chromatography.         08:24:50 |
| 5 the model name.  It probably doesn't exist   08:22:30 | 5       We subsequently ultimately did   08:24:52 |
| 6 anymore.              08:22:32 | 6 not use it.  But -- but, you know, it's like  08:24:54 |
| 7    Q.   Do you remember the       08:22:33 | 7 building a house.  You have to have the    08:24:56 |
| 8 manufacturer?             08:22:35 | 8 tools on-site in order to build the house.   08:24:58 |
| 9    A.   It no, I don't.         08:22:35 | 9 You don't want to have to run down to     08:25:00 |
| 10    Q.   Did you -- so in graduate school  08:22:37 | 10 Builders Square every ten minutes and get a  08:25:02 |
| 11 what were you using that system for?    08:22:41 | 11 new tool.             08:25:05 |
| 12    A.   That was -- I was just trained   08:22:45 | 12    Q.   Yeah, I'm quite familiar with   08:25:07 |
| 13 on that system.            08:22:47 | 13 that.  You know, when I was in the lab I    08:25:08 |
| 14    Q.   So you didn't actually perform  08:22:47 | 14 also worked with blood.        08:25:10 |
| 15 any real work that resulted in any kind of   08:22:49 | 15       So aside from using a centrifuge  08:25:11 |
| 16 publication on that system?       08:22:51 | 16 to separate the plasma from, say, red cells,  08:25:16 |
| 17    A.   So I think it's -- when you're a  08:22:54 | 17 what was your -- what was your research     08:25:21 |
| 18 graduate student, you're trained in a lot of  08:22:59 | 18 actually on?  Because obviously the most   08:25:23 |
| 19 different things, and ideally those topics  08:23:02 | 19 common way to separate those is with a    08:25:25 |
| 20 that you're trained in are focused towards   08:23:06 | 20 centrifuge.             08:25:28 |
| 21 your research area but not all of them end   08:23:08 | 21    A.   Yeah, the -- so the centrifuge   08:25:29 |
| 22 up being in your research area.  So liquid   08:23:11 | 22 approach is typically how cellular      08:25:31 |
| 23 chromatography was not something that I    08:23:13 | 23 components are separated from blood, let's   08:25:34 |
| 24 needed to do to complete my research.    08:23:15 | 24 say, after the fact.  So if you donate a    08:25:37 |
| 25    Q.   So when you say you were trained  08:23:19 | 25 unit of whole blood, they'll spin down the   08:25:41 |
| Page 70 | Page 72 |
| 1 in it in graduate school, was this a lab?   08:23:22 | 1 cells and then collect the plasma.  It    08:25:46 |
| 2 Like, was this course work or was this    08:23:24 | 2 depends on what the -- what the goal is.    08:25:49 |
| 3 actually in your advisor's lab he told you,  08:23:27 | 3 But if the goal is to collect plasma and    08:25:51 |
| 4 "I need you to learn to do liquid      08:23:31 | 4 cellular components, you're right.  A     08:25:53 |
| 5 chromatography"?            08:23:33 | 5 centrifuge is oftentimes used.       08:25:55 |
| 6    A.   Not -- so it was not a course.   08:23:35 | 6       But I don't know if you've been   08:25:57 |
| 7 And the machine was in a colleague's lab.   08:23:38 | 7 to donate blood recently, but most of the   08:25:58 |
| 8 And so -- and I was trained by a student in  08:23:42 | 8 major blood collection services have a    08:26:04 |
| 9 that colleague's lab.         08:23:46 | 9 machine that will collect your plasma and   08:26:08 |
| 10    Q.   For no particular purpose?  You   08:23:51 | 10 return the cellular component to the      08:26:13 |
| 11 didn't have any -- any actual experiments in  08:23:53 | 11 patient.  And the reason obviously is that   08:26:17 |
| 12 mind for your graduate dissertation or    08:23:56 | 12 you can donate plasma twice a week and you  08:26:19 |
| 13 master's thesis where you were going to need  08:24:00 | 13 can only donate whole blood, I think is    08:26:21 |
| 14 to use liquid chromatography.  You just did  08:24:02 | 14 every six weeks.  So they have these plasma  08:26:26 |
| 15 it because you thought, hey, it might be a   08:24:05 | 15 centers all over the place, you know, where  08:26:29 |
| 16 good idea to learn this?        08:24:07 | 16 they'll pay people to donate plasma.  That's  08:26:30 |
| 17    A.   Graduate school is a time when   08:24:11 | 17 how some people make ends meet.      08:26:33 |
| 18 you learn lots of things.  I also took many  08:24:12 | 18    Q.   So one of the things you talked   08:26:36 |
| 19 laser classes that I didn't use, you know,   08:24:15 | 19 about early on this morning was that you    08:26:38 |
| 20 let's say, immediately.  I subsequently did  08:24:19 | 20 have experience in automated fluid handling  08:26:40 |
| 21 use those classes.           08:24:22 | 21 systems.  Right?           08:26:44 |
| 22       But I guess I would say my     08:24:24 | 22    A.   I did say that.        08:26:46 |
| 23 project, my master's and PhD research, was   08:24:29 | 23    Q.   How does experience in an     08:26:47 |
| 24 oriented toward a biomedical device which   08:24:32 | 24 automated fluid handling system provide you  08:26:49 |
| 25 separates plasma from whole blood.  And one  08:24:36 | 25 the experience to act as an expert on an    08:26:54 |
| Page 71 | Page 73 |

19 (Pages 70 - 73)

**Page 74**

1  automated liquid chromatography system?    08:26:58
2      A.   I guess many operations that are  08:27:05
3  formed in liquid chromatography would be    08:27:08
4  characterized as automated liquid handling  08:27:12
5  operations.    08:27:16
6      Q.   Which ones?    08:27:18
7      A.   Pumping, valving, detecting,    08:27:23
8  that sort of thing.    08:27:27
9      Q.   What kinds of components do you    08:27:30
10  need to deliver automated controlled fluid    08:27:32
11  flow to a column, to a chromatography    08:27:39
12  column?  What components?    08:27:42
13      A.   So I'm -- is this question    08:27:47
14  you're asking me just about in order to    08:27:50
15  deliver the fluid to the column?    08:27:55
16      Q.   That is correct.    08:27:58
17          And I'm just going to note that    08:27:59
18  I do think you're kind of like fading in and  08:28:01
19  out a little bit right now, your voice.    08:28:03
20      A.   Yeah.  Okay.  Sorry.    08:28:07
21      Q.   Go ahead.    08:28:07
22      A.   Yeah.    08:28:12
23          So the -- just to make sure    08:28:12
24  we're both on the same page.  So I'm    08:28:15
25  delivering the fluid to the column.    08:28:17

**Page 75**

1      Q.   That is correct.    08:28:20
2      A.   Okay.  So at a minimum I would    08:28:22
3  need a pump and -- well, okay.  At a minimum  08:28:25
4  I would need a pump.    08:28:30
5      Q.   Anything else?    08:28:32
6      A.   So just to deliver a controlled    08:28:36
7  flow to a column --    08:28:38
8      Q.   Well, let's say to a column and  08:28:39
9  through the column.    08:28:41
10      A.   And do I care what I'm    08:28:45
11  collecting at the output of this column?    08:28:46
12      Q.   No, just deliver automated    08:28:48
13  controlled flow through a column.    08:28:51
14      A.   Okay.    08:28:53
15          So now the question is deliver    08:28:54
16  an automated controlled flow through the    08:28:56
17  column --    08:28:59
18      Q.   That's it.    08:29:00
19      A.   -- and out of the column, and I  08:29:00
20  don't care what happens after it comes out    08:29:02
21  of the column?    08:29:03
22      Q.   Correct.    08:29:03
23      A.   Okay.    08:29:05
24          So I would need a pump that can  08:29:06
25  deliver a flow rate that's settable, a    08:29:09

**Page 76**

1  determinable, user-determinable flow rate.    08:29:13
2  And potentially I would need to measure that  08:29:20
3  flow rate to ascertain that I've actually,    08:29:22
4  you know, gotten the flow rate that I    08:29:24
5  programmed.    08:29:26
6          Potentially I might need some    08:29:27
7  valving.  But pretty much that's it in this    08:29:29
8  hypothetical.    08:29:34
9      Q.   So when you say "potentially"    08:29:35
10  you might need something to make sure that    08:29:36
11  your flow rate is correct, what do you mean  08:29:39
12  by that?    08:29:44
13      A.   So there are many different    08:29:47
14  kinds of pumps in -- you know, in the world  08:29:49
15  of pumps, and there are pumps that will    08:29:52
16  deliver a -- when I -- called metering pumps  08:29:57
17  that will deliver a known flow rate.  So I    08:30:02
18  punch in "Give me so many milliliters per    08:30:04
19  hour," and I get that many milliliters per    08:30:07
20  hour.    08:30:09
21          There are other pumps that won't  08:30:09
22  give me have that degree of certainty.  And  08:30:11
23  so if I was using one of those other types    08:30:13
24  of pumps, then I would have to -- to measure  08:30:15
25  the flow rate --    08:30:18

**Page 77**

1      Q.   Okay.    08:30:21
2      A.   -- to verify it.    08:30:21
3      Q.   So if I had a pump where I could  08:30:21
4  set it to X mils per minute, that's what    08:30:23
5  you're talking about are as far as a pump    08:30:27
6  that's delivering a set amount?    08:30:31
7      A.   Yes.    08:30:37
8          I mean -- okay.  So -- and it    08:30:38
9  has to -- we have to know about that pump,    08:30:41
10  that that number is reliable.    08:30:44
11      Q.   So, for example, if I -- you    08:30:47
12  know, like one of the ones I use frequently  08:30:50
13  was a syringe pump.  Syringe pump has a --    08:30:52
14  has gradations on it.  It'll -- you know,    08:30:56
15  you can see it's like -- I mean, let's take  08:30:58
16  a small syringe.  10 mils.  Actually, that's  08:31:00
17  pretty small.  But let's say 50 mils.  And    08:31:05
18  you have every 10 mils there is a line.  You  08:31:10
19  could easily just see whether the piston or  08:31:15
20  the plunger is moving 10 mils over a set    08:31:18
21  period of time.  I mean, I could watch it    08:31:25
22  with a watch and see it go from 50 to 40 in  08:31:27
23  X number of seconds and then watch it go    08:31:30
24  from 40 to 30 in X number of seconds.  40 to  08:31:31
25  30.  And if it's consistent, then I know,    08:31:36

1      MR. MILLER:  Objection, form.    12:46:04
2      A.   I guess this calls for me to    12:46:06
3  answer a question about the mental state of    12:46:12
4  the person you're talking about.  The why    12:46:16
5  question I can't answer that.    12:46:18
6      Q.   So you do understand that to say    12:46:20
7  something is not obvious, you actually have    12:46:23
8  to do that as an expert?  You have to come    12:46:26
9  up with a reason why, using normal    12:46:28
10  creativity, that step would not be obvious    12:46:31
11  to a hypothetical person?    12:46:34
12      MR. MILLER:  Objection, form.    12:46:36
13  I'm not even sure that's a question,    12:46:43
14  but form.    12:46:44
15      A.   Could you repeat the question?    12:46:45
16      Q.   Do you understand that as an    12:46:45
17  expert saying that something is not obvious,    12:46:47
18  you have to answer the question why a    12:46:49
19  hypothetical person would not, given all the    12:46:51
20  knowledge which exists in the world as they    12:46:55
21  sit there, why they wouldn't think of going    12:46:57
22  from what already existed in the world to    12:46:59
23  the new thing, what impediments there would    12:47:01
24  have been, something that would have steered    12:47:05
25  them away from that or talked them away from    12:47:06

Page 218

1  that?  I mean, there's nothing in the 2040    12:47:09
2  that says anywhere in the manual or anywhere    12:47:11
3  about it, "Hey, this thing can only be used    12:47:13
4  for this -- the applications that are loaded    12:47:16
5  on the machine," is there?    12:47:19
6      A.   In the manual for the 2040,    12:47:26
7  there -- you're asking if there is anything    12:47:28
8  in the manual for the 2040 that says you    12:47:30
9  can't do automated liquid chromatography?    12:47:32
10      Q.   It says you can only use this    12:47:34
11  system for the -- for the applications which    12:47:36
12  are already preloaded on this machine.    12:47:39
13      A.   I don't believe so.  But I would    12:47:45
14  have to look at the manual again to confirm    12:47:47
15  that.    12:47:49
16      Q.   So there's no teaching away --    12:47:52
17  there's no teaching from anything that    12:47:53
18  you've seen that says the 2040 can only be    12:47:55
19  used for X, Y and Z applications and no    12:47:58
20  other by a person of ordinary skill in the    12:48:02
21  art?  You've never seen anything like that;    12:48:04
22  correct?    12:48:06
23      MR. MILLER:  Objection, form.    12:48:07
24      A.   I don't believe I've seen    12:48:12
25  anything that said the 2040 can't be used    12:48:13

Page 219

1  for certain -- for certain automated liquid    12:48:16
2  processes.    12:48:23
3      Q.   And there is nothing about    12:48:24
4  chromatography like if you create a module    12:48:26
5  that's going to do something for    12:48:29
6  chromatography and you put it into a housing    12:48:31
7  that someone of ordinary skill in the art    12:48:33
8  would know, "Hey, if you do that, like, the    12:48:35
9  instrument is going to blow up.  You can't    12:48:37
10  do it.  Like, you need some radioactive    12:48:39
11  component, and if you put it into a module    12:48:41
12  and put that module into a housing, it's    12:48:43
13  going to melt the metal and it's going to    12:48:45
14  contaminate everything and you're going to    12:48:48
15  have an explosion."  There's nothing like    12:48:49
16  that right?    12:48:52
17      MR. MILLER:  Objection, form.    12:48:53
18      A.   I haven't seen anything along    12:48:56
19  the lines of what you described.    12:48:57
20      Q.   So then why wouldn't -- again,    12:48:59
21  why wouldn't this hypothetical person with    12:49:01
22  normal creativity who has experience in    12:49:03
23  designing automated fluid handling systems,    12:49:06
24  has experience with automated liquid    12:49:09
25  chromatography systems, why would they,    12:49:12

Page 220

1  knowing about the 2040, knowing everything    12:49:14
2  else in the world, all the prior art, why    12:49:16
3  would they think that this design of the    12:49:18
4  2040 could not be used to design an    12:49:21
5  automated liquid chromatography system in    12:49:24
6  2005?    12:49:28
7      MR. MILLER:  Objection, form.    12:49:30
8      A.   I don't know.    12:49:33
9      Q.   You don't have any -- when you    12:49:46
10  say "I don't know," you can't give any    12:49:48
11  reason why they would not think that this    12:49:49
12  could be applied to designing an automated    12:49:51
13  liquid chromatography system, this design of    12:49:55
14  the 2040?    12:49:57
15      A.   Could you repeat the question?    12:49:59
16      Q.   When you say "I don't know," you    12:50:03
17  can come up with no reason why this person    12:50:05
18  of ordinary skill in the art, knowing    12:50:07
19  everything in the prior art, knowing about    12:50:09
20  the 2040, why that person would think that    12:50:11
21  that design that's used in the 2040 of an    12:50:14
22  automated fluid handling system could not be    12:50:19
23  used for an automated fluid handling system    12:50:22
24  that performs the application of    12:50:24
25  chromatography; correct?    12:50:28

Page 221

56 (Pages 218 - 221)

**Page 222**

1   A.   That is what I said, yes.   12:50:30
2   Q.   Let's take a look at your   12:50:34
3   rebuttal report which -- I've got to find   12:50:41
4   it.   12:51:06
5       [Pause.]   12:51:10
6   Q.   While we're waiting, at any of   12:51:24
7   the breaks they have you spoken to anyone?   12:51:26
8   A.   Yes, I have.   12:51:29
9   Q.   Who did you speak to at the   12:51:29
10   breaks?   12:51:31
11   A.   I spoke to Mr. Miller.   12:51:31
12   Q.   At each one of the breaks?   12:51:35
13   A.   Yes, I believe so.   12:51:37
14   Q.   Did you talk about any of the   12:51:39
15   testimony that you've given?   12:51:40
16   A.   No.   12:51:40
17   Q.   What did you talk about?   12:51:43
18   A.   He asked about my mental state.   12:51:47
19   You know, inquired as to how I was doing,   12:51:51
20   you know, how I was feeling, that sort of   12:51:55
21   thing.   12:51:56
22   Q.   Didn't discuss of any the   12:51:58
23   testimony that you've given or any of the   12:52:00
24   test- -- well, let me start with that.   12:52:03
25   Didn't discuss of any the testimony that   12:52:05

**Page 223**

1   you've given?   12:52:07
2   A.   I mean, to the extent that my --   12:52:08
3   how I'm feeling, how I'm doing is related to   12:52:12
4   the testimony.  You know, I -- there was   12:52:15
5   nothing substantive.  It was -- it was   12:52:19
6   entirely, you know, like, "How are you   12:52:22
7   doing?  How is everything going?"  That sort   12:52:26
8   of thing.   12:52:28
9   Q.   Did you talk about any questions   12:52:29
10   that may be coming up and how to answer   12:52:31
11   those?   12:52:33
12   A.   No, we did not.   12:52:34
13   Q.   All right.   12:52:34
14       Let take a look at Exhibit   12:52:41
15   Number 103.   12:52:43
16       [Deposition Exhibit 103 marked   12:52:43
17   for identification.]   12:52:43
18   A.   Okay.   12:52:58
19   Q.   Do you recognize -- do you see   12:52:58
20   103 now?   12:53:00
21   A.   I see it, yes.   12:53:01
22   Q.   And you recognize this as a   12:53:02
23   report that you participated in preparing?   12:53:03
24   A.   Actually, I should -- well, I   12:53:06
25   knew it was the rebuttal report.  So I was   12:53:09

**Page 224**

1   looking at the version on my computer.  But   12:53:10
2   I should look at the version that you   12:53:12
3   posted.  So just give me a second.   12:53:14
4   A.   I mean, quite honestly I don't   12:53:17
5   really care which one you look at.   12:53:18
6   A.   Okay.   12:53:20
7   Q.   I'm going to refer to paragraph   12:53:20
8   numbers, but I am referring to Exhibit   12:53:22
9   Number 103, which is the official one that   12:53:25
10   will be in the record.   12:53:26
11   A.   Okay.  Yes.   12:53:28
12   Q.   So if you go to Exhibit Number   12:53:30
13   264, which is on page 364 of the rebuttal   12:53:33
14   report.   12:53:37
15   A.   Okay.   12:53:41
16   Q.   Are you there?   12:53:44
17   A.   I'm getting there.  Let's see.   12:53:45
18   264?   12:53:54
19   Q.   Paragraph number 264, which   12:53:54
20   appears on the numbered page 364.   12:53:57
21   A.   Okay.  Yes, I have it.   12:54:05
22   Q.   So is this a paragraph that you   12:54:06
23   wrote?   12:54:09
24   A.   Yes.   12:54:09
25   Q.   In paragraph 264 you say:   12:54:25

**Page 225**

1       "The System" -- and I assume   12:54:28
2   you're referring to the 2040 system; right?   12:54:30
3   A.   Wait a second.  Wait.  264?   12:54:35
4   Q.   Paragraph number 264.   12:54:41
5   A.   So I have "The 2040 System...."   12:54:44
6   so maybe --   12:54:48
7   Q.   That's the first -- those are   12:54:49
8   the first three words.  If you go down one,   12:54:50
9   two, three, four, five -- five lines on the   12:54:56
10   right-hand side.   12:54:57
11   A.   Yes.   12:54:57
12   Q.   Okay.   12:54:58
13       It says "The System...."   12:54:58
14       Do you see that?   12:55:01
15   A.   Yes, yes, I see that.   12:55:01
16   Q.   "The System...."   12:55:02
17       I assume you're describing the   12:55:03
18   2040 system; correct?   12:55:04
19   A.   Yes.   12:55:04
20   Q.   "...is described for industrial   12:55:06
21   use and specifically designed to handle a   12:55:09
22   wide range of applications."   12:55:12
23       Do you see that?   12:55:15
24   A.   Yes, I do.   12:55:16
25   Q.   What do you mean by "a wide   12:55:17

57 (Pages 222 - 225)

1    MR. BILSKER:  Sean, I'm looking   15:30:03
2  for the '470 patent, Bergstrom.  Where   15:30:18
3  is it?                          15:30:23
4    MR. DAMON:  It is           15:30:32
5  GEHC_001775-Bergstrom.           15:30:39
6    MR. BILSKER:  Got it.  Sorry.   15:30:41
7  [Deposition Exhibit 106 marked   15:30:41
8  for identification.]             15:31:14
9 BY MR. BILSKER:                  15:31:14
10  Q.  Sir, do you remember that in   15:31:14
11 Bergstrom the fluid line was 5 and the   15:31:15
12 electrical line was 12 in base plate 1;   15:31:17
13 right?  Do you remember that?    15:31:20
14  A.  I -- I haven't been keeping that   15:31:22
15 in my memory.                   15:31:24
16  Q.  Let's take a look at -- so you   15:31:25
17 have Exhibit 106?               15:31:28
18  A.  Let's see.  There we go.  Okay.   15:31:28
19 I've got to refresh this.        15:31:39
20    Okay.  I see Exhibit 106 has   15:31:48
21 appeared.  I'm going to download it.   15:31:50
22    All right.  Wait.  Downloads.   15:32:00
23 Okay.                          15:32:02
24    I got it.                15:32:03
25  Q.  So if you look at Exhibit 106   15:32:04

Page 330

1 and you look at figure number 1 -- do you   15:32:07
2 see figure number 1?             15:32:11
3  A.  That's on the first page;    15:32:12
4 correct?                        15:32:17
5  Q.  Well, I don't know if it's on   15:32:17
6 the first page or the second page.  It's not   15:32:18
7 very hard to find.  It says figure 1.   15:32:20
8  A.  Oh, yeah.  Okay.  There it is.   15:32:22
9  Q.  In figure 1 you see something   15:32:25
10 labeled 12; right?             15:32:27
11  A.  Figure number 1.           15:32:27
12    Yes, I do.              15:32:32
13  Q.  And it looks like a series of   15:32:33
14 little dots; right?             15:32:35
15  A.  I see that, yes.           15:32:36
16  Q.  And you have something labeled   15:32:37
17 5, and 5 goes to something that says 1, 2,   15:32:39
18 3.                             15:32:39
19    Do you see that?         15:32:43
20  A.  I do.                   15:32:44
21  Q.  Those things are separated;   15:32:45
22 correct?                        15:32:47
23    MR. MILLER:  Objection, form.   15:32:50
24  A.  They are distinct entities.   15:32:52
25  Q.  Right.  So they're separated   15:32:56

Page 331

1 just like the LEDs and the display in the   15:32:57
2 Bio-Rad device and the fluidic components in   15:33:04
3 the Bio-Rad device; right?       15:33:07
4  A.  I wouldn't characterize them as   15:33:09
5 separated just like the LEDs and the fluid   15:33:11
6 components.                     15:33:15
7  Q.  Well, they are separated; right?   15:33:16
8  A.  Yes.  They are not the same   15:33:20
9 thing.  So --                   15:33:21
10  Q.  Yeah.                   15:33:22
11  A.  -- they do that occupy the same   15:33:23
12 space.  So they are separated.   15:33:24
13  Q.  Well, the inventor said at page   15:33:25
14 red 31 of the prior exhibit --   15:33:27
15    So if we go back to the prior   15:33:37
16 exhibit.                        15:33:39
17  A.  Okay.                   15:33:39
18  Q.  Which now I don't remember what   15:33:50
19 it was.  It's 104.  So you go to red 31 of   15:33:52
20 104.                           15:33:54
21  A.  Okay.  Let me see.  Red 31 of   15:33:56
22 104.                           15:33:59
23    Okay.                    15:34:05
24  Q.  It says about in the middle of   15:34:05
25 the page -- well, starting at the top [as   15:34:07

Page 332

1 read]:                          15:34:07
2    "However, the fluidics and   15:34:15
3 non fluidics of the modules are not   15:34:16
4 separated in Bergstrom, as in presently   15:34:19
5 claimed invention.  The module (4) shown in   15:34:24
6 Figure 4 has no electrical parts described,   15:34:28
7 and so it cannot have the fluidic and   15:34:32
8 non-fluidic sections as in presently claimed   15:34:35
9 invention."                     15:34:40
10    Well, we know that's not true   15:34:40
11 because we just looked at electrical   15:34:42
12 line 12; right?                 15:34:44
13    "More relevant, Applicants   15:34:45
14 believe, is the module 10 which has both   15:34:47
15 fluid and electrical paths but they occupy   15:34:51
16 adjacent paths."                15:34:55
17    "Adjacent."  That means near   15:34:57
18 each other.  Right?             15:34:58
19  A.  Well, adjacent?           15:35:04
20    Yeah.  Yes.  More or less.   15:35:09
21  Q.  So the LED lights in the accused   15:35:11
22 device, those are adjacent to fluid paths in   15:35:13
23 the accused device; correct?     15:35:16
24  A.  The LED lights are adjacent to   15:35:18
25 the fluid -- yeah, they're relatively close.   15:35:23

Page 333

84 (Pages 330 - 333)

1  Q.  And then it goes on to say [as  15:35:33
2  read]:                              15:35:33
3       "The modules of Bergstrom do not  15:35:34
4  separate their fluidic and electrical parts  15:35:36
5  (where they have them)" blah blah blah.  15:35:38
6       "The detector module 10 of      15:35:41
7  Figure 10 illustrates that fluid and  15:35:43
8  electrical parts are adjacent and not on  15:35:45
9  either side of a panel."            15:35:49
10      Wow!  That seems problematic for  15:35:53
11 you.  They're saying in a detector you've  15:35:55
12 got electrical and fluidic parts that are on  15:35:58
13 the same sides of a panel and they're saying  15:36:01
14 that verboten.                      15:36:05
15      "The detector module of Figure  15:36:06
16 10 illustrates that fluid and electrical  15:36:08
17 parts are adjacent, and not on either side  15:36:11
18 of a panel.  There is no suggestion in  15:36:13
19 Bergstrom that fluidic and non fluidic parts  15:36:17
20 are separated as in presently claimed  15:36:21
21 invention.  In Bergstrom, the opposite is  15:36:26
22 taught - that the fluidic and non fluidic  15:36:28
23 parts are together."                15:36:32
24      Wow!  Doesn't that shake your  15:36:33
25 confidence that a detector module with an  15:36:35

Page 334

1  electronic component right next to a fluidic  15:36:39
2  component can actually be the invention?  15:36:42
3      A.   I'm not sure of the question  15:36:44
4  there.                             15:36:49
5      Q.   Well, this says that a detector,  15:36:50
6  where you have an electronic component right  15:36:54
7  next to a fluidic component, just like all  15:36:57
8  detectors do, is not the invention.  15:37:03
9      MR. MILLER:  Objection.        15:37:04
10     Q.   And you just said, "No problem."  15:37:06
11     A.   Right.                     15:37:07
12     Q.   "I'll just call it a fluidic  15:37:08
13 component, not an electrical component" when  15:37:10
14 we were talking about the pH valve and pH  15:37:12
15 electrode; right?                  15:37:16
16     MR. MILLER:  Objection, form.  15:37:17
17     A.   The separation in the Bergstrom  15:37:29
18 patent is -- is different.  You know, it's a  15:37:32
19 completely different thing.         15:37:36
20     MR. MILLER:  Mr. Bilsker, it's  15:37:41
21 been seven hours.  So if you can wrap  15:37:44
22 it up, please, that would be great.  15:37:47
23     MR. BILSKER:  Sean, where is the  15:37:49
24 Notice of Allowability?             15:37:50
25     MR. DAMON:  The first two.  So  15:38:07

Page 335

1  the first one is the rejection.  The  15:38:08
2  second one is the notice of allow.  It  15:38:09
3  says "Notice" in it, "718 File  15:38:12
4  History."                          15:38:13
5      MR. BILSKER:  Got it.          15:38:13
6      [Deposition Exhibit 107 marked  15:38:13
7  for identification.]                15:38:13
8  BY MR. BILSKER:                     15:38:13
9      Q.   Dr. Wereley, you have in front  15:38:19
10 of you, or you should have in a second,  15:38:20
11 what's been marked as Exhibit Number 107.  15:38:22
12      Now, you remember discussing the  15:38:27
13 Hess reference in response to what Dr. Gale  15:38:30
14 wrote; correct?                     15:38:35
15     MR. MILLER:  Are you changing  15:38:37
16 subjects?  Because it's been seven  15:38:38
17 hours.  So I'll cut you --          15:38:40
18     MR. BILSKER:  We're still on the  15:38:41
19 file history with the prior art.  I  15:38:42
20 have about five more minutes.       15:38:44
21     MR. MILLER:  Are you going to  15:38:46
22 cut us the same courtesy next week?  15:38:47
23     MR. BILSKER:  Yes.             15:38:49
24 BY MR. BILSKER:                     15:38:49
25     Q.   So you remember discussing the  15:38:50

Page 336

1  Hess reference in relation to something that  15:38:53
2  Dr. Gale wrote where he said this thing --  15:38:57
3  the way the inventors distinguish the Hess  15:39:00
4  reference, the one that you have the  15:39:02
5  electrical cord coming outside of a box --  15:39:05
6  even though the box had electronics in it,  15:39:09
7  there was an electrical cord coming outside  15:39:10
8  of the box, and they said, "Ah, you've got  15:39:12
9  an electrical cord coming out of the box.  15:39:15
10 Therefore, your electronics section -- your  15:39:17
11 electronic components are not internal to  15:39:19
12 the housing."                      15:39:22
13      You remember that?            15:39:24
14     A.   I remember discussing the Hess  15:39:25
15 reference.  I need to refresh my memory on  15:39:27
16 that.                              15:39:29
17     Q.   And do you remember saying, "Oh,  15:39:30
18 all that discussion about electronics and  15:39:33
19 Hess was irrelevant because the way they  15:39:34
20 were disting-- the way the inventors  15:39:37
21 distinguished Hess was they were just saying  15:39:39
22 that Hess didn't have a housing."  15:39:40
23      Do you remember that?         15:39:42
24     A.   I don't recall that.  I need to  15:39:42
25 refresh my memory on that.          15:39:42

Page 337

85 (Pages 334 - 337)



1
2
3
4

*Paul Frederickson*

PAUL J. FREDERICKSON, CSR
5   CA CSR 13164
Expiration date January 31, 2021
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 346

1        ***********************
2        WITNESS SIGNATURE
3        ***********************
4
5
6        I, STEVEN WERELEY, PhD, do hereby
7   declare under penalty of perjury that I
8   have read the foregoing transcript of my
9   deposition; that I have made such
10  corrections as noted herein, in ink,
11  initialed by me, or attached hereto; that
12  my testimony as contained herein, as
13  corrected, is true and correct.
14
15      EXECUTED this_____day
16  of_____, 2020,
17  at_____(City),
18  _____(State).
19
20
21
22
23
24  _____
25      STEVEN WERELEY, PhD

Page 347

88 (Pages 346 - 347)

# EXHIBIT L

**From:** Sean Damon
**Sent:** Thursday, October 29, 2020 7:42 AM
**To:** Sebba, Michael <Michael.Sebba@arnoldporter.com>
**Cc:** asilverstein@potteranderson.com; bpalapura@potteranderson.com; dmoore@potteranderson.com; Brge Team <BrgeTeam@quinnemanuel.com>; jshaw@shawkeller.com; SKGEHealthcare@shawkeller.com; GE - BioRad <GE-BioRad@arnoldporter.com>; Felipe Corredor <felipecorredor@quinnemanuel.com>
**Subject:** Re: Cytiva v. Bio-Rad, No. 18-1899 - 2040 System Inspection

Michael—

We have read your email numerous times and cannot find an answer to the simple question we asked. You have continually been requesting "program" files for the 2040 machine and insisting that unless you receive those you will move to exclude Dr. Gales report that shows the 2040 performs chromatography. We have now told you on at least a dozen occasions, that no "programming" exists as that term is normally understood – writing code. Parameters were simply selected off the machine's menu-driven interface as it exists in its normal course. Even those values are not relevant to anything as the values existed on the machine. Nonetheless, we gave you screenshots of what you called the "program files" but you still complained.

Our question was simple. What in particular are you saying you do not have from the machine in terms of "programs" you have been requesting that we have the capability to provide. You were not able to answer that question or how this mysterious information is relevant to anything. That silence speaks for itself.

We have fully complied with our obligations under the Federal Rules. Information that was relied on was provided.

Best regards,

**Sean Damon**
*Attorney at Law,*
**Quinn Emanuel Urquhart & Sullivan, LLP**

1300 I Street, NW, Suite 900
Washington, D.C. 20005
202-538-8260 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
seandamon@quinnemanuel.com | www.quinnemanuel.com | LinkedIn

**From:** "Sebba, Michael"
**Date:** Tuesday, October 27, 2020 at 3:59 PM
**To:** Sean Damon
**Cc:** "asilverstein@potteranderson.com" , "bpalapura@potteranderson.com" , "dmoore@potteranderson.com" , Brge Team , "jshaw@shawkeller.com" ,

1

"[SKGEHealthcare@shawkeller.com](mailto:SKGEHealthcare@shawkeller.com)" , GE - BioRad , Felipe Corredor
**Subject:** RE: Cytiva v. Bio-Rad, No. 18-1899 - 2040 System Inspection

**[EXTERNAL EMAIL]**

Sean,

We are surprised that you would ask why our requests are relevant. Bio-Rad is attempting to invalidate Cytiva's patents using the experiments referenced in Exhibit 4 to Dr. Gale's Opening Report (the "2040 Experiments"). Clearly any information related to the 2040 Experiments is highly relevant. Furthermore, your suggestion that we propose what documents are in Bio-Rad's or Dr. Gale's possession is improper. Such a proposal is a blatant attempt at burden shifting. Once again, our understanding from our correspondence is that neither Bio-Rad, its counsel, nor Dr. Gale possesses any further discoverable information that can be provided to Cytiva relating to the 2040 System, including any documents, videos, or electronic files. If this is not the case, please let us know ASAP and be prepared to discuss this during our meet and confer conference.

Furthermore, in Dr. Gale's response to the subpoena, he stated that all documents "that were located after a reasonable search" were produced. Please let us know what this reasonable search entailed. In addition, Dr. Gale objected to RFPs 4 and 5 because they "seek[] information that is protected by the attorney-client privilege, work-product doctrine, and/or any other privilege, immunity, or protection afforded by law." However, in a prior meet and confer, QE stated that the only documents withheld based on privilege or work product were drafts of Dr. Gale's report. Please let us know if there were other documents responsive to RFPs 4 and 5 withheld based on privilege or work product and provide a log of any such documents.

Finally, please let us know your availability to meet and confer on these issues on Wednesday or Thursday.

Regards,

Mike

_____
Michael J. Sebba
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7529
[Michael.Sebba@arnoldporter.com](mailto:Michael.Sebba@arnoldporter.com) | [www.arnoldporter.com](http://www.arnoldporter.com)

**From:** Sean Damon
**Sent:** Friday, October 23, 2020 3:54 PM

2

**To:** Sebba, Michael
**Cc:** asilverstein@potteranderson.com; zzz.External.bpalapura@potteranderson.com ; zzz.External.dmoore@potteranderson.com ; Brge Team ; zzz.External.jshaw@shawkeller.com ; SKGEHealthcare@shawkeller.com; GE - BioRad ; Felipe Corredor
**Subject:** Re: Cytiva v. Bio-Rad, No. 18-1899 - 2040 System Inspection

External E-mail

Mike—

You have the 2040 System Manual, the student's lab book, and now pictures of the program that Dr. Gale relied upon despite failing to take them yourself during the inspection. Please tell us what else you think is accessible beyond the materials we provided and explain how it is relevant.

We have, now on numerous occasions, explained the system is not "programmed" in the manner it appears you believe.

Regards,

**Sean Damon**
*Attorney at Law,*
**Quinn Emanuel Urquhart & Sullivan, LLP**

1300 I Street, NW, Suite 900
Washington, D.C. 20005
202-538-8260 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
seandamon@quinnemanuel.com | www.quinnemanuel.com | LinkedIn

**From:** "Sebba, Michael" <Michael.Sebba@arnoldporter.com>
**Date:** Friday, October 23, 2020 at 5:12 PM
**To:** Sean Damon <seandamon@quinnemanuel.com>
**Cc:** "asilverstein@potteranderson.com" <asilverstein@potteranderson.com>, "bpalapura@potteranderson.com" <bpalapura@potteranderson.com>, "dmoore@potteranderson.com" <dmoore@potteranderson.com>, Brge Team <BrgeTeam@quinnemanuel.com>, "jshaw@shawkeller.com" <jshaw@shawkeller.com>, "SKGEHealthcare@shawkeller.com" <SKGEHealthcare@shawkeller.com>, GE - BioRad <GE-BioRad@arnoldporter.com>, Felipe Corredor <felipecorredor@quinnemanuel.com>
**Subject:** RE: Cytiva v. Bio-Rad, No. 18-1899 - 2040 System Inspection

**[EXTERNAL EMAIL]**

Sean,

3

We write regarding Bio-Rad's production of images of the chromtest2 file.

As we have explained before, the information available on the system is insufficient. Instead we requested the specific programming that was devised and/or the specific inputs into the 2040 System used to perform the experiments referenced in Exhibit 4, as well as the other items referenced in my prior emails. Sending eight photographs of what Dr. Wereley already reviewed on the system at the inspection does not remedy this.

Our understanding is that Bio-Rad's position is that there is no more information that can be provided, including documents, videos, or the actual electronic files relating to the 2040 System. If our understanding is incorrect, we are available to meet and confer regarding this issue early next week. If there is no additional information that can be provided regarding the experiments referenced in Exhibit 4, we will no longer pursue this discovery dispute and reserve all our rights, including the right to file an appropriate motion with respect to Dr. Gale's reliance on the experiments referenced in Exhibit 4.

Regards,

Mike

_____
Michael J. Sebba
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7529
Michael.Sebba@arnoldporter.com | www.arnoldporter.com

**From:** Sean Damon <seandamon@quinnemanuel.com>
**Sent:** Monday, October 19, 2020 8:11 PM
**To:** Sebba, Michael <Michael.Sebba@arnoldporter.com>
**Cc:** asilverstein@potteranderson.com; zzz.External.bpalapura@potteranderson.com <bpalapura@potteranderson.com>; zzz.External.dmoore@potteranderson.com <dmoore@potteranderson.com>; Brge Team <BrgeTeam@quinnemanuel.com>; zzz.External.jshaw@shawkeller.com <jshaw@shawkeller.com>; SKGEHealthcare@shawkeller.com; GE - BioRad <GE-BioRad@arnoldporter.com>; Felipe Corredor <felipecorredor@quinnemanuel.com>
**Subject:** Cytiva v. Bio-Rad, No. 18-1899 - 2040 System Inspection

External E-mail

Michael—

See the attached correspondence.

Download: Associated files with correspondence.

4

Best regards,

**Sean Damon**
*Attorney at Law,*
**Quinn Emanuel Urquhart & Sullivan, LLP**

1300 I Street, NW, Suite 900
Washington, D.C. 20005
202-538-8260 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
seandamon@quinnemanuel.com | www.quinnemanuel.com | LinkedIn

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# EXHIBIT M

# BRUCE KENT GALE

Professor and Chair of Mechanical Engineering, University of Utah
Director, State of Utah Center of Excellence for Biomedical Microfluidics
1495 E 100 S Room 1550 MEK, Salt Lake City, UT  84112
Phone (801) 585-5944   Fax (801) 585-9826
E-mail: bruce.gale@utah.edu   http://www.mems.utah.edu

## Education

| September, 1995 to August, 1999 | **PH.D. IN BIOENGINEERING**<br>University of Utah<br>Major Subjects: Microelectromechanical Systems (BioMEMS), Analytical Biosensors, VLSI Fabrication, Microfluidics, Cell and Tissue Engineering<br>Dissertation Chair: A. Bruno Frazier | SEPTEMBER 1999<br>Salt Lake City, UT |
|---|---|---|
| September, 1990 to June, 1991 and January, 1994 to August, 1995 | **B.S. IN MECHANICAL ENGINEERING**<br>Brigham Young University<br>Major Subjects: Control Systems, Robotics, Compliant Mechanisms | AUGUST 1995<br>Provo, UT |

## Academic Appointments

| July 2018 to present | **Chair,** Mechanical Engineering, University of Utah |
|---|---|
| July 2013 to present | **Professor**, Mechanical Engineering, University of Utah. |
| July 2013 - present | **Adjunct Professor,** Bioengineering; Electrical and Computer Engineering; Materials Science and Engineering, all at the University of Utah |
| July 2007 to June 2013 | **Associate Professor**, Mechanical Engineering, University of Utah. |
| July 2007 – June 2013 | **Adjunct Associate Professor,** Bioengineering; Electrical and Computer Engineering; Materials Science and Engineering, all at the University of Utah |
| July 2004 to present | **Director,** Utah State Center of Excellence for Biomedical Microfluidics. Supervise, direct, and perform research on biomedical microdevices important to the economy of the state of Utah. |
| February 2002 – June 2007 | **Adjunct Assistant Professor,** Bioengineering; Electrical and Computer Engineering; Materials Science and Engineering, all at the University of Utah |
| Dec 2001 to June 2007 | **Assistant Professor**, Mechanical Engineering, University of Utah.  Teach classes in Mechanical Engineering, advise students, and perform research involving MEMS devices and their applications to in microfluidics and sensing. |
| August, 1999 to Dec 2001 | **Assistant Professor**, Biomedical Engineering, Louisiana Tech University. Teach classes in Biomedical Engineering, advise students, and perform research involving MEMS devices and their applications to biology and medicine. |
| Sept 1995 to August, 1999 | **Graduate Research Assistant**, Micro Instrumentation Research Laboratory and Center for Biopolymers at Interfaces, University of Utah. |

## Industrial Appointments

| | |
|---|---|
| December, 2004 to present | **Founder and Director of Research**, Carterra (formerly Wasatch Microfluidics), Salt Lake City, Utah. |
| January, 2010 to 2017 | **Chief Science Officer**, Guanine, Inc., Salt Lake City, Utah. |
| February, 2013 to present | **Founder, Chairman and Chief Science Officer,** Espira, Inc., Salt Lake City, Utah. |
| January 2016 to present | **Founder and Vice President of Engineering,** Nanonc, Inc., Salt Lake City, Utah. |
| January 2016 to present | **Founder and Vice President of Engineering,** Microsurgical Innovations, Inc., Salt Lake City, Utah. |
| May 2018 to present | **Founder and Vice President of Engineering,** WFluidx, Inc., Salt Lake City, Utah. |

## Teaching and Graduate Student Training

| | |
|---|---|
| Fall 2012, 2013, 2014, 2016, 2017 | Instructor, ME EN 2450 Numerical Methods for Sustainable Engin. Design (3 h) |
| Spring 2011-2012, 2015 | Instructor, ME EN 4010 Senior Design II (3 h) |
| Fall 2009-2011, Spring 2013, -15, -17 | Instructor, ME EN 5/6960 and ECE 5/6962 and Bioen 5900 Microfluidic Chip Design and Fabrication (3 h) |
| Spring 2006/-08/-18/-20 | Instructor, ME EN 7960 and Bioen 6900  Microfluidic Design and Simulation (3 h) |
| Fall 2002-2007, 2019 | Instructor, ME EN 2400 &2410  Dynamics, University of Utah (4 h) |
| Spring 2002,-03,-05,-07, -13 | Instructor, ME EN 5960 & 6960, ECE 5221 and 6221, BIOEN 6421  Introduction to Micromachining, University of Utah (3 h) |
| Fall 2001 | Instructor, MSE 501  Microsystems Principles, Louisiana Tech (3 h) (67 students) |
| Winter 2000-2001 | Instructor, BIEN 550C  Biomedical Microsystems, Louisiana Tech (3 h) |
| Spring 2000 and 2001 | Instructor, BIEN 420  Biomaterials and Biomechanics, Louisiana Tech (3 h) |
| Winter 1999-2000 | Instructor, BIEN 515  Biosensors and Their Applications, Louisiana Tech (3 h) |
| Fall 1999 and 2000 | Instructor, BIEN 500  Physiology for Engineers, Louisiana Tech, (4 h) |
| Fall 1998 | Co-Instructor, BE 6900 & EE 6960: Micromachined Instrumentation Systems University of Utah. (3 h) |

### *Graduate Students Graduated*

**University of Utah**

| No. | Name | Thesis Topic | Degree | Dept | Defense Date |
|---|---|---|---|---|---|
| 1 | Nithin Narayanan | Microscale SPLITT Fractionation | MS | ME | Aug 2004 |
| 2 | Aju Badardeen | Oxygen Sensing Using Electrostatic Layer by Layer Assembly | MS | ME | December, 2004 |
| 3 | David Chang-yen | Design of Microscale Fluidic Sensing Arrays | PhD | ME | April 2005 |
| 4 | Ameya Kantak | Microscale Cyclical Electrical Field Flow Fractionation | PhD | ME | July 2005 |
| 5 | Rajesh Gopalakrishnan | Nanoassembled Glucose Sensing | MS | ECE | Nov 2005 |
| 6 | Siddharth Chakravarthy | Polymerized Liposome Analysis with FFF | MS | ME | Dec 2005 |
| 7 | Ryan Sincic | DNA Extraction from Cancer Cells | MS | Bioen | May 2006 |
| 8 | Casey Pehrson | Microneedle Arrays | MS | ME | May 2006 |
| 9 | Josh Eckman | Microfluidic Spotter Design | MS | ME | Dec 2006 |
| 10 | John Maxwell | Integrated Electronics and Pneumatics | MS | ME | Aug 2007 |

| 11 | Tammy Ho | A Novel Paraffin-Based Microactuator | MS | Bioen | Dec 2007 |
|---|---|---|---|---|---|
| 12 | Sriram Natarajan | High density biomolecule spotting systems | PhD | ChemE | April 2008 |
| 13 | Niel Crews | Ultra High Speed DNA Analysis | PhD | ME | May 2008 |
| 14 | Himanshu Sant | Microscale Field Flow Fractionation | PhD | Bioen | June 2008 |
| 15 | Mark Eddings | Integrated biomolecule spotting systems | PhD | Bioen | Aug 2008 |
| 16 | Jungkyu Kim | Integrated High Density DNA Extraction and Analysis | PhD | Bioen | Sept 2008 |
| 17 | Clint Holtey | Microvalves Integrated into Printed Circuit Boards | MS | ME | Dec. 2008 |
| 18 | Merugu Srinivas | Modeling of Cyclical Electrical Field Flow Fractionation | PhD | ECE | April 2009 |
| 19 | Rahul Sonkul | Hybrid PDMS/PMMA Microfluidic Systems | MS | ME | May 2009 |
| 20 | Rajesh Surapaneni | DNA Extraction | MS | ME | Dec 2009 |
| 21 | Rohit Sharma | Real time DNA extraction measurement | MS | ME | Dec 2009 |
| 22 | Venu Arremsetty | Microscale Flow SPLITT System | MS | ME | May 2010 |
| 23 | Austin Welborn | Modeling of microfluidic eye implants | MS | ME | Aug 2010 |
| 24 | Scott Sundberg | High density arrays for Homogenous RT-PCR | PhD | Bioen | Dec 2010 |
| 25 | Doug Anjewierden | Electrostatic Integrated Valves for Microfluidics | MS | ME | May 2011 |
| 26 | Keng-Min Lin | A Novel Drug Delivery Device for the Eye | MS | ME | May 2011 |
| 27 | Erik Liddiard | Microfluidic Worm Sorting | MS | Bioen | Aug 2011 |
| 28 | Victoria Ragsdale | Heat Transfer Analysis of Polymers for Flow PCR | MS | ME | Dec 2011 |
| 29 | Cody Gehrke | Vascular Coupling Device | MS | ME | May 2012 |
| 30 | Onur Tasci | Nanoparticle Characterization using Electrical FFF | PhD | Bioen | May 2013 |
| 31 | BJ Minson | Polycarbonate Microfluidic DNA Analysis Systems | MS | ME | May 2013 |
| 32 | Nathan Gooch (co) | Intraocular Drug Delivery Device | PhD | Bioen | May 2013 |
| 33 | Michael Johnson | Microfluidic Systems for Rapid Biological Assays | PhD | ME | Aug 2013 |
| 34 | Raheel Samuel | Microfluidic Systems for Neurotechnology | PhD | ME | April 2014 |
| 35 | Keng Min Lin | Miniature Drug Delivery Devices | PhD | ME | April 2014 |
| 36 | Harikrishnan Jayamohan | Nanoscale Bacteria Sensing Systems | PhD | ME | May 2015 |
| 37 | Huizhong Li | A Vascular Coupling Device | PhD | ME | May 2015 |
| 38 | Scott Ho | Manufacture of Nerve Regeneration Devices | MS | ME | June 2015 |
| 39 | Russ Reid | Contact Lens Biofuel Cell | PhD | ME | Dec 2015 |
| 40 | Jiyoung Son | Microfluidic Cell Separations | PhD | ECE | May 2017 |
| 41 | Pratima Labroo | Nerve Regeneration Devices | PhD | ME | May 2017 |
| 42 | Ryan Brewster | PLGA Vessel Anastomosis | MS | ME | May 2017 |
| 43 | Kevin Petersen | Exosome Separations | PhD | ME | May 2018 |
| 44 | Arlen Chung | Zebrafish Genotyping Chip Optimization | MS | ME | May 2018 |
| 45 | Valentin Romanov | Synthesis of Lipid Vesicles using Rapid Prototyping | PhD | ME | Dec 2018 |
| 46 | Joshua Burton | Novel Nerve Regeneration Devices | MS | BME | Dec 2018 |
| 47 | Farhad Shiri | Separation of Virus Like Particles | PhD | ME | May 2020 |
| 48 | Marzieh Chaharlang | Modeling of Sperm Transport in Inertial Microfluidics | PhD | Physics | May 2020 |
| 49 | John Nelson | Simulation of a Vascular Coupling Device | MS | Bioen | May 2020 |
| 50 | Haidong Feng | Inertial Microfluidics for Cell Processing | PhD | ME | Aug 2020 |
| 51 | Alex Jafek | Sperm Separations using Inertial Microfluidics | PhD | ME | Aug 2020 |

**Louisiana Tech University**

| No. | Name | Thesis Topic | Degree | Dept | Defense Date |
|---|---|---|---|---|---|
| 1 | Mengyan Li | Microstructures for Tissue Engineering | MS | BME | April 2002 |
| 2 | Avinash Saldanha | Viral Separations using a Micro SPLITT | MS | ECE | April 2002 |
| 3 | Krishnan Padmanabhan | Impedance Spectroscopy Detection of Nanoparticles | MS | ECE | April 2002 |
| 4 | Himanshu Sant | Scaling In EFFF | MS | BME | April 2002 |
| 5 | David Chang-yen | Oxygen Sensitive Self Assembled Films | MS | BME | August 2002 |
| 6 | Merugu Srinivas | Cyclical Electrical Field Flow Fractionation | MS | ECE | August 2002 |

**Mahidol University, Bangkok, Thailand (Co-Advisor)**

| No. | Name | Thesis Topic | Degree | Dept | Defense Date |
|---|---|---|---|---|---|

| 1 | Wilaiwan Somchue | Nanoparticle Characterization using ElFFF | PhD | Chemistry | April 2012 |
| 2 | Mathuros Ornthai | Improved CyElFFF for Nanoparticle Analysis | PhD | Chemistry | January 2016 |

## *Graduate Students Currently Supervised*

| # | Name | Thesis Topic | Degree | Dept | Expected Grad. Date |
|---|------|--------------|--------|------|---------------------|
| 1 | Greg Liddiard | Integrated Microfluidic DNA Analysis | PhD | ECE | May 2022 |
| 2 | Jesus Arellano | Continuous Flow Cells Integrated with Microscopy | PhD | Bioen | May 2020 |
| 3 | Brett Davis | Nerve Regerneration Devices | PhD | Bioen | May 2020 |
| 4 | Ugochukwu Nze | Cell Separation Devices | PnD | ME | May 2020 |
| 5 | Chris Lambert | High throughput Zebrafish Genotyping | PhD | ME | Dec 2021 |
| 6 | Matt Nelson | Organ on a Chip Systems | PhD | Bioen | May 2021 |
| 7 | Mike Beeman | Electrochemical Pathogren Detection | PhD | ME | May 2020 |
| 8 | Brady Goenner | 96 Channel Valve Card | PhD | ME | May 2022 |
| 9 | Utpal Saha | Microfluidic Sperm Analysis Devices | PhD | ECE | May 2022 |
| 10 | Tawsif Mahmood | Electrochemical Detection of Pathogens | PhD | ME | May 2022 |
| 11 | Dhruv Patel | Pathogen Analysis using Cavitation | PhD | ME | May 2022 |
| 12 | Nusrat Tazin | Zebrafish Instrumentation | PhD | ECE | May 2023 |
| 13 | Susan Wojtalewicz | Nerve Regeneration Wrap | MS | ME | May 2022 |

## *Post Doctoral Training Supervised*

| # | Name | Dates |
|---|------|-------|
| 1 | David Chang-yen | April 2005- April 2007 |
| 2 | Himanshu Sant | July 2008 – June 2013 |
| 3 | Jungkyu Kim | September 2008 – August 2009 |
| 4 | John Elsnab | September 2008 – December 2009 |
| 5 | Merugu Srinivas | October 2009 – September 2010 |
| 6 | Scott Sundberg | December 2010 – May 2011 |
| 7 | Raheel Samuel | May 2014 – present |
| 8 | Harikrishnan Jayamohan | July 2015 – March 2016 |
| 9 | Mohammad Rajesh Khan | December 2017 – present |

## *Undergraduate Student Research Projects Advised*

| # | Name | Dates | # | Name | Dates |
|---|------|-------|---|------|-------|
| 1 | Adam Miles | 2004-2006 | 21 | Ryan Brewster | 2014- 2016 |
| 2 | Andrew Christensen | 2004-2005 | 22 | Naveen Rathi | 2014-2018 |
| 3 | Jenny Greer | 2005-2007 | 23 | Megan Roach | 2014-2016 |
| 4 | John Brady | 2005 | 24 | Jordan Davis | 2014-present |
| 5 | Ahmed Bradshaw | 2005-2006 | 25 | Sean Jones | 2014-2015 |
| 6 | Joel Marsh | 2005-2006 | 26 | Rainey Cornaby | 2014-2016 |
| 7 | Chris Morrow | 2006-2007 | 27 | Taylor Howell | 2014-2015 |
| 8 | Dieter Bevans | 2006-2007 | 28 | Matthew Givens | 2014 |
| 9 | Phillip Brough | 2007-2008 | 29 | Brody King | 2015-present |
| 10 | Avdo Cutic | 2008-2009 | 30 | Derek Dunford | 2015-2016 |
| 11 | Darren Johnson | 2009-2010 | 31 | Susan Wojtalewicz | 2015-2018 |
| 12 | Johnny Lop Ng | 2009-2010 | 32 | Travis White | 2015-2017 |
| 13 | Cory Shorr | 2010-2011 | 33 | Kristina Royzman | 2015-2016 |
| 14 | Chao Gao | 2010-2011 | 34 | Blair Gerratt | 2014-2015 |
| 15 | Faris Ali | 2010-2012 | 35 | Edgar Vasquez | 2015-2016 |
| 16 | Rinchen | 2011-2012 | 36 | Nicholas Miller | 2014-2016 |
| 17 | Scott Ho | 2011- 2013 | 37 | Nika Belova | 2015-2016 |
| 18 | Chris Lambert | 2011- 2014 | 38 | Daniel Zhu | 2016-2018 |
| 19 | Rebecca Klaus | 2012-2013 | 39 | Carlos Vinatea | 2016 |
| 20 | John Nelson | 2013- 2016 | 40 | Connor Morgan | 2016-2017 |

| # | Name | Dates |
|---|------|-------|
| 41 | Sierra Erickson | 2016-present |
| 42 | Sean Harberston | 2016-present |
| 43 | Hayden Brady | 2016-present |
| 44 | Polly Creveling | 2017 |
| 45 | Jesse Griffin | 2017-2018 |
| 46 | Kade Lansford | 2017-present |

| # | Name | Dates |
|---|------|-------|
| 47 | Gareth Graves | 2018-present |
| 48 | Hyonoo Joo | 2018-2019 |
| 49 | Chidi Ahanonu | 2018-present |
| 50 | Elaine Wong | 2020-present |
| 51 | Madison Hanson | 2020-present |

*Senior Design Projects Advised*

| # | Project | Dates | Students |
|---|---------|-------|----------|
| 1 | Microneedles | 2003-2004 | Matthew Bown, Mark Eddings, Marc Leatherman, Casey Pehrson Scott Sundberg, Scot Waye, Mike Wyatt |
| 2 | DNA Extraction System | 2004-2005 | Lisa Bailey, Robert Bell, Jensen Dobbs, Brendan Perkins |
| 3 | Neurotap Mechanical Inserter | 2004-2005 | Daniel Cooley, Matt Mikkelsen, James Harris Richard Kiser, Ted Holt, Ryan Davis |
| 4 | Desalinization Device | 2005-2006 | Bryon Conner, Greg Hansen, Brad Tippetts, Richard Allen, Matt Goodro, Adam Pyper |
| 5 | Microfluidic Spotter | 2005-2006 | Jacob Browning, Louis Monaco, Todd Andelin, Christopher Weaver |
| 6 | DNA Melting Analysis | 2007-2008 | Christian Sellers, Steven Rabe, Seth Plazier, Jenny Greer, Dan Torgerson, Chad Meeks |
| 7 | DNA Haplotyping Disk | 2008-2009 | Avdo Cutic, Stuart Burton, Nellie Huynh |
| 8 | Arterial Coupler | 2009-2010 | Brian Stauffer, Lam Nguyen, Cory Shorr, Cody Gehrke |
| 9 | Mechanical Leech | 2012-2013 | Scott Ho, Jessica Kuhlman, Ladan Jiracek, Vic Walker, Andy Thompson |
| 10 | Rheumatoid Arthritis Sensor | 2014-2015 | Jaron Peck, Sarah Bentley, Rachel Ware, Parker Vance |
| 11 | 96 Channel Pump | 2015-2016 | Bryan Luke, Rodolfo Garcia, Tanner Hatch, Brian Butler |
| 12 | Rising Toilet Seat | 2015-2016 | Cody Mitchell, Khoa Dinh, Brandon Wilstead, Jose Garcia |
| 13 | Low Cost Insulin Pump | 2016-2017 | |
| 14 | Stem Cell Separations | 2016-2017 | Megan Roach, Joelle Hardy, Brianna Potter, Nelson Nieto, Travis Gowen |
| 15 | Sperm Cell Processing | 2018 | Trevor Teerlink, Cameron Hendricks, Jaron Ortega, Daniel Folsom, Mitch Shepherd |
| 16 | 96 Channel Peristaltic Pump | 2018 | Connor Wade, Brian Lee, Evan Smail, Joseph Blash |
| 17 | Zebrafish Embryo Dispenser | 2018-2019 | Brett Reeder, Hanna Nizam, Daniel Lee |
| 18 | Drum Screen for Municipal Wastewater Treatment | 2019 | Adnan Khan, Kyle Mays, Jeremy Nguyen, Alik Nielsen, Thomas Pembroke |
| 19 | Andrology Clinic in a Box | 2019 | Daniel Mochizuki, Travis Simpson, Natalia Dominguez, Gabriel Milla |

*High School Student Research Projects Advised*

| # | Name | Dates |
|---|------|-------|
| 1 | Dani Roush | Summer 2008 |
| 2 | Bryan Cerda | Spring 2010 |
| 3 | Matthew Bohman | Summer 2010 |
| 4 | Kristen Johnsen | Summer 2011 |
| 5 | Parker Awerkamp | Summer 2011 |
| 6 | Naveen Rathi | Summer 2013 & 2014 |
| 7 | Jacob Alder | Spring 2013 |
| 8 | Lia Gale | Summer 2014 |
| 9 | Sam Bonkowsky | May 2017-present |

## Consulting

| | |
|---|---|
| November 2018 – present | Qiagen, Patent Infringement Cases |
| July 2018 – October 2019 | Confluent Surgical, Patent Infringement Cases |
| October 2014 - present | BioRad, Inc. Patent Infringement Cases |
| Sept 2010 – June 2011 | Alcon Pharmaceuticals, Patent Infringement Case |
| August 2010 – June 2011 | Roche Diagnostics, Patent Infringement Case |
| July 2007 – December 2011 | Early Warning, Inc. |
| September 2005 – 2009 | Member scientific advisory board for Center for BioModular Multi-Scale Systems (Louisiana State University); Paid position |
| December 2004 – present | Chief Technology Officer, Carterra (formerly Wasatch Microfluidics LLC) |
| October, 2004 – July 2005 | Roche Diagnostics, Patent Infringement Case |

## Honors and Awards

| | |
|---|---|
| April 2020 | University of Utah Distinguished Research Award |
| April 2019 | Honoree in the Entrepreneur Category at the 2019 Celebrate U event |
| April 2018 | Honoree in the Entrepreneur Category at the 2018 Celebrate U event |
| August 2017 | Researcher of the Year for 2016, Mechanical Engineering Department |
| September 2016 | TVC Star Award |
| August 2014 | Researcher of the Year for 2013, Mechanical Engineering Department |
| May 2014 | Distinguished Mentor Award, University of Utah |
| August 2013 | Researcher of the Year for 2012, Mechanical Engineering Department |
| Fall 2004, 2010, 2011 | Top 15% Instructor Commendation, College of Engineering |
| April, 2004 | Nominated for Student Choice Teaching Award |
| September 2001 | Louisiana Tech College of Engineering Outstanding Researcher Award |
| 1996-1999 | NSF Graduate Research Fellowship |
| March 1996 | Awarded Whitaker Foundation Graduate Research Fellowship |
| 1995-1996 | Whitaker Foundation Biobased Engineering Internship |
| August 1995 | Mechanical Engineering Outstanding Student at Graduation Award |

## Proposal and Research Activities

*Currently Funded Projects*

Rapid processing of zebrafish embryos for mutant generation, wFluidx/NIH, PI, $219,000, Aug 2020 – Jan 2021.

Standard Microfluidic Chip, Medic.life, PI, $19,000, April 2020-July 2020.

Ion Separations using Electrical Field Flow Fractionation, Metrohm, PI, $79,000, April 2020 – Dec 2020

A Biodegradable Vascular Coupling Device for End-to-End Anastomosis, NIH/Microsurgical Innovations, co-PI, $1,650,000, August 2016 – July 2020

Sperm sample preparation for point of care applications, Nanonc/NIH, co-PI, $1,225,000, April 2018 – September 2020.

An Integrated Biohazard Analyzer for Multiplexed Food and Water Pathogens, Espira/DOD, co-PI, $1,050,000, April 2017-August 2019.

University of Utah Manufacturing Extension Partnership Center, NIST, co-PI, $12,000,000, October 2016-September 2021.

*Completed Projects*

Ion Current Rectification (ICR) Biosensing Biomedical Technologies, EBS (NIH), PI, $117,000, September 2017- August 2019.

Microfluidic Sensor Enhancement, Qorvo, PI, $44,000, May 2018 – December 2018.

Microfluidic Valve Card Array, Carterra, PI, $48,000, January 2018 – December 2018.

Nanopore Tools for RNA Analysis, EBS (NIH), PI, $50,000, September 2017- June 2018.

Nanotoxicology Assays Using a Microfluidic Array, UURF, PI, $17,500, July 1, 2017-June 30, 2018.

A Vascular Coupling Device, Utah TCIP, co-PI, $150,000, April 2016-March 2018.

Continuous Separations of Oncosomes from Exosomes, Espira/NIH, co-PI, $300,000, October 2016- Sept 2017.

Microfluidic Devices for Early (less than 48 hpf), non-destructive Zebrafish Genotyping, co-PI, $225,000, September 2016 – August 2017.

HT Label-Free Screening and Kinetic Analysis of Small Molecules and Biologics, NIH, co-PI, $1,300,000, May 2014 – April 2017

Enhancing Peripheral Nerve Regeneration with a Novel Drug-Delivering Nerve Conduit, DOD, co-PI, $750,000, October 2013 – September 2016.

Rapid sperm separations using inertial microfluidics, NSF STTR, co-PI, $225,000, January 2016-December 2016.

Passive microfluidic flow cells, Becton Dickinson/Boston University, PI, $25,000, March 2015-October 2016.

Nanopore Enabled Exonuclease Sequencing, NIH/Electronic Bioscience, subcontract PI, $15,000, October 2016-April 2017.

Tacrolimus Release in a Nerve Regeneration Device, UURF Engine, $25,000, June 2015 – May 2016.

Continuous Separation of Melanoma Exosomes Using Field-Flow Fractionation, NIH, PI, $560,000, August, 2013 – July, 2016.

Multiplexed bacteria, virus, and protozoa detection, DOD/Espira, co-PI, $100,000, October 2015 –September 2016.

Microfluidic GWAS, Mayo Clinic, $79,000, September 2015 – August 2016.

Nanoparticle Characterization, Pfizer, PI, $50,000, October 2015 – September 2016.

High Sensitivity Bacteria Detection, TCIP State of Utah, co-PI, $50,000, Jan 2015 – June 2016.

High Sensitivity Virus Detection, Espira Inc, PI, $30,000, May 2014 – April 2016.

Multiplexed Ovarian Cancer Microfluidic Tissue Microarray, NIH, co-PI, $225,000, June 2014 – December 2015.

Microfluidics Shared Equipment, UURF RIF, PI, $62,600, January 2015-December 2015.

IGERT: Nanobiosensors, Nanomaterials, and Microfluidics, NSF, co-PI, $3,000,000, August 2009 – July 2015.

Raman Laser Tweezers, UURF RIF, co-PI, $65,000, January 2015-December 2015.

Keck Center for Scaling Engineering Education: Transforming Undergraduate Micro/Nano Education through Scaling Engineering, Keck Foundation, co-PI, $200,000, December 2012 – May 2015.

Arterial Coupling Device, GOED, TCIP, co-PI, $120,000, May 2011 – May 2015.

A Drug Delivery Conduit for Nerve Regeneration, DOD, co-PI, $186,000, September, 2013 – May, 2015.

Arterial Coupling Device, UURF, Engine, co-PI, $30,000, January 2014 – May 2014.

Rapid bacteria detection from wastewater effluent, UURF, Engine, co-PI, $33,000, November 2013 – September 2014.

SBIR: 96 Channel Continuous Flow Print head and Integrated Flow Cell System, NIH/NIMH, PI, $1,056,000, August 1, 2008 – September 30, 2014.

SBIR: Submerged Printing of Lipid and Membrane Protein Arrays, NIH/NIGMS, PI, $350,000, September 1, 2012 – August 31, 2014.

SPLITT-based detection and monitoring of engineered nanomaterials in aquatic systems, NSF, co-PI, $418,000, September 2010 – August 2013.

K-Wire Drug Delivery Device, UofU TCP, co-PI, $35,000, January 2012-December 2013.

Nerve Regeneration Drug Delivery Device, UofU Seed Grant, co-PI, $31,000, July 2012 – June 2013

Near-Time Effluent Quality Sensor Technology for Organics and Bacteria for Shipboard Wastewater Treatment Systems, DOD SBIR, co-PI, $80,000, February, 2013 – August, 2013.

A Power-Free Complete Blood Count, I-Calc, PI, $36,000, August 15, 2012 – December 31, 2012.

Arterial Coupling Device, UofU TCP, co-PI, $70,000, January 2011 – December 2012.

Microfluidics for multiple engineering disciplines. NSF, PI, $60,000, December 1, 2008 – November 30, 2012.

Microneedle Arrays for Drug Delivery, PI, Hong Kong University, $15,700, July – October 2011.

Early Cancer Detection Platform: Sample In, Answer Out, U of U TCP/USTAR, PI, $120,000, January 2010 – December 2011.

Combined Flow Cytometry, Confocal Microscopy, and Highly Parallel Microfluidic Flow Cells, RIF, PI, $120,000, February 2010 – December 2010.

*In Vivo* Pressure Measurement and Drug Delivery for the Eye, UofU Seed, PI, $31,000, January 2011 – December 2011.

Rapid Detection of Foot and Mouth Disease, Indian Immunologicals, PI, $54,500, February 2010 – August 2011.

A High-throughput Flow-cell for Biosensor Platforms, NSF, PI, $600,000, July 1, 2008 – August 31, 2011.

Impact, Detection, and Tracking of Nanoparticles in Agriculture: A Focus on Crops and Rhizosphere Microbes, USDA, co-PI, $442,086, January 2009 – December 2011.  USDA-CSREES grant 2009-35603-05037

Spinning Disk Digital Microfluidics, UofU TCP, co-PI, $70,000, July 1, 2008-June 30, 2010

SBIR: Parallel Microfluidic System for High Throughput Label Free Cytokine Analysis, NIH/NIAID, PI, $200,000, July 1, 2008 – December 30, 2009

SBIR: Highly Parallel AIDS Assays Using A Microfluidic Flow Cell Array Integrated with SPR, NIH, PI, $100,000, April 2009 – March 2010.

SPLITT-based detection and monitoring of engineered nanomaterials in aquatic systems, U of U Seed, co-PI, $22,000, July 2009 – June 2010.

Instruments for detection of bacteria in environmental water, Early Warning Inc, PI, $775,000, August 1, 2007-November 30, 2009

Generic Platform for DNA Sample Preparation, Univ of Utah TCP, PI, $70,000, Aug 1, 2007 – July 31, 2009.

Integrated Pneumatic and Electrical Systems, Idaho Technology, PI, $103,557, February 1, 2006 – September 30, 2008.

DNA Melting Analysis in High Speed Microfluidic Chips, Canon US Life Sciences, co-PI, $135,000, April 1, 2007 – March 31, 2008.

Small Molecule Removal Using SPLITT Techniques, Hallandia Ventures, PI, $20,000, May 1, 2007 – October 31, 2007

Microfluidics Based Braille Cell, Tactile Response, PI, $20,000, November 1, 2006- October 31, 2007.

State of Utah Center of Excellence for Biomedical Microfluidics, GOED, PI, $455,000, July 1, 2004 – June 30, 2007.

Synergy: Development of a Technology for Personalized Medicine, U of U Synergy Program, PI, $100,000, July 1, 2006- June 30, 2007

Microneedle Development, ZARS, PI, $25,000, June 22, 2006 – November 21, 2006

Volume Manufacturing of 48 Spot CFM Devices, Wasatch Microfluidics, PI, $49,335, October 1, 2006 – March 31, 2007.

University TA, U of U, co-PI, $12,000, August 2006 – May 2007.

Development of an International Engineering Experience Course, U of U, $4,000, PI, August 2006 – May 2007.

A Graduate Training Program in Micro Thermal Fluids, NSF-IGERT, co-PI, $3,500,000, August 1, 2000 – July 30, 2006.

Osmotic Pumps, Foxboro, co-PI, $37,000, January, 2005 – August, 2005.

High Resolution Laser Micromachining System, U of U RIF, PI, $35,000, July 1, 2004 – June 30, 2005.

Pressure Compensation in Micropumps, Ceramatec, co-PI, $5,000, June 1, 2004 – May 31, 2005.

Viscous Microscale Pump, University of Utah– TCP Program, co-PI, $70,000, July 1, 2003 – June 30, 2005.

Planning Grant for Center of Excellence in Biomedical Microfluidics, State COEP, $5,000, November, 2003 – February, 2004, PI.

University TA, U of U, $11,000, August, 2003 – May, 2004, co-PI.

High Throughput Nanoparticle Separations Using Highly Parallel Electrical SPLITT Technology, University of Utah TTO – TCP Program, PI, $70,000, July 1, 2002 – June 30, 2004.

Microstructures for Directed Smooth Muscle Cell Growth, Louisiana Board of Regents RCS Program, PI, $130,500, July 1, 2001- June 30, 2004.

One-Two Three Go: A Strategic Initiative for Rapid Research Competitiveness in Microsystems Development (Salary and Research Enhancements), Louisiana BoR DEFE Program, co-PI, $910,000, Jun 2000 - May 2005.

Louisiana EPSCoR Research Infrastructure Improvement Award, NSF EPSCoR and Louisiana BoR, $13,500,000 ($2,850,000 under my direction), co-PI (coordinate activities of 12 investigators at seven research institutions and interface with other PIs), June 1, 2001- May 31, 2004.

Microfabricated Electrical Field Flow Fractionation Systems for Detection of Biowarfare Agents, United Engineering Foundation, PI, $25,000, January 2001 – December 2001.

Microstructures for Directed Cardiac Muscle Cell Growth, Rockefeller Brothers Foundation, PI, $25,000, January 1, 2001-December 31, 2001.

Biosensor Array, Los Alamos National Lab, PI, $16,053, May 1, 2001- July 15, 2001.

Optical Devices using X-ray Lithography, 3M Corporation, $70,000, co-PI, Sep 2000 - Mar 2001

## Scholarly Activities and Publications

*Submitted Journal Articles*
1. Wilaiwan Somchue, Atitaya Siripinyanond, and Bruce K. Gale, "Cyclical Electrical Field-Flow Fractionation for Metal Nanoparticles Characterization," *Electrophoresis*, submitted.

*Published Journal Articles*
1. Brett Davis, Sierra Erickson, Susan Wojtalewicz, Andrew Simpson, Cameron Metcalf, Himanshu Sant, Jill Shea, Bruce Gale, Jay Agarwal, "Entrapping bupivacaine-loaded emulsions in a crosslinked-hydrogel

increases anesthetic effect and duration in a rat sciatic nerve block model," *International Journal of Pharmaceutics*, accepted. https://doi.org/10.1016/j.ijpharm.2020.119703

2. Alex Jafek, Haidong Feng, Hayden Brady, Kevin Petersen, Marzieh Charharlang, Kenneth Aston, Bruce Gale, Timothy Jenkins, Raheel Samuel, "An Automated Instrument for Intrauterine Insemination Sperm Preparation," *Scientific Reports*, accepted.

3. Alex Jafek, Haidong Feng, Dallin Broberg, Bruce Gale, Raheel Samuel, Kenneth Aston, Timothy Jenkins, "Optimization of Dean-flow microfluidic chip for sperm preparation for intrauterine insemination," *Microfluidics and Nanofluidics*, accepted.

4. Farhad Shiri, Bruce K. Gale, Himanshu Sant, Gina Bardi, Joshua Hood, Kevin Petersen, "Characterization of Human Glioblastoma versus Normal Plasma-derived Extracellular Vesicles Pre-isolated by Differential Centrifugation using Cyclical Electrical Field-flow Fractionation, *Anal. Chem*., accepted.

5. Cathy L. Mangum, Darshan P. Patel, Alexander R. Jafek, Raheel Samuel, Tim G. Jenkins, Kenneth I. Aston, Bruce K. Gale, and James M. Hotaling, "Towards a better testicular sperm extraction: novel sperm sorting technologies for non-motile sperm extracted by microdissection TESE," *Transl Androl Urol*. Vol. 9(Suppl 2), pp. S206–S214, 2020. doi: 10.21037/tau.2019.08.36

6. Pratima Labroo, Scott Ho, Himanshu Sant, Jill E Shea, Jayant Agarwal, Bruce Gale, "Modelling diffusion based drug release inside a nerve conduit-In vitro and In vivo validation study," *Drug Delivery and Translational Research*, published pre print. doi: 10.1007/s13346-020-00755-y

7. Haidong Feng, Matthew Hockin, Shuhua Zhang, Mario Cappechi, Bruce K. Gale, Himanshu Sant, "Enhanced Chromosome Extraction from Cells Using A Pinched Flow Microfluidic Device," *Biomed. Microdev*., accepted.

8. Farhad Shiri, Kevin E. Petersen, Valentin Romanov, Qin Zou, and Bruce K. Gale, "Characterization and Differential Retention of Q beta bacteriophage Virus-like Particles using Cyclical Electrical Field-Flow Fractionation and Asymmetrical Flow Field-Flow Fractionation," *Anal. Bioanal. Chem*., accepted.

9. Raheel Samuel, Haidong Feng, Alex Jafek, Timothy G. Jenkins, Jiyoung Son, Bruce K. Gale, Douglas Carrell, Jim Hotaling, "Microfluidic system for rapid isolation of sperm from microdissection TESE specimens," *Urology*, Vol. 140, pp. 70-76, 2020. https://doi.org/10.1016/j.urology.2019.12.053

10. Ligeng Shao, Kevin Petersen, Farhad Shiri, Haidong Feng, Bruce Gale, "Characteristics of electrical field flow fractionation with chronoamperometry and electrochemical impedance," *Micro & Nano Letters*, Vol. 15, pp. 13-17, 2020. DOI: 10.1049/mnl.2018.5663

11. Haidong Feng, Jules J. Magda, and Bruce K. Gale, "Viscoelastic second normal stress difference dominated multiple-stream particle focusing in microfluidic channels," *Applied Physics Letters,* Vol. 115, pp. 263702, 2019. DOI: 10.1063/1.5129281.

12. Brett Davis, Jill Shea, Bruce K. Gale, Jay Agarwal, "FK506 delivery at the direct nerve repair site improves nerve regeneration," *Muscle and Nerve*, Vol. 60, pp. 613-620, 2019. DOI: 10.1002/mus.26656

13. Matt Nelson, Nirupama Ramkumar, Bruce K. Gale, "Flexible, transparent, sub-100 μm microfluidic channels with FDM 3D-printed thermoplastic polyurethane," *J. Micromech. Microeng*. Vol. 29, pp. 095010 (8 pp), 2019. https://doi.org/10.1088/1361-6439/ab2f26

14. Valentin Romanov, John McCullough, Bruce K. Gale, Adam Frost, "A tunable microfluidic device enables cargo encapsulation by cell-or organelle-sized lipid vesicles comprising asymmetric lipid bilayers", *Advanced Biosystems*, Vol. 3, pp. 1900010 (9 pages), 2019. DOI: 10.1002/adbi.201900010

15. Ugochukwu C. Nze, Michael G. Beeman, Christopher J. Lambert, Ghadhanfer Salih, Bruce K. Gale, Himanshu J. Sant, "Hydrodynamic cavitation for the rapid separation and electrochemical detection of Cryptosporidium parvum and Escherichia coli O157:H7 in ground beef," *Biosensors and Bioelectronics*, published online April 6, 2019. https://doi.org/10.1016/j.bios.2019.04.002

16. Jiyoung Son, Alexander R. Jafek, Douglas T. Carrell, James M. Hotaling, and Bruce K. Gale, "Sperm like particle (SLP) behavior under curved microfluidic channel and its application to inertial microfluidics principles," *Microfluidics and Nanofluidics*, Vol. 23:4, 2019. https://doi.org/10.1007/s10404-018-2170-1.

17. Jie Zhang, Sudeepa Bhattacharyya, Robert C. Hickner, Alan R. Light, Christopher J. Lambert, Bruce K. Gale, Oliver Fiehn, Sean H. Adams, "Skeletal muscle interstitial fluid metabolomics at rest and associated with an exercise bout: application in rats and humans," *AJP-Endocrinology and Metabolism*, Vol. 316, E43-E53, 2019.

18. Pratima Labroo, David Hilgart, Brett Davis, Himanshu J. Sant, Bruce K. Gale, Jill Shea, Jayant Agarwal, "Drug-delivering nerve conduit improves regeneration in a critical sized gap," *Biotechnology and Bioengineering*, Vol. 116, No. 1, pp, 143-154, 2019. DOI: 10.1002/bit.26837

19. Kevin Petersen, Farhad Shiri, Travis White; Gina Bardi, Himanshu Sant, Bruce Gale, Joshua Hood, "Exosome Isolation: Cyclical Electrical Field Flow Fractionation in Low Ionic Strength Fluids," *Anal. Chem*, Vol. 90, pp. 12783-12790, 2018.

20. Alexander R. Jafek, Chris Lambert, Brady Goenner, Hossein Moghimifam, Ugochukwu Nze, Suraj Kumar, Bruce K. Gale, "A Review of Current Methods in Microfluidic Device Fabrication and Future Commercialization Prospects," *Inventions*, Vol. 3, pp. 60 (25 pages), 2018; doi:10.3390/inventions3030060.

21. Valentin Romanov, Raheel Samuel, Marzieh Chaharlang, Alexander R. Jafek, Adam Frost, and Bruce K. Gale, "FDM 3D Printing of High-Pressure, Heat-Resistant Transparent Microfluidic Devices," *Anal. Chem.*, Vol. 90 (17), pp. 10450-10456, 2018; DOI: 10.1021/acs.analchem.8b02356

22. Brett Davis, Susan Wojtalewicz , Pratima Labroo, Jill Shea, Himanshu Sant, Bruce K. Gale, and Jayant Agarwal, "Controlled release of FK506 from micropatterned PLGA films: Potential for application in peripheral nerve repair," *Neural Regeneration Research*. Vol. 13, 1247-1252, 2018

23. Raheel Samuel, Haidong Feng, Alex Jafek, Dillon Despain, Timothy Jenkins, Bruce Gale, "Microfluidic—based sperm sorting & analysis for treatment of male infertility," *Translational Andrology and Urology*, Vol. 7(Suppl 3): S336–S347, 2018. doi: 10.21037/tau.2018.05.08.

24. Raheel Samuel, Nicholas Miller, Odgerel Badamjav, Timothy Jenkins, James Hotaling, Douglas Carrell, Bruce Gale, "Design and operation of a microfluidic chip for trapping, and off-chip collection of a few human sperm," *J. Micromech. Microeng.*, Vol. 28, pp. 097002, 2018. Doi:10.1088/1361-6439/aac40f.

25. Michael G. Beeman, Ugochukwu C. Nze, Himanshu J. Sant, Hammad Malik, Swomitra Mohanty, Bruce K Gale, Krista Carlson, "Electrochemical Detection of E. coli O157:H7 in Water after Electrocatalytic and Ultraviolet Treatments Using a Polyguanine-Labeled Secondary Bead Sensor," *Sensors*, Vol. 18(5) pp. 1497, 2018.

26. Alexander Jafek, Sean Harbertson, Hayden Brady, Raheel Samuel, Bruce K. Gale, "Instrumentation for xPCR incorporating qPCR and HRMA," *Anal. Chem.*, Vol. 90 (12), pp 7190–7196, 2018. DOI: 10.1021/acs.analchem.7b05176

27. Scott Ho, Pratima Labroo, Keng-min Lin, Himanshu Sant, Jill Shea, Bruce K. Gale, Jay Agarwal, "Designing a bioresorbable drug delivery conduit to promote nerve regeneration-a preliminary study," *Journal of Medical and Biological Engineering*, 2018. DOI: 10.1007/s40846-018-0393-y

28. Christopher J. Lambert, Briana C. Freshner, Arlen Chung, Tamara J. Stevenson, D. Miranda Bowles, Raheel Samuel, Bruce K. Gale, Joshua L. Bonkowsky, "An automated system for rapid cellular extraction from live zebrafish embryos and larvae: development and application to genotyping," *PLOS ONE*, published March 15, 2018. DOI: 10.1371/journal.pone.0193180

29. Ching-Wen Li, Jill Shea, Himanshu Sant, Jay Agarwal, Bruce K. Gale, "Optimization of Micropatterned PLGA Films for Enhancing Dorsal Root Ganglion Cell Orientation and Extension," *Neural Regeneration Research*, Vol. 13(1), pp. 105-111, 2018. DOI: 10.4103/1673-5374.224377

30. Ryan Brewster, Bruce K. Gale, Himanshu J. Sant, Ken Monson, Jill Shea, Jay Agarwal, "A Biodegradable Vascular Coupling Device for End-to-End Anastomosis," *Journal of Medical and Biological Engineering*, published on the web December 7, 2017. DOI: /10.1007/s40846-017-0348-8

31. Jiyoung Son, Raheel Samuel, Bruce K. Gale, Douglas T. Carrell, James M. Hotaling, "Separation Of Sperm Cells From Samples Containing High Concentrations Of White Blood Cells Using A Spiral Channel," *Biomicrofluidics*, Vol. 11, pp. 054106, 2017. DOI: /10.1063/1.4994548.

32. Pratima Labroo, Jill Shea, Kyle Edwards, Scott Ho, Brett Davis, Himanshu Sant, Isak Goodwin, Bruce K. Gale, Jay Agarwal, "Novel drug delivering conduit for peripheral nerve regeneration," *Journal of Neural Engineering*, Vol. 14(6), pp. 066011, 2017. doi: 10.1088/1741-2552/aa867d.

33. Jesús Arellano, Taylor Howell, James Gammon, Sungpil Cho, Margit Janat-Amsbury, and Bruce Gale, "Use of a highly parallel Microfluidic Flow Cell Array to determine therapeutic drug dose response curves," *Biomedical Microdevices,* Vol. 25, No. 19, 2017.  DOI: 10.1007/s10544-017-0166-3.

34. Huizhong Li, Jill Shea, Himanshu Sant, Bruce K. Gale, Christi Terry, Jay Agarwal, "Vascular Coupling System for End-to-End Anastomosis - An *In Vivo* Pilot Case Report," *Cardiovascular Engineering and Technology,* Vol. 8, No. 1, pp. 91-95, March 1, 2017.

35. Pratima Labroo, Jill E Shea, Himanshu Sant, Bruce K Gale, Jayant Agarwal, "Effect of combining FK506 and neurotrophins on axonal branching and elongation," *Muscle & Nerve*, Vol. 55(4), pp. 570–581, 2017. DOI: 10.1002/mus.25370

36. Vicki Ragsdale, Huizhong Li, Himanshu Sant, Tim A. Ameel, and Bruce K. Gale, "A Disposable Continuous-flow Polymerase Chain Reaction Device-Design, Fabrication and Evaluation" *Biomedical Microdevices*, Vol. 18, No. 4, pp. 1-9, 2016.

37. Pratima Labroo, Scott Ho, Himanshu Sant, Jill Shea, Bruce K. Gale, Jayant Agarwal, "Controlled Delivery of FK506 to Improve Nerve Regeneration," *Shock,* Vol. 46(3 Suppl 1), pp. 154-9, 2016. doi: 10.1097/SHK.0000000000000628

38. Russell C. Reid, Sean R. Jones, David P. Hickey, Shelley D. Minteer, Bruce K. Gale, "Modeling Carbon Nanotube Connectivity and Surface Activity in a Contact Lens Biofuel Cell," *Electrochim. Acta,* Vol. 203, pp. 30-40, 2016.

39. Keng-Min Lin, Jill Shea, Bruce Gale, Himanshu Sant, Patti Larrabee, Jay Agarwal, "Nerve growth factor released from a novel PLGA nerve conduit can improve axon growth," *J Micromech. Microeng.*, Vol. 26 (4), pp. 045016, 2016.

40. Raheel Samuel, Odgerel Badamjav, Kristin E Murphy, Darshan P Patel, Jiyoung Son, Bruce K Gale, Douglas T Carrell, James M Hotaling, "Microfluidics: The Future of Microdissection TESE Sperm Processing?" *Systems Biology in Reproductive Medicine,* Vol. 62(3), pp.161-170, 2016.

41. Deng Yan, Chen Jiao, Zhao Yi, Choy Kwong Wai, Xu Yan, Hu Jun, Himanshu J Sant, Bruce K Gale, and Tang Tao, "Microneedle Array Delivery of siRNA to Skin for Gene Silencing," *Scientific Reports,* Vol. 6, pp. 21422, 2016.

42. Mathuros Ornthai, Atitaya Siripinyanond, and Bruce K. Gale, "Effect of Ionic and Non-Ionic Carriers in Electrical Field-Flow Fractionation, *Anal. Chem.*, Vol. 88 (3), pp 1794–1803, 2016.

43. Harikrishnan Jayamohan, York Smith, Bruce K Gale, Swomitra K Mohanty, Manoranjan Misra, "Photocatalytic Microfluidic Reactors Utilizing Titania Nanotubes on Titanium Mesh for Degradation of Organic and Biological Contaminants," *Journal of Environmental Chemical Engineering,* Vol. 4, No. 1, pp. 657–663, 2016.

44. Mathuros Ornthai, Atitaya Siripinyanond, and Bruce K. Gale, "Biased Cyclical Electrical Field-Flow Fractionation for Separation of Submicron Particles," *Anal. Bioanal. Chem.*, Vol. 408, No. 3, pp. 855-863, 2016. DOI: 10.1007/s00216-015-9173-5

45. Huizhong Li, Jay Agarwal, Brittany Coats, and Bruce K. Gale, *"Optimization and Evaluation of a Vascular Coupling Device for End-to-End Anastomosis: A Finite Element Analysis," Journal of Medical Devices,* Vol. 10, No. 3, pp. 011003(1-7), 2016. DOI: 1.1115/1.4031810

46. Nikki Davidoff, David Au, Benjamin Brooks, Bruce K. Gale, Amanda Brooks, "Maximizing Fibroblast Adhesion on Protein-Coated Surfaces Using Microfluidic Cell Printing," *RSC Advances.*, Vol. 5, pp.104101 – 104109, 2015.

47. Harikrishnan Jayamohan, York R. Smith, Lauryn C. Hansen, Swomitra K. Mohanty, Bruce K. Gale, Mano Misra, "Anodized titania nanotube array microfluidic device for photocatalytic application: Experiment and simulation," *Applied Catalysis B: Environmental,* Vol. 174–175, pp. 167–175, 2015.

48. T. Onur Tasci, William P. Johnson, Diego P Fernandez, Eliana  Manangon , Bruce K. Gale, "Particle based Modeling Of Electrical Field Flow Fractionation Systems," *Chromatography*, Vol. 2, pp. 594-610, 2015, doi:10.3390/chromatography2040594.

49. Jiyoung Son, Kristin Murphy, Raheel Samuel, Bruce K Gale, Douglas Carrell, Jim Hotaling, "Non-Motile Sperm Cell Separation Using A Spiral Channel, *Anal. Meth.*, Vol. 7, pp. 8041 - 8047, 2015. DOI: 10.1039/C5AY02205C.

50. Harikrishnan Jayamohan, Bruce K Gale, John Minson, Christopher J Lambert, and Himanshu J. Sant, "Highly Sensitive Bacteria Quantification using Immunomagnetic Separation and Electrochemical Detection of Guanine-Labeled Secondary Beads," *Sensors*, Vol. 15(5), pp. 12034-12052, 2015; doi:10.3390/s150512034.

51. Raheel Samuel, Joshua Bonkowsky, Bruce K. Gale, "Microfluidic-aided genotyping of Zebrafish in the first 48 hours with 100% Viability," *Biomed. Microdev.* Vol. 17, pp. 43 (6 pages), 2015.

52. Huizhong Li, Cody Gehrke, Bruce K. Gale, Himanshu Sant, Brittany Coats and Jay Agarwal, "A New Vascular Coupler Design for End-to-End Anastomosis: Fabrication and Proof-of-Concept Evaluation," *J. Med. Devices*, Vol. 9, No. 3, pp. [031002], 2015.  DOI: 10.1115/1.4029924.

53. S. Nikki Davidoff, K. L. Stallings, Amanda E. Brooks, Bruce K. Gale and Ben D. Brooks, "Optimal tube length for the submerged printing of ovarian cancer cells," *Biomed. Sci. Instrum.*, Vol. 51, pp. 17–23, 2015.

54. Huizhong Li, Bruce K. Gale, Himanshu Sant, Jill Shea, E. David Bell and Jay Agarwal, "A Novel Vascular Coupling System for End-to-End Anastomosis," *Cardiovascular Engineering and Technology*, Vol. 6 (3), pp. 294-302, 2015.

55. Russell Reid, Shelley D Minteer, Bruce K Gale, "Contact Lens Biofuel Cell Tested in a Synthetic Tear Solution," *Biosensors and Bioelectronics*, Vol. 68, pp. 142-148, 2015.  DOI: 10.1016/j.bios.2014.12.034.

56. Kevin Petersen, Lucia Manangon, Joshua Hood, Samuel Wickline, Diego Fernandez, William Johnson, Bruce K. Gale, "A Review of Exosome Separation Techniques and Characterization of B16-F10 Mouse Melanoma Exosomes with AF4-UV-MALS-QELS-DLS-TEM," *Anal. Bioanal. Chem.*, Vol. 406 (30), pp. 7855-66, 2014.

57. Tonguc O. Tasci, William. P. Johnson, Diego. P. Fernandez, Eliana. Manangon, Bruce. K. Gale, "Circuit modification in electrical field flow fractionation systems generating higher resolution separation of nanoparticles," *J. Chromatography A*, Vol. 1365, pp. 164–172, 2014. DOI: 10.1016/j.chroma.2014.08.097

58. Raheel Samuel, Colin M Thacker, A. Villu Maricq and Bruce K. Gale, "Simple and cost-effective fabrication of microvalve arrays in PDMS using laser cut molds with application to *C. elegans* manipulation in microfluidics," *Journal of Micromechanics and Microengineering,* Vol. 24(10), pp. 105007 (8 pages), 2014. DOI: 10.1088/0960-1317/24/10/105007

59. Scott O. Sundberg, Carl T. Wittwer, Luming Zhou, Robert Palais, Zachary Dwight, and Bruce K. Gale, "Quasi-Digital PCR: Enrichment and Quantification of Rare DNA Variants," *Biomedical Microdevices*, Vol. 16(4), pp. 639-644, August 2014. doi: 10.1007/s10544-014-9866-0.

60. S. Nikki Davidoff, Adam R. Miles, Bruce K. Gale, Josh W. Eckman, and Benjamin D. Brooks, "The Submerged Printing of Cells onto a Modified Surface Using a Continuous Flow Microspotter," *J. Vis. Exp.* (86), e51273, 2014. doi:10.3791/51273

61. Valentin Romanov, S. Nikki Davidoff, Adam R. Miles, David W. Grainger, Bruce K. Gale, and Benjamin D. Brooks, "A Critical Comparison of Protein Microarray Fabrication Technologies," *Analyst*, Vol. 139 (6), pp. 1303-1326, 2014. doi: 10.1039/c3an01577g.

62. Wei Chen, Chong Wang, Li Yan, Longbiao Huang, Xiaoyue Zhu, Bing Chen, Himanshu J Sant, Xinrui Niu, Val Roy, Bruce K Gale, Xianfeng Chen, "Improved polyvinylpyrrolidone microneedle arrays with non-stoichimetric cyclodextrin," *J. Mater. Chem. B*, Vol. 2, pp. 1699-1705, 2014.

63. Cody Gehrke, Huizhong Li, Himanshu Sant, Bruce Gale and Jay Agarwal, "Design, Fabrication and Testing of a Novel Vascular Coupling Device," *J. Biomed. Microdev.*, Vol. 16, pp. 173-180, 2014.

64. Li Yan, Anthony P Raphael, Xiaoyue Zhu, Beilei Wang, Wei Chen, Tao Tang, Yan Deng, Himanshu J Sant, Guangyu Zhu, Kwong Wai Choy, Bruce K Gale, Tarl W Prow,  Xianfeng Chen, "Nanocomposite strengthened dissolving microneedles for improved transdermal delivery to human skin." *Advanced Healthcare Materials,*Vol.;3(4), pp. 555-564, April 2014.. DOI: 10.1002/adhm.201300312.

65. Tonguc O. Tasci, William. P. Johnson, Diego. P. Fernandez, Eliana. Manangon, Bruce. K. Gale, "Biased Cyclical Electrical Field Flow Fractionation for Separation of Sub 50 nm Particles," *Anal. Chem.,* Vol. 85, No. 23, pp. 11225-11232, December 3, 2013.

66. Russell C. Reid, Fabien Giroud, Shelley D. Minteer, Bruce K. Gale, "Enzymatic Biofuel Cell with a Flow-Through Toray Paper Bioanode for Improved Fuel Utilization," *J. Electrochem. Soc.*, Vol. 160, No. 9, pp. H612-H619, 2013.

67. Jungkyu Kim, John Elsnab, Cody Gehrke, Jun Li, Bruce K. Gale, "Microfluidic Integrated Multi-walled Carbon Nanotube (MWCNT) Sensor for Electrochemical Nucleic Acid Concentration Measurement," *Sens. Act. B: Chemical.*, Vol. 185, pp. 370-376, August 2013.

68. G.T. Carling, X. Diaz, M. Ponce, L. Perez, L. Nasimba, E. Pazmino, A. Rudd, S. Merugu, D.P. Fernandez, B.K. Gale, W.P. Johnson, "Particulate and dissolved trace element concentrations in three southern Ecuador rivers impacted by artisanal gold mining," *Water, Air, and Soil Pollution*, Vol. 224, No. 2, 2013.

69. Nathan Gooch, Randon Michael Burr, Dolly J. Holt, Bruce Gale, and Balamurali Ambati, "Design and *in Vitro* Biocompatibility of a Novel Ocular Drug Delivery Device," *J. Funct. Biomater.* Vol. *4*(1), pp. 14-27, doi:10.3390/jfb4010014, 2013.

70. T. O. Tasci, E. Manangon, D. P. Fernandez, W. P. Johnson, and B. K. Gale, "Separation of Magnetic Nanoparticles by Cyclical Electrical Field Flow Fractionation," *IEEE Trans. On Magnetics*, Vol. 49, No. 1, pp. 331-335, 2013.

71. Siddharth Chakravarty, Himanshu Sant, Colin Fergusson, and Bruce K. Gale, "Characterization of polymerized liposomes using a combination of normal and cyclical electrical field flow fractionation," *Anal. Chem.*, Vol. 84, pp. 8323-8329, 2012.

72. Srinivas Merugu, Himanshu J. Sant and Bruce K. Gale, "Diffusion Split-Flow Thin Cell (SPLITT) System for protein separations," *Journal of Chromatography B*, Vol. 902, pp. 78-83, 2012.

73. Rahul Kolekar, Daniel Torgerson, John Viner, Bruce Gale and Tim Ameel, "Depth measurement in fully enclosed microchannels using laser interferometry," *Meas. Sci. Technol.* Vol. 23, pp. 087004, 2012.

74. Wilaiwan Somchue, Atitaya Siripinyanond and Bruce K. Gale, "Electrical Field-Flow Fractionation for Metal Nanoparticles Characterization," *Anal. Chem*, Vol. 84, pp. 4993-4998, 2012.

75. T. Onur Tasci, William.P. Johnson, Bruce K. Gale. "Cyclical Magnetic Field Flow Fractionation". *J. Appl. Phys*. Vol. 111, pp. 07D128, 2012.

76. Douglas Anjewierden, Gregory A. Liddiard, and Bruce K. Gale, "An electrostatic microvalve for pneumatic control of microfluidic systems," *J. Micromech. Microeng.* Vol. 22, pp. 025019 (9pp), 2012.

77. Himanshu J. Sant and Bruce K. Gale, "Optimization and Characterization of a Microscale Thermal Field-Flow Fractionation System," *Sensors and Actuators B: Chemical*, Vol. 162, No. 1, pp. 223-228, 2012.

78. Himanshu J Sant and Bruce K. Gale, "Characterization Of A Microscale Thermal-Electrical Field-Flow Fractionation System," *Journal of Chromatography A*, Vol. 1225, pp. 174-181, 2012.

79. Srinivas Merugu, Himanshu J. Sant, and Bruce K. Gale, "A novel method for effective field measurements in electrical field-flow fractionation," *Electrophoresis*, Vol. 33, pp. 1040–1047, 2012.

80. Jungkyu Kim, Michael A. Johnson, Parker Hill, and Bruce K. Gale, "A microfluidic nucleic acid extraction system with both disposable and reusable components," *J. Micromech. Microeng.* Vol. 22, pp. 015007 (9pp), 2012.

81. Raheel Samuel, Himanshu J Sant, Fangxiang Jiao, Chris R Johnson and Bruce K Gale, 'Microfluidic laminate-based phantom for diffusion tensor-magnetic resonance imaging," *J. Micromech. Microeng.* Vol. 21, pp. 095027 (11pp), 2011.

82. Julien Gigault, Bruce K. Gale , Isabelle Le Hécho , and Gaëtane Lespes, "Nanoparticle characterization by Cyclical Electrical Field-Flow Fractionation, *Anal. Chem.* Vol. 83, No. 17, p 6565-6572, 2011. DOI: 10.1021/ac2008948.

83. Balamurali K. Ambati, Gilbert Wong, Griffin J. Jardine, Bruce Gale and John Elsnab, "Endocapsular Carousel Technique Phacoemulsification," *Journal of Cataract & Refractive Surgery*, Vol. 37, No. 3, pp. 433-437, 2011.

84. Merugu Srinivas, Himanshu Sant, and Bruce K. Gale, "Optimization of Cyclical Electrical Field Flow Fractionation," *Electrophoresis*, Vol. 31 (20), pp. 3372-3379, 2010.

85. Himanshu J. Sant, Tammy Ho, and Bruce K. Gale, "An *In situ* Heater for a Phase-Change-Material-based Actuation System," *JMM*. Vol. 20, pp. 085039 (7pp), 2010.

86. Jitae Kim, Michael Mauk, Dafeng Chen, Jungkyu Kim, Bruce Gale, and Haim H. Bau, "A PCR Reactor With an Integrated Alumina Isolation Membrane," *Analyst,* Vol. 135, pp. 2408–2414, 2010.

87. Jungkyu Kim, Adam Miles, and Bruce K. Gale, "Improved biomolecule microarrays by printing on nanoporous aluminum oxide using a continuous-flow microspotter," *Small*, Vol. 6, No. 13, pp. 1415–1421, 2010.

88. Danny Blanchard, Phil Ligrani, Bruce Gale, "Slip Due to Surface Roughness for a Newtonian Liquid in a Viscous Micro-Scale Disk Pump," *Physics of Fluids*, Vol. 22, No. 5, pp. 052002 (15 pgs), 2010.

89. Guang Yan, Kevin S. Warner, Jie Zhang, Sanjay Sharma, and Bruce K. Gale, "Evaluation needle length and density of microneedle arrays in the pretreatment of skin for transdermal drug delivery," *International Journal of Pharmaceutics*, Vol. 391, pp. 7-12, 2010.

90. Scott Sundberg, Carl Wittwer, Chao Gao, and Bruce Gale, "Spinning Disc Platform for Microfluidic Digital PCR," *Anal. Chem*, Vol. 82, pp. 1546-1550, 2010.

91. Sarah Molokhia, Himanshu J Sant; Jacquelyn M Simonis; Corey J Bishop; R. Michael Burr; Bruce K Gale; and Balamurali K Ambati, "The Capsule Drug Device: Novel Approach for Drug Delivery to the Eye," *Vision Research*, Vol. 50, No. 7, pp. 680-685, 2010.

92. Jungkyu Kim, Michael Johnson, Parker Hill and Bruce K. Gale, "Microfluidic sample preparation: cell lysis and nucleic acid purification," *Integr. Biol.*, Vol. 1, No. 10, pp. 574 – 586, 2009.

93. Michael Johnson, Greg Liddiard, Mark Eddings, and Bruce Gale, "Bubble inclusion and removal using PDMS membrane-based gas permeation for applications in pumping, valving, and mixing in microfluidic devices," *J. Micromech. Microeng.*, Vol. 9, pp. 095011 (9 pp), 2009.

94. James R. Joubert, Kathryn A. Smith, Erin Johnson, John P. Keogh, Vicki H. Wysocki, Bruce K. Gale, John C. Conboy, and S. Scott Saavedra, "Stable, ligand-doped, poly(bis-SorbPC) lipid bilayer arrays for protein binding and detection," *ACS Applied Materials and Interfaces*, Vol. 1, No. 6, pp. 1310-1315, 2009.

95. Himanshu J. Sant and Bruce K. Gale, "Flexible fabrication, packaging, and detection approach for microscale chromatography systems," *Sens. Act. B*, Vol. 141, No. 1, pp. 316-321, 2009.

96. Jianping Liu, Mark A. Eddings, Rostislav Bukasov, Bruce K. Gale, Jennifer S. Shumaker-Parry, "*In Situ* Microarray Fabrication and Analysis Using a Microfluidic Flow Cell Array Integrated with Surface Plasmon Resonance Microscopy," *Anal. Chem*., Vol. 81, No. 11, pp 4296–4301, 2009.

97. Jungkyu Kim, Michael Junkin, Deok-Ho Kim, Seunglee Kwon, Young Shik Shin, Pak Kin Wong, and Bruce K. Gale, "Applications, Techniques, and Microfluidic Interfacing for Nanoscale Biosensing," *Microfluidics and Nanofluidics*, Vol. 7, No. 2, pp. 149-167, 2009.

98. Niel Crews, Carl Wittwer, Jesse Montgomery, Robert Pryor, Bruce K. Gale, "DNA Melting Analysis for Genotyping and Variant Scanning," *Anal. Chem.* Vol. 81, No. 6, pp. 2053-2058, 2009.

99. Jungkyu Kim and Bruce K. Gale, "Rapid prototyping of microfluidic systems using a PDMS/polymer tape composite," *Lab. Chip*, Vol. 9, pp. 1290-1293, 2009.

100. Rebecca L. Rich, Adam R. Miles, Bruce K. Gale, and David G. Myszka, "Detergent screening of a GPCR using serial and array biosensor technologies," *Anal. Biochem*. Vol. 386, No. 1, pp. 98-104, 2009.

101. Ryan Sincic, David A. Chang-yen, Louis Barrows, Bruce K. Gale, "Parallel Determination of Phenotypic Cytotoxicity with a Micropattern of Mutant Cell Lines," *Biomed. Microdev.*, Vol. 11, No. 2, pp. 443-452, 2009. DOI: 10.1007/s10544-008-9250-z

102. Mark A. Eddings, Josh W. Eckman, Carlos A. Arana, John E. Connolly, Bruce K. Gale, and David G. Myszka, "Spot-and-Hop Interspot Referencing for Surface Plasmon Resonance Imaging Using a Three-Dimensional Microfluidic Flow Cell Array," *Anal. Biochem.*, Vol. 385, No. 2, pp. 309-313, 2009

103. Kathryn A. Smith, Bruce K. Gale, John C. Conboy, "Micropatterned fluid lipid bilayer array," *Anal. Chem.* Vol. 80, No. 21, pp. 7980-7987, 2008.

104. Sriram Natarajan, Andrew Hatch, David Myszka, and Bruce Gale, "Optimal Conditions for Protein Array Deposition using a Continuous Flow Microspotter," *Anal. Chem.*, Vol. 80, No. 22, pp. 8561-8567, 2008.

105. Mark A. Eddings, Adam Miles, Josh Eckman, Jungkyu Kim, Rebecca L. Rich, Bruce K. Gale, and David Myszka, "Improved continuous-flow print head for micro-array deposition," *Anal. Biochem,*. Vol. 382, No. 1, pp. 55-59, 2008.

106. Niel Crews, Timothy A. Ameel, Carl Wittwer, and Bruce Gale, "Flow-Induced Thermal Effects on Spatial DNA Melting," *Lab. Chip*, Vol. 8, pp. 1922-1929, 2008.

107. Jungkyu Kim and Bruce K. Gale, "Quantitative and qualitative analysis of a microfluidic DNA extraction system using a nanoporous AlOx membrane," *Lab. Chip*, Vol. 8, pp. 1516 – 1523, 2008.

108. Mark A. Eddings, Michael A. Johnson, and Bruce K. Gale, "Determining the optimal PDMS–PDMS bonding technique for microfluidic devices, *J. Micromech. Microeng.* Vol. 18, pp. 067001 (1-4), 2008.

109. Niel Crews, Carl Wittwer, Robert Palais, and Bruce Gale, "Product Differentiation during Continuous-Flow Thermal Gradient PCR," *Lab. Chip*, Vol. 8, pp. 919 – 924, 2008.

110. Sriram Natarajan, David Chang-Yen, and Bruce Gale, "Large-area, high-aspect-ratio SU-8 molds for fabrication of PDMS microfluidic devices," *J. Micromech. Microeng.* Vol. 18, 045021, 2008.

111. Niel Crews, Carl Wittwer, and Bruce Gale, "Thermal Gradient PCR in a Continuous-Flow Microchip," *Biomed. Microdevices*, Vol. 10, No. 2, 2008.

112.    Sriram Natarajan, Phini S. Katsamba, Adam Miles, Josh Eckman, Giuseppe A. Papalia, Rebecca L. Rich, Bruce Gale, David G. Myszka, "Continuous-flow microfluidic printing of proteins for array-based applications including surface plasmon resonance imaging," *Anal. Biochem.* Vol. 373, pp. 141-146, 2008.

113.    Jenny Greer, Scott O. Sundberg, Carl T. Wittwer, and Bruce K. Gale, "Comparison of glass etching to xurography prototyping of microfluidic channels for DNA melting analysis," *J. Micromech. Microeng.*, Vol. 17, pp. 2407-2413, 2007.

114.    F. Zhang, R.J. Gates, V. S. Smentkowski, S. Natarajan, B. K. Gale, R.K. Watt, M.C. Asplund, M.R. Linford, Direct Adsorption and Detection of Proteins, Including Ferritin, onto Microlens Array Patterned Bioarrays. *J. Am. Chem. Soc.*; Vol. 129(30); pp. 9252-9253, 2007.

115.    Scott O. Sundberg, Jenny Greer, Robert J. Pryor, Oluwole Elenitoba-Johnson, Carl T. Wittwer, and Bruce K. Gale, " Solution-phase DNA mutation scanning and SNP genotyping by nanoliter melting analysis," *Biomedical Microdevices.,* Vol. 9, pp. 159-166, April 2007.

116.    David A. Chang-Yen, Aju BA bardeen and Bruce. K. Gale, "Spin-Assembled Nanofilms for Gaseous Oxygen Sensing," *Sensors and Actuators B: Chemical*, Vol. 120, p 426-433, Jan 10, 2007.

117.    Himanshu J. Sant, Jung Woo Kim, and Bruce K. Gale, "Reduction of End Effect-Induced Zone Broadening In Field Flow Fractionation Channels," *Anal. Chem.*, Vol. 78, pp. 7978-7985, 2006.

118.    Mark A. Eddings and Bruce K. Gale, "A PDMS-based Diffusion Pump For On-Chip Fluid Handling In Microfluidic Devices," *J.Micromech. Microeng.*, Vol. 16, pp. 2396-2402, 2006.

119.    David A. Chang-Yen, and Bruce. K. Gale, "Design and Fabrication of a Practical, Multianalyte-Capable Optical Biosensor," *Journal of Microlithography, Microfabrication, and Microsystems*, Vol. 5, pp.1-8, 2006.

120.    David A. Chang-yen, David Myszka, and Bruce K. Gale, "A Novel PDMS Microfluidic Spotter for Fabrication of Protein Chips and Microarrays," *JMEMS*, Vol. 15, pp. 1145-1151, 2006.

121.    Ameya Kantak, Merugu Srinivas and Bruce K. Gale, "Particle Size and Electric Field Effects in Cyclical Electrical Field Flow Fractionation," *Electrophoresis*, Vol. 27, No. 14, pp. 2833-2843, 2006.

122.    Danny Blanchard, Phil Ligrani, Bruce Gale, "Miniature Single-Disk Viscous Pump (Single-DVP), Performance Characterization," *Journal of Fluids Engineering*, Vol. 128, pp. 602-610, 2006.

123.    Ameya Kantak, Merugu Srinivas and Bruce K. Gale, "Carrier Ionic Strength Effects in Cyclical Electrical Field Flow Fractionation," *Anal. Chem.,* Vol. 78, pp. 2557-2564, 2006.

124.    Ameya Kantak, Merugu Srinivas and Bruce K. Gale, "Characterization of a Microscale Cyclical Electrical Field Flow Fractionation System," *Lab. Chip.*, Vol. 6, pp. 645 - 654, 2006.

125.    Nithin Narayanan, Avinash Saldanha, and Bruce K. Gale, "A Microfabricated Electrical SPLITT System," *Lab on a Chip*, Vol. 6, pp. 105-114, 2006.

126.    Himanshu J. Sant and Bruce K. Gale , "Improved Models of Geometric Scaling Effects in Field Flow Fractionation," *Journal of Chromatography A,* Vol. 1104, pp 282-290, 2006.

127.    JungKyu Kim, Karl Voelkerding, and Bruce K. Gale, "Patterning of a nanoporous membrane for multi-sample DNA extraction," *Journal of Micromechanics and Microengineering*, Vol. 16, pp. 33-39, 2006.

128.    Danny Blanchard, Phil Ligrani, and Bruce Gale, "Single-Disk and Double-Disk Viscous Micropumps," *Sensors and Actuators A: Physical,*, Vol. 122, No. 1, 29 July 2005, pp. 149-158, 2005.

129.    Danny Blanchard, Phil Ligrani, and Bruce Gale, "Performance and Development of a Miniature Rotary Shaft Pump (RSP)," *Journal of Fluids Engineering*, Vol. 127, pp. 752-760, 2005.

130.  D. A. Chang-Yen, R. Eich, and B. K. Gale, "A Monolithic PDMS Waveguide System Fabricated Using Soft-Lithography Techniques," *IEEE Journal of Lightwave Technology*, Vol. 23, No. 6, pp. 2088-2093, June 2005.

131.  Bruce K. Gale and Merugu Srinivas, "Cyclical Electrical Field Flow Fractionation", *Electrophoresis*, Vol. 26, pp. 1623–1632, 2005.

132.  Andrew M. Christensen, David A. Chang-Yen, and Bruce K. Gale, "Characterization Of Interconnects Used In PDMS Microfluidic Systems," *Journal of Micromechanics and Microengineering*, Vol. 15, pp. 928-935, 2005.

133.  Danny Blanchard, Phil Ligrani, Bruce Gale, and Ian Harvey, "Micro-Structure Mechanical Failure Characterization Using Rotating Couette Flow in a Small Gap," *Journal of Micromechanics and Microengineering*, Vol. 15, pp. 792-801, 2005.

134.  David A. Chang-Yen and Bruce K. Gale, "An Integrated Optical Oxygen Sensor Fabricated Using Rapid-Prototyping Techniques," *Lab on a Chip,* Vol. 3, pp. 297-301, 2003.

135.  Ameya S. Kantak, Bruce K. Gale, Yuri Lvov, Steven A. Jones, "Shear Activation of Platelets in Microchannels," *Biomedical Microdevices*, Vol. 5, pp. 207-215, September, 2003.

136.  David A. Chang-yen, Yuri Lvov, Michael McShane, and Bruce K. Gale, "Electrostatic Self-Assembly Of A Ruthenium-Based Oxygen Sensitive Dye Using Polyion-Dye Interpolyelectrolyte Formation", *Sensors and Actuators, B: Chemical*, Vol. 87, No. 2, pp. 346-355, December 10, 2002.

137.  Bruce K. Gale, "BioMEMS Education at Louisiana Tech University," *Journal of Biomedical Microdevices*, Vol. 4, pp. 223-230, July, 2002.

138.  Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Geometric Scaling Effects in Electrical Field-Flow Fractionation. 2. Experimental Verification," *Analytical Chemistry*, Vol. 74, No. 5, pp. 1024-1030, March 1, 2002.

139.  Thayne Edwards, Bruce K. Gale, and A.Bruno Frazier, "A Microfabricated Thermal Field Flow Fractionation System", *Anal. Chem.*, Vol. 74, No 6, pp. 1211-1216, March 15, 2002.

140.  Thayne Edwards, Bruce K. Gale, and A.Bruno Frazier, "Micro Scale Sample Preparation Systems for Biological Analysis", *Journal of Biomedical MicroDevices*, Vol. 3, No. 3, pp. 211-218, 2001.

141.  Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Geometric Scaling Effects in Electrical Field-Flow Fractionation. 1. Theoretical Analysis," *Analytical Chemistry*, Vol. 73, No. 10, pp.2345-2352, May 15, 2001.

142.  Bruno Frazier, Karin D. Caldwell, Bruce K. Gale, and Ian Papautsky, "Integrated micromachined components for biological analysis systems," *Journal of Micromechatronics*, Vol. 1, No. 1, pp. 67-84, 2000

143.  Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "A Micromachined Electrical Field- Flow Fractionation System," *IEEE Tran. on Biomedical Engineering*, Vol. 45, No. 12, pp. 1459-1469, December 1998.

*Editorials*
1.  Gaetane Lespes, Catia Contado, and Bruce K. Gale, "Field and Flow Based Separations," *Anal. Bioanal. Chem.*, Vol. 407, No. 15, pp. 4299-4300, June 2015.

*Book Chapters*
1.  Harikrishnan Jayamohan, Valentin Romanov, Huizhong Li, Jiyoung Son, Raheel Samuel, John Nelson, and Bruce K. Gale, "Advances in Microfluidics and Lab-on-a-Chip Technologies" in Molecular Diagnostics, 3rd Edition.George P. Patrinos, Philip B. Danielson and Wilhelm J. Ansorge, Eds. Academic Press: New York, 2016

2.  Harikrishnan Jayamohan, Himanshu J. Sant, and Bruce K. Gale, "Applications of Microfluidics for Molecular Diagnostics," in *Microfluidic Diagnostics: Methods and Protocols, Volume 2: Application*

*Protocols and Commercialization*, Colin D. Mansfield and Gareth Jenkins, eds., Humana Press: New York, 2012.

3. Daniel A. Bartholomeusz, Ronald W. Boutté and Bruce K. Gale. "Xurography: Microfluidic Prototyping with a Cutting Plotter," in *Lab-on-a-Chip Technology: Fabrication and Microfluidics.,* Keith E. Herold and Avraham Rasooly, eds. Caister Academic Press: Norwich, UK, 2009.

4. Bruce K. Gale, Mark A. Eddings, Scott O. Sundberg, Andrew Hatch, JungKyu Kim, and Tammy Ho. "Fabrication and packaging: Low-cost MEMS technologies," in *Comprehensive Microsystems*, *1st Ed.* Yogesh B. Gianchandani, Osamu Tabata, Hans Zappe, eds. Elsevier Amsterdam, Vol. 1, pp. 341-378, 2008.

5. Himanshu Sant and Bruce K. Gale, "Microscale Field Flow Fractionation: Theory and Practice," in *Microfluidic Technologies for Miniaturized Analysis Systems*, Steffen Hardt Friedhelm Schönfeld, eds. Springer-Verlag, Berlin, Germany, pp. 471-522, 2007.

### Invited Conference Papers/Presentations

1. Bruce Gale, "Taking Microfluidics From Research Ideas to a Real Product," in *Proc. ASME 2019 International Mechanical Engineering Congress and Exposition (IMECE), November 10–14, 2019, Salt Lake City, Utah, USA*, IMECE2019-14008, 2019.

2. Bruce K. Gale, "The History and Applications of Electrical Field Flow Fractionation," in *Proc. Of 18th International Symposium on Field-and Flow-based Separations*, Columbia, SC, USA, , May 14-17, 2018.

3. Bruce K. Gale, "The Future Of Diagnostic Labs: Lab-On-A-Chip," 2018 Spring Seminar of the Utah Chapter of the American Society for Clinical Laboratory Science, Salt Lake City, UT, May 4, 2018.

4. Bruce K. Gale and Kevin E. Petersen, "Exosome separation using electrical field flow fractionation and a new continuous SPLITT/FFF approach, in *Proc. Of ACS 2016 Spring Meeting*, March, 13, 2016, San Diego, CA, Paper ANYL 12, 2016.

5. Matt Hockin, Himanshu Jayant Sant, Mario Capecchi, Bruce K. Gale, "Dean flow fractionation of chromosomes," in *Proc. Of SPIE 9705 (Biomedical Optics),* Microfluidics, BioMEMS, and Medical Microsystems XIV San Francisco, CA, February 13, 2016, paper 970502-1, 2016. doi:10.1117/12.2219842

6. Matt Hockin, Himanshu Jayant Sant, Mario Capecchi, Bruce K. Gale, "An Inertial Microfluidic Device for Rapid Purification of Chromosomes," in *Proc. Of RGJ 2015*, S2-L3, Pattaya, Thailand, June 5, 2015.

7. Bruce K. Gale, Raheel Samuel, Harikrishnan Jayamohan, and Himanshu Sant, "Microfluidic Devices for Rapid and Sensitive Identification of Organisms," in *Proc. EMBS 2014,* Chicago, IL, August 28-31, 2014.

8. Bruce K. Gale, "Spinning Disk Platform for Digital PCR," at Molecular Med Tri-con 2013, February 11, 2013, San Francisco, CA.

9. Bruce K. Gale, Microfluidic Tools for PCR and Digital PCR , at *Digital PCR - Applications and Advances*, October 15-16, 2012, San Diego, CA.

10. Bruce K. Gale, "A Microfluidic Toolbox for Biomedical Applications," in *Proc. of Royal Golden Jubilee-Ph.D. Congress XIII*, Pattaya, Chonburi, Thailand, April 6 – 8, 2012, pg. 82.

11. Bruce Gale, Himanshu Sant, Srinivas Merugu, and William Johnson, "Microfluidic field flow fractionation of SPLITT techniques for nanoparticles and protein characterization and separation," in *Proc. of the 2010 International Chemical Congress of Pacific Basin Societies*, Honolulu, Hawaii, December 15-20, 2010, paper 47.

12. Bruce K. Gale, "A Microfluidic Toolbox for Biomedical Applications," at the *54th International Conference on Electron, Ion, and Photon Beam Technology and Nanofabrication (EIPBN 2010)*, Anchorage, AK, June 4, 2010.

13. Mark A. Eddings, Adam Miles, Jianping Liu, David G. Myszka, Jennifer Shumaker-Parry, Josh W. Eckman, Gary Sams, Bruce K. Gale, "A Highly Parallel Flow Cell Enabling Multi-channel Sensing in Diagnostic Applications," at *Oak Ridge Conference (AACC)*, San Jose, CA, April 17-18, 2008.

14. Bruce K. Gale, "Better Microarrays using Continuous Flow Deposition," at the GOT *Summit: Microarrays in Medicine*, Boston, MA, April 12-13, 2007.

15. Bruce K. Gale, "A decade of progress in microscale FFF," in *Proc. SPIE Microfluidics, BioMEMS, and Medical Microsystems V*, San Jose, CA, January 22-27, 2007.

16. Bruce K. Gale, "Practical Biomedical Microfluidics," *MEMS Technology and Biomedical Applications Gordon Research Conference*, New London, CT, June 25-30, 2006.

17. Bruce K. Gale, David A. Chang-yen, JungKyu Kim, Ameya S. Kantak, Himanshu Sant, and Merugu Srinvas, "A Microfluidic Toolbox for Biomedical and Diagnostic Applications," in *Proc. of AICHE 2005*, Cincinnati, OH, October 31 – November 3, 2005.

18. Bruce K. Gale, "Nanoscale Field Flow Fractionation," in Proc. 226th ACS National Meeting, Anaheim, CA, March 27-April 1, 2004.

19. Bruce K. Gale, "Novel Techniques and Instruments for Field Flow Fractionation of Biological Materials," in Proc. 225th ACS National Meeting, New Orleans, LA, March 23-27, 2003.

20. Bruce K. Gale, David Chang-yen, Yuri Lvov, and Michael J. McShane, "Novel Optically-based Oxygen Sensor Fabricated Using a Combination of Microfabrication and Nanotechnology Techniques", in *Proc. Second Annual BioMEMS and Biomedical Nanotechnology World 2001 conference*, Columbus, OH, September 22-25, 2001.

21. Bruce K Gale, Himanshu J Sant, Avinash Saldanha, Meregu Srinivas, Mahesh Thoppil, "Microfabricated Field Flow Fractionation Systems," in *Proc. of the Second Annual Louisiana Microsystems and Materials Conference*, Baton Rouge, LA, August 20-22, 2001.

22. Mengyan Li, John D. Glawe, Heather Green, David K. Mills, Michael J. McShane, Bruce K. Gale. "Microfabricated Substrates for Tissue Engineering," in *Proc. of the Nineteenth Annual Houston Conference on Biomedical Engineering Research*, Houston, TX, February 8-9, 2001.

23. Bruce K. Gale, "Scaling Effects in Microchromatography Systems", in *Proc. Southeast/Southwest Regional ACS Conference*, New Orleans, LA, December 6-8, 2000.

24. Bruce K. Gale, Ian Papautsky, John Brazzle, Ronald S. Besser, and A. Bruno Frazier, "Packaging for Biomedical Analysis Systems," in *Proc. Advanced Technology Workshop (ATW) for MEMS and Microsystem Packaging and Integration*, Orlando, FL, November 10-12, 2000.

25. Bruno Frazier, Thayne L. Edwards, and Bruce K. Gale, "Micro Scale Purification Systems for Biological Sample Preparation", in *Proc. of 198th Meeting of the Electrochemical Society: Microfabricated Systems and MEMS V*, Phoenix, AZ, October 22-27, 2000.

26. Charles J. Robinson, Stan A. Napper, Bruce K. Gale, Michael J. McShane, "Rehabilitative Biomicrosystems", in *Proc.1st Annual International IEEE-EMBS Special Topic Conference on Microtechnologies in Medicine and Biology*, Lyon, France, October 12-14, 2000, pp. 547-551.

27. Bruce K. Gale, Karin Caldwell, and A. Bruno Frazier, "Blood and Protein Separations Using a Micromachined Electrical Field-flow Fractionation System," in *Proc. of the First Annual Louisiana Microsystems Conference*, Ruston, LA, April 5, 2000.

28. Bruno Frazier, John Brazzle, Bruce K. Gale, and Ian Papautsky, "Miniaturized Devices for Bio/Chemical Sample Preparation," in *Proc. International Device Research Symposium 1999,* Charlottesville, VA, Dec. 1-2, 1999.

29. Bruno Frazier, Ian Papautsky, Thayne Edwards, and Bruce K. Gale, "Integrated Sample Preparation Systems for Miniaturized Biochemical Analysis," in *Proc. International Symposium on Mechatronics and Human Science (MHS '99)*, Nagoya, Japan, Nov. 23-26, 1999.

30. Bruno Frazier, John D. Brazzle, Bruce K. Gale, and Ian Papautsky, "Packaging for Microfluidic Systems," in *Proc. of Interpack '99*, Lahaina, Hawaii, June 13-18, 1999.

31. Bruno Frazier, Bruce K. Gale, and Ian Papautsky, " Micromachined metallic pipettes and bioanalysis systems," in *Proc. International Symposium on Mechatronics and Human Science (MHS '97),* Nagoya, Japan, Oct. 5-8, pp. 5-12, 1997.

*Reviewed Conference Papers*

1. Alex Jafek, Haidong Feng, Hayden Brady, Raheel Samuel, and Bruce Gale, "PEO Can Improve The Resolution Of Size-Based Separations In Spiral Channels," in *Proc. Of MicroTAS 2019*, Basel, Switzerland, Pages W220h, October 27-31, 2019.

2. Matt D. Nelson, Nirupama Ramkumar, and Bruce K. Gale, "Flexible, Transparent, Sub-100 μm Microfluidic Channels With FDM 3D-Printed Thermoplastic Polyurethane," in *Proc. Of MicroTAS 2019*, Basel, Switzerland, Pages M149e, October 27-31, 2019.

3. Marzieh Chaharlang, Brady L. Goenner, and Bruce K. Gale, "Unravel The Physics Of Particle Focusing Mechanisms In Microchannels," in *Proc. Of MicroTAS 2019*, Basel, Switzerland, Pages T131d, October 27-31, 2019.

4. Haidong Feng and Bruce K. Gale, "Sheathless Particle Separation In Viscoelastic Solution Utilizing Viscoelastic Flow Induced Secondary Flow In A Spiral Channel," in *Proc. Of MicroTAS 2018*, Kaohsiung, Taiwan, Pages M197g, November 11-15, 2018.

5. Alexander R. Jafek, Haidong Feng, Dallin S. Broberg, Timothy G. Jenkins , Kenneth I. Aston , Bruce K. Gale , Raheel Samuel, "Motile Sperm Selection Using Dean Flow In A Spiral Channel," in *Proc. Of MicroTAS 2018*, Kaohsiung, Taiwan, Pages T196g, November 11-15, 2018.

6. Ugochukwu Nze, Chris Lambert, Bruce Kent Gale, Himanshu Jayant Sant, "A Rapid Cryptosporidium Biosensor based on the Electrochemical Detection of Polyguanine," in *Proc. Of EMBC 2018*, July 17-21 2018, Honolulu, Hawaii WePoS-28.4, 2018.

7. T. Jenkins, R. Samuel, A. Jafek, H. Feng, B. Gale, D. T. Carrell, J. M. Hotaling, "Rapid Microfluidic Sperm Isolation From Microtese Samples In Men With Nonobstructive Azoospermia," in *Proc. Of ASRM 2017 Scientific Congress & Expo* in San Antonio, Texas, P-360, October 28-November 1, 2017.

8. A.R. Jafek, H. Brady, S. Harbertson, A. Millington, R. Samuel, and B. Gale, "Quantifying Microfluidic PCR At Extreme Speeds," in *Proc. Of MicroTAS 2017*, October 22-26, 2017, Savannah, GA, USA, pp. 1229-1230, 2017.

9. H. Feng, T. Jenkins, A. Jafek, R. Samuel, and B.K. Gale, "Enhanced Focusing And Separation Of Sperm Cell In Microfluidic Inertial Separation  Device With Viscoelastic Liquid," in *Proc. Of MicroTAS 2017*, October 22-26, 2017, Savannah, GA, USA, pp. 1367-1368, 2017.

10. Joshua L. Hood , Gina T. Bardi , Kevin E. Petersen , Himanshu Sant , Bruce K. Gale, "Cyclical Electrical Field-Flow Fractionation of Melanoma Exosomes", In *Proc. Of ASEMV 2017,* Pacific Beach, CA, USA, October 8-12, 2017.

11. Yuguang Liu, Patricio Jeraldo, Samantha McDonough, Jin Jen, Robin Patel, Marina Walther-Antonio, Christopher Lambert, Bruce Gale, "Experimental validation of an optofluidic platform for microbial single cell isolation and whole genome amplification for human microbiome applications," In *2017 IEEE International Symposium on Medical Measurements and Applications, MeMeA 2017 - Proceedings* (pp. 62-66). [7985850] Institute of Electrical and Electronics Engineers Inc.. DOI: 10.1109/MeMeA.2017.7985850

12. Jiyoung Son, Bruce K. Gale, James M. Hotaling and Douglas T. Carrell, "Purification Of Sperm From High WBC Semen Samples Using A Spiral Channel," in *Proc. Of MicroTAS 2016*, October 9-13, 2016, Dublin, Ireland, pp. 248-249, 2016.

13. R. Samuel, A. Jafek, J. Trauba, K. Carney, R. Pryor, B. Gale, C. Wittwer, and K. Aston, "40 Cycle PCR Using Human Genomic DNA In Less Than 1 Minute On A Microfluidic Chip" in *Proc. Of MicroTAS 2016*, October 9-13, 2016, Dublin, Ireland, pp. 619-620, 2016.

14. H. Feng, M. Hockin, S. Zhang, H. Sant and B. K. Gale, "Cell Lysis And Chromosome Extraction In Microfluidic Pinched Flow Devices," in *Proc. Of MicroTAS 2016*, October 9-13, 2016, Dublin, Ireland, pp. 689-690, 2016.

15. Jiyoung Son, Odgerel Badamjav, Timothy Gerald Jenkins, Bruce Kent Gale, James M Hotaling, and Douglas T Carrell "Active Higher Quality Sperm Separation Using A Spiral Channel," in *Proc. Of MicroTAS 2015*, October 25-29, 2015, Gyeongju, Korea, pp. 367-369, 2015.

16. Victoria Ragsdale, Huizhong Li, Tim Ameel, and Bruce Kent Gale, "Three-Dimensional Heat Transfer Analysis Of A Disposable, Continuous-Flow Polymerase Chain Reaction Device," in *Proc. Of MicroTAS 2015*, October 25-29, 2015, Gyeongju, Korea, pp. 2038-2040, 2015.

17. Matthew F. Hockin, Himanshu J. Sant, Mario R. Capecchi and Bruce K. Gale, "An inertial microfluidic device for rapid purification of native chromosomes," in *Proc. of MicroTAS 2014*, San Antonio, TX, October 26-30, 2014, pp. 2510-2511.

18. Jiyoung Son, Raheel Samuel, Kristin Murphy, Himanshu Sant, Matthew Hockin, Bruce K. Gale, James M. Hotaling, and Douglas T. Carrell, "Sperm Cell Separation Using A Spiral Channel," in *Proc. of MicroTAS 2014*, San Antonio, TX, October 26-30, 2014, pp. 2570-2571.

19. T. Onur Tasci, Chris J. Lambert, Himanshu J. Sant, Eliana Manangon, Diego P. Fernandez, William P. Johnson, and Bruce K. Gale, "A Microfluidic System For High Throughput Continuous Separation Of Nanoparticles," in *Proc. of MicroTAS 2014*, San Antonio, TX, October 26-30, 2014, pp. 2444-2446.

20. Huizhong Li, Bruce Gale, Himanshu Sant, Jill Shea, and Jay Agarwal, "Design, Fabrication and Testing of A Novel End-to-End Vascular Coupling System*," in *Proc. EMBC 2014*, Chicago, IL, August 26-30, 2014.

21. Harikrishnan Jayamohan, Swomitra Mohanty, Bruce K. Gale, "Platinum functionalized titania nanotube array sensor for detection of trichloroethylene in water," in *Proc. of IEEE-Sensors 2013*, Baltimore, Maryland, 3-6 Nov. 2013. DOI: 10.1109/ICSENS.2013.6688608

22. Huizhong Li, Harikrishnan Jayamohan, Christopher Lambert, Swomitra Mohanty and Bruce K. Gale, "Automated Whole Blood Processing With A Portable Microfluidic Device For Point-Of-Care Diagnosis," in *Proc. of MicroTAS 2013*, Freiburg, Germany, October 27 –31, 2013, pp. 1758-1760.

23. Keng-Min Lin, Himanshu J. Sant, Balamurali K. Ambati and Bruce K. Gale, "Intraocular Pressure Sensors: New Approaches For Real-Time Intraocular Pressure Measurement Using A Purely Microfluidic Chip," in *Proc. of MicroTAS 2012*, Okinawa, Japan, October 28 – November 1, 2012.

24. Raheel Samuel, Colin Thacker, Andres Villu Maricq, Bruce K. Gale, "Simple And Low-Cost Fabrication Protocol For Producing 100's Of Pneumatic Microvalves In All-PDMS Substrates For Microfluidics Research," in *Proc. of MicroTAS 2012*, Okinawa, Japan, October 28 – November 1, 2012.

25. T. O. Tasci, C. J. Lambert, H. J. Sant, E. Manangon, D. P. Fernandez, W. P. Johnson, B. K. Gale, "Investigation Of The Channel Height On The Separation Efficiency Of An Electrical Field Flow Fractionation System," in *Proc. of MicroTAS 2012*, Okinawa, Japan, October 28 – November 1, 2012.

26. Keng-Min Lin, Himanshu J. Sant, Bruce K. Gale, and Jayant P. Agarwal, "New Approaches to Bridge Nerve Gaps: Development of a Novel Drug-Delivering Nerve Conduit," in *Proc. Of EMBC'12*, San Diego, CA, August 28- September 1, 2012.

27. T. O. Tasci, E. Manangon, D. P. Fernandez, W. P. Johnson, B. K. Gale, "Cyclical Magnetic Field Flow Fractionation for the Separation of Magnetic Nanoparticles", in *Proc. of 9th International Conference on the Scientific and Clinical Applications of Magnetic Carriers*, Minneapolis, MN, May 22-26, 2012.

28. Himanshu J. Sant, Michael Johnson, and Bruce K. Gale, "Integrated Microfluidics For Serotype Identification Of Foot-And- Mouth-Disease Virus," in *Proc. of MicroTAS 2011*, Seattle, WA, USA, October 2-6, 2011, pp. 2007-2009.

29. Rohit Sharma and Bruce K. Gale, "Electrochemical Quantification of DNA Using Aluminum Oxide Membranes," in *Proc. of Eurosensors XXV, September 4-7, 2011, Athens, Greece*, pp. 1578-1581.

30. Daniel Torgerson, Rahul Kolekar, Bruce Gale, and Tim Ameel, "Minor Losses In Rectangular Xurographic Microchannels," in *Proceedings of the ASME International Mechanical Engineering Conference & Exposition (IMECE2010)*, November 12-18, 2010, Vancouver, British Columbia, Canada, paper 39401 (10 pages).

31. Michael A. Johnson, Jungkyu Kim, Angela Williams, and Bruce K. Gale, "A Fully Automated Microfluidic Platform for Nucleic Acid Extraction," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 258b.

32. Greg A. Liddiard and Bruce K. Gale, "Pneumatically Controlled 32 Channel Scalable Disposable Microfluidic Sample Handling Device with Integrated Metering, Mixing, and Demultiplexing," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 258a.

33. Michael A. Johnson, Jungkyu Kim, Angela Williams, and Bruce K. Gale, "A Programmable Microfluidic System for Selective RNA or DNA Extraction From Various Raw Biological Sample," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 314a.

34. Venu M. Arremsetty and Bruce K Gale, "Asymmetrical Cross-Flow Based Split Thin Cell Fractionation," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 314g.

35. Himanshu Jayant Sant, Scott Sundberg, Erik Liddiard, Michael A. Johnson, and Bruce K. Gale, "Integrated Microfluidics for Serotype Identification of Foot and Mouth Disease Virus," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 314f.

36. Erik Liddiard, Himanshu Jayant Sant, Frederic Horndli, and Bruce K. Gale, "Measurement of Muscle Force in C. Elegans Worm Using Microfluidics," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 314h.

37. Michael A. Johnson, Erik Liddiard, and Bruce K. Gale, "A Masked Corona Discharge Method for Selective Bonding in PDMS for Microfluidic Applications," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 314i.

38. Greg A. Liddiard, Erik Liddiard, and Bruce K. Gale, "Pneumatically Driven 16 Channel Disposable Nucleic Acid Filter Device with Integrated Demultiplexing and Multiplexing," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 314d.

39. Bruce K. Gale, "Lessons Learned by An Entrepreneurial Minded University Professor On the Creation of New Companies," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 287c.

40. Keng-Min Lin, Corey J. Bishop, Himanshu J. Sant, Balamurali K. Ambati, and Bruce K. Gale, "Refilling Mechanism to Stabilize a Free-Floating Intraocular Capsule Drug Ring (CDR)," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 568v.

41. Raheel Samuel, Himanshu Jayant Sant, Fangxiang Jiao, Christopher R. Johnson, and Bruce K. Gale, "Fabrication of a MRI Standardization Device From Stacking Highly Patterned Thin PDMS Layers," in *Proc. of AICHE 2010, Salt Lake City, Utah*, November 7-12, 2010, paper 744a.

42. Catherine Maltbie, Ian Papautsky, Suzanne van den Hoogenhof, David Eddington, Bruce Gale, Jin-Woo Choi, Glenn Walker, "Expanding the introduction of microfluidics through a problem-based laboratory course to multiple engineering disciplines at five universities," *IEEE Frontiers in Education Conference (FIE 2010)*, Washington DC, October 27 - 30, 2010, Paper S2F-6.

43. Michael Johnson, Jungkyu Kim, Angela Williams, and Bruce Gale, "A Programmable Microfluidic System For Selective RNA Or DNA Extraction From Various Raw Biological Samples," in *Proc. of MicroTAS 2010*, Groningen, Netherlands, October 3-7, 2010, pp. 387-389.

44. Himanshu Sant, Scott Sundberg, Adam Miles, Michael Johnson, Erik Liddiard, and Bruce Gale, "Integrated Microfluidics For Serotype Identification Of Foot And Mouth Disease Virus," in *Proc. of MicroTAS 2010*, Groningen, Netherlands, October 3-7, 2010, pp. 1832-1834.

45. Raheel Samuel, Himanshu J. Sant, Fangxiang Jiao, Christopher R. Johnson, and Bruce K. Gale, "Fabrication Of A MRI Standardization Device By Stacking Highly Patterned Thin PDMS Layers," in *Proc. of MicroTAS 2010*, Groningen, Netherlands, October 3-7, 2010, pp. 1901-1903.

46. T. O. Tasci, A. Arat, E. Atalar, B. Gale, "Utilization of AC and DC Magnetic Fields for Focused Magnetic Fluid Hyperthermia and Magnetic Particle Fractionation," in *Proc. of 8th International Conference on the Scientific and Clinical Applications of Magnetic Carriers - Rostock, Germany,* May 25-29, 2010, paper 194.

47. Jungkyu Kim, John Elsnab, Michael Johnson, Bruce K. Gale, "Sample to Answer: A Fully Integrated Nucleic Acid Identification System For Bacteria Monitoring," in *Proc. Of SPIE: Microfluidics, BioMEMS, and Medical Microsystems VIII*, San Francisco, CA, January 23-28, 2010, Vol. 7593, pp. 75930S, 2010. doi: 10.1117/12.844856

48. Jungkyu Kim, Adam Miles, and Bruce K. Gale, Improved Protein Microarrays Using Continuous Flow Printing And A Nanoporous Substrate," in *Proc. of MicroTAS 2009*, Jeju, Korea, November 1-5, 2009, pg. 1781-1783.

49. Jungkyu Kim, Michael Johnson, Parker Hill, Rahul Sonkul, Jongwon Kim, Bruce K. Gale, "Integrated microfluidic RNA extraction system" in *Proc. of the 5th Conference on Microtechnologies in Medicine and Biology (MMB)*, Quebec City, Quebec, Canada 2009

50. Jungkyu Kim, Rajesh Surapaneni, Bruce K. Gale :" Rapid prototyping of microfluidic systems using a PDMS/tape composite," in *Proc. of the 5th Conference on Microtechnologies in Medicine and Biology (MMB)*, Quebec City, Quebec, Canada 2009

51. S.A. Molokhia, H.J. Sant, M.C. Hanson, R.M. Burr, A.E. Poursaid, C.J. Bishop, J.M. Simonis, B.K. Gale, B.K. Ambati, "New Intraocular Drug Delivery Device," *ARVO 2009 Annual Meeting* Fort Lauderdale, FL May 3-7, 2009.

52. Michael Johnson, Greg Liddiard, Mark Eddings, Bruce Gale, "Bubble Inclusion And Removal Using Pdms Membrane-Based Gas Permeation For Applications In Pumping And Mixing In Microfluidic Devices," in *Proc. of MicroTAS 2008,* San Diego, CA, Oct. 12-16, 2008, pg. 1006-1008.

53. Kathryn A. Smith, Bruce K. Gale, John C. Conboy, "Micropatterned Fluid Lipid Bilayers Created Using A Continuous Flow Microspotter For Multi-Analyte Assays," in *Proc. of AICHE 2007, Salt Lake City, Utah*, November 3-9, 2007, pp. 576d.

54. Jianping Liu, Mark A. Eddings, Bruce K. Gale, and Jennifer Shumaker-Parry, "A Three-Dimensional Microfluidic System Integrated With Surface Plasmon Resonance Microscopy For Immunoassays," in *Proc. of AICHE 2007, Salt Lake City, Utah*, November 3-9, 2007, pp. 523f.

55. Rajesh Surapaneni, Jungkyu Kim, Bruce Gale, "Microfluidic gDNA Quantification by Flow Rate Analysis", in *Proc. of AIChE, 2007 Annual Meeting, Salt Lake City, UT, November 3-9, 2007,* pp. 521.

56. Jungkyu Kim and Bruce K. Gale, "Evaluation of a Microfluidic DNA Extraction System Using A Nanoporous Aluminum Oxide Membrane," in *Proc. of MicroTAS 2007*, Paris, France, Oct. 7-11, 2007, pp. 643-645.

57. Himanshu J. Sant, Tammy Ho, and Bruce K. Gale, "A Microfluidic Switchboard," in *Proc. of MicroTAS 2007*, Paris, France, Oct. 7-11, 2007, pp. 1131-1133.

58. Niel Crews, Carl Wittwer, and Bruce Gale, "Thermal Gradient PCR in a Continuous-Flow Microchip," in *Proc. Of SPIE: Microfluidics, BioMEMS, and Medical Microsystems V*, San Jose, CA, January 23-28, Vol. 6465, pp. 646504 (1-11), 2007.

59. Niel Crews, Carl Wittwer, Luming Zhou, and Bruce Gale, "Rapid Prototyping of a Continuous-Flow PCR Microchip," in *Proc. of AICHE 2006*, San Francisco, CA, Nov. 12-17, 2006.

60. Scott O. Sundberg, Jenny Greer, Carl T. Wittwer, Robert J. Pryor, Oluwole Elenitoba-Johnson, and Bruce K. Gale, "Homogeneous DNA Melting Analysis For Mutation Scanning Using Nanoliter Volumes," to be presented in *Proc. of MicroTAS 2006*, Tokyo, Japan, Nov. 5-9, 2006.

61. Jungkyu Kim and Bruce K. Gale, "Geometric Optimization Of A Thin Film Ito Heater To Generate A Uniform Temperature Distribution,"to be presented in *Proc. of MicroTAS 2006*, Tokyo, Japan, Nov. 5-9, 2006.

62. Mark A. Eddings and Bruce K. Gale, "A PDMS Diffusion Pump For On-Chip Fluid Handling In Microfluidic Devices," to be presented in *Proc. of MicroTAS 2006*, Tokyo, Japan, Nov. 5-9, 2006.

63. Jungkyu Kim and Bruce K. Gale, Microfluidic DNA Extraction Using a Patterned Aluminum Oxide Membrane, in *Proc. Of SPIE: Microfluidics, BioMEMS, and Medical Microsystems IV, San Jose, CA, January 23-28, 2006*, Vol. 6112, pp. 167-174.

64. D. A. Chang-Yen, and B. K. Gale, "Design and Fabrication of a Multianalyte-Capable Optical Biosensor Using a Multiphysics Approach," in *Proc. of 3rd IEEE/EMBS Special Topic Conference on Microtechnology in Medicine and Biology, 2005*, pp. 326-328.

65. D. A. Chang-Yen, and B. K. Gale, "A PDMS Microfluidic Spotter for Fabrication of Lipid Microarrays," in *Proc. of 3rd IEEE/EMBS Special Topic Conference on Microtechnology in Medicine and Biology, 2005*, pp. 31-33.

*66.* Jungkyu Kim, Bruce K. Gale, "Multi-DNA Extraction Chip Based on an Aluminum Oxide Membrane Integrated into a PDMS Microfluidic Structure," in *Proc. of 3rd IEEE/EMBS Special Topic Conference on Microtechnology in Medicine and Biology, 2005*, pp. 5-7.

67. M. Graff, B.K. Gale and A.B. Frazier, Nanoparticle Separations Using Miniaturized Field-Flow Fractionation Systems, in *Proc. of 2005 NSTI Nanotechnology Conference and Trade Show*, May 8-12, 2005, Anaheim, California, U.S.A.

68. David A. Chang-yen and Bruce K. Gale, "PDMS microfluidic spotter for fabrication of protein chips and micro-arrays,"in *Proc. Of SPIE: Microfluidics, BioMEMS, and Medical Microsystems III*, San Jose, CA, January 22-27, 2005, pp. 110-120.

69. Danny Blanchard, Phil Ligrani, and Bruce Gale, "Single-Disk and Double-Disk Viscous Micropumps," in *Proceedings of IMECE2004, November 13-19, 2004, Anaheim, California USA*, pp. 411-417.

70. Danny Blanchard, Phil Ligrani, and Bruce Gale, "Performance and Development of a Miniature Rotary Shaft Pump (RSP)," to be published in *Proceedings of IMECE2004, November 13-19, 2004, Anaheim, California USA*, pp. 705-714.

71. Tim Ameel, Bruce Gale, and Ian Harvey, "A Three-semester Interdisciplinary Educational Program in Microsystems Engineering," in *Proc. Of 2004 ASEE International Conference and Exposition*, Salt Lake City, Utah, June 20-24, 2004.

72. David A. Chang-yen and Bruce K. Gale, "Integrated optical glucose sensor fabricated using PDMS waveguides on a PDMS substrate," *Proc. Of SPIE: Microfluidics, BioMEMS, and Medical Microsystems II*, San Jose, CA, Vol. 5345, January 25-27, 2004, pp. 98-107.

73. Himanshu J. Sant and Bruce K. Gale, "Flexible coupling of a waveguide detector with a microscale field flow fractionation device," *Proc. Of SPIE: Microfluidics, BioMEMS, and Medical Microsystems II*, San Jose, CA, Vol. 5345, January 25-27, 2004, pp. 250-257.

74. Himanshu J. Sant, Bruce K. Gale, "An Integrated Optical Detector For Microfabricated Electrical Field Flow Fractionation System," in *Proc. of MicroTAS 2003*, Squaw Valley, California, October 5-9, 2003.

75. Ameya S Kantak, Srinivas Merugu, Bruce K Gale, "Microfabricated Cyclical Electrical Field Flow Fractionation," in *Proc. of MicroTAS 2003*, Squaw Valley, California, October 5-9, 2003.

76. Srinivas Merugu, Nithin Narayanan and Bruce K. Gale, "High Throughput Separations Using A Microfabricated Serial Electric SPLITT System," in *Proc. of MicroTAS 2003*, Squaw Valley, California, October 5-9, 2003.

77. Jung Woo Kim, Himanshu J Sant and Bruce K Gale, "Reduction of Microfluidic End Effects In Micro-Field Flow Fractionation Channels," in *Proc. of MicroTAS 2003*, Squaw Valley, California, October 5-9, 2003.

78. David A. Chang-yen and Bruce K. Gale, "An Integrated Optical Biochemical Sensor Fabricated Using Rapid-Prototyping Techniques," in *Proc. of SPIE: Microfluidics, BioMEMS, and Medical Microsystems,* San Jose, CA, Vol. 4982, January 27-29, 2003, pp. 185-195.

79. Avinash Saldanha and Bruce K. Gale, "Viral Separations Using a Microfabricated Electrical Field Flow Fractionation System," *Proc. Of Micro Total Analysis Systems 2002*, Nara, Japan, Nov. 3-7, 2002.

80. Ameya Kantak, Bruce Gale, Yuri Lvov, Steven Jones, "Microfluidic Platelet Function Analyzer For Shear-induced Platelet Activation Studies," in *Proc. Of IEEE-MMB 2002*, Madison, WI, May 2-4, 2002, pp. 169-173.

81. Mengyan Li, Hua Ai, David K. Mills, Yuri M. Lvov, Michael J. McShane, Bruce K Gale, "Using Microfabrication and Electrostatic Layer-by-layer (LbL) Self-Assembly Technologies to Improve the Growth and Alignment of Smooth Muscle Cells," in *Proc. of IEEE-MMB 2002*, Madison, WI, May 2-4, 2002, pp. 109-114.

82. David A. Chang-Yen and Bruce K. Gale, "A Novel Integrated Optical Dissolved Oxygen Sensor For Cell Culture And Micro Total Analysis Systems," in *Proc. MEMS 2002*, Las Vegas, Nevada, January 20-24, 2002, pp. 574-577.

83. Himanshu J. Sant and Bruce K. Gale, "A Microfabricated Thermal Electric Field Flow Fractionation System," in *Proc. of MicroTAS 2001*, Monterrey, California, October 21-25, 2001.

84. Mengyan Li, John D. Glawe, David K. Mills, Michael J. McShane, Bruce K. Gale. "Effect of High Aspect Ratio Microstructures on Cell Growth and Attachment, to be presented at *IEEE Special Topics Conference on Microtechnology in Medicine*, Lyon, France, October 12-14, 2000.

85. Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Blood and Protein Separations Using a Micromachined Electrical Field- Flow Fractionation System," in *Proc. of MicroTAS 2000*, Enschede, Netherlands, May 14-18, 2000, pp. 399-402.

86. Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Scaling Effects in a Micromachined Electrical Field - Flow Fractionation System," in *Proc. of 1999 First Joint BMES/EMBS Conference*, Atlanta, GA, October 13-16, 1999, pp.842.

87. Thayne L. Edwards, Bruce K. Gale, and A. Bruno Frazier, "Miniaturized Thermal Field-Flow Fractionation System" in *Proc. of 1999 First Joint BMES/EMBS Conference*, Atlanta, GA, October 13-16, 1999, pp. 848.

88. Bruce K. Gale and A. Bruno Frazier, "Electrical Impedance Spectroscopy Particle Detector for Use in Microanalysis Systems," *in Proc. SPIE Symposium on Micromachining and Microfabrication: Micro Fluidic Devices and Systems*, Santa Clara, CA, Sep. 20-21, 1999, 190-201.

89. Ian Papautsky, Bruce K. Gale, Swomitra Mohanty, Tim A. Ameel, and A. Bruno Frazier, "Effects of rectangular microchannel aspect ratio on laminar friction constant," in *Proc. SPIE Symposium on Micromachining and Microfabrication: MicroFluidic Devices and Systems*, Santa Clara, CA, Sep. 20-21, 1999, pp. 147-158.

90. Thayne L. Edwards, Bruce K. Gale, and A. Bruno Frazier, "A Micromachined Thermal Field- Flow Fractionation System, in *Proc. of Transducers '99*, 1999 International Conference on Solid-State Sensors and Actuators, Sendai, Japan, June 7-11, 1999.

91. Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Electrical Conductivity Particle Detector for Use in Biological and Chemical Micro-analysis Systems," *in Proc. SPIE Symposium on Micromachining and Microfabrication: Micro Fluidic Devices and Systems*, Santa Clara, CA, Sep. 21-24, pp. 230-242, 1998.

92. Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Characterization of a Micromachined Electrical Field- Flow Fractionation System," *in Proc. of the Solid-State Sensor and Actuator Workshop*, Hilton Head, SC, June 8-11, pp. 342-345, 1998.

93. Bruce K. Gale, A. Bruno Frazier, and Karin D. Caldwell, "A Micromachined Electrical Field- Flow Fractionation System," in *Proc. 10th IEEE International Workshop on Micro Electro Mechanical Systems (MEMS '97)*, Nagoya, Japan, Jan. 26-30, pp. 317-322, 1997.

## *Conference Papers and Abstracts*

1. Haidong Feng, Alex Jafek, Timothy Jenkins, Kenneth Aston, Bruce Gale, "Self-Alignment Induced Sperm Separation in Inertial Focusing Device," in *Proc. ASME 2019 International Mechanical Engineering Congress and Exposition (IMECE), November 10–14, 2019, Salt Lake City, Utah, USA*, IMECE2019-13884, 2019.

2. Alex Jafek, Haidong Feng, Hayden Brady, Marzieh Chaharlang, Kevin Petersen, Dallin Broberg, Jim Hotaling, Douglas Carrell, Raheel Samuel, Kenneth Aston, Bruce Gale, "Microfluidic Sperm Preparation for Intrauterine Insemination," in *Proc. ASME 2019 International Mechanical Engineering Congress and Exposition (IMECE), November 10–14, 2019, Salt Lake City, Utah, USA*, IMECE2019-13401, 2019.

3. Haidong Feng, Eric Ervin, Sean German, Jack Wisniewski, Mike Krupta, Bruce Gale, "An Integrated Nanofluidic System for Blood Sample Ion Current Rectification (ICR) Biosensing," in *Proc. ASME 2019 International Mechanical Engineering Congress and Exposition (IMECE), November 10–14, 2019, Salt Lake City, Utah, USA*, IMECE2019-13047, 2019.

4. Utpal Saha, Dongwoon Shin, Himanshu Sant, Jiyoung, Chang, Bruce Gale, "Rapid Prototyping of Microfluidic Channels Using Electro-Spun Nano-Fiber Mold," in *Proc. ASME 2019 International Mechanical Engineering Congress and Exposition (IMECE), November 10–14, 2019, Salt Lake City, Utah, USA*, IMECE2019-12874, 2019.

5. Marzieh Chaharlang, Katrina Rose Cernucan, Bruce Gale, "Focusing Mechanism of Non-Spherical Particles in Microchannels," in *Proc. ASME 2019 International Mechanical Engineering Congress and Exposition (IMECE), November 10–14, 2019, Salt Lake City, Utah, USA*, IMECE2019-13851, 2019.

6. Chase Omana, Alex Jafek, and Bruce Gale, "Submillimeter Rapid Fabrication Techniques for Microfluidics," in *Proc. Utah Conference on Undergraduate Research 2018*, Cedar City, UT, February 9-10, 2018.

7. Gabriel Poulson and Bruce Gale, "Fabrication of Multi-material Microfluidic Devices," in *Proc. Utah Conference on Undergraduate Research 2018*, Cedar City, UT, February 9-10, 2018.

8. Sean Harbertson and Bruce Gale, "Micro Scale Filtration Using Spiral Channel Devices," in *Proc. Utah Conference on Undergraduate Research 2018*, Cedar City, UT, February 9-10, 2018.

9. Hayden Brady, Sean Harbertson, Alex Jafek, Raheel Samuel, Bruce Gale, "Utilization of Fluid Dynamic Testing to Improve Fluid Transport on Microfluidic PCR Chips," in *Proc. Utah Conference on Undergraduate Research 2018*, Cedar City, UT, February 9-10, 2018.

10. Trevor Teerlink and Bruce Gale, "One Step Semen Preparation Device," in *Proc. Utah Conference on Undergraduate Research 2018*, Cedar City, UT, February 9-10, 2018.

11. Kevin E. Petersen, Farhad Shiri, Bruce Gale, Himanshu Sant, Joshua Hood, Gina Bardi, "Separation of Oncosomes from Exosomes" in *Proc. Of 18th International Symposium on Field-and Flow-based Separations*, Columbia, SC, USA, , May 14-17, 2018.

12. Kevin E. Petersen, Farhad Shiri, Onur Tasci, Bruce Gale, "Theory, Experiment and Simulation of a new Flow Electrical FFF System" in *Proc. Of 18th International Symposium on Field-and Flow-based Separations*, Columbia, SC, USA, , May 14-17, 2018.

13. Farhad Shiri, Kevin E. Petersen (Coauthors), Himanshu Sant, Joshua Hood, Gina Bardi, Bruce Gale, "Separation of exosomes and oncosomes using continuous Asy-Fl-FFFF" in *Proc. Of 18th International Symposium on Field-and Flow-based Separations*, Columbia, SC, USA, , May 14-17, 2018.

14. Farhad Shiri, Kevin E. Petersen, Valentin Romanov, Qin Zou, Bruce K. Gale, "Separation of Virus like Particles using CyElFFF and AF4", in *Proc. Of 18th International Symposium on Field-and Flow-based Separations*, Columbia, SC, USA, , May 14-17, 2018.

15. Valentin Romanov, Bruce Kent Gale, Adam Frost, "Microfluidic Synthesis of Size and Lipid Asymmetry Controlled Biologically Relevant Nanoscale Liposomes," in *Proc. Of IMECE 2017*, Tampa, FL, USA, November 3-9, 2017.

16. Marzieh Chaharlang and Bruce Kent Gale, "Determination of the Optimialo Sperm Cell Alignment for Sperm Separation," in *Proc. Of IMECE 2017*, Tampa, FL, USA, November 3-9, 2017.

17. Joshua L. Hood , Gina T. Bardi , Kevin E. Petersen , Himanshu Sant , Bruce K. Gale, "Cyclical Electrical Field-Flow Fractionation of Melanoma Exosomes: Enabling Unprecedented "Label-Free" Isolation of Exosome Subpopulations based on Biophysical Properties", In *Proc. Of Research!Louisville 2017,* Poster Presentations, F-18, Louisville, Kentucky, Sept 14, 2017.

18. Christopher Lambert, Brianna Potter, Raheel Samuel, Bruce Gale, Josh Bonkowsky, "A rapid microfluidic device for genotyping of live zebrafish embryos," in Proc. Of the 10th European Zebrafish Meeting (Zebrafish 2017), Budapest, Hungary, July 3-7, 2017.

19. Susan Wojtalewicz, Brett Davis, Pratima Labroo, Ching-wen Li, Jill Shea, Bruce Gale, Himanshu Sant, Jay Agarwal, "Localized FK506 Delivery System for Peripheral Nerve Repair," in *Proc. of BMES 2016*, Minneapolis, MN, October 5-8, 2016.

20. Pratima Labroo, Ching-wen Li, Himanshu Sant, Bruce Gale, Jill Shea, Jay Agarwal , "Self Contained Bioreactor For Bone Regeneration," in *Proc. of BMES 2016*, Minneapolis, MN, October 5-8, 2016.

21. Pratima Labroo, Isak Goodwin, Brett Davis, Kyle Edwards, Scott Ho, Himanshu Sant, Bruce Gale, Jill Shea, Jay Agarwal, "Effect Of NGF Delivering Conduit On Peripheral Nerve Regeneration," in *Proc. of BMES 2016*, Minneapolis, MN, October 5-8, 2016.

22. Kevin E. Petersen, Bruce K. Gale, Joshua L. Hood, Brody King, Farhad Shiri, Sam A. Wickline, "Separation Of Exosomes With Electrical Field Flow Fractionation," in *Proc. Of FFF 2016*, Dresden, Germany, May 22-26, 2016, O22.

23. Farhad Shiri, Kevin E. Petersen, Bruce K. Gale, "EL-FFF Separation Of Nanoparticle Mixtures," in *Proc. Of FFF 2016*, Dresden, Germany, May 22-26, 2016, P7.

24. Kevin E. Petersen, Brody King, Travis White, Farhad Shiri, Joshua L. Hood, Samuel A. Wickline, Bruce K. Gale, "Recent Advances In EL-SPLITT: A Flow Addition With Porous Electrode," in *Proc. Of FFF 2016*, Dresden, Germany, May 22-26, 2016, P43.

25. Jesús Arellano, Taylor Howell, James Gammon, Sungpil Cho, Margit Janat-Amsbury, and Bruce K. Gale, "Utilization of a Microfluidic Flow Cell Array in the Implementation of a High-Throughput Drug Screening and Cytotoxicity Evaluation System," in *Proc. of BMES 2015*, Tampa, FL, October 7-10, 2015.

26. Pratima Labroo, Himanshu Sant, Scott Ho, Bruce Gale, Jill E. Shea and Jayant Agarwal, "Controlled Delivery of Growth Factors and Small Molecules for Peripheral Nerve Regeneration," in *Proc. Of AICHE*, November 10, 2015, Salt Lake City, UT, Paper 437560, 2015.

27. Jiyoung Son, Raheel Samuel, Kristin Murphy, Douglas Carrell, Bruce Gale, and James Hotaling, "Non-Motile Sperm Cell Separation Using A Spiral Channel," in *Proc. Of Andrology Society of America*, Poster #99, April 18-21, 2015, Salt Lake City, UT, 2015.

28. Naveen Rathi, Nikki Davidoff, Ben Brooks, and Bruce K. Gale, "Using COMSOL to Simulate the Flow of Cells through a Continuous Flow Microfluidic Printing Device," in *Proc. Of NanoUtah 2015*, October 15, 2015.

29. Y. R. Smith, H. Jayamohan, L. Hansen, S. K. Mohanty, B. K. Gale, and M. Misra, "Microfluidic Photocatalytic Device Utilizing Anodized Titania Nanotube Arrays: Application and Simulation Validation," in *Proc. Of ECS 2015 Spring Meeting,* May 24-28, 2015, Chicago, IL, paper 1995, 2015.

30. R. C. Reid, S. D. Minteer, and B. K. Gale, "Contact Lens Biofuel Cell Tested in Conditions Similar to Human Eyes," in *Proc. Of ECS 2015 Spring Meeting,* May 24-28, 2015, Chicago, IL, paper 1709, 2015.

31. R Samuel, B Gale, O Badamjav, K Murphy, T Jenkins, D Carrell, J Hotaling, "Microfluidic Sperm Trapping Chip for Processing Samples with Low Concentration for Assisted Reproductive Technology (ART) Therapies," in *Proc. Of SLAS 2015*, February 9-11, 2015, Washington DC, 2015.

32. Jesús Arellano, James Gammon, Chieh-Hsiang Yang, Margit Janat-Amsbury, and Bruce K. Gale, "Development of Continuous Flow Microspotter (CFM) for High-Throughput Drug Screening and Cytotoxity Evaluation," in *Proc. of BMES 2014*, San Antonio, TX, October 22-25, 2014.

33. Scott Ho, Pratima Labroo, Keng-Min Lin, Himanshu Sant, Jill Shea, Jay Agarwal, Bruce Gale, "Bioresorbable Multi-Drug Delivery Conduit to Promote Peripheral Nerve Regeneration," in *Proc. of BMES 2014*, San Antonio, TX, October 22-25, 2014.

34. Matthew Hockin, Himanshu Sant, Kevin Petersen, Bruce Gale, "Separation of Chromosomes Using FFF and Inertial Microfluidics," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Salt Lake City, UT, October 14-18, 2014, pp. O18, 2014

35. Kevin E. Petersen, Mathuros Ornthai, Joshua Hood, Sam Wickline, and Bruce K. Gale, "Electrical Field Flow Fractionation of Exosomes," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Salt Lake City, UT, October 14-18, 2014, pp. P22, 2014

36. Mathuros Ornthai, Bruce K. Gale, Juwadee Shiowatan and Atitaya Siripinyanond, "Biased Cyclical Electrical Field-Flow Fractionation for Separation of Submicron Particles," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Salt Lake City, UT, October 14-18, 2014, pp. P8, 2014

37. Mathuros Ornthai, Kevin E. Petersen, Bruce K. Gale, Jiyoung Son, and Atitaya Siripinyanond, "Separation of Biological Particles: El-FFF and Spiral Channels," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Salt Lake City, UT, October 14-18, 2014, pp. O33, 2014.

38. Ian R. Harvey, Bruce Gale, Tom Parks, Richard Brown, Florian Solzbacher, "USTAR / U of U / COE Partnerships to Spur R&D in micro/nano Materials & Systems, in Proc. Of COMS 2014, Salt Lake City, UT, October 12-16, 2014.

39. R Samuel, R Stephenson, P Roy, R Pryor, L Zhou, J L Bonkowsky, B K Gale "Microfluidic methods for early-stage zebrafish embryo genotyping while maintaining embryo viability" 2014 International Conference on Zebrafish Development and Genetics, Madison, USA

40. Harikrishnan Jayamohan, York R. Smith, Bruce K. Gale, Manoranjan Misra, Swomitra K. Mohanty, "Platinum functionalized titania nanotube array sensor for detection of trichloroethylene in water," in *Proc. of NanoUtah 2013*, Salt Lake City, UT, October 10-11, 2013.

41. Cady Lancaster, Aixiang Liu, Curtis Sudbury, Bruce K. Gale, Jennifer Shumaker-Parry, "Atomic layer deposition of Al2O3 on plasmonic nanostructures for surface chemistry and multiplex analysis," in *Proc. of NanoUtah 2013*, Salt Lake City, UT, October 10-11, 2013.

42. Huizhong Li, Cody Gehrke, Himanshu Sant, Bruce K. Gale, Jay Agarwal, "A novel arterial coupler for microvascular surgery,"  in *Proc. of NanoUtah 2013*, Salt Lake City, UT, October 10-11, 2013.

43. Huizhong Li, Cody Gehrke, Himanshu Sant, Bruce K. Gale, Jayant Agarwal, "An Implantable Vascular Coupling Device for End-to-End Anastomosis," in *Proc. of The BMES 2013 Annual Meeting*, Seattle, Washington, USA, September, 2013.

44. Keng-Min Lin, Bruce Gale, Himanshu Sant, Jill Shea, William Sanders, Christi Terry and Jay Agarwal. "BSA-Filled PLGA nerve conduits for potential applications in nerve regeneration," in *Proc. of The BMES 2013 Annual Meeting*, Seattle, Washington, USA, September, 2013.

45. Valentin Romanov, Adam Miles, Bruce K. Gale, Joshua Eckman, Ben Brooks, "Sensitivity of protein array deposition using continuous flow printing for fluorescent microarray applications," in P*roc. Of Biomed 2013, Biomedical Sciences Instrumentation*, Vol. 49, pp. 117-123, 2013.

46. Valentin Romanov, Adam Miles, Bruce K. Gale, Joshua Eckman, Ben Brooks, "Continuous scaling 3d micro flow printing for improved spot morphology in protein microarrays," in P*roc. Of Biomed 2013, Biomedical Sciences Instrumentation*, Vol. 49, pp. 25-31, 2013.

47. Kevin E. Petersen, Eliana Manangon, Joshua L. Hood, Diego P. Fernandez, William P. Johnson, Bruce K. Gale, "Separation of Melanoma Exosomes and Microparticles with As-FlFFF," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Pau, France, June 30-July 4, pp. 34, 2013.

48. Tonguc Onur Tasci, William Paul Johnson, Diego. P. Fernandez, Eliana Manangon, Bruce K. Gale, "Utilization of Biased Voltage Waveforms for High Resolution Cyclical Electrical Field Flow Fractionation," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Pau, France, June 30-July 4, pp. 23, 2013.

49. Tonguc Onur Tasci, William Paul Johnson, Diego. P. Fernandez, Himanshu J. Sant, Christopher J. Lambert, Eliana Manangon, Bruce K. Gale, "Continuous Separation of Nanoparticles by Cyclical Electrical Split Flow Thin Fractionation," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Pau, France, June 30-July 4, 2013, pp. 86.

50. Tonguc Onur Tasci, William Paul Johnson, Bruce K. Gale, "Magnetic Field Flow Fractionation Using Linear Halbach Arrays," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Pau, France, June 30-July 4, 2013, pp. 87.

51. Tonguc Onur Tasci, William Paul Johnson, Diego. P. Fernandez, Eliana Manangon, Bruce K. Gale, "External Electrical Circuits for High Resolution Cyclical Electrical Field Flow Fractionation," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Pau, France, June 30-July 4, 2013, pp. 102.

52. Tonguc Onur Tasci, William Paul Johnson, Diego. P. Fernandez, Eliana Manangon, Bruce K. Gale, "Computer Modeling of the Electrical Field Flow Fractionation Systems," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Pau, France, June 30-July 4, 2013, pp. 122.

53. Eliana Manangon, Diego. P. Fernandez, Bruce K. Gale, Tonguc Onur Tasci, William Paul Johnson, "Mass Recoveries in Nano- to Micro-Particle Analysis of Environmental Samples Via Flow Field Flow Fractionation-Inductively Coupled Plasma Mass Spectrometry," in *Proc. of 16th International Symposium on Field-and Flow-based Separation,* Pau, France, June 30-July 4, 2013, pp. 109.

54. T. O. Tasci, W. P. Johnson, B. K. Gale, "Particle Based Model For A Cyclical Magnetic Field Flow Fractionation System," in *Proc. of Frontiers in BioMagnetic Particles,* Telluride, CO, USA, June 2-5, 2013.

55. T. O. Tasci, C. J. Lambert, W. P. Johnson, B. K. Gale, "A Magnetic Particle Micromixer," in *Proc. of Frontiers in BioMagnetic Particles,* Telluride, CO, USA, June 2-5, 2013.

56. Valentin Romanov, Bruce Gale, Josh Eckman, Adam Miles, Benjamin Brooks, "Spot Morphology In Protein Microarrays," in *Proc. of 50th Annual Rocky Mountain Bioengineering Symposium & 50th International ISA Biomedical Sciences Instrumentation Symposium 2013*, Colorado Springs, Colorado, USA, 5-7 April 2013, pp. 25-32.

57. Valentin Romanov, Adam Miles, Bruce Gale, Josh Eckman, Benjamin Brooks, "Flow Printingfor Fluorescent Microarray Applications," in *Proc. of 50th Annual Rocky Mountain Bioengineering Symposium & 50th International ISA Biomedical Sciences Instrumentation Symposium 2013*, Colorado Springs, Colorado, USA, 5-7 April 2013, pp. 118-124.

58. J.W. Chamberlain, K. Peyvan, W. Lyon, D. Danley, J. Eckman, B. Gale, and D.M. Ratner, "Microelectrode Microarray Functionalization Via Continuous Flow Microfluidic Printing, in *Proc. of BMES 2012 Annual Meeting, Atlanta, Georgia*, October 24-27, 2012.

59. Lucia E. Manangon, Onur T. Tasci, Diego P. Fernandez, Bruce K. Gale, William P. Johnson, "Fractionation of size distributed samples by asymmetric flow field flow fractionation coupled

online to light scattering and inductively coupled plasma mass spectrometry detectors," in *Proc. of NanoUtah 2012*, Salt Lake City, UT, October 11-12, 2012, pp. 59.

60. Russell Reid, Shelley Minteer, Fabien Giroud, Bruce Gale, "A flow-through microfluidic biofuel cell," in *Proc. of NanoUtah 2012*, Salt Lake City, UT, October 11-12, 2012, pp. 44.

61. Kevin E. Petersen, Hyun-Tae Kim, Qingbo Guo, Hanseup Kim, Bruce Gale, "A valve-less electrostatic gas micropump with a peristaltic movement of a single zipper electrode," in *Proc. of NanoUtah 2012*, Salt Lake City, UT, October 11-12, 2012, pp. 40.

62. Harikrishnan Jayamohan, Himanshu Sant, York Smith, Swomitra K. Mohanty, Manoranjan Misra, Bruce K. Gale, "Ordered carbonized titania nanotube based electrochemical detection of hemoglobin," in *Proc. of NanoUtah 2012*, Salt Lake City, UT, October 11-12, 2012, pp. 38.

63. Jesus Arellano, Chieh-Hsiang Yang Bruce K. Gale, Margit Janat-Amsbury, Spencer B. Bremer, Naveen Rathi, "Development of continuous flow microspotter for high-throughput drug screening and cytotoxicity evaluation," in *Proc. of NanoUtah 2012*, Salt Lake City, UT, October 11-12, 2012, pp. 33.

64. Keng-Min Lin, Himanshu J. Sant, Jayant Agarwal and Bruce K. Gale, "New approaches to bridge nerve gaps: Development of a novel drug-delivering nerve conduit," *34th Annual International Conference of the IEEE Engineering in Medicine & Biology Society (IEEE EMBS)*. August, 2012. Paper WeB 15.7

65. T. O. Tasci, W.P. Johnson, B.K. Gale. "Cyclical Magnetic Field Flow Fractionation". *In Proc. of 56th Annual Conference On Magnetism And Magnetic Materials (MMM 2011)*, Oct 30-Nov 3, 2011, Scottsdale, Arizona, USA.

66. Christopher Lambert, Himanshu J. Sant, Scott O. Sundberg, Michael Johnson, Adam Miles, Cory Shorr and Bruce K. Gale, "Early cancer detection platform: Sample-in, answer-out," in *Proc. of NanoUtah 2011*, Salt Lake City, UT, October 13, 2011.

67. Greg Liddiard, Doug Anjewierden, Bruce K. Gale, "An electrostatic microvalve for microfluidic LOC control," in *Proc. of NanoUtah 2011, Salt Lake City, UT*, October 13, 2011.

68. Onur Tasci, W.P. Johnson, Bruce K. Gale, "Cyclical magnetic field flow fractionation", in *Proc. of NanoUtah 2011, Salt Lake City, UT*, October 13, 2011.

69. Wilaiwan Somchue, Juwadee Shiowatana , Atitaya Siripinyanond , Bruce K. Gale, "Cyclical Electrical Field-Flow Fractionation For Characterization Of Nanomaterials," in *Proc. of The 14th Asian Chemical Congress 2011 (14 ACC 2011)*, Sep 05,- Sep 08,2011, Bangkok, Thailand.

70. T. O. Tasci, W.P. Johnson, B.K. Gale, "Cyclical Magnetic Field Flow Fractionation," in *Proc. of 15th International Symposium on Field-and Flow-based Separation, San Francisco, CA, May 23-25, 2011.*

71. Srinivas Merugu, Christian Dimpka, Alyssa Calder-Anderson, William Johnson, Anne Anderson, David Britt, Joan McLean, and Bruce K. Gale, "Ag Nanoparticle binding of extracellular polymeric substances from bacteria characterized using flow field flow fractionation, "in *Proc. of 15th International Symposium on Field-and Flow-based Separation, San Francisco, CA, May 23-25, 2011.*

72. Doug Anjewierden, Greg Liddiard, Bruce K. Gale, "High-density ultra-efficient electrostatically driven low-pressure pneumatic valve banks," in *Proc. of NanoUtah 2010, Salt Lake City, UT*, October 14, 2010.

73. Venu M Arremsetty and Bruce Kent Gale, "An asymmetrical cross flow-based split flow thin fractionation (SPLITT) system" in *Proc. of NanoUtah 2010, Salt Lake City, UT*, October 14, 2010.

74. Michael Johnson, Jungkyu Kim, and Bruce Gale, "A programmable microfluidic system for selective RNA or DNA extraction from various raw biological samples," in *Proc. of NanoUtah 2010, Salt Lake City, UT*, October 14, 2010.

75. Greg Liddiard, Erik Liddiard, Bruce K. Gale, "Pneumatically driven 16-channel disposable nucleic acid filter device with integrated demultiplexing and multiplexing," in *Proc. of NanoUtah 2010, Salt Lake City, UT*, October 14, 2010.

76. Raheel Samuel, Himanshu J. Sant, Bruce K. Gale, "Fabrication of an MRI standardization device from stacking highly patterned thin PDMS layers," in *Proc. of NanoUtah 2010, Salt Lake City, UT*, October 14, 2010.

77. T. Onur Tasci and Bruce K. Gale, "Microfluidic magnetic particle fractionation device," in *Proc. of NanoUtah 2010, Salt Lake City, UT*, October 14, 2010.

78. Jungkyu Kim, John Elsnab, Michael Johnson, Prabhu Arumugam, Hua Chen, Rahul Sonkul, Cory Shorr, Cody Gehrke, Bruce K. Gale, "A fully integrated nucleic acid identification system for bacteria monitoring," in *Proc. of NanoUtah 2009*, October 15, 2009.

79. Srinivas Merugu, Himanshu J. Sant, and Bruce K. Gale, "Optimization of Cyclical Electrical Field Flow Fractionation," in *Proc. of 14th International Symposium on Field-and Flow-based Separation, Rio, Patras, Greece, July 5-9, 2009.*

80. Himanshu J. Sant, Srinivas Merugu, and Bruce K. Gale, "A Microscale Diffusional SPLITT System: Macromolecule Separations," in *Proc. of 14th International Symposium on Field-and Flow-based Separation, Rio, Patras, Greece, July 5-9, 2009.*

81. S.A. Molokhia, H.J. Sant, M.C. Hanson, R.M. Burr, A.E. Poursaid, C.J. Bishop, J.M. Simonis, B.K. Gale, B.K. Ambati, "New Intraocular Drug Delivery Device," *ARVO 2009 Annual Meeting,* Fort Lauderdale, FL May 3-7, 2009.

82. Scott O. Sundberg, Bruce K. Gale, and Carl T Wittwer, "Spinning disk platform for digital PCR," in *Proc. of the 41st Annual Oak Ridge Conference,* Baltimore, MD, April 16-17, 2009.

83. Jungkyu Kim, Adam Miles and Bruce K. Gale, "Three dimensional biomolecular microspots on a nanoporous substrate," *Fourth Annual Mountain West Biomedical Engineering Conference*, Park City, UT, September 5-6, 2008.

84. Scott O Sundberg, Bruce K. Gale, and Carl T. Wittwer, "Spinning Disc Platform for Digital PCR," in *Proc. of Association for Molecular Pathology 2008 Annual Meeting,* October 29-November 2, 2008.

85. Scott O. Sundberg, Carl Bruce K. Gale, and Carl T. Wittwer, "Spinning Disc Platform for Digital PCR," *Fourth Annual Mountain West Biomedical Engineering Conference*, Park City, UT, September 5-6, 2008.

86. Bruce K. Gale, "Printing of High Quality Protein and Lipid Microarrays Using a Continuous Flow Microspotter," *Joint 63rd Northwest / 21st Rocky Mountain Regional ACS Meeting*, June 15-18, 2008.

87. Jianping Liu, Mark A. Eddings, Bruce K. Gale, and Jennifer Shumaker-Parry, "SPR microscopy combined with a 3-D microfluidic system for high-throughput bioanalysis," *ACS National Meeting 2007, Boston, Massachusetts*, August 19-23, 2007.

88. Scott O. Sundberg, Carl T. Wittwer, Bruce K Gale, "Microchip Warfarin Metabolism Genotyping Using DNA Melting Analysis," *Third Annual Mountain West Biomedical Engineering Conference*, Park City, UT, Sept 21-22. 2007.

89. Mark A Eddings, Jianping Liu, Jennifer Shumaker-Parry, Bruce K Gale, "High-throughput in situ Biomolecule Analysis Integrating a 3-D Microfluidic Flow Cell Array and SPR Microscopy," *Third Annual Mountain West Biomedical Engineering Conference*, Park City, UT, Sept 21-22. 2007.

90. Mark A. Eddings, Jianping Liu, Jennifer Shumaker-Parry, and Bruce K. Gale, "High-throughput *in situ* biomolecule analysis integrating a 3-D Microfluidic Flow Cell Array and SPR Microscopy," presented at *Gordon Research Conference on Physics and Chemistry of Microfluidics*, Waterville Valley, New Hampshire, June 2007.

91. Srinivas Merugu, and Bruce K. Gale, "Combining Normal and Cyclical Electrical Field Flow Fractionation," in *Proc. of 13th International Symposium on Field-and Flow-based Separation, Salt Lake City, UT, June 27-30, 2007*, pp. L33.

92. Himanshu J. Sant, Srinivas Merugu, and Bruce K. Gale, "Numerical Simulations of Transport Processes in Electrical Field-Flow Fractionation Systems," in *Proc. of 13th International Symposium on Field-and Flow-based Separation, Salt Lake City, UT, June 27-30, 2007*, pp. P31.

93. Himanshu J.Sant and Bruce K. Gale, "Improvements in Microscale Thermal-Field Flow Fractionation Instrumentation," in *Proc. of 13th International Symposium on Field-and Flow-based Separation, Salt Lake City, UT, June 27-30, 2007*, pp. P41.

94. Sriram Natarajan, Bruce K. Gale, and David G. Myszka, "Continuous Flow Enhancement of Microarray Spots for Flexchip Analysis," in *Developments in Protein Interaction Analysis 2007*, May 6-9, 2007, Phoenix, AZ.

95. Mark A. Eddings and Bruce K. Gale, "A PDMS Diffusion Pump For On-Chip Fluid Handling In Microfluidic Devices," to be presented at *Second Annual Mountain West Biomedical Engineering Conference*, Snowbird, UT, Sept 15-17, 2006.

96. Scott O. Sundberg, Jenny Greer, Carl T. Wittwer, Robert J. Pryor, Oluwole Elenitoba-Johnson, and Bruce K. Gale, "Homogeneous DNA Melting Analysis For Mutation Scanning Using Nanoliter Volumes," to be presented at *Second Annual Mountain West Biomedical Engineering Conference*, Snowbird, UT, Sept 15-17, 2006.

97. Jungkyu Kim and Bruce K. Gale, "Geometric Optimization Of A Thin Film Ito Heater To Generate A Uniform Temperature Distribution,"to be presented at *Second Annual Mountain West Biomedical Engineering Conference*, Snowbird, UT, Sept 15-17, 2006.

98. Jungkyu Kim, Karl V. Voelkerding, Bruce K. Gale "Microfluidic DNA extraction array with patterned AlOx membrane," in *Proc. Of The 1st Annual Mountain West Biomedical Engineering Conference Snowbird, UT*, September 16-17, 2005

99. H.J. Sant and B.K. Gale, "Field programming in microscale electrical field flow fractionation," in *Proc. Of The 1st Annual Mountain West Biomedical Engineering Conference Snowbird, UT*, September 16-17, 2005

100. Scott O. Sundberg, Carl T. Wittwer, Bruce K. Gale, "DNA Melting Analysis on a Nano-Volume Scale," in *Proc. Of The 1st Annual Mountain West Biomedical Engineering Conference Snowbird, UT*, September 16-17, 2005.

101. Phini Katsamba, Rebecca Rich, Michelle Cannon, Jerry Jenkins, Prabhakar Pandian, Bruce Gale, Shankar Sundaram & David Myszka, "Extracting Kinetics from the Array-Based FLEXchip SPR Biosensor," in *Proc. of Developments in Protein Interaction Analysis Conference 2005*, Philadelphia, PA, August 28-31, 2005.

102. Ameya Kantak, Srinivas Merugu, and Bruce K. Gale, "Improved Theory of CyElFFF and Characterization of m-CyElFFF," in *Proc. Of the 12th International Symposium on Field Flow Fractionation*, Brno, Czech Republic, August, 28-30, 2005.

103. Himanshu Sant and Bruce K. Gale, "An Integrated polymer waveguide based optical flowcell for microscale field flow fractionation systems," in *Proc. Of the 12th International Symposium on Field Flow Fractionation*, Brno, Czech Republic, August, 28-30, 2005.

104. Himanshu Sant and Bruce K. Gale, "Field programming in microscale electrical field flow fractionation," in *Proc. Of the 12th International Symposium on Field Flow Fractionation*, Brno, Czech Republic, August, 28-30, 2005.

105. D. A Chang-Yen, D. Myszka and B. K. Gale, "A PDMS Microfluidic Spotter for Fabrication of Protein Chips and Microarrays," in *Proc. Of LabAutomation 2005, San Jose, CA* January 30 - February 3, 2005

106. Harvey, Ian R.; Miller, Mark S.; Blair, Steve; Ameel, Tim; Gale, Bruce K.; Ring, Terry, "Building academic, research, and commercialization programs in micro and nano science and engineering at the University of Utah," *Biennial University/Government/Industry Microelectronics Symposium - Proceedings*, 2003, p 33-35.

107. Ameya Kantak and Bruce K. Gale, "Microscale Cyclical Electrical Field Flow Fractionation," in *Proc. Of the 11th International Symposium on Field Flow Fractionation*, Cleveland, OH, October 7-10, 2003.

108. Himanshu Sant and Bruce K. Gale, "Optical Detectors for Miniaturized FFF Systems," in *Proc. Of the 11th International Symposium on Field Flow Fractionation*, Cleveland, OH, October 7-10, 2003.

109. Srinivas Merugu, Nithin Narayanan, and Bruce K. Gale, "Microscale Serial SPLITT Systems," in *Proc. Of the 11th International Symposium on Field Flow Fractionation*, Cleveland, OH, October 7-10, 2003.

110. Siddharth Chakravarthy and Bruce K. Gale, "PolyPIPosome Characterization using a Combination of Normal and Cyclical Electrical Field Flow Fractionation," in *Proc. Of the 11th International Symposium on Field Flow Fractionation*, Cleveland, OH, October 7-10, 2003.

111. Meregu Srinivas and Bruce K. Gale, "Cyclical Electrical Field Flow Fractionation," in *Proc. Of the 10th International Symposium on Field Flow Fractionation*, Amsterdam, Netherlands, July 2-5, 2002.

112. Himanshu J. Sant and Bruce K. Gale, "A Microfabricated Thermal Electric Field Flow Fractionation System," in *Proc. Of the 10th International Symposium on Field Flow Fractionation*, Amsterdam, Netherlands, July 2-5, 2002.

113. Avinash Saldanha and Bruce K. Gale, "Microfabricated Electrical SPLITT System," in *Proc. of the 10th International Symposium on Field Flow Fractionation*, Amsterdam, Netherlands, July 2-5, 2002.

114. Sreenivas Rao, Himanshu Sant, and Bruce K. Gale, "Minimization of End Effects in Field Flow Fractionation," in *Proc. Of the 10th International Symposium on Field Flow Fractionation*, Amsterdam, Netherlands, July 2-5, 2002.

115. Charles J Robinson, K Briski, B Choi, PD Coppola, T-H Cui, A Dunn, T Ehsan, Bruce K Gale, W Green, AM Hollister, A Jawahar, HF Ji, S Jones, Y Lvov, M McShane, D Mills, J Patterson, S Patton, H Price, S Roerig, M Sahin, R Schubert, W Simms, K Varahramyan, "The Newlane Consortium (Neural Engineering With Louisiana North Excellence) Building Newlanes To Record And Restore Neural Function," in *Proc. of Third Rehabilitation Research and Development Conference: Rehabilitation Research for the Twenty-First Century: The New Challenges*, Arlington, VA, February 10-12, 2002.

116. Mengyan Li, Hua Ai, David K. Mills, Yuri M. Lvov, Bruce K. Gale, "Increasing the Alignment of Smooth Muscle Cells by 100 mm Channels with Micro- and Nano- Technology," in *Proc. of IBE 2002 International Meeting: Interfacing Biology and Engineering*, Baton Rouge, LA, January 18-20, 2002

117. John Glawe, David Mills, and Bruce K. Gale, "Analysis of Cell Organization in a Smooth Muscle Culture Grown On High Aspect Ratio Microstructures," in *Proc. of IUVSTA 15th International Vacuum Congress (IVC-15), AVS 48th International Symposium (AVS-48), 11th International Conference on Solid Surfaces (ICSS-11)*, San Francisco, CA, October 28 - November 2, 2001.

118. Ameya Kantak, Himanshu Sant, Bruce K. Gale, David K. Mills, Yuri Lvov, and Steve Jones, "A Microfabricated Platelet Analyzer," in *Proc. Smalltalk 2001*, San Diego, CA, August 27-31, 2001.

119. Himanshu J. Sant and Bruce K. Gale, "Improved Scaling Models for Electrical and General Field Flow Fractionation Systems," in *Proc. 9th International Symposium on Field- Flow Fractionation*, Boulder, CO, June 26-29, 2001.

120. Avinash Saldanha and Bruce K. Gale, "A Microfabricated Electrical SPLITT System," in *Proc. 9th International Symposium on Field- Flow Fractionation*, Boulder, CO, June 26-29, 2001.

121. Bruce K. Gale and Mahesh Thoppil, "A Microfabricated Cyclical Electrical Field Flow Fractionation System," in *Proc. 9th International Symposium on Field- Flow Fractionation*, Boulder, CO, June 26-29, 2001.

122. Bruce K. Gale, "Microfabricated FFF and SPLITT Systems," in *Proc. Tex MEMS III*, Dallas, TX, June 7, 2001.

123.    Himanshu J. Sant and Bruce K. Gale, "Improved Models for Geometric Scaling in Field- Flow Fractionation," in *Proc. of the Nineteenth Annual Houston Conference on Biomedical Engineering Research*, Houston, TX, February 8-9, 2001.

124.    Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Blood and Protein Separations Using a Micromachined Electrical Field- Flow Fractionation System," in *Proc. of the Eighteenth Annual Houston Conference on Biomedical Engineering Research,* Houston, TX, Feb 10-11, 2000.

125.    Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Scaling Effects in a Micromachined Electrical Field Flow Fractionation System," in *Proc. 8th International Symposium on Field- Flow Fractionation*, Paris, France, Sep. 6-8, 1999.

126.    Bruce K. Gale, Karin D. Caldwell, and A. Bruno Frazier, "Characterization of a Micromachined Electrical Field- Flow Fractionation System," in *Proc. 7th International Symposium on Field-flow Fractionation*, Salt Lake City, UT, Feb. 8-11, 1998.

127.    Bruno Frazier, Karin Caldwell, Tim Ameel, Bruce K. Gale, and Ian Papautsky, "Micro scale fluid analysis systems: applications and engineering issues," in *Proc. 7th International Symposium on Field-flow Fractionation*, Salt Lake City, UT, Feb. 8-11, 1998.

## *Invited Workshop Presentations*

1.  Bruce K. Gale, "Rapid and Inexpensive Microfluidics-Based Tools for Clinical and Environmental Applications," at the Digital PCR Shortcourse, Molecular Medicine Tri-Con 2013, San Francisco, CA, February 12, 2013.

2.  Bruce K. Gale, "Active Components for Microfluidic Manipulation," CAMD / CBM2 2005 Summer Workshop, Baton Rouge, Louisiana, July 25-29, 2005.

3.  Bruce K. Gale, Ian Harvey, and Tim Ameel, "MEMS Workshop" sponsored by Korean Government, January 12-16, 2004. Full week course involving lectures and labs for 8 Professors from Korea on MEMS and MEMS education.

4.  Bruce K. Gale and Michael J. McShane, "BioMEMS and Biomedical Optics," Shortcourse Sponsored by Government of Taiwan (ROC), March 6-8, 2001 (Full three days of presentations: Over 100 paid attendees).

5.  Bruce K. Gale, "Advanced Bio-MEMS Techniques and Research Applications" BioMEMS workshop at Chicago 2000, the World Congress on Medical Physics and Biomedical Engineering, Chicago, IL, July 22, 2000.

6.  Bruce K. Gale, "Introduction to BioMEMS," Microfabrication Short Course held with the First Annual Louisiana Microsystems Conference, Ruston, LA, April 4, 2000.

7.  Bruce K. Gale, Laboratory Instruction in Microfabrication, MEMS Bootcamp, University of Utah, May 1999.

## *Patents*

1.  Patent No. 6,136,171, Micromachined Electrical Field- Flow Fractionation System; Bruce K. Gale, A. Bruno Frazier, and Karin D. Caldwell

2.  *Patent No. 8,210,119, Spotting device and method for high concentration spot deposition on microarrays and other microscale devices; Bruce Gale, David Chang-Yen, and David Myszka.

3.  *Patent No. 8,211,382, Microassay with internal referencing; David Myszka, Bruce Kent Gale, Joshua Wayne Eckman, and Sriram Natarajan.

4.  Patent No. 8,263,392, Methods and compositions related to continuous flow thermal gradient PCR; Bruce Kent Gale, Niel Davenport Crews, Carl Thomas Wittwer.

5.  Patent No. 8,269,497, Enhanced fill-factor NMR coils and associated methods; James C. Stephenson, Bruce K. Gale, and Cynthia Furse.

6.  Patent No. 8,277,759, Microfluidic Flow Cell, Scott O. Sundberg, Carl T. Wittwer, Bruce K. Gale.

7.  Patent No. 8,383,059, Microfluidic interface for highly parallel addressing of sensing arrays, David A. Chang-Yen, Sriram Natarajan, Josh Eckman, Bruce K. Gale, David Myszka.

8. Patent No. 8,395,468, High Field Strength Magnetic Field Generation System and Associated Methods, James C. Stephenson, Bruce K. Gale, and Cynthia Furse.
9. Patent No. 8,535,536 Cross-flow split-thin-flow cell, Bruce K. Gale, Himanshu Sant, Venu Madhav, Srinivas Merugu.
10. Patent No. 8,663,194, Intraocular Drug Delivery Device and Associated Methods, Balamurali K. Ambati, Bruce K. Gale and Srinivas Rao Chennamaneni.
11. Patent No. 8,975,027 Methods and compositions related to continuous flow thermal gradient PCR; Bruce Kent Gale, Niel Davenport Crews, Carl Thomas Wittwer.
12. Patent No. 8,999,726 B2, Microfluidic interface for highly parallel addressing of sensing arrays, David A. Chang-Yen, Sriram Natarajan, Josh Eckman, Bruce K. Gale, David Myszka.
13. Patent No. 9,095,404, Intraocular Drug Delivery Device and Associated Methods, Balamurali K. Ambati, Bruce K. Gale and Srinivas Rao Chennamaneni.
14. Patent No. 9,682,372, Tip overlay for continuous flow spotting apparatus, Bruce K. Gale, Adam Miles, Joshua Wayne Eckman, Sriram Natarajan, Jim Smith Mark Eddings
15. Patent No. 9,682,396, Dual flow cell fluid delivery systems, Joshua W. Eckman, Adam Miles, James Smith, Christopher Morrow, Bruce K. Gale
16. Patent No. 9,877,973, Intraocular Drug Delivery Device and Associated Methods, Balamurali K. Ambati, Bruce K. Gale and Srinivas Rao Chennamaneni.
17. Patent No. 9,931,121B2, Methods and devices for connecting nerves, Jayant P. Agarwal, Bruce Kent Gale, Himanshu Jayant Sant, Keng-Min Lin
18. Patent 10,300,450 Method and device for depositing a substance on a submerged surface, Bruce K. Gale, Joshua W. Eckman, Adam Miles, Christopher Morrow, James Smith, Sriram Natarajan, Mark Eddings.
19. Patent 10,667,816 Vascular Coupling Device, Jay Agarwal, Bruce K. Gale, Huizhong Li, Himanshu Sant.

*Pending Patent Applications*
1. Appl. No. 20070059156, Rotary centrifugal and viscous pumps: Danny Blanchard, Phil Ligrani, Bruce Gale
2. Xurography:  Rapid Prototyping Of Micro-Structures Using A Cutting Plotter: Dan Bartholomeusz, Sung Lee, Ameya Kantak, Merugu Srinivas, Himanshu Sant, Ronald Boutte, Bruce K. Gale, Charles Thomas
3. Diffusion Membrane Micropump, Mark Eddings and Bruce Gale
4. Ultra-Fast PCR Microchip with Real Time Melting Analysis, Niel Crews, Bruce Gale, Carl Wittwer
5. *Automated Arterial Anastomotic Device (multiple applications for different designs), Jay Agarwal, Bruce Gale, Himanshu Sant, Huizhong Li, Cody Gehrke, et. al.
6. Biodegradable Drug-Delivering Nerve Conduit, Jay Agarwal, Bruce Gale, Himanshu Sant, Keng Min Lin
7. *Endo-Contact Lens to Protect the Cornea During Cataract Surgery, Bala Ambati, Bruce Gale, Nathan Gooch
8. Circuit Modification of Electrical Field Flow Fractionation Systems for High Resolution Separations of Sub 100nm Nanoparticles and Macromolecules, Bruce Gale, Onur Tasci, William Johnson
9. *Multiplexed Cell/Tissue Response Assays-Integrated Microfluidic Spotting and Imaging Technology, Bruce Gale, Josh Eckman, Jim Smith
10. Sperm Separation Device, Bruce Gale, Jim Hotaling, Douglas Carrell, Kristin Murphy, Jiyoung Son
11. U.S. Provisional Application No. 62/528,339, filed July 3, 2017, entitled "Rapid Non-Destructive Genetic Material Collection
12. Methods and devices for connecting nerves, US 2019 / 0038290 A1, Jayant P. Agarwal, Bruce Kent Gale, Himanshu Jayant Sant, Pratima Labroo, Jill Shea.
13. Thermal gradient plug flow microfluidic devices for extreme PCR, US20180093273A1, Raheel Samuel, Bruce Gale, Alex Jafek, James Trauba, Kenneth Aston

*Other Invention Disclosures*
| U-3430 | Parallel and Serial SPLITT Systems (or combinations) |
| U-3431 | FFF Channel Design to Reduce end Effects |
| U-3432 | Design for SPLITT System with no Splitter (Or Some Version of a Microfabricated Electrical SPLITT System) |
| U-3433 | Cyclical Thermal FFF |

| | |
|---|---|
| U-3434 | Design of Thermal FFF |
| U-3435 | Design of Thermal Electrical FFF |
| U-3550 | Single and Double Disk Viscous Micro-Pump |
| U-3684 | A Method for Creating Monolithic PDMS Waveguides Structures Within a PDMS Microfluidic System |
| U-3685 | A Thermally-defined Monolithic Polydimethylsiloxane Waveguide Fabricated on a Polydimethylsiloxane Substrate |
| U-3686 | Integrated Optical Waveguide Chemical and Particle Detection Method Relying on Evanescent Interactions |
| U-3708 | Polydimethylsiloxane (PDMS) Fluidic Packaging with a Reusable Syringe Needle Compression Fitting |
| U-3744 | Process/Technique for Fabricating a Microneedle Array |
| U-3810 | Osmotically-Driven Dispense Pump for Use in High Pressure and High Temperature Applications |
| U-3862 | Method of Patterning Aluminum Oxide Membranes |
| U-3863 | Multi-DNA Extraction Chip Based on an Aluminum Oxide Membrane |
| U-3893 | Novel Manufacturing of Microdispenser or Microneedles:  Materials and Methods |
| U-3894 | Diffusion Membrane Micropump |
| U-3896 | Sample Collection and Spot Cleaning Technique Using a Continuous-Flow PDMS Microfluidic System |
| U-3963 | Use of Permanent Magnets and Flux Concentrators/Shunts to Utilize NMR for In-Ground Measurements |
| U-4140 | Integrated Pneumatics and Electronics Card |
| U-4154 | In-situ Heating and Actuation Mechanism Using Conductive Waxes (or Similar Materials), Methods and Applications Thereof |
| U-4234 | CFM Flow Cell with Switching of Solutions |
| U-4281 | DNA Quantification Method with Nanoporous Aluminum Oxide Membrane |
| U-4282 | High Diodicity Microvalve |
| U-4283 | Shuttle Gradient Multiplex MicroPCR Chip |
| U-4460 | Continuous Protein Separations Using SPLITT System |
| U-4464 | Surface Modified Nanoporous Substrate for High Sensitivity and High Density Microspot |
| U-4499 | Continuous Protein Separations Using SPLITT System |
| U-4689 | Nanoscale Electrochemical Biosensor |
| U-4944 | Refilling Mechanism to Stabilize a Free-Floating Intraocular Capsule Drug Ring (CDR) |
| U-4945 | Refilling Mechanism to Stabilize a Free-Floating Intraocular Capsule Drug Ring (DCR) |
| U-4956 | Electrostatically Actuated High Density Pneumatic Microvalve Array |
| U-4959 | An Intraocular Capsular Drug Ring With Biosensing Capabilities |
| U-5143 | Shorts/Pants with Integrated Pressure Alleviating Bladders |
| U-5144 | Annular Device for Intramedullary Infusion and Aspiration |
| U-5532 | A Novel Ferrofluidic Magnetic Micromixer |
| U-4638 | Assays for Anti-drug Antibodies Using Label-free Detection and Continuous Flow Microfluidics |
| U-4715 | Multichamber Disposable Microfludics Device |
| U-5035 | Subconjunctival Drug Delivery Device for Long-Term Glaucoma Therapy |
| U-5027 | High Throughput Intestinal Permeability Assay |
| U-4959 | An Intraocular Capsular Drug Ring With Biosensing Capabilities |
| U-5534 | Cyclical Electrical SPLITT Systems for High Resolution Continuous Separations of Sub 100nm Nanoparticles and Macromolecules |

| U-5531 | Utilization of Microfluidics Technology for Extraction of Chorionic Fluid of Zebrafish Embryos for Genotyping Zebrafish |
| U-5616 | Complete blood count device |
| U-5631 | Schlemm's Stent-Sieve |
| U-5653 | Automated Pathogen Detection System |
| U-5082 | Endo-Contact Lens to Protect the Cornea During Cataract Surgery |
| U-5720 | Interstitial Fluid Extraction Device |
| U-5742 | Microfluidics-based human sperm cell separation, sorting, and cryopreservation device |
| U-5889 | Wearable device for pressure ulcer prevention |
| U-6163 | Thermal Gradient Plug Flow Microfluidic Chip for Extreme PCR |
| U-6183 | Bioresorbable Drug Delivery Peripheral Nerve Wrap |
| U-6221 | Self contained bioreactor for repair of segmental bone defects |
| U-6337 | Bioresorbable Drug Loaded Peripheral Nerve Wrap Capable of Extended Localized Delivery of FK506 |
| U-6361 | Microfluidic system for sperm separation and enrichment from various types of sperm samples |
| U-6389 | Rapid non-destructive genetic material collection for genotyping of zebrafish |
| U-6470 | Injectable Hyaluronic Acid Hydrogel Drug Delivery System for Extended Release of a Local Anesthetic to Treat Post-Operative Pain |

## Service to the Department and University

| January 2019 – present | Advisor, University of Utah National Society of Black Engineers Chapter |
| August 2013 – June 2018 | Executive Director, University of Utah Nanofabrication Lab |
| October 2016 – May 2017 | Member, ME Dept Design Search Committee (hired Yong-lin Kong) |
| August 2016- July 2018 | Member of College of Engineering RPT Committee |
| June 2015 – March 2018 | Member, Senate Advisory Committee of Review of Administration |
| August 2014- August 2017 | Member of ME Research Committee |
| August 2013 – May 2014 | Chair, ME Dept Design Faculty Search Committee, (hired Jiyoung Chang and Roseanne Warren) |
| May 2012 – August 2013 | Associate Director, University of Utah Nanofabrication Lab |
| October 2010 – May 2011 | Member, ME Dept Design Search Committee (hired Shad Roundy) |
| August 2010 – July 2013 | Senator, Faculty Senate |
| June 2010 – July 2016 | Member, Innovation Scholars Academic Steering Committee |
| October 2009 – May 2010 | Member, ME Dept Manufacturing Search Committee (hired Bart Raeymakers) |
| August 2009 – June 2018 | Chair, University Conflict of Interest Committee |
| August 2006 – June 2018 | Member, University Conflict of Interest Committee |
| November 2005 – present | University of Utah Technology Review Board |
| September 2005 – July 2008 | University International Requirement Committee |
| August 2004 – May 2005 | ME Seminar Coordinator |
| January 2004 – May 2004 | URT Selection Committee |
| August 2003- August 2004 | Member of ME External Relations Committee |
| August 2003- May 2004 | Member of Design Faculty Search Committee (hired Will Provancher) |
| August 2003 – May 2004 | IGERT Seminar Coordinator |
| August 2002- July 2015 | Member of ME Curriculum Committee |
| February 2002- present | Member of College of Engineering Nanofabrication Lab Executive Committee |
| January 2002- August 2003 | Member of ME Public Relations Committee |
| 1999- 2001 | Internal advisory committee for the Institute for Micromanufacturing (La Tech) |
| 1999- 2001 | Biomedical Engineering program Webmaster (La Tech) |

## Service to the Academic Community

| April 2019 – Nov 2019 | Member of Organizing Committee IMECE 2019, Salt Lake City, Utah. |
| June 2017 – May 2018 | Member of Organizing Committee for 18th International FFF Symposium |

| | |
|---|---|
| Dec 2016 - October 2017 | Member of Organizing Committee (Sponsorship Committee) for MicroTAS 2017 in Savannah, GA. Served as Session Chair. |
| February 2017 | Alternate Separations Workshop (AltSep) on Electrical Separations |
| June 2015 – May 2016 | Member of Organizing Committee for17th International FFF Symposium |
| June 2013 – present | Tenure and promotion external reviews (10 completed) |
| January 2013 – present | Associate Editor, *Journal of Micromechanics and Microengineering* |
| June, 2013 – October 2014 | Chair, FFF 2014 Organizing Committee |
| January 2012 – present | Permanent Member of the Scientific Committee for FFF (sponsor organization of international field flow fractionation symposia) |
| June 2010 – May 2011 | Member of Organizing Committee for15th International FFF Symposium |
| Nov 2010 – Oct 2011 | Member of the NanoUtah 2011 Organizing Committee |
| Feb 2010 – present | Organizer of science fairs and judge at Viewmont Elementary and Riverview Jr High |
| Feb 2010 – Nov 2011 | Session Organizer, AICHE Annual Meeting 2010 in Salt Lake City, November 2010 |
| October 2009 – Oct 2010 | Chair of the NanoUtah 2010 Organizing Committee |
| January – October 2009 | Member of the NanoUtah 2009 Organizing Committee |
| November 2007 | Member of the Program Committee - Invited Speakers for American Physical Society – Division of Fluid Dynamics Annual Meeting, 2007 |
| June 2007 | Chair of Organizing Committee for13th International FFF Symposium |
| November 2006 | Session co-chair BioMEMS and Microfluidics: Biomedical Diagnostics, AICHE 2006 |
| September 2006 | Proposal Reviewer for Canadian Foundation for Innovation |
| June 2006 to present | Proposal Reviewer for NIH (16 panels and site visits) |
| January 2005 to present | Program committee for Microfluidics, BioMEMS, and Medical Microsystems III - XII |
| March 2004 | Organizer of Nanoscale Separations Track at ACS National Meeting |
| April 2003 to present | NSF Panel Reviewer (20 separate panels, over 200 proposals reviewed) |
| January 2003 | Chair of BioMEMS and Nanofabrication Session at SPIE 2003 |
| May 2001 | Reviewer of research proposals for DOE |
| February 2001 | Chair of BioMEMS session at HSEMB Conference |
| November 2000 | Chair at two sessions of Advanced Technology Workshop on MEMS Packaging |
| October 1999 | Chair at several sessions of Joint BMES/EMBS Conference |
| 1997-1999 | Co-President, IEEE Engineering in Medicine and Biology Chapter, Univ. of Utah |
| October 2002-present | Reviewer for *Journal of Nanoscience and Nanotechnology, Journal of Microelectromechanical Systems, Clinical Chemistry, Journal of Micromechanics and Microengineering, Journal of Measurement Science and Technology, Electrophoresis, Analytical Chemistry, IEEE- Transactions on Biomedical Engineering, Journal of Microfluidics and Nanofluidics, Sensors and Actuators A: Physical, Sensors and Actuators B: Chemical, Lab on a Chip, Applied Physics A, IEEE Sensors, Physics of Fluids, Journal of Fluids Engineering, Integrative Biology, Pharmacogenomics, Langmuir, Journal of Materials Engineering and Performance, Nanomedicine & Nanobiotechnology, Chromatography, Analytical Methods* |

## Professional Affiliations

| | |
|---|---|
| 2018-present | Member, American Society of Mechanical Engineers (ASME) |
| 2001-2003 | Member American Society for Engineering Education (ASEE) |
| 2001-2003 | Member, American Chemical Society (ACS) |
| 2000-2002 | Member, Institute for Microelectronics and Packaging Systems (IMAPS) |
| 1997-present | Member, Institute for Electrical and Electronics Engineers (IEEE) |
| 1997-present | Member, IEEE Engineering in Medicine and Biology Society (EMBS) |

# EXHIBIT N

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CYTIVA SWEDEN AB, and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC, | |
| Plaintiffs | C.A. No. 18-1899-CFC Consolidated |
| v. | **DEMAND FOR JURY TRIAL** |
| BIO-RAD LABORATORIES, INC., | **HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY** |
| Defendant. | |

<u>**REPLY EXPERT REPORT OF DR. BRUCE GALE**</u>

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

controlled fluid flow to a column, that separates components in a liquid,  as I showed in my experiments.

35.     Next, Dr. Wereley claims the court rejected the definition of a liquid chromatography system that I have been using.  He provides no citation for that claim.  I can address it if he does.

36.     In any event, as I described in the prior paragraphs and in my opening report, the 2040 System does have detectors of the same type as mentioned in the asserted patents.  Nor is it of any moment that some of the detectors in the 2040 System require calibration as Dr. Wereley claims is a basis for distinguishing the 2040 System.  Wereley ¶ 325. There is no description in the asserted patents for how the detectors must function and certainly nothing that excludes something from being a detector simply because it must be calibrated.  I understand that it is improper to read limitations into the claims from the specification and that it is even more improper to create limitations that are not even mentioned in the specification and import those into the claims.  Thus, the need to calibrate a sensor does not disqualify it from being a detector under the asserted patents.  If it does, detectors in the Bio-Rad accused systems would have to be disqualified.  I confirmed with Ms. Schaefer, one of the Bio-Rad specialists in the NGC, that

███████████████████████████████████████████. The same is true of the AKTA systems.  *See e.g.*, GEHCDEL123052 at GEHCDEL123222 ("If pH will be measured during the chromatographic run, the pH monitor should be calibrated before the run is started.").

37.     Next, Dr. Wereley claims that the 2040 System is not an automated liquid chromatography system because before running chromatography on the instrument, a significant amount of advanced planning went into the run like calculating salt and buffer concentrations, identifying a starch that would absorb the dyes and  determining the concentration of methanol.

HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY

Wereley at ¶¶ 333, 339.  It is difficult to understand Dr. Wereley's argument.  The fact that calculations had to be done before performing the chromatography to determine what buffers to use, what kind of column to use and what liquid constituents to use to illustrate the separation that the 2040 System liquid chromatography system would perform does not mean it is not a liquid chromatography system.  It simply means that the parameters of that particular separation had to be determined.  I do not consider the time spent on the calculations to be anything out of the ordinary.  In fact, the system was able to perform liquid chromatography quite easily.  Dr. Wereley fails to consider that when workers buy machines now, they usually have field service representatives who have used the particular machines hundreds if not thousands of times come on site to teach the user how to use the machine.  That did not happen here.  Rather, we were able to figure out how to use the machine relatively easily simply from reading the manual.  Moreover, many if not all of the same type of calculations would have to be performed even if using the Bio-Rad or Cytiva machines.  I confirmed this with one of Bio-Rad's field specialists, Katie Schaefer.  Ms. Schaefer told me that she had experience as a graduate student using the Akta machines as well as extensive experience using the NGC.  Mr. Schaefer confirmed what I understood, and what is known by anyone of ordinary skill who actually performs chromatography on an instrument, that the first time you run a particular LC separation experiment, you will have to do the types of calculations we did to determine buffers, concentrations flow rates, column material etc.  That is as true for the Plaintiffs' Atka machines and, Bio-Rad's accused machines as it is for the 2040 System prior art system.

38.    If Dr. Wereley actually believes that one could approach a Plaintiff or accused machine the first time running an experiment and somehow type in what you wanted to do and then hit a button and have the machine run, he is clearly mistaken.  On the Bio-Rad machine, for

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

example, the only information that is calculated on its own relates to the columns.  If you identify a column for use which happens to have been preloaded on the instrument, it will recognize the volume and the maximum pressure.  It can then insure that instrument is not set for example to exceed the maximum pressure.  But that is a far cry from what Dr. Wereley seems to be saying.

39.    Additionally, I asked Ms. Schaefer about the amount of training that a Bio-Rad customer typically receives upon purchasing a machine.  In addition to the fact that she said ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

40.    Given those metrics, I believe we spent much less time getting the 2040 System machine to perform chromatography.  We had no one come in to help us learn how the system operated.  All we had was the user manual.  Moreover, as I said, the user interface on the 2040 System was not as easy to use as more modern interfaces.  That slowed us down a little as well. Nonetheless, we were able to get the 2040 System to perform a chromatography experiment in an amount of time and with an amount of work that was less than or at least in the same range as a user who purchases an accused Bio-Rad device

41.    Moreover, to the extent that Dr. Wereley is claiming that some never used before programming had to be done to modify the 2040 System machine to perform chromatography, that is not the case and it is a distortion of the process.  The "programming" that Dr. Wereley refers to in paragraphs 340-349 of his rebuttal report is merely selecting from the menu driving system how long and in what order certain components of the system would operate. Those are

**HIGHLY CONFIDENTIAL (TECHNICAL) – ATTORNEYS' EYES ONLY**

DATED:  November 11, 2020

_____

Bruce K. Gale, Ph.D.

# EXHIBIT O

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT P

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT Q

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT R

1

```
1                 IN THE UNITED STATES DISTRICT COURT

2                 IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

4
       GE HEALTHCARE BIO-SCIENCES    :   CIVIL ACTION
5      AB, GE HEALTHCARE             :
       BIO-SCIENCES CORPORATION,     :
6      and GENERAL ELECTRIC          :
       COMPANY,                      :
7                                    :
                    Plaintiffs,      :
8                                    :
           vs.                       :
9                                    :
       BIO-RAD LABORATORIES, INC.,   :
10                                   :
                    Defendant.       :   NO. 18-1899-CFC
11

12                           - - -

13                            Wilmington, Delaware
                              Thursday, May 14, 2020
14                            10:30 o'clock, a.m.
                              ***Telephone conference
15

16                           - - -

17     BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

18                           - - -

19     APPEARANCES:

20
            SHAW KELLER LLP
            BY:  JOHN W. SHAW, ESQ.
21

22                   -and-

23

24
                              Valerie J. Gunning
25                            Official Court Reporter
```

90

1  if you look at the same portion of the patent, there's a UV
2  monitor.  Obviously, that's going to be electronic.
3        THE COURT:  All right.  So let's talk about the
4  prosecution history then.  I mean --
5        MR. MILLER:  Okay.
6        THE COURT:  -- I think Mr. Bilsker makes a
7  compelling argument that looks pretty clearly and
8  unequivocally, your client, or the applicant for the patent
9  I should say made clear, clearly and unequivocally, as far
10 as I'm concerned, that there are two sections, and that's
11 what differentiates this patent from Bergstrom and Hess.  So
12 why don't you walk me through your response to that.
13       MR. MILLER:  Okay.  So, first of all, I think
14 it's important to note that we don't disagree that there's
15 going to be a separation from the fluidics section and
16 non-fluidics section, but, first of all, there can be other
17 sections.
18       As you pointed out, the claim language talks
19 about a fluidics section and a non-fluidics section, and all
20 the claims use the transitional phrase comprising, which
21 means there can be other sections.
22       So even if you draw the circle --
23       THE COURT:  That wasn't how you distinguished
24 Bergstrom and Hess.  I mean, you pretty explicitly said to
25 the Examiner, hey, what makes this different is we've got

91

1  complete separation of the fluidic and the non-fluidic
2  section.  And, incidentally, I think that's consistent with,
3  you know, your slide, which says, hey, the phrase itself
4  tells you, there's no fluidic component in the non-fluidic
5  section.
6        MR. MILLER:  Well, our argument on non-fluidics
7  in the fluidics section, that's what I called the
8  non-fluidics section.
9        THE COURT:  As opposed to the fluidics section.
10 I mean, it's a referential definition.  Right?  It says,
11 this is a non-fluidics section as opposed to the fluidics
12 section.
13       MR. MILLER:  Well, yes, but where is the
14 negative language that says that there can't be?  I would
15 submit, Your Honor, that when it says fluidics, that just
16 means there can be fluidics components.  It doesn't say that
17 there can't be anything else.  There's going to be other
18 things.  There's going to be the pressure sensors, there's
19 going to be the UV monitors.  There's going to be all kinds
20 of other things, and the patent explicitly teaches that.
21       So why don't you turn to the prosecution
22 history.
23       So, first, let's talk about Bergstrom.  We
24 addressed Bergstrom in our brief, by the way.  I'm not sure
25 where they are coming from with that.

92

1        THE COURT:  Where in your brief?  Why don't you
2  point to me in your brief where you address it.
3        MR. MILLER:  One second, please.  I need to find
4  it.  It's on page 867.
5        THE COURT:  Okay.  Go ahead.
6        MR. MILLER:  So in Bergstrom, again, I'm looking
7  at their slide 58.
8        THE COURT:  Their slide?  Okay.
9        MR. MILLER:  Well, they have the Bergstrom slide
10 here.
11       THE COURT:  Yes.
12       MR. MILLER:  This is distinct in Bergstrom.
13 Again, it says the detector also includes a processing unit.
14 This is actually an important point.  Liquid chromatography
15 systems have detectors in them.
16       As far as I know, every model of a liquid
17 chromatography system has a detector in them and the
18 detector is going to be on the wet side.  So our argument is
19 actually consistent with what is being said here because it
20 makes a distinction between a detector and it says it
21 includes a processing unit, which is very likely to be
22 electronic in nature.  So in the systems in the patent,
23 there has to be a detector, and it's not going to be inside
24 the box, because that would be a fluidics component.
25       THE COURT:  Right.

93

1        MR. MILLER:  So in Bergstrom, in that particular
2  piece of prior art, I guess they were all one piece, and so
3  it says that they're going to be -- there's going to be
4  electronic -- it says, liquid and electrical parts sit side
5  by side in the module in the baseplate.
6        So, again, what they are saying is that, hey,
7  look, there's no non-fluidics section here.  They are not
8  saying, and the word all appears nowhere in any of this
9  prosecution --
10       THE COURT:  No, but it's saying liquid and
11 electrical parts sit side by side as opposed to your
12 invention.  But your invention -- I mean, if you want to
13 buy -- you know, you are saying that, well, no, we've got
14 a pH electrode that's electric which sits by side with
15 fluidics components.  You are saying it's actually attached
16 to a fluidics component.
17       MR. MILLER:  Yes.  It's inside of something
18 that's inside of the pH module.
19       THE COURT:  How do you reconcile that with the
20 statement that says, what distinguishes and makes patentable
21 your patent is that, "liquid and electrical parts sit side
22 by side in Bergstrom but they don't in yours"?
23       MR. MILLER:  Because it's saying in the
24 non-fluidics section, there aren't going to be -- in the
25 non-fluidics section, there won't be any electronics.  It

1    So basically, what you are saying makes sense to
2    me, I think.  Let's hear from Bio-Rad says.
3            MR. BILSKER:  Absolutely not, Your Honor.
4            THE COURT:  Why not?
5            MR. BILSKER:  Because again, it begs the
6    question.  What is a section?  They want to say you can have
7    a fluidics section, because if I have -- if I have this
8    fluid line here, I will draw a circle around this fluid line
9    and I'm going to call that a fluidics section, and then if I
10   have more fluidics on the side and they're next to
11   electronic parts, I'm not going to call those part of the
12   fluidics section.  Those are a different section.  And that
13   is completely inconsistent with the representation that they
14   made about Hess.
15           And let me just -- the reason I asked whether he
16   was pointing to page 1477 is because 1477 is talking about
17   Mourtada.  It's not talking about Bergstrom.
18           And if we go back to the slides on Hess --
19           THE COURT:  No, no.  Don't go there yet.  Let's
20   just finish up.  You see, look, if you've got --
21           MR. BILSKER:  Again, that's not what they
22   claimed.
23           THE COURT:  Just hold on a second, please.  I
24   mean, what I understand the compromise is, essentially, if
25   you agree with Bio-Rad, that if you have a non-fluidics

1    just not what they said during the prosecution.  The section
2    was defined as all parts of that type, and that's again, if
3    we go through slide 58, 59 --
4            THE COURT:  But I guess what I'm getting at it
5    is, I think, GE, would you agree then, would you agree to
6    Bio-Rad's construction?
7            MS. SKLENAR:  No, because our issue with their
8    construction is that it says essentially all electronics for
9    the module, for the entire module have to be in a
10   non-fluidics section.  And, again, that would allow --
11           THE COURT:  Fair enough.  So what if it just
12   said though, a section -- yes.  I mean, you know, here's
13   where I am.  I will just tell you right now.
14           So I'm not able to accept GE's position that on
15   one hand a non-fluidic section can contain fluidics.  On the
16   other hand, a fluidics section cannot contain non-fluidics.
17   On the other hand, the patent uses the indefinite article,
18   so it contemplates one or more sections, and the Federal
19   Circuit has said, understandably, that the indefinite
20   article does not mean all.
21           So that is what I find problematic about
22   Bio-Rad's construction, is they want to say all the fluidic
23   components.
24           MS. SKLENAR:  Yes.  I apologize.
25           THE COURT:  That's all right.  You know, but GE,

99

101

1    section, there can't be any fluidics in it, and a fluidics
2    section would mean there's no non-fluidics in it.
3            But could there be, in addition to those two
4    sections, a third section, and you could have a mix.  And as
5    I look at claim 1, for instance, of the '591 patent, it has
6    an external fluidics section.  It has to have one.  It has
7    to have an internal non-fluidics section.  So both of those
8    sections would have to exist and would have to have in one
9    case, the fluidics section, no non-fluidic component.  In
10   the second case, the non-fluidic section could not have any
11   fluidic component.
12           And then it has to have a separate section,
13   which is something distinct and different and is not within
14   those two sections, and Bio-Rad here is saying you can't
15   live with that.
16           MR. BILSKER:  Absolutely not.  Again, it begs
17   the question.  What is the section at that point?  So I have
18   a module and I have an outside part of it and I'm going to
19   split it up into little, little piles, and I'm going to say,
20   hey, I've actually got 45 different sections here on this
21   module, 45 different sections on the outside.  You know, I
22   don't -- there's a bunch of electronics, but they're all on
23   the top half.  So because they're on the top half, I'm going
24   to call only the bottom half my fluidics section and I'm not
25   going to call the top half my fluidics section, and that's

1    you know, I can't live with the way you want to interpret
2    it.
3            MS. SKLENAR:  Yes.  If we can put all of our
4    cards on the table.
5            THE COURT:  Well, that's helpful.
6            MS. SKLENAR:  The reason we're fighting about
7    this because Bio-Rad wants to argue for noninfringement
8    that they have some electrical components like lights that
9    are in the panel member, so neither of the sections we're
10   talking about, the fluidics or non-fluidics, but are in the
11   panel member.
12           So, for example, what we see in Figure 4A at 28,
13   they want their construction so they can then turn around
14   and say, we don't infringe because we don't have all of our
15   electrical components in one section.  And what we're
16   submitting -- and, again, we are modifying our approach.  We
17   are willing to agree that a fluidics section cannot have
18   electronics or electrical components, but what we can't live
19   with is this notion that somehow you could get outside of
20   the scope of this claims by putting little lights in a
21   different section.
22           THE COURT:  But that is not before you.  Right?
23   You kind of did an all-or-nothing in your proposal.  I mean,
24   it seems to me you could have been more judicious in the
25   proposal and then left this issue for trial and figure it

102

1  out.

2          So why don't we just step back and let's go

3  with, I'm looking at page 94 of your brief where we've got

4  the competing construction proposals for fluid handling

5  section.  Right?  And you've got a section of the

6  interchangeable fluid handling unit that includes fluidics

7  components.

8          So why don't you just change that to be

9  consistent with your construction of a non-fluidic section

10  and say that this would be a section of the interchangeable

11  fluid of the interchangeable fluid handling unit that does

12  not include electrical components.

13          MS. SKLENAR:  And we're willing to do that, Your

14  Honor.  It's the all issue we can't live with.

15          THE COURT:  Okay.  But, you know, then that's

16  fair and I think that's a legitimate complaint.  So here's

17  where I am.  That's how I'm going to interpret these terms.

18          I'm going to interpret non-fluidics section to

19  mean, "a section of the interchangeable fluid handling unit

20  that includes electrical components and does not include

21  fluidics components."

22          I'm going to construe a fluid handling section

23  to mean, "a section of the interchangeable fluid handling

24  unit that includes fluidics components and does not include

25  non-fluidics components."  And that seems to me to be the

103

1  most reasonable construction.  That is consistent with what

2  I think were clear and unequivocal statements to distinguish

3  this patent from Bergstrom and Hess, because the basis of

4  the distinctions to the Patent Examiner were that this

5  patent had two sections that, at least two sections, one is

6  non-fluidic, one is fluidic, that are separated consistently

7  and that do not contain components of the other section.

8          That does not, however, preclude the possibility

9  that there are other sections that are in the invention, and

10  that's important because that is consistent with the use of

11  the indefinite article, which is inconsistent with Bio-Rad's

12  insistence that "all," either fluidic or non-fluidic

13  components, are in the respective handling unit.

14          So that actually seems to me is the right result

15  in this case and I'm going to construe then these last group

16  of terms in that manner.

17          All right.  Is there anything else for me to

18  construe?

19          MS. SKLENAR:  Nothing from plaintiff, Your

20  Honor.

21          MR. BILSKER:  Mr. Bilsker.  None.

22          THE COURT:  Okay.  I'm going to ask the

23  plaintiff to submit within a week from today a written order

24  of the claim chart and the basis of my rulings are set forth

25  in today's telephone conference.

104

1          I read the briefs carefully.  I've articulated

2  the general basis of my rulings.  I'm cognizant that there's

3  de novo review in the Federal Circuit, so that really no

4  matter what I say has really no consequence, but I

5  appreciate the briefing and the arguments of the parties

6  today.  And if you will just submit that order that is

7  consistent with my rulings today within a week, I will sign

8  it forthwith.

9          Anything else from the plaintiffs?

10          MS. SKLENAR:  Nothing, Your Honor.  Thank you so

11  much for your time.

12          THE COURT:  Anything from the defense?

13          MR. BILSKER:  I was just curious about the

14  transcript, but I guess we can handle it.

15          THE COURT:  What do you mean?

16          MR. BILSKER:  Whether we would get the

17  transcript just to make sure that the order is consistent

18  with the transcript.  I was having a little trouble writing

19  as quickly as you were speaking.

20          THE COURT:  Well, let's actually, before we

21  leave, where is there any ambiguity in what I've ruled on in

22  your mind?

23          MR. BILSKER:  I don't think there's ambiguity.

24  I just didn't have the exact words that you said.  I didn't

25  get a chance to write them down exactly.  Maybe my associate

105

1  did.  That's all I was saying.

2          THE COURT:  No, that's fair.  And, really, I

3  think the big point is, it is kind of the thing that

4  disturbed me from the beginning with the plaintiffs'

5  argument, is on those last two, the fluidics and the

6  non-fluidics, I just interpreted it as far as I'm concerned

7  in a manner that's consistent, and I think that Bio-Rad even

8  agreed insofar as it being consistent.  That's the big

9  distinction there.

10          So, okay.  If because of the current situation

11  you need more time to get the order in, to get the

12  transcript ready, that's fine, but at least as of now we'll

13  set it for a week from today, and the obligation will be on

14  plaintiffs to submit the proposed claim construction order.

15  Okay?

16          Everybody have a great day.  Stay safe.  Thanks

17  very much.  Bye-bye.

18          (Counsel respond, "Thank you, Your Honor.")

19          (Telephone conference concluded at 1:12 p.m.)

20          - - -

21

22

23

24

25

# EXHIBIT S

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CYTIVA SWEDEN AB and GLOBAL LIFE SCIENCES SOLUTIONS USA LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 18-1899-CFC Consolidated |
| v. | ) ) | |
| BIO-RAD LABORATORIES, INC., | ) ) | |
| Defendant. | ) | |

**OPENING EXPERT REPORT OF STEVEN WERELEY, PH.D.**

i

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 56 (BRGEDEL000450753)

108.   Mr. Chapman testified that these specifications were met for the pump modules (Chapman Tr. 529:12-530:17) and sample inject valve module (Chapman Tr. 528:16-529:10).

109.   These documents and Mr. Chapman's testimony demonstrates that the "fluidics section" for each of these modules, *e.g.*, the two system pump modules and the sample inject valve module "*include[] fluidics components*," just as the Court's claim construction requires.

110.   The fluidics section for the system pump modules used in the NGC system is as follows:

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY



Ex. 211, pp. 28-29.  Note that this figure annotated to show hidden portions of the fluidics section, *i.e.*, a simplified illustration of the flow path within the fluidics section.

111.   Note that the NGC Instrument Guide illustrates the F10 pump module, but the F100 pump module is essentially identical for purposes of this infringement analysis, meaning that the structure corresponding to the recited fluidics section is the same.

112.   Note also that this portion of the Instrument Guide does not illustrate the priming ports that can be on the system pump modules.  These can be seen in the

HIGHLY CONFIDENTIAL (TECHNICAL) - ATTORNEYS' EYES ONLY

## X.      CONCLUSION

705.   For the reasons stated above, it is my opinion that Bio-Rad infringes the Asserted Claims.  I respectfully reserve the right to supplement, augment, or amend my opinions and/or to supplement my expert report.

Dated: September 11, 2020

_____

Steven Wereley, Ph.D.

412